


Departmental Appeals Board, MS 6127
Medicare Appeals Council
330 Independence Avenue
Cohen Building, Room G-644
Washington, DC 20201
(202)565-0100/Toll Free:1-866-365-8204

Date:    **JAN 2 2 2020**

ALJ Appeal Numbers: 1-7884275431 & 16 others
Docket Numbers: M-19-1261 & 30 others

## ACKNOWLEDGMENT OF ESCALATION REQUESTS
## AND NOTICE OF STAY

Parrish Law Offices
Debra Parrish
788 Washington Rd.
Pittsburgh, PA 15228

Dear Ms. Parrish:

The Medicare Appeals Council (Council) has received your requests to escalate the appeals listed in Attachment A to Federal district court. The Council previously received your requests for review for these appeals. The 90-day time frame for the Council to issue a decision, dismissal, or remand order has expired. *See* 42 C.F.R. § 405.1100(c). Due to the large number of pending appeals, the Council is unable to issue a decision, dismissal, or remand order within five calendar days of your request to escalate to Federal district court. 42 C.F.R. § 405.1132(a)(1). Under these circumstances, the regulations permit you to bypass Council review and seek review of the ALJ's decisions in Federal district court. 42 C.F.R. § 405.1132(a)(2).

In order to escalate, you must file an action in Federal district court within 60 calendar days after you receive this notice <u>and</u> the amount in controversy must be $1,670 or more. 42 C.F.R. §§ 405.1132(b), 405.1136(a)(1); *see also* 84 Fed. Reg. 53,445 (Oct. 7, 2019). If you cannot file your complaint within 60 days, you may ask the Council to extend the time in which you may begin a civil action. However, the Council will only extend the time if you provide a good reason for not meeting the deadline. Your reason must be set forth clearly in your request. 42 C.F.R. § 405.1134. If you do not file an action in Federal district court, then your appeals will remain before the Council. 42 C.F.R. § 405.1136(a)(2).

If a civil action is commenced, the complaint should name the Secretary of Health and Human Services as the defendant and should include the Council docket numbers and ALJ appeal numbers that you are appealing. 42 C.F.R. § 405.1136(d). The Secretary must be served by sending a copy of the summons and complaint by registered or certified mail to the General Counsel, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201. In addition, you must serve the United States Attorney for the district in which you file your complaint and the Attorney General of the United States. *See* rules 4(c) and (i) of the Federal Rules of Civil Procedure and 45 C.F.R. § 4.1.

Additionally, the supplier filed a separate request for review in each of the appeals for which you seek escalation. *See* Attachment B. This letter serves as notice to all parties that the Council will stay the supplier's requests for review until the Federal district court issues a final determination on the escalated appeals or the time period for filing a complaint in district court expires.

Sincerely,

Angela K. Roach
Administrative Appeals Judge

cc:    Novocure
       Beneficiaries

# Attachment A
## Appeals Escalated to Federal district court

| Docket Number | ALJ Appeal Number(s) |
|---|---|
| M-19-1261 | 1-7884275431 |
| M-19-2164 | 1-8411344383 |
| M-19-2173 | 1-8136495060 |
| M-19-2218 | 1-8411055191 & 1-8411055450 |
| M-19-2233 | 1-8390277469 |
| M-19-2426 | 3-8503660334 |
| M-19-2499 | 1-8429561876 |
| M-19-2560 | 1-8454636221 |
| M-19-2648 | 1-8510955262 |
| M-19-2649 | 3-8472551932 |
| M-19-2719 | 1-8393258352 |
| M-19-2723 | 1-8411066311 |
| M-19-2777 | 1-8630709341 |
| M-19-2780 | 1-8415607840 |
| M-19-2836 | 1-8665714599 |

# Attachment B
## Stayed Supplier Appeals

| Docket Number | ALJ Appeal Number |
|---|---|
| M-19-1380 | 1-7884275431 |
| M-19-2169 | 1-8411344383 |
| M-19-2179 | 1-8136495060 |
| M-19-2227 | 1-8411055191 & 1-8411055450 |
| M-19-2237 | 1-8390277469 |
| M-19-2275[1] | 1-8071086400 |
| M-19-2543 | 3-8503660334 |
| M-19-2542 | 1-8429561876 |
| M-19-2565 | 1-8454636221 |
| M-19-2750 | 1-8510955262 |
| M-19-2751 | 3-8472551932 |
| M-19-2810 | 1-8393258352 |
| M-20-75 | 1-8411066311 |
| M-19-2981 | 1-8630709341 |
| M-19-2985 | 1-8415607840 |
| M-19-2990 | 1-8665714599 |

---

[1] The beneficiary appeal associated with docket number M-19-2275 is docketed as M-19-2250. The Council previously acknowledged the beneficiary's request to escalate her appeal in a separate action.

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
FAX 412.561.6253
E-mail: info@dparrishlaw.com

January 2, 2020

**VIA E-file**
Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, DC 20201

> **RE:** **Request for Escalation**
> **Appellant/Medicare Beneficiary: Anniken Prosser**
> **HICN: 4R87U71QM75**
> **ALJ Decision Date: June 19, 2019**
> **ALJ Appeal Nos.: 1-8390277469**
> **Council No.: M-19-2233 (filed July 12, 2019)**
> **Our Ref: 19-51**

Dear Medicare Appeals Council:

    Ms. Anniken Prosser has received two favorable ALJ decisions finding TTFT meets Medicare coverage criteria for her. See ALJ Nos. 1-8380637906 and 1-8416188648. The Secretary chose not to appeal the decisions and they have become final. The Secretary is barred by the doctrine of collateral estoppel/issue preclusion from re-litigating those issues with respect to Ms. Prosser. As noted by a unanimous Supreme Court, "We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality." *See Astoria Federal Savings and Loan Assoc. v. Solimino*, 501 U.S. 104, 107-8 (1991) (internal citations and quotations omitted). The application of issue preclusion would not work as basic unfairness against the Secretary and there are no special circumstances that would make it unfair to apply the doctrine.

    The above-captioned Medicare beneficiary appeal has been pending for more than 90 days. Accordingly, pursuant to 42 C.F.R. §405.1132, Ms. Prosser requests escalation of the above-captioned claims to District Court.

            Sincerely,

            Debra M. Parrish for
            Medicare Beneficiary Anniken Prosser

Enclosures – Two Final Favorable ALJ Decisions

cc:     Anniken Prosser
        Novocure
        C2C



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Miami Field Office**

| | | | |
|---|---|---|---|
| Appeal of: | **Parrish Law Firm on behalf of A. Prosser** | ALJ Appeal No.: | **1-8380637906** |
| Beneficiary: | **Anniken Prosser** | **Medicare Part B** | |
| HICN: | *****4857A | Before: | **Lissette M. Figueroa**<br>U.S. Administrative Law Judge |

## DECISION

After carefully considering the evidence and arguments presented in the record and at the hearing, a **FAVORABLE** decision is entered in the appeal of A. Prosser. (Appellant).

## Procedural History

Novocure submitted claims to Medicare for an E0766 (electrical stimulation device used cancer treatment) for the dates of services of May 16, 2018, June 16, 2018, and July 16, 2018. The claims were initially denied on May 23, 2018, because Medicare guidelines were not met. Redetermination request was made to CGS, the Medicare Contractor with jurisdiction. On September 27, 2018, 2018, CGS concluded the following:

> Medicare does not cover tumor treatment field therapy (E0766) or therapy supplies (A4555) as the currently published studies in the medical literature do not clearly document the effectiveness of this device per LCD L34823. (Exhibit 1, pages 21-23).

On January 22, 2019, the Parrish Law Firm informed the Qualified Independent Contractor (QIC); it was representing Ms. Prosser and requested a reconsideration of the previous denial. On March 15, 2019, the QIC affirmed the Plan. (Exhibit 1, pages 1-13).

The QIC completed a review of the Manuals; peer review language submitted by the Appellant, and the LCD, yet still determined the requested service was denied as not reasonable and necessary. The QIC did acknowledge that DME MACs have found a "request for newly diagnosed glioblastoma as valid; however the DMEs have bot issued a new LCD providing coverage for newly diagnosed glioblastoma." (Exhibit 1, pages 9-10).

On March 21, 2019, the Office of Medicare Hearings and Appeals (OMHA) received the Appellant's timely Request for Medicare Hearing by an Administrative Law Judge (ALJ) from the Beneficiary's representative. (Exhibit 3, pages 1-4). The remaining amount in controversy meets the jurisdictional

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 7 of 631   Document 11-5   4238

requirements for a hearing before OMHA.[1]  Therefore, the jurisdictional predicates are met and the claim for ambulance services, which is covered by this decision, is properly before the ALJ for *de novo* review.

Ms. Parrish submitted additional items (peer review literature, LCD, and prior ALJ decisions) with the Request for Hearing and same were admitted into the record as Exhibit 5 and Exhibit 6.

On May 28, 2019, the undersigned conducted a telephone hearing from the OMHA Miami Field Office. The QIC was provided with a notice of hearing, but did not attend.  Attendees at the hearing included: Bridget Noonan, Esq. as Counsel for the Beneficiary and Mr. Timothy Parks on behalf of Novocure. Subsequent to the hearing, Ms. Parrish submitted the proposed LCD for newly diagnosed glioblastomas and this was admitted into the record as Exhibit 7.

## Issues

1) The appeal presents the following issue: Is the appellant entitled to Medicare reimbursement under Part B of Title XVIII of the Social Security Act (the Act) for the tumor treatment field therapy furnished to the appellant on the dates of service of May 16, 2018, June 16, 2018, and July 16, 2018? In other words, are such services within a covered category under 1861(s)(3) of the Act, and if so, are such services not otherwise excluded from coverage under §1862(a)(1) of the Act?

2) Whether payment can otherwise be made to the Appellant pursuant to the waiver of liability provisions under Section 1879 of the Act and 42 C.F.R. § 411.406, if it is determined that the item was not medically reasonable and necessary under Section 1862 (a)(1) of the Act.

## Findings of Fact

1. Physician progress note dated February 16, 2017, described the Beneficiary as a 33-year-old female that presented to her physician for follow-up evaluation and management of a left temporal Grade 4 astrocytoma[2].  Neuro-oncology exam revealed the following: 1) a history of migraines which started in her 20's possibly secondary to Crohn's medication; 2) intractable migraine on February 14, 2016, and MRI which showed a left cystic temporal mass; 3) left craniotomy- GBM on February 25, 2016; 4) completed radiation with concurrent temodar; 5) adjuvant temodar; and

---

[1] 67 Fed. Reg. 62478 (October 7, 2002) and 70 Fed. Reg. 11423 (March 8, 2005)

[2] Grade IV astrocytoma is also called glioblastoma or GBM and is the most aggressive type of nervous system tumor. It is also referred to as glioblastoma multiforme because of its wide variety of appearances under the microscope. Rarely, non-glial tissue elements can exist in a glioblastoma. The most common variant of GBM showing these additional tissue elements is called a mixed glioblastoma-sarcoma, or gliosarcoma. GBM occurs most often in adults between the ages of 50 and 80, is more common in men, and accounts for 23% of all primary brain tumors. Grade IV astrocytoma: The three main forms of treatment for GBM are surgery and radiation or chemotherapy. These treatments may be used alone or in combination with one another. The initial treatment in most cases is surgical excision and removal of as much as the tumor as possible (resection). Often, only a portion of the tumor can be safely removed because malignant cells may have spread to surrounding brain tissue. Because surgery cannot completely remove a tumor, radiation therapy and chemotherapy are used following surgery to continue treatment.

The FDA has approved Temozolomide (Temodar) for the treatment of adults with GBM. Temozolomide is used concurrently with radiation therapy, and for a period after completion of radiotherapy. For more information, contact:

https://rarediseases.org/rare-diseases/astrocytoma/

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 8 of 631   Document 11-5   4239

6) start of Optune TTFields. (Exhibit 2, page 34). Past medical history included Crohn's disease, and Wolff-Parkinson-White Syndrome[3] (1999). Physician's plan included a continuation of Optune TTFields, adjuvant temodar, and RTC 2 months with MRI. (Exhibit 2, page 37).

2. Physician progress note dated March 15, 2018, showed the Beneficiary presented for follow-up. The physician indicated the Beneficiary was neurologically intact and radiographically stable and was tolerating TTFields. Recommendation was to continue Optune TTFields and RTC 3 months with MRI. (Exhibit 2, pages 1-4).

3. Optune Prescription Form dated April 13, 2018, indicated the physician ordered a 6-month prescription for the Beneficiary due to glioblastoma multiforme. (Exhibit 2, pages 41-42).

4. The Beneficiary signed Optune Service Agreement and delivery confirmation on May 19, 2016. (Exhibit 1, pages 44-63A).

5. . Invoices from Novocure were submitted to Medicare for dates of service: May 16, 2018, June 16, 2018, and July 16, 2018. (Exhibit 2, pages 39-41).

6. The Parrish Law Firm submitted literature and Professional Studies. (See Exhibit 5).

## Legal Framework

### I.     ALJ Review Authority

#### A.   Jurisdiction

Individuals or organizations dissatisfied with the reconsideration of an initial determination are entitled to a hearing before the Secretary of the Department of Health and Human Services (HHS) provided there is a sufficient amount in controversy and a request for hearing is filed in a timely manner. Act § 1869(b)(1)(A).

In implementing this statutory directive, the Secretary has delegated the authority to administer the nationwide hearings and appeals system for the Medicare program to OMHA. 70 Fed. Reg. 36386, 36387 (June 23, 2005). The ALJs within OMHA issue the final decisions of the Secretary, except for decisions reviewed by the Medicare Appeals Council. *Id.*

---

[3] In Wolff-Parkinson-White (WPW) syndrome, an extra electrical pathway between your heart's upper and lower chambers causes a rapid heartbeat. The extra pathway is present at birth and rare.

The episodes of fast heartbeats usually are not life threatening, but serious heart problems can occur. Treatment can stop or prevent episodes of fast heartbeats. A catheter-based procedure (ablation) can permanently correct the heart rhythm problems. Most people with an extra electrical pathway experience no fast heartbeat. This condition, called Wolff-Parkinson-White pattern, is discovered only by chance during a heart exam. Although WPW pattern is often harmless, doctors might recommend further evaluation before children with WPW pattern participate in high-intensity sports. https://www.mayoclinic.org/diseases-conditions/wolff-parkinson-white-syndrome/symptoms-causes/syc-20354626

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 9 of 631   Document 11-5   4240

For requests filed on or after January 1, 2018, the AIC threshold for requests for Administrative Law Judge hearings will remain at $160, and the AIC threshold for seeking judicial review will increase to $1,600. The notice is available at https://www.gpo.gov/fdsys/pkg/FR-2017-09-29/pdf/2017-20883.pdf.

### B.  Scope of Review

For all appeals stemming from a QIC, the ALJ appeals process is governed by 42 C.F.R. §§ 405.1000 *et seq.* 42 C.F.R. § 405.1032 states, "[t]he issues before the administrative law judge include all the issues brought out in the initial, reconsidered, or revised determination that were not decided entirely in your favor. However, if evidence presented before or during the hearing causes the administrative law judge to question a fully favorable determination, he or she will notify you and will consider it an issue at the hearing."

### C.  Standard of Review

The ALJ conducts a de novo review of each claim at issue and issues a decision based on the hearing record. 42 C.F.R. § 405.1000(d) and Section 557 of the Administrative Procedure Act. A de novo review requires the ALJ to review and evaluate the evidence without regard to the findings in the prior determinations on the claim and make an independent assessment in reliance upon the evidence and controlling laws. All laws and regulations pertaining to the Medicare and Medicaid programs, including, but not limited to Titles XI, XVIII, and XIX of the Social Security Act and applicable implementing regulations, are binding on ALJ's. 42 CFR § 405.1063. The burden of proving each element of a Medicare claim lies with the Appellant and is by preponderance of the evidence (i.e. satisfied through the submission of sufficient evidence in accordance with Medicare rules). See e.g., Sections 1814(a)(1), 1815(b), and 1833(e) of the Act; see also 42 C.F.R. § 424.5(a)(6), 42 C.F.R. § 405.1018, 42 C.F.R. § 405.1028, and 42 C.F.R. § 405.1030.

## II.     Principles of Law

### A. *Statutes and Regulations*

Section 1831 of the Act establishes a supplementary insurance program for the aged and disabled. This insurance program, commonly referred to as Part B of Medicare, is financed through premium payments by enrollees together with contributions from funds appropriated by the Federal Government. §1831; *42 U.S.C. 1395j.* The program allows for the reimbursement of physicians' services including surgery, consultation, and office visits. §1861(q); *42 U.S.C. 1395x(q)*

The standard for payment of these services is found in section 1862(a)(1)(A) of the Act. There, the Act states that no payment may be made "…for items and services…[which] are reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

Section 1833(e) of the Act provides that payment will not be made unless sufficient information is furnished to determine the amounts due to the provider. *See also* 42 CFR §424.5(6).

Section 1862(a)(1)(A) of the Act provides that "[n]otwithstanding any other provision of the Act, no payment shall be made for any expenses incurred for items and services that are not reasonable and

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 10 of 631   Document 11-5   4241

necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." *See also* 42 C.F.R. §411.15(k).

Section 1862(a)(12) of the Act provides that no payment may be made for services in connection with the care, treatment, filling, removal, or replacement of teeth or structures directly supporting teeth, except that payment may be made under part A in the case of inpatient hospital services in connection with the provision of such dental services if the individual, because of his underlying medical condition and clinical status or because of the severity of the dental procedure, requires hospitalization in connection with the provision of such services.

Section 1866(a)(1)(A)(i) of the Act provides that "[a]ny provider of services (except a fund designated for purposes of section 1814(g) and section 1835(e)) shall be qualified to participate under this title and shall be eligible for payments under this title if it files with the Secretary an agreement not to charge, except as provided in paragraph (2), any individual or any other person for items or services for which such individual is entitled to have payment made under this title (or for which he would be so entitled if such provider of services had complied with the procedural and other requirements under or pursuant to this title or for which such provider is paid pursuant to the provisions of section 1814(e)) of the Act." *See also* 42 C.F.R. §489.1 *et seq.* (setting forth the terms and limitations on provider agreements).

Section 1879 of the Act limits the liability of the Beneficiary and providers of services if the services are found to be not medically reasonable and necessary under Section 1862(a)(1)(A) or care was custodial in nature under Section 1862(a)(9) of the Act. Payment will only be made pursuant to this section if neither the Beneficiary nor the provider knew or could reasonably have been expected to know that the services were not covered. *See also* 42 C.F.R. §411.404; 42 C.F.R. §411.406.

## B. *Policy and Guidance*

Section 1871(a)(2) of the Act states that unless promulgated as a regulation by CMS, no rule, requirement, or statement of policy, other than a National Coverage Determination (NCD), can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. However, in lieu of binding regulations with the full force and effect of law, CMS and its contractors have issued policy guidance that describe criteria for coverage of selected types of medical items and services in the form of manuals and local medical review policies (LMRPs) or local coverage determinations (LCDs).

Section 1869(f)(1) of the Act provides that NCDs are binding upon Administrative Law Judges. *See also* 42 CFR §405.1060. *Medicare National Coverage Determinations Manual, Pub. 100-03, Ch. 1, sec. 280* ("NCD 280.1") provides a mandatory statement as to what constitutes equipment that the meets the definition of DME, as follows:

"The term DME is defined as equipment which:

> \* Can withstand repeated use; i.e., could normally be rented and used by successive patients;
> **\* Is primarily and customarily used to serve a medical purpose;**
> \* Generally is not useful to a person in the absence of illness or injury; and,

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 11 of 631   Document 11-5 4242

"* Is appropriate for use in a patient's home."

Section §1869(f)(2) of the Act provides that Administrative Law Judges will give substantial deference to LCDs, LMRPs, or CMS program guidance when applicable, and if they do not follow the policy they must explain why in their decision. *See also* 42 CFR §405.1062. The Local Coverage Determination Policy applicable to this case. The LCD at issue is L34823 and Policy Article 52711.

### L34823

In addition to the "reasonable and necessary" criteria contained in this LCD, there are other payment rules, which are discussed in the following documents that must also be met prior to Medicare reimbursement:

- The LCD-related Standard Documentation Requirements Article, located at the bottom of this policy under the Related Local Coverage Documents section.
- The LCD-related Policy Article, located at the bottom of this policy under the Related Local Coverage Documents section.
- Refer to the Supplier Manual for additional information on documentation requirements.
- Refer to the DME MAC web sites for additional bulletin articles and other publications related to this LCD.

For the items addressed in this LCD, the "reasonable and necessary" criteria, based on Social Security Act § 1862(a)(1)(A) provisions, are defined by the following coverage indications, limitations and/or medical necessity.

Tumor treatment field therapy (E0766) will be denied as not reasonable and necessary.

### GENERAL

A Detailed Written Order (DWO) (if applicable) must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving a completed DWO, the claim shall be denied as not reasonable and necessary.

An item/service is correctly coded when it meets all the coding guidelines listed in CMS HCPCS guidelines, LCDs, LCD-related Policy Articles, or DME MAC articles. Claims that do not meet coding guidelines shall be denied as not reasonable and necessary/incorrectly coded.

Proof of delivery (POD) is a Supplier Standard and DMEPOS suppliers are required to maintain POD documentation in their files. Proof of delivery documentation must be made available to the Medicare contractor

### Policy Article 52711

Code E0766 describes devices that generate electromagnetic fields utilized in the treatment of cancer. The electromagnetic energy generated is transmitted to the body by means of surface

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 12 of 631   Document 11-5   4243

electrodes or transducers.

This code is inclusive of all associated supplies necessary for the effective use of code E0766 including, but not limited to, transducers/surface electrodes, lead wires, adhesive patches, connectors, conductive gel and skin preps.

### Proposed changes to LCD DL34823

On May 9, 2019, The Centers for Medicare and Medicaid Services (CMS) assigned to the Durable Medical Equipment Medicare Administrative Contractors (DME MACs) the task of developing Local Coverage Determinations (LCDs) for Durable Medical Equipment, Prostheses, Orthoses, and Supplies (DMEPOS). The DME MACs are proposing a revision to the **Tumor Treatment Field Therapy (TTFT LCD L34823)** to cover newly diagnosed glioblastoma multiforme (GBM).

The proposed policy extends coverage for use of TTFT as a treatment option for Medicare beneficiaries with newly diagnosed GBM when certain coverage criteria are met. Stakeholders may read the details of the proposed TTFT LCD posted on the Medicare Coverage Database (Reference DME MAC DL34823). The entire LCD should be completely reviewed prior to the submission of written comments.

*Medicare Benefit Policy Manual, Pub. 100-02 ("CMS Pub. 100-02"), Ch. 15, §110.1,* also provides guidance pertaining to Medicare coverage of DME, and explains that

> Expenses incurred by a beneficiary for the rental or purchases of durable medical equipment (DME) are reimbursable if the following three requirements are met:

- The equipment meets the definition of DME (§110.1);
- The equipment is necessary and reasonable for the treatment of the patient's illness or injury or to improve the functioning of his or her malformed body member (§110.1); and
- The equipment is used in the patient's home.

*Ch. 15, §110.1(A)* further explains as follows:

- Equipment, which is primarily and customarily used for a nonmedical purpose, may not be considered "medical" equipment for which payment can be made under the medical insurance program. This is true even though the item has some remote medically related use. For example, in the case of a cardiac patient, an air conditioner might possibly be used to lower room temperature to reduce fluid loss in the patient and to restore an environment conducive to maintenance of the proper fluid balance. Nevertheless, because the primary and customary use of an air conditioner is a nonmedical one, the air conditioner cannot be deemed medical equipment for which payment can be made.

- Other devices and equipment used for environmental control or to enhance the environmental setting in which the beneficiary is placed are not considered covered DME. These include, for example, room heaters, humidifiers, dehumidifiers, and electric air cleaners. Equipment, which serves comfort or convenience, functions or is primarily for the convenience of a person caring for the patient, such as elevators, stairway elevators, and posture chairs, do not constitute medical equipment. Similarly, physical fitness

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 13 of 631   Document 11-5 4244

equipment (such as an exercycle), first-aid **or precautionary-type equipment (such as preset portable oxygen units)**, self-help devices (such as safety grab bars), and training equipment (such as Braille training texts) **are considered nonmedical in nature.**

*Medicare Program Integrity Manual, Pub. 100-08, ("CMS Pub. 100-08"), Ch. 5,* provides guidance as to documentation for DME claims, including the requirement of both physician orders for DME and supporting documentation for medical necessity and delivery. *Ch. 5,* also provides guidance as to patient documentation requirements to support that Medicare coverage criteria for items of DME have been met.

For any DMEPOS [Durable Medical Equipment Prosthetics Orthotics and Supplies] item to be covered by Medicare, the patient's medical record must contain sufficient documentation of the patient's medical condition to substantiate the necessity for the type and quantity of items ordered and for the frequency of use or replacement (if applicable). The information should include the patient's diagnosis and other pertinent information including, but not limited to, duration of the patient's condition, clinical course (worsening or improvement), prognosis, nature and extent of functional limitations, other therapeutic interventions and results, past experience with related items, etc. . . . neither a physician's order nor a CMN [certificate of medical necessity] . . . nor a supplier prepared statement nor a physician attestation by itself provides sufficient documentation of medical necessity, even though it is signed by the treating physician or supplier. There must be information in the patient's medical record that supports the medical necessity for the item and substantiates the answers on the CMN (if applicable) . . . or information on a supplier prepared statement or physician attestation (if applicable). . . . The patient's medical record is not limited to the physician's office records. It may include hospital, nursing home, or HHA records and records from other health care professionals. *CMS Pub. 100-08, Ch. 5, §5.7.*

*Medicare Program Integrity Manual, Pub. 100-08 ("CMS Pub. 100-08"), Ch. 13, §13.5.1* explains the reasonable and necessary provisions in LCDs as follows:

Contractors shall describe in the draft LCD the circumstances under which the item or service is reasonable and necessary under 1862(a)(1)(A). Contractors shall consider a service to be reasonable and necessary if the contractor determines that the service is:
- Safe and effective;
- Not experimental or investigational (exception: routine costs of qualifying clinical trial services with dates of service on or after September 19, 2000 which meet the requirements of the Clinical Trials NCD are considered reasonable and necessary); and
- Appropriate, including the duration and frequency that is considered appropriate for the item or service, in terms of whether it is:
  o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;
  o Furnished in a setting appropriate to the patient's medical needs and condition;
  o Ordered and furnished by qualified personnel;
  o One that meets, but does not exceed, the patient's medical need; and
  o At least as beneficial as an existing and available medically appropriate alternative.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 14 of 631   Document 11-5 4245

I have given substantial deference to the Centers for Medicare and Medicaid Services (CMS) manuals implementing the Medicare program, which are of persuasive importance and instructive and influential. Specific to the instant case is the Medicare Benefit Policy Manual, Publication 100-2, Chapter 15, Covered and Other Health Services, §110 Durable Medical Equipment; and the Medicare Claims Processing Manual, Publication 100-4, Chapter 20, Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS). *See also* CFR §405.1062.

## Analysis

I have reviewed the criteria necessary for Medicare coverage of tumor treatment field therapy, established in accordance with the statutory and regulatory provisions of Part B of Title XVIII of the Social Security Act, and I have determined that the services at issue met such criteria. For the reasons set forth below, I find that the tumor treatment field therapy administered to the appellant on the dates of service at issue was medically reasonable and necessary.

In this appeal, Ms. Noonan (Parrish Law Firm) and Mr. Timothy Parks (Novocure) testified as to the pertinent medical facts concerning this Beneficiary. Ms. Noonan indicated additional appeals were submitted by the Parish Law firm and from the supplier. In reference to the facts, the following was noted:

Mr. Parks spoke to the Beneficiary and as of April 10, 2019, the Beneficiary is stable and is doing quite well. Her response to treatment is impressive. Beneficiary was listed as a 33-year-old female and clinical condition was determined on February 14, 2014. MRI showed large left cystic temporal illness. On February 25, 2016, she underwent a left craniotomy, which confirmed her condition was that of glioblastoma. In May 2016, she completed chemotherapy and radiation with concurrent temodar. On June 16, 2016, she started Optune TTFields. In April 2017, she completed 12 cycles of temodar and continued with TTFields. MRIs have remained stable with no progression. On March 2018- March 2019, she has been stable. In December 2018, her tumor was shown to have reduced in size. Her ECOG/WHO score was listed as "0" meaning she was able to carry on all predisease performance without restriction. Her Karnofsky Performance score was an 80% with indicated the Beneficiary could carry on normal activity and to work.

## REVIEW OF THE DEVICE AND REGULATIONS

Medicare is a defined benefit program, which means that it does not cover all available medical services and supplies.[4] Instead, Medicare coverage is limited to those medical services and supplies identified by Congress, by the Secretary of Health and Human Services, and by CMS in implementing Congressional directives. For example, Medicare does not cover medical services that are experimental or investigational.[5]

---

[4] *Consultants in Pain Medicine, P.A.* (December 2014). In general, although MAC decisions have no precedential value, the decisions may serve as a guidepost to disposition of similar cases. 70 Fed. Reg. 11420, 11449 (Mar. 8, 2005); *see also Vidant Medical Center,* (MAC March 2014).

[5] *See also* Medicare Program Integrity Manual, Publication 100-08, Chapter 13, §13.5.1.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 15 of 631   Document 11-5   4246

## *OPTUNE DEVICE*

The TTFT Optune device (E0766) is a portable, wearable medical device that produces alternating electrical fields, tumor treating field ("TTFields") within the brain by means of electrically insulated surface transducer arrays placed on the scalp. The TTFields disrupt the rapid cell division exhibited by cancer cells supporting tumor growth inhibition without damage to normal neuronal function or structure or any systemic toxicity.

## *FDA CLEARANCE*

At the hearing, Ms. Noonan argued that the FDA approved, through its more rigorous review process, a device to deliver TTFT, finding it to be safe and effective for the treatment of glioblastomas. In support of her argument, the Parrish Law Firm submitted a letter generated by the Center for Devices and Radiological Health of the FDA on October 5, 2015, which states in pertinent part as follows:

> This device is indicated as a treatment for adult patients (22 years or older) with histologically confirmed glioblastoma multiforme (GBM). Optune™ (formerly the NovoTTF-100A System) with Temozolomide is indicated for treatment of adult patients with newly diagnosed, supratentorial glioblastoma following maximal debulking surgery and completion of radiation together with concomitant standard of care chemotherapy. (Exhibit 5)

At the outset, I find that FDA clearance of a device is not synonymous with Medicare coverage.[6] The regulations state that "CMS *may consider* for Medicare coverage" FDA approved devices "that have been categorized as non-experimental/investigational."[7] The regulations further clarify that CMS uses FDA categorization *"as a factor"* in making coverage decisions.[8] Thus, under Medicare regulations, the fact that a device, Optune™, may be deemed non-experimental by virtue of its FDA classification means, as a threshold matter, only that it is eligible to be considered for Medicare coverage.[9]

This conclusion is further reinforced by the statements published by CMS and the FDA in the Federal Register explaining the difference between CMS review of a medical device as compared to reviews conducted by the FDA for pre-market approval.[10] Specifically, each process operates under different statutory standards and asks different questions to meet its respective mandates.[11] Moreover, CMS serves a different function by providing health insurance to protect the nation's aged and disabled. Under §1862(a)(1) of the Act, CMS makes determinations regarding the coverage of specific items and services. In short, CMS must decide: "what items and services it can and should pay for; how it should accomplish the payment; and how much to pay."[12] Thus, FDA clearance of an item or service does not preclude CMS or its contractors, in analyzing whether a particular item or service is medically reasonable and necessary, from making an independent inquiry into whether the item or service is safe and effective and not experimental or investigational.[13] Nor does it preclude CMS or its contractors from inquiring whether the

---

[6] *In the Case of Vision Quest Industries, Inc.,* (MAC June 2012).
[7] *See* 42 C.F.R. §405.201(a)(2).
[8] *See* 42 C.F.R. §405.201(a)(1).
[9] *In the Case of Vision Quest Industries, Inc.,* (MAC June 2012).
[10] *See* 68 Fed. Reg. 55634 (Sept. 26, 2003); *See also* 75 Fed. Ref. 57045.
[11] *Id.; See also* MPIM, Publication 100-08, Chapter 13, §5.1.
[12] *In the Case of Vision Quest Industries, Inc.,* (MAC June 2012).
[13] *Id.*

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 16 of 631   Document 11-5  4247

item or service is supported by *"[p]ublished authoritative evidence derived from definitive randomized clinical trials or other definitive studies."*[14]

Therefore, although Optune™ received FDA approval or clearance for treatment of newly diagnosed glioblastoma multiforme, the appellant's medical condition, I find that such FDA approval/clearance alone does not generally entitle a device to Medicare coverage. Accordingly, I find that FDA clearance for Optune™ by itself does not establish that the device meets Medicare coverage requirements; i.e., that it has been shown to be a medically reasonable and necessary treatment for treatment of newly diagnosed glioblastoma multiforme.

## *NCCN GUIDELINES*

Ms. Noonan further argued that TTFT for glioblastoma is included in the National Comprehensive Cancer Network ("CNNC") guidelines and is considered the standard of care for newly diagnosed glioblastoma.

**THE NATIONAL COMPREHENSIVE** Cancer Network (NCCN) has updated its Clinical Practice Guidelines in Oncology for Central Nervous System Cancers (NCCN Guidelines®) to recommend alternating electric field therapy (also known as tumor-treating fields, Optune) in combination with temozolomide as a category 1 treatment for patients with newly diagnosed glioblastoma. The NCCN panel members made this recommendation in conjunction with Temozolomide after maximal safe resection and completion of radiation therapy.

The updated recommendation follows the publication of a phase III trial that demonstrated improvement in 5-year survival results with the combination therapy in *The Journal of the American Medical Association*.[1] The study showed the combination therapy significantly improved survival outcomes compared with Temozolomide alone.

More than 1,800 patients with glioblastoma are receiving therapy with tumor-treating fields as of December 31, 2017, and more than 7,000 patients with glioblastoma have received such treatment to date. Physicians at more than 700 cancer centers in the United States, and at more than 1,100 medical institutions globally, have been certified to prescribe this radiation therapy to patients with newly diagnosed and recurrent glioblastoma.

**More on Therapy With Tumor-Treating Fields**

THERAPY WITH tumor-treating fields is intended as a treatment for adult patients 22 years of age or older with histologically confirmed glioblastoma multiforme. In combination with Temozolomide, it is indicated for the treatment of adult patients with newly diagnosed, supratentorial glioblastoma following maximal debulking surgery and completion of radiation therapy together with concomitant standard-of-care chemotherapy.[15]    https://www.ascopost.com/issues/april-25-2018/updated-nccn-guidelines-for-newly-diagnosed-glioblastoma/

---

[14] *Consultants in Pain Medicine, P.A.* (December 2014); *In the Case of Vision Quest Industries, Inc.*, (MAC June 2012).
[15] Effect of tumor-treating fields plus maintenance Temozolomide vs maintenance Temozolomide alone on survival in patients with glioblastoma. JAMA 318:2306-2316, 2017.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 17 of 631   Document 11-5 4248

Nearly all studies showed a significant negative relationship between advancing age and duration of postoperative survival.8–18 In a 2005 report of a study by Korshunov et al,18 the percentage of patients younger than age 40 years who survived more than five years was 34%, compared with 6% for patients age 40 years old and older. The researchers suggested age 40 years as the most appropriate cutoff for dividing patients with GB into groups according to prognosis. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3037140/

The applicable NCCN guidelines further state that all recommendations are category 2A unless otherwise indicated. It is undisputed that the FDA approved Optune™ for treatment of newly diagnosed glioblastoma multiforme, the appellant's medical condition. Moreover, the NCCN guidelines recommend treatment of methylated glioblastoma with the use alternative electric field therapy. Such recognition is Category 2A, which establishes that "based upon lower-level evidence, there is uniform NCCN consensus that the intervention is appropriate."16 "The MBPM guidelines at 50.4.5.B17 specifically state that, for purposes of the NCCN, a use will be medically accepted if the indication is a Category 1 or Category 2A designation.

## *PEER REVIEW LITERATURE*

The appellant contends that the NovoTTF 100-A System is reasonable and necessary and not investigational or experimental based on clinical studies, abstracts and publications. In making a determination as to whether the NovoTTF-100A System is reasonable and necessary, i.e., safe and effective, and not experimental or investigational, only evidence that was in existence on or before the dates of service at issue is relevant. The appellant must prove that the NovoTTF-100A System was medically reasonable and necessary when the service was furnished.

The Appellant has submitted documentation confirming that the Optune device received an initial April 2011 FDA pre-market approval and later October 2015 FDA pre-market approval supplement. Additional studies and literature have been submitted pertaining to the efficacy of tumor treating fields therapy for indications stated in those FDA approvals, including use of the Optune Device for treatment of recurrent Glioblastoma which has not responded to standard therapy (per the April 2011 FDA approval) and for treatment of newly diagnosed Glioblastoma (per the October 2015 FDA approval supplement). (*See* CD attachment at Exhibit 5).

Appellant submitted additional and relevant material in support of his appeal such as the article from the Journal of the American Medical Association (JAMA) titled Maintenance Therapy with Tumor-Treating Fields Plus Temozolomide Vs. Ternozolomide Alone for Glioblastoma — A Randomized Clinical Trial. The article describes the superior results in progression free survival as well as overall survival of glioblastoma patients using TTFields. This trial shows that the Optune device was safe, non-investigational and effective. Moreover, this trial shows that the Optune device was appropriate for this individual Enrollee's needs, specifically the treatment of newly discovered glioblastoma.

---

16 See https://www.nccn.org/professionals/physician_gls/categories_of_consensus.aspx (last visited on 2/5/2019).
17 In note that the aforementioned Medicare Manual provision refers to drugs and biological, not durable medical equipment; however, I find that it clearly explains the NCCN category designations, which apply to this case.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 18 of 631   Document 11-5  4249

Additional material submitted by the Beneficiary also shows the medical community generally accepts the use of TTFT. In the 2016 version of the National Comprehensive Cancer Network Clinical Practice Guidelines in Oncology Central Nervous System Cancers guidelines, alternating electric field therapy is a treatment option suggested for glioblastoma: This suggestion was found in a treatment guideline from a national cancer organization, not evidence based on an individual physician treating a single patient in a clinical setting.

## Applicable Medicare Regulations: LCD L34823

In this case, as in all Medicare appeals, the appellant has the burden to establish that she is entitled to Medicare payment. The regulations are clear that it is the responsibility of the supplier to furnish sufficient information to determine whether payment is due and the amount of payment.[18] The governing LCD clearly states that "**tumor treatment field therapy (E0766) will be denied as not reasonable and necessary.**" At the hearing, Ms. Noonan argued that the LCD was not applicable because it had not been updated since 2013 and that the DME MAC medical director had indicated that "the policy did not apply to newly diagnosed glioblastoma." In support of her argument, Ms. Parrish submitted a letter from CGS Administrators, LLC, which was addressed to Novocure and states in pertinent part as follows:

> The DME MAC Medical Directors received your June 20, 2018, e-mail to Dr. Robert Hoover requesting a formal reconsideration of the TTFT Local Coverage Determination (LCD) coverage criteria.
>
> Currently, the TTFT LCD includes language indicating that the coverage of TTFT for recurrent glioblastoma multiforme (GMB) is not reasonable and necessary. Coverage for newly diagnosed GBM is not addressed. Your letter asks that we revise the LCD to allow coverage for recurrent GBM and add coverage for newly diagnosed GBM.

*Proposed changes to LCD DL34823*—On May 9, 2019, The Centers for Medicare and Medicaid Services (CMS) assigned to the Durable Medical Equipment Medicare Administrative Contractors (DME MACs) the task of developing Local Coverage Determinations (LCDs) for Durable Medical Equipment, Prostheses, Orthoses, and Supplies (DMEPOS). The DME MACs are proposing a revision to the **Tumor Treatment Field Therapy (TTFT LCD L34823)** to cover newly diagnosed glioblastoma multiforme (GBM).

An ALJ is not bound by contractor LCDs or CMS program guidance, such as program memoranda and manual instructions, "but will give substantial deference to these policies if they are applicable to a particular case." 42 C.F.R. § 405.1062(a). An ALJ must explain the reason for not following such a policy in a specific case. 42 C.F.R. § 405.1062(b). Any decision to disregard a policy "applies only to the specific claim being considered and does not have precedential effect." (Id.)

Based upon the facts of this case, and giving appropriate deference to the LCD policy guidance, I decline to follow the LCD in this case, and instead find that the Optune device will be considered reasonable and necessary as specifically applied to the Beneficiary's diagnosis and treatment regimen. In declining to follow the pertinent LCD, I have considered the following criteria, as suggested by Medicare manual

---

[18] *See* §1833(e) of the Social Security Act; 42 C.F.R. §424.5(a)(6).

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 19 of 631   Document 11-5 4250

guidance: (1) whether the device can be expected to make a meaningful contribution to the treatment of the patient's illness or injury or to the improvement of his or her malformed body member; (2) whether the device can be considered a reasonable treatment, considering expense versus therapeutic benefits, comparative cost of feasible alternatives, and whether the device serves the same purpose as other available equipment or alternatives; (3) whether all features of the device are required for treatment of the Beneficiary's condition; and, (4) the period of time the DME will be considered medically necessary, which is generally based on the physician's estimate of the time that his or her patient will need the equipment. *CMS Pub. 100-02, Ch. 15, §110.1(c).*

Moreover, the LCD, as currently published does not cite any studies, articles or other sources for this determination, or specify any specific diagnoses for which the treatment will be considered as not reasonable and necessary. It makes no distinction between recurrent glioblastoma or newly discovered glioblastoma, and the lack of sources or information on which the determination was based makes it unascertainable. In addition, no reference is made in the LCD Sources of Information and Basis for Decision to several of the more recent studies and guidelines, including the more recent pivotal study and resulting October 2015 FDA pre-market approval supplement allowing the Optune device to be used for newly diagnosed GBM, and the additional even more recent literature and established guidelines supporting such use. NCCN Guidelines for Anaplastic Gliomas/Glioblastoma for 2017 and 2018 category of evidence 2A (based upon lower-level evidence, there is uniform NCCN consensus that the intervention is appropriate), the Mayo Clinic's information on Glioblastoma, and the fact that numerous commercial insurers cover the treatment.[19] (List of commercial insurers that cover TTFT in CD).

Applying the aforementioned criteria, a review of the medical record clearly demonstrates that the Appellant is a 34 year-old woman who is being treated for newly diagnosed, glioblastoma and has undergone debulking as well as total resection, followed by adjuvant TMZ treatment. Additionally, her physician documented that her KPS scale score was 80% and her Echo score was 0. Consequently, after a careful and thorough review of Appellant's arguments and the evidence in the record, the I find the use of the Optune device for an FDA approved indication can be expected to make a meaningful contribution to the treatment of Appellant's glioblastoma. In fact, the treatment was and is being provided under the supervision of an oncology specialist. The physician recommended treatment with the Optune device to halt the progression of her disease, which has proven successful. Mr. Timothy Parks testified to and the MRI supports that the Beneficiary had no appreciable evidence of worsening residual or recurrent lesion. Lastly proposed LCD changes to DL34823 show that two Contractors: Noridian and CGS have looked to allow coverage to newly diagnosed glioblastoma patients and the Beneficiary meets the criteria for coverage.

The undersigned understands Medicare often times lags behind other insurers in covering new medical technologies but it is unreasonable to deny Medicare coverage to this beneficiary in view of the extensive literature, favorable clinical trials, national adoption by other health plans and applicable NCCN Guidelines support. Therefore, the record supports the claimed Optune device treatment was safe and effective and clinically appropriate. Accordingly, the device is reasonable and necessary for the treatment of Appellant's glioblastoma.

---

[19] Glioblastoma, Mayo Clinic, *see* https://www.mayoclinic.org/diseases-conditions/glioblastoma/cdc-20350148

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 20 of 631   Document 11-5 4251

## CONCLUSIONS OF LAW

The Appellant's use of the Optune device, HCPCs Code E0766, during dates of service meets requirements for Medicare Part B DME coverage because the device is shown to: meet the definition of durable medical equipment, to have been reasonable and necessary for the treatment of the Beneficiary's GBM, and to have been for use in the Beneficiary's home. *See Sections 1832(a)(1), 1834(a)(13); 1861(n),(s)(6), 1862(a)(1)(A) of Title XVIII 42 C.F.R. §410.38(a); CMS Pub. 100-02, Ch. 15, §110 et seq..*

## ORDER

The Medicare Contractor is **DIRECTED** to process the claim in accordance with this decision.

**SO ORDERED.**

Dated: _____ JUN 2 7 2019

_____
Lissette M. Figueroa
U.S. Administrative Law Judge

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 21 of 631   Document 11-5 4252



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Miami, Florida**

| | | | |
|---|---|---|---|
| Appeal of: | **A. PROSSER** | OMHA Appeal No.: | **1-8380637906** |
| Beneficiary: | **A. PROSSER** | Medicare: | **Part B** |
| Medicare No.: | **\*\*\*\*\*4857A** | Before: | **Lissette M. Figueroa**<br>Administrative Law Judge |

## EXHIBIT LIST

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBERS |
|:---:|:---|:---:|
| 1 | Initial, Redetermination and Reconsideration Procedural Documents | 34 |
| 2 | Medical Records/Evidence Received by CMS Contractors | 156 |
| 3 | Request for ALJ Hearing | 4 |
| 4 | OMHA Proceedings | 26 |
| 5 | Medical Literature Provided by Appellant | 1044 |
| 6 | Additional Records Received After Hearing | 14 |

Dated: 6/27/2019

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 22 of 631   Document 11-5 4253



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City Field Office**
**Kansas City, Missouri**

| | | | |
|---|---|---|---|
| Appeal of: | **A. Prosser** | ALJ Appeal No.: | **1-8416188648** |
| Beneficiary: | **A. Prosser** | Medicare Part: **B** | |
| DOS: | **8/16/2018** **9/16/2018** **10/16/2018** | | |
| HICN: | **\*\*\*\*\*9206A** | Before: | **Kimberley Woodyard** U.S. Administrative Law Judge |

## DECISION

Upon a *de novo* review of the record, this Administrative Law Judge enters a **FULLY FAVORABLE** decision for the Appellant, Anniken Prosser. Ms. Prosser is entitled to coverage for Tumor Treatment Field Therapy (E0766).

## FINDINGS OF FACT AND
## HISTORY OF THE CASE

Ms. Prosser, was thirty-four years old at the time of services. (Exh. 2, p. 1). On February 14, 2016, MRI results showed Ms. Prosser had a large left cystic temporal mass. *Id*. Two weeks later, she underwent a left craniotomy. *Id*. The post-operative diagnosis was "GBM" (glioblastoma multiforme). *Id*.

In May 2016, Ms. Prosser completed radiation with Editha Kruegar, MD, and concurrent Temodar chemotherapy with Jasleen Randhawa, MD. (Exh. 2, p. 1). In June 2016, adjuvant Temodar chemotherapy was continued, and Optune TTFields therapy was started. *Id*. By April 2017, she had completed twelve cycles of Temodar chemotherapy, and Optune TTFields therapy was continued. *Id*.

On March 15, 2018, Jennifer Connelly, MD, examined Ms. Prosser. (Exh. 2, pp. 1-4). Dr. Connelly found Ms. Prosser was neurologically intact and radiographically stable, and she was tolerating TTFields well with excellent compliance. (Exh. 2, p. 4). Brain imaging showed similar

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 23 of 631   Document 11-5   4254

results compared to the previous images. *Id.* There were no new lesions, and no evidence of abnormal vascularity. *Id.* Dr. Connelly recommended continuing with Optune TTFields. *Id.*

On June 2016, Ms. Prosser began using Optune therapy treatment. (Exh. 5, p. 1,649). On April 13, 2018, and on October 11, 2018, Dr. Connelly signed an Optune Prescription Form renewing the Optune treatment prescription for an additional six months. (Exh. 5, pp. 1,650-1,651). The record includes invoices for Optune for August 16, 2018, September 16, 2018, and October 16, 2018. (Exh. 2, pp. 1,645-1,647).

### *Optune Background*

When Optune is turned on, it creates low-intensity, wave-like electric fields call Tumor Treating Fields, or TTFields. (*See* https://www.optune.com/discover-optune/how-optune-works). These TTFields are delivered by transducer arrays to the location of a GBM tumor. *Id.* TTFields interfere with GBM tumor cell division. *Id.* This action slows or stops GBM cells from dividing, and may destroy them. *Id.* Optune with temozalomide is indicated for the treatment of adult patients with *newly diagnosed* supratentorial glioblastoma following maximal debulking surgery and completion of radiation therapy together with concomitant standard of care chemotherapy. (*See* https://www.optune.com/hcp/therapy/moa). *Id.* For treatment of patients who have *recurrent* GBM, Optune is indicated following histologically-confirmed or radiologically-confirmed recurrence in the supra-tentorial region of the brain after receiving chemotherapy. *Id.* The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted. *Id.* Ms. Prosser is *newly diagnosed* with the disease. (Exh. 2, p. 1).

On April 8, 2011, Optune, previously called NovoTTF-100A System, received pre-market approval from the FDA for treatment of glioblastoma for use in patients with recurrent glioblastoma, based upon the result of a large randomized, controlled trial of patients with recurrent GBM.[1] (Exh. 5, pp. 32-36). The overall survival and progression-free survival to chemotherapy with minimal toxicity and an improvement in patients' quality of life, is demonstrated, compared to that of chemotherapy. *Id.* On October 5, 2015, the Provider received premarket approval from the FDA for use of Optune in patients newly diagnosed with glioblastoma.[2] (Exh. 5, pp. 37-40).

The record includes National Comprehensive Cancer Network publications that provide clinical practice oncology guidelines from 2013 through 2018 for the management of both newly diagnosed and recurring central nervous system cancers.[3] (Exh. 5, pp. 14-29). Alternating electric field therapy was considered an effective treatment option for recurrent glioblastomas and oligodendrogliomas. (Exh. 5, p. 15). Along with (1) palliative support care, (2) systemic

---

[1] http://www.accessdata.fda.gov/cdrh_docs/pdf10/p100034a.pdf.

[2] http://www.accessdata.fda.gov/cdrh_docs/pdf10/P100034S013a.pdf.

[3] National Comprehensive Cancer Network Clinical Practice Guidelines in Oncology, *Central Nervous System Cancers*, version 1.2018.

chemotherapy, and (3) surgery or reirradiation, alternating electric field therapy is considered a fourth modality of cancer treatment. *Id.*

A 2012 article summarized results from a study comparing NovoTTF-100A (Optune) treatment to a physician's choice of chemotherapy treatment in recurrent glioblastoma cases.[4] (Exh. 5, pp. 1,803-1,813).

> This is the first controlled trial evaluating an entirely novel cancer treatment modality delivering electric fields rather than chemotherapy. No improvement in overall survival was demonstrated, however efficacy and activity with this chemotherapy-free treatment device appears comparable to chemotherapy regimens that are commonly used for recurrent glioblastoma. Toxicity and quality of life clearly favoured TTF.

(Exh. 5, p. 1,804).

Within three years, studies showed significant advancements. On December 15, 2015, the Journal of the American Medical Association (JAMA) published an article analyzing the results of a phase III clinical trial related to TTFT.[5] (Exh. 5, pp. 1,518-1,526). The analysis of the clinical trial with 315 participants showed that adding TTFT to maintenance temozolomide in a population with new onset glioblastoma "significantly prolonged progression-free and overall survival." (Exh. 5, p. 1,525). After conclusion of the study, patients in the control group with ongoing maintenance therapy were offered TTFT therapy. (Exh. 5, p. 1,521).

On December 19, 2017, JAMA published an article that reports the findings of a phase III clinical trial involving 695 participants with glioblastoma.[6] (Exh. 5, pp. 1,529-1,550). The conclusion was:

> In the final analysis of this randomized clinical trial of patients with glioblastoma who had received standard radio-chemotherapy, the addition of TTFields [Optune] to maintenance temozolomide chemotherapy vs maintenance temozolomide alone, resulted in statistically significant improvement in progression-free survival and overall survival. These results are consistent with the previous interim analysis.

(Exh. 5, p. 1,549). The author noted that the findings were in contrast to the more than twenty-three randomized trials conducted during the previous decade that evaluated novel agents or

---

[4] Stupp, Roger, M.D. et al., *NovoTTF-100A Versus Physician's Choice Chemotherapy In Recurrent Glioblastoma: A Randomized Phase III Trial Of A Novel Treatment Modality*, European Journal of Cancer, Volume 48, Issue 14, pp. 2192-2201 (September 2012).

[5] Stupp, Roger, M.D. et al., *Maintenance Therapy With Tumor-Treating Field Plus Temozolomide vs Temozolomide Alone for Glioblastoma A Randomized Clinical Trial*, JAMA (December 15, 2015).

[6] Stupp, Roger, M.D. et al., *Effect of Tumor-Treating Field Plus Maintenance Temozolomide vs Maintenance Temozolomide Alone on Survival in Patients With Glioblastoma*, JAMA (December 19, 2017).

intensified treatment strategies for treatment of patients with newly diagnosed glioblastoma, and failed to demonstrate improved survival. (Exh. 5, pp. 1,548-1,549).

A 2018 article summarizes a study in which patients with newly diagnosed glioblastoma participated in a study conducted from July 2009 through November 2014, and were followed through December 2016.[7] (Exh. 5, pp. 1,551-1,559). Compared to patients in the temozolomide-alone part of the study, participants who received TTFields (Optune) had significantly longer deterioration-free survival in global health status, physical and emotional functioning, pain, and leg weakness. (Exh. 5, pp. 1,557-1,558).

The Medicare Administrative Contractor, initially and on redetermination, denied the claim for the services. The Qualified Independent Contractor (QIC) denied reconsideration of the claim on March 19, 2019. Both the Administrative Contractor and the QIC found that, based on the available documentation, Medicare requirements outlined in the LCD were not met. Ms. Prosser, filed a request for hearing before an Administrative Law Judge (ALJ) on March 27, 2019. (Exh. 3, pp. 1-3). Since the request was timely and the amount in controversy met the jurisdictional requirements for an ALJ hearing, 42 C.F.R. §§ 405.1002(a)(1), 405.1006(b)(1), this ALJ has jurisdiction to conduct the *de novo* review and issue a decision. 42 C.F.R. § 405.1000(d).

By Notice of Hearing served on April 4, 2019, the appeal was scheduled to be heard on May 29, 2019. As of the date of this decision, no contractor has responded to the Notice of Hearing.

An ALJ may decide a case on the record without hearing if an examination of the record supports a finding in favor of the Appellant on every issue. 42 C.F.R. § 405.1038(a). Inasmuch as this ALJ issues this decision as wholly favorable, no hearing will be held.

The issues before the ALJ include all the issues brought out in the initial determination, coverage determination, or organization determination; redetermination; or reconsideration that were not decided entirely in the Appellant's favor, for the claims or other appealed matters specified in the request for hearing. The issue was whether all Medicare coverage requirements have been met warranting payment for the Tumor Treatment Field Therapy.

## Legal Framework

### I.    ALJ Review Authority

#### A.    Jurisdiction

A party dissatisfied with the decisions of the Medicare contractor and the Qualified Independent Contractor is entitled to a hearing before the Secretary of the Department of Health

---

[7] Taphoorn, Martin, MD et al., *Influence of Treatment With Tumor-Treating Fields on Health-Related Quality of Life of Patients With Newly Diagnosed Glioblastoma*, JAMA (February 1, 2018).

and Human Services, Social Security Act § 1869(b)(1)(A), provided there is a sufficient amount in controversy and a request for hearing is filed in a timely manner, 42 C.F.R. § 405.1002. The request for hearing is timely if filed within sixty days after receipt of a Qualified Independent Contractor decision. 42 C.F.R. § 405.1014(c). The minimum amount in controversy required for hearing before an Administrative Law Judge are published in the Federal Register.

### B. Scope of Review

The issues before the ALJ include all the issues brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in the Appellant's favor. 42 C.F.R. § 405.1032(a).

### C. Standard of Review

The ALJ conducts a *de novo* review of each claim at issue and makes a decision based on the hearing record. 42 C.F.R. § 405.1000(d).

## II. Principles of Law

### A. Statutes and Regulations

Medicare Part B provides coverage to eligible beneficiaries for all or part of the cost of "medical and other health services," a term that is defined by the Social Security Act as including, among many other things, durable medical equipment. *See* Social Security Act § 1832(a)(1)(B); 42 C.F.R. §410.10(h). Notwithstanding any other provision of Title XVIII of the Social Security Act, no payment may be made under parts A or B for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. Social Security Act § 1862(a)(1)(A). Similarly, Medicare precludes payment to any claimant unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." Social Security Act § 1833(e).

### B. Policy and Guidance

The Social Security Act vests in the Secretary the authority to make coverage decisions. Under that authority, CMS issues National Coverage Determinations (NCDs) that state whether specific medical items, services, treatment procedures, or technologies may be paid for by Medicare. In the absence of a specific NCD, the Medicare contractor is responsible for determining whether an item or service is reasonable and necessary. (See preface to Coverage Issues Manual (reprinted at 54 Fed. Reg. 34555 (Aug. 21, 1989)). Accordingly, in addition to looking to the binding statutory and regulatory authority, this ALJ must accord substantial deference to manuals, program memoranda and other issuances issued by the Center for Medicare and Medicaid Services (CMS) and its carriers and intermediaries. 42 C.F.R. § 405.1062. Thus, the ALJ looks to the Local Coverage Determinations (LCD), if any, and the Medicare Benefit Policy Manual.

Historically, in making coverage determinations, CMS has interpreted the terms "reasonable and necessary" to mean that the item or service in question is safe and effective and not experimental. CMS has further determined that the relevant tests for applying these terms are whether the item or service has been proven safe and effective based on authoritative evidence, or alternatively, whether the item or service is generally accepted in the medical community as safe and effective for the condition for which it is used. 54 Fed. Reg. 4304 (Jan. 30, 1989); 60 Fed. Reg. 48417 (Sept. 19, 1995); see also 52 Fed. Reg. 15,560 (Apr. 29, 1987). Indeed, CMS has provided guidance in the *Medicare Program Integrity Manual* (CMS Pub. 100-08) (*MPIM*) to assist contractors in developing LCDs to aid in creating relevant tests and guidance. The *MPIM* contemplates that, in making a determination as to whether an item or service is reasonable and necessary, contractors will analyze whether the item or service is safe and effective, and not experimental or investigational. *MPIM*, Ch. 13 at § 13.5.1. Contractors shall consider a service reasonable and necessary if the contractor determines that the service is:

- Safe and effective;

- Not experimental or investigational; and

- Appropriate, including the duration and frequency that is considered appropriate for the service.

The *MPIM* further instructs contractors to base LCDs on the strongest evidence available at the time the determination is issued. In order of preference, this includes:

- Published authoritative evidence derived from definitive randomized clinical trials or other definitive studies, and ALJs and the Medicare Appeals Council are not bound by CMS program guidance, such as program memoranda and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case. 42 C.F.R. § 405.1062(a).

- General acceptance by the medical community (standards of practice), supported by sound medical evidence based on:

  o Scientific data or research studies published in peer-reviewed medical journals;

  o Consensus of expert medical opinion (i.e., recognized authorities in the field); or

  o Medical opinion derived from consultations with medical associations or other health care experts.

*Id.* at § 13.7.1. The Manual further explains:

Acceptance by individual health care providers, or even a limited group of health care providers, normally does not indicate general acceptance by the medical community. Testimonials indicating such limited acceptance, and limited case studies distributed by sponsors with financial interest in the outcome, are not sufficient evidence of general acceptance by the medical

Case 1:20-cv-00194-WCG  Filed 04/28/20  Page 28 of 631  Document 11-5 4259

community. The broad range of available evidence must be considered and its quality shall be evaluated before a conclusion is reached.

*Id.*

There is a Local Coverage Determination stating CMS' guidance for Tumor Treatment Field Therapy: CGS Administrators, LLC, Local Coverage Determination, LCD L34823, Tumor Treatment Field Therapy (TTFT) (January 2017). This LCD provides, without elucidation, that tumor treatment field therapy (E0766) will be denied as not reasonable and necessary.[8] The related Policy Article states that tumor treatment field therapy devices are covered under the Durable Medical Equipment benefit and must meet the reasonable and necessary requirements set out in the related LCD to be eligible for reimbursement. CGS Administrators, LLC, Local Coverage Article for Tumor Treatment Field Therapy Article A52711 (Article A52711) (January 2017).

## Analysis

The issue is whether the Tumor Treatment Field Therapy services are entitled to coverage. Pursuant to section 405.1032(a) of the regulations (42 C.F.R.), the unfavorable findings of the contractors are the issues before this ALJ. Both the Medicare Contractor and the QIC found, that based on the available documentation, Medicare requirements outlined in the LCD were not met. (Exh. 1, pp. 10, 31).

There is no NCD specific to TTFT. This ALJ, therefore, looks to the relevant LCD for guidance. ALJs are not bound by LCDs and will give substantial deference to the policies if they are applicable to a particular case. 42 C.F.R. § 405.1062. If an ALJ declines to follow an LCD in a particular case, the ALJ must explain the reasons why the policy was not followed. *Id.*

Ms. Prosser, in her prehearing brief, argues that the LCD L34823 does not apply to newly diagnosed glioblastoma cases. However, the LCD is silent on the type of glioblastoma and does not differentiate between newly diagnosed and recurrent glioblastoma. Consequently, LCD L34834 is applicable to this case, and I decline to follow it for multiple reasons. TTFT has been shown to be safe and effective for use in patients with recurrent and newly diagnosed glioblastoma, and it is medically reasonable and necessary to treat Ms. Prosser's condition.

LCD L34834 denies coverage for tumor treatment field therapy as not reasonable and necessary, omitting entirely the literature references in the prior LCDs. Data from the FDA, phase III clinical trials, and NCCN guidelines show the LCD, at best, is behind the medical literature curve – at least as applied to Ms. Prosser. The *Medicare Program Integrity Manual* (CMS Pub. 100-08) (*MPIM*) provides more appropriate, relevant, and helpful guidance for making a determination as to whether an item or service is reasonable and necessary, and not experimental or investigational. *MPIM*, Ch. 13 at § 13.5.1.

---

[8] This latest version of the LCD, omits entirely the literature previously shown in the 2016 LCD (an update from the 2015 version, which is not markedly distinguishable).

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 29 of 631   Document 11-5 4260

Applying that guidance, this ALJ first finds that the Optune device received FDA premarket approval for use in patients with recurrent glioblastoma on April 8, 2011. On October 5, 2015, the FDA gave premarket approval for use of Optune in patients with newly diagnosed glioblastoma. Premarket approval (PMA) entails the following:

> PMA is the most stringent type of device marketing application required by FDA. The applicant must receive FDA approval of its PMA application prior to marketing the device. PMA approval is based on a determination by FDA that the PMA contains sufficient valid scientific evidence to assure that the device is safe and effective for its intended use(s).[9]

While FDA premarket approval does not establish that the device is medically reasonable and necessary pursuant to Medicare requirements, it does ensure that the FDA has closely examined the device and its application. The FDA determined that sufficient scientific evidence existed to provide the FDA with assurance that the device was safe and effective for its intended use both in patients with recurrent and newly diagnosed glioblastoma. From this perspective, the use of the device meets Medicare guidance requiring that a device be proven safe and effective based on authoritative evidence.

Medicare does not pay for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member. Social Security Act § 1862(a)(1). To be reasonable and necessary, the procedure must be safe and effective and not experimental. The FDA approval, along with the other evidence below, supports the conclusion that the device is safe, and not experimental or investigational.

Second, this ALJ has reviewed clinical studies in the record related to the use of the Optune device. With respect to patients newly diagnosed with glioblastoma, results of a phase III study released in a December 15, 2015, JAMA article showed that adding TTFT to maintenance temozolomide significantly prolonged progression-free and overall survival. Significantly, patients in the control group in the JAMA-reported study crossed over to the combined therapy group for TTFT treatment due to the improvement in outcomes seen. The results from these phase III trials also led to FDA approval for the Optune device. These trials showed that the Optune device was safe, non-investigational and effective. It is noteworthy that the 2015 study contains proof of efficacy. These trials show that the Optune device is appropriate for treatment of Ms. Prosser's glioblastoma.

Third, the use of TTFT is generally accepted by the medical community. In the 2015 version of the National Comprehensive Cancer Network Clinical Practice Guidelines in Oncology Central Nervous System Cancers guidelines, alternating electric field therapy is a treatment option suggested for glioblastoma. This suggestion was found in a treatment guideline from a national cancer organization, not evidence based on an individual physician treating a single patient in a clinical setting. As such, TTFT treatment is generally accepted in the medical community as safe and effective for the treatment of recurrent glioblastoma.

---

[9]http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketApprovalPMA/default.htm

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 30 of 631   Document 11-5   4261

Overall, a review of the literature available supports that the Optune device is safe and effective and not investigational/experimental. The use of the Optune device in populations with recurrent glioblastoma or newly diagnosed glioblastoma was proven effective and appropriate through phase III clinical trials. The use of the Optune device appears in national cancer treatment guidelines for treatment of glioblastoma, showing general acceptance by the medical community. A number of commercial health plans also now cover TTFT. (Exh. 5, pp. 692-1,421).

For the reasons stated above, Optune (TTFT) has been shown to be safe and effective, and is not experimental. Medicare coverage is thus available for the tumor treatment field therapy.

### Conclusions of Law

Medicare coverage exists for the Optune Tumor Treatment Field Therapy services (E0766) provided to the Beneficiary for dates of service August 16, 2018, September 16, 2018, and October 16, 2018.

### Order

The Medicare Contractor shall process the claim in accord with this decision.

**IT IS SO ORDERED.**

Dated: MAY 1 6 2019

**Kimberley Woodyard**
U.S. Administrative Law Judge

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 31 of 631    Document 11-5 4262



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City Field Office**
**Kansas City, Missouri**

| | | | |
|---|---|---|---|
| Appeal of: | **A. Prosser** | ALJ Appeal No.: | **1-8416188648** |
| Beneficiary: | **A. Prosser** | Medicare Part: | **B** |
| Date of Service: | **Aug., Sept., Oct. 16, 2018** | | |
| HICN: | **\*\*\*\*4857A** | Before: | **Kimberley Woodyard** |
| RFH Date: | **March 29, 2019** | | U.S. Administrative Law Judge |

## EXHIBIT LIST[1]

| Exhibit | Description | Pages |
|:---:|---|:---:|
| 1 | Initial, Redetermination and Reconsideration Documents | 1-35 |
| 2 | Medical Records/Evidence Received by CMS Contractors | 1-4 |
| 3 | Request for Hearing | 1-12 |
| 4 | OMHA Proceedings:<br>• Notice of Hearing, Exhibit List, and blank response form<br>• Response to NOH (Appellant)<br>• Pre-Hearing Brief (Appellant) | 1-20 |
| 5 | Literature and Reports Received by CMS Contractors | 1-1876 |
| 6 | New Evidence April 17, 2019, Submission. (Documents and Disk) | 1-341 + 1 CD |

Dated: 5/16/2019

---

[1] If any records are dual-sided, the second side of the page is not included in the page count.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 32 of 631   Document 11-5 4263

**DEBRA M. PARRISH, P.C.**
788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA
Telephone: (412) 561-6250
Fax: (412) 561-6253

*RECEIVED*
*OCT - 4 2019*
*MOD*

## FAX TRANSMITTAL

| | |
|---|---|
| **TO:** | **DHHS – Departmental Appeals Board** |
| **ATTN:** | **Medical Appeals Council** |
| **FAX NO.:** | 202-565-0227 |
| **FROM:** | Debra M. Parrish |
| **DATE:** | October 2, 2019 |
| **REFERENCE:** | ALJ No.: 1-839027769  1-8390277469 |
| | Docket No.: M-19-2234'3  M-19-2233 |
| | Beneficiary: A. Prosser |

**TOTAL NUMBER OF PAGES INCLUDING COVER LETTER:** 4
CONTACT TANYA TERZA (412) 561-6250 IF PROBLEMS OCCUR.

Dear Medicare Appeals Council,

Per your request dated October 2, 2019, please find attached a **Certificate of Service** stating that copies of our Request for Review for the above-captioned case were sent to the other parties on **July 12, 2019**. If you have any questions or require anything further, please do not hesitate to contact us at (412) 561-6250. Thank you.

Debra M. Parrish

This facsimile transmission contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for the use of the Addressee(s) named above. If you are not the intended recipient of this facsimile, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original facsimile to us at the address above via the U.S. Postal Service. Thank you.

## CERTIFICATE OF SERVICE

I hereby certify that I sent a copy of the Request for Review submitted on behalf of Anniken Prosser to the following parties via the following methods on **July 12, 2019**:

**USPS First Class Mail:**

Anniken Prosser
W2973 Farmstead Drive
Appleton, WI 54915

C2C Innovative Solutions, Inc.
DME QIC Appeals-ALJ
P.O. Box 44006
Jacksonville, FL 32231-4006

**\*\*Electronic Mail [via secure server]:**

Novocure, Inc.
c/o Justin Kelly
JKelly@novocure.com
195 Commerce Way
Portsmouth, NH 03801

October 2, 2019

Tanya A. Terza
Paralegal
Parrish Law Offices



**DEPARTMENT OF HEALTH & HUMAN SERVICES**    Office of the Secretary

Departmental Appeals Board, MS 6127
Medicare Appeals Council
330 Independence Avenue
Cohen Building, Room G-644
Washington, DC 2020
(202)565-0100/Toll Free:1-866-365-8204

Date:        OCT   2 2019
                                7469
ALJ Appeal Number: 1-8390277569 ⟵——— incorrect
Docket Number: M-19-2234  2233
                         ⟵——— incorrect

Debra M. Parrish
Attn: Debra Parrish
788 Washington Rd
Pittsburgh, PA 15228

Dear Debra Parrish:

The Medicare Appeals Council (Council) received your appeal on July 12, 2019, which
requests review of an Administrative Law Judge (ALJ) decision dated June 20, 2019.
However, the request for review does not indicate that you sent a copy of your request to
the other parties to the appeal as required by the regulations. 42 C.F.R. § 405.1106.

Please furnish a copy of your request for review and any attachments to the provider and
its representative, if any. In addition, please notify the Council in writing that you have
sent a copy of your request for review to the beneficiary and his or her representative, if
any, within 30 days of the date of this letter. For example, you may send us a copy of the
cover letter that you sent to the other parties. Or you may send us a statement with the
names and addresses of the other parties and the date that you sent the copies to them.
You may send us this proof by mail to the address listed above or via facsimile (fax) to
202-565-0227.

**If you do not send this information to us within 30 days from the date of this letter,
the Council may dismiss your appeal.**

This letter also serves as notice to all parties that any further argument or evidence
submitted to the Council regarding this appeal must be copied to all other parties.

If you have any questions, please call the Medicare Operations Division support staff at
1-866-365-8204 or 202-565-0100.

                            Sincerely yours,

2

Anyi Fomengia
Contractor

cc:    A. Prosser

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
FAX 412.561.6253
E-mail: info@dparrishlaw.com

July 12, 2019

***VIA DAB E-FILE***

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building, Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

> **Re:** **ALJ Appeal No.: 1-8390277469**
> **Decision Date: June 19, 2018**
> **Appellant: A. Prosser**
> **Beneficiary: A. Prosser**
> **HICN: 4R87U71QM75**
> **Dates of Service: 1/16/18-4/16/18**
> **Service: E0766**
> **Our Ref. 19-51**

Dear Medicare Appeals Council:

    Ms. Anniken Prosser hereby appeals the attached June 19, 2019 unfavorable decision by Administrative Law Judge Joseph Grow with respect to the above-identified case. See Attachment 2. Appellant appeals the unfavorable portion of the decision based on mistake of fact and mistake of law.

    I.    **The issues to be considered in the appeal are:**

    1.   Did the ALJ conduct a *de novo* hearing and render a decision based on the record?

    2.   Did the ALJ Appellant reasonably believe that LCD L34823 did not apply to her newly diagnosed glioblastoma?

    3.   Was Appellant entitled to coverage based on collateral estoppel?

    4.   Did Appellant submit sufficient documentation to satisfy Medicare coverage criteria?

5. Was Appellant entitled to payment based on the waiver of limitation of liability?

## II.    Introduction

Ms. Prosser was prescribed an Optune system for her newly diagnosed glioblastoma (GBM). The Optune system delivers tumor treatment field therapy (TTFT). TTFT creates an electrical field that disrupts and corrupts the division of cancer cells and leads to the death of such cells. In 2011 and 2013, the FDA approved, through its more rigorous review process, the Optune device to deliver TTFT, finding it to be safe and effective for the treatment of glioblastomas. The initial FDA approval was for recurrent glioblastoma. The FDA then approved the Optune device for newly diagnosed glioblastomas. During the clinical trial for newly diagnosed glioblastomas, the interim TTFT results were so compelling (i.e., the treatment was able to show significant clinical benefit) that the Data Safety Monitoring Board recommended early termination of the study to enable patients not receiving the treatment to cross over and receive the treatment deeming it to be unethical to withhold TTFT from those not receiving it. The FDA agreed.

All the claims at issue were denied by the contractor citing LCD L34823 which simply states TTFT will be denied as not reasonable and necessary. The QIC denied the claims citing the LCD and finding that the "currently published studies in the medical literature do not clearly document the effectiveness of this device." Significantly, the DMAC medical directors issued a letter indicating that LCD L34823 does NOT apply to newly diagnosed glioblastoma and that they intend to undertake the LCD development process for the same. Despite this clear statement from the DMAC medical directors, the ALJ found the LCD applied.

The ALJ stated that Appellants arguments were challenges to the underlying record on which the LCD was based and asserted he did not have the LCD record before him.

## III.    Satisfaction of Medicare Coverage Criteria

All of the claims initially were denied by the Medicare contractor on the basis that TTFT was not reasonable and medically necessary generally and that the peer-reviewed literature does not document the effectiveness of the device. With respect to the second point, the evidence to the contrary is overwhelming. The data from the clinical trial for newly diagnosed glioblastomas demonstrated such remarkable effectiveness that the study was terminated early to enable those not receiving treatment during the clinical trial to receive the treatment. The FDA approved the device as effective. Because the peer-reviewed literature is so compelling, the NCCN guidelines give TTFT a level 1 recommendation for newly diagnosed glioblastomas, i.e., uniform agreement exists among the experts based on the highest level of evidence, that TTFT should be offered to those newly diagnosed with a glioblastoma. Thus, the experts agree that the peer-reviewed literature meets the highest level of evidence possible. The ALJ failed to consider the peer-reviewed literature – a primary Medicare coverage criterion.

Further, the ALJ's analysis fails to reflect consideration of the other Medicare coverage criteria, i.e., the consensus of experts (reflected in the NCCN guidelines and adoption by all the major medical centers in the United States), and acceptance by the relevant medical community (again in view of the inclusion in practice guidelines, the device has been prescribed in every state by hundreds of clinicians and is covered by all major payers). Thus, to the extent the ALJ found that the LCD was silent with respect to coverage for newly diagnosed GBM, the ALJ should have undertaken the foregoing analysis, which she did not. Further, even if the ALJ found the LCD did cover newly diagnosed GBM, notwithstanding the clear statement of the DMAC medical directors, the ALJ could have chosen not to give it deference in view of the overwhelming evidence that TTFT meets Medicare's coverage criteria.

It is difficult to follow the ALJ's statement that the CRD ruling "does include change in the treatment protocol it does not, on its own, invalidate the LCD." The Judge in the Civil Remedies Division found the LCD record did not support the validity of the LCD and invited the parties to supplement the record. The DMAC only submitted the Program Integrity Manual and indicated that it did not have witnesses to defend the LCD. Because the existing evidence did not support the LCD, and the DMACs offered no additional evidence, it is clear that the LCD will be revised or invalidated soon based on the overwhelming evidence that TTFT meets Medicare coverage criteria. It is unclear what "treatment protocol" the ALJ is referencing.

## IV.    Errors of Law and Fact - Procedural Defect

The claims were denied below on the basis that the TTFT generally is not covered. The ALJ's decision appears to confuse the distinction between an LCD challenge and its implication for a claims appeal. A beneficiary can file an appeal of a denied claim without challenging a coverage policy. ALJs can make payment for a claim and choose not to apply an LCD in an individual case. The fact that an LCD challenge or reconsideration was filed is additional evidence that the LCD does not conform to the MPIM requirements and provides another basis for declining to follow an LCD. However, the existence of an LCD challenge or reconsideration in no way undercuts the ability of a Medicare beneficiary to argue that the LCD should not be given deference in his or her case based on the obvious deficiencies of an LCD. The ALJ appeared to think that the beneficiary was challenging the LCD in the claim appeal process when she was simply indicating that it should not be applied in her case (as opposed to all Medicare beneficiaries) based on her medical condition and need for the treatment.

In either event, the ALJ stated he did not have the LCD record before him. However, Ms. Prosser had submitted the LCD Record Exhibit List from the LCD challenge process which showed that the Medical Directors had not considered any of the evidence regarding TTFT that had evolved since 2014. Further, after the hearing, but before Judge Grow issued his decision, the Civil Remedies Division found that the LCD record did not support the validity of the LCD under the reasonableness standard. Thus, the LCD should not have been applied against a Medicare beneficiary battling a life-threatening illness. As numerous judges have found, an LCD that has not kept pace with clinical and scientific developments, and which precludes coverage of a treatment that is the standard of care, should not be applied against Medicare beneficiaries.

The ALJ failed to consider the implications of the CRD ruling when denying coverage of a treatment that is the standard of care.

Finally, Ms. Prosser received a prior favorable ALJ decision on other dates of service for the same device for the same condition. See ALJ No. 1-8416188648. Accordingly, the Secretary is estopped from denying her claims for TTFT. The Secretary is barred by the doctrine of collateral estoppel/issue preclusion from re-litigating those issues. As noted by a unanimous Supreme Court:

> We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality. When an administrative agency is acting in a judicial capacity and resolves dispute issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose. Such repose is justified on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise. To hold otherwise would, as a general matter, impose unjustifiably upon those who have already shouldered their burdens, and drain the resources of an adjudicatory system with disputes resisting resolution. The principle holds true when a court has resolved an issue, and should do so equally when the issue has been decided by an administrative agency, be it state or federal, which acts in a judicial capacity.

*See Astoria Federal Savings and Loan Assoc. v. Solimino*, 501 U.S. 104, 107-8 (1991) (internal citations and quotations omitted). No basis exists for the Secretary to ignore the prior coverage rulings for this Medicare beneficiary.

## IV.    Limitation of Liability

The DMAC medical directors indicated the relevant LCD does not apply to newly diagnosed glioblastoma. Further, the Medicare beneficiary could not have reasonably known that the standard of care for newly diagnosed glioblastoma would not be covered by Medicare. In view of the overwhelming peer-reviewed literature, the consensus of medical experts and the widespread, nationwide adoption by payers and clinicians, Ms. Prosser could not have reasonably known the Optune system would not be covered by Medicare. Further, nothing distinguishes her case from the numerous claims paid by Medicare for medically similar Medicare beneficiaries. Indeed, Ms. Prosser received a favorable ALJ decision regarding Medicare coverage for TTFT for her GBM. Accordingly, she is entitled to coverage under Medicare's limitation of liability provisions.

## V. Conclusion

The Optune system was reasonable and medically necessary when it was provided to the Ms. Prosser. The ALJ committed fundamental errors of law when he denied a Medicare beneficiary coverage of a service which has extended her life. Judge Grow applied an LCD which on its face showed that it failed to consider any of the clinical and scientific developments that had occurred over the past five years and which the Civil Remedies Division found invalid under the reasonableness standard. Based on the foregoing, Judge Grows's decision should be reversed and the MAC should be ordered to cover the Optune system for Ms. Prosser.

Please contact me if you have any questions regarding this appeal.

Yours very truly,

Debra Pistorino Parrish

Enclosures:
    Appointment of Representative
    June 19, 2019 ALJ Decision

cc:    A. Prosser
       C2C Innovative Solutions, Inc.

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| 1. APPELLANT (the party requesting review)<br><br>ANNIKEN PROSSER | 2. ALJ APPEAL NUMBER (on the decision or dismissal)<br><br>1-8390277469 |
|---|---|
| 3. BENEFICIARY*<br><br>ANNIKEN PROSSER | 4. HEALTH INSURANCE CLAIM NUMBER (HICN)*<br><br>4R87U71QM75 |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, HICNs, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER<br>Novocure, Inc. | 6. SPECIFIC ITEM(S) OR SERVICE(S)<br>E0766 |
|---|---|

7. Medicare claim type: ☐ Part A    ☑ Part B    ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan    ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes    If Yes, skip to Block 9.
☑ No    If No, Specific Dates of Service:  1/16/18 - 4/16/18

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate?    ☐ Yes    ☑ No

I request that the Medicare Appeals Council review the ALJ's ☑ decision or ☐ dismissal order [check one]
dated 6/19/2019 . I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

Please see attached.

(Attach additional sheets if you need more space)

## PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE | DATE<br>7/12/2019 |
|---|---|
| APPELLANT'S SIGNATURE (the party requesting review) | REPRESENTATIVE'S SIGNATURE (include signed appointment of representative if not already submitted.) |
| PRINT NAME | PRINT NAME<br>Debra M. Parrish |
| ADDRESS | ADDRESS<br>788 Washington Road |
| CITY, STATE, ZIP CODE | CITY, STATE, ZIP CODE<br>Pittsburgh, PA  15228 |

| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER<br><br>412-561-6250 | FAX NUMBER<br><br>412-561-6253 | E-MAIL<br><br>debbie@dparrishlaw.com |
|---|---|---|---|---|---|

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. *You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.*

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0950

## APPOINTMENT OF REPRESENTATIVE

| NAME OF PARTY | MEDICARE OR NATIONAL PROVIDER IDENTIFIER NUMBER |
|---|---|
| Anniken S. Prosser | 4R87U71QM75 |

### SECTION I: APPOINTMENT OF REPRESENTATIVE

**To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):**

I appoint this individual: _Debra M. Parrish_ to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the "Act") and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my appeal, wholly in my stead. I understand that personal medical information related to my appeal may be disclosed to the representative indicated below.

| SIGNATURE OF PARTY SEEKING REPRESENTATION | DATE |
|---|---|
| *Anniken S. Prosser* | 1-11-19 |

| STREET ADDRESS | PHONE NUMBER (with Area Code) |
|---|---|
| W2973 Farmstead Dr. | (920) 257-3574 |

| CITY | STATE | ZIP |
|---|---|---|
| Appleton | WI | 54915 |

### SECTION II: ACCEPTANCE OF APPOINTMENT

**To be completed by the representative:**

I, _Debra M. Parrish_, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services; that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a / an_____ ATTORNEY (Debra M. Parrish)
_____
(PROFESSIONAL STATUS OR RELATIONSHIP TO THE PARTY, E.G. ATTORNEY, RELATIVE, ETC.)

| SIGNATURE OF REPRESENTATIVE | DATE |
|---|---|
| | 1-22-19 |

| STREET ADDRESS | PHONE NUMBER (with Area Code) |
|---|---|
| 788 Washington Road | (412)561-6250 |

| CITY | STATE | ZIP |
|---|---|---|
| Pittsburgh | PA | 15228 |

### SECTION III: WAIVER OF FEE FOR REPRESENTATION

**Instructions: This section must be completed if the representative is required to, or chooses to waive their fee for representation. (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge a fee for representation and must complete this section.)**

I waive my right to charge and collect a fee for representing _____
before the Secretary of the Department of Health and Human Services.

| SIGNATURE | DATE |
|---|---|
| | |

### SECTION IV: WAIVER OF PAYMENT FOR ITEMS OR SERVICES AT ISSUE

**Instructions: Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act. (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.)**

I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| SIGNATURE | DATE |
|---|---|
| | |

Form CMS-1696 (10/10)

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Miami Field Office
51 SW 1st Avenue, Suite 1536
Miami, FL 33130-1608
786-792-3700 (Main)
786-792-3791 (ALJ Grow Team)
305-536-5044 (Fax)
866-622-0382 (Toll Free)

Date:  **JUN 1 9 2019**

A. PROSSER
W2973 FARMSTEAD DR
APPLETON, WI 54915-8120

### NOTICE OF DECISION

Appellant:              A. PROSSER
OMHA Appeal Number:     1-8390277469

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

### What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

### How much time do I have to file an appeal?

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

OMHA-1051                    Page 1 of 4

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

### How do I file an appeal?

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

> Department of Health and Human Services
> Departmental Appeals Board
> Medicare Appeals Council, MS 6127
> Cohen Building Room G-644
> 330 Independence Ave., S.W.
> Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 46 of 631   Document 11-5   4277

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod.**

To file a new appeal using MOD E-File, you will need to register by:

    (1) Clicking **Register** on the MOD E-File home page;
    (2) Entering the information requested on the "Register New Account" form; and
    (3) Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new.** You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

    (1) Logging into MOD E-File;
    (2) Clicking the **File New Appeal** menu button on the top right of the screen;
    (3) Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
    (4) Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal – Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

    (1) Request for Review;
    (2) Appointment of Representative form (OMB Form 0938-0950);
    (3) Copy of Administrative Law Judge or attorney adjudicator decision;
    (4) Memorandum or brief or other written statement in support of your appeal; and
    (5) Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 47 of 631    Document 11-5    4278

decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited if (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

## How will the Medicare Appeals Council respond to my appeal?

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

## Questions?

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

DEBRA M PARRISH
788 WASHINGTON RD
PITTSBURGH, PA 15228

C2C Innovative Solutions, Inc.
DME QIC Appeals–ALJ
P.O. Box 44006
Jacksonville, FL 32231-4006

NOVOCURE INC.
195 Commerce Way
Portsmouth, NH 03801

Enclosures:

OMHA-152, Decision
OMHA-156, Exhibit List
DAB-101, Request for Review

Case 1:20-cv-00194-WCG  Filed 04/28/20  Page 48 of 631  Document 11-5    4279



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Miami, FL**

| | |
|---|---|
| Appeal of: **A. Prosser** | ALJ Appeal No.: **1-8390277469** |
| Beneficiary: **A. Prosser** | **Medicare Part B** |
| HICN: **\*\*\*\*\*4857A** | Before: **J. Grow**<br>U.S. Administrative Law Judge |

## DECISION

After careful consideration of the entire record, an unfavorable decision is entered.

## PROCEDURAL HISTORY

Claims were submitted to Medicare for an electrical stimulation device used for cancer treatment, HCPCS code E0766, dates of service 1/16/18, 2/16/18, 3/16/18, and 4/16/18. *See* Exh. 1 at 3. This type of treatment is also referred to as Tumor Treatment Field Therapy (TTFT). *Id.* These claims were denied, and Appellant filed an appeal which was denied upon redetermination and reconsideration. Exh. 1 at 13-16 and 1-7. At the reconsideration level, the Qualified Independent Contractor (QIC) listed the denial rationale as Local Coverage Determination L34823 (LCD L34823) requirements had not been met. Exh. 1 at 4. The QIC found the medical provider, and not the Appellant/Beneficiary (Appellant), liable for the non-covered charges. Exh. 1 at 5.

This matter involves a claim that meets the amount in controversy requirement, and the Appellant made a timely request for an Administrative Law Judge (ALJ) hearing before the Office of Medicare Hearings and Appeals (OMHA). *See* 42 C.F.R. § 405.1014(b)(1).

I held a telephone hearing on May 20, 2019. Debra M. Parrish, Esq., appeared for Appellant. Timothy Parks, Clinical Registered Nurse for the electrical stimulation device supplier, testified on Appellant's behalf. Exhibits 1 through 5 were admitted to the record without objection.

## ISSUES

A.    Whether Medicare covers the electrical stimulation device/treatment, and

B.    If Medicare coverage is denied, then whether the waiver of liability provisions pursuant to § 1879 of the Social Security Act are applicable.

## LEGAL FRAMEWORK

### I.     ALJ Review Authority

#### A.  Jurisdiction

An individual or an organization that is dissatisfied with the reconsideration of an initial determination is entitled to a hearing before the Secretary of the Department of Health and Human Services (HHS), provided there is a sufficient amount in controversy and a request for hearing is filed in a timely manner.  Social Security Act (Act) § 1869(b)(1)(A) (42 U.S.C. § 1395ff(b)(1)(A)).

In implementing this statutory directive, the Secretary has delegated the authority to administer the nationwide hearings and appeals system for the Medicare program to OMHA.  *See* 70 Fed. Reg. 36386, 36387 (June 23, 2005).  The ALJs within OMHA issue the final decisions of the Secretary, except for decisions the Medicare Appeals Council further review.  *Id.*

In calendar year 2019, a hearing before an ALJ is only available if the remaining amount in controversy is $160 or more for requests filed.  *See* 83 Fed. Reg. 47619 (Sep. 20, 2018).  A party to a QIC reconsideration may request a hearing before an ALJ if the party files a written request for an ALJ hearing within 60 days after receipt of the notice of the QIC's reconsideration.  42 C.F.R. § 405.1002(a).

#### B.  Scope of Review

The issues before the ALJ include all the issues from the initial, reconsidered or revised determination that were not decided entirely in the Appellant's favor; however, if evidence presented before or during the hearing causes the ALJ to question a fully favorable decision, the Appellant will be notified and it will be considered an issue at hearing.  42 C.F.R. § 405.1032(a).

The ALJ may decide a case on the record and not conduct an oral hearing if the evidence in the hearing record supports a finding in favor of Appellant on every issue, or if the Appellant and all parties indicate in writing that they do not wish to appear before the ALJ at oral hearing.  42 C.F.R. § 405.1038.

The burden of proving each element of a Medicare claim lies with the Appellant by a preponderance of the evidence.  *See* 42 C.F.R. §§ 424.5(a)(6), 405.1018, 405.1028, and 405.1030. All laws and regulations pertaining to the Medicare and Medicaid programs, including, but not limited to Titles XI, XVIII, and XIX of the Act and applicable implementing regulations, are binding on ALJ's.  42 C.F.R. § 405.1063.

An Appellant may offer new evidence for the first time at the ALJ level of appeal only upon a showing of good cause why the evidence was not submitted to the QIC or a prior decision maker. The ALJ will determine whether good cause exists for the late submission of the new evidence and may only consider the evidence in making a decision if good cause is found.  *See* 42 C.F.R.

§§ 405.1018, 405.1028, and 405.1030. This new evidence restriction does not apply to unrepresented beneficiaries. *See* 42 C.F.R. § 405.1018(d).

Unless the ALJ dismisses the hearing request, the ALJ will issue a written decision that states findings of fact, conclusions of law, and the reasons for the decision. 42 C.F.R. § 405.1046(a). The decision must be based on evidence offered at the hearing or otherwise admitted into the record. *Id.*

### C. Standard of Review

The ALJ conducts a *de novo* review of each claim at issue and issues a decision based on the hearing record. 42 C.F.R. § 405.1000(d). *De novo* review requires the ALJ to review and evaluate the evidence without regard to the findings of prior determinations on the claim and make an independent assessment relying upon the evidence and controlling laws.

## II. Applicable Law

The Medicare program, Title XVIII of the Act, is administered through CMS, a component of HHS. The Secretary of HHS is authorized to enter into contracts with private entities for the administration of Part B of Title XVIII, the Supplementary Medical Insurance program, which provides coverage for a variety of medical services and supplies furnished by physicians, or by others in connection with physicians' services, for outpatient hospital services, and for a number of specific health-related items and services. *See* Act § 1842(a).

Part B beneficiaries participate voluntarily in the Medicare Part B program and pay a monthly premium. Part B entitles a beneficiary to have payments made on his or her behalf for "medical and other health services." Act § 1861(s)(3).

The items and services that are "not reasonable and necessary" for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member are specifically excluded from Medicare coverage. Act § 1862(a)(1)(A). Further, payment to any provider of services is precluded unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." Act § 1833(e) of the Act; *see* 42 C.F.R. § 424.5(a)(6).

The Act limits the liability of the beneficiary and providers of services if the services are found to be not medically reasonable and necessary under Section 1862(a)(1) of the Act or care was custodial in nature under Section 1862(a)(9) of the Act, and neither the beneficiary nor the provider knew or could reasonably have been expected to know that the services were not covered. Act § 1879; 42 U.S.C. § 1395pp; *see* 42 C.F.R. §§ 411.404, 411.406.

Unless promulgated as a regulation by CMS, no rule, requirement, or statement of policy, other than a National Coverage Determination (NCD), can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. However, in lieu of binding regulations with the full force and effect of law, CMS and its contractors have issued policy guidance that describe criteria for coverage of selected types of

medical items and services in the form of manuals and local medical review policies (LMRPs) or Local Coverage Determinations (LCDs). Act § 1871(a)(2)

The Act provides that ALJs will give substantial deference to LCDs, LMRPs or CMS program guidance when applicable, and if they do not follow the policy they must explain why in their decision. Act § Section 1869(f)(2); *see also* 42 CFR § 405.1062.

Specific to the instant case is Local Coverage Determination L34823, LCD for Tumor Treatment Field Therapy (effective 10/01/15), which was promulgated by CGS Administrators, LLC. It provides, in part: Tumor treatment field therapy (E0766) will be denied as not reasonable necessary.

The Medicare Appeals Council has cited LCD L34823 on several occasions in determining no Medicare TTFT coverage exists. *See* Medicare Appeals Council docket numbers M-19-1231 (April 23, 2019); M-19-755 (March 14, 2019); M-19-525 (March 14, 2019); and M-19-453 (March 8, 2019). Although these Council decisions are not precedential, they nonetheless represent HHS's final decision.

## FINDINGS OF FACT AND ANALYSIS

*1.    Medicare does not cover the electrical stimulation device/treatment at issue because LCD L34823, which was in effect during the dates of service at issue, indicated there was no Medicare coverage for this device/treatment, and I must give LCDs substantial deference.*

The Appellant's attorney, Ms. Parrish, submitted a prehearing brief which discussed medical literature and professional medical societies which have determined that TTFT is safe and efficient. Exh. 4 at 6-7. Ms. Parrish's brief also discussed clinical trials which have shown TTFT to be safe and efficient. Ms. Parrish also emphasized in her brief that TTFT has been widely accepted by many major United States health coverage payors, as well as the fact that the Centers for Medicare Services previously assigned a HCPCS code with regard to TTFT devices. Exh. 4 at 8-8A. Finally, Ms. Parrish argued in her brief that LCD L34823 should not be given substantial deference due to several factors, including: "...the LCD's obvious failure to reflect the peer-reviewed literature, consensus of experts, and acceptance by the relevant medical community...." Exh. 4 at 8A.

At the hearing, Ms. Parrish emphasized that the Appellant was considered a "newly diagnosed" glioblastoma patient as of the dates of service at issue which were in 2016. She also discussed a favorable OMHA ALJ decision which had recently been issued with regard to different dates of service involving this same issue and this same Appellant. Ms. Parrish also indicated that medical contractors had proposed a new policy on May 9, 2019 which would allow Medicare TTFT coverage for newly diagnosed glioblastoma patients. According to Ms. Parrish, this had been preceded by a Medicare carrier advisory meeting which took place in early March 2019, following which the participants had recommended TTFT Medicare coverage for newly diagnosed glioblastoma patients. She also discussed a new proposed LCD which would provide TTFT coverage for newly diagnosed glioblastoma patients. According to Ms. Parrish, this new proposed LCD was in the public comment process as of the hearing date, May 20, 2019. Ms.

Parrish requested that I grant coverage for the Appellant here either by giving the current LCD substantial deference but refraining from applying the LCD or by taking the position that the evidence shows that the current LCD should only apply to "recurrent" glioblastoma patients and not to newly diagnosed glioblastoma patients.

Mr. Parks testified at the hearing regarding the Appellant's clinical presentation and the various treatment modalities she had undergone since being diagnosed. He also discussed the differences between "newly diagnosed" glioblastoma and "recurrent" glioblastoma.

Although I find the Appellant's arguments compelling, I also find the Appellant's arguments amount to challenges to the underlying record upon which the LCD is based. A separate adjudicative process is available for aggrieved parties to challenge whether that LCD record is complete and adequate to support the validity of the LCD. *See* 42 C.F.R. 426.25 and Part 426 generally. I cannot make those types of findings here because I do not have the record upon which the LCD is based before me.

Given that LCD L34823 was in effect during the dates of service at issue and continues to remain in effect at the present time, I must substantially defer to the LCD and find no coverage.

2.    *The provider, and not the Appellant, is responsible for the non-covered charges.*

The Act limits the liability of the Beneficiary and providers of items and services if the items and services are found to be not medically reasonable and necessary under Section 1862(a)(1) of the Act or care was custodial in nature under Section 1862(a)(9) of the Act, and neither the Beneficiary nor the provider knew or could reasonably have been expected to know that the items and services were not covered. Act § 1879; 42 U.S.C. § 1395pp; *see* 42 C.F.R. §§ 411.404, 411.406.

Medicare can reimburse for non-covered items and services if the provider or supplier of the items and services does not know, or have reason to know, that Medicare does not cover the items and services. The provider is a Medicare participant and must comply with all applicable laws and regulations. As a Medicare participant, the provider should be familiar with Medicare laws, regulations, and policies. The provider should have known the device and services that it provided to the Appellant are not covered by Medicare. The provider is therefore responsible for the non-covered charges.

The individual receiving the items and services is not liable for payment to the provider if the individual does not know, or have reason to know, that Medicare does not cover the items and services. There is no evidence in the record here indicating Appellant received advance notice, or knew, or should have known, that Medicare did not cover the item and service. Appellant is therefore not responsible for the non-covered charges.

## CONCLUSIONS OF LAW AND ORDER

Medicare does not cover the item and services the Appellant received on the dates of service at issue. The Appellant is not liable to the provider for the item and services. The provider is not

eligible for coverage under § 1879 of the Act or Medicare regulations.

The Medicare contractor will process Appellant's claim in accordance with this decision.

Dated:     JUN 1 9 2019

                     J. Crow
                     U.S. Administrative Law Judge



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Miami, Florida**

| | | | |
|---|---|---|---|
| Appeal of: | **A. PROSSER** | OMHA Appeal No.: | **1-8390277469** |
| Beneficiary: | **A. PROSSER** | Medicare: | **Part B** |
| Medicare No.: | **\*\*\*\*\*4857A** | Before: | **J. Grow** Administrative Law Judge |

## EXHIBIT LIST

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBERS |
|:---:|:---|:---:|
| 1 | Initial, Redetermination and Reconsideration Procedural Documents | 26 |
| 2 | Medical Records/Evidence Received by CMS Contractors | 243 |
| 3 | Request for ALJ Hearing | 11 |
| 4 | OMHA Proceedings | 24 |
| 5 | Additional Evidence | 30 |

Dated: **JUN 1 9 2019**

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 55 of 631   Document 11-5   4286

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD     Form  DAB-101 (08/09)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4. HEALTH INSURANCE CLAIM NUMBER (HICN)* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, HICNs, or other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A          ☐ Part B          ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan          ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes          If Yes, skip to Block 8.
☐ No          If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes          ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated _____ . I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

_____

_____

_____

(Attach additional sheets if you need more space)

PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE | DATE |
|---|---|
| APPELLANT'S SIGNATURE (the party requesting review) | REPRESENTATIVE'S SIGNATURE (include signed appointment if not already submitted.) |
| PRINT NAME | PRINT NAME |
| ADDRESS | ADDRESS |
| CITY, STATE, ZIP CODE | CITY, STATE, ZIP CODE |

| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |
|---|---|---|---|---|---|

**(SEE FURTHER INSTRUCTIONS ON PAGE 2)**

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review.*** *For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.*

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

------------------------------------------------------------------------------------------------------------------------

### PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.



Departmental Appeals Board, MS 6127
Medicare Appeals Council
330 Independence Avenue
Cohen Building, Room G-644
Washington, DC 20201
(202)565-0100/Toll Free:1-866-365-8204

Date:    **JAN 2 2 2020**

ALJ Appeal Numbers:  1-7884275431 & 16 others
Docket Numbers:  M-19-1261 & 30 others

### ACKNOWLEDGMENT OF ESCALATION REQUESTS AND NOTICE OF STAY

Parrish Law Offices
Debra Parrish
788 Washington Rd.
Pittsburgh, PA 15228

Dear Ms. Parrish:

The Medicare Appeals Council (Council) has received your requests to escalate the appeals listed in Attachment A to Federal district court. The Council previously received your requests for review for these appeals. The 90-day time frame for the Council to issue a decision, dismissal, or remand order has expired. *See* 42 C.F.R. § 405.1100(c). Due to the large number of pending appeals, the Council is unable to issue a decision, dismissal, or remand order within five calendar days of your request to escalate to Federal district court. 42 C.F.R. § 405.1132(a)(1). Under these circumstances, the regulations permit you to bypass Council review and seek review of the ALJ's decisions in Federal district court. 42 C.F.R. § 405.1132(a)(2).

In order to escalate, you must file an action in Federal district court within 60 calendar days after you receive this notice <u>and</u> the amount in controversy must be $1,670 or more. 42 C.F.R. §§ 405.1132(b), 405.1136(a)(1); *see also* 84 Fed. Reg. 53,445 (Oct. 7, 2019). If you cannot file your complaint within 60 days, you may ask the Council to extend the time in which you may begin a civil action. However, the Council will only extend the time if you provide a good reason for not meeting the deadline. Your reason must be set forth clearly in your request. 42 C.F.R. § 405.1134. If you do not file an action in Federal district court, then your appeals will remain before the Council. 42 C.F.R. § 405.1136(a)(2).

If a civil action is commenced, the complaint should name the Secretary of Health and Human Services as the defendant and should include the Council docket numbers and ALJ appeal numbers that you are appealing. 42 C.F.R. § 405.1136(d). The Secretary must be served by sending a copy of the summons and complaint by registered or certified mail to the General Counsel, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201. In addition, you must serve the United States Attorney for the district in which you file your complaint and the Attorney General of the United States. *See* rules 4(c) and (i) of the Federal Rules of Civil Procedure and 45 C.F.R. § 4.1.

Additionally, the supplier filed a separate request for review in each of the appeals for which you seek escalation. *See* Attachment B. This letter serves as notice to all parties that the Council will stay the supplier's requests for review until the Federal district court issues a final determination on the escalated appeals or the time period for filing a complaint in district court expires.

Sincerely,

Angela K. Roach
Administrative Appeals Judge

cc:     Novocure
        Beneficiaries

# Attachment A
## Appeals Escalated to Federal district court

| Docket Number | ALJ Appeal Number(s) |
|---------------|----------------------|
| M-19-1261 | 1-7884275431 |
| M-19-2164 | 1-8411344383 |
| M-19-2173 | 1-8136495060 |
| M-19-2218 | 1-8411055191 & 1-8411055450 |
| M-19-2233 | 1-8390277469 |
| M-19-2426 | 3-8503660334 |
| M-19-2499 | 1-8429561876 |
| M-19-2560 | 1-8454636221 |
| M-19-2648 | 1-8510955262 |
| M-19-2649 | 3-8472551932 |
| M-19-2719 | 1-8393258352 |
| M-19-2723 | 1-8411066311 |
| M-19-2777 | 1-8630709341 |
| M-19-2780 | 1-8415607840 |
| M-19-2836 | 1-8665714599 |

## Attachment B
### Stayed Supplier Appeals

| Docket Number | ALJ Appeal Number |
|---|---|
| M-19-1380 | 1-7884275431 |
| M-19-2169 | 1-8411344383 |
| M-19-2179 | 1-8136495060 |
| M-19-2227 | 1-8411055191 & 1-8411055450 |
| M-19-2237 | 1-8390277469 |
| M-19-2275[1] | 1-8071086400 |
| M-19-2543 | 3-8503660334 |
| M-19-2542 | 1-8429561876 |
| M-19-2565 | 1-8454636221 |
| M-19-2750 | 1-8510955262 |
| M-19-2751 | 3-8472551932 |
| M-19-2810 | 1-8393258352 |
| M-20-75 | 1-8411066311 |
| M-19-2981 | 1-8630709341 |
| M-19-2985 | 1-8415607840 |
| M-19-2990 | 1-8665714599 |

---

[1] The beneficiary appeal associated with docket number M-19-2275 is docketed as M-19-2250. The Council previously acknowledged the beneficiary's request to escalate her appeal in a separate action.



195 Commerce Way
Portsmouth, NH 03801

7/15/2019

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building, Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

    **Re: ALJ Appeal No.:  1-8390277469**
       **Decision Date:  6/19/2019**
       **Appellant: Novocure**
       **Beneficiary:  A. Prosser**
       **HICN: ####1QM75**
       **Dates of Service:  1/16/2018, 2/16/2018, 3/16/2018, 4/16/2018**
       **Service:  E0766**

Dear Medicare Appeals Council:

  Novocure appeals the above-captioned ALJ decision on the issues and for the reasons articulated in the beneficiary appeal filed on 7/12/2019 and adopts them and incorporates them as if fully restated herein.

**Timothy B Parks**
Clinical Appeals Specialist

| | |
|---|---|
| Direct:: | 603 570 9398 |
| Fax: | 603-718-3294 |
| Email: | tparks@novocure.com |

195 Commerce Way
Portsmouth, NH 03801
United States

cc: Debra M. Parrish for A. Prosser

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| | |
|---|---|
| 1. APPELLANT (the party requesting review)<br><br>Novocure | 2. ALJ APPEAL NUMBER (on the decision or dismissal)<br>1-8390277469 |
| 3. BENEFICIARY*<br><br>Anniken Prosser | 4. HEALTH INSURANCE CLAIM NUMBER (HICN)*<br><br>4R87U71QM75 |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, HICNs, and any other information to identify all claims being appealed.

| | |
|---|---|
| 5. PROVIDER, PRACTITIONER, OR SUPPLIER<br><br>Novocure | 6. SPECIFIC ITEM(S) OR SERVICE(S)<br>E0766 |

7. Medicare claim type: ☐ Part A    ☒ Part B    ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan    ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes    If Yes, skip to Block 9.
☒ No    If No, Specific Dates of Service:   1/16/2018, 2/16/2018, 3/16/2018, 4/16/2018

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate?    ☐ Yes    ☒ No

I request that the Medicare Appeals Council review the ALJ's ☒ decision or ☐ dismissal order [check one] dated ___6/19/2019_____ . I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

Novocure appeals the ALJ decision on the issues and reasons articulated in the beneficiary appeal filed

on 7/12/2019

(Attach additional sheets if you need more space)

## PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| | |
|---|---|
| DATE   7/15/2019 | DATE |
| APPELLANT'S SIGNATURE (the party requesting review) | REPRESENTATIVE'S SIGNATURE (include signed appointment of representative if not already submitted.) |
| PRINT NAME<br>Timothy Parks | PRINT NAME |
| ADDRESS<br>195 Commerce Way | ADDRESS |
| CITY, STATE, ZIP CODE<br>Portsmouth NH, 03801 | CITY, STATE, ZIP CODE |

| TELEPHONE NUMBER<br>603-570-9398 | FAX NUMBER<br>603-718-3294 | E-MAIL<br>TParks@novocure.com | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |
|---|---|---|---|---|---|

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review.** For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.*

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

---

### PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Miami Field Office
51 SW 1st Avenue, Suite 1536
Miami, FL 33130-1608
786-792-3700 (Main)
786-792-3791 (ALJ Grow Team)
305-536-5044 (Fax)
866-622-0382 (Toll Free)

Date: **JUN 1 9 2019**

A. PROSSER
W2973 FARMSTEAD DR
APPLETON, WI 54915-8120

## NOTICE OF DECISION

| | |
|---|---|
| Appellant: | A. PROSSER |
| OMHA Appeal Number: | 1-8390277469 |

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

## What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

## How much time do I have to file an appeal?

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 65 of 631   Document 11-5   4296

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

## How do I file an appeal?

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

> Department of Health and Human Services
> Departmental Appeals Board
> Medicare Appeals Council, MS 6127
> Cohen Building Room G-644
> 330 Independence Ave., S.W.
> Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 66 of 631   Document 11-5   4297

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

(1) Clicking **Register** on the MOD E-File home page;
(2) Entering the information requested on the "Register New Account" form; and
(3) Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

(1) Logging into MOD E-File;
(2) Clicking the **File New Appeal** menu button on the top right of the screen;
(3) Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
(4) Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal – Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

(1) Request for Review;
(2) Appointment of Representative form (OMB Form 0938-0950);
(3) Copy of Administrative Law Judge or attorney adjudicator decision;
(4) Memorandum or brief or other written statement in support of your appeal; and
(5) Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 67 of 631   Document 11-5   4298

decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited if (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

### How will the Medicare Appeals Council respond to my appeal?

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

### Questions?

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

DEBRA M PARRISH
788 WASHINGTON RD
PITTSBURGH, PA 15228

C2C Innovative Solutions, Inc.
DME QIC Appeals–ALJ
P.O. Box 44006
Jacksonville, FL 32231-4006

NOVOCURE INC.
195 Commerce Way
Portsmouth, NH 03801

Enclosures:

OMHA-152, Decision
OMHA-156, Exhibit List
DAB-101, Request for Review

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 68 of 631   Document 11-5   4299



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Miami, FL**

| | | | |
|---|---|---|---|
| Appeal of: | **A. Prosser** | ALJ Appeal No.: | **1-8390277469** |
| Beneficiary: | **A. Prosser** | **Medicare Part B** | |
| HICN: | **\*\*\*\*\*4857A** | Before: **J. Grow** | |
| | | U.S. Administrative Law Judge | |

## DECISION

After careful consideration of the entire record, an unfavorable decision is entered.

## PROCEDURAL HISTORY

Claims were submitted to Medicare for an electrical stimulation device used for cancer treatment, HCPCS code E0766, dates of service 1/16/18, 2/16/18, 3/16/18, and 4/16/18. *See* Exh. 1 at 3. This type of treatment is also referred to as Tumor Treatment Field Therapy (TTFT). *Id.* These claims were denied, and Appellant filed an appeal which was denied upon redetermination and reconsideration. Exh. 1 at 13-16 and 1-7. At the reconsideration level, the Qualified Independent Contractor (QIC) listed the denial rationale as Local Coverage Determination L34823 (LCD L34823) requirements had not been met. Exh. 1 at 4. The QIC found the medical provider, and not the Appellant/Beneficiary (Appellant), liable for the non-covered charges. Exh. 1 at 5.

This matter involves a claim that meets the amount in controversy requirement, and the Appellant made a timely request for an Administrative Law Judge (ALJ) hearing before the Office of Medicare Hearings and Appeals (OMHA). *See* 42 C.F.R. § 405.1014(b)(1).

I held a telephone hearing on May 20, 2019. Debra M. Parrish, Esq., appeared for Appellant. Timothy Parks, Clinical Registered Nurse for the electrical stimulation device supplier, testified on Appellant's behalf. Exhibits 1 through 5 were admitted to the record without objection.

## ISSUES

A.    Whether Medicare covers the electrical stimulation device/treatment, and

B.    If Medicare coverage is denied, then whether the waiver of liability provisions pursuant to § 1879 of the Social Security Act are applicable.

## LEGAL FRAMEWORK

### I.    ALJ Review Authority

#### A.  Jurisdiction

An individual or an organization that is dissatisfied with the reconsideration of an initial determination is entitled to a hearing before the Secretary of the Department of Health and Human Services (HHS), provided there is a sufficient amount in controversy and a request for hearing is filed in a timely manner. Social Security Act (Act) § 1869(b)(1)(A) (42 U.S.C. § 1395ff(b)(1)(A)).

In implementing this statutory directive, the Secretary has delegated the authority to administer the nationwide hearings and appeals system for the Medicare program to OMHA. *See* 70 Fed. Reg. 36386, 36387 (June 23, 2005). The ALJs within OMHA issue the final decisions of the Secretary, except for decisions the Medicare Appeals Council further review. *Id.*

In calendar year 2019, a hearing before an ALJ is only available if the remaining amount in controversy is $160 or more for requests filed. *See* 83 Fed. Reg. 47619 (Sep. 20, 2018). A party to a QIC reconsideration may request a hearing before an ALJ if the party files a written request for an ALJ hearing within 60 days after receipt of the notice of the QIC's reconsideration. 42 C.F.R. § 405.1002(a).

#### B.  Scope of Review

The issues before the ALJ include all the issues from the initial, reconsidered or revised determination that were not decided entirely in the Appellant's favor; however, if evidence presented before or during the hearing causes the ALJ to question a fully favorable decision, the Appellant will be notified and it will be considered an issue at hearing. 42 C.F.R. § 405.1032(a).

The ALJ may decide a case on the record and not conduct an oral hearing if the evidence in the hearing record supports a finding in favor of Appellant on every issue, or if the Appellant and all parties indicate in writing that they do not wish to appear before the ALJ at oral hearing. 42 C.F.R. § 405.1038.

The burden of proving each element of a Medicare claim lies with the Appellant by a preponderance of the evidence. *See* 42 C.F.R. §§ 424.5(a)(6), 405.1018, 405.1028, and 405.1030. All laws and regulations pertaining to the Medicare and Medicaid programs, including, but not limited to Titles XI, XVIII, and XIX of the Act and applicable implementing regulations, are binding on ALJ's. 42 C.F.R. § 405.1063.

An Appellant may offer new evidence for the first time at the ALJ level of appeal only upon a showing of good cause why the evidence was not submitted to the QIC or a prior decision maker. The ALJ will determine whether good cause exists for the late submission of the new evidence and may only consider the evidence in making a decision if good cause is found. *See* 42 C.F.R.

§§ 405.1018, 405.1028, and 405.1030. This new evidence restriction does not apply to unrepresented beneficiaries. *See* 42 C.F.R. § 405.1018(d).

Unless the ALJ dismisses the hearing request, the ALJ will issue a written decision that states findings of fact, conclusions of law, and the reasons for the decision. 42 C.F.R. § 405.1046(a). The decision must be based on evidence offered at the hearing or otherwise admitted into the record. *Id.*

### C. Standard of Review

The ALJ conducts a *de novo* review of each claim at issue and issues a decision based on the hearing record. 42 C.F.R. § 405.1000(d). *De novo* review requires the ALJ to review and evaluate the evidence without regard to the findings of prior determinations on the claim and make an independent assessment relying upon the evidence and controlling laws.

## II. Applicable Law

The Medicare program, Title XVIII of the Act, is administered through CMS, a component of HHS. The Secretary of HHS is authorized to enter into contracts with private entities for the administration of Part B of Title XVIII, the Supplementary Medical Insurance program, which provides coverage for a variety of medical services and supplies furnished by physicians, or by others in connection with physicians' services, for outpatient hospital services, and for a number of specific health-related items and services. *See* Act § 1842(a).

Part B beneficiaries participate voluntarily in the Medicare Part B program and pay a monthly premium. Part B entitles a beneficiary to have payments made on his or her behalf for "medical and other health services." Act § 1861(s)(3).

The items and services that are "not reasonable and necessary" for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member are specifically excluded from Medicare coverage. Act § 1862(a)(1)(A). Further, payment to any provider of services is precluded unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." Act § 1833(e) of the Act; *see* 42 C.F.R. § 424.5(a)(6).

The Act limits the liability of the beneficiary and providers of services if the services are found to be not medically reasonable and necessary under Section 1862(a)(1) of the Act or care was custodial in nature under Section 1862(a)(9) of the Act, and neither the beneficiary nor the provider knew or could reasonably have been expected to know that the services were not covered. Act § 1879; 42 U.S.C. § 1395pp; *see* 42 C.F.R. §§ 411.404, 411.406.

Unless promulgated as a regulation by CMS, no rule, requirement, or statement of policy, other than a National Coverage Determination (NCD), can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. However, in lieu of binding regulations with the full force and effect of law, CMS and its contractors have issued policy guidance that describe criteria for coverage of selected types of

medical items and services in the form of manuals and local medical review policies (LMRPs) or Local Coverage Determinations (LCDs). Act § 1871(a)(2)

The Act provides that ALJs will give substantial deference to LCDs, LMRPs or CMS program guidance when applicable, and if they do not follow the policy they must explain why in their decision. Act § Section 1869(f)(2); *see also* 42 CFR § 405.1062.

Specific to the instant case is Local Coverage Determination L34823, LCD for Tumor Treatment Field Therapy (effective 10/01/15), which was promulgated by CGS Administrators, LLC. It provides, in part: Tumor treatment field therapy (E0766) will be denied as not reasonable necessary.

The Medicare Appeals Council has cited LCD L34823 on several occasions in determining no Medicare TTFT coverage exists. *See* Medicare Appeals Council docket numbers M-19-1231 (April 23, 2019); M-19-755 (March 14, 2019); M-19-525 (March 14, 2019); and M-19-453 (March 8, 2019). Although these Council decisions are not precedential, they nonetheless represent HHS's final decision.

## FINDINGS OF FACT AND ANALYSIS

1.   *Medicare does not cover the electrical stimulation device/treatment at issue because LCD L34823, which was in effect during the dates of service at issue, indicated there was no Medicare coverage for this device/treatment, and I must give LCDs substantial deference.*

The Appellant's attorney, Ms. Parrish, submitted a prehearing brief which discussed medical literature and professional medical societies which have determined that TTFT is safe and efficient. Exh. 4 at 6-7. Ms. Parrish's brief also discussed clinical trials which have shown TTFT to be safe and efficient. Ms. Parrish also emphasized in her brief that TTFT has been widely accepted by many major United States health coverage payors, as well as the fact that the Centers for Medicare Services previously assigned a HCPCS code with regard to TTFT devices. Exh. 4 at 8-8A. Finally, Ms. Parrish argued in her brief that LCD L34823 should not be given substantial deference due to several factors, including: "…the LCD's obvious failure to reflect the peer-reviewed literature, consensus of experts, and acceptance by the relevant medical community…." Exh. 4 at 8A.

At the hearing, Ms. Parrish emphasized that the Appellant was considered a "newly diagnosed" glioblastoma patient as of the dates of service at issue which were in 2016. She also discussed a favorable OMHA ALJ decision which had recently been issued with regard to different dates of service involving this same issue and this same Appellant. Ms. Parrish also indicated that medical contractors had proposed a new policy on May 9, 2019 which would allow Medicare TTFT coverage for newly diagnosed glioblastoma patients. According to Ms. Parrish, this had been preceded by a Medicare carrier advisory meeting which took place in early March 2019, following which the participants had recommended TTFT Medicare coverage for newly diagnosed glioblastoma patients. She also discussed a new proposed LCD which would provide TTFT coverage for newly diagnosed glioblastoma patients. According to Ms. Parrish, this new proposed LCD was in the public comment process as of the hearing date, May 20, 2019. Ms.

Parrish requested that I grant coverage for the Appellant here either by giving the current LCD substantial deference but refraining from applying the LCD or by taking the position that the evidence shows that the current LCD should only apply to "recurrent" glioblastoma patients and not to newly diagnosed glioblastoma patients.

Mr. Parks testified at the hearing regarding the Appellant's clinical presentation and the various treatment modalities she had undergone since being diagnosed. He also discussed the differences between "newly diagnosed" glioblastoma and "recurrent" gliobastoma.

Although I find the Appellant's arguments compelling, I also find the Appellant's arguments amount to challenges to the underlying record upon which the LCD is based. A separate adjudicative process is available for aggrieved parties to challenge whether that LCD record is complete and adequate to support the validity of the LCD. *See* 42 C.F.R. 426.25 and Part 426 generally. I cannot make those types of findings here because I do not have the record upon which the LCD is based before me.

Given that LCD L34823 was in effect during the dates of service at issue and continues to remain in effect at the present time, I must substantially defer to the LCD and find no coverage.

2.      *The provider, and not the Appellant, is responsible for the non-covered charges.*

The Act limits the liability of the Beneficiary and providers of items and services if the items and services are found to be not medically reasonable and necessary under Section 1862(a)(1) of the Act or care was custodial in nature under Section 1862(a)(9) of the Act, and neither the Beneficiary nor the provider knew or could reasonably have been expected to know that the items and services were not covered. Act § 1879; 42 U.S.C. § 1395pp; *see* 42 C.F.R. §§ 411.404, 411.406.

Medicare can reimburse for non-covered items and services if the provider or supplier of the items and services does not know, or have reason to know, that Medicare does not cover the items and services. The provider is a Medicare participant and must comply with all applicable laws and regulations. As a Medicare participant, the provider should be familiar with Medicare laws, regulations, and policies. The provider should have known the device and services that it provided to the Appellant are not covered by Medicare. The provider is therefore responsible for the non-covered charges.

The individual receiving the items and services is not liable for payment to the provider if the individual does not know, or have reason to know, that Medicare does not cover the items and services. There is no evidence in the record here indicating Appellant received advance notice, or knew, or should have known, that Medicare did not cover the item and service. Appellant is therefore not responsible for the non-covered charges.

## CONCLUSIONS OF LAW AND ORDER

Medicare does not cover the item and services the Appellant received on the dates of service at issue. The Appellant is not liable to the provider for the item and services. The provider is not

eligible for coverage under § 1879 of the Act or Medicare regulations.

The Medicare contractor will process Appellant's claim in accordance with this decision.

Dated:     JUN 1 9 2019

J. Grow

U.S. Administrative Law Judge



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Miami, Florida**

| | | | |
|---|---|---|---|
| Appeal of: | **A. PROSSER** | OMHA Appeal No.: | **1-8390277469** |
| Beneficiary: | **A. PROSSER** | Medicare: | **Part B** |
| Medicare No.: | **\*\*\*\*\*4857A** | Before: | **J. Grow** <br> Administrative Law Judge |

## EXHIBIT LIST

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBERS |
|---|---|---|
| 1 | Initial, Redetermination and Reconsideration Procedural Documents | 26 |
| 2 | Medical Records/Evidence Received by CMS Contractors | 243 |
| 3 | Request for ALJ Hearing | 11 |
| 4 | OMHA Proceedings | 24 |
| 5 | Additional Evidence | 30 |

Dated: **JUN 1 9 2019**

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 75 of 631   Document 11-5   4306

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4.  HEALTH INSURANCE CLAIM NUMBER (HICN)* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, HICNs, or other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A        ☐ Part B        ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan      ☐ Entitlement/enrollment for Part A or Part B

8.  Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes        If Yes, skip to Block 8.
☐ No         If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes      ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated _____ . I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

_____

_____

_____

_____

(Attach additional sheets if you need more space)

PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE | DATE |
|---|---|
| APPELLANT'S SIGNATURE (the party requesting review) | REPRESENTATIVE'S SIGNATURE (include signed appointment if not already submitted.) |
| PRINT NAME | PRINT NAME |
| ADDRESS | ADDRESS |
| CITY, STATE, ZIP CODE | CITY, STATE, ZIP CODE |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

**(SEE FURTHER INSTRUCTIONS ON PAGE 2)**

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. *__You must send a copy of your appeal to the other parties__ __and indicate that all parties, to include all beneficiaries, have been copied on the request for review.__ For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.*

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

-----------------------------------------------------------------------------------------------------------------------------------

### PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

Box Number:    077338823

Appeals in Box:  17

Files In Box:  19





1-8390277469 M-001-002



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Miami, FL**

| | | | |
|---|---|---|---|
| Appeal of: | **A. Prosser** | ALJ Appeal No.: | **1-8390277469** |
| Beneficiary: | **A. Prosser** | **Medicare Part B** | |
| HICN: | **\*\*\*\*\*4857A** | Before: **J. Grow** | |
| | | U.S. Administrative Law Judge | |

## DECISION

After careful consideration of the entire record, an unfavorable decision is entered.

## PROCEDURAL HISTORY

Claims were submitted to Medicare for an electrical stimulation device used for cancer treatment, HCPCS code E0766, dates of service 1/16/18, 2/16/18, 3/16/18, and 4/16/18. *See* Exh. 1 at 3. This type of treatment is also referred to as Tumor Treatment Field Therapy (TTFT). *Id.* These claims were denied, and Appellant filed an appeal which was denied upon redetermination and reconsideration. Exh. 1 at 13-16 and 1-7. At the reconsideration level, the Qualified Independent Contractor (QIC) listed the denial rationale as Local Coverage Determination L34823 (LCD L34823) requirements had not been met. Exh. 1 at 4. The QIC found the medical provider, and not the Appellant/Beneficiary (Appellant), liable for the non-covered charges. Exh. 1 at 5.

This matter involves a claim that meets the amount in controversy requirement, and the Appellant made a timely request for an Administrative Law Judge (ALJ) hearing before the Office of Medicare Hearings and Appeals (OMHA). *See* 42 C.F.R. § 405.1014(b)(1).

I held a telephone hearing on May 20, 2019. Debra M. Parrish, Esq., appeared for Appellant. Timothy Parks, Clinical Registered Nurse for the electrical stimulation device supplier, testified on Appellant's behalf. Exhibits 1 through 5 were admitted to the record without objection.

## ISSUES

A.  Whether Medicare covers the electrical stimulation device/treatment, and

B.  If Medicare coverage is denied, then whether the waiver of liability provisions pursuant to § 1879 of the Social Security Act are applicable.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 79 of 631   Document 11-5   4310



# LEGAL FRAMEWORK

## I.  ALJ Review Authority

### A.  Jurisdiction

An individual or an organization that is dissatisfied with the reconsideration of an initial determination is entitled to a hearing before the Secretary of the Department of Health and Human Services (HHS), provided there is a sufficient amount in controversy and a request for hearing is filed in a timely manner.  Social Security Act (Act) § 1869(b)(1)(A) (42 U.S.C. § 1395ff(b)(1)(A)).

In implementing this statutory directive, the Secretary has delegated the authority to administer the nationwide hearings and appeals system for the Medicare program to OMHA.  *See* 70 Fed. Reg. 36386, 36387 (June 23, 2005).  The ALJs within OMHA issue the final decisions of the Secretary, except for decisions the Medicare Appeals Council further review.  *Id.*

In calendar year 2019, a hearing before an ALJ is only available if the remaining amount in controversy is $160 or more for requests filed.  *See* 83 Fed. Reg. 47619 (Sep. 20, 2018).  A party to a QIC reconsideration may request a hearing before an ALJ if the party files a written request for an ALJ hearing within 60 days after receipt of the notice of the QIC's reconsideration.  42 C.F.R. § 405.1002(a).

### B.  Scope of Review

The issues before the ALJ include all the issues from the initial, reconsidered or revised determination that were not decided entirely in the Appellant's favor; however, if evidence presented before or during the hearing causes the ALJ to question a fully favorable decision, the Appellant will be notified and it will be considered an issue at hearing.  42 C.F.R. § 405.1032(a).

The ALJ may decide a case on the record and not conduct an oral hearing if the evidence in the hearing record supports a finding in favor of Appellant on every issue, or if the Appellant and all parties indicate in writing that they do not wish to appear before the ALJ at oral hearing.  42 C.F.R. § 405.1038.

The burden of proving each element of a Medicare claim lies with the Appellant by a preponderance of the evidence.  *See* 42 C.F.R. §§ 424.5(a)(6), 405.1018, 405.1028, and 405.1030. All laws and regulations pertaining to the Medicare and Medicaid programs, including, but not limited to Titles XI, XVIII, and XIX of the Act and applicable implementing regulations, are binding on ALJ's.  42 C.F.R. § 405.1063.

An Appellant may offer new evidence for the first time at the ALJ level of appeal only upon a showing of good cause why the evidence was not submitted to the QIC or a prior decision maker. The ALJ will determine whether good cause exists for the late submission of the new evidence and may only consider the evidence in making a decision if good cause is found.  *See* 42 C.F.R.

§§ 405.1018, 405.1028, and 405.1030. This new evidence restriction does not apply to unrepresented beneficiaries. *See* 42 C.F.R. § 405.1018(d).

Unless the ALJ dismisses the hearing request, the ALJ will issue a written decision that states findings of fact, conclusions of law, and the reasons for the decision. 42 C.F.R. § 405.1046(a). The decision must be based on evidence offered at the hearing or otherwise admitted into the record. *Id.*

### C. Standard of Review

The ALJ conducts a *de novo* review of each claim at issue and issues a decision based on the hearing record. 42 C.F.R. § 405.1000(d). *De novo* review requires the ALJ to review and evaluate the evidence without regard to the findings of prior determinations on the claim and make an independent assessment relying upon the evidence and controlling laws.

## II.    Applicable Law

The Medicare program, Title XVIII of the Act, is administered through CMS, a component of HHS. The Secretary of HHS is authorized to enter into contracts with private entities for the administration of Part B of Title XVIII, the Supplementary Medical Insurance program, which provides coverage for a variety of medical services and supplies furnished by physicians, or by others in connection with physicians' services, for outpatient hospital services, and for a number of specific health-related items and services. *See* Act § 1842(a).

Part B beneficiaries participate voluntarily in the Medicare Part B program and pay a monthly premium. Part B entitles a beneficiary to have payments made on his or her behalf for "medical and other health services." Act § 1861(s)(3).

The items and services that are "not reasonable and necessary" for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member are specifically excluded from Medicare coverage. Act § 1862(a)(1)(A). Further, payment to any provider of services is precluded unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." Act § 1833(e) of the Act; *see* 42 C.F.R. § 424.5(a)(6).

The Act limits the liability of the beneficiary and providers of services if the services are found to be not medically reasonable and necessary under Section 1862(a)(1) of the Act or care was custodial in nature under Section 1862(a)(9) of the Act, and neither the beneficiary nor the provider knew or could reasonably have been expected to know that the services were not covered. Act § 1879; 42 U.S.C. § 1395pp; *see* 42 C.F.R. §§ 411.404, 411.406.

Unless promulgated as a regulation by CMS, no rule, requirement, or statement of policy, other than a National Coverage Determination (NCD), can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. However, in lieu of binding regulations with the full force and effect of law, CMS and its contractors have issued policy guidance that describe criteria for coverage of selected types of

medical items and services in the form of manuals and local medical review policies (LMRPs) or Local Coverage Determinations (LCDs). Act § 1871(a)(2)

The Act provides that ALJs will give substantial deference to LCDs, LMRPs or CMS program guidance when applicable, and if they do not follow the policy they must explain why in their decision. Act § Section 1869(f)(2); *see also* 42 CFR § 405.1062.

Specific to the instant case is Local Coverage Determination L34823, LCD for Tumor Treatment Field Therapy (effective 10/01/15), which was promulgated by CGS Administrators, LLC. It provides, in part: Tumor treatment field therapy (E0766) will be denied as not reasonable necessary.

The Medicare Appeals Council has cited LCD L34823 on several occasions in determining no Medicare TTFT coverage exists. *See* Medicare Appeals Council docket numbers M-19-1231 (April 23, 2019); M-19-755 (March 14, 2019); M-19-525 (March 14, 2019); and M-19-453 (March 8, 2019). Although these Council decisions are not precedential, they nonetheless represent HHS's final decision.

## FINDINGS OF FACT AND ANALYSIS

1.  *Medicare does not cover the electrical stimulation device/treatment at issue because LCD L34823, which was in effect during the dates of service at issue, indicated there was no Medicare coverage for this device/treatment, and I must give LCDs substantial deference.*

The Appellant's attorney, Ms. Parrish, submitted a prehearing brief which discussed medical literature and professional medical societies which have determined that TTFT is safe and efficient. Exh. 4 at 6-7. Ms. Parrish's brief also discussed clinical trials which have shown TTFT to be safe and efficient. Ms. Parrish also emphasized in her brief that TTFT has been widely accepted by many major United States health coverage payors, as well as the fact that the Centers for Medicare Services previously assigned a HCPCS code with regard to TTFT devices. Exh. 4 at 8-8A. Finally, Ms. Parrish argued in her brief that LCD L34823 should not be given substantial deference due to several factors, including: "...the LCD's obvious failure to reflect the peer-reviewed literature, consensus of experts, and acceptance by the relevant medical community...." Exh. 4 at 8A.

At the hearing, Ms. Parrish emphasized that the Appellant was considered a "newly diagnosed" glioblastoma patient as of the dates of service at issue which were in 2016. She also discussed a favorable OMHA ALJ decision which had recently been issued with regard to different dates of service involving this same issue and this same Appellant. Ms. Parrish also indicated that medical contractors had proposed a new policy on May 9, 2019 which would allow Medicare TTFT coverage for newly diagnosed glioblastoma patients. According to Ms. Parrish, this had been preceded by a Medicare carrier advisory meeting which took place in early March 2019, following which the participants had recommended TTFT Medicare coverage for newly diagnosed glioblastoma patients. She also discussed a new proposed LCD which would provide TTFT coverage for newly diagnosed glioblastoma patients. According to Ms. Parrish, this new proposed LCD was in the public comment process as of the hearing date, May 20, 2019. Ms.

Parrish requested that I grant coverage for the Appellant here either by giving the current LCD substantial deference but refraining from applying the LCD or by taking the position that the evidence shows that the current LCD should only apply to "recurrent" glioblastoma patients and not to newly diagnosed glioblastoma patients.

Mr. Parks testified at the hearing regarding the Appellant's clinical presentation and the various treatment modalities she had undergone since being diagnosed. He also discussed the differences between "newly diagnosed" glioblastoma and "recurrent" gliobastoma.

Although I find the Appellant's arguments compelling, I also find the Appellant's arguments amount to challenges to the underlying record upon which the LCD is based. A separate adjudicative process is available for aggrieved parties to challenge whether that LCD record is complete and adequate to support the validity of the LCD. *See* 42 C.F.R. 426.25 and Part 426 generally. I cannot make those types of findings here because I do not have the record upon which the LCD is based before me.

Given that LCD L34823 was in effect during the dates of service at issue and continues to remain in effect at the present time, I must substantially defer to the LCD and find no coverage.

2.     *The provider, and not the Appellant, is responsible for the non-covered charges.*

The Act limits the liability of the Beneficiary and providers of items and services if the items and services are found to be not medically reasonable and necessary under Section 1862(a)(1) of the Act or care was custodial in nature under Section 1862(a)(9) of the Act, and neither the Beneficiary nor the provider knew or could reasonably have been expected to know that the items and services were not covered. Act § 1879; 42 U.S.C. § 1395pp; *see* 42 C.F.R. §§ 411.404, 411.406.

Medicare can reimburse for non-covered items and services if the provider or supplier of the items and services does not know, or have reason to know, that Medicare does not cover the items and services. The provider is a Medicare participant and must comply with all applicable laws and regulations. As a Medicare participant, the provider should be familiar with Medicare laws, regulations, and policies. The provider should have known the device and services that it provided to the Appellant are not covered by Medicare. The provider is therefore responsible for the non-covered charges.

The individual receiving the items and services is not liable for payment to the provider if the individual does not know, or have reason to know, that Medicare does not cover the items and services. There is no evidence in the record here indicating Appellant received advance notice, or knew, or should have known, that Medicare did not cover the item and service. Appellant is therefore not responsible for the non-covered charges.

## CONCLUSIONS OF LAW AND ORDER

Medicare does not cover the item and services the Appellant received on the dates of service at issue. The Appellant is not liable to the provider for the item and services. The provider is not

eligible for coverage under § 1879 of the Act or Medicare regulations.

The Medicare contractor will process Appellant's claim in accordance with this decision.

Dated:      JUN 1 9 2019

J. Grow
U.S. Administrative Law Judge

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

**ADQIC-RECORDS MGMT**

Miami Field Office
51 SW 1st Avenue, Suite 1536
Miami, FL 33130-1608
786-792-3700 (Main)
786-792-3791 (ALJ Grow Team)
305-536-5044 (Fax)
866-622-0382 (Toll Free)

Date:  **JUN 1 9 2019**

A. PROSSER
W2973 FARMSTEAD DR
APPLETON, WI 54915-8120

## NOTICE OF DECISION

Appellant:              A. PROSSER
OMHA Appeal Number:     1-8390277469

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

## What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

## How much time do I have to file an appeal?

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 85 of 631   Document 11-5          4316

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

### How do I file an appeal?

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

> Department of Health and Human Services
> Departmental Appeals Board
> Medicare Appeals Council, MS 6127
> Cohen Building Room G-644
> 330 Independence Ave., S.W.
> Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 86 of 631   Document 11-5        4317

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

(1) Clicking **Register** on the MOD E-File home page;
(2) Entering the information requested on the "Register New Account" form; and
(3) Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

(1) Logging into MOD E-File;
(2) Clicking the **File New Appeal** menu button on the top right of the screen;
(3) Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
(4) Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal – Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

(1) Request for Review;
(2) Appointment of Representative form (OMB Form 0938-0950);
(3) Copy of Administrative Law Judge or attorney adjudicator decision;
(4) Memorandum or brief or other written statement in support of your appeal; and
(5) Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 87 of 631   Document 11-5          4318

decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited if (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

DEBRA M PARRISH
788 WASHINGTON RD
PITTSBURGH, PA 15228

C2C Innovative Solutions, Inc.
DME QIC Appeals–ALJ
P.O. Box 44006
Jacksonville, FL 32231-4006

NOVOCURE INC.
195 Commerce Way
Portsmouth, NH 03801

Enclosures:

OMHA-152, Decision
OMHA-156, Exhibit List
DAB-101, Request for Review

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 88 of 631   Document 11-5      4319



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Miami, Florida**

| | | | |
|---|---|---|---|
| Appeal of: | **A. PROSSER** | OMHA Appeal No.: | **1-8390277469** |
| Beneficiary: | **A. PROSSER** | Medicare: | **Part B** |
| Medicare No.: | *****4857A | Before: | **J. Grow** <br> Administrative Law Judge |

## EXHIBIT LIST

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBERS |
|---|---|---|
| 1 | Initial, Redetermination and Reconsideration Procedural Documents | 26 |
| 2 | Medical Records/Evidence Received by CMS Contractors | 243 |
| 3 | Request for ALJ Hearing | 11 |
| 4 | OMHA Proceedings | 24 |
| 5 | Additional Evidence | 30 |

Dated: **JUN 1 9 2019**

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4. HEALTH INSURANCE CLAIM NUMBER (HICN)* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, HICNs, or other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A    ☐ Part B    ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan    ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes    If Yes, skip to Block 8.
☐ No    If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes    ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated _____ . I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

_____

_____

_____

_____

(Attach additional sheets if you need more space)

PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE | DATE |
|---|---|
| APPELLANT'S SIGNATURE (the party requesting review) | REPRESENTATIVE'S SIGNATURE (include signed appointment if not already submitted.) |
| PRINT NAME | PRINT NAME |
| ADDRESS | ADDRESS |
| CITY, STATE, ZIP CODE | CITY, STATE, ZIP CODE |

| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |
|---|---|---|---|---|---|

**(SEE FURTHER INSTRUCTIONS ON PAGE 2)**

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

---------------------------------------------------------------------------------------------------------------------------------

### PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

# EXHIBIT
# 5

**DEBRA M. PARRISH, P.C.**
**788 WASHINGTON ROAD**
**PITTSBURGH, PA 15228**
**PHONE: (412) 561-6250**
**FAX: (412) 561-6253**

# FAX TRANSMITTAL

**TO:** Judge Grow

**FAX NO.:** 305-536-5044

**FROM:** Debra M. Parrish

**DATE:** May 20, 2019

*Add as Exhibit 5 Supplemental post hearing records*

## TOTAL NUMBER OF PAGES INCLUDING COVER LETTER: 30

Please contact Tanya Terza at (412) 561-6250 if there is a problem with transmission.

**RE:  Appellant:  A. Prosser**
**ALJ Appeal No. 1-8390277469**
**Our Reference:  19-51**

**ALJ Grow Team:**

Please find attached the draft LCD and decision regarding other dates of service.  If you have any questions, please do not hesitate to contact us at (412) 561-6250.

Kind regards,
Katie Parrish
Phone: (412) 561-6250
Fax: (412) 561-6253

This facsimile transmission contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for the use of the Addressee(s) named above. If you are not the intended recipient of this facsimile, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original facsimile to us at the address above via the U.S. Postal Service. Thank you.

Back to Local Coverage Determinations (LCD) Alphabetical Index (/medicare-coverage-database/indexes/lcd-alphabetical-index.aspx?LCDId=38197&ver=17&DocType=1&bc=AAIAAAAAAAAA&)

# Proposed Local Coverage Determination (LCD): Tumor Treatment Field Therapy (TTFT) (DL34823)

Select the **Print Complete Record, Add to Basket** or **Email Record** Buttons to print the record, to add it to your basket or to email the record.

**Printing Note:**
To print an entire document, including all codes in all code groups, use the **Need a PDF Button** or the **Print Complete Record Button.**

To print only the current visible page contents, use the **Print** Button in the page header.

**Section Navigation** | Select Section ▼ | **Go**

# Proposed LCD

**Please Note: This is a Proposed policy.**
Proposed LCDs are works in progress that are available on the Medicare Coverage Database site for public review. Proposed LCDs are not necessarily a reflection of the current policies or practices of the contractor.

## Contractor Information

| CONTRACTOR NAME | CONT. TYPE | ...CTION | STATE(S) |
|---|---|---|---|
| CGS Administrators, LLC (/medicare-coverage-database/staticpages/contractor-details.aspx?ContrId=388&ver=1) | DME... | DME MAC | Illinois Indiana Kentucky Michigan Minnesota Ohio Wisconsin |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 94 of 631·  Document 11-5     4325

5/9/2019                Proposed Local Coverage Determination for Tumor Treatment Field Therapy (TTFT) (DL34823)

| CGS Administrators, LLC (/medicare-coverage-database/staticpages/contractor-details.aspx?ContrId=140&ver=2) | DME MAC | 18003 - DME MAC | J-C | Alabama<br>Arkansas<br>Colorado<br>Florida<br>Georgia<br>Louisiana<br>Mississippi<br>North Carolina<br>New Mexico<br>Oklahoma<br>Puerto Rico<br>South Carolina<br>Tennessee<br>Texas<br>Virginia<br>Virgin Islands<br>West Virginia |
|---|---|---|---|---|
| Noridian Healthcare Solutions, LLC (/medicare-coverage-database/staticpages/contractor-details.aspx?ContrId=389&ver=1) | DME MAC | 16013 - DME MAC | J-A | Connecticut<br>District of Columbia<br>Delaware<br>Massachusetts<br>Maryland<br>Maine<br>New Hampshire<br>New Jersey<br>New York - Entire State<br>Pennsylvania<br>Rhode Island<br>Vermont |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 95 of 631   Document 11-5          4326

5/9/2019                Proposed Local Coverage Determination for Tumor Treatment Field Therapy (TTFT) (DL34823)

| Noridian Healthcare Solutions, LLC (/medicare-coverage-database/staticpages/contractor-details.aspx?ContrId=139&ver=2) | DME MAC | 19003 - DME MAC | J-D | Alaska American Samoa Arizona California - Entire State Guam Hawaii Iowa Idaho Kansas Missouri - Entire State Montana North Dakota Nebraska Nevada Oregon South Dakota Utah Washington Wyoming Northern Mariana Islands |
|---|---|---|---|---|

## Proposed LCD Information

### Document Information

EX 3 P. 4

# Proposed LCD



**Source LCD ID**
L34823 (/medicare-coverage-database/details/lcd-details.aspx?
LCDId=34823&ContrId=388&ver=14&ContrVer=1&DocType=1&bc=AAIAAAABAAAA&)

**Proposed LCD ID**
DL34823

**Original ICD-9 LCD ID**
L34665 (http://localcoverage.cms.gov/mcd_archive/m_d.asp?id=34665)
L34738 (http://localcoverage.cms.gov/mcd_archive/m_d.asp?id=34738)
L34730 (http://localcoverage.cms.gov/mcd_archive/m_d.asp?id=34730)
L34734 (http://localcoverage.cms.gov/mcd_archive/m_d.asp?id=34734)

**Proposed LCD Title**
Tumor Treatment Field Therapy (TTFT)

**AMA CPT / ADA CDT / AHA NUBC Copyright Statement**
CPT codes, descriptions and other data only are copyright 2018 American Medical
Association. All Rights Reserved. Applicable FARS/HHSARS apply.

Current Dental Terminology © 2018 American Dental Association. All rights reserved.

Copyright © 2018, the American Hospital Association, Chicago, Illinois. Reproduced
with permission. No portion of the AHA copyrighted materials contained within this
publication may be copied without the express written consent of the AHA. AHA
copyrighted materials including the UB-04 codes and descriptions may not be
removed, copied, or utilized within any software, product, service, solution or derivative
work without the written consent of the AHA. If an entity wishes to utilize any AHA
materials, please contact the AHA at 312-893-6816. Making copies or utilizing the
content of the UB-04 Manual, including the codes and/or descriptions, for internal
purposes, resale and/or to be used in any product or publication; creating any modified
or derivative work of the UB-04 Manual and/or codes and descriptions; and/or making
any commercial use of UB-04 Manual or any portion thereof, including the codes
and/or descriptions, is only authorized with an express license from the American
Hospital Association. To license the electronic data file of UB-04 Data Specifications,
contact Tim Carlson at (312) 893-6816 or Laryssa Marshall at (312) 893-6814. You
may also contact us at ub04@healthforum.com.

**CMS National Coverage Policy**

N/A

**Coverage Guidance**

**Coverage Indications, Limitations, and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare
benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness
or injury or to improve the functioning of a malformed body member, and 3) meet all other

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 97 of 631   Document 11-5          4328

applicable Medicare statutory and regulatory requirements.

The purpose of a Local Coverage Determination (LCD) is to provide information regarding "reasonable and necessary" criteria based on Social Security Act § 1862(a)(1)(A) provisions.

In addition to the "reasonable and necessary" criteria contained in this LCD there are other payment rules, which are discussed in the following documents, that must also be met prior to Medicare reimbursement:

- The LCD-related Standard Documentation Requirements Article, located at the bottom of this policy under the Related Local Coverage Documents section.
- The LCD-related Policy Article, located at the bottom of this policy under the Related Local Coverage Documents section.
- Refer to the Supplier Manual for additional information on documentation requirements.
- Refer to the DME MAC web sites for additional bulletin articles and other publications related to this LCD.

For the items addressed in this LCD, the "reasonable and necessary" criteria, based on Social Security Act § 1862(a)(1)(A) provisions, are defined by the following coverage indications, limitations and/or medical necessity.

INITIAL COVERAGE FOR NEWLY DIAGNOSED GLIOBLASTOMA MULTIFORME:

Tumor treatment field therapy (E0766) is only covered for the treatment of newly diagnosed Glioblastoma Multiforme (GBM) when all of the following criteria are met:

1. The beneficiary has histologically confirmed (World Health Organization (WHO) grade IV astrocytoma), newly diagnosed, supratentorial GBM; and,

2. The beneficiary has received initial treatment with maximal debulking surgery, followed by chemotherapy and radiotherapy; and,

3. Tumor treatment field therapy is initiated within 7 weeks from the last dose of concomitant chemotherapy or radiotherapy; and,

4. The beneficiary is receiving care for GBM at a National Cancer Institute-designated Cancer Center, National Cancer Institute-designated Comprehensive Cancer Center, or National Cancer Institute-designated Cancer Research Network facility; and,

5. The beneficiary has no evidence of progression by Response Assessment in Neuro-Oncology (RANO) criteria; and,

6. The beneficiary has a Karnofsky Performance Score (KPS) of at least 70; and,

7. The beneficiary will use TTFT for at least 18 hours/day.

If all of the coverage criteria above are not met, claims for code E0766 will be denied as not reasonable and necessary.

CONTINUED COVERAGE FOR NEWLY DIAGNOSED GBM BEYOND THE FIRST THREE MONTHS OF THERAPY:

Continued coverage of TTFT (E0766) beyond the first three months of therapy requires that no sooner than the 60th day but no later than the 91st day after initiating therapy, the treating practitioner must conduct a clinical re-evaluation and document that the beneficiary is continuing to use and is benefiting from TTFT.

Documentation of clinical benefit is demonstrated by:

1. Face-to-face clinical re-evaluation by the treating practitioner; and,

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 98 of 631   Document 11-5      4329

2. Objective evidence of adherence to the use of TTFT, reviewed by the treating practitioner.

Adherence to therapy is defined as the use of TTFT for at least 18 hrs/day (see criterion 7 above).

If the above criteria are not met, continued coverage of TTFT will be denied as not reasonable and necessary.

If the practitioner re-evaluation does not occur until after the 91st day but the evaluation demonstrates that the beneficiary is benefiting from TTFT as defined in criteria 1 and 2 above, continued coverage of TTFT will commence with the date of that re-evaluation. See Policy Specific Documentation Requirements in the LCD-related Policy Article, located in the Related Local Coverage Documents section of this LCD, for information about KX modifier use.

## RECURRENT GBM

Tumor treatment field therapy (E0766) will be denied as not reasonable and necessary for the treatment of recurrent GBM.

## OTHER USES

The use of TTFT for any indications other than newly diagnosed GBM will be denied as not reasonable and necessary.

## GENERAL

A Detailed Written Order (DWO) (if applicable) must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving a completed DWO, the claim shall be denied as not reasonable and necessary.

An item/service is correctly coded when it meets all the coding guidelines listed in CMS HCPCS guidelines, LCDs, LCD-related Policy Articles, or DME MAC articles. Claims that do not meet coding guidelines shall be denied as not reasonable and necessary/incorrectly coded.

Proof of delivery (POD) is a Supplier Standard and DMEPOS suppliers are required to maintain POD documentation in their files. Proof of delivery documentation must be made available to the Medicare contractor upon request. All services that do not have appropriate proof of delivery from the supplier shall be denied as not reasonable and necessary.


## Summary of Evidence

Support for TTFT in the treatment of newly diagnosed GBM stems from a study by Stupp et al. (2017), also referred to as the EF-14 study. The EF-14 study was a randomized, open-label trial of 695 patients with histologically-confirmed glioblastoma multiforme (World Health Organization (WHO) grade IV astrocytoma) whose tumor was resected or biopsied and had completed concomitant radiochemotherapy and TTFT. Of the 695 randomized patients, 637 (92%) completed the trial. Median progression-free survival from randomization was 6.7 months in the TTFT-temozolomide group vs 4.0 months in the temozolomide-alone group (HR, 0.63; 95% CI, 0.52-0.76; P < .001). Median overall survival was 20.9 months in the TTFT-temozolomide group vs 16.0 months in the temozolomide-alone group (HR, 0.63; 95% CI, 0.53-0.76; P < .001). Systemic adverse events were similar between the two study arms. Mild to moderate skin toxicity underneath the transducer arrays occurred in 52% of patients who received TTFT-temozolomide vs no patients who received temozolomide alone.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 99 of 631   Document 11-5     4330

The *National Comprehensive Cancer Network* assigns TTFT a Category 1 recommendation as an option for newly diagnosed GBM.



## Analysis of Evidence
## (Rationale for Determination)

### Background

Alternating electric fields are produced by a pulse generator and transmitted by ceramic transducers placed on a patient's head. Tumor Treatment Field Therapy (TTFT) uses alternating electric fields to target cancer cells. The electric fields reportedly attract and repel charged proteins during cancer cell division. Cellular proteins, because they are highly polarized, are presumed to be prevented from moving to their correct locations thus disrupting cancer cell division.

Glioblastoma, also known as glioblastoma multiforme (GBM) is an aggressive type of brain cancer. It is rare, with an incidence of 3.21 cases per 100,000 population per year in the US. Tumor Treatment Field Therapy is an additional option to standard surgical, chemotherapy, and radiotherapy treatment modalities for the treatment of newly diagnosed GBM.

### NEWLY DIAGNOSED GBM

In October 2015 the FDA expanded the marketing indications for TTFT to include newly diagnosed GBM (see https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P100034S013 (https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P100034S013)). In 2018 the DME MACs received a request to cover TTFT for newly diagnosed GBM. The request for coverage of newly diagnosed GBM is the subject of this proposed LCD.

### Contractor Advisory Committee (CAC)

Following an independent review of the literature, the DME MACs assembled a 13-member specialty-focused CAC, comprised of a national panel of neuro-oncologists, neurosurgeons and experts in the field of oncologic treatment. The CAC meeting was held on March 6, 2019 in Baltimore, Maryland. Five (5) Key Questions were discussed by the CAC members, and confidence in each Key Question scored (Chair and Industry Representative were excluded from scoring). Confidence was rated on a scale of 1-5, with 1 indicative of low confidence and 5 indicating high confidence.

The following is a summary of the CAC Panel scoring for each Key Question and the related discussion.

| 1. | How confident are you that there is sufficient evidence to determine that TTFT for newly diagnosed GBM can provide net positive health outcomes in the Medicare-eligible population? | Scoring Member Average |
|---|---|---|
| | *1 Low Confidence — 2 — 3 Intermediate — 4 — 5 High Confidence* | 3.82 |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 100 of 631   Document 11-5          4331

The members noted that both Progression Free Survival (PFS) and Overall Survival (OS) were both increased in the EF-14 treatment arm, and migrated together, for both Medicare age eligible and non-eligible populations, in spite of the small group of the latter. Comments were made as to what constitutes adequate PFS and OS, and there was acknowledgement that additional months of improved quality of life in a disease such as GBM is a desirable outcome.

Several substantial concerns were raised in regard to net positive health outcomes. Two were related to study design, one to the philosophical approach to assessment of a new technology, and one to concerns related to conflicts of interest. In spite of the relative consensus on the goodness of metrics to reflect positive health outcomes, significant concerns were expressed at the study design, lack of sham control group and data gaps regarding volume of study subjects, subset analyses and the lack of corroborative additional clinical study. There was also discussion but not consensus as to whether or not the bar should be higher for net positive health outcomes for such a new technology. Additional concerns were related to the lack of clarity regarding clinical mechanism of action and concerns regarding delivery and dose effect, and geographical localization of the treatment field. Concerns related to potential conflict of interest in study funding and analyses were also discussed.

| 2. | How confident are you that the available evidence demonstrates adequate predictors of success in Medicare-eligible population? | Scoring Member Average |
|----|----|----|
| | 1 Low Confidence — 2 — 3 Intermediate — 4 — 5 High Confidence | 3.45 |

When considering this question, there was repeated discussion of volume and data gaps. The most substantial concern revolved around the smallness of the Medicare age eligible subpopulation. There was consensus that predictors of response in the age eligible Medicare population were sparse.

| 3. | How confident are you that TTFT is generally accepted by the medical community for newly diagnosed GBM? | Scoring Member Average |
|----|----|----|
| | 1 Low Confidence — 2 — 3 Intermediate — 4 — 5 High Confidence | 2.91 |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 101 of 631   Document 11-5          4332

This question generated the most concerns regarding how the standard of care was established, how the provider community was defined and segmented, and what conflicts may contribute to drive adoption. There was consensus that guidelines are just one factor in the determination as to whether TTF is generally accepted in the medical community.

In balance the group did think that regardless of how practitioners were notified of the availability of TTF for GBM, there was broad superficial penetration in the USA community, but that its acceptance as standard of care or generally accepted practice was not clear.

| 4. | How confident are you that scientific evidence supports mitotic spindle disruption and cellular apoptosis as the mechanism of action of TTFT? | Scoring Member Average |
|---|---|---|
| | 1 Low Confidence — 2 — 3 Intermediate — 4 — 5 High Confidence | 3.27 |

There was discussion here as to the lack of actual human data to demonstrate the mechanism of action, but consensus that there was a plethora of preclinical data did uniformly seem to demonstrate mitotic spindle disruption and apoptosis as a mechanism of action of tumor cell death.

| 5. | How confident are you that there are no significant evidence gaps that may impact positive health outcomes in the Medicare-eligible population? | Scoring Member Average |
|---|---|---|
| | 1 Low Confidence — 2 — 3 Intermediate — 4 — 5 High Confidence | 2.91 |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 102 of 631   Document 11-5          4333

There was consensus in the group that there remained significant gaps in evidence that the CAC members would like to see explored, either through controlled trials or in a real world evidence study paradigms. There was consensus that more data is needed to identify the place of TTFT in therapy across a more broad range of patient population and within the treatment algorithm for GBM and to further explore its mechanism of action, prognostic features, and predictors of response.

There was discussion of the need to review the evolving evidence rapidly since the standard of care evolves so rapidly in this area. There was consensus that more data is needed to identify the place of TTFT in therapy across a more broad range of patient population and within the treatment algorithm for GBM and to further explore its mechanism of action, prognostic features, and predictors of response. Specific additional areas recommended for study included:

- Dose density and power
- Demographic diversity of subjects
- Prognostic indicators
- Impact on caretakers
- More on quality of life
- Medical economic assessment
- The best sequencing of treatment including where in the algorithm is TTFT best placed
- Exploration of the human mechanism of action

## CONCLUSION

The use of TTFT for the treatment of newly diagnosed GBM appears to be gaining acceptance in the neuro-oncology community in the United States. However, there are evidence gaps that preclude unreserved support for the use of TTFT in the treatment of newly diagnosed GBM in Medicare beneficiaries. Thus, the DME MACs are recommending coverage of TTFT only when Medicare beneficiaries are receiving their GBM care at a National Cancer Institute-designated Cancer Center, National Cancer Institute-designated Comprehensive Cancer Center, or National Cancer Institute-designated Cancer Research Network facility, in order to ensure optimal management of Medicare-eligible beneficiaries in a field with rapidly changing treatment armamentariums.

## RECURRENT GBM

In April 2011 the Food and Drug Administration (FDA) approved the marketing of the NovoTTF-100A (later rebranded Optune®) for the treatment of recurrent GBM. The current LCD for TTFT was effective in August 2014, following an Open Meeting and solicitation of public comments. The DME MACs determined that, based on the strength and quality of the evidence available at that time, TTFT was not reasonable and necessary for the treatment of GBM.

In 2018 the DME MACs received a request to reconsider the decision on recurrent GBM. The requestor, Novocure, did not submit new evidence in support of revised coverage for recurrent disease. Consequently, pursuant to Chapter 13 of the CMS Internet Only Manual 100-08, the DME MACs determined that the request was invalid.

## Proposed Process Information

**Synopsis of Changes**

| CHANGES | FIELDS CHANGED |
|---------|----------------|
| N/A     | N/A            |

**Associated Information**
**DOCUMENTATION REQUIREMENTS**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." It is expected that the beneficiary's medical records will reflect the need for the care provided. The beneficiary's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request.

**GENERAL DOCUMENTATION REQUIREMENTS**

In order to justify payment for DMEPOS items, suppliers must meet the following requirements:

- Prescription (orders)
- Medical Record Information (including continued need/use if applicable)
- Correct Coding
- Proof of Delivery

Refer to the LCD-related Standard Documentation Requirements article, located at the bottom of this policy under the Related Local Coverage Documents section for additional information regarding these requirements.

Refer to the Supplier Manual for additional information on documentation requirements.

Refer to the DME MAC web sites for additional bulletin articles and other publications related to this LCD.

**POLICY SPECIFIC DOCUMENTATION REQUIREMENTS**

Items covered in this LCD have additional policy-specific requirements that must be met prior to Medicare reimbursement.

Refer to the LCD-related Policy article, located at the bottom of this policy under the Related Local Coverage Documents section for additional information.

**Appendices**

**Utilization Guidelines**

Refer to Coverage Indications, Limitations and/or Medical Necessity

**Sources of Information**

Stupp R, Taillibert S, Kanner A, et al. Effect of Tumor-Treating Fields Plus Maintenance Temozolomide vs Maintenance Temozolomide Alone on Survival in Patients With Glioblastoma: A Randomized Clinical Trial. *JAMA*. 2017;318(23):2306. doi:10.1001/jama.2017.18718 (https://doi.org/10.1001/jama.2017.18718)

Food and Drug Administration. Summary of Safety and Effectiveness Data. PMA P100034/S013. Novocure TTF-100A. October 5, 2015.

National Comprehensive Cancer Network (NCCN) Clinical Practice Guidelines in Oncology. Central Nervous System Cancers. Version 2.2018 November 26, 2018. Accessed January 3, 2019.

National Comprehensive Cancer Network (NCCN) Clinical Practice Guidelines in Oncology. Central Nervous System Cancers. NCCN Evidence Blocks™. Version 2.2018 November 26, 2018. Accessed January 3, 2019.

**Bibliography**
*The following bibliography was provided to the Contractor Advisory Committee (CAC) for their consideration of Tumor Treatment Field Therapy for the treatment of newly diagnosed glioblastoma multiforme.*

Submitted by Novocure with Reconsideration Request

Stupp R, Taillibert S, Kanner A, et al. Maintenance Therapy With Tumor-Treating Fields Plus Temozolomide vs Temozolomide Alone for Glioblastoma: A Randomized Clinical Trial. *JAMA*. 2015;314(23):2535-2543. doi:10.1001/jama.2015.16669 (https://doi.org/10.1001/jama.2015.16669)

Stupp R, Taillibert S, Kanner A, et al. Effect of Tumor-Treating Fields Plus Maintenance Temozolomide vs Maintenance Temozolomide Alone on Survival in Patients With Glioblastoma: A Randomized Clinical Trial. *JAMA*. 2017;318(23):2306. doi:10.1001/jama.2017.18718 (https://doi.org/10.1001/jama.2017.18718)

Taphoorn MJB, Dirven L, Kanner AA, et al. Influence of Treatment With Tumor-Treating Fields on Health-Related Quality of Life of Patients With Newly Diagnosed Glioblastoma: A Secondary Analysis of a Randomized Clinical Trial. *JAMA Oncology*. 2018;4(4):495. doi:10.1001/jamaoncol.2017.5082 (https://doi.org/10.1001/jamaoncol.2017.5082)

National Comprehensive Cancer Network (NCCN) Clinical Practice Guidelines in Oncology. Central Nervous System Cancers. NCCN Flash Card™. Version 1.2018 March 20, 2018.

Provided by DME MACs

Batchelor T, Shih HA, Wen PY. Management of glioblastoma in older adults *UpToDate.* Waltham, Ma.: UpToDate; 2017. https://www.uptodate.com/contents/management-of-glioblastoma-in-older-adults (https://www.uptodate.com/contents/management-of-glioblastoma-in-older-adults). Accessed April 23, 2018.

Bhandari M. Comparative Study of Adjuvant Temozolomide six Cycles Versus Extended 12 Cycles in Newly Diagnosed Glioblastoma Multiforme. *Journal Of Clinical And Diagnostic Research*. 2017. doi:10.7860/JCDR/2017/27611.9945 (https://doi.org/10.7860/JCDR/2017/27611.9945)

Cloughesy TF, Lassman AB. NovoTTF: where to go from here? *Neuro-Oncology*. 2017;19(5):605-608. doi:10.1093/neuonc/nox014 (https://doi.org/10.1093/neuonc/nox014)

Food and Drug Administration. Novocure Submission to Neurological Devices Panel. NovoTTF-100A. March 17, 2011.

Food and Drug Administration. Summary of Safety and Effectiveness Data. PMA P100034. Novocure TTF-100A. April 8, 2011.

Food and Drug Administration. Summary of Safety and Effectiveness Data. PMA P100034/S013. Novocure TTF-100A. October 5, 2015. Accessed June 23, 2016.

5/9/2019          Proposed Local Coverage Determination for Tumor Treatment Field Therapy (TTFT) (DL34823)

Kesari S, Ram Z, on behalf of EF-14 Trial Investigators. Tumor-treating fields plus chemotherapy versus chemotherapy alone for glioblastoma at first recurrence: a post hoc analysis of the EF-14 trial. *CNS Oncology*. 2017;6(3):185-193. doi:10.2217/cns-2016-0049 (https://doi.org/10.2217/cns-2016-0049)

Kirson ED, Dbaly V, Tovarys F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. *Proceedings of the National Academy of Sciences*. 2007;104(24):10152-10157. doi: 10.1073/pnas.0702916104 (https://doi.org/10.1073/pnas.0702916104)

Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of Cancer Cell Replication by Alternating Electric Fields, *Cancer Research*. 2004;64(9):3288-3295. doi: 10.1158/0008-5472.can-04-0083 (https://doi.org/10.1158/0008-5472.can-04-0083)

Martínez-Garcia M, Álvarez-Linera J, Carrato C, et al. SEOM clinical guidelines for diagnosis and treatment of glioblastoma (2017). *Clinical and Translational Oncology*. 2018;20(1):22-28. doi:10.1007/s12094-017-1763-6 (https://doi.org/10.1007/s12094-017-1763-6)

Mehta M, Wen P, Nishikawa R, Reardon D, Peters K. Critical review of the addition of tumor treating fields (TTFields) to the existing standard of care for newly diagnosed glioblastoma patients. *Critical Reviews in Oncology/Hematology*. 2017;111:60-65. doi:10.1016/j.critrevonc.2017.01.005 (https://doi.org/10.1016/j.critrevonc.2017.01.005)

Mittal S, Klinger NV, Michelhaugh SK, Barger GR, Pannullo SC, Juhász C. Alternating electric tumor treating fields for treatment of glioblastoma: rationale, preclinical, and clinical studies. *Journal of Neurosurgery*. February 2018:414-421. doi:10.3171/2016.9.JNS16452 (https://doi.org/10.3171/2016.9.JNS16452)

National Comprehensive Cancer Network (NCCN) Clinical Practice Guidelines in Oncology. Central Nervous System Cancers. Version 2.2018 November 26, 2018. Accessed January 3, 2019.

National Comprehensive Cancer Network (NCCN) Clinical Practice Guidelines in Oncology. Central Nervous System Cancers. NCCN Evidence Blocks™. Version 2.2018 November 26, 2018. Accessed January 3, 2019.

Palmer JD, Bhamidipati D, Mehta M, et al. Treatment recommendations for elderly patients with newly diagnosed glioblastoma lack worldwide consensus. *Journal of Neuro-Oncology*. 2018;140(2):421-426. doi:10.1007/s11060-018-2969-3 (https://doi.org/10.1007/s11060-018-2969-3)

Sampson JH. Alternating Electric Fields for the Treatment of Glioblastoma. *JAMA*. 2015;314(23):2511. doi:10.1001/jama.2015.16701 (https://doi.org/10.1001/jama.2015.16701)

Sulman EP, Ismaila N, Armstrong TS, et al. Radiation Therapy for Glioblastoma: American Society of Clinical Oncology Clinical Practice Guideline Endorsement of the American Society for Radiation Oncology Guideline. *Journal of Clinical Oncology*. 2017;35(3):361-369. doi:10.1200/JCO.2016.70.7562 (https://doi.org/10.1200/JCO.2016.70.7562)

Toms SA, Kim CY, Nicholas G, Ram Z. Increased compliance with tumor treating fields therapy is prognostic for improved survival in the treatment of glioblastoma: a subgroup analysis of the EF-14 phase III trial. 2018 141:467–473. Doi: 10.1007/s11060-018-03057-z (https://doi.org/10.1007/s11060-018-03057-z)

Weller M, van den Bent M, Tonn JC, et al. European Association for Neuro-Oncology (EANO) guideline on the diagnosis and treatment of adult astrocytic and oligodendroglial gliomas. *The Lancet Oncology*. 2017;18(6):e315-e329. doi:10.1016/S1470-2045(17)30194-8 (https://doi.org/10.1016/S1470-2045(17)30194-8)

Wick W. TTFields: where does all the skepticism come from? *Neuro-Oncology*. 2016;18(3):303-305. doi:10.1093/neuonc/now012 (https://doi.org/10.1093/neuonc/now012)

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 106 of 631   Document 11-5          4337

Wick W, Osswald M, Wick A, Winkler F. Treatment of glioblastoma in adults.
*Therapeutic Advances in Neurological Disorders.* 2018;11:175628641879045.
doi:10.1177/1756286418790452 (https://doi.org/10.1177/1756286418790452)

Wick W, Platten M. Understanding and Treating Glioblastoma. *Neurologic Clinics.*
2018;36(3):485-499. doi:10.1016/j.ncl.2018.04.006
(https://doi.org/10.1016/j.ncl.2018.04.006)

Provided by CAC Members

Chang E, Patel CB, Pohling C, et al. Tumor treating fields increases membrane
permeability in glioblastoma cells. *Cell Death Discovery.* 2018;4(1):1-13. doi:
10.1038/s41420-018-0130-x (https://dx.doi.org/10.1038%2Fs41420-018-0130-x)

Kim EH, Kim YJ, Song HS, et al. Biological effect of an alternating electric field on cell
proliferation and synergistic antimitotic effect in combination with ionizing radiation.
*Oncotarget.* 2016;7(38):62267-62279. doi: 10.18632/oncotarget.11407
(https://doi.org/10.18632/oncotarget.11407)

Kim EH, Song HS, Yoo SH, Yoon M. Tumor treating fields inhibit glioblastoma cell
migration, invasion and angiogenesis. *Oncotarget.* 2016;7(40):65125-65136. doi:
10.18632/oncotarget.11372 (https://doi.org/10.18632/oncotarget.11372)

**Open Meetings**

| MEETING DATE | MEETING STATE(S) | MEETING INFORMATION |
|---|---|---|
| 06/20/2019 | Maryland | Location:<br><br>Westin Baltimore Washington International Airport<br>1110 Old Elkridge Landing Rd<br>Linthicum Heights, MD 21090<br><br>Time: 9 AM - 12 PM EDT<br><br>See DME MAC websites for information |

**Contractor Advisory Committee (CAC) Meetings**

| MEETING DATE | MEETING STATE(S) | MEETING INFORMATION |
|---|---|---|
| 03/06/2019 | Maryland | Location:<br><br>Centers for Medicare & Medicaid Services<br>7500 Security Blvd<br>Baltimore, MD 21244 |

**MAC Meeting Information URL(s)**
N/A

**Proposed LCD Posting Date**
05/09/2019

**Comment Period Start Date**
05/09/2019

**Comment Period End Date**

5/9/2019    Proposed Local Coverage Determination for Tumor Treatment Field Therapy (TTFT) (DL34823)

06/24/2019

**Released to Final LCD Date**
**Please Note: This is not the LCD Effective Date.**
N/A

**Reason for Proposed LCD**
- Request for Coverage by a Supplier

**Proposed Contact**
DME MAC Medical Directors
Two Vantage Way
Nashville, TN 37228-1504
TTFTLCDComments@cgsadmin.com (mailto:TTFTLCDComments@cgsadmin.com)

## Coding Information



**Bill Type Codes:**
Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.

N/A

**Revenue Codes:**
Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory. Unless specified in the policy, services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.

N/A

**CPT/HCPCS Codes**

**Group 1 Paragraph:**

The appearance of a code in this section does not necessarily indicate coverage.

**HCPCS MODIFIERS:**

EY -- No physician or other licensed health care provider order for this item or service

GA -- Waiver of liability statement issued as required by payer policy, individual case

GZ - Item or service expected to be denied as not reasonable and necessary

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 108 of 631   Document 11-5    4339
EX 5 P. 15

KX - Requirements specified in the medical policy have been met

**HCPCS CODES:**

**Group 1 Codes:**

| CODE | DESCRIPTION |
|------|-------------|
| A4555 | ELECTRODE/TRANSDUCER FOR USE WITH ELECTRICAL STIMULATION DEVICE USED FOR CANCER TREATMENT, REPLACEMENT ONLY |
| E0766 | ELECTRICAL STIMULATION DEVICE USED FOR CANCER TREATMENT, INCLUDES ALL ACCESSORIES, ANY TYPE |

**ICD-10 Codes that Support Medical Necessity**

**Group 1 Paragraph:**

Not specified

**Group 1 Codes:**
  N/A

**ICD-10 Codes that DO NOT Support Medical Necessity**

**Group 1 Paragraph:**

Not specified

**Group 1 Codes:**
  N/A
**Additional ICD-10 Information**
  N/A

## Associated Documents

**Attachments**
A52711 - TTFT Policy Article (http://downloads.cms.gov/medicare-coverage-database/lcd_attachments/38197_16/A52711TumorTreatmentFieldTherapyTTFTPolicyArticle.pdf)
(PDF - 233 KB )

**Related Local Coverage Documents**

Article(s)
A55426 - Standard Documentation Requirements for All Claims Submitted to DME MACs
(/medicare-coverage-database/details/article-details.aspx?
articleId=55426&ver=58&LCDId=38197&DocType=1&bc=AAIAAAABAAAA&)

**Related National Coverage Documents**

N/A

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 109 of 631   Document 11-5          4340

5/9/2019          Proposed Local Coverage Determination for Tumor Treatment Field Therapy (TTFT) (DL34823)

## Keywords

N/A

Read the LCD Disclaimer (../staticpages/lcd-disclaimer.aspx)

98

Home

# CMS.gov

A federal government website managed and paid for by the U.S. Centers for Medicare &
Medicaid Services. 7500 Security Boulevard, Baltimore, MD 21244

 Go to HHS Home Page (https://www.hhs.gov/)

## CMS & HHS Websites

❤ Visit other Centers for Medicare and Medicaid Services &
Health and Human Services Websites section

Medicare.gov Link to the medicare.gov website - Opens in a new window
(https://www.medicare.gov)

MyMedicare.gov Link to the MyMedicare.gov website - Opens in a new window
(https://www.MyMedicare.gov)

Medicaid.gov - Opens in a new window (https://www.Medicaid.gov)

InsureKidsNow.gov - Opens in a new window (https://www.insurekidsnow.gov)

HealthCare.gov - Opens in a new window (https://www.HealthCare.gov)

HHS.gov/Open - Opens in a new window (https://www.hhs.gov/open/)

## Tools

❤

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 110 of 631   Document 11-5      4341

EX 5 P. 18

AcronymsCenters for Medicare & Medicaid Services Acronym Lookup tool - Opens in a new window (https://www.cms.gov/apps/acronyms)

Contacts - Opens in a new window (https://www.cms.gov/apps/contacts)

Glossary - Opens in a new window (https://www.cms.gov/apps/glossary/)

Archive - Opens in a new window (https://www.archive-it.org/collections/2744)

## Helpful Links

Web Policies & Important Links (https://www.cms.gov/About-CMS/Agency-Information/Aboutwebsite/index.html)

For Developers (https://developer.cms.gov/)

Privacy Policy (https://www.cms.gov/About-CMS/Agency-Information/Aboutwebsite/Privacy-Policy.html)

Plain Language (https://www.medicare.gov/about-us/plain-writing/plain-writing.html)

Freedom of Information Act (https://www.cms.gov/center/freedom-of-information-act-center.html)

No Fear Act (https://www.cms.gov/About-CMS/Agency-Information/Aboutwebsite/NoFearAct.html)

Nondiscrimination/Accessibility (https://www.cms.gov/About-CMS/Agency-Information/Aboutwebsite/CMSNondiscriminationNotice.html)

HHS.gov - Opens in a new window (https://www.hhs.gov)

Inspector General - Opens in a new window (https://www.oig.hhs.gov)

USA.gov - Opens in a new window (https://www.usa.gov)

Help with file formats & plug-ins (https://www.cms.gov/About-CMS/Agency-Information/Aboutwebsite/Help.html)

# Receive Email Updates

Submit

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 112 of 631 Document 11-5 4343

EX 5 P. 20

RECEIVED MAY 2 0 2019



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Kansas City Field Office
Kansas City, Missouri

| | |
|---|---|
| Appeal of:  **A. Prosser** | ALJ Appeal No.:  **1-8416188648** |
| Beneficiary:  **A. Prosser** | Medicare Part: **B** |
| DOS:  **8/16/2018**<br>**9/16/2018**<br>**10/16/2018** | |
| HICN:  **\*\*\*\*\*9206A** | Before:  **Kimberley Woodyard**<br>U.S. Administrative Law Judge |

## DECISION

Upon a *de novo* review of the record, this Administrative Law Judge enters a **FULLY FAVORABLE** decision for the Appellant, Anniken Prosser. Ms. Prosser is entitled to coverage for Tumor Treatment Field Therapy (E0766).

## FINDINGS OF FACT AND
## HISTORY OF THE CASE

Ms. Prosser, was thirty-four years old at the time of services. (Exh. 2, p. 1). On February 14, 2016, MRI results showed Ms. Prosser had a large left cystic temporal mass. *Id.* Two weeks later, she underwent a left craniotomy. *Id.* The post-operative diagnosis was "GBM" (glioblastoma multiforme). *Id.*

In May 2016, Ms. Prosser completed radiation with Editha Kruegar, MD, and concurrent Temodar chemotherapy with Jasleen Randhawa, MD. (Exh. 2, p. 1). In June 2016, adjuvant Temodar chemotherapy was continued, and Optune TTFields therapy was started. *Id.* By April 2017, she had completed twelve cycles of Temodar chemotherapy, and Optune TTFields therapy was continued. *Id.*

On March 15, 2018, Jennifer Connelly, MD, examined Ms. Prosser. (Exh. 2, pp. 1-4). Dr. Connelly found Ms. Prosser was neurologically intact and radiographically stable, and she was tolerating TTFields well with excellent compliance. (Exh. 2, p. 4). Brain imaging showed similar

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 113 of 631   Document 11-5     4344
EX 8 P. 21

results compared to the previous images. *Id.* There were no new lesions, and no evidence of abnormal vascularity. *Id.* Dr. Connelly recommended continuing with Optune TTFields. *Id.*

On June 2016, Ms. Prosser began using Optune therapy treatment. (Exh. 5, p. 1,649). On April 13, 2018, and on October 11, 2018, Dr. Connelly signed an Optune Prescription Form renewing the Optune treatment prescription for an additional six months. (Exh. 5, pp. 1,650-1,651). The record includes invoices for Optune for August 16, 2018, September 16, 2018, and October 16, 2018. (Exh. 2, pp. 1,645-1,647).

### Optune Background

When Optune is turned on, it creates low-intensity, wave-like electric fields call Tumor Treating Fields, or TTFields. (*See* https://www.optune.com/discover-optune/how-optune-works). These TTFields are delivered by transducer arrays to the location of a GBM tumor. *Id.* TTFields interfere with GBM tumor cell division. *Id.* This action slows or stops GBM cells from dividing, and may destroy them. *Id.* Optune with temozalomide is indicated for the treatment of adult patients with *newly diagnosed* supratentorial glioblastoma following maximal debulking surgery and completion of radiation therapy together with concomitant standard of care chemotherapy. (*See* https://www.optune.com/hcp/therapy/moa). *Id.* For treatment of patients who have *recurrent* GBM, Optune is indicated following histologically-confirmed or radiologically-confirmed recurrence in the supra-tentorial region of the brain after receiving chemotherapy. *Id.* The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted. *Id.* Ms. Prosser is *newly diagnosed* with the disease. (Exh. 2, p. 1).

On April 8, 2011, Optune, previously called NovoTTF-100A System, received pre-market approval from the FDA for treatment of glioblastoma for use in patients with recurrent glioblastoma, based upon the result of a large randomized, controlled trial of patients with recurrent GBM.[1] (Exh. 5, pp. 32-36). The overall survival and progression-free survival to chemotherapy with minimal toxicity and an improvement in patients' quality of life, is demonstrated, compared to that of chemotherapy. *Id.* On October 5, 2015, the Provider received premarket approval from the FDA for use of Optune in patients newly diagnosed with glioblastoma.[2] (Exh. 5, pp. 37-40).

The record includes National Comprehensive Cancer Network publications that provide clinical practice oncology guidelines from 2013 through 2018 for the management of both newly diagnosed and recurring central nervous system cancers.[3] (Exh. 5, pp. 14-29). Alternating electric field therapy was considered an effective treatment option for recurrent glioblastomas and oligodendrogliomas. (Exh. 5, p. 15). Along with (1) palliative support care, (2) systemic

---

[1] http://www.accessdata.fda.gov/cdrh_docs/pdf10/p100034a.pdf.

[2] http://www.accessdata.fda.gov/cdrh_docs/pdf10/P100034S013a.pdf.

[3] National Comprehensive Cancer Network Clinical Practice Guidelines in Oncology, *Central Nervous System Cancers*, version 1.2018.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 114 of 631   Document 11-5          4345

chemotherapy, and (3) surgery or reirradiation, alternating electric field therapy is considered a fourth modality of cancer treatment. *Id.*

A 2012 article summarized results from a study comparing NovoTTF-100A (Optune) treatment to a physician's choice of chemotherapy treatment in recurrent glioblastoma cases.[4] (Exh. 5, pp. 1,803-1,813).

> This is the first controlled trial evaluating an entirely novel cancer treatment modality delivering electric fields rather than chemotherapy. No improvement in overall survival was demonstrated, however efficacy and activity with this chemotherapy-free treatment device appears comparable to chemotherapy regimens that are commonly used for recurrent glioblastoma. Toxicity and quality of life clearly favoured TTF.

(Exh. 5, p. 1,804).

Within three years, studies showed significant advancements. On December 15, 2015, the Journal of the American Medical Association (JAMA) published an article analyzing the results of a phase III clinical trial related to TTFT.[5] (Exh. 5, pp. 1,518-1,526). The analysis of the clinical trial with 315 participants showed that adding TTFT to maintenance temozolomide in a population with new onset glioblastoma "significantly prolonged progression-free and overall survival." (Exh. 5, p. 1,525). After conclusion of the study, patients in the control group with ongoing maintenance therapy were offered TTFT therapy. (Exh. 5, p. 1,521).

On December 19, 2017, JAMA published an article that reports the findings of a phase III clinical trial involving 695 participants with glioblastoma.[6] (Exh. 5, pp. 1,529-1,550). The conclusion was:

> In the final analysis of this randomized clinical trial of patients with glioblastoma who had received standard radio-chemotherapy, the addition of TTFields [Optune] to maintenance temozolomide chemotherapy vs maintenance temozolomide alone, resulted in statistically significant improvement in progression-free survival and overall survival. These results are consistent with the previous interim analysis.

(Exh. 5, p. 1,549). The author noted that the findings were in contrast to the more than twenty-three randomized trials conducted during the previous decade that evaluated novel agents or

---

[4] Stupp, Roger, M.D. et al., *NovoTTF-100A Versus Physician's Choice Chemotherapy In Recurrent Glioblastoma: A Randomized Phase III Trial Of A Novel Treatment Modality*, European Journal of Cancer, Volume 48, Issue 14, pp. 2192-2201 (September 2012).

[5] Stupp, Roger, M.D. et al., *Maintenance Therapy With Tumor-Treating Field Plus Temozolomide vs Temozolomide Alone for Glioblastoma A Randomized Clinical Trial*, JAMA (December 15, 2015).

[6] Stupp, Roger, M.D. et al., *Effect of Tumor-Treating Field Plus Maintenance Temozolomide vs Maintenance Temozolomide Alone on Survival in Patients With Glioblastoma*, JAMA (December 19, 2017).

intensified treatment strategies for treatment of patients with newly diagnosed glioblastoma, and failed to demonstrate improved survival. (Exh. 5, pp. 1,548-1,549).

A 2018 article summarizes a study in which patients with newly diagnosed glioblastoma participated in a study conducted from July 2009 through November 2014, and were followed through December 2016.[7] (Exh. 5, pp. 1,551-1,559). Compared to patients in the temozolomide-alone part of the study, participants who received TTFields (Optune) had significantly longer deterioration-free survival in global health status, physical and emotional functioning, pain, and leg weakness. (Exh. 5, pp. 1,557-1,558).

The Medicare Administrative Contractor, initially and on redetermination, denied the claim for the services. The Qualified Independent Contractor (QIC) denied reconsideration of the claim on March 19, 2019. Both the Administrative Contractor and the QIC found that, based on the available documentation, Medicare requirements outlined in the LCD were not met. Ms. Prosser, filed a request for hearing before an Administrative Law Judge (ALJ) on March 27, 2019. (Exh. 3, pp. 1-3). Since the request was timely and the amount in controversy met the jurisdictional requirements for an ALJ hearing, 42 C.F.R. §§ 405.1002(a)(1), 405.1006(b)(1), this ALJ has jurisdiction to conduct the *de novo* review and issue a decision. 42 C.F.R. § 405.1000(d).

By Notice of Hearing served on April 4, 2019, the appeal was scheduled to be heard on May 29, 2019. As of the date of this decision, no contractor has responded to the Notice of Hearing.

An ALJ may decide a case on the record without hearing if an examination of the record supports a finding in favor of the Appellant on every issue. 42 C.F.R. § 405.1038(a). Inasmuch as this ALJ issues this decision as wholly favorable, no hearing will be held.

The issues before the ALJ include all the issues brought out in the initial determination, coverage determination, or organization determination; redetermination; or reconsideration that were not decided entirely in the Appellant's favor, for the claims or other appealed matters specified in the request for hearing. The issue was whether all Medicare coverage requirements have been met warranting payment for the Tumor Treatment Field Therapy.

## Legal Framework

### I.   ALJ Review Authority

#### A.   Jurisdiction

A party dissatisfied with the decisions of the Medicare contractor and the Qualified Independent Contractor is entitled to a hearing before the Secretary of the Department of Health

---

[7] Taphoorn, Martin, MD et al., *Influence of Treatment With Tumor-Treating Fields on Health-Related Quality of Life of Patients With Newly Diagnosed Glioblastoma*, JAMA (February 1, 2018).

and Human Services, Social Security Act § 1869(b)(1)(A), provided there is a sufficient amount in controversy and a request for hearing is filed in a timely manner, 42 C.F.R. § 405.1002. The request for hearing is timely if filed within sixty days after receipt of a Qualified Independent Contractor decision. 42 C.F.R. § 405.1014(c). The minimum amount in controversy required for hearing before an Administrative Law Judge are published in the Federal Register.

### B.  Scope of Review

The issues before the ALJ include all the issues brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in the Appellant's favor. 42 C.F.R. § 405.1032(a).

### C.  Standard of Review

The ALJ conducts a *de novo* review of each claim at issue and makes a decision based on the hearing record. 42 C.F.R. § 405.1000(d).

## II.  Principles of Law

### A.  Statutes and Regulations

Medicare Part B provides coverage to eligible beneficiaries for all or part of the cost of "medical and other health services," a term that is defined by the Social Security Act as including, among many other things, durable medical equipment. *See* Social Security Act § 1832(a)(1)(B); 42 C.F.R. §410.10(h). Notwithstanding any other provision of Title XVIII of the Social Security Act, no payment may be made under parts A or B for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. Social Security Act § 1862(a)(1)(A). Similarly, Medicare precludes payment to any claimant unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." Social Security Act § 1833(e).

### B.  Policy and Guidance

The Social Security Act vests in the Secretary the authority to make coverage decisions. Under that authority, CMS issues National Coverage Determinations (NCDs) that state whether specific medical items, services, treatment procedures, or technologies may be paid for by Medicare. In the absence of a specific NCD, the Medicare contractor is responsible for determining whether an item or service is reasonable and necessary. (See preface to Coverage Issues Manual (reprinted at 54 Fed. Reg. 34555 (Aug. 21, 1989)). Accordingly, in addition to looking to the binding statutory and regulatory authority, this ALJ must accord substantial deference to manuals, program memoranda and other issuances issued by the Center for Medicare and Medicaid Services (CMS) and its carriers and intermediaries. 42 C.F.R. § 405.1062. Thus, the ALJ looks to the Local Coverage Determinations (LCD), if any, and the Medicare Benefit Policy Manual.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 117 of 631   Document 11-5          4348

Historically, in making coverage determinations, CMS has interpreted the terms "reasonable and necessary" to mean that the item or service in question is safe and effective and not experimental. CMS has further determined that the relevant tests for applying these terms are whether the item or service has been proven safe and effective based on authoritative evidence, or alternatively, whether the item or service is generally accepted in the medical community as safe and effective for the condition for which it is used. 54 Fed. Reg. 4304 (Jan. 30, 1989); 60 Fed. Reg. 48417 (Sept. 19, 1995); see also 52 Fed. Reg. 15,560 (Apr. 29, 1987). Indeed, CMS has provided guidance in the *Medicare Program Integrity Manual* (CMS Pub. 100-08) (*MPIM*) to assist contractors in developing LCDs to aid in creating relevant tests and guidance. The *MPIM* contemplates that, in making a determination as to whether an item or service is reasonable and necessary, contractors will analyze whether the item or service is safe and effective, and not experimental or investigational. *MPIM*, Ch. 13 at § 13.5.1. Contractors shall consider a service reasonable and necessary if the contractor determines that the service is:

- Safe and effective;
- Not experimental or investigational; and
- Appropriate, including the duration and frequency that is considered appropriate for the service.

The *MPIM* further instructs contractors to base LCDs on the strongest evidence available at the time the determination is issued. In order of preference, this includes:

- Published authoritative evidence derived from definitive randomized clinical trials or other definitive studies, and ALJs and the Medicare Appeals Council are not bound by CMS program guidance, such as program memoranda and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case. 42 C.F.R. § 405.1062(a).

- General acceptance by the medical community (standards of practice), supported by sound medical evidence based on:

  o Scientific data or research studies published in peer-reviewed medical journals;

  o Consensus of expert medical opinion (i.e., recognized authorities in the field); or

  o Medical opinion derived from consultations with medical associations or other health care experts.

*Id.* at § 13.7.1. The Manual further explains:

Acceptance by individual health care providers, or even a limited group of health care providers, normally does not indicate general acceptance by the medical community. Testimonials indicating such limited acceptance, and limited case studies distributed by sponsors with financial interest in the outcome, are not sufficient evidence of general acceptance by the medical

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 118 of 631 Document 11-5 4349
EX 5 P. 26

community. The broad range of available evidence must be considered and its quality shall be evaluated before a conclusion is reached.

*Id.*

There is a Local Coverage Determination stating CMS' guidance for Tumor Treatment Field Therapy: CGS Administrators, LLC, Local Coverage Determination, LCD L34823, Tumor Treatment Field Therapy (TTFT) (January 2017). This LCD provides, without elucidation, that tumor treatment field therapy (E0766) will be denied as not reasonable and necessary.[8] The related Policy Article states that tumor treatment field therapy devices are covered under the Durable Medical Equipment benefit and must meet the reasonable and necessary requirements set out in the related LCD to be eligible for reimbursement. CGS Administrators, LLC, Local Coverage Article for Tumor Treatment Field Therapy Article A52711 (Article A52711) (January 2017).

### Analysis

The issue is whether the Tumor Treatment Field Therapy services are entitled to coverage. Pursuant to section 405.1032(a) of the regulations (42 C.F.R.), the unfavorable findings of the contractors are the issues before this ALJ. Both the Medicare Contractor and the QIC found, that based on the available documentation, Medicare requirements outlined in the LCD were not met. (Exh. 1, pp. 10, 31).

There is no NCD specific to TTFT. This ALJ, therefore, looks to the relevant LCD for guidance. ALJs are not bound by LCDs and will give substantial deference to the policies if they are applicable to a particular case. 42 C.F.R. § 405.1062. If an ALJ declines to follow an LCD in a particular case, the ALJ must explain the reasons why the policy was not followed. *Id.*

Ms. Prosser, in her prehearing brief, argues that the LCD L34823 does not apply to newly diagnosed glioblastoma cases. However, the LCD is silent on the type of glioblastoma and does not differentiate between newly diagnosed and recurrent glioblastoma. Consequently, LCD L34834 is applicable to this case, and I decline to follow it for multiple reasons. TTFT has been shown to be safe and effective for use in patients with recurrent and newly diagnosed glioblastoma, and it is medically reasonable and necessary to treat Ms. Prosser's condition.

LCD L34834 denies coverage for tumor treatment field therapy as not reasonable and necessary, omitting entirely the literature references in the prior LCDs. Data from the FDA, phase III clinical trials, and NCCN guidelines show the LCD, at best, is behind the medical literature curve – at least as applied to Ms. Prosser. The *Medicare Program Integrity Manual* (CMS Pub. 100-08) (*MPIM*) provides more appropriate, relevant, and helpful guidance for making a determination as to whether an item or service is reasonable and necessary, and not experimental or investigational. *MPIM*, Ch. 13 at § 13.5.1.

---

[8] This latest version of the LCD, omits entirely the literature previously shown in the 2016 LCD (an update from the 2015 version, which is not markedly distinguishable).

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 119 of 631   Document 11-5          4350

Applying that guidance, this ALJ first finds that the Optune device received FDA premarket approval for use in patients with recurrent glioblastoma on April 8, 2011. On October 5, 2015, the FDA gave premarket approval for use of Optune in patients with newly diagnosed glioblastoma. Premarket approval (PMA) entails the following:

> PMA is the most stringent type of device marketing application required by FDA. The applicant must receive FDA approval of its PMA application prior to marketing the device. PMA approval is based on a determination by FDA that the PMA contains sufficient valid scientific evidence to assure that the device is safe and effective for its intended use(s).[9]

While FDA premarket approval does not establish that the device is medically reasonable and necessary pursuant to Medicare requirements, it does ensure that the FDA has closely examined the device and its application. The FDA determined that sufficient scientific evidence existed to provide the FDA with assurance that the device was safe and effective for its intended use both in patients with recurrent and newly diagnosed glioblastoma. From this perspective, the use of the device meets Medicare guidance requiring that a device be proven safe and effective based on authoritative evidence.

Medicare does not pay for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member. Social Security Act § 1862(a)(1). To be reasonable and necessary, the procedure must be safe and effective and not experimental. The FDA approval, along with the other evidence below, supports the conclusion that the device is safe, and not experimental or investigational.

Second, this ALJ has reviewed clinical studies in the record related to the use of the Optune device. With respect to patients newly diagnosed with glioblastoma, results of a phase III study released in a December 15, 2015, JAMA article showed that adding TTFT to maintenance temozolomide significantly prolonged progression-free and overall survival. Significantly, patients in the control group in the JAMA-reported study crossed over to the combined therapy group for TTFT treatment due to the improvement in outcomes seen. The results from these phase III trials also led to FDA approval for the Optune device. These trials showed that the Optune device was safe, non-investigational and effective. It is noteworthy that the 2015 study contains proof of efficacy. These trials show that the Optune device is appropriate for treatment of Ms. Prosser's glioblastoma.

Third, the use of TTFT is generally accepted by the medical community. In the 2015 version of the National Comprehensive Cancer Network Clinical Practice Guidelines in Oncology Central Nervous System Cancers guidelines, alternating electric field therapy is a treatment option suggested for glioblastoma. This suggestion was found in a treatment guideline from a national cancer organization, not evidence based on an individual physician treating a single patient in a clinical setting. As such, TTFT treatment is generally accepted in the medical community as safe and effective for the treatment of recurrent glioblastoma.

---

[9] http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketApprovalPMA/default.htm

ALJ Appeal No. 1-8416188648

Overall, a review of the literature available supports that the Optune device is safe and effective and not investigational/experimental. The use of the Optune device in populations with recurrent glioblastoma or newly diagnosed glioblastoma was proven effective and appropriate through phase III clinical trials. The use of the Optune device appears in national cancer treatment guidelines for treatment of glioblastoma, showing general acceptance by the medical community. A number of commercial health plans also now cover TTFT. (Exh. 5, pp. 692-1,421).

For the reasons stated above, Optune (TTFT) has been shown to be safe and effective, and is not experimental. Medicare coverage is thus available for the tumor treatment field therapy.

### Conclusions of Law

Medicare coverage exists for the Optune Tumor Treatment Field Therapy services (E0766) provided to the Beneficiary for dates of service August 16, 2018, September 16, 2018, and October 16, 2018.

### Order

The Medicare Contractor shall process the claim in accord with this decision.

IT IS SO ORDERED.

Dated: **MAY 1 6 2019**

**Kimberley Woodyard**
U.S. Administrative Law Judge

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 121 of 631   Document 11-5      4352



## Department of Health and Human Services
### OFFICE OF MEDICARE HEARINGS AND APPEALS
### Kansas City Field Office
### Kansas City, Missouri

| | | | |
|---|---|---|---|
| Appeal of: | **A. Prosser** | ALJ Appeal No.: | **1-8416188648** |
| Beneficiary: | **A. Prosser** | Medicare Part: | **B** |
| Date of Service: | **Aug., Sept., Oct. 16, 2018** | | |
| HICN: | **\*\*\*\*4857A** | Before: | **Kimberley Woodyard** |
| RFH Date: | **March 29, 2019** | | U.S. Administrative Law Judge |

## EXHIBIT LIST[1]

| Exhibit | Description | Pages |
|---|---|---|
| 1 | Initial, Redetermination and Reconsideration Documents | 1-35 |
| 2 | Medical Records/Evidence Received by CMS Contractors | 1-4 |
| 3 | Request for Hearing | 1-12 |
| 4 | OMHA Proceedings:<br>• Notice of Hearing, Exhibit List, and blank response form<br>• Response to NOH (Appellant)<br>• Pre-Hearing Brief (Appellant) | 1-20 |
| 5 | Literature and Reports Received by CMS Contractors | 1-1876 |
| 6 | New Evidence April 17, 2019, Submission. (Documents and Disk) | 1-341 + 1 CD |

Dated: 5/16/2019

---

[1] If any records are dual-sided, the second side of the page is not included in the page count.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 122 of 631   Document 11-5      4353

# OMHA PROCEEDINGS
# EXHIBIT
# 4

From:OMHA Miami            To:914125616253      04/19/2019 08:24   #440 P.012/016

2018321251632



# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## Office of Medicare Hearings and Appeals

### RESPONSE TO NOTICE OF HEARING

**Instructions:** Complete sections 2 through 6 below, as applicable, and return this form to the assigned Administrative Law Judge (ALJ) within 5 days of receiving the notice of hearing. For expedited Part D hearings, contact the ALJ at the telephone number provided at the top of the notice of hearing or complete and return this form to the ALJ within 2 days of receiving the notice of hearing. The return mailing address and fax number are at the top of the notice of hearing. You do not need to include the notice of hearing with your response.

Please note that only a party to the hearing may call witnesses; object to the time, place, or type of hearing; object to the statement of issues to be decided by the assigned ALJ (sections 4 through 6 below). Non-party participants are not permitted to call witnesses and may not file objections.

## Section 1: Hearing Information. [TO BE COMPLETED BY THE OFFICE OF MEDICARE HEARINGS AND APPEALS]

| OMHA Appeal Number | Appellant | |
|---|---|---|
| 1-8390277469 | A. PROSSER | |

| Type of Hearing | | Assigned ALJ |
|---|---|---|
| ☒ Telephone  ☐ Video-Teleconference (VTC)  ☐ In-Person | | J. Grow |

| Hearing Day of Week | Hearing Date | Hearing Time |
|---|---|---|
| **Monday** | **05/20/2019** | **2:00 PM Eastern Time** |

| Telephone Hearing Call-In Number *(If applicable)* | Passcode or Collaboration Code *(for telephone hearing)* |
|---|---|
| **844-892-5247** | **7867923633** |

| VTC or In-Person Hearing Address *(If applicable)* | City | State | ZIP Code |
|---|---|---|---|
| | | | |

## Section 2: What is the responding party's or participant's information? *(Representative information in next section)*

| Name *(First, Middle Initial, Last)* | Firm or Organization *(If applicable)* | Telephone Number |
|---|---|---|
| | | |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| | | | |

If the respondent is an entity or organization, please list all individuals who plan to attend the hearing and the capacity in which they are attending:

## Section 3: What is the representative's information? *(Skip if you do not have a representative)*

| Name | Firm or Organization *(If applicable)* | Telephone Number |
|---|---|---|
| Debra M. Parrish | Parrish Law Offices | 412-561-6250 |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| 788 Washington Road | Pittsburgh | PA | 15228 |

## Section 4: Will you be present at the time and place shown above? *(Check one)*

☒ I will be present at the time and place shown on the notice of hearing. If an emergency arises after I submit this response and I cannot be present, I will notify the ALJ at the telephone number shown at the top of the notice of hearing as soon as possible.

☐ I cannot be present at the time and place shown on the notice of hearing and would like to request that my hearing be rescheduled. I understand that the ALJ has the discretion to change the time and place of the hearing as long as my explanation for my request to reschedule meets the good cause standard for changing the time and place of the hearing. (For example, good cause may be found due to an inability to attend the hearing because of a serious physical or mental condition, incapacitating injury, or death in the family or if severe weather conditions make it impossible to travel to the hearing. See 42 C.F.R. sections 405.1020(f) and (g), and 42 C.F.R. sections 423.2020(f) and (g) for additional circumstances that may establish good cause.) I understand that if I am the appellant and the hearing is postponed at my request, the time between the originally scheduled hearing date and the new hearing date is not counted toward any applicable adjudication period.

I would like to reschedule my hearing for the following date and time, and I have good cause to reschedule my hearing because:

☐ I want to waive my right to appear at the ALJ hearing. *(Please complete form OMHA-104 and attach it to this response.)*

OMHA-102 (08/17)                     Page 1 of 2                    PSC Publishing Services (301) 443-6740. EF

From:OMHA Miami          To:914125616283      04/19/2019 09:25    #440 P.013/015

**Section 5: Do you intend to call any witnesses to provide testimony at the hearing?**

☐ No.

☒ Yes, I intend to call the following witnesses (*attach a continuation sheet if necessary*):

Tim Parks, RN, Clinical Appeals Specialist

**Section 6: Do you object to any of the following conditions?** (*Check all that apply*)

☐ I object to the type of hearing scheduled. If you are an unrepresented beneficiary or enrollee, and a telephone hearing is scheduled, you have the right to request that a VTC hearing be held instead if VTC technology is available. For all other parties, if a telephone hearing is scheduled, the ALJ may find good cause for an appearance by VTC if he or she determines that VTC is necessary to examine the facts or issues involved in the appeal.

If a telephone or VTC hearing is scheduled and the party, including an unrepresented beneficiary or enrollee, requests that an in-person hearing be held instead, the ALJ, with the agreement of the Chief ALJ or designee, may find good cause for an in-person hearing if VTC or telephone technology is not available, or if special or extraordinary circumstances exist.

I object to the type of hearing scheduled and request a (check *one*) ☐ VTC *or* ☐ In-person hearing because:

Note: No explanation is required if you are an unrepresented beneficiary or enrollee requesting a VTC hearing.

☐ I object to the issues described in the notice of hearing. I understand that I must send a copy of my objection to the issues to all the other parties who were sent a copy of the notice of hearing, and to CMS or a CMS contractor that elected to be a party to the hearing (if you do not have these addresses, please contact the ALJ's adjudication team at the telephone number shown at the top of the notice of hearing). I understand that the ALJ will make a decision on my objection either in writing, at a prehearing conference, or at the hearing.

I object to the issues described in the notice of hearing because:

☐ I object to the ALJ assigned to my appeal. I understand that an ALJ cannot adjudicate an appeal if he or she is prejudiced or partial with respect to any party or has an interest in the matter pending for decision, and that I may object to the ALJ assigned to my appeal for these reasons. I understand that the ALJ will consider my objection and decide whether to proceed with the appeal or withdraw. I understand that if I object to the ALJ assigned to my appeal, and the ALJ subsequently withdraws from the appeal, another ALJ will be assigned, and any applicable adjudication time frame will be extended by 14 calendar days.

I object to the assigned ALJ because:

**Section 7: If you are the appellant, do you want to waive or extend the time frame to decide your appeal?** (*If yes, check one*)

☐ I want to waive the time frame for the ALJ to decide my appeal. I understand that by waiving this time frame, the ALJ does not have to decide my appeal within any applicable adjudication period that would otherwise apply.

☐ I want to extend the time frame for the ALJ to decide my appeal. I want the time frame to be extended _____ calendar days beyond any applicable adjudication period.

**Section 8: Sign and date this form.**

| Party, Participant or Representative Signature | Date |
|---|---|
| Debra M Parish RPA | 4/23/2019 |

**Privacy Act Statement**

The legal authority for the collection of information on this form is authorized by the Social Security Act (section 1155 of Title XI and sections 1852(g)(5), 1860D-4(h)(1), 1869(b)(1), and 1876 of Title XVIII). The information provided will be used to further document your appeal. Submission of the information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your appeal. Information you furnish on this form may be disclosed by the Office of Medicare Hearings and Appeals to another person or governmental agency only with respect to the Medicare Program and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services and other agencies.

## If you need large print or assistance, please call 1-855-556-8475

OMHA-102 (08/17)                    Page 2 of 2                    PSC Publishing Services (301) 443-6740. EF

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 125 of 631   Document 11-5

4356

**DEBRA M. PARRISH, P.C.**
**788 WASHINGTON ROAD**
**PITTSBURGH, PA 15228**
**PHONE: (412) 561-6250**
**FAX: (412) 561-6253**

## FAX TRANSMITTAL

**TO:**          Judge Grow

**FAX NO.:**    305-536-5044

**FROM:**      Debra M. Parrish

**DATE:**       April 23, 2019

**TOTAL NUMBER OF PAGES INCLUDING COVER LETTER: 3**

Please contact Tanya Terza at (412) 561-6250 if there is a problem with transmission.

**RE:**  **Response to Notice of Hearing**
     **Beneficiary:  A. Prosser**
     **Appellant:  A. Prosser**
     **ALJ Appeal No. 1-8390277469**
     **Our Reference:  19-51**

**ALJ Grow Team:**

Please find attached the Response to Notice of Hearing for the above-captioned case.  If you have any questions, please do not hesitate to contact us at (412) 561-6250.

> Please note:  There are multiple dates of service on this appeal.  The Notice of Hearing only referenced one.
> 1/16/18
> 2/16/18
> 3/16/18
> 4/16/18

Kind regards,
Debra M. Parrish
Bridget Noonan
Phone:  (412) 561-6250
Fax:  (412) 561-6253

This facsimile transmission contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for the use of the Addressee(s) named above.  If you are not the intended recipient of this facsimile, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original facsimile to us at the address above via the U.S. Postal Service.  Thank you.

# PARRISH LAW OFFICES

788 Washington Road
Pittsburgh, Pennsylvania 15228-2021
www.dparrishlaw.com

412.561.6250
Fax 412.561.6253
E-mail: info@dparrishlaw.com

April 29, 2019

***VIA PRIORITY MAIL***

Judge Joseph Grow
Office of Medicare Hearings and Appeals
Miami Field Office
51 SW 1st Avenue, Suite 1536
Miami, FL 33130-1608

          **RE:**   **Prehearing Brief**
                 **ALJ Appeal No. 1-8390277469**
                 **Appellant/Beneficiary: A. Prosser**
                 **Service: E0766**
                 **Dates of Services: 1/16/18, 2/16/18, 3/16/18, 4/16/18**
                 **Hearing Date: 5/20/2019**
                 **Our Ref. No.: 19-51**

Dear Judge Grow:

      In anticipation of the scheduling of the hearing for the above-captioned case, please find attached a prehearing brief to assist in your analysis.

      If you have any questions regarding the foregoing, please do not hesitate to contact me at (412) 561-6250. We appreciate your consideration.

                    Respectfully submitted,

                    Debra M. Parrish
                    Attorney for A. Prosser

Enclosures:
      Prehearing Brief

  cc:   Ms. Prosser

**PREHEARING BRIEF - JUDGE J. GROW**
**ALJ APPEAL NO. 1-8390277469**
**APPELLANT: A. PROSSER**
**DOS: 1/16/2018 through 4/16/2018**
**HEARING DATE: May 20, 2019**
**April 29, 2019**



## A. Background

Ms. Anniken Prosser is a 35-year-old wife and mother to Liam, age 6. She wrote lyrics for and sang in various bands until she was diagnosed with a glioblastoma in February 2016. Her clinician prescribed chemotherapy, radiation, and surgery to treat her glioblastoma (GBM). Ms. Prosser started using the Optune device in June 2016 to treat her GBM. The supplier submitted claims for the Optune system to the relevant Durable Medical Equipment Contractor (DME MAC) which denied the claims.

The QIC denied the claims asserting "the medical documentation of the efficacy of this device is not within the usual scope and breath (sic) of current medical literature with peer acknowledgement and review." The QIC also asserted that the studies were "not non-biased" because they were supported by Novocure, and there were few clinical trials. Finally, the QIC asserted that although an LCD reconsideration request had been deemed valid, LCD L34823 has not been revised and is still in effect. As described more fully below, the denial is inconsistent with Medicare coverage criteria and the record.

### 1. Glioblastoma Multiforme (GBM)

Glioblastoma is the most common form of primary brain cancer, but is still very rare (~10,000 cases annually in the U.S.). The National Institutes of Health (NIH) designate glioblastoma multiforme as a rare disease, with few treatment options. See e.g., https://rarediseases.info.nih.gov/diseases/2491/glioblastoma. GBM tumors are typically highly aggressive. Survival at initial presentation is approximately 10 months, and upon recurrence, approximately 6 months, even with aggressive chemotherapy.[1] Because it is extremely rare for glioblastoma to metastasize, it is efficient to treat the disease with regional therapy as part of the treatment strategy.

### 2. Optune (formerly NovoTTF-100A System)

Optune, previously known as the NovoTTF-100A System, is durable medical equipment that delivers alternating electric fields or Tumor Treating Fields to the brain. The device consists of an electric field generator which is connected to four insulated transducer arrays. The arrays are placed on the patient's scalp and deliver the Tumor Treating Fields Therapy ("TTFT") to the patient's glioblastoma. Basically, the fields slow the replication of the cancer cells or stop their growth all together. The fields may also destroy some of the cancer cells.

Optune is FDA-approved for recurrent and newly diagnosed glioblastoma multiforme (GBM) brain tumors. On January 1, 2014, CMS classified the Optune device as DME requiring frequent and substantial servicing, which is billed under HCPCS code E0766 as a monthly rental

---

[1] Rulseh et al. "Long-term survival of patients suffering from glioblastoma multiforme treated with tumor-treating fields." World Journal of Surgical Oncology at 1 (2012).

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 128 of 631   Document 11-5      4359

PREHEARING BRIEF - JUDGE J. GROW
ALJ APPEAL NO. 1-8390277469
APPELLANT: A. PROSSER
DOS: 1/16/2018 through 4/16/2018
HEARING DATE: May 20, 2019
April 29, 2019



through the duration of medical necessity. Optune has been shown to extend the lives of patients suffering from glioblastoma tumors.

### B. Literature/Professional Societies

Optune is the subject of numerous peer-reviewed published studies that demonstrate the safety and efficacy of the Optune system and TTFT generally. The studies are reported in some of the most prestigious journals in our country including JAMA (the Journal of the American Medical Association). See submitted studies. Optune is included in the National Comprehensive Cancer Network (NCCN) guidelines for recurrent glioblastoma and for newly diagnosed GBM in combination with temozolomide. See submitted guidelines. The studies concluded the following:

- The final analysis of the randomized phase 3 trial (695 patients) found that the addition of Optune to standard chemotherapy treatment "resulted in statistically significant improvement in progression-free survival and overall survival" over patients that were treated with chemotherapy alone. Stupp et al. at 2315 (JAMA 2017). See also, interim analysis of 315 patients from this study (adding Optune to maintenance chemotherapy "significantly prolonged progression-free and overall survival"). Stupp et al. at 2542 (JAMA 2015).

- These important results come after a ten-year period of more than 23 randomized trials of new treatment modalities or products for glioblastoma that all "failed to demonstrate improved survival." JAMA 2017 at 2314-2315.

- Remarkably, adding Optune to traditional chemotherapy treatment "resulted in statistically significant longer deterioration-free survival in global health status, physical and emotional functioning, pain, and weakness of legs." Taphoorn et al. at E7 (JAMA Oncology 2018).

- As far back as 2012, researchers reported that in a study of 237 patients that received either Optune treatment or chemotherapy that the treatment was at least as effective as chemotherapy alone in terms of median survival, without the toxicity risks. Stupp et al. at 8-9 (European J of Cancer 2012).

To the extent the QIC denied the claim based on the lack of quantification of effectiveness of the device generally, the peer-reviewed literature shows the opposite. Indeed, the Data Safety Monitoring Board for the clinical trial for newly diagnosed glioblastoma (*and patients that suffered recurrences during the trial*) found the data so compelling, they recommended early termination and allowing patients who were not receiving the treatment to be able to cross over and receive the treatment, deeming it unethical to withhold it. The FDA agreed. The outcomes data from this trial represents results for both newly diagnosed patients and those that suffered recurrences during the trial. Please see the attached bibliography

PREHEARING BRIEF - JUDGE J. GROW
ALJ APPEAL NO. 1-8390277469
APPELLANT: A. PROSSER
DOS: 1/16/2018 through 4/16/2018
HEARING DATE: May 20, 2019
April 29, 2019



regarding TTFT which shows numerous peer-reviewed articles published on TTFT and its clinical application. Contrast the foregoing with the exhibit list reflecting that the DMAC has not considered any of the literature or evidence that has been published in the past four years.

### A. The QIC's assertions regarding peer-acknowledgement is belied by the evidence.

The QIC asserted, "The medical documentation in support of efficacy is not within the usual scope and brea[d]th of current medical literature with peer acknowledgement and review." Respectfully, the sentence and logic are difficult to follow. In terms of the breadth and scope of the peer-reviewed literature, a PubMed search reveals over 100 peer-reviewed articles ranging from randomized controlled trials, to case reports, to meta-analyses. The scope and breadth are particularly remarkable given the orphan status of the disease. In the past 10 years, TTFT was the only positive clinical trial and breakthrough treatment in glioblastoma. The pivotal studies were published in the Journal of the American Medical Association (JAMA), one of the most prestigious journals in the United States and one of the most cited journals in the world. Certainly, in view of the number of publications and the prestigious peer-reviewed articles that exist, it is difficult to understand the QIC's assertion that the studies do not have peer acknowledgement and review. Further, the peer-reviewed literature was and is so strong, that TTFT enjoys a level one recommendation in the NCCN guidelines. A cursory review of the NCCN guidelines reflects that less than ten percent of cancer treatments enjoy such "acknowledgement." Finally, based on the strength of the outcomes seen, the Data Safety Monitoring Board (DSMB) recommended early termination of the clinical trial so that those in the control arm of the clinical trial could cross over and receive treatment. This was so because it would have been unethical to withhold this life-saving treatment from the control group. Thus, the effectiveness of the treatment certainly enjoyed the "acknowledgement and review" of the DSMB and the FDA.

### B. The QIC's assertions regarding the clinical trials are belied by the evidence.

The QIC asserted, "[m]ore specifically, the QIC has reviewed the peer reviewed and evidence based literature relative to clinical trials for TTFT, and has found the literature and clinical trials to be limited in number and the clinicals trial not non-biased; that is, the clinical trials were not independent, but funded by Novocure." Respectfully, the sentence and logic are difficult to follow. As noted above, GBM is an orphan disease with a difficult prognosis. More than one randomized controlled clinical trial was performed and reported in the peer-reviewed literature and more than 50 articles regarding TTFT for glioblastoma have been reported in the peer-reviewed literature. One of the seminal clinical trials resulted in multiple publications in the Journal of the American Medical Association, one of the most prestigious journals in the United States. On March 6, 2019, the Contractor Advisory Committee (CAC) recommended Medicare coverage of TTFT.[2] The experts found that the peer-reviewed literature shows the

---

[2] See https://med.noridianmedicare.com/web/jddme/policies/lcd/contractor-advisory-committee.

PREHEARING BRIEF - JUDGE J. GROW
ALJ APPEAL NO. 1-8390277469
APPELLANT: A. PROSSER
DOS: 1/16/2018 through 4/16/2018
HEARING DATE: May 20, 2019
April 29, 2019



treatment is safe and effective. The experts did not find that the studies were limited in number or biased.

With respect to the "not non-biased" assertion, it is unclear if the QIC is attempting to assert that the manufacturer's funding of the clinical trials resulted in biased publications that could not support Medicare coverage. The studies were conducted at some of the most prestigious academic institutions in the United States by academic researchers. Most of the published clinical research on a medical intervention is sponsored in the United States. Indeed, Medicare often requires industry to sponsor certain studies as a condition of Medicare coverage. A cursory review of the literature supporting most LCDs shows that they are industry-sponsored studies. Industry sponsorship does not make a peer-reviewed study, written by academic authors, "not non-biased" such that the study cannot support Medicare coverage. If such a standard applied, Medicare would be precluded from considering most of the peer-reviewed literature published with respect to a technological advancement – an absurd result.

With respect to the number of clinical trials, Appellant notes that GBM is an orphan disease with a high mortality rate. Because the treatment is so effective, the FDA deemed it unethical to continue a study that withheld such an effective treatment from those battling a fatal disease. This is consistent with the Declaration of Helsinki, paragraph 18.[3] The CAC recognized that just as the FDA deemed it unethical to continue the clinical trial, it would be unethical to even begin more clinical studies which involved withholding a proven effective treatment for a fatal disease. A "limited number" of clinical trials is common when a treatment is proven so effective for a fatal condition. After the first study determining that a tourniquet is an effective treatment to prevent people from dying from arterial bleeding, ethically, a second study cannot be conducted. Likewise, with TTFT, given the conclusive effectiveness, additional trials that withhold the treatment cannot be conducted ethically.

## C.   Widespread Adoption

Based on the strength of the peer-reviewed literature and the lack of medical alternatives, the Optune system has been certified at more than 800 cancer treatment centers, and has been prescribed by over 1100 physicians in 50 states, the District of Columbia, and Puerto Rico, for over 7200 patients. Virtually every major payor in the United States covers the Optune system for individuals diagnosed with a glioblastoma. These payors include, among others, Highmark, Aetna, Anthem, Humana, Kaiser, UnitedHealthcare, Cigna, Harvard Pilgrim, Geisinger,

---

[3] See World Medical Association Declaration of Helsinki Ethical Principles for Medical Research Involving Human Subjects: "When the risks are found to outweigh the potential benefits or when there is conclusive proof of definitive outcomes, physicians must assess whether to continue, modify or immediately stop the study." The Declaration of Helsinki finds its roots in the Nuremberg Code which required informed consent for human clinical trials after the horrific experiments conducted in concentration camps during WWII. The quoted section has been interpreted to preclude continuation of a clinical trial when effectiveness has been established for a fatal illness.

PREHEARING BRIEF - JUDGE J. GROW
ALJ APPEAL NO. 1-8390277469
APPELLANT: A. PROSSER
DOS: 1/16/2018 through 4/16/2018
HEARING DATE: May 20, 2019
April 29, 2019

HealthPartners, and several Blue Cross plans. TTFT is used in 59 of the 62 NCI-designated cancer centers.

Indeed, support for the effectiveness and widespread adoption of the TTFT device is illustrated in CMS' assignment of a HCPCS code to the technology. When an existing HCPCS code does not adequately describe a device, a supplier applies to the HPCPS workgroup for a new HCPCS code. The code communicates relevant coverage decisions and criteria, fee schedule amounts, and billing information. In view of the criteria required to get a new HCPCS code, it is difficult for a DME device to obtain a HCPCS code. A review of the 2016-2017 DMEPOS HCPCS application summary documents reflects that only five new HCPCS codes were established although there were 63 new-code requests.[4]

For the HCPCS workgroup to award a HCPCS code for a device, CMS must have information that shows the technology (a) is deemed safe and effective by the FDA, (b) clinical studies demonstrate its use results in a significantly improved medical outcome or a significantly superior clinical outcome, (c) it is significantly functionally or therapeutically different from already-coded DME, and (d) has achieved sufficient adoption by the relevant medical community to justify the "administrative burden" of adding a new HCPCS code. See HCPCS Decision Tree attached to the request for hearing. Thus, CMS considers coverage criteria when awarding a HCPCS code.[5]

### D. The LCD

LCD L34823 does not reflect consideration of the required elements or provide a rationale. An LCD that on its face fails to conform to the requirements of the Medicare Program Integrity Manual, Ch. 13, is not entitled to deference. Accordingly, LCD L34823 is not entitled to deference. Importantly, LCD L34823 is also currently the subject of an LCD reconsideration and challenge request (Civil Remedies Division Docket No. C-19-396). As noted in the reconsideration request, the DME MAC medical directors have stated L34823 does not apply to cases of newly diagnosed glioblastoma (see Att. C to the reconsideration request).

As noted in the QIC decision, an LCD that challenges the standard of practice in a community must be based on sufficient evidence to convincingly refute evidence in support of coverage. In view of the LCD's obvious failure to reflect the peer-reviewed literature, consensus of experts, and acceptance by the relevant medical community (mandatory considerations for a valid LCD), the LCD should not be used to preclude Medicare coverage of a device that meets Medicare's coverage criteria and which is reasonable and medically necessary to treat Ms. Prosser's GBM.

---

[4] Revision requests were not included in the total number of code applications. June 7, 2017 and June 8, 2017 DMEPOS HCPCS Application Summaries available at:
https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/HCPCS-Application-Summaries.html.
[5] See www.ncbi.nlm.gov/PMC/articles/PMC3865619 for an article "HCPCS Coding: An Integral Part of Your Reimbursement Strategy" by Marcia Nusgart.

PREHEARING BRIEF - JUDGE J. GROW
ALJ APPEAL NO. 1-8390277469
APPELLANT: A. PROSSER
DOS: 1/16/2018 through 4/16/2018
HEARING DATE: May 20, 2019
April 29, 2019



Notably, Administrative Law Judges are not bound by LCDs. 42 C.F.R. § 405.1062. Given the beneficiary's limited treatment options and the rarity of the disease, in addition to the compelling support for the effectiveness of the device as represented by clinical study outcomes, professional societies' statements and policies, the FDA's approval, and other payors' policies, Appellant believes the LCD should not be deferred to for Ms. Prosser's claims.

### E.   Reimbursement Amount

If Medicare coverage is found, payment for DME is made under a regulation, 42 C.F.R. §414.210(a), which states that:

> . . . *Medicare pays for [DME] . . .on the basis of 80 percent of the lesser of:*
>
> > *(1) the actual charge for the item; [or]*
> > *(2) the fee schedule amount for the item, as determined in accordance with §§414.220 through 414.232.*

Because no fee schedule exists, payment is 80% of the amount billed. See also Medicare Appeal Council Decision for ALJ 1-178898474.

### F.  Conclusion

This is the technology that clinicians treating central nervous system tumors have embraced. No basis exists to deny Medicare coverage of a device that is shown in the peer-reviewed literature to be a safe and effective treatment for glioblastoma, a life-threatening condition. The Optune system was approved as safe and effective by the FDA. The peer-reviewed literature further supports its efficacy and the improved clinical outcome of patients who use the device. It is incorporated in the NCCN guidelines (considered the gold standard for cancer care), and it enjoys widespread adoption by clinicians and all the major payors in the United States based on the foregoing. The Medicare beneficiary has no reasonable medical alternatives. The claims should be approved.

Attachment:   CD containing:
              *Textbook Chapters*
              *2018 & 2019 Publications*
              *Bibliography*
              *LCD Record Exhibit List*

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 133 of 631   Document 11-5   4364



Department of Health and Human Services
Office of the Secretary

201921120340c

## OFFICE OF MEDICARE HEARINGS AND APPEALS

Miami Field Office
51 SW 1st Avenue, Suite 1536
Miami, FL 33130-1608
786-792-3700 (Main)
786-792-3791 (ALJ Grow Team)
305-536-5044 (Fax)
866-622-0382 (Toll Free)

April 19, 2019

A. PROSSER
W2973 FARMSTEAD DR
APPLETON, WI 54915-8120

### NOTICE OF HEARING

| | |
|---|---|
| Appellant: | **A. PROSSER** |
| Beneficiary: | **A. PROSSER** |
| Medicare Number: | **\*\*\*\*\*4857A** |
| Date(s) of Service: | **01/16/2018–01/16/2018** |
| OMHA Appeal Number: | **1-8390277469** |
| Administrative Law Judge: | **J. Grow** |

A hearing in the above appeal is scheduled for:

| | |
|---|---|
| Hearing Date: | **Monday May 20, 2019** |
| Hearing Time: | **2:00 PM Eastern Time** |

You are scheduled to appear by: ☒ Telephone
☐ Video-Teleconference (VTC)
☐ In-Person

## You must call 844-892-5247 at the designated time of the hearing and enter 7867923633 when asked for a passcode or collaboration code. Failure to call at the scheduled time will be considered a failure to appear for the hearing.

### What do I do next?

You must respond to this notice within 5 calendar days of receipt. You are encouraged, but not required, to use the enclosed *Response to Notice of Hearing* (form OMHA-102) when responding. If you are a party to the appeal, your response must indicate whether you plan to attend the scheduled hearing, or whether you object to the proposed time and/or place of the hearing. If applicable, you must specify who else from your organization or entity plans to attend the hearing and in what capacity, and list any witnesses who will be providing testimony.

OMHA-1024              Page 1 of 5

If you are an employee of CMS or a CMS contractor and wish to attend the hearing as a participant, your response must indicate that you plan to attend the hearing and specify each individual who plans to attend.

## What if I object to the type of hearing?

If you are a party to the appeal and you object to the type of hearing scheduled, please complete section 6 of the enclosed *Response to Notice of Hearing*, and indicate what type of hearing you would prefer (if you are also requesting to change the time of your scheduled hearing, see the section below titled "What if I can't attend my scheduled hearing?"). No explanation is required if you are an unrepresented beneficiary or enrollee requesting to appear by VTC. For all other requests for a VTC hearing, and any requests for an in-person hearing, you must explain why you object to the type of hearing scheduled. If the Administrative Law Judge changes the type of hearing, an amended notice of hearing will be sent to the parties and any potential participants who were sent a copy of this notice.

## What if I can't attend my scheduled hearing?

If you are a party to the appeal and you cannot attend the hearing at the scheduled time and place, please call our office immediately at the direct dial phone number at the top of this notice. Please *also* complete section 4 of the enclosed *Response to Notice of Hearing* and explain why you are unable to attend the hearing at the scheduled time and place. If the Administrative Law Judge finds good cause to reschedule the hearing, an amended notice of hearing will be sent to the parties and any potential participants who were sent a copy of this notice.

## What if I don't attend my scheduled hearing?

If you are the appellant and neither you nor your representative appears at the scheduled hearing, the Administrative Law Judge may dismiss your request for hearing unless good cause for the failure to appear is found. If you respond to this notice of hearing and fail to appear, you must contact the Administrative Law Judge within 10 calendar days after the hearing and provide a good cause reason for not appearing. If you do not respond to this notice of hearing and fail to appear, the Administrative Law Judge will send you a notice asking why you did not appear, and you will have 10 calendar days to respond. If you do not respond to the Administrative Law Judge's notice within 10 calendar days, or you do respond and the Administrative Law Judge determines you did not have good cause for failing to appear, your request for hearing will be dismissed. If the Administrative Law Judge determines that good cause exists, the hearing will be rescheduled and the time between the originally scheduled hearing date and new hearing date will not count toward the adjudication period.

## What if I don't want a hearing?

If you are a party to the appeal, you have a right to appear at the hearing to present arguments in favor of your position, and offer testimony and evidence to the Administrative Law Judge. However, if you do not wish to present your case at a hearing, you may request a decision based on the written and other evidence in the record. To do so, please complete section 4 of the enclosed *Response to Notice of Hearing*. Please also complete and submit a *Waiver of Right to an Administrative Law Judge (ALJ) Hearing* (form OMHA-104). You can find a copy of this form online at *www.hhs.gov/omha*, or you may contact our office to receive a copy. Please note

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 135 of 631   Document 11-5      4366

that your waiver does not affect the right of other parties to participate in the hearing and even if all parties waive the hearing, the Administrative Law Judge may still decide to conduct a hearing if it is necessary to decide the case. If a hearing is conducted and you do not attend, you may still offer written evidence to the Administrative Law Judge. Please see below for additional information regarding the submission of evidence.

**What if I no longer wish to pursue this appeal?**

If you decide that you no longer wish to pursue this appeal, you may withdraw your request for hearing in writing. You may do this by letter or by completing and submitting a *Withdrawal of Request for an Administrative Law Judge Hearing* (form OMHA-119). You can find a copy of this form online at www.hhs.gov/omha, or you may contact our office to receive a copy. If you submit a written request for withdrawal and no other party has filed a valid request for hearing, your appeal will be dismissed. Your request to withdraw will not be honored if a decision, dismissal or remand has already been issued.

**What issues will be addressed at the hearing?**

The issues before the Administrative Law Judge include all of the issues brought out in the initial determination, coverage determination, or organization determination; redetermination; or reconsideration that were not decided entirely in a party's favor, for the claims or other appealed matters specified in the request for hearing.

**What if I object to the issues listed above?**

If you are a party and you object to the issues, you must notify the Administrative Law Judge in writing at the earliest possible opportunity before the time set for the hearing and explain your objections. You can either do this in section 6 of the enclosed *Response to Notice of Hearing* or at a later time, but no later than 5 calendar days before the date of your scheduled hearing. You must send a copy of your objections to all the parties who were sent a copy of this notice and to CMS or any CMS contractor that has elected to be a party to the hearing. The Administrative Law Judge will make a decision on your objections either in writing, at a prehearing conference, or at the hearing.

**Can I have a representative?**

Yes. You have the right to have a representative attend the hearing on your behalf or attend the hearing with you. You can be represented by an attorney or other person. If you have a representative and have not completed and submitted an *Appointment of Representative* (form CMS-1696), which can be found online at www.hhs.gov/omha, or other written statement authorizing your representative to act on your behalf, please call our office as soon as possible.

**Can I request a copy of the case file?**

Yes. If you would like a copy of all or part of your file before the date of the hearing, please contact our office for further instructions.

**Can I submit additional evidence?**

If you want to submit additional written or other evidence, please complete and submit a *Filing of New Evidence* (form OMHA-115). You can find a copy of this form online at www.hhs.gov/omha, or you may contact our office to receive a copy. Unless you are an unrepresented beneficiary or enrollee, you must submit all evidence by the date (if any) you have specified in your request for hearing, or within 10 calendar days of receiving this notice. If evidence is submitted more than 10 calendar days after receiving this notice, any applicable adjudication period will be extended by the number of calendar days in the period between 10 calendar days after receipt of this notice and the day the evidence is received. Please note that although the 10-day submission time frame does not apply to unrepresented beneficiaries and enrollees, they may wish to submit any additional evidence as soon as possible to allow the Administrative Law Judge more time to consider the evidence before the hearing.

If you are a provider or supplier, or a beneficiary represented by a provider or supplier, and you are appealing a reconsideration issued by a Medicare Part A or Part B Qualified Independent Contractor (QIC), you must also submit a statement explaining why the evidence was not submitted prior to the issuance of the QIC's reconsideration. The Administrative Law Judge will determine whether you have good cause for submitting the evidence for the first time at the OMHA level of appeal.

**Will any experts participate or testify at the hearing?**

No experts are scheduled to testify at your hearing.

**What happens at the hearing?**

- The Administrative Law Judge will open the hearing and ask the parties, participants and any representatives to identify themselves and any witnesses they may be calling;
- The Administrative Law Judge will ask you and any other witnesses to take an oath or to affirm that the testimony is true;
- You will have the opportunity to present facts and arguments;
- If you are a party, you or your representative may present witnesses and may cross-examine the witnesses of the other parties;
- The Administrative Law Judge may question you and any other witnesses about the facts and issues;
- The Administrative Law Judge may allow you to submit additional written statements and affidavits about the matter in lieu of testimony or argument at the hearing. You must submit the additional statements and affidavits within the time frame designated by the Administrative Law Judge and provide a copy of them to the other parties to your hearing, if any, at the same time you submit them to the Administrative Law Judge;
- The Administrative Law Judge will review the issue(s) and entire record of your claim, independent of any determinations previously made on your claim; and
- The Administrative Law Judge will make an audio recording of the hearing.

**How will I know the result of my case?**

After the hearing, the Administrative Law Judge will issue a written decision, which will be mailed to all parties to the appeal, the relevant QIC or Independent Review Entity, and the Part D plan

sponsor if you are appealing a Part D coverage determination. The decision will include findings of fact, conclusions of law, and the reasons for the decision. The Administrative Law Judge will base the decision on the evidence of record, including the testimony at the hearing.

## **Whom do I contact with other questions about my hearing?**

If you have any questions about your hearing, please call or write our office. A direct-dial telephone number and mailing address are at the top of this notice. Please provide the Administrative Law Judge name and OMHA appeal number if you write to the office, or have the information available if you call.

cc:

DEBRA M PARRISH
788 WASHINGTON RD
PITTSBURGH, PA 15228

NOVOCURE INC.
195 Commerce Way
Portsmouth, NH 03801

DME MAC CGS Administrators

C2C Innovative Solutions, Inc.
DME QIC Appeals–ALJ
P.O. Box 44006
Jacksonville, FL 32231-4006

Enclosures:

CMS-1696, Appointment of Representative
OMHA-102, Response to Notice of Hearing
OMHA-105, CMS or Contractor Intent to Participate or be a Party
OMHA-115, Filing of New Evidence
OMHA-156, Exhibit list

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 138 of 631   Document 11-5      4369

| Appeal of: | **A. PROSSER** | ALJ Appeal No.: | **1-8390277469** |

| Beneficiary: | **A. PROSSER** | Medicare: | **Part B** |

| HICN: | **\*\*\*\*\*4857A** | Before: | **J. Grow**<br>Administrative Law Judge |

## EXHIBIT LIST

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBERS |
|---|---|---|
| 1 | Initial, Redetermination and Reconsideration Procedural Documents | 1-26 |
| 2 | Medical Records/Evidence Received by CMS Contractors | 1-243 |
| 3 | Request for ALJ Hearing | 1-11 |
| 4 | OMHA Proceedings | 0-0 |

Dated: 4/19/2019

OMHA-156 Page 1 of 1



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Miami, Florida**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0950

## APPOINTMENT OF REPRESENTATIVE

| Name of Party | Medicare Number (beneficiary as party) or National Provider Identifier Number (provider as party) |
|---|---|

### Section 1: Appointment of Representative

**To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):**

I appoint this individual,_____to act as my representative in connection with my claim or asserted right under title XVIII of the Social Security Act (the "Act") and related provisions of title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my appeal, wholly in my stead. I understand that personal medical information related to my appeal may be disclosed to the representative indicated below.

| Signature of Party Seeking Representation | Date |
|---|---|
| Street Address | Phone Number (with Area Code) |

| City | State | ZIP Code |
|---|---|---|

### Section 2: Acceptance of Appointment

**Ɔ be completed by the representative:**

I,_____, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the department of Health and Human Services; that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a / an _____
(Professional status or relationship to the party, e.g. attorney, relative, etc.)

| Signature of Representative | Date |
|---|---|
| Street Address | Phone Number (with Area Code) |

| City | State | ZIP Code |
|---|---|---|

### Section 3: Waiver of Fee for Representation

**Instructions: This section must be completed if the representative is required to, or chooses to waive their fee for representation.** (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge fee for representation and **must** complete this section.)

I waive my right to charge and collect a fee for representing_____before the Secretary of DHHS.

| Signature | Date |
|---|---|

### Section 4: Waiver of Payment for Items or Services at Issue

**Instructions: Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act.** (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.)

I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| Signature | Date |
|---|---|

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 141 of 631   Document 11-5

4372

**Charging of Fees for Representing Beneficiaries before the Secretary of DHHS**

An attorney, or other representative for a beneficiary, who wishes to charge a fee for services rendered in connection with an appeal before the Secretary of DHHS (i.e., an Administrative Law Judge (ALJ) hearing, Medicare Appeals Council review, or a proceeding before an ALJ or the Medicare Appeals Council as a result of a remand from federal district court) is required to obtain approval of the fee in accordance with 42 CFR 405.910(f).

The form, "Petition to Obtain Representative Fee" elicits the information required for a fee petition. It should be completed by the representative and filed with the request for ALJ hearing or request for Medicare Appeals Council review. Approval of a representative's fee is not required if: (1) the appellant being represented is a provider or supplier; (2) the fee is for services rendered in an official capacity such as that of legal guardian, committee, or similar court appointed representative and the court has approved the fee in question; (3) the fee is for representation of a beneficiary in a proceeding in federal district court; or (4) the fee is for representation of a beneficiary in a redetermination or reconsideration. If the representative wishes to waive a fee, he or she may do so. Section III on the front of this form can be used for that purpose. In some instances, as indicated on the form, the fee must be waived for representation.

**Approval of Fee**

The requirement for the approval of fees ensures that a representative will receive fair value for the services performed before DHHS on behalf of a beneficiary, and provides the beneficiary with a measure of security that the fees are determined to be reasonable. In approving a requested fee, the ALJ or Medicare Appeals Council will consider the nature and type of services rendered, the complexity of the case, the level of skill and competence required in rendition of the services, the amount of time spent on the case, the results achieved, the level of administrative review to which the representative carried the appeal and the amount of the fee requested by the representative.

**Conflict of Interest**

Sections 203, 205 and 207 of Title XVIII of the United States Code make it a criminal offense for certain officers, employees and former officers and employees of the United States to render certain services in matters affecting the Government or to aid or assist in the prosecution of claims against the United States. Individuals with a conflict of interest are excluded from being representatives of beneficiaries before DHHS.

**Where to Send This Form**

Send this form to the same location where you are sending (or have already sent) your: appeal if you are filing an appeal, grievance if you are filing a grievance, initial determination or decision if you are requesting an initial determination or decision. If additional help is needed, contact your Medicare plan or 1-800-MEDICARE (1-800-633-4227). TTY users please call 1-877-486-2048.

CMS does not discriminate in its programs and activities. To request this publication in an alternative format, please call: 1-800-MEDICARE or email: **AltFormatRequest@cms.hhs.gov**.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0950. The time required to prepare and distribute this collection is 15 minutes per notice, including the time to select the preprinted form, complete it and deliver it to the beneficiary. If you have comments concerning the accuracy of the time estimates or suggestions for improving this form, please write to CMS, PRA Clearance Officer, 7500 Security Boulevard, Baltimore, Maryland 21244-1850.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 142 of 631   Document 11-5          4373



DEPARTMENT OF HEALTH AND HUMAN SERVICES
Office of Medicare Hearings and Appeals
FILING OF NEW EVIDENCE

**Instructions:** If you have new evidence to submit, complete this form and include it with your request for an ALJ hearing (form OMHA-100), or if you have already filed your request for an ALJ hearing or if you are a party but not the appellant, send this form to the assigned Office of Medicare Hearings and Appeals (OMHA) adjudicator (visit www.hhs.gov/omha and use the appeal status lookup tool to find your assigned adjudicator). If an adjudicator has not yet been assigned, send this form to OMHA Central Operations, Attention: New Evidence Mail Stop (visit www.hhs.gov/omha or call the number at the bottom of this form for the full mailing address).

Unless you are an unrepresented beneficiary or enrollee, any additional evidence you wish to have considered in your appeal must be submitted with your request for hearing, by the date specified in your request for hearing, or if a hearing is scheduled, within 10 calendar days of receiving the notice of hearing from OMHA. If an expedited hearing is scheduled, even if you are not represented, you must submit any additional evidence with your request for hearing, by the date specified in your request for hearing, or within 2 calendar days of receiving the notice of expedited hearing. If evidence is submitted later than the filing deadline, any applicable adjudication period will be extended by the number of calendar days in the period between the filing deadline and the date when the evidence is received.

If you are a Part D enrollee and you are submitting evidence of a change in condition that occurred after your original coverage determination was made, the OMHA adjudicator will remand (return) your case to the Part D Independent Review Entity that issued your reconsideration for a new decision.

If you are a provider, supplier, or beneficiary represented by a provider or supplier, and you are appealing a reconsideration issued by a Medicare Part A or Part B Qualified Independent Contractor (QIC), any evidence that was not submitted prior to the QIC's reconsideration must be accompanied by a statement explaining why the evidence was not previously submitted. The OMHA adjudicator assigned to your appeal will consider this statement to determine whether you had good cause for submitting the evidence for the first time at the OMHA level (for example, if the new evidence is material to an issue addressed in the QIC reconsideration that was not identified as a material issue prior to the QIC's reconsideration). If you do not include a statement explaining why the evidence was not previously submitted, or if the OMHA adjudicator determines you did not have good cause for submitting the evidence for the first time at the OMHA level, the new evidence will not be considered. *A good cause statement is not required for evidence submitted by an unrepresented beneficiary, CMS or any of its contractors, a Medicaid State agency, an applicable plan, or a beneficiary represented by someone other than a provider or supplier.*

**Section 1: What is the OMHA appeal number or the reconsideration (Medicare appeal or case) number?**

| OMHA Appeal Number (*if known*) | Reconsideration Number (*if OMHA appeal number not known*) |
|---|---|
| | |

**Section 2: What is the information for the party filing the evidence?** (*Representative information in next section*)

| Name (*First, Middle initial, Last*) | Firm or Organization (*if applicable*) | Telephone Number |
|---|---|---|
| | | |

**Section 3: What is the representative's information?** (*Skip if you do not have a representative*)

| Name | Firm or Organization (*if applicable*) | Telephone Number |
|---|---|---|
| | | |

**Section 4: What is the new evidence that you wish to submit?** Please include the evidence with this form and describe the evidence below, including the title, relevance, and date of creation. If you are required to do so, also include a good cause statement explaining why this evidence was not previously submitted. If you need additional room, continue on a separate sheet of paper.

**Section 5: Sign and date this form.**

| Party or Representative Signature | Date |
|---|---|
| | |

Privacy Act Statement

The legal authority for the collection of information on this form is authorized by the Social Security Act (section 1155 of Title XI and sections 1852(g)(5), 1860D-4(h)(1), 1869(b)(1), and 1876 of Title XVIII). The information provided will be used to further document your appeal. Submission of the information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your appeal. Information you furnish on this form may be disclosed by the Office of Medicare Hearings and Appeals to another person or governmental agency only with respect to the Medicare Program and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services and other agencies.

# If you need large print or assistance, please call 1-855-556-8475

OMHA-115 (03/17)

Page 1 of 1

PSC Publishing Services (301) 443-6740. EF

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 143 of 631   Document 11-5

4374



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Office of Medicare Hearings and Appeals**

**RESPONSE TO NOTICE OF HEARING**

---

**Instructions:** Complete sections 2 through 8 below, as applicable, and return this form to the assigned Administrative Law Judge (ALJ) **within 5 days of receiving the notice of hearing**. For expedited Part D hearings, contact the ALJ at the telephone number provided at the top of the notice of hearing **or** complete and return this form to the ALJ **within 2 days of receiving the notice of hearing**. The return mailing address and fax number are at the top of the notice of hearing. You do not need to include the notice of hearing with your response.

Please note that only a party to the hearing may call witnesses; object to the time, place, or type of hearing; object to the statement of issues to be decided at the hearing; or object to the assigned ALJ (sections 4 through 6 below). Non-party participants are not permitted to call witnesses and may not file objections.

---

**Section 1: Hearing information. [TO BE COMPLETED BY THE OFFICE OF MEDICARE HEARINGS AND APPEALS]**

| OMHA Appeal Number | Appellant |
|---|---|
| 1-8390277469 | A. PROSSER |

| Type of Hearing | Assigned ALJ |
|---|---|
| ☒ Telephone ☐ Video-Teleconference (VTC) ☐ In-Person | J. Grow |

| Hearing Day of Week | Hearing Date | Hearing Time |
|---|---|---|
| **Monday** | **05/20/2019** | **2:00 PM Eastern Time** |

| Telephone Hearing Call-in Number (*if applicable*) | Passcode or Collaboration Code (*for telephone hearing*) |
|---|---|
| **844-892-5247** | **7867923633** |

| VTC or In-Person Hearing Address (*if applicable*) | City | State | ZIP Code |
|---|---|---|---|
| | | | |

---

**Section 2: What is the responding party's or participant's information?** (*Representative information in next section*)

| Name (*First, Middle initial, Last*) | Firm or Organization (*if applicable*) | Telephone Number |
|---|---|---|
| | | |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| | | | |

If the respondent is an entity or organization, please list all individuals who plan to attend the hearing and the capacity in which they are attending:

---

**Section 3: What is the representative's information?** (*Skip if you do not have a representative*)

| Name | Firm or Organization (*if applicable*) | Telephone Number |
|---|---|---|
| | | |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| | | | |

---

**Section 4: Will you be present at the time and place shown above?** (*Check one*)

☐ **I will be present at the time and place shown on the notice of hearing.** If an emergency arises after I submit this response and I cannot be present, I will notify the ALJ at the telephone number shown at the top of the notice of hearing as soon as possible.

☐ **I cannot be present at the time and place shown on the notice of hearing and would like to request that my hearing be rescheduled.** I understand that the ALJ has the discretion to change the time and place of the hearing as long as my explanation for my request to reschedule meets the good cause standard for changing the time and place of the hearing. (For example, good cause may be found due to an inability to attend the hearing because of a serious physical or mental condition, incapacitating injury, or death in the family or if severe weather conditions make it impossible to travel to the hearing. *See* 42 C.F.R. sections 405.1020(f) and (g), and 42 C.F.R. sections 423.2020(f) and (g) for additional circumstances that may establish good cause.) I understand that if I am the appellant and the hearing is postponed at my request, the time between the originally scheduled hearing date and the new hearing date is not counted toward any applicable adjudication period.

I would like to reschedule my hearing for the following date and time, and I have good cause to reschedule my hearing because:

☐ **I want to waive my right to appear at the ALJ hearing.** (*Please complete form OMHA-104 and attach it to this response.*)

---

OMHA-102 (08/17)

PSC Publishing Services (301) 443-6740. EF
4375

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 144 of 631   Document 11-5

**Section 5: Do you intend to call any witnesses to provide testimony at the hearing?**

☐ No.

☐ Yes, I intend to call the following witnesses (*attach a continuation sheet if necessary*):

---

**Section 6: Do you object to any of the following conditions?** (*Check all that apply*)

☐ **I object to the type of hearing scheduled.** If you are an unrepresented beneficiary or enrollee, and a telephone hearing is scheduled, you have the right to request that a VTC hearing be held instead if VTC technology is available. For all other parties, if a telephone hearing is scheduled, the ALJ may find good cause for an appearance by VTC if he or she determines that VTC is necessary to examine the facts or issues involved in the appeal.

If a telephone or VTC hearing is scheduled and the party, including an unrepresented beneficiary or enrollee, requests that an in-person hearing be held instead, the ALJ, with the agreement of the Chief ALJ or designee, may find good cause for an in-person hearing if VTC or telephone technology is not available, or if special or extraordinary circumstances exist.

I object to the type of hearing scheduled and request a (*check one*) ☐ VTC *or* ☐ in-person hearing because:

**Note:** No explanation is required if you are an unrepresented beneficiary or enrollee requesting a VTC hearing.

☐ **I object to the issues described in the notice of hearing.** I understand that I must send a copy of my objection to the issues to all the other parties who were sent a copy of the notice of hearing, and to CMS or a CMS contractor that elected to be a party to the hearing (if you do not have these addresses, please contact the ALJ's adjudication team at the telephone number shown at the top of the notice of nearing). I understand that the ALJ will make a decision on my objection either in writing, at a prehearing conference, or at the hearing.

I object to the issues described in the notice of hearing because:

☐ **I object to the ALJ assigned to my appeal.** I understand that an ALJ cannot adjudicate an appeal if he or she is prejudiced or partial with respect to any party or has an interest in the matter pending for decision, and that I may object to the ALJ assigned to my appeal for these reasons. I understand that the ALJ will consider my objection and decide whether to proceed with the appeal or withdraw. I understand that if I object to the ALJ assigned to my appeal, and the ALJ subsequently withdraws from the appeal, another ALJ will be assigned, and any applicable adjudication time frame will be extended by 14 calendar days.

I object to the assigned ALJ because:

---

**Section 7: If you are the appellant, do you want to waive or extend the time frame to decide your appeal?** (*If yes, check one*)

☐ **I want to waive the time frame for the ALJ to decide my appeal.** I understand that by waiving this time frame, the ALJ does not have to decide my appeal within any applicable adjudication period that would otherwise apply.

☐ **I want to extend the time frame for the ALJ to decide my appeal.** I want the time frame to be extended _____ calendar days beyond any applicable adjudication period.

**Section 8: Sign and date this form.**

| Party, Participant or Representative Signature | Date |
|---|---|
| | |

---

**Privacy Act Statement**

The legal authority for the collection of information on this form is authorized by the Social Security Act (section 1155 of Title XI and sections 1852(g)(5), 1860D-4(h)(1), 1869(b)(1), and 1876 of Title XVIII). The information provided will be used to further document your appeal. Submission of the information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your appeal. Information you furnish on this form may be disclosed by the Office of Medicare Hearings and Appeals to another person or governmental agency only with respect to the Medicare Program and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services and other agencies.

# If you need large print or assistance, please call 1-855-556-8475

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Office of Medicare Hearings and Appeals**
**NOTICE OF INTENT TO PARTICIPATE IN PROCEEDINGS ON A**
**REQUEST FOR AN ADMINISTRATIVE LAW JUDGE (ALJ) HEARING**
**OR TO BE A PARTY TO AN ALJ HEARING**

**Instructions:** CMS, a CMS contractor, or a Part D Plan Sponsor may use this form to elect (in Medicare Part A and B appeals) or request (in Medicare Part D appeals) to be a participant in the proceedings on a request for an Administrative Law Judge (ALJ) hearing. CMS or a CMS contractor may alternatively use this form to elect to be a party to an ALJ hearing on a Medicare Part A or Part B appeal, if one is scheduled, unless the request for hearing was filed by an unrepresented beneficiary. The time frames for submission of a valid election or request are set forth in 42 C.F.R. sections 405.1010, 405.1012, and 423.2010.

Complete this form and send it to the assigned OMHA adjudicator, or if an adjudicator has not yet been assigned, to OMHA Central Operations, Attention: CMS and CMS Contractor Elections Mail Stop. You must also send a copy of this form to the parties who were sent a copy of the notice of reconsideration or, if you are filing this form after receipt of a notice of hearing, any party that was sent a copy of the notice of hearing. An ALJ or attorney adjudicator may determine that your election is invalid if it was not timely filed or not sent to the correct parties. If an ALJ hearing is scheduled, you must also complete and return a response to the notice of hearing. If the appellant requested an expedited hearing, your request to participate may be made orally.

**Section 1: What is the OMHA appeal number or the reconsideration (Medicare appeal or case) number?**

| OMHA Appeal Number (*if known*) | Reconsideration Number (*if OMHA appeal number not known*) |
|---|---|
| | |

**Note:** If the appeal involves multiple claims and/or beneficiaries and you intend to be a party or participant with respect to some, but not all, include a separate sheet listing the claims and/or beneficiaries for which you are filing this notice of intent.

**Section 2: What is the information for the entity filing the notice of intent?**

| Name of CMS Office, Contractor, or Part D Plan Sponsor | Point of Contact (POC) | | |
|---|---|---|---|
| Mailing Address | City | State | ZIP Code |
| POC Telephone Number | POC Fax Number | POC E-Mail | |

**Section 3: At what stage in the appeal are you filing this request?** (*Check one*)

| | | | |
|---|---|---|---|
| ☐ | After notification that a request for hearing was filed | Date you were notified: | |
| ☐ | After receipt of a notice of hearing | Date you received the notice: | |

**Section 4: Do you intend to be a participant or a party?** (*Check one*)

☐ Party (*Only for CMS or a CMS contractor filing an election in a Part A or Part B appeal after receipt of a notice of hearing when the appellant is not an unrepresented beneficiary—see 42 C.F.R. section 405.1012 for additional limitations.*)

☐ Participant

**Section 5: Check all that apply.**

☐ I intend to participate in the oral hearing, if one is scheduled. (*See 42 C.F.R. sections 405.1010, 405.1012, and 423.2010 for limitations on the number of entities that may participate in the oral hearing.*)

☐ I am submitting a position paper or written testimony with this form.

☐ I intend to submit a position paper or written testimony on a future date.

☐ I am electing party status and I am submitting the evidence described below:

**Note:** You must provide a copy of all submitted position papers, written testimony, and/or evidence to the appropriate parties and within the time frames as set forth in 42 C.F.R. sections 405.1010, 405.1012, or 423.2010, as applicable. Failure to provide copies to the appropriate parties or to submit all items within the required time frames will result in the submissions not being considered by the OMHA adjudicator.

**Section 6: Sign and date this form.**

| POC Signature | Date |
|---|---|
| | |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 146 of 631   Document 11-5      4377

# APPEARANCE LIST

**If you intend to have additional participants attend the hearing (in addition to the name(s) identified in the Response to Notice of Hearing (Form OMHA-102)), please identify the names of those individuals and their relationship to you including their job title or position (if relevant), below. Please return this list with your completed Response to Notice of Hearing.**

**The following individuals also plan to participate in the hearing:**

1. _____

2. _____

3. _____

4. _____

5. _____

6. _____

| Addressee | Start Time | Time | Prints | Result | Note |
|-----------|------------|------|--------|--------|------|
| 914125616253 | 04-19 09:14 | 00:13:44 | 015/015 | OK | |

**Note**  TMR:Timer TX, POL:Polling, ORG:Original Size Setting, FME:Frame Erase TX, DPB:Page Separation TX, MIX:Mixed Original TX, CALL:Manual TX, CSRC:CSRC; FWD:Forward, ECC:ECC-FAX, BND:Double-Sided Binding Direction, SP:Special Original, FCODE:F-code, RTX:Re-TX, RLY:Relay, MBX:Confidential, BUL:Bulletin, SIP:SIP Fax; IPADR:IP Address Fax, I-FAX:Internet Fax

**Result**  OK: Communication OK, S-OK: Stop Communication, PW-OFF: Power Switch OFF, TEL: RX from TEL, RX: RX, OTH: Other Error, CONT: Continue, NO Ans: No Answer, Refuse: Receipt Refused, Busy: Busy, M-Full:Memory Full, LOVR:Receiving length Over, PGVR:Receiving page Over, FIL:File Error, DC:Decode Error, MDN:MDN Response Error, DSN:DSN Response Error, PRINT:Compulsory Memory Document Print, DEL:Compulsory Memory Document Delete, SEND:Compulsory Memory Document Send.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

**Office of Medicare Hearings and Appeals**
51 SW 1st Ave., Suite 1536
Miami, Florida 33130-1608
786-792-3700 (Main)
786-792-3796 (ALJ Grow Team)
305-536-5044 (Fax)
1-866-622-0382 (Toll Free)

---

### FACSIMILE TRANSMITTAL SHEET

**TO: PARISH LAW OFFICES**          **FROM: ANTONIO ZAMBRANA**
Att. Debra Parish                    **TORO**

**DATE: APRIL 19, 2019**

**FAX NUMBER:  (412)561-6253**       **FAX NUMBER:  (305)536-5044**
                                     **PHONE NUMBER: (786) 792-3796**

**RE:** Notice of Hearing            **TOTAL NO. OF PAGES INCLUDING**
#1-8390277469                        **COVER:  15**

x **URGENT**  ☐ **FOR REVIEW**  ☐ **PLEASE COMMENT**  ☐ **PLEASE REPLY**

**NOTES/COMMENTS:**
Attached you will find Notice of Hearing.
Thank You

THIS TRANSMISSION FROM THE OFFICE OF MEDICARE HEARINGS AND APPEALS IS
INTENDED ONLY FOR THE USE OF THE PERSON OR ENTITY LISTED ON THIS
TRANSMITTAL COVER SHEET AND MAY CONTAIN PRIVILEGED AND CONFIDENTIAL
INFORMATION. IF YOU ARE NOT AN INTENDED RECIPIENT OF THIS FACSIMILE, THE
DISSEMINATION, DISTRIBUTION, COPYING OR USE OF THE INFORMATION IT CONTAINS
IS PROHIBITED. IF THIS TRANSMISSION HAS BEEN SENT OR DIRECTED TO YOU IN
ERROR PLEASE CALL THE SENDER IMMEDIATELY AT (786)792-3796 TO ARRANGE FOR ITS
RETURN.

# EXHIBIT 3

# ALJ REQUEST

DEPARTMENT OF HEALTH AND HUMAN SERVICES
OFFICE OF MEDICARE HEARINGS AND APPEALS

# REQUEST FOR MEDICARE HEARING BY AN ADMINISTRATIVE LAW JUDGE   ☐ Part A   ☒ Part B

Effective July 1, 2005. For use by party to a reconsideration determination issued by a Qualified Independent Contractor (QIC)
(Amount in controversy must be $100 or more.)

Send copies of this completed form to:
**Original** — Office of Medicare Hearings and Appeals Field Office specified in the QIC Reconsideration Notice    **OMHA**
**Copy** — Appellant    **Copy** — All other parties
Failure to send a copy of this completed request to the other parties to the appeal will delay the start date of your appeal.
Did you send all required copies?    **X** Yes ☐ No    **FEB 08 2019 AO**

Appellant *(The party appealing the reconsideration determination)*
**NOVOCURE, INC**      **CENTRAL OPS DIV**

| Beneficiary *(Leave blank if same as the appellant.)* | Provider or Supplier *(Leave blank if same as the appellant.)* | | |
|---|---|---|---|
| ...iken S Prosser | Novocure Inc. | | |
| ...ess | Address | | |
| W2973 Farmstead Dr. | 195 Commerce Way | | |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Appleton | WI | 54915 | Portsmouth | NH | 03801 |

| Area Code/Telephone Number | E-mail Address | Area Code/Telephone Number | E-mail Address |
|---|---|---|---|
| 920-257-3574 | | 603-617-4755 | kfelix@novocure.com |

| ...lth Insurance (Medicare) Claim Number | Document control number assigned by the QIC |
|---|---|
| ...044857A | 1-8175102470 |

| QIC that made the reconsideration determination | Dates of Service | |
|---|---|---|
| C2C Solutions | From 01/16/2018 | 04/16/2018 |

**I DISAGREE WITH THE DETERMINATION MADE ON MY APPEAL BECAUSE:**
Novocure is an accredited CMS DMEPOS supplier by the Accreditation Commission for Healthcare and is a CMS supplier for

Durable Medical equipment. In addition, attached is a letter of medical necessity, FDA approval, NCCN and Clinical.

You have a right to be represented at the hearing. If you are not represented but would like to be, your Office of Medicare Hearings and Appeals
... ' Office will give you a list of legal referral and service organizations. *(If you are represented and have not already done so, complete form CMS-1696.)*

| ...k Only One Statement: | **X** I **wish** to have a hearing. | Check Only One Statement: | ☐ I **have** additional evidence to submit. |
|---|---|---|---|
| | ☐ I **do not wish** to have a hearing and I request that a decision be made on the basis of the evidence in my case. (Complete form HHS-723, "Waiver of Right to an ALJ Hearing.") | | **X** I **have no** additional evidence to submit. |

If you have additional evidence to submit, please attach the evidence or attach a statement explaining what you intend to submit and when you intend to submit it. If you are a provider, supplier, or beneficiary represented by a provider or supplier, the evidence must be accompanied by a good cause statement explaining why the evidence is being submitted for the first time at the ALJ level.

appellant should complete No. 1 and the representative, if any, should complete No. 2. If a representative is not present to sign, print
... her name in No. 2. Where applicable, check to indicate if appellant will accompany the representative at the hearing. ☐ Yes **x** No

| 1. (Appellant's Signature) | Date: 01/31/2019 | 2. (Representative's Signature/Name) | Date |
|---|---|---|---|
| Address | | Address | ☐ Attorney |
| 195 Commerce Way | | | **X** Non-Attorney |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Portsmouth | NH | 03801 | | | |

| Area Code/Telephone Number | E-mail Address | Area Code/Telephone Number | E-mail Address |
|---|---|---|---|
| 603-617-4755 | kfelix@novocure.com | | |

Answer the following questions that apply:
   A) Does request involve multiple claims? (If yes, a list of all the claims must be attached.)    **X** Yes ☐ No
   B) Does request involve multiple beneficiaries? (If yes, a list of beneficiaries, their HICNs and the dates of service.)    ☐ Yes **X** No
   C) Did the beneficiary assign his or her appeal rights to you as the provider/supplier?    ☐ Yes **X** No
     (If yes, you must complete and attach form CMS-20031. Failure to do so will prevent approval of the assignment.)

Must be completed by the provider/supplier if representing the beneficiary:

I waive my rights to charge and collect a fee for representing   Anniken S Prosser    before the Office of
Medicare Hearings and Appeals.      (Beneficiary name)

| ...ture of provider/supplier representing beneficiary | Date: 01/31/2019 |
|---|---|

CMS-20034 A/B U3 (08/05) EF 08/2005    ATTACH A COPY OF THE RECONSIDERATION DETERMINATION
(IF AVAILABLE) TO THIS COPY.

Must be completed by the provider/supplier if representing the beneficiary, they furnished the item(s) or services(s) at issue, and the appeal involves a question of liability under section 1879(a)(2) of the Social Security Act:

I waive my right to collect payment from the beneficiary for the furnished items or services at issue involving 1879(a)(2) of the Social Security Act.

| Signature of provider/supplier representing beneficiary | Date: 01/31/2019 |
|---|---|

## TO BE COMPLETED BY THE OFFICE OF MEDICARE HEARINGS AND APPEALS

Is this request filed timely?　　❑ Yes　❑ No

If no, attach appellant's explanation for delay. If there is no explanation, send a Notice of Late Filing of Request for ALJ Hearing to the appellant and representative, if applicable, to request such an explanation.

| ...uest received on | Field Office | Employee |
|---|---|---|
| Assigned on | Assigned by | Assigned to |

Special response case?　　❑ Yes　❑ No

If yes, explain why and state the targeted adjudication deadline.

Interpreter/translator needed (including sign language)　　❑ Yes　❑ No

If yes, type needed:

If appellant not represented, has a list of legal referral and service organizations been provided.　　❑ Yes　❑ No

## PRIVACY ACT STATEMENT

The legal authority for the collection of information on this form is authorized by the Social Security Act (section 1155 of Title XI and sections 1852(g)(5), 1860D-4(h)(1), 1869(b)(1), and 1876 of Title XVIII). The information provided will be used to further document your appeal. Submission of the information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your appeal. Information you furnish on this form may be disclosed by the Office of Medicare Hearings and Appeals to ...er person or governmental agency only with respect to the Medicare Program and to comply with Federal laws requiring the disclosure of ...nation or the exchange of information between the Department of Health and Human Services and other agencies.

CMS-20034 A/B U3 (08/05)　EF 08/2005



Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801

January 31, 2019

HHS OMHA Centralized Docketing
200 Public Square, Suite 1260
Cleveland, OH 44114

Dear Reviewer,

We are submitting a request for an Administrative Law Judge Hearing. Please find enclosed our completed CMS-20034 A/B form and all required supporting documentation. We have notified the patient and/or their contact that we are requesting an Administrative Law Judge Hearing for:

Beneficiary Name:  Anniken S Prosser
Beneficiary Address:  W2973 Farmstead Dr Appleton, WI 54915
Beneficiary Medicare ID:  389044857A
Beneficiary Claim Number:  18045802101000, 18050808224000
Beneficiary Claim Number:  18078813409000, 18107803853000
Date(s) of Service Being Appealed:  01/16/2018, 02/16/2018
Date(s) of Service Being Appealed:  03/16/2018, 04/16/2018
Medicare Appeal Number:  1-8175102470

We are requesting the ALJ due to the fact that the reconsideration was denied as a non-covered Medicare benefit. We categorically disagree with this assertion as Optune has been classified as frequently services durable medical equipment and the coverage decision was left to "Carrier Discretion." We have included the benefit category determination from Joel Kaiser, Director of DMEPOS Policy. At the time of service, there was no NCD or LCD in effect so Novocure provided the beneficiary with the system on good faith the medical necessity of the Optune System would be easily established due to the fact that they have an inoperable brain tumor.

Additionally, there are over 100 commercial payers within the United States covering Optune therapy either on a case by case basis or through published medical policy including Aetna, Tricare, Humana, and HealthNet, to name a few.

The Center for Devices and Radiological Health (CDRH) of the Food and Drug Administration (FDA) has completed review for premarket approval (PMA) for the Optune System in April 2011. As a device that has obtained FDA approval Optune should be eligible for coverage.

In addition, of great importance, is the fact that the NCCN Guidelines (National Comprehensive Cancer Network) were updated for 2015 to include TTFields treatment for recurrent glioblastoma. This recent guideline update should demonstrate the

favorable outcomes c. ...Fields therapy using the Optune in treating patients such as Ms. Prosser.

Furthermore, multiple patients have been approved for coverage at the reconsideration level including Medicare advantage patients approved through independent external review. Medicare Region C and Region D have established precedent by considering the Optune System as a Reasonable and Necessary treatment option for specific patients. We respectfully ask that Ms. Prosser be granted the same opportunity.

Thank you for your consideration of this important request.

Sincerely,

Dan McCoy
Case Management Manager

Enclosures

CC:    Medicare Region B
       Patient

tents.
rights reserved.

U.S. Postal Service® and is provided solely for use in sending Priority Ma
his packaging is not for resale. EP14L © U.S. Postal Service; February 20

This packaging is the property
may be a violation of fede
ode

201 93 3X09 423

**PRESS FIRMLY TO SEAL**

*PRESS FIRMLY TO SEAL*

US POSTAGE
$ 007.65⁰
Correction
02 11 94285   FEB 05 2019
0001194285
MAILED FROM ZIP CODE 03801

novocure

Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801

CMA

FEB 08 2019 10

CENTRAL OPS DIV

T⁰

HHS OMHA Centralized Docketing
200 Public Square, Suite 1260
Cleveland, OH 44114-2316

# PRIORITY®
## ★ MAIL ★

📅 **DATE OF DELIVERY SPECIFIED** *

📶 **USPS TRACKING™ INCLUDED** *

$ **INSURANCE INCLUDED** *

📦 **PICKUP AVAILABLE**
  * Domestic only

**WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.**

*UNITED STATES POSTAL SERVICE*

**USPS TRACKING #**

9114 9023 0722 4128 0347 36

UNITED STATES
POSTAL SERVICE®

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

Legal Flat Rate Envelope
EP14L February 2014
OD: 15 x 9.5

P S00001000060

EX. 3, P. 5

4385

# PARRISH LAW OFFICES

788 WASHINGTON ROAD
PITTSBURGH, PENNSYLVANIA 15228-2021
www.dparrishlaw.com

412.561.6250
FAX 412.561.6253
E-mail: info@dparrishlaw.com

March 21, 2019

*VIA PRIORITY MAIL*
DHHS – OMHA
Centralized Docketing
**Attn: Beneficiary Mail Stop**
200 Public Square, Suite 1260
Cleveland, OH 44114-2316

# BENEFICIARY APPEAL

**RE:    Request for ALJ Hearing**
**Beneficiary:  Anniken Prosser**
             **W2973 Farmstead Dr.**
             **Appleton, WI  54915**
**Dates of Service:  1/16/2018; 2/16/2018; 3/16/18; 4/16/18**
**HICN:  4R87U71QM75**
**Medicare Appeal No:  1-8175102470**
**Date of QIC Decision:  Jan. 18, 2019**
**Device:  Tumor Treatment Field Therapy (E0766)**
**Supplier:  Novocure, Inc.**
**Our Ref: 19-51**

Dear Claims Coordinator:

As an authorized representative of the above-captioned Medicare beneficiary, Anniken Prosser, I hereby appeal to an Administrative Law Judge the above-captioned decision rendered by the Qualified Independent Contractor ("QIC") C2C Innovative Solutions, Inc. for the claims submitted for tumor treatment field therapy ("TTFT") for a glioblastoma. The QIC denied the claim asserting that there is insufficient documentation to quantify the effects of the device and the published studies do not clearly document the effectiveness of the device. The QIC generally referenced LCD L34823.

Ms. Prosser was diagnosed with a glioblastoma in July 2015. She had surgery and was treated with radiation and chemotherapy. Her clinician also prescribed TTFT. TTFT disrupts and corrupts the division of cancer cells and leads to the death of such cells. In 2011 and 2015, the FDA approved, through its more rigorous review process, a device to deliver TTFT, finding it to be safe and effective for the treatment of glioblastomas. During the clinical trial for newly diagnosed glioblastomas, such as that of Ms. Prosser, the TTFT results were so compelling that at the interim analysis, the Data Safety Monitoring Board recommended that those not receiving TTFT be able to cross over to receive the treatment. The FDA agreed. Thus, the peer-reviewed literature more than adequately reflects the effectiveness of the treatment.

The published, peer-reviewed literature shows the improved clinical survival and the progression-free survival of patients who receive TTFT for their glioblastoma. TTFT for glioblastoma is included in the National Comprehensive Cancer Network ("NCCN") guidelines and is considered the standard of care for newly diagnosed glioblastoma. Hundreds of treating physicians, in all 50 states, have prescribed TTFT. TTFT is covered by all the large national payers. It is used in 59 of the 62 NCD-designated cancer centers. Medicare has paid for numerous claims for medically indistinguishable beneficiaries.

Finally, the DMAC medical directors have already indicated that the LCD does not apply to newly diagnosed glioblastoma, i.e., it is inapplicable to Ms. Prosser's case. In either event, because the 21st Century Cures Act requires the Medicare contractors to list all the evidence considered in support of the LCD, the LCD does not reflect consideration of the any literature, including the most current literature, the LCD is not entitled to deference. Further, a recent production of all the evidence upon which LCD L34823 is based, shows that the LCD has not been kept current with the scientific and clinical evidence. In fact, the LCD record shows that the medical directors have failed to consider any of the peer-reviewed literature, regulatory approvals, technology assessments, indicia of widespread adoption, that evolved after 2014 – a shocking five-year failure for a fatal illness. An LCD which conflicts with the standard of care must be "based on sufficient evidence to convincingly refute evidence presented in support of coverage." No such evidence exists.

Yours very truly,

Debra Parrish on behalf of
Ms. Anniken Prosser

Enclosures:
    Attachment A:  Appointment of Representative Form
    Attachment B:  Certificate of Service
    Attachment C:  CD containing - clinical studies, NCCN guidelines 2013 & 2016 - 2018, payer policies, FDA approvals, statement of adoption, article on clinical trial being stopped, list of patents, prior favorable ALJ decisions *(CD v.17)*

cc:    Ms. Anniken Prosser
    Novocure, Inc., c/o Justin Kelly

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0950

## APPOINTMENT OF REPRESENTATIVE

| NAME OF PARTY | MEDICARE/NATIONAL PROVIDER IDENTIFICATION NUMBER |
|---|---|
| Anniken S. Prosser | 4R87U71QM75 |

### SECTION I: APPOINTMENT OF REPRESENTATIVE

**To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):**

I appoint this individual: __Debra M. Parrish__ to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the "Act") and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my appeal, wholly in my stead. I understand that personal medical information related to my appeal may be disclosed to the representative indicated below.

| SIGNATURE OF PARTY SEEKING REPRESENTATION | DATE |
|---|---|
| *Anniken S Prosser* | 1-11-19 |

| STREET ADDRESS | PHONE NUMBER (with Area Code) |
|---|---|
| W2973 Farmstead Dr. | (920) 257-3574 |

| CITY | STATE | ZIP |
|---|---|---|
| Appleton | WI | 54915 |

### SECTION II: ACCEPTANCE OF APPOINTMENT

**To be completed by the representative:**

I, __Debra M. Parrish__, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services; that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a / an __ATTORNEY__ (Debra M. Parrish)
(PROFESSIONAL STATUS OR RELATIONSHIP TO THE PARTY, E.G. ATTORNEY, RELATIVE, ETC.)

| SIGNATURE OF REPRESENTATIVE | DATE |
|---|---|
| *[signature]* | 1-22-19 |

| STREET ADDRESS | PHONE NUMBER (with Area Code) |
|---|---|
| 788 Washington Road | (412) 561-6250 |

| CITY | STATE | ZIP |
|---|---|---|
| Pittsburgh | PA | 15228 |

### SECTION III: WAIVER OF FEE FOR REPRESENTATION

**Instructions:** This section must be completed if the representative is required to, or chooses to waive their fee for representation. (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge a fee for representation and must complete this section.)

I waive my right to charge and collect a fee for representing _____
before the Secretary of the Department of Health and Human Services.

| SIGNATURE | DATE |
|---|---|
| | |

### SECTION IV: WAIVER OF PAYMENT FOR ITEMS OR SERVICES AT ISSUE

**Instructions:** Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act. (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.)

I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| SIGNATURE | DATE |
|---|---|
| | |

Form CMS-1696 (10/10)

## CERTIFICATE OF SERVICE

I hereby certify that I sent a copy of the request for hearing and all attachments (except CD) submitted on behalf of Anniken Prosser to the following parties via the following methods on March 21, 2019:

**USPS First Class Mail**:

Anniken Prosser
W2973 Farmstead Drive
Appleton, WI 54915

**Electronic Mail [via secure server]**:

Novocure, Inc.
c/o Justin Kelly
JKelly@novocure.com
195 Commerce Way
Portsmouth, NH 03801

March 21, 2019

Tanya A. Terza
Paralegal
Parrish Law Offices

# ATTACHMENT C:

## CD Containing –
**Clinical Studies, NCCN Guidelines 2013, 2016-2018, Presentation at ASTRO, Payer Policies, FDA Approvals, Statement of Adoption, Article on clinical trial being stopped, List of Patents, prior favorable ALJ decisions** *(CD v.17)*



OMHA CENTRAL UPS

MAR 2 2 2019 AS

After printing this label:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be esponsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you leclare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value Is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# MEDICAL

# DOCUMENTS

# Change Healthcare

ERA Check 1 of 1

| EFT/Check #: 09180510044 | EFT/Check Date: 02/20/2018 | EFT/Check Amount: $ .00 | Payment Type: NON |
|---|---|---|---|
| Payer Name: CGS - DME MAC JURISDICTION B | | CH Payer Id: MR031 | CH Process Date: 02/21/2018 |
| Provider Name: NOVOCURE INC | Tax Id: 205063536 | NPI: 1255617569 | Other Payee Id: |
| Address: 195 COMMERCE WAY, PORTSMOUTH NH 038019999 | | Addl. Payee Id: 1255617569 | Total PLB Adj Amt: 21000 |

| Service Dates: 01/16/2018 | Processing Status: 4 - Denied | | |
|---|---|---|---|
| Payer Claim # / Medicare ICN #: 18045802101000 | CH Claim Trace Id: 044209775763659 | Place Of Service: | Total Adjustment Amount: $ .00 |
| Charge: $ 21,000.00 | Paid: $ .00 | Patient Responsibility: $ - | Deductible: $ - |
| Co-Insurance: $ - | Co-Pay: $ - | Other/Crossover Insurance: | |

| | | |
|---|---|---|
| Remark Codes: | MA13 | Alert: You may be subject to penalties if you bill the patient for amounts not reported with the PR (patient responsibility) group code. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 4/1/07) |
| | MA01 | Alert: If you do not agree with what we approved for these services, you may appeal our decision. To make sure that we are fair to you, we require another individual that did not process your initial claim to conduct the appeal. However, in order to be eligible for an appeal, you must write to us within 120 days of the date you received this notice, unless you have a good reason for being late. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 10/31/02, 6/30/03, 8/1/05, 4/1/07) |
| | M25 | The information furnished does not substantiate the need for this level of service. If you believe the service should have been fully covered as billed, or if you did not know and could not reasonably have been expected to know that we would not pay for this level of service, or if you notified the patient in writing in advance that we would not pay for this level of service and he/she agreed in writing to pay, ask us to review your claim within 120 days of the date of this notice. If you do not request an appeal, we will, upon application from the patient, reimburse him/her for the amount you have collected from him/her in excess of any deductible and coinsurance amounts. We will recover the reimbursement from you as an overpayment. Start: 01/01/1997 | Last Modified: 11/01/2010 Notes: (Modified 10/1/02, 6/30/03, 8/1/05, 11/5/07, 11/1/10) |
| | N115 | This decision was based on a Local Coverage Determination (LCD). An LCD provides a guide to assist in determining whether a particular item or service is covered. A copy of this policy is available at www.cms.gov/mcd, or if you do not have web access, you may contact the contractor to request a copy of the LCD. Start: 05/30/2002 | Last Modified: 07/01/2010 Notes: (Modified 4/1/04, 7/1/10) |

## PATIENT - SUBSCRIBER INFORMATION

| Patient Name: PROSSER, ANNIKEN S | Patient Id: 389044857A | Patient Control Number: 0001012479 |
|---|---|---|
| Corrected Patient/Subscriber Name: | | |
| Subscriber Name: | Subscriber Id: | Group/Policy Id: |
| Other Subscr. Name: | Other Subscriber Id: | Group/Policy Id: |

## REMITTANCE PROCESSING INFORMATION - SERVICE LINE DETAIL

| Svc Line # | Service Date | Proc Code - Units / Modifiers | Charge $ | Allowed $ | Not Allowed $ | Deductible $ | Co-Ins $ | Co-Pay $ | Late Filing Red. $ | Paid $ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01/16/2018 | E0766 - 0 / KF, RR | 21,000.00 | .00 | .00 | - | - | - | - | - |

## SUPPLEMENTAL INFORMATION/ADJUSTMENT INFORMATION - SERVICE LINES

| Svc Line # | Core Business Scenario | Supp/Adj Group Code | Description | Supp/Adj Reason Code | Description | Amount $ |
|---|---|---|---|---|---|---|
| 1 | 3 | CO | Contractual Obligations | 50 | These are non-covered services because this is not deemed a 'medical necessity' by the payer. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. Start: 01/01/1995 | Last Modified: 07/01/2017 | 21,000.00 |

| Claim 1 of 1 | Page 1 of 1 |
|---|---|

# Change
# Healthcare

ERA Check 1 of 1

| EFT/Check #: 09180540034 | EFT/Check Date: 02/23/2018 | EFT/Check Amount: $ .00 | Payment Type: NON |
|---|---|---|---|
| Payer Name: CGS - DME MAC JURISDICTION B | | CH Payer Id: MR031 | CH Process Date: 02/26/2018 |
| Provider Name: NOVOCURE INC | Tax Id: 205063536 | NPI: 1255617569 | Other Payee Id: |
| Address: 195 COMMERCE WAY, PORTSMOUTH NH 038019999 | | Addl. Payee Id: 1255617569 | Total PLB Adj Amt: 21000 |

| Service Dates: 02/16/2018 | Processing Status: 4 - Denied | | |
|---|---|---|---|
| Payer Claim # / Medicare ICN #: 18050808224000 | CH Claim Trace Id: 047211576398656 | Place Of Service: | Total Adjustment Amount: $ .00 |
| Charge: $ 21,000.00 | Paid: $ .00 | Patient Responsibility: $ - | Deductible: $ - |
| Co-Insurance: $ - | Co-Pay: $ - | Other/Crossover Insurance: | |

| Remark Codes: | MA13 | Alert: You may be subject to penalties if you bill the patient for amounts not reported with the PR (patient responsibility) group code. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 4/1/07) |
|---|---|---|
| | MA01 | Alert: If you do not agree with what we approved for these services, you may appeal our decision. To make sure that we are fair to you, we require another individual that did not process your initial claim to conduct the appeal. However, in order to be eligible for an appeal, you must write to us within 120 days of the date you received this notice, unless you have a good reason for being late. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 10/31/02, 6/30/03, 8/1/05, 4/1/07) |
| | M25 | The information furnished does not substantiate the need for this level of service. If you believe the service should have been fully covered as billed, or if you did not know and could not reasonably have been expected to know that we would not pay for this level of service, or if you notified the patient in writing in advance that we would not pay for this level of service and he/she agreed in writing to pay, ask us to review your claim within 120 days of the date of this notice. If you do not request an appeal, we will, upon application from the patient, reimburse him/her for the amount you have collected from him/her in excess of any deductible and coinsurance amounts. We will recover the reimbursement from you as an overpayment. Start: 01/01/1997 | Last Modified: 11/01/2010 Notes: (Modified 10/1/02, 6/30/03, 8/1/05, 11/5/07, 11/1/10) |
| | N115 | This decision was based on a Local Coverage Determination (LCD). An LCD provides a guide to assist in determining whether a particular item or service is covered. A copy of this policy is available at www.cms.gov/mcd, or if you do not have web access, you may contact the contractor to request a copy of the LCD. Start: 05/30/2002 | Last Modified: 07/01/2010 Notes: (Modified 4/1/04, 7/1/10) |

## PATIENT - SUBSCRIBER INFORMATION

| Patient Name: PROSSER, ANNIKEN S | Patient Id: 389044857A | Patient Control Number: 0001012479 |
|---|---|---|
| Corrected Patient/Subscriber Name: | | |
| Subscriber Name: | Subscriber Id: | Group/Policy Id: |
| Other Subscr. Name: | Other Subscriber Id: | Group/Policy Id: |

## REMITTANCE PROCESSING INFORMATION - SERVICE LINE DETAIL

| Svc Line # | Service Date | Proc Code - Units / Modifiers | Charge $ | Allowed $ | Not Allowed $ | Deductible $ | Co-Ins $ | Co-Pay $ | Late Filing Red. $ | Paid $ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 02/16/2018 | E0766 - 0 / KF, RR | 21,000.00 | .00 | 00 | - | - | | - | - |

## SUPPLEMENTAL INFORMATION/ADJUSTMENT INFORMATION - SERVICE LINES

| Svc Line # | Core Business Scenario | Supp/Adj Group Code | Description | Supp/Adj Reason Code | Description | Amount $ |
|---|---|---|---|---|---|---|
| 1 | 3 | CO | Contractual Obligations | 50 | These are non-covered services because this is not deemed a 'medical necessity' by the payer. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. Start: 01/01/1995 | Last Modified 07/01/2017 | 21,000.00 |

| Claim 1 of 1 | | Page 1 of 1 |
|---|---|---|

# Change Healthcare

ERA Check 1 of 1

| EFT/Check #. 09180820023 | EFT/Check Date 03/23/2018 | EFT/Check Amount. $ .00 | Payment Type NON |
|---|---|---|---|
| Payer Name: CGS - DME MAC JURISDICTION B | | CH Payer Id: MR031 | CH Process Date 03/26/2018 |
| Provider Name: NOVOCURE INC | Tax Id: 205063536 | NPI: 1255617569 | Other Payee Id: |
| Address: 195 COMMERCE WAY, PORTSMOUTH NH 038019900 | | Addl. Payee Id: 1255617569 | Total PLB Adj Amt: 21000 |

| Service Dates: 03/16/2018 | Processing Status. 4 - Denied | | |
|---|---|---|---|
| Payer Claim # / Medicare ICN #: 18078813409000 | CH Claim Trace Id: 075224952936657 | Place Of Service: | Total Adjustment Amount: $ .00 |
| Charge: $ 21,000.00 | Paid: $ .00 | Patient Responsibility: $ - | Deductible: $ - |
| Co-Insurance: $ - | Co-Pay: $ - | Other/Crossover Insurance. | |

| Remark Codes: | MA13 | Alert: You may be subject to penalties if you bill the patient for amounts not reported with the PR (patient responsibility) group code. Start: 01/01/1997 | Last Modified: 04/01/2007 (Modified 4/1/07) |
|---|---|---|
| | MA01 | Alert: If you do not agree with what we approved for these services, you may appeal our decision. To make sure that we are fair to you, we require another individual that did not process your initial claim to conduct the appeal. However, in order to be eligible for an appeal, you must write to us within 120 days of the date you received this notice, unless you have a good reason for being late. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 10/31/02, 6/30/03, 8/1/05, 4/1/07) |
| | M25 | The information furnished does not substantiate the need for this level of service. If you believe the service should have been fully covered as billed, or if you did not know and could not reasonably have been expected to know that we would not pay for this level of service, or if you notified the patient in writing in advance that we would not pay for this level of service and he/she agreed in writing to pay, ask us to review your claim within 120 days of the date of this notice. If you do not request an appeal. we will, upon application from the patient, reimburse him/her for the amount you have collected from him/her in excess of any deductible and coinsurance amounts. We will recover the reimbursement from you as an overpayment. Start: 01/01/1997 | Last Modified: 11/01/2010 Notes: (Modified 10/1/02, 6/30/03, 8/1/05, 11/5/07, 11/1/10) |
| | N115 | This decision was based on a Local Coverage Determination (LCD). An LCD provides a guide to assist in determining whether a particular item or service is covered. A copy of this policy is available at www.cms.gov/mcd, or if you do not have web access, you may contact the contractor to request a copy of the LCD. Start: 05/30/2002 | Last Modified: 07/01/2010 Notes: (Modified 4/1/04, 7/1/10) |

## PATIENT - SUBSCRIBER INFORMATION

| Patient Name: PROSSER, ANNIKEN S | Patient Id: 389044857A | Patient Control Number: 0001012479 |
|---|---|---|
| Corrected Patient/Subscriber Name: | | |
| Subscriber Name: | Subscriber Id: | Group/Policy Id: |
| Other Subscr. Name: | Other Subscriber Id: | Group/Policy Id: |

## REMITTANCE PROCESSING INFORMATION - SERVICE LINE DETAIL

| Svc Line # | Service Date | Proc Code - Units / Modifiers | Charge $ | Allowed $ | Not Allowed $ | Deductible $ | Co-Ins $ | Co-Pay $ | Late Filing Red. $ | Paid $ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 03/16/2018 | E0766 - 0 / KF, RR | 21,000.00 | .00 | .00 | - | - | - | - | - |

## SUPPLEMENTAL INFORMATION/ADJUSTMENT INFORMATION - SERVICE LINES

| Svc Line # | Core Business Scenario | Supp/Adj Group Code | Description | Supp/Adj Reason Code | Description | Amount $ |
|---|---|---|---|---|---|---|
| 1 | 3 | CO | Contractual Obligations | 50 | These are non-covered services because this is not deemed a 'medical necessity' by the payer. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. Start: 01/01/1995 | Last Modified: 07/01/2017 | 21,000.00 |

| Claim 1 of 1 | Page 1 of 1 |
|---|---|

# Change Healthcare

ERA Check 1 of 1

| | |
|---|---|
| EFT/Check #: 09181130049 | EFT/Check Date: 04/23/2018 |
| Payer Name  CGS - DME MAC JURISDICTION B | CH Payer Id: MR031 |
| Provider Name: NOVOCURE INC | Tax Id: 205063536 |
| Address:  195 COMMERCE WAY, PORTSMOUTH NH 038019999 | Addl. Payee Id 1255617569 |

| | |
|---|---|
| EFT/Check Amount: $ .00 | Payment Type: NON |
| CH Process Date: 04/24/2018 | |
| NPI  1255617569 | Other Payee Id: |
| Total PLB Adj Amt 21000 | |

| | |
|---|---|
| Service Dates:  04/16/2018 | Processing Status  4 - Denied |
| Payer Claim # / Medicare ICN #: 18107803853000 | CH Claim Trace Id: 106238980798659 |
| Charge: $ 21,000 00 | Paid:  $  00 |
| Co-Insurance:  $ - | Co-Pay:  $ - |

| | |
|---|---|
| Place Of Service: | Total Adjustment Amount:  $ .00 |
| Patient Responsibility: $ - | Deductible:  $ - |
| Other/Crossover Insurance: | |

## Remark Codes:

| | |
|---|---|
| N793 | Alert: CMS is changing from the Medicare Health Insurance Claim number (HICN) to the new Medicare Beneficiary Identifier (MBI). You can use either the HICN or MBI during the transition period  Visit www.cms.gov/newcard for important dates and information about this change. Start: 07/01/2017 | Last Modified: 11/01/2017 Notes: (Modified 11/1/2017) |
| MA13 | Alert: You may be subject to penalties if you bill the patient for amounts not reported with the PR (patient responsibility) group code. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 4/1/07) |
| MA01 | Alert: If you do not agree with what we approved for these services, you may appeal our decision. To make sure that we are fair to you, we require another individual that did not process your initial claim to conduct the appeal. However, in order to be eligible for an appeal, you must write to us within 120 days of the date you received this notice, unless you have a good reason for being late. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 10/31/02, 6/30/03, 8/1/05, 4/1/07) |
| M25 | The information furnished does not substantiate the need for this level of service. If you believe the service should have been fully covered as billed, or if you did not know and could not reasonably have been expected to know that we would not pay for this level of service, or if you notified the patient in writing in advance that we would not pay for this level of service and he/she agreed in writing to pay, ask us to review your claim within 120 days of the date of this notice. If you do not request an appeal, we will, upon application from the patient, reimburse him/her for the amount you have collected from him/her in excess of any deductible and coinsurance amounts. We will recover the reimbursement from you as an overpayment. Start: 01/01/1997 | Last Modified: 11/01/2010 Notes: (Modified 10/1/02, 6/30/03, 8/1/05, 11/5/07, 11/1/10) |
| N115 | This decision was based on a Local Coverage Determination (LCD). An LCD provides a guide to assist in determining whether a particular item or service is covered. A copy of this policy is available at www.cms gov/mcd, or if you do not have web access, you may contact the contractor to request a copy of the LCD. Start: 05/30/2002 | Last Modified: 07/01/2010 Notes: (Modified 4/1/04, 7/1/10) |

## PATIENT - SUBSCRIBER INFORMATION

| | | |
|---|---|---|
| Patient Name:  PROSSER, ANNIKEN S | Patient Id:  389044857A | Patient Control Number  0001012479 |
| Corrected Patient/Subscriber Name: | | |
| Subscriber Name. | Subscriber Id: | Group/Policy Id |
| Other Subscr. Name: | Other Subscriber Id: | Group/Policy Id |

## REMITTANCE PROCESSING INFORMATION - SERVICE LINE DETAIL

| Svc Line # | Service Date | Proc Code - Units / Modifiers | Charge $ | Allowed $ | Not Allowed $ | Deductible $ | Co-Ins $ | Co-Pay $ | Late Filing Red $ | Paid $ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 04/16/2018 | E0766 - 0 / KF, RR | 21,000.00 | .00 | .00 | - | - | - | - | - |

## SUPPLEMENTAL INFORMATION/ADJUSTMENT INFORMATION - SERVICE LINES

| Svc Line # | Core Business Scenario | Supp/Adj Group Code | Description | Supp/Adj Reason Code | Description | Amount $ |
|---|---|---|---|---|---|---|
| 1 | 3 | CO | Contractual Obligations | 50 | These are non-covered services because this is not deemed a 'medical necessity' by the payer  Usage: Refer | 21,000.00 |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 165 of 631   Document 11-5

4396

EX. 2, P. 4

# ✖OPTUNE

## Optune® Prescription Form

Please fax or email signed and completed forms with medical
records, face sheet, and copies of insurance card(s) to
603-501-4298 or support@novocure.com

## I. PRESCRIPTION INFORMATION

Patient Name: Anniken Prosser *(required)*

Date of Birth: 10|10|83 *(required)*

Please check the appropriate box:

☐ New Patient order

☑ Renewal

Is this patient enrolling in an Investigator Sponsored Trial (IST) or Cooperative Group Trial (e.g. RTOG)?  ☐ Yes   If yes, which trial? _____

Optune is comprised of: an Electric Field Generator (the "Device"), Transducer Arrays (the "Arrays"), power supply items, and accessories.

ICD-10 Code: C71.9 *(required)*   Diagnosis Description: Glioblastoma Multiforme

I prescribe use of Optune, as described above, for a period of: *(check box required)*

☐ 3 months
☑ 6 months

### Prescriber Information

Prescriber Name (Last, First, Middle Initial): Connelly Jennifer M *(required)*

Name of Preferred Office Contact: Carrie Guzlecki

NPI: 1780768531 *(required)*

Phone: 414.805.5231

Phone: 414.805.5204    Fax: 414.259.0469

Email: Carrie.guzlecki@froedtert.com

By signing and dating, I attest that I am prescribing Optune (DO NOT SUBSTITUTE) as medically necessary. I have read and understand all safety information and other instructions for use included with Optune.

Prescriber Signature: *(required)*

Date: 04/13/2018 *(required)*

## II. ORDER INFORMATION

Treatment education, head preparation and array application will take place in the patient's home. Upon completion of the education session, the patient or caregiver may initiate treatment in the presence of Novocure personnel.

**Preferred Treatment Start date (MM/DD/YYYY):** _____

Please allow 5 business days from submission of all required paperwork and preferred treatment start date.

Notes: Continuation of treatment

QSF-DME-024 Rev. 04    **novocure™**    Page 1 of 4

⌁ **OPTUNE**

# Optune® Prescription Form

Please fax or email signed and completed forms with medical
records, face sheet, and copies of insurance card(s) to
603-501-4298 or support@novocure.com

## I. PRESCRIPTION INFORMATION

**Patient Information**

**Patient Name:** Annikan Prosser
(required)

**Date of Birth:** 10/10/83
(required)

Please check the appropriate box:

☐ New Patient order

☒ Renewal

Is this patient enrolling in an Investigator Sponsored
Trial (IST) or Cooperative Group Trial (e.g. RTOG)?  ☒ Yes  If yes, which trial? _____

**Prescription Information**

Optune is comprised of: an Electric Field Generator (the "Device"), Transducer Arrays (the "Arrays"), power supply items, and
accessories.

**ICD-10 Code:** C 71 . 9        Diagnosis Description: Glioblastoma Multiforme
(required)

**I prescribe use of Optune, as
described above, for a period of:**
(check box required)

☐ 3 months

☒ 6 months

**Prescriber Information**                    **Contact Information**

Connelly Jennifer M            Carrie Gruzlecki
**Prescriber Name (Last, First, Middle Initial):**    Name of Preferred Office Contact
(required)

**NPI:** 1780768531
(required)

414.805.5231
Phone

414.805.5204    414.259.0469    carrie.gruzlecki@froedtert.com
Phone          Fax              Email

**Prescriber Only to Complete: Original Signature Required; No Stamps**

By signing and dating, I attest that I am prescribing Optune (DO NOT SUBSTITUTE) as medically necessary. I have read and
understand all safety information and other instructions for use included with Optune.

**Prescriber Signature:** _[signature]_              **Date (MM/DD/YYYY):** 10/17/2017
(required)                                         (required)

## II. ORDER INFORMATION

Treatment education, head preparation and array application will take place in the patient's home. Upon completion of the
education session, the patient or caregiver may initiate treatment in the presence of Novocure personnel.

**Preferred Treatment Start date (MM/DD/YYYY):** _____
Please allow **5 business days** from submission of all required paperwork and preferred treatment start date.

Notes   Continuation

QSF-DME-024 Rev. 04            **novocure**™              Page 1 of 4

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 167 of 631   Document 11-5    4398

EX. 2, P. 6

# ⚕ OPTUNE

## Optune™ Prescription Form

Fax the completed form with signature to 603-501-4298; or Email to support@novocure.com

### III. PATIENT INFORMATION (PLEASE COMPLETE IN FULL)

**Patient Information**

Permanent Address: W2973 Farmstead Dr.

City: Appleton    State: WI    Zip: 54915    Phone: 920-257-3574

Family Contact: Barry Prosser    Phone:

[✓] Shipping and mailing address same as permanent address.

[ ] Use the address below for shipping and mailing purposes related to equipment, supplies and billing. Patient must reside at this address:

Shipping and Mailing Address:

City:    State:    Zip:    Phone:

**Insurance Information**

Primary Insurance: National POS - Humana

Patient ID#: 100303512    Insurance Phone Number: 866-427-7478

Group#: 668526    Group Name:

Primary Insured (Subscriber) Name: Barry Prosser

Relationship to Patient: Husband    Subscriber Date of Birth: 5/24/85

**If you have secondary insurance, please attach this information if applicable.**

The use of "I" or "you" in this document refers to the patient named in the "Signatures" block.

**Authorization to Release Records to Novocure**

I authorize my physician and the practice, facility and hospital of my physician and any other holder of medical information about conditions for which I am being treated to release to Novocure Inc. and affiliated companies (together "Novocure") any information necessary for treatment, payment and healthcare operations related to my use of Optune. I authorize Novocure employees to deliver equipment and provide education in my home as well as attend my appointments as necessary to provide technical assistance to my physician and healthcare practitioners. I also authorize Novocure, my physician and the practice, facility and hospital of my physician and any other holder of medical information about conditions for which I am being treated to release such information to my insurer. These authorizations apply to my current physician and previous physicians. I understand that Novocure may and likely will use the information to seek a determination of whether my insurer will cover my use Optune.

**Authorization To Discuss Care**

I authorize Novocure to discuss my care with the family members and/or caregivers listed below. I may revoke this authorization at any time by calling or emailing Novocure at 855-281-9301 or support@novocure.com.

List all authorized individuals: Barry Prosser, Daniel Maas, Hilde Staven-maas

Signatures: Annika S Prosser

Patient Name (please print): Annika S. Prosser    Date: 5-31-16

If anyone other than patient completes or signs this form, please enter the following information:

Name:    Telephone Number:

Address:    City:

State:    Zip:

Relationship to Patient:    Reason for Signing:

GF-DME-024 Rev. 02    Printed on 18 Sep 2015 02:04 GMT. Printed by: JNATOLA.    Page 2 of 4



**Froedtert and the Medical College of Wisconsin Cancer Center**
**9200 W Wisconsin Ave**
**Milwaukee, WI 53226**
**414-805-6800**

## REVIEW OF DENIED TREATMENT REQUEST
### Life Threatening Condition

June 14, 2016

Humana
Clinical Review Team
1100 Employers Boulevard
Green Bay, WI 54344

**ATTN: Provider Appeal**

RE:  Anniken Prosser
     Policy: 100303512
     DOB: 10/10/1983

This letter is in response to the denial received after review of predetermination of benefits for my patient, Anniken Prosser. It is my understanding that Ms. Prosser is entitled to appeal this adverse benefit determination. Your denial letter indicates that you consider treatment with Optune to be investigational.

Please accept this letter as a formal appeal for coverage for Optune. I am also reiterating our request for a network exception for this patient due to the fact that there is no provider in the Humana network who can provide this service. I also request that a physician who is experienced in treating glioblastoma review this material as regulated by ERISA. The type of physician familiar with the treatment of glioblastoma would be a neuro-oncologist or radiation oncologist with specific expertise treating GBM.

Anniken Prosser is a young 32-year old female who initially presented with a severe migraine with associated nausea. MRI revealed a large enhancing left temporal cystic mass. She underwent a gross total resection on February 25, 2016. Pathology demonstrated glioblastoma multiforme. Following surgery, she went on to initiate treatment with radiation with concurrent Temodar. This was completed in May of 2016. After discussing treatment options with Ms. Prosser, I have decided to prescribe Optune in combination with temozolomide as this currently is the best option for treating her glioblastoma.

Optune is an innovative approach to cancer treatment, using tumor treating fields (TTFields) to interfere with the division of malignant cells. TTFields therapy is a locally or regionally delivered treatment that uses alternating electric fields to disrupt the rapid

Anniken S Prosser    MR# 10790724

cell division exhibited by cancer cells. GBM patients treated with TTFields wear insulated transducer arrays on the scalp attached to the portable electric field generator.

Optune received pre-market approval from the FDA for recurrent glioblastoma in April 2011. This approval was based on the results of a large randomized controlled trial of patients with recurrent GBM comparing Optune as a monotherapy to standard chemotherapy used in recurrent GBM. The results showed that treatment with Optune delivered comparable overall survival and progression free survival to chemotherapy with minimal toxicity and an improvement in patients qualify of life compared to chemotherapy.

In 2015, Optune received pre market approval from the FDA for newly diagnosed glioblastoma in combination with temozolomide after standard surgical resection and radiation therapy. This approval was based on a prospective, randomized, open label, active parallel control trial to compare the effectiveness and safety outcomes of newly diagnosed GBM patients treated with Optune and TMZ to those treated with TMZ alone. The results of the trial at the interim analysis showed superior efficacy both in progression free survival as well as overall survival. The data was so compelling that the independent data monitoring committee recommended the trial be terminated so that patients in the standard of care arm could cross over. The FDA approved the supplemental IDE to allow for crossover of patients on the control arm to the TTFields arm on December 1, 2014.

The pre-specified interim analysis of EF-14 trial data was conducted on the first 315 patients, representing approximately 50 percent of the targeted study population The data show that.

   Patients treated with TTFields together with temozolomide demonstrated a significant increase in progression free survival compared to temozolomide alone (median PFS of 7 1 months compared to 4.0 months, respectively, hazard ratio=0.63, p=0.001).

   Patients treated with TTFields together with temozolomide demonstrated a significant increase in overall survival compared to temozolomide alone (median OS of 19.6 months compared to 16.6 months, respectively, hazard ratio=0.75, p=0 034).

   The percentage of patients alive at 2 years in the TTFields together with temozolomide arm was 43% compared to 29% in the temozolomide alone arm.

Glioblastoma is an orphan disease, with limited available treatment options. Most payers are covering Optune for patients based on published medical policy as well as individual medical necessity review. Over 180 payers including Humana, have covered this therapy for members after an appeal process. This new data is an important advancement in the treatment of glioblastoma. It is imperative that Humana review their current policy for Optune and amend it to cover this therapy for patients with glioblastoma.

At Froedtert Health and Medical College of Wisconsin, Optune has been employed successfully for patients such as Ms. Prosser, and we have achieved excellent outcomes. We have been very fortunate in working with payers who specifically consider the above information as well as the patient's orphan disease status in issuing

Anniken S Prosser   MR#: 107911724

positive coverage for our patients. I request Humana, offer the same consideration to Ms. Prosser, when considering this request for coverage of Optune.

It is my belief that Optune in combination with temozolomide is the most appropriate option for her at the present time. Based upon her orphan disease status, limited treatment options and the recently published peer reviewed data showing superiority of adding Optune to temozolomide I respectfully request reconsideration of the adverse benefit determination.

Sincerely,

*Jennifer Connelly, MD*

Jennifer Connelly, MD
Neurology
Neuro-Oncology – Board Certified
Froedtert Health and Medical College of Wisconsin
Phone: 414-805-5204
Fax: 414-805-5282

Anniken S Prosser    MR#: 10790724

start + date : 6/3/16
Repair account (R) A000069327 12-19-2013
shaved ✓

## ASSESSMENT of NEED

| Customer Name: MS | Anni Ken Prosser | Date: | 6/3/16 |
|---|---|---|---|
| Customer # | 1012479 | | |
| DSS/Site | Jen Nancy Newberg / Froedtert + Med Cl | Initiation: Home ☒ Office ☐ | |

| **Social Component:** | See Service Agreement | | |
|---|---|---|---|
| Responsible Party/ Emergency Contact: | Mr. Barry Prosser | Tel: | 920-257-9525  920-257-3574 |

**Economic Component:**   See Patient Document Acknowledgement

Patient acknowledges that financial responsibility has been discussed and agreed to: *(Indicate date of welcome call and person spoken to)*

Patti 6/7/16

**Environmental Component: NOT APPLICABLE – No Home Visits /Treatment initiated at HCP site**

**Functional Component:** (circle one)

| How did you hear about Optune Therapy? | Physician |
|---|---|
| What factors led to the decision to start treatment? | Physician |

Did you receive a package from us containing printed material and DVD? (Yes)  No  Not Sure

| Does patient live alone?  Yes  (No) | Patient has access to telephone:  Yes  (No) |
|---|---|

Is patient residence?  (Home)  Assisted Living  Other facility:

In what type of structure do you reside?  (House)  Apart/Condo- Assisting Living  - Rehab Facility

Where will parking be?  Yes   No    Driveway

How will we enter / exit residence?   Front door, ring doorbell, 2 steps

Should I be made aware of any safety concerns? ex lack of lighting , no elevator (if apt is not on 1st floor)
Please specify:  (N/A)

| Are there any pets in your home? (Yes)  No | Cats # | Dogs # 2 | Other types # |
|---|---|---|---|

Can pets be placed in another room while DSS present?  (Yes)   No   N/A

Is there smoking in the home?   Yes   (No)

Is there anything that our DSS should know about the home environment or the people residing there that could be important for the safety of the visit? (N/A)

Is patient able to speak:  (Yes)  No  If yes, what is his/her primary language?   English

Does patient have adequate electrical capacity to utilize device and recharge batteries (Yes)   No

Does he/she require assistance with mobility? (Yes)   No

| Are you employed?  Yes  (No) | If so do you plan on continuing to work?  Yes   (No) |
|---|---|

If you are planning on continuing to work what is your occupation?   N/A

Have you discussed treatment during work hours with your employer? Yes - (No)

| **Type of verification that client/caregiver understands safe operation of equipment:** | | |
|---|---|---|
| See Technical Review Checklist:   Yes - No | | |
| Other: (Explain) | | |
| Explain any special needs or additional training required (if applicable) N/A ☐ | | |
| Training on the Optune device is performed, conducted, and observed by certified physicians in accordance with FDA approval guidelines. | | |

| Completed by: | *[signature]* | Date: | 6/8/16 |
|---|---|---|---|

QSF-DME-027 Rev. 02

# Prosser, Anniken S

MRN: 10790724

**Progress Notes** Encounter Date: 9/19/2018

## Connelly, Jennifer M, MD
Neurology
Neuro-Oncology followup Visit

RE: Anniken S Prosser
MR#: 10790724
DOB: 10/10/1983
Date of Clinic Visit: 9/19/2018

Chief Complaint: GBM

History of Present Illness:
Ms. Prosser is a 34 Y/o lady who returns to the Neuro-Oncology clinic for further evaluation and management of a left temporal Grade 4 astrocytoma. She comes to clinic today with her husband and son, Liam. Since her last visit, she has remained on TTFields (compliance 87% in August). She is using clobetasol as needed. She denies any skin issues. She has headaches with her menses. She has otherwise been healthy.

Neuro-oncology History:
H/o migraines – started in mid-20's; possibly secondary to Crohn's meds; diffuse in nature and daily
Feb. 14, 2016 – intractable migraine
 MRI – large left cystic temporal mass
Feb. 25, 2016 – left craniotomy – GBM
May 2016 – completed radiation with Dr. Editha Kruegar with concurrent temodar with Dr. Jasleen Randhawa
June 2016 – continue with adjuvant temodar
June 16, 2016 – started Optune TTFields
April 2017 – completed 12 cycles of temodar; continue TTFields

Past Medical History:

| Diagnosis | Date |
|---|---|
| • Crohn's disease (*) | |
| • GBM (glioblastoma multiforme) (*) left temporal | 2/25/16 |
| • WPW (Wolff-Parkinson-White syndrome) s/p ablation | 1999 |

## Social History

Social History

| | |
|---|---|
| • Marital status: | Married |
| Spouse name: | N/A |
| • Number of children: | N/A |
| • Years of education: | N/A |

Social-History Main Topics
- Smoking status:                    Never Smoker
- Smokeless tobacco:                 Never Used
- Alcohol use                        Not on file
- Drug use:                          Unknown
- Sexual activity:                   Not on file

Other Topics                                           Concern
- Not on file

Social History Narrative
- No narrative on file

**Family History**

| Problem | Relation | Age of Onset |
|---|---|---|
| •Breast Cancer | Maternal Aunt | |
| •Ovarian Cancer | Maternal Cousin | |
| onset in 20's | | |
| •Cancer | Paternal Grandfather | |
| onset in 80's - leukemia | | |

**Current Outpatient Prescriptions**

| Medication | Sig |
|---|---|
| • Calcium Citrate-Vitamin D (CALCIUM + D PO) | Take 2 tablets by mouth daily. |
| • clobetasol propionate (CLOBEVATE OR TEMOVATE) 0.05 % cream | APPLY AS NEEDED TO SCALP RASH. LEAVE ON FOR 20-60 MINUTES, CLEANSE LIGHTLY WITH ALCOHOL AND APPLY ARRAYS |
| • fish oil | Take 1 tablet by mouth daily. |
| • Multiple Vitamins-Minerals (WOMENS DAILY MULTIVITAMIN PO) | Take 1 tablet by mouth daily. |
| • NON FORMULARY MEDICATION | 2 tablets daily. |
| • TURMERIC CURCUMIN PO | Take 2 tablets by mouth daily. Patient uses brand Curcubrain |
| • acetaminophen (TYLENOL) 500 MG tablet | Take 500 mg by mouth every 4 hours as needed. |

**Allergies**

| Allergen | Reactions |
|---|---|
| • Ragweed | EENT - watery eyes |
| • Sulfa Drugs | RESP - shortness of breath |

ROS:
Constitutional - denies fevers, weight loss
Eyes - denies diplopia

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 174 of 631   Document 1-3
EX. 2, P. 13

Ears, Nose, Mouth, Throat - denies difficulty swallowing
Cardiovascular - denies chest pain
Respiratory - denies SOB, cough
Gastrointestinal - denies constipation, diarrhea
Genitourinary - denies dysuria
Integumentary - as per HPI
Neurological - as per HPI
Psych - denies depression, anxiety

Exam:
Vitals:

|  | 09/19/18 1443 |
| --- | --- |
| BP: | 114/76 |
| Pulse: | 75 |
| Patient Position During BP: | Sitting |
| BP taken on: | Right Upper Arm |
| Cuff Size: | Adult Regular |
| Resp: | 16 |
| Temp: | 97.1 °F (36.2 °C) |
| SpO2: | 100% |
| Weight: | 52 kg (114 lb 10.2 oz) |

General: no distress.
Skin: mild contact dermatitis

Neurologic:
Mental Status: Alert and attentive. Oriented to person, place, time and reason for visit. Language fluent with intact comprehension. Immediate recall, working memory, and long-term memory intact. No neglect.

Cranial Nerves:
1 - not assessed
2 - Fully intact visual fields bilaterally via confrontation.
3, 4, 6 - extraocular movements intact and conjugate. Normal smooth pursuit. Normal saccades.
5 - normal facial sensation to light touch bilaterally.
7 - symmetric facies with normal smile, palpebral fractures, nasal labial folds and forced eyelid closure.
8 - grossly intact
9, 10 - symmetric palate elevation.
11 - 5/5 head turning, bilaterally.
12 - tongue midline at rest and upon protrusion.

Motor: 5/5 throughout with normal bulk and tone; no evidence of pronation
Finger tapping: normal frequency and amplitude bilaterally

Reflexes: 2+ throughout

Sensation: Intact to light touch in all 4 extremities

Motor Integration (Cerebellar):
Finger to Nose: Normal bilaterally without ataxia, dysmetria, or tremor.

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 175 of 631 Document 11-5 4406
EX. 2, P. 14

Rapid Alternating Movements: Normal with bilateral hands

Gait:
Normal, not wide-based, no circumduction, no foot drop, no hyperextension of the knee or ankle, no spasticity. No assistive devices.

Karnofsky Performance Score
Able to carry on normal activity and to work; no special care needed - Score = 80% (Normal activity with effort; some signs or symptoms of disease).

ECOG/WHO Score
0 = Fully active, able to carry on all predisease performance without restriction.

Review of Imaging
Mr Brain Wo + W Cont/rCBV Result Date: 9/19/2018
Impression 1. Left temporal treatment bed with small focus of enhancement at the posterior medial margin of the left anterior temporal resection cavity, similar to the prior study. 2. An area of nonenhancing abnormal long TR signal with gyral expansion in the left lateral and medial temporal lobes and in the left insular cortex, similar to the prior study. No new lesions. 3. No evidence for abnormal vascularity on MR perfusion study.



Assessment: Ms. Prosser is a 34 Y/o lady with left temporal GBM on TTFields. She is neurologically intact and radiographically stable. Over the past two years, there has definitely been tumor regression. She is tolerating TTFields well. She will proceed as outlined below.

Recommendations:
1. GBM - Continue Optune TTFields
     Clobetasol for skin irritation
2. RTC 3 months with MRI

25 minutes spent in evaluation, management and coordination of care of patient of which >50% was counseling.

Office Visit on 9/19/2018    Note shared with
                                            patient

Prosser, Anniken S (MR # 10790724) Printed by Guzlecki, Carrie A, RN [27113] at 12/7/...   Page 4 of 5
Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 176 of 631   Document 11-5   4407
EX. 2, P. 15

# Results

MR BRAIN WO + W CONT [70553.000] (Accession#
FH1166-091918) (Order# 224683787)
MR RCBV SEQUENCE [76498.003] (Accession#
FH1165-091918) (Order# 224683788)

## Study Result

**Exam:** MR BRAIN WO + W CONT [70553.000]     **Service Date:**
9/19/18

**Impression:**

1. Left temporal treatment bed with small focus of
enhancement at the posterior medial margin of the left
anterior temporal resection cavity, similar to the prior
study.
2. An area of nonenhancing abnormal long TR signal with
gyral expansion in the left lateral and medial temporal
lobes and in the left insular cortex, similar to the prior
study. No new lesions.
3. No evidence for abnormal vascularity on MR perfusion
study.

**Narrative:**
Examination:
1. MRI of the brain without and with contrast.
2. MR perfusion study with contrast.

Clinical information: 34-year-old female with left temporal
GBM, status postop and post chemoradiation.

Comparison: 06/13/2018.

Technique: Multisequence, multiplanar MR imaging of the
brain was performed without and with contrast. Postcontrast
imaging was performed after the intravenous injection of 5
mL Gadavist. An additional 5 mL of Gadavist were
administered for MR perfusion study.

Prosser, Anniken S (MR # 10790724) Printed by Guzlecki, Carrie A, RN [27113] at 12/7/18 8:58 AM
Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 177 of 631   Document 11-5      4408
EX. 2, P. 16

**Findings:**

Postoperative changes from prior left temporal craniotomy
are again seen. An anterior left temporal resection cavity
is seen, similar in size and appearance to the prior study.
Linear enhancement at the posteromedial margin of the
resection cavity is again seen, similar to the prior study.
There is no definite nodular enhancement. Elsewhere along
the resection cavity, no abnormal enhancement is seen.

No areas of abnormal vascularity are noted on MR perfusion
study.

Gyral expansion and nonenhancing abnormal long TR signal
involving the left lateral and medial temporal lobes and the
left insular cortex is again noted, similar in extent to the
prior study. No new lesions are identified.

Brain parenchymal volume is appropriate for the patient's
age. No acute or subacute infarcts are seen. No acute
intracranial hemorrhage or extra-axial fluid collections are
seen. Areas of susceptibility in the operative bed are
unchanged. Scattered foci of chronic microhemorrhage are
seen in the brain parenchyma, more numerous on the left
side, likely posttreatment. There is no hydrocephalus. No
midline shift is seen and the basal cisterns are patent.
Major intracranial flow voids are present.

Minor scattered sinus mucosal disease is seen. Orbits and
mastoids are unremarkable.

## Result History
MR BRAIN WO + W CONT (Order #224683787) on 9/19/2018 - Order Result History Report

## Signing Information
A preliminary report has been dictated and approved by MOHIT AGARWAL MD on Wed Sep 19, 2018
2:01:32 PM CDT
Image(s) reviewed and final report confirmed by MOHIT AGARWAL MD on Wed Sep 19, 2018 6:02:27
PM CDT

## Reading physician
MOHIT AGARWAL, MD

## PACS Images
Show images for MR BRAIN WO + W CONT

## Scanned Documents - Results, Orders, Documentation
History, Radiology - Scan on 9/19/2018 1:10 PM by Larsen, Jennifer, RTR : mr history brain/rcbv

## Hard Copy Result Report
Open Hard Copy Result Report (Order #224683787 - MR BRAIN WO + W CONT)

## Reviewed By List

Prosser, Anniken S (MR # 10790724) Printed by Guzlecki, Carrie A, RN [27113] at 12/7/18 8:58 AM
Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 178 of 631   Document 11-5    4409
EX. 2, P. 17

# Prosser, Anniken S

MRN: 10790724

**Progress Notes** Encounter Date: 6/13/2018

## Connelly, Jennifer M, MD
Neurology
Neuro-Oncology followup Visit

RE: Anniken S Prosser
MR#: 10790724
DOB: 10/10/1983
Date of Clinic Visit: 6/13/2018

Chief Complaint: GBM

History of Present Illness:
Ms. Prosser is a 34 Y/o lady who returns to the Neuro-Oncology clinic for further evaluation and management of a left temporal Grade 4 astrocytoma. She comes to clinic today with her husband and son, Liam. Since her last visit, she has remained on TTFields (compliance 87% in May). She is using clobetasol as needed. Her skin is doing well. They went on vacation to Florida last month and she was able to manage the heat and humidity and remained compliance with Optune. She denies any neuro symptoms. She inquires about the use of Optune should they decide to expand their family.

Neuro-oncology History:
H/o migraines - started in mid-20's; possibly secondary to Crohn's meds; diffuse in nature and daily
Feb. 14, 2016 - intractable migraine
          MRI - large left cystic temporal mass
Feb. 25, 2016 - left craniotomy - GBM
May 2016 - completed radiation with Dr. Editha Kruegar with concurrent temodar with Dr. Jasleen Randhawa
June 2016 - continue with adjuvant temodar
June 16, 2016 - started Optune TTFields
April 2017 - completed 12 cycles of temodar; continue TTFields

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Crohn's disease (*) | |
| • GBM (glioblastoma multiforme) (*) *left temporal* | 2/25/16 |
| • WPW (Wolff-Parkinson-White syndrome) *s/p ablation* | 1999 |

**Social History**

Social History
| • Marital status: | Married |
|---|---|
| Spouse name: | N/A |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 179 of 631   Document 11-5      4410
EX. 2. P. 18

Encounter Date: 06/13/2018

- Number of children:  N/A
- Years of education:  N/A

Social History Main Topics
- Smoking status:  Never Smoker
- Smokeless tobacco:  Never Used
- Alcohol use  Not on file
- Drug use:  Unknown
- Sexual activity:  Not on file

Other Topics                                              Concern
- Not on file

Social History Narrative
- No narrative on file

**Family History**

| Problem | Relation | Age of Onset |
|---|---|---|
| • Breast Cancer | Maternal Aunt | |
| • Ovarian Cancer | Maternal Cousin | |
| *onset in 20's* | | |
| • Cancer | Paternal Grandfather | |
| *onset in 80's - leukemia* | | |

**Current Outpatient Prescriptions**

| Medication | Sig |
|---|---|
| • acetaminophen (TYLENOL) 500 MG tablet | Take 500 mg by mouth every 4 hours as needed. |
| • Calcium Citrate-Vitamin D (CALCIUM + D PO) | Take 2 tablets by mouth daily. |
| • clobetasol propionate (CLOBEVATE OR TEMOVATE) 0.05 % cream | Apply as needed to scalp rash. Leave on for 20-60 minutes, cleanse lightly with alcohol and apply arrays. |
| • fish oil | Take 1 tablet by mouth daily. |
| • Multiple Vitamins-Minerals (WOMENS DAILY MULTIVITAMIN PO) | Take 1 tablet by mouth daily. |
| • NON FORMULARY MEDICATION | Reasonsreishi mushroom for immune support |
| • TURMERIC CURCUMIN PO | Take 1 tablet by mouth daily. Patient uses brand Curcubrain |

**Allergies**

| Allergen | Reactions |
|---|---|
| • Ragweed | EENT - watery eyes |
| • Sulfa Drugs | RESP - shortness of breath |

ROS:

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 180 of 631   Document 11-5
EX. 2, P. 19

Constitutional - denies fevers, weight loss
Eyes - denies diplopia
Ears, Nose, Mouth, Throat - denies difficulty swallowing
Cardiovascular - denies chest pain
Respiratory - denies SOB, cough
Gastrointestinal - denies constipation, diarrhea
Genitourinary - denies dysuria
Integumentary - as per HPI
Neurological - as per HPI
Psych - denies depression, anxiety

Exam:
Vitals:

|  | 06/13/18 1417 |
|---|---|
| BP: | 132/83 |
| Pulse: | 72 |
| Resp: | 14 |
| Temp: | 97.2 °F (36.2 °C) |
| SpO2: | 99% |
| Weight: | 51.3 kg (113 lb 1.5 oz) |

General: no distress.
Skin: mild contact dermatitis

Neurologic:
Mental Status: Alert and attentive. Oriented to person, place, time and reason for visit. Language fluent with intact comprehension. Immediate recall, working memory, and long-term memory intact. No neglect.

Cranial Nerves:
1 - not assessed
2 - Fully intact visual fields bilaterally via confrontation.
3, 4, 6 - extraocular movements intact and conjugate. Normal smooth pursuit. Normal saccades.
5 - normal facial sensation to light touch bilaterally.
7 - symmetric facies with normal smile, palpebral fractures, nasal labial folds and forced eyelid closure.
8 - grossly intact
9, 10 - symmetric palate elevation.
11 - 5/5 head turning, bilaterally.
12 - tongue midline at rest and upon protrusion.

Motor: 5/5 throughout with normal bulk and tone; no evidence of pronation
Finger tapping: normal frequency and amplitude bilaterally

Reflexes: 2+ throughout

Sensation: Intact to light touch in all 4 extremities

Motor Integration (Cerebellar):
Finger to Nose: Normal bilaterally without ataxia, dysmetria, or tremor.
Rapid Alternating Movements: Normal with bilateral hands

Gait:

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 181 of 631   Document 11-5   4412
EX. 2, P. 20

Normal, not wide-based, no circumduction, no foot drop, no hyperextension of the knee or ankle, no spasticity. No assistive devices.

Karnofsky Performance Score
Able to carry on normal activity and to work; no special care needed - Score = 80% (Normal activity with effort; some signs or symptoms of disease).

ECOG/WHO Score
0 = Fully active, able to carry on all predisease performance without restriction.

Review of Imaging
**Mr Brain Wo + W Cont/rCBV Result Date: 6/13/2018**
Impression  No evidence of disease progression. Left temporal resection cavity with linear enhancement within the anterior and posteromedial aspects of the cavity as well as T2/FLAIR hyperintensity of the adjacent left temporal lobe, insula, and subinsular white matter appear unchanged from 03/15/2018.



Assessment:  Ms. Prosser is a 34 Y/o lady with left temporal GBM on TTFields. She is radiographically stable and neurologically intact.  She is tolerating TTFields very well.  We discussed that pregnancy and Optune have not been formally studied but that there are case reports.  In theory, because the therapy is delivered locally, there would be minimal to low risk to the fetus.  We discussed in pregnancy, we avoid contrast MRIs but can continue with noncontrast studies.  She will proceed as outlined below.

Recommendations:
1.  GBM - Continue Optune TTFields
        Clobetasol for skin irritation
2.  RTC 3 months with MRI

25 minutes spent in evaluation, management and coordination of care of patient of which >50% was counseling.

Office Visit on 6/13/2018    Note shared with
                        patient

# Results

PACS Images
Show images for MR BRAIN WO + W CONT

MR BRAIN WO + W CONT [70553.000] (Accession#
FH0149-061318) (Order# 216928898)
MR RCBV SEQUENCE [76498.003] (Accession#
FH0148-061318) (Order# 216928899)

## Study Result

**Exam:** MR BRAIN WO + W CONT [70553.000]    **Service Date:**
6/13/18

**Impression:**

No evidence of disease progression. Left temporal resection
cavity with linear enhancement within the anterior and
posteromedial aspects of the cavity as well as T2/FLAIR
hyperintensity of the adjacent left temporal lobe, insula,
and subinsular white matter appear unchanged from
03/15/2018.

**Narrative:**

Examination: MRI of the brain without and with contrast; MR
perfusion of the brain with contrast.

Clinical information: 34-year-old female with glioblastoma
multiforme status post resection 02/25/2016, radiation with
concurrent temozolomide completed 5/2016, adjuvant
temozolomide and OPTune 6/2016 completed 4/2017.

Comparison: 12/14/2017, 03/15/2018, 02/24/2016.

Technique: Multisequence, multiplanar MR imaging of the
brain was performed without and with contrast. MR perfusion
was also performed using dynamic susceptibility contrast
(DSC) method with echoplanar technique after contrast
administration. rCBV and rCBF data were post-processed
off-line with the IB Neuro software package. The patient
received a total of 15 mL Gadavist.

Findings:

Post surgical changes: Postoperative changes of large left
frontal-squamous temporal-parietal craniotomy with

Prosser, Anniken S (MR # 10790724) Printed by Guzlecki, Carrie A, RN [27113] at 12/7/18 8:58 AM
Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 183 of 631   Document 11-5     4414
EX. 2, P. 22

underlying resection cavity involving the anterolateral aspect of the left temporal lobe. There is a small amount of irregular enhancement along the posterior medial margin of the resection cavity that appears unchanged, may represent choroid plexus from the left temporal horn. Unchanged linear enhancement within the anterior aspect of the resection cavity. Thin susceptibility artifact along the margin of the resection cavity compatible with hemosiderin deposition from prior blood products. These findings appear unchanged from 03/15/2018.

White matter: There is confluent T2/FLAIR hyperintensity involving the white matter and cortex of the left temporal lobe medial and posterior to the resection cavity. This signal abnormality also extends through the temporal stem into the insula and subinsular white matter. This appears unchanged.

Additional comments: There are a few punctate foci of susceptibility artifact within the left supratentorial brain parenchyma compatible with hemosiderin deposition from chronic microhemorrhages. There is no midline shift, abnormal extra-axial fluid collection, or acute intracranial hemorrhage. The basal cisterns are patent.

Ventricles: There is no hydrocephalus.

Restricted diffusion: There is no restricted diffusion to suggest acute or subacute ischemic infarct.

Enhancement: No abnormal intra-axial or extra-axial enhancement is identified.

Midline structures: The pituitary and craniocervical junction are normal.

Flow voids: The normal major intracranial arterial flow voids are visualized.

Sinuses and mastoid air cells: The imaged paranasal sinuses and mastoid air cells are clear.

Orbits: The imaged orbits are unremarkable.

Marrow: T1 marrow signal of the skull and upper cervical spine is appropriate for age.

MR perfusion: Susceptibility artifact limits evaluation of perfusion signal at the treatment site. However, no focal hyperperfusion is identified to suggest tumor angiogenesis.

**Result History**

Prosser, Anniken S (MR # 10790724) Printed by Guzlecki, Carrie A, RN [27113] at 12/7/18 8:58 AM
Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 184 of 631   Document 11-5   4415
EX. 2, P. 23

MR BRAIN WO + W CONT (Order #216928898) on 6/13/2018 - Order Result History Report

## Signing Information

A preliminary report has been dictated and approved by ANTHONY ZBACNIK MD on Wed Jun 13, 2018 2:23:41 PM CDT

Image(s) reviewed and final report confirmed by STEPHEN A QUINET MD on Wed Jun 13, 2018 3:47:54 PM CDT

## Reading physician

STEPHEN A QUINET, MD

ANTHONY P ZBACNIK, MD

## PACS Images

Show images for MR BRAIN WO + W CONT

## Scanned Documents - Results, Orders, Documentation

History, Radiology - Scan on 6/13/2018 1:38 PM by Pupak, Susan M, RTR : mri

## Hard Copy Result Report

Open Hard Copy Result Report (Order #216928898 - MR BRAIN WO + W CONT)

## Reviewed By List

Connelly, Jennifer M, MD on 6/13/2018 16:29

Connelly, Jennifer M, MD on 6/13/2018 16:29

## Patient Release Status:

This result is not viewable by the patient.

# Order

MR BRAIN WO + W CONT [70553.000] (Accession# FH0149-061318) (Order# 216928898)
MR RCBV SEQUENCE [76498.003] (Accession# FH0148-061318) (Order# 216928899)

## Patient Information

| Patient Name | Sex | DOB |
|---|---|---|
| Prosser, Anniken S (10790724) | Female | 10/10/1983 |

## Service Location

| Name | Address | Phone |
|---|---|---|
| FROEDTERT & THE MEDICAL COLLEGE OF WISCONSIN | 9200 W Wisconsin Ave Milwaukee WI 53226 | 414-805-3000 |

## Performed Date/Time

| DOS | Time |
|---|---|
| Jun 13, 2018 | 12:52 PM |

## Order Providers

| Authorizing Provider | Authorizing Provider Dept | Encounter Provider |
|---|---|---|
| JENNIFER CONNELLY MD, MD | NEUROSCIENCES CC | JENNIFER CONNELLY MD, MD |

## Order Information

| Date of Service | Ordering User | | Ordered As |
|---|---|---|---|
| 6/13/2018 (13:34) | JENNIFER CONNELLY MD, MD | 0000 | NORMAL |

# Results

**PACS Images**
Show images for MR BRAIN WO + W CONT

MR BRAIN WO + W CONT [70553.000] (Accession#
FH0232-031518) (Order# 209170296)
MR RCBV SEQUENCE [76498.003] (Accession#
FH0231-031518) (Order# 209170298)

## Study Result

**Exam:** MR BRAIN WO + W CONT [70553.000]  **Service Date:**
3/15/18

### Impression:

1. Postoperative changes in the left temporal region are
similar to the prior study. Linear enhancement at the
posterior medial margin of the left anterior temporal
resection cavity similar to the prior study.
2. An area of nonenhancing abnormal long TR signal with
gyral expansion in the left lateral and medial temporal
lobes and in the left subinsular region, similar to the
prior study. No new lesions.
3. No evidence for abnormal vascularity on MR perfusion
study.

### Narrative:

Examination:
1. MRI of the brain without and with contrast.
2. MR perfusion study with contrast.

Clinical information: 34-year-old female status postop left
temporal GBM.

Comparison: 12/14/2017.

Technique: Multisequence, multiplanar MR imaging of the
brain was performed without and with contrast. Postcontrast
imaging was performed after the intravenous injection of 6
mL Gadavist. An additional 6 mL of Gadavist were
administered for MR perfusion study.

Findings:

Prosser, Anniken S (MR # 10790724) Printed by Guzlecki, Carrie A, RN [27113] at 12/7/18 9:21 AM
Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 186 of 631   Document 11-5   4417
EX. 2, P. 25

Postoperative changes from prior left temporal craniotomy
are again seen. An anterior left temporal resection cavity
is seen, similar in size and appearance to the prior study.
Linear enhancement at the posteromedial margin of the
resection cavity is again seen, similar to the prior study.
There is no definite nodular enhancement. Elsewhere along
the resection cavity, no abnormal enhancement is seen.

No areas of abnormal vascularity are noted on MR perfusion
study.

Gyral expansion and nonenhancing abnormal long TR signal
involving the left lateral and medial temporal lobes and the
left subinsular region is again noted, similar in extent to
the prior study. No new lesions are identified.

Brain parenchymal volume is appropriate for the patient's
age. No acute or subacute infarcts are seen. No acute
intracranial hemorrhage or extra-axial fluid collections are
seen. Areas of susceptibility in the operative bed are
unchanged. Scattered foci of chronic microhemorrhage are
seen in the brain parenchyma, more numerous on the left
side, likely posttreatment. There is no hydrocephalus. No
midline shift is seen and the basal cisterns are patent.
Major intracranial flow voids are present.

Minor scattered sinus mucosal disease is seen. Orbits and
mastoids are unremarkable.

## Result History

MR BRAIN WO + W CONT (Order #209170296) on 3/15/2018 - Order Result History Report

## Signing Information

A preliminary report has been dictated and approved by MOHIT AGARWAL MD on Thu Mar 15, 2018
1:38:50 PM CDT

Image(s) reviewed and final report confirmed by MOHIT AGARWAL MD on Thu Mar 15, 2018 2:07:01
PM CDT

## Reading physician

MOHIT AGARWAL, MD

## PACS Images

Show images for MR BRAIN WO + W CONT

## Scanned Documents - Results, Orders, Documentation

History, Radiology - Scan on 3/15/2018 12:23 PM by Mercier, Gretchen A, RTR : MRI HISTORY

## Scanned Documents - Results, Orders, Documentation

History, Radiology - Scan on 3/15/2018 12:23 PM by Mercier, Gretchen A, RTR : MRI HISTORY

## Hard Copy Result Report

Open Hard Copy Result Report (Order #209170296 - MR BRAIN WO + W CONT)

Prosser, Anniken S (MR # 10790724) Printed by Guzlecki, Carrie A, RN [27113] at 12/7/18 9:21 AM
Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 187 of 631   Document 11-5   4418
EX. 2, P. 26

992169  05-29-118 16:18:68 89327  12-19-2018
Prosser, Anniken S (MR # 10790 /24)

# Prosser, Anniken S

MRN: 10790724
Description: 34 year old female

**Progress Notes** Encounter Date: 3/15/2018

## Connelly, Jennifer M, MD
Neurology
Neuro-Oncology followup Visit

RE: Anniken S Prosser
MR#: 10790724
DOB: 10/10/1983
Date of Clinic Visit: 3/15/2018

Chief Complaint: GBM

History of Present Illness:
Ms. Prosser is a 34 Y/o lady who returns to the Neuro-Oncology clinic for further evaluation and management of a left temporal Grade 4 astrocytoma. She comes to clinic today with her husband and son, Liam. Since her last visit, she has remained on TTFields (compliance 91% for march). She is using clobetasol as needed. They rotate around open lesions. Neurologically, she is doing great with no other symptoms. She has otherwise been healthy.

Neuro-oncology History:
H/o migraines - started in mid-20's; possibly secondary to Crohn's meds; diffuse in nature and daily
Feb. 14, 2016 - intractable migraine
        MRI - large left cystic temporal mass
Feb. 25, 2016 - left craniotomy - GBM
May 2016 - completed radiation with Dr. Editha Kruegar with concurrent temodar with Dr. Jasleen Randhawa
June 2016 - continue with adjuvant temodar
June 16, 2016 - started Optune TTFields
April 2017 - completed 12 cycles of temodar; continue TTFields

### Past Medical History:

| Diagnosis | Date |
|---|---|
| • Crohn's disease (*) | |
| • GBM (glioblastoma multiforme) | 2/25/16 |
|   left temporal | |
| • WPW (Wolff-Parkinson-White syndrome) | 1999 |
|   s/p ablation | |

### Social History

Social History
| | |
|---|---|
| • Marital status: | Married |
|    Spouse name: | N/A |
| • Number of children: | N/A |
| • Years of education: | N/A |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 188 of 631   Document 11-5   4419
EX. 2, P. 27

Social History Main Topics
- Smoking status:                    Never Smoker
- Smokeless tobacco:                 Never Used
- Alcohol use                        Not on file
- Drug use:                          Unknown
- Sexual activity:                   Not on file

Other Topics                                        Concern
- Not on file

Social History Narrative
- No narrative on file

## Family History

| Problem | Relation | Age of Onset |
|---|---|---|
| • Breast Cancer | Maternal Aunt | |
| • Ovarian Cancer  onset in 20's | Maternal Cousin | |
| • Cancer  onset in 80's - leukemia | Paternal Grandfather | |

## Current Outpatient Prescriptions

| Medication | Sig |
|---|---|
| • acetaminophen (TYLENOL) 500 MG tablet | Take 500 mg by mouth every 4 hours as needed. |
| • Calcium Citrate-Vitamin D (CALCIUM + D PO) | Take 1 tablet by mouth daily. |
| • clobetasol propionate (CLOBEVATE OR- TEMOVATE) 0.05 % cream | Apply as needed to scalp rash. Leave on for 20-60 minutes, cleanse lightly with alcohol and apply arrays. |
| • fish oil | Take 1 tablet by mouth daily. |
| • Multiple Vitamins-Minerals (WOMENS DAILY MULTIVITAMIN PO) | Take 1 tablet by mouth daily. |
| • NON FORMULARY MEDICATION | Reasonsreishi mushroom for immune support |
| • TURMERIC CURCUMIN PO | Take 1 tablet by mouth daily. Patient uses brand Curcubrain |

## Allergies

| Allergen | Reactions |
|---|---|
| • Ragweed | EENT - watery eyes |
| • Sulfa Drugs | RESP - shortness of breath |

ROS:
Constitutional - denies fevers, weight loss
Eyes - denies diplopia

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 189 of 631   Document 11-5    4420
EX. 2, P. 28

Ears, Nose, Mouth, Throat - denies difficulty swallowing
Cardiovascular - denies chest pain
Respiratory - denies SOB, cough
Gastrointestinal - has constipation intermittently while on temodar, this balances the diarrhea caused by Crohns
Genitourinary - denies dysuria
Integumentary - has skin breakdown in scalp
Neurological - as per HPI
Psych - denies depression, anxiety

Exam:
Vitals:

|  | 03/15/18 1429 |
|---|---|
| BP: | 129/87 |
| Pulse: | 85 |
| Resp: | 16 |
| Temp: | 98.2 °F (36.8 °C) |
| SpO2: | 98% |
| Weight: | 51.8 kg (114 lb 3.2 oz) |

General: no distress.
Skin: mild contact dermatitis

Neurologic:
Mental Status: Alert and attentive. Oriented to person, place, time and reason for visit. Language fluent with intact comprehension. Immediate recall, working memory, and long-term memory intact. No neglect.

Cranial Nerves:
1 - not assessed
2 - Fully intact visual fields bilaterally via confrontation.
3, 4, 6 - extraocular movements intact and conjugate. Normal smooth pursuit. Normal saccades.
5 - normal facial sensation to light touch bilaterally.
7 - symmetric facies with normal smile, palpebral fractures, nasal labial folds and forced eyelid closure.
8 - grossly intact
9, 10 - symmetric palate elevation.
11 - 5/5 head turning, bilaterally.
12 - tongue midline at rest and upon protrusion.

Motor: 5/5 throughout with normal bulk and tone; no evidence of pronation
Finger tapping: normal frequency and amplitude bilaterally

Reflexes: 2+ throughout

Sensation: Intact to light touch in all 4 extremities

Motor Integration (Cerebellar):
Finger to Nose: Normal bilaterally without ataxia, dysmetria, or tremor.
Rapid Alternating Movements: Normal with bilateral hands

Gait:

Normal, not wide-based, no circumduction, no foot drop, no hyperextension of the knee or ankle, no spasticity. No assistive devices.

Karnofsky Performance Score
Able to carry on normal activity and to work; no special care needed - Score = 80% (Normal activity with effort; some signs or symptoms of disease).

ECOG/WHO Score
0 = Fully active, able to carry on all predisease performance without restriction.

Review of Imaging
**Mr Brain Wo + W Cont/rCBV Result Date: 3/15/2018**
Impression 1. Postoperative changes in the left temporal region are similar to the prior study. Linear enhancement at the posterior medial margin of the left anterior temporal resection cavity similar to the prior study. 2. An area of nonenhancing abnormal long TR signal with gyral expansion in the left lateral and medial temporal lobes and in the left subinsular region, similar to the prior study. No new lesions. 3. No evidence for abnormal vascularity on MR perfusion study.

Assessment:  Ms. Prosser is a 34 Y/o lady with left temporal GBM on TTFields.  She is neurologically intact and radiographically stable.  She is tolerating TTFields well and has excellent compliance.  She will proceed as outlined below.

Recommendations:
1.  GBM - Continue Optune TTFields
        Clobetasol for skin irritation
2.  RTC 3 months with MRI

 25 minutes spent in evaluation, management and coordination of care of patient of which >50% was counseling.


Office Visit on 3/15/2018  .Note shared with
                                        patient

# novocure

## Patient Compliance Report

**Patient Name:** Anniken Prosser

**Treating Physician:** Dr. Jennifer Connelly

**Treating Institution:** Froedtert Hospital and the Medical College of Wisconsin

**Novocure Patient Number:** 1012479

**Report Date:** March 21, 2018

**Period Covered:** February 24, 2018 – March 20, 2018

**Average Daily Usage:**



Site Patient 1012479
Average Daily Usage 86%

75% Target

**Overall Compliance for the Period:**

**86%**

0%          25%          50%          75%          100%

**Report compiled by: Danita Ziegler**

002123 C2C DIAR_A0000060327 12 13 2013

ANNIKEN PROSSER #1012479

NovoTTF™-100A System is now

# ✖ OPTUNE™ | OPTUNE™ SERVICE AGREEMENT



novocure™    Printed on: 10 May 2016, 07:28:05 am; Printed by: BMILLS

# Supply Terms For Optune™

## Background

Novocure™ inc. is referred to as "we" or "Novocure" in this service agreement ("Service Agreement"). The use of "you" or "your" refers to the patient named in the associated Service Agreement. All capitalized terms not defined herein have the meaning defined in the Service Agreement.

## Supply Terms

Optune (the "System") is comprised of two main components: (1) an Electric Field Generator (the "Device"); and (2) INE Transducer Arrays (the "Arrays") that are disposable supplies to the Device. The System also consists of power supply items and accessories.

Novocure's affiliates hold patents that cover the System, various components of the System, and using the System. Novocure hereby grants an expressly conditional license to you to use the inventions covered by those patents under the terms set forth herein. No other licenses to you is implied.

As an element of consideration for the grant of a license to you, you agree to pay Novocure a monthly fee for access to the System. Notwithstanding anything to the contrary contained in this agreement, any use of the System for which this element of consideration is absent is not licensed under the patents

You acknowledge that, taken together, the consideration due to Novocure for access to the System reflects only the value of the "use" rights conferred by Novocure, and does not provide you with the same suite of rights that would accompany an unconditional sale. Notwithstanding anything to the contrary contained in this agreement, (1) you are not

licensed to use the Device with Arrays that were not purchased from Novocure, and (2) you are not licensed to use any given Array for more than seven (7) days.

You understand that the Device shall at all times remain the property of Novocure.

You understand and agree that Novocure has the right to inspect the System upon request and that you may be responsible for the replacement value of the System in the event it is lost, damaged, or stolen while in your possession or control.

You understand that (i) Novocure has the option to provide new or used equipment including the Device, power supplies and accessories, (ii) you shall not modify or alter any equipment provided to you by Novocure, (iii) you will notify Novocure immediately of any equipment problems, and (iv) the equipment is only to be used upon the order and direction of your doctor.

You understand that the System fees will continue until the date that you call Novocure to pick up the System. You understand that Novocure may stop providing the technical support for the System and may stop providing additional Arrays or replacement items if you fail to comply with the terms of the Service Agreement and Supply Terms, including failure to pay amounts owed or to remit payments due to Novocure that you receive directly from payers.

## Patient Care Responsibilities

You understand and acknowledge that (1) your care is under the supervision and control of your treating physician or other healthcare provider (e.g., nurse practitioner, physician's assistant) who is appropriately licensed, trained and authorized to prescribe and administer the System, (2) your physician or other healthcare provider has prescribed the System as part of your treatment and has explained to you its risks, advantages, possible complications and

2

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 194 of 631   Document 11-5
4425

EX. 2, P. 33

992131 C2C DIAR_A9999969327 12-19-2013

alternatives, and why it is considered necessary treatment for your condition, (3) Novocure's services do not include diagnostic, prescriptive or other functions pertaining to licensed physicians or healthcare providers, and (4) your physician or other healthcare provider is solely responsible for diagnosing and prescribing drugs, equipment and therapy for your condition and otherwise supervising and controlling your medical condition.

## Financial Responsibilities

The rental fee for the System, including use of the Device, related power supplies/accessories and Arrays for 30 days is $21,000.

**Please call (855) 281-9301 if you have any questions about your financial responsibilities.**

Novocure will review your insurance or third party payer (together "Payer") coverage for the purposes of providing you with an estimate of your out of pocket costs associated with the rental fee to use the Device and the purchase of Arrays. Novocure will also prequalify you for eligibility for our Patient Assistance Programs. Formal qualification for financial assistance will require a separate application and documentation of income.

Novocure will submit a claim to your Payer for the System and may appeal such claim if denied. Novocure will bill you for your financial responsibilities related to the System when i) your Payer affirms coverage for your use of the System at the list rental fees and supply prices for the System or ii) Novocure elects not to continue appeals of your case.

If your cost share for the System is not affordable or your Payer refuses to provide coverage for the System, you can also apply to Novocure for financial assistance

Please contact 855-281-9301 or email **support@novocure.com** to inquire about financial assistance programs.

## Warranty Information

Novocure will provide a replacement Device in the event of malfunction that cannot be corrected over the phone by our technical support staff. Novocure will provide replacement Arrays in the event that the Transducer Arrays are defective to manufacturer standards. Novocure will provide replacement power supplies and accessories in accordance with the expected useful lifetime of these items. The above warranty is only valid if the System is used in accordance with the User Manual provided to you. This warranty is personal to you and non-transferable.

Lost equipment, including the Device, Arrays, power supplies and related accessories, and equipment damaged by you or your caregivers is not covered by this warranty.

Printed on. 10 May 2016, 07:28:05 am, Printed by. BMILLS.

3

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 195 of 631   Document 11-5   4426

EX. 2, P. 34

# Patient Information Form For Optune™

## Background

Novocure™ inc. is referred to as "Novocure" in this service agreement ("Service Agreement"). The use of "you" or "your" refers to the patient named in the associated Service Agreement. All capitalized terms not defined herein have the meaning defined in the Service Agreement.

## Notice of Privacy Practices

THIS NOTICE DESCRIBES HOW HEALTH INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION PLEASE REVIEW IT CAREFULLY.

Please contact 855-281-9301 or **support@novocure.com** if you have questions.

## Purpose of this Notice

This notice will tell you about the ways in which Novocure may use and disclose your health information that identifies you ("PHI"). We also describe your rights and certain obligations we have regarding the use and disclosure of PHI

## Our Pledge Regarding Protected Health Information

We understand that health information about you and your health is personal We are committed to protecting health information about you. We create a record of the products and services that we provide to you. We need this record to provide you with quality products and services used in your care and to comply with certain legal requirements. This notice applies to all of the PHI we use and disclose related to the products and services used in your care Your personal doctor, healthcare provider and other entities

providing products or services to you may have different policies or notices regarding their use and disclosure of your PHI

## Our Legal Requirements

We are required by law to

- Make sure that health information that identifies you is kept private.
- Give you this notice of our legal duties and privacy practices with respect to PHI about you,
- Notify you if we are unable to agree to a requested restriction on how your information is used and disclosed,
- Accommodate reasonable requests that you may make to communicate PHI by alternative means or at alternative locations;
- Obtain your written authorization for purposes other than those listed below and permitted under law, and
- Follow the terms of the notice that currently is in effect.

## Who Will Follow Our Privacy Practices

This notice describes Novocure's practices and that of all Novocure employees, staff and other company personnel for US operations only

These entities, sites and locations follow the terms of this notice. Additionally, these entities sites and location may share PHI with each for treatment, payment or health care operations purpose described in this notice

Printed on 10 May 2016, 07 28 05 am, Printed by BMILLS.

## Your Rights Regarding Protected Health Information About You

You have the following rights regarding PHI we maintain about you:

### Right to Inspect and Copy

You have the right to inspect and copy PHI that may be used to make decisions about your care. Usually this includes medical and billing records. To inspect and copy PHI that may be used to make decisions about you, please contact 855-281-9301 or support@novocure.com. We may charge a fee for copying requested files. We may deny your request to inspect and copy in certain circumstances. If you are denied access to PHI, you may request that the denial be reviewed. Another person chosen by us will review your request and the denial. We will comply with the outcome of that review.

### Right to Amend

If you feel that PHI we have about you is incorrect or incomplete, you may ask us to amend the information. You have the right to request an amendment for as long as the information is kept by us. To request an amendment,please contact 855-281-9301 or support@novocure.com. You must provide a reason that supports your request. We may deny your request for an amendment if it does not include a reason to support that request. Additionally, we may deny your request if you ask us to amend information that

- Was not created by us, unless the person or entity that created the information is no longer available to make the amendment,

- Is not part of the PHI kept by or for us

- Is not part of the information which you would be permitted to inspect and copy; or

- Is accurate and complete

## Right to Accounting of Disclosures

You have the right to request an "accounting of disclosures". This accounting is a list of the disclosure we made of PHI about you. Novocure will provide an accounting of all but the following types of disclosure:

- Those made for treatment, payment and health care operations;

- Those made to you about your own PHI;

- Those made to persons involved in your care or other notification purposes;

- Those made pursuant to an authorization signed by you disclosing specific uses and disclosures,

- Where the disclosures are part of a Limited Data Set (as defined in the Health Insurance Portability and Accountability Act);

- Where the disclosures are incidental to an otherwise permissible disclosure,

- For national security or intelligence purposes, and

- To correctional institutions or law enforcement custodial situations.

To request this list or accounting of disclosures, please contact 855-281-9301 or support@novocure.com. We may request that you submit the request in writing. Your request must state a time period that may not be longer than six years from the date of service. Your request should indicate in what form you want the list (i.e., paper or electronic). The first list you request within a 12-month period will be free. For additional lists, we will charge you for the costs of providing the lists. We will notify you of the cost involved and you may choose to withdraw or modify your request at the time before any costs are incurred.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 197 of 631   Document 11-5

4428

EX. 2, P. 36

802134 C2C DIAR_A0000069327 12-19-2018

## Right to Request Restrictions

You have the right to request a restriction or limitation on the PHI we use or disclose about you for treatment, payment. or health care operations. You also have the right to request a limit on the PHI we disclose about you to someone who is involved in your care or the payment for your care, like a family member or friend. You may restrict disclosures of PHI to a health plan if you have paid out-of-pocket in full for the health care item or service. We are not required to agree to your request. If we do agree. we will comply with your request unless the information is needed to provide you emergency treatment. Please contact 855-281-9301 or **support@novocure.com** to request restrictions. We may request a written request You must tell us i) what information you want to limit, ii) whether you want to limit our use, disclosure or both. and iii) to whom you want the limits to apply, for example, disclosures to your spouse.

## Right to Request Confidential Communications

You have the right to request that we communicate with you about medical matters in a certain way or at a certain location. For example, you can ask that we only contact you at work or by mail. Please contact 855-281-9301 or **support@novocure.com** to request confidential communications. We may request a written request. We will accommodate all reasonable requests Your request must specify how or where you wish to be contacted.

## Right to Revoke Authorization

You have the right, in those instances where written authorization is required, to revoke such authorization to use or disclose PHI except to the extent action has already been taken. Such revocation must be in writing

## Right to a Paper Copy of this Notice

You have the right to a paper copy of this notice. You may ask us to give you a copy of this notice at any time. Even if you have agreed to receive this notice electronically, you are still entitled to a paper copy of this notice. Please contact 855-281-9301 or **support@novocure.com** to request a paper copy.

## How We May Use and Disclose Protected Health Information About You

The following categories describe different ways that we are permitted to use and disclose PHI as a health care provider. Certain of these categories may not apply to our business and we may not actually use or disclose your PHI for such purposes. Not every use or disclosure in a category will be listed. However, all of the ways we are permitted or required to use and disclosure PHI, without your authorization, will fall within one of the categories.

## For Treatment

We may use or disclosure PHI about you to assist healthcare professionals and providers provide you with medical treatment or services. For example, we may provide PHI related to your use of our products or services to your physician and the staff at your physician's practice to assist your physician in maintaining appropriate use of the device.

## For Payment

We may use and disclose PHI about you so that the products and services we provide you may be billed to and payment may be collected from you, an insurance company or a third party. For example, we may need to receive from or disclose to your health plan, Medicare, or the medical facility you resided in information about the products and services we provided to you so they or another responsible payor can pay us. This may specifically include information required for the Prescription Order Form, Assignment of Benefits.

6

MRIs, and medical record information. We may also tell your health care provider or plan about a product or service you are going to receive to obtain prior approval or to determine whether your provider or plan will cover that product or service.

## For Health Care Operations

We may use and disclose PHI about you for our health care operations and we may use and disclose PHI about you to other health care providers involved in your care for certain health care operations they have to undertake. These uses and disclosures are necessary to run our company and make sure that users of our products receive the most cost effective and therapeutic products possible. Examples of health care operations activities by Novocure include but are not limited to delivery, pick-up and service functions, collection efforts, internal auditing, business planning (including analysis of product length of use, utility, or development/improvement of reimbursement methods or policy), assessing the quality of care and outcomes in your case and similar cases, and quality assurance/improvement activities. We may also combine PHI about many patients to decide what additional products and services we should offer, what products and services are not needed, and to justify how effective our products are in the care of individuals such as you. We may also disclose information to medical facilities and independent researchers for review and learning purposes. We may remove information that identifies you from this set of PHI so others may use it to study health care and health care delivery without learning who the specific patients are.

## Notice/Reminders

We may use and disclose PHI to contact you or arrange for your health care provider to contact you regarding product delivery, maintenance, in-service or pick-up.

## Individuals Involved in Your Care or Payment for Your Care

We may disclose to a family member, other relative, close personal friend of yours or any other person identified by you PHI directly relevant to such person's involvement with your care or payment for your health care when you are present for, or otherwise available prior to, a disclosure and you are able to make health care decisions, if: (i) we obtain your agreement, (ii) we provide you with the opportunity to object to the disclosure and you failed to do so; or (iii) we infer from the circumstances, based upon professional judgment, that you do not object to the disclosure. We may obtain your oral agreement or disagreement to a disclosure. However, if you are not present, or the opportunity to agree or object to the disclosure cannot practicably be provided because of your incapacity or an emergency circumstance, we may, in the exercise of professional judgment, determine whether the disclosure is in your best interests, and, if so, disclose only PHI that is directly relevant to the person's involvement with your health care.

## Research

Under certain circumstances, we may use and disclose PHI about you for research purposes. For example, a research project may involve comparing the health and recovery of all patients who received on product or service for the same condition. We may also disclose PHI about you to people preparing to conduct a research project, for example to help them look for patients with specific medical circumstances. We will in most circumstances ask for your specific authorization if the researcher will have access to your name, address or other identifying information that reveals who you are.

## As Required by Law

We will disclose PHI about you when required to do so by federal, state or local law. For example, we may disclose information for judicial and administrative proceedings pursuant to legal authority, to report information related to victims of abuse, neglect or domestic violence, or to assist law enforcement officials in their law enforcement duties.

## Government Functions

We may use and disclose PHI about you as required for specialized government functions such as protection of public officials, reporting to various branches of the armed services or national security activities authorized by law

## To Avert a Serious Threat to Health or Safety

We may use and disclose PHI about you when necessary to prevent a serious threat to your health and safety or the health and safety of the public or another person. Any disclosure, however, would only be to someone able to help prevent the threat.

## Business Transfers

There may arise in the course of business the acquisition or sale of our business assets (Business Transfers). Such Business Transfers may involve the sale or purchase of PHI. Also, in the event that Novocure Inc. or its parent entity, Novocure™ Limited of Jersey (Channel Islands), or any subsidiary of Novocure Limited are acquired or substantially all of its assets are acquired, PHI likely will be one of the transferred assets.

## Workers' Compensation

We may release PHI about you for workers' compensation or similar programs. These programs provide benefits for work-related injuries or illness.

## Public Health Activities

We may use or disclose your PHI to a health oversight agency for activities authorized by law. These oversight activities include, for example, audits, investigations, inspections, and licensure. These activities are necessary for the government to monitor the health care system, government programs, and compliance with civil rights laws.

## Lawsuits and Disputes

If you are involved in a lawsuit or a dispute, we may disclose PHI about you in response to a court or administrative order. We may also disclose PHI about you in response to a subpoena, discovery request, or other lawful process by someone else involved in the dispute, but only if efforts have been made to tell you about the request and obtain your written authorization or to obtain an order protecting the information requested.

8

Printed on. 10 May 2016, 07:28:05 am; Printed by. BMILLS

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 200 of 631   Document 11-5

4431

EX. 2, P. 39

## Other Uses of Protected Health Information

Other uses and discloses of PHI not covered by this notice or otherwise permitted by laws that apply to us will be made only with your written authorization. Your authorization will not be required if Novocure uses or discloses health information for purposes other than as covered by this notice or permitted by law if Novocure removes any information that individually identifies you before disclosing the remaining information. If you provide us authorization to use or disclose PHI about you, you may revoke that permission, in writing, at any time. If you revoke your permission we will no longer use or disclose PHI about you for the reasons covered by your written authorization. You understand that we are unable to take back any disclosures we have already made with your permission, and that we are required to retain our records of the products and services that we provided to you.

## Changes to This Notice

We reserve the right to change our information practices and to make the new provisions effective for all PHI we maintain. We also reserve the right to change this notice at any time. We reserve the right to make the revised or changed notice effective for PHI we already have about you as well as any information we receive in the future. You may request current version of our privacy practices by contacting 855-281-9301 or **support@novocure.com**

## Complaints

If you believe your privacy rights have been violated, you may file a complaint with us or with the Secretary of the Department of Health and Human Services. To file a complaint with us, you must submit it in writing to Novocure. Please contact 855-281-9301 or **support@novocure.com** to request the current mailing instructions for Novocure.

# Patient Bill of Rights

## Your Rights

As a patient you have certain rights including but not limited to the following:

- **Information.** Patients have the right to receive accurate, easily understood information to assist them in making informed choices.

- **Choice.** Patients have the right to a choice of health care providers.

- **Access to Emergency Services.** Patients have the right to access emergency health services when and where the need arises

- **Being a Full Partner in Health Care Decisions.** Patients have the right to participate fully in all decisions related to their health care.

- **Care Without Discrimination.** Patients have the right to considerate, respectful care from all members of the healthcare industry at all times and under all circumstances.

- **Privacy.** Patients have the right to communication with healthcare providers in confidence and to have the confidentiality of their individual identifiable health care information protected.

- **Speedy Complaint Resolution.** Patients have the right to a fair and efficient process for resolving differences.

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 201 of 631    Document 11-5    4432

EX. 2, P. 40

882138 C2C DIAR_A000069327 12-19-2018

## Your Responsibilities

As a patient you have certain responsibilities including, but not limited to the following

- **Provide information.** You must give accurate and complete health information concerning your past illnesses, hospital stays, medications, allergies and other pertinent items. You are also responsible for providing documentation required by your insurance company

- **Ask questions.** You must ask question when you do not understand medical conditions, equipment, instructions, and or medical terminology.

- **Follow instructions.** You must adhere to your developed and updated treatment plans.

- **Accept consequences** You must accept consequences for not following the treatment plan instructions of your doctor and nurse.

- **Understand your benefits.** You must understand what your insurance company will or will not authorize for durable medical equipment (DME) benefits.

- **Product responsibilities.** Your doctor has prescribed this medical device for the treatment and care of your disease. This is a rental device and cannot be resold. Prompt return of this device is required once therapy is completed.

- **Show respect and consideration.** You must show respect and consideration to those who are assisting you in your treatment plan including Novocure's staff providing technical support for your use of the device.

- **Meet financial commitments.** You are responsible for any applicable co-insurance, co-payments, or private pay amounts not covered by your insurance provider.

# Contact Information for Questions or Complaints

Any questions, concerns or complaints may be addressed to 855-281-9301 (toll-free) or **support@novocure.com**.

You may contact the Accreditation Commission on Health Care to report any concerns or register a complaint by calling ACHC toll-free at 855-937-2242 or 919-785-1214 and request the Complaints Department.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 202 of 631   Document 11-5   4433
EX. 2, P. 41

002139 C2C DIAR_A00000069327 12-19-2018

# Authorization to Release Information; Assignment of Benefits; Acknowledgment of Education and Training; Acknowledgment of Receipt of Certain Forms; and Delivery Confirmation

## Background

Optune™ (the "System") is comprised of two main components: (1) an Electric Field Generator (the "Device"); and (2) INE Transducer Arrays (the "Arrays") that are disposable supplies to the Device. Novocure™ Inc is referred to as "we" or "Novocure" in this service agreement ("Service Agreement"). The use of "you" in this Service Agreement refers to the patient named in this Service Agreement.

## Authorization to Release Information

You authorize your physician and the practice, facility and hospital of your physician and any other holder of medical information about conditions for which you are being treated to release to Novocure any information necessary for treatment, payment and healthcare operations related to your use of the System. You also authorize Novocure, your physician and the practice, facility and hospital of your physician and any other holder of medical information about conditions for which you are being treated to release such information to your insurance company and any other entity paying for your medical care ("your payer"). These authorizations apply to your current physician and previous physicians, their practices, facilities and hospitals.

## Authorization To Discuss Care

You authorize Novocure to discuss your care with the family members and/or caregivers listed below You may revoke this authorization at any time by calling or emailing Novocure at 855-281-9301 or **support@novocure.com.**

List all authorized individuals

_Barry Prosser , Daniel mees_

## Assignment of Benefits

You give Novocure the right to bill for and receive payments for your medical care and you direct your payer to pay Novocure directly for the System. You agree to forward all payments to Novocure in the event that your payer pays you directly, and you acknowledge that Novocure may stop supplying the

System to you if you fail to do so. You acknowledge receipt of the supply terms and information on financial responsibilities and warranties ("Supply Terms") from Novocure and agree to those terms

## Acknowledgment of Education and Training

You have received education on the use and maintenance of the System. You have been provided a technical support phone number for questions about use of the System. You have been provided with the User Manual for the System. You consent to accept phone calls from Novocure for technical support and health care operations matters, including billing matters.

## Acknowledgment of Certain Forms

You acknowledge that you have received, read and accepted all terms and conditions set forth in these documents.

1. **Patient Information Form**, which includes a Statement of Privacy Practices, Patient Bill of Rights, and Contact Information for Novocure for Questions and/or Complaints

   *We are required by regulation to respond to your complaints within 5 calendar days and respond back to you with the results of our investigation within 14 calendar days*

2. **Supply Terms**, which includes Financial Responsibilities and Warranty information

3. **Advanced Beneficiary Notice** (for Medicare patients only)

*The products and/or services provided to you by Novocure are subject to the supplier standards contained in the Federal regulations shown in 42 Code of Federal Regulations Section 424 57© These standards concern business professional and operational matters (e g , honoring warranties and hours of operation) The full text of these standards can be obtained at http //ecfr.gpoaccess gov Upon request we will furnish you a written copy of the standards "*

Please sign here·

_____  6-16-16
Signature                           Date

Printed on. 10 May 2016, 07:28:05 am; Printed by· BMILLS

## Delivery Confirmation

You acknowledge receipt of the equipment and supplies listed below

| Part Description | Quantity | S/N or Lot Number |
|---|---|---|
| Optune™ Device E0766 | 1 | TFH00801 |
| Connection Cable | 2 | CAD13343    CAD14244 |
| Portable Charger | 1 | ICH10698 |
| Power Supply | 1 | SPS11414 |
| Rack | 1 | PBH11834 |
| Portable Battery | 4 | IBH17598   IBH19986  IBH11571   IBH19609 |
| Black Transducer Array (Lot#) E0766 | 20 | C601203 |
| White Transducer Array (Lot#) E0766 | 20 | C1604101 |
| Device Combo Bag | 1 | |
| Power Cord | 2 | |
| Manual – Instructions for Use | 1 | |
| Operation Manual | 1 | |
| Self-Exchange Kit | 1 | |

You agree to the terms of this Service Agreement and of the related forms that you have received.
The authorizations granted in this Service Agreement will expire two (2) years from the date signed below.

## Signatures

Patient Name (please print): Anniken Prosser

Patient or authorized signature: Anniken S Prosser       Date: 6-16-16

If anyone other than patient completes or signs this form, please enter the following information:

Name _____ Telephone Number _____

Address _____

City, State, Zip _____

Relationship to Patient _____

Reason for Signing _____

## For Novocure™ Use Only

Delivery Person/Service Print: Nancy Newberry

Signature/Tracking#: Nancy Newberry

Delivery Date: 6/16/16

Novocure Patient ID# 1012479

Novocure Order # 18251

©2015 Novocure. All rights reserved. Optune, NovoTTF, and Novocure are trademarks of Novocure
QSF-DME-002 Rev. QR 10 May 2016, 07 28 05 am, Printed by BMILLS

**novocure**

002141 C2C DIAR_A0000069327 12-19-2018



# ✕OPTUNE™ | **PATIENT INFORMATION AND CONSENT**

Optune™ Treatment Education Visit

**IMPORTANT:** Please do not sign this consent until you read and understand the consent  Please discuss any questions you may have with the Novocure™ personnel that will conduct your treatment education  You should feel that signing this form is something you are doing voluntarily. If you feel that you are under pressure, please do not sign this form  Please read this consent to understand the purpose and nature of this treatment education visit  If you sign this consent, you confirm that you understand the purpose and nature of this visit and that you give your consent to participate in the treatment education

You or your physician has requested that Novocure personnel conduct a treatment education visit for Optune. *If you want to hold this session at your physician's office, please tell Novocure personnel prior to the start of the session and do not sign this consent.*

You (and your caregiver(s)) are being trained regarding the use of Optune  As part of this session, you will be taught about the following

• Use of Optune, including how to change the battery, how to recharge the battery and connect to an external power supply, how to connect the transducer arrays connectors to the connector box, and what to do when an alarm occurs;

• How to shave your head to maintain appropriate transducer array contact with your scalp

• How to apply the transducer arrays to your scalp, and

• How to turn Optune "on" and "off"

By signing this consent, you confirm your understanding that

• Novocure personnel conducting your treatment education session are not physicians or healthcare providers  Please talk to your physician regarding your medical care and any questions you may have regarding your medical condition and your treatment options

• Novocure personnel are providing education regarding the use of Optune. You will also receive the Patient Instruction and Operation Manual (PIOM) for Optune, which will be a resource for any questions you may have after this session

• Novocure personnel will teach you and/or your caregiver(s) how to shave your head and apply the transducer arrays. You and/or your caregiver(s) will shave your head and apply the transducer arrays, with assistance from Novocure personnel  Novocure personnel may touch you during the session while teaching you and/or your caregiver(s) to perform these activities

– *You may suffer cuts and possible skin irritation associated with shaving your head*

– *You may suffer mild to moderate skin irritation associated with application of the transducer arrays*

– *You should contact your physician regarding care for any injury you suffer during this treatment education session*

Printed on  20 May 2016, 07:01:14 am; Printed by: BMILLS  Expiration Date

- Novocure personnel will show you and/or your caregiver(s) how to begin therapy by turning Optune "on." It is your decision when to begin Optune therapy. If you initiate therapy today, please initiate therapy in the presence of Novocure personnel, who will confirm Optune is working appropriately

- If you have a medical issue during the session, you consent to Novocure personnel calling 911 and/or emergency medical services

- Your physician will confirm that you understand how to use Optune and its use at your next physician visit

I agree to participate in the treatment-education session described and to allow Novocure personnel to conduct the session.

By signing this form, I have not given up any of my legal rights.

Please print your name  Anniken Prosser

6-16-16
(Date)

_____
(Signature of Participant)

©2015 Novocure. All rights reserved. Optune and Novocure are trademarks of Novocure.
FRM-I FC-Posted on: 20 May 2016, 07:01:14 am, Printed by: BMILLS. Expiration Date.

novocure

982143 C2C DIAR_A0000069327 12-19-2018

# novocure

## Patient Document Acknowledgement

| Document | Initials |
|----------|----------|
| 1. Service Agreement | ASP |
| 2. Patient Rights and Responsibilities (From service agreement) | ASP |
| 3. Supplier Standards (Medicare only) | |
| 4. Financial review/Assessment (Patient was contacted and these items discussed) | ASP |
| 5. How to file a complaint | ASP |

**This form is to be returned to the Commercial Operations Center along with the signed Service Agreement.**

QSF-DME-010 rev: 02

Page 1 of 1

Printed on 20 May 2016, 07:00:31 am, Printed by: BMILLS

002144 C2C DIAR_A0000069327 12-19-2013

# Technical Review of Optune™

| Patient Name: Annika Prosser | Patient #: 1012479 |
|---|---|
| Patient Signature: Annika S Prosser | Date: 6-16-16 |

## Optune ☑
- Overview and Description
- Powering On/Off

## Connection Cable ☑
- Overview and Description
- Connecting to Device

## Powering the Device ☑
- Portable Batteries
- Connecting Power Sources
- Charging Portable Batteries
- Battery Rack and Charger
- Wall Power Supply

## Carrier Bag ☑
- Placement and Carry Options

## Transducer Arrays ☑
- Overview and Description
- Transducer Array Components
- Placement Recommendations
- How to Shift Paired Arrays at Each Array Change
- Skin Observation and Care
- Showering
- Disposal and Reorder

## Troubleshooting ☑
- Alarms
- Common Causes
- Correcting Alarms
- Novocure Support Information
- Equipment Exchange Process

## Placing the Arrays ☑
- Preparing the Head
- Review NovoTAL Map
- Applying the Transducer Arrays

## Patient Literature ☑
- PIOM
- Patient Quick Start Guide

| Novocure Employee Name: Nancy Newberg | |
|---|---|
| Novocure Employee Signature: Nancy C Newberg | Date: 6/16/16 |

# novocure

TM-MA-002 Rev 06
©2015 Novocure. All rights reserved. Optune and Novocure are trademarks of Novocure.
Printed on: 20 May 2016, 07:02:02 am; Printed by: BMILLS  Expiration Date

PAGE 1 of 1

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 208 of 631   Document 11-5   4439
EX. 2, P. 47

NCCN Clinical Practice Guidelines in Oncology
(NCCN Guidelines®)

# Central Nervous System Cancers

Overall management of Central Nervous System Cancers from diagnosis through recurrence is described in the full NCCN Guidelines® for Central Nervous System Cancers. Visit NCCN.org to view the complete library of NCCN Guidelines.

Reproduced with permission from the NCCN Guidelines for Central Nervous System Cancers V.1.2018. © 2018 National Comprehensive Cancer Network, Inc. All rights reserved. The NCCN Guidelines and illustrations herein may not be reproduced in any form for any purpose without the express written permission of NCCN. To view the most recent and complete version of the NCCN Guidelines, go online to NCCN.org. The NCCN Guidelines are a work in progress that may be refined as often as new significant data becomes available.

NCCN makes no warranties of any kind whatsoever regarding their content, use or application and disclaims any responsibility for their application or use in any way.



National
Comprehensive
Cancer
Network®

NCCN

## Anaplastic Gliomas^a/Glioblastoma



**GLIOBLASTOMA PATHOLOGY^d**

**MGMT^q PROMOTER STATUS**

**ADJUVANT TREATMENT**

**FOLLOW-UP^b**

Glioblastoma^a → Age ≤70 y → Good performance status (KPS ≥60)

**Methylated**

- Consider clinical trial (preferred for eligible patients)
- or
- Standard brain RT^t + concurrent temozolomide and adjuvant temozolomide + alternating electric field therapy (category 1)^n,r,s,t
- or
- Standard brain RT^t + concurrent temozolomide and adjuvant temozolomide (category 1)^n,r,s

**Unmethylated or indeterminate**

- Consider clinical trial (preferred for eligible patients)
- or
- Standard brain RT^t + concurrent temozolomide^u and adjuvant temozolomide^u + alternating electric field therapy (category 1)^n,r,s,t
- or
- Standard brain RT^t + concurrent temozolomide^u and adjuvant temozolomide (category 1)^n,r,s,u
- or
- Standard brain RT alone^t

Age >70 y → See GLIO-4

Poor performance status (KPS <60)

- Hypofractionated brain RT^t (preferred) ± concurrent or adjuvant TMZ
- or
- Temozolomide^o
- or
- Palliative/Best supportive care

**Brain MRI** 2–6 wk after RT,^p then every 2–4 mo for 3 y, then every 6 mo indefinitely

See Recurrence (GLIO-5)

---

^a This pathway includes the classification of mixed AOA, AA, AO, and other rare anaplastic gliomas.
^b See Principles of Brain and Spine Tumor Imaging (BRAIN-A).
^c See Principles of Brain Tumor Pathology (BRAIN-F).
^d This pathway also includes gliosarcoma.
^e See Principles of Brain and Spinal Cord Tumor Radiation Therapy (BRAIN-C).
^n See Principles of Brain and Spinal Cord Tumor Systemic Therapy (BRAIN-D).
^o Consider temozolomide if tumor is MGMT promoter methylated.

^p Within the first 3 months after completion of RT and concomitant temozolomide, diagnosis of recurrence can be indistinguishable from pseudoprogression on neuroimaging.
^q MGMT = O^6-methylguanine-DNA methyltransferase.
^r Combination of agents may lead to increased toxicity or radiographic changes.
^s Benefit of treatment with temozolomide beyond 6 months is unknown
^t Alternating electric field therapy is only an option for patients with supratentorial disease.
^u Clinical benefit from temozolomide is likely to be lower in patients whose tumors lack MGMT promoter methylation.

All recommendations are category 2A unless otherwise indicated.
Clinical Trials: NCCN believes that the best management of any patient with cancer is in a clinical trial. Participation in clinical trials is especially encouraged.

GLIO-3

Version 1.2018, 02/20/18 © National Comprehensive Cancer Network, Inc. 2018, All rights reserved. The NCCN Guidelines® and this illustration may not be reproduced in any form without the express written permission of NCCN.

Visit NCCN.org to view the complete library of NCCN Guidelines.

# Central Nervous System Cancers | NCCN Guidelines®

Version 1.2018

## Anaplastic Gliomas[a]/Glioblastoma



| GLIOBLASTOMA PATHOLOGY[d] | MGMT PROMOTER STATUS[q] | ADJUVANT TREATMENT | FOLLOW-UP[b] |
|---|---|---|---|

**Good performance status (KPS ≥60)**

**Methylated** →
- Consider clinical trial (preferred for eligible patients)
  or
- Hypofractionated brain RT[t]
  or
- Standard RT[t] + concurrent and adjuvant temozolomide (category 1)[n,r,s]
  or
- Standard RT[t] + concurrent temozolomide and adjuvant temozolomide + alternating electric field therapy (category 1)[n,r,s,t]
  or
- Standard RT[t] + concurrent temozolomide and adjuvant temozolomide[n,r,s]
  or
- Temozolomide
  or
- Hypofractionated brain RT alone[t]

**Unmethylated or Indeterminate** →
- Consider clinical trial (preferred for eligible patients)
  or
- Hypofractionated brain RT[t]
  or
- Standard RT[t] + concurrent and adjuvant temozolomide[n,r,s]
  or
- Standard RT[t] + concurrent temozolomide[u] and adjuvant temozolomide[u]
+ alternating electric field therapy (category 1)[n,r,s,t]
  or
- Standard RT[t] + concurrent temozolomide[u] and adjuvant temozolomide[n,r,s,u]
  or
- Hypofractionated brain RT alone[t]

**Age >70 y Glioblastoma[j]**

**Poor performance status (KPS <60)** →
- Hypofractionated brain RT alone[t]
  or
- Temozolomide[o]
  or
- Palliative/Best supportive care

**FOLLOW-UP[b]:**
Brain MRI 2–6 wk after RT,[b] then every 2–4 mo for 3 y, then every 6 mo indefinitely → See Recurrence (GLIO-5)

See footnotes on GLIO-4A

All recommendations are category 2A unless otherwise indicated.
Clinical trials: NCCN believes that the best management of any patient with cancer is in a clinical trial. Participation in clinical trials is especially encouraged.

Version 1.2018, 12/2018 © National Comprehensive Cancer Network, Inc. 2018, All rights reserved. The NCCN Guidelines® and this illustration may not be reproduced in any form without the express written permission of NCCN®.

GLIO-4

Visit NCCN.org to view the complete library of NCCN Guidelines.

P........... Wilfred Mamuya on 4/23/2018 8:38:21 AM. For personal use only. Not approved for distribution. Copyright.       National Comprehensive Cancer Network, Inc., All Rights Reserve.

National
Comprehensive
Cancer
Network®

**NCCN Guidelines Version 1.2018**
**Anaplastic Gliomas<sup>a</sup>/Glioblastoma**

NCCN Guidelines Index
Table of Contents
Discussion



**RECURRENCE**

Recurrent
disease<sup>x,p</sup> for:
- Anaplastic
  oligodendroglioma
- Anaplastic
  oligoastrocytoma,
  NOS<sup>c</sup>
- Anaplastic
  astrocytoma
- Anaplastic gliomas
- Glioblastoma

Diffuse or multiple

Local → Resectable → Consider clinical trial or Resection<sup>y</sup>

Unresectable or resection not recommended/elected

→ Brain MRI<sup>b,l</sup>

**TREATMENT<sup>w</sup>**

Consider clinical trials (preferred for eligible patients)
or
Palliative/Best supportive care if poor performance status
or
Systemic chemotherapy<sup>n,y</sup>

Surgery for symptomatic, large lesion
or
Consider alternating electric field therapy for glioblastoma (category 2B)

Consider clinical trials (preferred for eligible patients)
or
Palliative/Best supportive care if poor performance status
or
Systemic chemotherapy<sup>n,y</sup>
or
Consider reirradiation (category 2B)<sup>t,z</sup>
or
Consider alternating electric field therapy for glioblastoma (category 2B)

**Palliative/Best supportive care**
See NCCN Guidelines For Palliative Care

<sup>a</sup>This pathway includes the classification of mixed AOA, AA, AO, and other rare anaplastic gliomas.
<sup>b</sup>See Principles of Brain and Spine Tumor Imaging (BRAIN-A).
<sup>l</sup>Postoperative brain MRI within 24–72 hours after surgery.
<sup>c</sup>The 2016 WHO Classification of Tumors of the CNS has deleted oligoastrocytoma as a category, although "anaplastic oligoastrocytoma, NOS" may continue to be used for 1) patients with mixed histology and no available molecular data (ie, no tissue available for analysis) for determining whether to classify as oligodendroglioma versus astrocytoma; or 2) rare instances in which the tumor has regions with histologic features of oligodendroglioma with 1p19q-codeletion, and distinct regions with histologic features of astrocytoma without 1p19q-codeletion.
<sup>t</sup>See Principles of Brain and Spinal Cord Tumor Radiation Therapy (BRAIN-C).
<sup>n</sup>See Principles of Brain and Spinal Cord Tumor Systemic Therapy (BRAIN-D).

<sup>p</sup>Within the first 3 months after completion of RT and concomitant temozolomide, diagnosis of recurrence can be indistinguishable from pseudoprogression on neuroimaging.
<sup>x</sup>Consider carmustine (BCNU) wafer implant during resection. Treatment with carmustine wafer may impact enrollment in clinical trials.
<sup>w</sup>The efficacy of standard-of-care treatment for recurrent glioblastoma is suboptimal, so for eligible patients consideration of clinical trials is highly encouraged. Prior treatment may impact enrollment in clinical trials.
<sup>x</sup>Consider biopsy, MR spectroscopy, MR perfusion, brain PET/CT, or brain PET/MRI, or re-image to follow changes that may be due to progression versus radionecrosis.
<sup>y</sup>Anaplastic oligodendrogliomas have been reported to be especially sensitive to chemotherapy. Chemotherapy using temozolomide or nitrosourea-based regimens may be appropriate.
<sup>z</sup>Especially if long interval since prior RT and/or if there was a good response to prior RT.

Note: All recommendations are category 2A unless otherwise indicated.
Clinical Trials: NCCN believes that the best management of any patient with cancer is in a clinical trial. Participation in clinical trials is especially encouraged.

Version 1.2018, 03/20/18 © National Comprehensive Cancer Network, Inc. 2018, All rights reserved. The NCCN Guidelines® and this illustration may not be reproduced in any form without the express written permission of NCCN®.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 212 of 631   Document 11-5        4443
EX.   2.   P.   51

002167 C2C DIAR_A00000069327 12-19-2018

JAMA Oncology | Original Investigation

# Influence of Treatment With Tumor-Treating Fields on Health-Related Quality of Life of Patients With Newly Diagnosed Glioblastoma
## A Secondary Analysis of a Randomized Clinical Trial

Martin J. B. Taphoorn, MD; Linda Dirven, PhD; Andrew A. Kanner, MD; Gitit Lavy-Shahaf, PhD; Uri Weinberg, MD, PhD; Sophie Taillibert, MD; Steven A. Toms, MD; Jerome Honnorat, MD, PhD; Thomas C. Chen, MD; Ian Sroubek, MD; Carlos David, MD; Ahmed Idbaih, MD, PhD; Jacob C. Easaw, MD, PhD; Chae-Yong Kim, MD, PhD; Jordi Bruna, MD, PhD; Andreas F. Hottinger, MD, PhD; Yvonne Kew, MD, PhD; Patrick Roth, MD; Rajiv Desai, MD; John L. Villano, MD, PhD; Eilon D. Kirson, MD, PhD; Zvi Ram, MD; Roger Stupp, MD

**IMPORTANCE** Tumor-treating fields (TTFields) therapy improves both progression-free and overall survival in patients with glioblastoma. There is a need to assess the influence of TTFields on patients' health-related quality of life (HRQoL).

**OBJECTIVE** To examine the association of TTFields therapy with progression-free survival and HRQoL among patients with glioblastoma.

**DESIGN, SETTING, AND PARTICIPANTS** This secondary analysis of EF-14, a phase 3 randomized clinical trial, compares TTFields and temozolomide or temozolomide alone in 695 patients with glioblastoma after completion of radiochemotherapy. Patients with glioblastoma were randomized 2:1 to combined treatment with TTFields and temozolomide or temozolomide alone. The study was conducted from July 2009 until November 2014, and patients were followed up through December 2016.

**INTERVENTIONS** Temozolomide, 150 to 200 mg/m²/d, was given for 5 days during each 28-day cycle. TTFields were delivered continuously via 4 transducer arrays placed on the shaved scalp of patients and were connected to a portable medical device.

**MAIN OUTCOMES AND MEASURES** Primary study end point was progression-free survival; HRQoL was a predefined secondary end point, measured with questionnaires at baseline and every 3 months thereafter. Mean changes from baseline scores were evaluated, as well as scores over time. Deterioration-free survival and time to deterioration were assessed for each of 9 preselected scales and items.

**RESULTS** Of the 695 patients in the study, 639 (91.9%) completed the baseline HRQoL questionnaire. Of these patients, 437 (68.4%) were men; mean (SD) age, 54.8 (11.5) years. Health-related quality of life did not differ significantly between treatment arms except for itchy skin. Deterioration-free survival was significantly longer with TTFields for global health (4.8 vs 3.3 months; $P < .01$); physical (5.1 vs 3.7 months; $P < .01$) and emotional functioning (5.3 vs 3.9 months; $P < .01$); pain (5.6 vs 3.6 months; $P < .01$); and leg weakness (5.6 vs 3.9 months; $P < .01$), likely related to improved progression-free survival. Time to deterioration, reflecting the influence of treatment, did not differ significantly except for itchy skin (TTFields worse: 8.2 vs 14.4 months; $P < .001$) and pain (TTFields improved; 13.4 vs 12.1 months; $P < .01$). Role, social, and physical functioning were not affected by TTFields.

**CONCLUSIONS AND RELEVANCE** The addition of TTFields to standard treatment with temozolomide for patients with glioblastoma results in improved survival without a negative influence on HRQoL except for more itchy skin, an expected consequence from the transducer arrays.

**TRIAL REGISTRATION** clinicaltrials.gov Identifier: NCT00916409

JAMA Oncol. doi:10.1001/jamaoncol.2017.5082
Published online February 1, 2018.

Invited Commentary

Supplemental content

Author Affiliations: Author affiliations are listed at the end of this article.

Corresponding Author: Martin J. B. Taphoorn, MD, PhD, Department of Neurology, Haaglanden Medical Center, PO BOX 2191, 2501 VC, The Hague, The Netherlands (m.taphoorn@haaglandenmc.nl).

© 2018 American Medical Association. All rights reserved.

E1

Downloaded From: on 02/01/2018

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 213 of 631 Document 11-5

EX. 2, P. 52

4444

G lioblastoma has a poor prognosis,[1,2] and, as tumors grow, patients often experience a progressive decline in neurologic function and health-related quality of life (HRQoL).[3-7] The current standard of care is not curative but results in prolongation of life. However, extension of survival is meaningful only if patients' functioning and well-being can be retained or improved.[8-11] Therefore, it is important to determine the net clinical benefit of each new treatment or treatment modality introduced; possible benefits of a new treatment, in terms of prolonged survival, have to be carefully weighed against potential negative effects of the treatment on the patients' quality of life.

The current standard of care for patients with newly diagnosed glioblastoma comprises surgical resection to the extent safely feasible followed by radiotherapy with concomitant and maintenance chemotherapy with temozolomide.[12] Tumor-treating fields (TTFields) (Optune; Novocure Ltd) is an antimitotic physical treatment modality[13,14] delivered by a home use medical device with wired transducer arrays placed on the patients' scalp. When added to standard maintenance temozolomide chemotherapy, TTFields has been demonstrated to improve both progression-free survival and overall survival in a randomized clinical trial (NCT00916409).[15]

Treatment with TTFields involves the patient carrying a mobile electrical device for more than 18 hours per day and having 4 arrays of transducers continuously fixed to the shaved scalp. Concerns regarding the influence of wearing the device on patients' HRQoL have therefore been raised.[16,17] The incidence of adverse events was not increased by the addition of TTFields to temozolomide therapy except for an expected mild to moderate skin irritation beneath the electrodes in 52% of pateints (severe in 2%). Herein, we report on the influence of treatment with TTFields on the patients' HRQoL, which was a predefined secondary objective of the randomized clinical trial. The present study was conducted from July 2009 and November 2014, and patients were followed up through December 2016.

## Methods

### Study Population

Patients eligible for this study were aged 18 years or older, had newly diagnosed and histologically confirmed supratentorial glioblastoma (World Health Organization grade IV astrocytoma), were progression free after undergoing maximal safe debulking surgery or biopsy, and had completed standard radiotherapy with concomitant temozolomide. Patients were required to have a Karnofsky Performance Status score of at least 70 at the time of enrollment, corresponding to at least being able to perform self-care. Further details on the study population are available elsewhere.[15] All patients provided written informed consent, and the study was approved by the institutional review boards or ethics committees of all participating centers and the relevant competent authorities (eAppendix 1 in Supplement 1); the participants did not receive financial compensation.

### Key Points

**Question** What is the influence of adding tumor-treating fields to the standard treatment on health-related quality of life in patients with glioblastoma?

**Findings** In this secondary analysis of the EF-14 randomized clinical trial, the addition of tumor-treating fields did not negatively influence health-related quality of life except for itchy skin, an expected consequence from the transducer arrays.

**Meaning** Tumor-treating field therapy has previously been shown to prolong both progression-free and overall survival. When considering the net clinical benefit, improved survival without a negative influence on health-related quality of life supports the addition of tumor-treating fields to standard treatment in patients with glioblastoma.

### Study Design and Treatment

This prospective, multicenter, open-label, randomized clinical phase 3 trial recruited 695 patients at 90 medical centers in North America, Europe, the Republic of Korea, and Israel. The trial protocol is available in Supplement 2. The trial was designed to test the efficacy of TTFields in combination with the best standard of care in the treatment of newly diagnosed glioblastoma (ie, radiotherapy with concomitant and adjuvant temozolomide). The primary end point was progression-free survival, with overall survival as a powered secondary end point. Health-related quality of life was a secondary end point. Patients who were progression free after completion of radiochemotherapy were randomized within 4 to 7 weeks at a ratio of 2:1 to receive standard maintenance temozolomide chemotherapy (150-200 mg/m² for 5 days every 28 days for 6 cycles) with or without the addition of TTFields. If tolerated well, TTField therapy was to be continued until the second progression or up to 2 years.

Patients in the TTFields plus temozolomide group received continuous TTFields combined with maintenance temozolomide. TTFields were delivered through a portable device in an outpatient setting. Patients receiving TTFields had 4 transducer arrays with 9 insulated electrodes each placed on the shaved scalp and connected to a portable device set to generate 200-kHz electric fields within the brain. Although uninterrupted treatment was recommended, the patient could take short breaks if needed; patients were advised to continue treatment for at least 18 hours a day. More details on the study design and treatment are published elsewhere.[15]

### HRQoL Assessment

The evaluation of HRQoL was performed using the validated European Organisation for Research and Treatment of Cancer (EORTC) quality-of-life questionnaire (QLQ-C30) and brain module (QLQ-BN20).[18-20] Questionnaires were completed on paper at baseline (prior to randomization) and subsequently every 3 months for up to 12 months. Nine scales and items were preselected as important based on relevance for patients with glioblastoma and hypothesized effects of the TTFields delivery device on patients' HRQoL: global health status; physical, cognitive, role, social, and emotional functioning; itchy skin;

© 2018 American Medical Association. All rights reserved.

Downloaded From: on 02/01/2018

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 214 of 631    Document 11-5    4445

EX. 2, P. 53

992168 C2C DIAR_A0000060327 12-19-2018

pain; and weakness of legs. We hypothesized that any burden of carrying the device (on physical functioning and itchy skin) or detriment to social and role functioning due to the visibility of the therapy may be balanced by patients' feeling of well-being (global health status and emotional functioning) related to active participation of both the patient and the caregiver in the fight against cancer and increasing patient empowerment. Moreover, we hypothesized that treatment with TTFields would not have an influence on cognitive functioning, pain, and weakness of legs.

## Statistical Analysis

### Calculation of HRQoL Scores

The items on both questionnaires were scaled and scored using the recommended EORTC procedures.[21] Raw scores were transformed to a linear scale ranging from 0 to 100, with a higher score representing a higher level of functioning or higher level of symptoms. The results of this study are presented in accordance with guidelines for reporting HRQoL in cancer clinical trials and methods.[22-24] Differences of at least 10 points (on a 0-100 scale) were classified as the minimum clinically meaningful change in any HRQoL scale/item.[24]

### Descriptive Statistics

Descriptive statistics were used to report HRQoL scores as well as the sociodemographic and clinical variables for the population of patients who completed at least 1 HRQoL scale at baseline separately for both treatment groups. Means and SDs or medians and ranges were calculated for continuous variables depending on the distribution of the variable. Frequencies and percentages were calculated for nominal variables. Differences between arms were tested using a 2-sided $\chi^2$ test or an independent 2-tailed, unpaired $t$ test or Mann-Whitney test at an $\alpha$ value of .05 for each aspect.

Adherence to HRQoL assessments was calculated as the number of forms received divided by the number of forms expected at every assessment. Patients who completed the assessments at the time of progression were included in this analysis.

### HRQoL Scores Over Time

Mean HRQoL scores over time were calculated as well as the mean changes from baseline. A stable HRQoL score was defined as a change of less than 10 points, and a change of 10 or more points indicated a deterioration or improvement depending on the scale or item. Mean change from baseline was plotted to evaluate the longitudinal course of patients' experience of disease and treatment, and a linear mixed-model repeated-measures analysis was used to estimate the treatment effect over time. A sensitivity analysis of complete cases using multiple imputations with a predictive mean matching regression model was used to check the robustness of the treatment effect over time. An additional sensitivity analysis used a repeated-measures model that assumes there is random variation among participants that is related to the time of dropout.

### Stable or Improved HRQoL During the Progression-Free Period

The percentage of patients with stable (<10-point change) or improved (≥10-point change) HRQoL during the progression-

free period, thus excluding the HRQoL assessment at progression, was determined separately for both treatment arms. This calculation was based on the total number of patients with a valid baseline HRQoL assessment and at least 1 additional follow-up assessment. Moreover, the area under the curve of stable or improved HRQoL for the entire duration of stability or improvement was determined, and differences between arms were assessed with the trapezoidal method (eAppendix 2 in Supplement 1).

### Deterioration-Free Survival and Time to Deterioration

Deterioration-free survival was defined as the time to a greater than 10-point deterioration in scores from baseline without a subsequent 10-point or more improvement in scores compared with baseline, progressive disease, or death in the absence of a previous definitive deterioration before the next assessment. Disease progression was included as a surrogate measure. Data were censored at the last HRQoL assessment date for patients with a change of less than 10 points, patients who did not progress, or patients who died after 9 weeks since the last assessment. Data for patients with missing baseline scores were not included, and patients missing all postbaseline HRQoL assessments were censored at randomization. Time to deterioration (TTD) was defined similarly to deterioration-free survival, with the exception that progressive disease was excluded as an event (ie, nonmissing HRQoL data beyond progression were included). Kaplan-Meier methodology was used to estimate deterioration-free survival and TTD distributions and median times, and 95% CIs were computed using the Greenwood formula. The difference between treatment arms



**Figure 1. Consort Diagram**

695 Intent-to-treat population

466 TTFields/temozolomide — 229 Temozolomide alone

437 Baseline HRQoL (93.8% of pts) — 202 Baseline HRQoL (88.2% of pts)

3-Month HRQoL
305 Alive pts (68.2%)
265 Progression-free pts (77.7%)

3-Month HRQoL
126 Alive pts (60.6%)
97 Progression-free pts (78.9%)

6-Month HRQoL
244 Alive pts (58.0%)
172 Progression-free pts (75.1%)

6-Month HRQoL
107 Alive pts (56.0%)
54 Progression-free pts (81.8%)

9-Month HRQoL
156 Alive pts (41.4%)
104 Progression-free pts (72.2%)

9-Month HRQoL
78 Alive pts (47.0%)
41 Progression-free pts (78.9%)

12-Month HRQoL
139 Alive pts (42.3%)
75 Progression-free pts (75.0%)

12-Month HRQoL
58 Alive pts (40.3%)
28 Progression-free pts (80.0%)

Data are the number and percentage of patients in the categories (baseline, alive, and progression-free) who completed the health-related quality-of-life (HRQoL) questionnaire at the indicated times. pts indicates patients. TTFields, tumor-treating fields.

© 2018 American Medical Association. All rights reserved.

Downloaded From: on 02/01/2018

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 215 of 631 Document 11-5

EX. 2, P. 54

4446

Table 1. Baseline Demographic and Disease Characteristics

| Characteristic | TTFields Plus Temozolomide (n = 437) | Temozolomide (n = 202) | All Patients (N = 639) | P Value |
|---|---|---|---|---|
| **Age, y** | | | | |
| Mean (SD) | 54.6 (11.4) | 55.2 (11.6) | 54.8 (11.5) | .50 |
| Median (range) | 56.0 (19-83) | 57.0 (19-80) | 56.0 (19-83) | |
| **Sex, No. (%)** | | | | |
| Male | 297 (68.0) | 140 (69.3) | 437 (68.4) | .73 |
| Female | 140 (32.0) | 62 (30.7) | 202 (31.6) | |
| Antiepileptic medication at baseline, No. (%) | 174 (39.8) | 79 (39.1) | 253 (39.6) | .87 |
| Corticosteroid therapy at baseline, No. (%) | 129 (29.5) | 60 (29.7) | 189 (29.6) | .96 |
| **Region, No. (%)** | | | | |
| United States | 203 (46.5) | 97 (48.0) | 300 (46.9) | .71 |
| Canada, Europe, Israel, and Korea | 234 (53.5) | 105 (52.0) | 339 (53.1) | |
| **Extent of resection, No. (%)** | | | | |
| Biopsy | 55 (12.6) | 24 (11.9) | 79 (12.4) | |
| Partial resection | 149 (34.1) | 70 (34.7) | 219 (34.3) | .97 |
| Gross total resection | 233 (53.3) | 108 (53.5) | 341 (53.4) | |
| **Tumor position, No. (%)[a]** | | | | |
| Corpus callosum | 23 (5.3) | 12 (5.9) | 35 (5.5) | |
| Frontal lobe | 177 (40.5) | 74 (36.6) | 251 (39.3) | |
| Occipital lobe | 55 (12.6) | 24 (11.9) | 79 (12.4) | |
| Parietal lobe | 138 (31.6) | 78 (38.6) | 216 (33.8) | .66 |
| Temporal lobe | 179 (41.0) | 81 (40 1) | 260 (40.7) | |
| Missing | 2 (<1) | 2 (1.0) | 4 (0.6) | |
| **Tumor location, No. (%)[a]** | | | | |
| Left | 202 (46.2) | 84 (41.6) | 286 (44.8) | |
| Right | 234 (53.5) | 116 (57.4) | 350 (54.8) | |
| Both | 4 (0.9) | 2 (1.0) | 6 (0.9) | .65 |
| Corpus callosum | 14 (3.2) | 9 (4.5) | 23 (3.6) | |
| **Completed radiotherapy, No. (%)** | | | | |
| <57 Gy | 20 (4.6) | 10 (5.0) | 30 (4.7) | |
| 60 Gy (standard, ±5%) | 399 (91.3) | 188 (93.1) | 587 (91.9) | |
| >63 Gy | 15 (3.4) | 3 (1.5) | 18 (2.8) | .38 |
| Missing | 3 (0.7) | 1 (0.5) | 4 (0.6) | |
| **Karnofsky performance score** | | | | |
| Median (range) | 90 (60-100) | 90 (70-100) | 90 (60-100) | .26 |
| **Baseline Mini-Mental State Examination score available, No. (%)** | 429 (98.2) | 194 (96.0) | 623 (97.5) | |
| ≤26 | 81 (18.9) | 43 (22.2) | 124 (19.9) | |
| 27-30 | 348 (81.1) | 151 (77.8) | 499 (80.1) | .34 |
| **Cycles (months) of treatment with TTFields** | | NA | NA | NA |
| No. | 425 | | | |
| Mean (SD) | 12.5 (11.8) | | | |
| Median (range) | 8.3 (0-82) | | | |
| **Cycles of treatment with temozolomide** | | | | |
| No. | 430 | 192 | 622 | |
| Mean (SD) | 8.9 (8.3) | 7 5 (6.2) | 8.5 (7.8) | .02 |
| Median (range) | 6.2 (0-51) | 5.5 (0-33) | 5.9 (0-51) | |
| Adherence to TTFields therapy [b] | 327 (74.8) | NA | NA | NA |

Abbreviations: Gy, gray; NA, not applicable; TTFields, tumor-treating fields

[a] Multiple locations possible.

[b] Defined as use of the device 75% or more of the time during the first 3 months of treatment.

was compared using a 2-sided stratified log-rank test. Hazard ratios were estimated using a stratified (for extent of resection and *MGMT* status) Cox proportional hazards regression model.

SAS, version 9.4 (SAS Institute) was used for all statistical analyses, and comparisons between groups were based on the intent-to-treat principle. *P* values <.05 were considered to be

© 2018 American Medical Association. All rights reserved.

Downloaded From: on 02/01/2018

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 216 of 631   Document 11-5

4447

EX. 2, P. 55

002169 C2C DIAR_A0000069327 12-19-2018



Figure 2. Changes in Global Health Status and Itchy Skin



Mean changes in points on health-related quality of life scales from baseline in global health status (A) and itchy skin with (B) with tumor-treating fields (TTFields) plus temozolomide compared with temozolomide alone. No change, between 0 and 10 points; improvement and deterioration, changes of 10 points or more. Error bars indicate SD.

statistically significant. The Hochberg procedure was used to adjust for the multiplicity of treatment comparisons in the preselected HRQoL scales analyses.

## Results

### Patients

A total of 695 patients were randomly assigned in a 2:1 ratio to TTFields plus temozolomide (n = 466) or temozolomide alone (n = 229). A total of 639 (91.9%) patients completed at least 1 HRQoL scale at baseline: 437 (93.8%) of those in the TTFields plus temozolomide arm and 202 (88.2%) patients in temozolomide-alone arm (Figure 1). The baseline demographics of the patients who provided HRQoL data were comparable to those of the intention-to-treat population[15] and were well balanced between treatment arms in this subpopulation (Table 1).

### HRQoL Completion Rates and Baseline Scores

Adherence to HRQoL assessments decreased from 91.9% at baseline to 65.8% (431 of 655 patients alive) at 3 months and dropped to 41.7% (197 of 473 patients alive) at 12 months of follow-up (Figure 1). Mean and median baseline HRQoL scores were comparable between arms for all preselected scales/items (eTable 1 in Supplement 1), as well as the exploratory scales and items. Reference values of HRQoL scores of a healthy general population[25] were available for 7 of 9 predefined scales and items (except itchy skin and weakness of legs). Patients with glioblastoma after completion of radiochemotherapy showed clinically relevant worse functioning or more symptoms compared with the general population on all scales except pain, which was similar.[45]

### Mean Changes in HRQoL From Baseline and the Repeated-Measures Mixed-Effect Model

Mean changes in HRQoL over time for the global health status is presented in Figure 2A and for all 9 predefined HRQoL scales

in the eFigure in Supplement 1. Throughout the 12-month assessment period, mean changes from baseline were stable (<10-point change from baseline) for all 9 predefined HRQoL scales in both treatment arms (eFigure in Supplement 1) with the exception of itchy skin (Figure 2B). For itchy skin, a clinically relevant deterioration (ie, an increase in itchy skin) compared with baseline was seen at the month 3 evaluation in the TTFields plus temozolomide arm (mean [SD] increase, 10.4 [30.1] points vs an improvement of 2.3 [24.4] points in the temozolomide arm). For differences between treatment arms, patients treated with TTFields plus temozolomide had significantly and clinically relevant worse itchy skin at 3, 6, and 9 months than patients treated with temozolomide alone, but not at 12 months (mean [SD] increase of 10.4 [30.1] in the TTFields plus temozolomide arm vs a decrease of 2.3 [24.4] in the temozolomide-alone arm, *P* = .005; increase of 8.1 [31.6] in the TTFields plus temozolomide arm vs a decrease of 4.2 [31.4] in the temozolomide-alone arm, *P* = .008; increase of 5.3 [28.0] in the TTFields plus temozolomide arm vs a decrease of 5.2 [29.6] in the temozolomide-alone arm, *P* = .04; increase of 4.6 [32.8] in the TTFields plus temozolomide arm vs a decrease of 1.9 [36.9] in the temozolomide-alone arm, *P* = .66, respectively). For all other scales, there were no statistically significant or clinically relevant differences between treatment arms.

The repeated-measures mixed-effect model supported this finding, with no statistically significant difference between treatment arms in HRQoL scores over time in any predefined scale or item except for itchy skin (*P* < .001), which was worse in the TTFields plus temozolomide arm (eTable 2 in Supplement 1). The sensitivity analyses showed that the results of the linear mixed model were robust.

### Stable or Improved HRQoL During Progression-Free Time

Compared with baseline, more patients in the TTFields plus temozolomide arm compared with the temozolomide-alone arm reported stable or improved scores for global health status (53.5% vs 38.0%, respectively, *P* = .001), physical func-

© 2018 American Medical Association. All rights reserved.

Downloaded From: on 02/01/2018

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 217 of 631   Document 11-5    4448
EX. 2, P. 56

**Table 2. Stable or Improved Health-Related Quality of Life During Progression-Free Time**

| Characteristic | TTFields Plus Temozolomide (n = 361) | Temozolomide (n = 142) | P Value | α Value |
|---|---|---|---|---|
| **Pain** | | | | |
| Stable/improved from baseline, No./No. (%) | 205/361 (56.8) | 51/142 (35.9) | <.001 | .05 |
| Median duration (95% CI), mo | 6.2 (5.9 to 7 0) | 6.3 (5.6 to 9.1) | .88 | |
| Median CFB AUC until last stable/improved status (95% CI) | 0 (0 to 0) | 0 (0 to 0) | .80 | |
| **Global health status** | | | | |
| Stable/improved from baseline, No./No. (%) | 192/359 (53.5) | 53/141 (37.6) | .001 | .025 |
| Median duration (95% CI), mo | 6.3 (5.9 to 7.0) | 7.9 (5.9 to 9.8) | .24 | |
| Median CFB AUC until last stable/improved status (95% CI) | 24.4 (11.9 to 35.0) | 65.9 (13.1 to 121.3) | .13 | |
| **Physical functioning** | | | | |
| Stable/improved from baseline, No./No. (%) | 195/361 (54.0) | 54/142 (38.0) | .001 | .017 |
| Median duration (95% CI), mo | 6.2 (5.9 to 8.2) | 9.1 (5.9 to 9.8) | .21 | |
| Median CFB AUC until last stable/improved status (95% CI) | 0 (0 to 18.7) | 0 (0 to 30.0) | .53 | |
| **Weakness of legs** | | | | |
| Stable/improved from baseline, No./No. (%) | 206/351 (58.7) | 58/138 (42.0) | .001 | .013 |
| Median duration (95% CI), mo | 6.3 (6.0 to 8 3) | 9.1 (5.9 to 9.8) | .08 | |
| Median CFB AUC until last stable/improved status (95% CI) | 0 (0 to 0) | 0 (0 to 0) | .51 | |
| **Cognitive functioning** | | | | |
| Stable/improved from baseline, No./No. (%) | 181/359 (50.4) | 55/142 (38.7) | .02 | .01 |
| Median duration (95% CI), mo | 6.0 (4.9 to 6.5) | 6.2 (5.7 to 9.6) | .65 | |
| Median CFB AUC until last stable/improved status (95% CI) | 26.3 (0 to 48.6) | 0 (0 to 93.3) | .37 | |
| **Emotional functioning** | | | | |
| Stable/improved from baseline, No./No. (%) | 196/359 (54.6) | 62/142 (43.7) | .03 | .008 |
| Median duration (95% CI), mo | 6.3 (6.0 to 8.3) | 7.7 (5.8 to 9.4) | .38 | |
| Median CFB AUC until last stable/improved status (95% CI) | 22.6 (5.8 to 35.0) | 25.2 (0 to 54 4) | .73 | |
| **Social functioning** | | | | |
| Stable/improved from baseline, No./No. (%) | 173/359 (48.2) | 58/142 (40.8) | .14 | .007 |
| Median duration (95% CI), mo | 6.2 (5.9 to 7.1) | 6.7 (5.9 to 9.6) | .40 | |
| Median CFB AUC until last stable/improved status (95% CI) | 16.5 (0 to 47.2) | 0 (0 to 54.4) | .90 | |
| **Role functioning** | | | | |
| Stable/improved from baseline, No./No. (%) | 173/361 (47.9) | 58/141 (41.1) | .17 | .006 |
| Median duration (95% CI), mo | 5.9 (4.4 to 6.3) | 7.3 (5.7 to 9.3) | .27 | |
| Median CFB AUC until last stable/improved status (95% CI) | 0 (0 to 25 0) | 46.7 (0 to 75.8) | .34 | |
| **Itchy skin** | | | | |
| Stable/improved from baseline, No./No. (%) | 148/349 (42.4) | 64/137 (46.7) | .39 | .0056 |
| Median duration (95% CI), mo | 6.0 (4.7 to 6 3) | 6 7 (5.6 to 9.4) | .37 | |
| Median CFB AUC until last stable/improved status (95% CI) | 0 (0 to 0) | 0 (−102.2 to 0) | .19 | |

Abbreviations AUC, area under the curve; CFB, change from baseline. TTFields, tumor-treating fields.

tioning (54.0% vs 37.0%, respectively; P = .001), pain (56.8% vs 35.9%, respectively; P < .001), and weakness of legs (58.7% vs 42.0%, respectively; P = .001) but not in any of the other HRQoL scales and items. However, the duration of stable or improved HRQoL was shorter in the TTFields plus temozolomide arm, although not significantly different from the temo-

zolomide arm for any of the HRQoL scales and items. Overall, with a combination of these measures, the area under the curve analysis showed no significant differences between treatment arms for any of the HRQoL scales and items, indicating a similar HRQoL between treatment arms while patients did not experience tumor progression (Table 2).

© 2018 American Medical Association. All rights reserved.

Downloaded From: on 02/01/2018

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 218 of 631    Document 11-5    4449

EX. 2, P. 57

002179 C2C DIAR_A00000068327 12-19-2018

**Figure 3. Deterioration-Free Survival and Time to Deterioration**



**A** Deterioration-free survival

| Source | Median, mo | | HR (95% CI) |
|---|---|---|---|
| | TTFields Plus Temozolomide | Temozolomide Alone | |
| Progression-free survival | 6.7 | 4.0 | 0.69 (0.57-0.83) |
| Deterioration-free survival | | | |
| Global health status | 4.8 | 3.3 | 0.73 (0.60-0.88) |
| Physical functioning | 5.1 | 3.7 | 0.73 (0.60-0.88) |
| Cognitive functioning | 4.4 | 3.6 | 0.78 (0.64-0.94) |
| Role functioning | 4.3 | 3.8 | 0.86 (0.71-1.02) |
| Social functioning | 4.5 | 3.9 | 0.84 (0.70-1.06) |
| Emotional functioning | 5.3 | 3.9 | 0.75 (0.62-0.91) |
| Pain | 5.6 | 3.6 | 0.67 (0.56-0.81) |
| Itchy skin | 3.9 | 4.0 | 1.03 (0.85-1.25) |
| Weakness of legs | 5.6 | 3.9 | 0.74 (0.61-0.89) |

**B** Time to deterioration

| Source | Median, mo | | HR (95% CI) |
|---|---|---|---|
| | TTFields Plus Temozolomide | Temozolomide Alone | |
| Global health status | 14.130 | 9.63 | 0.81 (0.60-1.10) |
| Physical functioning | 14.170 | 13.97 | 0.90 (0.66-1.24) |
| Cognitive functioning | 10.270 | 13.97 | 0.95 (0.71-1.28) |
| Role functioning | 9.20 | 13.97 | 1.16 (0.86-1.56) |
| Social functioning | 10.60 | 13.97 | 1.25 (0.91-1.72) |
| Emotional functioning | 13.430 | 14.03 | 0.88 (0.64-1.21) |
| Pain | 13.370 | 12.13 | 0.65 (0.48-0.89) |
| Itchy skin | 8.167 | 14.40 | 1.85 (1.33-2.57) |
| Weakness of legs | 14.170 | 14.03 | 0.71 (0.51-0.99) |

Deterioration-free survival (A) and time to deterioration (B) for health-related quality-of-life domains in patients who received tumor-treating fields (TTFields) plus temozolomide compared with temozolomide alone. HR indicates hazard ratio.

## Deterioration-Free Survival and TTD

The addition of TTFields to standard temozolomide chemotherapy resulted in statistically significant longer deterioration-free survival in global health status, physical and emotional functioning, pain, and weakness of legs (Figure 3A and eTable 2 in Supplement 1); the significant difference remained after correction for multiple testing. When progression was removed as a deterioration event (TTD), there was no negative influence of TTFields plus temozolomide treatment on the TTD of HRQoL (Figure 3B) except for itchy skin, which was worse in the TTFields plus temozolomide arm (8.2 vs 14.4 months). In contrast, the addition of TTFields to temozolomide resulted in a statistically significant prolongation until deterioration for pain (13.4 vs 12.1 months, $P < .01$). There were no other significant differences in TTD between arms (Figure 3B).

## Discussion

In our detailed analysis of HRQoL during therapy with TTFields in addition to temozolomide, no significant difference was found between the groups in patients' HRQoL over time except for the skin reaction. As expected, itchy skin was reported more frequently in patients treated with TTFields because of the transducer arrays that have to be placed on the scalp of the patient. Consistently, over half of the patients also reported skin irritation as an adverse event. We had hypothesized that patients treated with TTFields may have better HRQoL in some domains as a result of active participation in the fight against cancer and the frequent interactions between patients and caregivers and device technicians regarding the device. However, on a group level, global health status and emotional functioning were not significantly different between treatment arms. Likewise, our hypotheses that the addition of TTFields would result in worse role and social functioning (due to the visibility of the device) and worse physical functioning were not confirmed. In line with our hypotheses, cognitive functioning, pain, and weakness of legs were not negatively affected by the addition of TTFields to temozolomide treatment. Most relevant for patients, HRQoL was maintained (in 8 of 9 of the predefined scales/items) over time. Combining the results of the survival and HRQoL analyses suggests that the addition of TTFields to adjuvant temozolomide is of value to patients with glioblastoma.

Patients who received TTFields had significantly longer deterioration-free survival compared with those in the temozolomide-alone arm for global health status (4.8 vs 3.3 months; $P < .01$), physical (5.1 vs 3.7 months; $P < .01$) and

© 2018 American Medical Association. All rights reserved.

Downloaded From: on 02/01/2018

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 219 of 631 Document 11-5

4450

EX. 2, P. 58

emotional functioning (5.3 vs 3.9 months; $P < .01$), pain (5.6 vs 3.6 months; $P < .01$), and weakness of legs (5.4 vs 3.9 months; $P < .01$). For the other scales and items, there was no significant difference in deterioration-free survival between the 2 treatment arms. The prolonged deterioration-free survival for these scales is explained by the extended progression-free survival for patients in the combined TTFields plus temozolomide arm, as progressive disease is included as an event in this analysis. Therefore, TTD analyses, excluding progressive disease as an event, is important to illustrate the influence of a treatment on HRQoL: TTD was not significantly different across any HRQoL scale or item in TTFields-treated patients except for pain and itchy skin, indicating that treatment with TTFields had an influence only on the level of pain and itchy skin. In patients treated with TTFields, TTD was significantly longer for pain (13.4 vs 12.1 months; $P < .01$) and significantly shorter for itchy skin (8.2 vs 14.4 months; $P < .001$). The difference between deterioration-free survival and TTD indicates the importance of disease progression (rather than treatment) as a key event driving HRQoL decline, as suggested by previous studies.[26,27] Moreover, in only 1% of patients, regardless of treatment arm, was a clinically relevant improvement in HRQoL seen after initial deterioration, supporting this observation. Taken together, the results of the deterioration-free survival and TTD analyses support the results of the longitudinal analysis by showing that the addition of TTFields to the standard of care did not adversely affect HRQoL. In fact, the delay in TTD for pain seen in TTFields-treated patients may reflect a delay in the occurrence of tumor-related headaches (although not significant, patients in the TTFields plus temozolomide arm had a longer TTD compared with patients in the temozolomide-alone arm for headaches: hazard ratio, 0.77; 95% CI, 0.54-1.10; $P = .16$). Future studies are needed to better understand this finding, as the median TTD values for pain were longer than the median progression-free survival for both arms.

## Limitations

A common problem in many cancer clinical trials, as in this study, is missing HRQOL data. This absence is especially apparent during the follow-up period, hampering longitudinal data analysis. Patients with better prognostic factors and a good treatment response will be overrepresented at later stages.[28,29] However, our mixed-model analyses, accounting for missing data, confirmed the results found in the mean change from baseline analyses. Another limitation of clinical trials is generalizability of results—patients in clinical trials may not be representative of a general glioblastoma population. Patients in this trial were included only if they successfully completed the combined radiochemotherapy. In addition, it may be that not all patients are prepared to accept wearing the TTFields device. Nevertheless, patients participating in this trial were similar with respect to clinical characteristics to those participating in the EORTC 26981 study[12] comparing radiotherapy alone with radiotherapy plus temozolomide. Lastly, many factors may affect HRQoL, such as age, comorbidity, tumor characteristics, previous antitumor treatment (eg, radiation dose), and supportive treatment. However, it is unlikely that these factors influenced our conclusion, as the objective of this study was to compare HRQoL results between 2 treatment arms in which patients were similar due to randomization.

## Conclusions

Use of TTFields prolongs progression-free and overall survival in patients with glioblastoma. The addition of this novel device-delivered treatment well neither negatively affects nor improves functioning and well-being of the patient, including critical HRQOL issues, such as role, social, and physical functioning. Patients reported more itchy skin, which is a direct and expected consequence of the placement of transducer arrays on the patients' scalp. Considering the net clinical benefit, our HRQoL data support the addition of TTFields to standard therapy in patients with glioblastoma.

**ARTICLE INFORMATION**

**Accepted for Publication:** November 12, 2017.

**Published Online:** February 1, 2018.
doi:10.1001/jamaoncol.2017.5082

**Open Access:** This article is published under the JN-OA license and is free to read on the day of publication.

**Author Affiliations:** Department of Neurology, Haaglanden Medical Center, The Hague, The Netherlands (Taphoorn, Dirven); Department of Neurology, Leiden University Medical Center, Leiden, The Netherlands (Taphoorn, Dirven); Department of Neurosurgery, Rabin Medical Center, Sackler School of Medicine, Tel Aviv University, Tel Aviv, Israel (Kanner); Research and Development, Novocure, Haifa, Switzerland (Lavy-Shahaf, Weinberg, Kirson); Department of Neurology 2, Salpêtrière University Hospital, Assistance Public Hôpitaux de Paris, L'Université Pierre et Marie Curie University, Paris VI University, Paris, France (Taillibert, Idbaih); Department of Neurosurgery, Geisinger Medical Center, Danville, Pennsylvania (Toms); Department of Neuro-

oncology, Hospices Civils de Lyon, University Claude Bernard Lyon, Lyon, France (Honnorat); Department of Neurosurgery, University of Southern California, Los Angeles (Chen); Department of Neurosurgery, Na Homolce Hospital, Prague, Czech Republic (Sroubek); Department of Neurosurgery, Lahey Clinic, Burlington, Massachusetts (David); Department of Medical Oncology, Cross Cancer Institute, Edmonton, California (Easaw); Department of Neurosurgery, Seoul National University Bundang Hospital, Seoul National University College of Medicine, Bundang, Korea (Kim); Department of Neurology, Hospital Universitari Bellvitge, Barcelona, Spain (Bruna); Department of Medical Oncology, Centre Hospitalier Universitaire Vaudois, Lausanne, Switzerland (Hottinger); Clinical Neuro-Oncology Research Program, Department of Internal Medicine, Methodist Hospital, Houston, Texas (Kew); Department of Neurology, University of Zurich, Zurich, Switzerland (Roth); Neurosurgery and Spine Association, Maine Medical Center, Scarborough, Maine (Desai); Clinical Neuro-Oncology Research Program, Department of

Internal Medicine, University of Kentucky Medical Center, Lexington (Villano); Department of Neurosurgery, Tel Aviv Medical Center, Tel Aviv University, Tel Aviv, Israel (Ram); Robert H. Lurie Comprehensive Cancer Center, Northwestern University Feinberg School of Medicine, Chicago, Illinois (Stupp); Northwestern Brain Tumor Institute, Northwestern University Feinberg School of Medicine, Chicago, Illinois (Stupp).

**Author Contributions:** Drs Taphoorn and Dirven contributed equally to the study. Drs Stupp and Kirson had full access to all data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* Taphoorn, Dirven, Villano, Kirson, Ram, Stupp.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* Taphoorn, Dirven, Lavy-Shahaf, Bruna, Kirson, Stupp.
*Critical revision of the manuscript for important intellectual content:* Taphoorn, Dirven, Kanner, Lavy-Shahaf, Weinberg, Taillibert, Toms, Honnorat, Chen, Sroubek, David, Idbaih, Easaw, Kim, Bruna,

© 2018 American Medical Association. All rights reserved.

Downloaded From: on 02/01/2018

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 220 of 631    Document 11-5    4451

EX. 2, P. 59

002171 C2C DIAR_A0000068327 12-19-2018

Hottinger, Kew, Roth, Desai, Villano, Ram, Stupp, Kirson.

*Statistical analysis:* Taphoorn, Dirven, Lavy-Shahaf, Kirson.

*Administrative, technical, or material support:* Kanner, Lavy-Shahaf, Weinberg, Taillibert, Toms, Chen, David, Kim, Hottinger, Kew, Roth, Villano, Stupp

*Study supervision:* Bruna, Roth, Desai, Villano, Kirson, Ram, Stupp.

**Conflict of Interest Disclosures:** Dr Taphoorn has performed paid consultancy for Hoffmann-La Roche. Dr Lavy-Shahaf is an employee of and received personal fees from Novocure during the conduct of the study. Drs Weinberg and Kirson are employees of and own minority stock in Novocure. Dr Taillibert received fees from Centre-de-Recherche-en-Neuro-Oncologie for enrolling patients at Salpêtrière University Hospital during the conduct of the study. Dr Idbaih received research support from Foundation ARC, IntselChimos, Beta-Innov, and Carthera and travel support from Carthera and Hoffmann-La Roche and served as a paid member of the advisory boards of BMS, Hoffmann-La Roche, and Lettre du Cancérologue. Dr Hottinger received research support from Novocure and served on advisory boards of Servier and BMS (fees paid to the institution). Dr Roth served as a paid member of the advisory boards of Roche and MSD and received personal fees for lectures on behalf of BMS and Novocure. Dr Ram received grants and personal fees from and owns minority stock in Novocure. Dr Stupp received nonfinancial support from Novocure, and his institution received fees from Celgene, Novartis, AbbVie, Merck KGaA (Darmstadt), and MSD-Merck & Co. Dr Stupp's spouse is a full-time employee of Celgene. No other conflicts were reported.

**Funding/Support:** The study was funded by Novocure Ltd.

**Role of the Funder/Sponsor:** Novocure Ltd had a role in the design and conduct of the study; collection, management, and analysis of the data; and decision to submit the manuscript for publication. The study was designed by Drs Stupp and Ram, together with representatives from Novocure, mainly Dr Kirson. The study oversight was supported and monitored by a clinical research organization, which also held the database. Data were collected by the investigators and monitored by the clinical research organization. The statistical analysis plan for the quality of life analyses was developed by Drs Taphoorn, Dirven, Kirson, and Lavy-Shahaf, the sponsor's statistician. Data interpretation was the responsibility of Drs Taphoorn, Dirven, Kirson, and Stupp. The first draft of this manuscript was developed by Drs Taphoorn, Dirven, Kirson, and Stupp. A subsequent mature draft and prefinal version were circulated among all authors who gave additional input, contributed to, and approved the manuscript. The decision to publish the data and its interpretation was made by Drs Stupp and Ram and was supported by all coauthors.

**Meeting Presentation:** This research was presented as a late-breaking oral presentation at the 2017 American Society for Radiation Oncology Annual Meeting; September 24, 2017; San Diego, California.

**Additional Contributions:** We thank the patients and their families for participating in the trial. We are grateful to all study investigators, nurses, and supporting staff for providing care to the patients and data management.

**Additional Information:** The study oversight was supported and monitored by a clinical research organization that also held the database. The clinical research organization varied among countries and each was paid by Novocure Ltd.

**REFERENCES**

1. Adamson C, Kanu OO, Mehta AI, et al. Glioblastoma multiforme: a review of where we have been and where we are going. *Expert Opin Investig Drugs*. 2009;18(8):1061-1083.

2. Ohgaki H. Epidemiology of brain tumors. *Methods Mol Biol*. 2009;472:323-342.

3. Henriksson R, Asklund T, Poulsen HS. Impact of therapy on quality of life, neurocognitive function and their correlates in glioblastoma multiforme: a review. *J Neurooncol*. 2011;104(3) 639-646.

4. Osoba D, Aaronson NK, Muller M, et al. Effect of neurological dysfunction on health-related quality of life in patients with high-grade glioma. *J Neurooncol*. 1997;34(3)-263-278.

5. Taphoorn MJ, Klein M. Cognitive deficits in adult patients with brain tumours. *Lancet Neurol*. 2004;3 (3).159-168.

6. Taphoorn MJ, Sizoo EM, Bottomley A. Review on quality of life issues in patients with primary brain tumors. *Oncologist*. 2010;15(6).618-626.

7. Corn BW, Wang M, Fox S, et al. Health related quality of life and cognitive status in patients with glioblastoma multiforme receiving escalating doses of conformal three dimensional radiation on RTOG 98-03. *J Neurooncol*. 2009;95(2).247-257.

8. Chu L, Chu N, Zeng L, et al. Quality of life in patients with primary and metastatic brain cancer as reported in the literature in the EORTC QLQ-BN20 and QLQ-C30 *Expert Rev Pharmacoecon Outcomes Res*. 2012;12(6):831-837

9. Archibald YM, Lunn D, Ruttan LA, et al. Cognitive functioning in long-term survivors of high-grade glioma. *J Neurosurg*. 1994;80(2).247-253.

10. Meyers CA, Rock EP, Fine HA. Refining endpoints in brain tumor clinical trials. *J Neurooncol*. 2012;108(2) 227-230.

11. Hottinger AF, Yoon H, DeAngelis LM, Abrey LE. Neurological outcome of long-term glioblastoma survivors. *J Neurooncol*. 2009;95(3):301-305.

12. Stupp R, Mason WP, van den Bent MJ, et al, European Organisation for Research and Treatment of Cancer Brain Tumor and Radiotherapy Groups. National Cancer Institute of Canada Clinical Trials Group. Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. *N Engl J Med*. 2005;352(10):987-996.

13. Giladi M, Schneiderman RS, Voloshin T, et al. Mitotic spindle disruption by alternating electric fields leads to improper chromosome segregation and mitotic catastrophe in cancer cells. *Sci Rep*. 2015;5 18046.

14. Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of cancer cell replication by alternating electric fields. *Cancer Res*. 2004;64(9).3288-3295.

15. Stupp R, Taillibert S, Kanner AA, et al. Effect of tumor-treating fields plus maintenance temozolomide vs maintenance temozolomide alone on survival in patients with glioblastoma: a randomized clinical trial. *JAMA*. 2017;318(23): 2306-2316.

16. Wick W. TTFields: where does all the skepticism come from? *Neuro Oncol*. 2016.18(3).303-305.

17. Cloughesy TF, Lassman AB. NovoTTF where to go from here? *Neuro Oncol*. 2017;19(5)-605-608.

18. Aaronson NK, Ahmedzai S, Bergman B, et al. The European Organization for Research and Treatment of Cancer QLQ-C30: a quality-of-life instrument for use in international clinical trials in oncology. *J Natl Cancer Inst*. 1993;85(5) 365-376.

19. Osoba D, Aaronson NK, Muller M, et al. The development and psychometric validation of a brain cancer quality-of-life questionnaire for use in combination with general cancer-specific questionnaires. *Qual Life Res*. 1996;5(1).139-150.

20. Taphoorn MJ, Claassens L, Aaronson NK, et al, EORTC Quality of Life Group, and Brain Cancer, NCIC and Radiotherapy Groups. An international validation study of the EORTC brain cancer module (EORTC QLQ-BN20) for assessing health-related quality of life and symptoms in brain cancer patients. *Eur J Cancer*. 2010;46(6) 1033-1040. .

21. Fayers P, Aaronson N, Bjordal K, et al, eds. *EORTC QLQ-C30 Scoring Manual*. 3rd ed. Brussels, Belgium: EORTC Publications, 2001.

22. Efficace F, Bottomley A, Osoba D, et al. Beyond the development of health-related quality-of-life (HRQOL) measures: a checklist for evaluating HRQOL outcomes in cancer clinical trials—does HRQOL evaluation in prostate cancer research inform clinical decision making? *J Clin Oncol*. 2003;21(18)-3502-3511.

23. Brundage M, Blazeby J, Revicki D, et al. Patient-reported outcomes in randomized clinical trials: development of ISOQOL reporting standards. *Qual Life Res*. 2013;22(6)-1161-1175.

24. Osoba D, Rodrigues G, Myles J, Zee B, Pater J. Interpreting the significance of changes in health-related quality-of-life scores. *J Clin Oncol*. 1998;16(1):139-144.

25. van de Poll-Franse LV, Mols F, Gundy CM, et al. Normative data for the EORTC QLQ-C30 and EORTC-sexuality items in the general Dutch population. *Eur J Cancer*. 2011;47(5):667-675.

26. Yung WK, Albright RE, Olson J, et al. A phase II study of temozolomide vs procarbazine in patients with glioblastoma multiforme at first relapse. *Br J Cancer*. 2000.83(5):588-593.

27. Yavas C, Zorlu F, Ozyigit G, et al. Health-related quality of life in high-grade glioma patients a prospective single-center study. *Support Care Cancer* 2012;20(10)-2315-2325

28. Vardermark O. Avoiding bias in the prospective evaluation of patients with brain metastases. *J Clin Oncol*. 2007;25(25)-4023.

29. Walker M, Brown J, Brown K, Gregor A, Whittle IR, Grant R. Practical problems with the collection and interpretation of serial quality of life assessments in patients with malignant glioma. *J Neurooncol*. 2003;63(2) 179-186.

30. Taphoorn MJ, Henriksson R, Bottomley A, et al. Health-related quality of life in a randomized phase III study of bevacizumab, temozolomide, and radiotherapy in newly diagnosed glioblastoma. *J Clin Oncol*. 2015 33(19) 2166-2175.

© 2018 American Medical Association. All rights reserved.

Downloaded From: on 02/01/2018

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 221 of 631   Document 11-5

4452

EX. 2, P. 60

JAMA | Original Investigation

# Effect of Tumor-Treating Fields Plus Maintenance Temozolomide vs Maintenance Temozolomide Alone on Survival in Patients With Glioblastoma
## A Randomized Clinical Trial

Roger Stupp, MD; Sophie Taillibert, MD; Andrew Kanner, MD; William Read, MD; David M. Steinberg, PhD; Benoit Lhermitte, MD; Steven Toms, MD; Ahmed Idbaih, MD; Manmeet S. Ahluwalia, MD; Karen Fink, MD, PhD; Francesco Di Meco, MD; Frank Lieberman, MD; Jay-Jiguang Zhu, MD, PhD; Giuseppe Stragliotto, MD, PhD; David O. Tran, MD, PhD; Steven Brem, MD; Andreas F. Hottinger, MD, PhD; Eilon D. Kirson, MD, PhD; Gitit Lavy-Shahaf, PhD; Uri Weinberg, MD, PhD; Chae-Yong Kim, MD, PhD; Sun-Ha Paek, MD, PhD; Garth Nicholas, MD; Jordi Bruna, MD; Hal Hirte, MD; Michael Weller, MD; Yoram Palti, MD, PhD; Monika E. Hegi, PhD; Zvi Ram, MD

**IMPORTANCE** Tumor-treating fields (TTFields) is an antimitotic treatment modality that interferes with glioblastoma cell division and organelle assembly by delivering low-intensity alternating electric fields to the tumor.

**OBJECTIVE** To investigate whether TTFields improves progression-free and overall survival of patients with glioblastoma, a fatal disease that commonly recurs at the initial tumor site or in the central nervous system.

**DESIGN, SETTING, AND PARTICIPANTS** In this randomized, open-label trial, 695 patients with glioblastoma whose tumor was resected or biopsied and had completed concomitant radiochemotherapy (median time from diagnosis to randomization, 3.8 months) were enrolled at 83 centers (July 2009-2014) and followed up through December 2016. A preliminary report from this trial was published in 2015; this report describes the final analysis.

**INTERVENTIONS** Patients were randomized 2:1 to TTFields plus maintenance temozolomide chemotherapy (n = 466) or temozolomide alone (n = 229). The TTFields, consisting of low-intensity, 200 kHz frequency, alternating electric fields, was delivered (≥ 18 hours/d) via 4 transducer arrays on the shaved scalp and connected to a portable device. Temozolomide was administered to both groups (150-200 mg/m²) for 5 days per 28-day cycle (6-12 cycles).

**MAIN OUTCOMES AND MEASURES** Progression-free survival (tested at α = .046). The secondary end point was overall survival (tested hierarchically at α = .048). Analyses were performed for the intent-to-treat population. Adverse events were compared by group.

**RESULTS** Of the 695 randomized patients (median age, 56 years; IQR, 48-63; 473 men [68%]), 637 (92%) completed the trial. Median progression-free survival from randomization was 6.7 months in the TTFields-temozolomide group and 4.0 months in the temozolomide-alone group (HR, 0.63; 95% CI, 0.52-0.76; P < .001). Median overall survival was 20.9 months in the TTFields-temozolomide group vs 16.0 months in the temozolomide-alone group (HR, 0.63; 95% CI, 0.53-0.76; P < .001). Systemic adverse event frequency was 48% in the TTFields-temozolomide group and 44% in the temozolomide-alone group. Mild to moderate skin toxicity underneath the transducer arrays occurred in 52% of patients who received TTFields-temozolomide vs no patients who received temozolomide alone.

**CONCLUSIONS AND RELEVANCE** In the final analysis of this randomized clinical trial of patients with glioblastoma who had received standard radiochemotherapy, the addition of TTFields to maintenance temozolomide chemotherapy vs maintenance temozolomide alone, resulted in statistically significant improvement in progression-free survival and overall survival. These results are consistent with the previous interim analysis.

**TRIAL REGISTRATION** clinicaltrials.gov Identifier: NCT00916409

*JAMA*. 2017;318(23):2306-2316. doi:10.1001/jama.2017.18718

+ Summary Video
+ Supplemental content
+ CME Quiz at jamanetwork.com/learning

**Author Affiliations:** Author affiliations are listed at the end of this article.

**Corresponding Author:** Roger Stupp, MD, Lou and Jean Malnati Brain Tumor Institute of the Robert H. Lurie Comprehensive Cancer Center of Northwestern University, 676 N St Clair St, Ste 2210, Chicago, IL 60611 (roger.stupp@northwestern.edu).

© 2017 American Medical Association. All rights reserved.

Downloaded From: by a Rutgers University Libraries User on 12/19/2017

Case 1:20-cv-00194-WCG  Filed 04/28/20  Page 222 of 631  Document 11-5

EX. 2, P. 61

4453



G lioblastoma is the most common and aggressive primary brain tumor with an annual incidence of 3.19 per 100 000.[1-5] The disease course is typically rapid, with only approximately 1 in 4 patients alive 2 years after diagnosis, and only 5% to 10% of patients alive at 5 years.[1,6,7]

Since the current standard of care is established, consisting of surgical resection or biopsy, followed by radiotherapy with concomitant temozolomide chemotherapy, followed by maintenance temozolomide for 6 to 12 months,[6] little progress has been made in the treatment of this disease.[3,8,9] Most trials have shown median progression-free survival and median overall survival from diagnosis of 6.2 to 7.5 months and 14.6 to 16.7 months, respectively.[1,6,8]

Tumor-treating fields (TTFields) are an antimitotic treatment that selectively affects dividing glioblastoma cells by delivering low-intensity, intermediate-frequency (200 kHz) alternating electric fields via transducer arrays applied to the scalp.[10,11] Tumor-treating fields cause mitotic arrest and apoptosis of rapidly dividing cells.[10,11] Preclinical studies demonstrated increased sensitivity to chemotherapy with the addition of TTFields in human glioblastoma cell lines and in animal tumor models.[12] In a randomized phase 3 trial involving 237 patients with recurrent glioblastoma whose several lines of prior therapy had failed, TTFields monotherapy was compared with the treating physicians' best choice of salvage chemotherapy. Although no survival difference was observed, the higher objective response rate (12% vs 7%) suggested single-modality activity of TTFields.[13]

In 2009, this randomized phase 3 clinical trial was initiated, comparing maintenance temozolomide alone with maintenance temozolomide in combination with TTFields among patients with glioblastoma. A preplanned interim analysis involving the first 315 patients randomized was previously reported and demonstrated improved progression-free and overall survival.[14] This article reports the final analysis involving all 695 randomized patients, with a median follow-up of 40 months and a minimum follow-up of 24 months.

## Methods

The study was approved by the institutional review boards or ethics committees of all participating centers, and all patients provided written informed consent before entering the study. The trial protocol and statistical analysis plan are included in Supplement 1.

### Study Population

Patients eligible for this study were aged 18 years or older, had a Karnofsky performance score of 70 or higher (a score of ≥70 ensures independence in activities of daily living), and had newly diagnosed and histologically confirmed supratentorial glioblastoma (World Health Organization [WHO] grade IV astrocytoma[15]). All participants had undergone maximal safe debulking surgery when feasible or biopsy and had completed standard radiotherapy with concomitant temozolomide at the time of enrollment. Prior use of implanted

### Key Points

**Question** Does the use of tumor-treating fields (TTFields), consisting of low-intensity, alternating electric fields delivered via transducer arrays applied to the scalp, when added to maintenance temozolomide chemotherapy, improve progression-free survival for patients with glioblastoma?

**Findings** In this randomized clinical trial involving 695 patients with glioblastoma who had completed initial radiochemotherapy, median progression-free survival from randomization was 6.7 months in the TTFields plus temozolomide group and 4.0 months in the temozolomide-alone group (hazard ratio, 0.63), a significant difference.

**Meaning** Among patients with glioblastoma, the addition of TTFields to maintenance temozolomide chemotherapy resulted in statistically significant improvement in survival. These results are consistent with those reported in a previous interim analysis.

carmustine wafers was allowed. Patients with evidence of progressive disease following radiochemotherapy, infratentorial tumor location, and severe comorbidities were excluded. Adequate hematological, liver, and kidney function tests to allow for temozolomide chemotherapy were required.[6,14,16]

### Study Design and Treatment

This multicenter, open-label, randomized clinical phase 3 trial, recruited 695 patients at 83 sites in North America, Europe, the Republic of Korea, and Israel. The trial was designed to test the efficacy and safety of TTFields in combination with best standard of care in the treatment of newly diagnosed glioblastoma. Patients were randomized after the end of radiochemotherapy at a ratio of 2:1 to receive standard maintenance temozolomide chemotherapy (150-200 mg/m²/d for 5 days every 28 days for 6 cycles) with or without the addition of TTFields. Tumor treating fields treatment was to be initiated at least 4 weeks but not more than 7 weeks from the last day of radiotherapy. Maintenance temozolomide was delivered in 28-day cycles according to the protocol established by the European Organisation for Research and Treatment of Cancer (EORTC) Brain Tumor and Radiotherapy Groups and the National Cancer Institute of Canada (NCIC) Clinical Trials Group.[6] Extension of the duration of maintenance temozolomide beyond 6 cycles was allowed per local practice. Randomization was performed using a central web-based randomization system and was stratified by extent of resection (biopsy, partial resection, gross total resection) and by the methylation status of the O6-methylguanine-DNA methyltransferase (MGMT) gene promoter (methylated, unmethylated, unknown).

Treatment with TTFields was delivered through 4 transducer arrays with 9 insulated electrodes each placed on the shaved scalp and connected to a portable device set to generate 200-kHz electric fields within the brain (Optune, Novocure Inc). Transducer array layouts were determined using a TTFields mapping software system to optimize field intensity within the treated tumor (NovoTAL, Novocure Inc). Patients were trained by the nursing staff and device technician to operate the device independently, replace transducer arrays, and troubleshoot any

© 2017 American Medical Association. All rights reserved.

Downloaded From: by a Rutgers University Libraries User on 12/19/2017

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 223 of 631 Document 11-5

EX. 2, P. 62

Figure 1. Recruitment and Inclusion of Patients in the Study



1019 Patients signed informed consent
and were assessed for eligibility

324 Excluded
52 Did not meet eligibility criteria[a]
82 Progressive disease prior to randomization
53 Refused to participate (did not want
to be randomized)
46 Did not want to use the device
20 Agreed to participate in another trial
18 Lived too far away
8 Did not complete radiotherapy
4 Refused further treatment
4 Could not tolerate temozolomide
chemotherapy
37 Other reasons

695 Randomized

466 Randomized to receive tumor-treating
fields therapy plus maintenance
temozolomide
456 Received intervention as randomized
10 Did not receive intervention as
randomized (withdrew consent prior
to treatment start)

229 Randomized to receive maintenance
temozolomide alone
216 Received intervention as randomized
13 Did not receive intervention as
randomized (withdrew consent prior
to treatment start)

39 Patients lost to follow-up
25 Withdrew consent
3 Investigator decision
2 No adherence
9 Disease progression

14 Patients lost to follow-up
12 Withdrew consent
1 Investigator decision
1 Disease progression

26 Crossed over to receive tumor-treating
fields plus temozolomide following
interim results release

466 Included in the primary analysis
456 Included in the safety end point
analysis

229 Included in the primary analysis
216 Included in the safety end point
analysis

[a] Ten patients were out of
randomization window; 8 had low
platelet counts; 17, infratentorial
disease; 4, elevated liver enzymes;
3, programmable shunts,
10, pacemakers or defibrillators.

alarm conditions (eg, disconnected cables). All treatment was delivered on an outpatient basis and at home. The transducer arrays were supplied in individual sterile packages, and replaced by the patient, a caregiver, or a device technician twice a week. Although uninterrupted treatment was recommended, the patient could take short treatment breaks to tend to personal needs. The patient was advised to continue treatment for no fewer than 18 hours a day.

If tumor progression occurred, second-line therapy was offered per local practice. However, in the experimental group, TTFields could be continued until second radiologic progression occurred or for a maximum of 24 months.

Patient Surveillance and Follow-up
Patients diagnosed with glioblastoma who had undergone surgical resection or biopsy and had received standard radiochemotherapy were randomized to receive either TTFields plus temozolomide or temozolomide alone between July 2009 and December 2014 (Figure 1). The database was locked for final analysis on December 28, 2016. Baseline contrast-enhanced magnetic resonance imaging (MRI) of the brain was required within 2 weeks before starting treatment with maintenance

temozolomide with or without TTFields. A complete physical examination and laboratory parameters were performed within 1 week of treatment start. Evaluation also included the EORTC QLQ-C30 quality-of-life questionnaire with its brain-specific module (BN-20)[17,18] and a Mini-Mental State Examination (a test result of 27-30 points is considered normal function). Patients were seen monthly for medical follow-up and routine laboratory examinations. Quality of life was assessed every 3 months.

Adverse events were recorded for 2 months after treatment discontinuation according to National Cancer Institute Common Toxicity Criteria (NCI-CTC) v3.0. Adverse events were presented descriptively as number and percentage of patients with each adverse event term for all patients available at the time of the analysis.

Independent Radiological Review
Magnetic resonance imaging was performed at 2-month intervals until second progression. In the event of clinical progression, MRI was to be performed within 1 week after the investigator had become aware of it. All MRIs were reviewed by 2 blinded central independent radiologists (BioClinica Inc) and were evaluated for tumor response and progression (Macdonald criteria[15]). For cases

© 2017 American Medical Association. All rights reserved.

Downloaded From: .by a Rutgers University Libraries User on 12/19/2017

002173 C2C

in which the 2 reviewers were not in agreement, a third blinded radiologist adjudicated between them.

### Central MGMT Testing, Pathology Review, and Molecular Analyses

In patients with paraffin-embedded tumor tissue available, evaluation of the *MGMT* methylation status was performed using quantitative methylation-specific polymerase chain reaction[9,20] by a central laboratory licensed by MDxHealth. If the *MGMT* methylation status could not be determined centrally prior to randomization, local *MGMT* methylation status was used for stratification. All data analyses were based on the central blinded assessment.

Patients were included based on initial local histological diagnosis. A retrospective pathology review and evaluation of molecular testing was performed by a neuropathologist (B.L.) and molecular biologist (M.E.H.). Deletion of chromosomal arms 1p and 19q and amplification of the epidermal growth factor receptor (*EGFR*) were evaluated by fluorescent in situ hybridization (FISH), immunohistochemistry (IHC), or both; and the mutation status of the isocitrate dehydrogenase 1 (*IDH1*) gene was determined by immunohistochemistry for the most common mutant *IDH1-R132H* as described previously.[21] For cases in which insufficient tissue was available for EGFR FISH, the result of EGFR IHC was used as a surrogate (Hirsch score, ≥200 amplified; <200, not amplified).[22]

### Outcomes

#### Primary and Secondary End Points

The primary end point was progression-free survival, and the secondary end point was overall survival, with analyses conducted in the intent-to-treat population.

The protocol defined that overall survival would be analyzed in a per-protocol population including only patients who received their original allocated treatments. However, 26 patients (11%) in the temozolomide-alone control group crossed over and received TTFields after December 2014, following release of the results of the interim analysis of the trial. These 26 patients had more favorable baseline characteristics than the rest of the control patients (*MGMT* methylated, 48%; Karnofsky performance score, 80-100; time from end of radiotherapy to randomization, 31 days) and received more cycles of temozolomide (median, 10.5 cycles). To avoid possible bias, these patients were analyzed as randomized in the control group according to the intent-to-treat principle.

#### Exploratory End Points

Other predefined exploratory end points were percentage of patients alive and progression free at 6 months, annualized survival rates, quality of life, Mini-Mental State Examination, and Karnofsky performance score. The quality-of-life data are not reported in this article.

### Statistical Analysis

#### Primary and Secondary End Points

For the primary end point of progression-free survival, the calculated sample size was 700 patients aimed to detect a hazard ratio (HR) of 0.78 or less, with 80% power allowing for 10%

loss to follow-up and a 2-sided α = .05. Overall survival was a powered secondary end point in the study (80% power; HR, 0.76; 2-sided α = .05). To avoid multiplicity, overall survival was to be tested statistically only if the primary end point of the study was met.

To allow for 2 analyses in the trial, the final type I error of 0.05 was split between the interim and final analyses based on a standard α spending function (Lan and DeMets[23,24]). The primary end point at the final analysis would be achieved if progression-free survival was significantly longer in the TTFields plus temozolomide group using a stratified log-rank test (stratified by the randomization strata) with an α of .046 (an α of 0.014 was spent on the interim analysis).

The secondary end point would be achieved at the final analysis if overall survival was significantly longer in the TTFields plus temozolomide group using a stratified log-rank test with an α of .048 (an α of .006 was spent on the interim analysis).

#### Missing Data

For the analysis of progression-free survival patients were censored for progression when treatment was changed before evidence of progression (at the date of treatment change), at the date of their last MRI if lost to follow up, or upon reaching the cutoff date without progression. For the analysis of overall survival, patients without a known date of death were censored at the last known date they were documented to be alive.

#### Exploratory End Points

The exploratory end points of annual survival rates and the rate of progression-free survival at 6 months were compared between groups using a 1-sided *Z* distribution of the Kaplan-Meier estimates of the survival rates at the defined time point. In addition, the Cox proportional hazards model was used to analyze both progression-free survival and overall survival controlling for treatment group, age, sex, *MGMT* methylation status (as determined by the central laboratory), tumor location in the brain, and country of residence (United States vs all other countries). The threshold for significant interactions in the model was specified at an α of .05.

#### Post Hoc Analysis

Post hoc analyses of prespecified subgroups (*MGMT* promoter methylation status, extent of resection (complete, partial resection, or biopsy), age (continuous), performance status (90-100 vs ≤80), sex, and geographic region (United States vs the rest of the world) was performed using a multivariate analysis testing the difference between treatment groups while controlling for the other prognostic factors.

#### Analysis of Adverse Events and Tolerability

Differences in the incidence of adverse events between groups was tested using a $\chi^2$ test at an α of .05. The incidence of adverse events was also compared between groups after normalizing the incidence to the average treatment duration per group. Differences in the time to decline in Karnofsky performance score and Mini-Mental State Examination were tested using a log-rank test at an α of .05. All analyses were performed using SAS version 9.4.

© 2017 American Medical Association. All rights reserved.

Downloaded From: by a Rutgers University Libraries User on 12/19/2017

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 225 of 631 Document 11-5
4456
EX. 2, P. 64

**Table 1. Patient and Treatment Characteristics**

| Characteristics | No. (%) of Patients | |
| --- | --- | --- |
| | TTFields + Temozolomide (n = 466) | Temozolomide Alone (n = 229) |
| **Age, y** | | |
| Median (range) | 56.0 (19-83) | 57.0 (19-80) |
| ≥65 | 89 (19) | 45 (20) |
| <65 | 377 (81) | 184 (80) |
| **Karnofsky performance score[a]** | | |
| Median (range) | 90.0 (60-100) | 90.0 (70-100) |
| 90-100 | 308 (66) | 149 (65) |
| ≤80 | 154 (33) | 74 (32) |
| Missing | 4 (1) | 6 (3) |
| **Sex** | | |
| Men | 316 (68) | 157 (69) |
| Women | 150 (32) | 72 (31) |
| **Region** | | |
| United States | 221 (47) | 118 (52) |
| Outside the United States | 245 (53) | 111 (48) |
| **Race/ethnicity** | | |
| White | 416 (89) | 201 (88) |
| African American | 3 (1) | 1 (<1) |
| Asian | 27 (6) | 19 (8) |
| Hispanic | 18 (4) | 7 (3) |
| American Indian | 1 (<1) | 1 (<1) |
| Antiepileptic drug use at baseline | 205 (44) | 95 (41) |
| Corticosteroid use at baseline | 135 (29) | 64 (28) |
| **Mini-Mental State Examination score[b]** | | |
| 27-30 | 356 (76) | 160 (70) |
| ≤26 | 88 (19) | 48 (21) |
| Missing | 22 (5) | 21 (9) |
| **Extent of resection** | | |
| Biopsy | 60 (13) | 29 (13) |
| Partial resection | 157 (34) | 77 (33) |
| Gross total resection | 249 (53) | 123 (54) |
| **MGMT promotor region methylation status** | | |
| Tissue available and tested | 386 (83) | 185 (81) |
| Methylated | 137 (36) | 77 (42) |
| Unmethylated | 209 (54) | 95 (51) |
| Invalid | 40 (10) | 13 (7) |
| Slides available for central pathology review | 296 (64) | 138 (60) |
| Confirmed glioblastoma | 285 (96) | 134 (97) |
| WHO grade II or III glioma | 4 (1) | 2 (1) |
| Insufficient quality for diagnosis | 7 (2) | 2 (1) |
| **IDH1-R132H status** | | |
| Tissue available and tested | 260 (56) | 119 (52) |
| Mutated | 19 (7) | 6 (5) |
| Negative test results | 240 (92) | 113 (95) |
| Invalid | 1 (<1) | |
| **EGFR status** | | |
| Tissue available and tested | 252 (54) | 112 (49) |
| Amplified | 102 (41) | 43 (38) |
| Not amplified | 147 (58) | 68 (61) |
| Invalid | 3 (1) | 1 (1) |
| **Tumor tissue chromosomes 1p and 19q** | | |
| Tissue available and tested | 259 (56) | 112 (49) |
| Codeletion | 2 (1) | |
| Loss 1p only | 4 (2) | 1 (1) |
| Loss 19q only | 3 (1) | 3 (3) |
| Retained | 239 (92) | 102 (91) |
| Invalid | 11 (4) | 6 (5) |

*(continued)*

**Table 1. Patient and Treatment Characteristics (continued)**

| Characteristics | No. (%) of Patients | |
| --- | --- | --- |
| | TTFields + Temozolomide (n = 466) | Temozolomide Alone (n = 229) |
| **Tumor position[c]** | | |
| Corpus callosum | 25 (5) | 12 (5) |
| Frontal lobe | 190 (41) | 84 (37) |
| Occipital lobe | 58 (12) | 27 (12) |
| Parietal lobe | 146 (31) | 89 (39) |
| Temporal lobe | 191 (41) | 90 (40) |
| Missing | 3 (1) | 3 (1) |
| **Tumor location[c]** | | |
| Left hemisphere | 214 (46) | 99 (43) |
| Right hemisphere | 249 (53) | 127 (55) |
| Both hemispheres | 4 (1) | 2 (1) |
| Corpus callosum | 15 (3) | 9 (4) |
| Missing | 1 (<1) | 1 (<1) |
| **Treatment delivery** | | |
| Completed standard radiation therapy | | |
| 57-63 Gy | 422 (91) | 212 (93) |
| <57 Gy | 21 (5) | 11 (5) |
| >63 Gy | 18 (4) | 3 (1) |
| Dose not reported | 5 (1) | 3 (1) |
| Concomitant radiation therapy and temozolomide | | |
| Yes | 433 (93) | 212 (93) |
| No record available | 33 (7) | 17 (7) |
| Time from last day of radiation treatment to randomization, median (range), d | 37 (15-128) | 36 (15-70) |
| Time from initial diagnosis to randomization, median (range), mo | 3.8 (1.7-6.2) | 3.7 (1.4-6.3) |
| Temozolomide cycles, median (range) | 6 (0-51) | 5 (0-33) |
| **Tumor-treating fields therapy** | | |
| Duration, median (range), mo | 8.2 (0-82) | |
| ≥18 h/d (first 3 mo of treatment), mean | 347 (75) | |

Abbreviations: EGFR, epidermal growth factor receptor gene; IDH1-R132H, isocitrate dehydrogenase 1 (IDH1) R132H mutation site; MGMT, O6-methylguanine-DNA-methyltransferase gene; TTFields, tumor-treating fields; WHO, World Health Organization.

[a] Karnofsky performance score ranges from 0 to 100 in 10-point increments, with a higher score representing better performance status.

[b] Scores range from 1 to 30, with a higher score representing better cognitive function.

[c] Multiple positions for each patient allowed (for multifocal tumors).

## Results

### Study Participants

Four hundred and sixty-six patients were randomized to receive TTFields plus temozolomide and 229 to receive temozolomide alone (Figure 1). Patient baseline characteristics were balanced between the 2 groups (Table 1). The median age was 56 years (interquartile range [IQR], 48-63 years), 68% were men, and median Karnofsky performance score was 90%. Eighty-nine percent of patients were white, and 49% of the patients were treated in the United States.

Fifty-four percent had undergone a gross total resection (>95% of the tumor removed; as assessed and reported by the surgeon), 13% of patients had a diagnostic biopsy only. Histological slides for central pathology review were available for

© 2017 American Medical Association. All rights reserved.

Downloaded From: by a Rutgers University Libraries User on 12/19/2017

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 226 of 631 Document 11-5

EX. 2, P. 65

4457



Figure 2. Kaplan-Meier Survival Curves for Patients Included in the Final Analysis in the Intent-to-Treat Population



A, Median progression-free survival from randomization for the tumor-treating fields (TTFields) plus temozolomide group was 6.7 months and was 4.0 months for the temozolomide-alone group (hazard ratio [HR], 0.63; 95% CI, 0.52-0.76; P < .001). B, Median survival from randomization was 20.9 for the TTFields plus temozolomide group vs 16.0 months for the temozolomide-alone group (HR, 0.63; 95% CI, 0.53-0.76; P < .001). Median follow up was 44 months (range, 25-91 months) in both groups.

434 of 695 patients (62%). The local diagnosis of glioblastoma was confirmed in 419 of 434 patients (97%). For 6 cases WHO grade II or III diagnoses were made, and for the remaining 9 patients, the available tissue for review did not allow for a definitive diagnosis or showed no tumor, yet all these patients were included in the intent-to-treat analysis. Tumor tissue for *MGMT* testing was available for 82% of the patients; of the cases with a valid test (518 of 571) 41% were *MGMT* methylated (40% TTFields plus temozolomide group and 45% for the temozolomide-only group). In 7% of tumors, expression of the *IDH1*-R132H⁺mutant¹ was demonstrated by a positive immunohistochemistry, *EGFR* was amplified in 40%.

Tumor location (lobe, hemisphere) in the brain was also comparable between the groups. The median time from histological diagnosis to randomization was 3.8 months (range, 1.7-6.2 months) for patients in the TTFields plus temozolomide group, and 3.7 months (range, 1.4-6.3 months) for those in the temozolomide-only group. Median time from the end of radiotherapy to randomization was 37 days in the TTFields plus temozolomide group and 36 days in the temozolomide-only group and occurred in most patients after starting of the first cycle of maintenance temozolomide. Median time from randomization to TTFields was 5 days (IQR, 3-7 days).

### Treatment Delivery

All patients had completed radiotherapy and concomitant temozolomide as per local practice. The median number of temozolomide cycles until first tumor progression was 6 (range, 0-51) for the TTFields plus temozolomide group and 5 (range, 0-33) for the temozolomide-only group. Median duration of TTFields treatment was 8.2 months (range, 0-82 months), 51% (n = 237) of patients continued TTFields after the first progression.

### Efficacy End points

After a median follow-up of 40 months (IQR, 34-66 months), and a minimum follow-up of 24 months, the primary end point

of median progression-free survival was 6.7 months (95% CI, 6.1-8.1 months) for patients treated with TTFields plus temozolomide vs 4.0 months (95% CI, 3.8-4.4 months) for patients treated with temozolomide alone, for a proportional hazard ratio (HR) of 0.63 (95% CI, 0.52-0.76; P < .001; stratified log-rank test; Figure 2A). For the secondary end point of overall survival, the median survival duration from randomization was 20.9 months (95% CI, 19.3-22.7 months) in the TTFields plus temozolomide group vs 16.0 months (95% CI, 14.0-18.4 months) in the temozolomide-only group, proportional HR of 0.63 (95% CI, 0.53-0.76; P < .001; stratified log-rank test; Figure 2B).

In exploratory analyses, the percentage of patients alive at 2 years from randomization was 43% (95% CI, 39%-48%); at 3 years, 26% (95% CI, 22%-31%), and at 5 years, 13% (95% CI, 9%-18%) in the TTFields plus temozolomide group and for the temozolomide-only group at 2 years was 31% (95% CI, 25%-38%; P < .001); at 3 years, 16% (95% CI, 12%-23%; P = .009); and at 5 years, 5% (95% CI, 2%-11%; P = .004). Progression-free survival at 6 months was 56% (95% CI, 51%-61%) for patients treated with TTFields plus temozolomide and 37% (95% CI, 30%-44%) with temozolomide only (P < .001) (Table 2).

An exploratory Cox proportional hazards model adjusting for Karnofsky performance score, *MGMT* promoter methylation status, geographic region, age, tumor location, and extent of resection were consistent with the findings of the progression-free and overall survival analyses. The following factors were associated with longer overall survival: TTFields plus temozolomide treatment (HR, 0.63; 95% CI, 0.53-0.76; P < .001), female sex (HR, 0.76, 95% CI, 0.63-0.92; P = .005), methylated *MGMT* promoter (HR, 0.50; 95% CI, 0.41-0.62; P < .001), younger age (as a continuous variable; HR, 0.978 per year; 95% CI, 0.969-0.985; P < .001) and higher Karnofsky performance score (as a categorical variable in 10 point increments; P < .001). Patients with frontal tumors had nonsignificantly longer survival (HR = 0.82, CI 0.67-1.01, P = .061). Country of treatment and extent of resection were not

© 2017 American Medical Association. All rights reserved.

Downloaded From: by a Rutgers University Libraries User on 12/19/2017

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 227 of 631    Document 11-5

EX. 2, P. 66

Table 2. Summary of Study End Points[a]

| | TTFields + Temozolomide (n = 466) | Temozolomide Alone (n = 229) | Between-Group Differences |
|---|---|---|---|
| **Progression-free survival** | | | |
| Primary end point, median (95% CI), mo | 6.7 (6.1-8.1) | 4.0 (3.8-4.4) | 2.7 (2.1-4.2) |
| **Overall survival** | | | |
| Secondary end point, median (95% CI), mo | 20.9 (19.3-22.7) | 16.0 (14.0-18.4) | 4.9 (2.3-7.9) |
| **Exploratory end points, % (95% CI** | | | |
| Progression-free 6-mo survival rate | 56 (51-61) | 37 (30-44) | 19 (15-23) |
| Annual survival rates, y | | | |
| 1 | 73 (69-77) | 65 (59-72) | 18 (10-25) |
| 2 | 43 (39-48) | 31 (25-38) | 12 (4-18) |
| 3 | 26 (22-31) | 16 (12-23) | 10 (3-17) |
| 4 | 20 (16-25) | 8 (4-14) | 12 (5-19) |
| 5 | 13 (9-18) | 5 (2-11) | 8 (2-14) |

Abbreviation:
TTFields, tumor-treating fields.

[a] Survival rates are actuarial estimates according to the Kaplan-Meier method.

Figure 3. Overall Survival for Each Prognostic Patient Subgroup of Patients Treated With Tumor-Treating Fields Plus Temozolomide vs Temozolomide Alone

| | TTFields + Temozolomide | | Temozolomide Alone | | Median Survival (IQR), mo | | | Favors TTFields + Temozolomide | Favors Temozolomide Alone |
|---|---|---|---|---|---|---|---|---|---|
| Subgroup | No. of Patients | No. (%) Alive at End of Study | No. of Patients | No. (%) Alive at End of Study | TTFields + Temozolomide | Temozolomide Alone | Hazard Ratio (95% CI) | | |
| **MGMT promoter region methylation status** | | | | | | | | | |
| Unmethylated | 209 | 18 (9) | 95 | 3 (3) | 16.9 (9.7-28.2) | 14.7 (9.8-24.8) | 0.66 (0.49-0.85) | | |
| Methylated | 137 | 26 (19) | 77 | 9 (12) | 31.6 (21.1-48.5) | 21.2 (12.3-37.9) | 0.62 (0.44-0.88) | | |
| **Resection** | | | | | | | | | |
| Biopsy | 60 | 5 (8) | 29 | 0 (0) | 16.5 (9.0-24.7) | 11.6 (7.1-18.1) | 0.50 (0.30-0.84) | | |
| Partial | 157 | 20 (13) | 77 | 3 (4) | 21.4 (9.9-37.6) | 15.1 (7.8-23.3) | 0.56 (0.41-0.77) | | |
| Gross total | 249 | 32 (13) | 123 | 13 (11) | 22.6 (13.4-39.8) | 18.5 (12.1-31.6) | 0.70 (0.54-0.91) | | |
| **Region** | | | | | | | | | |
| Outside United States | 245 | 32 (13) | 111 | 9 (8) | 20.1 (11.3-32.2) | 15.5 (9.3-26.5) | 0.66 (0.51-0.85) | | |
| United States | 221 | 25 (11) | 118 | 7 (6) | 22.0 (11.3-48.2) | 17.1 (9.8-29.2) | 0.63 (0.49-0.82) | | |
| **Age, y** | | | | | | | | | |
| <65 | 377 | 47 (12) | 184 | 14 (8) | 21.6 (12.0-39.4) | 17.3 (10.6-29.3) | 0.69 (0.57-0.85) | | |
| ≥65 | 89 | 10 (11) | 45 | 2 (4) | 17.4 (9.0-31.5) | 13.7 (7.6-24.8) | 0.51 (0.33-0.77) | | |
| **Karnofsky performance score** | | | | | | | | | |
| 90-100 | 308 | 39 (13) | 149 | 11 (7) | 23.3 (13.5-41.9) | 17.8 (11.9-29.3) | 0.70 (0.56-0.87) | | |
| ≤80 | 154 | 16 (10) | 74 | 5 (7) | 14.9 (8.4-29.8) | 11.0 (5.7-23.3) | 0.58 (0.45-0.88) | | |
| **Sex** | | | | | | | | | |
| Women | 150 | 21 (14) | 72 | 6 (8) | 24.6 (14.4-48.2) | 18.5 (11.3-27.6) | 0.64 (0 56-0.87) | | |
| Men | 316 | 36 (11) | 157 | 10 (6) | 19.1 (10.0-34.1) | 15.5 (8.4-26.5) | 0.63 (0.45-0.88) | | |
| **Overall** | 466 | 57 (12) | 229 | 16 (7) | 20.9 (11.3-37.6) | 16.0 (9.3-27.5) | 0.63 (0.52-0.76) | | |



Hazard Ratio (95% CI)  0.1    1.0    10

Data points represent Cox hazard ratios of overall survival in each subgroup of patients treated with tumor-treating fields (TTFields) plus temozolomide compared with temozolomide alone and were adjusted for the other subgroups. Error bars represent 95% CIs of the hazard ratios. The Karnofsky performance score is measured from 0 to 100 in 10-point increments, with higher scores indicating better the patient performance status.

IQR, indicates interquartile range; MGMT, O[6]-methylguanine-DNA methyltransferase promoter region methylation status.

associated with a significant difference in survival ($P$ = .101 and $P$ = .183, respectively).

Post Hoc Subgroup Analysis
In post hoc analyses, TTFields plus temozolomide was associated with an increase in progression-free survival and overall survival (Figure 3; Cox proportional hazards, $P$ < .05 for the treatment effect within each subgroup) in all subgroups of patients regardless of age, sex, Karnofsky performance score, MGMT promoter methylation status, geographic region, or extent of resection. Patients 65 years or older had shorter survival than patients younger than 65 years. In both age groups, TTFields plus temozolomide was associated with significantly increased survival compared with temozolomide alone for older (HR, 0.51; 95% CI, 0.33-0.77) and younger patients (HR, 0.67; 95% CI, 0.55-0.82; Figure 4A and Figure 4B).

© 2017 American Medical Association. All rights reserved.

Downloaded From: by a Rutgers University Libraries User on 12/19/2017

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 228 of 631    Document 11-5

EX. 2, P. 67

4459

992175 C2C

Figure 4. Overall Survival by Patient Age and by *MGMT* Promotor Region Methylation Status



A Age <65 y

Overall survival, median (range)
TTFields + temozolomide , 21.6 mo (12.0-39.4)
Temozolomide alone, 17.1 mo (10.6-29 3)

TTFields + temozolomide

Temozolomide alone

No. at risk
TTFields          377    277    142    56    28    14
Temozolomide   184    120    49     20     7      2



B Age ≥65 y

Overall survival, median (range)
TTFields + temozolomide , 17.1 mo (9.0-31.5)
Temozolomide alone, 13.7 mo (7.6-24.8)

TTFields + temozolomide

Temozolomide alone

TTFields          89    59    32    9    7    2
Temozolomide   45    24    11    2    2    0



C *MGMT* promotor region methylated

Overall survival, median (range)
TTFields + temozolomide , 31.6 mo (21.1-48.5)
Temozolomide alone, 21.2 mo (12 3-37 9)

TTFields + temozolomide

Temozolomide alone

No. at risk
TTFields          137    118    81    29    12    5
Temozolomide   77     56     29    12    4      1



D *MGMT* promotor region unmethylated

Overall survival, median (range)
TTFields + temozolomide , 16.9 mo (9.7-28.2)
Temozolomide alone, 14.7 mo (9.8-24.8)

TTFields + temozolomide

Temozolomide alone

TTFields          209    137    56    17    10    5
Temozolomide   95     60     21    4     2     0

A, In comparing tumor-treating fields (TTFields) plus temozolomide vs temozolomide alone among patients younger than 65 years the hazard ratio (HR) was 0.67 (95% CI, 0.55-0.82). B, In comparing the 2 treatments among patients 65 years or older, the HR was 0.51 (95% CI, 0.22-0.77) C, In comparing the treatments among patients with O⁶-methylguanine-DNA methyltransferase

*MGMT* promotor region methylation, the HR was 0.62 (95% CI, 0.43-0.88). D, In comparing the treatments among patients without the *MGMT* promotor region methylation, the HR was 0.66 (95% CI, 0.49-0.85). The median follow-up of patients was 44 months (range, 25-91 months) in all groups.

Patients with tumors that lacked *MGMT* promoter methylation had a significantly shorter survival than patients with tumors with *MGMT* promoter methylation, although use of TTFields with temozolomide was associated with longer survival (HR, 0.66; 95% CI, 0.49-0.85 both in patients with tumors that were *MGMT* methylated and tumors that were unmethylated, respectively; Figure 4C and Figure 4D). In the TTFields plus temozolomide group, 265 patients who were treated with TTFields for 18 hours a day or more (monthly average in the first 6 months of treatment) had longer survival than 185 patients treated less than 18 hours a day (22.6 months, 95% CI, 19.7-25.1 months vs 19.1 months, 95% CI, 16.5-21.9; HR, 0.65; 95% CI, 0.49-0.85; *P* = .009).

### Adverse Events and Tolerability

The addition of TTFields to temozolomide therapy was not associated with any significant increase in rates of systemic adverse events compared with temozolomide therapy alone (48% vs 44%, respectively; *P* = .58; Table 3), and the overall incidence,

distribution, and severity of adverse events were not statistically different in patients in the 2 treatment groups. The numerically higher incidence of some adverse events in the TTFields plus temozolomide group was a reflection of the longer duration of temozolomide treatment in this group due to delayed occurrence of progression. When adverse event incidence normalized to duration of treatment was analyzed, these differences disappeared. The only exception was a higher incidence of localized skin toxic effects (medical device site reaction beneath the transducer arrays) in patients treated with TTFields plus temozolomide; mild to moderate skin irritation was observed in 52% of patients, and severe (grade 3) skin involvement occurred in 2%. Anxiety, confusion, insomnia, and headaches which were reported more frequently (statistically nonsignificant) in patients treated with TTFields at the interim analysis were not seen in the final adverse event analysis of the trial. The incidence of seizures was identical in the 2 groups.

To estimate tolerability, prespecified exploratory analyses of the association of TTFields device use with patients'

© 2017 American Medical Association. All rights reserved.

Downloaded From: by a Rutgers University Libraries User on 12/19/2017

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 229 of 631   Document 11-5

4460

EX. 2, P. 68

**Table 3. Adverse Events by Body System and Severity (≥5% Incidence in Any Group)**

| | Grade 3-4 Events, No. (%) of Patients | |
| --- | --- | --- |
| | TTFields + Temozolomide (n = 456) | Temozolomide Alone (n = 229) |
| ≥1 Adverse event | 218 (48) | 94 (44) |
| Blood and lymphatic system disorders[a] | 59 (13) | 23 (11) |
| Thrombocytopenia | 39 (9) | 11 (5) |
| Gastrointestinal disorders | 23 (5) | 8 (4) |
| Asthenia, fatigue, and gait disturbance | 42 (9) | 13 (6) |
| Infections | 32 (7) | 10 (5) |
| Injury, poisoning, and procedural complications (falls and medical device site reaction) | 24 (5) | 7 (3) |
| Metabolism and nutrition disorders (anorexia, dehydration, and hyperglycemia) | 16 (4) | 10 (5) |
| Musculoskeletal and connective tissue disorders | 21 (5) | 9 (4) |
| Nervous system disorders | 109 (24) | 43 (20) |
| Seizures | 26 (6) | 13 (6) |
| Respiratory, thoracic and mediastinal disorders (pulmonary embolism, dyspnea, and aspiration pneumonia) | 24 (5) | 11 (5) |

Abbreviation: TTFields, tumor-treating fields.

[a] The numerically slightly higher incidence of hematological toxicity, fatigue, and some other adverse effects are due to the longer treatment duration and observation time in the experimental group. The differences disappear when data are normalized to treatment duration.

activities of daily life and cognition were performed using the Karnofsky performance score and the Mini-Mental State Examination. Time to a sustained 6-point decline in the Mini-Mental State Examination score was significantly longer in the TTFields plus temozolomide group than the temozolomide-alone group (16.7 months, 95% CI, 14.7-19.0 months vs 14.2 months, 95% CI, 12.7-17.0 months, respectively; HR, 0.79; 95% CI, 0.66-0.95; $P$ = .01). Time to a sustained 10-point decrease in Karnofsky performance score was also significantly longer in the TTFields plus temozolomide group than in the temozolomide-alone group (5.5 months; 95% CI, 5.0-6.3 months vs 3.9 months; 95% CI, 3.1-5.2 months, respectively; HR, 0.80; 95% CI, 0.67-0.95; $P$ = .009).

## Discussion

In the final analysis of this randomized phase 3 trial, the addition of the TTFields treatment to standard temozolomide maintenance therapy, compared with standard temozolomide maintenance therapy alone, resulted in increased progression-free survival and overall survival in patients with newly diagnosed glioblastoma. After a median follow-up of 40 months, the addition of TTFields to temozolomide, compared with temozolomide alone, resulted in longer median progression-free survival from the time of randomization, 6.7 months vs 4.0 months and longer median overall survival from randomization, 20.9 months vs 16.0 months, respectively. These findings are consistent with the preliminary results reported based on a planned interim analysis of the first 315 patients enrolled, after a median follow-up of 38 months, in which median progression-free survival in the intent-to-treat population was 7.1 months (95% CI, 5.9-8.2 months) in the TTFields plus temozolomide group (210 patients analyzed) and 4.0 months (95% CI, 3.3-5.2 months) in the temozolomide-alone group (105 patients analyzed).

In the current study, exploratory end points were consistent with the primary and secondary end points in this trial. In a post hoc analysis the effect of TTFields was observed in all clinical and molecular subgroups, including patients older than age 65 years and patients with *MGMT* unmethylated tumors.

To assess whether the improved outcome may have been related to other factors than the TTFields therapy the data were scrutinized for possible imbalances, unexpected poor performance of the control group, or differences in supportive care administered to patients between the 2 groups. Both clinical factors and molecular tumor characteristics were well balanced and comparable between the 2 groups. *MGMT* promoter methylation, the strongest predictive factor for outcome in temozolomide-treated patients,[25] was more prevalent in the control group (45% vs 40% of samples with a valid result). Patients with early tumor progression occurring during the first 3 months after diagnosis were not included in this trial, and so the randomized patient population had a better prognosis, for both groups, compared with other trials that had randomized patients before radiation therapy. The reported survival times were measured from randomization, not from diagnosis, so for an estimation of the overall survival time 3.8 months should be added in both groups. The RTOG 0525/Intergroup study, which evaluated dose-dense temozolomide, also randomized patients only after completion of radiochemotherapy.[8] Outcome of the control group in the current study and of the RTOG study were very similar, and in both studies, the median survival from randomization was 16 months.

In this trial, the rates of systemic adverse effects were not significantly different in the 2 treatment groups. The occurrence of mild to moderate skin irritation related to reaction beneath the transducer arrays of the device occurred in more than half of patients in the TTFields plus temozolomide group.

These findings are in contrast to the more than 23 randomized trials conducted over the last decade that have evaluated novel agents or intensified treatment strategies

© 2017 American Medical Association. All rights reserved.

Downloaded From: by a Rutgers University Libraries User on 12/19/2017

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 230 of 631   Document 11-5

EX. 2, P. 69

4461

992176 C2C

 

(eg, dose-dense temozolomide, cilengitide, nimotuzumab, bevacizumab, and rindopepimut[2,5,8,26]) for treatment of patients with newly diagnosed glioblastoma and have failed to demonstrate improved survival. Innovative treatments for glioblastoma are needed.

## Limitations

This study has several limitations. First, the current trial was open-label because it was considered practically unfeasible (heat and easy measure of current associated with TTFields) and ethically unacceptable to expose patients to a sham device. Although a placebo effect may affect subjective end points like quality of life or even progression-free survival by influencing the frequency of imaging and its interpretation, in the current trial a consistent benefit was observed in progression-free survival as assessed by blinded central radiology review, as well as in the gold standard of objective outcome, overall survival. Second, delivery of TTFields therapy requires the patient to continuously carry a device on a

shaved scalp and may create burdens for patients. Nevertheless, the majority of patients were able to handle the device independently or with some help from a caregiver. The fact that 75% of patients achieved treatment adherence of 75% or more (ie, using the device for ≥18 hours per day) indicated good tolerability. The effects of the TTFields treatment and the need for continuous use of the device on quality of life will be reported separately.

## Conclusions

In the final analysis of this randomized clinical trial of patients with glioblastoma who had received standard radiochemotherapy, the addition of TTFields to maintenance temozolomide chemotherapy vs maintenance temozolomide alone, resulted in statistically significant improvement in progression-free survival and overall survival. These results are consistent with the previous interim analysis.

ARTICLE INFORMATION

Accepted for Publication: November 9, 2017.

Author Affiliations: Lou and Jean Malnati Brain Tumor Institute of the Robert H. Lurie Comprehensive Cancer Center of Northwestern University Feinberg School of Medicine, Chicago, Illinois (Stupp); Centre Hospitalier Universitaire Vaudois and University of Lausanne, Lausanne, Switzerland (Stupp, Lhermitte, Hottinger, Hegi); University Hospital Zurich and University of Zurich, Zurich, Switzerland (Stupp, Weller); Inserm U 1127, CNRS UMR 7225, Sorbonne Universités, UPMC Univ Paris 06 UMR S 1127, Institut du Cerveau et de la Moelle épinière, ICM, F-75013, Paris, France (Taillibert, Idbaih), Tel Aviv Medical Center, Tel Aviv, Israel (Kanner, Ram); University of California, San Diego (Read); Emory University, Atlanta, Georgia (Read); Tel Aviv University, Tel Aviv, Israel (Steinberg); Geisinger Health System, Danville, Pennsylvania (Toms); Cleveland Clinic Foundation, Cleveland, Ohio (Ahluwalia); Baylor University Medical Center, Houston, Texas (Fink); Istituto Nazionale Neurologico Carlo Besta, Milan, Italy (DI Meco); University of Pittsburgh Medical Center, Pittsburgh, Pennsylvania (Lieberman); University of Texas Health Sciences Center at Houston (Zhu); Tufts Medical Center, Boston, Massachusetts (Zhu); Karolinska Hospital, Stockholm, Sweden (Stragliotto); Washington University Barnes-Jewish Hospital, St Louis, Missouri (Tran); Moffitt Cancer Center, Tampa, Florida (Brem); University of Pennsylvania, Philadelphia (Brem); Novocure Ltd, Israel (Kirson, Lavy-Shahaf, Weinberg, Palti); Seoul National University Bundang Hospital, Seoul National University College of Medicine, Bundang, Korea (Kim), Seoul National University, Seoul, Korea (Paek); Ottawa Hospital Research Institute, Ottawa, Ontario, Canada (Nicholas); Hospital Universitario de Bellvitge, Barcelona, Spain (Bruna); Juravinski Cancer Centre, Hamilton, Ontario, Canada (Hirte).

Author Contributions: Drs Stupp, Ram, and Kirson had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.

Concept and design: Stupp, Lieberman, Kirson, Palti, Ram.

Acquisition, analysis, or interpretation of data: Stupp, Taillibert, Kanner, Read, Steinberg, Lhermitte, Toms, Idbaih, Ahluwalia, Fink, DiMeco, Lieberman, Zhu, Stragliotto, Tran, Brem, Hottinger, Kirson, Lavy-Shahaf, Weinberg, Kim, Paek, Nicholas, Bruna, Hirte, Weller, Hegi, Ram.

Drafting of the manuscript: Stupp, Steinberg, Hottinger, Kirson, Lavy-Shahaf, Ram.

Critical revision of the manuscript for important intellectual content: Stupp, Taillibert, Kanner, Read, Lhermitte, Toms, Idbaih, Ahluwalia, Fink, DiMeco, Lieberman, Zhu, Stragliotto, Tran, Brem, Hottinger, Kirson, Weinberg, Kim, Paek, Nicholas, Bruna, Hirte, Weller, Palti, Hegi, Ram.

Statistical analysis: Steinberg, Kirson, Lavy-Shahaf.

Obtained funding: Kirson, Palti.

Administrative, technical, or material support: Stupp, Taillibert, Kanner, Read, Toms, DiMeco, Tran, Weinberg, Kim, Paek, Nicholas, Bruna, Weller, Palti.

Supervision: Stupp, Ahluwalia, DiMeco, Brem, Kirson, Paek, Bruna, Weller, Ram.

Conflict of Interest Disclosures: All authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest. Dr Stupp reports fees paid to his institution his serving on advisory boards of Celgene, Novartis, AbbVie, and Merck KGaA (Darmstadt) and travel support from Novocure and that his spouse works full time for Celgene. Dr Taillibert reports that she receives fees for patients in clinical trials from the CRNO-private foundation of the neurology department in Salpêtrière Hospital. Dr Steinberg reports receiving serving as a statistical consultant for Novocure. Dr Toms reports receiving honoraria for serving on the strategic advisory board and lecturing for Novocure. Dr Idbaih reports receiving research support from Foundation ARC, Beta-Innov, and Carthera; travel support from Hoffmann-LaRoche and Carthera; serving on the editorial advisory board of Lettre du Cancérologue, serving on the advisory boards of Bristol-Myers Squibb and Hoffmann-La Roche; and receiving personal fees from Cipla. Dr Ahluwalia reports receiving grant support, personal fees, or both from Monteris Medical, AbbVie, Bristol-Myers Squibb, AstraZeneca, Datar Genetics, CBT Pharmaceuticals, Kadmon Pharmaceuticals, Elsevier, Novocure,

Novartis, Incyte, Pharmacyclics, Tracon Pharmaceuticals, Prime Oncology, and Carls Lifesciences. Dr Fink reports serving in the speakers program for Genentech and receiving personal fees from Novocure and UCB Pharma. Dr Lieberman reports receiving grant support from Novocure, Stemline, and Roche. Dr Zhu reports receiving grant support from Novocure, Immuno-Cellular Therapeutics, Diffusion Pharmaceutical LLC, DEKK-TEC Inc, NRG Oncology/Radiation Therapy Oncology Group/National Cancer Institute, Boston Biomedical, Sumitomo Dainippon Pharma Global Oncology, Five Prime Therapeutics, Tocagen Inc, and Northwest Biotherapeutics. Dr Tran reports receiving grant support from Merck, Novartis, Northwest Biotherapeutics, Stemline, VBL Therapeutics, and Tocagen, receiving personal fees from Monteris, and serving on the advisory board of Novocure. Dr Hottinger reports receiving institutional grant support from Novocure and fees paid to his institution for serving on the advisory boards of Servier and Bristol-Myers Squibb. Dr Kirson reports that he is an employee of and owns stock in Novocure. Dr Lavy Shahaf reports that he is an employee of and owns stock in Novocure Ltd. Dr Weinberg reports that he is an employee of and owns stock in Novocure Ltd. Dr Weller reports receiving grant support or personal fees from Novocure, Acceleron, Actelion, Bayer, MSD, Merck EMD, Novocure, OGD2 Pharma, Piqur, Roche, Tragara, AbbVie, Bristol-Myers Squibb, Celldex, Pfizer, Progenics, Teva, Tocagen, and Orbus. Dr Palti reports serving as a consultant for, owning stock in, and having pending patents licensed through Novocure. Dr Hegi reports receiving financial support from Novocure, serving as an adviser to Bristol-Myers Squibb, and receiving nonfinancial support from MDxHealth. Dr Ram reports that he is a paid consultant for and owns stock in Novocure. No other disclosures were reported.

Funding/Support: The study was funded by Novocure Ltd.

Role of the Funder/Sponsor: Novocure Ltd had a role in the design and conduct of the study: collection, management, and analysis of the data; and decision to submit the manuscript for publication. The study was designed by Drs Stupp

© 2017 American Medical Association. All rights reserved.

Downloaded From: by a Rutgers University Libraries User on 12/19/2017

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 231 of 631 Document 11-5
4462

EX. 2, P. 70

and Ram, together with representatives from Novocure, mainly Dr Kirson. The study oversight was supported and monitored by a clinical research organization, which also held the database. Data were collected by the investigators and monitored by the clinical research organization. The data were analyzed by Dr Steinberg, the independent study statistician, and by Dr Lavy-Shahaf, the sponsor statistician. Data interpretation was the responsibility of Drs Stupp and Ram, with Dr Kirson, the study sponsor representative and project lead, all of whom jointly developed the first draft. A subsequent mature draft and prefinal version were circulated among all authors who gave additional input, contributed to, and approved the manuscript. Drs Stupp and Kirson reviewed all patient profiles for consistency. The decision to publish the data and its interpretation was made by Drs Stupp and Ram and was supported by all coauthors.

Additional Contributions: We thank the patients and their families for participating in the trial. We are grateful to all EF-14 investigators (whose names and institutions are listed in the eAppendix in Supplement 2) and grateful to the nurses who provided excellent care to the patients and the supporting staff for data management.

## REFERENCES

1. Ostrom QT, Gittleman H, Xu J, et al. CBTRUS statistical report: primary brain and other central nervous system tumors diagnosed in the United States in 2009-2013. Neuro Oncol. 2016;18(suppl 5):v1-v75.

2. Stupp R, Hegi ME, Gilbert MR, Chakravarti A. Chemoradiotherapy in malignant glioma: standard of care and future directions. J Clin Oncol. 2007; 25(26):4127-4136.

3. Stupp R, Hegi ME, Gorlia T, et al; European Organisation for Research and Treatment of Cancer (EORTC); Canadian Brain Tumor Consortium; CENTRIC study team. Cilengitide combined with standard treatment for patients with newly diagnosed glioblastoma with methylated MGMT promoter (CENTRIC EORTC 26071-22072 study): a multicentre, randomised, open-label, phase 3 trial. Lancet Oncol. 2014;15(10):1100-1108.

4. Chinot OL, Wick W, Mason W, et al. Bevacizumab plus radiotherapy-temozolomide for newly diagnosed glioblastoma. N Engl J Med. 2014;370 (8):709-722.

5. Gilbert MR, Dignam JJ, Armstrong TS, et al. A randomized trial of bevacizumab for newly diagnosed glioblastoma. N Engl J Med. 2014;370 (8) 699-708.

6. Stupp R, Mason WP, van den Bent MJ, et al; European Organisation for Research and Treatment of Cancer Brain Tumor and Radiotherapy Groups; National Cancer Institute of Canada Clinical Trials Group. Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. N Engl J Med. 2005;352(10):987-996.

7. Stupp R, Hegi ME, Mason WP, et al; European Organisation for Research and Treatment of Cancer Brain Tumour and Radiation Oncology Groups; National Cancer Institute of Canada Clinical Trials Group. Effects of radiotherapy with concomitant and adjuvant temozolomide versus radiotherapy alone on survival in glioblastoma in a randomised phase III study: 5-year analysis of the EORTC-NCIC trial. Lancet Oncol. 2009;10(5):459-466.

8. Gilbert MR, Wang M, Aldape KD, et al. Dose-dense temozolomide for newly diagnosed glioblastoma: a randomized phase III clinical trial. J Clin Oncol. 2013;31(32):4085-4091.

9. Westphal M, Heese O, Steinbach JP, et al. A randomised, open label phase III trial with nimotuzumab, an anti-epidermal growth factor receptor monoclonal antibody in the treatment of newly diagnosed adult glioblastoma. Eur J Cancer. 2015;51(4):522-532.

10. Kirson ED, Dbalý V, Tovaryš F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. Proc Natl Acad Sci U S A. 2007;104(24):10152-10157.

11. Giladi M, Schneiderman RS, Voloshin T, et al. Mitotic spindle disruption by alternating electric fields leads to improper chromosome segregation and mitotic catastrophe in cancer cells. Sci Rep. 2015;5:18046.

12. Kirson ED, Schneiderman RS, Dbalý V, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). BMC Med Phys. 2009;9:1.

13. Stupp R, Wong ET, Kanner AA, et al. NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomised phase III trial of a novel treatment modality. Eur J Cancer. 2012;48(14):2192-2202.

14. Stupp R, Taillibert S, Kanner AA, et al. Maintenance therapy with tumor-treating fields plus temozolomide vs temozolomide alone for glioblastoma: a randomized clinical trial. JAMA. 2015;314(23):2535-2543.

15. Louis DN, Ohgaki H, Wiestler OD, et al. The 2007 WHO classification of tumours of the central nervous system. Acta Neuropathol. 2007;114(2): 97-109.

16. Ganiere V, Christen G, Bally F, et al. Listeria brain abscess, Pneumocystis pneumonia and Kaposi's sarcoma after temozolomide. Nat Clin Pract Oncol. 2006;3(6) 339-343.

17. Aaronson NK, Ahmedzai S, Bergman B, et al. The European Organization for Research and Treatment of Cancer QLQ-C30: a quality-of-life instrument for use in international clinical trials in oncology. J Natl Cancer Inst. 1993;85(5):365-376.

18. Taphoorn MJ, Claassens L, Aaronson NK, et al; EORTC Quality of Life Group, and Brain Cancer, NCIC and Radiotherapy Groups. An international validation study of the EORTC brain cancer module (EORTC QLQ-BN20) for assessing health-related quality of life and symptoms in brain cancer patients. Eur J Cancer. 2010;46(6).1033-1040.

19. Macdonald DR, Cascino TL, Schold SC Jr, Cairncross JG. Response criteria for phase II studies of supratentorial malignant glioma. J Clin Oncol. 1990;8(7):1277-1280.

20. Vlassenbroeck I, Califice S, Diserens AC, et al. Validation of real-time methylation-specific PCR to determine O6-methylguanine-DNA methyltransferase gene promoter methylation in glioma. J Mol Diagn. 2008:10(4):332-337.

21. Hegi ME, Janzer RC, Lambiv WL, et al; European Organisation for Research and Treatment of Cancer Brain Tumour and Radiation Oncology Groups; National Cancer Institute of Canada Clinical Trials Group. Presence of an oligodendroglioma-like component in newly diagnosed glioblastoma identifies a pathogenetically heterogeneous subgroup and lacks prognostic value: central pathology review of the EORTC_26981/NCIC_CE.3 trial. Acta Neuropathol. 2012;123(6):841-852.

22. Coulibaly B, Nanni I, Quilichini B, et al. Epidermal growth factor receptor in glioblastomas: correlation between gene copy number and protein expression. Hum Pathol. 2010:41(6).815-823.

23. DeMets DL, Lan G. The alpha spending function approach to interim data analyses. Cancer Treat Res. 1995;75:1-27.

24. DeMets DL, Lan KK. Interim analysis: the alpha spending function approach. Stat Med. 1994, 13(13-14):1341-1352.

25. Hegi ME, Diserens AC, Gorlia T, et al. MGMT gene silencing and benefit from temozolomide in glioblastoma. N Engl J Med. 2005;352(10).997-1003.

26. Weller M, Butowski N, Tran DD, et al; ACT IV trial investigators. Rindopepimut with temozolomide for patients with newly diagnosed, EGFRvIII-expressing glioblastoma (ACT IV): a randomised, double-blind, international phase 3 trial. Lancet Oncol. 2017 18(10) 1373-1385.

© 2017 American Medical Association. All rights reserved.

Downloaded From: by a Rutgers University Libraries User on 12/19/2017

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 232 of 631   Document 11-5   4463

EX. 2, P. 71



Journal of the
American Medical Association

Reprint Article

**Preliminary Communication**

# Maintenance Therapy With Tumor-Treating Fields Plus Temozolomide vs Temozolomide Alone for Glioblastoma
## A Randomized Clinical Trial

Roger Stupp, MD; Sophie Taillibert, MD; Andrew A. Kanner, MD; Santosh Kesari, MD, PhD; David M. Steinberg, PhD; Steven A. Toms, MD, FACS, MPH; Lynne P. Taylor, MD, FAAN; Frank Lieberman, MD; Antonio Silvani, MD; Karen L. Fink, MD, PhD; Gene H. Barnett, MD, MBA; Jay-Jiguang Zhu, MD, PhD; John W. Henson, MD, MBA, FAAN; Herbert H. Engelhard, MD, PhD; Thomas C. Chen, MD, PhD; David D. Tran, MD, PhD; Jan Sroubek, MD; Nam D. Tran, MD, PhD; Andreas F. Hottinger, MD, PhD; Joseph Landolfi, DO; Rajiv Desai, MD; Manuela Caroli, MD; Yvonne Kew, MD, PhD; Jerome Honnorat, MD, PhD; Ahmed Idbaih, MD, PhD; Eilon D. Kirson, MD, PhD; Uri Weinberg, MD, PhD; Yoram Palti, MD, PhD; Monika E. Hegi, PhD; Zvi Ram, MD

☒ Reprinted Article from: Volume 314, Number 23 | Pages 2535-2543 | December 15, 2015



A JAMA NETWORK
PUBLICATION

Preliminary Communication

# Maintenance Therapy With Tumor-Treating Fields Plus Temozolomide vs Temozolomide Alone for Glioblastoma
## A Randomized Clinical Trial

Roger Stupp, MD; Sophie Taillibert, MD; Andrew A. Kanner, MD; Santosh Kesari, MD, PhD; David M. Steinberg, PhD;
Steven A. Toms, MD, FACS, MPH; Lynne P. Taylor, MD, FAAN; Frank Lieberman, MD; Antonio Silvani, MD; Karen L. Fink, MD, PhD;
Gene H. Barnett, MD, MBA; Jay-Jiguang Zhu, MD, PhD; John W. Henson, MD, MBA, FAAN; Herbert H. Engelhard, MD, PhD;
Thomas C. Chen, MD, PhD; David D. Tran, MD, PhD; Jan Sroubek, MD; Nam D. Tran, MD, PhD; Andreas F. Hottinger, MD, PhD;
Joseph Landolfi, DO; Rajiv Desai, MD; Manuela Caroli, MD; Yvonne Kew, MD, PhD; Jerome Honnorat, MD, PhD; Ahmed Idbaih, MD, PhD;
Eilon D. Kirson, MD, PhD; Uri Weinberg, MD, PhD; Yoram Palti, MD, PhD; Monika E. Hegi, PhD; Zvi Ram, MD

**IMPORTANCE** Glioblastoma is the most devastating primary malignancy of the central nervous system in adults. Most patients die within 1 to 2 years of diagnosis. Tumor-treating fields (TTFields) are a locoregionally delivered antimitotic treatment that interferes with cell division and organelle assembly.

**OBJECTIVE** To evaluate the efficacy and safety of TTFields used in combination with temozolomide maintenance treatment after chemoradiation therapy for patients with glioblastoma.

**DESIGN, SETTING, AND PARTICIPANTS** After completion of chemoradiotherapy, patients with glioblastoma were randomized (2:1) to receive maintenance treatment with either TTFields plus temozolomide (n = 466) or temozolomide alone (n = 229) (median time from diagnosis to randomization, 3.8 months in both groups). The study enrolled 695 of the planned 700 patients between July 2009 and November 2014 at 83 centers in the United States, Canada, Europe, Israel, and South Korea. The trial was terminated based on the results of this planned interim analysis.

**INTERVENTIONS** Treatment with TTFields was delivered continuously (>18 hours/day) via 4 transducer arrays placed on the shaved scalp and connected to a portable medical device. Temozolomide (150-200 mg/m²/d) was given for 5 days of each 28-day cycle.

**MAIN OUTCOMES AND MEASURES** The primary end point was progression-free survival in the intent-to-treat population (significance threshold of .01) with overall survival in the per-protocol population (n = 280) as a powered secondary end point (significance threshold of .006). This prespecified interim analysis was to be conducted on the first 315 patients after at least 18 months of follow-up.

**RESULTS** The interim analysis included 210 patients randomized to TTFields plus temozolomide and 105 randomized to temozolomide alone, and was conducted at a median follow-up of 38 months (range, 18-60 months). Median progression-free survival in the intent-to-treat population was 7.1 months (95% CI, 5.9-8.2 months) in the TTFields plus temozolomide group and 4.0 months (95% CI, 3.3-5.2 months) in the temozolomide alone group (hazard ratio [HR], 0.62 [98.7% CI, 0.43-0.89]; P = .001). Median overall survival in the per-protocol population was 20.5 months (95% CI, 16.7-25.0 months) in the TTFields plus temozolomide group (n = 196) and 15.6 months (95% CI, 13.3-19.1 months) in the temozolomide alone group (n = 84) (HR, 0.64 [99.4% CI, 0.42-0.98]; P = .004).

**CONCLUSIONS AND RELEVANCE** In this interim analysis of 315 patients with glioblastoma who had completed standard chemoradiation therapy, adding TTFields to maintenance temozolomide chemotherapy significantly prolonged progression-free and overall survival.

**TRIAL REGISTRATION** clinicaltrials.gov Identifier: NCT00916409

JAMA. 2015;314(23):2535-2543. doi:10.1001/jama.2015.16669

Editorial page 2511

JAMA Report Video at jama.com

Supplemental content at jama.com

**Author Affiliations:** Author affiliations are listed at the end of this article.

**Corresponding Author:** Roger Stupp, MD, Department of Oncology and Cancer Center, University Hospital Zurich, CH-8091 Zurich, Switzerland (roger.stupp@usz.ch).

Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 234 of 631 Document 11-5

EX. 2, P. 73

AMB2592365
4465

G lioblastoma is the most devastating primary malignancy of the central nervous system in adults. Standard treatment consists of maximal safe surgical resection or a diagnostic biopsy, followed by radiotherapy (60 Gy) with concomitant daily temozolomide chemotherapy, and then maintenance treatment with temozolomide for 6 to 12 months.[1] However, most patients will die within 1 to 2 years. Median progression-free survival from diagnosis of 6.2 to 7.5 months and median overall survival from diagnosis of 14.6 to 16.7 months have been reported in clinical trials.[1-4] The reported 2- and 5-year survival rates[5] are 27% and 10%, respectively. During the last decade, all attempts to improve the outcome for patients with glioblastoma have failed when evaluated in large randomized trials.[2-4,6,7]

Tumor-treating fields (TTFields) are an antimitotic treatment that selectively disrupts the division of cells by delivering low-intensity, intermediate-frequency (200 kHz) alternating electric fields via transducer arrays applied to the shaved scalp.[8-10] In preclinical models, TTFields have been shown to cause mitotic arrest and apoptosis by disrupting mitotic spindle formation during metaphase and causing dielectrophoretic movement of polar molecules during cytokinesis.[8,10-12] In a randomized phase 3 trial in which TTFields were compared with chemotherapy in 237 patients with recurrent glioblastoma, the use of TTFields did not prolong progression-free survival or overall survival, but the therapy was associated with better quality of life without the typical chemotherapy-associated toxic effects.[13]

Based on preclinical data demonstrating a synergistic antitumor effect with chemotherapy and TTFields, and pilot clinical feasibility data in combination with temozolomide,[9] we initiated this phase 3 trial. The objective was to evaluate the efficacy and safety of TTFields used in combination with maintenance temozolomide in patients with glioblastoma after initial treatment with temozolomide and radiotherapy.

## Methods

### Study Population

Patients eligible for this study (1) had histologically confirmed supratentorial glioblastoma (World Health Organization grade IV astrocytoma[14]), (2) were progression-free after having undergone maximal safe debulking surgery when feasible or biopsy, and (3) had completed standard concomitant chemoradiotherapy with temozolomide. Other eligibility criteria were (1) age of 18 years or older, (2) Karnofsky Performance Status (KPS) score of 70% or higher (the KPS score describes the general condition of a patient; a KPS score ≥70% ensures some independence in activities of daily living), and (3) adequate bone marrow, liver, and renal function.

Prior use of implanted carmustine wafers was allowed. Patients with infratentorial tumor location and severe comorbidities were excluded. All patients provided written informed consent before entering the study; the study was approved by the institutional review boards or ethics committees of all 83 participating centers. The trial protocol appears in Supplement 1.

### Study Design and Treatment

This multicenter, open-label, randomized phase 3 trial was designed to test the efficacy and safety of TTFields in combination with temozolomide for treatment of glioblastoma after initial treatment with chemoradiation. After the completion of treatment with temozolomide and radiotherapy, patients were randomized at a ratio of 2 to 1 (Figure 1) to receive standard maintenance temozolomide chemotherapy (150-200 mg/m²/d for 5 days every 28 days for 6-12 cycles according to the protocol[1] from the European Organisation for Research and Treatment of Cancer Brain Tumor and Radiotherapy Groups and the National Cancer Institute of Canada Clinical Trials Group) with or without the addition of TTFields. Treatment with TTFields was to be initiated within 4 to 7 weeks from the last dose of concomitant temozolomide and radiotherapy. Randomization was performed through a central web-based randomization system and was stratified by extent of resection (biopsy, partial resection, gross total resection) and by O⁶-methylguanine-DNA methyltransferase (MGMT) methylation status (methylated, unmethylated, or unknown).

For patients with available paraffin-embedded tumor tissue, evaluation of MGMT gene promoter methylation status was performed as described previously[7,15,16] by a central laboratory blinded to treatment group (MDxHealth). If MGMT methylation status could not be determined centrally prior to randomization, local MGMT methylation status was used for stratification.

Patients in the TTFields plus temozolomide group received continuous TTFields combined with standard maintenance temozolomide. Patients receiving TTFields had 4 transducer arrays placed on the shaved scalp and connected to a portable device set to generate 200-kHz electric fields within the brain (Optune, Novocure Ltd). Transducer array layouts were determined using a mapping software system for TTFields to optimize field intensity within the treated tumor (NovoTAL, Novocure Ltd). After being trained to operate the device, the patient continued treatment at home. The transducer arrays were supplied in sterile packaging and replaced by the patient, a caregiver, or a device technician twice per week. Although uninterrupted treatment was recommended, short treatment breaks for personal needs were allowed.

If a patient experienced tumor progression, second-line chemotherapy was offered per local practice. In the TTFields plus temozolomide group, TTFields could be continued until the second radiological progression, or clinical deterioration, for a maximum of 24 months.

### Patient Surveillance and Follow-up

Baseline contrast-enhanced magnetic resonance imaging (MRI) of the brain was required within 2 weeks before starting treatment with maintenance temozolomide with or without TTFields. A complete physical examination with collection of laboratory parameters was performed within 1 week of treatment initiation. The evaluation also included a quality-of-life questionnaire (QLQ-C30) that has a brain-specific module (BN-20), which was developed by the European Organisation

(REPRINTED)
Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 235 of 631   Document 11-5
EX. 2, P. 74
4466

### Figure 1. Recruitment and Inclusion of Patients in the Study



for Research and Treatment of Cancer Brain Tumor and Radiotherapy Groups.[17,18] A Mini-Mental State Examination (a short bedside test used to evaluate cognition and memory) also was administered (a test result of 27-30 points is considered normal function).

Patients were seen monthly for medical follow-up and routine laboratory examinations. Quality of life was assessed every 3 months. Magnetic resonance imaging was to be performed every second month after the baseline MRI until second radiological progression in all patients. In the event of clinical progression, MRI was to be performed within 1 week after the study investigator became aware of it. All MRIs were reviewed centrally by 2 blinded independent radiologists (BioClinica Inc) and were evaluated for tumor response and progression using the criteria developed by Macdonald et al.[19] In cases in which the central reviewers were not in agreement, a third blinded radiologist adjudicated between them. The third radiologist was involved in 17% of the cases in the TTFields plus temozolomide group and in 18% of the cases in the temozolomide alone group.

The results of the central review were not communicated to the study investigator, and all treatment decisions were based on local imaging interpretation. Eight patients in the

TTFields plus temozolomide group (4%) compared with 6 patients in the temozolomide alone group (3%) were considered stable by blinded central review; however, treatment had been changed by the study investigator due to local interpretation of tumor progression. Patients were removed from the progression-free survival analysis at the date of treatment change when this occurred before evidence of tumor progression or when patients reached the cutoff date without tumor progression.

Adverse events were recorded prospectively according to the National Cancer Institute's Common Terminology Criteria (version 3.0) until 2 months after treatment discontinuation. Adverse events are presented descriptively as number and percentage of patients with each adverse event term for all patients available at the time of the interim analysis. Treatment adherence with TTFields was recorded electronically by the device as average daily use in hours per day and information was reviewed and transferred at the monthly follow-up visit.

#### Statistical Considerations
The primary end point was progression-free survival in the intent-to-treat (ITT) population assessed by an independent review panel (80% power; hazard ratio [HR], 0.78; 2-sided α level

(REPRINTED)
Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 236 of 631   Document 11-5          4467
EX. 2, P. 75

of .05). The study was also designed to have 80% power (HR, 0.76; 2-sided α level of .05) to examine overall survival as a secondary end point. To avoid an increase in the risk of a false-positive result, overall survival was to be tested statistically only if the primary end point was met.

This prespecified interim analysis was to be performed after the first 315 randomized patients reached a minimum 18-month follow-up. The final type I error rate of 0.05 was split between the interim and final analyses based on a standard α spending function.[20-22] The protocol prespecified that overall survival would be analyzed in an as-treated population, excluding all patients in both treatment groups who (1) never started maintenance temozolomide, (2) had major protocol violations, (3) crossed over to the other treatment group, or (4) received TTFields outside the protocol setting.

The primary end point would be achieved in the interim analysis if progression-free survival in the ITT population was significantly longer in the intervention group compared with the control group using a stratified log-rank test with an α level of .01. The secondary end point would be achieved in the interim analysis if overall survival in the as-treated population (per-protocol population) was significantly longer in the TTFields plus temozolomide group using a stratified log-rank test with an α level of .006. The confidence intervals that go with the HRs are presented as 1 minus the prespecified α level for each analysis. For example, the α level in the per-protocol interim analysis for overall survival was .006. Therefore, the corresponding confidence interval used for presenting the HRs was 1.000 − 0.006 (99.4% confidence interval). An upper confidence limit of less than 1 indicates the prespecified statistical threshold was met. An independent data and safety monitoring committee was chartered to stop the trial if the interim analysis of progression-free survival (ITT population) and overall survival (per-protocol population) surpassed these predetermined thresholds, as well as for futility or safety concerns.

In addition to these prespecified analyses, an analysis of overall survival in the ITT population was performed. Furthermore, a robustness analysis including all 695 patients enrolled in the trial served to validate the findings of the interim analysis (database lock: December 29, 2014; eAppendix 1 in Supplement 2).

Multiple imputation analyses were also performed for the trial's primary end point of progression-free survival in the ITT population to test the sensitivity of the results to possible bias using informative and interval censoring. These analyses included (1) treating all patients with informative censoring as treatment failures in the TTFields plus temozolomide group, (2) censoring all patients with informative censoring in the temozolomide alone group (worst case scenario), and (3) treating all events in the TTFields plus temozolomide group and in the temozolomide alone group as occurring differentially at different periods during the inter-MRI interval before the date of tumor progression.

All statistical analyses were performed using SAS version 9.4 (SAS Institute Inc) and R version 3.1.1.[23] The final analysis will be performed when all 695 patients enrolled in the study have at least 18 months of follow-up and will include prespecified subgroup analyses and additional secondary end points, including quality of life.

## Results

### Study Participants

Between July 2009 and November 2014, there were 695 patients with newly diagnosed glioblastoma randomized to receive either TTFields plus temozolomide (n = 466) or temozolomide alone (n = 229). Data for the interim analysis included 210 patients randomized to TTFields plus temozolomide and 105 to temozolomide alone (Figure 1; database lock: September 5, 2014). The independent data and safety monitoring committee met in October 2014 to review the interim analysis; the trial met the predefined boundaries for success (improvement of both progression-free and overall survival) and the committee recommended study termination, thus allowing patients in the control group to crossover and receive TTFields.

After approval of study termination by the US Food and Drug Administration, the trial was closed to recruitment on November 29, 2014, after 695 patients of the planned 700 patients had already been randomized. All patients in the control group with ongoing maintenance therapy were offered to receive TTFields. At the time of this report, 35 patients in the control group crossed over to receive TTFields. Follow-up for all patients continues according to the protocol.

Patient baseline characteristics were well balanced between the 2 groups (Table 1). The median age was 57 years and 66% were male. The median KPS score was 90%. Sixty-four percent of patients had a gross total resection and 11% had only a diagnostic biopsy. Tumor tissue for central MGMT testing was available for 72% of the patients; the MGMT methylation frequency was 39% (75/191 valid tests; 39% for the TTFields plus temozolomide group and 41% for the temozolomide alone group). Tumor location in the brain was also comparable.

Carmustine wafers (Gliadel) were used at initial surgery in 2.4% of patients in the TTFields plus temozolomide group vs 2.9% of patients in the temozolomide alone group. Ninety-five percent of the patients were white and 61% were treated in the United States. The rest of the patients were treated at centers in Canada, Europe, Israel, and South Korea. The median time from diagnosis to randomization was 3.8 months (range, 2.0-5.7 months) for patients in the TTFields plus temozolomide group and 3.8 months (range, 1.4-5.7 months) for those in the temozolomide alone group. The median time from the end of treatment with temozolomide and radiotherapy to randomization was 36 days in the TTFields plus temozolomide group and 38 days in the temozolomide alone group; 53% of patients were randomized after having started the first cycle of maintenance temozolomide. The median time from randomization to initiation of TTFields was 5 days.

### Treatment Delivery

All patients had completed radiotherapy and concomitant temozolomide as per local practice. The median number of temozolomide cycles until evidence of first tumor progression was 6 cycles (range, 1-26 cycles) for patients in the TTFields

(REPRINTED)
Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 237 of 631   Document 11-5

EX. 2, P. 76

4468

**Table 1. Patient Baseline Characteristics and Treatment Details**

| | All Patients (N = 315) | TTFields Plus Temozolomide (n = 210) | Temozolomide Alone (n = 105) |
|---|---|---|---|
| **Age, y** | | | |
| Mean (SD) | 55.8 (11.1) | 55.3 (11.3) | 56.8 (10 5) |
| Median (range) | 57 (20-83) | 57 (20-83) | 58 (21-80) |
| Karnofsky Performance Status score, median (range), %[a] | 90 (60-100) | 90 (60-100) | 90 (70-100) |
| **Sex, No. (%)** | | | |
| Male | 207 (66) | 140 (67) | 67 (64) |
| Female | 108 (34) | 70 (33) | 38 (36) |
| **Use at baseline, No. (%)** | | | |
| Antiepileptic medication | 126 (40) | 88 (42) | 38 (36) |
| Corticosteroid therapy | 77 (24) | 51 (24) | 26 (25) |
| **Mini-Mental State Examination score, No. (%)[b]** | | | |
| ≤26 | 45 (15) | 31 (15) | 14 (13) |
| 27-30 | 247 (78) | 174 (83) | 73 (70) |
| Unknown | 23 (7) | 5 (2) | 18 (17) |
| **Extent of resection, No. (%)** | | | |
| Biopsy | 34 (11) | 23 (11) | 11 (10) |
| Partial resection | 79 (25) | 52 (25) | 27 (26) |
| Gross total resection | 202 (64) | 135 (64) | 67 (64) |
| **Tissue available and tested, No. (%)** | 227 (72) | 152 (72) | 75 (71) |
| MGMT methylation | 75 (33) | 49 (32) | 26 (35) |
| No methylation | 116 (51) | 79 (52) | 38 (51) |
| Invalid test result | 36 (16) | 24 (16) | 11 (15) |
| **Region, No. (%)** | | | |
| United States | 191 (61) | 127 (60) | 64 (61) |
| Rest of world | 124 (39) | 83 (40) | 41 (39) |
| **Completed radiation therapy, No. (%)** | | | |
| <57 Gy | 18 (6) | 13 (6) | 5 (5) |
| 60 Gy (standard; ±5%) | 291 (92) | 191 (91) | 100 (95) |
| >63 Gy | 6 (2) | 6 (3) | 0 (0) |
| **Concomitant temozolomid use, No. (%)** | | | |
| Yes | 308 (98) | 207 (99) | 101 (96) |
| Unknown | 7 (2) | 3 (1) | 4 (4) |
| **Time from event to randomization, median (range), d** | | | |
| Last day of radiotherapy | 37 (13-68) | 36 (13-53) | 38 (13-68) |
| Initial diagnosis | 114 (43-171) | 115 (59-171) | 113 (43-170) |
| No. of maintenance temozolomide cycles until first tumor progression, median (range) | 6 (1-26) | 6 (1-26) | 4 (1-24) |
| Duration of treatment with TTFields, median (range), mo | 9 (1-58) | 9 (1-58) | |
| Adherence to TTFields therapy ≥75% during first 3 mo of treatment | | 157 (75) | |

Abbreviations: MGMT, O⁶-methylguanine-DNA methyltransferase; TTFields, tumor-treating fields.

[a] A higher score indicates better functional status.

[b] A higher score indicates better cognitive capability.

plus temozolomide group and 4.0 cycles (range, 1-24 cycles) for patients in the temozolomide alone group; the median duration of treatment with TTFields was 9 months (range, 1-58 months). Two-thirds (n = 141) of patients in the TTFields plus temozolomide group continued treatment with TTFields after first tumor progression. Three-quarters (n = 157) of patients receiving treatment with TTFields were adherent to therapy (ie, wearing the device >18 hours per day on average during the first 3 treatment months).

**Efficacy End Points**

As prespecified, the primary end point for the efficacy results was based on progression-free survival in the ITT population of the interim analysis data set. After a median follow-up of 38 months (range, 18-60 months), the median progression-free survival from randomization was 7.1 months (95% CI, 5.9-8.2 months) in the TTFields plus temozolomide group compared with 4.0 months (95% CI, 3.3-5.2 months) in the temozolomide alone group (HR, 0.62 [98.7% CI, 0.43-0.89];

(REPRINTED)
Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 238 of 631   Document 11-5

EX. 2, P. 77

4469



Figure 2. Survival Curves for Patients Included in the Interim Analysis in the Intent-to-Treat Population



No. at risk

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| TTFields plus temozolomide | 210 | 149 | 94 | 60 | 45 | 35 | 29 | 22 | 16 | 12 | 11 |
| Temozolomide alone | 105 | 55 | 26 | 21 | 15 | 12 | 12 | 6 | 5 | 1 | 1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| TTFields plus temozolomide | 210 | 195 | 147 | 94 | 65 | 43 | 28 |
| Temozolomide alone | 105 | 86 | 68 | 42 | 23 | 14 | 8 |

Survival analyses on time from date of randomization until tumor progression, death, or last follow-up (censored patients) according to the Kaplan-Meier method. The small vertical ticks on the curves indicate censored patients. HR indicates hazard ratio; TTFields, tumor-treating fields.

stratified log-rank $P$ = .001; Figure 2A). Thus, adding TTFields to temozolomide treatment increased median progression-free survival in the ITT population by 3.1 months.

As per the statistical analysis plan, overall survival was to be tested in a prespecified per-protocol population only after the primary end point was found to surpass the threshold for significance in the interim analysis. Median overall survival in the per-protocol population was 20.5 months (95% CI, 16.7-25.0 months) in the TTFields plus temozolomide group (n = 196) compared with 15.6 months (95% CI, 13.3-19.1 months) in the temozolomide alone group (n = 84) (HR, 0.64 [99.4% CI, 0.42-0.98]; stratified log-rank $P$ = .004). The details on the per-protocol population and analyses are summarized in eAppendix 2 in Supplement 2.

In additional analyses in the ITT population, the median overall survival was 19.6 months (95% CI, 16.6-24.4 months) in the TTFields plus temozolomide group compared with 16.6 months (95% CI, 13.6-19.2 months) in the temozolomide alone group (HR, 0.74 [95% CI, 0.56-0.98]; stratified log-rank $P$ = .03; Figure 2B). The percentage of patients alive at 2 years following enrollment was 43% in the TTFields plus temozolomide group and 29% in the temozolomide alone group ($P$ = .006).

To assess the robustness of the interim analysis findings, additional analyses on all 695 patients randomized were performed. Patient characteristics of all patients randomized did not differ significantly from the interim data set, and the results for the main end points were similar in these analyses compared with the interim analysis (eAppendix 1 in Supplement 2).

Second-line treatments, such as nitrosoureas, temozolomide rechallenge, and bevacizumab, were received by 67% of the patients in the TTFields plus temozolomide group compared with 57% in the temozolomide alone group; about 40% of second-line therapies included bevacizumab and about 40% included nitrosoureas. The type of chemotherapy used at recurrence was balanced between treatment groups.

Secondary imputation analyses of progression-free survival with relation to the effects of interval and informational censoring did not change the conclusions of the primary progression-free survival analysis (eAppendix 3 in Supplement 2).

### Safety and Tolerability

The addition of TTFields to temozolomide therapy in patients with newly diagnosed glioblastoma was not associated with any significant increase in systemic toxic effects compared with temozolomide therapy alone (Table 2). The overall incidence, distribution, and severity of adverse events were similar in patients treated with TTFields plus temozolomide and in those treated with temozolomide alone. The only notable exception was a higher incidence rate of localized skin toxicity (medical device site reaction beneath the transducer arrays) in patients treated with TTFields plus temozolomide. Mild to moderate skin irritation was observed in 43% of patients treated with TTFields plus temozolomide and severe skin reaction (grade 3) in 2%. Mild anxiety, confusion, insomnia, and headaches were reported more frequently in the patients treated with TTFields plus temozolomide and occurred mainly at the time of therapy initiation. The incidence of seizures was almost identical in the 2 groups (15 [7%] in the TTFields plus temozolomide group vs 8 [8%] in temozolomide alone group). A total of 12 patients died of causes considered unrelated to treatment while receiving adjuvant therapy (8 [3.9%] in the temozolomide plus TTFields group and 4 [4.0%] in the temozolomide alone group; Table 2).

## Discussion

Glioblastoma is a highly aggressive brain tumor affecting men and women, frequently at the peak of life. Prognosis remains poor with no major treatment advance in more than a decade. In the interim analysis of this randomized clinical trial,

(REPRINTED)

Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 239 of 631    Document 11-5        4470

EX. 2, P. 78

the addition of TTFields to standard maintenance temozolomide significantly improved progression-free and overall survival. The prespecified analyses revealed that patients randomized to receive TTFields plus temozolomide compared with patients randomized to receive temozolomide alone had a median progression-free survival of 7.1 months vs 4.0 months (ITT analyses). Patients who received TTFields plus temozolomide had a median overall survival of 20.5 months compared with 15.6 months in those who received temozolomide alone (as per the prespecified per-protocol analysis; the ITT analysis did not differ substantially).

Based on the results of this planned interim analysis, the trial's independent data and safety monitoring committee recommended termination of the trial. Because almost all patients had been enrolled (695/700) in the study by the time the recommendation was implemented, the full trial population will be followed up for both progression-free and overall survival. Subsequent analyses of all secondary end points and subgroups will be performed when the follow-up data are available.

The trial population and the results in the control group in this study were comparable with other glioblastoma clinical trials. Nevertheless, patients in this trial were randomized only after the end of radiochemotherapy, and for most, the first cycle of maintenance temozolomide had been started at the time of randomization; thus, patients with early tumor progression during radiochemotherapy were excluded. Most glioblastoma trials have reported survival from the date of initial diagnosis or study enrollment before starting radiochemotherapy, thus 3 to 4 months before randomization of the current study.

When the interval from diagnosis to randomization is added to the outcome results in this study, the progression-free survival of 7.8 months in the control group is comparable with most other reported studies, and supports the generalizability of these results. The Radiation Therapy Oncology Group (RTOG) 0525 protocol randomized patients only after the end of treatment with temozolomide and radiotherapy, similar to our study.[3] The control groups with standard dose temozolomide only in these 2 trials were comparable: progression-free survival from randomization of 4.0 months in the present study and 5.5 months in the RTOG 0525 trial and overall survival of 16.6 months in both trials. Thus, the benefit observed with TTFields cannot be simply attributed to patient selection. In the present trial, the gain of 3 months in both median progression-free survival (from 4.0 months to 7.2 months; HR, 0.62) and median overall survival (from 16.6 months to 19.6 months; HR, 0.74), translating into a survival gain at 2 years of 14% (from 29% to 43%) in the ITT population is in the range of benefit that is considered clinically meaningful for therapeutic agents in oncology.

The prespecified analysis for overall survival in the interim analysis was to be based on the per-protocol population (n = 280); ie, removal in both study groups of the patients who did not start their second course of maintenance temozolomide or had major protocol violations. This analysis met the prespecified threshold for efficacy in the interim analysis for the per-protocol population. In a more conservative analysis using the ITT population, an overall survival benefit was also manifest. Furthermore, an analysis of robustness performed on all randomized patients enrolled at the time

**Table 2. Grade 3 to 4 Treatment-Emergent Adverse Events**

| | No. (%) of Patients With Adverse Events[a] | |
| --- | --- | --- |
| | TTFields Plus Temozolomide (n = 203)[b] | Temozolomide Alone (n = 101)[c] |
| Hematological disorders[d] | 25 (12) | 9 (9) |
| Anemia | 1 (<1) | 2 (2) |
| Leukopenia or lymphopenia | 11 (5) | 5 (5) |
| Neutropenia | 6 (3) | 1 (1) |
| Thrombocytopenia | 19 (9) | 3 (3) |
| Cardiac disorders | 2 (1) | 3 (3) |
| Eye disorders | 2 (1) | 1 (1) |
| Gastrointestinal disorders[d] | 11 (5) | 2 (2) |
| Abdominal pain | 2 (1) | 0 |
| Constipation | 2 (1) | 0 |
| Diarrhea | 1 (<1) | 2 (2) |
| Vomiting | 3 (1) | 1 (1) |
| General disorders | 17 (8) | 5 (5) |
| Fatigue | 8 (4) | 4 (4) |
| Infections | 10 (5) | 5 (5) |
| Injury and procedural complications[d] | 14 (7) | 5 (5) |
| Fall | 6 (3) | 2 (2) |
| Medical device site reaction | 4 (2) | 0 |
| Metabolism and nutrition disorders | 7 (3) | 3 (3) |
| Musculoskeletal disorders | 8 (4) | 3 (3) |
| Nervous system disorders[d] | 45 (22) | 25 (25) |
| Seizure | 15 (7) | 8 (8) |
| Headache | 4 (2) | 2 (2) |
| Psychiatric disorders[d] | 9 (4) | 3 (3) |
| Anxiety | 2 (1) | 0 |
| Bradyphrenia | 0 | 1 (1) |
| Confusional state | 2 (1) | 1 (1) |
| Mental status changes | 4 (2) | 1 (1) |
| Psychotic disorder | 2 (1) | 0 |
| Respiratory disorders | 4 (2) | 1 (1) |
| Skin disorders | 0 | 1 (1) |
| Vascular disorders[d] | 8 (4) | 8 (8) |
| Deep vein thrombosis | 1 (<1) | 3 (3) |
| Pulmonary embolism | 4 (2) | 6 (6) |

Abbreviation: TTFields, tumor-treating fields.

[a] Safety is reported on patients who have received any treatment. Randomized patients who never received any maintenance therapy were excluded from this safety analysis.

[b] Eight patients died while receiving adjuvant therapy due to causes unrelated to therapy (1 patient for each of the following reasons: cardiac events, pulmonary emboli, respiratory, and infection; and 4 patients with central nervous system disorders likely due to tumor progression).

[c] Four patients died while receiving adjuvant therapy due to causes unrelated to therapy (1 patient for each of the following reasons: cardiac events, pulmonary emboli, respiratory, and unknown).

[d] Patients may have had more than 1 adverse event so subcategories do not total and not all events are subcategorized.

(REPRINTED)
Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 240 of 631 Document 11-5
4471
EX. 2, P. 79

of study termination (eAppendix 1 in Supplement 2) supports the conclusions of the interim analysis.

This clinical trial has some important limitations. Patient enrollment occurred only after the end of radiochemotherapy, leading to some variation in the delivery of standard treatment of temozolomide and radiotherapy. Patients who had progressed early during radiochemotherapy were not eligible for randomization, thus excluding patients with very poor prognoses. There is likely reporting bias for second-line therapies after tumor progression because in the TTFields plus temozolomide group, TTFields were to be continued, and thus, more detailed treatment information has been tracked for this group.

This analysis reports a planned interim analysis on data from the first 315 patients with at least 18 months of follow-up; however, for detailed and meaningful subgroup analyses, the mature data of the full data set will be needed. Treatment failure patterns, effects of second-line therapies, and additional molecular analyses on baseline tumor biopsies will allow for better understanding of the clinical effects of this novel treatment modality. With the last patient randomized on November 29, 2014, however, these data are not expected before the end of 2016.

This was an open-labeled study. A sham or placebo treatment for the control group was considered neither practical (patients would be able to sense heat when they were receiving TTFields) nor appropriate (due to the burden for patients and caregivers and the need to shave the scalp and have transducer arrays placed). In this respect, the trial resembles studies evaluating radiation therapy. This raises the question of a placebo effect leading to the improved outcome. Although some effect of placebo may be expected on subjective end points, such as cognitive function and quality of life, objective end points, such as overall and progression-free survival (assessed by a blinded review panel), are independent of placebo effects in cancer therapy.[34] The panel did not have information on treatment received and no stigmata of TTFields array pads were evident on MRI.

Recent randomized studies of patients with glioblastoma, which did not use placebo controls, failed to show any increase in progression-free or overall survival[3,7] despite intensive treatment regimens requiring twice weekly hospital visits.[7] The magnitude of effect size seen in the present trial (HR of 0.62 for progression-free survival and 0.74 for overall survival) is beyond what could be attributed to a placebo effect. In addition, the support provided to patients in the TTFields plus temozolomide group by device support specialists during the trial was largely technical in nature and did not include equal supportive care. Medical follow-up with monthly visits was the same for both treatment groups.

Because TTFields were applied only to the head, an increase in systemic adverse events was neither seen nor expected. No increase in seizure rate or neurological adverse events was observed. Almost half of the patients treated with TTFields did experience some grade 1 to 2 (mild to moderate) localized skin reaction related to the application of the transducer arrays used to deliver the TTFields. This adverse effect could be managed using published skin care guidelines for patients receiving TTFields.[35] Only 2% of patients receiving TTFields had grade 3 to 4 (severe) skin reactions beneath the transducer arrays.

## Conclusions

In this interim analysis of 315 patients with glioblastoma who had completed standard chemoradiation therapy, adding TTFields to maintenance temozolomide chemotherapy significantly prolonged progression-free and overall survival.

ARTICLE INFORMATION

Author Affiliations: University Hospital Zurich and University of Zurich, Zurich, Switzerland (Stupp); Lausanne University Hospital (CHUV), Lausanne, Switzerland (Stupp, Hottinger, Hegi); Assistance Publique des Hôpitaux de Paris, La Pitié-Salpêtrière-University Hospital, Pierre and Marie Curie University, Paris, France (Taillibert, Idbaih); Tel Aviv Sourasky Medical Center, Tel Aviv University, Tel Aviv, Israel (Kanner, Ram); University of California, San Diego (Kesari); Tel Aviv University, Tel Aviv, Israel (Steinberg); Geisinger Health System, Danville, Pennsylvania (Toms); Tufts Medical Center, Boston, Massachusetts (Taylor); University of Pittsburgh Medical Center, Pittsburgh, Pennsylvania (Lieberman); Istituto Nazionale Neurologico Carlo Besta, Milan, Italy (Silvani); Baylor University Medical Center, Dallas, Texas (Fink, Zhu); Cleveland Clinic Foundation, Cleveland, Ohio (Barnett); University of Texas Health Science Center, Houston (Zhu), Swedish Neuroscience Institute, Seattle, Washington (Henson); University of Illinois, Chicago (Engelhard); University of Southern California, Los Angeles (Chen); Washington University Barnes-Jewish Hospital, St Louis, Missouri (D. D. Tran); Na Homolce Hospital, Prague, Czech Republic (Sroubek); Moffitt Cancer Center, Tampa, Florida (N. D. Tran);

New Jersey Neuroscience Institute, Edison (Landolfi); Maine Medical Center, Portland (Desai); Fondazione Ospedale Maggiore Policlinico, Milan, Italy (Caroli); Houston Methodist Hospital, Houston, Texas (Kew); Hospices Civils de Lyon, University Claude Bernard Lyon 1, Lyon, France (Honnorat); Novocure, Haifa, Israel (Kirson, Weinberg, Palti).

Author Contributions: Drs Stupp and Ram had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.
Study concept and design: Stupp, Kirson, Weinberg, Palti, Ram.
Acquisition, analysis, or interpretation of data: All authors.
Drafting of the manuscript: Stupp, Kirson, Ram.
Critical revision of the manuscript for important intellectual content: All authors.
Statistical analysis: Steinberg.
Obtained funding: Palti.
Administrative, technical, or material support: Stupp, Kirson, Weinberg, Hegi, Ram.
Study supervision: Stupp, Kirson, Weinberg, Hegi, Ram.

Conflict of Interest Disclosures: The authors have completed and submitted the ICMJE Form for

Disclosure of Potential Conflicts of Interest. Dr Stupp reported receiving travel assistance from Novocure for data review and presentation of the results at medical meetings, and receiving personal fees for serving on advisory boards for Roche/Genentech, Merck KGaA, Merck & Co. and Novartis. Dr Taillibert reported receiving personal fees from Mundipharma EDO and Roche. Dr Kanner reported receiving institutional grant funding and personal fees for speaking and device training from Novocure. Dr Kesari reported receiving institutional grant funding and personal fees for consulting and attending advisory meetings from Novocure. Dr Steinberg reported receiving consulting fees from Novocure for performing the statistical analysis. Dr Toms reported receiving personal fees from Novocure for serving on an advisory board. Dr Lieberman reported receiving institutional grant funding from Novocure. Dr Fink reported receiving personal fees from Novocure for serving on an advisory board and receiving personal fees from Genetech for serving in the speakers program. Dr Zhu reported receiving institutional grant funding and personal fees from Novocure. Dr Engelhard reported receiving institutional grant funding and personal fees from Novocure. Dr Chen reported receiving grant funding, personal fees, nonfinancial support, and being a stock holder and chief

(REPRINTED)
Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 241 of 631   Document 11-5     4472

EX.   2,   P.   80

oncology officer in Pharmo-kinesis; and receiving grant funding, personal fees, nonfinancial support, and being a stock holder in and CEO of NeOnc Technologies. Dr David Tran reported receiving grant funding from Celldex, NWBiotech, Novocure, and Merck; and receiving personal fees from Novocure and prIME Oncology. Dr Hottinger reported receiving travel reimbursement and speakers fees from Novocure and Merck Sharp & Dohme; and receiving personal fees for serving on an advisory board for Roche. Dr Landolfi reported receiving personal fees from Novocure for serving on an advisory board. Dr Honnorat reported receiving trial support from Novocure and serving on an advisory board for Novocure. Dr Idbaih reported receiving grants from Fondation ARC pour la recherche sur le Cancer; receiving research support from InselChimos and Beta-Innov; receiving personal fees from Novartis for attending a conference; receiving travel reimbursement from Hoffmann-La Roche; and serving as an editorial advisory board member for Lettre du Cancérologue. Drs Kirson, Weinberg, and Palti reported being employees of Novocure. Dr Palti also reported holding 35 issued US patents and minority stock ownership in Novocure. Dr Hegi reported receiving institutional grant funding from Novocure, Merck Sharp & Dohme, Roche, and Merck-Serono; and nonfinancial support from MDxHealth for sample testing. Dr Ram reported receiving institutional grant funding from Novocure; and serving as a paid consultant for and holding stock options in Novocure. Drs Taylor, Silvani, Barnett, Henson, Sroubek, Nam Tran, Desai, Caroli, and Kew reported having no disclosures.

Funding/Support: The study was funded by Novocure Ltd.

Role of the Funder/Sponsor: Novocure Ltd had a role in the design and conduct of the study: collection, management, analysis, and interpretation of the data: preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication. The study was designed by the first and last authors (R.S. and Z.R.), together with representatives from Novocure (mainly E.D.K.). The study oversight was supported and monitored by a clinical research organization (CRO), who also holds the database. Data were collected by the investigators and monitored by the CRO. Device use data were downloaded monthly and transferred to the study investigators or their research staff by device support specialists from Novocure Ltd. The data were analyzed separately by the statistician of the independent data monitoring committee and the study statistician (D.M.S.). Data interpretation was the responsibility of the first and last authors (R.S. and Z.R.), together with the study sponsor representative and project lead (E.D.K.). These 3 physicians also jointly developed the first draft. A subsequent mature draft and a prefinal version were circulated among all authors who gave additional input, contributed to, and approved the manuscript. The first and last authors (R.S. and Z.R.) and E.D.K. had full access to all data, and also reviewed all patient profiles for consistency (R.S. and E.D.K.). The decision to publish the data followed the independent data and safety monitoring committee recommendation for data release, and was supported by all coauthors.

The roles of employees of Novocure are described in the respective author contributions. Other employees' involvement was limited to technical support of the device.

Additional Contributions: We thank the patients and their families for participating in the trial. We are grateful to all of the EF-14 investigators, who are listed in eAppendix 4 in Supplement 2, and the nursing staff for taking care of the patients.

## REFERENCES

1. Stupp R, Mason WP, van den Bent MJ, et al; European Organisation for Research and Treatment of Cancer Brain Tumor and Radiotherapy Groups; National Cancer Institute of Canada Clinical Trials Group. Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. N Engl J Med. 2005;352(10):987-996.

2. Gilbert MR, Dignam JJ, Armstrong TS, et al. A randomized trial of bevacizumab for newly diagnosed glioblastoma. N Engl J Med. 2014;370 (8):699-708.

3. Gilbert MR, Wang M, Aldape KD, et al. Dose-dense temozolomide for newly diagnosed glioblastoma: a randomized phase III clinical trial. J Clin Oncol. 2013;31(32):4085-4091.

4. Chinot OL, Wick W, Mason W, et al. Bevacizumab plus radiotherapy-temozolomide for newly diagnosed glioblastoma. N Engl J Med. 2014;370 (8):709-722.

5. Stupp R, Hegi ME, Mason WP, et al; European Organisation for Research and Treatment of Cancer Brain Tumour and Radiation Oncology Groups; National Cancer Institute of Canada Clinical Trials Group. Effects of radiotherapy with concomitant and adjuvant temozolomide versus radiotherapy alone on survival in glioblastoma in a randomised phase III study; 5-year analysis of the EORTC-NCIC trial. Lancet Oncol. 2009;10(5):459-466.

6. Westphal M, Heese O, Steinbach JP, et al. A randomised, open label phase III trial with nimotuzumab, an anti-epidermal growth factor receptor monoclonal antibody in the treatment of newly diagnosed adult glioblastoma. Eur J Cancer. 2015;51(4):522-532.

7. Stupp R, Hegi ME, Gorlia T, et al; European Organisation for Research and Treatment of Cancer (EORTC); Canadian Brain Tumor Consortium; CENTRIC study team. Cilengitide combined with standard treatment for patients with newly diagnosed glioblastoma with methylated MGMT promoter (CENTRIC EORTC 26071-22072 study): a multicentre, randomised, open-label, phase 3 trial. Lancet Oncol. 2014;15(10):1100-1108.

8. Kirson ED, Dbalý V, Tovaryš F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. Proc Natl Acad Sci U S A. 2007;104(24):10152-10157.

9. Kirson ED, Schneiderman RS, Dbalý V, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). BMC Med Phys. 2009;9:1.

10. Turikem E, Wong ET. NovoTTF-100A: a new treatment modality for recurrent glioblastoma. Expert Rev Neurother. 2012;12(8):895-899.

11. Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of cancer cell replication by alternating electric fields. Cancer Res. 2004;64(9):3288-3295.

12. Gutin PH, Wong ET. Noninvasive application of alternating electric fields in glioblastoma: a fourth cancer treatment modality. Am Soc Clin Oncol Educ Book. 2012;126-131.

13. Stupp R, Wong ET, Kanner AA, et al. NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomised phase III trial of a novel treatment modality. Eur J Cancer. 2012;48(14):2192-2202.

14. Louis DN, Ohgaki H, Wiestler OD, et al. The 2007 WHO classification of tumours of the central nervous system. Acta Neuropathol. 2007;114(2):97-109.

15. Hegi ME, Diserens AC, Gorlia T, et al. MGMT gene silencing and benefit from temozolomide in glioblastoma. N Engl J Med. 2005;352(10):997-1003.

16. Vlassenbroeck I, Califice S, Diserens AC, et al. Validation of real-time methylation-specific PCR to determine O6-methylguanine-DNA methyltransferase gene promoter methylation in glioma. J Mol Diagn. 2008;10(4):332-337.

17. Aaronson NK, Ahmedzai S, Bergman B, et al. The European Organization for Research and Treatment of Cancer QLQ-C30: a quality-of-life instrument for use in international clinical trials in oncology. J Natl Cancer Inst. 1993;85(5):365-376.

18. Taphoorn MJ, Claassens L, Aaronson NK, et al; EORTC Quality of Life Group, and Brain Cancer, NCIC and Radiotherapy Groups. An international validation study of the EORTC brain cancer module (EORTC QLQ-BN20) for assessing health-related quality of life and symptoms in brain cancer patients. Eur J Cancer. 2010;46(6):1033-1040.

19. Macdonald DR, Cascino TL, Schold SC Jr, Cairncross JG. Response criteria for phase II studies of supratentorial malignant glioma. J Clin Oncol. 1990;8(7):1277-1280.

20. O'Brien PC, Fleming TR. A multiple testing procedure for clinical trials. Biometrics. 1979;35(3): 549-556.

21. DeMets DL, Lan G. The alpha spending function approach to interim data analyses. Cancer Treat Res. 1995;75:1-27.

22. DeMets DL, Lan KK. Interim analysis: the alpha spending function approach. Stat Med. 1994;13 (13-14):1341-1352.

23. R_Development_Core_Team. R: A Language and Environment for Statistical Computing. Vienna, Austria: R Foundation for Statistical Computing; 2008.

24. Chvetzoff G, Tannock IF. Placebo effects in oncology. J Natl Cancer Inst. 2003;95(1):19-29.

25. Lacouture ME, Davis ME, Elzinga G, et al. Characterization and management of dermatologic adverse events with the NovoTTF-100A System, a novel anti-mitotic electric field device for the treatment of recurrent glioblastoma. Semin Oncol. 2014;41(suppl 4):S1-S14.

(REPRINTED)
Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 242 of 631 Document 11-5
4473
EX. 2, P. 81

## Indications For Use and Safety Information in the United States:

Please visit www.optune.com/IFU for Optune Instructions For Use (IFU) for complete information regarding the device's indications, contraindications, w arnings and precautions.

Optune is intended as a treatment for adult patients (22 years of age or older) with histologically-confirmed glioblastoma multiforme (GBM).

Optune with temozolomide is indicated for the treatment of adult patients with newly diagnosed, supratentorial glioblastoma following maximal debulking surgery, and completion of radiation therapy together with concomitant standard of care chemotherapy..

For the treatment of recurrent GBM, Optune is indicated following histologically-or radiologically-confirmed recurrence in the supratentorial region of the brain after receiving chemotherapy. The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted.

### Summary of Important Safety Information
#### Contraindications
Do not use Optune in patients with an active implanted medical device, a skull defect (such as; missing bone with no replacement), or bullet fragments. Use of Optune together with implanted electronic devices has not been tested and may theoretically lead to malfunctioning of the implanted device. Use of Optune together with skull defects or bullet fragments has not been tested and may possibly lead to tissue damage or render Optune ineffective.

Do not use Optune in patients that are known to be sensitive to conductive hydrogels. In this case, skin contact with the gel used with Optune may commonly cause increased redness and itching, and rarely may even lead to severe allergic reactions such as shock and respiratory failure.

### Warnings and Precautions
Optune can only be prescribed by a healthcare provider that has completed the required certification training provided by Novocure (the device manufacturer).

Do not prescribe Optune for patients that are pregnant, you think might be pregnant or are trying to get pregnant, as the safety and effectiveness of Optune in these populations have not been established.

The most common ($\geq$10%) adverse events involving Optune in combination with temozolomide were thrombocytopenia, nausea, constipation, vomiting, fatigue, medical device site reaction, headache, convulsions, and depression.

Use of Optune in patients with an inactive implanted medical device in the brain has not been studied for safety and effectiveness, and use of Optune in these patients could lead to tissue damage or lower the chance of Optune being effective.

If the patient has an underlying serious skin condition on the scalp, evaluate whether this may prevent or temporarily interfere with Optune treatment.

### Indications for use and safety information in Europe:
#### Newly diagnosed GBM
Optune is intended for the treatment of patients with newly diagnosed GBM, after surgery and radiotherapy with adjuvant temozolomide, concomitant to maintenance temozolomide. The treatment is intended for adult patients, 18 years of age or older, and should be started more than 4 weeks after surgery and radiation therapy with adjuvant temozolomide. Treatment may be given together with maintenance temozolomide (according to the prescribing information in the Temodar package insert) and after maintenance temozolomide is stopped.

#### Recurrent GBM
Optune is intended for the treatment of patients with recurrent GBM who have progressed after surgery, radiotherapy and temozolomide treatment for their primary disease. The treatment is intended for adult patients, 18 years of age or older, and should be started more than 4 weeks after the latest surgery, radiation therapy or chemotherapy.

#### Contraindications
Do not use Optune if you are pregnant, think you might be pregnant, or are trying to get pregnant. If you are a woman who is able to get pregnant, you must use birth control when using the device. Optune was not tested in pregnant woman. Do not use Optune you have clinically significant hepatic, renal or haematologic disease. Do not use Optune you have significant additional neurological disease (primary seizure disorder, dementia, progressive degenerative neurological disorder, meningitis or encephalitis, hydrocephalus associated with increased intracranial pressure). Do not use Optune if you are known to be sensitive to conductive hydrogels like the gel used on electrocardiogram (ECG) stickers or transcutaneous electrical nerve stimulation (TENS) electrodes. In this case, skin contact with the gel used with Optune Treatment Kit may commonly cause increased redness and itching, and rarely may even lead to severe allergic reactions such as shock and respiratory failure.

#### Warnings and Precautions
Use Optune only after receiving training from qualified personnel, such as your doctor, a nurse, or other medical personnel who have completed a training course given by the device manufacturer (Novocure). All servicing procedures must be performed by qualified and trained personnel.

Do not use Optune Treatment Kit if you are 17 years old or younger. The system has not been tested in persons 17 years old or younger. It is unknown what side effects the device may cause in these cases or if it will be effective.
Do not wet the device or the transducer arrays. Do not use any parts that do not come with the Optune treatment kit, or that were not sent to you by the device manufacturer or given to you by your doctor..

Optune commonly causes skin irritation beneath the transducer arrays and in rare cases lead to headaches, falls, fatigue, muscle twitching or skin ulcers.
For complete information regarding Optune's indication, contraindication, warnings and precautions please see the Instructions for Use (IFU). (http://www.optune.com/deutsch/materialien/schulungen.aspx)



**DEPARTMENT OF HEALTH & HUMAN SERVICES**     Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center - WO66-G609
Silver Spring, MD 20993-0002

October 05, 2015

Novocure, Ltd.
℅ Mr. Jonathan S. Kahan
Partner
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004

Re: P100034/S013
    Trade/Device Name: Optune™ (Formerly the NovoTTF-100A System)
    Filed: April 10, 2015
    Amended: July 23, 2015
    Product Code: NZK

Dear Mr. Jonathan S. Kahan:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug Administration (FDA) has completed its review of your premarket approval application (PMA) supplement for the Optune™ (formerly the NovoTTF-100A System). This device is indicated as a treatment for adult patients (22 years of age or older) with histologically-confirmed glioblastoma multiforme (GBM). Optune™ with temozolomide is indicated for the treatment of adult patients with newly diagnosed, supratentorial glioblastoma following maximal debulking surgery and completion of radiation therapy together with concomitant standard of care chemotherapy. Optune™ was previously approved in 2011 for the treatment of recurrent GBM with the following Indications for Use (IFU): Optune™ is indicated following histologically-or radiologically-confirmed recurrence in the supra-tentorial region of the brain after receiving chemotherapy. The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted. We are pleased to inform you that the PMA supplement is approved. You may begin commercial distribution of the device as modified in accordance with the conditions of approval described below.

The sale and distribution of this device are restricted to prescription use in accordance with 21 CFR 801.109 and under section 515(d)(1)(B)(ii) of the Federal Food, Drug, and Cosmetic Act (the act). The device is further restricted under section 515(d)(1)(B)(ii) of the act insofar as the labeling must specify the specific training or experience practitioners need in order to use the device. FDA has determined that these restrictions on sale and distribution are necessary to provide reasonable assurance of the safety and effectiveness of the device. Your device is

therefore a restricted device subject to the requirements in sections 502(q) and (r) of the act, in addition to the many other FDA requirements governing the manufacture, distribution, and marketing of devices.

Continued approval of this PMA is contingent upon the submission of periodic reports, required under 21 CFR 814.84, at intervals of one year (unless otherwise specified) from the date of approval of the original PMA. Two copies of this report, identified as "Annual Report" and bearing the applicable PMA reference number, should be submitted to the address below. The Annual Report should indicate the beginning and ending date of the period covered by the report and should include the information required by 21 CFR 814.84. This is a reminder that as of September 24, 2014, class III devices are subject to certain provisions of the final UDI rule. These provisions include the requirement to provide a UDI on the device label and packages (21 CFR 801.20), format dates on the device label in accordance with 21 CFR 801.18, and submit data to the Global Unique Device Identification Database (GUDID) (21 CFR 830 Subpart E). Additionally, 21 CFR 814.84 (b)(4) requires PMA annual reports submitted after September 24, 2014, to identify each device identifier currently in use for the subject device, and the device identifiers for devices that have been discontinued since the previous periodic report. It is not necessary to identify any device identifier discontinued prior to December 23, 2013. For more information on these requirements, please see the UDI website, http://www.fda.gov/udi.

In addition to the above, and in order to provide continued reasonable assurance of the safety and effectiveness of the device, the Annual Report must include, separately for each model number (if applicable), the number of devices sold and distributed during the reporting period, including those distributed to distributors. The distribution data will serve as a denominator and provide necessary context for FDA to ascertain the frequency and prevalence of adverse events, as FDA evaluates the continued safety and effectiveness of the device.

Before making any change affecting the safety or effectiveness of the device, you must submit a PMA supplement or an alternate submission (30-day notice) in accordance with 21 CFR 814.39. All PMA supplements and alternate submissions (30-day notice) must comply with the applicable requirements in 21 CFR 814.39. For more information, please refer to the FDA guidance document entitled, "Modifications to Devices Subject to Premarket Approval (PMA) - The PMA Supplement Decision-Making Process" http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm0 89274.htm

You are reminded that many FDA requirements govern the manufacture, distribution, and marketing of devices. For example, in accordance with the Medical Device Reporting (MDR) regulation, 21 CFR 803.50 and 21 CFR 803.52, you are required to report adverse events for this device. Manufacturers of medical devices, including in vitro diagnostic devices, are required to report to FDA no later than 30 calendar days after the day they receive or otherwise becomes aware of information, from any source, that reasonably suggests that one of their marketed devices:

1. May have caused or contributed to a death or serious injury; or

2. Has malfunctioned and such device or similar device marketed by the manufacturer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.

Additional information on MDR, including how, when, and where to report, is available at http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm.

In accordance with the recall requirements specified in 21 CFR 806.10, you are required to submit a written report to FDA of any correction or removal of this device initiated by you to: (1) reduce a risk to health posed by the device; or (2) remedy a violation of the act caused by the device which may present a risk to health, with certain exceptions specified in 21 CFR 806.10(a)(2). Additional information on recalls is available at http://www.fda.gov/Safety/Recalls/IndustryGuidance/default.htm

CDRH does not evaluate information related to contract liability warranties. We remind you; however, that device labeling must be truthful and not misleading. CDRH will notify the public of its decision to approve your PMA by making available, among other information, a summary of the safety and effectiveness data upon which the approval is based. The information can be found on the FDA CDRH Internet HomePage located at http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DeviceApprovalsandClearances/PMAApprovals/default.htm. Written requests for this information can also be made to the Food and Drug Administration, Dockets Management Branch, (HFA-305), 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852. The written request should include the PMA number or docket number. Within 30 days from the date that this information is placed on the Internet, any interested person may seek review of this decision by submitting a petition for review under section 515(g) of the act and requesting either a hearing or review by an independent advisory committee. FDA may, for good cause, extend this 30-day filing period.

Failure to comply with any post-approval requirement constitutes a ground for withdrawal of approval of a PMA. The introduction or delivery for introduction into interstate commerce of a device that is not in compliance with its conditions of approval is a violation of law.

You are reminded that, as soon as possible and before commercial distribution of your device, you must submit an amendment to this PMA submission with copies of all approved labeling in final printed form. Final printed labeling that is identical to the labeling approved in draft form will not routinely be reviewed by FDA staff when accompanied by a cover letter stating that the final printed labeling is identical to the labeling approved in draft form. If the final printed labeling is not identical, any changes from the final draft labeling should be highlighted and explained in the amendment.

All required documents should be submitted in 6 copies, unless otherwise specified, to the address below and should reference the above PMA number to facilitate processing.

U.S. Food and Drug Administration
Center for Devices and Radiological Health
PMA Document Control Center - WO66-G609
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

If you have any questions concerning this approval order, please contact Daryl Kaufman at 301-796-6467 or Daryl.Kaufman@fda.hhs.gov.

Sincerely yours,

Carlos L. Pena -S

Carlos L. Peña, PhD, MS
Director
Division of Neurological
  and Physical Medicine Devices
Office of Device Evaluation
Center for Devices and Radiological Health



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Room –WO66-G609
Silver Spring, MD 20993-0002

NovoCure, Ltd.
℅ Mr. Jonathan S. Kahan
Hogan Lovells US LLP                                    APR   8 2011
Columbia Square
555 Thirteenth Street, N.W.
Washington, D.C. 20004

Re:    P100034
       NovoTTF-100A System
       Filed: August 16, 2010
       Amended: September 10, October 19, December 13, and December 27, 2011; and
               February 17, and April 8, 2011
       Procode: NZK

Dear Mr. Kahan:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug Administration
(FDA) has completed its review of your premarket approval application (PMA) for the NovoTTF-
100A System. This device is indicated for treatment of adult patients (22 years of age or older)
with histologically-confirmed glioblastoma multiforme, following histologically- or radiologically-
confirmed recurrence in the supratentorial region of the brain after receiving chemotherapy. The
device is intended to be used as a monotherapy, and is intended as an alternative to standard
medical therapy for GBM after surgical and radiation options have been exhausted.

We are pleased to inform you that the PMA is approved. You may begin commercial distribution
of the device in accordance with the conditions of approval described below.

The sale and distribution of this device are restricted to prescription use in accordance with 21
CFR 801.109 and under section 515(d)(1)(B)(ii) of the Federal Food, Drug, and Cosmetic Act (the
act). The device is further restricted under section 515(d)(1)(B)(ii) of the act insofar as the labeling
must specify the specific training or experience practitioners need in order to use the device. FDA
has determined that these restrictions on sale and distribution are necessary to provide reasonable
assurance of the safety and effectiveness of the device. Your device is therefore a restricted device
subject to the requirements in sections 502(q) and (r) of the act, in addition to the many other FDA
requirements governing the manufacture, distribution, and marketing of devices.

501 9313 0521 6

Page 2 - Mr. Jonathan S. Kahan

Continued approval of this PMA is contingent upon the submission of periodic reports, required under 21 CFR 814.84, at intervals of one year (unless otherwise specified) from the date of approval of the original PMA. Two copies of this report, identified as "Annual Report" and bearing the applicable PMA reference number, should be submitted to the address below. The Annual Report should indicate the beginning and ending date of the period covered by the report and should include the information required by 21 CFR 814.84.

In addition to the above, and in order to provide continued reasonable assurance of the safety and effectiveness of the device, the Annual Report must include, separately for each model number (if applicable), the number of devices sold and distributed during the reporting period, including those distributed to distributors. The distribution data will serve as a denominator and provide necessary context for FDA to ascertain the frequency and prevalence of adverse events, as FDA evaluates the continued safety and effectiveness of the device.

In addition to the conditions outline above, you must conduct the following post-approval study (PAS):

*The New Enrollment Study for NovoTTF-100A in Recurrent GBM Patients:* Per agreed on study outline (e-mail dated April 5, 2011) this study will address the following question: Is the overall survival of patients treated with NovoTTF-100A non-inferior to the survival of patients treated with the best standard of care (chemotherapy)?. This question will be addressed with a prospective, multi-center, non-randomized, unblinded, concurrent control study of NovoTTF-100A in recurrent Glioblastoma Multiforme (GBM) patients. The study will be conducted in at least 30 sites, at least half of them in the United States, and may include centers with previous experience with the device. Patients 22 years old and older will be included in the PAS. A total of 406 subjects will be enrolled, with 243 subjects per study arm. All study participants will be followed until death. Study follow-up visits include baseline and monthly in-office visits until disease progression. Assessment at baseline includes the Mini Mental State Examination (MMSE) and genetic profiling. The monthly assessments include survival status, MMSE and adverse events assessment. After disease progression study participants will be followed by monthly phone calls to determine survival status.

The primary data analysis will compare overall survival in NovoTTF-100A patients to that seen in concurrent BSC comparison patients, in the investigational device exemption (IDE) study Intent-to-Treat population, within a predefined confidence interval bound consistent with a performance goal of 1:375. The secondary endpoints will be: Change in neuro-cognitive function from baseline based on the MMSE; Genetic profiling of tumors and correlation with response to NovoTTF-100A treatment, specifically:

- MGMT promoter methylation status
- EGFR amplification, over expression or rearrangement
- Chromosomes 1p/19q deletion status
- Adverse event incidence by body system and term, including:
- Incidence of seizures
- Anticonvulsant use

2

Please be advised that the results from these studies should be included in the labeling as these data become available. Any updated labeling must be submitted to FDA in the form of a PMA Supplement.

In addition to the Annual Report requirements, FDA would like to remind you that you are required to submit PAS Progress Reports every six months during the first two years and annually thereafter. The reports should clearly be identified as Post-Approval Study Report. Two copies, identified as "PMA Post-Approval Study Report" and bearing the applicable PMA reference number, should be submitted to the address below. For more information on post-approval studies, see the FDA guidance document entitled, "Procedures for Handling Post-Approval Studies Imposed by PMA Order"
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm070974.htm

Be advised that the failure to conduct any such study in compliance with the good clinical laboratory practices in 21 CFR part 58 (if a non-clinical study subject to part 58) or the institutional review board regulations in 21 CFR part 56 and the informed consent regulations in 21 CFR part 50 (if a clinical study involving human subjects) may be grounds for FDA withdrawal of approval of the PMA.

Within 30 days of your receipt of this letter, you must submit a PMA supplement that includes a complete protocol of your post-approval study. Your PMA supplement should be clearly labeled as a "Post-Approval Study Protocol" and submitted in triplicate to the address below. Please reference the PMA number above to facilitate processing. If there are multiple protocols being finalized after PMA approval, please submit each protocol as a separate PMA supplement. For more information on post-approval studies, see the FDA guidance document entitled, "Procedures for Handling Post-Approval Studies Imposed by PMA Order
(www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm070974.htm#2).

Before making any change affecting the safety or effectiveness of the device, you must submit a PMA supplement or an alternate submission (30-day notice) in accordance with 21 CFR 814.39. All PMA supplements and alternate submissions (30-day notice) must comply with the applicable requirements in 21 CFR 814.39. For more information, please refer to the FDA guidance document entitled, "Modifications to Devices Subject to Premarket Approval (PMA) - The PMA Supplement Decision-Making Process"
(www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm089274.htm).

You are reminded that many FDA requirements govern the manufacture, distribution, and marketing of devices. For example, in accordance with the Medical Device Reporting (MDR) regulation, 21 CFR 803.50 and 21 CFR 803.52, you are required to report adverse events for this device. Manufacturers of medical devices, including in vitro diagnostic devices, are required to report to FDA no later than 30 calendar days after the day they receive or otherwise becomes aware of information, from any source, that reasonably suggests that one of their marketed devices:

3

Page 4 - Mr. Jonathan S. Kahan

device. Manufacturers of medical devices, including in vitro diagnostic devices, are required to report to FDA no later than 30 calendar days after the day they receive or otherwise becomes aware of information, from any source, that reasonably suggests that one of their marketed devices:

1.    May have caused or contributed to a death or serious injury; or

2.    Has malfunctioned and such device or similar device marketed by the manufacturer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.

Additional information on MDR, including how, when, and where to report, is available at www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm.

In accordance with the recall requirements specified in 21 CFR 806.10, you are required to submit a written report to FDA of any correction or removal of this device initiated by you to: (1) reduce a risk to health posed by the device; or (2) remedy a violation of the act caused by the device which may present a risk to health, with certain exceptions specified in 21 CFR 806.10(a)(2). Additional information on recalls is available at www.fda.gov/Safety/Recalls/IndustryGuidance/default.htm.

CDRH does not evaluate information related to contract liability warranties. We remind you; however, that device labeling must be truthful and not misleading. CDRH will notify the public of its decision to approve your PMA by making available, among other information, a summary of the safety and effectiveness data upon which the approval is based. The information can be found on the FDA CDRH Internet HomePage located at www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DeviceApprovalsandClearances/PMAApprovals/default.htm. Written requests for this information can also be made to the Food and Drug Administration, Dockets Management Branch, (HFA-305), 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852. The written request should include the PMA number or docket number. Within 30 days from the date that this information is placed on the Internet, any interested person may seek review of this decision by submitting a petition for review under section 515(g) of the act and requesting either a hearing or review by an independent advisory committee. FDA may, for good cause, extend this 30-day filing period.

Failure to comply with any post-approval requirement constitutes a ground for withdrawal of approval of a PMA. The introduction or delivery for introduction into interstate commerce of a device that is not in compliance with its conditions of approval is a violation of law.

You are reminded that, as soon as possible and before commercial distribution of your device, you must submit an amendment to this PMA submission with copies of all approved labeling in final printed form. Final printed labeling that is identical to the labeling approved in draft form will not routinely be reviewed by FDA staff when accompanied by a cover letter stating that the final printed labeling is identical to the labeling approved in draft form. If the final printed labeling is not identical, any changes from the final draft labeling should be highlighted and explained in the amendment.

4

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 251 of 631   Document 11-5     4482
EX. 2, P. 90

All required documents should be submitted in triplicate, unless otherwise specified, to the address below and should reference the above PMA number to facilitate processing. One of those three copies may be an electronic copy (eCopy), in an electronic format that FDA can process, review and archive (general information):
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/Pre marketSubmissions/ucm134508.htm; clinical and statistical data:
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/Pre marketSubmissions/ucm136377.htm)

> U.S. Food and Drug Administration
> Center for Devices and Radiological Health
> PMA Document Mail Center -- WO66-G609
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

If you have any questions concerning this approval order, please contact Ms. Jan C. Callaway at 301-796-5620.

Sincerely yours,

Christy Foreman
Acting Director
Office of Device Evaluation
Center for Devices and Radiological Health
Food and Drug Administration

5

# OPTUNE

## (NovoTTF™-100A System)

## INSTRUCTIONS FOR USE





This manual is intended for physicians prescribing the use of Optune.
Additional information is found in the following materials:
• Patient Information and Operation Manual

**Caution:** Federal law restricts this device to sale by or on the order of a physician

# Table of contents

Indications for Use ........................................................................................................................... 3

Contraindications, Warnings and Precautions ................................................................................ 4

Description ....................................................................................................................................... 6

Principles of Operation .................................................................................................................... 7

Preclinical Data ............................................................................................................................... 8

Clinical Data .................................................................................................................................... 9

Directions for Use .......................................................................................................................... 22

Abbreviations ................................................................................................................................. 23

Contact Information ........................................................................................................................ 24

Bibliography ................................................................................................................................... 25

002198 C2C DIAR_A0000069327 12-19-2018

# Indications for Use

Optune™ is intended as a treatment for adult patients (22 years of age or older) with histologically-confirmed glioblastoma multiforme (GBM).

Optune™ with temozolomide is indicated for the treatment of adult patients with newly diagnosed, supratentorial glioblastoma following maximal debulking surgery and completion of radiation therapy together with concomitant standard of care chemotherapy.

For the treatment of recurrent GBM, Optune™ is indicated following histologically-or radiologically-confirmed recurrence in the supra-tentorial region of the brain after receiving chemotherapy. The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted.

# Contraindications, Warnings and Precautions

## Contraindications

Do not use Optune if you have an active implanted medical device, a skull defect (such as, missing bone with no replacement) or bullet fragments. Examples of active electronic devices include deep brain stimulators, spinal cord stimulators, vagus nerve stimulators, pacemakers, defibrillators, and programmable shunts. Use of Optune together with implanted electronic devices has not been tested and may theoretically lead to malfunctioning of the implanted device. Use of Optune together with skull defects or bullet fragments has not been tested and may possibly lead to tissue damage or render Optune ineffective.

Do not use Optune if you are known to be sensitive to conductive hydrogels like the gel used on electrocardiogram (ECG) stickers or transcutaneous electrical nerve stimulation (TENS) electrodes. In this case, skin contact with the gel used with Optune may commonly cause increased redness and itching, and rarely may even lead to severe allergic reactions such as shock and respiratory failure.

## Warnings

Warning – Use Optune only after receiving training from qualified personnel, such as your doctor, a nurse, or other medical personnel who have completed a training course given by the device manufacturer (Novocure). Ask to see a certificate signed by Novocure that says they completed a training course. Your training will include a detailed review of this manual and practice in the use of the system. In addition, you will be trained in what to do if there are problems with treatment. Use of Optune without receiving this training can result in breaks in treatment and may rarely cause increased scalp rash, open sores on your head, allergic reactions or even an electric shock.

Warning – Optune is not intended to be used as a substitute for chemotherapy but rather as an adjunct to treatment with TMZ for newly diagnosed GBM.

Warning - Do not use Optune if you are 21 years old or younger. It is unknown what side effects the device may cause in these cases or if it will be effective

Warning - Do not use Optune if you are pregnant, you think you might be pregnant, or are trying to get pregnant. If you are a woman who is able to get pregnant, you must use birth control when using the device. Optune was not tested in pregnant women. It is unknown what side effects the device may cause if you are pregnant or if it will be effective.

Warning - In case of skin irritation, which appears as redness under the transducer arrays (a mild rash), use high potency topical steroids (hydrocortisone cream) when replacing transducer arrays. This will help relieve your skin irritation. If you do not use this cream, the skin irritation can become more serious and may even lead to skin break down, infections, pain and blisters. If this happens, stop using the topical steroid cream and contact your doctor. Your doctor will supply you with an antibiotic cream to use when replacing transducer arrays. If you do not use this cream, your symptoms may continue and your doctor may ask you to take a break from treatment until your skin heals. Taking a break from treatment may lower your chance to respond to treatment.

Warning – All servicing procedures must be performed by qualified and trained personnel. If you attempt to open and service the system alone you may cause damage to the system. You could also get an electric shock by touching the inner parts of the device.

## Precautions

Caution – Keep Optune out of the reach of children. If children touch the device, they could damage the device. This could cause a break in treatment. Breaks in treatment may lower your chance to respond to treatment.

Caution – Do not use any parts that do not come with the Optune Treatment Kit, or that were not sent to you by the device manufacturer or given to you by your doctor. Use of other parts, manufactured by other companies or for use with other devices, can damage the device. This may lead to a break in treatment. Breaks in treatment may lower your chance to respond to treatment.

Caution – If your doctor used plates or screws to close your skull bone during your surgery, be careful when placing the transducer arrays. Make sure the round disks that make up the transducer arrays are not on top of the areas where you can feel the screws or plates under your skin. In other words, make sure the screws or plates under your skin are in between the round disks that make up the transducer arrays. If you do not do this, you may have increased skin damage which may lead to a break in treatment. Breaks in treatment may lower the chance of the device being effective.

Caution – Tell your doctor before using the device if you have an inactive implanted medical device in the brain (for example, stents, plastic drug delivery reservoirs, aneurysm clips or coils, device leads). Use of Optune in subjects with inactive implanted medical devices in their brain was not been tested and could lead to tissue damage or lower the chance of the device being effective.

Caution – Do not use Optune if any parts look damaged (torn wires, loose connectors, loose sockets, cracks or breaks in the plastic case). Use of damaged components can damage the device, and cause a break in treatment. Breaks from treatment may lower your chance to respond to treatment

Caution – Do not wet the device or transducer arrays. Getting the device wet may damage it, preventing you from receiving treatment for the right amount of time. Getting the transducer arrays very wet is likely to cause the transducer arrays to come loose from your head. If this happens, the device will turn off and you will need to change the transducer arrays

Caution - Before connecting or disconnecting the transducer arrays, make sure that the Optune power switch is in the OFF position. Disconnecting transducer arrays with the device power switch in the ON position may cause a device alarm to go off, and could damage the device.

Caution – If you have an underlying serious skin condition on the scalp, discuss with your doctor whether this may prevent or temporarily interfere with Optune treatment.

## Notices

**Notice!** The Optune device and transducer arrays will activate metal detectors

**Notice!** Do not use Optune if your tumor is located in the lower parts of the brain close to the spinal cord. Ask your doctor if your tumor is located in this part of your brain. Optune has not been tested in patients with tumors in these locations. It is unknown whether these tumors will respond to treatment

**Notice!** You should use Optune for at least 18 hours a day to get the best response to treatment. Using Optune for less than 18 hours a day lowers the chances that you will respond to treatment.

**Notice!** Do not stop using Optune before you finish at least four full weeks of therapy to get the best response to treatment. Stopping treatment before four weeks lowers the chances that you will respond to treatment

**Notice!** Do not stop using Optune even if you have used it less than the recommended 18 hours per day. You should stop using the device only if your doctor tells you to. Stopping treatment could lower the chances that you will respond to treatment.

**Notice!** If you plan to be away from home for more than 2 hours, carry an extra battery and/or the power supply with you in case the battery you are using runs out. If you do not take a spare battery and/or the power supply you may have a break in your treatment. Breaks in treatment may lower your chance to respond to treatment.

**Notice!** Make sure you have at least 12 extra transducer arrays at all times. This will last you until the next transducer array shipment arrives. Remember to order more transducer arrays when there are at least 12 extra transducer arrays left. If you do not order transducer arrays in time you may have a break in your treatment. Breaks in treatment may lower your chance to respond to treatment.

**Notice!** Batteries may weaken over time and need to be replaced. You will know this has happened when the amount of time the device can run on a fully charged battery begins to shorten. For example, if the low battery indicator light flashes within only 1.5 hours from the start of treatment, replace the battery. If you do not have replacement batteries when your batteries run out, you may have a break in your treatment. Breaks in treatment may lower your chance to respond to treatment.

**Notice!** You should carry the Troubleshooting Guide (Section 26) at all times. This guide is necessary to ensure Optune works properly. If you do not work the system correctly you may have a break in your treatment. Breaks in treatment may lower your chance to respond to treatment.

**Notice!** Do not block the device vents located on the sides of the Optune device. Blocking the vents may cause the device to overheat and turn off, leading to a break in treatment. If this happens, unblock the vents, wait 5 minutes and restart the device.

**Notice!** Do not block the battery charger vents located on the front of the battery chargers. Blocking the vents may cause the charger to overheat. This could prevent your batteries from charging.

**Notice!** Before using a transducer array, make sure its package is sealed by gently rubbing the package between thumb and pointer finger on all four sides. The package should be closed on all sides. There should be no openings in the package seal. If the package is not sealed, the transducer array may be damaged. A damaged transducer array will not work properly and may cause the device to turn off.

**Notice!** The transducer arrays are for single use and should not be taken off your head and put back on again. If you put a used transducer array back on your head again, it may not stick well to your skin and the device could turn off.

# Description

Optune, for the treatment of newly diagnosed and/or recurrent GBM, is a portable battery or power supply operated device which produces alternating electrical fields, called tumor treatment fields ("TTFields") within the human body. TTFields are applied to the patient by electrically-insulated surface transducer arrays. TTFields disrupt the rapid cell division exhibited by cancer cells[1].

Optune is comprised of two main components: (1) an Electric Field Generator (the Optune device); and (2) INE Insulated Transducer Arrays (the transducer arrays). In addition, the following components are also included in the Optune Treatment Kit: power supply, portable battery, battery rack, battery charger, connection cable and carrying case.

Treatment parameters are preset by Novocure such that there are no electrical output adjustments available to the patient. The patient must learn to change and recharge depleted device batteries and to connect to an external power supply overnight. In addition, the transducer arrays need to be replaced once to twice a week and the scalp re-shaved in order to maintain optimal contact. Patients carry the device in an over-the-shoulder bag or backpack and receive continuous treatment without changing their daily routine.

1 Kirson, E. D., V. Dbaly, et al. (2007). "Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors." Proc Natl Acad Sci U S A 104(24): 10152-7

## Principles of Operation

Optune produces alternating electrical fields within the human body that disrupt the rapid cell division exhibited by cancer cells, with the alternating electrical fields applied to the brain through transducer arrays placed on the scalp.

TTFields harness electric fields to arrest the proliferation of tumor cells and to destroy them. The TTField technology takes advantage of the special characteristics and geometrical shape of dividing cells, which make them susceptible to the effects of the alternating electric TTFields. These special fields alter the tumor cell polarity at an intermediate frequency (on the order of 100-300 kHz). The frequency used for a particular treatment is specific to the cell type being treated (e.g., 200kHz for GBM)

In contrast, the TTFields have not been shown to have an effect on cells that are not undergoing division. Since most normal adult brain cells proliferate very slowly, if at all, they are hypothesized to be little affected by the TTFields. Testing demonstrates no differences between treated and control animals in histology of the major internal organs (including the brain), blood examination, cardiac rhythm, body temperature, or in animal behavior. In addition, because the fields alternate so rapidly, they have no effect on normal quiescent cells nor do they stimulate nerves and muscles. It is noted that, because TTFields are only applied to the brain, they have no effect on rapidly proliferating cells in the rest of the body. The intensities of the electric fields within the tissues are very small and do not result in any meaningful increase in tissue temperature. Thus, TTField application has the advantage of being highly selective and is not expected to be associated with significant toxicity

The above mechanisms of action are consistent with the extensive research regarding the effects of TTFields. These results demonstrate both disruption of cell division up to complete cessation of the process, as well as complete destruction of the dividing cells. It is important to note that all the described effects can be obtained by fields of low intensity such that they are not accompanied by any significant elevation of temperature.

# Preclinical Data

TTFields have been shown both in vitro and in vivo to effectively inhibit cancer cell replication during mitosis without any systemic side effects. At intensities of approximately 1 V/cm, TTFields can be frequency-tuned to effectively inhibit different cancer cell types (i.e., the smaller the cell, the higher the frequency needed), due to disruption of microtubule polymerization and physical disruption of cell integrity at the cleavage plane during telophase[2].

Specifically, TTFields have been shown to inhibit glioblastoma cells in vitro and in vivo at a frequency of 200 kHz and an intensity of 0.7 V/cm. Based on realistic finite element mesh simulations and direct measurements of TTFields intensity in experimental animals, and in the human brain, Novocure has concluded that effective TTField intensities can be generated in the brains of large animals and humans. Extensive safety studies in healthy animals (mice, rats and rabbits) have shown that TTFields are not associated with significant systemic toxicities. Neither acute, nor chronic systemic toxicities were seen when TTFields were applied to the torso or head, at different frequencies (100-200 kHz), different intensities and for different periods of time[3].

Using a model developed to simulate the growth kinetics of a malignant tumor, the minimal treatment course duration for Optune has been determined to be approximately 4 weeks to reach tumor stabilization. Stopping treatment prior to completion of a 4 week treatment course will most likely lead to continued tumor growth and appearance of symptoms within approximately 1-2 weeks.

---

2  Kirson, E. D., Z. Gurvich, et al. (2004). "Disruption of cancer cell replication by alternating electric fields." Cancer Res 64(9): 3288-95.
3  Kirson, E. D., V. Dbaly, et al. (2007).

8

Clinical Data



# NEWLY DIAGNOSED GLIOBLASTOMA (see page 17 for recurrent GBM)

## Pilot Clinical Study in Newly Diagnosed GBM

Optune together with temozolomide (TMZ) has been tested in ten newly diagnosed GBM subjects in a single center, pilot study in Europe. Median progression free survival (PFS) of the patients in this study exceeded historical controls (14.4 months versus 7.1 months, respectively). At the end of the study (4 years from initiation) 5 of the 10 patients died; of the remaining 5 patients 2 were lost to follow up and 3 were reported alive and progression free. Median OS from diagnosis was greater than 40 months (compared to 14.7 months in historical controls). The only device related adverse event (AE) seen in this trial was a mild to moderate skin irritation beneath the device transducer arrays

## Pivotal Clinical Study in Newly Diagnosed GBM

**Study Design:** The study was a prospective, randomized, open label, active parallel control trial to compare the effectiveness and safety outcomes of newly diagnosed GBM subjects treated with Optune and Temozolomide (TMZ) to those treated with TMZ alone.

The following were the objectives of the study:

To prospectively compare the progression free survival and overall survival of newly diagnosed GBM subjects treated with Optune and TMZ to those treated TMZ alone.

To collect evidence of the safety of TTFields applied to subjects with newly diagnosed GBM using Optune

**Eligibility Criteria:** The inclusion and exclusion criteria for the trial were as follows

### Inclusion Criteria

    a. Pathological evidence of GBM using WHO classification criteria.

    b. ≥ 18 years of age.

    c. Received maximal debulking surgery and radiotherapy concomitant with Temozolomide (45-70Gy).

        1) Patients may enroll in the study if received Gliadel wafers before entering the trial

        2) Any additional treatments received prior to enrollment will be considered an exclusion

        3) Minimal dose for concomitant radiotherapy is 45 Gy

    d. Karnofsky scale ≥ 70

    e. Life expectancy at least 3 months

    f. Participants of childbearing age must use effective contraception.

    g. All patients must sign written informed consent

    h. Treatment start date at least 4 weeks out from surgery.

    i. Treatment start date at least 4 weeks out but not more than 7 weeks from the later of last dose of concomitant Temozolomide or radiotherapy

### Exclusion Criteria

    a. Progressive disease (according to MacDonald Criteria) If pseudoprogression is suspected, additional imaging studies must be performed to rule out true progression.

    b. Actively participating in another clinical treatment trial

    c. Pregnant

    d. Significant co-morbidities at baseline which would prevent maintenance Temozolomide treatment.

        1) Thrombocytopenia (platelet count < 100 x 103/μL)

        2) Neutropenia (absolute neutrophil count < 1.5 x 103/μL)

        3) CTC grade 4 non-hematological Toxicity (except for alopecia, nausea, vomiting)

        4) Significant liver function impairment - AST or ALT > 3 times the upper limit of normal

        5) Total bilirubin > upper limit of normal

        6) Significant renal impairment (serum creatinine > 1.7 mg/dL)

    e. Implanted pacemaker, programmable shunts, defibrillator, deep brain stimulator, other implanted electronic devices in the brain, or documented clinically significant arrhythmias

    f. Infra-tentorial tumor

    g. Evidence of increased intracranial pressure (midline shift > 5mm, clinically significant papilledema, vomiting and nausea or reduced level of consciousness)

    h. History of hypersensitivity reaction to Temozolomide or a history of hypersensitivity to DTIC

9

## Study Procedures:

### Treatment Arm

Optune was given together with maintenance TMZ. At treatment initiation patients were seen at an outpatient clinic. During this visit baseline examinations were performed and Optune treatment initiated. The patients were instructed on the operation of Optune and battery replacement. Once the patients were trained in operating the device they were released to continue treatment at home. The patients received multiple 1 month courses of continuous Optune treatment. Patients were treated with maintenance TMZ according to the standard dosing regimen. Following radiological progression or unacceptable toxicity, TMZ could be replaced with best standard of care second line therapy.

### Control Arm

All subjects had baseline examinations performed prior to treatment initiation. Patients were treated with maintenance TMZ according to the standard dosing regimen. Following radiological progression or unacceptable toxicity, TMZ could be replaced with best standard of care second line therapy

### Follow-up

During treatment all patients were seen once every month at an outpatient clinic where they underwent medical follow-up and routine laboratory exams. An MRI was performed every second month following the baseline MRI until second progression or 24 months (whichever came first, when treatment on both arms of the study was terminated). In the case of clinical progression an unscheduled MRI was obtained within 1 week of the investigator becoming aware of the clinical progression. No additional MRIs were required after second progression. Central MRI review was performed by a neuro-radiologist blinded to the treatment group of each patient. Medical follow-up continued for 2 months after treatment termination in order to capture treatment related toxicities. After these visits, mortality was assessed based on monthly telephone interviews with the patients or the patients' caregivers.

**Analyses:** Two analyses were performed in the study: An interim analysis on the first 315 patients with a minimum of 18 months follow up and a final analysis on the full study cohort of 695 patients

**Protocol Deviations:** Major protocol deviations were defined as deviations that have the potential to influence the primary and secondary efficacy endpoints of the study. There were a total of 13 major protocol deviations in the interim analysis and a total of 24 major protocol violations at the final analysis.

In the interim analysis dataset, 2 patients received experimental chemotherapies as part of other clinical trials together with their standard of care temozolomide (1 in each treatment arm). In addition, 11 patients in the TMZ alone arm received Optune treatment through prescription at other institutions. This deviation was termed "crossover" although no official crossover was allowed in the protocol, and Optune therapy was given without sponsor or investigator consent.

In the final analysis dataset, 2 patients received experimental chemotherapies as part of other clinical trials together with their standard of care temozolomide (1 in each treatment arm). In addition, 22 patients in the TMZ alone arm received Optune treatment through prescription at other institutions. This deviation was termed "crossover" although no official crossover was allowed in the protocol, and Optune therapy was given without sponsor or investigator consent.

**Analysis Populations:** Progression free survival was analyzed in the intent to treat (ITT) population which included all randomized subjects (210 Optune / TMZ and 105 TMZ alone at the interim analysis, 466 Optune / TMZ and 229 TMZ alone at the final analysis). Overall survival was analyzed in the per protocol (PP) population which included all patients receiving at least the first course of TMZ and had no major protocol deviations (196 Optune / TMZ and 84 TMZ alone at the interim analysis; 429 Optune / TMZ and 180 TMZ alone at the final analysis). Major protocol deviations included patients who received other experimental therapies on protocol or crossed over from the TMZ alone arm to Optune / TMZ.

Subject Characteristics: 315 subjects (210 Optune/TMZ; 105 TMZ) with newly diagnosed GBM were enrolled in the interim analysis of the study. Baseline characteristics in the ITT population were as follows:



| Baseline Characteristic | | Treatment Group | |
|---|---|---|---|
| | | Optune/TMZ (N=210) n(%) | TMZ Alone (N=105) n(%) |
| Gender | | | |
| Male | | 140 (66.67) | 67 (63.81) |
| Female | | 70 (33.33) | 38 (36.19) |
| Central MGMT Assessment | | | |
| Invalid | | 24 (11.43) | 11 (10.48) |
| Unknown | | 58 (27.62) | 30 (28.57) |
| Methylated | | 49 (23.33) | 26 (24.76) |
| Unmethylated | | 79 (37.62) | 38 (36.19) |
| Extent of Resection | | | |
| Biopsy | | 23 (10.95) | 11 (10.48) |
| Gross Total Resection | | 135 (64.29) | 67 (63.81) |
| Partial Resection | | 52 (24.76) | 27 (25.71) |
| Area | | | |
| ROW | | 83 (39.52) | 41 (39.05) |
| USA | | 127 (60.48) | 64 (60.95) |
| Tumor Position | | | |
| Missing | | 0 (0) | 3 (2.86) |
| Corpus Callosum | | 12 (5.71) | 3 (2.86) |
| Frontal Lobe | | 64 (30.48) | 32 (30.48) |
| Occipital Lobe | | 7 (3.33) | 4 (3.81) |
| Parietal Lobe | | 35 (16.67) | 27 (25.71) |
| Temporal Lobe | | 92 (43.81) | 36 (34.29) |
| Tumor Location | | | |
| Missing | | 0 (0) | 1 (0.95) |
| Both | | 2 (0.95) | 1 (0.95) |
| Corpus Callosum | | 8 (3.81) | 3 (2.86) |
| Left | | 93 (44.29) | 41 (39.05) |
| Right | | 107 (50.95) | 59 (56.19) |
| Karnofsky Performance Score | Median | 90 | 90 |
| | Min, Max | 60, 100 | 70, 100 |
| Age in Years | Median | 57 | 58 |
| | Min, Max | 20, 83 | 21, 80 |
| No. of Cycles of TMZ Received | Median | 6 | 6 |
| | Min, Max | 1, 26 | 1, 24 |
| No. of Cycles of Optune Received | Median | 9 | 0 |
| | Min, Max | 1, 58 | 0, 0 |
| Time from GBM Diagnosis to Randomization (Days) | Median | 115 | 113 |
| | Min, Max | 59, 171 | 43, 170 |

As seen above, all baseline characteristics are well balanced between arms in the ITT population at the interim analysis. The baseline characteristics of the PP population also remained well balanced between treatment arms. As noted in the table above, 35 patients (11.11%) had tissue that was not evaluable, and 88 patients (27.94%) did not have tissue available for analysis.

695 subjects (466 Optune / TMZ; 229 TMZ alone) with newly diagnosed GBM were enrolled in the study and had CRF information available at the time of the final analysis. Baseline characteristics in the ITT population were as follows:

| Baseline Characteristic | | Treatment Group | |
|---|---|---|---|
| | | Optune/TMZ (N=446) n(%) | TMZ Alone (N=229) n(%) |
| Gender | | | |
| Male | | 316 (67.81) | 157 (68.56) |
| Female | | 150 (32.19) | 72 (31.44) |
| Central MGMT Assessment | | | |
| Invalid | | 46 (9.87) | 18 (7.86) |
| Unknown | | 106 (22.75) | 57 (24.89) |
| Methylated | | 127 (27.25) | 67 (29.26) |
| Unmethylated | | 187 (40.13) | 87 (37.99) |
| Extent of Resection | | | |
| Biopsy | | 61 (13.09) | 30 (13.1) |
| Gross Total Resection | | 253 (54.29) | 124 (54.15) |
| Partial Resection | | 152 (32.62) | 75 (32.75) |
| Area | | | |
| ROW | | 245 (52.58) | 111 (48.47) |
| USA | | 221 (47.42) | 118 (51.53) |
| Tumor Position | | | |
| Missing | | 31 (6.65) | 15 (6.55) |
| Corpus Callosum | | 21 (4.51) | 9 (3.93) |
| Frontal Lobe | | 142 (30.47) | 67 (29.26) |
| Occipital Lobe | | 14 (3) | 4 (1.75) |
| Parietal Lobe | | 77 (16.52) | 50 (21.83) |
| Temporal Lobe | | 181 (38.84) | 84 (36.68) |
| Tumor Location | | | |
| Missing | | 30 (6.44) | 12 (5.24) |
| Both | | 12 (2.58) | 3 (1.31) |
| Corpus Callosum | | 12 (2.58) | 7 (3.06) |
| Left | | 193 (41.42) | 93 (40.61) |
| Right | | 219 (47) | 114 (49.78) |
| Karnofsky Performance Score | Median | 90 | 90 |
| | Min, Max | 60, 100 | 70, 100 |
| Age in Years | Median | 56 | 57 |
| | Min, Max | 19, 83 | 19, 80 |
| No. of Cycles of TMZ Received | Median | 5 | 4 |
| | Min, Max | 1, 26 | 1, 24 |
| No. of Cycles of Optune Received | Median | 6 | 0 |
| | Min, Max | 1, 58 | 0, 0 |
| Time from GBM Diagnosis to Randomization (Days) | Median | 113 | 111 |
| | Min, Max | 59, 498 | 43, 500 |

As seen above, all baseline characteristics are well balanced between arms in the ITT population at the final analysis. The baseline characteristics of the PP population also remained well balanced between treatment arms. As noted in the table above, 64 patients (9.21%) had tissue that was not evaluable, and 163 patients (23.45%) did not have tissue available for analysis.

12

## Effectiveness Results:

### Primary Effectiveness Endpoint: Progression Free Survival at the Interim Analysis

The threshold for statistical significance based on the Lan-DeMets O'Brien-Fleming method at the interim analysis was pre-defined as p=0.01394, and the test was to be performed in the ITT population according to the protocol. In the ITT population, which included all randomized subjects (Optune/TMZ=210, TMZ alone=105), PFS at the interim analysis met this threshold. The difference of more than 3 months in median PFS is highly clinically significant. The Hazard Ratio for PFS was 0.621, which translates into a 37.9% decrease in the risk of progression when using Optune/TMZ compared to TMZ alone. At the final analysis, which included 695 patients (Optune/TMZ=466, TMZ alone=229), PFS was also highly significant with a hazard ratio of 0.694.

### Primary Efficacy Endpoint - Progression Free Survival (ITT)



|  | Interim Analysis | | Final Analysis | |
|---|---|---|---|---|
|  | Optune/TMZ | TMZ Alone | Optune/TMZ | TMZ Alone |
| Median (95% CI) | 7.2 (5.9, 8.2) | 4.0 (3.0, 4.3) | 7.1 (6.0, 8.1) | 4.2 (3.9, 5.5) |
| Log-rank test | p=0.0015 | | p=0.0010 | |
| Hazard Ratio (95% CI) | 0.621 (0.468, 0.823) | | 0.694 (0.558, 0.823) | |

Although not a pre-specified endpoint, PFS was also analyzed in the PP population at the interim and final analyses. Median PFS in the PP population was identical to the ITT population at the interim analysis and slightly longer than the ITT population at the final analysis. Notably, median PFS remained significantly higher in the Optune/TMZ group than in the TMZ alone group in the PP population at both the interim and final analyses.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 265 of 631   Document 11-5

EX. 2, P. 104

4496

13

## Powered Secondary Effectiveness Endpoint: Overall Survival at the Interim Analysis

Overall survival (OS) was a powered secondary analysis in the trial. The threshold for superior OS at the interim analysis was predefined in the protocol at 0.00398 according to the Lan-DeMets O'Brien-Fleming alpha spending function, and was to be tested in the PP population. In the PP population, which analyzed patients according to the treatment they actually received (as treated Optune/TMZ=196, TMZ=84), OS was also significantly longer in the Optune/TMZ arm compared to the TMZ alone arm. An increase of almost 5 months as seen here is highly significant clinically. The hazard ratio for OS was 0.666. This translates into a 33.4% decrease in the risk of death when using Optune/TMZ compared to TMZ alone. At the final analysis, which included 609 patients (Optune/TMZ =429, TMZ alone =180), OS was also highly significant with a hazard ratio of 0.683.

### Overall Survival (PP)



|  | Interim Analysis | | Final Analysis | |
|---|---|---|---|---|
|  | Optune/TMZ | TMZ Alone | Optune/TMZ | TMZ Alone |
| Median (95% CI) | 20.5 (16.6, 24.9) | 15.6 (12.9, 18.5) | 19.6 (16.6, 24.1) | 15.2 (13.5, 18.2) |
| Log-rank test | p=0.0042 | | p=0.0030 | |
| Hazard Ratio (95% CI) | 0.666 (0.495, 0.898) | | 0.683 (0.529, 0.882) | |

Although not a pre-specified secondary endpoint, OS was also analyzed in the ITT population. At the interim analysis, OS in the ITT population was also significantly longer in the Optune/TMZ arm compared to TMZ alone by almost 20%. The median OS was 19.6 months (95% CI 16.5-24.1) in the Optune/TMZ group and 16.6 months in the TMZ alone group (95% CI 13.5-19.1). An increase of 3 months as seen here is highly significant both statistically (log-rank p=0.0338) and clinically. The hazard ratio for OS was 0.744 using a Cox regression analysis. This translates into a 25.6% decrease in the risk of death when using Optune/TMZ compared to TMZ alone.

Furthermore, at the final analysis, OS in the ITT population was also significantly longer in the Optune/TMZ arm compared to TMZ alone by 17%. The median OS was 19.4 months (95% CI 16.5-23.8) in the Optune/TMZ group and 16.6 months in the TMZ alone group (95% CI 13.7-19.5). An increase of almost 3 months as seen here is highly significant statistically and clinically (log-rank p=0.0229). The hazard ratio for OS was 0.754 using a Cox regression analysis. This translates into a 24.6% decrease in the risk of death when using Optune/TMZ compared to TMZ alone.

**Secondary Endpoints:** Secondary endpoints also showed an advantage for Optune/TMZ compared to TMZ alone. The results below are from the interim analysis which included 315 patients (210 Optune/TMZ and 105 TMZ alone).

| Endpoint | Optune/TMZ | TMZ Alone | P-Value |
|---|---|---|---|
| Progression Free Survival at 6 months (ITT) | 56.7% | 33.7% | 0.0004 |
| 1-year survival (PP) | 75% | 69% | 0.151 |
| 2-year survival (PP) | 48% | 32% | 0.0058 |
| Complete response rate (ITT) | 9% | 3.5% | NA |

In addition, although not a pre-specified endpoint, 1- and 2-year survival were also analyzed in the ITT population at the interim analysis. In the ITT population, 1-year survival was 75% in the Optune/TMZ group and 70% in the TMZ alone group (p-value=0.162) at the interim analysis. 2-year survival in the ITT population at the interim analysis was 48% in the Optune/TMZ group and 34% in the TMZ alone group (p-value=0.0122). Furthermore, the 1-year survival rates at the final analysis are shown in the table below:

| Endpoint | Optune/TMZ | TMZ Alone | P-Value |
|---|---|---|---|
| 1-year survival (PP) | 69% | 63% | 0.131 |
| 1-year survival (ITT) | 69% | 66% | 0.265 |

**Quality of Life:** Quality of Life assessments were based on the interim analysis cohort of 315 subjects. Quality of life, cognitive function and functional status were all maintained throughout treatment with the device, leading to the clear conclusion that use of Optune does not harm patients' quality of life, cognitive function or ability to perform activities of daily living.

**Safety Results:** Safety was assessed on all patients at the final analysis who received any treatment at the time of the analysis (Optune/TMZ =437, TMZ alone =207). A slightly higher incidence of grade 1-2 adverse events was seen in some of the systems in the Optune/TMZ arm of the study. This is most likely a reflection of the longer duration of TMZ treatment in those patients (median of 6 cycles versus 4 cycles in the control arm) due to the increase in PFS seen in the treatment group. Grade 3-5 adverse events were well balanced between arms. None of the grade 3-5 adverse events in these body systems were considered related to Optune by any of the investigators except for <1% grade 3 skin irritation.

## All Adverse Events by Body System and Severity (Safety Population)

| System Organ Class | Optune/TMZ (N=437) | | | TMZ Alone (N=207) | | |
|---|---|---|---|---|---|---|
| | Low-Medium | Severe | Fatal | Low-Medium | Severe | Fatal |
| Number of Patients with ≥1 AE | 214 (49%) | 169 (39%) | 15 (3%) | 91 (44%) | 82 (40%) | 7 (3%) |
| Blood and Lymphatic System Disorders | 86 (20%) | 47 (11%) | 0 | 49 (24%) | 21 (10%) | 0 |
| Cardiac Disorders | 12 (3%) | 4 (1%) | 5 (1%) | 6 (3%) | 4 (2%) | 0 |
| Ear and Labyrinth Disorders | 26 (6%) | 0 | 0 | 8 (4%) | 0 | 0 |
| Endocrine Disorders | 11 (3%) | 0 | 0 | 4 (2%) | 0 | 0 |
| Eye Disorders | 36 (8%) | 3 (1%) | 0 | 15 (7%) | 2 (1%) | 0 |
| Gastrointestinal Disorders | 202 (46%) | 18 (4%) | 0 | 76 (37%) | 4 (2%) | 0 |
| General Disorders and Administration Site Conditions | 175 (40%) | 27 (6%) | 1 (<1%) | 76 (37%) | 10 (5%) | 1 (<1%) |
| Hepatobiliary Disorders | 1 (<1%) | 1 (<1%) | 0 | 5 (2%) | 0 | 0 |
| Liver Disorder | 1 (<1%) | 0 | 0 | 3 (1%) | 0 | 0 |
| Immune System Disorders | 10 (2%) | 0 | 0 | 7 (3%) | 0 | 0 |
| Infections and Infestations | 117 (27%) | 19 (4%) | 3 (1%) | 50 (24%) | 6 (3%) | 1 (<1%) |
| Injury, Poisoning and Procedural Complications | 216 (49%) | 20 (5%) | 0 | 13 (6%) | 4 (2%) | 0 |
| Abnormal Laboratory Tests | 58 (13%) | 19 (4%) | 0 | 26 (13%) | 7 (3%) | 1 (<1%) |
| Metabolism and Nutrition Disorders | 89 (20%) | 12 (3%) | 0 | 44 (21%) | 6 (3%) | 0 |
| Musculoskeletal and Connective Tissue Disorders | 98 (22%) | 16 (4%) | 0 | 44 (21%) | 8 (4%) | 0 |
| Neoplasms Benign, Malignant and Unspecified (Incl Cysts and Polyps) | 5 (1%) | 1 (<1%) | 2 (<1%) | 2 (1%) | 1 (<1%) | 1 (<1%) |
| Nervous System Disorder | 190 (43%) | 83 (19%) | 3 (1%) | 75 (36%) | 42 (20%) | 0 |
| Psychiatric Disorders | 108 (25%) | 16 (4%) | 0 | 38 (18%) | 6 (3%) | 0 |
| Renal and Urinary Disorders | 42 (10%) | 0 | 0 | 8 (4%) | 2 (1%) | 0 |
| Reproductive System and Breast Disorders | 8 (2%) | 0 | 0 | 3 (1%) | 0 | 0 |
| Skin and Subcutaneous Tissue Disorders | 104 (24%) | 0 | 0 | 32 (15%) | 1 (<1%) | 0 |
| Surgical and Medical Procedures | 2 (<1%) | 0 | 0 | 2 (1%) | 0 | 0 |
| Vascular Disorders | 48 (11%) | 16 (4%) | 1 (<1%) | 19 (9%) | 10 (5%) | 3 (1%) |

Patients treated with Optune/TMZ experienced a small increase in TMZ-related AEs and SAEs due to the longer TMZ exposure afforded to these patient by their longer PFS. The only AEs which may have been caused by Optune therapy are the known skin irritation seen in 45% of patients in this study (1% severe) falls which were seen at a slightly higher incidence in patients carrying the device, headaches related to wearing the arrays 24 hours a day and mild psychiatric symptoms (anxiety, insomnia, confusion) which could be caused by the need to incorporate the device and arrays into daily life. No SAEs were considered related to device use. The remainder of AEs and SAEs seen in the trial were well balanced between treatment arms. In conclusion, Optune is very well tolerated with mild to moderate toxicity mainly related to array contact with the scalp

**Conclusions:** Optune is a portable, battery operated device which delivers TTFields to patients with recurrent diagnosed GBM. The results of the pivotal trial in newly diagnosed GBM showed that Optune/TMZ extends progression free and overall survival significantly compared to patients receiving TMZ alone. No significant increase in adverse events is seen when Optune treatment is added to TMZ. The only common device-related AE was a skin irritation seen beneath the transducer arrays in 45% percent of patients. The majority (14 of 45%) of these events were mild to moderate. Based on an assessment of the Quality of life of the interim analysis cohort of 315 patients, cognitive function and functional status did not decline due to the use of Optune/TMZ

# RECURRENT DIAGNOSED GLIOBLASTOMA

## Pilot Clinical Study in Recurrent GBM

Optune has been tested in 10 recurrent GBM subjects in a single center, pilot study in Europe. In this study, Optune monotherapy led to a significant increase in time to progression (from 13 to 26 weeks; p=0.013), progression free survival at 6 months (PFS6) (from 15 to 50%) and overall survival (OS) (from 6.0 to 14.7 months; p=0.002) compared to matched concomitant and historical comparator groups. The only device related adverse event (AE) seen in this trial was a mild to moderate skin irritation beneath the device transducer arrays.

## Other Clinical Experience in Recurrent GBM

The Patient Registry Dataset (PRiDe) is a post-marketing registry of all recurrent GBM patients who received Optune in a real-world, clinical practice setting in the US between 2011 and 2013. The registry included 457 recurrent GBM patients who received Optune in 91 US cancer centers. More patients in PRiDe than the pivotal clinical trial in recurrent GBM (EF-11) received Optune for first recurrence (33% vs. 9%) and had received prior bevacizumab therapy (55.1% vs. 19%). Median OS was significantly longer with Optune in clinical practice (PRiDe data set) than in the EF-11 pivotal trial in recurrent GBM (9.6 vs. 6.6 months). One- and 2-year OS rates were more than double for NovoTTF Therapy patients in PRiDe than in the EF-11 trial (1-year, 44% vs. 20%; 2-year 30% vs. 9%). Favorable prognostic factors included first and second vs. third and subsequent recurrences, high Karnofsky Performance Score (KPS) and no prior bevacizumab use. No unexpected adverse events were detected in PRiDe. As in the EF-11 trial, the most frequent adverse events were mild to moderate skin reactions associated with application of the Optune transducer arrays.

## Pivotal Clinical Study in Recurrent GBM[1]

**Study Design:** The study was a prospective, randomized, open label, active parallel control trial to compare the effectiveness and safety outcomes of recurrent GBM subjects treated with Optune to those treated with an effective best standard of care (BSC) chemotherapy (including bevacizumab).

The following were the objectives of the study.

- To prospectively compare the median overall survival of recurrent GBM subjects treated with Optune to those treated with best standard of care (BSC) active chemotherapy
- To prospectively determine PFS6, TTP, %1-year survival and quality of life of subjects treated with Optune compared to BSC.
- To collect evidence of the safety of TTFields applied to subjects with recurrent GBM using Optune.

**Eligibility Criteria:** The inclusion and exclusion criteria for the trial were as follows.

### Inclusion Criteria

a. Pathological evidence of GBM using WHO classification criteria
b. ≥ 18 years of age
c. Not a candidate for further radiotherapy or additional resection of residual tumor
d. Subjects with disease progression (by Macdonald criteria [i.e. > 25% or new lesion]) documented by CT or MRI within 4 weeks prior to enrollment
e. Karnofsky scale ≥ 70
f. Life expectancy at least 3 months
g. Participants of childbearing age must use effective contraception
h. All subjects must sign written informed consent

### Exclusion Criteria

a. Actively participating in another clinical treatment trial
b. Within 4 weeks from surgery for recurrence
c. Within 4 weeks from any prior chemotherapy
d. Within 4 weeks from radiation therapy
e. Pregnant
f. Significant co-morbidities within 4 weeks prior to enrollment
   1) Significant liver function impairment AST or ALT > 3 times the upper limit of normal
   2) Total bilirubin > upper limit of normal
   3) Significant renal impairment (serum creatinine > 1.7 mg/dL)
   4) Coagulopathy (as evidenced by PT or APTT >1.5 times control in subjects not undergoing anticoagulation)
   5) Thrombocytopenia (platelet count < 100 x 103/µl)
   6) Neutropenia (absolute neutrophil count < 1 x 103/µL)
   7) Anemia (Hb < 10 g/L)
   8) Severe acute infection
g. Implanted pacemaker, defibrillator or deep brain stimulator, or documented clinically significant arrhythmias
h. Infra-tentorial tumor
i. Evidence of increased intracranial pressure (midline shift > 5mm, clinically significant papilledema, vomiting and nausea or reduced level of consciousness)

---

[1] Stupp, R. et al. (2012). NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomised phase III trial of a novel treatment mortality. Eur J Cancer 48(14): 2192-2202.

## Study Procedures:

### Treatment Arm

At treatment initiation subjects were hospitalized for 24 hours. During this period baseline examinations were performed and Optune treatment was initiated by the investigator under continuous medical supervision. The subjects were also instructed by the investigator on the operation of Optune and battery replacement. Once the subjects were trained in operating the device they were released to continue treatment at home. The subjects received continuous Optune treatment. Treatment was discontinued in the case of non-compliance or clinical disease progression.

### Control Arm

All subjects had baseline examinations performed prior to treatment initiation. Subjects received the best effective standard of care chemotherapy practiced at each of the participating centers. The effective BSC treatments used in the study were comprised mainly of the following chemotherapies: Platinum based chemotherapy (Carboplatin), Nitrosureas (BCNU), Procarbazine, lomustine and vincristine (PCV), TMZ, Bevacizumab, and Imatinib, erlotinib, irinotecan (mainly in Europe). Because these therapies were included in the trial as a group, no comparisons can be made to each individual chemotherapy regimen. Chemotherapeutic treatment protocol was according to standard procedures at each of the participating centers.

### Follow-up

During treatment, and until progression for subjects who stopped treatment before progression, all subjects were seen once a month at an outpatient clinic where they underwent medical follow up and routine laboratory exams. An MRI was performed every 2 months until disease progression. Central MRI review was performed by a neuro-radiologist blinded to the treatment group of each subject. Medical follow-up continued for 2 months following disease progression. Subject survival was assessed based on monthly telephone interviews with the subjects' caregivers.

**Subject Characteristics:** 237 subjects (120 Optune, 117 BSC) with progressive or recurrent GBM were enrolled in the study. Baseline characteristics were as follows: mean age  53.6 years; mean Karnofsky score: 81.6±10.9%, tumor size (cm²): 16.2±12.4; progression number 1.4±0.9; re-operated: 26%; male: 70%; previous low grade: 10%; prior bevacizumab failure: 19%. Baseline characteristics were similar between treatment groups with slightly more men in the Optune group than in the BSC group (77% vs. 62%), a lower incidence of frontal lobe tumors in the Optune group than in the BSC group (32% vs. 50%), and a slightly higher mean KPS in the Optune group than in the BSC group (83% vs. 80%), though the median KPS was 80 in both groups. Adjusted analyses for all pre-specified or all statistically significant baseline covariates for overall survival did not change the outcome of the trial.

| Demographics and Baseline Characteristics (ITT) | | |
|---|---|---|
| | Optune | BSC |
| **Characteristics** | (N=120) | (N=117) |
| | n (%) | n (%) |
| | | |
| Caucasian | 111 (93) | 106 (91) |
| African American | 2 (2) | 5 (4) |
| Asian | 0 | 3 (3) |
| Hispanic | 7 (6) | 2 (2) |
| Other | 0 | 1 (1) |
| Female Gender | 28 (23) | 44 (38) |
| Frontal Tumor Position | 38 (32) | 58 (50) |
| Bilateral or Midline Tumor Location | 23 (19) | 17 (15) |
| Prior Avastin Use | 24 (20) | 21 (18) |
| Re-operation for Recurrence | 33 (28) | 29 (25) |
| Prior Low-grade Glioma | 12 (10) | 11 (9) |
| Median Age (years) (min, max) | 54 (24, 80) | 54 (29, 74) |
| Median Weight (kg) | 80 | 80 |
| Mean Number of Prior GBM Recurrences | 1.5 | 1.3 |
| Median Karnofsky Performance Score (min, max) | 88 (50, 100) | 80 (50, 100) |
| Median Tumor Area (mm²) | 1440 | 1391 |
| Median Time from GBM Diagnosis to Randomization (days) | 334 | 540 |
| Mean Time from Last Radiotherapy Dose to Randomization (Months) | 13.71 | 13.93 |

**Effectiveness Results:**

Primary Effectiveness Endpoint: Overall Survival (ITT)

In the ITT population which included all randomized subjects (Novo-TTF=120, BSC=117), overall survival in subjects treated with Optune was comparable to that observed in subjects treated with BSC (median OS=6.3 vs. 6.4 months; p=0.98). In the US, the median overall survival was 6.1 vs. 5.3 months in the ITT population. The pivotal study data establish that Optune therapy is comparable to BSC therapy in extending OS.

| | Treatment Group | |
|---|---|---|
| | Optune | BSC |
| N | 120 | 117 |
| Median OS (months) | 6.3 | 6.4 |
| Log-rank p-Value | 0.98 | |
| Hazard Ratio (95% CI) | 1.00 (0.76-1.32) | |

The Kaplan-Meier survival curve for the two treatment groups appeared to be very similar during the first 12 months of follow-up, where 80% of the events occurred in both groups. Between 12 and 24 months, the survival curves separated slightly in favor of the BSC control group. However, after 12 months, the number of subjects remaining may be too small to reliably estimate the long term survival outcome.



| | Optune (N=120) | Active BSC Control (N=117) |
|---|---|---|
| Deaths | 105 | 97 |
| Censored | 15 | 20 |
|    Lost to follow-up | 6 | 10 |
|    Alive at end of follow-up | 9 | 10 |
| Median (months) | 6.3 | 6.4 |
| 95% Confidence Interval | 5.6, 7.8 | 5.2, 7.4 |

**Correlation between Treatment Compliance and Overall Survival:** Optune has an internal log file which allows the calculation of patient compliance with treatment. Significantly higher overall survival (p=0.0447) was observed in patients who were treated 75% or more of the time on average (OS=7.7 months) compared to patients treated less than 75% of the time on average (OS=4.5 months).

**Secondary Effectiveness Endpoints:** Secondary endpoint results support the findings in the primary endpoint. The one-year survival is similar in the Optune and BSC groups in the ITT population (21.9% vs. 22.1%). Progression free survival at 6 months (PFS6) is the same in the ITT population (21.4% vs. 15.2%). Radiological response rates from the subset of patients evaluated were reported as 14% for the Optune group compared to 9.6% for the BSC group in the ITT population. Median time to progression (TTP) was 9.3 weeks for Optune vs. 9.6 weeks for BSC.

| | Treatment Group | |
| --- | --- | --- |
| | Optune | BSC |
| N | 120 | 117 |
| 1-year survival | 21.9%<br>25/114 | 22.1%<br>23/104 |
| | | |
| PFS6 (%) | 21.4%<br>22/103 | 15.2%<br>14/92 |
| | | |
| Radiological Response Rate (%) | 14.0%<br>14/100 | 9.6%<br>7/73 |
| | | |
| Median TTP (weeks) | 9.3 | 9.6 |

**Quality of Life:** Quality of life in subjects using Optune was better than those on BSC chemotherapy in most subscale domains, including vomiting, nausea, pain, diarrhea, constipation, cognitive and emotional functioning.

**Safety Results:** The characteristic adverse events of almost all chemotherapies are seen in a significantly higher proportion of BSC control subjects than in Optune subjects: gastrointestinal (30% vs. 8%), hematological (19% vs. 4%) and infectious (12% vs. 4%). Mild to moderate skin irritation beneath the device transducer arrays was observed in 16% of Optune subjects; none of these cases were assessed as severe by the investigator, all resolved after discontinuing treatment, and all were treated with topical steroids and periodic shifting of transducer array positions.

## Number of Patients with Adverse Events by Body System (>2%)

| System Organ Class | Optune N=116 (%) | BSC Chemotherapy N=91 (%) |
|---|---|---|
| Blood and lymphatic disorders | 5 (4.3%) | 17 (18.7%) |
| Gastrointestinal disorders | 9 (7.8%) | 27 (29.7%) |
| General disorders and administration site conditions | 15 (12.9%) | 14 (15.4%) |
| Infections and infestations | 5 (4.3%) | 11 (12.1%) |
| Injury, poisoning and procedural complications | 21 (18.1%) | 1 (1.1%) |
| Metabolism and nutrition disorders | 9 (7.8%) | 12 (13.2%) |
| Nervous system disorders | 50 (43.1%) | 33 (36.3%) |
| Psychiatric disorders | 12 (10.3%) | 7 (7.7%) |
| Respiratory, thoracic and mediastinal disorders | 7 (6.0%) | 10 (11.0%) |

**Conclusions:** Optune is a portable, battery operated device which delivers TTFields to patients with recurrent GBM. The results of the pivotal trial showed that Optune subjects had comparable overall survival to subjects receiving the best available chemotherapy in the US today (OS 6.3 vs. 6.4 months; HR 1.0; p=0.98). Similar results showing comparability of Optune to BSC chemotherapy in the ITT population were seen in all secondary endpoints.

Optune subjects experienced fewer adverse events in general, significantly fewer treatment related adverse events, and significantly lower gastrointestinal, hematological and infectious adverse events compared to BSC controls. The only device-related adverse event seen was a mild to moderate skin irritation beneath the device transducer arrays, which was easily treated with topical ointments. Finally, certain quality of life measures were better in Optune subjects as a group when compared to subjects receiving effective BSC chemotherapy.

# Directions for Use

Detailed directions for use for Optune can be found in:
The Optune Patient Information and Operation Manual

## Abbreviations

**AE** – Adverse event

**BSC** – Best standard of care (effective chemotherapies)

**GBM** – Glioblastoma Multiforme (Glioblastoma, Astrocytoma grade IV), the most common and anaplastic primary brain tumor

**ITT** – Intent-to-Treat. This analysis population includes all randomized subjects.

**kHz** – kilo hertz; number of cycles per second

**Optune**– A portable battery, or power supply, operated device for delivering 200 kHz TTFields to the brain of patients with recurrent GBM

**OS** – Overall survival

**PP** – Per Protocol. This analysis population includes all patients who received at least the first course of TMZ and had no major protocol deviations.

**PFS** – Progression free survival

**PFS6** – Proportion of patients alive and progression free at 6 months from randomization

**Radiological Response Rate** - sum of complete and partial radiological response rates

**TMZ** – a type of cancer drug used to treat newly diagnosed GBM

**TTFields** – Tumor Treating Fields: Low intensity (1-3 V/cm), intermediate frequency (100-300 kHz), alternating electric fields, delivered using insulated transducer arrays to the region of the body inflicted with a solid tumor. The fields have been shown in vitro to arrest the replication of tumor cells by disrupting the proper formation of the microtubule spindle nd by dielectrophoretic disruption of cell integrity during late telophase

**TP** – Time to progression

**V/cm** – Volts per centimeter; the unit of intensity measurement of electric fields

# Contact Information

Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801
Tel: 1.855.281.9301
e-mail: patientinfo@novocure.com

Kirson, E. D., V. Obaly, et al. (2007). "Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors." Proc Natl Acad Sci U S A 104(24): 10152-7.

Kirson, E. D., Z. Gurvich, et al. (2004). "Disruption of cancer cell replication by alternating electric fields." Cancer Res 64(9): 3288-95.

Mrugala, M., et al. (2014). "Clinical Practice Experience With NovoTTF-100A™ System for Glioblastoma: The Patient Registry Dataset (PRiDe)" Seminars in Oncology, Vol 41,No 5,Suppl 6,October 2014,pp S4-S13

Stupp, R., et al. (2012). "NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomised phase III trial of a novel treatment modality." Eur J Cancer 48(14): 2192-202.



# The Society for NeuroOncology

*A multidisciplinary organization for the advancement of neuro-oncology through research and education*

*President*
David A. Reardon, MD

*Vice President*
E. Antonio Chiocca, MD, PhD

*Secretary-Treasurer*
Evanthia Galanis, MD

**Board of Directors**
Manish Aghi, PhD
Eric Bouffet, MD
Daniel Brat, M.D, PhD
Paul Brown, MD
Mary Lovely, PhD
Margaretta Page, MS, RN
Andrew Parsa, PhD
David Peereboom, MD
Russell Pieper, PhD

**Past President**
Kenneth Aldape, MD

**Foundation President**
Mark R. Gilbert, M.D

**Foundation Board**
Mitchel S. Berger, MD
Susan Chang, MD
Victor A. Levin, MD

**Journal Editor in Chief**
Patrick Wen, MD

**SNO Executive Editor**
Kenneth Aldape, MD

**Executive Director**
J. Charles Haynes, JD
chaz@soc-neuro-onc.org

**Chief Administrative Officer**
Jan Esenwein
jan@soc-neuro-onc.org

*The following abstract will be presented on Saturday, November 15, 2014, at 11:40am at the 19th Annual Scientific Meeting of the Society for Neuro-Oncology. The information below is embargoed until 8:00am, Saturday, November 15, 2014.*

## Interim Analysis of the EF-14 Trial: A Prospective, Multi-center Trial of NovoTTF-100A Together With Temozolomide Compared to Temozolomide Alone in Patients with Newly Diagnosed GBM

*Rüger Stupp, Eric Wong, Charles Scott, Sophie Taillibert, Andrew Kanner, Santosh Kesari and Zvi Ram on behalf of the EF-14 Trial investigators*

**BACKGROUND:** Tumor Treating Fields (TTFields) are an anti-mitotic, physical treatment modality that acts in metaphase, anaphase and telophase. The NovoTTF-100A System (NovoTTF), a home-use medical device that delivers TTFields to the brain, is an established monotherapy for recurrent glioblastoma (GBM).

**METHODS:** We conducted an international, multicenter, prospective, randomized phase III trial in newly diagnosed GBM patients. After completion of radiotherapy (RT) with concomitant temozolomide (TMZ), patients were randomized (2:1) to adjuvant TMZ with NovoTTF or adjuvant TMZ alone. The primary endpoint was progression-free survival (PFS), with overall survival (OS) an important secondary endpoint. Here we report on a pre-specified interim analysis of the first 315 patients randomized, after a minimum follow-up of 18 months (range 18-60 months).

**RESULTS:** (intent-to-treat): 210 pts were randomized to NovoTTF/TMZ and 105 to TMZ alone. Patient characteristics were balanced: median age 57 and 58 years, tumor resection in 89 and 90%, KPS 90%, for the NovoTTF and the control arms, respectively. *MGMT* promoter methylation status was assessable centrally in 60% of patients; of these 39% and 41% were methylated. Adverse events (AE) were comparable between treatment arms. The most common device-related AE was skin irritation in 45% of patients (all grades, severe 2%). Severe seizures were observed at a frequency of 7% in both arms. Median PFS was 7.1 months [mo] (95% confidence interval [CI] 5.9-8.2) and 4.0 mo (CI 3.0-4.3; Hazard ratio 0.63, p=0.001), OS was 19.6 mo (CI 16.5-24.1) and 16.6 mo (CI 13.5-19.1) (HR 0.75, p=0.034), both favoring NovoTTF. This translates into a 24-mo survival rate of 43% (CI 36-50%) and 29% (CI 21-39%) for the NovoTTF/TMZ and the TMZ alone arm, respectively.

**CONCLUSIONS:** The trial met its primary and main secondary endpoints, and was closed to accrual after this interim analysis. Adjuvant TMZ chemotherapy and NovoTTF provides a clinically and statistically significant improvement in progression-free and overall survival, and should become the new standard of care against GBM.

6017 Birch Street, Bellaire, Texas 77401-5509    Tel: 713-349-0952, Fax 832-201-8129    www.soc-neuro-onc.org

002200 C2C DIAR_A0000069327 12-19-2013

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C5-08-27
Baltimore, Maryland 21244-1850



CENTERS FOR MEDICARE & MEDICAID SERVICES
**CENTER FOR MEDICARE**

Center for Medicare

Refer to: FCHBE

JUL 26 2013

James C. Stansel
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005

Dear Mr. Stansel:

Thank you for your inquiry requesting an informal benefit category determination (BCD) for the NovoTTF™-100A System.

According to your letter and the information you provided during the meeting with Centers for Medicare and Medicaid Services (CMS) on May 21, 2013, the NovoTTF™-100A System is a non-invasive system used in the patient's home that delivers tumor treating fields therapy to the brain to disrupt rapid cell division exhibited by recurrent GMB tumors. The NovoTTF™-100A System is comprised of a durable electrical field generator and disposable insulated transducer arrays for use with the Generator. The System also includes lithium ion batteries, battery rack, battery charger, power supply, connection cables, and a carrying case. The NovoTTF™-100A System received pre-market approval (PMA) from FDA in April 2011 for recurrent GBM.

In order for an item to be covered by Medicare, it must meet the definition of a Medicare-covered benefit. However, it is important to note that although Medicare provides coverage for certain items, it does not provide coverage for every item that may be useful to a person with a medical problem, even if a physician prescribes the item. The Medicare definition of durable medical equipment (DME) includes equipment which: can withstand repeated use; has an expected life of at least three years; is primarily and customarily used to serve a medical purpose; generally is not useful to a person in the absence of an illness or injury; and is appropriate for use in the home.

Based on the product information we reviewed, we believe that the NovoTTF™-100A System falls within the DME benefit category. I hope that this information is helpful to you.

Sincerely,

Joel E. Kaiser
Director
Division of DMEPOS Policy

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 501-4298

novocure

# novocure

---

## OPTUNE™
### (FORMERLY NOVOTTF™-100A SYSTEM)

# CLINICAL DOSSIER

### TUMOR TREATING FIELDS THERAPY

### Treatment for <u>Glioblastoma Multiforme</u>

---

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 280 of 631   Document 11-5   4511
EX. 2, P. 119

802201 C2C DIAR_A0000069327 12-19-2018

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax. (603) 501-4298

**novocure**

## Table of Contents

|  | Page |
|---|---|
| List of Figures | 3 |
| List of Abbreviations and Definition of Terms | 4 |
| Burden of Illness and Standard of Care for GBM | 10 |
| Description and Use of Optune | 12 |
| Optune Mechanism of Action | 16 |
| Summary of Clinical Studies | 17 |
| A) EF-14 Pivotal Study | 18 |
| B) EF-11 Pivotal Study | 23 |
| C) Patient Registry Dataset (PRiDe) | 24 |
| Appendix A--FDA Approval Letters | 26 |
| Appendix B--EF-14 Pivotal Trial Interim Analysis Patient Characteristics | 27 |
| Appendix C—EF-14 Pivotal Trial Adverse Events—Interim Analysis Population | 28 |
| Bibliography | 29 |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 281 of 631   Document 11-5   4512
EX. 2, P. 120

## List of Figures

Figure 1. Optune Treatment Kit............................................................................7

Figure 2. Use of Device Overview........................................................................8

Figure 3. Progression Free Survival: Intent to Treat Population................... 21

Figure 4. Overall Survival: Per Protocol Population......................................22

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 282 of 631   Document 11-5   4513
EX. 2, P. 121

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax. (603) 501-4298

novocure

**List of Abbreviations and Definitions of Terms**

**AE** – Adverse Event

**BCNU** – Carmustine, chemotherapy

**BPC** – Best Physician Choice

**BSC** – Best Standard Care

**c** – Centigrade

**CCNU** – Lomustine (CeeNU), chemotherapy

**CE Mark** -- Conformité Européene mark, for products sold in the European Economic Area

**CI** – Confidence Interval

**cm** – Centimeters

**DTIC** -- Dacarbazine

**dAEs** -- Dermatologic adverse events

**ECG** -- Electrocardiogram

**EMC** -- Electromagnetic Compatibility

**F-98** – Rat glioblastoma cell line

**FDA** -- Food and Drug Administration

**GBM** – Glioblastoma Multiforme (Glioblastoma, Astrocytoma grade IV), the most common and anaplastic primary brain tumor

**Gy** – Gray, unit of radiation

**HR** -- Hazard Ratio

**ITT** – Intent-to-Treat

**INE** – Insulated Electrical Array

**kHz** – Kilo Hertz; number of cycles per second

**KPS** – Karnofsky Scale

**mHz** -- Mega Hertz, number of cycles per second

**MGMT** -- 06-methylguanine-DNA methyltransferase

**mITT** -- Modified intention-to-treat

**mo.** -- Months

**MRI** -- Magnetic Resonance Imaging

**ORR** - Objective Response Rate

**OS** – Overall Survival

**PCV** – Procarbazine, CCNU and vincristine-combination chemotherapy

**PFS** – Progression Free Survival

**PFS6** – Progression Free Survival at 6 months

**PMA** – Pre-market Approval

**PRiDe** -- Patient Registry Dataset

**QOL** – Quality of Life

**RR** – Radiological Response Rate--Sum of complete and partial radiological response rates

**TENS** -- Transcutaneous Electrical Nerve Stimulation

**TMZ**--Temozolomide

**TTFields** – Tumor Treating Fields: Low intensity (1-3 V/cm), intermediate frequency (100-300 kHz), alternating electric fields, delivered using insulated transducer arrays to the region of the body inflicted with a solid tumor. The fields have been shown to arrest the replication of tumor cells by disrupting the proper formation of the microtubule spindle and by dielectrophoretic disruption of cell integrity during late telophase.

**U-87** - Human glioblastoma cell line

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 284 of 631   Document 11-5   4515
EX. 2, P. 123

002203 C2C DIAR_A0000063327 12-19-2013

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 501-4298



novocure

**US** – United States

**V/cm** – Volts per centimeter; the unit of intensity measurement of electric fields

**WHO** -- World Health Organization

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 285 of 631   Document 11-5   4516

EX. 2, P. 124

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone 855-281-9301 | Fax: (603) 501-4298

novocure

**Figure 1. Optune Treatment Kit**

4
5
2
6
3
7
1

1 Plug in Power Supply

2 Charger for Portable Batteries

3 Transducer Arrays

4 Device & Battery Carrying Bag

5 Electric Field Generator (the Device)

6 Portable Battery

7 Connection Cable & Box

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 286 of 631 Document 11-5 4517
EX. 2, P. 125

002294 C2C DIAR_A0000069327 12-19-2018

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 501-4298

novocure

## Figure 2. Use of Device Overview



1. Prepare scalp.





2. Remove four transducer arrays from package.

5. Place device and battery in bag (if applicable) and connect battery or power supply.



3. Place transducer arrays on scalp.



6. Connect connection cable to device.



4. Connect transducer arrays to connection cable & device. Match colored rings to color coded sockets.



7. Start treatment. Turn on power switch and push TTFields button.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 287 of 631   Document 11-5   4518
EX. 2, P. 126



8. Place bag over shoulder.



9. Replace transducer arrays as needed.



10. Recharge batteries when not in use.

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone. 855-281-9301 | Fax: (603) 501-4298

**novocure**

## 1] Burden of Illness and Standard of Care for GBM

Glioblastoma multiforme (GBM), a malignant form of astrocytoma, is the most common and most aggressive form of primary brain cancer; but it remains a rare disease.

### Burden of Illness

The incidence of GBM increases steadily above 45 years of age, with approximately 10,000 new cases annually in the United States. GBM tends to occur more frequently in males than females by a ratio of about 3:2. The outcome of patients with this disease has not improved significantly in recent years, despite the introduction of improved chemotherapies, including temozolomide (TMZ) (Merck; Temodar), bevacizumab (Roche, Avastin), and the use of GLIADEL® Wafers (carmustine). The 4-year survival of these patients is only 6.3% with a median overall survival (OS) of 14.6 months (Ostrom, 2015).

Nearly all patients with newly diagnosed GBM relapse within the first year despite aggressive treatment. Recurrent GBM is an end-stage condition; median OS from time of recurrence is approximately 3 to 5 months without additional effective treatment.

Quality of Life (QOL) for patients with GBM is generally poor due to the neurological deficits caused by the tumor itself together with the associated side effects of the various approved and experimental treatments.

### Insurance Burden

To determine which US health insurers cover GBM patients, it is helpful to know that the median age at diagnosis is approximately 64 years Therefore, the expected population for a private health care payer in the US is approximately 16 patients per 1 million covered lives (10,000 with GBM x 50% non-Medicare x 64% with private health care coverage = 3,200 divided by 201.1 million covered lives with private insurance = 16 lives per million covered).

### Existing Treatment Options for GBM

There are currently four principal treatment options for GBM. Even with these treatments, the median time to recurrence of the tumor has been extended by only a few months. Once the tumor has recurred, patients have limited treatment options.

#### Newly Diagnosed GBM

Standard of care for a patient with newly diagnosed GBM and adequate functional status is debulking surgery, radiation with concurrent TMZ followed by adjuvant TMZ. Some elderly patients simply receive standard radiation or TMZ. Any or all of the following options may be pursued:

- **Surgical Resection** – Surgery to debulk the tumor and obtain tissue for diagnosis is the most common initial approach for newly diagnosed GBM. The surgical goal is to remove as much of the tumor as possible without

compromising neurological function. When surgical resection is not feasible due to tumor location or patient's clinical condition, open or stereotactic biopsy may be performed.

- **GLIADEL® Wafer in Combination with Surgical Resection** – The GLIADEL® Wafer may be placed in the brain cavity at the time of surgical resection to deliver carmustine (BCNU) directly to the site of the brain tumor (interstitial chemotherapy). A modest increase in median survival has been shown over placebo (13.9 mo. vs. 11.6 mo.) when used in newly diagnosed GBM. Treatment with GLIADEL® wafer is associated with the following common side effects (incidence >10% and between arm difference ≥4%): cerebral edema, asthenia, nausea, vomiting, constipation, wound healing abnormalities and depression.

- **Radiation Therapy – Localized radiotherapy is typically** given over a six-week period following surgical resection with a total dose of approximately 60 grays (Gy). Side effects of radiation therapy depend on the type of radiation received, the amount of the surface of the brain targeted, the site targeted, and the total dose of radiation. In general, there will be hair loss, skin irritation, possible hearing problems, nausea, vomiting, loss of appetite, and neurologic effects. The most prevalent side effect is fatigue, which may last through treatment and for many months afterwards.

- **Cytotoxic Chemotherapy** – TMZ, an oral alkylating agent, is administered concomitant with radiation therapy and continued for a minimum of six months following radiation. Significantly improved OS and median survival have been demonstrated in large trials. Recent studies have shown that patients with methylated 06-methylguanine-DNA methyltransferase (MGMT) may have a superior response to TMZ therapy. Side effects from TMZ therapy include: nausea, vomiting, loss of appetite, constipation, tiredness, and headache. Temporary loss of hair also can be expected.

*Recurrent GBM*
There is little data on effective strategies for treatment of recurrent GBM.

- **Surgical Resection** – Repeat surgery for GBM at the time of tumor recurrence may be offered when it is feasible although there is no data indicating that it offers significant survival benefit. Second surgery is considered in only about 20% of patients.

- **GLIADEL® Wafer in Combination with Surgical Resection** – Use of GLIADEL® Wafer is limited to selected cases undergoing additional surgical resection for recurrent GBM. The package insert indicates that for recurrent GBM, GLIADEL® Wafer increased median OS from 4.6 to 6.5 months compared to placebo.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 290 of 631   Document 11-5

4521

EX. 2, P. 129

G02296 C2C DIAR_A9000069327 12-19-2018

- **Radiation Therapy -** Because the full standard dose of radiation (60 Gy) typically is given after initial diagnosis with GBM, irradiation for disease recurrence may not be possible. However, with advances in technology, re-irradiation with fractionated stereotactic radiotherapy can provide survival benefit.

- **Cytotoxic Chemotherapy -** There is no established standard treatment for recurrent GBM. Chemotherapy treatment strategies are ill-defined, with several different preferred regimens. The most common are: nitrosureas, (BCNU), procarbazine, PCV (procarbazine, CCNU and vincristine), and platinum based (e.g. carboplatin). None of these agents is FDA approved specifically for recurrent GBM. Most patients suffer from combinations of unpleasant and sometimes life-threatening side effects of their chemotherapeutic treatments,

- **Bevacizumab (Avastin)** may be used as monotherapy for patients with recurrent GBM (Cohen, 2009). The FDA approval was based on two phase 2, single arm trials comparing bevacizumab to historical control data. Benefit was seen in objective response (OR) rates and progression free survival at six month (PFS6) compared to historical control data. OS was shown to be between 8 to 9 months however, an OS claim is not made in the approved labeling

In summary, despite an aggressive initial standard of therapy treatment, most GBM patients develop recurrent disease. When tumors recur, only 20% of patients are eligible for additional resection. There is a high unmet need for therapies to treat recurrent GBM.

## 2] Description and Use of Optune

**Overview**
Optune is a portable, wearable medical device, which produces alternating electrical fields, tumor treating fields or "TTFields," within the brain by means of electrically-insulated surface transducer arrays placed on the scalp. The TTFields are believed to disrupt the rapid cell division exhibited by cancer cells.

*Indication for Use:*
*Optune™ is intended as a treatment for adult patients (22 years of age or older) with histologically-confirmed glioblastoma multiforme. (GBM)*

*Optune™ with temozolomide is indicated for the treatment of adult patients with newly diagnosed, supratentorial glioblastoma following maximal debulking surgery and completion of radiation therapy together with concomitant standard of care chemotherapy*

*For the treatment of recurrent GBM, Optune™ is indicated following histologically-or radiologically-confirmed recurrence in the supratentorial region of the brain after*

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 291 of 631   Document 11-5   4522
EX. 2, P. 130

*receiving chemotherapy. The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options*

**Summary of Important Safety Information:**

*Contraindications*
*Do not use Optune if you have an active implanted medical device, a skull defect (such as, missing bone with no replacement), or bullet fragments. Use of Optune together with implanted electronic devices has not been tested and may theoretically lead to malfunctioning of the implanted device. Use of Optune together with skull defects or bullet fragments has not been tested and may possibly lead to tissue damage or render Optune ineffective.*

*Do not use Optune if you are known to be sensitive to conductive hydrogels. In this case, skin contact with the gel used with Optune may commonly cause increased redness and itching, and rarely may even lead to severe allergic reactions such as shock and respiratory failure.*

*Warnings and Precautions*
*Use Optune only after receiving training from qualified personnel, such as your doctor, a nurse, or other medical personnel who have completed a training course given by Novocure (the device manufacturer).*

*Do not use Optune if you are pregnant, you think you might be pregnant or are trying to get pregnant. It is not known if Optune is safe or effective in these populations.*

*The most common (≥10%) adverse events involving Optune in combination with temozolomide were low blood platelet count, nausea, constipation, vomiting, fatigue, scalp irritation from device use, headache, convulsions, and depression.*
*The most common (≥10%) adverse events seen when using Optune alone were scalp irritation from device use and headache.*

*The following adverse reactions were considered related to Optune when using the device alone: scalp irritation from device use, headache, malaise, muscle twitching, fall and skin ulcer.*

*All servicing procedures must be performed by qualified and trained personnel.*

*Do not use any parts that do not come with the Optune Treatment Kit, or that were not sent to you by the device manufacturer or given to you by your doctor.*

*Do not wet the device or transducer arrays.*

*If you have an underlying serious skin condition on the scalp, discuss with your doctor whether this may prevent or temporarily interfere with Optune treatment.*

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 292 of 631   Document 11-5      4523
EX. 2, P. 131

002207 C2C DIAR_A0000069327 12-19-2018

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 501-4298



novocure

## System Components

Optune is comprised of two main components: 1) an Electric Field Generator (the "device") and 2) INE Insulated Transducer Arrays (the "arrays"). (See **Figure 1** for illustration.)

- The device is portable, battery- or power supply-operated. It is connected to two pairs of array sets, which operate sequentially. The intensity of the field, the frequency of the waves, and the temperature of the transducer arrays are pre-set and monitored by the device. The device and battery weigh about six pounds together.

- The transducer arrays are disposable and approved for single use only. They are highly engineered, using military grade insulation that cannot withstand repeated use due to micro-cracks that form over time. The arrays are embedded with a precise temperature sensing technology to prevent skin burns. They are designed to deliver and monitor the therapy simultaneously while maintaining electrical insulation and patient safety. Due to their advanced engineering requirements and unique material composition, they contribute meaningfully to the device cost.

**Additional Components:** In addition to the device and transducer arrays, the Optune treatment kit includes a plug-in power supply, portable batteries, battery charger, connection cable, and carrying case. (See **Figure 1** for illustration.)

## Treatment Overview
### Overview
The US FDA requires that the treating physician complete training and receive certification from the manufacturer prior to prescribing treatment with Optune. Additionally, nurses, nurse practitioners, physician's assistants, and any other health care professional providing direct patient care related to Optune must also have completed training and certification.

The manufacturer-provided training is designed to educate the prescribing physician and allied healthcare professionals on the scientific basis for Optune therapy, clinical information on the efficacy and safety of Optune, the process to interpret an MRI to determine the array layout plan, the training required for the patient, and also the steps to start and oversee treatment, including the process of assessing monthly compliance.

### Transducer Array Layout Plan
The physician must plan the appropriate layout of the transducer arrays around the tumor location prior to starting treatment. This layout planning process requires a current patient MRI. Treatment planning determines the appropriate array placement to maximize Optune intensity within the tumor.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 293 of 631   Document 11-5   4524

EX. 2, P. 132

### Treatment Start
Treatment initiation often takes place in the patient home. The patient and caregiver receive device related training from a Novocure representative. The patient has his or her scalp shaved to ensure proper contact of the transducer arrays to the skin. The caregiver places the arrays in accordance with the prescribed array layout and initiates therapy by turning the device on.  (See **Figure 2** for illustration.)

### Patient and Caregiver Training
Novocure representatives are responsible for training the patient and caregiver on the technical aspects and use of the device.  All medical questions are referred back to patient's provider. This training involves technical training related to the device operation, including educating the patient on battery replacement, battery charging, using the power supply, connecting and disconnecting from the device, and on the appropriate placement of transducer arrays in accordance with the treatment plan. Additionally, the patient and caregiver will have access to a 24-hour technical support service offered by the device manufacturer.

### Transducer Array Placements – After Successful Patient Training
The patient and caregiver, once properly trained, are expected to change the transducer arrays.  The caregiver will be trained to shave the patient's scalp, maintain good skin care protocols, and to place the arrays in accordance with the prescribed treatment plan.  The arrays are changed and the scalp is re-shaved about every three to four days to ensure contact with the skin.  Patients know to change the arrays when the alarm beeps more often to signal the need for the change.

### Monthly Treatment Assessment
Patients typically are scheduled to meet the physician once per month, exclusive of Optune treatment. The Novocure Representative will provide the physician a monthly compliance report which is reviewed with the patient during this appointment. The compliance log provides the physician with an overview of device usage by day and by time of day (day versus night).  The physician uses this compliance log to encourage appropriate use of Optune.  During this monthly appointment, the physician also reviews transducer array location to ensure appropriate placement in accordance with the prescribed treatment plan. If compliance is problematic, patients and caregivers may be retrained in the proper use of the device.

### Device Use Overview
### Treatment Duration
The physician-prescribed device is used for newly diagnosed patients in combination with temozolomide and as monotherapy for patients diagnosed with recurrent glioblastoma. Physicians may choose to keep patients on Optune at first recurrence. For maximum benefit, the recommended average daily use is at least 18 hours a day.

### Device Settings
Novocure pre-sets all device treatment parameters; there are no programming adjustments available to the patient. The patient simply connects the device to an

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 294 of 631   Document 11-5     4525
EX. 2, P. 133

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 501-4298

novocure

appropriate power supply (i.e., a charged battery or connection of the power supply to an electrical outlet) and turns it on and off.

### Practical Considerations

Treatment may be interrupted for personal needs such as bathing or exercise. In order to take a shower, the patient must disconnect from the device (leaving the transducer arrays on the head), put on a shower cap, and be cautious not to get his/her head or any components of the device wet. Treatment also must be stopped to replace the arrays. When leaving the house, patients can put a wig or hat over the arrays, if desired.

### Device Service

The device and batteries require frequent servicing. Novocure provides the patient with replacements for these components, as needed, and in most cases ships on an overnight basis. For minor technical issues, an alarm will sound to notify the patient. The patient manual has a simple troubleshooting guide that addresses the most common problems that may arise. In addition, Novocure has around-the-clock technical support. Patients are encouraged to call the Novocure technical support telephone number with questions about operations or device function.

## FDA Approvals.

The US Food and Drug Administration (FDA) approved Optune for use in newly diagnosed GBM in October 2015. (See FDA Approval Letter, **Appendix A**.)

Optune has been available for use in recurrent GBM since FDA approval (via premarket approval (PMA) pathway) in April 2011. (See FDA Approval Letter, Appendix A.)

### Regulatory Approval Outside the United States

Optune is a CE Marked (Conformité Européene) device cleared for sale in the European Union, Switzerland, Australia, Israel and Japan.

## 3] Optune Mechanism of Action

### Background

The Optune System delivers tumor treating fields (TTFields) to the tumor. TTFields are intended to disrupt cancer cell division by utilizing the unique electrical and geometric properties of cells during the mitotic process.

Electric fields traditionally have been used in medicine in two different modes: 1) steady or low frequency electric fields (<1 kHz); and 2) high frequency alternating fields (>10 mHz). Steady or <u>low</u> frequency electric fields generate action potentials in excitable cells. These fields are used therapeutically in bone and soft tissue repair, pain control (TENS), and stimulation (neurologic or cardiac). In contrast, very <u>high</u> frequency

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 295 of 631   Document 11-5   4526
EX. 2, P. 134

novocure

alternating fields generate heat in the tissues by dielectric losses. Applications in therapeutic use include ablation, diathermy and hyperthermia.

In contrast, Optune harnesses intermediate frequency (200 kHz), low intensity (1-3 V/cm), alternating electric fields) to achieve its therapeutic effect. At this frequency and intensity, Optune cannot stimulate nerves or muscles or bone growth, nor do they heat the tumor or surrounding tissues. Since Optune is applied using electrically insulated arrays, there is no direct current flow into the tissue hence electrolysis and tissue damage do not occur. TTFields are delivered non-invasively via the arrays to GBM tumors using the Optune device.

**Mechanism of Action**

TTFields target two specific characteristics of cancer cells: the presence of electrically charged particles during mitosis and the geometrical shape of dividing cancer cells. TTFields have been shown to:

- inhibit cancer cell replication by interference with the proper formation of the mitotic spindle during metaphase and anaphase; and

- cause intracellular dielectrophoesis of macromolecule and organelles during cytokinesis.

Acting together, these two processes, which are specific to dividing cells only, may lead to apoptosis and can result in tumor arrest or regression *in vivo*.

In contrast, data indicate that Optune does not affect cells that are quiescent, that is, that are not dividing. Since most normal adult brain cells proliferate very slowly, if at all, scientists hypothesize that these cells are affected minimally by Optune. Additionally, the antimitotic effect of Optune has been shown to be frequency-specific to the cell type treated.

Optune application has the advantage of being locally-directed and is not expected to be associated with systemic toxicity.

## 4] Summary of Clinical Studies

Pilot and pivotal studies in both newly diagnosed and recurrent GBM have demonstrated·that Optune is safe and effective in patients with GBM. The most recently completed study, EF-14 in newly diagnosed GBM, compared Optune in combination with maintenance TMZ compared to TMZ alone. The previous EF-11 trial for recurrent GBM compared Optune alone with best physician choice chemotherapy (BPC). To date, Optune therapy has been used in more than 2500 patients in the clinical as well as commercial setting. What follows is a synopsis of the EF-14 pivotal trial in newly

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 501-4298

**novocure**

diagnosed GBM and a summary of the published clinical study literature for both indications.

## Newly Diagnosed GBM

### A] EF-14 Pivotal Study

*Overview*

The EF-14 trial, as reported by Stupp et al. 2015, was a prospective, randomized, open label, active parallel control trial to compare the effectiveness and safety outcomes of newly diagnosed GBM subjects treated with Optune and TMZ to those treated with TMZ alone. The multicenter, multinational (83 global centers) trial had a medium follow-up of 38 months (range 18 to 60 mo.). Sixty-one percent of study patients were from the US. Study endpoints were as follows:

*Primary Endpoint:* Progression-free survival (PFS) in the intent-to-treat population assessed by an independent review panel (significance threshold of .01)

*Secondary Endpoint:* Overall survival (OS) in the per-protocol (PP) population (significance threshold of .006)

### *Study Population*

Patients with histologically confirmed GBM were recruited to the trial after completing maximal safe debulking surgery or biopsy, followed by radio-therapy in combination with TMZ chemotherapy.

### Eligibility Criteria

*Inclusion Criteria*
- *Pathological evidence of GBM using World Health Organization (WHO) classification criteria*
- *≥18 years of age*
- *Received maximal debulking surgery and radiotherapy (45-70Gy) concomitant with TMZ*
- *Karnofsky scale ≥ 70*
- *Life expectancy at least 3 months*
- *Participants of childbearing age must use effective contraception.*
- *All patients must sign written informed consent.*
- *Treatment start date at least 4 weeks out from surgery.*
- *Treatment start date at least 4 weeks out but not more than 7 weeks from the later of last dose of concomitant TMZ.*
- *Treatment start date at least 4 weeks out from radiation therapy*

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 297 of 631   Document 11-5   4528
EX. 2, P. 136

### Exclusion Criteria

- Progressive disease (according to MacDonald Criteria[1]).
- Actively participating in another clinical treatment trial
- Pregnant
- Significant co-morbidities at baseline which would prevent maintenance TMZ treatment:
    o Thrombocytopenia (platelet count < 100 x 10³/µL)
    o Neutropenia (absolute neutrophil count < 1.5 x 10³/µL)
    o CTC grade 4 non-hematological Toxicity (except for alopecia, nausea, vomiting)
    o Significant liver function impairment - AST or ALT > 3 times the upper limit of normal
    o Total bilirubin > upper limit of normal
    o Significant renal impairment (serum creatinine > 1.7 mg/dL)
- Implanted pacemaker, defibrillator, deep brain stimulator, or documented clinically significant arrhythmia.
- Infra-tentorial tumor
- Evidence of increased intracranial pressure (midline shift > 5mm, clinically significant papilledema, vomiting and nausea or reduced level of consciousness)
- History of hypersensitivity reaction to TMZ or a history of hypersensitivity to dacarbazine (DTIC).

**Study Procedure** After completion of treatment with TMZ and radiotherapy, patients were randomized at a ratio of 2:1 to receive standard maintenance TMZ (150-200 mg/m /d for 5 days every 28 days for 6-12 cycles) with or without the addition of Optune. The web-based randomization was stratified by extent of resection and MGMT methylation status.

**Treatment Arm:** Optune was given together with maintenance TMZ. At treatment initiation, patients were seen at an outpatient clinic. During this visit, patients received baseline examinations and Optune treatment was initiated. The patients were instructed on the operation of Optune and battery replacement. Once the patients were trained in operating the device, they were released to continue treatment at home. Following radiological progression or unacceptable toxicity, TMZ could be replaced with BSC second line chemotherapy. However, Optune could be continued until the second radiological progression, or clinical deterioration, for a maximum of 24 months.

---

[1] The Macdonald criteria divides response into 4 types of response based on imaging (MRI) and clinical features: complete response; partial response; stable disease; progression.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 298 of 631   Document 11-5   4529
EX. 2, P. 137

002215 C2C DIAR_A00000069327 12-19-2015

**Control Arm:** All subjects had baseline examinations performed prior to treatment initiation. Patients were treated with maintenance TMZ according to the standard dosing regimen. Following radiological progression or unacceptable toxicity, TMZ could be replaced with BSC second line therapy.

**Follow Up:** During treatment, all patients were seen once every month at an outpatient clinic where they underwent medical follow-up and routine laboratory exams. Treatment adherence with Optune was recorded by the device, then reviewed and transferred at follow-up visits. A magnetic resonance imaging (MRI) was performed every second month following the baseline MRI until second progression or 24 months (whichever came first), when treatment on both arms of the study was terminated. In the case of clinical progression, an unscheduled MRI was obtained within 1 week after the investigator became aware of the clinical progression. No additional MRIs were required after second progression. Central MRI review was performed by an independent radiologist blinded to the treatment group of each patient. Medical follow-up continued for 2 months after treatment termination in order to capture treatment related toxicities. After these visits, mortality was assessed based on monthly telephone interviews with the patients or the patients' caregivers.

**Study Patients:** The study enrolled 695 of the 700 planned patients between July 2009 and November 2014; Optune/TMZ (n = 466) or TMZ alone (n = 229). Data from the prespecified interim analysis of the first 315 patients with a minimum of 18 months of follow-up included 210 patients in the Optune plus TMZ arm and 105 in the TMZ alone arm. Baseline characteristics were well balanced in both groups. (See Appendix B) An independent data and safety monitoring committee review of the interim data determined that the predefined improvement in PFS and OS had been met and recommended termination of the study. Following FDA approval of the termination, the study was closed to recruitment and patients in the control group were allowed to crossover and receive Optune. A total of 35 patients crossed over. Follow-up for all patients continues; final analysis data are not expected before the end of 2016. The results that follow here are from the interim analysis.

**Analysis Populations:** PFS was analyzed in the intent-to-treat (ITT) population, which included all randomized subjects (Optune/TMZ--210; TMZ alone--105 at the interim analysis). OS was analyzed in the PP population which excluded all patients who 1) never started TMZ maintenance therapy, 2) had major protocol violations, 3) crossed over to the other treatment group, or 4) received Optune outside the protocol (Optune/TMZ=196; TMZ alone=84).

**Treatment Delivery**

The median number of TMZ cycles until evidence of first tumor progression was 6 cycles (range, 1-26 cycles) for patients in the Optune plus TMZ arm and 4 cycles (range, 1-24 months) in the TMZ arm alone. The median duration of treatment with Optune was 9 months (range, 1-58 months). Two-thirds of patients in the Optune plus TMZ arm continued treatment with TTFields after first tumor progression. Three-quarters of

patients receiving Optune complied with therapy, wearing the device >18 hours per day on average for the first 3 treatment months.

## Effectiveness Results:

### Primary Effectiveness Endpoint: Progression Free Survival--ITT Population

The threshold for statistical significance of PFS at the interim analysis was pre-defined as an α level of .01 using a stratified log-rank test. PFS at the interim analysis met this threshold. After a median follow-up of 38 months (range, 18-60 months), the median PFS from randomization was 7.1 months (95% CI, 5.9-8.2 months) in the Optune plus TMZ arm compared with 4.0 months (95% CI, 3.3-5.2 months) in the TMZ only arm. Thus, the addition, of Optune to BSC TMZ extended median PFS by 3.1 months. (See Figure 3.)

### Figure 3. Progression Free Survival: ITT Population



| ITT Population | Optune + TMZ (n=210) | TMZ Alone (n=105) |
|---|---|---|
| Median PFS from randomization, mo | 7.2 | 4.0 |
| 95% CI, mo | 5.9-8.2 | 3.0-4.3 |
| Stratified log-rank | P=0.0013 | |
| HR (95% CI) | 0 621 (0.468-0.823) | |
| Median PFS from diagnosis, mo | 11.0 | 7.8 |

| | 0 | 3 | 6 | 9 | 12 | 15 | 18 | 21 | 24 |
|---|---|---|---|---|---|---|---|---|---|
| Optune + TMZ | 210 | 149 | 94 | 60 | 45 | 35 | 29 | 22 | 16 |
| TMZ | 105 | 55 | 26 | 21 | 15 | 12 | 12 | 8 | 5 |

### Secondary Effectiveness Endpoint: Overall Survival--PP population

OS was a powered secondary analysis in the trial and was to be tested only after the primary endpoint was found to surpass the threshold for significance in the interim analysis. The threshold for superior OS at the interim analysis was predefined in the protocol as an α level of .006 using a stratified log-rank test and was to be tested in the PP population (Optune/ TMZ = 196, TMZ alone = 84). Median OS in the PP population was 20.5 months (95%CI, 16.7-25.0 months) in the Optune plus TMZ arm compared with 15.6 months (95%CI, 13.3-19.1 months) in the TMZ alone arm.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 300 of 631   Document 11-5    4531
EX. 2, P. 139

992211 C2C DIAR_A0000069327 12-19-2018

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 501-4298

novocure

## Figure 4. Overall Survival: PP Population



| PP Population | Optune + TMZ (n=196) | TMZ Alone (n=84) |
|---|---|---|
| Median OS from randomization, mo[1] | 20.5 | 15.6 |
| 95% CI, mo[1] | 16.6-24.9 | 12.9-18.5 |
| Stratified log-rank[1] | P=0.0042 | |
| HR (95% CI)[1] | 0.866 (0.495-0.898) | |
| Median OS from diagnosis, mo[2] | 24.4 | 19.4 |
| 2-year OS[1] | 48% | 32% |

Overall Survival (months)

| | 0 | 6 | 12 | 18 | 24 | 30 | 36 | 42 | 48 | 54 | 60 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Optune + TMZ | 196 | 185 | 139 | 90 | 63 | 42 | 27 | 11 | 6 | 2 | 1 |
| TMZ | 84 | 72 | 55 | 32 | 16 | 9 | 4 | 3 | 3 | 1 | 0 |

In an additional survival analysis of the ITT population, median OS was 19.6 months (95% CI, 16.6-24.4 months) in the Optune plus TMZ arm compared with 16.6 months (95% CI, 13.6-19.2 months) in the TMZ alone arm. Further, the percentage of patients alive at 2 years following enrollment was 43% in the Optune plus TMZ arm compared with 29% in the TMZ alone arm.

**Robustness Analysis:** To assess the robustness of the interim analysis findings, additional analyses on all 695 patients randomized were performed. Baseline characteristics of all patients randomized were similar to the interim data set as were the results for the main endpoints. PFS in the ITT population was 7.1 months (95% CI, 6.1-8.13 months) for the Optune plus TMZ arm and 4.2 months (95% CI, 3.93-5.87 months for the TMZ alone arm. OS in the ITT population also favored Optune treated patients with a median of 19.4 months (95% CI, 16.6-23.9 months) vs. 16.6 months (95% CI, 13.9-18.6 months).

**Safety Results:** The addition of Optune to TMZ in patients with newly diagnosed GBM was not associated with any significant increase in systemic toxic effects compared with TMZ alone. (See **Appendix C**) However, patients receiving Optune did experience a higher incidence of localized skin toxicity (medical device reaction beneath the transducer arrays). Mild to moderate skin irritation was observed in 43% of patients treated with Optune plus TMZ and severe skin reaction (grade 3) noted in 2%. Skin reactions could be managed by using published skin care guidelines for patients receiving Optune. Mild anxiety, confusion, insomnia and headaches were reported more frequently in patients treated with Optune plus TMZ and occurred mainly at the time of therapy initiation. The incidence of seizures was 7% for the Optune plus TMZ arm and

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 301 of 631   Document 11-5
4532
EX. 2, P. 140


novocure

8% in the TMZ alone arm. Twelve patients died of causes considered to be unrelated to treatment, 8 (3.9%) in the Optune plus TMZ arm and 4 (4.0%) in the TMZ alone arm.

**Conclusions:** Results of the interim analysis of the pivotal trial in newly diagnosed GBM show that Optune plus TMZ significantly extends PFS and OS compared to patients receiving TMZ alone. The addition of Optune to BSC TMZ was shown to be safe; no significant increase in serious AEs was seen when Optune treatment was added to TMZ. The most common (≥10%) adverse events involving Optune in combination with TMZ were low blood platelet count, nausea, constipation, vomiting, fatigue, scalp irritation from device use, headache, convulsions, and depression.

## Recurrent GBM

### B] EF-11 Pivotal Study

Stupp et al. (2012) published data from the EF-11 trial, a prospective, multicenter, randomized, active controlled clinical trial designed to compare the safety and effectiveness outcomes of recurrent GBM patients treated with Optune to those treated with BPC chemotherapy (including bevacizumab) selected by the treating physician. A total of 237 patients were enrolled in the study from 28 clinical centers in the US and Europe. The final study analysis compared 120 Optune patients with 117 BPC chemotherapy patients.

The study objectives were:

- To prospectively compare the OS of recurrent GBM patients treated with Optune to those treated with BPC chemotherapy.

- To prospectively determine the median survival, percent one-year survival rate, PFS, PFS6, RR rate and QOL of patients treated with the Optune compared to BPC chemotherapy.

- To collect evidence of the safety of Optune for patients with recurrent GBM using Optune.

Patients with previously diagnosed GBM who had relapsed or progressed despite conventional therapy (surgery and chemo-radiotherapy followed by chemotherapy) were recruited into the study. More than 80% of patients had failed two or more prior lines of chemotherapy and 20% had failed bevacizumab prior to enrollment, a population that usually fares poorly with subsequent treatments. Patients in the treatment arm received continuous Optune treatment at home while maintaining normal daily activity. Chemotherapy treatments used in the control arm were comprised mainly of the following as single agents or in combination: bevacizumab (Avastin) or irinotecan

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 302 of 631    Document 11-5    4533
EX. 2, P. 141

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 501-4298

**novocure**

(mainly in Europe) followed by nitrosureas (BCNU), platinum based chemotherapy (carboplatin), and TMZ. Patients were seen monthly and had an MRI every two months until disease progression. Mean use of Optune was 20.6 hours per day.

Study results are summarized below.

- The pivotal study data establish that Optune therapy is at least comparable to chemotherapy in extending OS for patients with recurrent GBM; 6.6 months vs. 6.0 months.

- The secondary effectiveness endpoint results support the findings of the primary endpoint; they show the Optune device is at least clinically equivalent to active chemotherapy. In summary: PFS for treatment arm was 2.2 mo. vs. 2.1 mo.; PFS6 was 21.4% vs. 15.1%; and radiological response rate (RR) rate was 14.0% vs. 9.6%.

- QOL for patients treated with Optune is significantly improved compared to patients treated with active chemotherapies. Patients in the study arm reported improved cognitive, emotional and role functioning, and a marked improvement in adverse treatment-related symptoms such as nausea and pain.

- In a clinical trial, Optune was shown to be safe and well tolerated with significantly less toxicity than existing treatment options for recurrent GBM. The most common (≥10%) adverse events seen when using Optune alone were scalp irritation from device use and headache. The following adverse reactions were considered related to Optune when using the device alone: scalp irritation from device use, headache, malaise, muscle twitching, fall and skin ulcer.

**Conclusion:** The pivotal study data established that Optune produces clinically comparable outcomes to BPC chemotherapy, including bevacizumab (Roche; Avastin), across both primary OS and secondary effectiveness end-points for recurrent GBM patients. Additionally, Optune therapy results in fewer treatment related adverse events and certain QOL measures were better with Optune than compared to BSC chemotherapy.

## C] Patient Registry Dataset (PRiDe)

Mrugala et al (2014) report on PRiDe a post-marketing registry of patients who received Optune Therapy for recurrent GBM in the U.S. between October 2011 and November 2013. Data were collected from all 457 recurrent GBM patients who began commercial treatment during that period. Age and gender characteristics were similar in the PRiDe and EF-11 trial. OS was collected using the Social Security Death Date Registry and obituaries. Subgroup analyses were performed on patient/clinical characteristics and found to be significantly correlated with OS . A monthly compliance assessment was

performed for each patient using a computer download of an internal log file from the Optune device.

Study findings include the following:

- Median OS for those on Optune therapy was significantly longer in PRiDe than in the EF-11 trial (9.6 mo. vs. 6.6 mo.)
- One- and two-year OS rates for Optune therapy patients were more than double in PRiDe as compared to the EF-11 trial (1-year- 44% vs. 20%; 2-year- 30% vs. 9%).

- No new adverse events were detected in PRiDe. The most common device-related adverse event was a skin irritation beneath the transducer arrays, easily treated with topical corticosteroids.

Major median OS differences in patients registered in PRiDe compared to median OS of those treated with Optune monotherapy in the EF-11 trial led to subgroup analyses to explore reasons for the variation. These analyses suggest there may be several favorable prognostic factors that influence OS in Optune–treated patients. These include: daily compliance ≥75%, Optune therapy initiated at first recurrence, use in Bevacizumab naïve patients , and KPS ≥90.

**Conclusion:** Understanding favorable prognostic factors may assist in appropriate patient selection for Optune

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 304 of 631   Document 11-5      4535
EX. 2, P. 143

002213 C2C DIAR_A0000069327 12-19-2018

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 501-4298

**novocure**

## Appendix A

### FDA Approval Letters

**Newly Diagnosed GBM**
http://www.accessdata.fda.gov/cdrh_docs/pdf10/P100034S013a.pdf

**Recurrent GBM**
http://www.accessdata.fda.gov/cdrh_docs/pdf10/p100034a.pdf

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 305 of 631   Document 11-5   4536
EX. 2, P. 144

## Appendix B

### EF-14 Pivotal Trial Interim Analysis Patient Characteristics

| ITT Population<br>Characteristics | Optune + TMZ<br>(n=210) | TMZ Alone<br>(n=105) |
|---|---|---|
| Median age, years (range) | 57 (20-83) | 58 (21-80) |
| Female sex, n (%) | 70 (33) | 38 (36) |
| Median KPS (range) | 90 (60-100) | 90 (70-100) |
| Extent of resection, n (%) | | |
|   Gross total resection | 135 (64) | 67 (64) |
|   Partial resection | 52 (25) | 27 (26) |
|   Biopsy | 23 (11) | 11(10) |
| MGMT status, n (%) | | |
|   Methylated | 49 (23) | 26 (25) |
|   Unmethylated | 79 (38) | 38 (36) |
|   Insufficient for testing | 24 (11) | 11 (10) |
|   Not assessed | 58 (28) | 30 (29) |
| Median time from diagnosis to randomization, mo (range) | 3.8 (2.0-5.7) | 3.8 (1.4-5.7) |
| Duration of Therapy | | |
| Median number of TMZ cycles, n (range) | 6.0 (1-26) | 4.0 (1-24) |
| Median number of Optune cycles, n (range) | 9.0 (1-58) | 0 (0-0) |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 306 of 631   Document 11-5   4537
EX. 2, P. 145

## Appendix C
## Pivotal Trial Adverse Events—Interim Analysis Population

| Safety Population<br><br>System Organ Class | Optune + TMZ<br>(n=437)<br>n (%) | TMZ Alone<br>(n=207)<br>n (%) |
|---|---|---|
| Blood and lymphatic system disorders | | |
| Thrombocytopenia | 32 (7) | 10 (5) |
| Leukopenia | 8 (2) | 1 (<1) |
| Lymphopenia | 14 (3) | 7 (3) |
| Neutropenia | 8 (2) | 3 (1) |
| Anemia | 5 (1) | 4 (2) |
| General disorders and administration site conditions | | |
| Fatigue | 15 (3) | 7 (3) |
| Asthenia | 7 (2) | 1 (<1) |
| Procedural complications | | |
| Fall | 8 (2) | 1 (<1) |
| Nervous system disorders | | |
| Headache | 10 (2) | 3 (1) |
| Convulsion | 19 (4) | 11 (5) |
| Cognitive disorder | 4 (1) | 4 (2) |
| Hemiparesis | 9 (2) | 1 (<1) |
| Brain edema | 9 (2) | 8 (3) |
| Cerebral hemorrhage | 0 (0) | 4 (2) |
| Respiratory disorders | | |
| Pulmonary embolism | 8 (2) | 7 (3) |

- The most common (≥10%) adverse events involving Optune in combination with TMZ were thrombocytopenia, nausea, constipation, vomiting, fatigue, medical device site reaction, headache, convulsions, and depression

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 307 of 631   Document 11-5   4538
EX. 2, P. 146

# Bibliography
# Optune
### (Formerly NovoTTF-100A)
## Glioblastoma Multiforme (GBM)
#### (Alphabetical by Year)

### Newly Diagnosed GBM

## Clinical Studies

Stupp R, Tallibert S, et al. Maintenance therapy with tumor-treating fields plus temozolomide vs temozolomide alone for glioblastoma; a randomized clinical trial. JAMA 2015; 314(23): 2535-2543.

Stupp R, Wong ET, et al. NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomized phase III trial of a novel treatment modality. *Eur J Cancer* 2012; 48(14): 2192-2202. doi: 10.1016/j.ejca.2012.04.011

## Clinical Reports and Articles

Chaudhry, A, Benson, L, Varshaver, M, et al. NovoTTF™-100A System (Tumor Treating Fields) transducer array layout planning for glioblastoma: a NovoTAL™ system user study. *World Journal of Surgical Oncology*, (2015) 13:316. doi: 10.1186/s12957-015-0722-3

Gutin H, Wong ET. Noninvasive application of alternating electric fields in glioblastoma: a fourth cancer treatment modality. ASCO Educational Book 2012; 126-131.

Lacouture ME, Davis ME, Elzinga G, et al. Characteristics and management of dermatologic adverse events with the NovoTTF-100A System, a novel anti-mitotic electric field device for the treatment of recurrent glioblastoma (rGB). Poster SM-014, Neuro Oncol (2013) 15 (suppl 3)

Mrugala MM, Engelhard HH, et al. Clinical practice experience with NovoTTF-100A™ system for glioblastoma: the patient registry dataset (PRiDe). *Semin Oncol* 2014; 41(suppl 6): S4-S13. doi: 10.1053/j.seminoncol.2014.09.010

Swanson, Lok, Wong, An Overview of Alternating Electric Fields Therapy (NovoTTF Therapy) for the Treatment of Malignant Glioma. Neuro-oncology (LE Abrey, Section Editor) *Current Neurology and Neuroscience Reports,* 16:8. Online Jan 6, 2016

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 308 of 631   Document 11-5   4539
EX. 2, P. 147

002215 C2C DIAR_A0000069327 12-19-2018

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 501-4298

**novocure**

## Abstracts

Stupp R, Kanner A, Engelhard H, et al. A prospective, randomized, open-label, phase III clinical trial of NovoTTF-100A versus best standard of care chemotherapy in patients with recurrent glioblastoma. J Clin Oncol 32, 2014 (suppl; abstr e22239).

Zhu J-J, Pannullo S, Mehdorn M, et al. Quality of Life, Cognitive Function and Functional Status in the EF-14 Trial: a Prospective, Multi-Center Trial of Tumor Treating Fields Together With Temozolomide (TMZ) Compared to TMZ Alone in Patients With Newly Diagnosed GBM. Neuro Oncol. 2015;17 (suppl 5):v9.

## Overview of Technology

Optune (NovoTTF-100A System) Instructions for Use.
http://www.optune.com/Content/pdfs/Optune_IFU_8.5x11.pdf

Summary of Safety and Effectiveness Data for the NovoTTF-100A (SSED), US FDA, 2011. http://www.accessdata.fda.gov/cdrh_docs/pdf10/P100034b.pdf

Avastin (bevacizumab) package insert. South San Francisco, CA: Genentech, Inc.
http://www.gene.com/download/pdf/avastin_prescribing.pdf

GLIADEL® Wafer package insert. Woodcliff Lake, NJ: Eisai, Inc.
http://gliadel.com/hcp/media/_pdfs/prescribing-information-gliadel.pdf

© 2016 Novocure. All rights reserved. Optune, NovoTTF, NovoTAL, and Novocure are trademarks of Novocure.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 309 of 631   Document 11-5   4540
EX. 2, P. 148

ARTICLE IN PRESS

# Clinical Practice Experience With NovoTTF-100A™ System for Glioblastoma: The Patient Registry Dataset (PRiDe)

Maciej M. Mrugala,[a] Herbert H. Engelhard,[b] David Dinh Tran,[c] Yvonne Kew,[d] Robert Cavaliere,[e] John L. Villano,[f] Daniela Annenelie Bota,[g] Jeremy Rudnick,[h] Ashley Love Sumrall,[i] Jay-Jiguang Zhu,[j] and Nicholas Butowski[k]

Recurrent glioblastoma multiforme (GBM) is a highly aggressive cancer with poor prognosis, and an overall survival of 6 to 7 months with optimal therapies. The NovoTTF-100A™ System is a novel antimitotic cancer therapy recently approved for the treatment of recurrent GBM, based on phase III (EF-11) trial results. The Patient Registry Dataset (PRiDe) is a post-marketing registry of all recurrent GBM patients who received NovoTTF Therapy in a real-world, clinical practice setting in the United States between 2011 and 2013. Data were collected from all adult patients with recurrent GBM who began commercial NovoTTF Therapy in the United States between October 2011 and November 2013. All patients provided written consent before treatment was started. Overall survival (OS) curves were constructed for PRiDe using the Kaplan-Meier method. Median OS in PRiDe was compared for patients stratified by average daily compliance ($\geq 75\%$ $v$ $<75\%$ per day) and other prognostic variables. Adverse events were also evaluated. Data from 457 recurrent GBM patients who received NovoTTF Therapy in 91 US cancer centers were analyzed. More patients in PRiDe than the EF-11 trial received NovoTTF Therapy for first recurrence (33% $v$ 9%) and had received prior bevacizumab therapy (55.1% $v$ 19%). Median OS was significantly longer with NovoTTF Therapy in clinical practice (PRiDe data set) than in the EF-11 trial (9.6 $v$ 6.6 months). One- and 2-year OS rates were more than double for NovoTTF Therapy patients in PRiDe than in the EF-11 trial (1-year: 44% $v$ 20%; 2-year: 30% $v$ 9%). First and second versus third and subsequent recurrences, high Karnofsky performance status (KPS), and no prior bevacizumab use were favorable prognostic factors. No unexpected adverse event was detected in PRiDe. As in the EF-11 trial, the most frequent

[a] University of Washington, Seattle, WA.
[b] University of Illinois Hospital and Health Sciences System, Chicago, IL.
[c] Washington University School of Medicine, St. Louis, MO.
[d] Houston Methodist Hospital, Houston, TX.
[e] The Ohio State University, Columbus, OH
[f] University of Illinois, Chicago, IL.
[g] University of California, Irvine Medical Center, Orange, CA.
[h] Neuro-Oncology Program, Cedars-Sinai Medical Center, Los Angeles, CA.
[i] Levine Cancer Institute, Charlotte, NC.
[j] University of Texas Health Science Center at Houston, Houston, TX.
[k] University of California, San Francisco, San Francisco, CA.

Disclosures: The following authors received funding from Novocure clinical trial sponsorship: Herbert H. Engelhard, David Dinh Tran, Yvonne Kew, Robert Cavaliere, Daniela Annenelie Bota, Jeremy Rudnick, Ashley Love Sumrall, Jay-Jiguang Zhu, and Nicolas Butowski. Dr. Maciej Mrugala has received research funding and has served on an advisory board sponsored by Novocure. Dr. John L. Villano, MD, PhD, has been a member of a speakers bureau and has served on an advisory board for Novocure.
Conflicts of interest: Advisory Board, Novocure; research funding: Novocure (EF-14 study).
This supplement was supported by Novocure, Inc., Haifa, Israel. Medical writing service and editorial support were provided by MDOL, Parsippany, NJ.
Address correspondence to Maciej M. Mrugala, MD, University of Washington and Fred Hutchinson Cancer Research Center, 1959 NE Pacific St, Seattle, WA 98195 E-mail: mmrugala@uw.edu
0093-7754/- see front matter
© 2014 Published by Elsevier Inc.
http://dx.doi.org/10.1053/j.seminoncol.2014.09.010

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 310 of 631   Document 11-5   4541
EX. 2, P. 149

002216 C2C DIAR_A000069327 12-19-2019

adverse events were mild to moderate skin reactions associated with application of the NovoTTF Therapy transducer arrays. Results from PRiDe, together with those previously reported in the EF-11 trial, indicate that NovoTTF Therapy offers clinical benefit to patients with recurrent GBM. NovoTTF Therapy has high patient tolerability and favorable safety profile in the real-world, clinical practice setting.

Semin Oncol ▪:▪▪▪-▪▪▪ © 2014 Published by Elsevier Inc.

Glioblastoma multiforme (GBM) is the most aggressive form of human glioma and accounts for approximately 60% to 70% of all malignant gliomas.[1,2] Based on data from the 2013 Central Brain Tumor Registry of the United States (CBTRUS) statistical report on primary brain and CNS tumors in the United States, an estimated 9,600 to 11,200 new cases of GBM will be diagnosed in 2014.[1,2] Virtually all patients with newly diagnosed GBM relapse despite maximal multimodality treatment,[3] with a median time to recurrence of approximately 7 months.[4] The prognosis for patients with recurrent GBM is even worse. The median progression-free survival (PFS) was only 9 weeks in the pre-bevacizumab era.[5] In 2009, bevacizumab received accelerated approval from the US Food and Drug Administration (FDA) for the treatment for recurrent GBM based on two single-arm studies with favorable response rates and PFS data.[1,6,7] Formal phase III data is not available in the recurrent setting, however phase III comparison of bevacizumab versus placebo in newly diagnosed glioblastoma patients failed to demonstrate prolongation of survival with bevacizumab.[1,8] A major challenge in treatment of recurrent GBM, particularly with bevacizumab, is that the tumor eventually develops resistance to the drug. Moreover, bevacizumab-treated tumors may convert to a more aggressive phenotype histologically and exhibit infiltrative tumor growth as observed on magnetic resonance imaging (MRI).[9,10] Furthermore, patients with recurrent GBM who progress following bevacizumab therapy are typically resistant to subsequent cytotoxic chemotherapies.[1,11,12] Therefore, new treatments that can offer a different mechanism of action and potentially overcome resistance of GBM are desperately needed.

The NovoTTF-100A™ System (Novocure, Ltd., Haifa, Israel) is a novel antimitotic cancer therapy approved in 2011 by the US FDA for the treatment of recurrent supratentorial GBM,[13,14] based on the results of a phase III trial comparing NovoTTF Therapy with best chemotherapy according to physician choice.[15] The unique mechanism of action of NovoTTF Therapy involves localized delivery of alternating low-intensity, intermediate-frequency, tumor-treating fields (TTFields) via non-invasive transducer arrays attached to the patient's scalp.[14] In preclinical studies, TTFields have been shown to selectively kill or arrest the growth of rapidly dividing cancer cells including glioblastoma cell lines by disrupting both mitotic spindle formation and normal cytokinesis by interrupting cytoplasmic furrow formation.[16–20]

The pivotal phase III (EF-11) trial that led to FDA approval of the device compared NovoTTF Therapy (n. =.120) with best chemotherapy. according to physician's choice (n = 117) in recurrent GBM patients from 28 institutions in seven countries.[15] More than 80% of patients in the study had failed two or more prior chemotherapies, and 20% had experienced recurrence while on bevacizumab. Seventy-eight percent of the 116 patients who started NovoTTF Therapy completed at least one full-treatment course (4 weeks). The results demonstrated comparable median OS with NovoTTF Therapy compared with chemotherapy (6.6 v 6.0 months; hazard ratio [HR], 0.86; 95% confidence interval [CI], 0.66 to 1.12; $P = .27$), together with fewer severe adverse events (6% v 16%, $P = .022$) and improved quality-of-life measures for the NovoTTF Therapy arm compared with chemotherapy. The most common adverse events with NovoTTF Therapy were mild to moderate skin irritation associated with the transducer arrays. Systemic adverse events commonly associated with chemotherapy were generally absent in patients receiving NovoTTF Therapy.

Given the mechanism of action of TTFields and the results of preclinical studies, optimal device compliance is required for therapeutic effectiveness with NovoTTF Therapy. NovoTTF Therapy does not have a half-life, therefore it requires continuous application to exert a therapeutic effect. This differs from systemic chemotherapy, which exerts anticancer effects between administrations due to the drug pharmacokinetics. Based on modeling of tumor growth kinetics and supporting preclinical and clinical data, NovoTTF Therapy must be administered almost "continuously" for at least 4 weeks in order to halt tumor growth and subsequently demonstrate an objective response.[21,22] Recommended administration of NovoTTF Therapy

is ≥18 hours per day for each 4-week treatment cycle.[21] A post hoc analysis of the phase III trial data recently showed significantly longer median OS in NovoTTF Therapy patients with a maximal monthly compliance rate ≥75% (≥18 hours daily) versus those with a <75% compliance rate (7.7 $v$ 4.5 months, $P$ = .042) (see Kanner in this supplement). A recent responder analysis also demonstrated very high compliance rates >90% in EF-11 responders.[23]

The Patient Registry DataSet (PRiDe) is a registry of 457 recurrent GBM patients who received NovoTTF Therapy in the clinical practice setting on the US commercial prescription-use program between October 2011 and November 2013. Patients treated in clinical trials often differ from those who receive treatment in the real-world setting due to patient selection criteria and frequently represent a less homogenous group. Hence registry data can be an important source of additional information about the efficacy and safety of a newly approved treatment. This report analyzes data from PRiDe to help us better understand the potential benefits of NovoTTF Therapy for patients with recurrent GBM, including analyses of median OS, tolerability, and the relationship between survival and compliance as well as other prognostic factors.

## METHODS

### Patients and Data Collection

PRiDe data were collected from all patients ≥18 years old with recurrent GBM who began commercial treatment with NovoTTF Therapy in the United States between October 2011 and November 2013. All participating patients provided written informed consent to use protected health information to advance the understanding of NovoTTF Therapy. Recurrent GBM was defined as histologically-confirmed, supratentorial GBM (World Health Organization grade IV astrocytoma) with radiologically confirmed evidence of disease progression, as defined by the Macdonald criteria,[24] following treatment with radiotherapy with or without concomitant and/or adjuvant chemotherapy. Patients who received NovoTTF Therapy were not restricted to the number or types of prior therapies or recurrences. Information about combination use of NovoTTF Therapy as part of the prescription-use program was not captured. Therefore some patients may have received combination therapy (chemotherapy or anti-vascular endothelial growth factor [VEGF] agents) rather than monotherapy.

Baseline characteristics were assessed by manual patient chart review. OS was collected using the Social Security Death Date Registry and obituaries. Novocure started collecting compliance data centrally in January 2013, so such data are only available for under two thirds of patients in the registry. A monthly compliance assessment was performed for each patient by computer download of an internal log file which captures the cumulative amount of time therapy is delivered to the patient. Patient compliance was calculated as the average percentage of each day the system was delivering fields (out of each 24-hour period). In addition, other prognostic factors, such as the number of prior recurrences, age, KPS, prior bevacizumab use, and any debulking surgery were captured and analyzed Adverse events were recorded prospectively according to National Cancer Institute Common Toxicity Criteria. Quality-of-life measures were not assessed in PRiDe.

### Statistical Analysis

The OS and treatment duration curves were constructed using the Kaplan-Meier method. OS in PRiDe was compared to OS for patients receiving NovoTTF Therapy or best chemotherapy in the phase III EF-11 trial (ITT population) using a log-rank (Mantel-Cox) test. Patient or disease characteristics prognostic for survival with NovoTTF Therapy were assessed using a Cox proportional hazards model ($P$ value of .15 for significant interactions). Subgroup analyses were performed on patient/clinical characteristics found to be significantly correlated with OS. A log-rank test was used to compare the relationship between OS and daily compliance (<75% $v$ ≥75%), prior debulking surgery (yes, no), KPS (90–100, 70–80, 10–60), recurrence number (1st, 2nd, 3rd–5th recurrence) and prior bevacizumab use (prior use $v$ naïve).

## RESULTS

### Patient Characteristics

Four-hundred fifty-seven patients with recurrent GBM were treated with NovoTTF Therapy between October 2011 and November 2013 at 91 oncology centers. This population is more than three times the 120 subjects treated with NovoTTF monotherapy, as well as the 117 subjects treated with chemotherapy, in the phase III EF-11 trial, from which we were making a comparison. Baseline patient characteristics are presented in Table 1. Patient characteristics (age and gender) were generally similar in PRiDe and the two treatment groups in the EF-11 trial. Approximately one third of patients treated commercially with NovoTTF Therapy were women, which is an important observation given the perceived cosmetic considerations of head shaving and array placement.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 312 of 631   Document 11-5
4543
EX. 2, P. 151

992217 C2C DIAR_A000969327 12-19-2018

**Table 1.** Baseline Patients and Clinical Characteristics for Patients With Recurrent Glioblastoma Multiforme in PRiDe and EF-11 Trial

| Characteristic | | PRiDe NovoTTF Therapy (n = 457) | EF-11 NovoTTF Therapy (n = 120) | EF-11 Chemotherapy (n = 117) |
|---|---|---|---|---|
| Age (y) | Median (range) | 55 (18–86) | 54 (24–80) | 54 (29–74) |
| Gender | Male | 67.6% | 77% | 62% |
| | Female | 32.4% | 23% | 38% |
| KPS | Median (range) | 80 (10–100) | 80 (50–100) | 80 (50–100) |
| | 10–60 | 19.0% | NA | NA |
| | 70–80 | 46.6% | NA | NA |
| | 90–100 | 30.9% | NA | NA |
| | Unknown | 3.5% | NA | NA |
| Recurrence | Median (range) | 2 (1–5) | 2 (1–5) | 2 (1–4) |
| | First | 33.3% | 9% | 15% |
| | Second | 26.9% | 48% | 46% |
| | Third to Fifth | 27.4% | 43% | 39% |
| | Unknown | 12.5% | 0% | 0% |
| Prior treatments | Bevacizumab | 55.1% | 19% | 18% |
| | RT + temozolomide | 77.9% | 86% | 82% |
| | Debulking surgery | 63.9% | 79% | 85% |
| | Carmustine wafers | 3.7% | NA | NA |

Abbreviations. KPS, Karnofsky performance status; NA, not applicable; RT, radiotherapy.

## Tolerability and Safety

No new adverse events were detected in PRiDe compared to those found in EF-11. The most common device-related adverse events associated with NovoTTF Therapy in the registry were skin reactions/irritation and heat sensations on the scalp beneath the transducer arrays (Table 2). Patients sometimes described these events as "warmth" or "tingling" sensations, none of which were associated with injury to the patient. Systemic adverse events, which were often associated with chemotherapy (eg, gastrointestinal, hematologic, and infectious adverse events), were rare for patients treated with NovoTTF Therapy in the registry.

## Survival Rates

Figure 1 presents Kaplan-Meier curves of OS for patients treated with NovoTTF Therapy in the clinical practice setting (PRiDe) and those who received NovoTTF Therapy or best chemotherapy as part of the EF-11 trial (ITT population). Median OS on NovoTTF Therapy appeared to be markedly longer in PRiDe than in the EF-11 trial (9.6 v 6.6 months). Median OS was also significantly longer with NovoTTF Therapy in PRiDe than with best chemotherapy group in the EF-11 trial (9.6 v 6.0 months). One- and 2-year OS rates for NovoTTF Therapy patients in PRiDe were more than double

those seen with either NovoTTF Therapy or best chemotherapy in the EF-11 trial (Table 3).

Median treatment duration for patients in PRiDe was 4.1 months (95% CI, 3.5–4.8). In comparison, the median treatment duration in the EF-11 study was 2.3 months (95% CI, 2.1– 2.4) for NovoTTF Therapy arm and 2.1 months (95% CI, 2.0–2.9) for best chemotherapy. Figure 2 shows the fraction of NovoTTF Therapy patients still on treatment over time. Roughly 50% were still on NovoTTF Therapy after 4 months from treatment start, and roughly 10% were still on NovoTTF Therapy at 2 years after treatment start.

## Compliance as a Prognostic Factor and Its Relationship to OS

Because of the major difference in the OS in patients registered in PRiDe as compared to the OS of subjects treated with NovoTTF monotherapy in EF-11, we sought to identify the prognostic factors in the former cohort. The first prognostic factor we analyzed was NovoTTF treatment compliance because it was found to be prognostically important in EF-11 in post hoc analysis. Compliance data was collected centrally starting in January 2013 and, therefore, were only available for 287 of the 457 patients (63%) in the registry. The median daily compliance was 70% for patients treated with NovoTTF Therapy in PRiDe (range, 12%–99%). One

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 313 of 631   Document 11-5   4544

EX. 2, P. 152

**Table 2.** Adverse Events in Patients With Recurrent Glioblastoma Multiforme Treated With NovoTTF Therapy in PRiDe

| Adverse event | Percentage of Patients PRiDe (n = 457) |
|---|---|
| Skin reaction | 24.3 |
| Heat sensation | 11.3 |
| Neurological disorder | 10.4 |
| Seizure | 8.9 |
| Electric sensation | 7.7 |
| Headache | 5.7 |
| Pain/discomfort | 4.7 |
| Fall | 3.9 |
| Psychiatric disorder | 2.9 |
| Gastrointestinal disorder | 2.9 |
| Fatigue | 2.5 |
| Vascular disorder | 1.6 |
| Weakness | 1.4 |
| Infections | 1.4 |
| Eye disorder | 1.3 |

hundred twenty-seven (44%) with available data achieved daily compliance of ≥75% of each day, while 160 (56%) had daily compliance of <75%. As illustrated in Figure 3, median OS was significantly longer in patients with a NovoTTF Therapy daily compliance ≥75% than in those with <75% daily compliance (13.5% v 4.0%; HR, 0.43; 95% CI, 0.29–0.63; P <.0001).



**Figure 1.** Kaplan-Meier overall survival (OS) curves for patients with recurrent glioblastoma multiforme treated with NovoTTF Therapy in PRiDe or with NovoTTF Therapy or best chemotherapy in the EF-11 trial.

**Other Prognostic Factors**

The Cox proportional hazards model identified the presence or absence of debulking surgery, number of prior recurrences, compliance, KPS, and prior bevacizumab therapy as significant independent predictors of OS in patients treated with NovoTTF Therapy in PRiDe (P <.15). Table 4 presents log-rank OS testing between patient subgroups in PRiDe for each of these prognostic factors; Figure 4 presents Kaplan-Meier survival curves for these same factors. First, no difference in median OS was observed between patients who did not have surgical debulking and those who did (8.9 v 9.8, respectively; HR, 1.1; 95% CI, 0.8–1.5; P = .7927). Second, recurrent GBM patients treated with NovoTTF Therapy in clinical practice at their first recurrence experienced a significantly longer median OS as compared to patients treated at their second, third, or subsequent recurrence (20 months compared to 8.5 and 4.9 months, respectively; HR, 0.6; 95% CI, 0.4–0.9; p = 0.0271 and HR, 0.3; 95% CI, 0.2–0.5; P <.0001). It should be noted that a greater percentage of patients in PRiDe were at their first recurrence compared with patients treated with NovoTTF Therapy or best chemotherapy in the EF-11 trial (33.3% v 9% and 15%, respectively). In addition, differences were also apparent between patients in PRiDe and those in the EF-11 trial with respect to prior treatments. More than half of NovoTTF Therapy patients in PRiDe had previously received bevacizumab (55.1%), compared with only 19% of NovoTTF monotherapy and 18% of best active chemotherapy cohorts in the EF-11 trial. Third, recurrent GBM patients with KPS ≥90 experienced a near doubling of median OS compared with patients with a KPS of 70–80, median OS 14.8 versus 7.7 months, respectively, HR 0.6 (95% CI, 0.4–0.9), P = .0070. Lastly, the survival of bevacizumab-naïve patients was significantly longer compared to patients who had received prior bevacizumab before starting NovoTTF Therapy, with a respective median OS 13.4 versus 7.2 months, HR 0.5 (95% CI, 0.4–0.7), P <.0001. These data suggest

**Table 3.** One- and 2-Year Survival Rates for Patients With Recurrent Glioblastoma Multiforme Treated With NovoTTF Therapy in PRiDe and EF-11 trial, and With Best Chemotherapy in the EF-11 Trial

| Endpoint | PRiDe NovoTTF Therapy (n = 457) | EF-11 NovoTTF Therapy (n = 120) | EF-11 Chemo-therapy (n = 117) |
|---|---|---|---|
| 1-Year survival | 44% | 20% | 20% |
| 2-Year survival | 30% | 9% | 7% |

002219 C2C DIAR_A9999069327 12-19-2019



**Figure 2.** Fraction of NovoTTF Therapy patients alive by treatment duration (PRiDe).

that, within this heterogeneous group of patients registered in PRiDe, there were many patients who derived significant benefit from NovoTTF Therapy.

## DISCUSSION

The Patient Registry Dataset, or PRiDe, represents 457 unselected patients with recurrent GBM who received NovoTTF Therapy in a real-world, clinical practice setting across 91 cancer centers in the United States between October 2011 and November 2013 No new, unexpected adverse event was detected with NovoTTF Therapy in this cohort. Similar to those found in the EF-11 trial,[15] the most common adverse events associated with NovoTTF Therapy were mild to moderate skin reactions localized to the scalp beneath the transducer arrays. These reactions were easily treated with topical corticosteroids or antibiotics, were not associated with serious injury to the scalp, and typically did not require interruption of treatment. Some patients in PRiDe reported subjective sensations beneath the transducer arrays, often described as "warmth" or "tingling." These heat or electric sensations were captured as adverse events in PRiDe ("skin reactions"), but not in the EF-11 trial. These sensations occur when the contact between transducer arrays and the skin is suboptimal, and usually indicate the presence of hair regrowth. In these instances, re-shaving the head can re-establish optimal contact between the skin and transducer arrays. Furthermore, systemic adverse events commonly observed with chemotherapy were largely absent in patients

treated with NovoTTF Therapy in PRiDe as they were in the EF-11 trial.[15]

Patients receiving NovoTTF Therapy for recurrent GBM demonstrated a median OS of 9.6 months in clinical practice. This compares favorably to the reported median OS for the EF-11 pivotal trial cohort treated with NovoTTF monotherapy, where median OS was 6.6 months, and to OS of patients who received treatments for recurrent GBM in other clinical trials.[25–28] For example, recent reports of median OS in recurrent GBM patients treated with bevacizumab are in the range of 6 to 10.5 months,[7,12,25–27,29] and those treated with temozolomide in the range 6 to 9 months.[30–32] It should be noted that many of the longer term survivals noted in clinical trials of bevacizumab and temozolomide in recurrent GBM included small sample sizes and none were randomized.

The difference between the OS seen in clinical practice and in the EF-11 trial may in part be due the greater percentage of patients with a first GBM recurrence in PRiDe versus patients in the EF-11 study (33.3% v 9%, respectively). This observation is also supported by a prior post hoc analysis of EF-11 that showed a significantly longer median OS in patients treated with NovoTTF Therapy at their first or second recurrence compared to those treated at third or subsequent recurrences. Furthermore, when used as intended (daily compliance ≥75% or ≥18 hours daily), the median OS for patients treated with NovoTTF Therapy in PRiDe was remarkably high at 13.5 months compared to only 4.0 months in those who had suboptimal compliance (daily compliance <75% or <18 hours daily). Kanner et al (see accompanying Kanner article in this supplement)



**Figure 3.**

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 315 of 631   Document 11-5   4546
EX. 2, P. 154

**Table 4.** Results of Subgroup Analyses of Overall Survival (OS) in Patients With Recurrent Glioblastoma Multiforme Treated With NovoTTF Therapy in PRiDe Based on Prognostic Factors Significantly Correlated With OS in the Cox Proportional Hazards

| Variable | Median OS (mo) | Hazard Ratio | P Value |
|---|---|---|---|
| **No. of recurrences** | | | |
| 1st | 20 | — | — |
| 2nd | 8.5 | 0.6 (95% CI, 0.4–0.9) | .0271[a] |
| 3rd–5th | 4.9 | 0.3 (95% CI, 0.2–0.5) | <.0001[b] |
| **Compliance** | | | |
| ≥75% | 13.5 | 0.4 (95% CI, 0.3–0.6) | <.0001 |
| <75% | 4.0 | | |
| **Karnofsky performance status (KPS)** | | | |
| 90–100 | 14.8 | — | — |
| 70–90 | 7.7 | 0.6 (95% CI, 0.4–0.9) | .0070[c] |
| 10–60 | 6.1 | 0.4 (95% CI, 0.2–0.6) | <.0001[d] |
| **Bevacizumab use** | | | |
| Naïve | 13.4 | 0.5 (95% CI, 0.4–0.7) | <.0001 |
| Prior use | 7.2 | | |
| **Debulking surgery** | | | |
| No | 8.9 | 1.1 (95% CI, 0.8–1.5) | .7927 |
| Yes (any surgery) | 9.8 | | |

[a] First recurrence compared to 2nd recurrence.
[b] First recurrence compared to 3rd–5th recurrence.
[c] KPS 90–100 compared to KPS 70–80.
[d] KPS 90–100 compared to KPS 10–60.

recently reported similar findings when re-examining data from the EF-11 trial: median OS was significantly longer with a monthly compliance rate for NovoTTF Therapy ≥75% than <75% (7.7 $v$ 4.5 months, $P$ = .042). The compliance findings from each of these studies are consistent with the mechanism of action of NovoTTF Therapy, which depends on almost continuous administration (≥18 hours per day) for a prolonged period of time (≥4 weeks).[21,22] However, patients in PRiDe who had suboptimal compliance were also found to have lower KPS and were, in general, at later stages of their disease. It is unclear whether they also may have had larger tumors or inadequate social support. Nevertheless, consistent with previous findings, our data suggest that applying NovoTTF Therapy to patients with higher performance status, earlier in their recurrence and ensuring treatment compliance, can maximize clinical benefit.

Additional analyses uncovered other prognostic factors that were important for patients in PRiDe. Of interest, in our subgroup analysis, 55.1% of patients in PRiDe who received prior bevacizumab therapy demonstrated a shorter median OS of 7.2 months, as compared to a median OS of 13.4 months in bevacizumab-naive patients. The shorter survival in patients treated previously with bevacizumab may be a result of acquired tumor resistance and development of a more aggressive phenotype with infiltrative tumor progression on MRI.[9,10] Moreover,

patients with recurrent GBM tumors that progress while on bevacizumab therapy are typically resistant or refractory to subsequent cytotoxic chemotherapy,[1,11,12] and have a median OS of just 2.7 months. Therefore, the PRiDe data suggest that at least a percentage of bevacizumab-resistant tumors remain responsive to NovoTTF Therapy. Future analysis of responders and nonresponders to NovoTTF Therapy will need to include molecular genetic analysis of the tumor (and especially MGMT methylation status), the estimated tumor size (volume) as measured by fluid attenuated inversion recovery sequence on MRI, and more detailed analysis of the extent of resection.

Our analysis of KPS in PRiDe also demonstrated that higher KPS correlated with longer OS. It is unclear at this time whether or not patients who had KPS 90–100 had smaller tumors than the rest of the cohort or perhaps more extensive resections. KPS is often, but not always, a measure of tumor size, particularly the microscopic invasive component of the glioblastoma. Whether or not the median tumor size, as measured by gadolinium-enhanced T1-weighted and/or FLAIR MRI, differ between the subgroup with KPS 90–100 versus 70–90 and 10–60 remains to be determined. Of note, age was not a predictor of OS in the PRiDe dataset when evaluated either by direct correlation (Pearson correlation coefficient) or a Cox proportional hazards model ($P$ = .20). In addition, age was

992213 C2C DIAR_A000969327 12-19-2016





**Figure 4.** Kaplan-Meier overall survival (OS) curves for recurrent glioblastoma multiforme patients treated with NovoTTF Therapy in PRiDe based on (A) recurrence number, (B) Karnofsky performance status (KPS), (C) prior bevacizumab use, and (D) prior debulking surgery, respectively.

not correlated with compliance in the PRiDe (correlation coefficient = 0.02; $P = .37$). Taken in the context of the overall efficacy results, these findings suggest NovoTTF Therapy works well for patients of all ages and that advanced age is not associated with lower compliance. It would also be interesting to know if marital status (or other measures of patient support) influence compliance and survival, but data on marital status were not collected in PRiDe.

Finally, the PRiDe dataset did not capture patients on combination treatments in which additional biologic therapy or chemotherapy were added to

NovoTTF Therapy in a combined regimen. It is possible that the longer survival seen in clinical practice with NovoTTF Therapy compared to NovoTTF monotherapy in the EF-11 trial is a reflection of combination use of NovoTTF Therapy with biological agents or cytotoxic chemotherapy. In fact, preclinical data have suggested that TTFields are additive or even synergistic with chemotherapies in cell culture.[33–35] Therefore, the potential benefits of combining NovoTTF Therapy with other systemic therapies warrant further investigation. A phase III trial of NovoTTF Therapy together with temozolomide compared to temozolomide alone is currently

ongoing in patients with newly diagnosed glioblastoma. The results of this trial will shed light on the possible additive effects of NovoTTF Therapy and systemic chemotherapy.

In summary, PRiDe and the EF-11 trial represent one of the largest datasets of patients with recurrent GBM published to date, containing 700 patients in total, 567 of whom were treated with NovoTTF Therapy. The results, individually and collectively, provide further support for the use of NovoTTF Therapy to treat recurrent, supratentorial GBM. Observations from the post-marketing registry demonstrate that the safety and efficacy observed with NovoTTF Therapy in a clinical trial extend to the real-world, clinical practice setting. Future investigations may need to include NovoTTF Therapy in combination with other recurrent GBM treatments, which together may have additive or synergistic effects on patient outcome.

## Acknowledgments

The final manuscript was written by Maciej M. Mrugala with substantive input from all the coauthors, and with logistical and editorial assistance from MDOL, Inc.

## REFERENCES

1. Ahmed R, Oborski MJ, Hwang M, Lieberman FS, Mountz JM. Malignant gliomas: current perspectives in diagnosis, treatment, and early response assessment using advanced quantitative imaging methods. Cancer Manag Res. 2014;6:149–70.
2. Ostrom QT, Bauchet L, Davis FG, Deltour I, Fisher JL, Langer CE, et al. The epidemiology of glioma in adults: a "state of the science" review. Neurooncology. 2014 (Epub ahead of print).
3. Anton K, Baehring JM, Mayer T. Glioblastoma multiforme: overview of current treatment and future perspectives. Hematol Oncol Clin North Am. 2012;26:825–53.
4. Stupp R, Hegi ME, Mason WP, van den Bent MJ, Taphoorn MJ, Janzer RC, et al. Effects of radiotherapy with concomitant and adjuvant temozolomide versus radiotherapy alone on survival in glioblastoma in a randomised phase III study: 5-year analysis of the EORTC-NCIC trial. Lancet Oncol 2009;10:459–66
5. Wong ET, Hess KR, Gleason MJ, Jaeckle KA, Kyritsis AP, Prados MD, et al. Outcomes and prognostic factors in recurrent glioma patients enrolled onto phase II clinical trials. J Clin Oncol 1999;17:2572–8.
6. Friedman HS, Prados MD, Wen PY, Mikkelsen T, Schiff D, Abrey LE, et al. Bevacizumab alone and in combination with irinotecan in recurrent glioblastoma. J Clin Oncol. 2009;27:4733–40.
7. Vredenburgh JJ, Desjardins A, Herndon JE, 2nd, Marcello J, Reardon DA, Quinn JA, et al. Bevacizumab plus irinotecan in recurrent glioblastoma multiforme. J Clin Oncol. 2007;25:4722–9.
8. Norden AD, Drappatz J, Muzikansky A, David K, Gerard M, McNamara MB, et al. An exploratory survival analysis of anti-angiogenic therapy for recurrent malignant glioma. J Neurooncol. 2009;92:149–55.
9. Ramirez YP, Weatherbee JL, Wheelhouse RT, Ross AH. Glioblastoma multiforme therapy and mechanisms of resistance. Pharmaceuticals (Basel). 2013;6:1475–506.
10. Soda Y, Myskiw C, Rommel A, Verma IM. Mechanisms of neovascularization and resistance to anti-angiogenic therapies in glioblastoma multiforme. J Mol Med (Berl). 2013;91:439–48.
11. Khasraw M, Lassman AB. Advances in the treatment of malignant gliomas. Curr Oncol Rep. 2010;12:26–33.
12. Kreisl TN, Kim L, Moore K, Duic P, Royce C, Stroud I, et al. Phase II trial of single-agent bevacizumab followed by bevacizumab plus irinotecan at tumor progression in recurrent glioblastoma. J Clin Oncol. 2009;27:740–5.
13. Food & Drug Administration (FDA) approval: NovoTTF-100A System-P100034. Available at http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DeviceApprovalsandClearances/Recently-ApprovedDevices/ucm254480.htm.
14. Fonkem E, Wong ET. NovoTTF-100A: a new treatment modality for recurrent glioblastoma. Exp Rev Neurotherapeut. 2012;12:895–9.
15. Stupp R, Wong ET, Kanner AA, Steinberg D, Engelhard H, Heidecke V, et al. NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomised phase III trial of a novel treatment modality. Eur J Cancer. 2012;48:2192–202.
16. Davies AM, Weinberg U, Palti Y. Tumor treating fields: a new frontier in cancer therapy. Ann N Y Acad Sci. 2013;1291:86–95.
17. Gutin PH, Wong ET. Noninvasive Application of Alternating Electric Fields in Glioblastoma: A Fourth Cancer Treatment Modality. Am Soc Clin Oncol Educ Book. 2012;32:126–31.
18. Kirson ED, Dbaly V, Tovarys F, Vymazal J, Soustiel JF, Itzhaki A, et al Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. Proc Natl Acad Sci U S A. 2007;104:10152–7.
19. Kirson ED, Gurvich Z, Schneiderman R, Dekel E, Itzhaki A, Wasserman Y, et al. Disruption of cancer cell replication by alternating electric fields. Cancer Res. 2004;64:3288–95.
20. Pless M, Weinberg U. Tumor treating fields: concept, evidence and future. Exp Opin Invest Drugs. 2011; 20:1099–106.
21. Instructions for Use. NovoTTF-100A system. March 3, 2012.
22. Kirson ED, Wasserman Y, Izhaki A, Mordechovich D, Gurvich Z, Dbaly V, et al. Modeling tumor growth kinetics and its implications for TTFields treatment planning. [abstract]. Neurooncology (Meeting Abstracts). 2010;12(suppl 4) (NO-54).
23. Wong ET, Lok E, Swanson KD, Gautam S, Engelhard HH, Lieberman F, et al. Response assessment of NovoTTF-100A versus best physician's choice chemotherapy in recurrent glioblastoma. Cancer Med. 2014; 3:592–602.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 318 of 631   Document 11-5   4549

EX. 2, P. 157

992229 C2C DIAR_A0009069327 12-19-2018

24. Macdonald DR, Cascino TL, Schold SC, Jr, Cairncross JG. Response criteria for phase II studies of supratentorial malignant glioma. J Clin Oncol. 1990;8: 1277-80.

25. Desjardins A, Reardon DA, Coan A, Marcello J, Herndon JE, 2nd, Bailey L, et al. Bevacizumab and daily temozolomide for recurrent glioblastoma. Cancer. 2012;118:1302-12.

26. Raizer JJ, Grimm S, Chamberlain MC, Nicholas MK, Chandler JP, Muro K, et al. A phase 2 trial of single-agent bevacizumab given in an every-3-week schedule for patients with recurrent high-grade gliomas. Cancer. 2010;116:5297-305.

27. Soffietti R, Trevisan E, Bertero L, Cassoni P, Morra I, Fabrini MG, et al. Bevacizumab and fotemustine for recurrent glioblastoma: a phase II study of AINO (Italian Association of Neuro-Oncology). J Neurooncol. 2014;116:533-41.

28. Weller M, Cloughesy T, Perry JR, Wick W. Standards of care for treatment of recurrent glioblastoma—are we there yet? Neuro Oncol. 2013;15:4-27

29. Nagane M, Nishikawa R, Narita Y, Kobayashi H, Takano S, Shinoura N, et al. Phase II study of single-agent bevacizumab in Japanese patients with recurrent malignant glioma. Jpn J Clin Oncol. 2012;42: 887-95.

30. Archavlis E, Tselis N, Birn G, Ulrich P, Baltas D, Zamboglou N. Survival analysis of HDR brachytherapy versus reoperation versus temozolomide alone: a retrospective cohort analysis of recurrent glioblastoma multiforme. BMJ Open. 2013;3:e002262.

31. Greenspoon JN, Sharieff W, Hirte H, Overholt A, Devillers R, Gunnarsson T, et al. Fractionated stereotactic radiosurgery with concurrent temozolomide chemotherapy for locally recurrent glioblastoma multiforme: a prospective cohort study. Onco Targets Ther. 2014;7:485-90.

32. Omuro A, Chan TA, Abrey LE, Khasraw M, Reiner AS, Kaley TJ, et al. Phase II trial of continuous low-dose temozolomide for patients with recurrent malignant glioma. Neurooncology. 2013;15:242-50.

33. Giladi M, Schneiderman RS, Porat Y, Munster M, Itzhaki A, Mordechovich D, et al. Mitotic disruption and reduced clonogenicity of pancreatic cancer cells in vitro and in vivo by tumor treating fields. Pancreatology. 2014;14:54-63.

34. Kirson ED, Schneiderman RS, Dbaly V, Tovarys F, Vymazal J, Itzhaki A, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). BMC. Med Phys. 2009;9:1.

35. Schneiderman RS, Shmueli E, Kirson ED, Palti Y. TTFields alone and in combination with chemotherapeutic agents effectively reduce the viability of MDR cell sub-lines that over-express ABC transporters. BMC Cancer 2010;10:229.

Curr. Treat. Options in Oncol. (2015) 16:40
DOI 10.1007/s11864-015-0353-5

Neuro-oncology (CJ Lesser, Section Editor)

# An Evidence-Based Review of Alternating Electric Fields Therapy for Malignant Gliomas

Eric T Wong, M.D.[1,2,*]
Edwin Lok, M.S.[1]
Kenneth D. Swanson, Ph.D.[1]

Address
[*,1]Brain Tumor Center and Neuro-Oncology Unit, Beth Israel Deaconess Medical Center, Harvard Medical School, 330 Brookline Avenue, Boston, MA 02215, USA
Email: ewong@bidmc.harvard.edu
[2]Department of Physics, University of Massachusetts in Lowell, Lowell, MA, USA

© The Author(s) 2015. This article is published with open access at Springerlink.com

This article is part of the Topical Collection on *Neuro-oncology*

Keywords Alternating electric fields · Malignant gliomas · Glioblastoma · Review

## Opinion statement

Glioblastoma is a deadly disease and even aggressive neurosurgical resection followed by radiation and chemotherapy only extends patient survival to a median of 1.5 years. The challenge in treating this type of tumor stems from the rapid proliferation of the malignant glioma cells, the diffuse infiltrative nature of the disease, multiple activated signal transduction pathways within the tumor, development of resistant clones during treatment, the blood brain barrier that limits the delivery of drugs into the central nervous system, and the sensitivity of the brain to treatment effect. Therefore, new therapies that possess a unique mechanism of action are needed to treat this tumor. Recently, alternating electric fields, also known as tumor treating fields (TTFields), have been developed for the treatment of glioblastoma. TTFields use electromagnetic energy at an intermediate frequency of 200 kHz as a locoregional intervention and act to disrupt tumor cells as they undergo mitosis. In a phase III clinical trial for recurrent glioblastoma, TTFields were shown to have equivalent efficacy when compared to conventional chemotherapies, while lacking the typical side effects associated with chemotherapies. Furthermore, an interim analysis of a recent clinical trial in the upfront setting demonstrated superiority to standard of care cytotoxic chemotherapy, most likely because the subjects' tumors were at an earlier stage of clonal evolution, possessed less tumor-induced immunosuppression, or both. Therefore, it is likely that the efficacy of TTFields can be increased by combining it with other anti-cancer treatment modalities.

Published online: 05 July 2015

992221 C2C DIAR_A9999969327 12-19-2919

40    Page 2 of 11    Curr. Treat. Options in Oncol (2015) 16:40

## Introduction

Tumor treating fields (TTFields) represent a novel treatment modality for cancer that utilizes alternating electric fields at an intermediate frequency of 200 kHz. At this specific' frequency, TTFields have been shown to penetrate into the head from the surface of the scalp. Computational modeling also showed that the fields are distributed inhomogeneously within the supratentorial regions of the brain, and they tend to become intensified near the ventricles [1•]. At the cellular level, the electromagnetic energy perturbs proteins that have large dipole moments. Cells treated with TTFields exhibited a variety of abnormalities indicative of mitotic catastrophe and aberrant mitotic exit, including cells in polyploidy prophase, rosettes, multi-spindled metaphase, single-spindled metaphase, and asymmetric anaphase [2]. Indeed, cells exhibit violent membrane blebbing as they enter anaphase and attempt to divide. This results in aberrant mitotic exit and subsequent cell death [3••]. Some of the proteins that are critical for the proper progression through mitosis have sufficiently high dipole moments to suggest that they may be targets of TTFields, including the mitotic septin complex and the α/β-tubulin monomeric subunit of tubulin. Septins constitute a family of GTP-binding proteins and septin 2, 6, and 7 oligomerize into a heterotrimer with an extremely large dipole moment of 2711 Debyes [4]. Importantly, this septin complex is required for functions that are necessary for the later stages of cell division. Septin 2, 6, and 7 heterotrimers rapidly polymerize and structurally organize within the cytokinetic furrow as cells exit metaphase.

Once it is recruited, it then organizes contractile elements within the cytokinetic furrow above the equatorial cleavage plane by binding to F-actin filaments and spatially regulates myosin activation. RNAi-directed depletion of septin subunits of the heterotrimer results in mitotic catastrophe similar to that seen when cells attempt to divide in the presence of TTFields [5]. We have shown that TTFields disrupt the ability of septins to re-localize to the cytokinetic furrow and reduce the accumulation of F-actin [3••]. Therefore, TTFields affect tumor cells by interfering with their ability to complete mitosis by exerting electromagnetic induction forces that interfere with the function of proteins with high dipole moments [2, 3••].

TTFields therapy has been shown to have equivalent efficacy when compared to the best physician's choice chemotherapy in a registration phase III clinical trial for recurrent glioblastoma [6]. This led to the FDA approval on April 8, 2011 for recurrent glioblastoma [Http://Www.Accessdata.Fda.Gov/Cdrh_Docs/Pdf10/P100034a.Pdf]. Interim analysis of the most recent phase III study in the newly diagnosed setting showed a significant improvement of outcomes leading to a crossover of subjects from the control arm to the experimental arm of the trial [7]. Here, we review our current understanding of the mechanisms of TTFields therapy, particularly from the physics and cell biology perspectives, as well as the available clinical data when it is applied to the treatment of glioblastoma.

# Electric field distribution within the brain

At a frequency of 200 kHz, the electric fields from the surface of the scalp can permeate into the brain. This is because the penetration of electromagnetic waves through any medium is frequency dependent. Past analyses have shown that the permittivity values were similar among the calvarial bone, gray matter, and white matter, while the conductivity values varied somewhat among these three structures [8].

The electric field intensity was directly measured in a patient receiving TTFields therapy while undergoing surgery for obstructive hydrocephalus from a large pineal meningioma at the Rambam Medical Center in Haifa, Israel. The measured intensity of electric field was validated to within 10 % of the simulated value using finite element method simulation [9].

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 321 of 631    Document 11-5    4552

EX. 2. P. 160

Curr. Treat. Options in Oncol. (2015) 16:40

Page 3 of 11 40

Using finite element analysis, 3-dimensional mapping of the electric field distribution within the brain revealed inhomogeneous distribution of the fields, with a higher field strength near the ventricular horns that is most likely a result of the high conductivity of the cerebrospinal fluid (Fig. 1).

# Cell biology effects of alternating electric fields on dividing tumor cells

TTFields disrupt the mitotic process in dividing tumor cells that results in violent membrane blebbing [3••, 10]. This results in the disordering of chromosomes from the metaphase plate during late metaphase or early anaphase, followed by aberrant mitotic exit in the absence of cytokinesis resulting in multinucleated cells and subsequent apoptosis [3••].

The septin 2, 6, and 7 family members heterotrimerize into a protein complex that possesses an extremely large dipole moment of 2711 Debyes, and it is active in mitosis [4]. This complex serves to regulate contractile function within the cytokinetic furrow, and it is likely to provide tensile strength needed within the submembranous cortical cytoskeleton to restrain the hydrostatic pressures within the cytoplasm during cell division. It has been shown to be a target of alternating electric fields, and the disruption of this protein results in disordered segregation of chromosome and cytoplasmic contents [3••].

Following TTFields-induced aberrant mitotic exit, cells exhibit signs of cellular stress that mark them for immune destruction and facilitate immune activation. Specifically, this type of cellular stress causes increased cell surface expression of the endoplasmic reticulum chaparonin calreticulin and the secretion of HMGB1 that acts as a danger signal when released from cells [11]. The presence of calreticulin on the plasma membrane is also seen in virally infected cells, as well as tumor cells exposed to certain chemotherapy agents [12]. This has been termed "immunogenic cell death" to differentiate it from apoptosis, which is immunosuppressive. Immunogenic cell death leads to tumor destruction.

There is a compelling evidence that TTFields increase the anti-tumor immunogenicity in vivo. When highly metastatic VX-2 tumors were injected into the kidney capsule of rabbits and treated with TTFields for 7 days then allowed to grow for an additional 21 days, the number of pulmonary metastases was significantly reduced when compared to untreated control animals [13]. When the lung metastases were recovered from animals, there was increased infiltration of immune cells in the TTFields-treated metastases as compared with the non-treated ones [14].

# Treatment

The management of malignant gliomas should be undertaken in a multimodal fashion, with neurosurgical input, radiation oncology expertise, and chemotherapy administration. Now, with the availability of alternating electric fields therapy as a fourth modality of treatment, neuro-oncologists will need to factor in this therapy within the spectrum of available treatments. For newly diagnosed malignant gliomas, maximal safe neurosurgical resection is still

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 322 of 631   Document 11-5

EX. 2, P. 161

4553

992222 C2C DIAR_A0009069327 12-19-2013



**Fig. 1.** A 3-dimensional render of a human head with TTFields clinically applied via electrode arrays on a glioblastoma patient whose gross tumor volume is on the right side. **a** Streamlines showing the magnitude of the electric field and direction of the current emanating from each electrode on the surface of the scalp. **b** *Red arrows* indicating vector field of the electric field distribution inside the brain. The intracranial electric fields are displayed in **c** axial and **d** coronal planes. **e** TTFields induce a force on the septin 2, 6, and 7 complex that has an extremely large dipole moment of 2711 Debyes. **f** This results in mitotic catastrophe and aberrant mitotic exit, leading to an increased cell surface expression of the endoplasmic reticulum chaperonin calreticulin and the secretion of HMGB1 that acts as a danger signal when release from cells, both of which are essential for immunogenic cell death.

recommended and resection accomplishes two goals of establishing a histological diagnosis and achieving cytoreduction. Although it has not been subjected to a randomized clinical trial, the best evidence for a benefit of cytoreduction is based on a retrospective analysis showing a 4.2-month survival advantage in patients with at least a 98 % resection versus those with less than 98 % [15]. However, if safe resection is not possible, biopsy to obtain a histological diagnosis is still indicated. Once a diagnosis of glioblastoma is established, patients proceed to standard of care treatment, which consists of external beam, involved-field cranial radiotherapy plus concomitant daily temozolomide, followed by 6 cycles of adjuvant temozolomide [16]. Alternatively, patients may be enrolled in a clinical trial at initial diagnosis and, depending on the conduct of the trial, may either receive treatment independently or in conjunction with standard of care treatment. Although upfront treatment can provide a period of stabilization for the glioblastoma, recurrence is the rule and additional treatments are typically needed to control tumor progression, alleviate neurological deficits, or both.

At the time of tumor recurrence, patients with a Karnofsky performance score of 70 or higher may be eligible for clinical trials. Those who are ineligible can be treated with single-agent bevacizumab or TTFields therapy since both were approved by the FDA for recurrent glioblastoma in 2009 and 2011, respectively. The benefit of bevacizumab was based on two single-arm phase II studies demonstrating a radiographic response rate of 30–40 % [17, 18]. However, infiltrative glioblastoma is the typical pattern of relapse and salvage chemotherapy after bevacizumab failure only offered a median overall survival of 5.2 months and progression-free survival of 2.0 months [19]. Therefore, alternative treatments are desperately needed for this population and TTFields therapy was demonstrated to have equivalent efficacy when compared to chemotherapy in this setting [6]. However, the optimal use of this device and its combination with conventional treatments are awaiting further investigation. Here, we review the currently available clinical data when it is applied to the treatment of glioblastoma, which is also summarized in Table 1.

# TTFields therapy for recurrent glioblastoma

At present, the only indication approved by the FDA is for the treatment of recurrent glioblastoma. This is based on the registration phase III clinical trial (ClinicalTrials.gov: NCT00379470) demonstrating equivalent efficacy between TTFields therapy and best physician's choice chemotherapy (based on the best available treatment as offered by the treating physician) [6].

The primary endpoint of the trial was overall survival, and the median overall survival was 6.6 months for TTFields ($n=120$) versus 6.0 months for the best physician's choice chemotherapy ($n=117$), with a hazard ratio of 0.86 (95 % CI 0.66–1.12; $P=0.27$). It is notable that 31 % of the BPC cohort received bevacizumab alone or in combination with chemotherapy. The median progression-free survival of TTFields and the best physician's choice chemotherapy was 2.2 and 2.1 months, respectively, with a hazard ratio of 0.81 (95 % CI 0.60–1.09; $P=0.16$), and the progression-free survival at 6 months was 21.4 % (95 % CI 13.5–29.3) and 15.1 % (95 % CI 7.8–22.3), respectively ($P=0.13$). One year survival rate was 20 % in both cohorts.

902223 C2C DIAR_A0000069327 12-19-2019

**Table 1. Summary of clinical data on TTFields treatment for malignant gliomas**

| Phase III trial for newly diagnosed glioblastoma interim analysis | TTfields treatment + temozolomide | Temozolomide alone | Hazard ratio | P |
|---|---|---|---|---|
| Overall survival, median[a] | 19.6 months | 16.6 months | 0.75 | 0.03 |
| Progression-free survival[a] | 7.1 months | 4.0 months | 0.63 | <0.01 |
| Phase III recurrent glioblastoma | TTfields treatment (n=120) | Active chemotherapy (n=117) | | |
| Overall survival, median[b] | 6.6 months | 6.0 months | 0.86 (95 % CI 0.66–1.12) | 0.27 |
| 1-year survival | 20 % | 20 % | | |
| 2-year survival | 8 % | 4 | | |
| 3-year survival | 5 % | 1 % | | |
| Prognostic factors, median overall survival[c] | | | | |
| Prior bevacizumab failure | 6.0 months (n=23) | 3.3 months (n=21) | 0.43 (95 % CI 0.22–0.85) | 0.02 |
| Prior low-grade glioma | 25.3 months (n=12) | 7.7 months (n=9) | 0.31 (95 % CI 0.09–0.99) | 0.05 |
| Tumor size ≥18 cm³ | 5.6 months (n=39) | 3.3 months (n=41) | 0.53 (95 % CI 0.32–0.85) | <0.01 |
| Karnofsky performance status ≥80 | 7.9 months (n=83) | 6.1 months (n=77) | 0.71 (95 % CI 0.51–0.99) | 0.05 |
| TTfields treatment versus bevacizumab | 6.6 months (n=120) | 4.9 months (n=36) | 0.64 (95 % CI 0.41–0.99) | 0.05 |
| Progression-free survival, median[b] | 2.2 months | 2.1 months | 0.81 (95 % CI 0.60–1.09) | 0.13 |
| PFS at 6 months | 21 % | 15 % | | |
| Responders[d] | 14 | 7 | | |
| Response status, median overall survival | | | | |
| Partial and complete response versus | 24.7 months (n=14) | | 0.28 (95 % CI 0.14–0.58) | <0.01 |
| Stable disease | 7.6 months (n=34) | | | |
| Progressive disease | 5.5 months (n=59) | | 0.24 (95 % CI 0.14–0.42) | <0.01 |
| Prognostic factor in TTFields treatment responders[e] | | | | |
| Overall survival, median | | | | |
| With prior low-grade glioma | 27.7 months | | | |
| Without prior low-grade glioma | 16.6 months | | | 0.05 |
| Daily dexamethasone dose, median | | | | |
| Responders | 1.0 mg | | | |
| Nonresponders | 5.2 mg | | | <0.01 |
| Cumulative dexamethasone dose, median | | | | |
| Responders | 7.1 mg | | | |
| Nonresponders | 261.7 mg | | | <0.01 |
| Treatment-related adverse events, ≥grade 2[b,f] | | | | |
| Hematological | 3 % | 17 % | | |
| Gastrointestinal | 4 % | 17 % | | |
| Dermatological | 2 % | 0 % | | |
| Nervous system disorders | 30 % | 28 % | | |
| Recurrent glioblastoma from patient registry data set (PRiDe) | PRiDe TTFields treatment (n=457) | EF-11 TTfields treatment (n=120) | | |
| Survival[g] | | | | |
| 1-year survival | 44 % | 20 % | | |
| 2-year survival | 30 % | 9 % | | |

EX. 2, P. 164

## Table 1. (Continued)

| Prognostic factors, median overall survival[g] | TTFields treatment + temozolomide | Temozolomide alone | Hazard ratio | P |
|---|---|---|---|---|
| **Phase III trial for newly diagnosed glioblastoma interim analysis** | | | | |
| Number of prior recurrences | | | | |
| First recurrence versus | 20 months | | | |
| Second recurrence | 8.5 months, HR=0.6 | | | |
| | (95 % CI 0.4–0.9), P=0.03 | | | |
| Third to fifth recurrence | 4.9 months, HR=0.3 | | | |
| | (95 % CI 0.2–0.5), P<0.01 | | | |
| Compliance | | | | |
| <75 % versus | 4.0 months | | | |
| ≥75 % | 13.5 months, HR=0.4 | | | |
| | (95 % CI 0.3–0.6), P<0.01 | | | |
| Karnofsky performance status | | | | |
| 90–100 versus | 14.8 months | | | |
| 70–90 | 7.7 months, HR=0.6 | | | |
| | (95 % CI 0.4–0.9), P<0.01 | | | |
| 10–60 | 6.1 months, HR=0.4 | | | |
| | (95 % CI 0.2–0.6), P<0.01 | | | |
| Prior bevacizumab use | | | | |
| No versus | 13.4 months | | | |
| Yes | 7.2 months, HR=0.5 | | | |
| | (95 % CI 0.4–0.7), P<0.01 | | | |
| Prior debulking surgery | | | | |
| No versus | 8.9 months | | | |
| Yes | 9.8 months, HR=1.1 | | | |
| | (95 % CI 0.8–1.5), P=0.79 | | | |

[a]Stupp R, Wong E, Scott C, et al. Neuro-Oncol 2014;16(Suppl 5):v167
[b]Stupp R, Wong ET, Kanner AA, et al. Eur J Cancer 2012;48:2192-2202
[c]Kanner AA, Wong ET, Villano JL, et al. Semin Oncol 2014;41(Suppl 6):S25-S34
[d]Vymazal J, Wong ET. Semin Oncol 2014;41(Suppl 6):S14-S24
[e]Wong ET, Lok E, Swanson KD, et al. Cancer Med 2014;3:592-602
[f]Lacouture ME, Davis ME, Elzinga G, et al. Semin Oncol 2014;41(Supple 4):S1-S14
[g]Mrugala MM, Engelhard HH, Tran DD, et al. Semin Oncol 2014;41(Supple 6):S4-S13

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 326 of 631   Document 11-5
EX. 2, P. 165
4557

002224 C2C DIAR_A0000069327 12-19-2013

The most common toxicity associated with the device was grade 1 or 2 scalp irritation at a rate of 16 %, but none had severity of grade 3 or 4. The scalp irritation can be managed by applying topical corticosteroid and by shifting of the arrays slightly during each array exchange [20]. The most important advantage associated with the TTFields therapy device, when compared to chemotherapy, is that it has far fewer grade 2 or greater hematological toxicities, 3 versus 17 %, respectively, and fewer adverse gastrointestinal events, 4 versus 17 %, respectively.

Analysis of quality of life demonstrated that patient treated with the device had better cognitive and emotional functions than those treated with chemotherapy while appetite loss, constipation, diarrhea, fatigue, nausea, vomiting, and pain were more often seen in patients treated with chemotherapy. Based on the equivalent efficacy results and the lack of serious toxicities, the TTFields therapy device was approved by US FDA on April 8, 2011 for the treatment of recurrent glioblastoma.

Post hoc analysis showed that a higher proportion of responders had secondary glioblastoma than nonresponders [21••]. Five of the 14 responders (36 %) treated with TTFields monotherapy had prior low-grade histology while none of the seven responders (0 %) treated with the best physician's choice chemotherapy did.

The analysis also showed that responders used less dexamethasone than nonresponders [21••]. In the TTFields therapy cohort, the median daily dexamethasone dose used was 1.0 mg for responders versus 5.2 mg for nonresponders (P=0.0019) and the median cumulative dexamethasone dose was 7.1 mg for responders versus 261.7 mg for nonresponders (P<0.0001). In the best physician's choice chemotherapy cohort, the median daily dexamethasone dose used was 1.2 mg for responders versus 6.0 mg for nonresponders (P=0.0041) and the median cumulative dexamethasone dose was 348.5 mg for responders versus 242.3 mg for nonresponders (P=0.9520). These data suggest that concurrent dexamethasone use may influence the efficacy of TTFields therapy.

## TTFields therapy as used in clinical practice

Patients who received treatment from the TTFields device in clinical practice may have different clinical characteristics and outcomes from those who participated in the registration trial. To determine whether or not this is the case, a patient registry dataset (PRiDe) was developed in an effort to capture clinical practice data pertaining to the use of TTFields therapy. At the time of publication, this dataset included 457 patients from 91 treatment centers in the USA [22•].

The median OS was 9.6 months among patients treated in PRiDe as compared to 6.6 months in the TTFields monotherapy arm in the phase III trial while the 1-year OS rate was also longer at 44 % as compared to 20 %, respectively [6, 22•]. It is important to note that some patients in PRiDe may have used other treatments, such as conventional cytotoxic chemotherapy, bevacizumab, or even alternative medicine, in conjunction with TTFields therapy, but this aspect of treatment was not adequately captured because this dataset is from a registry.

About 33 % of patients at their first glioblastoma recurrence used TTFields therapy as compared to only 9 % in the registration phase III clinical trial [22•].

Favorable prognostic factors for patient survival include treatment with TTFields therapy at first or second relapses versus third or later recurrences, as well as no prior bevacizumab use [22•].

# TTFields therapy for newly diagnosed glioblastoma

TTFields therapy is currently being tested in a randomized phase III clinical trial for subjects with newly diagnosed glioblastoma (NCT0916409). The goal of this study is to compare the efficacy of TTFields plus adjuvant temozolomide versus adjuvant temozolomide alone by randomizing the subjects to the respective treatment arms in a 2:1 fashion, after the completion of initial treatment with radiation and concomitant daily temozolomide [16]. The primary endpoint is progression-free survival, and the secondary endpoints are overall survival, progression-free survival at 6 months, survival at 1 and 2 years, as well as quality of life assessment. So far, all 700 pre-specified subjects have been enrolled and randomized.

In a pre-specified interim analysis of the first 315 subjects after a minimum follow-up of 18 months, the intent-to-treat cohort received TTFields plus temozolomide ($n=210$) had a longer progression-free survival than the cohort treated with temozolomide alone ($n=105$), median 7.1 (95 % CI 5.9–8.2) months versus 4.0 (95 % CI 3.0–4.3) months (HR=0.63, Log rank $P=0.0014$). The median overall survival also favors the TTFields plus temozolomide group, 19.6 (95 % CI 16.5–24.1) months versus 16.6 (95 % CI 13.5–19.1) months, respectively (HR=0.75, Log rank $P=0.034$), as well as the per protocol population that started the second cycle of treatment, 20.5 (95 % CI 16.5–24.1) months ($n=196$) versus 15.5 (95 % CI 13.5–19.1) months ($n=84$), respectively (HR=0.67, Log rank $P=0.0042$).

There were no unexpected adverse events between the TTFields plus temozolomide and the temozolomide alone cohorts, and respective grade 3 and 4 hematological toxicities (12 versus 9 %), gastrointestinal disorders (5 versus 2 %), and convulsions (7 versus 7 %) were similar. Scalp reaction, however, was more common in the device-treated cohort, 49 % for grades 1 and 2 as well as 7 % for grade 3 and 4 toxicities, than the temozolomide-only cohort, 5 % for grade 1 and 2 toxicities as well as 5 % for grade 3 and 4 toxicities.

The follow-up of the remaining trial subjects will most likely mature in another year such that final data from the trial will be available by the end of 2016.

# Additional investigational studies of TTFields therapy for the central nervous system or other malignancies

Combinations with TTFields are being studied in patients with recurrent glioblastoma including bevacizumab (NCT01894061) and bevacizumab together with hypofractionated stereotactic irradiation (NCT01925573).

TTFields therapy is currently being investigated in patients with other types of central nervous system malignancies, including its use for recurrent atypical and anaplastic meningiomas (NCT01892397), as well as in those patients with 1–5 brain metastases from non-small cell lung cancer (NCT01755624).

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 328 of 631   Document 11-5    4559

EX. 2, P. 167

992225 C2C DIAR_A9999069327 12-19-2018

TTFields therapy is also being investigated in systemic malignancies, including its use in combination with gemcitabine for advanced pancreatic adenocarcinoma (NCT01971281), in combination with paclitaxel in recurrent ovarian carcinoma (NCT02244502), as well as in combination with pemetrexed and cisplatin or carboplatin for malignant pleural mesothelioma (NCT02397928).

## Compliance with Ethics Guidelines

### Conflict of Interest

Eric T Wong received an unrestricted grant from Novocure for the investigation of the cell biology effects of TTFields; participated in the registration trial for recurrent glioblastoma and the PRiDe dataset; and has received sponsored clinical research through grants from AngioChem, AstraZeneca, Cephalon, Eli Lilly, Northwest Biotherapeutics, Novartis, Pfizer, and Plexxikon.

Edwin Lok declares that he has no conflict of interest.

Kenneth D. Swanson received an unrestricted grant from Novocure for the investigation of the cell biology effects of TTFields and has also received a reimbursement for travel expenses for training on use of laboratory equipment and an honorarium for a lecture at Novocure headquarters to present the results of basic research studies.

### Human and Animal Rights and Informed Consent

This article does not contain any studies with human or animal subjects performed by any of the authors.

## Open Access

This article is distributed under the terms of the Creative Commons Attribution 4.0 International License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons license, and indicate if changes were made.

## References and Recommended Reading

Papers of particular interest, published recently, have been highlighted as:
•    Of importance
••   Of major importance

1.•   Miranda PC, Mekonnen A, Salvador R, Basser PJ. Predicting the electric field distribution in the brain for the treatment of glioblastoma. Phys Med Biol. 2014;59(15):4137–47.
This paper demonstrated the computed electric fields distribution from TTFields therapy within the brain.

2.   Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of cancer cell replication by alternating electric fields. Cancer Res. 2004;64(9):3288–95.

3.••   Gera N, Yang A, Holtzman T, Lee SX, Wong ET, Swanson KD. Tumor treating fields perturb the localization of septins and cause aberrant mitotic exit. PLOS One (2015) doi:10.1371/journal.pone.0125269.
This study demonstrated that septin 2, 6 and 7

complexes likely constitute the major intracellular target of TTFields. It also demonstrated that mitotic disruption occurred during anaphase and resulted in aberrant mitosis and subsequent p53 dependent cell cycle arrest and apoptosis suggesting a possible role for individual patient tumor genetics in TTFields response.

4.   Felder CE, Prilusky J, Silman I, Sussman JL. A server and database for dipole moments of proteins. Nucleic Acids Res. 2007;35(Web Server issue):W512–21.

5.   Gilden JK, Peck S, Chen YC, Krummel MF. The septin cytoskeleton facilitates membrane retraction during motility and blebbing. J Cell Biol. 2012;196(1):103–14.

6.  Stupp R, Wong ET, Kanner AA, et al. NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomised phase III trial of a novel treatment modality. Eur J Cancer. 2012;48(14):2192–202.

7.  Stupp R, Wong ET, Scott C, et al. Interim analysis of the EF-14 trial: a prospective, multi-center trial of NovoTTF-100A together with temozolomide compared to temozolomide alone in patients with newly diagnosed GBM. Neuro-Oncology. 2014;16 Suppl 5:v167.

8.  Gabriel C, Gabriel S, Corthout E. The dielectric properties of biological tissues: I. Literature survey. Phys Med Biol. 1996;41(11):2231–49.

9.  Kirson ED, Dbaly V, Tovarys F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. Proc Natl Acad Sci U S A. 2007;104(24):10152–7.

10. Lee SX, Wong ET, Swanson KD. Mitosis interference of cancer cells during anaphase by electric field from NovoTTF-100A. Neuro-Oncology. 2011;13 Suppl 3:iii13–4.

11. Chaput N, De Botton S, Obeid M, et al. Molecular determinants of immunogenic cell death: surface exposure of calreticulin makes the difference. J Mol Med (Berl). 2007;85(10):1069–76.

12. Obeid M, Tesniere A, Ghiringhelli F, et al. Calreticulin exposure dictates the immunogenicity of cancer cell death. Nat Med. 2007;13(1):54–61.

13. Kirson ED, Schneiderman RS, Dbaly V, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). BMC Med Phys. 2009;9:1.

14. Kirson ED, Giladi M, Gurvich Z, et al. Alternating electric fields (TTFields) inhibit metastatic spread of solid tumors to the lungs. Clin Exp Metastasis. 2009;26(7):633–40.

15. Lacroix M, Abi-Said D, Fourney DR, et al. A multivariate analysis of 416 patients with glioblastoma multiforme: prognosis, extent of resection, and survival. J Neurosurg. 2001;95(2):190–8.

16. Stupp R, Hegi ME, Mason WP, et al. Effects of radiotherapy with concomitant and adjuvant temozolomide versus radiotherapy alone on survival in glioblastoma in a randomised phase III study: 5-year analysis of the EORTC-NCIC trial. Lancet Oncol. 2009;10(5):459–66.

17. Friedman HS, Prados MD, Wen PY, et al. Bevacizumab alone and in combination with irinotecan in recurrent glioblastoma. J Clin Oncol Off J Am Soc Clin Oncol. 2009;27(28):4733–40.

18. Kreisl TN, Kim L, Moore K, et al. Phase II trial of single-agent bevacizumab followed by bevacizumab plus irinotecan at tumor progression in recurrent glioblastoma. J Clin Oncol Off J Am Soc Clin Oncol. 2009;27(5):592–602.

19. Iwamoto FM, Abrey LE, Beal K, et al. Patterns of relapse and prognosis after bevacizumab failure in recurrent glioblastoma. Neurology 2009;73(15):1200–1206.

20. Lacouture ME, Davis ME, Elzinga G, et al. Characterization and management of dermatologic adverse events with the NovoTTF-100A System, a novel antimitotic electric field device for the treatment of recurrent glioblastoma. Semin Oncol. 2014;41 Suppl 4:S1–14.

21.•• Wong ET, Lok E, Swanson KD, et al. Response assessment of NovoTTF-100A versus best physician's choice chemotherapy in recurrent glioblastoma. Cancer Med. 2014;3(3):592–602.
The post hoc analysis demonstrated the importance of the dose of concurrent dexamethasone used by subjects in the phase III trial that had an association with response to TTFields therapy.

22.• Mrugala MM, Engelhard HH, Dinh Tran D, et al. Clinical practice experience with NovoTTF-100A system for glioblastoma: the Patient Registry Dataset (PRiDe). Semin Oncol. 2014;41 Suppl 6:S4–13.
This paper documented the pattern of TTFields therapy usage in clinical practice.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 330 of 631   Document 11-5   4561

EX. 2, P. 169

002226 C2C DIAR_A0000069327 12-19-2019



FULL PAPER

# BJC

Keywords: dexamethasone; glioblastoma; NovoTTF-100A; tumour immunology; chemotherapy

# Dexamethasone exerts profound immunologic interference on treatment efficacy for recurrent glioblastoma

E T Wong[*,1], E Lok[1], S Gautam[2] and K D Swanson[*,1]

[1]Brain Tumor Center and Neuro-Oncology Unit, Beth Israel Deaconess Medical Center, Harvard Medical School, Boston, MA 02215, USA and [2]Division of Biostatistics, Department of Medicine, Beth Israel Deaconess Medical Center, Boston, MA 02215, USA

**Background:** Patients with recurrent glioblastoma have a poor outcome. Data from the phase III registration trial comparing tumour-treating alternating electric fields (TTFields) vs chemotherapy provided a unique opportunity to study dexamethasone effects on patient outcome unencumbered by the confounding immune and myeloablative side effects of chemotherapy.

**Methods:** Using an unsupervised binary partitioning algorithm, we segregated both cohorts of the trial based on the dexamethasone dose that yielded the greatest statistical difference in overall survival (OS). The results were validated in a separate cohort treated in a single institution with TTFields and their T lymphocytes were correlated with OS.

**Results:** Patients who used dexamethasone doses >4.1 mg per day had a significant reduction in OS when compared with those who used ≤4.1 mg per day, 4.8 vs 11.0 months respectively ($\chi^2 = 34.6$, $P < 0.0001$) in the TTField-treated cohort and 6.0 vs 8.9 months respectively ($\chi^2 = 10.0$, $P < 0.0015$) in the chemotherapy-treated cohort. In a single institution validation cohort treated with TTFields, the median OS of patients who used dexamethasone >4.1 mg per day was 3.2 months compared with those who used ≤4.1 mg per day was 8.7 months ($\chi^2 = 11.1$, $P = 0.0009$). There was a significant correlation between OS and T-lymphocyte counts

**Conclusions:** Dexamethasone exerted profound effects on both TTFields and chemotherapy efficacy resulting in lower patient OS. Therefore, global immunosuppression by dexamethasone likely interferes with immune functions that are necessary for the treatment of glioblastoma.

Patients with recurrent glioblastoma have limited treatment options. Bevacizumab is a standard of care for patients with recurrent glioblastoma and it produces an objective response rate of 25–60% (Wong et al, 2011). However, its ability to prolong patient overall survival (OS) is questionable (Iwamoto and Fine, 2010; Reardon et al, 2012). The NovoTTF-100A device is another FDA-approved treatment for recurrent glioblastoma by emitting tumour-treating alternating electric fields (TTFields) via two pairs of transducer arrays placed orthogonally on the scalp and acts to perturb tumour cells during mitosis (Kirson et al, 2004, 2007; Gera et al, 2015). Preclinical data show that cells affected by TTFields exhibit violent plasma membrane blebbing that disrupts the normal spatial ordering of the mitotic chromosomes.

This results in asymmetric chromosome segregation and aneuploidy owing to defects in cytokinesis and aberrant mitotic exit. Furthermore, these cells also exhibit signs of stress that include elevated cell surface expression of calreticulin, which makes them more readily detectable by phagocytic immune cells, facilitating an immune response against the tumour (Lee et al, 2013). Importantly, the NovoTTF-100A device was demonstrated to possess equivalent efficacy when compared with best physician's choice (BPC) chemotherapy in the registration phase III clinical trial, but without the myeloablative toxicities associated with systemic chemotherapies that may cause secondary systemic infection or interference with immune effector function (Vecht et al, 1994; Hughes et al, 2005; Stupp et al, 2012; Fonkem and Wong, 2012).

*Correspondence: Dr ET Wong, E-mail: ewong@bidmc.harvard.edu or Dr KD Swanson, E-mail: kswanson@bidmc.harvard.edu

Revised 23 May 2015; accepted 4 June 2015; published online 30 June 2015

© 2015 Cancer Research UK. All rights reserved 0007 – 0920/15

 

www.bjcancer.com | DOI:10.1038/bjc.2015.238

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 331 of 631   Document 11-5
4562
EX. 2, P. 170

More recently, a prespecified interim analysis of the results from an upfront phase III clinical trial in newly diagnosed glioblastoma patients, comparing NovoTTF-100A plus adjuvant temozolomide *vs* adjuvant temozolomide alone, revealed significantly improved patient outcome with a respective progression-free survival of 7.1 *vs* 4.0 months and OS of 19.6 *vs* 16.6 months (Stupp *et al*, 2014). Compared with newly diagnosed glioblastomas, patients with recurrent glioblastoma likely have several factors that led to a worse outcome, including clonal evolution of the tumour, evasion of the immune system and reduction of immune competence because of prior exposure to chemotherapy.

Dexamethasone is commonly used to treat neurologic symptoms caused by the glioblastoma (Vecht *et al*, 1994). However, it also has a plethora of systemic toxicities, including gastrointestinal haemorrhage with or without perforation, infection, and hyperglycaemia (Heimdal *et al*, 1992). Although dexamethasone has not been shown to interfere directly with the efficacy of treatments against glioblastoma, there is emerging evidence from both preclinical and clinical data in other malignancies to suggest that dexamethasone may affect the patient's antitumour immunity. First, although the immune system has evolved multiple mechanisms to recognise and eliminate neoplastic cells (Senovilla *et al*, 2013), tumours emerge within the patient when they escape immune surveillance (Mittal *et al*, 2014). At this point, the tumour further subverts the immune system by eliciting normal wound healing and tissue remodelling responses, whereas promoting a state of immune privilege within the tumour microenvironment (Schreiber *et al*, 2011). In this setting, dexamethasone may potentiate existing local immunosuppression via global induction of IκBα and inhibition of NF-κB activity in lymphocytes, resulting in global immunosuppression (Auphan *et al*, 1995). Second, dexamethasone can lower the number of CD4$^+$ lymphocytes in newly diagnosed patients with glioblastoma treated with radiation alone or in combination with temozolomide, and this attenuated CD4$^+$ lymphocyte count is associated with increased infections and decreased survival (Hughes *et al*, 2005; Grossman *et al*, 2011). Lastly, recent clinical trial data have shown that there were more systemic and central nervous system responders to ipilimumab, an immune checkpoint inhibitor, in the cohort taking no dexamethasone as compared with the cohort taking dexamethasone, suggesting that dexamethasone interferes with the efficacy of ipilimumab (Margolin *et al*, 2012).

In this paper, we present evidence that immune suppression by dexamethasone markedly interferes with the clinical efficacy of two disparate therapies for recurrent glioblastoma: electric field-based therapy delivered by the NovoTTF-100A as well as conventional chemotherapies. Unlike prior clinical trials, the cohort treated with TTField monotherapy offered us an opportunity to study unambiguously the effect of dexamethasone on patient survival unencumbered by concurrent chemotherapies that suppress the immune system. We also present data that strongly support a role for immune competence in effecting TTField treatment by analysing T-cell subsets measured in a separate cohort of patients for validation.

## PATIENTS AND METHODS

**Patients.** Subjects signed informed consent from their respective treating institutions before participation in the phase III trial comparing NovoTTF-100A *vs* BPC chemotherapy (Fonkem and Wong, 2012; Stupp *et al*, 2012). A *post hoc* analysis of the dexamethasone effect on the two cohorts was performed based on anonymised data obtained from the sponsor, from whom the corresponding author had full access to the primary data. The outcome of the analysis was then validated retrospectively, under

an institutional review board-approved protocol from Dana Farber/Harvard Cancer Center (protocol no. 12-519), using a separate cohort of patients who were treated with NovoTTF-100A and bevacizumab at Beth Israel Deaconess Medical Center.

**Statistical analysis.** Statistical analyses were performed by using R statistics base package (http://www.r-project.org) and its libraries. Two-tailed Wilcoxon's rank-sum test with continuity correction was used to determine whether two independent groups of data were statistically different from each other. A modified binary search algorithm (Knuth, 1971; Tøndel *et al*, 2002), written in R, was used to iteratively partition data in both two and three dimensions. The Loess local nonparametric polynomial regression was used to perform curve fitting of the OS as a function of dexamethasone dose (Cleveland, 1979; Shipley and Hunt, 1996; Cleveland and Loader, 1996) and OS was analyzed using Kaplan–Meier statistics (Kaplan and Meier, 1958).

## RESULTS

**Effect of dexamethasone on TTField therapy and BPC chemotherapy.** Our previous *post hoc* analysis of responders in the phase III trial demonstrated that responders to TTField therapy required significantly lower doses of dexamethasone compared with non-responders (Wong *et al*, 2014). We therefore investigated further whether there was a threshold dose of dexamethasone that affected outcome within the entire trial population. Using an unsupervised binary partitioning algorithm (Knuth, 1971; Tøndel *et al*, 2002), we stratified the TTField therapy cohort based on the dexamethasone dose that yielded the greatest statistical difference in median OS. The results revealed that subjects who used >4.1 mg per day dexamethasone ($n = 64$) exhibited a significantly shortened median OS of 4.8 months (95% confidence interval (CI): 3.9–6.0) *vs* those who used ≤4.1 mg per day ($n = 56$), with a median OS of 11.0 months (95% CI: 8.8–16.6) ($\chi^2 = 34.6$, $P < 0.0001$; Figure 1A). We then used the same dexamethasone cutoff to stratify control patients in the BPC chemotherapy cohort and observed a similar, albeit less robust, dichotomisation, with a respective median OS of 6.0 months (95% CI: 3.5–8.3) ($n = 54$) *vs* 8.9 months (95% CI: 7.2–16.1) ($n = 63$) ($\chi^2 = 10.0$, $P = 0.0015$; Figure 1B) for those receiving >4.1 *vs* ≤4.1 mg per day of dexamethasone, respectively. There are two potential explanations for these results: either patients with larger, more aggressive tumours required a higher dose of dexamethasone for symptom control or doses of dexamethasone >4.1 mg per day interfered with both therapeutic interventions used in this trial. However, tumour size did not differ statistically between patient cohorts that used dexamethasone at either >4.1 or ≤4.1 mg per day (Figures 1C and D). Therefore, factors other than tumour size influence the OS of subjects receiving high *vs* low doses of dexamethasone.

To further investigate the effect of dexamethasone on patient outcome, we compared the survival characteristics of the cohort treated with TTField therapy to the one treated with BPC chemotherapy in the respective dexamethasone dosage groups. First, we compared the two treatment groups when the dosage of dexamethasone used was ≤4.1 mg per day. Although the two OS curves overlapped ($\chi^2 = 0.9$, $P = 0.3510$; Figure 2A), we detected a marked separation between these two curves at time points less than the median OS. Indeed, when we compared the survival curves of the two cohorts for subjects who used dexamethasone ≤4.1 mg per day and possessed survival times of less than the median OS, we found a significant difference between the two subgroups, with a median OS of 6.6 (range 1.4–10.1) months for the TTField-treated subgroup ($n = 31$) *vs* 3.9 (range 0.0–8.6) months for the BPC chemotherapy-treated subgroup ($n = 40$) ($P = 0.0015$; Figure 2C). However, for subjects who lived longer

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 332 of 631    Document 11-5

EX. 2, P. 171

4563

002227 C2C DIAR_A0000069327 12-19-2019



Figure 1. Kaplan–Meier OS and tumour size with respect to dexamethasone requirement of ≤4.1 vs >4.1 mg per day from subjects enrolled in the phase III trial comparing TTField therapy vs BPC chemotherapy. (A) Subjects enrolled in the TTField treatment arm taking dexamethasone ≤4.1 mg per day (solid blue) vs >4.1 (dashed blue) mg per day, which was determined by an unsupervised binary partitioning algorithm. Subjects who used ≤4.1 mg per day of dexamethasone (n = 56) had a median OS of 11.0 months (95% CI: 8.8–16.6) as compared with those who used >4 1 mg per day (n = 64) had a median OS of 4.8 months (95% CI: 3.9–6.0) ($\chi^2 = 34.6$, $P < 0.0001$). (B) Subjects enrolled in the BPC chemotherapy arm taking dexamethasone ≤4.1 (solid red) vs >4.1 (dashed red) mg per day was determined by the same unsupervised binary partitioning algorithm. Subjects who used ≤4.1 mg per day of dexamethasone (n = 63) had a median OS of 8 9 months (95% CI: 7.2–16.1) as compared with those who used >4.1 mg per day (n = 54) had a median OS of 6.0 months (95% CI: 3 5–8.3) ($\chi^2 = 10.0$, $P = 0 0015$) (C) Box-and-whisker plot of bidimensional tumour size in the TTField therapy cohort that received dexamethasone ≤4.1 vs >4.1 mg per day. Subjects who took dexamethasone ≤4.1 mg per day (n = 56) had a median tumour size of 11.9 (range 0.0–56.7) cm² as compared with those who used >4.1 mg per day (n = 64) had a median tumour size of 16 8 (range 0.3–51.0) cm² (P = 0.1369) (D) Box-and-whisker plot of bidimensional tumour size in the BPC chemotherapy cohort that received dexamethasone ≤4.1 vs >4.1 mg per day. Subjects who took dexamethasone ≤4.1 mg per day (n = 63) had a median tumour size of 4.2 (range 0 0–11.2) cm² as compared with those who used >4.1 mg per day (n = 54) had a median tumour size of 9.6 (range 0.0–46 0) cm² (P = 0 1638)

than the median OS, there was no difference in the OS curves, with a median OS of 16.7 (range 11.0–66.9) months for the TTField-treated subgroup (n = 25) vs 16 8 (range 8.9–36.7) months for the BPC chemotherapy-treated subgroup (n = 23) (P = 0.5773; Figure 2E). In contrast, among subjects who received high dexamethasone doses of >4.1 mg per day, the overlapping OS curves ($\chi^2 = 1.5$, P = 0.2240; Figure 2B) appeared to diverge for the subjects whose survival were greater than the median OS. Remarkably, the TTField-treated subgroup was worse compared with the BPC chemotherapy-treated subgroup when treated with

dexamethasone doses >4.1 mg per day, with a respective median OS of 6.7 (range 4.8–24.3) months (n = 29) vs 8.7 (range 6.0–29.6) months (n = 22) (P = 0.0097; Figure 2D). However, for subjects whose survival were less than the median OS and used >4.1 mg per day dexamethasone, there was no difference between the TTField-treated and the BPC chemotherapy-treated subgroups, with the former having a median OS of 3.0 (range 0.8–4.5) months (n = 35) as compared with the latter having a median OS of 2.8 (range 0.2–5.8) months (n = 32) (P = 0.8456; Figure 2E). Collectively, the data in Figures 2C and D indicate that the extent

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 333 of 631   Document 11-5        4564
EX. 2, P. 172



**Figure 2. Comparison of OS in subjects treated with TTField therapy vs BPC chemotherapy segregated by dexamethasone usage.**
(A) Comparison of subjects using dexamethasone ⩽4.1 mg per day in both TTField therapy (blue) and BPC chemotherapy (red) arms.
(B) Comparison of subjects using dexamethasone >4.1 mg per day in both TTField therapy and BPC chemotherapy arms. (C) Box-and-whisker plot of OS between TTField vs BPC chemotherapy-treated subjects using ⩽4.1 mg per day of dexamethasone and <the median OS in (A).
The median OS was 6.6 months (range 1.4–10.1) for TTField-treated subjects ($n=31$) vs 3.9 months (range 0.0–8.6) for BPC chemotherapy-treated subjects ($n=40$) ($P=0.0015$). (D) Box-and-whisker plot of OS between TTFields vs BPC chemotherapy-treated subjects using >4.1 mg per day of dexamethasone and ⩾the median OS in (B). The median OS was 6.7 months (range 4.8–24.3) for TTField-treated subjects ($n=29$) vs 8.7 months (range 6.0–29.6) for BPC chemotherapy-treated subjects ($n=22$) ($P=0.0097$). (E) Median OS, range, and P-values for the four subgroups:
(i) dexamethasone ⩽4.1 mg per day and <median OS in (A), (ii) dexamethasone >4.1 mg per day and <median OS in (B), (iii) dexamethasone ⩽4.1 mg per day and ⩾median OS in (A), and (iv) dexamethasone >4.1 mg per day and ⩾median OS in (B).

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 334 of 631    Document 11-5    4565
EX. 2, P. 173

002228 C2C DIAR_A00000969327 12-19-2019

of dexamethasone exposure not only predicted treatment efficacy but also strongly suggest that TTField therapy is superior to BPC chemotherapy in the setting of low dexamethasone usage. However, under the influence of higher dexamethasone usage, the benefit of TTField therapy appeared to be negated to a greater extent when compared with BPC chemotherapy as if TTField-treated subjects were not provided with any therapy at all.

***Dose-dependent effect of dexamethasone on treatment efficacy.***
We next asked whether or not dexamethasone has a dose-dependent influence on treatment efficacy by analysing the entire dose spectrum used in the trial. We partitioned the TTField-treated cohort using a dexamethasone dose cutoff from 0.0 to 37.0 mg per day, plotted the respective median OS of the groups at ≤cutoff or >cutoff vs successive dexamethasone dosages, and fitted the data with the best curves using the nonparametric Loess local polynomial regression (Figure 3) (Cleveland, 1979; Cleveland and Loader, 1996; Shipley and Hunt, 1996). In addition, we plotted the log-rank $P$-values of the dichotomised groups in each successive dexamethasone dosage and found two nadir $P$-values of 0.00000008 and 0.00002524 corresponding to dexamethasone doses of 4.1 and 7.8 mg per day, respectively. We observed that there was decremental OS starting at a dexamethasone dose of 4.1 mg per day and, with successive increases of dexamethasone, reached an inflection point at 7.8 mg per day, after which the rate of OS decreased slowly (Figure 3A).

We also performed the same dose-dependent analysis of dexamethasone in the BPC chemotherapy-treated cohort and found a nadir $P$-value of 0.00163291 at 3.3 mg per day and another of 0.00011858 at 7.5 mg per day. Similarly, the best-fit curve derived in Figure 3B also suggests that the dexamethasone dose near 4 mg per day may also represent a point at which decremental OS can be observed with successive increases in dexamethasone dosage. This progressive decrement in OS occurred with successive increases of dexamethasone until an inflection point is observed at a dose near 7.5 mg per day, after which the rate of OS decreased slowly. Taken together, both cohorts experienced interference from dexamethasone at a dose near 4.0 mg per day and a maximal effect was observed near 7.5 mg per day.

***Validation of the dexamethasone effect on TTField-treated patients from a single institution.*** We next proceeded to validate the observed dexamethasone effect on patient outcome within the trial by retrospectively analysing our own single-institution cohort. From November 2012 to February 2014, we treated 38 patients (Table 1) using TTField monotherapy as treatment or in combination with bevacizumab, whereas dexamethasone usage was aggressively reduced. Three patients who were referred specifically to our institution did not receive TTField therapy because of patient choice of other treatments, severe medical comorbidities, or advanced intracranial disease that was deemed more suitable for hospice care. Among the remaining 35 patients, their median OS was 4.3 months (95% CI: 3.5–8.7). To properly compare this cohort with the subjects enrolled in the phase III trial, we included only those with a KPS ⩾70 or greater ($n = 23$) in our validation set. This sub-population exhibited a median OS of 8.0 months (95% CI: 3.8–13.8) compared with 3.2 months (95% CI: 1.4–NA) for the remaining patients with a KPS <70 ($n = 12$) ($\chi^2 = 8.5$, $P = 0.0035$; Figure 4A). We then applied a cutoff of dexamethasone 4.1 mg per day as was found in our previous binary partitioning analysis. Patients who used dexamethasone ⩽4.1 mg per day had a significantly longer OS compared with those who used >4.1 mg per day, with a median OS of 8.7 months (95% CI: 6.7–NA) ($n = 19$) vs 3.2 months (95% CI: 1.2–NA) ($n = 4$), respectively ($\chi^2 = 11.1$, $P = 0.0009$; Figure 4B). Although our single-institution cohort has fewer patients compared with the cohorts in the phase III trial, we nevertheless observed a robust segregation of OS in the patient groups, validating the previously observed effect of dexamethasone on patient outcome.

Comparison of patients within the validation cohort with a KPS ⩾70 and dexamethasone usage ⩽4.1 mg per day ($n = 19$) to the phase III TTField therapy cohort who used dexamethasone ⩽4.1 mg per day ($n = 56$, from Figure 2A) revealed no statistical difference between the two groups, with a median OS of 8.7 months (95% CI: 6.7–NA) vs 11.0 months (95% CI: 8.8–16.6), respectively ($\chi^2 = 2.1$, $P = 0.1520$; Figure 4C). We next asked whether important prognostic factors within our cohort varied relative to patients within the phase III cohort by examining the possible effects of age and tumour size. The median age of our



**Figure 3.** Loess local polynomial regression of median OS vs dexamethasone dose. Dexamethasone was treated as a discrete variable successively and the median OS was plotted for the group ≤(green) and >(blue) compared with the variable dosage of dexamethasone. Curve fitting was performed using the Loess local polynomial regression. (A) In the TTField therapy cohort (n = 120), there was decremental OS from 4.1 mg per day that reached an inflection point at 7.8 mg per day, after which the rate of OS decrease slowed. (B) In the BPC chemotherapy cohort (n = 117), there was decremental OS from 3.3 mg per day that reached an inflection point at 7.5 mg per day, after which the rate of OS decrease slowed.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 335 of 631   Document 11-5   4566
EX. 2, P. 174

## Table 1. Patient characteristics in the validation cohort and the NovoTTF-100A cohort in phase III trial

| Patient characteristics | Validation cohort (n = 35) | NovoTTF-100A cohort (n = 120) | P-value |
|---|---|---|---|
| Age (range) | 57 (30 – 77) years | 54 (24–80) years | |
| **Gender** | | | |
| Male | 22 (63%) | 92 (77%) | |
| Female | 13 (37%) | 28 (23%) | |
| **Karnofsky performance status** | | | |
| Median | 70 (range 50-90) | 80 (range 50-100) | |
| **Tumour size, bidimensional** | | | |
| T1 Gad, median (range) (cm²) | 12.2 (0.3 – 40.6) | 14.2 (0.0-56.7) | 0.6178 |
| FLAIR, median (range) (cm²) | 35.2 (7.0 – 90.9) | N/A | |
| **Dexamethasone dose** | | | |
| Median (range) (mg per day) | 3 0 (0.0 – 15.0) | 4.7 (0.0-37.5) | |
| **Absolute T-cell subsets** | | | |
| CD3, median (range) (cells per mm³) | 733 (70  1458) | N/A | |
| CD4, median (range) (cells per mm³) | 414 (25 – 788) | N/A | |
| CD8, median (range) (cells per mm³) | 302 (44 – 1039) | N/A | |
| **Prior therapy** | | | |
| First recurrence | 6 (17%) | 11 (9%) | |
| Second recurrence | 10 (29%) | 58 (48%) | |
| Third recurrence | 19 (54%) | 51 (43%) | |
| Prior bevacizumab | 25 (71%) | 23 (19%) | |
| **Outcome** | | | |
| Overall survival, median (months) | 4.3 (95% CI: 3.5–8.7) | 7.1 (95% CI: 6.1–8.8) | 0.0468 |

Abbreviations: CI = confidence interval; FLAIR = fluid-attenuated inversion recovery; Gad = gadolinium; N/A = not applicable; TTF = tumour-treating alternating electric field.

cohort was 57 (range 30–77) years and it is not different from the median age of 54 (range 24–80) years in the TTField-treated cohort from the phase III trial (Stupp *et al*, 2012). Average tumour size in our cohort as measured by gadolinium-enhanced T1-weighted MRI showed a median bidimensional measurement of 12.2 (range 0.30–40.6) cm², which is similar to the median bidimensional measurement of 14.2 (0.0–56.7) cm² in the TTField-treated phase III cohort (*P* = 0.6178; Table 1). However, 15 of 23 patients (65%) were already on bevacizumab before their neuroimaging studies, possibly interfering with tumour measurement because bevacizumab can reduce vascular permeability in tumours causing decreased gadolinium enhancement (Wong and Brem, 2008). Further, blockade of vascular endothelial growth factor can promote an invasive and diffuse glioblastoma phenotype that result in tumours possessing greater size than can be measured on gadolinium-enhanced T1-weighted MRI (Norden *et al*, 2008; Lu *et al*, 2012). We therefore measured the bidimensional size of the FLAIR abnormality. Indeed, in our cohort, the median bidimensional FLAIR abnormality was 29.6 (range 7.0–60.2) cm², which is more than two times the tumour size observed on gadolinium-enhanced T1-weighted MRI in the phase III trial (Stupp *et al*, 2012). As expected, this bevacizumab effect on tumour measurement was corroborated in our entire patient cohort (*n* = 38) by the strong correlation between the size of the gadolinium-enhanced T1-weighted and FLAIR measured bidimensional tumour size among those not on bevacizumab (*r²* = 0.7333, *n* = 10; Supplementary Figure 1A), whereas no such correlation was seen among those on bevacizumab (*r²* = 0.1446, *n* = 27; Supplementary Figure 1B). Furthermore, we found that patients in our validation cohort who used dexamethasone > 4.1 mg per day (*n* = 4) had a worse outcome compared with the corresponding cohort in the phase III trial (*n* = 64), with a median OS of 3.2 months (95% CI: 1.2–NA) *vs* 4.8 months (95% CI: 3.9–6.0), respectively (*χ²* = 6.3, *P* = 0.0121; Figure 4D). Therefore, our single-institution validation cohort, who had KPS ≥ 70, used dexamethasone ≤ 4.1 mg per day and possessed greater tumour burden, compared favourably with those treated with TTFields therapy in the phase III trial, but those with KPS ≥ 70 but used

dexamethasone > 4.1 mg per day probably suffered from a worse outcome compared with the corresponding trial cohort.

**Patient immune characteristics and TTField therapy efficacy.** Dexamethasone has been associated with profound immunosuppression (Hughes *et al*, 2005; Grossman *et al*, 2011) and it may severely limit a patient's ability to mount an antitumour immune response against the glioblastoma (Zitvogel *et al*, 2008a). Our data clearly demonstrated that dexamethasone doses higher than a threshold level of 4.1 mg per day correlated with a poorer patient outcome during TTField therapy. This finding strongly suggests an immunological component behind the efficacy of this intervention and that factors required for general immune competence may have a role in predicting therapeutic outcome in our patients. We therefore analysed their CD3+, CD4+, and CD8+ T-lymphocyte subsets during the course of their treatment. Using the unsupervised binary partitioning approach described above for dexamethasone dose, we attempted to identify whether there was any threshold for the absolute CD3+, CD4+, or CD8+ T-lymphocyte count, which yielded the greatest statistical difference in OS when used to stratify our patient population. Significantly, this analysis revealed that the median OS of patients with absolute CD3+ ≤ 382 cells per mm³ was 2.0 months (95% CI: 1.2–NA) (*n* = 7). In contrast, the median OS of those with CD3+ > 382 cells per mm³ was 7.6 months (95% CI: 4.3–13.9) (*n* = 22) (*χ²* = 17.8, *P* < 0.0001; Figure 5A), with the data showing that patient survival was positively correlated with the absolute numbers of CD3+ T lymphocytes. Similarly, we found that patients with absolute CD4+ ≤ 236 cells per mm³ exhibited a median OS of 2.7 months (95% CI: 1.4–NA) (*n* = 9) as compared with those with CD4+ > 236 cells per mm³ with a median OS of 8.0 months (95% CI: 4.6–NA) (*n* = 20) (*χ²* = 13.4, *P* = 0.0002; Figure 5B). Furthermore, patients with an absolute CD8+ count of ≤ 144 cells per mm³ exhibited a median OS of 2.0 months (95% CI: 2.0–NA) (*n* = 5) as compared with 6.8 months (95% CI: 3.9–13.8) (*n* = 24) for those with CD8+ > 144 cells per mm³ (*χ²* = 8.1, *P* = 0.0045; Figure 5C).

We next asked whether CD3+, CD4+, and CD8+ lymphocyte counts was related to the overall status of the patient's peripheral

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 336 of 631   Document 11-5    4567

EX. 2, P. 175

Box Number:     077338823

Appeals in Box:  17

Files In Box:  19

1-8390277469 M-002-002

002229 C2C DIAR_A0000069327 12-19-2019



Figure 4. Kaplan–Meier estimates of survival in the validation cohort from a single institution. (A) The Kaplan–Meier survival curves for patients with KPS ≥ 70 (solid green) vs those with KPS < 70 (solid black) (B) Dexamethasone effect on the cohort with KPS ≥ 70 by comparing patients taking dexamethasone ≤ 4.1 (solid green) vs those taking > 4.1 mg per day (dashed green). (C) Comparison of the TTField-treated subjects who used ≤ 4.1 mg per day of dexamethasone in the phase III trial (from Figure 2A) vs the validation cohort with having KPS ≥ 70 and taking dexamethasone ≤ 4.1 mg per day. (D) Comparison of the TTField-treated subjects who used > 4.1 mg per day of dexamethasone in the phase III trial (from Figure 2B) vs the validation cohort with having KPS ≥ 70 and taking dexamethasone > 4.1 mg per day.

blood counts and dexamethasone requirement. As expected, there was a correlation between $CD3^+$ and $CD4^+$ cells ($r^2 = 0.6949$) and between $CD3^+$ and $CD8^+$ cells ($r^2 = 0.5001$) but not between $CD4^+$ and $CD8^+$ cells ($r^2 = 0.0733$). However, there was no correlation between white blood cells (WBC) and $CD3^+$ cells ($r^2 = 0.0053$), WBC and $CD4^+$ cells ($r^2 = 0.0023$), and WBC and $CD8^+$ cells ($r^2 = 0.0032$). No correlation was also detected between platelets and $CD3^+$ cells ($r^2 = 0.2576$), platelets and $CD4^+$ ($r^2 = 0.2746$), and platelets and $CD8^+$ ($r^2 = 0.0887$). Similarly, there was no correlation between the daily dexamethasone dose and $CD3^+$ cells ($r^2 = 0.1888$), dexamethasone and $CD4^+$ cells ($r^2 = 0.1531$), and dexamethasone and $CD8^+$ cells ($r^2 = 0.0451$). Taken together, $CD3^+$, $CD4^+$, and $CD8^+$ lymphocyte counts appear to be independent of the peripheral blood counts and dexamethasone dose effect. Therefore, T-lymphocyte counts may serve as an independent measure of immunocompetence in our patients and predict treatment outcome when using NovoTTF-100A.

## DISCUSSION

Our previous *post hoc* analysis of responders in the phase III trial comparing NovoTTF-100A monotherapy and BPC chemotherapy for recurrent glioblastoma revealed that dexamethasone and prior low-grade glioma histology were predictors of response (Wong *et al*, 2014). Traditionally, oncologists view dexamethasone's influence on glioblastoma patients from the perspective of its antioedema effect from the tumour (Vecht *et al*, 1994), antiemetic efficacy against emetogenic chemotherapies, infections from its systemic immunosuppressive property (Vecht *et al*, 1994; Hughes *et al*, 2005), and changes in contrast enhancement on computed tomography (Chamberlain *et al*, 1988) or MRI (Ostergaard *et al*, 1999). Because dexamethasone has the potential to produce profound toxicities in patients in large part by suppressing their immune system and it is a clinically modifiable factor, we therefore extended our analysis of possible dexamethasone effect on outcome

2 ⊥ 9 2381 2 X 0 2 6 0 0

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 338 of 631    Document 11-5    4569
EX. 2, P. 176



Figure 5. Wilcoxon's rank-sum test of the optimal cutoff T-lymphocyte subsets as determined by an unsupervised binary partitioning algorithm. (A) Median OS of patients with absolute $CD3^+$ ≤382 vs >382 cells per $mm^3$ was 2.0 months (range 0 3–5.4) (n = 7) and 7.7 months (range 1.3–22.7) (n = 25), respectively ($P = 0$ 0017). (B) Median OS of patients with absolute $CD4^+$ ≤236 vs >236 cells per $mm^3$ was 2.7 months (range 0.3–6.7) (n = 9) and 8 0 months (range 1.3–22.7) (n = 23), respectively ($P = 0.0029$). (C) Median OS of patients with absolute $CD8^+$ ≤144 vs >144 cells per $mm^3$ was 2.7 months (range 1.2–5.4) (n = 5) and 7.6 months (range 0.3–22.7) (n = 27), respectively ($P = 0.0313$).

to the entire trial cohort. In this study, we have uncovered compelling evidence that dexamethasone counteracted the therapeutic efficacy of TTFields. Further, we also found that its use negatively correlated with survival in the cohort treated with chemotherapy. Our analysis is the first to show this significant impact of dexamethasone on treatment efficacy and patient OS, which is a discrete and unequivocal endpoint in contrast to progression-free survival or response for the conduct of clinical trials for recurrent glioblastomas.

In contrast to commonly used chemotherapeutic regimens, TTField monotherapy does not exert deleterious effects on the immune system, and thus, unlike the chemotherapy-treated cohort, TTField-treated subjects did not receive concurrent immunosuppressive agents other than dexamethasone during the entire trial period. Therefore, this trial provided us with a unique opportunity to examine the interference of dexamethasone on the clinical outcome of patients without the confounding influence of cytotoxic chemotherapies. Given our previous observation that responders from this trial had low dexamethasone usage (Wong et al, 2014), we first asked whether we could determine a threshold of dexamethasone exposure below which a benefit in patient survival could be detected within the entire cohort. Using an unsupervised mathematical algorithm, we found that a dexamethasone dose of 4.1 mg per day produced the greatest statistical segregation of OS in the TTField-treated cohort, and subjects who received >4.1 mg per day had a 2.3-fold decrease in median OS compared with those who used ≤4.1 mg per day. Notably, using this dose level to stratify the control cohort treated with BPC chemotherapy also produced a statistically significant, but less robust, OS segregation, and subjects who received >4.1 mg per day had a 1.5-fold decrease in median OS compared with those who used ≤4.1 mg per day. Within both cohorts, patients exhibited a decrease in OS starting at about 4.0 mg per day, with progressive decrement until a dosage of 8.0 mg per day, above which there was no further decrease in OS. Therefore, our data indicate that dexamethasone has a generalised and profound interference on treatment efficacy regardless of whether the treatment has non-cytotoxic or cytotoxic properties on the haematopoietic system.

Our analysis strongly indicates that dexamethasone interferes with the efficacy of both TTFields and BPC chemotherapies, the latter of which consisted largely of alkylating chemotherapies. In the sub-populations taking ≤4.1 mg per day of dexamethasone, 31 subjects treated with TTField monotherapy exhibited a better

outcome compared with the corresponding 40 subjects treated with BPC chemotherapy. This small but statistically significant benefit occurred within the first 11 months, after which the OS of the two cohorts overlapped and the benefit from TTField therapy dissipated. In contrast, for the sub-population taking >4.1 mg per day of dexamethasone, 29 subjects treated with TTField monotherapy exhibited a worse outcome relative to the corresponding 22 subjects treated with BPC chemotherapy. Therefore, high dexamethasone dosage appears to negate or counteract the effect of both TTField therapy and BPC chemotherapy. Because the overall trial population in the TTField-treated cohort is only 120, the benefit of treatment in the 31 (26%) subjects taking ≤4.1 mg per day of dexamethasone is essentially negated by the hindrance caused by the 29 (24%) patients taking >4.1 mg per day of dexamethasone when the populations were not segregated based on dexamethasone burden. This dexamethasone interference with TTField efficacy may explained the improved outcome seen in the trial for newly diagnosed glioblastoma patients (Stupp et al, 2014), who were not as severely affected by treatment effects when compared with recurrent glioblastoma patients who had a longer exposure to cytotoxic chemotherapy, dexamethasone, or both.

Our data also indicate that T-lymphocyte subsets may have an important role in the outcome of our validation cohort of patients treated with TTField therapy, with prolonged OS associated with absolute $CD3^+$ >382 cells per $mm^3$, $CD4^+$ >235 cells per $mm^3$, and $CD8^+$ >144 cells per $mm^3$ in an unsupervised analysis. Hughes et al (2005) and Grossman et al (2011) both showed that dexamethasone induces a drop in $CD4^+$ lymphocyte count, which predisposes glioblastoma patients to infectious complications, and a $CD4^+$ count <200 cells per $mm^3$ is associated with poor survival. However, we also noted that dexamethasone's immunosuppressive effect also blunted the therapeutic efficacy of TTField therapy and chemotherapy, probably as a result of its global interference with the patient's immune system. This notion is supported by our in vitro experiments, which demonstrated that cells attempting to divide in the presence of the TTFields are disrupted in mitosis during the metaphase-to-anaphase transition and experienced aberrant mitotic exit (Gera et al, 2015). These cells subsequently exhibited changes consistent with immunogenic cell death and thus were susceptible to immune elimination (Lee et al, 2011, 2013). Because subjects that received dexamethasone ≤4.1 mg per day in the phase III trial exhibited benefit from TTField therapy, the observed benefit is strongly consistent with an

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 339 of 631   Document 11-5          4570
EX. 2, P. 177

992239 C2C DIAR_A0000069327 12-19-2019

increased immunogenicity of cells affected by TTFields. Furthermore, a number of cytotoxic chemotherapy agents, such as doxorubicin, 5-fluorouracil, and oxaliplatin, can induce either genomic or cytoplasmic stress in the tumour cell leading to immunogenic cell death (Zitvogel et al, 2008b). Although the extent of immunostimulatory effects of alkylators, such as lomustine, carmustine, procarbazine, and temozolomide is unknown, dacarbazine has been shown to upregulate NKG2D ligands on tumour cells and thereby target them for immune elimination by natural killer (NK) cells and $CD8^+$ cytotoxic T-lymphocytes (Hervieu et al, 2013). Furthermore, alkylating agents have been shown to induce the secretion of ATP and HMGB1, both of which are danger signals that can activate immune responses against dying cells (Zong et al, 2004). Lastly, in myeloma patients, dexamethasone can severely block lenolidomide-induced NK cell activation (Hsu et al, 2011). Taken together, there is a strong indication from our data that the cytotoxic agents used in the trial against recurrent glioblastomas also act by inducing immune responses against the tumour and that concurrent dexamethasone usage negated this benefit.

There are a number of limitations in the interpretation of our findings. First, our data only allowed us to examine global immunosuppression in our patients but provide no means to assess local immunosuppression within the tumour microenvironment. This local suppression of immune surveillance is thought to be mediated by arginase, regulatory T cells, and myeloid-derived immunosuppressive cells (Fecci et al, 2006; Jacobs et al, 2010; Raychaudhuri et al, 2011). Nevertheless, removal of global immunosuppressive factors is the first step towards successful antiglioblastoma therapy. Second, our T-lymphocyte analysis only measured cells in the adaptive immune system. However, TTField therapy and certain chemotherapy agents could potentially induce an NK cell response against the glioblastoma (Hervieu et al, 2013; Lee et al, 2013). However, the observed dexamethasone effect on absolute $CD3^+$, $CD4^+$, and $CD8^+$ lymphocytes could also negatively influence the activation of other cytotoxic subsets such as NK cells (Hsu et al, 2011). Therefore, future analysis of the specific effects of dexamethasone on glioblastoma treatment would need to include the global effect on these cells.

In conclusion, dexamethasone exerted a profound interference on the therapeutic effects of both TTField therapy and BPC chemotherapies. The threshold dose at which dexamethasone was able to be used with minimal interference on these treatments was 4.1 mg per day or lower. In our validation set of TTField-treated patients, the cluster that had the longest OS had $CD3^+ > 382$ cells per $mm^3$, $CD4^+ > 236$ cells per $mm^3$, and $CD8^+ > 144$ cells per $mm^3$. Taken together, these data strongly suggest that the stimulation of immunity against the tumour operates in both of these therapeutic approaches. Future clinical trials for recurrent glioblastoma, as well as other types of brain tumours, may need to take into account the influence of dexamethasone on therapeutic outcome.

# REFERENCES

Auphan N, Didonato JA, Rosette C, Helmberg A, Karin M (1995) Immunosuppression by glucocorticoids: inhibition of NF-kappa B activity through induction of I kappa B synthesis. Science 270: 286–290.

Chamberlain MC, Murovic JA, Levin VA (1988) Absence of contrast enhancement on CT brain scans of patients with supratentorial malignant gliomas. Neurology 38: 1371–1374.

Cleveland WS (1979) Robust locally weighted regression and smoothing scatterplots. J Am Stat Assoc 74: 829–836

Cleveland WS, Loader C (1996) Smoothing by local regression: principles and methods. In Statistical Theory and Computational Aspects of Smoothing, Haedle W, Schimek MG (eds), pp 10–49. Physica-Verlag: Heidelberg, Germany.

Fecci PE, Mitchell DA, Whitesides JF, Xie W, Friedman AH, Archer GE, Herndon II JE, Bigner DD, Dranoff G, Sampson JH (2006) Increased regulatory T-cell fraction amidst a diminished CD4 compartment explains cellular immune defects in patients with malignant glioma. Cancer Res 66: 3294–3302.

Fonkem E, Wong ET (2012) NovoTTF-100 A: a new treatment modality for recurrent glioblastoma. Expert Rev Neurother 12: 895–899.

Gera N, Yang A, Holtzman T, Lee SX, Wong ET, Swanson KD (2015) Tumor treating fields perturb the localization of septins and cause aberrant mitotic exit. PLoS One 10: e0125269.

Grossman SA, Ye X, Lesser G, Sloan A, Carraway H, Desideri S, Piantadosi S (2011) Immunosuppression in patients with high-grade gliomas treated with radiation and temozolomide. Clin Cancer Res 17: 5473–5480.

Heimdal K, Hirschberg H, Slettebo H, Watne K, Nome O (1992) High incidence of serious side effects of high dose dexamethasone treatment in patients with epidural spinal cord compression. J Neurooncol 12: 141–144.

Hervieu A, Rebe C, Vegran F, Chalmin F, Bruchard M, Vabres P, Apetoh L, Ghiringhelli F, Mignot G (2013) Dacarbazine-mediated upregulation of NKG2D ligands on tumor cells activates NK and CD8 T cells and restrains melanoma growth. J Invest Dermatol 133: 499–508.

Hsu AK, Quach H, Tai T, Prince HM, Harrison SJ, Trapani JA, Smyth MJ, Neeson P, Ritchie DS (2011) The immunostimulatory effect of lenalidomide on NK-cell function is profoundly inhibited by concurrent dexamethasone therapy. Blood 117: 1605–1613.

Hughes MA, Parisi M, Grossman S, Kleinberg L (2005) Primary brain tumors treated with steroids and radiotherapy: low CD4 counts and risk of infection. Int J Radiat Oncol Biol Phys 62: 1423–1426.

Iwamoto FM, Fine HA (2010) Bevacizumab for malignant gliomas. Arch Neurol 67: 285–288.

Jacobs JF, Idema AJ, Bol KF, Grotenhuis JA, de Vries IJ, Wesseling P, Adema GJ (2010) Prognostic significance and mechanism of Treg infiltration in human brain tumors. J Neuroimmunol 225: 195–199.

Kaplan EL, Meier P (1958) Nonparametric estimation from incomplete observation. J Am Stat Assoc 53: 457–481.

Kirson ED, Dbaly V, Tovarys F, Vymazal J, Soustiel JF, Itzhaki A, Mordechovich D, Steinberg-Shapira S, Gurvich Z, Schneiderman R, Wasserman Y, Salzberg M, Ryffel B, Goldsher D, Dekel E, Palti Y (2007) Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. Proc Natl Acad Sci USA 104: 10152–10157.

Kirson ED, Gurvich Z, Schneiderman R, Dekel E, Itzhaki A, Wasserman Y, Schatzberger R, Palti Y (2004) Disruption of cancer cell replication by alternating electric fields. Cancer Res 64: 3288–3295.

Knuth DE (1971) Optimum binary search trees. Acta Inform 1: 14–25.

Lee SX, Wong ET, Swanson KD (2011) Mitotic interference of cancer cells during anaphase by electric field from Novo-TTF-100A. Neuro-Oncology 13: iii13–iii14.

Lee SX, Wong ET, Swanson KD (2013) Disruption of cell division within anaphase by tumor treating electric fields (TTFields) leads to immunogenic cell death. Neuro-Oncology 15: iii66–iii67.

Lu KV, Chang JP, Parachoniak CA, Pandika MM, Aghi MK, Meyronet D, Isachenko N, Fouse SD, Phillips JJ, Cheresh DA, Park M, Bergers G (2012) VEGF inhibits tumor cell invasion and mesenchymal transition through a MET/VEGFR2 complex. Cancer Cell 22: 21–35.

Margolin K, Ernstoff MS, Hamid O, Lawrence D, Mcdermott D, Puzanov I, Wolchok JD, Clark JI, Sznol M, Logan TF, Richards J, Michener T, Balogh A, Heller KN, Hodi FS (2012) Ipilimumab in patients with melanoma and brain metastases: an open-label, phase 2 trial. Lancet Oncol 13: 459–465.

Mittal D, Gubin MM, Schreiber RD, Smyth MJ (2014) New insights into cancer immunoediting and its three component phases-elimination, equilibrium and escape. Curr Opin Immunol 27C: 16–25.

Norden AD, Young GS, Setayesh K, Muzikansky A, Klufas R, Ross GL, Ciampa AS, Ebbeling LG, Levy B, Drappatz J, Kesari S, Wen PY (2008) Bevacizumab for recurrent malignant gliomas: efficacy, toxicity, and patterns of recurrence. Neurology 70. 779–787.

Ostergaard L, Hochberg FH, Rabinov JD, Sorensen AG, Lev M, Kim L, Weisskoff RM, Gonzalez RG, Gyldensted C, Rosen BR (1999) Early changes measured by magnetic resonance imaging in cerebral blood flow, blood volume, and blood-brain barrier permeability following dexamethasone treatment in patients with brain tumors. J Neurosurg 90: 300–305.

2-1 9 2 12 X02 608

Raychaudhuri B, Rayman P, Ireland J, Ko J, Rini B, Borden EC, Garcia J, Vogelbaum MA, Finke J (2011) Myeloid-derived suppressor cell accumulation and function in patients with newly diagnosed glioblastoma. Neuro-Oncology 13: 591–599.

Reardon DA, Herndon II JE, Peters KB, Desjardins A, Coan A, Lou E, Sumrall AL, Turner S, Lipp ES, Sathornsumetee S, Rich JN, Sampson JH, Friedman AH, Boulton ST, Bigner DD, Friedman HS, Vredenburgh JJ (2012) Bevacizumab continuation beyond initial bevacizumab progression among recurrent glioblastoma patients. Br J Cancer 107: 1481–1487.

Schreiber RD, Old LJ, Smyth MJ (2011) Cancer immunoediting: integrating immunity's roles in cancer suppression and promotion. Science 331: 1565–1570.

Senovilla L, Galluzzi L, Zitvogel L, Kroemer G (2013) Immunosurveillance as a regulator of tissue homeostasis. Trends Immunol 34: 471–481.

Shipley B, Hunt R (1996) Regression smoothers for estimating parameters of growth analyses. Ann Bot 78: 569–576.

Stupp R, Wong E, Scott C, Taillibert S, Kanner A, Kesari S, Ram Z (2014) Interim analysis of the EF-14 trial: a prospective, multi-center trial of NovoTTF-100A together with temozolomide compared to temozolomide alone in patients with newly diagnosed GBM. Neuro-Oncology 16: v167.

Stupp R, Wong ET, Kanner AA, Steinberg D, Engelhard H, Heidecke V, Kirson ED, Taillibert S, Liebermann F, Dbaly V, Ram Z, Villano JL, Rainov N, Weinberg U, Schiff D, Kunschner L, Raizer J, Honnorat J, Sloan A, Malkin M, Landolfi JC, Payer F, Mehdorn M, Weil RJ, Pannullo SC, Westphal M, Smrcka M, Chin L, Kostron H, Hofer S, Bruce J, Cosgrove R, Paleologous N, Palti Y, Gutin PH (2012) NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomised phase III trial of a novel treatment modality. Eur J Cancer 48: 2192–2202.

Tondel P, Johansen TA, Bemporad A (2002) Computation and approximation of piecewise affine control laws via binary search trees. In Proceedings of the 41st IEEE Conference on Decision and Control. Vol. 3, pp 3144–3149.

Vecht CJ, Hovestadt A, Verbiest HB, van Vliet JJ, van Putten WL (1994) Dose-effect relationship of dexamethasone on Karnofsky performance in metastatic brain tumors. a randomized study of doses of 4, 8, and 16 mg per day. Neurology 44: 675–680.

Wong ET, Brem S (2008) Antiangiogenesis treatment for glioblastoma multiforme: challenges and opportunities. J Natl Compr Canc Netw 6: 515–522.

Wong ET, Gautam S, Malchow C, Lun M, Pan E, Brem S (2011) Bevacizumab for recurrent glioblastoma multiforme: a meta-analysis. J Natl Compr Canc Netw 9: 403–407.

Wong ET, Lok E, Swanson KD, Gautam S, Engelhard HH, Lieberman F, Taillibert S, Ram Z, Villano JL (2014) Response assessment of NovoTTF-100A versus best physician's choice chemotherapy in recurrent glioblastoma. Cancer Med 3: 592–602.

Zitvogel L, Apetoh L, Ghiringhelli F, Andre F, Tesniere A, Kroemer G (2008a) The anticancer immune response: indispensable for therapeutic success? J Clin Invest 118: 1991–2001.

Zitvogel L, Apetoh L, Ghiringhelli F, Kroemer G (2008b) Immunological aspects of cancer chemotherapy. Nat Rev Immunol 8: 59–73.

Zong WX, Ditsworth D, Bauer DE, Wang ZQ, Thompson CB (2004) Alkylating DNA damage stimulates a regulated form of necrotic cell death. Genes Dev 18: 1272–1282.

 This work is licensed under the Creative Commons Attribution 4.0 International License. To view a copy of this license, visit http://creativecommons.org/licenses/by/4.0/

Supplementary Information accompanies this paper on British Journal of Cancer website (http://www.nature.com/bjc)

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 341 of 631    Document 11-5    4572

EX. 2. P. 179

002231 C2C DIAR_A0000069327 12-19-2019

Available at www.sciencedirect.com

SciVerse ScienceDirect

journal homepage: www.ejconline.com



# NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: A randomised phase III trial of a novel treatment modality

Roger Stupp [a,*], Eric T. Wong [b], Andrew A. Kanner [c], David Steinberg [d],
Herbert Engelhard [e], Volkmar Heidecke [f], Eilon D. Kirson [g], Sophie Taillibert [h],
Frank Liebermann [i], Vladimir Dbaly [j], Zvi Ram [c], J. Lee Villano [e], Nikolai Rainov [f],
Uri Weinberg [g], David Schiff [k], Lara Kunschner [l], Jeffrey Raizer [m], Jerome Honnorat [n],
Andrew Sloan [o], Mark Malkin [p], Joseph C. Landolfi [q], Franz Payer [r],
Maximilian Mehdorn [s], Robert J. Weil [t], Susan C. Pannullo [u], Manfred Westphal [v],
Martin Smrcka [w], Lawrence Chin [x], Herwig Kostron [y], Silvia Hofer [z], Jeffrey Bruce [aa],
Rees Cosgrove [ab], Nina Paleologous [ac], Yoram Palti [g], Philip H. Gutin [ad]

[a] Centre Hospitalier Universitaire Vaudois, University of Lausanne, Lausanne, Switzerland
[b] Harvard Medical School, Beth Israel Deaconess Medical Center, Boston, MA, United States
[c] Tel Aviv Medical Center, Tel Aviv, Israel
[d] Department of Biostatistics, Tel Aviv University, Tel Aviv, Israel
[e] University of Illinois at Chicago, Chicago, IL, United States
[f] Augsburg Clinic, Augsburg, Germany
[g] Novocure Ltd., Haifa, Israel
[h] Hospital de la Pitié-Salpêtrière, Paris, France
[i] University of Pittsburgh Medical Center, Pittsburgh, PA, United States
[j] Na Homolce Hospital, Prague, Czech Republic
[k] University of Virginia, Charlottesville, VA, United States
[l] Allegheny Neurological Brain Tumor Center, Pittsburgh, PA, United States
[m] Northwestern University, Chicago, IL, United States
[n] Department of Neuro-Oncology, Hospices Civils de Lyon, Université Claude Bernard, Lyon, France
[o] University Hospitals of Cleveland, Case Western Reserve University School of Medicine, Cleveland, OH, United States
[p] Medical College of Wisconsin, Milwaukee, WI, United States
[q] New Jersey Neuroscience Institute at JFK Medical Center, Edison, NY, United States
[r] University Graz, Graz, Austria
[s] University of Kiel, Kiel, Germany
[t] The Cleveland Clinic Foundation Taussig Cancer Center, Cleveland, OH, United States
[u] New York Presbyterian Hospital-Weill Cornell Medical Center, New York, NY, United States
[v] University of Hamburg, Hamburg, Germany
[w] Brno University Hospital, Brno, Czech Republic
[x] Boston Medical Center, Boston, MA, United States

* Corresponding author: Address: Department of Neurosurgery, Centre Hospitalier Universitaire Vaudois (CHUV), 46, rue du Bugnon, Lausanne 1011, Switzerland. Tel.: +41 21 314 0156; fax: +41 21 314 0737.
E-mail address: Roger.Stupp@chuv.ch (R. Stupp).

0959-8049/$ - see front matter © 2012 Published by Elsevier Ltd.
http://dx.doi.org/10.1016/j.ejca.2012.04.011


Please cite this article in press as: Stupp R. et al., NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: A randomised phase III trial of a novel treatment modality, Eur J Cancer (2012), http://dx.doi.org/10.1016/j.ejca.2012.04.011

[y] University of Innsbruck, Austria
[z] University Hospital Zurich, Switzerland
[aa] Columbia University Medical Center, New York, NY, United States
[ab] Lahey Clinic, Boston, MA, United States
[ac] NorthShore University Health System, Evanston, IL, United States
[ad] Memorial Sloan Kettering Cancer Center, New York, NY, United States

KEYWORDS
Glioblastoma
Brain tumour
Chemotherapy
Randomised trial

Abstract *Purpose:* NovoTTF-100A is a portable device delivering low-intensity, intermediate frequency electric fields via non-invasive, transducer arrays. Tumour Treatment Fields (TTF), a completely new therapeutic modality in cancer treatment, physically interfere with cell division.

*Methods:* Phase III trial of chemotherapy-free treatment of NovoTTF (20–24 h/day) versus active chemotherapy in the treatment of patients with recurrent glioblastoma. Primary endpoint was improvement of overall survival.

*Results:* Patients (median age 54 years (range 23–80), Karnofsky performance status 80% (range 50–100) were randomised to TTF alone ($n = 120$) or active chemotherapy control ($n = 117$). Number of prior treatments was two (range 1–6). Median survival was 6.6 versus 6.0 months (hazard ratio 0.86 [95% CI 0.66–1.12]; $p = 0.27$), 1-year survival rate was 20% and 20%, progression-free survival rate at 6 months was 21.4% and 15.1% ($p = 0.13$), respectively in TTF and active control patients. Responses were more common in the TTF arm (14% versus 9.6%, $p = 0.19$). The TTF-related adverse events were mild (14%) to moderate (2%) skin rash beneath the transducer arrays. Severe adverse events occurred in 6% and 16% ($p = 0.022$) of patients treated with TTF and chemotherapy, respectively. Quality of life analyses favoured TTF therapy in most domains.

*Conclusions:* This is the first controlled trial evaluating an entirely novel cancer treatment modality delivering electric fields rather than chemotherapy. No improvement in overall survival was demonstrated, however efficacy and activity with this chemotherapy-free treatment device appears comparable to chemotherapy regimens that are commonly used for recurrent glioblastoma. Toxicity and quality of life clearly favoured TTF.

© 2012 Published by Elsevier Ltd.

## 1. Background

Glioblastoma is the most prevalent primary malignant brain tumour in adults. Median survival with optimal therapy is only 15 months from diagnosis, and most tumours recur within 9 months of initial treatment.[1] At the time of disease recurrence, treatment options for glioblastoma patients are limited. Repeat surgery may be considered in approximately 20% of patients,[2–4] and re-irradiation is possible in rare circumstances. For most patients chemotherapy is indicated at disease recurrence, with the choice of drug varying greatly. In the United States, bevacizumab has been provisionally approved for recurrent glioblastoma, while the European Medicines Agency (EMEA) rejected the application in the absence of a controlled trial.[5,6] Cytotoxic agents most frequently used are alkylating agents like nitrosoureas (e.g. lomustine [CCNU] or carmustine [BCNU],[7] procarbazine[8] or re-treatment with temozolomide.[9,10] Response rates are below 10%, progression-free survival rates at 6 months <20%.[7,8] In the absence of an established and satisfactory standard treatment, bevacizumab alone and in combination with irinotecan and experimental treatments are commonly used.[11–13]

Overall survival (OS) from recurrence is commonly short and without effective therapy rarely exceeds 3–5 months.[14–19] In a randomised trial of repeat surgery with implantation of carmustine wafers versus placebo median survival was 6.5 versus 4.7 months.[20] With active therapy, a median survival of 7 months (range 5–9.2 months)[7–10,12,13,21–24] has been reported. A recent randomised comparison of enzastaurin versus lomustine at first recurrence demonstrated a median survival of 7.1 months, with 19% of patients alive and progression-free at 6 months when treated with lomustine.[7] Based on these results active chemotherapy as salvage treatment for patients with recurrent glioma is recommended, which strives to improve survival and quality of life despite inherent chemotherapy-related toxicity.

The NovoTTF-100A system (Novocure Ltd., Haifa, Israel) is a portable device delivering low intensity, intermediate frequency, alternating electric fields (Tumour Treating Fields; TTF) using non-invasive, disposable transducer arrays (Fig. 1A). These fields physically

Please cite this article in press as: Stupp R. et al., NovoTTF-100A (tumour treating fields) physician's choice chemotherapy in recurrent glioblastoma: A randomised phase III trial of a novel treatment modality, *Eur J Cancer* (2012), http://dx.doi.org/10.1016/j.ejca.2012.04.011

Fig. 1. Female patient wearing the portable NovoTTF-100A device (A). Grade 2 skin rash underneath transducer arrays in a different patient (B). With the patients' permission.

interfere with cell division by causing misalignment of microtubule subunits in the mitotic spindle during the metaphase to anaphase transition[25] and by dielectrophoretic movement of intracellular macromolecules and organelles during telophase.[26,27] This causes failure of cytokinetic furrow formation and resultant mitotic blebbing, leading to the disruption of chromosome segregation and eventual cell death. The exact pathways by which spindle disruption and physical aggregation of macromolecules lead to cell death are unknown. TTF has been tested in several pilot clinical studies[26,28,29] including a small single arm study as monotherapy for recurrent glioblastoma. The results of this pilot trial were promising[16] and served as the basis of this phase III trial comparing NovoTTF-100A monotherapy (TTF) to best active chemotherapy according to the physician's best choice (active treatment control group). This report describes for the first time the efficacy and safety of this entirely novel treatment modality compared to widely accepted active chemotherapies for the treatment of recurrent glioblastoma patients.

## 2. Methods

### 2.1. Patient selection

Patients 18 years or older with histologically confirmed glioblastoma (World Health Organization grade IV astrocytoma) were eligible following radiologically confirmed disease progression (Macdonald criteria). Patients had a Karnofsky performance status $\geqslant 70\%$ and adequate haematologic, renal and hepatic function (absolute neutrophil count $\geqslant 1000/mm^3$; haemoglobin $\geqslant 100$ g/L platelet count, $\geqslant 100,000/mm^3$; serum creatinine level $\leqslant 1.7$ mg/dL ($<150$ µmol/L); total serum bilirubin level $\leqslant$ the upper limit of normal and liver-function values, $<3$ times the upper limit of normal). Prior therapy must have included radiotherapy (with and without concomitant and/or adjuvant temozolomide). There was no limit on number or type of prior

therapies or recurrences. Patients with infra-tentorial tumour location were excluded, as were patients with implanted electronic medical devices (e.g. pacemaker, programmable ventriculo-peritoneal shunt). All patients provided written informed consent, and the study was approved by the institutional review boards or ethics committees of all participating centres.

### 2.2. Study design and treatment

Patients were randomised at a 1:1 ratio to receive either TTF monotherapy (without chemotherapy) or the best available active chemotherapy according to the local physician's choice (active control). Randomisation was performed using random block sizes and was stratified by centre and according to whether patients underwent surgery for their latest recurrence prior to trial entry. Assigned treatment had to start within 1 week of randomisation, and was to be continued until disease progression or intolerance.

For patients assigned to the TTF group four transducer arrays were placed on the patient's shaved scalp and connected to a portable, battery or power supply operated device (NovoTTF-100A) which was set to generate 200 kHz electric fields within the brain in two perpendicular directions (operated sequentially). Field intensity was set at $>0.7$ V/cm at the centre of the brain. Patients were trained on how to operate the device and then continued treatment at home. Treatment was continuous while maintaining normal daily activity. Transducer arrays were replaced by the patients, their caregivers or device technicians once or twice a week. Prior to placement, the scalp was shaved carefully with an electric razor in order to avoid skin wounding, transducer arrays were supplied sterile. Although uninterrupted treatment was recommended, patients were allowed to take treatment breaks of up to an hour, twice per day, for personal needs (e.g. shower). In addition, they were allowed to take 2–3 days off treatment at the end of each 4 weeks of treatment (which is the minimal

Please cite this article in press as: Stupp R, et al., NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: A randomised phase III trial of a novel treatment modality, Eur J Cancer (2012), http://dx.doi.org/10.1016/j.ejca.2012.04.011

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 344 of 631    Document 11-5    4575

EX. 2, P. 182

required treatment duration for TTF therapy to reverse tumour growth).[30]

Patients assigned to the active control received chemotherapy at the local investigators discretion. The best available chemotherapy was prescribed according to local practice and depending on prior treatment exposure.

### 2.3. Patient surveillance and follow up

Baseline examinations included a gadolinium-enhanced magnetic resonance imaging (MRI) of the brain, full blood counts, blood chemistry tests, blood coagulation tests, electrocardiogram (ECG), physical examination including a detailed neurological examination and quality-of-life (QoL) questionnaire (European Organisation for Research and Treatment of Cancer (EORTC) QLQ C-30).

Patients were followed once a month, including laboratory tests. MRI was repeated every 2 months. QoL questionnaires were completed at baseline and then every 3 months. Tumour response and progression were determined by blinded central radiology review, according to Macdonald criteria.[31] When an MRI could not be obtained, progression was assessed clinically based on neurological status, steroid dosing, adverse events and investigator assessment of progression.

Adverse events were recorded prospectively according to National Cancer Institute Common Toxicity Criteria (NCI CTC V3.0)

### 2.4. Statistical analysis

The primary end-point was OS. Secondary end-points were progression free survival (PFS), the percentage of patients alive and progression-free at 6 months (PFS6), 1-year survival rate, radiological response rate (RR), QoL and safety. OS and PFS were computed from the day of randomisation until event or censored at last follow-up according to the Kaplan–Meier method, with 2-sided logrank statistics for comparison. The study had an 80 per cent power at a significance level of 0.05 to detect a 60 per cent increase in median OS (hazard ratio for death, 0.63). All analyses were performed using the intent to treat population of all randomised patients, patients lost to follow-up were censored at the time of last contact. A Cox proportional hazards model was used to adjust for confounding baseline variables (continuous and categorical). The survival data were tested for proportional hazards and the assumption of proportionality met. The Cox model was performed in two steps; first, all protocol pre-specified baseline variables were tested directly for interactions with OS; then a reduced model was performed testing the effect of all variables with significant interactions ($p < 0.05$) with OS together on the treatment effect of TTF versus active chemotherapy. Secondary end-points are presented without adjustment. QoL is pre-

sented as change from baseline to 3 months for each of the subscale domains and symptom scales of the QLQ-C30 questionnaire.

### 2.5. Organisational aspects

The trial was registered on www.clinicaltrials.gov, NCT#00379470. The trial was funded and sponsored by Novocure Ltd. Statistical analysis was performed by David Steinberg. The manuscript was written by Roger Stupp and Eilon Kirson, with substantial input by all co-authors. The final manuscript was reviewed and approved by all authors. The statistician and the corresponding author had unrestricted access to all data.

### 2.6. Role of the funding source

Representatives of the study sponsor were involved in the study design, data collection, data analysis, data interpretation and writing of the report. Data analysis was performed by David Steinberg, a compensated independent biostatistician. The corresponding author had full access to all data in the study and had final responsibility for the decision to submit for publication.

## 3. Results

### 3.1. Patients

From September 2006 until May 2009, 237 patients from 28 institutions in 7 countries were randomly assigned to receive TTF monotherapy (120 patients) or active control chemotherapy (117 patients). The baseline patient characteristics were balanced (Table 1). The median age was 54, and a quarter of the patients had undergone some surgical resection of the recurrent tumour prior to enrolment into the trial. More than 80% of patients had failed two or more prior lines of chemotherapy ($\geqslant$second recurrence) and 20% of the patients had failed bevacizumab prior to enrolment. Histology was per local pathological diagnosis; in 8% a history of a prior lower grade glioma had been reported (secondary glioblastoma). *Methyl-guanine methyl-transferase (MGMT)* gene promoter methylation, an important predictive factor for benefit of temozolomide chemotherapy in newly diagnosed glioblastoma, was not assessed in this trial of patients with recurrent disease.

### 3.2. Patient disposition, treatment and compliance

In the TTF group, 116 of 120 patients (97%) started treatment and 93 patients (78%) completed 4 weeks of therapy (1 cycle). Twenty-seven patients discontinued treatment early, often within a few days, due to non-compliance or inability to handle the device (trial flow

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 345 of 631    Document 11-5    4576

EX. 2, P. 183

992233 C2C DIAR_A0000069327 12-19-2918

diagram). Four patients had pre-treatment events related to the progressive nature of their disease and never started therapy with the device. In the TTF patients who started treatment (116 patients) mean compliance was measured by downloading a log file from the device, which recorded the actual time TTF therapy was delivered. Median compliance was 86 per cent (range 41–98%) of the time in each treatment month, translating into a mean use of 20.6 h per day.

apy (6.6 versus 6.0 months, respectively). One-year survival proportion was 20% in both groups, the 2- and 3-year survival rates survival rates were 8% (95% CI 4, 13) and 4% (95% CI 1, 8) versus 5% (95% CI 3, 10) and 1% (95% CI 0, 3), for TTF versus active control, respectively (Fig. 1A). The hazard ratio for death was 0.86 (95% CI 0.66, 1.12) in favour of NovoTTF ($p = 0.27$). Adjusting for baseline characteristics using a Cox proportional hazards model did not substantially

trial flow diagram



In the active control group, 113 of 117 patients (97%) started chemotherapy and all but 1 patient completed one full treatment course of the chosen chemotherapy. In four patients disease related adverse events and tumour progression prevented the initiation of the planned chemotherapy, they only received supportive care (hospice care). Twenty-one patients randomised to the control group decided not to return to the investigational site for treatment, thus details on disease progression and toxicity are not available. Most of patients received single agent or a combination chemotherapy regimen containing bevacizumab (31%), or irinotecan (31%), followed by nitrosoureas (25%), carboplatin (13%), temozolomide (11%) or various other agents (5%; Supplementary Table 1).

### 3.3. Survival, progression and radiological response

At a median follow up of 39 months, 220 patients had died (93%). Median survival was marginally higher in the TTF group compared to active control chemother-

alter the results. In the active chemotherapy control arm of the trial, survival was not significantly affected by the choice of chemotherapy (Cox proportional hazards test; $p = 0.66$).

More objective radiological responses (partial and complete responses) were seen in the TTF group than in the active control chemotherapy group (14 versus 7, respectively), translating into a response rate in evaluated patients of 14.0% (95% CI 7.9–22.4%) versus 9.6% (95% CI 3.9–18.8%), respectively (chi squared $p = 0.19$). All three complete responses were observed in the TTF group. Two exemplary partial responses from TTF are shown in Fig. 3.

The trial had been designed for superiority. Since the control group in the trial is an active chemotherapy control which showed similar efficacy to that seen in previous trials and the device was used as monotherapy it is reasonable to analyse the results also in the context of a non-inferiority analysis. The HR for death in the TTF group compared to the active control chemotherapy group was below 1.0 (0.86; 95% CI 0.66–1.12), indi-

Please cite this article in press as: Stupp R. et al., NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: A randomised phase III trial of a novel treatment modality, Eur J Cancer (2012), http://dx.doi.org/10.1016/j.ejca.2012.04.011

2 – 1

Table 1
Baseline characteristics.

| Characteristics | Tumour Treatment Fields (TTF) (n = 120) # pts (%) | Active control (n = 117) # pts (%) |
|---|---|---|
| Age, median (range) | 54 years (24–80) | 54 years (29–74) |
| Gender | | |
|   Male | 92 (77) | 73 (62) |
|   Female | 28 (23) | 44 (38) |
| Histology | | |
|   Glioblastoma | 100% | 100% |
|   Prior lower grade glioma | 10 (8) | 9 (8) |
| Karnofsky performance status, median (range) | 80% (50–100) | 80% (50–100) |
| Steroid use at enrolment | | |
|   Yes | 55 (46) | 62 (53) |
|   No | 55 (46) | 49 (42) |
|   Unknown | 10 (8) | 6 (5) |
| Largest tumour diameter at randomisation, median (range) | 6.1 cm (0–15.2) | 5.5 cm (0–16.2) |
| Interval from initial glioma diagnosis, median (range) | 11.8 months (3.2–99.3) | 11.4 months (2.9–77.1) |
| Prior therapy | | |
| 1st recurrence | 11 (9) | 17 (15) |
| 2nd recurrence | 58 (48) | 54 (46) |
| 3rd or greater recurrence | 51 (43) | 46 (39) |
| Surgery | | |
|   Debulking before enrolment | 33 (20) | 29 (25) |
|   Debulking at any stage | 95 (79) | 99 (85) |
|   Biopsy only | 25 (21) | 18 (15) |
| Radiotherapy | 100% | 100% |
|   With concomitant temozolomide | 103 (86) | 96 (82) |
|   No concomitant temozolomide | 15 (13) | 20 (17) |
|   Unknown | 2 (1) | 1 (1) |
| Prior adjuvant (maintenance) temozolomide | 100 (83) | 89 (76) |
|   Median no of cycles | 4 (0–19) | 3 (0–27) |
| Prior bevacizumab | 23 (19) | 21 (18) |



| At risk | 0 m | 6 m | 12 m | 18 m | 24 m | 30 m | 36 m | 42 m | 48 m |
|---|---|---|---|---|---|---|---|---|---|
| TTF | 120 | 63 | 24 | 16 | 8 | 7 | 4 | 2 | 1 |
| BPC | 117 | 66 | 22 | 14 | 6 | 2 | 1 | 0 | 0 |

| 0 m | 13 w | 26 w | 39 w | 52 w | 65 w | 78 w | 91 w |
|---|---|---|---|---|---|---|---|
| 120 | 36 | 19 | 14 | 11 | 6 | 4 | 3 |
| 117 | 34 | 14 | 10 | 3 | 1 | 0 | 0 |

Fig. 2. Overall survival (A) and progression free survival (B) Kaplan–Meier curves.

cating that TTF may be at least equivalent to active chemotherapy.

PFS showed a similar trend in favour of TTF patients as seen for OS (Fig. 1B). Median PFS was 2.2 and

Please cite this article in press as: Stupp R et al., NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: A randomised phase III trial of a novel treatment modality. Eur J Cancer (2012), http://dx.doi.org/10.1016/j.ejca.2012.04.011

302234 OIC D7HR_2000069277 12 19-2015



2.1 months for TTF and active control groups, respectively (Fig. 2; HR 0.81, 95% CI 0.60–1.09; log rank $p = 0.16$). PFS6 was 21.4 per cent (95% CI 13.5–29.3) in the TTF group and 15.1 per cent (95% CI 7.8–22.3) in the active control group (chi squared $p = 0.13$).

### 3.4. Safety and toxicity

As expected from the mechanism of action of TTF therapy and the fact that its delivery is localised to the head, the typical systemic side-effects of chemotherapies were not observed in the TTF treated patients. Mild to moderate (grade 1 and 2) contact dermatitis on the scalp beneath the transducer arrays occurred in 16% of TTF patients (Fig. 1B). This condition was easily treated with topical corticosteroids, resolved completely after treatment, was stopped and did not require substantial treatment breaks.

Patients receiving active control chemotherapy experienced toxicity related to pharmacologic mechanism of the agents used. A list of grade 2–4 adverse events by organ system and adverse event terms seen in more than 2% of patients in either group is presented in Table 2. As expected, there were significantly more gastrointestinal, haematological and infectious adverse events seen in the chemotherapy group than in the TTF group. Severe (grades 3 and 4) toxicity was observed in only 3% of patients.

### 3.5. Quality of life

Longitudinal Quality of Life (QOL) could be analysed in the patients who remained on study therapy for ⩾3 months and for whom QoL data were available (63 patients, 27%). In the domains of global health and social functioning no meaningful differences between chemotherapy and TTF were observed. However, cognitive and emotional functioning favoured TTF. Physical functioning may be slightly worse with TTF, while role functioning favoured TTF (Fig. 4A). Symptom scale analysis is in accordance to treatment-associated toxicity; appetite loss, diarrhoea, constipation, nausea and vomiting were directly related to the chemotherapy administration. Increased pain and fatigue was reported in the chemotherapy-treated patients and not in the TTF treatment group (Fig. 4B).

### 3.6. Treatment after progression

In order to rule out the effect of subsequent treatments on the OS results reported above, we compared the number and type of post-progression treatments patients received after failing the trial therapy. Due to




Fig. 3. Exemplary T1 weighted magnetic resonance imaging (MRI) images with gadolinium from two Tumour Treatment Fields (TTF) patients with partial response to therapy. (A) A 48 years old male with prior grade II astrocytoma which transformed to glioblastoma (based on tissue biopsy. The subject progressed 7 months after receiving chemoradiotherapy, and subsequently responded to TTF therapy (partial response at 12 months) and remained stable for an additional 36+ months on TTF. (B) A 55 years old male with primary glioblastoma who recurred for the third time after receiving chemoradiotherapy, adjuvant temozolomide (2 cycles), bevacizumab with irinotecan (3 months) and erlotinib with sorafenib (one cycle). The subject had a partial response to TTF therapy after 4 months of treatment and remained stable for an additional 8 months while on TTF.

2 — 1 0 2 1 2 X 0 2 6 1 6

Please cite this article in press as: Stupp R. et al., NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: A randomised phase III trial of a novel treatment modality, Eur J Cancer (2012), http://dx.doi.org/10.1016/j.ejca.2012.04.011

Table 2
Treatment-emergent adverse events ≥grade 2 by body system.

| System | Adverse event term | Tumour Treatment Fields (TTF) (n = 116) % (% gr. 3 + 4) | Active control (n = 91) % (% gr. 3 + 4) |
|---|---|---|---|
| Haematological | | 3 (0) | 17 (4) |
| | Leucopenia | 0 (0) | 5 (1) |
| | Neutropenia | 0 (0) | 2 (1) |
| | Thrombocytopenia | 1 (1)[a] | 7 (2) |
| Gastrointestinal disorders | | 4 (1) | 17 (3) |
| | Abdominal pain | 0 (0) | 3 (0) |
| | Diarrhoea | 0 (0) | 6 (2) |
| | Nausea/vomiting | 2 (0) | 7 (0) |
| General deterioration and malaise | | 5 (1) | 6 (1) |
| Infections | | 4 (0) | 8 (1) |
| Skin rash (transducer arrays) | | 2 (0) | 0 (0) |
| Metabolism and nutrition disorders | | 4 (1) | 6 (3) |
| Musculoskeletal disorders | | 2 (0) | 5 (0) |
| Nervous system disorders | | 30 (7) | 28 (7) |
| | Brain oedema | 0 (0) | 2 (0) |
| | Cognitive disorder | 2 (1) | 2 (1) |
| | Convulsion | 7 (2) | 5 (2) |
| | Dysphasia | 2 (0) | 1 (0) |
| | Headache | 8 (1) | 6 (0) |
| | Hemianopsia | 1 (0) | 3 (1) |
| | Hemiparesis | 3 (1) | 2 (1) |
| | Neuropathy peripheral | 2 (0) | 2 (0) |
| Psychiatric disorders | | 5 (0) | 4 (0) |
| Renal and urinary disorders | | 3 (1) | 3 (0) |
| Respiratory disorders | | 1 (0) | 3 (1) |
| Vascular disorders | | 3 (1) | 4 (3) |
| | Pulmonary embolism | 1 (1) | 2 (2) |
| | Hypertension | 1 (0) | 1 (1) |
| | Deep vein thrombosis | 1 (0) | 1 (0) |

[a] Thrombocytopenia from prior chemotherapy, normalised subsequently.

the very advanced stage they were recruited to the study (most patients were at their second or subsequent recurrence), only 5.8% of the TTF-treated patients and 10.3% of the chemotherapy-treated patients received subsequent salvage antitumour therapy (chi square $p = 0.24$) (mainly bevacizumab, irinotecan, nitrosoureas and temozolomide). The majority of patients received only supportive care once tumour progression developed.

## 4. Discussion

Tumour treatment with alternating electrical fields that interfere with the metaphase to anaphase transition in dividing tumour cells is an entirely novel cancer treatment modality. We report the first prospective, randomised, controlled study using this new treatment modality in the most aggressive primary brain tumour. Although glioblastoma diffusely infiltrates the brain, it almost never metastasises and is thus amenable to a loco-regional therapy.

Prognosis of patients with recurrent glioblastoma is poor, and chemotherapy is usually recommended. Depending on prior treatments and treatment centre expertise, variable chemotherapy agents alone or in combination are commonly prescribed. Our randomised trial compared this standard chemotherapy per local practice (active treatment control group) with TTF in a prospective, multicentre phase III trial. Although the trial did not reach its primary end-point of improved survival compared to active chemotherapy, this new minimally invasive and chemotherapy-free local treatment modality demonstrated a statistically non-significant increased response rate (14 versus 9.6%, $p = 0.19$), an improved PFS6 rate (21% versus 15%, $p = 0.13$), and a trend towards reduction of the risk of death (hazard ratio 0.86, 95% CI 0.66–1.12, $p = 0.27$), as well as sustained improvement in QoL.

These results cannot be explained by subsequent salvage chemotherapy, as few patients received additional therapy after failure of protocol treatment. Importantly, the majority of our patients were recruited to the trial at an advanced stage of the disease, after failure of two or more chemotherapy agents, while other trials in recurrent glioblastoma usually only enrol patients at first recurrence. It is also notable that 20% of patients had failed prior bevacizumab therapy, a population that usually fares poorly with most subsequent treatments.

One limitation of the study was the absence of a placebo or treatment-free control arm. In the setting of advanced disease and chemotherapy considered indicated and effective, such a control would hardly have been acceptable to patients and physicians alike. Fur-

Please cite this article in press as: Stupp R. et al., NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: A randomised phase III trial of a novel treatment modality, Eur J Cancer (2012), http://dx.doi.org/10.1016/j.ejca.2012.04.011

R. Stupp et al. / European Journal of Cancer xxx (2012) xxx–xxx

9





Fig. 4. QLQ C30 longitudinal change from base to 3 months. (A) General functional scales (an increase in percentage corresponds to an increase in QOL). (B) Symptom scales (an increase in percentage corresponds to a decrease in QOL).

thermore, chemotherapy with lomustine has shown superior efficacy versus investigational treatments in two recent randomised trials. And based on high response rates and prolonged survival compared to historical controls bevacizumab has received accelerated Food and Drug Administration (FDA) approval. Furthermore, the observation of objective responses in 14 patients with NovoTTF alone (median time since end of prior RT 7 months, thus unlikely to be all pseudoprogression) strongly suggests singular activity of this device.

Another limitation is the somewhat heterogeneous patient population, with patients included after progression of one or several lines of prior chemotherapy. This underscores the demand from patients for further treatments, even when the expected benefit of a 2 months prolongation in PFS may appear modest. In the ongoing randomised phase III trial for newly diagnosed glioblastoma, only patients non-progressive after completion of chemoradiation are eligible (Novocure EF-14, www.clinicaltrials.gov, NCT#00916409).

As expected with a local treatment, toxicity was limited to skin irritation from transducer arrays (Fig. 1B). After proper instructions, most patients became independent in handling this device and replacing transducer arrays, allowing them to be ambulatory and even going to work. Despite the inconvenience of carrying and

using the device almost permanently, compliance was high and patients reported improvement in QoL in the absence of chemotherapy related toxicities.

In vitro and animal experiments suggest enhanced effect when TTF is combined with chemotherapy.[26,32] We therefore initiated a subsequent randomised phase III trial currently enrolling newly diagnosed glioblastoma patients after completion of standard radiochemotherapy, parallel to starting the adjuvant or maintenance temozolomide chemotherapy. Patients randomised to the experimental arm will receive TTF in addition to maintenance temozolomide (www.clinicaltrials.gov, NCT#00916409).

Based on the result of this trial TTF therapy has recently been approved in the US and Europe for the treatment of recurrent glioblastoma (www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm251669.htm).

The universal anti-cancer effect of TTF may be applicable to other solid tumour types, alone or in combination with chemotherapy. In particular, in a situation of morbidity induced by a heavy local tumour burden, and in conditions where further radiotherapy is not an option, this non-invasive treatment may allow for a clinical benefit and will substantially expand our treatment armamentarium.

Please cite this article in press as: Stupp R, et al., NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: A randomised phase III trial of a novel treatment modality, Eur J Cancer (2012), http://dx.doi.org/10.1016/j.ejca.2012.04.011

## Conflict of interest statement

Eilon Kirson and Uri Weinberg are employees of Novocure Ltd., and have stock options in the company.

Herwig Kostron has received honoraria from Novocure Ltd.

Yoram Palti is the inventor of the Novo-TTF principle. He received consulting honoraria and travel support by Novocure Ltd.

Nina Paleologos has served on advisory boards and speakers bureau to Genentech, Merck & Co (previously Schering-Plough).

Susan Pannullo has received research grants from Novocure, NTI Pharma, Eisai, Immunocellular and Parexel, and honoraria for lectures from Merck & Co (previously Schering-Plough).

Zvi Ram is a board member for Novocure, and received consultancy honoraria.

Jeffrey Raizer has received research support from Novocure Ltd., performed consultancy for Merck and Genentech/Roche, and lectures on behalf of Merck & Co, Genentech and Enzon.

David Schiff has performed consultancy for Genentech and Tau Pharmaceuticals.

Andrew Sloan has provided consultancy to Genentech/Roche, Real Bio Inc., Nautiber Solutions, Surgical Theatre and Monteris Medical Inc.

Roger Stupp has served on scientific advisory boards for Merck-Serono, Roche, Actelion, MDxHealth (previously OncoMethylomeSiences) and Merck and Co (previously Schering-Plough).

Manfred Westphal has received consultancy honoraria from Roche, OncoScience and Ark Therapeutics.

Eric T. Wong has received research support from Novocure Ltd.

The following authors declare no potential conflict of interest: Jeffrey Bruce, Lawrence Chin, Rees Cosgrove, Vladimir Dbaly, Herbert Engelhard, Philip Gutin, Volkmar Heidecke, Silvia Hofer, Andrew Kanner, Lara Kunschner, Joseph Landolfi, Frank Lieberman, Marc Malkin, Maximilliam Mehdorn, Franz Payer, Martin Smrcka, David Steinburg, J. Lee Villano, and Robert Weil.

## Acknowledgements

We are indebted to the patients and their families for agreeing to participate in this trial. We thank all the local site co-investigators, and trial coordinators at the participating centres for their hard and diligent work, as well as the nurses at the trial site and Novocure technicians for the great patient care provided. We express our special thanks to Martine Lionnet, Francois Ducray, Stéphanie Cartalat-Carel, Marie Fasol, Valerie Elsig, Mike Ambrogi, Shawn Andrews, Yoram Wasserman and Zoya Gurvich.

## Appendix A. Supplementary data

Supplementary data associated with this article can be found, in the online version, at http://dx.doi.org/10.1016/j.ejca.2012.04.011.

## References

1. Stupp R, Mason WP, van den Bent MJ, et al. Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. N Engl J Med 2005;352(10):987-96.
2. Brandes AA, Vastola F, Monfardini S. Reoperation in recurrent high-grade gliomas: literature review of prognostic factors and outcome. Am J Clin Oncol 1999;22(4):387-90.
3. Gaspar L, Signorelli F, Frappaz D, Madarnas G, Ricci AC, Bret P. Is reoperation for recurrence of glioblastoma justified? Oncol Rep 2000;7(4):899-904.
4. Mandl ES, Dirven CM, Buis DR, Postma TJ, Vandertop WP. Repeated surgery for glioblastoma multiforme: only in combination with other salvage therapy. Surg Neurol 2008;69(5):506-9 [discussion 509].
5. Verhoeff JJ, van Tellingen O, Claes A, et al. Concerns about anti-angiogenic treatment in patients with glioblastoma multiforme. BMC Cancer 2009;9:444.
6. Wick W, Weller M, van den Bent M, Stupp R. Bevacizumab and recurrent malignant gliomas: a European perspective. J Clin Oncol 2010;28(12):188-9 [author reply e190-2].
7. Wick W, Puduvalli VK, Chamberlain MC, et al. Phase III study of enzastaurin compared with lomustine in the treatment of recurrent intracranial glioblastoma. J Clin Oncol 2010;28(7):1168-74.
8. Yung WK, Albright RE, Olson J, et al. A phase II study of temozolomide vs. procarbazine in patients with glioblastoma multiforme at first relapse. Br J Cancer 2000;83(5):588-93.
9. Balmaceda C, Peereboom D, Pannullo S, et al. Multi-institutional phase II study of temozolomide administered twice daily in the treatment of recurrent high-grade gliomas. Cancer 2008;112(5):1139-46.
10. Chang SM, Theodosopoulos P, Lamborn K, et al. Temozolomide in the treatment of recurrent malignant glioma. Cancer 2004;100(3):605-11.
11. Cohen MH, Shen YL, Keegan P, Pazdur R. FDA drug approval summary: bevacizumab (Avastin) as treatment of recurrent glioblastoma multiforme. Oncologist 2009;14(11):1131-8
12. Friedman HS, Prados MD, Wen PY, et al. Bevacizumab alone and in combination with irinotecan in recurrent glioblastoma. J Clin Oncol 2009;27(28):4733-40.
13. Vredenburgh JJ, Desjardins A, Herndon 2nd JE, et al. Bevacizumab plus irinotecan in recurrent glioblastoma multiforme. J Clin Oncol 2007;25(30):4722-9.
14. Rosenthal MA, Gruber ML, Glass J, et al. Phase II study of combination taxol and estramustine phosphate in the treatment of recurrent glioblastoma multiforme. J Neurooncol 2000;47(1):59-63.
15. Ondard S, Carpentier A, Baut F, et al. Phase II study of fotemustine and diazepam in the treatment of recurrent glioblastoma multiforme. J Neurooncol 2003;63(1):81-6.
16. Chamberlain MC, Tsao-Wei DD. Salvage chemotherapy with cyclophosphamide for recurrent, temozolomide-refractory glioblastoma multiforme. Cancer 2004;100(6):1213-20.
17. Kesari S, Schiff D, Doherty L, et al. Phase II study of metronomic chemotherapy for recurrent malignant gliomas in adults. Neuro-oncol 2007;9(3):354-63.
18. Puduvalli VK, Yung WK, Hess KR, et al. Phase II study of fenretinide (NSC 374551) in adults with recurrent malignant gliomas: a North American Brain Tumor Consortium study. J Clin Oncol 2004;22(21):4282-9.

Case 1:20-cv-00194-WCG　Filed 04/28/20　Page 351 of 631　Document 11-5

4582

EX. 2, P. 189

002236 C2C DIAR_A0000069327 12-19-2018

19. Kuba PA, Martin DH, Nguyen-Khoa MT, et al. Early termination of ISRCTN45828668, a phase 1/2 prospective, randomized study of sulfasalazine for the treatment of progressing malignant gliomas in adults. *BMC Cancer* 2009;9:372.

20. Brem H, Piantadosi S, Burger PC, et al. Placebo-controlled trial of safety and efficacy of intraoperative controlled delivery by biodegradable polymers of chemotherapy for recurrent gliomas. The polymer-brain tumor treatment group. *Lancet* 1995;345(8956):1008–12.

21. Bradu M, Huang-Xian K, Rampling R, et al. Multicenter phase II trial of temozolomide in patients with glioblastoma multiforme at first relapse. *Ann Oncol* 2001;12(2):259–66.

22. Rich JN, Reardon DA, Peery T, et al. Phase II trial of gefitinib in recurrent glioblastoma. *J Clin Oncol* 2004;22(1):133–42.

23. Neyns B, Sadones J, Joosens E, et al. Stratified phase II trial of cetuximab in patients with recurrent high-grade glioma. *Ann Oncol* 2009;20(9):1596–603.

24. Perry JR, Belanger K, Mason WP, et al. Phase II trial of continuous dose-intense temozolomide in recurrent malignant glioma: rescue study. *J Clin Oncol* 2010;28(12):2051–7.

25. Lee S, Wong E, Swanson K. Mitosis interference of cancer cells during anaphase by electric field from NovoTTF-100A. In: *Society for Neuro Oncology*, 2011, Orange County, CA; 2011. *Neuro Oncol* 2011;13(Suppl. 3):1–167 [Abstract CB-17].

26. Kirson ED, Dbaly V, Tovnrys F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. *Proc Natl Acad Sci U S A* 2007;104(24):10152–7.

27. Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of cancer cell replication by alternating electric fields. *Cancer Res* 2004;64(9):3288–95.

28. Kirson ED, Schneiderman RS, Dbaly V, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). *BMC Med Phys* 2009;9(1):1.

29. Salzberg M, Kirson E, Palti Y, Rochlitz C. A pilot study with very low-intensity, intermediate-frequency electric fields in patients with locally advanced and/or metastatic solid tumors. *Onkologie* 2008;31(7):362–5.

30. Kirson ED, Wasserman Y, Izhaki A, Mordechovich D, Gurvich Z, Dbaly V, et al. Modeling tumor growth kinetics and its implications for TTFields treatment planning. In: *The 2010 Society of Neuro-Oncology Scientific Meeting and Education Day*, Montreal, Canada; 2010. *Neuro Oncol* 2010;12(Suppl. 4):1–148 [Abstract NO-54].

31. Macdonald DR, Cascino TL, Schold Jr SC, Cairncross JG. Response criteria for phase II studies of supratentorial malignant glioma. *J Clin Oncol* 1990;8(7):1277–80.

32. Schneiderman RS, Shmueli E, Kirson ED, Palti Y. TTFields alone and in combination with chemotherapeutic agents effectively reduce the viability of MDR cell sub-lines that over-express ABC transporters. *BMC Cancer* 2010;10:229.

Please cite this article in press as: Stupp R, et al., NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: A randomized phase III trial of a novel treatment modality, *Eur J Cancer* (2012), http://dx.doi.org/10.1016/j.ejca.2012.04.011

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 352 of 631   Document 11-5      4583

EX. 2, P. 190

For reprint orders, please contact reprints@expert-reviews.com





# NovoTTF-100A: a new treatment modality for recurrent glioblastoma

Expert Rev. Neurother. doi:10.1586/ERN.12.80 (2012) (Epub ahead of print)

Ekokobe Fonkem[1,2] and Eric T Wong*[1,2]

[1]Brain Tumor Center and Neuro-Oncology Unit, Beth Israel Deaconess Medical Center, Harvard Medical School, 330 Brookline Avenue, Boston, MA 02215, USA
[2]Departments of Neurology, Beth Israel Deaconess Medical Center, Harvard Medical School, Boston, MA, USA
*Author for correspondence:
Tel.: +1 617 667 1665
Fax: +1 617 667 1664
ewong@bidmc.harvard.edu

NovoTTF-100A (Novocure Inc., Haifa, Israel) is a first-of-a-kind device approved by the US FDA for the treatment of recurrent glioblastoma. It works by emitting a low-intensity, intermediate-frequency (200 kHz), alternating electric field administered via insulated transducer arrays applied onto the scalp. The electric field penetrates the brain and inhibits the growth and proliferation of glioblastoma by interfering with tumor cell mitosis at anaphase. Results from a Phase III clinical trial indicate that the efficacy of NovoTTF-100A is equivalent to standard-of-care chemotherapy. The side effect profile favors device-treated patients, obviating typical toxicities associated with chemotherapy or targeted drugs, and results in improvements in their quality of life. NovoTTF-100A is a new modality of cancer treatment that offers equivalent efficacy, but less toxicity, to recurrent glioblastoma patients when compared with existing treatments.

Keywords: chemotherapy • electric field • glioblastoma • NovoTTF-100A • tumor-treating field

## Overview of the market

Despite continuing research in drug treatments for glioblastomas, median patient survival remains a dismal 14.6 months from the time of initial diagnosis using combined radiation and chemotherapy [1]. Fewer than 10% of patients survive to the 5-year time point [2]. At the time of glioblastoma recurrence or progression, the overall survival (OS) of patients is even worse – typically 6 months or less [3]. The only US FDA-approved medical treatment for recurrence is bevacizumab, but this drug has never been tested in a Phase III clinical trial. Current salvage treatment with bevacizumab prolongs only the progression-free survival (PFS), but not OS, and the tumor invariably progresses in an infiltrative pattern, causing neurological deficits and eventual death [4,5]. Both bevacizumab and cytotoxic chemotherapies have serious side effects that include hemorrhage, thromboembolism, infection, hypertensive crisis, renal failure, diarrhea, nausea and vomiting [4–6]. Therefore, there is a great unmet need for novel therapies that have new mechanisms of action against glioblastoma and a more favorable toxicity profile.

## Introduction

NovoTTF-100A (Novocure Inc., Haifa, Israel) is a novel class of therapeutic device being used for the treatment of recurrent glioblastoma. It works by emitting low-intensity, intermediate-frequency (200 kHz), alternating electric fields administered by insulated transducer arrays to inhibit the growth and proliferation of intracranial glioblastomas [7]. This device, which consists of the transducer arrays, electric field generator (set at a frequency of 200 kHz) and battery (Figure 1), was approved for use by the FDA on 8 April 2011 [101]. This review summarizes its mechanisms of action, Phase III efficacy and safety data, and current use in clinical practice.

## Mechanism of action

NovoTTF-100A exerts its anti-tumor effect on glioblastoma cells by interfering with mitosis at anaphase. In synchronized cell culture, such a tumor-treating electric field (TTField) first disrupted cytokinesis and then impaired chromosome separation from the metaphase plates [8]. Biochemical assays also confirmed that these cells had already transited from metaphase to anaphase [8]. Immunofluorescence of treated cells demonstrated lagging chromosomes, dispersion of chromosomes, chromosome decondensation in the absence of cytokinesis, and asymmetric chromosome segregation [8,9]. Exposed cells showed no p53 induction, suggesting that cell death was mediated via a p53-independent

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 353 of 631   Document 11-5     4584
EX. 2, P. 191

992237 C2C DIAR_A0000069327 12-19-2019



Figure 1. The NovoTTF-100A device setup. Left panel: The NovoTTF-100A device. Right panel: Two opposing pairs of transducer arrays (A) are applied to the scalp and the cables are linked to the connection box (B). The connection box is then attached to the electric field generator (C), which is connected to a power supply (D). The entire set up weighs approximately 7 lbs.

mechanism [8]. Furthermore, susceptibility to TTField is cell type dependent. Both glioma cells from rats (F-98) and humans (U87 and U118) have a significantly decreased growth rate when exposed to TTField [9]. The best result appears to occur at an intensity of 2.25 V/cm and a frequency of 200 kHz [9]. Taken together, TTField represents a new modality of anticancer treatment via a mechanism that differs from conventional radiotherapy, cytotoxic chemotherapies or targeted kinase inhibitors. However, additional research is needed to determine the effect on postmitotic neurons and glia, as well as dividing progenitor cells, within the brain.

## Clinical efficacy
NovoTTF-100A underwent initial testing in a pilot trial of ten patients with recurrent glioblastoma [7]. The results showed that the median time to disease progression was 26.1 weeks (range: 3.0–124.0 weeks), the PFS at 6 months (PFS6) was 50% (95% CI: 23–77%), and the median OS was 62.2 weeks (range: 20.3–124.0 weeks) [8]. There were two durable responses, including two patients with complete and partial responses lasting 43.3+ weeks and 30.3+ weeks, respectively [7]. These preliminary data compared favorably to benchmark outcomes from conventional cytotoxic chemotherapies, which had a response rate of 9%, PFS6 of 15%, median PFS of 9.0 weeks, and a median OS of 25.0 weeks (95% CI: 21–28 weeks) [9].

NovoTTF-100A was subsequently compared to best standard of care (BSC) chemotherapy for recurrent glioblastoma after initial temozolomide chemoirradiation in a prospective, randomized, open-label Phase III clinical trial. Among the 28 centers in the USA and Europe, 237 individuals were randomized to NovoTTF-100A alone (120 subjects) or BSC (117 subjects) [10,11]. The primary end point was OS and secondary end points included PFS, PFS6, 1-year survival rate, objective radiological response, quality of life and safety. All analyses were performed on the intent-to-treat population, and Kaplan–Meier OS and PFS were computed from the time of randomization until event or censoring at last

follow-up. The trial was powered at 80%, with a significance of p ≤ 0.05 and a hazard ratio (HR) for death of ≤0.67. The median age, Karnofsky Performance Score and other clinical characteristics were balanced between the two cohorts, with the exception of slightly larger tumor size in the NovoTTF-100A group versus the BSC group, at a median size of 6.1 cm (range: 0.0–15.2 cm) and 5.5 cm (range: 0.0–16.2 cm), respectively (TABLE 1) [10,11]. BSC chemotherapies chosen by the treating physician included single-agent or combination irinotecan (31%), bevacizumab (31%), BCNU/CCNU (25%), carboplatin (13%), temozolomide (11%), combination procarbazine, CCNU and vincristine (9%), etoposide (3%), imatinib (2%), hydroxyurea (1%), or nothing (3%) [10,11]. In the intent-to-treat population, the median OS was 28.6 versus 26.0 weeks (HR: 0.86; 95% CI: 0.66–1.12), the median PFS was 9.5 versus 9.1 weeks (HR: 0.84, 95% CI: 0.64–1.13), and the median PFS6 was 21 versus 15% for NovoTTF-100A and BSC chemotherapy, respectively (FIGURE 2) [10,11]. The data indicate that NovoTTF-100A has an equivalent efficacy when compared to salvage cytotoxic chemotherapies and targeted drugs for recurrent glioblastoma. Interestingly, patients who failed bevacizumab and then enrolled to receive NovoTTF-100A (n = 23) had a significantly longer survival than those who received BSC chemotherapy (n = 21), at 19.1 versus 13.4 weeks (p < 0.02), respectively [12].

## Safety & tolerability
The side effect profile favors NovoTTF-100A treatment significantly more than BSC. Notably, there were only 3 versus 17% hematological toxicities, 4 versus 17% gastrointestinal side effects, and 4 versus 8% infections at grade 3 or 4 severity in the NovoTTF-100A versus BSC cohorts, respectively [10,11]. Other systemic toxicities were well-balanced between the two groups. However, scalp irritation from transducer array placement did occur at a higher frequency, with 17% grade 1 and 2 skin rash in the NovoTTF-100A subjects when compared with 0% in those treated with BSC chemotherapy [10,11]. However, none of the device-treated patients experienced skin toxicity higher than grade 2. Additional self-reported quality-of-life analysis by EORTC QLQ C-30 showed positive scores from NovoTTF-100A usage due to improved cognitive function, decreased constipation and diarrhea complications, as well as absence of pain [11,12].

## Use in practice
Certain medical conditions are contraindicated in NovoTTF-100A usage and may post unknown risks to patients. First, it is inadvisable to prescribe this device to patients with active implanted medical devices, such as cardiac pacemakers, defibrillators, deep-brain stimulators, vagus nerve stimulators and

doi:10.1586/ERN.12.80

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 354 of 631   Document 11-5
EX. 2, P. 192
4585

**Table 1. Baseline characteristics of subjects enrolled in the Phase III NovoTTF-100A trial for recurrent glioblastoma.**

| | | |
|---|---|---|
| Age, median (range) | 54 (24–80) years | 54 (29–74) years |
| Gender: | | |
| – Male | 92 (77%) | 73 (62%) |
| – Female | 28 (23%) | 44 (38%) |
| Histology: | | |
| – Primary glioblastoma | 110 (92%) | 108 (92%) |
| – Secondary glioblastoma | 10 (8%) | 9 (9%) |
| Karnofsky performance status, median (range) | 80 (50–100) | 80 (50–100) |
| Corticosteroid use at the time of enrollment: | | |
| – Yes | 55 (46%) | 62 (53%) |
| No | 55 (46%) | 49 (42%) |
| – Unknown | 10 (8%) | 6 (5%) |
| Maximum tumor diameter at randomization, median (range) | 6.1 (0.0–15.2) cm | 5.5 (0.0–16.2) cm |
| Time from initial glioma diagnosis, median (range) | 11.8 (3.2–99.3) months | 11.4 (2.9–77.1) months |
| First recurrence | 11 (9%) | 17 (15%) |
| Second recurrence | 58 (48%) | 54 (46%) |
| Third or greater recurrence | 51 (43%) | 46 (39%) |
| Surgery: | | |
| – Debulking surgery prior to enrollment | 33 (28%) | 29 (25%) |
| – Debulking at any stage | 95 (79%) | 99 (85%) |
| · Biopsy only | 25 (21%) | 18 (15%) |
| Radiotherapy: | 120 (100%) | 117 (100%) |
| – Radiotherapy with concomitant temozolomide | 103 (86%) | 96 (82%) |
| – Radiotherapy without concomitant temozolomide | 15 (13%) | 20 (17%) |
| – Unknown | 2 (1%) | 1 (1%) |
| Prior adjuvant (maintenance) temozolomide | 100 (83%) | 89 (76%) |
| Median number of cycles | 4 (0–19) | 3 (0–27) |
| Prior bevacizumab use | 23 (19%) | 21 (18%) |

Data taken from [11].

programmable ventriculoperitoneal shunts. These devices may cause reciprocal electromagnetic interference, induction or both, and the extent of this risk is unknown. Second, patients with major skull defects cannot receive this treatment. For example, those with a missing section of the calvarium may experience elevated electric field strength on the brain. However, those with healed burr holes and craniotomy sutures can receive this treatment without complications. Third, metals within the brain are also contraindicated because NovoTTF-100A has not been tested in patients with bullet fragments or aneurysm clips in their head. Last, those with hypersensitivity to hydrogel, which is used as a

conductive interface between the transducer array disks and the scalp, may not be able to receive this treatment.

Pretreatment evaluation consists of baseline history, physical examination (including evaluation of skin integrity on the scalp), blood work and gadolinium-enhanced head MRI. The MRI images are used to construct a mapping diagram for placement of the transducer arrays. Typically, there are two pairs of opposing arrays, which are separately color coded (Figure 1). The wires of the arrays are then connected to the electric field generator and power supply (Figure 1). The patient's hair is then shaved off with an electric shaver instead of a razor in order to avoid superficial

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 355 of 631   Document 11-5   4586

EX. 2. P. 193



Figure 2. Data from a Phase III NovoTTF-100A trial for recurrent glioblastoma. (A) Kaplan–Meier curves showing equivalent overall survival between the NovoTT00A therapy group and the BPC active control. (B) Kaplan–Meier progression-free survival curves showing a greater number of subjects with disease stabilization in the NovoTTF-100A-treated group than BPC active control: four subjects without disease progression at 78 weeks and three at 91 weeks versus none in the control.
BPC: Best physician choice; m: Months; PFS: Progression-free survival; w: Weeks.
Reproduced with permission from [11].

cues. The scalp is then cleaned with alcohol prior to application of the arrays. This procedure typically requires the help of another individual and it is necessary to bring a family member or assistant to learn array placement and operation of the NovoTTF-100A device. Follow-up clinic visits are scheduled monthly in the first 3 months and then every 2 months thereafter. Gadolinium-enhanced head MRI is performed once every 2 months for monitoring the status of glioblastoma during treatment.

The efficacy of NovoTTF-100A on brain tumors other than glioblastoma is unknown. However, other gliomas may respond to the same frequency (200 kHz) emitted by the NovoTTF-100A device, based on published preclinical data. However, it is still unknown whether or not TTField at 200 kHz would be effective in controlling metastatic brain tumors because the optimal frequency for specific metastasis may be different. For example, in preclinical cell culture melanoma was most sensitive at a frequency of 120 kHz [9].

### Regulatory affairs
NovoTTF-100A is currently approved by the FDA and the EMA for the treatment of recurrent or progressive glioblastomas.

### Conclusion
NovoTTF-100A is a novel therapy for the treatment of recurrent glioblastoma. It emits TTField that interferes with dividing tumor cells at anaphase. The clinical trial results indicate that it has comparable efficacy and less toxicity, when compared to conventional drug treatments in the recurrence setting.

### Expert commentary
The Phase III clinical trial demonstrated comparable, but not superior, efficacy when compared to conventional drug treatments. This result is likely to be influenced by a number of factors. First, the population of patients with recurrent glioblastomas has neurological deterioration and death within a shorter time than those with newly diagnosed disease. As a result, these patients may deteriorate early and therefore their tumors may not receive enough exposure to NovoTTF-100A treatment. Unlike conventional cytotoxic chemotherapies that have a biological effect lasting the entire duration of the treatment cycle (typically 4–6 weeks), the TTField needs to be applied continuously otherwise the anti-tumor effect would disappear as soon as the generator is switched off. Consistent with this reasoning, the per-protocol analysis of the Phase III trial data, in which patients who received less than 4 weeks of NovoTTF-100A treatment were removed from analysis, showed that NovoTTF-100A offered a statistically significant survival advantage when compared to BSC chemotherapy. Second, compared to newly diagnosed glioblastomas, recurrent glioblastomas have additional genetic alterations making them more resistant to treatment [13,14]. Therefore, NovoTTF-100A may have a greater benefit to newly diagnosed patients than those with recurrent disease. A Phase III clinical trial is currently underway investigating the efficacy of NovoTTF-100A with temozolomide chemoirradiation compared to standard temozolomide chemoirradiation for newly diagnosed glioblastoma. Last, NovoTTF-100A does not appear to have overlapping toxicity with conventional drug treatments [10,11]. Therefore,

doi:10.1586/ERN.12.80

Expert Rev. Neurother. 12(8), (2012)

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 356 of 631   Document 11-5   4587

EX. 2, P. 194

combining it with cytotoxic chemotherapies or targeted agents can potentially result in increased efficacy and without added toxicity. The pivotal Phase III trial did include patients after failure of polifeprosan 20 with carmustine implant (Gliadel wafer) [11]. However, for patients who have undergone wafer implantation, it would be best to withhold the use of NovoTTF-100A until complete dissolution of the wafer, which typically occurs in 4 weeks. However, more preclinical data are needed in order to find the optimal NovoTTF-100A and drug combinations before they can be applied in a clinical trial setting.

### Five-year view

In the next 5 years, more preclinical studies are needed in order to determine the mechanisms of TTField's action on tumor cells. The results would most likely offer ideas for investigator-initiated clinical research that would help to maximize the efficacy of NovoTTF-100A against glioblastomas. This will most likely

be accomplished by the addition of drugs that have synergistic or additive activities. A logical combinatorial treatment would include NovoTTF-100A and bevacizumab because these two therapies do not have overlapping toxicity and both are approved by the FDA for the treatment of recurrent glioblastomas. Furthermore, the device could also be used to treat patients with metastatic brain tumors. However, more preclinical and clinical research is needed to support its use in these patients, as well as the specific type of metastatic brain tumor that shows sensitivity to TTField.

### Financial & competing interests disclosure

*Dr ET Wong receives research support from NovoCure, Inc. The authors have no other relevant affiliations or financial involvement with any organization or entity with a financial interest in or financial conflict with the subject matter or materials discussed in the manuscript apart from those disclosed.*

*No writing assistance was utilized in the production of this manuscript.*

### Key issues

- NovoTTF-100A (Novocure Inc., Haifa, Israel) emits a low-intensity, intermediate-frequency (200 kHz) alternating electric field that treats recurrent glioblastomas.
- NovoTTF-100A exerts its anti-tumor effect on glioblastoma cells by interfering with mitosis at anaphase.
- NovoTTF-100A treatment offers comparable efficacy when compared to conventional drug treatments, including bevacizumab, for recurrent glioblastoma.
- The toxicity profile favors NovoTTF-100A over conventional drug treatments.

### References

1   Stupp R, Mason WP, van Den Bent MJ *et al.* Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. *N. Engl. J. Med.* 352(10), 987–996 (2005).

2   Stupp R, Hegi ME, Mason WP *et al.* Effects of radiotherapy with concomitant and adjuvant temozolomide versus radiotherapy alone on survival in glioblastoma in a randomized Phase III study: 5-year analysis of the EORTC-NCIC trial. *Lancet Oncol.* 10(5), 459–466 (2009).

3   Wong ET, Hess KR, Gleason MJ *et al.* Outcome and prognostic factors in recurrent glioma patients enrolled onto Phase II clinical trials. *J. Clin. Oncol.* 17(8), 2572–2578 (1999).

4   Norden AD, Young GS, Setayesh K *et al.* Bevacizumab for recurrent malignant gliomas: efficacy, toxicity, and patterns of recurrence. *Neurology* 70(10), 779–787 (2008).

5   Iwamoto FM, Abrey LE, Beal K *et al.* Pattern of relapse and prognosis after bevacizumab failure in recurrent glioblastoma. *Neurology* 73(15), 1200–1206 (2009).

6   Nieder C, Grosu AL, Molls M. A comparison of treatment results for recurrent malignant glioma. *Cancer Treat. Rev.* 26(6), 397–409 (2000).

7   Kirson ED, Dbaly V, Tovaryš F *et al.* Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. *Proc. Natl Acad. Sci. USA* 104(24), 10152–10157 (2007).

8   Lee S X, Wong ET, Swanson KD. Mitotic interference of cancer cells during anaphase by electric field from NovoTTF-100A. *Neuro-Oncol.* 13(Suppl. 3), iii13–iii14 (2011).

9   Kirson ED, Gurvich Z, Schneiderman R *et al.* Disruption of cancer cell replication by alternating electric fields. *Cancer Res.* 64(9), 3288–3295 (2004).

10  Wong ET, Ram Z, Gutin PH, Stupp R. Updated survival data of the Phase III clinical trial of NovoTTF-100A versus best standard chemotherapy for recurrent glioblastoma. *Neuro-Oncol.* 13(Suppl. 3), iii87 (2011).

11  Stupp R, Wong ET, Kanner AA *et al.* NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomized Phase III trial of a novel

treatment modality. *Eur. J. Cancer* doi:org/10.1016/j.ejca.2012.04.011 (2012) (Epub ahead of print).

12  Ram Z, Gutin PH, Stupp R. Subgroup and quality of life analyses of the Phase III clinical trial of NovoTTF-100A versus best standard chemotherapy for recurrent glioblastoma. *Neuro-Oncol.* 12(Suppl. 4). iv48–iv49 (2010).

13  Sidransky D, Mikkelsen T, Schweckheimer K, Rosenblum ML, Cavanee W, Vogelstein B. Clonal expansion of p53 mutant cells is associated with brain tumour progression. *Nature* 355(6363), 846–847 (1992).

14  Cahill DP, Levine KK, Betensky RA *et al.* Loss of the mismatch repair protein MSH6 in human glioblastoma is associated with tumor progression during temozolomide treatment. *Clin. Cancer Res.* 13(7), 2038–2045 (2007).

### Website

101 US FDA News Release 4 April 2011: FDA approves new medical device for form of brain cancer. www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm251669.htm

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 357 of 631   Document 11-5

4588

EX. 2, P. 195

002239 C2C DIAR_A0000069327 12-19-2019

By Philip H. Gutin, MD, and Eric T. Wong, MD

*Overview:* Tumor treating fields (TTF) therapy is a novel antimitotic, electric field–based treatment for cancer. This nonchemical, nonablative treatment is unlike any of the established cancer treatment modalities, such as surgery, radiation, and chemotherapy. Recently, it has entered clinical use after a decade of intensive translational research. TTF therapy is delivered to patients by a portable, battery-operated, medical device using noninvasive transducer arrays placed on the skin surface surrounding the treated tumor. TTF therapy is now a U.S. Food and Drug Administration (FDA)–approved treatment for patients with recurrent glioblastoma (GBM) who have exhausted surgical and radiation treatments. This article will introduce the basic science behind TTF therapy, its mechanism of action, the preclinical findings that led to its clinical testing, and the clinical safety and efficacy data available to date, as well as offer future research directions on this novel treatment modality for cancer.

THE DEFINITION of the electric field is attributed to Michael Faraday in the 1820s and was later formulated by James Clerk Maxwell in his electromagnetic theory in 1865.[1] It is a field of electric forces that surround a source charge. When a test charge is placed within an electric field, a force acts on it. Negative charges attract positive charges, while similar signed charges repel each other. As seen in Fig. 1A, an electric field surrounding a source charge can be described using diverging lines of force. The closer this test charge is to the source charge, the closer the lines of force are to each other, which represents higher field intensity.

To understand the effects of electric fields within cells, it is important to introduce three definitions. First, electric fields can be uniform or nonuniform. A uniform electric field is represented by parallel lines of force (Fig. 1B). A nonuniform electric field is represented by converging or diverging lines of force (Fig. 1A and 1D). Second, an electric field can be a constant field or a time-varying field, resulting in electrostatic or electrodynamic phenomena, respectively. In a constant field, the source charges remain the same over time. A test charge will move in one direction within a constant electric field toward the oppositely charged source (Fig. 1B). In a time-varying or alternating electric field, the charge of the sources alternates over time (Fig. 1C). Third, the test charge can be an electric charge or an electric dipole (an element with a positive charge on one end and a negative charge on the opposite end). An electric charge will move back and forth, while a dipole will rotate within an alternating uniform electric field and align with the direction of the field. In a nonuniform converging electric field, both dipoles and charges move in the direction of the higher field intensity through a process known as dielectrophoresis (Fig. 1D).

## Mechanism of Action of TTF Therapy

Over 100 years after Maxwell's original publication, Yoram Palti, MD, PhD, hypothesized that properly tuned alternating electric fields at physiological intensities (i.e., 1–3 V/cm) would disrupt the mitotic process of dividing cancer cells.[2,3] Dr. Palti hypothesized and subsequently demonstrated in vitro that at frequencies between 100 and 300 kHz, alternating electric fields disrupt the formation of the mitotic spindle during metaphase and lead to dielectrophoretic movement of charged molecules and organelles during anaphase and telophase, disrupting normal cytokinesis and leading to apoptosis.[2,3] According to this model, the first mechanism of action is explained by the fact

that the tubulin subunits are one of the most polar molecules in the cell. These tubulin subunits align in the direction of the applied electric field (Fig. 2A), interfering with the normal polymerization of the mitotic spindle, which results in formation of abnormal mitotic figures in vitro.[3] The second mechanism of action is explained by examining the change in shape of the electric field within a dividing cell from anaphase to telophase. When the cell division axis is aligned with the direction of the electric field, the field lines that enter the cell at one end and converge at the cytokinetic furrow between the developing daughter cells and then diverge on the opposite side (Fig. 2B). This nonuniform electric field within the cell generates dielectrophoretic forces that act on polar and charged elements in the cell, pushing them toward the cytokinetic furrow leading to violent blebbing of the plasma membrane.[3] This finding was also validated by researchers from Beth Israel Deaconess Medical Center and may be mediated by improper placement of the contractile elements that form the cytokinetic ring on anaphase entry.[4]

## Preclinical Studies of the Antitumor Effects of TTF Therapy

Between 2004 and 2010, a series of publications and conference presentations addressed the issue of the applicability range of TTF therapy to different in vitro and in vivo cancer models either alone or in combination with standard chemotherapy.[3,6-8] Tables 1 and 2 summarize the state-of-the-art preclinical research with TTF therapy. TTF therapy has been shown to effectively inhibit cancer cell growth in various cell lines in vitro (Table 1). This effect was clearly dose (field intensity) dependent in the range of 1 to 3 V/cm.[3] The optimal frequency for the inhibitory effect of TTF therapy differed between cell types and was inversely related to cell size (Table 1; e.g., glioma cell cultures at 200 kHz).[2,3] In addition, based on the directional nature of TTF

From the Department of Neurosurgery, Memorial Sloan-Kettering Cancer Center Brain Tumor Center, New York, NY; and Brain Tumor Center and Neuro-Oncology Unit, Beth Israel Deaconess Medical Center, Boston, MA.

Authors' disclosures of potential conflicts of interest are found at the end of this article.

Address reprint requests to Philip H. Gutin, MD, Department of Neurosurgery, C-703, Memorial Sloan-Kettering Cancer Center, 1275 York Ave., New York, NY 10065; email: gutinp@mskcc.org.

©2012 by American Society of Clinical Oncology.
1092-9118/18/1001-16

2 _ 1 9⁰126 1 2 )(0 2 6 2 6 ⁻ ⁻



Fig. 1. Electric field theory. (A) Opposite charges attract. (B) A constant, uniform, electric field. (C) Charges and dipoles in a time-varying, uniform electric field. (D) A dipole in a time-varying, nonuniform electric field (dielectrophoresis).

therapy, its antimitotic effect in cultures was enhanced by sequentially applying more than one field direction to the treated cells.[6] The combination of TTF therapy with different chemotherapeutic agents has been shown to have at least additive if not synergistic effects.[7,8] Specifically, the combination of TTF therapy with temozolomide in glioma cell lines was shown to be additive. Interestingly, in breast cancer cells, TTF therapy showed overt synergism with taxanes (e.g., paclitaxel), probably a result of the temporal

proximity of taxanes' effect in metaphase and TTF therapy's mitotic interference on cell entry into anaphase.[6]

TTF therapy has been tested in numerous in vivo cancer models (Table 2).[2,5,6,10] Noninvasive application of TTF therapy to animals was performed using electrically insulated transducer arrays placed on the head or torso surrounding the region of the tumor. Inhibition of tumor growth was seen in each of these models when the correct frequency of TTF therapy was applied. Specifically, 200 kHz TTF therapy applied in two sequential and perpendicular field directions lead to significant (p < 0.01) inhibition of a syngeneic, orthotopic F-98 glioma in rats after 7 days of treatment.[6] An additional syngeneic, orthotopic model of non-small cell lung cancer in mice showed that 150 kHz TTF therapy significantly (p < 0.01) inhibited tumor growth within 7 days of treatment.[6,11] Furthermore, the additive effect of TTF therapy with chemotherapy seen in vitro was recapitulated in different in vivo models.[6,8] Finally, in a metastatic tumor model using a squamous carcinoma tumor implanted in the kidney capsule of rabbits, TTF therapy applied to the abdomen blocked metastatic spread of tumor from the kidney to the lungs.[10,27]

### Translating TTF Therapy Into Clinical Use

Since TTF therapy is a physical antimitotic modality with no half-life, its application should be continuous. Kinetic modeling was used to predict the minimal treatment duration needed with TTF therapy.[12] Based on these data, a minimal treatment course of 4 weeks was defined and implemented in clinical studies. In vivo animal experiments and pilot clinical data subsequently verified the 4-week minimal treatment duration.[12] Such continuous delivery was made possible by the development of a portable, battery-operated, medical device that patients can use at home (NovoTTF-100A, Novocure, Haifa, Israel). Finally, extensive toxicity studies of TTF therapy were performed in healthy

---

KEY POINTS

- Tumor treating fields (TTF) therapy is an emerging, low-toxicity treatment modality for solid tumors based on the delivery of antimitotic alternating electric fields to the tumor, which interfere with cytokinesis and microtubule assembly that eventually lead to cell death.

- As a monotherapy, TTF therapy is at least as effective as currently available active chemotherapy and biologic therapies for the treatment of recurrent glioblastoma (GBM).

- The efficacy of this noninvasive treatment modality is achieved with significantly less toxicity and a better quality of life compared with chemotherapy.

- Preliminary data suggest TTF therapy acts synergistically with temozolomide and other chemotherapy in both preclinical and clinical trials.

- Future research should focus on integrating TTF therapy into the treatment of GBM in the adjuvant and maintenance settings, as well as in the treatment of other solid tumor malignancies.

127

2 J 1 9 2 1 2 X 0 2 6 2 7

002249 C2C DIAR_A0000963327 12-19-2019

A



B



**Fig. 2.** Effects of tumor treating fields therapy on intracellular structures during mitosis. (A) During metaphase, tubulin dimers align with the external electric field, interfering with the formation of the mitotic spindle. (B) During cytokinesis, the nonuniform electric field formed within the dividing cell drives charged and polar macro-molecules and organelles toward the cleavage furrow.

mice, rats, and rabbits.[5,9] Clinical, laboratory, and pathologic analyses showed that TTF therapy is well tolerated and does not lead to systemic toxicity in animals. As expected by the frequency range of TTF therapy (100–300 kHz), these electric fields do not have any effect on excitable tissues (neural, muscular, or cardiac), nor do they cause significant heating.[18-15]

## Clinical Testing of TTF Therapy as a Monotherapy

The NovoTTF device was first applied to patients in a small feasibility trial in Switzerland in 2002.[10] In 2004, TTF therapy was tested in a pilot clinical trial in patients with recurrent GBM (Table 3).[6] This single-center, single-arm trial included patients with favorable prognostic character

### Table 1. In Vitro Evidence Overview

| Histology | Cell line | Optimal/Effective TTF Frequency (kHz) | Additive/Synergistic with Chemotherapy | Reference |
|---|---|---|---|---|
| High-grade glioma | F-98; C-6; RG-2 | 200* | Temozolomide (dacarbazine) | Can Res, 2004[3] |
| | U-118; U-87 | | | Proc Natl Acad Sci U S A, 2007[5] |
| Breast adenocarcinoma | Normal: MDA-MB-231 | 120 | Cyclophosphamide | Can Res, 2004[3] |
| | MCF7 | | Doxorubicin | Neuro Oncol, 2011[4] |
| | Multiple drug resistant: MDA-MB-231Dox | 120 | Paclitaxel | BMC Cancer, 2010[7] |
| | AA8/EmⁿR1 MCF7/Mx | | Doxorubicin Paclitaxel | |
| Non-small cell lung cancer (adenocarcinoma) | H1299 | 150 | Paclitaxel | ERS, 2010[8] |
| | LLC | | Pemetrexed | AACR, 2007[6] |
| | | | | Can Res, 2004[3] |
| Colorectal adenocarcinoma | CT-26 | 100* | NA | Can Res, 2004[3] |
| Malignant melanoma | B16F1 Patrida | 100 | NA | Can Res, 2004[3] |
| Prostate | PC-3 | 100* | NA | Can Res, 2004[3] |
| Cervical cancer | HeLa | 200* | NA | Neuro Oncol, 2011[4] |

Abbreviations: TTF, tumor treating fields; NA, not available (was not reported by the authors).
* Effect seen at this frequency; additional frequencies were not tested.

2 _ 1 9128 12 X82628

**Table 2. In Vivo Evidence Overview**

| Tumor Type | Anatomic location | Animal Model | Frequency (kHz) | Effect of TTF | References |
|---|---|---|---|---|---|
| GBM | Right hemisphere | Rat | 200 | Tumor growth inhibition with 2 and 3 field directions | Proc Natl Acad Sci U S A, 2007[3] |
| Non-small cell lung cancer | Lung parenchyma | Mouse | 150 | 1. Tumor growth inhibition with 2 field directions<br>2. Additive tumor inhibition with pemetrexed | ERS, 2010[9] |
| Malignant melanoma | Intradermal | Mouse | 100 | Tumor growth inhibition with 1 and 2 field directions | Can Res, 2004[3]<br>Proc Natl Acad Sci U S A, 2007[3] |
| Malignant melanoma | Innavenous | Mouse | 100 | Inhibition of metastatic seeding in the lungs | Clin Exp Metastasis, 2009[16] |
| VX-2 (anaplastic) | Kidney capsule | Rabbit | 150–200 | 1. Tumor growth inhibition seen with 2 field directions<br>2. Increase in median survival<br>3. Inhibition of metastatic seeding in the lungs<br>4. Additive tumor inhibition with paclitaxel | Clin Exp Metastasis, 2009[12]<br>AACR, 2009[27]<br>Neuro Oncol, 2010[12] |

Abbreviation: GBM, glioblastoma.

istics. Treatment with the device was well tolerated, and no treatment-related serious adverse events were reported. Most patients developed grade 1 to 2 contact dermatitis beneath the transducer arrays on the scalp. Efficacy endpoints were very encouraging with a 20% objective response rate, progression-free survival (PFS) at 6 months of 50%, median time to progression (TTP) of 26 weeks, and median overall survival (OS) of 62.2 weeks (14.4 months). Compared to the historic results of salvage chemotherapy, these results showed clear activity of TTF therapy when used as a monotherapy in recurrent GBM.[17]

Based on the results of this pilot trial, a pivotal phase III, multicenter, randomized (1:1) clinical study was initiated in patients with recurrent GBM (Table 3). The randomized study, which recruited 237 patients between 2006 and 2009, compared the efficacy and safety of monotherapy with the NovoTTF device to that of the best available active chemotherapy according to physician's choice. Thirty-six patients received bevacizumab, 36 received nitrosoureas, 12 received temozolumide, and 33 received other agents. This was the largest randomized study in recurrent GBM to be completed to date. The results of the study were presented at the 2010

ASCO Annual Meeting and were updated at the 2011 Society for Neuro-Oncology (SNO) Annual Meeting.[18,19] Baseline characteristics of patients were balanced between the two treatment groups. In both groups, patients had poor prognostic predictors compared with previous clinical trials of recurrent GBM (90% of patients were at their second or subsequent recurrence; 20% had failed bevacizumab before entering the trial; and the average tumor diameter was above 5 cm). In the conservative intent-to-treat (ITT) analysis, the study showed that patients with recurrent GBM treated with NovoTTF alone had comparable OS to that of patients who received chemotherapy and/or bevacizumab (6.6 months vs. 6.0 months, respectively; p = 0.26; hazard ratio [HR] = 0.86; Table 3). Although NovoTTF did not show superiority over active chemotherapies, it was clear that it was at least as effective as these treatments. Secondary endpoints in the trial were supportive: blinded radiology review showed that PFS at 6 months was 21.4% in the NovoTTF group compared with 15.2% in the chemotherapy group (p = 0.24). There were more radiological responses seen in the NovoTTF group compared with the chemotherapy group (12% vs. 6%, respectively; p = 0.07), including

**Table 3. Clinical Evidence Overview**

| Indication (Analysis Group) | Trial Phase (# of Subjects) Analysis | Overall Survival (Months) TTF | Overall Survival (Months) Chemo | Hazard Ratio (p) | Progression-Free Survival (PFS) at 6 Months or Median PFS (Weeks) TTF | Progression-Free Survival (PFS) at 6 Months or Median PFS (Weeks) Chemo | P value | References |
|---|---|---|---|---|---|---|---|---|
| Recurrent GBM (at first relapse) | Phase I-II (n = 10) ITT analysis | 14.5 m | 6.0 m* | Non-randomized | 50% | 15%* | NA | Proc Natl Acad Sci U S A, 2007[3] |
| Recurrent GBM (at second and fourth relapse) | Phase III (n = 237) ITT analysis | 6.6 m | 6.0 m | HR = 0.86 (p = 0.26) | 21.4% | 15.2% | p = 0.24 | J Clin Oncol, 2010[18] Neuro Oncol, 2011[19] |
| Recurrent GBM (treated patients only) | Phase III (n = 210) PP Analysis | 7.8 m | 6.0 m | HR = 0.67 (p < 0.012) | 26.2% | 15.2% | p = 0.03 | J Clin Oncol, 2010[18] Neuro Oncol, 2011[19] |
| Recurrent GBM (KPS ≥ 80, age < 61) | Phase III (n = 110) Subgroup analysis | 8.8 m | 4.6 m | HR = NA (n < 0.01) | 25.6% | 7.7% | NA | Neuro Oncol, 2010[19] |
| Recurrent GBM (after bevacizumab failure) | Phase III (n = 43) Subgroup analysis | 4.4 m | 3.1 m | (p = 0.02) | NA | NA | NA | Neuro Oncol, 2010[20] |
| Recurrent GBM (TTF versus bevacizumab) | Phase III (n = 156) Subgroup analysis | 6.6 m | 5.0 m | HR = 0.65 (p = 0.048) | 21% | 21% | p > 0.05 | Neuro Oncol, 2011[21] |
| Newly diagnosed GBM (together with temozolomide) | I-II (n = 10) ITT Analysis | 39+ m | 14.7 m* | (p = 0.002) | 90% 155 w | 50%* 26 w | NA | BMC Med Phys, 2009[9] |
| Relapsed advanced NSCLC (together with pemetrexed) | I-II (n = 42) ITT Analysis | 13.8 m | 8.2 m* | NA | 28 w | 12 w* | | ESMO, 2010[25] ERS, 2010[9] Expert Opin Investig Drugs, 2010[11] |

Abbreviations: GBM, glioblastoma. ITT, intention to treat; NA, not available (was not reported by the authors); HR, hazard ratio; PP, per protocol; KPS, Karnofsky performance status; TTF, tumor treating fields; NSCLC, non-small cell lung cancer.
*Single-arm trials with literature control.

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 361 of 631    Document 11-5    4592
EX. 2, P. 199

three sustained complete responses in the NovoTTF group compared with none in the chemotherapy group. These results were accompanied by significantly ($p < 0.05$) less treatment-related adverse events with NovoTTF compared with chemotherapy. Patients in the NovoTTF group reported a higher quality of life compared with patients treated with chemotherapy. This analysis was based on the European Organisation for Research and Treatment of Cancer QLQ-C30 and mirrored the lack of chemotherapy-related toxicities in the NovoTTF group. Interestingly, patients in the NovoTTF group reported better cognitive and emotional functioning and much less pain than patients in the chemotherapy group, although these domains of the questionnaires are not related to known side effects of chemotherapy.

To date, several exploratory analyses of the study data have been performed. The first analysis compared patients who received the same "amount" of therapy in both groups. This prospectively defined per-protocol analysis excluded patients from both groups who received less than one predefined treatment course. The analysis demonstrated superior survival in the NovoTTF group compared with the chemotherapy group (7.8 months vs. 6.0 months; $p = 0.012$, $HR = 0.67$).[18,19] The rationale behind this analysis is that TTF is a physical modality with no half-life, so that the moment the therapy is stopped, its antimitotic effect stops as well. In contrast, chemotherapies have measurable plasma and tissue half-life, which results in continued efficacy and toxicity long after a dose has been given. Therefore, to achieve pharmacokinetic balance in the "amount" of treatment in both groups, this analysis used a simplified criterion that one course of chemotherapy (e.g., 1 day of carmustine or 5 days of temozolomide) is equivalent to four weeks of continuous TTF therapy.

Two more analyses of the study data were presented at the 2010 and 2011 SNO Annual Meetings.[20,21] The first study analyzed known clinical prognostic factors of age and Karnofsky performance status (KPS). This analysis demonstrated that in patients age 60 and younger with a KPS greater than 70, treatment with NovoTTF resulted in superior OS compared with chemotherapy (6.8 months vs. 6.6 months; $p < 0.01$). This survival advantage could be attributed to better compliance with TTF therapy in this group of patients. In support of this finding, a statistically significant correlation was seen in the NovoTTF group between treatment compliance (as measured by the device computerized log file) and OS ($p = 0.0476$).

The second analysis is a post hoc, exploratory analysis of the treatment of 120 patients with NovoTTF compared with 36 patients with bevacizumab. Although without a prespecified analysis in the trial, patients in the study treated with NovoTTF lived significantly longer than those treated with bevacizumab (6.6 months vs. 5.0 months, respectively; $p = 0.048$, $HR = 0.66$).[21] This analysis included all ITT patients who received either bevacizumab or NovoTTF. Patient characteristics were almost identical and, in fact, favored the bevacizumab group prognostically. Clearly, this analysis cannot be taken as final evidence of superiority of NovoTTF over bevacizumab; however, it should be treated as hypothesis-generating data for future clinical studies. Finally, in the 40 patients who entered the study after bevacizumab therapy failure (approximately 20% of patients in both groups), OS was significantly longer with TTF therapy

than with chemotherapy (4.4 months vs. 3.1 months, respectively; $p = 0.02$). The data for the chemotherapy-treated group is in line with previous publications, which showed that following bevacizumab failure, the survival of patients with recurrent GBM is limited.[22]

Based on the results of this pivotal phase III study, the FDA approved the NovoTTF-100A device on April 8, 2011, through the premarket approval (PMA) regulatory pathway. The PMA pathway is reserved for class III (high-risk) medical devices and required preclinical, clinical, and manufacturing evidence, including review of both efficacy and safety data by a panel of independent experts. The FDA concluded that the study results showed NovoTTF to be comparable "in" efficacy "to" "active" chemotherapy," without many of the side effects associated with chemotherapies and with a better quality of life.[23]

## Clinical Trials Evaluating TTF Therapy in Combination with Chemotherapy

Two studies of combined TTF therapy and chemotherapy have been published to date. The first was a single-arm, single-center trial performed in 2000 in patients with newly diagnosed GBM.[9] Patients received the Stupp protocol with TTF therapy added to maintenance temozolomide.[24] This trial showed promising PFS and OS data (PFS > 14 months; OS > 39 months; Table 3) and served as the basis for an ongoing, multicenter, pivotal phase III, randomized clinical study comparing TTF therapy and temozolomide with temozolomide alone in the maintenance stage of the Stupp protocol.

The second study tested TTF therapy together with pemetrexed in 42 patients with pretreated, advanced non-small cell lung cancer.[8,11,25] Efficacy and safety with this combined treatment paradigm were promising. Time to local disease progression in the lungs and liver (where TTF was applied) was 28 weeks, and OS was 13.8 months. In contrast, TTP and OS for pemetrexed alone were previously reported to be 12 weeks and 8.3 months, respectively.[25]

TTF therapy is still in its early days. However, it has an established mechanism of action, and a growing body of preclinical evidence has shown its wide applicability in solid tumor malignancies either alone or in combination with standard chemotherapies. Objective antitumor activity and an unprecedented safety profile of this treatment modality have been seen in patients with recurrent GBM. Although TTF monotherapy has been shown to be at least as effective as the best available chemotherapies today for recurrent GBM, in-depth analysis of the phase III study data identified at least two subgroups where TTF therapy was superior to chemotherapy and could be offered to patients as an alternative to chemotherapy: younger patients with a better functional status and patients in whom bevacizumab treatment has failed in the past.

## Conclusion

The approval of TTF therapy for recurrent GBM ushers in a fourth modality of cancer treatment. More importantly, TTF treatment has a superior safety profile, and its minor side effects do not appear to overlap with those of cytotoxic chemotherapies, targeted agents, or antiangiogenesis drugs. Therefore, the rational combination of TTF therapy with specific pharmacologic agents may enhance tumor cell death,

because of potential additive or synergistic effects. First, as demonstrated in preclinical and clinical models, chemotherapy administered together with TTF therapy may result in additive or synergistic tumor control without increasing systemic toxicities. Second, TTF treatment could be combined with targeted agents that block survival signaling within the tumor cell. This block may be sufficiently strong to enhance the cytotoxic effect of TTF therapy or vice versa.

Third, the combination of TTF and antiangiogenesis agents may be another promising path that combines different antitumor treatments to improve tumor control. Lastly, the proper scheduling of TTF therapy with other agents is unknown. Additional research may shed light on the optimal scheduling that may achieve a synergistic effect on tumor growth leading to long-term tumor control and enhanced patient survival.

## Authors' Disclosures of Potential Conflicts of Interest

| Author | Employment or Leadership Positions | Consultant or Advisory Role | Stock Ownership | Honoraria | Research Funding | Expert Testimony | Other Remuneration |
|---|---|---|---|---|---|---|---|
| Philip H. Gutin | | | | | Novocure | | Novocure |
| Eric T. Wong | | | | | Novocure | | |

## REFERENCES

1. Maxwell JC. A Dynamical Theory of the Electromagnetic Field. Royal Society Transactions. CLV:1865.

2. Palti Y, Schneiderman R, Gurvich Z, et al. Cell proliferation arrest and tumor cell destruction by low intensity, frequency tuned electric fields. 2002 AACR Meeting Abstracts. (abstr 1020).

3. Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of cancer cell replication by alternating electric fields. Cancer Res. 2004;64:3288-3295.

4. Lee SX, Wong ET, Swanson KD. Mitotic Interference of Cancer Cells During Anaphase By Electric Field from NovoTTF-100A. Neuro Oncol. 2011;13:iii10-iii26 (suppl 3; abstr CB-17).

5. Kirson ED, Dbaly V, Tovarys F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. Proc Natl Acad Sci U S A. 2007;104:10152-10157.

6. Schneiderman R, Shmueli E, Kirson E, et al. Synergism between chemotherapy and alternating electric fields in the inhibition of cancer cell proliferation in-vitro. 2007 AACR Meeting Abstracts. (abstr 2276).

7. Schneiderman RS, Shmueli E, Kirson ED, et al. TTFields alone and in combination with chemotherapeutic agents effectively reduce the viability of MDR cell sub-lines that over-express ABC transporters. BMC Cancer. 2010; 10:229.

8. Weinberg U, Froanti J, Kuong M, et al. An Open Label Pilot Study of Tumor Treating Fields (TTFields) in Combination with Pemetrexed for Advanced Non-small Cell Lung Cancer (NSCLC). 2010 ERS Annual Congress. (abstr 363).

9. Kirson ED, Schneiderman RS, Dbaly V, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). BMC Med Phys. 2009;9:1.

10. Kirson ED, Giladi M, Gurvich Z, et al. Alternating electric fields (TTFields) inhibit metastatic spread of solid tumors to the lungs. Clin Exp Metastasis. 2009;26:633-640.

11. Pless M, Weinberg U. Tumor treating fields: Concept, evidence and future. Expert Opin Investig Drugs. 2010;20:1099-1106.

12. Kirson ED, Wasserman Y, Tehaki A, et al. Modeling tumor growth kinetics and its implications for TTFields treatment planning. Neuro Oncol. 2010;12:iv39-iv57 (suppl 4; abstr NO-64).

13. Palti Y. Stimulation of muscles and nerves by means of externally applied electrodes. Bull Res Counc Isr Exp Med. 1962;10:54-56.

14. Bhirgel P, Mathews G. Electrical stimulation of the rat diencephalon: Differential effects of interrupted stimulation on un- and off-responding. Brain Res. 1977;126:313-333.

15. Yearwood TL, Hershey B, Bradley K, et al. Pulse width programming in spinal cord stimulation: A clinical study. Pain Physician. 2010;13:821-835.

16. Salzberg M, Kirson E, Palti Y, et al. A pilot study with very low-intensity, intermediate-frequency electric fields in patients with locally advanced and/or metastatic solid tumors. Onkologie. 2008;31:362-365.

17. Wong ET, Hess KR, Gleason MJ, et al. Outcomes and prognostic factors in recurrent glioma patients enrolled onto phase II clinical trials. J Clin Oncol. 1999;17:2572-2578.

18. Stupp R, Kanner A, Engelhard H, et al. A prospective, randomized, open-label, phase III clinical trial of NovoTTF-100A versus best standard of care chemotherapy in patients with recurrent glioblastoma. J Clin Oncol. 2010;28:18s (suppl; abstr LBA2007).

19. Stupp R, Kanner A, et al. Updated survival data of the phase III clinical trial of NovoTTF-100A versus best standard chemotherapy for recurrent glioblastoma. Neuro Oncol. 2011;12:iii85-iii91 (suppl 3; abstr OT-09).

20. Ram Z, Gutin PH, Stupp R. Subgroup and quality of life analyses of the phase III clinical trial of NovoTTF-100A versus best standard chemotherapy for recurrent glioblastoma. Neuro Oncol. 2010;12:iv86-iv57 (suppl 4; abstr NO-55).

21. Ram Z, Gutin PH, Stupp R. Comparing the effect of NovoTTF to Bevacizumab in Recurrent GBM: A Post-Hoc Sub-Analysis of the Phase III Trial Data. Neuro Oncol. 2011;13:iii41-iii05 (suppl 3; abstr NO-50).

22. Iwamoto FM, Abrey LE, Beal K, et al. Patterns of relapse and prognosis after bevacizumab failure in recurrent glioblastoma. Neurology. 2009;73: 1200-1206.

23. FDA: NovoTTF-100A Information for Use. 2011. http://www.accessdata.fda.gov/cdrh_docs/pdf10/P100034a.pdf. Accessed January 28, 2012.

24. Stupp R, Mason WP, van den Bent MJ, et al. Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. N Engl J Med. 2005;352:987-996.

25. Pless M, Betticher DC, Buess M, et al. A phase II study of tumor treating fields (TTFields) in combination with pemetrexed for advanced non small cell lung cancer (NSCLC). Ann Oncol. 2010;vi8:122-vi1181.

26. Hanna N, Shepherd FA, Fossella FV, et al. Randomized phase III trial of pemetrexed versus docetaxel in patients with non-small-cell lung cancer previously treated with chemotherapy. J Clin Oncol. 2004;22:1589-1597.

27. Kirson E, Gurvich Z, Tehaki A, et al. Alternating electric fields (TTFields) inhibit metastatic spread of solid tumors to the lungs in-vivo. 2009 AACR Meeting Abstracts. (abstr 152).

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 363 of 631   Document 11-5

EX. 2, P. 201

4594

# Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors

Eilon D. Kirson*, Vladimír Dbalý†, František Tovaryš†, Josef Vymazal†, Jean F. Soustiel‡, Aviran Itzhaki*, Daniel Mordechovich*, Shirley Steinberg-Shapira*, Zoya Gurvich*, Rosa Schneiderman*, Yoram Wasserman*, Marc Salzberg§, Bernhard Ryffel¶, Dorit Goldsher‡, Erez Dekel∥, and Yoram Palti*,**††

*NovoCure Limited, Matam Advanced Technology Centre, Haifa 31905, Israel; †Na Homolce Hospital, Roentgenova 2, 150 30 Prague 5, Czech Republic; ‡Rambam Medical Center, PO Box 9602, Haifa 31096, Israel; §Basel University Hospitals, Hebelstrasse 32, 4031 Basel, Switzerland; ¶Centre National de la Recherche Scientifique, Laboratoire d'immunologie et embryologie Moléculaire, rue de la Ferollerie, 45071 Orleans, France; ∥Weizmann Institute of Science, PO Box 26, Rehovot 76100, Israel; and **B. Rappaport Faculty of Medicine, Technion-Israel Institute of Technology, Technion City, Haifa 32000, Israel

Communicated by Joseph Schlessinger, Yale University School of Medicine, New Haven, CT, April 5, 2007 (received for review January 15, 2007)

We have recently shown that low intensity, intermediate frequency, electric fields inhibit by an anti-microtubule mechanism of action, cancerous cell growth *in vitro*. Using implanted electrodes, these fields were also shown to inhibit the growth of dermal tumors in mice. The present study extends these findings to additional cell lines (human breast carcinoma; MDA-MB-231, and human non-small-cell lung carcinoma (H1299)) and to animal tumor models (intradermal B16F1 melanoma and intracranial F-98 glioma) using external insulated electrodes. These findings led to the initiation of a pilot clinical trial of the effects of TTFields in 10 patients with recurrent glioblastoma (GBM). Median time to disease progression in these patients was 26.1 weeks and median overall survival was 62.2 weeks. These time to disease progression and OS values are more than double the reported medians of historical control patients. No device-related serious adverse events were seen after >70 months of cumulative treatment in all of the patients. The only device-related side effect seen was a mild to moderate contact dermatitis beneath the field delivering electrodes. We conclude that TTFields are a safe and effective new treatment modality which effectively slows down tumor growth *in vitro*, *in vivo* and, as demonstrated here, in human cancer patients.

cancer | glioblastoma | tumor treating fields

**B**ecause living cells consist of ions, polar or charged molecules, membranes, and organelles, they are responsive to and often generate electric fields and currents. The electric activity of cells plays a key role in many essential biological processes. The electric fields associated with all of the above phenomena are in the range of 0–10 V/cm, except within cell membranes (1) where they may reach $10^5$ V/cm. Whereas electric fields induce ion flow, polar molecules only orient themselves along the lines of a uniform field (2). However, nonuniform electric fields exert forces on polar molecules forcing them to move toward higher field intensity, a well known process known as dielectrophoresis (3, 4). Electric fields and resulting currents, when sufficiently large, stimulate nerves, muscles, cardiac muscle, etc. Only much larger fields generate heat that may damage cells (5).

In an electric field of alternating direction (ac field) all charges and polar molecules are subjected to forces of alternating direction so that ionic flows and dipole rotation oscillate (Fig. 1). In view of the (relatively slow) kinetics of the bioelectrical responses, as the ac fields' frequency is elevated, their biological effect (except for heating) is reduced such that, >10 kHz, it becomes negligible. Therefore, it is generally believed that ac fields of 100 kHz or above have no meaningful biological effects (5), although a number of nonsignificant effects have been described (6–8).

In contradiction to this belief, we have recently demonstrated (9) that 100–300 kHz ac fields have significant specific effects on dividing cells. The basis of these effects during cytokinesis was shown to be the unidirectional forces induced by

the inhomogeneous fields at the bridge separating the daughter cells (Fig. 1D) that interfere with spindle tubulin orientation and induce dielectrophoresis.

It is the aim of this work to further study the effects of ac fields on quiescent and proliferating cells in culture, animal cancer models, and cancerous tumors in humans. Following a basic work on cell cultures (9), we demonstrate here that such fields, termed tumor treating fields (TTFields), are effective when applied by insulated external electrodes to animal cancer models and patients with recurrent glioblastoma (GBM). In a pilot clinical trial conducted on this extremely malignant tumor of glial cell origin (10, 11), TTFields treatment was found to be both safe and effective in slowing tumor progression. These promising results raise the possibility that TTFields could become a new treatment modality for cancer.

## Results

### Cells in Culture

The effects of a 24-h exposure of four of the most common types of cancer [malignant melanoma, glioma (part of the data for malignant melanoma and glioma cells was taken from ref. 9), breast carcinoma, and non-small-cell lung carcinoma to TTFields] are illustrated in Fig. 2. It is seen that the number of unexposed (control) cells roughly doubles every 24 h, whereas the proliferation rate of the exposed cells is slowed down during exposure and gradually recovers after treatment is terminated (Fig. 2A). The frequency dependence of the effects is depicted in Fig. 2B. It is seen that the optimal frequency is 100 kHz for mouse melanoma (B16F1), 150 kHz for human breast carcinoma (MDA-MB-231), and 200 kHz for rat glioma (F-98). In addition, similar experiments were performed in two human glioma cell lines (U-118 and U-87). In both, the optimal TTFields frequency was identical to rat glioma cell lines (i.e., 200 kHz).

The "dose-response curve," i.e., the relationship between the TTFields effects and field intensity, is given in Fig. 2C. It is seen that effect on cell division and cell death (by apoptosis) is intensity dependent; the sensitivity being highest for mouse

**Author contributions:** E.D.K., D.M., R.S., Y.W., E.D., and Y.P. designed research; E.D.K., V.D., F.T., J.V., J.F.S., A.I., D.M., S.S.-S., Z.G., R.S., B.R., D.G., E.D., and Y.P. performed research; E.D. contributed new reagents/analytic tools; E.D.K., V.D., F.T., J.V., D.M., S.S.-S., Z.G., R.S., Y.W., E.D., and Y.P. analyzed data; and E.D.K., R.S., and Y.P. wrote the paper.

**Conflict of interest statement:** Y.P. has a minority holding in NovoCure Ltd. and is a member of the company board of directors; E.D.K., A.I., D.M., S.S.-S., Z.G., R.S., and Y.W. are employed in full or part by NovoCure Ltd.; and M.S. is a clinical trial consultant to NovoCure Ltd.

Freely available online through the PNAS open access option.

Abbreviations: FEM, finite element mesh; GBM, glioblastoma; OS, overall survival; PFS, progression-free survival at 6 months; TTFields, tumor treating fields; TTP, time to disease progression.

††To whom correspondence should be addressed. E-mail: yoram@novocure.com

This article contains supporting information online at www.pnas.org/cgi/content/full/0702916104/DC1.

© 2007 by The National Academy of Sciences of the USA

002242 C2C DIAR_A0000069327 12-19-2018

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 364 of 631   Document 11-5     4595

EX. 2, P. 202



A

○ Oscillating
Direction of Force
Acting on Charge

○ Oscillating
Direction of Force
Acting on Dipole

Field of Alternating Direction



B

○ Unidirectional Net Force
Acting on Dipole
During All Cycle Phases

○ Unidirectional Net Force
Acting on Charge
During All Cycle Phases

Field of Alternating Direction

**Fig. 1.** ac field distribution in and around quiescent (A) and dividing (B) cells. Inside quiescent cells, the field is uniform, and the oscillating electric forces result only in "vibration" of ions and dipoles (the forces associated with each half cycle are denoted white and gray arrows). In contrast, the nonuniform field within dividing cell (B) induces forces pushing all dipoles toward the furrow. Note that at frequencies of 0.1–1.0 MHz, the cell membrane impedance is relatively high, so only a small fraction of the currents penetrate the cells as seen from the density of lines.

melanoma cells, decreasing for rat glioma and for human non-small-cell lung carcinoma and lowest for human breast carcinoma.

From the mechanism of action of TTFields, as illustrated in Fig. 1, it can be deduced that their efficacy must be a function of the angle between the field and axis of division; when the two are parallel its maximal and when one is perpendicular to the

other, it must be minimal. Because in culture the axis of division is randomly oriented, only a fraction of the dividing cells are subjected to optimal treatment. To overcome this problem, multiple field directions were applied sequentially every 0.25 -1 sec. Two perpendicular fields were found to be ≈20% more effective than the single-direction one for B16F1 and F-98 cells. This result is consistent with the previously reported effects on malignant melanoma cells (9).

**Animal Tumor Models**

Intracranial Glioblastoma. Our report (9) described the effects of TTFields applied by means of implanted electrodes to intradermal malignant melanoma in mice. This report compares 40 Fischer rats inoculated intracranially with glioma cells, treated by means of external electrodes with a temperature, and geometry matched electrode control group. The treatment duration was 6 days, using the optimal frequency of 200 kHz (see Fig. 2) at 2 V/cm. Fig. 3 depicts the computed field distribution in the rat brain (Fig. 3A), exemplary posttreatment MRI images of a control (Fig. 3B) and a treated tumor (Fig. 3C). The maximal diameter of the treated tumor is about half that of the control one.

The average inhibitory effect of unidirectional TTFields (in a temporal-temporal direction) was small and did not reach statistical significance (treated tumor volume 19.8% smaller than sham control tumors; $n = 26$; $P = 0.19$, Student's $t$ test). However, increasing the number of TTFields directions caused statistically significant inhibition of tumor growth, reaching 42.6% and 53.4% for two ($n = 42$; $P < 0.01$, Student's $t$ test) and three ($n = 10$; $P < 0.01$, Student's $t$ test) directions positioned at 45–90° to each other, respectively.

**Frequency Dependence of the Inhibitory Effect of TTFields.** The TTFields inhibitory efficacy vs. frequency was studied in mice inoculated with B16F1 melanoma. The mice ($n = 26$) were treated for 5 days by single-direction TTFields of different frequencies. The maximal growth inhibition was found at 100 kHz, with the treated tumor size $62.7 \pm 8.9\%$ that of control tumors. Although this frequency dependence *in vivo* did not reach statistical significance (single-factor ANOVA, $P = 0.11$), it shows the same frequency dependency as the dependence of cultured B16F1 cells reported in ref. 9, which supports the



**Fig. 2.** Time, frequency, and intensity dependence of the effect of TTFields on cancer cell proliferation. (A) The number of cells in untreated cultures (filled symbols) as compared with cultures treated with TTFields (open symbols) for 24 h (1.75 V/cm for MDA-MB-231, F-98, and H1299 cells and 1.1 V/cm for B16F1 cells). (B) The relative change in number of cells after 24 h of treatment of different frequencies (same TTFields intensity). (C) The effect of 24 h of exposure to TTFields of increasing intensities (at optimal frequencies). ● and ○, B16F1; ■ and □, MDA-MB-231; ▲ and △, F-98; ◆ and ◇, H1299.

MEDICAL SCIENCES

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 365 of 631   Document 11-5   4596
EX. 2, P. 203

002243 C2C DIAR_A0000969327 12-13-2013



Fig. 3. TTFields inhibition of the growth of intracranial glioma. (A) FEM simulations (using a three-dimensional mesh) of the distribution of TTFields intensity within a simplified rat brain model. (B and C) Exemplary T1 weighted coronal MRI sections (after IV injection of Gd-DTPA) of the heads of a control and a TTFields treated (200 kHz, two-directional TTFields) rat, respectively. In both examples, the section shown is that with the largest diameter tumor. Head simulations are 3.1 × 1.9 cm ellipsoid; skin thickness, 0.6 mm ($\sigma$ = 0.00045 S/m; $\varepsilon$ = 1,120); skull thickness, 1.1 mm ($\sigma$ = 0.015 S/m; $\varepsilon$ = 16); thickness of the CSF surrounding the brain, 0.5 mm ($\sigma$ = 2 S/m; $\varepsilon$ = 109); and brain itself has the properties of a uniform white matter ($\sigma$ = 0.15 S/m; $\varepsilon$ = 3,200). The electrodes placed over a 0.5-mm layer of hydrogel. Note the almost uniform field intensity in most brain volume. (Scale bars, 1 cm.)

conclusion that this is the optimum frequency. In contrast, rats bearing intracerebral glioma were unaffected by 100 kHz TTFields, whereas 200 kHz TTFields caused significant inhibition of tumor growth.

**Safety Profile of TTFields in Healthy Animals.** TTFields (100 kHz) at 6-V/cm were applied to the chest of three New Zealand rabbits. No changes were seen in the rate or regularity of cardiac rhythm throughout and following the exposure. To test the safety of chronic TTFields application TTFields were applied to either the head ($n$ = 30, 1 V/cm for 4 weeks) or the chest ($n$ = 10, 3 V/cm for 2 weeks) of New Zealand Rabbits. All animals were assessed weekly for weight, temperature, ECG, CBC, wide chemistry panel and coagulation. After a 1-month follow-up period, all animals were killed and and samples of major organs examined by a pathologist. No treatment-related toxicities were recorded in any of the animals.

### GBM Patients

**TTFields Treatment of Patients with Recurrent GBM Brain Tumor.** Ten patients with recurrent GBM were included in the trial [see *Materials and Methods* and supporting information (SI) Table 1].

As seen in Fig. 4A, the median time to disease progression (TTP) of the patients is 26.1 weeks (range 3–124 weeks) and the progression-free survival at 6 months (PFS6) is 50% (23–77%; 95% confidence interval). Two of the patients were still progression free at study closure.

The median overall survival (OS) of TTFields treated patients is currently 62.2 weeks (range 20.3–124.0 weeks). These TTP and OS values are more than double the reported medians of historical control patients. Three of the patients are still alive at this time. The Kaplan–Meier survival curve (12) of the treatment results is shown in Fig. 4B.

The TTFields treatment resulted in one complete response (Fig. 5A) which is still tumor free per MRI ten months after stopping treatment and one partial response (Fig. 5B) that is still responding 7 months after stopping treatment. Both are still progression free >2 years from treatment initiation. In addition one patient had minimal response and four had stable disease for over 4 months before progressing.

**Safety Profile of TTFields Applied to GBM Patients.** The 10 recurrent GBM Patients received treatment for a total of 280 weeks without a single treatment-related serious adverse event and no significant changes seen in serum chemistry or blood count in any of the patients. The only changes seen consistently were elevated liver enzymes, attributed to anti-epileptic drug usage. Two patients had partial seizures that were unrelated to treatment. Nine of ten patients suffered from a mild to moderate contact dermatitis beneath the electrode gel. This treatment-related adverse event responded well to application of steroid creams and periodic electrode relocation.




Fig. 4. Efficacy of TTFields treatment in recurrent GBM. (A) TTP of treated patients ($n$ = 10); median TTP is 26.1 weeks (dashed black line). (B) Kaplan–Meier OS curve for NovoTTF-100A treated patients ($n$ = 10). The median OS in these patients is 62.2 weeks (black dashed line), and the 1-year survival rate is 67.5% (blue dashed line).

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 366 of 631    Document 11-5    4597

EX. 2, P. 204



*Fig. 5.* Exemplary T1-weighted, post contrast, MRI scans of recurrent GBM patients before (*Left*) and after (*Right*) TTFields treatment. (*A*) Complete response after 8 months of treatment. (*B*) Stable disease (10% reduction in contrast enhancing area) after 9 months of treatment.

## Discussion

Alternating electric fields have been shown to have a wide range of effects on living tissues. At very low frequencies (<1 KHz), electric fields stimulate excitable tissues through membrane depolarization (13) and have been claimed to stimulate bone growth and accelerate fracture healing (14). However, as the frequency of the electric field increases the stimulatory effect diminishes, whereas above MHz a completely different biological effect, tissue heating, becomes dominant (15, 16).

Alternating electric fields of intermediate frequencies (10 kHz to 1 MHz) were considered not to have any meaningful non-thermal biological effects (5). An exception, are the TTFields described in ref. 9. This presumed lack of effect of such fields is consistent with the fact that when electric fields, that exert forces only on charges and dipoles reverse direction at a high frequency, their net effect tends to null out. Thus, the effects were minor and have neither been shown to be beneficial or detrimental to humans (5, 8, 17).

In this study we try to use TTFields as a new cancer treatment modality. We first extended the In-Vitro study of TTFields effect on glioma and melanoma cells (9) to several of the most prevalent cancers; breast carcinoma and non-small-cell lung carcinoma. It was found that the proliferation of these cells is arrested and the cells are destroyed (Fig. 2). The optimal frequencies differed between cancer cell types. To understand this finding we calculated the force on a 1 μm polarizable spherical particle in a dividing cell as function of cell radius, membrane thickness and cytoplasm conductivity. It was found that optimal TTFields frequency is inversely related to cell size (see *SI Appendix A*) in a way consistent the diameter variability of the different cell types studied.

In the previous study (9) animal treatment was done by using implanted electrodes. In the present study, we used the much more practical externally applied electrodes. Furthermore, as the available data suggests that treatment may need to be prolonged, the use of conducting electrodes may result in serious problems: local damage to the skin because of electrolysis and the generation of free radicals at the electrode-tissue interface, skin permeabilization by the transdermal currents (18, 19), and calcium accumulation within cells (20) that can result in cell death (21). Clearly, the first 2 adverse effects do not occur at the surface of insulated electrodes. Using fluorescence calcium imaging techniques, we could demonstrate that electric field

induced calcium accumulation is eliminated by the use of insulated electrodes (see *SI Appendix B*). However, the large potential drop across the insulation high impedance poses a serious problem; to generate the fields of the required intensity potentials of >1,000 V must be used. As such high voltages may compromise patient safety, low impedance electrodes were developed. The impedance of insulation is lowered by using an insulating material, lead magnesium niobate–lead titanate (PMN-PT) (EDO, New York, NY), that has a dielectric constant of ε > 5,000. Under these conditions the electrodes have a capacitance of ~10nF/cm², i.e., an impedance of 100–200 Ω at the TTFields frequency range. Thus, only 50% of the applied voltage is lost on the insulation in the mice experiments. The corresponding potential drop on the 22.5 cm² electrodes placed on the patient's head, in the trial presented here, is only ~10% of the applied voltage.

A major limitation of all current cancer treatments is their unfavorable therapeutic index. Two types of toxicities may be expected from an electric field based treatment. First, the fields could theoretically affect excitable tissues causing cardiac arrhythmias or seizures. However, such effects are not expected to occur, because for sinusoidal alternating fields of >10 kHz, excitation of nerves and muscles decreases dramatically, because of the parallel resistor-capacitor nature of the cell membrane (22). Indeed, in both acute and chronic application of TTFields to animals and patients, there was no trace of abnormal cardiac or neurological activity. Secondly, TTFields might be expected to damage rapidly dividing normal cells within the body, i.e., bone marrow and small intestine mucosa. However, no treatment-related toxicities were found in any of the treated patients or upon animal exposure to field intensities threefold higher than the effective anti-tumoral dose. With regards to hematopoesis the reason for this is that these cells, which reside mainly in the bone marrow, are protected from the TTFields by the high impedance of both the bone and bone marrow (23). This was demonstrated by calculating the TTFields distribution in an extremity, such as a leg, by using the finite element mesh (FEM) method. It was found that the field intensity is 100-fold lower within the bone marrow compared with the surrounding tissues. The lack of damage to intestinal mucosa probably reflects that the small intestine mucosal cells have a slower replication cycle than neoplastic cells (24) and that the intestine changes its orientation, relative to the applied field, often lowering the efficacy of the mitotic disruption.

The tumor inhibitory effect of TTFields has been attributed previously to two separate mechanisms (9): interference with the formation of the mitotic spindle microtubules and physical destruction of cells during cleavage, both of which are strongly dependent on the orientation of mitosis axis versus the field vectors. Because the relative orientation of the mitosis axis during cytokinesis is random, it would be expected that only a fraction of dividing cells would be affected by TTFields of any specific direction. To overcome this problem, we applied sequentially several field directions and have shown that increasing the number of directions from 1 to 3, resulted in a significant increase in the anti-proliferative efficacy of TTFields *in vitro* and *in vivo*.

Following encouraging evidence from experimental animals, a clinical trial of the effect of TTFields on patients with recurrent GBM was initiated. Because *in vitro* data indicate that TTFields are most effective when applied for >16 h continuously (data not shown), patients were treated daily for an average of 18 h per day until progression. The results reported here are the first evidence of the safety and efficacy of TTFields used to treat cancer in patients. Preliminary accounts of this data were published in

Kirson *et al.*  PNAS | June 12, 2007 | vol. 104 | no. 24 | 10155

MEDICAL SCIENCES

abstract form.[18,19] Because this was a pilot trial there was no randomized control group and the results were evaluated by comparing to historical control data. Most historically controlled pilot studies in recurrent GBM are compared with a large metaanalysis performed by Wong et al. in 1999 (10) and to this data we added the four prospective trials (25–28), which included >50 GBM patients, performed since that date. The average historical PFS6 based on the above studies is 15.3 ± 3.8%, and the average historical TTP is 9.5 ± 1.6 weeks. OS averaged 29.3 ± 6 weeks (see SI Table 2). When compared with these outcomes, the efficacy data collected in the current pilot trial is extremely promising (TTP, 26.1 weeks; PFS6, 50%; and OS, 62.2 weeks). These results were not accompanied by hematological or gastrointestinal toxicities, epileptic seizures, cardiac arrhythmias, etc., despite >70 months of cumulative treatment. The only side effect detected was 'contact' dermatitis beneath the 'electrodes. This reaction is most likely the result of a combination of factors, including chronic moisture, heat, and occlusion of the skin; chemical irritation by constituents of the hydrogel and medical tape (29); and possibly inhibition of cellular replication in the skin by the TTFields. Thus, in conclusion, this treatment modality was well tolerated and caused almost no toxicity at all.

In summary, we demonstrated initially that TTFields are effective in arresting the proliferation and inducing death in a wide range of tumor cells in culture as well as solid tumors in animals. On this basis a clinical trial was carried out treating human patients suffering from recurrent GBM, a malignant brain tumor. It was demonstrated that the TTFields inhibit the growth of this highly treatment-resistant tumor by using special insulated electrodes, with little or no side effects. Can we expect to have similar efficacy on other human tumors? The fact that in cultures and animal models TTFields were found to be effective on all cells and tumors tested is definitely encouraging. Furthermore, TTFields being a physical, rather than chemical, modality, their efficacy is likely to be highly insensitive to specific interactions with tumor and patient receptors and other characteristic elements. Thus, like irradiation, they have the potential to be effective over a wide range of tumors. However, from the above it is apparent that their practical specificity to cancerous cells is significantly higher than that of irradiation, the therapeutic efficacy of which is often severely limited by toxicity. Therefore, we believe that there is a high probability that TTFields may prove to be an effective and safe therapeutic modality to a large number of human cancers.

## Materials and Methods

**Cell Cultures.** Cell cultures were grown in DMEM plus 10% FCS media in a $CO_2$ incubator (5% $CO_2$) at 37°C. Cell suspension (200 μl; total 20 × $10^3$ cells) was placed as a drop in the centre of 35-mm Petri dishes, incubated for 24 h and then the cell number was estimated by using standard XTT method (Cell proliferation assay Kit, Biological Industries Ltd., Israel) and expressed as $OD_0$. Temperature was measured by a thermocouple (Omega, Stamford, CT) placed at the center of the dish. Two pairs of electrodes, insulated by a high dielectric constant ceramic (lead magnesium niobate–lead titanate (PMN-PT)), positioned in the petri dish perpendicular to each other were connected to a sinusoid function generator and amplifier. Two-directional fields were generated sequentially (1) by switching the output of the amplifier between two pairs of electrodes every

0.25–1 sec. The electric field intensity in the culture medium was measured as described in ref. 1.

At the end of 24 h of treatment, the cell number was measured by using the XTT method and expressed as $OD_1$. The rate of cell proliferation was expressed as the $OD_1/OD_0$ ratio.

**Animal Models. *Tumor inoculation and in vivo size assessment.*** Animal experiments were conducted after approval by the Technion-Israel Institute of Technology committee for the care of laboratory animals. Intracranial glioma (F-98) was inoculated stereotactically into the subcortical white matter in the right hemisphere of Fischer rats (Harlan laboratories, Israel) by using a modification of the method described in refs. 30 and 31. Briefly, a hole, 1 mm in diameter, was punched through the scalp, 2 mm to the right of the midline and 4 mm rostral to the line connecting the external ear canals. A 0.5 mm burr hole was drilled in the bone at same location and a 26G needle was inserted to a depth of 7 mm beneath the scalp surface. Five microliters of saline containing 2.5 × $10^5$ F-98 cells was then injected by using a microsyringe operated by a micromanipulator. The needle was left in position for 60 sec and then retracted slowly at a rate of 2 mm/min. Rats were allowed to recuperate for 24 h before treatment initiation. Tumor volume was assessed based on serial (2-mm interval) T1 weighted axial MRI images (0.5 Tesla MRI; Gyrex orbital coil; Elscint; Haifa, Israel) obtained 10 min following injection of 0.7 ml of Gadolinium (Magnetol; Soreq Radiopharmaceuticals, Yavne, Israel) into the tail vein. Tumor volume was assessed by calculating the area in square millimeters of the contrast enhanced lesion in each section. In view of the small size of the head of the rat, only three electrodes could be positioned on it, generating one to three different field directions.

**Computation of the distribution of electric fields generated by external insulated electrodes.** The distributions of the alternating electric field generated by external electrodes within the brains of rats were estimated by using FEM simulations. These field distributions are determined by the geometry and electrical properties of the electrodes and tissues. On average, the capacitance of each electrode is 8 nF. This translates into an impedance of 190 and 95 Ω at 100 and 200 kHz, respectively. Because the impedance of the rat head is on the order of 400 Ω, when applying 42 V, 200 kHz TTFields to rats, 14-V drop on the insulation of both electrodes and the remaining 28 V on the rat itself. The fields generated in the areas of interest are in the range of 1–2 V/cm. The calculated field distribution for the rat head is given in Fig. 3A.

**Human GBM Trial. *GBM patient eligibility and characteristics.*** Twelve patients, suffering from the brain tumor GBM were enrolled in the study. Patients eligible for enrollment had recurrence based on Macdonald criteria (32), were >18 years old, had histologically established GBM (World Health Organization grade IV), had a Karnofsky performance scale ≥ 70, and were at least 4 weeks from any brain surgery and at least 8 weeks from radiotherapy. Patients could be at any recurrence and may have received other salvage therapies before enrollment. All patients had received adjuvant Temozolomide for their primary tumor. No concomitant chemotherapy was allowed. Multifocal disease was allowed. Patients with significant comorbidities, intratentorial tumors, implanted pacemakers or documented clinically significant arrhythmias, were excluded from the trial. During review of the histology from postprogression debulking surgery, one patient was excluded from efficacy analysis because of failure to meet histological criteria for grade IV glioma. An additional patient dropped out of the trial immediately following the baseline visit because of withdrawal of consent. Individual patient characteristics are listed in SI Table 1.

††Kirson, E. D., Obalý, V., Rochlitz, C., Townyt, F., Salzberg, M., Palti, Y., AACR Meeting Abstracts, April 5, 2006, Washington, DC, Abstract 5259.

§§Palti, V., Kirson, E. D., Palti, Y., Gutin, P. H., Congress of Neurological Surgeons, October 13, 2005, Boston, MA (abstr.).

¶¶Gutin, P., Kirson, E., Palti, Y., Obalý, V., International Brain Tumor Research and Therapy Meeting, April 26, 2005, Napa Valley, CA (abstr.).

Kirson et al.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 368 of 631   Document 11-5

EX. 2, P. 206

*The clinical trial.* A single arm, pilot trial of the safety and efficacy of TTField treatment was performed in 10 patients with recurrent GBM. Written informed consent was obtained from each subject. The trial was performed after approval by the Na Homolce Institutional Review Board and the Czech Ministry of Health. Efficacy analysis was performed for 10 recurrent GBM patients by comparing TTP, PFS6, and OS in recurrent GBM patients treated with the NovoTTF-100A device with the TTP, PFS6, and OS of recurrent GBM patients in a literature based historical control group (10, 25–28). No statistical hypothesis testing was planned because of the small sample size. Ninety-five percent confidence intervals of survival proportions were calculated from Kaplan–Meier survival curves, by using standard formulae (33).

*Measurement and simulation of TTFields intensity within the human brain.* To plan the TTFields intensity necessary to treat patients with intracranial tumors, we performed FEM simulations of the intensity distribution of TTFields within a three-dimensional model of the human head. Field intensity was slightly higher in the cortex than in the center of the brain (by ≈30%), but effective (1–2 V/cm) TTFields could be generated at the center of the brain by applying ≈50 V to surface electrodes placed on the scalp. To validate these findings, TTFields intensity was measured within the brain of a volunteer undergoing surgery because of obstructive hydrocephalus because of a huge meningioma of the pineal region. The study was performed according to an experimental protocol approved by the Rambam Medical Center ethics committee. The measured TTFields intensity was accurate within 10% of the FEM simulated values.

*TTFields treatment of GBM patients.* TTFields were applied to recurrent GBM patients by using the NovoTTF-100A device (Novo-Cure Ltd., Haifa, Israel). This portable battery-operated device generates TTFields in GBM patients by means of insulated electrodes placed on their shaved scalps. The area of each insulated electrode array used was 22.5 cm². Fields of 1–2 V/cm were generated by controlling the current density through the electrodes <31 mA/cm² RMS, approximately one-third of the level that is generally recognized to present a risk of skin injury (100 mA/cm²) (34). In addition, the maximal power density beneath the electrodes was kept beneath 0.22 W/cm², i.e., below the level associated with thermal skin injury (35). Electrode temperature was monitored and the power was lowered automatically when the temperature of any electrode exceeded 41°C. This value is well below the threshold of 44°C, i.e., the lowest prolonged temperature that can cause thermal injury (34).

TTFields having the optimal frequency of 200 kHz for rat and human gliomas (see Fig. 2) and an intensity of 1–2 V/cm (peak) were used in the trial. TTFields were switched sequentially every 1 sec between two perpendicular directions; lateral and anterior-posterior, through two sets of insulated electrode pairs. Patients received treatment continuously until disease progression or for a maximum of 18 months. Treatment was applied daily for an average of 18 h per day.

*Patient evaluation.* Objective tumor assessment was performed by Gd-enhanced MRI according to a strictly defined protocol. MRI scanning was performed at trial entry within one week of NovoTTF-100A treatment initiation and after every treatment course (28–30 days). All scans were reviewed by a board certified radiologist (J.V.). The assessment of tumor response was based on criteria defined by Macdonald *et al.* (32). Study visits were performed once per week during the first month of treatment and monthly thereafter. The following examinations were carried out at each visit: Neurological evaluation, EKG, complete blood count with differential, chemistry panel, and coagulation studies. Adverse events occurring during treatment or up to 60 days after termination of therapy were scored according to the common toxicity criteria scale (version 3). Disease progression was not captured as a serious adverse event.

This work was supported by NovoCure Ltd.

1. Cole KS (1968) *Membranes, Ions and Impulses: A Chapter of Classical Biophysics* (Univ of Calif Press, Berkeley).
2. Keller RH, Gettys WE, Skove MJ (1993) *Physics* (McGraw-Hill, New York).
3. Cloye DS, Wheeler EK (2001) *Phys Rev E Stat Nonlin Soft Matter Phys* 64:026605.
4. Gonzalez CF, Remcho VT (2005) *J Chromatogr A* 1079:59–68.
5. Polk C, Postow E (1995) *Biological Effects of Electromagnetic Fields Handbooks, Manuals, Etc.* (CRC, Boca Raton, FL), p 618.
6. Guster AD, Pethig R (1990) *Parasitology* 117:S177–S189.
7. Sowers AE (1984) *J Cell Biol* 99:1989–1996.
8. Takashima S, Schwan HP (1985) *Biophys J* 47:513–518.
9. Kirson ED, Ourvich Z, Schneiderman R, Dekel E, Itzhaki A, Wasserman Y, Schatzberger R, Palti Y (2004) *Cancer Res* 64:3288–3295.
10. Wong ET, Hess KR, Gleason MJ, Jaeckle KA, Kyritsis AP, Prados MD, Levin VA, Yung WK (1999) *J Clin Oncol* 17:2572–2578.
11. DeVita VT, Rosenberg SA, Hellman S (2001) *Cancer, Principles and Practice of Oncology* (Lippincott Williams & Wilkins, Philadelphia).
12. Kaplan EL, Meier P (1958) *J Am Stat Assoc* 457–481.
13. Polk C (1995) in *The Biomedical Engineering Handbook,* ed Bronzino JD (CRC, Hartford, CT), pp 1404–1416.
14. Bassett CA (1985) *Clin Plast Surg* 12:259–277.
15. Elson E (1995) in *The Biomedical Engineering Handbook,* ed Bronzino JD (CRC, Hartford, CT), pp 1417–1423.
16. Chou CK (1995) in *The Biomedical Engineering Handbook,* ed Bronzino JD (CRC, Hartford, CT), pp 1424–1430.
17. Maier H (1997) *Biophys J* 73:1617–1626.
18. Webster JG, Clark JW (1998) *Medical Instrumentation: Application and Design* (Wiley, New York).
19. Burnette RR, Ongpipattanakul B (1988) *J Pharm Sci* 77:132–137.
20. Cho MR, Thatte HS, Silvia MT, Golan DE (1999) *FASEB J* 13:677–683.
21. Orrenius S, McCabe MJ, Jr, Nicotera P (1992) *Toxicol Lett* 64–65 Spec no:357–364.
22. Palti Y (1962) *Bull Res Counc Isr Sect E Exp Med* 10:54–56.
23. Bronzino JD (1995) *The Biomedical Engineering Handbook* (CRC, IEEE Press, Boca Raton, FL).
24. Ross MH, Kaye GI, Pawlina W (2003) *Histology: a Text and Atlas* (Lippincott Williams & Wilkins, Philadelphia).
25. Yung WK, Albright RE, Olson J, Fredericks R, Fink K, Prados MD, Brada M, Spence A, Hohl RJ, Shapiro W, *et al.* (2000) *Br J Cancer* 83:588–593.
26. Brada M, Hoang-Xuan K, Rampling R, Dietrich PY, Dirix LY, Macdonald D, Heimans JJ, Zonnenberg BA, Bravo-Marques JM, Henriksson R, *et al.* (2001) *Ann Oncol* 12:259–266.
27. Chang SM, Theodosopoulos P, Lamborn K, Malec M, Rabbitt J, Page M, Prados MD (2004) *Cancer* 100:605–611.
28. Rich JN, Reardon DA, Peery T, Dowell JM, Quinn JA, Penne KL, Wikstrand CJ, Van Duyn LB, Dancey JH, McLendon RE, *et al.* (2004) *J Clin Oncol* 22:133–142.
29. Ancona A, Arevalo A, Macarleta E (1990) *Dermatol Clin* 8:95–105.
30. Langen KJ, Clauss RP, Holschbach M, Muhlensiepen H, Kiwit JC, Zilles K, Coenen HH, Muller-Gartner HW (1998) *J Nucl Med* 39:1596–1599.
31. Salal M, Bellinzona M, Moyer F, Call G, Samil M (1999) *J Neurooncol* 42:59–67.
32. Macdonald DR, Cascino TL, Schold SC, Jr, Cairncross JG (1990) *J Clin Oncol* 8:1277–1280.
33. Altman DG (1999) *Practical Statistics for Medical Research* (Chapman & Hall, London).
34. Moritz AR, Henriques FCJ (1947) *Am J Pathol* 23:695–720.
35. Hocker CM, Malhotra IV, Hedley-Whyte J (1973) *Anesthesiology* 38:106–122.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 369 of 631   Document 11-5
EX. 2, P. 207
4600

002245 C2C DIAR_A0000969327 12-19-2019

[CANCER RESEARCH 64, 3288–3295, May 1, 2004]

# Disruption of Cancer Cell Replication by Alternating Electric Fields

Eilon D. Kirson,[1] Zoya Gurvich,[2] Rosa Schneiderman,[2] Erez Dekel,[3] Aviran Itzhaki,[4] Yoram Wasserman,[1,4] Rachel Schatzberger,[2] and Yoram Palti[1]

[1]Department of Biomedical Engineering, NovaCure Ltd., Haifa, Israel; [2]B. Rappaport Faculty of Medicine, Technion—Israel Institute of Technology, Haifa, Israel; [3]Department of Molecular Cell Biology, Weizmann Institute of Science, Rehovot, Israel; and [4]Elisha Medical Centre, Haifa, Israel

## ABSTRACT

Low-intensity, intermediate-frequency (100–300 kHz), alternating electric fields, delivered by means of insulated electrodes, were found to have a profound inhibitory effect on the growth rate of a variety of human and rodent tumor cell lines (Patricia C, U-118, U-87, H-1299, MDA231, PC3, B16F1, F-98, C-6, RG2, and CT-26) and malignant tumors in animals. This effect, shown to be nonthermal, selectively affects dividing cells while quiescent cells are left intact. These fields act in two modes: arrest of cell proliferation and destruction of cells while undergoing division. Both effects are demonstrated when such fields are applied for 24 h to cells undergoing mitosis that is oriented roughly along the field direction. The first mode of action is manifested by interference with the proper formation of the mitotic spindle, whereas the second results in rapid disintegration of the dividing cells. Both effects, which are frequency dependent, are consistent with the computed directional forces exerted by these specific fields on charges and dipoles within the dividing cells. In vivo treatment of tumors in C57BL/6 and BALB/c mice (B16F1 and CT-26 syngeneic tumor models, respectively), resulted in significant slowing of tumor growth and extensive destruction of tumor cells within 3–6 days. These findings demonstrate the potential applicability of the described electric fields as a novel therapeutic modality for malignant tumors.

## INTRODUCTION

In the laboratory setting and in clinical practice, alternating electric fields show a wide range of effects on living tissues. At very low frequencies (under 1 kHz), alternating electric fields stimulate excitable tissues through membrane depolarization (1). The transmission of such fields by radiation is insignificant, and therefore they are usually applied directly by contact electrodes, although some applications have also used insulated electrodes. Some well-known examples of such effects include nerve, muscle, and heart stimulation by alternating electric fields (1, 2). In addition, low-frequency pulsed electric fields have been claimed to stimulate bone growth and accelerate fracture healing (3). However, as the frequency of the electric field increases above 1 kHz, the stimulatory effect diminishes. Under these conditions, although a greater fraction of the fields penetrates the cells, due to the parallel resistor-capacitor nature of all biological membranes, the stimulatory power greatly diminishes as the alternating cell membrane hyper-depolarization cycles are integrated such that the net effect is nulled. At very high frequencies (i.e., above many MHz), although the integration becomes even more effective, a completely different biological effect is observed. At these frequencies tissue heating becomes dominant due to dielectric losses. This effect becomes more intense as frequency, field intensity, or tissue dissipation factor increases (4). This phenomenon serves as the basis for some commonly used medical treatment modalities including diathermy and radio frequency tumor ablation, which can be applied through insulated electrodes (5). Intermediate-frequency electric

fields (i.e., tens of kilohertz to megahertz) alternate too fast for causing nerve-muscle stimulation and involve only minute dielectric losses (heating). Such fields of low to moderate intensities are commonly considered to have no biological effect (4). However, a number of nonthermal effects of minor biological consequence have been reported even at low field intensities. These include microscopic particle alignment (i.e., the pearl chain effect; Ref. 6) and cell rotation (7, 8). With pulsed "electric fields" of $10^3$ V/cm and 100-ms pulse length, reversible pore formation appears in the cell membrane, a phenomenon usually called electroporation (9).

In the present study we show for the first time, to our knowledge, that very low-intensity (<2 V/cm), intermediate-frequency (100–300 kHz), alternating electric fields induced by insulated electrodes have specific inhibitory effects on dividing cells in culture. We demonstrate that applying these fields to cancerous cells leads to proliferation arrest and cell destruction. When applied to syngeneic mice tumor models, these tumor treating fields (TTFields) cause a significant reduction in tumor growth rate without any significant side effects.

## MATERIALS AND METHODS

*In Vitro* Experimental Set Up. Cultures were grown in standard culture dishes (4-well) and culture chambers: SN 138 (21; Nalge Nunc International). The TTFields were generated by pairs of 15-mm-long, completely insulated wires (P/N K-30-1000; VT Corporation; outer diameter, 0.5 mm; ethylene tetrafluoroethylene insulation thickness, 0.125 mm; dielectric breakdown, 1800 V/mil) fixed to the bottom of each dish at a distance of 1 mm from each other. The wires were connected to an oscillator (OPG0219A; Instek) and a high-voltage amplifier (A303; A. A. Lab Systems Ltd.) that generated the required sine-wave signals (range, 300–800 V). Cells were plated by carefully smearing 10 μl of DMEM (Biological Industries Ltd., Beit Haemek, Israel) containing $1.5 \times 10^4$ cells along the gap between the wires (Fig. 1A). After the cells settled and attached to the plate surface, 500 μl of DMEM were added to each culture dish, which was then transferred to a 5% $CO_2$ humidified incubator held at 36°C. The culture was incubated for a control period of 24 h before treatment. Culture medium was replaced manually every 24 h throughout the experiments. TTFields were then applied by connecting the wires to a high-voltage amplifier operated by a signal generator with frequency and amplitude controls. Finite element simulation of the TTFields generated between the wires demonstrated that the field in the vicinity of the cell culture was homogenous (not shown). Different types of cancerous cell lines were subjected to TTFields. These included human melanoma (Patricia), glioma (U-118, U-87), Lung (H-1299), prostate (PC3), and breast (MDA231) cancerous cell lines as well as mouse melanoma (B16F1), rat glioma (F-98, C-6, and RG2), and mouse adenocarcinoma (CT-26) cell lines (all from American Type Culture Collection, except for Patricia, which was a generous gift from Dr. Ruth Halaban, Department of Dermatology, Yale University School of Medicine). In addition, a noncancerous cell line (BHK) was grown under conditions that stunt cell replication (0.1% FCS) and then subjected to TTFields. Also, segments of excised rat mesentery and diaphragm were subjected to the fields *in vitro*. Cell counts were made every 24 h after seeding using the standard 2,3-bis(2-methoxy-4-nitro-5-sulfophenyl)-5-[(phenylamino)carbonyl]-2H-tetrazolium hydroxide method to measure cell proliferation as described previously (10) using cell proliferation assay kit (Biological Industries, Beit Haemek, Israel). In brief, culture media was replaced with 0.2 ml of preheated 2,3-bis(2-methoxy-4-nitro-5 sulfophenyl)-5-[(phenylamino)carbonyl]-2H-tetrazolium hydroxide reagent and incubated for 1 h at 37°C in a 5% $CO_2$ incubator. After incubation and gentle stirring,

Received 1/11/04; revised 2/12/04; accepted 2/17/04.

Grant support: NovaCure Ltd.

The costs of publication of this article were defrayed in part by the payment of page charges. This article must therefore be hereby marked *advertisement* in accordance with 18 U.S.C. Section 1734 solely to indicate this fact.

Requests for reprints: Yoram Palti, Department of Physiology, B. Rappaport Faculty of Medicine, Technion—Israel Institute of Technology, Haifa 31096, Israel. Phone: 972-4-8501204; Fax: 972-4-8501207; E-mail: yoramp@netvision.net.il.

3288

2019212X02638

EX. 2, P. 208

4601

0.15 ml of the reaction solution was transferred to a 96-well plate (SN 92696; TPP, Trasendigen, Switzerland). The absorbance of the samples was then read with a spectrophotometer (Tecan ELISA Reader; 450 nm). The colorimetric measurements at each time point were normalized to the measurement performed immediately before beginning of treatment. To verify that the colorimetric assessments were accurate, direct visual cell counts were performed on sample culture dishes. At the optic densities used (0.2–2), optic density was linearly related to the number of cells in the culture dishes ($n = 10$; $r^2 = 0.99$). The growth rate of both treated ($GR_t$) and control cultures ($GR_c$) was calculated for each experiment by plotting the optic density values on a logarithmic scale and fitting a linear regression line to the values. The growth rate for each culture dish was the slope of this linear regression. The therapeutic enhancement ratio (TER) was calculated as the ratio of the decrease in the growth rate of treated cells compared with the growth rate of control cells [($GR_c - GR_t$)/$GR_c$]. Thus, if the increase in the number of treated cells is equal to that of the controls, TER = 0; if the increase in cell number is smaller in the treated cultures than in the controls, TER > 0; and if the number of cells in the treated cultures decreases absolutely, TER > 1.

In time-lapse microphotography experiments, cell lines were grown on a 35-mm standard culture dish (SN 430165; Corning Inc.) by plating $3 \times 10^4$ cells in 2.5 ml of DMEM with 25 mM HEPES. The Petri dish temperature was controlled at 34°C (B16F1) or at 37°C (all other cell lines). Subsequently, two parallel insulated wires were positioned on the bottom of the dish with 1 mm distance between through which TTFields was applied. The entire set-up was placed on an inverted microscope (Eclipse TS-100; Nikon) and video microphotographs at ×200 magnification were taken with a standard VCR camera (Handicam X 320; Sony). Photographs were captured using a personal computer every 60–120 s for 6–10 h/culture.

Fluorescent Labeling of α-Tubulin, Actin, and DNA. Mouse melanoma cells were grown on coverslips and subjected to TTFields for 24 h. After treatment, the medium was removed, and the cells were washed in a buffer solution [10 mM 4-morpholineethanesulfonic acid, 150 mM NaCl, 5 mM EGTA, 5 mM MgCl₂, and 5 mM glucose (pH 6.1)], permeabilized, and fixed with 0.5% Triton X-100 and 0.25% glutaraldehyde (Sigma) for 5 min and then post-fixed with 1% glutaraldehyde for 20 min. Subsequently, the cells were washed in PBS and 1 mM sodium borohydride (Sigma) to eliminate autofluorescence. The coverslips were then incubated with a primary antibody clone for α-tubulin (DM1A; Sigma) for 30 min, washed, and incubated for 30 min with a secondary antibody (Alexa Fluor 488 goat antimouse IgG; Molecular Probes). Rhodamine-conjugated phalloidin (Sigma) was added with the secondary antibody to stain actin filaments. The cells were then washed and incubated with 4′,6-diamidino-2-phenylindole (Molecular Probes) to stain the DNA. After staining, the coverslips were mounted and viewed with a fluorescence microscope at ×630 magnification and photographed.

Electric Field Measurement. The electric field intensity in the culture medium was measured by means of a probe, consisting of two (0.25 mm in diameter) insulated wires with exposed tips 0.5 mm apart, that was dipped in the culture medium. The wires were connected to a high-input impedance differential amplifier that translated the waveform amplitude into a calibrated steady voltage that was digitally recorded. Field intensities throughout the manuscript are expressed in peak voltage amplitude per centimeter (V/cm). Care was taken to eliminate any pickup from the field outside the culture medium. Continuous field monitoring could also be made by measuring the potential drop across a 100Ω resistor placed in series with one of the field-generating wires. The voltage drop on this resistor was linearly correlated to the field intensity ($r^2 = 0.96$). To verify that the experimental setups were not exposed to any significant magnetic fields, the electromagnetic radiation in the immediate vicinity of the treated cultures was measured using a loop antennae (EMCO 6507 1 kHz to 30 MHz) connected to a spectrum analyzer (Anritsu 9 kHz to 2.2 GHz). The electromagnetic radiation in the 100–300-kHz range within the incubators containing treated culture dishes was found to be $10^{-12}$ Tesla and within animal cages containing TTField-treated animals, $10^{-14}$ Tesla, i.e., negligible.

Finite Element Simulations of Electric Field Distribution. The calculations of the electric field within the cells are based on finite element mesh (11), using a simplified description of the cell morphology (see Fig. 7). In all calculations, the dielectric constant of both the cytoplasm and medium was 80, their conductance was 0.3 S/m, the cell diameter was 10 μm, and the membrane thickness was 3 nm (with a dielectric constant of 3). The electric field

intensity was mapped within the cell, based on the amplitude (1 V/cm), frequency (100 kHz) and waveform (sine) of the electric field applied to the cell culture. The force exerted by an inhomogeneous field, such as that created inside the cells on a single tubulin dimer, was calculated based on the direct interaction between the electric field and the dipole. The force exerted on a microscopic polarizable organelle was calculated by the following equation (12):

$$\langle \vec{F} \rangle = 2\pi r^3 \varepsilon_m Re[K(\omega)] \vec{\nabla} E_{RMS}^2 \tag{1}$$

where $\langle \vec{F} \rangle$ is the expectation value of the force vector, $Re$ symbolized the real component of the variable, $\vec{\nabla}$ is the divergence of the variable, $\varepsilon_m$ is the cytoplasm dielectric constant, $r$ is the tubulin dimer length or particle radius, $E_{RMS}$ is the RMS value of the electric field, and $K(\omega)$ is the Clausius-Mossotti factor:

$$K(\omega) = \frac{\varepsilon_p^* - \varepsilon_m^*}{\varepsilon_p^* + 2\varepsilon_m^*} \tag{2}$$

$$\varepsilon^* = \varepsilon - i \cdot \frac{\sigma}{\psi}$$

where $\varepsilon^*_p$, $\varepsilon^*_m$ are the complex dielectric constants of the particle and cytoplasm respectively, each of which is calculated from the dielectric constant ($\varepsilon$) and conductance ($\sigma$) as a function of frequency ($\omega$). $K(\omega)$ in this case is always positive at the relatively low frequencies used (i.e., 100 kHz), assuming that at these frequencies, $\varepsilon_p \approx \varepsilon_m$. This means that the force acting on a polarizable particle will always act in the direction of the convergence of the electric field lines. The terminal velocity of particles due to these forces was calculated using Stoke's law.

In Vivo Experimental Setup. TTField treatment was applied by means of 10-mm-long pairs of parallel, insulated wires (outer diameter, 0.5 mm; insulation thickness, 0.125 mm; Tefcel) placed intradermally on the back of a mouse. Another pair of identical wires was placed parallel to the first pair in each mouse, with an interval of 5 mm between the pairs. Cell line inoculums were injected (4 μl; $3 \times 10^5$ cells) intradermally in between the two members of each pair of implanted wires. Only one pair was then connected to a voltage amplifier to apply 100 kHz of TTFields treatment to one tumor. The other pair of wires was left disconnected, and the tumor between them served as a paired control of the treated tumor (see Fig. 1B). Tumors were measured using a caliper. Tumor size was calculated by multiplying maximal tumor length by maximal tumor width. Animal experiments were conducted in accordance with the Technion—Israel Institute of Technology guidelines for the care of laboratory animals.

## RESULTS

Effect of TTFields on Cells in Culture. More than 500 culture dishes were exposed to TTFields. The number of cells in each treatment dish was assessed periodically using colorimetric determination (as described in "Materials and Methods"). Because under control conditions, most of the cell lines had doubling times of less than 24 h (range, 17–24 h; except for PC-3 for which the doubling time was 73 h), treatment duration was at least 24 h. Exposure began 24 h after seeding and was continued for up to 72 h. In all cell lines tested, 24-h exposure to TTFields at 100 kHz (at an intensity of 1.0–1.4 V/cm) caused significant inhibition of cell proliferation (TER range, 0.14–0.96; $P < 0.05$; Fig. 1). This effect lasted beyond the exposure time of the cells to TTFields. In fact in some experiments (e.g., malignant melanoma), culture growth was stunted for as long as 72 h after TTField exposure was terminated (Fig. 2A).

We next checked whether nonreplicating cultures and tissues are affected by TTFields. BHK cultures were maintained in low-serum (0.1% FCS) conditions to slow their replication rate. These cultures were then exposed to 100 kHz of TTFields (at an intensity of 1.2 V/cm) for 24 h. No significant difference in cell number between control and TTField-treated cultures was observed under these con-

3289

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 371 of 631   Document 11-5

EX. 2, P. 209

4602

CANCER CELL DESTRUCTION BY ALTERNATING ELECTRIC FIELDS



Fig. 1. Schematic representations of experimental setups in vitro (A) and in vivo (B) are shown. C. TTFields inhibit the growth of cancerous cell lines in vitro. Cultures were exposed to 100-kHz TTFields at an intensity of 1-1.4 V/cm. Ordinate, TER, i.e., the ratio of the decrease in the growth rate of treated cells compared with the growth rate of control cells ($GR_c - GR_t/GR_c$). In all four animal cell lines (□) and seven human cell lines (□) tested, the ratio is greater than 0, indicating an inhibition in the growth rate of the treated cultures compared with temperature matched controls. All effects were statistically significant ($P < 0.05$; Student's $t$ test).

ditions ($P = 0.97$). After returning these cultures to normal media (10% FCS), normal replication resumed both in cultures exposed to TTFields and in control cultures. We also tested the effect of TTField treatment on the number of viable cells in nonreplicating tissues dissected from rats. Four segments of rat mesentery and four segments of rat diaphragm were exposed to TTFields at an intensity of 1.2 V/cm for 24 h. No differences were observed between the number of viable cells in both types of treated tissues compared with control tissues (mesentery, $P = 0.3$; diaphragm, $P = 0.54$).

To test the relationship between TTField intensity and inhibition of cell proliferation, mouse melanoma (B16F1) and rat glioma (F-98) cell lines were exposed to TTFields of different intensities between 1 and 2.5 V/cm. The inhibitory effect on cell proliferation increased as intensity was raised (Fig. 2B) until complete proliferation arrest was achieved at intensities of 1.4 and 2.25 V/cm in melanoma and glioma cells, respectively.

The effects of TTFields are expected to be frequency dependent in view of the dependence of cell membrane electric impedance on frequency (due to the cell membrane capacitance). These changes in impedance render the fraction of field penetrating the cells a function of frequency. Therefore, we tested the frequency dependence of the inhibitory effect of TTFields on growth rate of cultured melanoma (B16F1) and glioma (F-98) cells. Comparison between the efficacy of the TTFields at different frequencies was performed by normalizing the TER to the electric-field intensity. As seen in Fig. 2C, the inhibitory effect of TTFields was frequency dependent. Interestingly, the frequency at which maximal inhibition was achieved differed between cell types (120 kHz versus ~200 kHz for melanoma and glioma, respectively).

**The Effects of TTFields on Cellular and Molecular Processes in Proliferating Cells.** To gain insight into the cellular processes by means of which TTFields affect cell proliferation, time-lapse microphotography was performed while TTFields were applied to mouse melanoma cultures (see "Materials and Methods"). Several unique processes became evident in time-lapse microphotography of TTField-treated cultures. The most pronounced phenomenon was

prolongation of mitosis. In the treated cells, mitosis seemed to begin normally but was prolonged for variable periods of time before completing cleavage into two daughter cells. Fig. 3A shows an exemplary mitosis in a TTFields-treated cell. As seen in the treated cell, mitosis was not complete within 3 h. Due to this proliferation arrest, in treated cultures, mitosis lasted on average $124 \pm 91$ min (mean $\pm$ SD, $n = 53$; range, 40–541 min), whereas under control conditions, average mitosis duration was $62 \pm 8$ min from cell rounding to cytokinesis (mean $\pm$ SD, $n = 12$; range, 47–78 min). This prolongation is statistically significant ($P < 0.01$, Mann-Whitney $U$ test).

The second major phenomenon, seen in the TTField-treated melanoma cultures, was that one-fourth of cells undergoing mitosis were destroyed as the formation of the cleavage furrow approached completion. During this process, the cell membrane ruptured, and many small membrane blebs formed, resembling 'post-mitotic apoptotic cell death (13). Two exemplary cells undergoing such destruction are shown in Fig. 3, B and C. Destructive effects were observed only in mitotic cells, whereas quiescent cells remained morphologically and functionally intact.

The third phenomenon, seen only in TTField-treated cultures, was nuclear rotation. In early mitosis, after cell rounding, nuclei could be seen rotating within the cell. A full rotation lasted on average 15 min. This effect resembles the whole-cell rotation previously described during exposure to intermediate-frequency alternating electric fields (7, 8).

A fundamental characteristic of electric fields is that at any point in space, they have a defined orientation corresponding to the direction of the force they exert on charges and polar elements. With regard to the latter, the force exerted by the field is maximal when the dipole is oriented in the direction of the field. With regard to the above, there are two main structural differences between quiescent and dividing cells. One is that the latter contain highly polar, spatially oriented microtubules and that they develop a directional, hourglass-shaped cell morphology during the cytokinesis phase. In view of these facts, one may expect that the electric field forces will have maximal effect

3290



Fig. 2. Time, field frequency, and intensity dependence of the effect of TTFields on malignant melanoma (B16F1, *left column*) and glioma cell (F-98, *right column*) proliferation. *A*, the number of cells in untreated cultures (control; □) as compared with cultures treated with TTFields (■). The number of cells at each time point ($OD_t$) was normalized by the number of cells in the culture before initiation of treatment ($OD_0$). The number of control cells is seen to roughly double every 24 h throughout the experiment. TTFields were applied for 24 h continuously (*solid lines*) at 100 kHz in the melanoma cultures and at 200 kHz in the glioma cultures. The increase in the number of treated melanoma (*left*) and glioma (*right*) cells over time is significantly smaller than control cells ($P < 0.001$). *B*, the effect of 24-h exposure to TTFields of increasing intensities. The magnitude of the effect is expressed using the TER. The inhibitory effect of the TTFields on proliferation increases with intensity in both cell types. Complete proliferation arrest (TER = 1) is seen at 1.35 and 2.25 V/cm in melanoma and glioma cells, respectively. EF, electric field. *C*, change in the melanoma (*left*) and glioma (*right*) growth rate after 24 h of exposure to TTFields of different frequencies is normalized to the field intensity (TER/EF). A window effect is seen with maximal inhibition by TTFields at 120 kHz in melanoma cells and at ~200 kHz in glioma cells. Data are mean + SE.

on the mitotic process when it is oriented along the lines of force of the field. To investigate this point, we fixed melanoma cell cultures and stained them with toluidine blue, immediately after 24 h of TTField treatment, to demonstrate mitoses and to distinguish vital from damaged or dead cells. The live and damaged mitotic cells (at the time of fixation) were grouped according to the orientation of their cleavage axis relative to the electric field direction. The cells were counted separately in each of four equal sectors that form angles of 0°, 45° (two sectors, 45 and 135), and 90° relative to the field direction. As seen in Fig. 4A, the live cells were randomly distributed in all sectors. In contrast, a much higher proportion of the damaged cells had their axis of division oriented along the field: 56% at 0° versus an average of 15% in each of the other orientations. Surprisingly, the number of cells per unit area in the two 45° sectors was found to be one-half that in the 0° sector. This finding may serve as an indication of an additional effect of TTFields: orientation of the cell division in the field direction. The cells in each of the above spatially oriented defined groups were further divided according to stages of mitosis at the time of fixation. At all stages, a higher fraction of damaged cells

had their axis of division oriented along the field. Moreover, 74% of the parallel oriented cells were damaged while being in metaphase (Fig. 4B).

The spatially organized mitotic spindle, which forms in dividing cells, consists of microtubules that have very large electric dipole moments (14) and may therefore be disoriented by the forces of the electric fields (15, 16). Actin filaments are also polar, however, they have no defined spatial orientation within the cells and are therefore not expected to be significantly affected by the fields. This prompted us to test whether TTFields disrupt mitosis by interfering with the normal formation, orientation, and movement of microtubules as compared with actin filaments as follows: Melanoma cell cultures were treated with TTFields for 24 h. After treatment, the cells were fixated, stained with monoclonal antibodies directed against microtubules and actin filaments, as well as for DNA, and thereafter studied with fluorescence microscopy (see "Materials and Methods"). In control cultures, 95% of cells undergoing mitosis exhibited the normal stages of mitosis with intact mitotic spindles. However, in TTField-treated cultures, more than one-half of the mitoses were abnormal.

3291

992247 C2C DIAR_A0000069327 12-19-2019

CANCER CELL DESTRUCTION BY ALTERNATING ELECTRIC FIELDS



+2h   +3h
A:

+30m   +50m
B:

+30m   +60m
C:

Fig. 3. Time-lapse microphotography of malignant melanoma cells exposed to TTFields. A, an example of a cell in mitosis arrested by TTFields. Contrary to normal mitosis, the duration of which is less than 1 h, the depicted cell is seen to be stationary at anaphase/telophase for 3 h. B and C, two examples of disintegration of TTField-treated cells during cytokinesis. Three consecutive stages are shown: cell rounding (left); formation of the cleavage furrow (middle); and cell disintegration (right). Scale bar = 10 μm.

Fig. 5 shows examples of the different forms of abnormal mitosis seen under TTField treatment. These included polyploid cells in prophase, ill-separated, multi-spindled and single-spindled cells in metaphase, asymmetric anaphases, and a large proportion of cells in metaphase (>20%) with rosette shaped chromosome ensembles. The normal and abnormal stages of mitosis in control and TTField-treated cultures are summarized and compared in Fig. 5G. In general, these abnormalities may serve as an indication of interference of TTFields with the normal behavior of the microtubules. In contrast, staining for actin filaments showed no difference between TTField-treated and control cultures.

**Effect of TTFields on Tumors in Vivo.** To test whether TTFields are effective in destroying tumor cells in vivo, we tested their effect on two animal tumor models: C57BL/6 mice inoculated intradermally with malignant melanoma cells (B16F1) and BALB/c mice inoculated intradermally with adenocarcinoma cells (CT-26). TTFields were generated between implanted (intradermal) wholly insulated wires placed on both sides of the tumor (see Fig. 1B). Mice with implanted electrodes were treated for 3–6 days continuously beginning 1 day after cell line inoculation. We found that 100–200 kHz of TTFields at low intensities of <2 V/cm effectively inhibited malignant melanoma growth compared with the growth of nontreated control tumors. Photographs of examples of treated and nontreated malignant melanoma tumors are given in Fig. 6 for comparison. Treated tumors were significantly smaller than control tumors at the end of treatment (average treated tumor size was 47% of control tumor size; n = 78 mice, P < 0.001; Student's t test). Histopathological analysis of treated tumors showed extensive necrosis with aggregations of karyorrhectic and karyolytic debris (Fig. 6F). To test whether TTFields are effective on different tumor types, BALB/c mice with intradermal adenocarcinomas were treated with the same field parameters. Photographs of examples of such a treated and a nontreated adenocarcinoma tumors are provided for comparison in Fig. 6B. The average effect of TTFields on adenocarcinoma carrying mice was less dramatic than that seen for malignant melanoma (average treated tumor size was 73% of control tumor size at the end of treatment; n = 14 mice). After treatment, the tumors and their adjacent tissues were fixated, stained with H&E, and analyzed histopathologically. No damage to the surrounding tissues was detected.

## DISCUSSION

In this study, we have shown that when properly tuned, very low-intensity, intermediate-frequency electric fields (TTFields) stunt the growth of cancerous cells. We have demonstrated this inhibitory effect in all proliferating cell types tested, whereas, nonproliferating cells and tissues were unaffected. Interestingly, different types of cancerous cells showed specific intensity and frequency dependencies of TTFields inhibition. We have demonstrated that two main processes occur at the cellular level during exposure to TTFields: arrest of proliferation and cell destruction. The damage caused by TTFields to these replicating cells was shown to be dependent on the orientation of the division process in relation to the field vectors, indicating that this effect is nonthermal. Indeed, temperature measurements made within culture dishes during treatment, and on the skin above treated tumors in vivo, showed no significant elevation in temperature compared with control cultures/mice. Also, TTFields caused the dividing cells to orient in the direction of the applied field in a manner similar to that described in cultured human corneal epithelial cells exposed to constant electric fields (17). At the subcellular level, we have found evidence indicating that TTFields disrupt the normal polymerization-depolymerization process of microtubules during mitosis. Indeed, the described abnormal mitotic configurations seen after exposure to



Fig. 4. Dependency of TTFields-induced cellular damage on the orientation rate of cell division (relative to field direction). Ordinate represents the number of mitotic cells counted in four TTField treated malignant melanoma cultures (100 kHz). A, total number of damaged (D) and live (L) mitotic cells in each of three sectors of different angles relative to the field direction (inset). The number of damaged cells is more than 3-fold larger than the corresponding number of live cells when division is aligned at or close to 0° relative to the electric field direction. In sectors of other angles, the number of damaged cells only slightly exceeds the live ones. Note that because the 45° is double that of each of the other two sectors, the number of cells presented in this orientation was halved. B, dividing cell sensitivity to fields of different orientation at different stages of mitosis. When cell division axis is aligned at 0° to the electric field, the number of damaged cells (D) is significantly larger than that of intact cells (L) at all three phases of mitosis. However, the highest number of damaged cells in this orientation is seen at metaphase (8-fold more than intact cells).

2⎯19212X02642

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 374 of 631   Document 11-5

4605

EX. 2, P. 212





Fig. 5. Immunohistochemical staining of abnormal mitotic figures in TTFields-treated cultures. Malignant melanoma cultures (n = 4) were treated for 24 h at 100 kHz and then stained with monoclonal antibodies for microtubules (*green*), actin (*red*), and DNA (*blue*). The photomicrographs show exemplary abnormal mitoses including: polyploid prophase (*A*); rosette (*B*); D) separated metaphase (*C*); multispindled metaphase (*D*); single-spindled metaphase (*E*); and asymmetric anaphase (*F*). G, the percentage of treated (□) and control (■) mitotic cells in each of the normal and abnormal phases of mitosis.

TTFields are similar to the morphological abnormalities seen in cells treated with agents that interfere directly (18, 19) or indirectly (20–22) with microtubule polymerization (*e.g.*, Taxol).

To explain how TTFields cause orientation-dependent damage to dividing cancerous cells and disrupt the proper formation of the mitotic spindle, we modeled the forces exerted by TTFields on intracellular charges and polar particles using finite element simulations (see "Materials and Methods"). We identified two main mechanisms by means of which the electric fields may affect dividing cells. The first relates to the field effect on polar macromolecule orientation. Within this framework, during the early phases of mitosis, *i.e.*, in pre-telophase, when tubulin polymerization-depolymerization drives the proliferation process, the electric field forces any tubulin dimers, positioned further than 14 nm away from the growing end of a microtubule, to orient in the direction of the field (Fig. 7A). This force moment, ($10^{-5}$ pN) acting on the dimers, is sufficient to interfere with the proper process of assembly and disassembly of microtubules that is essential for chromosome alignment and separation (23). This effect can explain the mitotic arrest of TTField-treated cells (24). The second mechanism, which interferes with cell division and is most likely to play an important role in cell destruction, becomes dominant during cleavage. As seen in the simulations depicted in Fig. 7B, the electric field within quiescent cells is homogenous, whereas the field inside mitotic cells, during cytokinesis, is not homogenous. We see an

increased field line concentration (indicating increased field intensity) at the furrow, a phenomenon that highly resembles the focusing of a light beam by a lens. This inhomogeneity in field intensity exerts a unidirectional electric force on all intracellular charged and polar entities, pulling them toward the furrow (regardless of field polarity). For example, for a cleavage furrow that reached a diameter of 1 μm in an external field of only 1 V/cm, the force exerted on the microtubules is in the order of 5 pN. This magnitude is compatible with the reported forces necessary to stall microtubule polymerization that is 4.3 pN (25). With regard to other particles such as cytoplasmatic organelles, they are polarized by the field within dividing cells. Once polarized, the forces acting on such particles may reach values up to an order of 60 pN resulting in their movement toward the furrow at velocities that may approach 0.03 μm/s. At such velocity, cytoplasmatic organelles would pile up at the cleavage furrow within a few minutes, interfering with cytokinesis and possibly leading to cell destruction. We also found that the electric forces acting on intracellular particles are maximal when the axis of division is aligned with the external field. This is consistent with the dependence of the destructive effect of TTFields on the angle between division axis and the field (Fig. 4). In addition, the calculated dependence of the magnitude of this force on frequency (data not shown) is consistent with the experimentally determined frequency dependence of the

3293



Fig. 6. *In vivo* effects of TTFields on intradermal tumors in mice. Malignant melanoma (A) and adenocarcinoma (B) tumor cells were injected in two parallel locations intradermally on the back of each mouse. Only the tumor on the left side of the mouse was treated. After 6 days of TTFields treatment (at 100 kHz), no tumor can be discerned on the treated side, whereas on the untreated side a large tumor has grown. C–F, histological sections of TTFields-treated intradermal melanoma versus a control (untreated) melanoma on the same mouse. C, after H&E staining, a large (5 mm diameter) nodule of melanoma cells can be seen in the dermis of the control tumor (×60). Note that due to the large size of the tumor, its deep portion has been lost in preparation. D, treated tumor; only two small (<0.4 mm diameter) nodules are present (scale bar = 0.5 mm). The nontumor structures of the dermis are morphologically intact. E, control tumor, malignant melanoma cells appear intact and viable (×200). (Scale bar = 100 μm). F, only necrotic tissue and cellular debris are seen in the treated tumor.



Fig. 7. A, schematic representation of two tubulin dimers positioned near the tip of an elongating microtubule in a dividing cell. The force that a 1-V/cm extracellular TTField exerts on a tubulin dimer located less than 14 nm away from the microtubule (a) is smaller than the force exerted by the polar microtubule tip, and therefore it will align according to the field generated by the microtubule. In contrast, dimers further than 14 nm from the end of the microtubule (b) are aligned by the forces of the TTFields (dashed line) in a direction that may not be compatible with the polymerization depolymerization process. B, finite element mesh simulation of the lines of force of the electric field inside a quiescent cell (left) and a cell undergoing mitotic symbiosis (right). The diameter of the cells in the two simulations was 10 μm and membrane thickness 3 nm. Inside the quiescent cell, the electric field is mostly uniform (equal distances between the lines of force). In contrast, in the dividing cell, the field is inhomogeneous—the field intensity (line density) increases toward the cleavage furrow.

inhibitory effect of TTFields on melanoma and glioma cell proliferation (Fig. 2C).

In conclusion, we have demonstrated that TTFields inhibit both the proliferation of malignant cells in culture and the growth of tumors in mice while showing no general side effects or local histopathological damage. The mechanism of action of the fields is, at least in part, dependent on disruption of the microtubules of the mitotic spindle and the electric forces resulting from focusing of the field in the dividing cells. The highly specific effects of these fields on dividing cells, together with the relative ease of applying them, focusing them, and screening from them, make them an attractive candidate to serve as a novel treatment modality for cancer.

## REFERENCES

1. Polk C. Therapeutic applications of low-frequency sinusoidal and pulsed electric and magnetic fields. In: Bronzino JD, editor. The biomedical engineering handbook. Boca Raton, FL: CRC Press, Inc.; 1995. p. 1404–16.

2. Palti Y. Stimulation of internal organs by means of externally applied electrodes. J Appl Physiol 1966;21:1619–23.

3. Bassett CA. The development and application of pulsed electromagnetic fields (PEMFs) for ununited fractures and arthrodeses. Clin Plast Surg 1985;12:259–77.

4. Elson E. Biologic effects of radiofrequency and microwave fields: in vivo and in vitro experimental results. In: Bronzino JD, editor. The biomedical engineering handbook. Boca Raton, FL: CRC Press, Inc.; 1995. p. 1417–23.

5. Chou CK. Radiofrequency hyperthermia in cancer therapy. In: Bronzino JD, editor. The biomedical engineering handbook. Boca Raton, FL: CRC Press, Inc.; 1995. p. 1424–30.

6. Takashima S, Schwan HP. Alignment of microscopic particles in electric fields and its biological implications. Biophys J 1985;47:513–8.

7. Zimmermann U, Vienken J, Pilwat G. Rotation of cells in an alternating electric field: the hypothesis of a resonance frequency. Z Naturforsch C 1981;36:173–7.

8. Holzapfel C, Vienken J, Zimmermann U. Rotation of cells in an alternating electric field: theory and experimental proof. J Membr Biol 1982;67:13–26.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 376 of 631   Document 11-5   4607

EX. 2, P. 214

3294

9. Pawlowski P, Szutowicz I, Marszalek P, Fikus M. Bioelectrorheological model of the cell. 5. Electrodestruction of cellular membrane in alternating electric field. Biophys J 1993;65:541–9.

10. Jost LM, Kirkwood JM, Whiteside TL. Improved short- and long-term XTT-based colorimetric cellular cytotoxicity assay for melanoma and other tumor cells. J Immunol Methods 1992;147:153–65.

11. Volakis JL, Chatterjee A, Kempel LC. Finite element method electromagnetics: antennas; microwave circuits, and scattering applications. New York, NY: IEEE/ OUP; 2001.

12. Pohl HA. Dielectrophoresis. Cambridge, UK: Cambridge University Press; 1978.

13. Bauffiot B, Radford IR, Forrester HB, Dewey WC. Computerized video time-lapse microscopy studies of ionizing radiation-induced rapid-interphase and mitosis-related apoptosis in lymphoid cells. Radiat Res 2000;153:36–48.

14. Alberts B, Roberts K, Lewis J, Raff M, Watson JD. Molecular biology of the cell. 2nd ed. New York: Garland Publishing, Inc.; 1989. p. 1216.

15. Maggs WJ. Electric fields determine the spatial organization of microtubules and actin filaments. Med Hypotheses 1988;26:165–70.

16. Cho MR, Thatte HS, Lee RC, Golan DE. Reorganization of microfilament structure induced by ac electric fields. FASEB J 1996;10:1552–8.

17. Zhao M, Forrester JV, McCaig CD. A small, physiological electric field orients cell division. Proc Natl Acad Sci USA 1999;96:4942–6.

18. Jordan MA, Thrower D, Wilson L. Effects of vinblastine, podophyllotoxin and nocodazole on mitotic spindles. Implications for the role of microtubule dynamics in mitosis. J Cell Sci 1992;102:401–16.

19. Rowinsky GK, Donehower RC. Paclitaxel (Taxol). N Engl J Med 1995;332: 1004–14.

20. Kline-Smith SL, Walczak CE. The microtubule-destabilizing kinesin XKCM1 regulates microtubule dynamic instability in cells. Mol Biol Cell 2002;13:2718–31.

21. Kapoor TM, Mayer TU, Coughlin ML, Mitchison TJ. Probing spindle assembly mechanisms with monastrol, a small molecule inhibitor of the mitotic kinesin, Eg5. J Cell Biol 2000;150:975–88.

22. Maiato H, Sampaio P, Lemos CL, et al. MAST/Orbit has a role in microtubule-kinetochore attachment and is essential for chromosome alignment and maintenance of spindle bipolarity. J Cell Biol 2002;157:749–60.

23. Gagliardi LJ. Electrostatic force in prometaphase, metaphase, and anaphase-A chromosome motions. Phys Rev E Stat Nonlin Soft Matter Phys 2002;66:011901.

24. Fishkind DJ, Silverman JD, Wang YL. Function of spindle microtubules in directing cortical movement and actin filament organization in dividing cultured cells. J Cell Sci 1996;109:2041–51.

25. Dogterom M, Yurke B. Measurement of the force-velocity relation for growing microtubules. Science 1997;278:856–60.

2 ci 9 2 1 2 X 0 2 6 4 5

002249 C2C DIAR_A0000069327 12-19-2019

Schneiderman et al, BMC Cancer 2010, 10:229
http://www.biomedcentral.com/1471-2407/10/229



BMC
Cancer

RESEARCH ARTICLE     Open Access

# TTFields alone and in combination with chemotherapeutic agents effectively reduce the viability of MDR cell sub-lines that over-express ABC transporters

Rosa S Schneiderman[1†], Esther Shmueli[1], Eilon D Kirson[1] and Yoram Palti[*†1,2]

## Abstract

**Background:** Exposure of cancer cells to chemotherapeutic agents may result in reduced sensitivity to structurally unrelated agents, a phenomenon known as multidrug resistance, MDR. The purpose of this study is to investigate cell growth inhibition of wild type and the corresponding MDR cells by Tumor Treating Fields - TTFields, a new cancer treatment modality that is free of systemic toxicity. The TTFields were applied alone and in combination with paclitaxel and doxorubicin.

**Methods:** Three pairs of wild type/MDR cell lines, having resistivity resulting from over-expression of ABC transporters, were studied: a clonal derivative (C11) of parental Chinese hamster ovary AA8 cells and their emetine-resistant sub-line Emt[R1]; human breast cancer cells MCF-7 and their mitoxantrone-resistant sub lines MCF-7/Mx and human breast cancer cells MDA-MB-231 and their doxorubicin resistant MDA-MB-231/Dox cells. TTFields were applied for 72 hours with and without the chemotherapeutic agents. The numbers of viable cells in the treated cultures and the untreated control groups were determined using the XTT assay. Student t-test was applied to assess the significance of the differences between results obtained for each of the three cell pairs.

**Results:** TTFields caused a similar reduction in the number of viable cells of wild type and MDR cells. Treatments by TTFields/drug combinations resulted in a similar increased reduction in cell survival of wild type and MDR cells. TTFields had no effect on intracellular doxorubicin accumulation in both wild type and MDR cells.

**Conclusions:** The results indicate that TTFields alone and in combination with paclitaxel and doxorubicin effectively reduce the viability of both wild type and MDR cell sub-lines and thus can potentially be used as an effective treatment of drug resistant tumors.

## Background

Multidrug resistance (MDR) [1] is encountered when cancer cells are exposed to chemotherapeutic agents for a few replication cycles. It is manifested in reduced sensitivity to both the specific chemotherapy as well as to a number of structurally unrelated agents. This phenomenon obviously poses a serious impediment to successful chemotherapy. Three decades of multidrug resistance research have identified a number of mechanisms by means of which cancer cells elude the effects of chemotherapeutic agents. The most often encountered MDR is the one resulting from over-expression of ATP-binding cassette transporters such as P-glycoprotein (MDR1), multidrug resistance-associated protein-1 (MRP1), and the breast cancer resistance protein (BCRP) [1-3]. These transporters, that recognize substrates of diverse chemical nature, lower the intracellular concentration of these substrates and are normally involved in detoxification [4,5].

MDR can potentially be overcome by the use of antitumor modalities that are not involved in membrane transport, for example, anti-angiogenic agents and physical

* Correspondence: Yoram@novocure.com
[1] NovoCure Ltd. MATAM Advanced Technology Centre, Haifa 31905, Israel
† Contributed equally
Full list of author information is available at the end of the article.

 BioMed Central   © 2010 Schneiderman et al; licensee BioMed Central Ltd. This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

201 9212X02646

modalities such as radiotherapy, heat and electric fields. Different types of electric fields were reported to inhibit cancer cell proliferation and cause cancer cell destruction, for example: exposure of cancer cells to low amplitude DC currents [6], low intensity, low frequency (50 Hz) AC currents [7] and the intermediate frequency (100-300 kHz) alternating electric fields, termed TTFields [8-12].

TTFields are a new physical cancer treatment modality that has recently been demonstrated to be highly effective when applied to cell cultures, animal cancer models, as well as patients suffering from locally advanced and/or metastatic solid tumors [8-12]. TTFields are alternating electric fields of low intensity (1-3 V/cm) and intermediate frequency (100 - 300 kHz) that are generated by special insulated electrodes applied to the skin surface. These specially tuned fields have no effect on quiescent cells while having an anti-proliferation and destructive effect on mitotic cells. This effect is due to the fact that during cytokinesis, TTFields exert forces that move charged or polar macromolecules and organelles towards the narrow neck, separating the newly forming daughter cells [8,9]. They also interfere with the polymerization processes of the microtubule spindle during cell division. Thus, TTFields disrupt the cell structure, inhibit cell division and result in cell death. In contrast to most anti-cancer agents, TTFields are not associated with any meaningful systemic toxicity [9-12]. Furthermore, it was recently shown that TTFields may be used clinically, not only as an anti-proliferation agent, but also as effective adjuvant to currently used chemotherapeutic agents [9].

In view of the above, the target of the present study was to test the possibility of using TTFields for treating multi-drug resistant cancerous and non cancerous cell lines, both as a standalone treatment and in combination with chemotherapy.

## Methods
### Materials
All cell culture media, serum and media supplements were obtained from Biological Industries, Beth Haemek, Israel. All drugs and chemical agents were obtained from Sigma.

### Cell lines
The following cell lines and their drug resistant derivatives were used: A clonal derivative (C11) of parental Chinese hamster ovary AA8 cells and their emetine-resistant sub-lines Emt$^{R1}$ cells having ATP dependent MDR1 type drug resistance [13], a kind gift from Prof. G. Eytan Dept. of Biology, Technion, Haifa, Israel; Human breast cancer wild type MCF-7 cells, obtained from ATCC and their mitoxantrone-resistant sub-lines MCF-7/Mx having ABCG2 transporter [14], a kind gift from Prof. M. Lisco-

vitch, Dept. of Biological Regulation Weizmann Institute of Science, Rehovot, Israel; Human breast cancer wild type MDA-MB-231 cells obtained from ATCC and from which doxorubicin resistant MDA-MB-231/Dox cells were developed in our laboratory using a stepwise increase in drug concentration protocol. This procedure is identical with that developed for these cells in other laboratories [15] for inducing MDR1 type of ABC transporters. The AA8/Emt$^{R1}$ cell lines were maintained as a monolayer in minimal essential medium containing 5% fetal calf serum, 2 mM glutamine, 100 units/ml penicillin G, and 100 μg/ml streptomycin sulphate. The Emt$^{R1}$ cell medium also included 1 μM of emetine. The MCF-7/MCF-7MX and MDA-MB-231/MDA-MB-231Dox cell lines were maintained under monolayer conditions in DMEM containing 10% fetal calf serum, 2 mM glutamine, 100 units/ml penicillin G, and 100 μg/ml streptomycin sulphate. The MCF-7/Mx cell medium also included 250 nM of mitoxantrone and the MDA-MB-231/Dox cells medium also included 0.1 μM of doxorubicin.

All cells were kept in a 5% $CO_2$ incubator at 37°C. Exponentially growing cells were passaged twice a week using a standard trypsinization procedure.

### Cytotoxicity assay
The level of resistance to doxorubicin and paclitaxel was determined by means of the XTT assay as previously described [8,9]. Briefly, $2 \times 10^4$ cells/well were plated in 24-well plate (NUNC), incubated without drugs for 24 h and then the initial number of cells, $OD_0$, was determined following incubation of with the XTT reagent using ELISA Reader (TECAN Sunrise, USA). The medium was then exchanged with ones containing different drug concentrations, 4 wells for each drug concentration (doxorubicin: 0.001-100 μM; paclitaxel: 0.0001-100 μM). After 72 h, the culture media was discharged, XTT reagent was added and the final cell number, $OD_{72\,h}$, was determined. Data obtained from 3 - 5 experiments were collected and the mean values and standard deviations (SEM) of $OD_{72\,h}$, representing final number of viable cells, were calculated for each drug concentration. Cell survival was presented as percentage of viable cells as compared to the corresponding viable cell number in no - drug controls. Drug concentrations inhibiting cell growth by 50% ($IC_{50}$) were calculated from relative survival curves using the median-effect principle [16].

### Exposure to TTFields
As previously described [9,11], two pairs of electrodes, insulated by a ceramic having a very high dielectric constant (NovoCure Ltd, Haifa, Israel), were positioned at 90° with respect to each other in both treatment and control Petri dishes. The distance between the electrodes in each

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 379 of 631    Document 11-5    4610

EX. 2, P. 217

002259 C2C DIAR_A0000069327 12-18-2018

pair was 20 mm. Each pair of electrodes was alternately connected for 250 ms to a sinusoidal waveform generator (NovoTTF, NovoCure Ltd, Haifa, Israel) that produced 1.75 V/cm, 150 kHz fields in the medium [8]. The 150 kHz frequency of TTFields was found to be effective for treatment of all cells studied.

Four different sets of conditions in each experiment were conducted for each cell line in conjunction with each chemotherapeutic agent: untreated control cells, cells treated by the chemotherapeutic agent alone, cells exposed to TTFields, and cells having a combined TTFields - Chemo exposure (8 Petri dishes for each condition). After 72 h, the culture media was discharged, XTT reagent was added and the final number of viable cells, $OD_{72\ hr}$ was determined. Data obtained from 3 - 5 experiments were collected and the mean values and standard deviations (SEM) of $OD_{72\ hr}$ representing final viable cell numbers were calculated for each set of conditions. Cell survival was presented as percentage of viable cells out of the corresponding viable cell number in untreated controls. Student t-test was applied to asses the significance of the differences between results obtained for each of the four conditions tested. In order to assess the extent of possible chemotherapeutic dose reduction when applied in combination with TTFields, dose reduction indexes (DRI) for each TTFields/drug combination were calculated according to [17].

The DRI for the same level of effect ($DRI_m$) was calculated as the ratio of the concentration of drug alone to that of the combined drug-TTFields treatment:

$$DRI_m = D_{m(drug\ alone)}/D_{m(combined\ treatment)}.$$ The DRIs determine the magnitude of dose reduction allowed for each drug when given in combination with TTFields, as compared with the agent dose that achieves the same level of effect. DRI values larger than 1 indicate increased sensitivity to the drug.

### Intracellular Doxorubicin Accumulation

The intracellular accumulation of doxorubicin was determined for both wild type and drug resistant sub-lines. Cells were grown in total 16 Petri dishes (35 mm, NUNC) as monolayers for 24 h in drug-free medium and then incubated for 1 h in the absence or presence of doxorubicin with or without exposure to TTFields (1.75 V/cm, 150 kHz) (4 Petri dishes for each treatment condition). The cells were washed with ice cold PBS three times and solubilised with 100 µl of 2% SDS. The solutions were then transferred to black 96-well plates (NUNC) and doxorubicin fluorescence was measured by spectrofluorometry (ELISA Reader TECAN F-200) at $\lambda_{em}$ 600 nm and $\lambda_{ex}$ 450 nm. Data obtained from 2 - 4 experiments were collected and the mean values and standard deviations (SEM) of doxorubicin fluorescence were calculated for each condi-

tion. Student t-test was applied to asses the significance of the differences between results obtained for each of the three cell pairs.

### Results

#### Effect of TTFields on wild type cells and their MDR sub-lines

In order to study the TTFields effect, field intensities that reduce the WT cell survival by about 50% were used. A comparison between the survival of wild type and MDR cells, when exposed to such TTFields, is given in Figure 1. The reduction in the number of viable cells is seen to be very similar (48-61% of control) in all wild type and paired MDR lines. In other words, the drug resistant cell lines have about the same sensitivity to TTFields as their corresponding wild type cell lines.

#### Exposure to doxorubicin or paclitaxel in combination with TTFields

Figure 2 compares between the cytotoxicity-dose curves of chemotherapeutic agents (paclitaxel and doxorubicin) of wild type cells and MDR sub-lines. It is seen that the resistivity of the MDR sub-lines is manifested in a significant right shift of the drug cytotoxicity-dose curves. As a result of these shifts the calculated $IC_{50}$ values (Table 1) for doxorubicin and paclitaxel, for all pairs of WT-MDR cell lines studied, give very high $IC_{50}$ ratios (resistance index RI): 55 - 79 for doxorubicin and 128 - 663 for paclitaxel.

A comparison between cell viability following separate and combined TTFields/drug exposures are presented in Figure 3. It is seen that in all combined exposures cell survival is lower as compared with exposure to any of the



Figure 1 The reduction in the number of viable WT and MDR cells following a 72 h exposure to TTFields. Open bar - WT cells; filled bars - MDR cell sub-lines; TTFields intensity - 1.75 V/cm. Data presented as mean ± SEM of 30-40 replicate measurements from 4-5 experiments. Note that there is no statistical difference between WT and MDR pairs (student t-test)

2 o i 9 2 1 2 X 0 2 6 4 8



**Figure 2** Cytotoxicity of doxorubicin and of paclitaxel for wild type cells and the corresponding MDR sub-line cells. A, B & C - doxorubicin. D, E & F - paclitaxel. A & D - AAB & EmtR1 cell lines; B & E - MCF-7 & MCF-7/Mx cell lines; C & F - MDA-MB-231 & MDA-MB-231/Dox cell lines. Open symbols - wild type cell lines. Filled symbols - MDR cell sub-lines. Treatment duration - 72 h. Data presented as mean ± SEM of 12-20 replicate measurements from 3-5 experiments.

chemical agents (doxorubicin or paclitaxel) or TTFields alone (see Figure 1). Moreover, the cell survival of the MDR sub-lines and WT cell lines, when subjected to the combined exposure is similar, i.e. the resistivity or reduced drug sensitivity of MDR cells are not evident under these conditions.

Table 2 summarizes the combined treatment efficacy for MDR cells (see Figures 2 &3) expressed in terms of Dose Reduction Index (DRI). TTFields are seen to increase the sensitivity to doxorubicin of all three MDR sub-lines by at least two orders of magnitude. The corre-

sponding increase for paclitaxel is even greater, i.e. two to three orders of magnitude. In other words, the efficacy of combined drug/TTFields treatment of MDR cells greatly exceeds that of treatment with drug alone.

**Intracellular Doxorubicin Accumulation**

An inherent feature of overexpressed ABC transporters phenotype is the reduction in cell uptake of doxorubicin due to its exclusion [18]. The ability of MDR cells to exclude doxorubicin was determined by means of spectrofluorometric analysis. Figure 4A illustrates the intrac-

**Table 1: IC$_{50}$ values for doxorubicin and paclitaxel**

|  | IC50 | | | | | |
|---|---|---|---|---|---|---|
| Drug | AAB | EmtR1 | MCF-7 | MCF-7/Mx | MDA-MB-231 | MDA-MB-231/Dox |
| Doxorubicin (µM) | 0.6 | 48.4 | 0.5 | 30.5 | 0.04 | 2.2 |
| Paclitaxel (µM) | 0.1 | 65.3 | 0.09 | 9.9 | 0.005 | 0.829 |

Drug concentrations inhibiting cell growth by 50% (IC$_{50}$) were calculated from relative survival curves (see Figure 2) using the median-effect principle [16].

2 0 1 9 2 1 2 X 0 2 6 4 9

992251 C2C DIAR_A0000069327 12-19-2018



## Table 2: Dose reduction indexes for MDR cell sub-lines treated alone and in combination with TTFields.

| Drug | Dose reduction index (DRI) | | |
|---|---|---|---|
| | EmtR1 | MCF-7/Mx | MDA-MB-231/Dox |
| Doxorubicin | 105 | 195 | > 250 |
| Paclitaxel | 815 | 4404 | > 10,000 |

The DRI estimates the extent to which the dose of one or more agents in the combination can be reduced to achieve effect levels that are comparable with those achieved with single agents. The effect of TTFields/drug combined treatment for each MDR cell sub-line was as shown in Figure 3. The same effect of single drug was obtained from dose-response curves (see Figure 2). The DRI was calculated as a ratio of drug concentrations used alone vs. drug concentrations used in combination with TTFields.

Figure 3 Effects of doxorubicin and paclitaxel when applied separately and in combination with TTFields on the viability of wild type and MDR cells. A - MDA-MB-231 & MDA-MB-231/Dox; B - MCF-7 & MCF-7/Mx; C - AA8 & EmtR1. Open bars - wild type cells; filled bars - MDR cell sub-lines. I & III - Separate exposures; II & IV - combined exposures. TTFields intensity - 1.75 V/cm. Doxorubicin concentrations: A - 0.04 μM; B - 0.5 μM; C - 0.6 nM. Paclitaxel concentrations: A - 5 nM; B - 0.1 μM; C - 0.1 μM. Treatment duration - 72 h. Data presented as mean ± SEM of 24-36 replicate measurements from 3-5 experiments. * P < 0.01, student t-test.

ellular concentration of doxorubicin in AA8 (WT) and EmtR1 (MDR) cell lines as a function of extracellular doxorubicin concentration with and without exposure to TTFields. As the drug is partially excluded from drug resistant sub line, the relative intracellular doxorubicin concentration in EmtR1 cells is lower by 44.9, 49.7 and 49.8% at 15, 30 and 45 μM extracellular doxorubicin concentration respectively, as compared with the wild type cells (Figure 4A, open symbols). Exposure of AA8 (WT) and EmtR1 (MDR) cell lines to TTFields during incubation with doxorubicin had no effect on the intracellular concentration of the drug in both wild type and drug resistant sub lines indicating that TTFields affect neither doxorubicin uptake nor its exclusion (Figure 4A, filled symbols). Figure 4B depicts doxorubicin accumulation by MDR sub lines relative to the corresponding WT cell

lines exposed to 30 μM of doxorubicin with and without TTFields. The relative intracellular doxorubicin concentration is lower by 49.7 ± 5% for EmtR1, 66.4 ± 5% for MCF-7/Mx and by 32.6 ± 5% for MDA-MB-231/Dox as compared with the corresponding wild type cells (Figure 4B, open bars). TTFields have no effect on intracellular doxorubicin concentrations in all wild type and drug resistant cell lines (Figure 4B, filled bars).

## Discussion

ABC transporters provide vital protection from foreign compounds by exporting these compounds from the cell, thus lowering their intracellular concentration. Unfortunately, exposure of cancer cells to chemotherapeutics, mainly during relapse treatment, causes transporter upregulation such that the resulting over-expression of ABC transporters becomes one of the main causes of treatment failure. Moreover, various tumors such as renal cell, adrenocortical, colon and hepatocellular cancers express ABCB1 and are practically chemoresistant [19]. To overcome this problem chemosensitizers that block ABC transporter-mediated efflux were developed and have been used to combat MDR. However, this approach has not been clinically successful and therefore novel approaches that bypass, rather than block ABC transporters, are being sought for [20]. As the TTFields do not affect drug transport (see Figure 4) they fall into this category.

The results of this study clearly indicate that both the MDR and WT cells are similarly sensitive to TTFields. Moreover, TTFields were shown to enhance MDR cell sensitivity to chemotherapeutic agents, so as to equal that of WT cells under the same set of conditions (Figure 3). This phenomenon can only be partially explained on the basis of the corresponding dose - response curves (Figure 2) and the drug export rate (Figure 4). As demonstrated

2 0 i 9 2 1 2 X 0 2 6 5 0



**Figure 4** Effect of TTFields on doxorubicin accumulation. A - Dose response curve for A48 cells and for their MDR sub-lines. Open symbols - cells exposed to drug alone, filled symbols - cells exposed simultaneously to drug and TTFields. Circles - A48 cell line; squares - Emt[6] sub line. Intensity of TTFields - 1.75 V/cm, frequency - 150 kHz. Treatment duration - 1 h. Data presented as means ± SEM of 16-24 replicate measurements from 2-3 experiments. B - Effect of TTFields on doxorubicin accumulation by different MDR cell sub-lines relative to their parental wild type cell lines. Ordinate: relative intracellular doxorubicin concentration in the drug resistant sub lines presented as % of the corresponding concentration in the wild type cells. Open bars - cells exposed to drug alone, filled bars - cells exposed simultaneously to drug and TTFields. Doxorubicin concentration: 10 μM. TTFields intensity - 1.75 V/cm, TTFields frequency - 150 kHz. Treatment duration - 1 h. Data are presented as mean ± SEM of 12-24 replicate measurements from 3-4 experiments.

In Figure 5, the dose - response curve of the drug resistant cells is shifted to the right relative to the WT cells (see also Figure 2). The magnitude of the shift is such that the 50% inhibition of WT cells that is obtained at a concentration of 0.04 μM requires a concentration of 2.2 μM for the MDR sub-line, i.e. a 55 fold higher concentration. However, the data depicted in Figure 4 and corresponding reports for low doxorubicin doses [21] indicate that the drug export lowers the intracellular concentration only by a factor of about 2. This means that some other factors must be responsible for the MDR resistance that corresponds to additional 20-30 fold drug concentration change. From the data in Figure 3A we also learn that both the MDR and WT cells are similarly highly sensitive to chemotherapy - TTFields treatments. Thus, while a 50% inhibition of MDR cells by doxorubicin alone requires a concentration of 2.2 μM, the combined treat-



**Figure 5** Effect of 72 h application of TTFields and chemotherapeutic agents, separately and in combination on the viability of MDA-MB-231 wild type cells and MDA-MB-231/Dox MDR cells. - O - MDA-MB-231 cells treated with doxorubicin alone; - △ - MDA-MB-231 cells treated with doxorubicin in combination with TTFields (ref. [9]); - □ - MDA-MB-231/Dox cells treated with doxorubicin alone.

ment of TTFields and low concentration of doxorubicin (0.0017 μM) is sufficient to induce a similar inhibition. This is equivalent to an increased intracellular concentration of doxorubicin by a factor of over 1000. Thus, TTFields seem to have effects specific to MDR cells, not related to drug transport, that increase the MDR cell's sensitivity to chemotherapy. This conclusion is consistent with that of others [22-24] that attribute the MDR resistance, in addition to reduced drug uptake, to a number of potential mechanisms such as: sugar metabolism and energy production, alterations in cytoskeletal elements, microtubule and mitochondria distribution, etc. Within the framework of the above suggested mechanisms [22-24] it seems that the integrity of cytoskeleton and microtubule as well as the mitochondria distribution may be the most vulnerable to the forces produced by TTFields. The former may be disrupted by particle movements induced by the dielectrophoresis induced during TTFields application [8] while the latter are highly polar in themselves and are therefore directly subjected to the alternating field forces.

## Conclusions

The results of this study support the notion that TTFields may be used, both as an effective stand alone anti-proliferation agent for MDR cells, as well as an effective adjuvant that enhances chemotherapy efficacy. Furthermore, since TTFields are a physical modality, their therapeutic efficacy is independent of interaction with cell receptors. Therefore their efficacy is not expected to be limited to a specific set of cell types [8-12]. On the basis of the above, we believe that there is a high probability that TTFields

may prove to be an effective therapeutic modality to a wide range of human cancers including those that developed multi drug resistance.

## List of abbreviations

MDR: multidrug resistance; TTFields: tumor treating electric fields; DRI: dose reduction index; WT: wild type.

**Competing interests**
IIOS, ES and DK are employees of NovoCure Ltd. YP has a minority holding in NovoCure Ltd.

**Authors' contributions**
YP: Conceived the concept of TTFields, designed experiments was involved in data analysis & interpretation of results and wrote the majority of the manuscript. RCS: Participated in experimental design, supervised the experiments execution, analysed results and wrote parts of the manuscript. ES: Carried out the experiments. IIOS: Participated in experimental design and in the interpretation of the results.
All authors read and approved the final manuscript.

**Acknowledgements**
We wish to thank Dr. Yoram Wasserman for technological support in of the experiments. YP is an employee of NovoCure Ltd.
IIOS, ES and DK are employees of NovoCure Ltd. YP is a consultant of NovoCure Ltd.
This study was sponsored by NovoCure Ltd, Haifa, Israel.

**Author Details**
[1]NovoCure Ltd, MATAM Advanced Technology Centre, Haifa 31905, Israel and [2]Rappaport Faculty of Medicine, Technion - Israel Institute of Technology, Haifa 32000, Israel

Received: 28 December 2009 Accepted: 23 May 2010
Published: 23 May 2010

## References

1. Ling V: Multidrug resistance: molecular mechanisms and clinical relevance. *Cancer Chemother Pharmacol* 1997, 40(Suppl):S3-S4.
2. Stein U, Lage H, Jordan A, Walther W, Bates SE, Litman T, Fojo T, Shoemaker RH: Impact of BCRP/MXR, MRP1 and MDR1/P-Glycoprotein on thermoresistant variants of atypical and classical multidrug resistant cancer cells. *Int J Cancer* 2002, 97:751-760.
3. Fojo T: An overview of cancer multidrug resistance: a still unsolved problem. *Cell Mol Life Sci* 2008, 65:3145-50.
4. Ambudkar SV, Kimchi-Sarfaty C, Sauna ZE, Gottesman MM: P-glycoprotein: from genomics to mechanisms. *Oncogene* 2003, 22:7468-85.
5. Gottesman MM, Fojo T, Bates SE: Multidrug resistance in cancer: role of ATP-dependent transporters. *Nat Rev Cancer* 2002, 2:48-58.
6. Wartenberg M, Wirtz N, Grob A, Niedermeier W, Hescheler J, Peters SC, Sauer H: Direct current electrical fields induce apoptosis in oral mucosa cancer cells by NADPH oxidase-derived reactive oxygen species. *Bioelectromagnetics* 2008, 29:47-54.
7. Janigro D, Perju C, Fazio V, Hallene K, Dini G, Agarwal MK, Cucullo L: Alternating current electrical stimulation enhanced chemotherapy: a novel strategy to bypass multidrug resistance in tumor cells. *BMC Cancer* 2006, 6:72-84.
8. Kirson ED, Gurvich Z, Schneiderman R, Dekel E, Itzhaki A, Wasserman Y, Schatzberger R, Palti Y: Disruption of cancer cell replication by alternating electric fields. *Cancer Res* 2004, 64:3288-95.
9. Kirson ED, Schneiderman R, Dbaly V, Tovarys F, Vymazal J, Itzhaki A, Mordechovich D, Gurvich Z, Shmueli E, Goldsher D, Wasserman Y, Palti Y: Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). *BMC Med Phys* 2009, 9:1-13.
10. Salzberg M, Kirson E, Palti Y, Rochlitz C: A pilot study with very low-intensity, intermediate-frequency electric fields in patients with locally advanced and/or metastatic solid tumors. *Onkologie* 2008, 31:362-5.
11. Kirson ED, Dbaly V, Tovarys F, Vymazal J, Soustiel JF, Itzhaki A, Mordechovich D, Steinberg-Shapira S, Gurvich Z, Schneiderman R, Wasserman Y, Salzberg M, Ryffel B, Goldsher D, Dekel E, Palti Y: Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. *Proc Natl Acad Sci USA* 2007, 104:10152-7.
12. Kirson ED, Gurvich Z, Itzhaki A, Mordechovich D, Schneiderman RS, Wasserman Y, Ryffel B, Goldsher D, Palti Y: Alternating electric fields (TTFields) inhibit metastatic spread of solid tumors to the lungs. *Clin Exp Metastasis* 2009, 26(7):633-40.
13. Borgnia MJ, Eytan GD, Assaraf YC: Competition of hydrophobic peptides, cytotoxic drugs, and chemosensitizers on a common P-glycoprotein pharmacophore as revealed by its ATPase activity. *J Biol Chem* 1996, 271(6):3163-71.
14. Johnson A, Valera-Christensen L, Brünner N, Litman T, Rasken J: Gene expression profiling to characterise the variants of three cell lines of different origin. *Anticancer Res* 2005, 29:2623-8.
15. Yen WC, Lamph WW: The selective retinoid X receptor agonist bexarotene (LGD1069, Targretin) prevents and overcomes multidrug resistance in advanced breast carcinoma. *Mol Cancer Ther* 2005, 4:824-34.
16. Chou TC, Talalay P: Quantitative analysis of dose-effect relationships: the combined effects of multiple drugs or enzyme inhibitors. *Adv Enzyme Regul* 1984, 22:27-55.
17. Chou TC: Theoretical basis, experimental design, and computerized simulation of synergism and antagonism in drug combination studies. *Pharmacol Rev* 2006, 58:621-681.
18. Pérez-Tomás R: Multidrug resistance: retrospect and prospects in anti-cancer drug treatment. *Curr Med Chem* 2006, 13:1859-76.
19. Fojo AT, Ueda K, Slamon DJ, Poplack DG, Gottesman MM, Pastan I: Expression of a multidrug-resistance gene in human tumors and tissues. *Proc Natl Acad Sci USA* 1987, 84:265-269.
20. Yu CP, Calcagno AM, Ambudkar SV: Reversal of ABC drug transporter-mediated multidrug resistance in cancer cells: Evaluation of current strategies. *Curr Mol Pharmacol* 2008, 1:93-105.
21. Hamburg SI, Vicherge ML, Villeneuve DJ, Ciro M, Veitch Z, Cecchetto M, Parissenti AM: Role of drug transporters and drug accumulation in the temporal acquisition of drug resistance. *BMC Cancer* 2008, 8:318-334.
22. Baker A, Baranek, EK, Sudová J, Ehrlich B: P-glycoprotein: implications of metabolism of neoplastic cells and cancer therapy. *Curr Cancer Drug Targets* 2005, 5:457-69.
23. Neil M, Wang Y, Veeranagouda Y, Cabral J: Mutations in alpha and beta-tubulin that stabilize microtubules and confer resistance to colchicine and vinblastine. *Mol Pharm* 2003, 2:597-605.
24. Villa AM, Doglia SM: Mitochondria in tumor cells studied by laser scanning confocal microscopy. *J Biomed Opt* 2004, 9:385-94.

**Pre-publication history**
The pre-publication history for this paper can be accessed here:
http://www.biomedcentral.com/1471-2407/10/229/prepub

doi: 10.1186/1471-2407-10-229
**Cite this article as:** Schneiderman et al., *TTFields alone and in combination with chemotherapeutic agents effectively reduce the viability of MDR cell sublines that over-express ABC transporters* BMC Cancer 2010, **10**:229

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 384 of 631   Document 11-5
EX. 2, P. 222
4615

# BMC Medical Physics



BioMed Central

Research article

**Open Access**

# Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields)

Eilon D Kirson*[1], Rosa S Schneiderman[1], Vladimír Dbalý[2], František Tovaryš[2], Josef Vymazal[2], Aviran Itzhaki[1], Daniel Mordechovich[1], Zoya Gurvich[1], Esther Shmueli[1], Dorit Goldsher[3,4], Yoram Wasserman[1] and Yoram Palti[1,4]

Address: [1]NovoCure Ltd., MATAM Advanced Technology Centre, Haifa 31905, Israel, [2]Na Homolce Hospital, Roentgenova 2, Prague 5, 150 30, Czech Republic, [3]Rambam Medical Center, PO Box 9602, Haifa 31096, Israel and [4]B. Rappaport Faculty of Medicine, Technion – Israel Institute of Technology, Technion City, Haifa 32000, Israel

Email: Eilon D Kirson* - eilon@novo-cure.com; Rosa S Schneiderman - rosa@novo-cure.com; Vladimír Dbalý - vladimir.dbaly@homolka.cz; František Tovaryš - frantisek.tovarys@homolka.cz; Josef Vymazal - josef.vymazal@homolka.cz; Aviran Itzhaki - aviran@novo-cure.com; Daniel Mordechovich - danial@novo-cure.com; Zoya Gurvich - zoya@novo-cure.com; Esther Shmueli - etl@novo-cure.com; Dorit Goldsher - dgoldsher@rambam.health.gov.il; Yoram Wasserman - yoramw@novo-cure.com; Yoram Palti - yoram@novo-cure.com
* Corresponding author

Published: 8 January 2009

*BMC Medical Physics* 2009, 9:1   doi:10.1186/1756-6649-9-1

This article is available from: http://www.biomedcentral.com/1756-6649/9/1

Received: 3 September 2008
Accepted: 8 January 2009

© 2009 Kirson et al; licensee BioMed Central Ltd.
This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

## Abstract

**Background:** The present study explores the efficacy and toxicity of combining a new, non-toxic, cancer treatment modality, termed Tumor Treating Fields (TTFields), with chemotherapeutic treatment in-vitro, in-vivo and in a pilot clinical trial.

**Methods:** Cell proliferation in culture was studied in human breast carcinoma (MDA-MB-231) and human glioma (U-118) cell lines, exposed to TTFields, paclitaxel, doxorubicin, cyclophosphamide and dacarbazine (DTIC) separately and in combinations. In addition, we studied the effects of combining chemotherapy with TTFields in an animal tumor model and in a pilot clinical trial in recurrent and newly diagnosed GBM patients.

**Results:** The efficacy of TTFields-chemotherapy combination in-vitro was found to be additive with a tendency towards synergism for all drugs and cell lines tested (combination index ≤ 1). The sensitivity to chemotherapeutic treatment was increased by 1–3 orders of magnitude by adjuvant TTFields therapy (dose reduction indexes 23 – 1316). Similar findings were seen in an animal tumor model. Finally, 20 GBM patients were treated with TTFields for a median duration of 1 year. No TTFields related systemic toxicity was observed in any of these patients, nor was an increase in Temozolomide toxicity seen in patients receiving combined treatment. In newly diagnosed GBM patients, combining TTFields with Temozolomide treatment led to a progression free survival of 155 weeks and overall survival of 39+ months.

**Conclusion:** These results indicate that combining chemotherapeutic cancer treatment with TTFields may increase chemotherapeutic efficacy and sensitivity without increasing treatment related toxicity.

2 0 1 9 2 1 2 X 0 2 6 5 3

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 385 of 631   Document 11-5   4616

EX. 2, P. 223

992253 C2C DIAR_A0000000327 12-19-2019

## Background

A new physical cancer treatment modality termed Tumor Treating Fields, or TTFields, has recently been demonstrated to be highly effective when applied to cell cultures, animal cancer models, as well as to patients suffering from locally advanced and or metastatic solid tumors [1-3]. In a pilot clinical trial, the medians of time to disease progression and overall survival of recurrent GBM patients treated by TTFields alone were more than double the reported medians of historical control patients [1]. In contrast to the widely used physical treatment modality, ionizing radiation, TTFields are not associated with significant side effects.

TTFields are low intensity (1–2 V/cm), intermediate frequency (100 – 200 kHz) alternating electric fields generated by special insulated electrodes applied to the skin surface. These specially tuned fields have no effect on quiescent cells while having an anti-mitotic effect on dividing cells. During cytokinesis, TTFields generate non-uniform intracellular fields that exert forces that move polar macromolecules and organelles towards the narrow neck, separating the newly forming daughter cells, by a process termed dielectrophoresis. These molecular and organelle movements, together with an interference with the spindle tubulin polymerization process, inhibit cell division and lead to cell death[2]. Fortunately, the dividing cells of the hematopoietic system are not affected by TTFields as the muscles surrounding the marrow containing bones serve as an effective electric field shield. Moreover, due to their relatively high frequency range and very low intensity, TTFields do not stimulate nerves and muscles, do not generate meaningful temperature elevation or puncture the cell membrane (as the strong electroporation fields do [4]). Thus, TTFields are not associated with meaningful toxicity in contrast to most anti-cancer agents currently in use [5].

In view of the unfavorable therapeutic indexes of the available effective chemical and physical (i.e. ionizing radiation) therapeutic agents, many cancer treatment protocols require simultaneous or sequential use of a number of therapeutic agents in an attempt to increase efficacy while maintaining tolerable toxicity [5-7]. Within this framework it is generally accepted that by adding ionizing radiation [8] to chemotherapy one gets both the benefit of the radiation effect as well as sensitization leading to an increased efficacy without a corresponding increase in toxicity. On the basis of the above this study explores the potential use of the new physical treatment modality, TTFields, in combination with chemotherapeutic agents in cell cultures, an animal tumor model, as well as in patients with glioblastoma (GBM). As TTFields are not associated with systemic toxicity [1] the expectation is that their addition will result in an increase in efficacy alone.

## Methods

### Cell cultures

Cells were cultured and maintained as previously described [1,2]. In brief: Human breast cancer (MDA-MB-231) and human glioma (U-118) obtained from ATCC (USA) were cultured in DMEM + 10% FCS media in a 5% $CO_2$ incubator at 37°C. Drops consisting of 200 μl suspension of cells (100 × $10^3$ cells/ml) were placed at the centre of 35 mm Petri dishes, incubated for 2 hours to allow for cell attachment, then 1.5 ml of media were added and incubation was continued for an additional 22 h. Following this, the baseline cell count was estimated using the XTT colorimetric method (expressed as $OD_0$). The media in the Petri dishes was replaced by fresh media (3 ml), with or without a chemotherapeutic agent and incubated at a final temperature of 37° ± 0.5°C for 24 to 72 hours after which the cell number was re-estimated ($OD_1$). The relative number of viable cells at each time point following baseline was expressed as $OD_1/OD_0$ and treatment efficacy as the % change in proliferation relative to control:

$$(OD_1/OD_0)_{experiment} * 100/(OD_1/OD_0)_{control} \quad (1)$$

### TTFields treatment of cultures

As previously described [1,2], two pairs of electrodes, insulated by a high dielectric constant ceramic, were positioned normal to each other at a distance of 20 mm in treatment and control dishes. In the former, the electrodes were connected to sinusoidal waveform generator that generated fields of optimal frequencies in the medium [1,2,9]: 150 kHz for breast cancer and 200 kHz for glioma, that changed direction by 90° every 250 ms. Field intensity was measured as described previously [2] and expressed as V/cm. For 72 h experiments the TTFields intensity of 1.75 V/cm was used. For 24 h experiments 0.65, 1.25 and 1.75 V/cm TTFields were used.

Four different sets of experiments were conducted in conjunction with each chemotherapeutic agent: untreated sham control, treatment with TTFields, treatment with the chemotherapeutic agents, and combined TTFields – Chemo treatment.

### Assessment of combination index and dose reduction index

The Chou and Talalay [10] method for assessing the combined effect of multiple drugs was used for the drug – TTFields combinations. In order to assess whether the interactions between TTFields and each of the chemotherapeutic agents is synergistic, additive or antagonistic, combination indexes were calculated as follows; TTFields intensity replaced the concentration (dose) variable in the analyses. Dose-response curves were generated for TTFields and each drug to determine the median effect

2 of 921 2XO2654

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 386 of 631   Document 11-5   4617

EX. 2, P. 224

points. Variable ratios of drug concentrations to TTFields intensities were used to calculate the Combination Indexes (CI) as follows:

$$CI = (C_{Drug(incombination),\ X\%\ effec}/C_{Drug(alone),\ X\%\ effect}) + (I_{TT\text{-}Fields(incombination),\ X\%\ effect}/I_{TTFields(alone),\ X\%\ effect})\quad (2)$$

Where: C are the drug concentrations and I the TTFields intensities use to achieve a preset X% effect. Relationships of CI<1 indicate more than additive – synergy, CI = 1 reflects additivity – summation and CI>1 indicates less than additive or antagonism.

In order to asses whether TTFields increase the sensitivity of tumor cells to various chemotherapeutic agents, the dose reduction index (DRI) of for each of these agents was calculated according to [11]. In short, the median-effect plots were for each chemotherapy-TTFields combination, were constructed. The ratio of affected to unaffected number of cells ($f_a/f_u$) was plotted versus drug concentration on a log-log scale. The median effect point ($D_m$) was assessed by deriving the slope of the linear regression for each of the plots. The DRI for a 50% effect ($DRI_m$) was calculated as the ratio of $D_m$ for drug alone and for combined drug-TTFields:

$$DRI_m = D_{m(drugalone)}/D_{m(combinedtreatment)}\quad (3)$$

A DRI greater than 1 indicates an increase in sensitivity to the drug. The greater the DRI, the more significant the possible dose reduction.

*In-vivo experiments*

Combined TTFields and Paclitaxel efficacy study in VX2 tumor bearing rabbits was conducted after approval by the NovoCure Internal Animal Care and Use Committee. All painful or anxiogenic procedures were performed under general anesthesia induced by intramuscular administration of 30 mg/kg of ketamine hydrochloride, 10 mg/kg xylazine hydrochloride and 1.5 mg/kg Acepromazine. The tumor tissue required for implantation was obtained from VX-2 tumor bearing carrier rabbits. The carrier rabbits had VX-2 tumors implanted intramuscularly in the thigh. When the tumor reached approximately 1 cm in diameter (about 3 weeks from implantation), the tumor was excised, minced in sterile saline and VX-2 tumor fragments obtained. Two fragments were injected using a large bore needle into the thigh muscles of both legs in a recipient rabbit for tumor propagation. For experimental animals, after laparotomy, a fragment of tumor tissue (1 mm³) was implanted beneath the kidney capsule of the recipient rabbit.

The current experiment comprised 28 animals (7 in each of 4 groups). Fourteen days after tumor implantation the

initial tumor volume was assessed based on serial (2.2 mm interval) T1 weighted axial MRI images (1.5 Tesla, GE Genesis-Signa) obtained 3 minutes following IV injection of 3 ml of Gadolinium. Tumor volume was assessed from the area of the contrast enhancing lesion in each section. The animals were assigned randomly into 4 groups before treatment start:

1. TTFields treated group: TTFields were applied by using the NovoTTF-100A device (NovoCure LTD., Haifa, Israel). An optimal frequency of 150 kHz and intensity of 1–2 V/cm were used. TTFields were switched sequentially between two perpendicular field directions.

2. Control group: sham electrode heated to mimic heat generated by the TTFields treatment. (38–39.9 °C)

3. Paclitaxel (Medixel Injection., Taro Pharmaceutical Industries LTD., Israel) treated group: 5 mg/animal diluted in 100 ml of normal saline were infused intravenously over a period of 30 minutes. Premedication was given subcutaneous 8 hours before and immediately prior to Paclitaxel administration (Dexamethasone (Dexaveto-0.2 veterinary, V.M.D n.v/s.a Belgium) 0.5 mg/animal; Pramine (Metoclopramide HCL, Rafa Laboratories LTD., Israel) 1 mg/animal; Diphenhydramine (10%, Medical M., Israel) 10 mg/animal).

4. Combined TTFields and Paclitaxel treatment as above.

TTFields were delivered to awake and behaving rabbits through four insulated electrode arrays placed circumferentially around the animal's abdomen, caudal to the ribcage. The electrode insulation consisted of a high dielectric constant (>10,000) ceramic (PMN-PT) allowing efficient energy transfer through the insulation into the animals body at the given frequencies. The electrodes were connected by a spiral cable to a swivel mechanism at the top of the cage, enabling the free movement. TTFields were generated using the NovoTTF-100A system (Novo-Cure Ltd., Haifa, Israel). The animals were treated for 21 days continuously with MRI performed on days 14 and 21 for tumor volume assessment. The TTFields intensity within the kidneys of the rabbits, using this electrode configuration, is between 1–3 V/cm (based on both finite element mesh simulations and direct measurements using an invasive probe – data not shown).

*Pilot clinical trial*

A single arm, pilot trial of the safety and efficacy of TTFields treatment was performed in 20 patients with histologically proven glioblastoma multiforme (GBM) that met the inclusion/exclusion criteria specified in Supplemental Material Appendix A (briefly, KPS 70–100%, Age ≥ 18). The trial was performed according to a protocol

2 u 1 9 2 1 2 X 0 2 6 5 5

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 387 of 631   Document 11-5    4618

EX. 2, P. 225

002254 C2C DIAR_A0000069327 12-19-2018

approved by the Na Homolce Institutional Review Board and the Czech Republic Ministry of Health. The patients were divided into two groups: The first group included 10 patients with recurrent GBM treated with TTFields alone following failure of maintenance Temozolomide [1]. The second group consisted of 10 newly diagnosed patients who were at least 4 weeks post radiation therapy, who received TTFields combined with maintenance Temozolomide. Prior to initiation of treatment, all patients underwent a baseline contrast MRI of the head, chest radiograph, EEG, ECG, complete blood & urine analyses, physical examination and neurological status. The patients were hospitalized for 1–3 days for observation and then released home where they received multiple 4-week courses of continuous NovoTTF-100A treatment until progression. The patients were seen once/month at an outpatient clinic where they underwent an examination similar to the initial one. TTFields were applied to the patients using the NovoTTF-100A device set to deliver 200 kHz, 0.7 V/cm (RMS) fields (at the center of the brain) in 2 perpendicular directions, 1 second in each direction sequentially. The TTFields were applied continuously using four insulated electrode arrays, each having a surface area of 22.5 cm², placed on opposing sides of the head with the tumor positioned directly between the electrode pairs [1]. As previously reported, to avoid electrolysis at the electrode surface and intracellular ion concentration changes that accompany long term current application, the electrodes were completely insulated by a ceramic having a very high dielectric constant (>10,000) that allowed the generation of the necessary electric fields [1,2]. Using this electrode configuration, the lowest TTFields intensity at the center of the brain was 0.7 V/cm (RMS). This intensity was calculated using finite element mesh simulations and verified by direct measurement in large animals and a human volunteer [1].

The outcome endpoints of the study included safety, overall survival (OS) and progression free survival (PFS). Assessment of tumor response was based on monthly MRIs according to the Macdonald criteria [12]. Median OS and PFS were determined using Kaplan Meier curves [13]. In the first group, PFS in NovoTTF-100A treated patients was compared to a matched group of concurrent control patients who received salvage chemotherapy at recurrence (n = 18). PFS in Temozolomide/NovoTTF-100A treated patients was compared to the PFS of a matched group of concurrent control patients (n = 32) who received Temozolomide alone (according to the protocol described by Stupp et al. [14]). OS in both groups was compared to matched historical control data with the same Karnofsky performance score (>60) and age [14].

## Results

*Breast cancer cell cultures*

*Dose – response of culture exposure to TTFields, paclitaxel, doxorubicin and cyclophosphamide, alone and in combination*

The relationship between TTFields intensity, at 150 kHz, and cell proliferation rate is given in Figure 1A. At the lowest field intensity of 0.63 V/cm there is no significant change in cell proliferation. For TTFields intensities of 1.25, 1.75 and 2.95 V/cm cell proliferation decreases (control = 100%) to: 90 ± 3%, 74 ± 4% and 25 ± 5%, respectively. The dose-response curves of cells exposed to paclitaxel, doxorubicin and cyclophosphamide, alone and in combination with 1.75 V/cm TTFields for 72 hours, are given in Figures 1B, C & D. For each drug alone there is a decrease in cell proliferation with increase in concentration. For cyclophosphamide and doxorubicin complete inhibition of proliferation is achieved at high drug concentrations. For paclitaxel, the inhibitory effect of the drug saturates at about 900 nM, near the 13% level, indicating that a fraction of the cells are insensitive to the agent. Combined treatment with TTFields and each of the chemotherapeutic agents caused a leftward shift of the dose response curves. This shift can be expressed as a decrease in the drug concentration leading to 50% inhibition of cell proliferation ($IC_{50}$ – Table 1).

*Time course of the effects TTFields, paclitaxel, doxorubicin and cyclophosphamide*

Figure 2 displays the time course of proliferation inhibition during a continuous 72 hour exposure to TTFields, paclitaxel, doxorubicin and cyclophosphamide alone and in combination with 1.75 V/cm TTFields. It is seen that in all cases the inhibition during combined exposure is greater than for the chemotherapeutic agent alone. The differences between the separate and combined effects increase with time.

*Recovery from treatment*

Figure 3 demonstrates that a 24 hour exposure to individual chemotherapeutic agents induces a reduction of approximately 25% in viable cell number compared to

Table 1: $IC_{50}$ for chemotherapeutic drugs alone and in combination with 1.75 V/cm TTFields after 72 hours of continuous treatment.

| Chemotherapy | $IC_{50}$ (drug alone) | $IC_{50}$ (drug-TTFields combination) |
| --- | --- | --- |
| Paclitaxel | 5.00 nM | 0.005 nM |
| Doxorubicin | 0.04 µM | 0.002 µM |
| Cyclophosphamide | 6.60 mM | 0.044 mM |

2 01 9 21 2 X02 65 8

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 388 of 631   Document 11-5   4619

EX.  2,  P.  226



**Figure I**
**Effect of 72 hour continuous application of TTFields and chemotherapeutic agents, separately and in combination on the cell proliferation of ER-negative MDA-MB-231 cells (presented as percent viable cells compared to control).** (A) Percent viable cells vs. TTFields intensity. Effect of different concentrations of paclitaxel (B), doxorubicin (C) and cyclophosphamide (D), alone and in combination with TTFields of 1.75 V/cm, in B, C and D Filled Circles – represent drug alone; Filled Squares – drug in combination with TTFields. Each point represents mean values ± SEM of 18 to 36 replicate measurements. Dotted lines demarcate the IC$_{50}$ values for each curve.

controls. The proliferation rate (slope of the graph) recovers almost completely during the following 48 hours, except for doxorubicin, where recovery is slower and delayed by about 24 hours. In contrast, addition of TTFields to any one of these chemotherapeutic agents results in irreversible and complete inhibition of cell pro-

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 389 of 631    Document 11-5
EX. 2, P. 227

BMC Medical Physics 2009, 9:1                    http://www.biomedcentral.com/1756-6649/9/1



**Figure 2**

Time course of the effects of 72 hour exposure of MDA cells to Paclitaxel (A), Doxorubicin (B) and Cyclophosphamide (C) alone and in combination with 1.75 V/cm TTFields. Each graph shows the number of viable cells in culture over time in control cells (interrupted lines), drug alone (open squares), TTFields alone (open circles) and drug-TTFields combination (closed squares). Data are presented as mean ± SEM. Each experimental condition included 18–36 samples.

liferation rate manifested as a decrease in the number of cells in culture. For Cyclophosphamide there is an almost complete loss of viable cells after 72 hours of combined treatment.

*Glioma cell cultures*
*Combined effect of DTIC and TTFields in human glioma cell cultures*
In order to asses the combination between Temozolomide and TTFields in glioma cells, DTIC and TTFields

2 0 1 9 2 1 2 X 0 2 6 5 8

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 390 of 631    Document 11-5    4621
EX. 2, P. 228



**Figure 3**
**Time course of recovery from 24 hour exposure to Paclitaxel (A), Doxorubicin (B) and Cyclophosphamide (C) alone and in combination with 1.75 V/cm TTFields.** Each graph shows the number of viable cells in culture over time in control cells (interrupted lines), drug alone (open squares), TTFields alone (open circles) and drug-TTFields combination (closed squares). Data are presented as mean ± SEM. Each experimental condition included 18–36 samples.

were applied alone and in combination to U-118 cells in culture. Both DTIC and Temozolomide act through a common degradation product (MTIC). Thus light activated DTIC was used for these experiments as described previously [15,16]. Figure 4 compares the DTIC dose-response curve with that obtained with DTIC – TTFields combination. As we have shown in breast cancer cultures, the addition of TTFields to a chemotherapeutic agent

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 391 of 631   Document 11-5   4622

EX. 2, P. 229



**Figure 4**
Effect of light activated DTIC and TTFields (1.75 V/cm) on cell proliferation of U-118 glioma cells, presented as percent of viable cells compared to control. Open Circles – 72 hours of DTIC treatment alone. Filled Circles – 72 h of Combined DTIC – TTFields treatment.

causes a leftward shift in the dose-response curve in glioma cells as well. The $IC_{50}$ for DTIC alone in Figure 4 is 6.4 mM, whereas the $IC_{50}$ for combined DTIC-TTFields is two orders of magnitude lower (0.023 mM).

### Analysis of combination efficacy and sensitivity in-vitro

#### Combination indexes

The mode of interaction between TTFields and chemotherapeutic agents (synergism, additivity or antagonism) can be analyzed using Combination Indexes (CI) as described by [10,17]. In order to calculate the CIs for TTFields-Chemotherapeutic agents, the extent of inhibition of cell growth was assessed after 24 hours of treatment with Paclitaxel, Doxorubicin and Cyclophosphamide alone or in combination with different intensities of TTFields (0.625–1.75 V/cm; see Materials and Methods). Table 2 demonstrates that for breast cancer cells the CI for Doxorubicin is very close to 1, indicating additivity [10,11]. In contrast, for TTFields with Paclitaxel and Cyclophosphamide the CIs are <1 indicating additivity with a tendency towards synergism.

#### Dose reduction indexes

In order to assess the extent of possible chemotherapeutic dose reduction when applied in combination with TTFields, dose reduction indexes (DRI) for each drug-TTFields combination were calculated based on the meth-

**Table 2: Calculated Combination Indexes for human breast cancer (MDA-MB-231) cells treated with paclitaxel, doxorubicin or cyclophosphamide in combination with TTFields.**

| | Combination Index | | |
| --- | --- | --- | --- |
| | MDA-MB-231 cells | | |
| TTFields intensity (V/cm) | Paclitaxel | Doxorubicin | Cyclophosphamide |
| | $CI_{40}$ | $CI_{50}$ | $CI_{50}$ |
| 0.625 | - | - | 0.74 |
| 1.25 | 0.97 | 0.99 | 0.84 |
| 1.75 | 0.86 | 0.98 | 0.95 |

odology described by [11]. The DRIs for TTFields-drug interaction after 72 hours of combined treatment was 1316 for paclitaxel, 23 for doxorubicin, 152 for cyclophosphamide and 175 for DTIC (in U-118 glioma cells). Thus a significantly reduced dose (1–3 orders of magnitude lower drug concentration) may be used in combination with TTFields to achieve the same level of efficacy.

### Effect of combined paclitaxel and TTFields on VX2 tumors in rabbits

Prior to testing the combined efficacy of paclitaxel and TTFields on VX2 tumors implanted within the kidneys of rabbits, the dose-response of paclitaxel in this animal tumor model was determined. A dose of Paclitaxel leading consistently to a 15–20% inhibition in tumor growth (5 mg/rabbit) was chosen for subsequent combination experiments with TTFields.

As seen in Figure 5, untreated tumors increased in volume by a factor of 70 from baseline. Paclitaxel treated tumors grew by a factor of 58 from baseline. TTFields treated tumors grew by a factor of 34 from baseline and tumors treated by TTFields-Paclitaxel combination grew by a factor of 22 from baseline. Thus the TTFields-Paclitaxel combination treatment inhibited tumor growth by 69% compared to the growth of control tumors, while Paclitaxel alone inhibited tumor growth by 15% compared to the growth of control tumors, and TTFields alone by 53% compared to the growth of control tumors. Thus, additivity was seen between TTFields and Paclitaxel at the intensity and concentration used. Differences between curves were statistically significant (p < 0.01; ANOVA).

### Pilot clinical trial in GBM patients

Twenty patients with histological diagnosis of GBM were treated continuously for an average of 1 year (range 2.5–24 months). Ten recurrent GBM patients were treated with TTFields alone as salvage therapy. Ten newly diagnosed

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 392 of 631    Document 11-5    4623

EX. 2, P. 230



**Figure 5**
Effect of combined Paclitaxel/TTFields on VX2 tumors in Rabbits. A VX-2 Kidney tumor volumes were normalized to pre-treatment tumor volume (day 7) and are presented over time for; control (diamonds), 5 mg Paclitaxel (circles), TTFields (squares) and combined TTFields-Paclitaxel (triangles). The effect of combined TTFields and Paclitaxel is equal to the sum of the effects of either treatment alone at both time points measured during the study (2 and 3 weeks from treatment start; n = 23; bars are standard errors of means). B Exemplary MRIs of the maximal contrast enhancing tumor area (demarcated by orange boarders) in the kidneys of rabbits in each of the experimental groups (sham control, Paclitaxel 5 mg, TTFields 2 V/cm, combined Paclitaxel and TTFields).

GBM patients, that had undergone surgery and thereafter received radiation therapy with adjuvant Temozolomide, were treated with the combination of TTFields in parallel to maintenance Temozolomide [14]. In both groups of patients no device related serious adverse effects were observed. The only device related toxicity reported was a dermatitis which appeared most often (18 of 20 patients) during the second month of treatment. The severity of the dermatitis decreased upon use of topical corticosteroids and periodic electrode relocation. The dermatitis continued for the duration of treatment and resolved completely within days to weeks from treatment termination.

In the second group, no increase in Temozolomide related adverse events was seen due to the combination with TTFields (see Table 3).

As reported previously [1], both progression free survival (PFS) and overall survival (OS) in the recurrent GBM salvage therapy group were at least double that of concurrent and historical controls, respectively. The efficacy of the TTFields-Temozolomide combination in the second group of patients was assessed using Kaplan Meier curves [13] of PFS and OS. The Kaplan Meier curves for the PFS of these patients, treated by combined TTFields - Temozolomide are shown in Figure 6A. The median PFS of the

combination treated patients is 155 weeks versus 31 weeks for concurrent controls treated with maintenance Temozolomide alone. Note that 5 of 10 patients are currently progression free. Figure 6B compares the OS of the patients that received the combination treatment (Red line) with a matched historical control (KPS>60, Median age 54) (Black line [14]). It is seen that for the TTFields – Temozolomide combination treated patients, the Median OS > 39 months versus about 14.7 months for matched historical control patients who received maintenance Temozolomide alone. It should be noted that at the time

**Table 3: Toxicities by grade and causality in the newly diagnosed GBM patients treated with combined TTFields-Temozolomide.**

|  | Grade | | Causality assessment |
|---|---|---|---|
|  | I-II | III-IV |  |
| Elevated LFTs | 6/10 | 0/10 | Anti Epileptic Drugs |
| Hyperglycemia | 4/10 | 0/10 | Oral Steroids |
| Anemia | 6/10 | 0/10 | Temozolomide |
| Thrombocytopenia | 2/10 | 0/10 | Temozolomide |
| Leucopenia | 3/10 | 0/10 | Temozolomide |
| Headache | 2/10 | 0/10 | Underlying disease |
| Seizures | 1/10 | 0/10 | Underlying disease |
| Dermatitis | 10/10 | 0/10 | NovoTTF-100A |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 393 of 631   Document 11-5        4624
EX. 2, P. 231



**Figure 6**
Kaplan Meier curves for **A – progression free survival (PFS)** and **B – overall survival (OS)** of newly diagnosed GBM patients receiving either combined TTFields – Temozolomide treatment or Temozolomide treatment alone. Red line – patients receiving combined TTFields – Temozolomide treatment (n = 10), Black line – concurrent/historical control patients that received Temozolomide treatment alone. A – The difference between the PFS curves is highly significant – Log-Rank Test (P = 0.0002), Hazard Ratio 3.32 (95%CI 1.9–5.9). B – The difference between the OS curves is highly significant – (Log-Rank Test; P = 0.0018). Dashed lines mark the median values for each curve.

of this report 8 of 10 patients, receiving the TTFields-Temozolomide combination treatment, are alive.

## Discussion

Cancer treatment with drug combinations was introduced in order to improve therapeutic indexes through dose reduction of each drug and increase treatment efficacy. In this study the exposure of cancer cells to combined chemotherapy and TTFields was studied in cell cultures, an animal tumor model and in a pilot clinical trial in recurrent and newly diagnosed GBM patients. The results of this study support the possibility that TTFields may be used, not only as an effective stand alone anti-proliferation agent (as shown previously in [1]), but also as an effective adjuvant that enhances chemotherapy efficacy without an increase in toxicity. In addition to this increase in efficacy, these results raise the possibility of dose reduction of chemotherapy when used in combination with TTFields. This is of outmost importance since, at tolerable doses the efficacy of available cancer therapeutic agents is often far from optimum while being associated with a high degree of toxicity.

With regards to the mechanisms involved, one may assume that tumor cells are sensitized to TTFields by chemotherapy, much like another well established physical therapy – ionizing radiation [8,18,19]. In the specific case of Paclitaxel, one of the most commonly used treatments for late-stage human breast cancer [20], the combined effect may be attributed to their similar site of action – the spindle microtubules [1,2,21]. Taxanes act by stabilizing the link between individual tubulin dimmers [21]. As illustrated schematically in Figure 7A taxanes increase the length of tubulin filaments within the cell. One of the mechanisms of action of TTFields is the misalignment of mitotic spindle filaments as a result of TTFields forces on tubulin chains [2]. The increase in filament length due to taxanes, increases the dipole moment of these macromolecules, leading to an increase in the TTFields induced forces and thus to a higher sensitivity of the cell to TTFields (see Figure 7A).

Doxorubicin that has a broad spectrum of activity both in experimental tumor models and in human malignancy, affects both DNA and RNA synthesis [22]. Cyclophosphamide (an alkylating agent) inhibits DNA replication by

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 394 of 631    Document 11-5

EX. 2, P. 232

4625

*BMC Medical Physics 2009, 9:1*



**Figure 7**
**Mechanisms of potentiation of chemotherapeutic efficacy by TTFields.** A Tubulin chains are elongated by Paclitaxel, leading to an increase in the average dipole moment of free tubulin chains (d – length of an individual tubulin dimmer; f – force between the microtubule chain and the dimmer; F-force acting on the tubulin dimmers by TTFields; Arrow length is proportional to the intensity of these forces). The forces TTFields exert on these larger dipoles, F, are enhanced leading to an increase in the disruption of the mitotic spindle by TTFields. B TTFields act as an M-phase inhibitor, while alkylating agents act at the G and S phases of the cell cycle. This separation between cell cycle phases affected explains the additivity seen experimentally.

interfering with the separation of the double stranded DNA essential for transcription [23]. As illustrated in Figure 7B, since TTFields act at a completely different stage (M phase) of the cell cycle from both these agents, additivity between chemotherapy and TTFields can be expected.

Since the data for newly diagnosed GBM patients, which points to well over a 300% increase in PFS and OS, was obtained only with combination treatment, one cannot directly separate the TTFields effects from the chemotherapeutic effect. However, if we assume that the TTFields therapeutic efficacy for newly diagnosed patients is similar to recurrent GBM, i.e. the median of OS is increased by 270% [1] while the published Temozolomide data indicates an increase of about 20% in OS compared to ionizing radiation treatment alone [14], the results presented in Figure 6 point towards additivity between TTFields and Temozolomide. It is important to note that this significant increase in efficacy was obtained without any increase in device or drug related toxicity (see table 3).

An additional important finding is that both 24 h and 72 h combination treatments in-vitro result in severe irreversible cellular damage in contrast to chemotherapy alone. This result strengthens the assumption that combination therapy with TTFields may be much more effective than treatment by individual agents.

## Conclusion
The results of the present study support the notion that TTFields may be used clinically not only as an anti-proliferation agent as shown before [1], but also as effective sensitizers of currently used chemotherapeutic agents. Such sensitization was not shown to be associated with any additional systemic toxicity. Moreover, as demonstrated by the high DRIs calculated in this study, chemo/TTFields combinations are expected to provide the same or even greater therapeutic efficacy with much lower drug concentrations thus lowering further the overall toxicity.

## Competing interests
EK, RSS, AI, DM, ZG, ES and YW are employees of Novo-Cure Ltd.

YP has a minority holding in NovoCure Ltd.

VD, FT, JV and DG have no competing interests.

## Authors' contributions
EK – planned the pre-clinical and clinical experiments, supervised their execution, analyzed results and wrote parts of the manuscript. RSS and ET – Performed the in-vitro experiment and assisted in the in-vivo experiments. DM, ZG and AI – Performed the in-vivo experiments. DG – Performed the MRI imaging for the in-vivo experiments. YW – Planned the medical devices and treatment parame-

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 395 of 631   Document 11-5   4626
EX. 2. P. 233

ters for all experiments. VD, FT and JV – performed the clinical trial in GBM patients (clinical investigators). YP – invented the concept of TTfields, helped interpret all results and wrote the majority of the manuscript.

## Appendix

Appendix A – Eligibility criteria for the pilot GBM trial

Inclusion criteria:

Histologically proven diagnosis of GBM.

Age over 18 years.

Karnofsky scale ≥ 70.

Participants of child bearing age had to be receiving efficient contraception.

Willing and able to sign an informed consent prior to participation in the study.

Exclusion criteria:

Patients actively participating in another clinical trial

Patients who received any anti-tumor therapy in the four weeks prior to trial initiation (steroids are permitted; however, the dose must be stable or decreasing during the trial).

Patients suspected of suffering from radiation necrosis (according to a PET scan).

Pregnancy

Patients with one of the following co-morbidities:

Patients with an implanted pacemaker or documented arrhythmias.

Significant renal, hepatic or hematologic disease.

Significant additional neurological disorder.

Seizure disorder unrelated to the patient's tumor

Pre-existing dementia

Progressive degenerative neurological disorder

Meningitis or encephalitis

Hydrocephalus associated with increased intracranial pressure (ICP)

## Acknowledgements
We wish to thank Mr. Michael Parkanski and Mrs. Orly Azrad for providing technical support and study coordination for the clinical study. Both MP and OA are employees of NovoCure Ltd. EK, RSS, AI, DM, ZG, ES and YW are employees of NovoCure Ltd. VD, FT, and JV performed the clinical trial which was sponsored by NovoCure Ltd.

## References
1. Kirson ED, Dbaly V, Tovarys F, Vymazal J, Soustiel JF, Itzhaki A, Mordechovich D, Steinberg-Shapira S, Gurvich Z, Schneiderman R, Wasserman Y, Salzberg M, Ryffel B, Goldsher D, Dekel E, Palti Y: Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. *Proc Natl Acad Sci USA*: 2007, 104(24):10152-10157.
2. Kirson ED, Gurvich Z, Schneiderman R, Onkel E, Itzhaki A, Wasserman Y, Schatzberger R, Palti Y: Disruption of cancer cell replication by alternating electric fields. *Cancer Res*: 2004, 64(9):3288-3295.
3. Salzberg M, Kirson E, Palti Y, Rochlitz C: A pilot study with very low-intensity, intermediate-frequency electric fields in patients with locally advanced and/or metastatic solid tumors. *Onkologie* 2008, 31(7):362-365.
4. Haller R, Gilbert R, Jaroszeski MJ: Electrochemotherapy an emerging drug delivery method for the treatment of cancer. *Adv Drug Deliv Rev* 1997, 26(2-3):185-197.
5. Boniface R, Hahl R, Paterson D: Management of Drug Toxicity. In *The Chemotherapy Source Book 3rd edition.* Edited by: Perry MC. Lippincott Williams & Wilkins; 2001:399-559.
6. Bryar M: Combined Modality Therapy. In *The Chemotherapy Source Book 3rd edition.* Edited by: Perry MC. Lippincott Williams & Wilkins; 2001:73-81.
7. Burris H: Combination Chemotherapy. In *The Chemotherapy Source Book 3rd edition.* Edited by: Perry MC. Lippincott Williams & Wilkins; 2001:69-73.
8. Leonard CE, Chan DC, Chou TC, Kumar R, Bunn PA: Paclitaxel enhances in vitro radiosensitivity of squamous carcinoma cell lines of the head and neck. *Cancer Res* 1996, 56(22):5198-5204.
9. Kirson ED, Rochlitz C, Tovarys F, Salzberg M, Palti Y: Treatment of locally advanced solid tumors using alternating electric fields (TTFields) – a translational study. *Proceedings of 97th AACR Annual Meeting: 2006; Washington, DC* 2006.
10. Chou TC: Talalay P: Quantitative analysis of dose-effect relationships: the combined effects of multiple drugs or enzyme inhibitors. *Adv Enzyme Regul* 1984, 22:27-55.
11. Chou TC: Theoretical basis, experimental design, and computerized simulation of synergism and antagonism in drug combination studies. *Pharmacol Rev* 2006, 58(3):621-681.
12. Macdonald DR, Cascino TL, Schold SC Jr, Cairncross JG: Response criteria for phase II studies of supratentorial malignant glioma. *J Clin Oncol* 1990, 8(7):1277-1280.
13. Jagur KJ, van Dijk PC, Zoccali C, Dekker FW: The analysis of survival data: The Kaplan-Meier method. *Kidney Int* 2000.
14. Stupp R, Mason WP, Bent MJ van den, Weller M, Fisher B, Taphoorn MJ, Belanger K, Brandes AA, Marosi C, Bogdahn U, Curschmann J, Janzer RC, Ludwin SK, Gorlia T, Allgeier A, Lacombe D, Cairncross JG, Eisenhauer E, Mirimanoff RO: Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. *N Engl J Med* 2005, 352(10):987-996.
15. Lev DC, Ruiz M, Mills L, McGary EC, Price JE, Bar-Eli M: Dacarbazine causes transcriptional up-regulation of interleukin 8 and vascular endothelial growth factor in melanoma cells: a possible escape mechanism from chemotherapy. *Mol Cancer Ther* 2003, 2(6):753-763.
16. Shimizu M, Saito S, Mita M, Iinba T, Tsubul R, Kogi M, Toyota H, Minagold J: Induction of apoptosis and/or necrosis following exposure to antitumour agents in a melanoma cell line, probably through modulation of Bcl-2 family proteins. *Melanoma Res* 2003, 13(5):457-464.
17. Steel GG, Peckham MJ: Exploitable mechanisms in combined radiotherapy-chemotherapy: the concept of additivity. *Int J Radiat Oncol Biol Phys* 1979, 5(1):85-91.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 396 of 631   Document 11-5   4627

EX. 2. P. 234

18. Novello S, Le Chevalier T: **Use of chemo-radiotherapy in locally advanced non-small cell lung cancer.** *Eur J Cancer* 2002, 38(2):292-299.
19. Choy H, Kim DW: **Chemotherapy and irradiation interaction.** *Semin Oncol* 2003, 30(4 Suppl 9):3-10.
20. Rowinsky EK, Donehower RC: **Paclitaxel (taxol).** *N Engl J Med* 1995, 332(15):1004-1014.
21. Abal M, Andreu JM, Barasoain I: **Taxanes: microtubule and centrosome targets, and cell cycle dependent mechanisms of action.** *Curr Cancer Drug Targets* 2003, 3(3):193-203.
22. Plosker GL, Faulds D: **Epirubicin. A review of its pharmacodynamic and pharmacokinetic properties, and therapeutic use in cancer chemotherapy.** *Drugs* 1993, 45(5):788-856.
23. Sladek NE: **Influence of aldehyde dehydrogenase activity on the sensitivity of lymphocytes and other blood cells to oxazaphosphorines.** *Methods Find Exp Clin Pharmacol* 1987, 9(9):617-626.

## Pre-publication history

The pre-publication history for this paper can be accessed here:

http://www.biomedcentral.com/1756-6649/9/1/prepub

**Publish with BioMed Central and every scientist can read your work free of charge**

*"BioMed Central will be the most significant development for disseminating the results of biomedical research in our lifetime."*

Sir Paul Nurse, Cancer Research UK

Your research papers will be:

• available free of charge to the entire biomedical community
• peer reviewed and published immediately upon acceptance
• cited in PubMed and archived on PubMed Central
• yours — you keep the copyright

Submit your manuscript here:
http://www.biomedcentral.com/info/publishing_adv.asp


BioMedcentral

201921 2X02665

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 397 of 631   Document 11-5   4628

EX. 2, P. 235

992259 C2C DIAR_A0000969327 12-19-2018

*Expert Opinion*

1. Background
2. TTFields's mechanism of action
3. Preclinical studies with TTFields
4. Clinical studies with TTFields
5. Summary
6. Expert opinion

Expert Opin. Investig.    Downloaded from informahealthcare.com by Tel Aviv University    0/1    For personal use only.

# Tumor treating fields: concept, evidence and future

Miklos Pless[†] & Uri Weinberg
[†]Medical Oncology, Department of Internal Medicine and Tumor Center, Kantonsspital Winterthur, Winterthur, Switzerland

*Introduction:* Local control is fundamental, both for the curative as well as the palliative treatment of cancer. Tumor treating fields (TTFields) are low intensity (1 – 2 V/cm), intermediate frequency (100 – 200 kHz) alternating electric fields administered using insulated electrodes placed on the skin surrounding the region of a malignant tumor. TTFields were shown to destroy cells within the process of mitosis via apoptosis, thereby inhibiting tumor growth. TTFields have no effect on non-dividing cells.
*Areas covered:* This article reviews *in vitro* and *in vivo* preclinical studies, demonstrating the activity of TTFields both as a monotherapy as well as in combination with several cytotoxic agents. Furthermore, it summarizes the clinical experience with TTFields, mainly in two indications: one in recurrent glioblastoma multiforme: in a large prospective randomized Phase III trial TTFields was compared with best standard care (including chemotherapy): TTFields significantly improved median overall survival (OS) compared with standard therapy (7.8 vs 6.1 months) for the patients treated per protocol. Importantly, quality of life was also better in the TTFields group. The second indication was a Phase II study in second-line non-small cell lung cancer, where TTFields was administered concomitantly with pemetrexed. This combination resulted in an excellent median OS of 13.8 months. Interestingly, the progression-free survival (PFS) within the area of the TTFields was 28, however, outside the TTFields the PFS was only 22 weeks.
*Expert opinion:* The proof of concept of TTFields has been well demonstrated in the preclinical setting, and the clinical data seem promising in various tumor types. The side effects of TTFields were minimal and in general consisted of skin reaction to the electrodes. There are a number of ways in which TTFields could be further evaluated, for example, in combination with chemotherapy, as a maintenance treatment, or as a salvage therapy if radiotherapy or surgery is not possible. While more clinical data are clearly needed, TTFields is an emerging and promising novel treatment concept.

*Keywords:* cancer, electric fields, glioblastoma, non-small cell lung cancer, TTFields

*Expert Opin. Investig. Drugs [Early Online]*

## 1. Background

Alternating electric fields have been used since many years for the diagnosis, research and treatment of various medical conditions. Such electric fields have different properties, depending on their frequency and intensity (Table 1). Very low frequencies (lower than 1 kHz) are used to excite the membrane of muscles and nerves, thereby leading to membrane depolarization and finally to action potentials (i.e). Higher frequency alternating electric fields penetrate cells better, but the overall effect of hyper-depolarization on the cell membrane balances in a way that the integrated stimulation does not yield an action potential. However, at frequencies higher than 10 MHz, the electrophysiological properties of the eukaryotic

**informa**
healthcare

10.1517/13543784.2011.583236 © 2011 Informa UK, Ltd. ISSN 1354-3784
All rights reserved: reproduction in whole or in part not permitted

**RIGHTSLINK()**

201 921 2X02666

Expert Opin Investig

Downloaded from Infor... State com by Tel Aviv University
For person... ....nly

---

**Article highlights.**

- Tumor treating fields (TTFields) are low intensity (1 – 2 V/cm), intermediate frequency (100 – 200 kHz) alternating electric fields, which can induce apoptosis.
- TTFields are able to inhibit tumor growth in various cell lines and animal models.
- The combination of TTFields with several cytotoxic agents resulted in a supra-additive tumor growth inhibition in vitro and in vivo.
- Two clinical trials, a Phase III trial in glioblastoma multiforme (GBM) and a Phase II study in non-small cell lung cancer (NSCLC) have shown antitumor activity of TTFields.
- Toxicity was low; it consisted mainly of skin reactions at the site of the electrodes.

This box summarizes key points contained in the article.

---

membrane lead to dielectric polarization that eventually heats the tissue [4,5]. Intermediate-frequency alternating electric fields, at frequencies between 10 kHz and 1 MHz, neither cause net depolarization nor significant dielectric losses, therefore, cannot stimulate nerves/muscles, but also cannot seriously heat tissues at low enough intensities. It was thought that such electric fields have no meaningful biological effect on cells [4,6-9]. Nevertheless, it was recently found that such fields, named tumor treating fields (TTFields), have an anti-mitotic activity and may lead to the death of dividing cells. The fields were found to have these properties already at a very low intensity (< 2 V/cm) and at intermediate frequency of 100 – 300 kHz.

## 2. TTFields's mechanism of action

Each cell contains numerous electrically charged molecules, such as proteins and DNA. Under an alternating electric field, these molecules will oscillate according to the changing direction of the field and its density (Figure 1). If the field is uniform, the forces acting intermittently to opposite directions will cause a movement parallel to the direction of the field. When the frequency of the field is high enough, such as in the case of TTFields, this molecular movement will reduce. In the case of dipoles, where there is an electric split between the positive and negative poles of a molecule, it will align with the direction of the electric field and remain at the same place. All charged molecules, including dipoles, will move toward the higher field density in a non-uniform alternating electric field. Within a non-dividing cell, the field is mostly uniform and the net force on charges and dipoles will, therefore, yield minimal movement. Non-uniform electric fields, on the other hand, force polar molecules to move toward higher field intensity, in a process called dielectrophoresis [10,11]. Such fields are characteristic of dividing cell when a narrow furrow connects the two forming daughter cells.

### 2.1 Arrest of mitotic spindle formation
Mitotic spindle is the organelle that separates the cell's chromosomes to each of the daughter cells during mitosis. The arms that hold to the chromosomes consist of small polar molecules called tubulins, which polymerize to form a 'chain' of subunits that will reach the genetic material at the center of the cell. As noted before, the field is uniform within the non-dividing cells, but the tubulin subunits will tend to align according to the direction of the field. Finite element simulations showed that the electrical forces acting on the subunits prevent them from attaining the orientation required for efficient polymerization, therefore, mitosis becomes arrested for an abnormally long time [12]. This happens since subunits far enough from the growing microtubule will be subjected to an electric force strong enough to prevent further polymerization. When this process takes place, cells could either complete mitosis or disintegrate.

### 2.2 Mitotic furrow destruction
Not all cells seem to be affected by means of disruption of mitotic spindle formation. The membranes of cells that completed metaphase will start dividing into two daughter cells, pulling the daughter chromosomes to each of the cells' poles. During the last step in mitosis, that is, cytokinesis, a cleavage furrow is eventually formed, which completes the process of cell separation. This narrow membranous link results in an hourglass-shaped non-uniform electric field, unlike non-dividing cells, in which the electric field is uniform. During cytokinesis, the densest electric field is found in the narrow center. This focusing of the field directs all electric charges and dipoles to the furrow due to the unidirectional character of the electric force (dielectrophoretic force) under this condition. Finite element simulations have shown that polarized molecules and organelles within the cell will be affected by forces high enough to move toward the furrow so as to disrupt the internal cell structure and cause the cell destruction seen under TTFields therapy [12].

## 3. Preclinical studies with TTFields

A number of preclinical trials have shown the efficacy of TTFields in the inhibition of cancer cell proliferation and their destruction in vitro [12,13]. Many cell lines were cultured and tested under TTFields, among others melanoma, glioma, lung, prostate and breast cancers. TTFields was applied continuously for 24 – 72 h, in all cases, proliferation was significantly inhibited, compared with control cultures and to non-replicating cultures (baby hamster kidney (BHK) cells) treated with TTFields. For some of the cell lines, a specific optimal frequency that demonstrated maximal inhibitory effect was found, possibly reflecting different cell size and shape (Table 2) [13]. Under time-lapse microscopy, cancer cells demonstrated significantly prolonged mitosis and even cell destruction on the formation of the cleavage furrow. Immunohistochemistry studies of cell cultures treated with TTFields showed many abnormal

2019212X02667

RIGHTSLINK

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 399 of 631   Document 11-5

4630

EX. 2, P. 237

002269 C2C DIAR_A0000069327 12-19-2018

**Table 1. Alternating electric fields used in medicine**

| Frequency | Biological activity | Application |
| --- | --- | --- |
| < 1 kHz | Membrane depolarization | Defibrillators, ECT, bone growth, fracture healing, ICD |
| 100 – 300 kHz | Mitotic arrest and apoptosis | TTFields |
| 1 – > 10 MHz | Dielectric polarization | Diathermy, radio frequency tumor ablation |

ECT, electroconvulsive therapy; ICD, implantable cardioverter-defibrillator; TTFields, tumor treating fields.



**Figure 1. Antimitotic effects of tumor treating fields (TTFields).** At the beginning of mitosis, the electric field is uniform within the cell, causing tubulin subunits to align with the direction of the field and inhibiting their polymerization to form a normal microtubule spindle. In a non-uniform electric field formed during cytokinesis, charges and dipoles move toward the high field density at the mitotic furrow, disrupting mitosis and disintegrating the daughter cells.

mitotic figures that could be related to the interference of TTFields with the mitotic spindle formation. These figures resemble the presentation of cancer cells treated with agents that interfere with mitotic spindle formation, such as paclitaxel. Further experiments showed that the efficacy of TTFields in combination with different chemotherapies is additive and could be synergistic [14].

Interestingly, TTFields caused cultured cells to orient in the direction of the electric field [12]. This could be explained by the fact that the electric forces are maximal when the axis of division is aligned with the external field. This also implies that the angle of the cell affects its vulnerability to TTFields during mitosis.

TTFields was also shown to inhibit tumor growth in several mouse, rat and rabbit cancer models [12,13]. Implanted cell lines were used to test the most effective frequency and intensity for this *in vivo* treatment. Postmortem analysis of the treated animals showed a significant tumor size reduction in the case of TTFields-treated animals, compared with control animals. No difference of the local temperature in the vicinity of the tumor was found between the two groups. *In vivo* experiments showed that it is possible to deliver the field to the target region using insulated non-invasive electrodes. While there was no statistically significant inhibition of tumor growth when a unidirectional TTFields was delivered this way, two- and three-directional fields led to a statistically significant growth inhibition [13]. *In vivo* tumor models have shown the same optimization in tumor inhibition when using the effective specific frequency for each cell type. No abnormality in vital signs, electrocardiograms (ECG), complete blood counts (CBC), chemistry and coagulation panels was found during the follow-up period of animals treated with TTFields, and no treatment-related pathologies were found postmortem.

In a metastatic melanoma mouse model and metastatic kidney cancer rabbit model, TTFields was shown to reduce the extent of metastatic spread, possibly due to metastasis growth inhibition, migration capability impairment and primary tumor local control [15].

## 4. Clinical studies with TTFields

Prior to applying TTFields to human patients, feasibility was tested using finite element mesh (FEM) simulations and measurements within the brain of a volunteer undergoing brain

Downloaded from informahealthcare.com by Tel Aviv University on 05/15/11
For personal use only.

Expert Opin. Investig.

2e1 9212X02668.

RIGHTSLINK()

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 400 of 631    Document 11-5    4631

EX. 2, P. 238

**Table 2. Optimal TTFields frequency for tested cell lines**

| Cell line | Optimal frequency (kHz) |
|---|---|
| B16F1 (mouse melanoma) | 120 |
| AA8 (Chinese hamster ovary) | 150 |
| VX-2 (rabbit kidney) | 150 |
| MCF-7 (human breast) | 150 |
| MDA-MB-231 (human breast) | 150 |
| F-98 (rat glioma) | 200 |
| U-87 (Human glioma) | 200 |
| U-118 (Human glioma) | 200 |

TTFields, tumor treating fields.

surgery. It was found that TTFields can be effectively applied to the cerebrum using surface electrodes. TTFields was first tested on 10 recurrent malignant glioblastoma multiforme (GBM) patients. No concomitant chemotherapy was used during the clinical trial, and TTFields was the only antitumor therapy. TTFields was delivered via a portable, light-weight (~ 3 kg) device carried by the patient (NovoTTFields-100A, NovoCure Ltd, Haifa, Israel), connected to two pairs of insulated electrodes that were applied to the patients' skin. The device continuously (18 h/day on average) delivered two perpendicular 1 – 2 V/cm, 200 kHz alternating electric fields (Figure 2). Patients had a highly significant increase in the median time to disease progression (26.1 weeks) and progression-free survival (PFS) at 6 months (50%) compared with historical controls, with a median overall survival (OS) of more than 62 weeks [13]. In addition, no treatment-related serious adverse event was detected in a total of 280 treatment weeks. The only treatment-related adverse event was mild-to-moderate contact dermatitis beneath the electrode gel, which was easily managed using topical treatments.

These preliminary findings led to a Phase III clinical trial of TTFields compared with best standard of care chemotherapy in 237 patients with recurrent GBM [16,17]. Patients in this study were previously treated with an unlimited number of surgeries/chemotherapy cycles. They were randomized to either a TTFields arm, given as a monotherapy without additional antitumor treatments, or to the best standard chemotherapy (BSCh) arm, which was at the treating physician's discretion. TTFields was administered continuously and patients' compliance was excellent, with a median duration of 20 h/day. Patient characteristics were balanced in both groups, with median age of 54 years and median Karnofsky performance status (KPS) of 80%. Mean treatment duration was 4.4 months in the TTFields group versus 2.3 months in the BSCh group. In the group of 185 patients who were treated per protocol, a statistically significant survival benefit was seen for the TTFields group (median OS 7.8 vs 6.1 months for TTFields and BSCh, respectively). Moreover, patients with better prognostic baseline characteristics (KPS 80% or higher, age 60 or lower) demonstrated an even higher survival benefit when treated with TTFields (median OS 8.8 vs 6.6 months; n = 110). These results show that TTFields

as a monotherapy are at least as effective as the best available chemotherapy or supportive care in this poor prognosis disease. It is noteworthy that quality of life (QOL) was equivalent or superior in patients treated with TTFields compared with BSCh. This clinical trial also showed that the only TTFields-related adverse events were mild-to-moderate contact dermatitis beneath the electrodes in a minority of patients. The incidence of toxicities was significantly higher in the BSCh arm.

TTFields was also explored in a Phase I/II single arm study in combination with pemetrexed for advanced (stage IIIB/IV) non-small cell lung cancer (NSCLC) as a second-line treatment, after failure of standard first-line chemotherapy [18]. Electrodes were applied to the chest and upper abdomen and the device delivered 150 kHz TTFields, in accordance with the preclinical findings relating to lung cancer cell lines. Forty-one patients were treated, including 7 (17.1%) with squamous cell carcinoma and 30 (73%) with stage IV disease. The device was well tolerated and the average daily use was 11.2 h. No TTFields-related serious adverse event was reported for a cumulative time of over 720 weeks. Median PFS was 22 weeks and in-field PFS (i.e., PFS within the area of the TTFields; the study's primary end point) in the lungs and liver was 28 weeks. This is an important finding because it can be assumed that in the same patient the higher tumor control within the TTFields area was a specific effect of TTFields. Median OS was 13.8 months and 1-year survival was 57% (Figure 3). Six patients (14.6%) had a radiological partial remission (PR) and 16 patients had stable disease (SD) (39%). These results are very promising and compare extremely well with matched historical controls treated with pemetrexed alone in second-line treatment [19].

Special attention was given to potential adverse events using TTFields: in the glioblastoma trial careful neurological examination and documentation was required once a month. In the lung cancer trial, ECGs were mandated at the beginning of the trial, during the treatment if adverse effects occurred and at the end. Finally, skin reactions were monitored at every visit and documented according to the National Cancer Institute (NCI)-Common Toxicity Criteria (CTC) (version 3.0) in all studies. All other adverse events were monitored routinely at every visit according to the CTC criteria. In all studies involving TTFields the only side effect, which occurred more frequently was grade 1 – 2 skin toxicity. In the glioblastoma trial there was a direct control group, in the lung cancer trial we compared the side effects with the large Phase III study by Hanna et al., in which pemetrexed was given as a second-line treatment [19].

## 5. Summary

TTFields was shown to inhibit proliferation and to cause cell destruction of many cancer cells in vitro and in vivo. In addition, TTFields significantly improved human patients' prognosis in recurrent GBM and probably also in NSCLC. At the time this review was submitted, there were no serious adverse events found related to TTFields.

Expert Opin Invest __  the site sent by Tel Aviv University us on 10/11
_g Downloaded from info  For personal use only.

4632

EX. 2, P. 239

RIGHTS LINK

992261 C2C DIAR_A0000969327 12-19-2018

end points were excellent, compared with historical data for pemetrexed alone [19].

The good safety profile along with the significant clinical efficacy and QOL advantages make TTFields an attractive treatment in GBM, and perhaps in many other malignancies.

## 6. Expert opinion

TTFields is a novel and promising concept for treating solid tumors. *In vitro* and *in vivo* experiments have repeatedly shown a significant inhibitory effect on cancer cell proliferation upon application of TTFields. We already know that at least two physical mechanisms are involved: the first is interference with the mitotic spindle formation as a result of electric forces preventing the normal polymerization of the tubulin subunits. The second mechanism results from the non-uniformity of the electric field in the context of cytokinesis, and the movement of molecules in the direction of the mitotic furrow as a result of the unidirectional force generated by TTFields.

There are also some data indicating that combining chemotherapeutic cancer treatments with TTFields may increase efficacy and sensitivity to chemotherapy [14]. Several tumor types are sensitized to radiation after adding different chemotherapies, even at low doses [24-26]. Could some tumors similarly be more susceptible to TTFields treatment if treated concomitantly with certain cytotoxic agents? This is a plausible idea, since TTFields acts on specific organelles (e.g., the mitotic spindle), which are also the target of some of the anticancer drugs. Taxanes act through stabilizing the link between tubulin dimers in the spindle microtubules. It could be that the abnormal increase in microtubule length caused by this class of agents, which leads to the formation of a larger dipole moment, results in an increase in the efficacy of TTFields [14]. This possible synergism could be used to achieve a better response, but alternatively also as a way to decrease chemotherapy intensity in patients who cannot tolerate the toxicity of full-dose chemotherapy. The fact that TTFields itself was not toxic and in combination with pemetrexed did not increase the known side effects of the latter in the clinical trials mentioned above, makes combination therapies an attractive therapeutic option.

Preclinical experiments showed the frequency-dependant effect of TTFields, with different frequencies showing a maximal inhibitory effect in certain cancer cell types [19]. In the future, it will be interesting to see how this characteristic could be exploited in order to maximize the effect, by adjusting the frequency on an individual tumor basis, using cytological/pathological specimens for the analysis. Such adjustments could be possible for tumors of the same entity but in different patients, and maybe even at different stages in the course of the same disease.

Other fields of interest that will probably be investigated in the future include the pathway in which cell death occurs following exposure to TTFields. Unpublished findings show that apoptosis is the process that leads to cancer cell death



**Figure 2. The tumor treating fields (TTFields) generating portable device (NovoTTFields-100A).**

On the contrary, the treatment was toxicity-free for treated patients, except for mild-to-moderate contact dermatitis underneath the electrodes. Importantly, there were no cardiac or neurological abnormalities as a result of TTFields treatment. The use of non-invasive surface electrodes prevented flow of ionic currents [20,21] or cell death [22] as a result of direct currents, and thus decreased skin damage and enabled continuous treatment.

TTFields can actively inhibit different cell types, including multi-drug-resistant (MDR) ovarian and breast cancer cell lines that overexpress ABC (ATP-binding cassette) transporters [23]. It may not only be useful in the treatment of locally advanced tumors, but also in the prevention and treatment of metastatic disease. TTFields has the potential to inhibit the migration of metastases from a primary tumor; it can inhibit the growth of metastases in the lungs once they have been seeded in the target organ, through the presence of the fields in the lungs themselves.

In the first Phase III study published to date [16,17], TTFields had minimal toxicity and patients' compliance was excellent, over an extended period of time. The application of TTFields resulted in an improved median OS, higher response rate and longer time to treatment failure compared with best standard chemotherapies and also led to an improvement in many QOL parameters. A large-scale Phase III clinical trial in newly diagnosed GBM is currently being conducted.

In the first clinical trial for NSCLC patients, TTFields was well tolerated in a second-line setting. It was safe and efficacy

Downloaded from informa by Tel Aviv University of 2/11

Expert Opin. Investig.

RIGHTSLINK



**Figure 3. Phase II trial using tumor treating fields (TTFields) in combination with pemetrexed in non-small cell lung cancer as a second-line therapy. Median in-field progression-free survival (PFS) was 28 weeks. Median overall survival (OS) was 13.8 months; n = 41.**
Adapted from poster presentation ESMO 2010 [18].

under TTFields. Finding the specific pathway through which apoptosis is carried out will provide a better understanding of the basic mechanism and will pave the way for other combinations or treatment optimization. The immune system plays an important role in the pathogenesis of cancer [27]. TTFields has the potential to beneficially affect the microenvironment of the tumor: it could act directly on recruited immune cells, alternatively, it could change the interaction between these cells and the tumor following changes to the tumor cell structure, vasculature, etc. Preliminary data show that there is a change in the presence of immune cells that interplay with cancer cells, following TTFields treatment [15].

Both the Phase III (for recurrent GBM patients) and the Phase II (for advanced NSCLC) trials have given some important insights on using TTFields [16-18]. The high compliance demonstrates that it is feasible to administer TTFields continuously using a light-weight portable device, in spite of the necessity to be attached to the device. Since most patients enrolled in the trials were somewhat hindered by their malignant disease, they generally adjusted to TTFields quite quickly and well. In the NSCLC trial, the majority of patients used TTFields overnight and was free at daytime. It can be assumed that other cancer patients will tolerate TTFields as well. It will be interesting to see how other chemotherapies administered concomitantly to TTFields will affect the course of these patients. A Phase III trial (NCT00916409) for newly diagnosed GBM patients treated with a combination of temozolomide and TTFields is currently ongoing.

As a physical treatment modality, TTFields has the potential to be active in other solid tumors as well. In a pilot study,

TTFields therapy was very well tolerated and safe for four patients bearing skin lesions from breast and melanoma tumors. These tumors showed transient inhibition in the growth rate during a 2- to 4-week treatment and the findings warrant further investigations [26]. While systemic chemotherapy usually has significant toxicities, biologically targeted therapies often affect only a subset of tumors carrying specific mutations or proteins. Glioblastoma and NSCLC, like many other tumors, harbor many different genotypes [29-31] and it has been difficult to show a major impact of chemotherapy or even targeted agents in these tumor types, at least for the majority of patients. TTFields acts independently of the expression of cell surface receptors or other tumor biomarkers. There are no alternative mitosis mechanisms, thus cancer cells are unlikely to be or to become resistant to TTFields.

There are several ways of further developing TTFields clinically. TTFields is a regional treatment: it could be employed in situations where radiotherapy is not possible anymore, for example, after a full course of radiation to the brain. Another option would be to test it in situations in which prophylactic radiotherapy is used: for example, prophylactic cranial irradiation (PCI) small cell lung cancer, hopefully circumventing the late toxicity of PCI. Lastly, it can of course be tested together with radiotherapy. Even though TTFields is a regional treatment, it still managed to decrease the likelihood of metastases formation in animal experiments [15], the most common cause of death in cancer. It could be that TTFields was able to prevent malignant cell evasion from the primary tumor in the lung cancer treated population, thereby leading to decreased formation of micrometastases [18].

RIGHTSLINK4)

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 403 of 631   Document 11-5   4634

EX. 2. P. 241

002262 C2C DIAR_A0000069327 12-19-2018

In summary, TTFields could be considered as a potential effective treatment for patients suffering from different cancer types. The non-toxic characteristics and promising clinical outcomes in several clinical trials conducted to date should encourage investigators to further evaluate TTFields, either as a monotherapy or in combination with other treatments.

## Declaration of interest

M Pless declares no conflicts of interest. U Weinberg works for NovoCure Ltd. as Medical Director. Novocure has supported experiments described in this review and was the sponsor for the clinical trials. The paper was not supported by a commercial company.

## Bibliography

Papers of special note have been highlighted as either of interest (•) or of considerable interest (••) to readers.

1. Polk C. Therapeutic applications of low-frequency sinusoidal and pulsed electric and magnetic fields. In: Bronzino JD, editor. The biomedical engineering handbook. CRC Press, Inc., Boca Raton, FL: 1995. p. 1404-16

2. Stimulation of internal organs by means of externally applied electrodes. Vahl Y J Appl Physiol 1966;21(5):1619-12

3. Bassett CA. The development and application of pulsed electromagnetic fields (PEMFs) for ununited fractures and arthrodeses. Clin Plast Surg 1985;12:259-77

4. Kirson E. Biologic effects of radiofrequency and microwave fields: in vivo and in vitro experimental results. In: Bronzino JD, editor. The biomedical engineering handbook. CRC Press, Inc., Boca Raton, FL: 1995. p. 1417-23

5. Chou CK. Radiofrequency hyperthermia in cancer therapy. In: Bronzino JD, editor. The biomedical engineering handbook. CRC Press, Inc., Boca Raton, FL: 1995. p. 1424-30

6. Gascoyne AD, Pethig R. Electrorotation and dielectrophoresis. Parasitology 1998;117(Suppl):S177-89

7. Sowers AE. Characterization of electric field-induced fusion in erythrocyte ghost membranes. J Cell Biol 1986;102(4):1358-62

8. Takashima S, Schwan HP. Alignment of microscopic particles in electric fields and its biological implications. Biophys J 1985;47(4):513-18

9. Maier H. Electrorotation of colloidal particles and rolls depends on surface charge. Biophys J 1997;73(3):1617-26

10. Clague DS, Wheeler EK. Dielectrophoretic manipulation of macromolecules: the electric field.

Phys Rev E Stat Nonlin Soft Matter Phys 2001;64(2 Pt 2):026605

11. Gonzalez CF, Remcho VT. Harnessing dielectric forces for separations of cells, fine particles and macromolecules. J Chromatogr A 2005;1079(1-2):59-68

12. Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of cancer cell replication by alternating electric fields. Cancer Res 2004;64(9):3288-95

• TTFields significantly inhibited different cancer cell lines by disrupting cells undergoing mitosis.

13. Kirson ED, Dbaly V, Tovarys F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. Proc Natl Acad Sci USA 2007;104(24):10152-7

•• Proof of concept — TTFields was shown to arrest cancer growth both in vitro and in vivo in a frequency- and intensity-dependant manner.

14. Kirson ED, Schneiderman RS, Dbaly V, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). BMC Med Phys 2009;9:1

• Combining chemotherapy with TTFields may increase efficacy and sensitivity without any increase in the toxicity of treatments.

15. Kirson ED, Giladi M, Gurvich Z, et al. Alternating electric fields (TTFields) inhibit metastatic spread of solid tumors to the lungs. Clin Exp Metastasis 2009;26(7):633-40

• TTFields inhibited metastatic spread of solid tumors to lungs and may have a role in preventing metastatic spread from the primary tumor.

16. Stupp R, Kanner A, Engelhard H, et al. A prospective, randomized, open-label, phase III clinical trial of NovoTTFields-100A versus best standard

of care chemotherapy in patients with recurrent glioblastoma. J Clin Oncol 2010;28(18S):abstract LBA2007

•• NovoTTFields-100A is at least as effective as active BSC chemotherapies, without the toxicities associated with chemotherapy and with a much better quality of life.

17. Ram Z, Gutin PH, Stupp R. Subgroup and quality of life analyses of the phase III clinical trial of NovoTTFields-100A versus best standard chemotherapy for recurrent glioblastoma. Neuro Oncol 2010;12(Suppl 4):iv36-iv57

18. Pless M, Betticher DC, Buess M, et al. A phase II study of tumor-treating fields (TTFields) in combination with pemetrexed for advanced non-small cell lung cancer (NSCLC) [abstract 371PD]. ESMO: 2010

19. Hanna N, Shepherd FA, Fossella FV, et al. Randomized phase III trial of pemetrexed versus docetaxel in patients with non-small-cell lung cancer previously treated with chemotherapy. J Clin Oncol 2004;22(9):1589-97

20. Webster JG, Clark JW. Medical Instrumentation: application and design. Wiley, New York; 1998

21. Burnette RR, Ongpipattanakul B. Characterization of the pore transport properties and tissue alteration of excised human skin during iontophoresis. J Pharm Sci 1988;77(2):132-7

22. Orrenius S, McCabe MJ Jr, Nicotera P. Ca(2+)-dependent mechanisms of cytotoxicity and programmed cell death. Toxicol Lett 1992;64-65 Spec No:357-64

23. Schneiderman RS, Shmueli E, Kirson ED, Palti Y. TTFields alone and in combination with chemotherapeutic agents effectively reduce the viability of MDR cell sub-lines that over-express ABC transporters. BMC Cancer 2010;10:229

24. Leonard CE, Chan DC, Chou TC, et al. Paclitaxel enhances in vitro

Expert Opin Invest Downloaded from informa ... healthcare.com by Tel Aviv University ......12/11 For personal use only.

2019212X02672

radiosensitivity of squamous carcinoma cell lines of the head and neck. Cancer Res 1996;56(22):5198-204

25. Novello S, Le Chevalier T. Use of chemo-radiotherapy in locally advanced non-small cell lung cancer. Eur J Cancer 2002;38(2):292-9

26. Choy H, Kim DW. Chemotherapy and irradiation interaction. Semin Oncol 2003;30(4 Suppl 9):3-10

27. Stewart TJ, Greeneltch KM, Lutsiak ME, Abrams SI. Immunological responses can have both pro- and antitumour effects: implications for immunotherapy. Expert Rev Mol Med 2007;9(4):1-20

28. Salzberg M, Kirson E, Palti Y, Rochlitz C. A pilot study with very

low-intensity, intermediate-frequency electric fields in patients with locally advanced and/or metastatic solid tumors. Onkologie 2008;31(7):362-5

29. Dong H, Luo L, Hong S, et al. Integrated analysis of mutations, miRNA and mRNA expression in glioblastoma. BMC Syst Biol 2010;4:163

30. Sjostrom S, Andersson U, Liu Y, et al. Genetic variations in EGF and EGFR and glioblastoma outcome. Neuro Oncol 2010;12(8):815-21

31. Luo W, Jiang Z, Liu J, et al. The mutation spectrum revealed by paired genome sequences from a lung cancer patient. Nature 2010;465(7297):473-7

Affiliation

Miklos Pless[†1] & Uri Weinberg[2]
[†]Author for correspondence
[1]Medical Oncology,
Department of Internal Medicine; and Tumor Center; Kantonsspital Winterthur,
Brauerstrasse 15,
8400 Winterthur, Switzerland
Tel: +41 52 266 25 52; Fax: +41 52 266 45 20;
E-mail: miklos.pless@ksw.ch
[2]NovoCure Ltd,
Matam Advanced Technology Centre,
31905, Haifa, Israel

Expert Opin. Inves    igs Downloaded from inf    idcurr.com by Tel Aviv Universit,    . /10/11    For personal use only.

2019212X02673

RIGHTSLINK()

# PROCEDURAL

# DOCUMENTS

201921200267 4

4637

January 18, 2019

NOVOCURE, INC.
195 COMMERCE WAY
PORTSMOUTH, NH 03801

**Medicare Reconsideration Decision**

RE:
Beneficiary: A. Prosser
Med ID#: *****4857A
Appellant: Novocure, Inc.

Dear S. Rice:

This letter is to inform you of the decision on your Medicare Appeal. An appeal is a new and independent review of a claim. You are receiving this letter because you requested an appeal for the services shown under the Appeal Details section.

The appeal decision is UNFAVORABLE. Our decision is that Medicare will make n additional payment. More information on the decision is provided on the next pages. You are not required to take any action.

If you disagree with the decision, you may appeal to an Administrative Law Judge (ALJ). You must file your appeal, in writing, within 60 days of receipt of this letter. For more information on how to appeal, see the page entitled "Important Information About Your Appeal Rights." The amount still in dispute is estimated to be equal to o over $160.00. However, the ALJ will determine if your appeal case meets the $160.00 amount in controversy requirement for an ALJ hearing.

**Contact Information**

If you have questions, write or call:

*C2C Innovative Solutions, Inc.*
QIC DME
P.O. Box 44163
Jacksonville, FL 32231-4163

*Telephone:*
904-224-7433

Who we are:
We are a Qualified Independent Contractor (QIC). Medicare has contracted with us to review your file and make an independent decision.

2019212X02675

If this appeal is partially favorable or unfavorable,, and it originated from an overpayment, recoupment will begin 31 days from the date of this letter in the absence of an acceptable request for an extended repayment schedule (ERS). Please refer to the original demand letter for information regarding the collection process, interest accrual, and requesting an ERS.

A copy of this letter was also sent to the parties shown below. C2C Innovative Solutions, Inc. was contracted by Medicare to review your appeal. For more information on how to appeal, see the page titled "Important Information About Your Appeal Rights."

Sincerely,

Frank A. Delli Carpini, M.D.
Medical Director


CC:    A. Prosser

**C2C Innovative Solutions, Inc.**
P.O. Box 44163, Jacksonville, Florida 32231-4163
www.C2Cinc.com

## Summary of Facts

The service(s) shown below were submitted for payment to CGS Administrators. The explanation of the decision was released in a Medicare Summary Notice to the beneficiary and a Remittance Advice to the provider of service. A request for a Redetermination appeal was submitted to the Medicare Administrative Contractor (MAC). On July 10, 2018, CGS Administrators completed the appeal and sent notice of the decision to the appropriate parties. On December 17, 2018, we received a QIC Reconsideration request for the services referenced in the "Appeal Details" section. Information and records reviewed by the QIC in this case included:

- Test Result(s)
- Redetermination Letter
- Proof of Delivery (POD)
- Physician Order/Prescription (RX)
- Medical Literature
- National or Local Coverage Determination (NCD or LCD) Medical Policy
- Request for Medical Records
- Treatment Record(s)
- Letter/Correspondence on behalf of beneficiary
- Supplier Delivery Documentation
- Reconsideration Request
- Beneficiary Letter/Correspondence
- Correspondence(s)

## Decision

A panel of clinical experts consisting of a physician and a licensed health care professional reviewed the claim(s).

The decision on your appeal is shown below:

| Medicare Coverage | Claim Number (ICN) | Procedure /Date of Service |
|---|---|---|
| Non-covered | 18045802101000 | E0766: Elec Stim Cancer Treatment - (01/16/18) |
| Non-covered | 18050808224000 | E0766: Elec Stim Cancer Treatment - (02/16/18) |
| Non-covered | 18078813409000 | E0766: Elec Stim Cancer Treatment - (03/16/18) |
| Non-covered | 18107803853000 | E0766: Elec Stim Cancer Treatment - (04/16/18) |

We have determined that Novocure, Inc. is responsible for the denied charges.



**C2C Innovative Solutions, Inc.**
P.O. Box 44163, Jacksonville, Florida 32231-4163
www.C2Cinc.com

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 409 of 631   Document 11-5

4640

EX. 1, P. 3

## Explanation of the Decision

Claim Number: 18045802101000

For any item or service to be covered by Medicare, it must fall into a defined Medicare benefit category, it must not be statutorily excluded, it must be reasonable and necessary under Section (§) 1862(a)(1)(A) of the Social Security Act (SSA), and it must meet other Medicare program requirements for payment. §§ 414.200 through 414.232 of 42 Code of Federal Regulations (CFR) cover payment for durable medical equipment and prosthetic and orthotic devices. The Medicare National Coverage Determinations (NCD) Manual, Publication 100-03, includes NCDs that pertain to certain Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) items. The Medicare Claims Processing Manual, Publication 100-04, Chapter 20, instructs on billing and payment for DMEPOS. The Medicare Program Integrity Manual (PIM), Publication 100-08, Chapter 5, provides guidance on medical review. The manuals are based upon the above cited law and regulations. DME Medicare Administrative Contractors (MACs) publish Local Coverage Determinations (LCDs) and related Policy Articles. The LCDs address the criteria for "reasonable and necessary," based on Social Security Act § 1862(a)(1)(A). The articles encompass the non-medical necessity coverage and payment rules.

At issue is payment for an electrical stimulation device used for cancer treatment.

The Local Coverage Determination (LCD) for Tumor Treatment Field Therapy (TTFT) (L34823) states for any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this local coverage determination, the criteria for reasonable and necessary, based on Social Security Act § 1862(a)(1)(A) provisions, are defined by the coverage indications, limitations and/or medical necessity.

The Durable Medical Equipment (DME) Medicare Administrative Contractor (MAC) did not allow payment because the currently published studies in the medical literature did not clearly document the effectiveness of the device.

The DME Qualified Independent Contractor (QIC) performed an independent review. The available documentation submitted indicates the Beneficiary has a diagnosis of glioblastoma multiforme and is receiving TTFT treatment.

However, the currently published studies in the medical literature do not clearly document the effectiveness of this device, which is required as outlined in the LCD L34823. If the Novocure TTF is denied as not reasonable and necessary, the corresponding transducer arrays will be denied as not reasonable and necessary. Payment cannot be allowed. Based on the available documentation, the requirements of the LCD L34823 have not been met. Therefore, no payment can be allowed.

In conclusion, the decision of the DME QIC is unfavorable.

Claim Number: 18050808224000

Please see the complete decision under claim number 18045802101000.

**C2C Innovative Solutions, Inc.**
P.O. Box 44163, Jacksonville, Florida 32231-4163
www.C2Cinc.com

Claim Number: 18078813409000

Please see the complete decision under claim number 18045802101000.

Claim Number: 18107803853000

Please see the complete decision under claim number 18045802101000.

| Who is Responsible for the Bill? |
| --- |

When services are denied as not medically reasonable and necessary under the Medicare program, we must also determine if the provider or beneficiary is liable for payment. Section 1879(a)-(g) of the SSA, also referred to as "the limitation on liability provision," specifies how to arrive at this decision. Medicare regulations, 42 CFR 424, require providers to be familiar with Medicare rules and regulations. In addition, 42 CFR 411.406 provides criteria for determining when a provider is responsible for payment for the services considered not reasonable and necessary. This regulation states that providers are presumed to have knowledge of published Medicare coverage rules and regulations, Centers for Medicare and Medicaid Services (CMS) Rulings, Medicare coverage policies in CGS Administrators bulletins or websites, and acceptable standards within the local community. We find that Novocure Inc is liable for the denied charges. The record does not support that the beneficiary was notified in advance that Medicare would likely deny payment.

| Other Important Information |
| --- |

If you appeal this decision, the Administrative Law Judge (ALJ) will not consider new evidence unless you show good cause for not presenting the evidence to the QIC. This requirement does not apply to beneficiaries, unless a provider or supplier represents the beneficiary.

For information on how to appeal this decision, refer to the page titled "Important Information About Your Appeal Rights." If you need more information or have any questions, please call 1-800-Medicare (1-800-633-4227) [TTY/TDD: 1-800-486-2048] or the phone number listed on page one.

You can receive copies of statutes, regulations, policies, and/or manual instructions we used to arrive at this decision. For instructions on how to do this, please see 'Other Important Information' on the page entitled "Important Information About Your Appeal Rights." The request must be submitted in writing to this office.

## Appeal Details

| Beneficiary | A. Prosser |
|---|---|
| Provider | Novocure, Inc. |

| Claim Number | Date of Service | Procedure | Medicare QIC Decision |
|---|---|---|---|
| 18045802101000 | 01/16/18 | E0766: Elec Stim Cancer Treatment | Unfavorable |
| 18050808224000 | 02/16/18 | E0766: Elec Stim Cancer Treatment | Unfavorable |
| 18078813409000 | 03/16/18 | E0766: Elec Stim Cancer Treatment | Unfavorable |
| 18107803853000 | 04/16/18 | E0766: Elec Stim Cancer Treatment | Unfavorable |

THIS IS NOT A BILL – Keep this letter or a copy for your records.

# IMPORTANT INFORMATION ABOUT YOUR APPEAL RIGHTS

## Your Right to Appeal this Decision

If you do not agree with this decision, you may appeal the decision to an Administrative Law Judge (ALJ) at the Office of Medicare Hearings and Appeals (OMHA). The ALJ will review the decision to determine whether it is correct.

*As of January 1, 2018, you must have $160.00 in dispute to appeal to an ALJ.* A claim can be combined ("aggregated") with others to reach this amount if: (1) the other claims have also been decided or dismissed by a QIC; (2) all of the claims are listed on your request for review; (3) your request for review is filed within 60 days of receipt of all of the Qualified Independent Contractor (QIC) decisions being appealed; and (4) you explain why you believe the claims involve similar or related services.

You can find more information about your right to an ALJ review of a QIC decision at www.hhs.gov/omha or by calling 1-855-556-8475. This is a toll free call.

## How to Appeal

To exercise your right to appeal, you must file a written request for an ALJ review within **60 days** of receiving this letter. If your request for review is being filed late, you must explain why your request is being filed late. After you file an appeal, you may check your appeal's status via the OMHA website at www.hhs.gov/omha (click on Appeal Status Lookup).

When preparing your request for review, please use **Form OMHA-100**, available at:

www.hhs.gov/omha/forms/index.html

If you do not use the form, your request for review must include the following:

1. The Beneficiary's name, address, and Medicare health insurance claim number;
2. The name and address of the person appealing, if the person is not the beneficiary;
3. The representative's name and address, if any;
4. The Medicare appeal number listed on the front page of this Reconsideration notice;
5. The dates of service for the claims at issue;
6. The reasons why you disagree with the QIC's decision; and
7. A statement of any additional evidence to be submitted and the date it will be submitted.

You must send a copy of the request for ALJ review to the other parties who received a copy of this decision (for example, the beneficiary or provider/supplier). Please **do not** send a copy of your review request to the QIC that issued this decision or to the Medicare Administrative Contractor (MAC) that issued the Redetermination.

Mail your review request to (tracked mail is suggested):

**HHS OMHA Central Operations**
**200 Public Square, Suite 1260**
**Cleveland, OH 44114-2316**

OMHA processes Medicare **Beneficiary** appeals on a priority basis. If you are a Beneficiary or you represent a Beneficiary, mail your review request to:

**HHS OMHA Central Operations**
**Attn: Beneficiary Mail Stop**
**200 Public Square, Suite 1260**
**Cleveland, OH 44114-2316**

If you are a Beneficiary or represent a Beneficiary, you can also call the OMHA Beneficiary help line at 1-844-419-3358 for assistance. This is a toll free call. For more information on the OMHA Beneficiary prioritization program, including limitations for Beneficiaries represented by a provider/supplier, or a shared representative, visit the OMHA website at www.hhs.gov/omha or call the Beneficiary help line.

## Who May File an Appeal

You or someone you name to act for you (your **appointed representative**) may file an appeal. You can name a relative, friend, advocate, attorney, doctor, or someone else to act for you.

If you want someone to act for you, you and your appointed representative must sign and date a statement naming that person to act for you and send it with your request for review. Call 1-800-MEDICARE (1-800-633-4227) to learn more about how to name a representative.

## Help With Your Appeal

You can have a friend or someone else help you with your appeal. If you have any questions about payment denials or appeals, you can also contact your State Health Insurance Assistance Program (SHIP). For information on contacting your local SHIP, call 1-800-MEDICARE (1-800-633-4227).

## Other Important Information

If you want copies of statutes, regulations, and/or policies we used to arrive at this dismissal, please write to us and attach a copy of this letter, at:

**C2C Innovative Solutions, Inc.**
**A Medicare Contractor**
**P.O. Box 44163**
**Jacksonville FL 32231-4163**

If you have questions, please call us at the phone number provided on the front of this notice.

## Other Resources To Help You

1-800-MEDICARE (1-800-633-4227),
TTY/TDD: 1-800-486-2048

## If you need large print or assistance, call 1-800-633-4227

EX . 1 , P . 7

December 26, 2018

**NOVOCURE, INC.**
**195 COMMERCE WAY**
**PORTSMOUTH, NH 03801**

**Contact
Information**

If you have
questions, write or
call:

*C2C Innovative
Solutions, Inc.*
QIC DME
P.O. Box 44163
Jacksonville, FL
32231-4163

*Telephone:*
904-224-7433

Who we are:
We are a Qualified
Independent
Contractor (QIC).
Medicare has
contracted with us to
review your file and
make an independent
decision.

RE:
    Beneficiary:  A. S. Prosser
    MED ID#:  *****4857A
    Appellant:  Novocure, Inc.

Dear S. Rice:

This letter is to inform you that we received your reconsideration request on
December 17, 2018. Medicare hired C2C Innovative Solutions, Inc. to review
your appeal and make a decision.

**What we do**

We will look at your file carefully to make a decision. We will review Medicare
rules to decide your case. If the items or service was denied as not being
medically necessary, then we will ask a clinical panel to review your file.

In most cases, we will issue a decision within 60 days of your request.

**What you can do**

We ask that you submit any additional information you wish to have considered in
your appeal to our office within 14 days. Evidence that is not submitted prior to the
issuance of the reconsideration decision will not be considered at the Administrative
Law Judge (ALJ) level, or made part of the administrative record, unless the
appellant demonstrates good cause as to why the evidence was not provided prior to
the issuance of this decision. See 42 Code of Federal Regulations (CFR)
§405.966(a)(2). This requirement does not apply to beneficiaries, unless they are
represented by a physician, supplier or a provider of services. Submission of all
evidence will allow us to thoroughly address the issues of the case and provide an
accurate determination for your appeal. Due to a rapid increase in claim appeals at

the third level of Medicare appeal, a substantial backlog has resulted that has increased the average time to decision. Our review of all pertinent supporting documentation and medical evidence will help to ensure that cases are resolved as early as possible in the appeals process.

When submitting additional documentation, please ensure the Medicare Appeals Number referenced in the upper right corner on this letter is included on all information you would like to submit and fax it to (904) 224-2760. You can also mail this information to:

> QIC DME
> P.O. Box 44163
> Jacksonville, FL 32231-4163

You do not have to call or write to us to find out our decision. We will review your file and send you our decision.

**How to get more information:**

If you want a status update on your appeal, you can contact:
Beneficiaries: call 1-800-MEDICARE (1-800-633-4227)
Providers: check www.Q2A.com

For questions about your appeal other than status, please call <u>904-224-7433.</u>

Sincerely,

Brian Stotler,
DME QIC-C2C Innovative Solutions, Inc.
Medicare Contractor

## Appeal Details

| Appellant | Novocure, Inc. - |
| --- | --- |
| AC | CGS Administrators(17013) |

| Redetermination Number | Beneficiary | Date of Service |
| --- | --- | --- |
| 18157000135 | *****4857A<br>A. S. Prosser | 01/16/2018 |
| 18157000135 | *****4857A<br>A. S. Prosser | 02/16/2018 |
| 18157000135 | *****4857A<br>A. S. Prosser | 03/16/2018 |
| 18157000135 | *****4857A<br>A. S. Prosser | 04/16/2018 |

THIS IS NOT A BILL – Keep this letter or a copy for your records.

2019212X02684

862198 C2C DIAP A8888868327 12-13-2018

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

## MEDICARE RECONSIDERATION REQUEST FORM — 2ND LEVEL OF APPEAL

1. Beneficiary's name: Anniken S. Prosser

2. Medicare number: 389044857A

3. Item or service you wish to appeal: E0766 KF RR

**Received**
**C2C Mailroom**

**DEC 17 2018**

**QA# MR115**
**C2C Solutions, Inc.**

4. Date the service or item was received: 01/16/2018, 02/16/2018, 03/16/2018, 04/16/2018

5. Date of the redetermination notice (please include a copy of the notice with this request):
   *(If you received your redetermination notice more than 180 days ago, include your reason for the late filing.)*

   July 10, 2018

   5a. Name of the Medicare contractor that made the redetermination (not required if copy of notice attached):

   5b. Does this appeal involve an overpayment? ☐ Yes  ☒ No
   *(for providers and suppliers only)*

6. I do not agree with the redetermination decision on my claim because:

   This is a FDA approved treatment for recurrent glioblastoma multiforme. I have attached the physician order, FDA approval letter, NCCN Guidelines, a clinical overview of the device and the patient's medical record.

7. Additional information Medicare should consider:

   Novocure is an accredited CMS DMEPOS supplier by the Accreditation Commission for Healthcare and Novocure is a CMS supplier for Durable Medical Equipment as of March 1, 2013 completed the Medicare application process and received their PTAN on 3/1/13. On 7/26/13, Novocure received a letter from CMS stating the NovoTTF-100A System falls within the DME benefit category. Please see attached.

8. ☒ I have evidence to submit. Please attach the evidence to this form or attach a statement explaining what you intend to submit and when you intend to submit it. You may also submit additional evidence at a later time, but all evidence must be received prior to the issuance of the reconsideration.

   ☐ I do not have evidence to submit.

9. Person appealing: ☐ Beneficiary  ☒ Provider/Supplier  ☐ Representative

10. Name, address, and telephone number of person appealing: Sandy Rice (603) 617-4768

    195 Commerce Way Portsmouth, NH 03801

11. Signature of person appealing: *Sandy Rice*

12. Date signed: 12-11-2018

**PRIVACY ACT STATEMENT:** The legal authority for the collection of information on this form is authorized by section 1869 (a)(3) of the Social Security Act. The information provided will be used to further document your appeal. Submission of the information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your appeal. Information you furnish on this form may be disclosed by the Centers for Medicare and Medicaid Services to another person or government agency only with respect to the Medicare Program and to comply with Federal laws requiring or permitting the disclosure of information or the exchange of information between the Department of Health and Human Services and other agencies. Additional information about these disclosures can be found in the system of records notice for system no. 09-70-0566, as amended, available at 71 Fed Reg 54489 (2006) or at http://www.cms.gov/PrivacyActSystemofRecords/downloads/0566.pdf

Form CMS-20033 (12/10)

**RECONSIDERATION REQUEST FORM** Redetermination Number: 18157000135
Contractor #: 17013, CGS, DME MAC Jurisdiction B

**Directions:** If you wish to appeal this decision, please fill out the information below and mail this form to the address below. At a minimum, you must complete/include information for items 1, 2a, 6, 7, 11, & 12, but to help us serve you better, please include a copy of the redetermination notice with your request.

C2C Solutions, Inc.
Attn: DME Qualified Independent Contractor (QIC)
P. O. Box 44013
Jacksonville, FL 32231-4013

1. Name of Beneficiary: _Anniken S. Prosser_

2a. Medicare Number: _389044857A_

2b. Claim Number (ICN/DCN, if available): _18157000135_

3. Provider/Supplier Name and Number (PTAN): _Novocure 6723630001_

4. Person Appealing ☐ Beneficiary ☑ Provider ☐ Representative of Service

5. Address of the Person Appealing: _195 Commerce Way, Portsmouth, NH_

5a. Telephone Number of the Person Appealing: _603-617-4768_

5b. Email Address of the Person Appealing: _SRice@novocure.com_

6. Item or service you wish to appeal: _E0766 KF RR_

7. Date of Service: From _1/16/2018_ To _4/16/2018_

8. Does this appeal involve an overpayment? ☐ Yes ☑ No
   *Please include a copy of the demand letter with your request.*

9. Why do you disagree? Or what are your reasons for your appeal? (Attach additional pages, if necessary.) _Please see attached_

10. You may also include any supporting material to assist your appeal. Examples of supporting materials include:

☑ Medical Records  ☑ Office Records/Progress Notes  ☑ Copy of the Claim

☑ Treatment Plan  ☐ Certificate of Medical Necessity

11. Printed Name of Person Appealing: _Sandy Rice_

12. Signature of Person Appealing: _Sandy Rice_
    Date: _12-11-2018_

Contractor Number: 17013, CGS, DME MAC Jurisdiction B

July 10, 2018



Novocure Inc
195 Commerce Way
Portsmouth, NH 03801-9999

Beneficiary Name: Anniken S. Prosser
HICN: XXX-XX-4857A
Appeal Number: 18157000135
Date of Service: January 16, 2018 through April 16, 2018
Type of Service: Tumor Treatment Field Therapy (TTFT)
Supplier: Novocure Inc

Dear Novocure Inc:

Please note that if you did not request this appeal, you are receiving this letter as a copy.

## DECISION
This letter is to inform you of an **UNFAVORABLE** Medicare Appeal decision. Based on a new and independent review of the claims at issue, we find the electrical stimulation device is not covered by Medicare. The beneficiary is not responsible for payment. If you disagree with this decision, you may appeal to the Qualified Independent Contractor (QIC), C2C Innovative Solutions, Inc., as explained in the Future Appeal Rights section of this letter.

## SUMMARY OF FACTS
Claims were submitted for the electrical stimulation device for dates of service January 16, 2018 through April 16, 2018. The claims were initially denied on February 20, 2018, because Medicare guidelines were not met. A redetermination request was received on June 6, 2018. The redetermination case included the following documentation: medical and administrative records.

## APPLICABLE MEDICARE GUIDELINES AND RULES
The Medicare coverage policies are set forth below for the item or service in question. These rules are available at www.cgsmedicare.com.

- CMS Medicare Coverage Database, Local Coverage Determination (LCD) L34823-Tumor Treatment Field Therapy (TTFT)
- Social Security Act, Section 1879, Limitation on Liability

## EXPLANATION OF DECISION

18157000135

4650

The CMS Medicare Coverage Database, Local Coverage Determination (LCD) L34823-Tumor Treatment Field Therapy (TTFT) states that for any item to be covered by Medicare the items or services must: 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. It is expected that the beneficiary's medical records will reflect the need for the care provided. The beneficiary's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request. Our review finds the following criteria have not been met:

- Tumor treatment field therapy (E0766) or therapy supplies (A4555) is not covered by Medicare as the currently published studies in the medical literature do not clearly document the effectiveness of this device. (LCD L34823- Tumor Treatment Field Therapy (TTFT), Coverage Indications, Limitations, and/or Medical Necessity)

A review of the documentation submitted with the redetermination request has been completed. Due to the Medicare guidelines discussed above, a favorable decision cannot be made at this time.

**WHO IS RESPONSIBLE FOR THE BILL**
After determining that the item or service will not be covered by Medicare, we must determine who is financially liable for the denied item or service. When an item or service is denied under §1862(a)(1), §1862(a)(9), or §1879(g) of the Social Security Act (the Act), we must determine if the beneficiary and the provider or supplier either knew or could reasonably be expected to know that the item or service would not be covered. This is known as the limitation on liability provision of §1879 of the Act.

If the beneficiary was informed by their provider or supplier in writing in advance of receiving the item/service that Medicare may not make payment (through receipt of an Advance Beneficiary Notice of Noncoverage (ABN)), the beneficiary may be responsible for the cost of the denied item or service. If the provider or supplier knew or could reasonably be expected to know the item or service would not be covered, but the beneficiary did not have such knowledge, then the provider or supplier may be responsible for the cost of the denied item or service.

In addition, we have determined that the supplier either knew or could reasonably be expected to know that the service/item would not be covered. After reviewing the claims, we have determined that the services were not reasonable and necessary. We have also determined the beneficiary could not have been expected to know these services were non-covered. Prior to furnishing this service you did not obtain a valid signed Advance Beneficiary Notice of Noncoverage notifying the beneficiary that Medicare may not pay. Based on the information contained in the CMS Medicare Coverage Database, Local Coverage Determination (LCD) L34823-Tumor Treatment Field Therapy (TTFT), you could have been expected to know these services were non-covered. Therefore, you are liable for full charges for the services.

You may not bill the beneficiary for the cost of the denied item or service, and must refund any monies collected from the beneficiary.

Beneficiaries who have incurred a charge for this service may be due a refund. In order to receive reimbursement, the beneficiary must submit the following to this office: (1) a copy of this notice,

18157000135

(2) the supplier's invoice, and (3) a receipt or other documents indicating the beneficiary has made payment.

**FUTURE APPEALS RIGHTS**

If you disagree with this decision, you must request a reconsideration, in writing, within 180 days of receiving this letter. Your reconsideration request must include a copy of this letter along with the beneficiary's name, Medicare number, item or service in question, date of service, name of person appealing, signature, and date of signature. You may request an appeal by using the form enclosed with this letter. A copy of the reconsideration request form is also located at www.cgsmedicare.com or at www.C2Cinc.com. Reconsideration requests must be mailed to:

<div align="center">

C2C Solutions, Inc.
Attn: DME Qualified Independent Contractor (QIC)
P. O. Box 44013
Jacksonville, FL 32231-4013

</div>

All evidence should be submitted with the reconsideration request. As explained in the Explanation of Decision section above, your reconsideration request should include documentation to support payment for the item billed. All evidence must be presented before the reconsideration decision is issued. You will not be allowed to submit any new evidence to the Administrative Law Judge or the Medicare Appeals Council unless you can demonstrate good cause for not submitting the evidence to the QIC during the reconsideration process.

**NOTE:** You do not need to resubmit documentation that was submitted as part of the redetermination. This information will be forwarded to the QIC as part of the case file utilized in the reconsideration process.

If you need more information or have any questions, please visit our Web site at www.cgsmedicare.com or call 1-866-590-6727.

Sincerely,

CGS, DME MAC Jurisdiction B
Medicare Appeals Department

cc:     Anniken S. Prosser

18157000135

**RECONSIDERATION REQUEST FORM**   **Redetermination Number: 18157000135**
**Contractor #:** 17013, CGS, DME MAC Jurisdiction B

**Directions:** If you wish to appeal this decision, please fill out the information below and mail this form to the address below. At a minimum, you must complete/include information for items 1, 2a, 6, 7, 11, & 12, but to help us serve you better, please include a copy of the redetermination notice with your request.

C2C Solutions, Inc.
Attn: DME Qualified Independent Contractor (QIC)
P. O. Box 44013
Jacksonville, FL 32231-4013

1.   Name of Beneficiary: _____

2a.  Medicare Number: _____

2b.  Claim Number (ICN/DCN, if available): _____

3.   Provider/Supplier Name and Number (PTAN):_____

4.   Person Appealing   ☐ Beneficiary   ☐ Provider   ☐ Representative of Service

5.   Address of the Person Appealing: _____

5a.  Telephone Number of the Person Appealing: _____

5b.  Email Address of the Person Appealing: _____

6.   Item or service you wish to appeal: _____

7.   Date of Service:  From _____   To _____

8.   Does this appeal involve an overpayment?   ☐ Yes   ☐ No
        *Please include a copy of the demand letter with your request.*

9.   Why do you disagree? Or what are your reasons for your appeal? (Attach additional pages, if necessary.) _____
_____

10.  You may also include any supporting material to assist your appeal. Examples of supporting materials include:

☐ Medical Records   ☐ Office Records/Progress Notes   ☐ Copy of the Claim

☐ Treatment Plan   ☐ Certificate of Medical Necessity

11.  Printed Name of Person Appealing: _____

12.  Signature of Person Appealing: _____
     Date:_____
Contractor Number: 17013, CGS, DME MAC Jurisdiction B

18157000135

CGS
Jurisdiction B
P.O. Box 20007
Nashville, TN 37202

**MEDICARE DME**



July 10, 2018



Anniken Prosser
W2973 Farmstead Drive
Appleton, WI 54915-8120

Attention:

Enclosed is a copy of a letter we recently sent to the addressee named. If you have any questions about this letter, please contact us. If you are a Medicare beneficiary or representative, please call 1-800-Medicare (1-800-633-4227). If you are a supplier, please call 1-866-590-6727.

Sincerely

Medicare Administration

18157000135

EOF 5320 (02/16)


Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 423 of 631   Document 11-5
4654
EX. 1 P. 17

# MEDICARE DME Redetermination Request Form

## Supplier Information

Supplier Name    Novocure INC

PTAN    6723630001      NPI    1255617569

Tax ID    205063536

Address    195 Commerce Way

City    Portsmouth

State    NH      Zip Code    03801

Phone Number    (603) 617-4768

___ Jurisdiction A - Noridian Healthcare Solutions

_X_ Jurisdiction B - CGS

___ Jurisdiction C - CGS

___ Jurisdiction D - Noridian Healthcare Solutions

## Beneficiary Information

Patient Name    Anniken S. Prosser

Medicare Number    389044857A

State    Wisconsin

Phone Number    (920)257-3574

---

Requestor's Name/Supplier Contact Name    Sandy Rice

Requestor's Signature (required)    *Sandy Rice*      Date   06 - 05 - 2018

Overpayment Appeal    ___ Yes If yes, who requested overpayment:    ___ Medical Review    ___ ZPIC/PSC    ___ CERT    ___ Recovery Auditor

| Date of Service | HCPCS & Modifiers | CCN | Date of Initial Determination |
|---|---|---|---|
| 01/16/2018 | E0766 KF RR | 18045802101000 | 02/20/2018 |
| 02/16/2018 | E0766 KF RR | 18050808224000 | 02/23/2018 |
| 03/16/2018 | E0766 KF RR | 18078813409000 | 03/23/2018 |
| 04/16/2018 | E0766 KF RR | 18107803853000 | 04/23/2018 |
|  |  |  |  |
|  |  |  |  |

Suggested Documentation Check List:    _X_ Medicare Remittance Advice    ___ ABN    _X_ CMN/DIF/Physician's Written Order    _X_ Medical Documentation

Reasons/Rationale    - The submission of this redetermination is in regards to the denial code received: (CO-50)-"These are non-covered services because this is not deemed a 'medical necessity' by the payer." Novocure has been FDA approved since April 2011. Please see attached documentation for review.

---

**Fax Numbers**
Noridian Healthcare Solutions - JA ......... 1-701-277-7855
CGS Administrators, LLC - JB ...... ..... 1-615-660-5976
CGS Administrators, LLC - JC ....... ..... 1-615-782-4630
Noridian Healthcare Solutions - JD ...... ..... 1-701-277-7886

Page 1 of 1
April 12, 2016.
© 2016 Copyright.

992116 C2C DIAR_A0000969327 12-19-2018

# novocure

# Invoice

Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801

DATE. JANUARY 16, 2018
INVOICE # [102]

Bill To:
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ship To:
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ordered By: Jennifer Connelly, MD

| ITEM # | DESCRIPTION | QTY | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| TFH9000 | NOVO-TTF 100A PLUS TRANSDUCERS | 1 | $21,000 | $21,000 |

| | |
|---|---|
| SUBTOTAL | $21,000 |
| SALES TAX | 0 |
| TOTAL | $21,000 Per Month |

PLEASE REMIT TO: Novocure Inc., 195 Commerce Way, Portsmouth, NH 03801
**Make all checks payable to Novocure Inc.**

If you have any questions concerning this invoice, contact Justin Kelly, RN @ 603-501-4299.

201 921 2 X02693

982117 C2C DIAR_A0000003327 12-19-2018



# Invoice

Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801

DATE· FEBRUARY 16, 2018
INVOICE # [103]

**Bill To:**
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

**Ship To:**
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ordered By: Jennifer Connelly, MD

| ITEM # | DESCRIPTION | QTY | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| TFH9000 | NOVO-TTF 100A PLUS TRANSDUCERS | 1 | $21,000 | $21,000 |

| | | |
|---|---|---|
| SUBTOTAL | $21,000 |
| SALES TAX | 0 |
| TOTAL | **$21,000 Per Month** |

**PLEASE REMIT TO: Novocure Inc., 195 Commerce Way, Portsmouth, NH 03801**
**Make all checks payable to Novocure Inc.**

If you have any questions concerning this invoice, contact Justin Kelly, RN @ 603-501-4299.

2 o 1 9 2 1 2 X 0 2 6 9 4

902118 C2C DIAR_A0000069327 12-19-2018



# Invoice

Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801

DATE: MARCH 16, 2018
INVOICE # [104]

**Bill To:**
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

**Ship To:**
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ordered By: Jennifer Connelly, MD

| ITEM # | DESCRIPTION | QTY | UNIT PRICE | LINE TOTAL |
|--------|-------------|-----|------------|------------|
| TFH9000 | NOVO-TTF 100A PLUS TRANSDUCERS | 1 | $21,000 | $21,000 |

| | |
|---|---|
| SUBTOTAL | $21,000 |
| SALES TAX | 0 |
| TOTAL | **$21,000 Per Month** |

**PLEASE REMIT TO: Novocure Inc., 195 Commerce Way, Portsmouth, NH 03801**
**Make all checks payable to Novocure Inc.**

If you have any questions concerning this invoice, contact Justin Kelly, RN @ 603-501-4299.

261921202695

002119 C2C DIAR_A0000069327 12-19-2018



# Invoice

Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801

DATE· APRIL 16, 2018
INVOICE # [105]

Bill To:
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ship To:
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ordered By: Jennifer Connelly, MD

| ITEM # | DESCRIPTION | QTY | UNIT PRICE | LINE TOTAL |
|--------|-------------|-----|-----------|-----------|
| TFH9000 | NOVO-TTF 100A PLUS TRANSDUCERS | 1 | $21,000 | $21,000 |

|  |  |
|--|--|
| SUBTOTAL | $21,000 |
| SALES TAX | 0 |
| TOTAL | $21,000 Per Month |

**PLEASE REMIT TO: Novocure Inc., 195 Commerce Way, Portsmouth, NH 03801**
**Make all checks payable to Novocure Inc.**

If you have any questions concerning this invoice, contact Justin Kelly, RN @ 603-501-4299.

2 ot 9 2 1 2 X0 2 6 9 6

Anniken S. Prosser
W2973 Farmstead Dr.
Appleton, WI 54915

October 24, 2017

Attn: Medicare Appeals
Re: Denial of My Cancer Treatment
Policy#: 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-A

To whom it may concern:

This letter is in response to Medicare's denial of my physician's prior authorization request for coverage of Tumor Treatment Fields therapy (TTF) using Optune for my glioblastoma.

I am submitting this letter as an urgent member grievance so that I may obtain approval of my badly needed, FDA APPROVED, treatment for my cancer.

According to the letter we received from Medicare, the request for coverage for services was denied based upon the following reason: experimental.

First of all, I have to strongly disagree with this rationale. This treatment has been approved by the **United States Food and Drug Administration** for treatment of recurrent glioblastoma. Furthermore, my physician feels that this treatment is my best hope for slowing down the progression of my disease. I find it unconscionable that Medicare is second guessing the treatment decisions of my physician, Dr. Jennifer Connelly, who is one of the country's leading experts on this treatment.

TTF is my **best option** to treat this fatal disease. I have submitted the attached clinical information from my physicians as well as peer reviewed literature to assist you in considering approval of this treatment.

This procedure has been covered by many local and national insurance companies including: Medicare, Aetna (**Medical Policy Bulletin 0827**), Humana, Health Net (**Medical Policy Bulletin NMP523**), Health Partners (**Medical Policy Bulletin E003-01**), United Healthcare, Cigna (HMO and PPO), Anthem Blue Cross Blue Shield, BCBS Texas/Illinois/New Mexico/Oklahoma, Blue Cross Blue shield of Louisiana, Blue Cross Blue Shield of Michigan, HealthLink, Kaiser Permanente, Harvard Pilgrim Health Care, GHI, Horizon Blue Cross Blue Shield of New Jersey, NYS Empire Plan, Network Health Plan, and Blue Cross Blue Shield of Florida. This is only a representative sampling of payers covering Optune for this cancer indicating that there is enough "proven" evidence to warrant coverage for Optune in treating glioblastoma. **I am demanding that my clinical situation be reviewed by a board certified physician specializing in neuro-**

201921 2X02697

oncology or neurosurgery who has specific expertise in treating patients with glioblastoma with TTF.

I am a 34 year old woman with glioblastoma. I like drawing, writing lyrics and singing for the bands Antidote For Sorrow and Resisting the Solace. I also enjoy spending time with family and friends. I married Barry Prosser in September 2010. We have a son, Liam; he will be 4 years old on January 31st. I am currently not working. I enjoy vacations at the cottage.

I was diagnosed at the ER in February 2016. I had surgery at St. Elizabeth Hospital in Appleton Wisconsin and it was confirmed that I had GBM. I have had the following treatments; surgery, radiation, chemotherapy and Optune. I am off chemotherapy now, possibly may have to do more in the future still on Optune. I experienced the following symptoms; passing out, bad headaches, dizziness, throwing up, but these have been better with treatments and Optune. I have had fewer side effects with Optune and it is helping me so much. I am able to get up each day and be with my husband and son because of Optune. In my own words, I believe Optune is helping me very much; I am smiling because it's helping me keep the pain away!

After discussing treatment options with Dr. Jennifer Connelly, my doctor decided to prescribe Optune. Given the aggressive nature, and extremely limited treatment options of my disease, my doctor recommended I receive coverage for Optune, as it is the best FDA approved option at this time for treating my glioblastoma. I began utilizing TTFields on June 16, 2016.

**Alternating electric field therapy (Optune) + adjuvant temozolomide is now an NCCN Category 2A recommendation following postoperative standard brain radiation therapy with concurrent temozolomide.**

I am aware that my cancer is considered an "orphan disease," by the National Institutes of Health due to the rarity of people who get glioblastoma. Despite these interventions I have received to date, TTF therapy is my best hope to control my brain tumor.

I cannot emphasize enough the urgency and importance of this matter.

Should you have any additional questions regarding my condition or the proposed treatment, please feel free to contact me at (920)-257-3574.

I also give consent for Novocure to work on the appeal on my behalf.

Thank you for your timely consideration and hopeful approval of this case.

Sincerely,

Anniken S. Prosser

Attachments

This fax contains sensitive information including PHI or PII information

# Redetermination Case File Request/Transmittal DME QIC Form

| 1. Joint File Request Type | X QIC Request | Misfiled | Misrouted |
|---|---|---|---|

☐ Supplemental File Request/Basis for Request

| 2. QIC Reconsideration # | 1-8175102470 | Reconsideration Request Date | December 17, 2018 |
|---|---|---|---|

| 3. AC Name / Number | CGS Administrators(17013) |
|---|---|

| 4. Claim Type | ☐ Part B ☒ DME | Redetermination # | :Multiple |
|---|---|---|---|

| 4a. Overpayments | ☐ RAC ☐ AC/MAC MR Probe | ☐ PSC/ZPIC ☐ Overpayment-other |
|---|---|---|

| 5. * Beneficiary Name Multiple | Bene HIC# Multiple | Provider # | Redet. Date Multiple | DOS Multiple |
|---|---|---|---|---|

| Claim # or CPT/HCPCS Codes at issue: | Multiple |
|---|---|

* Use Redetermination Request Continuation Sheet for multiple beneficiaries

| AC Acknowledgement: Return to Name and QIC Fax # | LaCon Williams |
|---|---|
| AC Receipt Date & Signature | |

**Exhibits List:** Label exhibits with the letters provided below, and place them in order by letter. Refer to Exhibit List Quick Guide in JOA for detailed description of exhibits.

| Procedural Documents | ☐ A. Claims and System Screens<br>☐ B. MSN or RA<br>☒ C. Redetermination Request | ☒ D. Redetermination Notice<br>☐ E. Appointment of Rep.<br>☐ F. Other |
|---|---|---|
| Evidentiary Documents | ☒ G. Medical Records<br>☐ H. Referral to/from Contractor Med. Staff<br>☐ I. Contractor Medical Policies<br>☐ L. Other | ☒ J. Regs/CMS Rulings/NCDs, etc.<br>☐ K. Overpayment Extrapolation Materials |

**Comments (discrepancies, no redetermination, other comments):**
☐ No redetermination ☐ Claim fully paid ☐ Incorrect HICN ☐ Other _____
☐ Complete case previously sent to _____ (QIC) on (date) . No additional appellant information.
☐ RAC ☐ PSC/ZPIC ☐ AC/MAC MR Probe ☐ Overpayment ☐ CERT

**Interest in ALJ Participation:** ☐ Yes ☐ No
**Position Paper Enclosed:** ☐ Yes ☐ No

| Form Completed By | |
|---|---|
| Name of Contact Person | Contact Phone # |
| Date Sent | # of Boxes |
| QIC Acknowledgement – AC Fax # | |
| QIC Receipt Date & Signature | |

QIC Case File Transmittal Form

Revision Date 11/30/2011

**Redetermination Request Section 5**

| QIC Recon # | Beneficiary Name / HIC | Claim # | CPT/HCPCS | Dates of Service | Redeter Date | AC Redeter # |
|---|---|---|---|---|---|---|
| 1-8175102470 | Anniken S. Prosser 389044857A | 1804580210100 | E0766 | 01/16/2018 | 07/10/18 | 18157000135 |
| 1-8175102470 | Anniken S. Prosser 389044857A | 1805080822400 | E0766 | 02/16/2018 | 07/10/18 | 18157000135 |
| 1-8175102470 | Anniken S. Prosser 389044857A | 1807881340900 | E0766 | 03/16/2018 | 07/10/18 | 18157000135 |
| 1-8175102470 | Anniken S. Prosser 389044857A | 1810780385300 | E0766 | 04/16/2018 | 07/10/18 | 18157000135 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

QIC Case File Transmittal Form

Revision Date 11/30/2011

01/05/06

Version 4

4663

EX. 1 P. 26

# NON

# PROBABLES /

# DUPLICATES

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 433 of 631   Document 11-5   4664

# Change

# Healthcare

ERA Check 1 of 1

| EFT/Check #: 09180510044 | EFT/Check Date: 02/20/2018 | EFT/Check Amount: $ .00 | Payment Type: NON |
|---|---|---|---|
| Payer Name: CGS - DME MAC JURISDICTION B | | CH Payer Id: MR031 | CH Process Date: 02/21/2018 |
| Provider Name: NOVOCURE INC | Tax Id: 205063536 | NPI: 1255617569 | Other Payee Id: |
| Address: 195 COMMERCE WAY, PORTSMOUTH NH 038019999 | | Addl. Payee Id: 1255017569 | Total PLB Adj Amt: 21000 |

| Service Dates: 01/16/2018 | Processing Status: 4 - Denied | | | |
|---|---|---|---|---|
| Payer Claim # / Medicare ICN #: 18045802101000 | CH Claim Trace Id: 044209775763669 | | Place Of Service: | Total Adjustment Amount: $.00 |
| Charge: $ 21,000.00 | Paid: $ .00 | | Patient Responsibility $ - | Deductible: $ - |
| Co-Insurance: $ - | Co-Pay: $ - | | Other/Crossover Insurance: | |

| Remark Codes: | MA13 | Alert: You may be subject to penalties if you bill the patient for amounts not reported with the PR (patient responsibility) group code. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 4/1/07) |
|---|---|---|
| | MA01 | Alert: If you do not agree with what we approved for these services, you may appeal our decision. To make sure that we are fair to you, we require another individual that did not process your initial claim to conduct the appeal. However, in order to be eligible for an appeal, you must write to us within 120 days of the date you received this notice, unless you have a good reason for being late. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 10/31/02, 6/30/03, 8/1/05, 4/1/07) |
| | M25 | The information furnished does not substantiate the need for this level of service. If you believe the service should have been fully covered as billed, or if you did not know and could not reasonably have been expected to know that we would not pay for this level of service, or if you notified the patient in writing in advance that we would not pay for this level of service and he/she agreed in writing to pay, ask us to review your claim within 120 days of the date of this notice. If you do not request an appeal, we will, upon application from the patient, reimburse him/her for the amount you have collected from him/her in excess of any deductible and coinsurance amounts. We will recover the reimbursement from you as an overpayment. Start: 01/01/1997 | Last Modified: 11/01/2010 Notes: (Modified 10/1/02, 6/30/03, 8/1/05, 11/5/07, 11/1/10) |
| | N115 | This decision was based on a Local Coverage Determination (LCD). An LCD provides a guide to assist in determining whether a particular item or service is covered. A copy of this policy is available at www.cms.gov/mcd, or if you do not have web access, you may contact the contractor to request a copy of the LCD. Start: 05/30/2002 | Last Modified: 07/01/2010 Notes: (Modified 4/1/04, 7/1/10) |

## PATIENT - SUBSCRIBER INFORMATION

| Patient Name: PROSSER, ANNIKEN S | Patient Id: 389044857A | Patient Control Number: 0001012478 |
|---|---|---|
| Corrected Patient/Subscriber Name: | | |
| Subscriber Name: | Subscriber Id: | Group/Policy Id: |
| Other Subscr. Name: | Other Subscriber Id: | Group/Policy Id: |

## REMITTANCE PROCESSING INFORMATION - SERVICE LINE DETAIL

| Svc Line # | Service Date | Proc Code - Units / Modifiers | Charge $ | Allowed $ | Not Allowed $ | Deductible $ | Co- Ins $ | Co- Pay $ | Late Filing Red. $ | Paid $ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01/16/2018 | E0766 - 0 / KF, RR | 21,000.00 | .00 | .00 | - | - | - | - | - |

## SUPPLEMENTAL INFORMATION/ADJUSTMENT INFORMATION - SERVICE LINES

| Svc Line # | Core Business Scenario | Supp/Adj Group Code | Description | Supp/Adj Reason Code | Description | Amount $ |
|---|---|---|---|---|---|---|
| 1 | 3 | CO | Contractual Obligations | 50 | These are non-covered services because this is not deemed a 'medical necessity' by the payer. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. Start: 01/01/1995 | Last Modified: 07/01/2017 | 21,000.00 |

| Claim 1 of 1 | Page 1 of 1 |
|---|---|

2 u 1 9 2 1 2 X 0 2 7 0 2

# Change Healthcare

ERA Check 1 of 1

| EFT/Check #: 09180540034 | EFT/Check Date: 02/23/2018 | EFT/Check Amount: $ .00 | Payment Type: NON |
| Payer Name: CGS - DME MAC JURISDICTION B | | CH Payer Id: MR031 | CH Process Date: 02/26/2018 |
| Provider Name: NOVOCURE INC | Tax Id: 205063536 | NPI: 1255617569 | Other Payee Id: |
| Address: 195 COMMERCE WAY, PORTSMOUTH NH 038019999 | | Addl. Payee Id: 1255617569 | Total PLB Adj Amt: 21000 |

| Service Dates: 02/16/2018 | Processing Status: 4 - Denied | | | |
| Payer Claim # / Medicare ICN #: 1805008224000 | CH Claim Trace Id: 047211576398656 | Place Of Service: | Total Adjustment Amount: $ .00 |
| Charge: $ 21,000.00 | Paid: $ .00 | Patient Responsibility: $ - | Deductible: $ - |
| Co-Insurance: $ - | Co-Pay: $ - | Other/Crossover Insurance: | |

| Remark Codes: | MA13 | Alert: You may be subject to penalties if you bill the patient for amounts not reported with the PR (patient responsibility) group code. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 4/1/07) |
| | MA01 | Alert: If you do not agree with what we approved for these services, you may appeal our decision. To make sure that we are fair to you, we require another individual that did not process your initial claim to conduct the appeal. However, in order to be eligible for an appeal, you must write to us within 120 days of the date you received this notice, unless you have a good reason for being late. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 10/31/02, 6/30/03, 8/1/05, 4/1/07) |
| | M25 | The information furnished does not substantiate the need for this level of service. If you believe the service should have been fully covered as billed, or if you did not know and could not reasonably have been expected to know that we would not pay for this level of service, or if you notified the patient in writing in advance that we would not pay for this level of service and he/she agreed in writing to pay, ask us to review your claim within 120 days of the date of this notice. If you do not request an appeal, we will, upon application from the patient, reimburse him/her for the amount you have collected from him/her in excess of any deductible and coinsurance amounts. We will recover the reimbursement from you as an overpayment. Start: 01/01/1997 | Last Modified: 11/01/2010 Notes: (Modified 10/1/02, 6/30/03, 8/1/05, 11/5/07, 11/1/10) |
| | N115 | This decision was based on a Local Coverage Determination (LCD). An LCD provides a guide to assist in determining whether a particular item or service is covered. A copy of this policy is available at www.cms.gov/mcd, or if you do not have web access, you may contact the contractor to request a copy of the LCD. Start: 05/30/2002 | Last Modified: 07/01/2010 Notes: (Modified 4/1/04, 7/1/10) |

## PATIENT - SUBSCRIBER INFORMATION

| Patient Name: PROSSER, ANNIKEN S | Patient Id: 389044857A | Patient Control Number: 0001012479 |
| Corrected Patient/Subscriber Name: | | |
| Subscriber Name: | Subscriber Id: | Group/Policy Id: |
| Other Subscr. Name: | Other Subscriber Id: | Group/Policy Id: |

## REMITTANCE PROCESSING INFORMATION - SERVICE LINE DETAIL

| Svc Line # | Service Date | Proc Code - Units / Modifiers | Charge $ | Allowed $ | Not Allowed $ | Deductible $ | Co-Ins $ | Co-Pay $ | Late Filing Red. $ | Paid $ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 02/16/2018 | E0766 - 0 / KF, RR | 21,000.00 | .00 | .00 | - | - | - | - | - |

## SUPPLEMENTAL INFORMATION/ADJUSTMENT INFORMATION - SERVICE LINES

| Svc Line # | Core Business Scenario | Supp/Adj Group Code | Description | Supp/Adj Reason Code | Description | Amount $ |
|---|---|---|---|---|---|---|
| 1 | 3 | CO | Contractual Obligations | 50 | These are non-covered services because this is not deemed a 'medical necessity' by the payer. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. Start: 01/01/1995 | Last Modified: 07/01/2017 | 21,000.00 |

| Claim 1 of 1 | | Page 1 of 1 |

# Change Healthcare

ERA Check 1 of 1

| EFT/Check #:<br>09180820023 | EFT/Check Date:<br>03/23/2018 | EFT/Check<br>Amount: $ .00 | Payment Type:<br>NON |
|---|---|---|---|
| Payer Name: .CGS - DME MAC<br>JURISDICTION B | | CH Payer Id:<br>MR031 | CH Process Date:<br>03/26/2018 |
| Provider Name:<br>NOVOCURE INC | Tax Id:<br>205063536 | NPI: 1255617569 | Other Payee Id: |
| Address: 195 COMMERCE WAY,<br>PORTSMOUTH NH 038019999 | | Addl. Payee Id:<br>1255617569 | Total PLB Adj Amt:<br>21000 |

| Service Dates: 03/16/2018 | Processing Status: 4 – Denied | | |
|---|---|---|---|
| Payer Claim # / Medicare ICN #:<br>18078813409000 | CH Claim Trace Id:<br>075224952936657 | Place Of Service: | Total Adjustment<br>Amount: $ .00 |
| Charge: $ 21,000.00 | Paid: $ .00 | Patient Responsibility:<br>$ - | Deductible: $ - |
| Co-Insurance: $ - | Co-Pay: $ - | Other/Crossover Insurance: | |

| Remark<br>Codes: | MA13 | Alert: You may be subject to penalties if you bill the patient for amounts not reported with the PR (patient responsibility) group code. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 4/1/07) |
|---|---|---|
| | MA01 | Alert: If you do not agree with what we approved for these services, you may appeal our decision. To make sure that we are fair to you, we require another individual that did not process your initial claim to conduct the appeal. However, in order to be eligible for an appeal, you must write to us within 120 days of the date you received this notice, unless you have a good reason for being late. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 10/31/02, 6/30/03, 8/1/05, 4/1/07) |
| | M25 | The information furnished does not substantiate the need for this level of service. If you believe the service should have been fully covered as billed, or if you did not know and could not reasonably have been expected to know that we would not pay for this level of service, or if you notified the patient in writing in advance that we would not pay for this level of service and he/she agreed in writing to pay, ask us to review your claim within 120 days of the date of this notice. If you do not request an appeal, we will, upon application from the patient, reimburse him/her for the amount you have collected from him/her in excess of any deductible and coinsurance amounts. We will recover the reimbursement from you as an overpayment. Start: 01/01/1997 | Last Modified: 11/01/2010 Notes: (Modified 10/1/02, 6/30/03, 8/1/05, 11/5/07, 11/1/10) |
| | N115 | This decision was based on a Local Coverage Determination (LCD). An LCD provides a guide to assist in determining whether a particular item or service is covered. A copy of this policy is available at www.cms.gov/mcd, or if you do not have web access, you may contact the contractor to request a copy of the LCD. Start: 05/30/2002 | Last Modified: 07/01/2010 Notes: (Modified 4/1/04, 7/1/10) |

## PATIENT - SUBSCRIBER INFORMATION

| Patient Name: PROSSER, ANNIKEN S | | Patient Id: 389044857A | Patient Control Number: 0001012479 |
|---|---|---|---|
| Corrected Patient/Subscriber Name: | | | |
| Subscriber Name: | Subscriber Id: | Group/Policy Id: | |
| Other Subscr. Name: | Other Subscriber Id: | Group/Policy Id: | |

## REMITTANCE PROCESSING INFORMATION - SERVICE LINE DETAIL

| Svc<br>Line # | Service<br>Date | Proc Code -<br>Units<br>Modifiers | Charge $ | Allowed<br>$ | Not<br>Allowed $ | Deductible<br>$ | Co-<br>Ins $ | Co-<br>Pay $ | Late Filing<br>Red. $ | Paid<br>$ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 03/16/2018 | E0766 - 0<br>KF, RR | 21,000.00 | .00 | .00 | - | - | - | - | - |

## SUPPLEMENTAL INFORMATION/ADJUSTMENT INFORMATION - SERVICE LINES

| Svc<br>Line<br># | Core<br>Business<br>Scenario | Supp/Adj<br>Group<br>Code | Description | Supp/Adj<br>Reason<br>Code | Description | Amount $ |
|---|---|---|---|---|---|---|
| 1 | 3 | CO | Contractual<br>Obligations | 50 | These are non-covered services because this is not deemed a 'medical necessity' by the payer. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. Start: 01/01/1995 | Last Modified: 07/01/2017 | 21,000.00 |

| Claim 1 of 1 | Page 1 of 1 |
|---|---|

| Change Healthcare | EFT/Check #: 09181130049 | EFT/Check Date: 04/23/2018 | EFT/Check Amount: $ .00 | Payment Type: NON |
|---|---|---|---|---|
| | Payer Name: CGS - DME MAC JURISDICTION B | | CH Payer Id: MR031 | CH Process Date: 04/24/2018 |
| | Provider Name: NOVOCURE INC | Tax Id: 205063536 | NPI: 1255617569 | Other Payee Id: |
| ERA Check 1 of 1 | Address: 195 COMMERCE WAY, PORTSMOUTH NH 038019999 | | Addl. Payee Id: 1255617569 | Total PLB Adj Amt: 21000 |

| Service Dates: 04/16/2018 | Processing Status: 4 - Denied | | | |
|---|---|---|---|---|
| Payer Claim # / Medicare ICN #: 18107803853000 | CH Claim Trace Id: 106238980798659 | | Place Of Service. | Total Adjustment Amount: $ .00 |
| Charge: $ 21,000.00 | Paid: $ .00 | | Patient Responsibility: $ - | Deductible: $ - |
| Co-Insurance: $ - | Co-Pay: $ - | | Other/Crossover Insurance: | |

| Remark Codes: | N793 | Alert: CMS is changing from the Medicare Health Insurance Claim number (HICN) to the new Medicare Beneficiary Identifier (MBI). You can use either the HICN or MBI during the transition period. Visit www.cms.gov/newcard for important dates and information about this change. Start: 07/01/2017 | Last Modified: 11/01/2017 Notes: (Modified 11/1/2017) |
|---|---|---|
| | MA13 | Alert: You may be subject to penalties if you bill the patient for amounts not reported with the PR (patient responsibility) group code. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 4/1/07) |
| | MA01 | Alert: If you do not agree with what we approved for these services, you may appeal our decision. To make sure that we are fair to you, we require another individual that did not process your initial claim to conduct the appeal. However, in order to be eligible for an appeal, you must write to us within 120 days of the date you received this notice, unless you have a good reason for being late. Start: 01/01/1997 | Last Modified: 04/01/2007 Notes: (Modified 10/31/02, 6/30/03, 8/1/05, 4/1/07) |
| | M25 | The information furnished does not substantiate the need for this level of service. If you believe the service should have been fully covered as billed, or if you did not know and could not reasonably have been expected to know that we would not pay for this level of service, or if you notified the patient in writing in advance that we would not pay for this level of service and he/she agreed in writing to pay, ask us to review your claim within 120 days of the date of this notice. If you do not request an appeal, we will, upon application from the patient, reimburse him/her for the amount you have collected from him/her in excess of any deductible and coinsurance amounts. We will recover the reimbursement from you as an overpayment. Start: 01/01/1997 | Last Modified: 11/01/2010 Notes: (Modified 10/1/02, 6/30/03, 8/1/05, 11/5/07, 11/1/10) |
| | N115 | This decision was based on a Local Coverage Determination (LCD). An LCD provides a guide to assist in determining whether a particular item or service is covered. A copy of this policy is available at www.cms.gov/mcd, or if you do not have web access, you may contact the contractor to request a copy of the LCD. Start: 05/30/2002 | Last Modified: 07/01/2010 Notes: (Modified 4/1/04, 7/1/10) |

## PATIENT - SUBSCRIBER INFORMATION

| Patient Name: PROSSER, ANNIKEN S | Patient Id: 389044857A | Patient Control Number: 0001012479 |
|---|---|---|
| Corrected Patient/Subscriber Name: | | |
| Subscriber Name: | Subscriber Id: | Group/Policy Id: |
| Other Subscr. Name: | Other Subscriber Id: | Group/Policy Id: |

## REMITTANCE PROCESSING INFORMATION - SERVICE LINE DETAIL

| Svc Line # | Service Date | Proc Code • Units Modifiers | Charge $ | Allowed $ | Not Allowed $ | Deductible $ | Co-Ins $ | Co-Pay $ | Late Filing Red. $ | Paid $ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 04/16/2018 | E0766 - 0 KF, RR | 21,000.00 | .00 | .00 | - | - | - | - | - |

## SUPPLEMENTAL INFORMATION/ADJUSTMENT INFORMATION - SERVICE LINES

| Svc Line # | Core Business Scenario | Supp/Adj Group Code | Description | Supp/Adj Reason Code | Description | Amount $ |
|---|---|---|---|---|---|---|
| 1 | 3 | CO | Contractual Obligations | 50 | These are non-covered services because this is not deemed a 'medical necessity' by the payer. Usage: Refer | 21,000.00 |

2 0 1 9 2 1 2 X 0 2 7 0 5

# novocure

# Invoice

Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801

DATE: JANUARY 16, 2018
INVOICE # [102]

Bill To:
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ship To:
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ordered By: Jennifer Connelly, MD

| ITEM # | DESCRIPTION | QTY | UNIT PRICE | LINE TOTAL |
|--------|-------------|-----|------------|------------|
| TFH9000 | NOVO-TTF 100A PLUS TRANSDUCERS | 1 | $21,000 | $21,000 |

| | |
|---|---|
| SUBTOTAL | $21,000 |
| SALES TAX | 0 |
| TOTAL | $21,000 Per Month |

**PLEASE REMIT TO: Novocure Inc., 195 Commerce Way, Portsmouth, NH 03801**
**Make all checks payable to Novocure Inc.**

If you have any questions concerning this invoice, contact Justin Kelly, RN @ 603-501-4299.

# novocure

## Invoice

Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801

DATE: FEBRUARY 16, 2018
INVOICE # [103]

Bill To:
Anniken S. Prosser
W 2973 Farmstead Drive
**Appleton, WI 54915**

Ship To:
Anniken S. Prosser
W 2973 Farmstead Drive
**Appleton, WI 54915**

Ordered By: Jennifer Connelly, MD

| ITEM # | DESCRIPTION | QTY | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| TFH9000 | NOVO-TTF 100A PLUS TRANSDUCERS | 1 | $21,000 | $21,000 |

| | | |
|---|---|---|
| **SUBTOTAL** | $21,000 |
| **SALES TAX** | 0 |
| **TOTAL** | **$21,000** Per Month |

**PLEASE REMIT TO:** Novocure Inc., 195 Commerce Way, Portsmouth, NH 03801
**Make all checks payable to Novocure Inc.**

If you have any questions concerning this invoice, contact Justin Kelly, RN @ 603-501-4299.

261921 2X02707

# novocure

## Invoice

Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801

DATE: MARCH 16, 2018
INVOICE # [104]

Bill To:
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ship To:
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ordered By: Jennifer Connelly, MD

| ITEM # | DESCRIPTION | QTY | UNIT PRICE | LINE TOTAL |
|--------|-------------|-----|------------|------------|
| TFH9000 | NOVO-TTF 100A PLUS TRANSDUCERS | 1 | $21,000 | $21,000 |

| | | |
|---|---|---|
| SUBTOTAL | $21,000 |
| SALES TAX | 0 |
| TOTAL | $21,000 Per Month |

**PLEASE REMIT TO: Novocure Inc., 195 Commerce Way, Portsmouth, NH 03801**
**Make all checks payable to Novocure Inc.**

If you have any questions concerning this invoice, contact Justin Kelly, RN @ 603-501-4299.

# novocure

## Invoice

Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801

DATE: APRIL 16, 2018
INVOICE # |105|

Bill To:
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ship To:
Anniken S. Prosser
W 2973 Farmstead Drive
Appleton, WI 54915

Ordered By: Jennifer Connelly, MD

| ITEM # | DESCRIPTION | QTY | UNIT PRICE | LINE TOTAL |
|--------|-------------|-----|-----------|-----------|
| TFH9000 | NOVO-TTF 100A PLUS TRANSDUCERS | 1 | $21,000 | $21,000 |

|  |  |
|---|---|
| SUBTOTAL | $21,000 |
| SALES TAX | 0 |
| TOTAL | $21,000 Per Month |

**PLEASE REMIT TO: Novocure Inc., 195 Commerce Way, Portsmouth, NH 03801**
**Make all checks payable to Novocure Inc.**

If you have any questions concerning this invoice, contact Justin Kelly, RN @ 603-501-4299.

Anniken S. Prosser
W2973 Farmstead Dr.
Appleton, WI 54915

October 24, 2017

Attn: Medicare Appeals
Re: Denial of My Cancer Treatment
Policy#: 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-A

To whom it may concern:

This letter is in response to Medicare's denial of my physician's prior authorization request for coverage of Tumor Treatment Fields therapy (TTF) using Optune for my glioblastoma.

I am submitting this letter as an urgent member grievance so that I may obtain approval of my badly needed, FDA APPROVED, treatment for my cancer.

According to the letter we received from Medicare, the request for coverage for services was denied based upon the following reason: experimental.

First of all, I have to strongly disagree with this rationale. This treatment has been approved by the **United States Food and Drug Administration** for treatment of recurrent glioblastoma. Furthermore, my physician feels that this treatment is my best hope for slowing down the progression of my disease. I find it unconscionable that Medicare is second guessing the treatment decisions of my physician, Dr. Jennifer Connelly, who is one of the country's leading experts on this treatment.

TTF is my **best option** to treat this fatal disease. I have submitted the attached clinical information from my physicians as well as peer reviewed literature to assist you in considering approval of this treatment.

This procedure has been covered by many local and national insurance companies including: Medicare, Aetna (**Medical Policy Bulletin 0827**), Humana, Health Net (**Medical Policy Bulletin NMP523**), Health Partners (**Medical Policy Bulletin E003-01**), United Healthcare, Cigna (HMO and PPO), Anthem Blue Cross Blue Shield, BCBS Texas/Illinois/New Mexico/Oklahoma, Blue Cross Blue shield of Louisiana, Blue Cross Blue Shield of Michigan, HealthLink, Kaiser Permanente, Harvard Pilgrim Health Care, GHI, Horizon Blue Cross Blue Shield of New Jersey, NYS Empire Plan, Network Health Plan, and Blue Cross Blue Shield of Florida. This is only a representative sampling of payers covering Optune for this cancer indicating that there is enough "proven" evidence to warrant coverage for Optune in treating glioblastoma. **I am demanding that my clinical situation be reviewed by a board certified physician specializing in neuro-**

oncology or neurosurgery who has specific expertise in treating patients with glioblastoma with TTF.

I am a 34 year old woman with glioblastoma. I like drawing, writing lyrics and singing for the bands Antidote For Sorrow and Resisting the Solace. I also enjoy spending time with family and friends. I married Barry Prosser in September 2010. We have a son, Liam; he will be 4 years old on January 31st. I am currently not working. I enjoy vacations at the cottage.

I was diagnosed at the ER in February 2016. I had surgery at St. Elizabeth Hospital in Appleton Wisconsin and it was confirmed that I had GBM. I have had the following treatments; surgery, radiation, chemotherapy and Optune. I am off chemotherapy now, possibly may have to do more in the future still on Optune. I experienced the following symptoms; passing out, bad headaches, dizziness, throwing up, but these have been better with treatments and Optune. I have had fewer side effects with Optune and it is helping me so much. I am able to get up each day and be with my husband and son because of Optune. In my own words, I believe Optune is helping me very much; I am smiling because it's helping me keep the pain away!

After discussing treatment options with Dr. Jennifer Connelly, my doctor decided to prescribe Optune. Given the aggressive nature, and extremely limited treatment options of my disease, my doctor recommended I receive coverage for Optune, as it is the best FDA approved option at this time for treating my glioblastoma. I began utilizing TTFields on June 16, 2016.

**Alternating electric field therapy (Optune) + adjuvant temozolomide is now an <u>NCCN Category 2A recommendation</u> following postoperative standard brain radiation therapy with concurrent temozolomide.**

I am aware that my cancer is considered an "orphan disease," by the National Institutes of Health due to the rarity of people who get glioblastoma. Despite these interventions I have received to date, TTF therapy is my best hope to control my brain tumor.

I cannot emphasize enough the urgency and importance of this matter.

Should you have any additional questions regarding my condition or the proposed treatment, please feel free to contact me at (920)-257-3574.

I also give consent for Novocure to work on the appeal on my behalf.

Thank you for your timely consideration and hopeful approval of this case.

Sincerely, *Anniken S Prosser*

Anniken S. Prosser

Attachments

# ✖OPTUNE

## Optune® Prescription Form

Please fax or email signed and completed forms with medical
records, face sheet, and copies of insurance card(s) to
603-501-4298 or support@novocure.com

## I. PRESCRIPTION INFORMATION

**Patient Name:** Anni Kian Prosser
*(required)*

**Date of Birth:** 10/10/03
*(required)*

Please check the appropriate box:
☐ New Patient order
☒ Renewal

Is this patient enrolling in an Investigator Sponsored
Trial (IST) or Cooperative Group Trial (e.g. RTOG)? ☐ Yes    If yes, which trial? _____

Optune is comprised of: an Electric Field Generator (the "Device"), Transducer Arrays (the "Arrays"), power supply items, and accessories.

**ICD-10 Code:** C 71 . 9    **Diagnosis Description:** Glioblastoma Multiforme
*(required)*

I prescribe use of Optune, as described above, for a period of:
*(check box required)*
☐ 3 months
☒ 6 months

**Prescriber Information:**

Connally Jennifer M                    Carrie Gruzlecki
**Prescriber Name (Last, First, Middle Initial):**    **Name of Preferred Office Contact**
*(required)*

**NPI:** 1 8007 6 B53 1                414 . 805 . 5231
*(required)*                           **Phone**

414 . 805 . 5204    414 . 259 . 0469    Carrie.gruzlecki@froedtert.com
**Phone**            **Fax**             **Email**

By signing and dating, I attest that I am prescribing Optune (DO NOT SUBSTITUTE) as medically necessary. I have read and understand all safety information and other instructions for use included with Optune.

*(signature)*    *(required)*    04/13/2018    *(required)*

## II. ORDER INFORMATION

Treatment education, head preparation and array application will take place in the patient's home. Upon completion of the education session, the patient or caregiver may initiate treatment in the presence of Novocure personnel.

**Preferred Treatment Start date (MM/DD/YYYY):** _____
Please allow 5 business days from submission of all required paperwork and preferred treatment start date.

**Notes:** Continuation of treatment

QSF-DME-024 Rev. 04          **novocure™**          Page 1 of 4

001 9212 02712

# ⊠OPTUNE

## Optune® Prescription Form

Please fax or email signed and completed forms with medical
records, face sheet, and copies of insurance card(s) to
603-501-4298 or support@novocure.com

## I. PRESCRIPTION INFORMATION

**Patient Name:** Annikan Prosser
*(required)*

**Date of Birth:** 10/10/83
*(required)*

Is this patient enrolling in an Investigator Sponsored
Trial (IST) or Cooperative Group Trial (e.g. RTOG)?  ☐ Yes   If yes, which trial? _____

Please check the appropriate box:

☐ New Patient order

☒ Renewal

### Prescription Information

Optune is comprised of: an Electric Field Generator (the "Device"), Transducer Arrays (the "Arrays"), power supply Items, and
accessories.

**ICD-10 Code:** C-71.9   **Diagnosis Description:** Glioblastoma Multiforme
*(required)*

I **prescribe use of Optune, as**
**described above, for a period of:**
*(check box required)*

☐ 3 months

☒ 6 months

### Prescriber Information

**Prescriber Name (Last, First, Middle Initial):** Connelly Jennifer M
*(required)*

**NPI:** 1780768531
*(required)*

**Phone:** 414.805.5204   **Fax:** 414.259.0469

### Contact Information

**Name of Preferred Office Contact:** Carrie Guzlecki

**Phone:** 414.805.5231

**Email:** carrie.guzlecki@froedtert.com

### Prescriber Signature Original Signature Required No Stamp

By signing and dating, I attest that I am prescribing Optune (DO NOT SUBSTITUTE) as medically necessary. I have read and
understand all safety information and other instructions for use included with Optune.

**Prescriber Signature:** _[signature]_
*(required)*

**Date (MM/DD/YYYY):** 10/17/2017
*(required)*

## II. ORDER INFORMATION

Treatment education, head preparation and array application will take place in the patient's home. Upon completion of the
education session, the patient or caregiver may initiate treatment in the presence of Novocure personnel.

**Preferred Treatment Start date (MM/DD/YYYY):** _____

Please allow **5 business days** from submission of all required paperwork and preferred treatment start date.

**Notes** Continuation

QSF-DME-024 Rev. 04

novocure™

Page 1 of 4

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 445 of 631   Document 11-5   4676

# ✖ OPTUNE

# Optune™ Prescription Form

Fax the completed form with signature to 603-501-4298; or Email to support@novocure.com

## III. PATIENT INFORMATION (PLEASE COMPLETE IN FULL)

**Patient Information**

Permanent Address: W2973 Farmstead Dr.

City: Appleton     State: WI     Zip: 54915     Phone: 920-257-3574

Family Contact: Barry Prosser     Phone:

☑ Shipping and mailing address same as permanent address.

☐ Use the address below for shipping and mailing purposes related to equipment, supplies and billing. Patient must reside at this address

Shipping and Mailing Address:

City:     State:     Zip:     Phone:

**Insurance Information**

Primary Insurance: National POS - Humana

Patient ID#: 100303512     Insurance Phone Number: 866-427-7478

Group#: 668526     Group Name:

Primary Insured (Subscriber) Name: Barry Prosser

Relationship to Patient: Husband     Subscriber Date of Birth: 5/24/85

**If you have secondary insurance, please attach this information if applicable.

The use of "I" or "you" in this document refers to the patient named in the "Signatures" block.

**Authorization to Release Records to Novocure**
I authorize my physician and the practice, facility and hospital of my physician and any other holder of medical information about conditions for which I am being treated to release to Novocure Inc. and affiliated companies (together "Novocure") any information necessary for treatment, payment and healthcare operations related to my use of Optune. I authorize Novocure employees to deliver equipment and provide education in my home as well as attend my appointments as necessary to provide technical assistance to my physician and healthcare practitioners. I also authorize Novocure, my physician and the practice, facility and hospital of my physician and any other holder of medical information about conditions for which I am being treated to release such information to my insurer. These authorizations apply to my current physician and previous physicians. I understand that Novocure may and likely will use the information to seek a determination of whether my insurer will cover my use Optune.

**Authorization To Discuss Care**
I authorize Novocure to discuss my care with the family members and/or caregivers listed below. I may revoke this authorization at any time by calling or emailing Novocure at 855-281-9301 or support@novocure.com.

List all authorized individuals: Barry Prosser, Daniel Maas, Hilde Staven-Maas

Signatures: Annika S Prosser

Patient Name (please print): Annika S. Prosser     Date: 5-31-16

If anyone other than patient completes or signs this form, please enter the following information:

Name:     Telephone Number:

Address:     City:

State:     Zip

Relationship to Patient:     Reason for Signing:



Froedtert & MEDICAL COLLEGE of WISCONSIN

**Froedtert and the Medical College of Wisconsin Cancer Center**
**9200 W Wisconsin Ave**
**Milwaukee, WI 53226**
**414-805-8800**

## REVIEW OF DENIED TREATMENT REQUEST
## Life Threatening Condition

June 14, 2016

Humana
Clinical Review Team
1100 Employers Boulevard
Green Bay, WI 54344

**ATTN: Provider Appeal**

RE: Anniken Prosser
     Policy: 100303512
     DOB: 10/10/1983

This letter is in response to the denial received after review of predetermination of benefits for my patient, Anniken Prosser. It is my understanding that Ms. Prosser is entitled to appeal this adverse benefit determination. Your denial letter indicates that you consider treatment with Optune to be investigational.

Please accept this letter as a formal appeal for coverage for Optune. I am also reiterating our request for a network exception for this patient due to the fact that there is no provider in the Humana network who can provide this service. I also request that a physician who is experienced in treating glioblastoma review this material as regulated by ERISA. **The type of physician familiar with the treatment of glioblastoma would be a neuro-oncologist or radiation oncologist with specific expertise treating GBM.**

Anniken Prosser is a young 32-year old female who initially presented with a severe migraine with associated nausea. MRI revealed a large enhancing left temporal cystic mass. She underwent a gross total resection on February 25, 2016. Pathology demonstrated glioblastoma multiforme. Following surgery, she went on to initiate treatment with radiation with concurrent Temodar. This was completed in May of 2016. After discussing treatment options with Ms. Prosser, I have decided to prescribe Optune in combination with temozolomide as this currently is the best option for treating her glioblastoma.

Optune is an innovative approach to cancer treatment, using tumor treating fields (TTFields) to interfere with the division of malignant cells. TTFields therapy is a locally or regionally delivered treatment that uses alternating electric fields to disrupt the rapid

Anniken S Prosser   MR#: 10790724

cell division exhibited by cancer cells. GBM patients treated with TTFields wear insulated transducer arrays on the scalp attached to the portable electric field generator.

Optune received pre-market approval from the FDA for recurrent glioblastoma in April 2011. This approval was based on the results of a large randomized controlled trial of patients with recurrent GBM comparing Optune as a monotherapy to standard chemotherapy used in recurrent GBM. The results showed that treatment with Optune delivered comparable overall survival and progression free survival to chemotherapy with minimal toxicity and an improvement in patients qualify of life compared to chemotherapy.

In 2015, Optune received pre-market approval from the FDA for newly diagnosed glioblastoma in combination with temozolomide after standard surgical resection and radiation therapy. This approval was based on a prospective, randomized, open label, active parallel control trial to compare the effectiveness and safety outcomes of newly diagnosed GBM patients treated with Optune and TMZ to those treated with TMZ alone. The results of the trial at the interim analysis showed superior efficacy both in progression free survival as well as overall survival. The data was so compelling that the independent data monitoring committee recommended the trial be terminated so that patients in the standard of care arm could cross over. The FDA approved the supplemental IDE to allow for crossover of patients on the control arm to the TTFields arm on December 1, 2014.

The pre-specified, interim analysis of EF-14 trial data was conducted on the first 315 patients, representing approximately 50 percent of the targeted study population. The data show that:

- Patients treated with TTFields together with temozolomide demonstrated a significant increase in progression free survival compared to temozolomide alone (median PFS of 7 1 months compared to 4.0 months, respectively, hazard ratio=0.63, p=0.001).
- Patients treated with TTFields together with temozolomide demonstrated a significant increase in overall survival compared to temozolomide alone (median OS of 19.6 months compared to 16.6 months, respectively, hazard ratio=0.75, p=0.034).
- The percentage of patients alive at 2 years in the TTFields together with temozolomide arm was 43% compared to 29% in the temozolomide alone arm.

Glioblastoma is an orphan disease, with limited available treatment options. Most payers are covering Optune for patients based on published medical policy as well as individual medical necessity review. Over 180 payers including Humana, have covered this therapy for members after an appeal process. This new data is an important advancement in the treatment of glioblastoma. It is imperative that Humana review their current policy for Optune and amend it to cover this therapy for patients with glioblastoma.

At Froedtert Health and Medical College of Wisconsin, Optune has been employed successfully for patients such as Ms. Prosser, and we have achieved excellent outcomes. We have been very fortunate in working with payers who specifically consider the above information as well as the patient's orphan disease status in issuing

Anniken S Prosser MR#: 10790724

( )

positive coverage for our patients. I request Humana, offer the same consideration to Ms. Prosser, when considering this request for coverage of Optune.

It is my belief that Optune in combination with temozolomide is the most appropriate option for her at the present time. Based upon her orphan disease status, limited treatment options and the recently published peer reviewed data showing superiority of adding Optune to temozolomide I respectfully request reconsideration of the adverse benefit determination.

Sincerely,

*Jennifer Connelly, MD* (signature)

Jennifer Connelly, MD
Neurology
Neuro-Oncology – Board Certified
Froedtert Health and Medical College of Wisconsin
Phone: 414-805-8204
Fax: 414-805-5262

Anniken S Prosser MR# 10790724

*Start + finish 0:11*
70% alcohol ✓
shaved ✓

2 0 1 7 3 0 X 2 1 2 5 7 1 8

# ASSESSMENT of NEED

| Customer Name: Ms. Anniken Prosser | | Date: | 6/8/16 |
|---|---|---|---|
| Customer # | 1012479 | | |
| DSS/Site | Dr. Nancy Newberg /Froedtert + Med Cl | Initiation: | Home ☒ Office ☐ |

**Responsible Party/ Emergency Contact:** Mr. Barry Prosser
Tel: 920-257-9525 *
920-257-3574

Patient acknowledges that financial responsibility has been discussed and agreed to: *(Indicate date of welcome call and person spoken to)*

Patti 6/7/16

| | |
|---|---|
| How did you hear about Optune Therapy? | Physician |
| What factors led to the decision to start treatment? | Physician |
| Did you receive a package from us containing printed material and DVD? | Yes  No  Not Sure |
| Does patient live alone?  Yes  (No) | Patient has access to telephone:  Yes  (No) |
| Is patient residence?  (Home)  Assisted Living  Other facility: | |
| In what type of structure do you reside?  (House) - Apart/Condo- Assisting Living - Rehab Facility | |
| Where will parking be?  Yes  No  Driveway | |
| How will we enter / exit residence?  Front door, ring doorbell, 2 steps | |
| Should I be made aware of any safety concerns? ex lack of lighting, no elevator (if apt is not on 1st floor) Please specify: (N/A) | |
| Are there any pets in your home? (Yes)  No | Cats # | Dogs # 2 | Other types # |
| Can pets be placed in another room while DSS present? (Yes)  No  N/A | |
| Is there smoking in the home?  Yes  (No) | |
| Is there anything that our DSS should know about the home environment or the people residing there that could be important for the safety of the visit? (N/A) | |
| Is patient able to speak: (Yes)  No  If yes, what is his/her primary language?  English | |
| Does patient have adequate electrical capacity to utilize device and recharge batteries (Yes)  No | |
| Does he/she require assistance with mobility? (Yes)  No | |
| Are you employed?  Yes  (No)  If so do you plan on continuing to work?  Yes  (No) | |
| If you are planning on continuing to work what is your occupation?  N/A | |
| Have you discussed treatment during work hours with your employer? Yes - (No) | |

| | |
|---|---|
| See Technical Review Checklist:  Yes - No | |
| Other: (Explain) | |
| Explain any special needs or additional training required (if applicable) N/A ☐ | |

Training on the Optune device is performed, conducted, and observed by certified physicians in accordance with FDA approval guidelines.

| Completed by: | *[signature]* | Date: | 6/8/16 |
|---|---|---|---|

QSF-DME-027 Rev. 02

Printed on: 24 May 2016, 11:01:11 am; Printed by: RSULLIVAN.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 450 of 631   Document 11-5   4681

Page 18 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_58173E312028   25976

ANNIKEN PROSSER #1012479

NovoTTF™-100A System is now



# OPTUNE™

## OPTUNE™ SERVICE AGREEMENT



**novɑcure**™

Printed on: 10 May 2016, 07:28:05 am; Printed by: BMILLS.

# Supply Terms For Optune™

## Background

Novocure™ Inc. is referred to as "we" or "Novocure" in this service agreement ("Service Agreement"). The use of "you" or "your" refers to the patient named in the associated Service Agreement. All capitalized terms not defined herein have the meaning defined in the Service Agreement.

## Supply Terms

Optune (the "System") is comprised of two main components: (1) an Electric Field Generator (the "Device"); and (2) INE Transducer Arrays (the "Arrays") that are disposable supplies to the Device. The System also consists of power supply items and accessories.

Novocure's affiliates hold patents that cover the System, various components of the System, and using the System. Novocure hereby grants an expressly conditional license to you to use the inventions covered by those patents under the terms set forth herein. No other licenses to you is implied.

As an element of consideration for the grant of a license to you, you agree to pay Novocure a monthly fee for access to the System. Notwithstanding anything to the contrary contained in this agreement, any use of the System for which this element of consideration is absent is not licensed under the patents.

You acknowledge that, taken together, the consideration due to Novocure for access to the System reflects only the value of the "use" rights conferred by Novocure, and does not provide you with the same suite of rights that would accompany an unconditional sale. Notwithstanding anything to the contrary contained in this agreement, (1) you are not

licensed to use the Device with Arrays that were not purchased from Novocure; and (2) you are not licensed to use any given Array for more than seven (7) days.

You understand that the Device shall at all times remain the property of Novocure.

You understand and agree that Novocure has the right to inspect the System upon request and that you may be responsible for the replacement value of the System in the event it is lost, damaged, or stolen while in your possession or control.

You understand that: (i) Novocure has the option to provide new or used equipment including the Device, power supplies and accessories; (ii) you shall not modify or alter any equipment provided to you by Novocure; (iii) you will notify Novocure immediately of any equipment problems; and (iv) the equipment is only to be used upon the order and direction of your doctor.

You understand that the System fees will continue until the date that you call Novocure to pick up the System. You understand that Novocure may stop providing the technical support for the System and may stop providing additional Arrays or replacement items if you fail to comply with the terms of the Service Agreement and Supply Terms, including failure to pay amounts owed or to remit payments due to Novocure that you receive directly from payers.

## Patient Care Responsibilities

You understand and acknowledge that (1) your care is under the supervision and control of your treating physician or other healthcare provider (e.g., nurse practitioner, physician's assistant) who is appropriately licensed, trained and authorized to prescribe and administer the System, (2) your physician or other healthcare provider has prescribed the System as part of your treatment and has explained to you its risks, advantages, possible complications and

2   Printed on: 10 May 2016, 07:28:06 am; Printed by: BMILLS.

alternatives, and why it is considered necessary treatment for your condition, (3) Novocure's services do not include diagnostic, prescriptive or other functions pertaining to licensed physicians or healthcare providers, and (4) your physician or other healthcare provider is solely responsible for diagnosing and prescribing drugs, equipment and therapy for your condition and otherwise supervising and controlling your medical condition.

## Financial Responsibilities

The rental fee for the System, including use of the Device, related power supplies/accessories and Arrays for 30 days is $21,000.

**Please call (855) 281-9301 if you have any questions about your financial responsibilities.**

Novocure will review your insurance or third party payer (together "Payer") coverage for the purposes of providing you with an estimate of your out of pocket costs associated with the rental fee to use the Device and the purchase of Arrays. Novocure will also prequalify you for eligibility for our Patient Assistance Programs. Formal qualification for financial assistance will require a separate application and documentation of income.

Novocure will submit a claim to your Payer for the System and may appeal such claim if denied. Novocure will bill you for your financial responsibilities related to the System when i) your Payer affirms coverage for your use of the System at the list rental fees and supply prices for the System or ii) Novocure elects not to continue appeals of your case.

If your cost share for the System is not affordable or your Payer refuses to provide coverage for the System, you can also apply to Novocure for financial assistance

Please contact 855-281-9301 or email **support@novocure.com** to inquire about financial assistance programs.

## Warranty Information

Novocure will provide a replacement Device in the event of malfunction that cannot be corrected over the phone by our technical support staff. Novocure will provide replacement Arrays in the event that the Transducer Arrays are defective to manufacturer standards. Novocure will provide replacement power supplies and accessories in accordance with the expected useful lifetime of these items. The above warranty is only valid if the System is used in accordance with the User Manual provided to you. This warranty is personal to you and non-transferable.

Lost equipment, including the Device, Arrays, power supplies and related accessories, and equipment damaged by you or your caregivers is not covered by this warranty.

Case 1:20-cv-00194-WCG  Filed 04/28/20  Page 453 of 631  Document 11-5      4684

Page 21 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_58173E312028    25976

# Patient Information Form For Optune™

## Background

Novocure™ Inc. is referred to as "Novocure" in this service agreement ("Service Agreement"). The use of "you" or "your" refers to the patient named in the associated Service Agreement. All capitalized terms not defined herein have the meaning defined in the Service Agreement.

## Notice of Privacy Practices

THIS NOTICE DESCRIBES HOW HEALTH INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.

Please contact 855-281-9301 or **support@novocure.com** if you have questions.

## Purpose of this Notice

This notice will tell you about the ways in which Novocure may use and disclose your health information that identifies you ("PHI"). We also describe your rights and certain obligations we have regarding the use and disclosure of PHI.

## Our Pledge Regarding Protected Health Information

We understand that health information about you and your health is personal. We are committed to protecting health information about you. We create a record of the products and services that we provide to you. We need this record to provide you with quality products and services used in your care and to comply with certain legal requirements. This notice applies to all of the PHI we use and disclose related to the products and services used in your care. Your personal doctor, healthcare provider and other entities providing products or services to you may have different policies or notices regarding their use and disclosure of your PHI.

## Our Legal Requirements

We are required by law to:

- Make sure that health information that identifies you is kept private;

- Give you this notice of our legal duties and privacy practices with respect to PHI about you;

- Notify you if we are unable to agree to a requested restriction on how your information is used and disclosed;

- Accommodate reasonable requests that you may make to communicate PHI by alternative means or at alternative locations;

- Obtain your written authorization for purposes other than those listed below and permitted under law; and

- Follow the terms of the notice that currently is in effect.

## Who Will Follow Our Privacy Practices

This notice describes Novocure's practices and that of all Novocure employees, staff and other company personnel for US operations only.

These entities, sites and locations follow the terms of this notice. Additionally, these entities sites and location may share PHI with each for treatment, payment or health care operations purpose described in this notice.

## Your Rights Regarding Protected Health Information About You

You have the following rights regarding PHI we maintain about you:

### Right to Inspect and Copy

You have the right to inspect and copy PHI that may be used to make decisions about your care. Usually this includes medical and billing records. To inspect and copy PHI that may be used to make decisions about you, please contact 855-281-9301 or support@novocure.com. We may charge a fee for copying requested files. We may deny your request to inspect and copy in certain circumstances. If you are denied access to PHI, you may request that the denial be reviewed. Another person chosen by us will review your request and the denial. We will comply with the outcome of that review.

### Right to Amend

If you feel that PHI we have about you is incorrect or incomplete, you may ask us to amend the information. You have the right to request an amendment for as long as the information is kept by us. To request an amendment, please contact 855-281-9301 or support@novocure.com. You must provide a reason that supports your request. We may deny your request for an amendment if it does not include a reason to support that request. Additionally, we may deny your request if you ask us to amend information that:

- Was not created by us, unless the person or entity that created the information is no longer available to make the amendment,

- Is not part of the PHI kept by or for us

- Is not part of the information which you would be permitted to inspect and copy; or

- Is accurate and complete.

## Right to Accounting of Disclosures

You have the right to request an "accounting of disclosures". This accounting is a list of the disclosure we made of PHI about you. Novocure will provide an accounting of all but the following types of disclosure:

- Those made for treatment, payment and health care operations;

- Those made to you about your own PHI;

- Those made to persons involved in your care or other notification purposes;

- Those made pursuant to an authorization signed by you disclosing specific uses and disclosures;

- Where the disclosures are part of a Limited Data Set (as defined in the Health Insurance Portability and Accountability Act);

- Where the disclosures are incidental to an otherwise permissible disclosure;

- For national security or intelligence purposes; and

- To correctional institutions or law enforcement custodial situations.

To request this list or accounting of disclosures, please contact 855-281-9301 or **support@novocure.com**. We may request that you submit the request in writing. Your request must state a time period that may not be longer than six years from the date of service. Your request should indicate in what form you want the list (i.e., paper or electronic). The first list you request within a 12-month period will be free. For additional lists, we will charge you for the costs of providing the lists. We will notify you of the cost involved and you may choose to withdraw or modify your request at the time before any costs are incurred.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 455 of 631   Document 11-5

4686

Page 23 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)   JB_58173E312028   25976

## Right to Request Restrictions

You have the right to request a restriction or limitation on the PHI we use or disclose about you for treatment, payment, or health care operations. You also have the right to request a limit on the PHI we disclose about you to someone who is involved in your care or the payment for your care, like a family member or friend. You may restrict disclosures of PHI to a health plan if you have paid out-of-pocket in full for the health care item or service. We are not required to agree to your request. If we do agree, we will comply with your request unless the information is needed to provide you emergency treatment. Please contact 855-281-9301 or **support@novocure.com** to request restrictions. We may request a written request. You must tell us i) what information you want to limit, ii) whether you want to limit our use, disclosure or both, and iii) to whom you want the limits to apply, for example, disclosures to your spouse.

## Right to Request Confidential Communications

You have the right to request that we communicate with you about medical matters in a certain way or at a certain location. For example, you can ask that we only contact you at work or by mail. Please contact 855-281-9301 or **support@novocure.com** to request confidential communications. We may request a written request. We will accommodate all reasonable requests. Your request must specify how or where you wish to be contacted.

## Right to Revoke Authorization

You have the right, in those instances where written authorization is required, to revoke such authorization to use or disclose PHI except to the extent action has already been taken. Such revocation must be in writing.

## Right to a Paper Copy of this Notice

You have the right to a paper copy of this notice. You may ask us to give you a copy of this notice at any time. Even if you have agreed to receive this notice electronically, you are still entitled to a paper copy of this notice. Please contact 855-281-9301 or **support@novocure.com** to request a paper copy.

## How We May Use and Disclose Protected Health Information About You

The following categories describe different ways that we are permitted to use and disclose PHI as a health care provider. Certain of these categories may not apply to our business and we may not actually use or disclose your PHI for such purposes. Not every use or disclosure in a category will be listed. However, all of the ways we are permitted or required to use and disclosure PHI, without your authorization, will fall within one of the categories.

## For Treatment

We may use or disclosure PHI about you to assist healthcare professionals and providers provide you with medical treatment or services. For example, we may provide PHI related to your use of our products or services to your physician and the staff at your physician's practice to assist your physician in maintaining appropriate use of the device.

## For Payment

We may use and disclose PHI about you so that the products and services we provide you may be billed to and payment may be collected from you, an insurance company or a third party. For example, we may need to receive from or disclose to your health plan, Medicare, or the medical facility you resided in information about the products and services we provided to you so they or another responsible payor can pay us. This may specifically include information required for the Prescription Order Form. Assignment of Benefits,

6

MRIs, and medical record information. We may also tell your health care provider or plan about a product or service you are going to receive to obtain prior approval or to determine whether your provider or plan will cover that product or service.

## For Health Care Operations

We may use and disclose PHI about you for our health care operations and we may use and disclose PHI about you to other health care providers involved in your care for certain health care operations they have to undertake. These uses and disclosures are necessary to run our company and make sure that users of our products receive the most cost effective and therapeutic products possible. Examples of health care operations activities by Novocure include but are not limited to delivery, pick-up and service functions, collection efforts, internal auditing, business planning (including analysis of product length of use, utility, or development/improvement of reimbursement methods or policy), assessing the quality of care and outcomes in your case and similar cases, and quality assurance/improvement activities. We may also combine PHI about many patients to decide what additional products and services we should offer, what products and services are not needed, and to justify how effective our products are in the care of individuals such as you. We may also disclose information to medical facilities and independent researchers for review and learning purposes. We may remove information that identifies you from this set of PHI so others may use it to study health care and health care delivery without learning who the specific patients are.

## Notice/Reminders

We may use and disclose PHI to contact you or arrange for your health care provider to contact you regarding product delivery, maintenance, in-service or pick-up.

## Individuals Involved in Your Care or Payment for Your Care

We may disclose to a family member, other relative, close personal friend of yours or any other person identified by you PHI directly relevant to such person's involvement with your care or payment for your health care when you are present for, or otherwise available prior to, a disclosure and you are able to make health care decisions, if: (i) we obtain your agreement; (ii) we provide you with the opportunity to object to the disclosure and you failed to do so; or (iii) we infer from the circumstances, based upon professional judgment, that you do not object to the disclosure. We may obtain your oral agreement or disagreement to a disclosure. However, if you are not present, or the opportunity to agree or object to the disclosure cannot practicably be provided because of your incapacity or an emergency circumstance, we may, in the exercise of professional judgment, determine whether the disclosure is in your best interests, and, if so, disclose only PHI that is directly relevant to the person's involvement with your health care.

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 457 of 631    Document 11-5    4688

Page 25 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_59173C312028    25976

## Research

Under certain circumstances, we may use and disclose PHI about you for research purposes. For example, a research project may involve comparing the health and recovery of all patients who received on product or service for the same condition. We may also disclose PHI about you to people preparing to conduct a research project, for example to help them look for patients with specific medical circumstances. We will in most circumstances ask for your specific authorization if the researcher will have access to your name, address or other identifying information that reveals who you are.

## As Required by Law

We will disclose PHI about you when required to do so by federal, state or local law. For example, we may disclose information for judicial and administrative proceedings pursuant to legal authority; to report information related to victims of abuse, neglect or domestic violence; or to assist law enforcement officials in their law enforcement duties.

## Government Functions

We may use and disclose PHI about you as required for specialized government functions such as protection of public officials, reporting to various branches of the armed services or national security activities authorized by law.

## To Avert a Serious Threat to Health or Safety

We may use and disclose PHI about you when necessary to prevent a serious threat to your health and safety or the health and safety of the public or another person. Any disclosure, however, would only be to someone able to help prevent the threat.

## Business Transfers

There may arise in the course of business the acquisition or sale of our business assets (Business Transfers). Such Business Transfers may involve the sale or purchase of PHI. Also, in the event that Novocure Inc. or its parent entity, Novocure™ Limited of Jersey (Channel Islands), or any subsidiary of Novocure Limited are acquired or substantially all of its assets are acquired, PHI likely will be one of the transferred assets.

## Workers' Compensation

We may release PHI about you for workers' compensation or similar programs. These programs provide benefits for work-related injuries or illness.

## Public Health Activities

We may use or disclose your PHI to a health oversight agency for activities authorized by law. These oversight activities include, for example, audits, investigations, inspections, and licensure. These activities are necessary for the government to monitor the health care system, government programs, and compliance with civil rights laws.

## Lawsuits and Disputes

If you are involved in a lawsuit or a dispute, we may disclose PHI about you in response to a court or administrative order. We may also disclose PHI about you in response to a subpoena, discovery request, or other lawful process by someone else involved in the dispute, but only if efforts have been made to tell you about the request and obtain your written authorization or to obtain an order protecting the information requested.

## Other Uses of Protected Health Information

Other uses and discloses of PHI not covered by this notice or otherwise permitted by laws that apply to us will be made only with your written authorization. Your authorization will not be required if Novocure uses or discloses health information for purposes other than as covered by this notice or permitted by law if Novocure removes any information that individually identifies you before disclosing the remaining information. If you provide us authorization to use or disclose PHI about you, you may revoke that permission, in writing, at any time. If you revoke your permission we will no longer use or disclose PHI about you for the reasons covered by your written authorization. You understand that we are unable to take back any disclosures we have already made with your permission, and that we are required to retain our records of the products and services that we provided to you.

## Changes to This Notice

We reserve the right to change our information practices and to make the new provisions effective for all PHI we maintain. We also reserve the right to change this notice at any time. We reserve the right to make the revised or changed notice effective for PHI we already have about you as well as any information we receive in the future. You may request current version of our privacy practices by contacting 855-281-9301 or **support@novocure.com**.

## Complaints

If you believe your privacy rights have been violated, you may file a complaint with us or with the Secretary of the Department of Health and Human Services. To file a complaint with us, you must submit it in writing to Novocure. Please contact 855-281-9301 or **support@novocure.com** to request the current mailing instructions for Novocure.

# Patient Bill of Rights

## Your Rights

As a patient you have certain rights including but not limited to the following:

- **Information.** Patients have the right to receive accurate, easily understood information to assist them in making informed choices.

- **Choice.** Patients have the right to a choice of health care providers.

- **Access to Emergency Services.** Patients have the right to access emergency health services when and where the need arises.

- **Being a Full Partner in Health Care Decisions.** Patients have the right to participate fully in all decisions related to their health care.

- **Care Without Discrimination.** Patients have the right to considerate, respectful care from all members of the healthcare industry at all times and under all circumstances.

- **Privacy.** Patients have the right to communication with healthcare providers in confidence and to have the confidentiality of their individual identifiable health care information protected.

- **Speedy Complaint Resolution.** Patients have the right to a fair and efficient process for resolving differences.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 459 of 631   Document 11-5   4690
Page 27 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_58173E312028   25976

## Your Responsibilities

As a patient you have certain responsibilities including, but not limited to the following:

- **Provide information.** You must give accurate and complete health information concerning your past illnesses, hospital stays, medications, allergies and other pertinent items. You are also responsible for providing documentation required by your insurance company.

- **Ask questions.** You must ask question when you do not understand medical conditions, equipment, instructions, and or medical terminology.

- **Follow instructions.** You must adhere to your developed and updated treatment plans.

- **Accept consequences.** You must accept consequences for not following the treatment plan Instructions of your doctor and nurse.

- **Understand your benefits.** You must understand what your insurance company will or will not authorize for durable medical equipment (DME) benefits.

- **Product responsibilities.** Your doctor has prescribed this medical device for the treatment and care of your disease. This is a rental device and cannot be resold. Prompt return of this device is required once therapy is completed.

- **Show respect and consideration.** You must show respect and consideration to those who are assisting you in your treatment plan including Novocure's staff providing technical support for your use of the device.

- **Meet financial commitments.** You are responsible for any applicable co-insurance, co-payments, or private pay amounts not covered by your insurance provider.

# Contact Information for Questions or Complaints

Any questions, concerns or complaints may be addressed to: 855-281-9301 (toll-free) or **support@novocure.com**.

You may contact the Accreditation Commission on Health Care to report any concerns or register a complaint by calling ACHC toll-free at 855-937-2242 or 919-785-1214 and request the Complaints Department.

10

Page 28 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)    Case 2:17-cv-00190-LCG    Filed 04/28/20    Page 460 of 631    Document 11-5    4691

# Authorization to Release Information; Assignment of Benefits; Acknowledgment of Education and Training; Acknowledgment of Receipt of Certain Forms; and Delivery Confirmation

## Background

Optune™ (the "System") is comprised of two main components: (1) an Electric Field Generator (the "Device"); and (2) INE Transducer Arrays (the "Arrays") that are disposable supplies to the Device. Novocure™ Inc. is referred to as "we" or "Novocure" in this service agreement ("Service Agreement"). The use of "you" in this Service Agreement refers to the patient named in this Service Agreement.

## Authorization to Release Information

You authorize your physician and the practice, facility and hospital of your physician and any other holder of medical information about conditions for which you are being treated to release to Novocure any information necessary for treatment, payment and healthcare operations related to your use of the System. You also authorize Novocure, your physician and the practice, facility and hospital of your physician and any other holder of medical information about conditions for which you are being treated to release such information to your insurance company and any other entity paying for your medical care ("your payer"). These authorizations apply to your current physician and previous physicians, their practices, facilities and hospitals.

## Authorization To Discuss Care

You authorize Novocure to discuss your care with the family members and/or caregivers listed below. You may revoke this authorization at any time by calling or emailing Novocure at 855-281-9301 or **support@novocure.com**.

List all authorized individuals:

Barry Prosser , Daniel mees

## Assignment of Benefits

You give Novocure the right to bill for and receive payments for your medical care and you direct your payer to pay Novocure directly for the System. You agree to forward all payments to Novocure in the event that your payer pays you directly, and you acknowledge that Novocure may stop supplying the

System to you if you fail to do so. You acknowledge receipt of the supply terms and information on financial responsibilities and warranties ("Supply Terms") from Novocure and agree to those terms.

## Acknowledgment of Education and Training

You have received education on the use and maintenance of the System. You have been provided a technical support phone number for questions about use of the System. You have been provided with the User Manual for the System. You consent to accept phone calls from Novocure for technical support and health care operations matters, including billing matters.

## Acknowledgment of Certain Forms

You acknowledge that you have received, read and accepted all terms and conditions set forth in these documents:

1. **Patient Information Form,** which includes a Statement of Privacy Practices, Patient Bill of Rights, and Contact Information for Novocure for Questions and/or Complaints

   *We are required by regulation to respond to your complaints within 5 calendar days and respond back to you with the results of our investigation within 14 calendar days.*

2. **Supply Terms,** which includes Financial Responsibilities and Warranty information

3. **Advanced Beneficiary Notice** (for Medicare patients only)

*The products and/or services provided to you by Novocure are subject to the supplier standards contained in the Federal regulations shown at 42 Code of Federal Regulations Section 424.57©. These standards concern business professional and operational matters (e.g., honoring warranties and hours of operation). The full text of these standards can be obtained at http://ecfr.gpoaccess.gov. Upon request we will furnish you a written copy of the standards."*

Please sign here:

Amus SS Prosser     6-16-16

Signature                Date

Printed on: 10 May 2016, 07:28:05 am; Printed by: BMILLS.

## Delivery Confirmation

You acknowledge receipt of the equipment and supplies listed below:

| Part Description | Quantity | S/N or Lot Number |
|---|---|---|
| Optune™ Device E0766 | 1 | TFH00801 |
| Connection Cable | 2 | CAD13343 · CAD14244 |
| Portable Charger | 1 | ICH10698 |
| Power Supply | 1 | SPS11414 |
| Rack | 1 | PBH11834 |
| Portable Battery | 4 | IBH19898  IBH19986  IBH11571  IBH14609 |
| Black Transducer Array (Lot#) E0766 | 20 | C601203 |
| White Transducer Array (Lot#) E0766 | 20 | C1604101 |
| Device Combo Bag | 1 | |
| Power Cord | 2 | |
| Manual – Instructions for Use | 1 | |
| Operation Manual | 1 | |
| Self-Exchange Kit | 1 | |

**You agree to the terms of this Service Agreement and of the related forms that you have received.**
**The authorizations granted in this Service Agreement will expire two (2) years from the date signed below.**

## Signatures

Patient Name (please print): Anniken Prosser

Patient or authorized signature: _Anniken S Prosser_  Date: 6-16-16

**If anyone other than patient completes or signs this form, please enter the following information:**

Name: _____  Telephone Number: _____

Address: _____

City, State, Zip: _____

Relationship to Patient: _____

Reason for Signing: _____

## For Novocure™ Use Only

Delivery Person/Service Print: Nancy Newberg

Signature/Tracking#: _Nancy Newberg_

Delivery Date: 6/16/16

Novocure Patient ID#: 1012479

Novocure Order #: 18251

©2015 Novocure. All rights reserved. Optune, NovoTTF, and Novocure are trademarks of Novocure.
QSF-DME-002 created on: 10 May 2016, 07:28:05 am; Printed by: BMILLS.

**novocure**™

 | **PATIENT INFORMATION AND CONSENT**

Optune™ Treatment Education Visit

**IMPORTANT:** Please do not sign this consent until you read and understand the consent. Please discuss any questions you may have with the Novocure™ personnel that will conduct your treatment education. You should feel that signing this form is something you are doing voluntarily. If you feel that you are under pressure, please do not sign this form. Please read this consent to understand the purpose and nature of this treatment education visit. If you sign this consent, you confirm that you understand the purpose and nature of this visit and that you give your consent to participate in the treatment education.

You or your physician has requested that Novocure personnel conduct a treatment education visit for Optune. *If you want to hold this session at your physician's office, please tell Novocure personnel prior to the start of the session and do not sign this consent.*

You (and your caregiver(s)) are being trained regarding the use of Optune. As part of this session, you will be taught about the following:

- Use of Optune, including how to change the battery, how to recharge the battery and connect to an external power supply, how to connect the transducer arrays connectors to the connector box, and what to do when an alarm occurs;
- How to shave your head to maintain appropriate transducer array contact with your scalp;
- How to apply the transducer arrays to your scalp; and
- How to turn Optune "on" and "off"

By signing this consent, you confirm your understanding that:

- Novocure personnel conducting your treatment education session are not physicians or healthcare providers. Please talk to your physician regarding your medical care and any questions you may have regarding your medical condition and your treatment options

- Novocure personnel are providing education regarding the use of Optune. You will also receive the Patient Instruction and Operation Manual (PIOM) for Optune, which will be a resource for any questions you may have after this session

- Novocure personnel will teach you and/or your caregiver(s) how to shave your head and apply the transducer arrays. You and/or your caregiver(s) will shave your head and apply the transducer arrays, with assistance from Novocure personnel. Novocure personnel may touch you during the session while teaching you and/or your caregiver(s) to perform these activities

  - *You may suffer cuts and possible skin irritation associated with shaving your head*

  - *You may suffer mild to moderate skin irritation associated with application of the transducer arrays*

  - *You should contact your physician regarding care for any injury you suffer during this treatment education session*

Printed on: 20 May 2016, 07:01:14 am; Printed by: BMILLS. Expiration Date:

- Novocure personnel will show you and/or your caregiver(s) how to begin therapy by turning Optune "on." It is your decision when to begin Optune therapy. If you initiate therapy today, please initiate therapy in the presence of Novocure personnel, who will confirm Optune is working appropriately

- If you have a medical issue during the session, you consent to Novocure personnel calling 911 and/or emergency medical services

- Your physician will confirm that you understand how to use Optune and its use at your next physician visit

I agree to participate in the treatment education session described and to allow Novocure personnel to conduct the session.

By signing this form, I have not given up any of my legal rights.

Please print your name: _Anniken Prosser_

Date: _6-16-16_
(Date)

Signature: _Anniken D Prosser_
(Signature of Participant)

novocure™ ©2015 Novocure. All rights reserved. Optune and Novocure are trademarks of Novocure.
FRM-I FG-002 Rev. Printed on: 20 May 2016; 07:01:14 am; Printed by: BMILLS. Expiration Date:

# novocure

## Patient Document Acknowledgement

| Document | Initials |
|---|---|
| 1. Service Agreement | ASP |
| 2. Patient Rights and Responsibilities (From service agreement) | ASP |
| 3. Supplier Standards (Medicare only) | |
| 4. Financial review/Assessment (Patient was contacted and these items discussed) | ASP |
| 5. How to file a complaint | ASP |

**This form is to be returned to the Commercial Operations Center along with the signed Service Agreement.**

QSF-DME-010 rev: 02

Page 1 of 1

Printed on: 20 May 2018, 07:00:31 am; Printed by: BMILLS.

# Technical Review of Optune™

| Patient Name: Annika Prosser | Patient #: 1012479 |
|---|---|
| Patient Signature: Annika Prosser | Date: 6-16-16 |

## Optune ☑
- Overview and Description
- Powering On/Off

## Powering the Device ☑
- Portable Batteries
- Connecting Power Sources
- Charging Portable Batteries
- Battery Rack and Charger
- Wall Power Supply

## Transducer Arrays ☑
- Overview and Description
- Transducer Array Components
- Placement Recommendations
- How to Shift Paired Arrays at Each Array Change
- Skin Observation and Care
- Showering
- Disposal and Reorder

## Connection Cable ☑
- Overview and Description
- Connecting to Device

## Carrier Bag ☑
- Placement and Carry Options

## Troubleshooting ☑
- Alarms
- Common Causes
- Correcting Alarms
- Novocure Support Information
- Equipment Exchange Process

## Placing the Arrays ☑
- Preparing the Head
- Review NovoTAL Map
- Applying the Transducer Arrays

## Patient Literature ☑
- PIOM
- Patient Quick Start Guide

| Novocure Employee Name: Nancy Newbern |
|---|
| Novocure Employee Signature: Nancy Newbern — Date: 6/16/16 |

## novocure

TM-MA-002 Rev 06
©2016 Novocure. All rights reserved. Optune and Novocure are trademarks of Novocure.
Printed on: 20 May 2016, 07:02:02 am, Printed by: BMILLS. Expiration Date:

PAGE 1 of 1

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 466 of 631   Document 11-5     4697

Page 34 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_59173E312028     25976

05-29-'18 16:18 FROM-
Prosser, Anniken S (MR # 10790724)

T-580 P0002/0015 F-198
Encounter Date: 03/15/2018

# Prosser, Anniken S

MRN: 10790724
Description: 34 year old female

**Progress Notes** Encounter Date: 3/15/2018

## Connelly, Jennifer M, MD
Neurology
Neuro-Oncology followup Visit

RE: Anniken S Prosser
MR#: 10790724
DOB: 10/10/1983
Date of Clinic Visit: 3/15/2018

Chief Complaint: GBM

History of Present Illness:
Ms. Prosser is a 34 Y/o lady who returns to the Neuro-Oncology clinic for further evaluation and management of a left temporal Grade 4 astrocytoma. She comes to clinic today with her husband and son, Liam. Since her last visit, she has remained on TTFields (compliance 91% for march). She is using clobetasol as needed. They rotate around open lesions. Neurologically, she is doing great with no other symptoms. She has otherwise been healthy.

Neuro-oncology History:
H/o migraines - started in mid-20's; possibly secondary to Crohn's meds; diffuse in nature and daily
Feb. 14, 2016 - intractable migraine
        MRI - large left cystic temporal mass
Feb. 25, 2016 - left craniotomy - GBM
May 2016 - completed radiation with Dr. Editha Kruegar with concurrent temodar with Dr. Jasleen Randhawa
June 2016 - continue with adjuvant temodar
June 16, 2016 - started Optune TTFields
April 2017 - completed 12 cycles of temodar; continue TTFields

Past Medical History:

| Diagnosis | Date |
|---|---|
| • Crohn's disease (*) | |
| • GBM (glioblastoma multiforme) | 2/25/16 |
|   *left temporal* | |
| • WPW (Wolff-Parkinson-White syndrome) | 1999 |
|   *s/p ablation* | |

Social History

Social History
| | |
|---|---|
| • Marital status: | Married |
|   Spouse name: | N/A |
| • Number of children: | N/A |
| • Years of education: | N/A |

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 467 of 631 Document 11-5
Page 35 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time] JB_58173E312028
4698

## Social History Main Topics
- Smoking status:       Never Smoker
- Smokeless tobacco:     Never Used
- Alcohol use           Not on file
- Drug use:            Unknown
- Sexual activity:        Not on file

## Other Topics
- Not on file                              Concern

## Social History Narrative
- No narrative on file

## Family History

| Problem | Relation | Age of Onset |
|---|---|---|
| • Breast Cancer | Maternal Aunt | |
| • Ovarian Cancer | Maternal Cousin | |
| *onset in 20's* | | |
| • Cancer | Paternal Grandfather | |
| *onset in 80's - leukemia* | | |

## Current Outpatient Prescriptions

| Medication | Sig |
|---|---|
| • acetaminophen (TYLENOL) 500 MG tablet | Take 500 mg by mouth every 4 hours as needed. |
| • Calcium Citrate-Vitamin D (CALCIUM + D PO) | Take 1 tablet by mouth daily. |
| • clobetasol propionate (CLOBEVATE OR TEMOVATE) 0.05 % cream | Apply as needed to scalp rash. Leave on for 20-60 minutes, cleanse lightly with alcohol and apply arrays. |
| • fish oil | Take 1 tablet by mouth daily. |
| • Multiple Vitamins-Minerals (WOMENS DAILY MULTIVITAMIN PO) | Take 1 tablet by mouth daily. |
| • NON FORMULARY MEDICATION | Reasonsreishi mushroom for immune support |
| • TURMERIC CURCUMIN PO | Take 1 tablet by mouth daily. Patient uses brand Curcubrain |

## Allergies

| Allergen | Reactions |
|---|---|
| • Ragweed | EENT - watery eyes |
| • Sulfa Drugs | RESP - shortness of breath |

## ROS:
Constitutional - denies fevers, weight loss
Eyes - denies diplopia

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 468 of 631   Document 11-5    4699

Ears, Nose, Mouth, Throat – denies difficulty swallowing
Cardiovascular - denies chest pain
Respiratory - denies SOB, cough
Gastrointestinal - has constipation intermittently while on temodar, this balances the diarrhea caused by Crohns
Genitourinary - denies dysuria
Integumentary - has skin breakdown in scalp
Neurological - as per HPI
Psych - denies depression, anxiety

Exam:
Vitals:

|         | 03/15/18 1429          |
|---------|------------------------|
| BP:     | 129/87                 |
| Pulse:  | 85                     |
| Resp:   | 16                     |
| Temp:   | 98.2 °F (36.8 °C)      |
| SpO2:   | 98%                    |
| Weight: | 51.8 kg (114 lb 3.2 oz) |

General: no distress.
Skin: mild contact dermatitis

Neurologic:
Mental Status: Alert and attentive. Oriented to person, place, time and reason for visit. Language fluent with intact comprehension. Immediate recall, working memory, and long-term memory intact. No neglect.

Cranial Nerves:
1 - not assessed
2 - Fully intact visual fields bilaterally via confrontation.
3, 4, 6 - extraocular movements intact and conjugate. Normal smooth pursuit. Normal saccades.
5 - normal facial sensation to light touch bilaterally.
7 - symmetric facies with normal smile, palpebral fractures, nasal labial folds and forced eyelid closure.
8 - grossly intact
9, 10 - symmetric palate elevation.
11 - 5/5 head turning, bilaterally.
12 - tongue midline at rest and upon protrusion.

Motor: 5/5 throughout with normal bulk and tone; no evidence of pronation
Finger tapping: normal frequency and amplitude bilaterally

Reflexes: 2+ throughout

Sensation: Intact to light touch in all 4 extremities

Motor Integration (Cerebellar):
Finger to Nose: Normal bilaterally without ataxia, dysmetria, or tremor.
Rapid Alternating Movements: Normal with bilateral hands

Gait:

Page 37 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_59173E312028   25976

Normal, not wide-based, no circumduction, no foot drop, no hyperextension of the knee or ankle, no spasticity. No assistive devices.

## Karnofsky Performance Score
Able to carry on normal activity and to work; no special care needed - Score = 80% (Normal activity with effort; some signs or symptoms of disease).

## ECOG/WHO Score
0 = Fully active, able to carry on all predisease performance without restriction.

## Review of Imaging
**Mr Brain Wo + W Cont/rCBV Result Date: 3/16/2018**
Impression 1. Postoperative changes in the left temporal region are similar to the prior study. Linear enhancement at the posterior medial margin of the left anterior temporal resection cavity similar to the prior study. 2. An area of nonenhancing abnormal long TR signal with gyral expansion in the left lateral and medial temporal lobes and in the left subinsular region, similar to the prior study. No new lesions. 3. No evidence for abnormal vascularity on MR perfusion study.

Assessment: Ms. Prosser is a 34 Y/o lady with left temporal GBM on TTFields. She is neurologically intact and radiographically stable. She is tolerating TTFields well and has excellent compliance. She will proceed as outlined below.

Recommendations:
1. GBM - Continue Optune **TTFields**
   Clobetasol for skin irritation
2. RTC 3 months with MRI

25 minutes spent in evaluation, management and coordination of care of patient of which >50% was counseling.


Office Visit on 3/15/2018 . Note shared with
                    patient

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 470 of 631 Document 11-5
Page 38 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_59173E312028   25976

4701

# novocure

## Patient Compliance Report

**Patient Name:** Anniken Prosser

**Treating Physician:** Dr. Jennifer Connelly

**Treating Institution:** Froedtert Hospital and the Medical College of Wisconsin

**Novocure Patient Number:** 1012479

**Report Date:** March 21, 2018

**Period Covered:** February 24, 2018 – March 20, 2018

**Average Daily Usage:**



Site Patient 1012479
Average Daily Usage 86%

75% Target

**Overall Compliance for the Period:**

**86%**

0%          25%          50%          75%          100%

**Report compiled by:  Danita Ziegler**

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 471 of 631    Document 11-5    4702

NCCN Clinical Practice Guidelines in Oncology
(NCCN Guidelines®) for

# Central Nervous System Cancers

Overall management of Central Nervous System Cancers from diagnosis through recurrence is described in the full NCCN Guidelines® for Central Nervous System Cancers. Visit NCCN.org to view the complete library of NCCN Guidelines.

Reproduced with permission from the NCCN Clinical Practice Guidelines in Oncology (NCCN Guidelines®) for Central Nervous System Cancers V.1.2016. © 2016 National Comprehensive Cancer Network, Inc. All rights reserved. The NCCN Guidelines® and illustrations herein may not be reproduced in any form for any purpose without the express written permission of the NCCN. To view the most recent and complete version of the NCCN Guidelines, go online to NCCN.org. NATIONAL COMPREHENSIVE CANCER NETWORK®, NCCN®, NCCN GUIDELINES®, and all other NCCN Content are trademarks owned by the National Comprehensive Cancer Network, Inc.



National
Comprehensive
Cancer
Network®

| GLIOBLASTOMA PATHOLOGY[d] | MGMT[n] PROMOTOR STATUS | ADJUVANT TREATMENT | FOLLOW-UP[b] |
|---|---|---|---|



Glioblastoma[j] ± carmustine (BCNU) wafer[o]

Age ≤70 y → Good performance status (KPS ≥60)

Methylated → Standard brain RT[k] + concurrent temozolomide and adjuvant temozolomide + alternating electric field therapy[m,p,q,r] or Standard brain RT[k] + concurrent temozolomide and adjuvant temozolomide (category 1)[m,p,q]

Unmethylated or indeterminate → Standard brain RT[k] + concurrent temozolomide[s] and adjuvant temozolomide[s] + alternating electric field therapy[m,p,q,r] or Standard brain RT[k] + concurrent temozolomide[s] and adjuvant temozolomide (category 1)[m,p,q,s] or Standard brain RT alone[k]

Poor performance status (KPS <60) → Standard or hypofractionated brain RT[k] or Temozolomide[t] or Palliative/Best supportive care

MRI 2–6 wk after RT, then every 2–4 mo for 2–3 y, then less frequently → See Recurrence (GLIO-5)

Age >70 y → See GLIO-4

[a] This pathway includes the classification of mixed anaplastic oligoastrocytoma (AOA), anaplastic astrocytoma (AA), anaplastic oligodendroglioma (AO), and other rare anaplastic gliomas.
[b] See Principles of Brain and Spine Tumor Imaging (BRAIN-A).
[d] See Principles of Brain Tumor Pathology (BRAIN-F).
[j] This pathway also includes gliosarcoma.
[k] See Principles of Brain and Spinal Cord Tumor Radiation Therapy (BRAIN-C).
[m] See Principles of Brain and Spinal Cord Tumor Systemic Therapy (BRAIN-D).
[n] MGMT= O⁶-methylguanine-DNA methyltransferase.
[o] Treatment with carmustine wafer, reirradiation, or multiple prior systemic therapies may impact enrollment in some adjuvant clinical trials.

[p] Combination of agents may lead to increased toxicity or radiographic changes.
[q] Benefit of treatment with temozolomide for glioblastomas beyond 6 months is unknown. The optimal duration of treatment with temozolomide for anaplastic astrocytoma is unknown.
[s] Alternating electric field therapy is only an option for patients with supratentorial disease.
[s] Clinical benefit from temozolomide is likely to be lower in patients whose tumors lack MGMT promoter methylation.
[t] Temozolomide monotherapy is only recommended if tumor is MGMT promotor methylated.

Note: All recommendations are category 2A unless otherwise indicated.
Clinical Trials: NCCN believes that the best management of any patient with cancer is in a clinical trial. Participation in clinical trials is especially encouraged.

Version 1.2016, 07/25/16 © National Comprehensive Cancer Network, Inc. 2016, All rights reserved. The NCCN Guidelines® and this illustration may not be reproduced in any form without the express written permission of NCCN.

GLIO-3

Visit NCCN.org to view the complete library of NCCN Guidelines.

# NCCN National Comprehensive Cancer Network — Central Nervous System Cancers | NCCN Guidelines® | Version 1.2016



**GLIOBLASTOMA PATHOLOGY[d]** | **MGMT PROMOTOR STATUS[f]** | **ADJUVANT TREATMENT** | **FOLLOW-UP[b]**

Age >70 y (Glioblastoma ± carmustine (BCNU) wafer[o])

Good performance status (KPS ≥60)

→ Methylated
→ Unmethylated or Indeterminate

**Methylated:**
- Temozolomide
  or
- Hypofractionated brain RT alone[k] (category 1)
  or
- Hypofractionated brain RT[k] + concurrent and adjuvant temozolomide[m,p,q]
  or
- Standard RT[k] + concurrent temozolomide and adjuvant temozolomide and adjuvant electric field therapy[m,p,q,r,s]
  or
- Standard RT[k] + concurrent temozolomide and adjuvant temozolomide[m,p,q]

**Unmethylated or Indeterminate:**
- Hypofractionated brain RT alone[k] (category 1)
  or
- Standard RT[k] + concurrent temozolomide[s] and adjuvant temozolomide[s] + alternating electric field therapy[m,p,q,r]
  or
- Standard RT[k] + concurrent temozolomide[s] and adjuvant temozolomide[m,p,q]

Poor performance status (KPS <60)
- Hypofractionated brain RT alone[k]
  or
- Temozolomide[t]
  or
- Palliative/Best supportive care

→ MRI 2–6 wk after RT, then every 2–4 mo for 2–3 y, then less frequently → See Recurrence (GLIO-6)

---

[a] This pathway includes the classification of mixed anaplastic oligoastrocytoma (AOA), anaplastic astrocytoma (AA), anaplastic oligodendroglioma (AO), and other rare anaplastic gliomas.

[b] See Principles of Brain and Spine Tumor Imaging (BRAIN-A).

[c] See Principles of Brain Tumor Pathology (BRAIN-F).

[d] This pathway also includes gliosarcoma.

[e] See Principles of Brain and Spinal Cord Tumor Radiation Therapy (BRAIN-C).

[f] See Principles of Brain and Spinal Cord Tumor Systemic Therapy (BRAIN-D).

[g] MGMT= O⁶-methylguanine-DNA methyltransferase.

[k] Treatment with carmustine wafer, reirradiation, or multiple prior systemic therapies may impact enrollment in some adjuvant clinical trials.

[m] Combination of agents may lead to increased toxicity or radiographic changes.

[p] Benefit of treatment with temozolomide for glioblastomas beyond 6 months is unknown. The optimal duration of treatment with temozolomide for anaplastic astrocytomas is unknown.

[r] Alternating electric field therapy is only an option for patients with supratentorial disease.

[s] Clinical benefit from temozolomide is likely to be lower in patients whose tumors lack MGMT promoter methylation.

[t] Temozolomide monotherapy is only recommended if tumor is MGMT promoter methylated.

*Note: All recommendations are category 2A unless otherwise indicated.*

*Clinical Trials: NCCN believes that the best management of any patient with cancer is in a clinical trial. Participation in clinical trials is especially encouraged.*

Version 1.2016, 07/25/16 © National Comprehensive Cancer Network, Inc. 2016, All rights reserved. The NCCN Guidelines® and this illustration may not be reproduced in any form without the express written permission of NCCN.

GLIO-4

Visit NCCN.org to view the complete library of NCCN Guidelines.



**RECURRENCE**  **TREATMENT**

**Recurrent disease[a,v] for:**
- Anaplastic oligodendroglioma
- Anaplastic oligoastrocytoma
- Anaplastic astrocytoma
- Anaplastic gliomas
- Glioblastoma

Diffuse or multiple →
- Palliative/Best supportive care if poor performance status
- or
- Systemic chemotherapy[m,w]
- or
- Surgery for symptomatic, large lesion
- or
- Consider alternating electric field therapy for glioblastoma (category 2B)

→ Palliative/Best supportive care
See NCCN Guidelines For Palliative Care

Local → Resectable → Resection + carmustine (BCNU) wafer[o] / Resection without carmustine (BCNU) wafer → Brain MRI[b,j] →
- Palliative/Best supportive care if poor performance status
- or
- Systemic chemotherapy[m,w]
- or
- Consider reirradiation (category 2B)[k,x]
- or
- Consider alternating electric field therapy for glioblastoma (category 2B)

Unresectable →

---

[a] This pathway includes the classification of mixed anaplastic oligoastrocytoma (AOA), anaplastic astrocytoma (AA), anaplastic oligodendroglioma (AO), and other rare anaplastic gliomas.
[b] See Principles of Brain and Spine Tumor Imaging (BRAIN-A).
[j] Postoperative brain MRI within 24–72 hours after surgery.
[k] See Principles of Brain and Spinal Cord Tumor Radiation Therapy (BRAIN-C).
[m] See Principles of Brain and Spinal Cord Tumor Systemic Therapy (BRAIN-D).
[o] Treatment with carmustine wafer, reirradiation, or multiple prior systemic therapies may impact enrollment in some adjuvant clinical trials.
[v] Consider MR spectroscopy, MR perfusion, or brain PET to rule out radiation necrosis.

[w] Within the first 3 months after completion of RT and concomitant temozolomide, diagnosis of recurrence can be indistinguishable from pseudoprogression on neuroimaging. With pseudoprogression, stabilization or improvement should be expected within 3 mo of the end of radiotherapy.
[w] Anaplastic oligodendrogliomas have been reported to be especially sensitive to chemotherapy. Chemotherapy using temozolomide or nitrosourea-based regimens may be appropriate.
[x] Especially if long interval since prior RT and/or if there was a good response to prior RT.

**Note: All recommendations are category 2A unless otherwise indicated.**
**Clinical Trials: NCCN believes that the best management of any patient with cancer is in a clinical trial. Participation in clinical trials is especially encouraged.**

Version 1.2016, 07/25/16 © National Comprehensive Cancer Network, Inc. 2016, All rights reserved. The NCCN Guidelines® and this illustration may not be reproduced in any form without the express written permission of NCCN®.

GLIO-5

The National Comprehensive Cancer Network® (NCCN®) appreciates that supporting companies recognize NCCN's need for autonomy in the development of the content of NCCN resources. All NCCN Guidelines are produced completely independently. NCCN Guidelines are not intended to promote any specific therapeutic modality. The distribution of this flash card is supported by Novocure, Inc.

OPT-558  © 2016 National Comprehensive Cancer Network  GL-N-0751-1016

www.jama.com

# JAMA

Journal of the
American Medical Association

Reprint Article

Preliminary Communication

# Maintenance Therapy With Tumor-Treating Fields Plus Temozolomide vs Temozolomide Alone for Glioblastoma
## A Randomized Clinical Trial

Roger Stupp, MD; Sophie Taillibert, MD; Andrew A. Kanner, MD; Santosh Kesari, MD, PhD; David M. Steinberg, PhD; Steven A. Toms, MD, FACS, MPH; Lynne P. Taylor, MD, FAAN; Frank Lieberman, MD; Antonio Silvani, MD; Karen L. Fink, MD, PhD; Gene H. Barnett, MD, MBA; Jay-Jiguang Zhu, MD, PhD; John W. Henson, MD, MBA, FAAN; Herbert H. Engelhard, MD, PhD; Thomas C. Chen, MD, PhD; David D. Tran, MD, PhD; Jan Sroubek, MD; Nam D. Tran, MD, PhD; Andreas F. Hottinger, MD, PhD; Joseph Landolfi, DO; Rajiv Desai, MD; Manuela Caroli, MD; Yvonne Kew, MD, PhD; Jerome Honnorat, MD, PhD; Ahmed Idbaih, MD, PhD; Eilon D. Kirson, MD, PhD; Uri Weinberg, MD, PhD; Yoram Palti, MD, PhD; Monika E. Hegi, PhD; Zvi Ram, MD

✡ Reprinted Article from: Volume 314, Number 23 | Pages 2535-2543 | December 15, 2015



A JAMA NETWORK
PUBLICATION

Case 1:20-cv-00442-WCG    Filed 04/28/20    Page 476 of 631    Document 11-5    4707

Research

Preliminary Communication

# Maintenance Therapy With Tumor-Treating Fields Plus Temozolomide vs Temozolomide Alone for Glioblastoma
## A Randomized Clinical Trial

Roger Stupp, MD; Sophie Taillibert, MD; Andrew A. Kanner, MD; Santosh Kesari, MD, PhD; David M. Steinberg, PhD;
Steven A. Toms, MD, FACS, MPH; Lynne P. Taylor, MD, FAAN; Frank Lieberman, MD; Antonio Silvani, MD; Karen L. Fink, MD, PhD;
Gene H. Barnett, MD, MBA; Jay-Jiguang Zhu, MD, PhD; John W. Hanson, MD, MBA, FAAN; Herbert H. Engelhard, MD, PhD;
Thomas C. Chen, MD, PhD; David D. Tran, MD, PhD; Jan Sroubek, MD; Nam D. Tran, MD, PhD; Andreas F. Hottinger, MD, PhD;
Joseph Landolfi, DO; Rajiv Desai, MD; Manuela Caroli, MD; Yvonne Kew, MD, PhD; Jerome Honnorat, MD, PhD; Ahmed Idbaih, MD, PhD;
Eilon D. Kirson, MD, PhD; Uri Weinberg, MD, PhD; Yoram Palti, MD, PhD; Monika E. Hegi, PhD; Zvi Ram, MD

**IMPORTANCE** Glioblastoma is the most devastating primary malignancy of the central nervous system in adults. Most patients die within 1 to 2 years of diagnosis. Tumor-treating fields (TTFields) are a locoregionally delivered antimitotic treatment that interferes with cell division and organelle assembly.

**OBJECTIVE** To evaluate the efficacy and safety of TTFields used in combination with temozolomide maintenance treatment after chemoradiation therapy for patients with glioblastoma.

**DESIGN, SETTING, AND PARTICIPANTS** After completion of chemoradiotherapy, patients with glioblastoma were randomized (2:1) to receive maintenance treatment with either TTFields plus temozolomide (n = 466) or temozolomide alone (n = 229) (median time from diagnosis to randomization, 3.8 months in both groups). The study enrolled 695 of the planned 700 patients between July 2009 and November 2014 at 83 centers in the United States, Canada, Europe, Israel, and South Korea. The trial was terminated based on the results of this planned interim analysis.

**INTERVENTIONS** Treatment with TTFields was delivered continuously (>18 hours/day) via 4 transducer arrays placed on the shaved scalp and connected to a portable medical device. Temozolomide (150-200 mg/m²/d) was given for 5 days of each 28-day cycle.

**MAIN OUTCOMES AND MEASURES** The primary end point was progression-free survival in the intent-to-treat population (significance threshold of .01) with overall survival in the per-protocol population (n = 280) as a powered secondary end point (significance threshold of .006). This prespecified interim analysis was to be conducted on the first 315 patients after at least 18 months of follow-up.

**RESULTS** The interim analysis included 210 patients randomized to TTFields plus temozolomide and 105 randomized to temozolomide alone, and was conducted at a median follow-up of 38 months (range, 18-60 months). Median progression-free survival in the intent-to-treat population was 7.1 months (95% CI, 5.9-8.2 months) in the TTFields plus temozolomide group and 4.0 months (95% CI, 3.3-5.2 months) in the temozolomide alone group (hazard ratio [HR], 0.62 [98.7% CI, 0.43-0.89]; P = .001). Median overall survival in the per-protocol population was 20.5 months (95% CI, 16.7-25.0 months) in the TTFields plus temozolomide group (n = 196) and 15.6 months (95% CI, 13.3-19.1 months) in the temozolomide alone group (n = 84) (HR, 0.64 [99.4% CI, 0.42-0.98]; P = .004).

**CONCLUSIONS AND RELEVANCE** In this interim analysis of 315 patients with glioblastoma who had completed standard chemoradiation therapy, adding TTFields to maintenance temozolomide chemotherapy significantly prolonged progression-free and overall survival.

**TRIAL REGISTRATION** clinicaltrials.gov Identifier: NCT00916409

← Editorial page 2511

JAMA Report Video at jama.com

Supplemental content at jama.com

Author Affiliations: Author affiliations are listed at the end of this article.

Corresponding Author: Roger Stupp, MD, Department of Oncology and Cancer Center, University Hospital Zurich, CH-8091 Zurich, Switzerland (roger.stupp@usz.ch).

JAMA. 2015;314(23):2535-2543. doi:10.1001/jama.2015.16669

Copyright 2015 American Medical Association. All rights reserved.
Case 1:20-cv-00484-NGG Filed 0 Document 11-5 Page 477 of 631
Page 45 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]
JB_58173E312028 25976
AMB2512366

G lioblastoma is the most devastating primary malignancy of the central nervous system in adults. Standard treatment consists of maximal safe surgical resection or a diagnostic biopsy, followed by radiotherapy (60 Gy) with concomitant daily temozolomide chemotherapy, and then maintenance treatment with temozolomide for 6 to 12 months.[1] However, most patients will die within 1 to 2 years. Median progression-free survival from diagnosis of 6.2 to 7.5 months and median overall survival from diagnosis of 14.6 to 16.7 months have been reported in clinical trials.[1-4] The reported 2- and 5-year survival rates[5] are 27% and 10%, respectively. During the last decade, all attempts to improve the outcome for patients with glioblastoma have failed when evaluated in large randomized trials.[2-4,6,7]

Tumor-treating fields (TTFields) are an antimitotic treatment that selectively disrupts the division of cells by delivering low-intensity, intermediate-frequency (200 kHz) alternating electric fields via transducer arrays applied to the shaved scalp.[8-10] In preclinical models, TTFields have been shown to cause mitotic arrest and apoptosis by disrupting mitotic spindle formation during metaphase and causing dielectrophoretic movement of polar molecules during cytokinesis.[8,10-12] In a randomized phase 3 trial in which TTFields were compared with chemotherapy in 237 patients with recurrent glioblastoma, the use of TTFields did not prolong progression-free survival or overall survival, but the therapy was associated with better quality of life without the typical chemotherapy-associated toxic effects.[13]

Based on preclinical data demonstrating a synergistic antitumor effect with chemotherapy and TTFields, and pilot clinical feasibility data in combination with temozolomide,[9] we initiated this phase 3 trial. The objective was to evaluate the efficacy and safety of TTFields used in combination with maintenance temozolomide in patients with glioblastoma after initial treatment with temozolomide and radiotherapy.

## Methods

### Study Population

Patients eligible for this study (1) had histologically confirmed supratentorial glioblastoma (World Health Organization grade IV astrocytoma[14]), (2) were progression-free after having undergone maximal safe debulking surgery when feasible or biopsy, and (3) had completed standard concomitant chemoradiotherapy with temozolomide. Other eligibility criteria were (1) age of 18 years or older, (2) Karnofsky Performance Status (KPS) score of 70% or higher (the KPS score describes the general condition of a patient; a KPS score ≥70% ensures some independence in activities of daily living), and (3) adequate bone marrow, liver, and renal function.

Prior use of implanted carmustine wafers was allowed. Patients with infratentorial tumor location and severe comorbidities were excluded. All patients provided written informed consent before entering the study; the study was approved by the institutional review boards or ethics committees of all 83 participating centers. The trial protocol appears in Supplement 1.

## Study Design and Treatment

This multicenter, open-label, randomized phase 3 trial was designed to test the efficacy and safety of TTFields in combination with temozolomide for treatment of glioblastoma after initial treatment with chemoradiation. After the completion of treatment with temozolomide and radiotherapy, patients were randomized at a ratio of 2 to 1 (Figure 1) to receive standard maintenance temozolomide chemotherapy (150-200 mg/m²/d for 5 days every 28 days for 6-12 cycles according to the protocol[1] from the European Organisation for Research and Treatment of Cancer Brain Tumor and Radiotherapy Groups and the National Cancer Institute of Canada Clinical Trials Group) with or without the addition of TTFields. Treatment with TTFields was to be initiated within 4 to 7 weeks from the last dose of concomitant temozolomide and radiotherapy. Randomization was performed through a central web-based randomization system and was stratified by extent of resection (biopsy, partial resection, gross total resection) and by O⁶-methylguanine-DNA methyltransferase (*MGMT*) methylation status (methylated, unmethylated, or unknown).

For patients with available paraffin-embedded tumor tissue, evaluation of *MGMT* gene promoter methylation status was performed as described previously[7,15,16] by a central laboratory blinded to treatment group (MDxHealth). If *MGMT* methylation status could not be determined centrally prior to randomization, local *MGMT* methylation status was used for stratification.

Patients in the TTFields plus temozolomide group received continuous TTFields combined with standard maintenance temozolomide. Patients receiving TTFields had 4 transducer arrays placed on the shaved scalp and connected to a portable device set to generate 200-kHz electric fields within the brain (Optune, Novocure Ltd). Transducer array layouts were determined using a mapping software system for TTFields to optimize field intensity within the treated tumor (NovoTAL, Novocure Ltd). After being trained to operate the device, the patient continued treatment at home. The transducer arrays were supplied in sterile packaging and replaced by the patient, a caregiver, or a device technician twice per week. Although uninterrupted treatment was recommended, short treatment breaks for personal needs were allowed.

If a patient experienced tumor progression, second-line chemotherapy was offered per local practice. However, in the TTFields plus temozolomide group, TTFields could be continued until the second radiological progression, or clinical deterioration, for a maximum of 24 months.

## Patient Surveillance and Follow-up

Baseline contrast-enhanced magnetic resonance imaging (MRI) of the brain was required within 2 weeks before starting treatment with maintenance temozolomide with or without TTFields. A complete physical examination with collection of laboratory parameters was performed within 1 week of treatment initiation. The evaluation also included a quality-of-life questionnaire (QLQ-C30) that has a brain-specific module (BN-20), which was developed by the European Organisation

(REPRINTED)                      Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-00613-SB Document 11-5 ... Page 478 of 631

Page 46 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]                4709

**Figure 1. Recruitment and Inclusion of Patients in the Study**



1019 Patients signed informed consent and were screened

324 Excluded
62 Progressive disease prior to randomization
53 Refused to participate (did not want to be randomized)
52 Did not meet eligibility criteria
46 Did not want to use the device
20 Agreed to participate in another trial
18 Lived too far away from study site
8 Did not complete radiotherapy and temozolomide chemotherapy
4 Refused any further treatment
4 Could not tolerate temozolomide chemotherapy
37 Other reasons

695 Randomized

466 Randomized to receive tumor-treating fields therapy plus temozolomide

229 Randomized to receive temozolomide alone

11 Withdrew consent
5 Lost to follow-up
8 Had clinical decline

5 Withdrew consent
4 Lost to follow-up
4 Had clinical decline

210 Completed ≥18 mo of follow-up

105 Completed ≥18 mo of follow-up

210 Included in interim primary analysis
196 Included in per-protocol analysis
14 Excluded
7 Never started treatment
1 Started other experimental treatment
6 Did not start second cycle of temozolomide

105 Included in interim primary analysis
84 Included in per-protocol analysis
21 Excluded
4 Never started treatment
1 Started other experimental treatment
5 Did not start second cycle of temozolomide
11 Crossed over and started tumor-treating fields therapy

for Research and Treatment of Cancer Brain Tumor and Radiotherapy Groups.[17,10] A Mini-Mental State Examination (a short bedside test used to evaluate cognition and memory) also was administered (a test result of 27-30 points is considered normal function).

Patients were seen monthly for medical follow-up and routine laboratory examinations. Quality of life was assessed every 3 months. Magnetic resonance imaging was to be performed every second month after the baseline MRI until second radiological progression in all patients. In cases of clinical progression, MRI was to be performed within 1 week after the study investigator became aware of it. All MRIs were reviewed centrally by 2 blinded independent radiologists (BioClinica Inc) and were evaluated for tumor response and progression using the criteria developed by Macdonald et al.[19] In cases in which the central reviewers were not in agreement, a third blinded radiologist adjudicated between them. The third radiologist was involved in 17% of the cases in the TTFields plus temozolomide group and in 18% of the cases in the temozolomide alone group.

The results of the central review were not communicated to the study investigator, and all treatment decisions were based on local imaging interpretation. Eight patients in the

TTFields plus temozolomide group (4%) compared with 6 patients in the temozolomide alone group (3%) were considered stable by blinded central review; however, treatment had been changed by the study investigator due to local interpretation of tumor progression. Patients were removed from the progression-free survival analysis at the date of treatment change when this occurred before evidence of tumor progression or when patients reached the cutoff date without tumor progression.

Adverse events were recorded prospectively according to the National Cancer Institute's Common Terminology Criteria (version 3.0) until 2 months after treatment discontinuation. Adverse events are presented descriptively as number and percentage of patients with each adverse event term for all patients available at the time of the interim analysis. Treatment adherence with TTFields was recorded electronically by the device as average daily use in hours per day and information was reviewed and transferred at the monthly follow-up visit.

**Statistical Considerations**

The primary end point was progression-free survival in the intent-to-treat (ITT) population assessed by an independent review panel (80% power; hazard ratio [HR], 0.78; 2-sided α level

Case 1:20-cv-00194-WCG Filed 09/18/20 Page 479 of 631 Document 11-5

of .05). The study was also designed to have 80% power (HR, 0.76; 2-sided α level of .05) to examine overall survival as a secondary end point. To avoid an increase in the risk of a false-positive result, overall survival was to be tested statistically only if the primary end point was met.

This prespecified interim analysis was to be performed after the first 315 randomized patients reached a minimum 18-month follow-up. The final type I error rate of 0.05 was split between the interim and final analyses based on a standard α spending function.[20-22] The protocol prespecified that overall survival would be analyzed in an as-treated population, excluding all patients in both treatment groups who (1) never started maintenance temozolomide, (2) had major protocol violations, (3) crossed over to the other treatment group, or (4) received TTFields outside the protocol setting.

The primary end point would be achieved in the interim analysis if progression-free survival in the ITT population was significantly longer in the intervention group compared with the control group using a stratified log-rank test with an α level of .01. The secondary end point would be achieved in the interim analysis if overall survival in the as-treated population (per-protocol population) was significantly longer in the TTFields plus temozolomide group using a stratified log-rank test with an α level of .006. The confidence intervals that go with the HRs are presented as 1 minus the prespecified α level for each analysis. For example, the α level in the per-protocol interim analysis for overall survival was .006. Therefore, the corresponding confidence interval used for presenting the HRs was 1.000 – 0.006 (99.4% confidence interval). An upper confidence limit of less than 1 indicates the prespecified statistical threshold was met. An independent data and safety monitoring committee was chartered to stop the trial if the interim analysis of progression-free survival (ITT population) and overall survival (per-protocol population) surpassed these predetermined thresholds, as well as for futility or safety concerns.

In addition to these prespecified analyses, an analysis of overall survival in the ITT population was performed. Furthermore, a robustness analysis including all 695 patients enrolled in the trial served to validate the findings of the interim analysis (database lock: December 29, 2014; eAppendix 1 in Supplement 2).

Multiple imputation analyses also were performed for the trial's primary end point of progression-free survival in the ITT population to test the sensitivity of the results to possible bias using informative and interval censoring. These analyses included (1) treating all patients with informative censoring as treatment failures in the TTFields plus temozolomide group, (2) censoring all patients with informative censoring in the temozolomide alone group (worst case scenario), and (3) treating all events in the TTFields plus temozolomide group and in the temozolomide alone group as occurring differentially at different periods during the inter-MRI interval before the date of tumor progression.

All statistical analyses were performed using SAS version 9.4 (SAS Institute Inc) and R version 3.1.1.[23] The final analysis will be performed when all 695 patients enrolled in the study have at least 18 months of follow-up and will include prespecified subgroup analyses and additional secondary end points, including quality of life.

## Results

### Study Participants

Between July 2009 and November 2014, there were 695 patients with newly diagnosed glioblastoma randomized to receive either TTFields plus temozolomide (n = 466) or temozolomide alone (n = 229). Data for the interim analysis included 210 patients randomized to TTFields plus temozolomide and 105 to temozolomide alone (Figure 1; database lock: September 5, 2014). The independent data and safety monitoring committee met in October 2014 to review the interim analysis; the trial met the predefined boundaries for success (improvement of both progression-free and overall survival) and the committee recommended study termination, thus allowing patients in the control group to crossover and receive TTFields.

After approval of study termination by the US Food and Drug Administration, the trial was closed to recruitment on November 29, 2014, after 695 patients of the planned 700 patients had already been randomized. All patients in the control group with ongoing maintenance therapy were offered to receive TTFields. At the time of this report, 35 patients in the control group crossed over to receive TTFields. Follow-up for all patients continues according to the protocol.

Patient baseline characteristics were well balanced between the 2 groups (Table 1). The median age was 57 years and 66% were male. The median KPS score was 90%. Sixty-four percent of patients had a gross total resection and 11% had only a diagnostic biopsy. Tumor tissue for central MGMT testing was available for 72% of the patients; the MGMT methylation frequency was 39% (75/191 valid tests); 39% for the TTFields plus temozolomide group and 41% for the temozolomide alone group). Tumor location in the brain was also comparable.

Carmustine wafers (Gliadel) were used at initial surgery in 2.4% of patients in the TTFields plus temozolomide group vs 2.9% of patients in the temozolomide alone group. Ninety-five percent of the patients were white and 61% were treated in the United States. The rest of the patients were treated at centers in Canada, Europe, Israel, and South Korea. The median time from diagnosis to randomization was 3.8 months (range, 2.0-5.7 months) for patients in the TTFields plus temozolomide group and 3.8 months (range, 1.4-5.7 months) for those in the temozolomide alone group. The median time from the end of treatment with temozolomide and radiotherapy to randomization was 36 days in the TTFields plus temozolomide group and 38 days in the temozolomide alone group; 53% of patients were randomized after having started the first cycle of maintenance temozolomide. The median time from randomization to initiation of TTFields was 5 days.

### Treatment Delivery

All patients had completed radiotherapy and concomitant temozolomide as per local practice. The median number of temozolomide cycles until evidence of first tumor progression was 6 cycles (range, 1-26 cycles) for patients in the TTFields

Case 1:20-cv-00451-WCB Document 11-5
Page 49 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]
4711

Maintenance Therapy After Chemoradiation in Patients With Glioblastoma

Preliminary Communication Research

2015031216073 50

Table 1. Patient Baseline Characteristics and Treatment Details

| | All Patients (N = 315) | TTFields Plus Temozolomide (n = 210) | Temozolomide Alone (n = 105) |
|---|---|---|---|
| **Age, y** | | | |
| Mean (SD) | 55.3 (11.1) | 55.3 (11.3) | 56.8 (10.5) |
| Median (range) | 57 (20-83) | 57 (20-83) | 58 (21-80) |
| Karnofsky Performance Status score, median (range), %[a] | 90 (60-100) | 90 (60-100) | 90 (70-100) |
| **Sex, No. (%)** | | | |
| Male | 207 (66) | 140 (67) | 67 (64) |
| Female | 108 (34) | 70 (33) | 38 (36) |
| **Use at baseline, No. (%)** | | | |
| Antiepileptic medication | 126 (40) | 88 (42) | 38 (36) |
| Corticosteroid therapy | 77 (24) | 51 (24) | 26 (25) |
| **Mini-Mental State Examination score, No. (%)[b]** | | | |
| ≤26 | 45 (15) | 31 (15) | 14 (13) |
| 27-30 | 247 (78) | 174 (83) | 73 (70) |
| Unknown | 23 (7) | 5 (2) | 18 (17) |
| **Extent of resection, No. (%)** | | | |
| Biopsy | 34 (11) | 23 (11) | 11 (10) |
| Partial resection | 79 (25) | 52 (25) | 27 (26) |
| Gross total resection | 202 (64) | 135 (64) | 67 (64) |
| **Tissue available and tested, No. (%)** | 227 (72) | 152 (72) | 75 (71) |
| MGMT methylation | 75 (33) | 49 (32) | 26 (35) |
| No methylation | 116 (51) | 79 (52) | 38 (51) |
| Invalid test result | 36 (16) | 24 (16) | 11 (15) |
| **Region, No. (%)** | | | |
| United States | 191 (61) | 127 (60) | 64 (61) |
| Rest of world | 124 (39) | 83 (40) | 41 (39) |
| **Completed radiation therapy, No. (%)** | | | |
| <57 Gy | 18 (6) | 13 (6) | 5 (5) |
| 60 Gy (standard; ±5%) | 291 (92) | 191 (91) | 100 (95) |
| >63 Gy | 6 (2) | 6 (3) | 0 (0) |
| **Concomitant temozolomid use, No. (%)** | | | |
| Yes | 308 (98) | 207 (99) | 101 (96) |
| Unknown | 7 (2) | 3 (1) | 4 (4) |
| **Time from event to randomization, median (range), d** | | | |
| Last day of radiotherapy | 37 (13-68) | 36 (13-53) | 38 (13-68) |
| Initial diagnosis | 114 (43-171) | 115 (59-171) | 113 (43-170) |
| No. of maintenance temozolomide cycles until first tumor progression, median (range) | 6 (1-26) | 6 (1-26) | 4 (1-24) |
| Duration of treatment with TTFields, median (range), mo | 9 (1-58) | 9 (1-58) | |
| Adherence to TTFields therapy ≥75% during first 3 mo of treatment | | 157 (75) | |

Abbreviations: MGMT, O6-methylguanine-DNA methyltransferase; TTFields, tumor-treating fields.

[a] A higher score indicates better functional status.

[b] A higher score indicates better cognitive capability.

plus temozolomide group and 4.0 cycles (range, 1-24 cycles) for patients in the temozolomide alone group; the median duration of treatment with TTFields was 9 months (range, 1-58 months). Two-thirds (n = 141) of patients in the TTFields plus temozolomide group continued treatment with TTFields after first tumor progression. Three-quarters (n = 157) of patients receiving treatment with TTFields were adherent to therapy (ie, wearing the device >18 hours per day on average during the first 3 treatment months).

**Efficacy End Points**

As prespecified, the primary end point for the efficacy results was based on progression-free survival in the ITT population of the interim analysis data set. After a median follow-up of 38 months (range, 18-60 months), the median progression-free survival from randomization was 7.1 months (95% CI, 5.9-8.2 months) in the TTFields plus temozolomide group compared with 4.0 months (95% CI, 3.3-5.2 months) in the temozolomide alone group (HR, 0.62 [98.7% CI, 0.43-0.89];

(REPRINTED) JAMA December 15, 2015 Volume 314, Number 23 2539

© 2015 American Medical Association. All rights reserved.
Page 50 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time] JB_59173E312028 25976

Figure 2. Survival Curves for Patients Included in the Interim Analysis in the Intent-to-Treat Population



No. at risk

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| TTFields plus temozolomide | 210 | 149 | 94 | 60 | 45 | 35 | 29 | 22 | 16 | 12 | 11 |
| Temozolomide alone | 105 | 55 | 28 | 21 | 15 | 12 | 12 | 6 | 5 | 1 | 1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| TTFields plus temozolomide | 210 | 195 | 147 | 94 | 65 | 43 | 28 |
| Temozolomide alone | 105 | 86 | 68 | 42 | 23 | 14 | 8 |

Survival analyses on time from date of randomization until tumor progression, death, or last follow-up (censored patients) according to the Kaplan-Meier

method. The small vertical ticks on the curves indicate censored patients. HR indicates hazard ratio; TTFields, tumor-treating fields.

stratified log-rank $P = .001$; Figure 2A). Thus, adding TTFields to temozolomide treatment increased median progression-free survival in the ITT population by 3.1 months.

As per the statistical analysis plan, overall survival was to be tested in a prespecified per-protocol population only after the primary end point was found to surpass the threshold for significance in the interim analysis. Median overall survival in the per-protocol population was 20.5 months (95% CI, 16.7-25.0 months) in the TTFields plus temozolomide group (n = 196) compared with 15.6 months (95% CI, 13.3-19.1 months) in the temozolomide alone group (n = 84) (HR, 0.64 [99.4% CI, 0.42-0.98]; stratified log-rank $P = .004$). The details on the per-protocol population and analyses are summarized in eAppendix 2 in Supplement 2.

In additional analyses in the ITT population, the median overall survival was 19.6 months (95% CI, 16.6-24.4 months) in the TTFields plus temozolomide group compared with 16.6 months (95% CI, 13.6-19.2 months) in the temozolomide alone group (HR, 0.74 [95% CI, 0.56-0.98]; stratified log-rank $P = .03$; Figure 2B). The percentage of patients alive at 2 years following enrollment was 43% in the TTFields plus temozolomide group and 29% in the temozolomide alone group ($P = .006$).

To assess the robustness of the interim analysis findings, additional analyses on all 695 patients randomized were performed. Patient characteristics of all patients randomized did not differ significantly from the interim data set, and the results for the main end points were similar in these analyses compared with the interim analysis (eAppendix 1 in Supplement 2).

Second-line treatments, such as nitrosoureas, temozolomide rechallenge, and bevacizumab, were received by 67% of the patients in the TTFields plus temozolomide group compared with 57% in the temozolomide alone group; about 40% of second-line therapies included bevacizumab and about 40% included nitrosoureas. The type of chemotherapy used at recurrence was balanced between treatment groups.

Secondary imputation analyses of progression-free survival with relation to the effects of interval and informational censoring did not change the conclusions of the primary progression-free survival analysis (eAppendix 3 in Supplement 2).

### Safety and Tolerability

The addition of TTFields to temozolomide therapy in patients with newly diagnosed glioblastoma was not associated with any significant increase in systemic toxic effects compared with temozolomide therapy alone (Table 2). The overall incidence, distribution, and severity of adverse events were similar in patients treated with TTFields plus temozolomide and in those treated with temozolomide alone. The only notable exception was a higher incidence rate of localized skin toxicity (medical device site reaction beneath the transducer arrays) in patients treated with TTFields plus temozolomide. Mild to moderate skin irritation was observed in 43% of patients treated with TTFields plus temozolomide and severe skin reaction (grade 3) in 2%. Mild anxiety, confusion, insomnia, and headaches were reported more frequently in the patients treated with TTFields plus temozolomide and occurred mainly at the time of therapy initiation. The incidence of seizures was almost identical in the 2 groups (15 [7%] in the TTFields plus temozolomide group vs 8 [8%] in temozolomide alone group). A total of 12 patients died of causes considered unrelated to treatment while receiving adjuvant therapy (8 [3.9%] in the temozolomide plus TTFields group and 4 [4.0%] in the temozolomide alone group; Table 2).

### Discussion

Glioblastoma is a highly aggressive brain tumor affecting men and women, frequently at the peak of life. Prognosis remains poor with no major treatment advance in more than a decade. In the interim analysis of this randomized clinical trial,

Copyright 2015 American Medical Association. All rights reserved.

the addition of TTFields to standard maintenance temozolomide significantly improved progression-free and overall survival. The prespecified analyses revealed that patients randomized to receive TTFields plus temozolomide compared with patients randomized to receive temozolomide alone had a median progression-free survival of 7.1 months vs 4.0 months (ITT analyses). Patients who received TTFields plus temozolomide had a median overall survival of 20.5 months compared with 15.6 months in those who received temozolomide alone (as per the prespecified per-protocol analysis; the ITT analysis did not differ substantially).

Based on the results of this planned interim analysis, the trial's independent data and safety monitoring committee recommended termination of the trial. Because almost all patients had been enrolled (695/700) in the study by the time the recommendation was implemented, the full trial population will be followed up for both progression-free and overall survival. Subsequent analyses of all secondary end points and subgroups will be performed when the follow-up data are available.

The trial population and the results in the control group in this study were comparable with other glioblastoma clinical trials. Nevertheless, patients in this trial were randomized only after the end of radiochemotherapy, and for most, the first cycle of maintenance temozolomide had been started at the time of randomization; thus, patients with early tumor progression during radiochemotherapy were excluded. Most glioblastoma trials have reported survival from the date of initial diagnosis or study enrollment before starting radiochemotherapy, thus 3 to 4 months before randomization of the current study.

When the interval from diagnosis to randomization is added to the outcome results in this study, the progression-free survival of 7.8 months in the control group is comparable with most other reported studies, and supports the generalizability of these results. The Radiation Therapy Oncology Group (RTOG) 0525 protocol randomized patients only after the end of treatment with temozolomide and radiotherapy, similar to our study.[3] The control groups with standard dose temozolomide only in these 2 trials were comparable: progression-free survival from randomization of 4.0 months in the present study and 5.5 months in the RTOG 0525 trial and overall survival of 16.6 months in both trials. Thus, the benefit observed with TTFields cannot be simply attributed to patient selection. In the present trial, the gain of 3 months in both median progression-free survival (from 4.0 months to 7.2 months; HR, 0.62) and median overall survival (from 16.6 months to 19.6 months; HR, 0.74), translating into a survival gain at 2 years of 14% (from 29% to 43%) in the ITT population is in the range of benefit that is considered clinically meaningful for therapeutic agents in oncology.

The prespecified analysis for overall survival in the interim analysis was to be based on the per-protocol population (n = 280); ie, removal in both study groups of the patients who did not start their second course of maintenance temozolomide or had major protocol violations. This analysis met the prespecified threshold for efficacy in the interim analysis for the per-protocol population. In a more conservative analysis using the ITT population, an overall survival benefit was also manifest. Furthermore, an analysis of robustness performed on all randomized patients enrolled at the time

**Table 2. Grade 3 to 4 Treatment-Emergent Adverse Events**

| | No. (%) of Patients With Adverse Events[a] | |
| --- | --- | --- |
| | TTFields Plus Temozolomide (n = 203)[b] | Temozolomide Alone (n = 101)[c] |
| Hematological disorders[d] | 25 (12) | 9 (9) |
| Anemia | 8 (<1) | 2 (2) |
| Leukopenia or lymphopenia | 11 (5) | 5 (5) |
| Neutropenia | 6 (3) | 1 (1) |
| Thrombocytopenia | 19 (9) | 3 (3) |
| Cardiac disorders | 2 (1) | 3 (3) |
| Eye disorders | 2 (1) | 1 (1) |
| Gastrointestinal disorders[d] | 11 (5) | 2 (2) |
| Abdominal pain | 2 (1) | 0 |
| Constipation | 2 (1) | 0 |
| Diarrhea | 1 (<1) | 2 (2) |
| Vomiting | 3 (1) | 1 (1) |
| General disorders[d] | 17 (8) | 5 (5) |
| Fatigue | 8 (4) | 4 (4) |
| Infections | 10 (5) | 5 (5) |
| Injury and procedural complications[d] | 14 (7) | 5 (5) |
| Fall | 6 (3) | 2 (2) |
| Medical device site reaction | 4 (2) | 0 |
| Metabolism and nutrition disorders | 7 (3) | 3 (3) |
| Musculoskeletal disorders | 8 (4) | 3 (3) |
| Nervous system disorders[d] | 45 (22) | 25 (25) |
| Seizure | 15 (7) | 8 (8) |
| Headache | 4 (2) | 2 (2) |
| Psychiatric disorders[d] | 9 (4) | 3 (3) |
| Anxiety | 2 (1) | 0 |
| Bradyphrenia | 0 | 1 (1) |
| Confusional state | 2 (1) | 1 (1) |
| Mental status changes | 4 (2) | 1 (1) |
| Psychotic disorder | 2 (1) | 0 |
| Respiratory disorders | 4 (2) | 1 (1) |
| Skin disorders | 0 | |
| Vascular disorders[d] | 8 (4) | 8 (8) |
| Deep vein thrombosis | 1 (<1) | 3 (3) |
| Pulmonary embolism | 4 (2) | 6 (6) |

Abbreviation: TTFields, tumor-treating fields.

[a] Safety is reported on patients who have received any treatment. Randomized patients who never received any maintenance therapy were excluded from this safety analysis.

[b] Eight patients died while receiving adjuvant therapy due to causes unrelated to therapy (1 patient for each of the following reasons: cardiac events, pulmonary emboli, respiratory, and infection; and 4 patients with central nervous system disorders likely due to tumor progression).

[c] Four patients died while receiving adjuvant therapy due to causes unrelated to therapy (1 patient for each of the following reasons: cardiac events, pulmonary emboli, respiratory, and unknown).

[d] Patients may have had more than 1 adverse event so subcategories do not total and not all events are subcategorized.

Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-03345-WMR Filed Under Seal Document 11-5 Page 483 of 631

Page 52 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_58173E312028    25976    4714

of study termination (eAppendix 1 in Supplement 2) supports the conclusions of the interim analysis.

This clinical trial has some important limitations. Patient enrollment occurred only after the end of radiochemotherapy, leading to some variation in the delivery of standard treatment of temozolomide and radiotherapy. Patients who had progressed early during radiochemotherapy were not eligible for randomization, thus excluding patients with very poor prognoses. There is likely reporting bias for second-line therapies after tumor progression because in the TTFields plus temozolomide group, TTFields were to be continued, and thus, more detailed treatment information has been tracked for this group.

This analysis reports a planned interim analysis on data from the first 315 patients with at least 18 months of follow-up; however, for detailed and meaningful subgroup analyses, the mature data of the full data set will be needed. Treatment failure patterns, effects of second-line therapies, and additional molecular analyses on baseline tumor biopsies will allow for better understanding of the clinical effects of this novel treatment modality. With the last patient randomized on November 29, 2014, however, these data are not expected before the end of 2016.

This was an open-labeled study. A sham or placebo treatment for the control group was considered neither practical (patients would be able to sense heat when they were receiving TTFields) nor appropriate (due to the burden for patients and caregivers and the need to shave the scalp and have transducer arrays placed). In this respect, the trial resembles studies evaluating radiation therapy. This raises the question of a placebo effect leading to the improved outcome. Although some effect of placebo may be expected on subjective end points, such as cognitive function and quality of life, objective end points, such as overall and progression-free survival (assessed by a blinded review panel), are independent of placebo effects in cancer therapy.[24] The panel did not have information on treatment received and no stigmata of TTFields array pads were evident on MRI.

Recent randomized studies of patients with glioblastoma, which did not use placebo controls, failed to show any increase in progression-free or overall survival[9,7] despite intensive treatment regimens requiring twice weekly hospital visits.[7] The magnitude of effect size seen in the present trial (HR of 0.62 for progression-free survival and 0.74 for overall survival) is beyond what could be attributed to a placebo effect. In addition, the support provided to patients in the TTFields plus temozolomide group by device support specialists during the trial was largely technical in nature and did not include medical supportive care. Medical follow-up with monthly visits was the same for both treatment groups.

Because TTFields were applied only to the head, an increase in systemic adverse events was neither seen nor expected. No increase in seizure rate or neurological adverse events was observed. Almost half of the patients treated with TTFields did experience some grade 1 to 2 (mild to moderate) localized skin reaction related to the application of the transducer arrays used to deliver the TTFields. This adverse effect could be managed using published skin care guidelines for patients receiving TTFields.[25] Only 2% of patients receiving TTFields had grade 3 to 4 (severe) skin reactions beneath the transducer arrays.

## Conclusions

In this interim analysis of 315 patients with glioblastoma who had completed standard chemoradiation therapy, adding TTFields to maintenance temozolomide chemotherapy significantly prolonged progression-free and overall survival.

ARTICLE INFORMATION

Author Affiliations: University Hospital Zurich and University of Zurich, Zurich, Switzerland (Stupp); Lausanne University Hospital (CHUV), Lausanne, Switzerland (Stupp, Hottinger, Hegi); Assistance Publique des Hôpitaux de Paris, La Pitié-Salpêtrière-University Hospital, Pierre and Marie Curie University, Paris, France (Taillibert, Idbaih); Tel Aviv Sourasky Medical Center, Tel Aviv University, Tel Aviv, Israel (Kanner, Ram); University of California, San Diego (Kesari); Tel Aviv University, Tel Aviv, Israel (Steinberg); Geisinger Health System, Danville, Pennsylvania (Toms); Tufts Medical Center, Boston, Massachusetts (Taylor); University of Pittsburgh Medical Center, Pittsburgh, Pennsylvania (Lieberman); Istituto Nazionale Neurologico Carlo Besta, Milan, Italy (Silvani); Baylor University Medical Center, Dallas, Texas (Fink, Zhu); Cleveland Clinic Foundation, Cleveland, Ohio (Barnett); University of Texas Health Science Center, Houston (Zhu); Swedish Neuroscience Institute, Seattle, Washington (Henson); University of Illinois, Chicago (Engelhard); University of Southern California, Los Angeles (Chen); Washington University Barnes-Jewish Hospital, St Louis, Missouri (D. D. Tran); Na Homolce Hospital, Prague, Czech Republic (Sroubek); Moffitt Cancer Center, Tampa, Florida (N. D. Tran);

New Jersey Neuroscience Institute, Edison (Landolfi); Maine Medical Center, Portland (Desai); Fondazione Ospedale Maggiore Policlinico, Milan, Italy (Caroli); Houston Methodist Hospital, Houston, Texas (Kew); Hospices Civils de Lyon, University Claude Bernard Lyon 1, Lyon, France (Honnorat); Novocure, Haifa, Israel (Kirson, Weinberg, Palti).

Author Contributions: Drs Stupp and Ram had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.
Study concept and design: Stupp, Kirson, Weinberg, Palti, Ram.
Acquisition, analysis, or interpretation of data: All authors.
Drafting of the manuscript: Stupp, Kirson, Ram.
Critical revision of the manuscript for important intellectual content: All authors.
Statistical analysis: Steinberg.
Obtained funding: Palti.
Administrative, technical, or material support: Stupp, Kirson, Weinberg, Hegi, Ram.
Study supervision: Stupp, Kirson, Weinberg, Hegi, Ram.

Conflict of Interest Disclosures: The authors have completed and submitted the ICMJE Form for

Disclosure of Potential Conflicts of Interest. Dr Stupp reported receiving travel assistance from Novocure for data review and presentation of the results at medical meetings and receiving personal fees for serving on advisory boards for Roche/Genentech, Merck KGaA, Merck & Co, and Novartis. Dr Taillibert reported receiving personal fees from Mundipharma EDO and Roche. Dr Kanner reported receiving institutional grant funding and personal fees for speaking and device training from Novocure. Dr Kesari reported receiving institutional grant funding and personal fees for consulting and attending advisory meetings from Novocure. Dr Steinberg reported receiving consulting fees from Novocure for performing the statistical analysis. Dr Toms reported receiving personal fees from Novocure for serving on an advisory board. Dr Lieberman reported receiving institutional grant funding from Novocure. Dr Fink reported receiving personal fees from Novocure for serving on an advisory board; and receiving personal fees from Genetech for serving in the speakers program. Dr Zhu reported receiving institutional grant funding and personal fees from Novocure. Dr Engelhard reported receiving institutional grant funding and personal fees from Novocure. Dr Chen reported receiving grant funding, personal fees, nonfinancial support, and being a stock holder and chief

(REPRINTED)
Copyright 2015 American Medical Association. All rights reserved.

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 484 of 631 Document 11-5

Page 53 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time] JB_58173E121208 29976

4715

oncology officer in Pharmo-kinesis: and receiving grant funding, personal fees, nonfinancial support, and being a stock holder in and CEO of NeOnc Technologies. Dr David Tran reported receiving grant funding from Celldex, NWBiotech, Novocure, and Merck; and receiving personal fees from Novocure and prIME Oncology. Dr Hottinger reported receiving travel reimbursement and speakers fees from Novocure and Merck Sharp & Dohme; and receiving personal fees for serving on an advisory board for Roche. Dr Landolfi reported receiving personal fees from Novocure for serving on an advisory board. Dr Honnorat reported receiving trial support from Novocure and serving on an advisory board for Novocure. Dr Idbaih reported receiving grants from Fondation ARC pour la recherche sur le Cancer; receiving research support from IniselChimos and Beta-Innov; receiving personal fees from Novartis for attending a conference; receiving travel reimbursement from Hoffmann-La Roche: and serving as an editorial advisory board member for Lettre du Cancérologue. Drs Kirson, Weinberg, and Palti reported being employees of Novocure. Dr Palti also reported holding 35 issued US patents and minority stock ownership in Novocure. Dr Hegi reported receiving institutional grant funding from Novocure, Merck Sharp & Dohme, Roche, and Merck-Serono; and nonfinancial support from MDxHealth for sample testing. Dr Ram reported receiving institutional grant funding from Novocure; and serving as a paid consultant for and holding stock options in Novocure. Drs Taylor, Silvani, Barnett, Henson, Sroubek, Nam Tran, Desai, Caroli, and Kew reported having no disclosures.

**Funding/Support:** The study was funded by Novocure Ltd.

**Role of the Funder/Sponsor:** Novocure Ltd had a role in the design and conduct of the study: collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication. The study was designed by the first and last authors (R.S. and Z.R.), together with representatives from Novocure (mainly E.D.K.). The study oversight was supported and monitored by a clinical research organization (CRO), who also holds the database. Data were collected by the investigators and monitored by the CRO. Device use data were downloaded monthly and transferred to the study investigators or their research staff by device support specialists from Novocure Ltd. The data were analyzed separately by the statistician of the independent data monitoring committee and the study statistician (D.M.S.). Data interpretation was the responsibility of the first and last authors (R.S. and Z.R.), together with the study sponsor representative and project lead (E.D.K.). These 3 physicians also jointly developed the first draft. A subsequent mature draft and a prefinal version were circulated among all authors who gave additional input, contributed to, and approved the manuscript. The first and last authors (R.S. and Z.R.) had full access to all data, and also reviewed all patient profiles for consistency (R.S. and E.D.K.). The decision to publish the data followed the independent data and safety monitoring committee recommendation for data release, and was supported by all coauthors.

The roles of employees of Novocure are described in the respective author contributions. Other employees' involvement was limited to technical support of the device.

**Additional Contributions:** We thank the patients and their families for participating in the trial. We are grateful to all of the EF-14 investigators, who are listed in eAppendix 4 in Supplement 2, and the nursing staff for taking care of the patients.

## REFERENCES

1. Stupp R, Mason WP, van den Bent MJ, et al; European Organisation for Research and Treatment of Cancer Brain Tumor and Radiotherapy Groups; National Cancer Institute of Canada Clinical Trials Group. Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. *N Engl J Med*. 2005;352(10):987-996.

2. Gilbert MR, Dignam JJ, Armstrong TS, et al. A randomized trial of bevacizumab for newly diagnosed glioblastoma. *N Engl J Med*. 2014:370 (8):699-708.

3. Gilbert MR, Wang M, Aldape KD, et al. Dose-dense temozolomide for newly diagnosed globlastoma: a randomized phase III clinical trial. *J Clin Oncol*. 2013;31(32):4085-4091.

4. Chinot OL, Wick W, Mason W, et al. Bevacizumab plus radiotherapy-temozolomide for newly diagnosed glioblastoma. *N Engl J Med*. 2014:370 (8):709-722.

5. Stupp R, Hegi ME, Mason WP, et al; European Organisation for Research and Treatment of Cancer Brain Tumour and Radiation Oncology Groups; National Cancer Institute of Canada Clinical Trials Group. Effects of radiotherapy with concomitant and adjuvant temozolomide versus radiotherapy alone on survival in glioblastoma in a randomised phase III study: 5-year analysis of the EORTC-NCIC trial. *Lancet Oncol*. 2009;10(5):459-466.

6. Westphal M, Heese O, Steinbach JP, et al. A randomised, open label phase III trial with nimotuzumab, an anti-epidermal growth factor receptor monoclonal antibody in the treatment of newly diagnosed adult glioblastoma. *Eur J Cancer*. 2015;51(4):522-532.

7. Stupp R, Hegi ME, Gorlia T, et al; European Organisation for Research and Treatment of Cancer (EORTC); Canadian Brain Tumor Consortium; CENTRIC study team. Cilengitide combined with standard treatment for patients with newly diagnosed glioblastoma with methylated *MGMT* promoter (CENTRIC EORTC 26071-22072 study): a multicentre, randomised, open-label, phase 3 trial. *Lancet Oncol*. 2014;15(10):1100-1108.

8. Kirson ED, Dbaly V, Tovarys F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. *Proc Natl Acad Sci U S A*. 2007;104(24):10152-10157.

9. Kirson ED, Schneiderman RS, Dbaly V, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). *BMC Med Phys*. 2009;9:1.

10. Fonkem E, Wong ET. NovoTTF-100A: a new treatment modality for recurrent glioblastoma. *Expert Rev Neurother*. 2012;12(8):895-899.

11. Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of cancer cell replication by alternating electric fields. *Cancer Res*. 2004;64(9):3288-3295.

12. Gutin PH, Wong ET. Noninvasive application of alternating electric fields in glioblastoma: a fourth cancer treatment modality. *Am Soc Clin Oncol Educ Book*. 2012;126-131.

13. Stupp R, Wong ET, Kanner AA, et al. NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomised phase III trial of a novel treatment modality. *Eur J Cancer*. 2012;48(14):2192-2202.

14. Louis DN, Ohgaki H, Wiestler OD, et al. The 2007 WHO classification of tumours of the central nervous system. *Acta Neuropathol*. 2007;114(2):97-109.

15. Hegi ME, Diserens AC, Gorlia T. et al. MGMT gene silencing and benefit from temozolomide in glioblastoma. *N Engl J Med*. 2005;352(10):997-1003.

16. Vlassenbroeck I, Califice S, Diserens AC, et al. Validation of real-time methylation-specific PCR to determine O6-methylguanine-DNA methyltransferase gene promoter methylation in glioma. *J Mol Diagn*. 2008;10(4):332-337.

17. Aaronson NK, Ahmadzai S, Bergman B, et al. The European Organization for Research and Treatment of Cancer QLQ-C30: a quality-of-life instrument for use in international clinical trials in oncology. *J Natl Cancer Inst*. 1993;85(5):365-376.

18. Taphoorn MJ, Claessens L, Aaronson NK, et al; EORTC Quality of Life Group, and Brain Cancer, NCIC and Radiotherapy Groups. An international validation study of the EORTC brain cancer module (EORTC QLQ-BN20) for assessing health-related quality of life and symptoms in brain cancer patients. *Eur J Cancer*. 2010;46(6):1033-1040.

19. Macdonald DR, Cascino TL, Schold SC Jr, Cairncross JG. Response criteria for phase II studies of supratentorial malignant glioma. *J Clin Oncol*. 1990;8(7):1277-1280.

20. O'Brien PC, Fleming TR. A multiple testing procedure for clinical trials. *Biometrics*. 1979;35(3): 549-556.

21. DeMets DL, Lan G. The alpha spending function approach to interim data analyses. *Cancer Treat Res*. 1995;75:1-27.

22. DeMets DL, Lan KK. Interim analysis: the alpha spending function approach. *Stat Med*. 1994;13 (13-14):1341-1352.

23. R_Development_Core_Team. R: *A Language and Environment for Statistical Computing*. Vienna, Austria: R Foundation for Statistical Computing; 2008.

24. Clivetzoff G, Tannock IF. Placebo effects in oncology. *J Natl Cancer Inst*. 2003;95(1):19-29.

25. Lacouture ME, Davis ME, Elzinga G, et al. Characterization and management of dermatologic adverse events with the NovoTTF-100A System, a novel anti-mitotic electric field device for the treatment of recurrent glioblastoma. *Semin Oncol*. 2014:41(suppl 4):S1-S14.

Copyright 2015 American Medical Association. All rights reserved.
Page 54 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]     JB_58173E312028     25976

Case 1:20-cv-00194-WCG   Filed 04/10/25   Page 485 of 631   Document 11-5

## Indications For Use and Safety Information in the United States:

Please visit www.optune.com/IFU for Optune Instructions For Use (IFU) for complete information regarding the device's indications, contraindications, warnings and precautions.

Optune is intended as a treatment for adult patients (22 years of age or older) with histologically-confirmed glioblastoma multiforme (GBM).

Optune with temozolomide is indicated for the treatment of adult patients with newly diagnosed, supratentorial glioblastoma following maximal debulking surgery, and completion of radiation therapy together with concomitant standard of care chemotherapy.

For the treatment of recurrent GBM, Optune is indicated following histologically-or radiologically-confirmed recurrence in the supratentorial region of the brain after receiving chemotherapy. The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted.

### Summary of Important Safety Information
#### Contraindications
Do not use Optune in patients with an active implanted medical device, a skull defect (such as, missing bone with no replacement), or bullet fragments. Use of Optune together with implanted electronic devices has not been tested and may theoretically lead to malfunctioning of the implanted device. Use of Optune together with skull defects or bullet fragments has not been tested and may possibly lead to tissue damage or render Optune ineffective.
Do not use Optune in patients that are known to be sensitive to conductive hydrogels. In this case, skin contact with the gel used with Optune may commonly cause increased redness and itching, and rarely may even lead to severe allergic reactions such as shock and respiratory failure.

### Warnings and Precautions
Optune can only be prescribed by a healthcare provider that has completed the required certification training provided by Novocure (the device manufacturer).

Do not prescribe Optune for patients that are pregnant, you think might be pregnant or are trying to get pregnant, as the safety and effectiveness of Optune in these populations have not been established.

The most common (≥10%) adverse events involving Optune in combination with temozolomide were thrombocytopenia, nausea, constipation, vomiting, fatigue, medical device site reaction, headache, convulsions, and depression.

Use of Optune in patients with an inactive implanted medical device in the brain has not been studied for safety and effectiveness, and use of Optune in these patients could lead to tissue damage or lower the chance of Optune being effective.

If the patient has an underlying serious skin condition on the scalp, evaluate whether this may prevent or temporarily interfere with Optune treatment.

## Indications for use and safety information in Europe:

### Newly diagnosed GBM
Optune is intended for the treatment of patients with newly diagnosed GBM, after surgery and radiotherapy with adjuvant temozolomide, concomitant to maintenance temozolomide. The treatment is intended for adult patients, 18 years of age or older, and should be started more than 4 weeks after surgery and radiation therapy with adjuvant temozolomide. Treatment may be given together with maintenance temozolomide (according to the prescribing information in the Temodar package insert) and after maintenance temozolomide is stopped.

### Recurrent GBM
Optune is intended for the treatment of patients with recurrent GBM who have progressed after surgery, radiotherapy and temozolomide treatment for their primary disease. The treatment is intended for adult patients, 18 years of age or older, and should be started more than 4 weeks after the latest surgery, radiation therapy or chemotherapy.

### Contraindications
Do not use Optune if you are pregnant, think you might be pregnant, or are trying to get pregnant. If you are a woman who is able to get pregnant, you must use birth control while using Optune. Optune was not tested in pregnant women. Do not use Optune you have clinically significant hepatic, renal or haematologic disease. Do not use Optune you have significant additional neurological disease (primary seizure disorder, dementia, progressive degenerative neurological disorder, meningitis or encephalitis, hydrocephalus associated with increased intracranial pressure). Do not use Optune if you are known to be sensitive to conductive hydrogels like the gel used on electrocardiogram (ECG) stickers or transcutaneous electrical nerve stimulation (TENS) electrodes. In this case, skin contact with the gel used with Optune Treatment Kit may commonly cause increased redness and itching, and rarely may even lead to severe allergic reactions such as shock and respiratory failure.

### Warnings and Precautions
Use Optune only after receiving training from qualified personnel, such as your doctor, a nurse, or other medical personnel who have completed a training course given by the device manufacturer (Novocure). All servicing procedures must be performed by qualified and trained personnel.

Do not use Optune Treatment Kit if you are 17 years old or younger. The system has not been tested in persons 17 years old or younger. It is unknown what side effects the device may cause in these cases or if it will be effective.
Do not wet the device or the transducer arrays. Do not use any parts that do not come with the Optune treatment kit, or that were not sent to you by the device manufacturer or given to you by your doctor.

Optune commonly causes skin irritation beneath the transducer arrays and in rare cases lead to headaches, falls, fatigue, muscle twitching or skin ulcers.
For complete information regarding Optune's indication, contraindication, warnings and precautions please see the Instructions for Use (IFU).
(http://www.optune.com/deutsch/materialien/schulungen.aspx)

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 486 of 631   Document 11-5
4717
Page 55 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_59173E312028   25976



# ✕OPTUNE™ | INSTRUCTIONS FOR USE

(NovoTTF™-100A System)



novocure™

This manual is intended for physicians prescribing the use of Optune.
Additional information is found in the following materials:
• Patient Information and Operation Manual

Caution: Federal law restricts this device to sale by or on the order of a physician

# Table of contents

Indications for Use...................................................................................................................3

Contraindications, Warnings and Precautions..........................................................................4

Description................................................................................................................................6

Principles of Operation............................................................................................................7

Preclinical Data........................................................................................................................8

Clinical Data.............................................................................................................................9

Directions for Use..................................................................................................................22

Abbreviations.........................................................................................................................23

Contact Information...............................................................................................................24

Bibliography...........................................................................................................................25

# Indications for Use

Optune™ is intended as a treatment for adult patients (22 years of age or older) with histologically-confirmed glioblastoma multiforme (GBM).

Optune™ with temozolomide is indicated for the treatment of adult patients with newly diagnosed, supratentorial glioblastoma following maximal debulking surgery and completion of radiation therapy together with concomitant standard of care chemotherapy.

For the treatment of recurrent GBM, Optune™ is indicated following histologically-or radiologically-confirmed recurrence in the supra-tentorial region of the brain after receiving chemotherapy. The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted.

# Contraindications, Warnings and Precautions

## Contraindications

Do not use Optune if you have an active implanted medical device, a skull defect (such as, missing bone with no replacement) or bullet fragments. Examples of active electronic devices include deep brain stimulators, spinal cord stimulators, vagus nerve stimulators, pacemakers, defibrillators, and programmable shunts. Use of Optune together with implanted electronic devices has not been tested and may theoretically lead to malfunctioning of the implanted device. Use of Optune together with skull defects or bullet fragments has not been tested and may possibly lead to tissue damage or render Optune ineffective.

Do not use Optune if you are known to be sensitive to conductive hydrogels like the gel used on electrocardiogram (ECG) stickers or transcutaneous electrical nerve stimulation (TENS) electrodes. In this case, skin contact with the gel used with Optune may commonly cause increased redness and itching, and rarely may even lead to severe allergic reactions such as shock and respiratory failure.

## Warnings

**Warning** – Use Optune only after receiving training from qualified personnel, such as your doctor, a nurse, or other medical personnel who have completed a training course given by the device manufacturer (Novocure). Ask to see a certificate signed by Novocure that says they completed a training course. Your training will include a detailed review of this manual and practice in the use of the system. In addition, you will be trained in what to do if there are problems with treatment. Use of Optune without receiving this training can result in breaks in treatment and may rarely cause increased scalp rash, open sores on your head, allergic reactions or even an electric shock.

**Warning** – Optune is not intended to be used as a substitute for chemotherapy but rather as an adjunct to treatment with TMZ for newly diagnosed GBM.

**Warning** – Do not use Optune if you are 21 years old or younger. It is unknown what side effects the device may cause in these cases or if it will be effective.

**Warning** – Do not use Optune if you are pregnant, you think you might be pregnant, or are trying to get pregnant. If you are a woman who is able to get pregnant, you must use birth control when using the device. Optune was not tested in pregnant women. It is unknown what side effects the device may cause if you are pregnant or if it will be effective.

**Warning** – In case of skin irritation, which appears as redness under the transducer arrays (a mild rash), use high potency topical steroids (hydrocortisone cream) when replacing transducer arrays. This will help relieve your skin irritation. If you do not use this cream, the skin irritation can become more serious and may even lead to skin break down, infections, pain and blisters. If this happens, stop using the topical steroid cream and contact your doctor. Your doctor will supply you with an antibiotic cream to use when replacing transducer arrays. If you do not use this cream, your symptoms may continue and your doctor may ask you to take a break from treatment until your skin heals. Taking a break from treatment may lower your chance to respond to treatment.

**Warning** – All servicing procedures must be performed by qualified and trained personnel. If you attempt to open and service the system alone you may cause damage to the system. You could also get an electric shock by touching the inner parts of the device.

## Precautions

**Caution** – Keep Optune out of the reach of children. If children touch the device, they could damage the device. This could cause a break in treatment. Breaks in treatment may lower your chance to respond to treatment.

**Caution** – Do not use any parts that do not come with the Optune Treatment Kit, or that were not sent to you by the device manufacturer or given to you by your doctor. Use of other parts, manufactured by other companies or for use with other devices, can damage the device. This may lead to a break in treatment. Breaks in treatment may lower your chance to respond to treatment.

**Caution** – If your doctor used plates or screws to close your skull bone during your surgery, be careful when placing the transducer arrays. Make sure the round disks that make up the transducer arrays are not on top of the areas where you can feel the screws or plates under your skin. In other words, make sure the screws or plates under your skin are in between the round disks that make up the transducer arrays. If you do not do this, you may have increased skin damage which may lead to a break in treatment. Breaks in treatment may lower the chance of the device being effective.

**Caution** – Tell your doctor before using the device if you have an inactive implanted medical device in the brain (for example, stents, plastic drug delivery reservoirs, aneurysm clips or coils, device leads). Use of Optune in subjects with inactive implanted medical devices in their brain was not been tested and could lead to tissue damage or lower the chance of the device being effective.

**Caution** – Do not use Optune if any parts look damaged (torn wires, loose connectors, loose sockets, cracks or breaks in the plastic case). Use of damaged components can damage the device, and cause a break in treatment. Breaks from treatment may lower your chance to spond to treatment.

**Caution** – Do not wet the device or transducer arrays. Getting the device wet may damage it, preventing you from receiving treatment for the right amount of time. Getting the transducer arrays very wet is likely to cause the transducer arrays to come loose from your head. If this happens, the device will turn off and you will need to change the transducer arrays.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 490 of 631   Document 11-5

Caution - Before connecting or disconnecting the transducer arrays, make sure that the Optune power switch is in the OFF position. Disconnecting transducer arrays with the device power switch in the ON position may cause a device alarm to go off, and could damage the device.

Caution - If you have an underlying serious skin condition on the scalp, discuss with your doctor whether this may prevent or temporarily interfere with Optune treatment.

## Notices

**Notice!** The Optune device and transducer arrays will activate metal detectors.

**Notice!** Do not use Optune if your tumor is located in the lower parts of the brain close to the spinal cord. Ask your doctor if your tumor is located in this part of your brain. Optune has not been tested in patients with tumors in these locations. It is unknown whether these tumors will respond to treatment.

**Notice!** You should use Optune for at least 18 hours a day to get the best response to treatment. Using Optune for less than 18 hours a day lowers the chances that you will respond to treatment.

**Notice!** Do not stop using Optune before you finish at least four full weeks of therapy to get the best response to treatment. Stopping treatment before four weeks lowers the chances that you will respond to treatment.

**Notice!** Do not stop using Optune even if you have used it less than the recommended 18 hours per day. You should stop using the device only if your doctor tells you to. Stopping treatment could lower the chances that you will respond to treatment.

**Notice!** If you plan to be away from home for more than 2 hours, carry an extra battery and/or the power supply with you in case the battery you are using runs out. If you do not take a spare battery and/or the power supply you may have a break in your treatment. Breaks in treatment may lower your chance to respond to treatment.

**Notice!** Make sure you have at least 12 extra transducer arrays at all times. This will last you until the next transducer array shipment arrives. Remember to order more transducer arrays when there are at least 12 extra transducer arrays left. If you do not order transducer arrays in time you may have a break in your treatment. Breaks in treatment may lower your chance to respond to treatment.

**Notice!** Batteries may weaken over time and need to be replaced. You will know this has happened when the amount of time the device can run on a fully charged battery begins to shorten. For example, if the low battery indicator light flashes within only 1.5 hours from the start of treatment, replace the battery. If you do not have replacement batteries when your batteries run out, you may have a break in your treatment. Breaks in treatment may lower your chance to respond to treatment.

**Notice!** You should carry the Troubleshooting Guide (Section 26) at all times. This guide is necessary to ensure Optune works properly. If you do not work the system correctly you may have a break in your treatment. Breaks in treatment may lower your chance to respond to treatment.

**Notice!** Do not block the device vents located on the sides of the Optune device. Blocking the vents may cause the device to overheat and turn off, leading to a break in treatment. If this happens, unblock the vents, wait 5 minutes and restart the device.

**Notice!** Do not block the battery charger vents located on the front of the battery chargers. Blocking the vents may cause the charger to overheat. This could prevent your batteries from charging.

**Notice!** Before using a transducer array, make sure its package is sealed by gently rubbing the package between thumb and pointer finger on all four sides. The package should be closed on all sides. There should be no openings in the package seal. If the package is not sealed, the transducer array may be damaged. A damaged transducer array will not work properly and may cause the device to turn off.

**Notice!** The transducer arrays are for single use and should not be taken off your head and put back on again. If you put a used transducer array back on your head again, it may not stick well to your skin and the device could turn off.

# Description

Optune, for the treatment of newly diagnosed and/or recurrent GBM, is a portable battery or power supply operated device which produces alternating electrical fields, called tumor treatment fields ("TTFields") within the human body. TTFields are applied to the patient by electrically-insulated surface transducer arrays. TTFields disrupt the rapid cell division exhibited by cancer cells[1].

Optune is comprised of two main components: (1) an Electric Field Generator (the Optune device); and (2) INE Insulated Transducer Arrays (the transducer arrays). In addition, the following components are also included in the Optune Treatment Kit: power supply, portable battery, battery rack, battery charger, connection cable and carrying case.

Treatment parameters are preset by Novocure such that there are no electrical output adjustments available to the patient. The patient must learn to change and recharge depleted device batteries and to connect to an external power supply overnight. In addition, the transducer arrays need to be replaced once to twice a week and the scalp re-shaved in order to maintain optimal contact. Patients carry the device in an over-the-shoulder bag or backpack and receive continuous treatment without changing their daily routine.

1. Kirson, E. D., V. Dbaly, et al. (2007), "Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors." Proc Natl Acad Sci U S A 104(24): 10152-7.

Page 61 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_58173E312028    25976
Case 2:20-cv-00194-WCG   Filed 04/28/20   Page 492 of 631   Document 11-5    4723

6.

# Principles of Operation

Optune produces alternating electrical fields within the human body that disrupt the rapid cell division exhibited by cancer cells, with the alternating electrical fields applied to the brain through transducer arrays placed on the scalp.

TTFields harness electric fields to arrest the proliferation of tumor cells and to destroy them. The TTField technology takes advantage of the special characteristics and geometrical shape of dividing cells, which make them susceptible to the effects of the alternating electric TTFields. These special fields alter the tumor cell polarity at an intermediate frequency (on the order of 100-300 kHz). The frequency used for a particular treatment is specific to the cell type being treated (e.g., 200kHz for GBM).

In contrast, the TTFields have not been shown to have an effect on cells that are not undergoing division. Since most normal adult brain cells proliferate very slowly, if at all, they are hypothesized to be little affected by the TTFields. Testing demonstrates no differences between treated and control animals in histology of the major internal organs (including the brain), blood examination, cardiac rhythm, body temperature, or in animal behavior. In addition, because the fields alternate so rapidly, they have no effect on normal quiescent cells nor do they stimulate nerves and muscles. It is noted that, because TTFields are only applied to the brain, they have no effect on rapidly proliferating cells in the rest of the body. The intensities of the electric fields within the tissues are very small and do not result in any meaningful increase in tissue temperature. Thus, TTField application has the advantage of being highly selective and is not expected to be associated with significant toxicity.

The above mechanisms of action are consistent with the extensive research regarding the effects of TTFields. These results demonstrate both disruption of cell division up to complete cessation of the process, as well as complete destruction of the dividing cells. It is important to note that all the described effects can be obtained by fields of low intensity such that they are not accompanied by any significant elevation of temperature.

# Preclinical Data

TTFields have been shown both in vitro and in vivo to effectively inhibit cancer cell replication during mitosis without any systemic side effects. At intensities of approximately 1 V/cm, TTFields can be frequency-tuned to effectively inhibit different cancer cell types (i.e., the smaller the cell, the higher the frequency needed), due to disruption of microtubule polymerization and physical disruption of cell integrity at the cleavage plane during telophase[2].

Specifically, TTFields have been shown to inhibit glioblastoma cells in vitro and in vivo at a frequency of 200 kHz and an intensity of 0.7 V/cm. Based on realistic finite element mesh simulations and direct measurements of TTFields intensity in experimental animals, and in the human brain, Novocure has concluded that effective TTField intensities can be generated in the brains of large animals and humans. Extensive safety studies in healthy animals (mice, rats and rabbits) have shown that TTFields are not associated with significant systemic toxicities. Neither acute, nor chronic systemic toxicities were seen when TTFields were applied to the torso or head, at different frequencies (100-200 kHz), different intensities and for different periods of time[3].

Using a model developed to simulate the growth kinetics of a malignant tumor, the minimal treatment course duration for Optune has been determined to be approximately 4 weeks to reach tumor stabilization. Stopping treatment prior to completion of a 4 week treatment course will most likely lead to continued tumor growth and appearance of symptoms within approximately 1-2 weeks

2 Kirson, E. D., Z. Gurvich, et al. (2004). "Disruption of cancer cell replication by alternating electric fields." Cancer Res 64(9): 3288-95.
3 Kirson, E. D., V. Dbaly, et al. (2007).

Page 63 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_58173E312028    25976

# Clinical Data

## NEWLY DIAGNOSED GLIOBLASTOMA (see page 17 for recurrent GBM)

### Pilot Clinical Study in Newly Diagnosed GBM

Optune together with temozolomide (TMZ) has been tested in ten newly diagnosed GBM subjects in a single center, pilot study in Europe. Median progression free survival (PFS) of the patients in this study exceeded historical controls (14.4 months versus 7.1 months, respectively). At the end of the study (4 years from initiation) 5 of the 10 patients died; of the remaining 5 patients 2 were lost to follow up and 3 were reported alive and progression free. Median OS from diagnosis was greater than 40 months (compared to 14.7 months in historical controls) The only device related adverse event (AE) seen in this trial was a mild to moderate skin irritation beneath the device transducer arrays.

### Pivotal Clinical Study in Newly Diagnosed GBM

**Study Design:** The study was a prospective, randomized, open label, active parallel control trial to compare the effectiveness and safety outcomes of newly diagnosed GBM subjects treated with Optune and Temozolomide (TMZ) to those treated with TMZ alone.

The following were the objectives of the study:

To prospectively compare the progression free survival and overall survival of newly diagnosed GBM subjects treated with Optune and TMZ to those treated TMZ alone.

To collect evidence of the safety of TTFields applied to subjects with newly diagnosed GBM using Optune.

**Eligibility Criteria:** The inclusion and exclusion criteria for the trial were as follows:

#### Inclusion Criteria
a. Pathological evidence of GBM using WHO classification criteria.
b. ≥ 18 years of age.
c. Received maximal debulking surgery and radiotherapy concomitant with Temozolomide (45-70Gy):
   1) Patients may enroll in the study if received Gliadel wafers before entering the trial
   2) Any additional treatments received prior to enrollment will be considered an exclusion.
   3) Minimal dose for concomitant radiotherapy is 45 Gy
d. Karnofsky scale ≥ 70
e. Life expectancy at least 3 months
f. Participants of childbearing age must use effective contraception.
g. All patients must sign written informed consent.
h. Treatment start date at least 4 weeks out from surgery.
i. Treatment start date at least 4 weeks out but not more than 7 weeks from the later of last dose of concomitant Temozolomide or radiotherapy.

#### Exclusion Criteria
a. Progressive disease (according to MacDonald Criteria). If pseudoprogression is suspected, additional imaging studies must be performed to rule out true progression.
b. Actively participating in another clinical treatment trial
c. Pregnant
d. Significant co-morbidities at baseline which would prevent maintenance Temozolomide treatment:
   1) Thrombocytopenia (platelet count < $100 \times 10^3/\mu L$)
   2) Neutropenia (absolute neutrophil count < $1.5 \times 10^3/\mu L$)
   3) CTC grade 4 non-hematological Toxicity (except for alopecia, nausea, vomiting)
   4) Significant liver function impairment - AST or ALT > 3 times the upper limit of normal
   5) Total bilirubin > upper limit of normal
   6) Significant renal impairment (serum creatinine > 1.7 mg/dL)
e. Implanted pacemaker, programmable shunts, defibrillator, deep brain stimulator, other Implanted electronic devices in the brain, or documented clinically significant arrhythmias.
f. Infra-tentorial tumor
g. Evidence of increased intracranial pressure (midline shift > 5mm, clinically significant papilledema, vomiting and nausea or reduced level of consciousness)
h. History of hypersensitivity reaction to Temozolomide or a history of hypersensitivity to DTIC.

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 495 of 631 Document 11-5

## Study Procedures:

### Treatment Arm

Optune was given together with maintenance TMZ. At treatment initiation patients were seen at an outpatient clinic. During this visit baseline examinations were performed and Optune treatment initiated. The patients were instructed on the operation of Optune and battery replacement. Once the patients were trained in operating the device they were released to continue treatment at home. The patients received multiple 1 month courses of continuous Optune treatment. Patients were treated with maintenance TMZ according to the standard dosing regimen. Following radiological progression or unacceptable toxicity, TMZ could be replaced with best standard of care second line therapy.

### Control Arm

All subjects had baseline examinations performed prior to treatment initiation. Patients were treated with maintenance TMZ according to the standard dosing regimen. Following radiological progression or unacceptable toxicity, TMZ could be replaced with best standard of care second line therapy.

### Follow-up

During treatment all patients were seen once every month at an outpatient clinic where they underwent medical follow-up and routine laboratory exams. An MRI was performed every second month following the baseline MRI until second progression or 24 months (whichever came first, when treatment on both arms of the study was terminated). In the case of clinical progression an unscheduled MRI was obtained within 1 week of the investigator becoming aware of the clinical progression. No additional MRIs were required after second progression. Central MRI review was performed by a neuro-radiologist blinded to the treatment group of each patient. Medical follow-up continued for 2 months after treatment termination in order to capture treatment related toxicities. After these visits, mortality was assessed based on monthly telephone interviews with the patients or the patients' caregivers.

**Analyses:** Two analyses were performed in the study: An interim analysis on the first 315 patients with a minimum of 18 months follow up and a final analysis on the full study cohort of 695 patients.

**Protocol Deviations:** Major protocol deviations were defined as deviations that have the potential to influence the primary and secondary efficacy endpoints of the study. There were a total of 13 major protocol deviations in the interim analysis and a total of 24 major protocol violations at the final analysis.

In the interim analysis dataset, 2 patients received experimental chemotherapies as part of other clinical trials together with their standard of care temozolomide (1 in each treatment arm). In addition, 11 patients in the TMZ alone arm received Optune treatment through prescription at other institutions. This deviation was termed "crossover" although no official crossover was allowed in the protocol, and Optune therapy was given without sponsor or investigator consent.

In the final analysis dataset, 2 patients received experimental chemotherapies as part of other clinical trials together with their standard of care temozolomide (1 in each treatment arm). In addition, 22 patients in the TMZ alone arm received Optune treatment through prescription at other institutions. This deviation was termed "crossover" although no official crossover was allowed in the protocol, and Optune therapy was given without sponsor or investigator consent.

**Analysis Populations:** Progression free survival was analyzed in the intent to treat (ITT) population which included all randomized subjects 210 Optune / TMZ and 105 TMZ alone at the interim analysis, 466 Optune /TMZ and 229 TMZ alone at the final analysis). Overall survival was analyzed in the per protocol (PP) population which included all patients receiving at least the first course of TMZ and had no major protocol deviations (196 Optune / TMZ and 84 TMZ alone in the interim analysis; 429 Optune / TMZ and 180 TMZ alone at the final analysis). Major protocol deviations included patients who received other experimental therapies on protocol or crossed over from the TMZ alone arm to Optune / TMZ.

**Subject Characteristics:** 315 subjects (210 Optune/TMZ; 105 TMZ) with newly diagnosed GBM were enrolled in the interim analysis of the study. Baseline characteristics in the ITT population were as follows:

| Baseline Characteristic | | Treatment Group Optune/TMZ (N=210) n(%) | TMZ Alone (N=41) n(%) |
|---|---|---|---|
| Gender | | | |
| Male | | 140 (66.67) | 67 (63.81) |
| Female | | 70 (33.33) | 38 (36.19) |
| Central MGMT Assessment | | | |
| Invalid | | 24 (11.43) | 11 (10.48) |
| Unknown | | 58 (27.62) | 30 (28.57) |
| Methylated | | 49 (23.33) | 26 (24.76) |
| Unmethylated | | 79 (37.62) | 38 (36.19) |
| Extent of Resection | | | |
| Biopsy | | 23 (10.95) | 11 (10.48) |
| Gross Total Resection | | 135 (64.29) | 67 (63.81) |
| Partial Resection | | 52 (24.76) | 27 (25.71) |
| Area | | | |
| ROW | | 83 (39.52) | 41 (39.05) |
| USA | | 127 (60.48) | 64 (60.95) |
| Tumor Position | | | |
| Missing | | 0 (0) | 3 (2.86) |
| Corpus Callosum | | 12 (5.71) | 3 (2.86) |
| Frontal Lobe | | 64 (30.48) | 32 (30.48) |
| Occipital Lobe | | 7 (3.33) | 4 (3.81) |
| Parietal Lobe | | 35 (16.67) | 27 (25.71) |
| Temporal Lobe | | 92 (43.81) | 36 (34.29) |
| Tumor Location | | | |
| Missing | | 0 (0) | 1 (0.95) |
| Both | | 2 (0.95) | 1 (0.95) |
| Corpus Callosum | | 8 (3.81) | 3 (2.86) |
| Left | | 93 (44.29) | 41 (39.05) |
| Right | | 107 (50.95) | 59 (56.19) |
| Karnofsky Performance Score | Median | 90 | 90 |
| | Min, Max | 60, 100 | 70, 100 |
| Age in Years | Median | 57 | 58 |
| | Min, Max | 20, 83 | 21, 80 |
| No. of Cycles of TMZ Received | Median | 6 | 4 |
| | Min, Max | 1, 26 | 1, 24 |
| No. of Cycles of Optune Received | Median | 9 | 0 |
| | Min, Max | 1, 58 | 0, 0 |
| Time from GBM Diagnosis to Randomization (Days) | Median | 115 | 113 |
| | Min, Max | 59, 171 | 43, 170 |

As seen above, all baseline characteristics are well balanced between arms in the ITT population at the interim analysis. The baseline characteristics of the PP population also remained well balanced between treatment arms. As noted in the table above, 35 patients (11.11%) ...d tissue that was not evaluable, and 88 patients (27.94%) did not have tissue available for analysis.

695 subjects (466 Optune / TMZ; 229 TMZ alone) with newly diagnosed GBM were enrolled in the study and had CRF information available at the time of the final analysis. Baseline characteristics in the ITT population were as follows:

| Baseline Characteristic | | Optune/TMZ (N=466) | TMZ Alone (N=229) |
|---|---|---|---|
| **Gender** | | | |
| Male | | 316 (67.81) | 157 (68.56) |
| Female | | 150 (32.19) | 72 (31.44) |
| **Central MGMT Assessment** | | | |
| Invalid | | 46 (9.87) | 18 (7.86) |
| Unknown | | 106 (22.75) | 57 (24.89) |
| Methylated | | 127 (27.25) | 67 (29.26) |
| Unmethylated | | 187 (40.13) | 87 (37.99) |
| **Extent of Resection** | | | |
| Biopsy | | 61 (13.09) | 30 (13.1) |
| Gross Total Resection | | 253 (54.29) | 124 (54.15) |
| Partial Resection | | 152 (32.62) | 75 (32.75) |
| **Area** | | | |
| ROW | | 245 (52.58) | 111 (48.47) |
| USA | | 221 (47.42) | 118 (51.53) |
| **Turnor Position** | | | |
| Missing | | 31 (6.65) | 15 (6.55) |
| Corpus Callosum | | 21 (4.51) | 9 (3.93) |
| Frontal Lobe | | 142 (30.47) | 67 (29.26) |
| Occipital Lobe | | 14 (3) | 4 (1.75) |
| Parietal Lobe | | 77 (16.52) | 50 (21.83) |
| Temporal Lobe | | 181 (38.84) | 84 (36.68) |
| **Tumor Location** | | | |
| Missing | | 30 (6.44) | 12 (5.24) |
| Both | | 12 (2.58) | 3 (1.31) |
| Corpus Callosum | | 12 (2.58) | 7 (3.06) |
| Left | | 193 (41.42) | 93 (40.61) |
| Right | | 219 (47) | 114 (49.78) |
| Karnofsky Performance Score | Median | 90 | 90 |
| | Min, Max | 60, 100 | 70, 100 |
| Age in Years | Median | 56 | 57 |
| | Min, Max | 19, 83 | 19, 80 |
| No. of Cycles of TMZ Received | Median | 5 | 4 |
| | Min, Max | 1, 26 | 1, 24 |
| No. of Cycles of Optune Received | Median | 6 | 0 |
| | Min, Max | 1, 58 | 0, 0 |
| Time from GBM Diagnosis to Randomization (Days) | Median | 113 | 111 |
| | Min, Max | 59, 498 | 43, 500 |

As seen above, all baseline characteristics are well balanced between arms in the ITT population at the final analysis. The baseline characteristics of the PP population also remained well balanced between treatment arms. As noted in the table above, 64 patients (9.21%) had tissue that was not evaluable, and 163 patients (23.45%) did not have tissue available for analysis.

Page 67 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time] JB_58173E312028 25976

## Effectiveness Results:

**Primary Effectiveness Endpoint: Progression Free Survival at the Interim Analysis**
The threshold for statistical significance based on the Lan-DeMets O'Brien-Fleming method at the interim analysis was pre-defined as p=0.01394, and the test was to be performed in the ITT population according to the protocol. In the ITT population, which included all randomized subjects (Optune/TMZ=210, TMZ alone=105), PFS at the interim analysis met this threshold. The difference of more than 3 months in median PFS is highly clinically significant. The Hazard Ratio for PFS was 0.621, which translates into a 37.9% decrease in the risk of progression when using Optune/TMZ compared to TMZ alone. At the final analysis, which included 695 patients (Optune/TMZ=466, TMZ alone=229), PFS was also highly significant with a hazard ratio of 0.694.

### Primary Efficacy Endpoint - Progression Free Survival (ITT)



|  | Interim Analysis | | Final Analysis | |
|---|---|---|---|---|
|  | Optune/TMZ | TMZ Alone | Optune/TMZ | TMZ Alone |
| Median (95% CI) | 7.2 (5.9, 8.2) | 4.0 (3.0, 4.3) | 7.1 (6.0, 8.1) | 4.2 (3.9, 5.5) |
| Log-rank test | p=0.0013 | | p=0.0010 | |
| Hazard Ratio (95% CI) | 0.621 (0.468, 0.823) | | 0.694 (0.558, 0.823) | |

Although not a pre-specified endpoint, PFS was also analyzed in the PP population at the interim and final analyses. Median PFS in the PP population was identical to the ITT population at the interim analysis and slightly longer than the ITT population at the final analysis. Notably, median PFS remained significantly higher in the Optune/TMZ group than in the TMZ alone group in the PP population at both the interim and final analyses.

Page 68 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_58173E312028   25976

## Powered Secondary Effectiveness Endpoint: Overall Survival at the Interim Analysis

Overall survival (OS) was a powered secondary analysis in the trial. The threshold for superior OS at the interim analysis was predefined in the protocol at 0.00598 according to the Lan-DeMets O'Brien-Fleming alpha spending function, and was to be tested in the PP population. In the PP population, which analyzed patients according to the treatment they actually received (as treated, Optune/TMZ=196, TMZ =84), OS was also significantly longer in the Optune/TMZ arm compared to the TMZ alone arm. An increase of almost 5 months as seen here is highly significant clinically. The hazard ratio for OS was 0.666. This translates into a 33.4% decrease in the risk of death when using Optune/TMZ compared to TMZ alone. At the final analysis, which included 609 patients (Optune/TMZ=429, TMZ alone=180), OS was also highly significant with a hazard ratio of 0.683.

### Overall Survival (PP)



| | Interim Analysis | | Final Analysis | |
|---|---|---|---|---|
| | Optune/TMZ | TMZ Alone | Optune/TMZ | TMZ Alone |
| Median (95% CI) | 20.5 (16.6, 24.9) | 15.6 (12.9, 18.5) | 19.6 (16.6, 24.1) | 15.2 (13.5, 18.2) |
| Log-rank test | p=0.0042 | | p=0.0030 | |
| Hazard Ratio (95% CI) | 0.666 (0.495, 0.898) | | 0.683 (0.529, 0.882) | |

Although not a pre-specified secondary endpoint, OS was also analyzed in the ITT population. At the interim analysis, OS in the ITT population was also significantly longer in the Optune/TMZ arm compared to TMZ alone by almost 20%. The median OS was 19.6 months (95% CI 16.5-24.1) in the Optune/TMZ group and 16.6 months in the TMZ alone group (95% CI 13.5-19.1). An increase of 3 months as seen here is highly significant both statistically (log-rank p=0.0338) and clinically. The hazard ratio for OS was 0.744 using a Cox regression analysis. This translates into a 25.6% decrease in the risk of death when using Optune/TMZ compared to TMZ alone.

Furthermore, at the final analysis, OS in the ITT population was also significantly longer in the Optune/TMZ arm compared to TMZ alone by 17%. The median OS was 19.4 months (95% CI 16.5-23.8) in the Optune/TMZ group and 16.6 months in the TMZ alone group (95% CI 13.7-18.5). An increase of almost 3 months as seen here is highly significant statistically and clinically (log-rank p=0.0229). The hazard ratio for OS was 0.754 using a Cox regression analysis. This translates into a 24.6% decrease in the risk of death when using Optune/TMZ compared to TMZ alone.

**Secondary Endpoints:** Secondary endpoints also showed an advantage for Optune/TMZ compared to TMZ alone. The results below are from the interim analysis which included 315 patients (210 Optune/TMZ and 105 TMZ alone):

| Endpoint | Optune/TMZ | TMZ Alone | P value |
|---|---|---|---|
| Progression Free Survival at 6 months (ITT) | 56.7% | 33.7% | 0.0004 |
| 1-year survival (PP) | 75% | 69% | 0.151 |
| 2-year survival (PP) | 48% | 32% | 0.0058 |
| Complete response rate (ITT) | 9% | 3.5% | NA |

In addition, although not a pre-specified endpoint, 1- and 2-year survival were also analyzed in the ITT population at the interim analysis. In the ITT population, 1-year survival was 75% in the Optune/TMZ group and 70% in the TMZ alone group (p-value=0.162) at the interim analysis. 2-year survival in the ITT population at the interim analysis was 48% in the Optune/TMZ group and 34% in the TMZ alone group (p-value=0.0122). Furthermore, the 1-year survival rates at the final analysis are shown in the table below:

| Endpoint | Optune/TMZ | TMZ Alone | P value |
|---|---|---|---|
| 1-year survival (PP) | 69% | 63% | 0.131 |
| 1-year survival (ITT) | 69% | 66% | 0.265 |

**Quality of Life:** Quality of Life assessments were based on the interim analysis cohort of 315 subjects. Quality of life, cognitive function and functional status were all maintained throughout treatment with the device, leading to the clear conclusion that use of Optune does not harm patients' quality of life, cognitive function or ability to perform activities of daily living.

**Safety Results:** Safety was assessed on all patients at the final analysis who received any treatment at the time of the analysis (Optune/TMZ=437, TMZ alone=207). A slightly higher incidence of grade 1-2 adverse events was seen in some of the systems in the Optune/TMZ arm of the study. This is most likely a reflection of the longer duration of TMZ treatment in these patients (median of 6 cycles versus 4 cycles in the control arm) due to the increase in PFS seen in the treatment group. Grade 3-5 adverse events were well balanced between arms. None of the grade 3-5 adverse events in these body systems were considered related to Optune by any of the investigators except for 1% grade 3 skin irritation.

## All Adverse Events by Body System and Severity (Safety Population)

| System Organ Class | Optune/TMZ (N=437) Low Medium Severe | | Grade | TMZ Alone (N=207) Low Medium Severe | | Grade |
|---|---|---|---|---|---|---|
| Number of Patients with ≥1 AE | 214 (49%) | 169 (39%) | 15 (3%) | 91 (44%) | 82 (40%) | 7 (3%) |
| Blood and Lymphatic System Disorders | 86 (20%) | 47 (11%) | 0 | 49 (24%) | 21 (10%) | 0 |
| Cardiac Disorders | 12 (3%) | 4 (1%) | 3 (1%) | 6 (3%) | 4 (2%) | 0 |
| Ear and Labyrinth Disorders | 25 (6%) | 0 | 0 | 8 (4%) | 0 | 0 |
| Endocrine Disorders | 11 (3%) | 0 | 0 | 4 (2%) | 0 | 0 |
| Eye Disorders | 36 (8%) | 3 (1%) | 0 | 15 (7%) | 2 (1%) | 0 |
| Gastrointestinal Disorders | 202 (46%) | 18 (4%) | 0 | 76 (37%) | 4 (2%) | 0 |
| General Disorders and Administration Site Conditions | 175 (40%) | 27 (6%) | 1 (<1%) | 76 (37%) | 10 (5%) | 1 (<1%) |
| Hepatobiliary Disorders | 1 (<1%) | 1 (<1%) | 0 | 5 (2%) | 0 | 0 |
| Liver Disorder | 1 (<1%) | 0 | 0 | 3 (1%) | 0 | 0 |
| Immune System Disorders | 10 (2%) | 0 | 0 | 7 (3%) | 0 | 0 |
| Infections and Infestations | 117 (27%) | 19 (4%) | 3 (1%) | 50 (24%) | 6 (3%) | 1 (<1%) |
| Injury, Poisoning and Procedural Complications | 216 (49%) | 20 (5%) | 0 | 13 (6%) | 4 (2%) | 0 |
| Abnormal Laboratory Tests | 58 (13%) | 19 (4%) | 0 | 26 (13%) | 7 (3%) | 1 (<1%) |
| Metabolism and Nutrition Disorders | 89 (20%) | 12 (3%) | 0 | 44 (21%) | 6 (3%) | 0 |
| Musculoskeletal and Connective Tissue Disorders | 98 (22%) | 16 (4%) | 0 | 44 (21%) | 8 (4%) | 0 |
| Neoplasms Benign, Malignant and Unspecified (Incl. Cysts and Polyps) | 5 (1%) | 1 (<1%) | 2 (<1%) | 2 (1%) | 1 (<1%) | 1 (<1%) |
| Nervous System Disorder | 190 (43%) | 83 (19%) | 3 (1%) | 75 (36%) | 42 (20%) | 0 |
| Psychiatric Disorders | 108 (25%) | 16 (4%) | 0 | 38 (18%) | 6 (3%) | 0 |
| Renal and Urinary Disorders | 42 (10%) | 0 | 0 | 8 (4%) | 2 (1%) | 0 |
| Reproductive System and Breast Disorders | 8 (2%) | 0 | 0 | 3 (1%) | 0 | 0 |
| Skin and Subcutaneous Tissue Disorders | 104 (24%) | 0 | 0 | 32 (15%) | 1 (<1%) | 0 |
| Surgical and Medical Procedures | 2 (<1%) | 0 | 0 | 2 (1%) | 0 | 0 |
| Vascular Disorders | 48 (11%) | 16 (4%) | 1 (<1%) | 19 (9%) | 10 (5%) | 3 (1%) |

Patients treated with Optune/TMZ experienced a small increase in TMZ-related AEs and SAEs due to the longer TMZ exposure afforded to these patient by their longer PFS. The only AEs which may have been caused by Optune therapy are the known skin irritation seen in 45% of patients in this study (1% severe), falls which were seen at a slightly higher incidence in patients carrying the device, headaches related to wearing the arrays 24 hours a day and mild psychiatric symptoms (anxiety, insomnia, confusion) which could be caused by the need to incorporate the device and arrays into daily life. No SAEs were considered related to device use. The remainder of AEs and SAEs seen in the trial were well balanced between treatment arms. In conclusion, Optune is very well tolerated with mild to moderate toxicity mainly related to array contact with the scalp.

**Conclusions:** Optune is a portable, battery operated device which delivers TTFields to patients with recurrent diagnosed GBM. The results of the pivotal trial in newly diagnosed GBM showed that Optune/TMZ extends progression free and overall survival significantly compared to patients receiving TMZ alone. No significant increase in adverse events is seen when Optune treatment is added to TMZ. The only common device-related AE was a skin irritation seen beneath the transducer arrays in 45% percent of patients. The majority (44 of 45%) of these events were mild to moderate. Based on an assessment of the Quality of life of the interim analysis cohort of 315 patients, cognitive function and functional status did not decline due to the use of Optune/TMZ.

# RECURRENT DIAGNOSED GLIOBLASTOMA

## Pilot Clinical Study in Recurrent GBM

Optune has been tested in 10 recurrent GBM subjects in a single center, pilot study in Europe. In this study, Optune monotherapy led to a significant increase in time to progression (from 13 to 26 weeks; p=0.013), progression free survival at 6 months (PFS6) (from 15 to 50%) and overall survival (OS) (from 6.0 to 14.7 months; p=0.002) compared to matched concomitant and historical comparator groups. The only device related adverse event (AE) seen in this trial was a mild to moderate skin irritation beneath the device transducer arrays.

## Other Clinical Experience in Recurrent GBM

The Patient Registry Dataset (PRiDe) is a post-marketing registry of all recurrent GBM patients who received Optune in a real-world, clinical practice setting in the US between 2011 and 2013. The registry included 457 recurrent GBM patients who received Optune in 91 US cancer centers. More patients in PRiDe than the pivotal clinical trial in recurrent GBM (EF-11) received Optune for first recurrence (33% vs. 9%) and had received prior bevacizumab therapy (55.1% vs. 19%). Median OS was significantly longer with Optune in clinical practice (PRiDe data set) han in the EF-11 clinical trial in recurrent GBM (9.6 vs. 6.6 months). One- and 2-year OS rates were more than double for NovoTTF Therapy patients in PRiDe than in the EF-11 trial (1-year: 44% vs. 20%; 2-year: 30% vs. 9%). Favorable prognostic factors included first and second vs. third and subsequent recurrences, high Karnofsky Performance Score (KPS) and no prior bevacizumab use. No unexpected adverse events were detected in PRiDe. As in the EF-11 trial, the most frequent adverse events were mild to moderate skin reactions associated with application of the Optune transducer arrays

## Pivotal Clinical Study in Recurrent GBM[1]

**Study Design:** The study was a prospective, randomized, open label, active parallel control trial to compare the effectiveness and safety outcomes of recurrent GBM subjects treated with Optune to those treated with an effective best standard of care (BSC) chemotherapy (including bevacizumab).

The following were the objectives of the study:
- To prospectively compare the median overall survival of recurrent GBM subjects treated with Optune to those treated with best standard of care (BSC) active chemotherapy
- To prospectively determine PFS6, TTP, %1-year survival and quality of life of subjects treated with Optune compared to BSC.
- To collect evidence of the safety of TTFields applied to subjects with recurrent GBM using Optune.

**Eligibility Criteria:** The inclusion and exclusion criteria for the trial were as follows:

### Inclusion Criteria

a. Pathological evidence of GBM using WHO classification criteria
b. ≥ 18 years of age
c. Not a candidate for further radiotherapy or additional resection of residual tumor
d. Subjects with disease progression (by Macdonald criteria (i.e., > 25% or new lesion)) documented by CT or MRI within 4 weeks prior to enrollment
e. Karnofsky scale ≥ 70
f. Life expectancy at least 3 months
g. Participants of childbearing age must use effective contraception
h. All subjects must sign written informed consent

### Exclusion Criteria

a. Actively participating in another clinical treatment trial
b. Within 4 weeks from surgery for recurrence
c. Within 4 weeks from any prior chemotherapy
d. Within 4 weeks from radiation therapy
e. Pregnant
f. Significant co-morbidities within 4 weeks prior to enrollment:
   1) Significant liver function impairment AST or ALT > 3 times the upper limit of normal
   2) Total bilirubin > upper limit of normal
   3) Significant renal impairment (serum creatinine > 1.7 mg/dL)
   4) Coagulopathy (as evidenced by PT or APTT >1.5 times control in subjects not undergoing anticoagulation)
   5) Thrombocytopenia (platelet count < 100 x 103/μL)
   6) Neutropenia (absolute neutrophil count < 1 x 103/μL)
   7) Anemia (Hb < 10 g/L)
   8) Severe acute infection
g. Implanted pacemaker, defibrillator or deep brain stimulator, or documented clinically significant arrhythmias
h. Infra-tentorial tumor
i. Evidence of increased intracranial pressure (midline shift > 5mm, clinically significant papilledema, vomiting and nausea or reduced level of consciousness)

[1]Stupp, R., et al., (2012), "NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomised phase III trial of a novel treatment modality," Eur J Cancer (48): 2192-2202.

Page 72 of 204 received on 6/6/2018 11:30:24 PM [Central Daylight Time]    JB_58173E312028    29976

## Study Procedures:

### Treatment Arm

At treatment initiation subjects were hospitalized for 24 hours. During this period baseline examinations were performed and Optune treatment was initiated by the investigator under continuous medical supervision. The subjects were also instructed by the investigator on the operation of Optune and battery replacement. Once the subjects were trained in operating the device they were released to continue treatment at home. The subjects received continuous Optune treatment. Treatment was discontinued in the case of non-compliance or clinical disease progression.

### Control Arm

All subjects had baseline examinations performed prior to treatment initiation., Subjects received the best effective standard of care chemotherapy practiced at each of the participating centers. The effective BSC treatments used in the study were comprised mainly of the following chemotherapies: Platinum based chemotherapy (Carboplatin), Nitrosureas (BCNU), Procarbazine, lomustine and vincristine (PCV), TMZ, Bevacizumab, and Imatinib, erlotinib, Irinotecan (mainly in Europe). Because these therapies were included in the trial as a group, no comparisons can be made to each individual chemotherapy regimen. Chemotherapeutic treatment protocol was according to standard procedures at each of the participating centers.

### Follow-up

During treatment, and until progression for subjects who stopped treatment before progression, all subjects were seen once a month at an outpatient clinic where they underwent medical follow up and routine laboratory exams. An MRI was performed every 2 months until disease progression. Central MRI review was performed by a neuro-radiologist blinded to the treatment group of each subject. Medical follow-up continued for 2 months following disease progression. Subject survival was assessed based on monthly telephone interviews with the subjects' caregivers.

### Subject Characteristics:

237 subjects (120 Optune; 117 BSC) with progressive or recurrent GBM were enrolled in the study. Baseline characteristics were as follows: mean age: 53.6 years; mean Karnofsky score: 81.6±10.9%; tumor size (cm²): 16.2±12.4; progression number: 1.4±0.9; re-operated: 26%; male: 70%; previous low grade: 10%; prior bevacizumab failure: 19%. Baseline characteristics were similar between treatment groups with slightly more men in the Optune group than in the BSC group (77% vs. 62%), a lower incidence of frontal lobe tumors in the Optune group than in the BSC group (32% vs. 50%), and a slightly higher mean KPS in the Optune group than in the BSC group (83% vs. 80%), though the median KPS was 80 in both groups. Adjusted analyses for all pre-specified or all statistically significant baseline covariates for overall survival did not change the outcome of the trial.

| Characteristics | (N=120) | (N=117) |
|---|---|---|
| | n (%) | n (%) |
| | | |
| Caucasian | 111 (93) | 106 (91) |
| African American | 2 (2) | 5 (4) |
| Asian | 0 | 3 (3) |
| Hispanic | 7 (6) | 2 (2) |
| Other | 0 | 1 (1) |
| Female Gender | 28 (23) | 44 (38) |
| Frontal Tumor Position | 38 (32) | 58 (50) |
| Bilateral or Midine Tumor Location | 23 (19) | 17 (15) |
| Prior Avastin Use | 24 (20) | 21 (18) |
| Re-operation for Recurrence | 33 (28) | 29 (25) |
| Prior Low-grade Glioma | 12 (10) | 11 (9) |
| Median Age (years) (min, max) | 54 (24, 80) | 54 (29, 74) |
| Median Weight (kg) | 80 | 80 |
| Mean Number of Prior GBM Recurrences | 1.5 | 1.3 |
| Median Karnofsky Performance Score (min, max) | 88 (50, 100) | 80 (50, 100) |
| Median Tumor Area (mm⁴ | 1440 | 1391 |
| Median Time from GBM Diagnosis to Randomization (days) | 334 | 340 |
| Mean Time from Last Radiotherapy Dose to Randomization (Months) | 13.71 | 13.93 |

## Effectiveness Results:

### Primary Effectiveness Endpoint: Overall Survival (ITT)

In the ITT population which included all randomized subjects (Novo-TTF=120, BSC=117), overall survival in subjects treated with Optune was comparable to that observed in subjects treated with BSC (median OS=6.3 vs. 6.4 months; p=0.98). In the US, the median overall survival was 6.1 vs. 5.3 months in the ITT population. The pivotal study data establish that Optune therapy is comparable to BSC therapy in extending OS.

| | Treatment Group | |
| --- | --- | --- |
| | Optune | BSC |
| N | 120 | 117 |
| Median OS (months) | 6.3 | 6.4 |
| Log-rank p-Value | 0.98 | |
| Hazard Ratio (95% CI) | 1.00 (0.76-1.32) | |

The Kaplan-Meier survival curve for the two treatment groups appeared to be very similar during the first 12 months of follow-up, where 80% of the events occurred in both groups. Between 12 and 24 months, the survival curves separated slightly in favor of the BSC control group. However, after 12 months, the number of subjects remaining may be too small to reliably estimate the long term survival outcome.



| | Optune (N=120) | Active BSC Control (N=117) |
| --- | --- | --- |
| Deaths | 105 | 97 |
| Censored | 15 | 20 |
|   Lost to follow-up | 6 | 10 |
|   Alive at end of follow-up | 9 | 10 |
| Median (months) | 6.3 | 6.4 |
| 95% Confidence Interval | 5.6, 7.8 | 5.2, 7.4 |

**Correlation between Treatment Compliance and Overall Survival:** Optune has an internal log file which allows the calculation of patient compliance with treatment. Significantly higher overall survival (p=0.0447) was observed in patients who were treated 75% or more of the time on average (OS=7.7 months) compared to patients treated less than 75% of the time on average (OS=4.5 months).

**Secondary Effectiveness Endpoints:** Secondary endpoint results support the findings in the primary endpoint. The one-year survival is similar in the Optune and BSC groups in the ITT population (21.9% vs. 22.1%). Progression free survival at 6 months (PFS6) is the same in the ITT population (21.4% vs. 15.2%). Radiological response rates from the subset of patients evaluated were reported as 14% for the Optune group compared to 9.6% for the BSC group in the ITT population. Median time to progression (TTP) was 9.3 weeks for Optune vs. 9.6 weeks for BSC.

|  | Treatment Group | |
|---|---|---|
|  | Optune | BSC |
| N | 120 | 117 |
| 1-year survival | 21.9%<br>25/114 | 22.1%<br>23/104 |
|  |  |  |
| PFS6 (%) | 21.4%<br>22/103 | 15.2%<br>14/92 |
|  |  |  |
| Radiological Response Rate (%) | 14.0%<br>14/100 | 9.6%<br>7/73 |
|  |  |  |
| Median TTP (weeks) | 9.3 | 9.6 |

**Quality of Life:** Quality of life in subjects using Optune was better than those on BSC chemotherapy in most subscale domains, including vomiting, nausea, pain, diarrhea, constipation, cognitive and emotional functioning.

**Safety Results:** The characteristic adverse events of almost all chemotherapies are seen in a significantly higher proportion of BSC control subjects than in Optune subjects: gastrointestinal (30% vs. 8%), hematological (19% vs. 4%) and infectious (12% vs. 4%). Mild to moderate skin irritation beneath the device transducer arrays was observed in 16% of Optune subjects; none of these cases were assessed as severe by the Investigator, all resolved after discontinuing treatment, and all were treated with topical steroids and periodic shifting of transducer array positions.

### Number of Patients with Adverse Events by Body System (>2%)

| System Organ Class | Optune N=116 (%) | BSC (chemotherapy) N=91 (%) |
|---|---|---|
| Blood and lymphatic disorders | 5 (4.3%) | 17 (18.7%) |
| Gastrointestinal disorders | 9 (7.8%) | 27 (29.7%) |
| General disorders and administration site conditions | 15 (12.9%) | 14 (15.4%) |
| Infections and infestations | 5 (4.3%) | 11 (12.1%) |
| Injury, poisoning and procedural complications | 21 (18.1%) | 1 (1.1%) |
| Metabolism and nutrition disorders | 9 (7.8%) | 12 (13.2%) |
| Nervous system disorders | 50 (43.1%) | 33 (36.3%) |
| Psychiatric disorders | 12 (10.3%) | 7 (7.7%) |
| Respiratory, thoracic and mediastinal disorders | 7 (6.0%) | 10 (11.0%) |

**Conclusions:** Optune is a portable, battery operated device which delivers TTFields to patients with recurrent GBM. The results of the pivotal trial showed that Optune subjects had comparable overall survival to subjects receiving the best available chemotherapy in the US today (OS 6.3 vs. 6.4 months; HR 1.0; p=0.98). Similar results showing comparability of Optune to BSC chemotherapy in the ITT population were seen in all secondary endpoints.

Optune subjects experienced fewer adverse events in general, significantly fewer treatment related adverse events, and significantly lower astrointestinal, hematological and infectious adverse events compared to BSC controls. The only device-related adverse event seen was a mild to moderate skin irritation beneath the device transducer arrays, which was easily treated with topical ointments. Finally, certain quality of life measures were better in Optune subjects as a group when compared to subjects receiving effective BSC chemotherapy.

# Directions for Use

Detailed directions for use for Optune can be found In:
The Optune Patient Information and Operation Manual

# Abbreviations

**AE** – Adverse event

**BSC** – Best standard of care (effective chemotherapies)

**GBM** – Glioblastoma Multiforme (Glioblastoma, Astrocytoma grade IV), the most common and anaplastic primary brain tumor

**ITT** – Intent-to-Treat. This analysis population includes all randomized subjects.

**kHz** – kilo hertz; number of cycles per second

**Optune**-- A portable battery, or power supply, operated device for delivering 200 kHz TTFields to the brain of patients with recurrent GBM

**OS** – Overall survival

**PP** – Per Protocol. This analysis population includes all patients who received at least the first course of TMZ and had no major protocol deviations.

**PFS** – Progression free survival

**PFS6** – Proportion of patients alive and progression free at 6 months from randomization

**Radiological Response Rate** - sum of complete and partial radiological response rates

**TMZ** – a type of cancer drug used to treat newly diagnosed GBM

**TTFields** – Tumor Treating Fields: Low intensity (1-3 V/cm), intermediate frequency (100-300 kHz), alternating electric fields, delivered using insulated transducer arrays to the region of the body inflicted with a solid tumor. The fields have been shown in vitro to arrest the replication of tumor cells by disrupting the proper formation of the microtubule spindle nd by dielectrophoretic disruption of cell integrity during late telophase

**TTP** – Time to progression

**V/cm** – Volts per centimeter; the unit of intensity measurement of electric fields

# Contact Information

Novocure Inc.
195 Commerce Way
Portsmouth, NH 03801
Tel: 1.855.281.9301
e-mail: patientinfo@novocure.com

# Bibliography

Kirson, E. D., V. Dbaly, et al. (2007). "Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors." Proc Natl Acad Sci U S A 104(24): 10152-7.

Kirson, E. D., Z. Gurvich, et al. (2004). "Disruption of cancer cell replication by alternating electric fields." Cancer Res 64(9): 3288-95.

Mrugala, M., et al. (2014). "Clinical Practice Experience With NovoTTF-100A™ System for Glioblastoma: The Patient Registry Dataset (PRiDe)" Seminars in Oncology. Vol 41.No 5,Suppl 6.October 2014,pp S4-S13

Stupp, R., et al, (2012). "NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomised phase III trial of a novel treatment modality." Eur J Cancer 48(14): 2192-202.



# SNO

## The Society for NeuroOncology

*A multidisciplinary organization for the advancement of neuro-oncology through research and education*

*President*
David A. Reardon, MD

*Vice President*
E. Antonio Chiocca, MD, PhD

*Secretary-Treasurer*
Evanthia Galanis, MD

**Board of Directors**
Manish Aghi, PhD
Eric Bouffet, MD
Daniel Bota, M.D. PhD
Paul Brown, MD
Mary Lovely, PhD
Margaretta Page, MS, RN
Andrew Parsa, PhD
David Peereboom, MD
Russell Pieper, PhD

**Past President**
Kenneth Aldape, MD

**Foundation President**
Mark R. Gilbert, M.D

**Foundation Board**
Mitchel S. Berger, MD
Susan Chang, MD
Victor A. Levin, MD

**Journal Editor in Chief**
Patrick Wen, MD

**SNO Executive Editor**
Kenneth Aldape, MD

**Executive Director**
J. Charles Haynes, JD
chas@soc-neuro-onc.org

**Chief Administrative Officer**
Jan Esenwein
jan@soc-neuro-onc.org

*The following abstract will be presented on Saturday, November 15, 2014, at 11:40am at the 19th Annual Scientific Meeting of the Society for Neuro-Oncology. The information below is embargoed until 8:00am, Saturday, November 15, 2014.*

## Interim Analysis of the EF-14 Trial: A Prospective, Multi-center Trial of NovoTTF-100A Together With Temozolomide Compared to Temozolomide Alone in Patients with Newly Diagnosed GBM

*Roger Stupp, Eric Wong, Charles Scott, Sophie Taillibert, Andrew Kanner, Santosh Kesari and Zvi Ram on behalf of the EF-14 Trial Investigators*

**BACKGROUND:** Tumor Treating Fields (TTFields) are an anti-mitotic, physical treatment modality that acts in metaphase, anaphase and telophase. The NovoTTF-100A System (NovoTTF), a home-use medical device that delivers TTFields to the brain, is an established monotherapy for recurrent glioblastoma (GBM).

**METHODS:** We conducted an international, multicenter, prospective, randomized phase III trial in newly diagnosed GBM patients. After completion of radiotherapy (RT) with concomitant temozolomide (TMZ), patients were randomized (2:1) to adjuvant TMZ with NovoTTF or adjuvant TMZ alone. The primary endpoint was progression-free survival (PFS), with overall survival (OS) an important secondary endpoint. Here we report on a pre-specified interim analysis of the first 315 patients randomized, after a minimum follow-up of 18 months (range 18-60 months).

**RESULTS:** (intent-to-treat): 210 pts were randomized to NovoTTF/TMZ and 105 to TMZ alone. Patient characteristics were balanced: median age 57 and 58 years, tumor resection in 89 and 90%, KPS 90%, for the NovoTTF and the control arms, respectively. MGMT promoter methylation status was assessable centrally in 60% of patients; of these 39% and 41% were methylated. Adverse events (AE) were comparable between treatment arms. The most common device-related AE was skin irritation in 45% of patients (all grades, severe 2%). Severe seizures were observed at a frequency of 7% in both arms. Median PFS was 7 1 months (mo) (95% confidence interval [CI] 5.9-8.2) and 4.0 mo (CI 3.0-4.3; Hazard ratio 0.63, p=0.001), OS was 19.6 mo (CI 16.5.-24.1) and 16.6 mo (CI 13.5-19.1) (HR 0.75, p=0.034), both favoring NovoTTF. This translates into a 24-mo survival rate of 43% (CI 36-50%) and 29% (CI 21-39%) for the NovoTFF/TMZ and the TMZ alone arm, respectively.

**CONCLUSIONS:** The trial met its primary and main secondary endpoints, and was closed to accrual after this interim analysis. Adjuvant TMZ chemotherapy and NovoTTF provides a clinically and statistically significant improvement in progression-free and overall survival, and should become the new standard of care against GBM.

4617 Birch Street, Bellaire, Texas 77401-5509   Tel: 713-349-0952, Fax 832-201-8129   www.soc-neuro-onc.org

501931206789

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C5-06-27
Baltimore, Maryland 21244-1850



Center for Medicare
Refer to: FCHBE

**JUL 26 2013**

James C. Stansel
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005

Dear Mr. Stansel:

Thank you for your inquiry requesting an informal benefit category determination (BCD) for the NovoTTF™-100A System.

According to your letter and the information you provided during the meeting with Centers for Medicare and Medicaid Services (CMS) on May 21, 2013, the NovoTTF™-100A System is a non-invasive system used in the patient's home that delivers tumor treating fields therapy to the brain to disrupt rapid cell division exhibited by recurrent GMB tumors. The NovoTTF™-100A System is comprised of a durable electrical field generator and disposable insulated transducer arrays for use with the Generator. The System also includes lithium ion batteries, battery rack, battery charger, power supply, connection cables, and a carrying case. The NovoTTF™-100A System received pre-market approval (PMA) from FDA in April 2011 for recurrent GBM.

In order for an item to be covered by Medicare, it must meet the definition of a Medicare-covered benefit. However, it is important to note that although Medicare provides coverage for certain items, it does not provide coverage for every item that may be useful to a person with a medical problem, even if a physician prescribes the item. The Medicare definition of durable medical equipment (DME) includes equipment which: can withstand repeated use; has an expected life of at least three years; is primarily and customarily used to serve a medical purpose; generally is not useful to a person in the absence of an illness or injury; and is appropriate for use in the home.

Based on the product information we reviewed, we believe that the NovoTTF™-100A System falls within the DME benefit category. I hope that this information is helpful to you.

Sincerely,

Joel B. Kaiser
Director
Division of DMEPOS Policy



**DEPARTMENT OF HEALTH & HUMAN SERVICES**        Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Room –WO66-G609
Silver Spring, MD 20993-0002

NovoCure, Ltd.
% Mr. Jonathan S. Kahan
Hogan Lovells US LLP
Columbia Square                              APR  8 2011
555 Thirteenth Street, N.W.
Washington, D.C. 20004

Re:  P100034
     NovoTTF-100A System
     Filed: August 16, 2010
     Amended: September 10, October 19, December 13, and December 27, 2011; and
              February 17, and April 8, 2011
     Procode: NZK

Dear Mr. Kahan:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug Administration (FDA) has completed its review of your premarket approval application (PMA) for the NovoTTF-100A System. This device is indicated for treatment of adult patients (22 years of age or older) with histologically-confirmed glioblastoma multiforme, following histologically- or radiologically-confirmed recurrence in the supratentorial region of the brain after receiving chemotherapy. The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted.

We are pleased to inform you that the PMA is approved. You may begin commercial distribution of the device in accordance with the conditions of approval described below.

The sale and distribution of this device are restricted to prescription use in accordance with 21 CFR 801.109 and under section 515(d)(1)(B)(ii) of the Federal Food, Drug, and Cosmetic Act (the act). The device is further restricted under section 515(d)(1)(B)(ii) of the act insofar as the labeling must specify the specific training or experience practitioners need in order to use the device. FDA has determined that these restrictions on sale and distribution are necessary to provide reasonable assurance of the safety and effectiveness of the device. Your device is therefore a restricted device subject to the requirements in sections 502(q) and (r) of the act, in addition to the many other FDA requirements governing the manufacture, distribution, and marketing of devices.

501931XX02784

Page 2 - Mr. Jonathan S. Kahan

Continued approval of this PMA is contingent upon the submission of periodic reports, required under 21 CFR 814.84, at intervals of one year (unless otherwise specified) from the date of approval of the original PMA. Two copies of this report, identified as "Annual Report" and bearing the applicable PMA reference number, should be submitted to the address below. The Annual Report should indicate the beginning and ending date of the period covered by the report and should include the information required by 21 CFR 814.84.

In addition to the above, and in order to provide continued reasonable assurance of the safety and effectiveness of the device, the Annual Report must include, separately for each model number (if applicable), the number of devices sold and distributed during the reporting period, including those distributed to distributors. The distribution data will serve as a denominator and provide necessary context for FDA to ascertain the frequency and prevalence of adverse events, as FDA evaluates the continued safety and effectiveness of the device.

In addition to the conditions outline above, you must conduct the following post-approval study (PAS):

*The New Enrollment Study for NovoTTF-100A in Recurrent GBM Patients:* Per agreed on study outline (e-mail dated April 5, 2011) this study will address the following question: Is the overall survival of patients treated with NovoTTF-100A non-inferior to the survival of patients treated with the best standard of care (chemotherapy)? This question will be addressed with a prospective, multi-center, non-randomized, unblinded, concurrent control study of NovoTTF-100A in recurrent Glioblastoma Multiforme (GBM) patients. The study will be conducted in at least 30 sites, at least half of them in the United States, and may include centers with previous experience with the device. Patients 22 years old and older will be included in the PAS. A total of 486 subjects will be enrolled, with 243 subjects per study arm. All study participants will be followed until death. Study follow-up visits include baseline and monthly in-office visits until disease progression. Assessment at baseline includes the Mini Mental State Examination (MMSE) and genetic profiling. The monthly assessments include survival status, MMSE and adverse event assessment. After disease progression study participants will be followed by monthly phone calls to determine survival status.

The primary data analysis will compare overall survival in NovoTTF-100A patients to that seen in concurrent BSC comparison patients, in the investigational device exemption (IDE) study Intent-to-Treat population, within a predefined confidence interval bound consistent with a performance goal of 1.375. The secondary endpoints will be: Change in neuro-cognitive function from baseline based on the MMSE; Genetic profiling of tumors and correlation with response to NovoTTF-100A treatment, specifically:

- MGMT promoter methylation status
- EGFR amplification, over expression or rearrangement
- Chromosomes 1p/19q deletion status
- Adverse event incidence by body system and term, including:
- Incidence of seizures
- Anticonvulsant use

2

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 515 of 631   Document 11-5     4746

5817313212785

Page 3 - Mr. Jonathan S. Kahan

Please be advised that the results from these studies should be included in the labeling as these data become available. Any updated labeling must be submitted to FDA in the form of a PMA Supplement.

In addition to the Annual Report requirements, FDA would like to remind you that you are required to submit PAS Progress Reports every six months during the first two years and annually thereafter. The reports should clearly be identified as Post-Approval Study Report. Two copies, identified as "PMA Post-Approval Study Report" and bearing the applicable PMA reference number, should be submitted to the address below. For more information on post-approval studies, see the FDA guidance document entitled, "Procedures for Handling Post-Approval Studies Imposed by PMA Order"
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm070974.htm

Be advised that the failure to conduct any such study in compliance with the good clinical laboratory practices in 21 CFR part 58 (if a non-clinical study subject to part 58) or the institutional review board regulations in 21 CFR part 56 and the informed consent regulations in 21 CFR part 50 (if a clinical study involving human subjects) may be grounds for FDA withdrawal of approval of the PMA.

Within 30 days of your receipt of this letter, you must submit a PMA supplement that includes a complete protocol of your post-approval study. Your PMA supplement should be clearly labeled as a "Post-Approval Study Protocol" and submitted in triplicate to the address below. Please reference the PMA number above to facilitate processing. If there are multiple protocols being finalized after PMA approval, please submit each protocol as a separate PMA supplement. For more information on post-approval studies, see the FDA guidance document entitled, "Procedures for Handling Post-Approval Studies Imposed by PMA Order (www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm070974.htm#2

Before making any change affecting the safety or effectiveness of the device, you must submit a PMA supplement or an alternate submission (30-day notice) in accordance with 21 CFR 814.39. All PMA supplements and alternate submissions (30-day notice) must comply with the applicable requirements in 21 CFR 814.39. For more information, please refer to the FDA guidance document entitled, "Modifications to Devices Subject to Premarket Approval (PMA) - The PMA Supplement Decision-Making Process" (www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm089274.htm).

You are reminded that many FDA requirements govern the manufacture, distribution, and marketing of devices. For example, in accordance with the Medical Device Reporting (MDR) regulation, 21 CFR 803.50 and 21 CFR 803.52, you are required to report adverse events for this device. Manufacturers of medical devices, including in vitro diagnostic devices, are required to report to FDA no later than 30 calendar days after the day they receive or otherwise becomes aware of information, from any source, that reasonably suggests that one of their marketed devices:

3

501931206786

Page 4 - Mr. Jonathan S. Kahan

device. Manufacturers of medical devices, including in vitro diagnostic devices, are required to report to FDA no later than 30 calendar days after the day they receive or otherwise becomes aware of information, from any source, that reasonably suggests that one of their marketed devices:

1.     May have caused or contributed to a death or serious injury; or

2.     Has malfunctioned and such device or similar device marketed by the manufacturer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.

Additional information on MDR, including how, when, and where to report, is available at www.fda.gov/MedicalDevices/Safety/ReportsProblem/default.htm.

In accordance with the recall requirements specified in 21 CFR 806.10, you are required to submit a written report to FDA of any correction or removal of this device initiated by you to: (1) reduce a risk to health posed by the device; or (2) remedy a violation of the act caused by the device which may present a risk to health, with certain exceptions specified in 21 CFR 806.10(a)(2). Additional information on recalls is available at www.fda.gov/Safety/Recalls/IndustryGuidance/default.htm.

CDRH does not evaluate information related to contract liability warranties. We remind you; however, that device labeling must be truthful and not misleading. CDRH will notify the public of its decision to approve your PMA by making available, among other information, a summary of the safety and effectiveness data upon which the approval is based. The information can be found on the FDA CDRH Internet HomePage located at www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DeviceApprovalandClearances/P MAApprovals/default.htm. Written requests for this information can also be made to the Food and Drug Administration, Dockets Management Branch, (HFA-305), 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852. The written request should include the PMA number or docket number. Within 30 days from the date that this information is placed on the internet, any interested person may seek review of this decision by submitting a petition for review under section 515(g) of the act and requesting either a hearing or review by an independent advisory committee. FDA may, for good cause, extend this 30-day filing period.

Failure to comply with any post-approval requirement constitutes a ground for withdrawal of approval of a PMA. The introduction or delivery for introduction into interstate commerce of a device that is not in compliance with its conditions of approval is a violation of law.

You are reminded that, as soon as possible and before commercial distribution of your device, you must submit an amendment to this PMA submission with copies of all approved labeling in final printed form. Final printed labeling that is identical to the labeling approved in draft form will not routinely be reviewed by FDA staff when accompanied by a cover letter stating that the final printed labeling is identical to the labeling approved in draft form. If the final printed labeling is not identical, any changes from the final draft labeling should be highlighted and explained in the amendment.

4

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 517 of 631   Document 11-5       4748

201921306787

Page 5 - Mr. Jonathan S. Kahan

All required documents should be submitted in triplicate, unless otherwise specified, to the address below and should reference the above PMA number to facilitate processing. One of those three copies may be an electronic copy (eCopy), in an electronic format that FDA can process, review and archive (general information: http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/ucm134508.htm; clinical and statistical data: http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/ucm136377.htm)

**U.S. Food and Drug Administration**
**Center for Devices and Radiological Health**
**PMA Document Mail Center -- WO66-G609**
**10903 New Hampshire Avenue**
**Silver Spring, MD 20993-0002**

If you have any questions concerning this approval order, please contact Ms. Jan C. Callaway at 301-796-5620.

Sincerely yours,

Christy Foreman
Acting Director
Office of Device Evaluation
Center for Devices and Radiological Health
Food and Drug Administration

5

# novocure

---

## NOVOTTF-100A SYSTEM

## PRODUCT DOSSIER

**FDA Approved Treatment for Recurrent Glioblastoma Multiforme**

**US FDA Pre-Market Approval (PMA) P100034**

---

Novacure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 865-281-9301 | Fax: (603) 215-2022

novocure

## Table of Contents

|  | Page |
|---|---|
| List of Tables and Figures | 3 |
| List of Abbreviations and Definition of Terms | 4 |
| Executive Summary | 7 |
| Burden of Illness and Standard of Care for GBM | 17 |
| Description and Use of NovoTTF-100A System | 20 |
| NovoTTF-100A Mechanism of Action and Preclinical Data | 24 |
| Summary of Clinical Studies | 27 |
| Appendix A--FDA Approval Letter | 37 |
| Appendix B--Summary of Preclinical Studies | 38 |
| Appendix C--Pivotal Trial Sites and Investigators | 41 |
| Appendix D--Adverse Events | 43 |
| Bibliography | 46 |

Page 89 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_59173E312028   25976

Novocure | http://www.novocure.com/
196 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

novocure

## List of Tables and Figures

Page

Table 1 Pivotal Trial Efficacy Results...................................................................10

Table 2. Demographics and Baseline Characteristics by Treatment Group............ 31

Table 3. Primary Effectiveness Endpoint analysis .......................................... 32

Table 4. Overall Survival by Region.....................................................................32

Table 5. Summary of Secondary Effectiveness Endpoints ................................34

Table 6. Treatment Related AEs by Body System...............................................36


Figure 1. NovoTTF-100A System Components....................................................14

Figure 2. Use of Device Overview.......................................................................15

Figure 3. Kaplan-Meier Curves for Overall Survival............................................33

Figure 4. Quality of Life-QLQ C30 General.........................................................34

Figure 5. Quality of Life-QLQ C30 Symptom Scale..............................................35

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 521 of 631   Document 11-5   4752

Page 90 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_59173E312028   25976

ΤΘ᠘ΤƐΘ᙭Ɛ᠐ΤᏆ᠐Ꮧ

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (803) 215-2022

# novocure

## List of Abbreviations and Definitions of Terms

**AE** – Adverse Event

**ALT** – Alanine Transaminase

**APTT** – Activate Partial Thromboplastin Time

**AST** – Aspartate Transaminase

**B16F1** – Type of melanoma cells

**BCNU** – Carmustine, chemotherapy

**CHEMOTHERAPY** – Best Standard of Care (effective chemotherapies)

**C** – Centigrade

**CCNU** – Lomustine (CeeNU), chemotherapy

**CNS** – Central Nervous System

**CRF** – Case Report Form

**ECG** – Electrocardiogram

**EMC** – Electromagnetic Compatibility

**F-98** – Rat glioblastoma cell line

**FDA** – Food and Drug Administration

**GBM** – Glioblastoma Multiforme (Glioblastoma, Astrocytoma grade IV), the most common and anaplastic primary brain tumor.

**Gy** – Gray, unit of radiation

**Hb** – Hemoglobin

**ITT** – Intent-to-Treat

**INE** – Insulated Electrical Array

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

novocure

**kHz** — Kilo Hertz; number of cycles per second

**KPS** — Karnofsky Scale

**Ltd.** — Private limited company

**mA** — Measure of electrical current

**mg/dL** — Milligrams per deciliter

**mm** — Millimeter

**mm2** — Millimeter squared

**MHz** — Mega Hertz, number of cycles per second

**MRI** — Magnetic Resonance Imaging

**NSCLC** — Non-Small Cell Lung Cancer

**NovoTTF-100A System** — A portable battery, or power supply, operated device for delivering 200 kHz TTFields to the brain of patients with recurrent GBM.
  • Abbreviated in this document as the NovoTTF device

**OS** – Overall Survival

**OUS** — Outside United States

**p-value** — Probability Value

**PCV** — Procarbazine, CCNU and vincristine-combination chemotherapy

**PFS6** — Progression Free Survival at 6 months

**PMA** — Pre-market Approval

**PT** — Prothrombin Time

**QOL** — Quality of Life

**QLQ C30** — Questionnaire developed to assess the quality of life of cancer patients

**Radiological Response Rate or RR** — Sum of complete and partial radiological response rates

Page 92 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_59173E312028   29976

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

novocure

**RMS** – Root Mean Square; a measure of the intensity of a sinusoidal waveform

**RT Dose** – Radiation dose

**SAEs** – Serious Adverse Events

**TENS** – Transcutaneous Electrical Nerve Stimulation

**TTFields** – Tumor Treating Fields: Low intensity (1-3 V/cm), intermediate frequency (100-300 kHz); alternating electric fields, delivered using insulated transducer arrays to the region of the body inflicted with a solid tumor. The fields have been shown to arrest the replication of tumor cells by disrupting the proper formation of the microtubule spindle and by dielectrophoretic disruption of cell integrity during late telophase.

**TTF Therapy** – treatment using Tumor Treating Fields

**TTP** – Time to Progression

**uL** – Microliter

**U-87** - Human glioblastoma cell line

**US** – United States

**V/cm** – Volts per centimeter; the unit of intensity measurement of electric fields

**WHO** – World Health Organization

**95% CI** – 95% Confidence level

Page 93 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (803) 215-2022

novocure

## Executive Summary

### Introduction
The NovoTTF-100A System (the "NovoTTF") is a portable, wearable medical device that delivers tumor treating fields ("TTFields") therapy ("TTF therapy") to a targeted tumor. Patients maintain normal daily activities while receiving TTF therapy continuously. The FDA has approved the device as a treatment for recurrent glioblastoma multiforme ("GBM") brain tumors.

### FDA Approval
The US Food and Drug Administration (FDA) approved the NovoTTF-100A System under the pre-market approval (PMA) pathway in April 2011. The PMA approval pathway is the most rigorous medical device approval pathway and is analogous to the FDA new drug application (NDA) pathway. The FDA approved the device on the basis of results from a multi-center randomized controlled pivotal (phase III) clinical trial. The FDA PMA approval followed a positive vote from the FDA's Independent Medical Device Advisory Committee's Neurological Devices Panel. (See FDA Approval Letter, Appendix A.)

> **Indication for Use:** The NovoTTF-100A is intended as a treatment for adult patients [22 years of age or older] with histologically-confirmed glioblastoma multiforme [GBM], following histologically- or radiologically-confirmed recurrence in the supra-tentorial region of the brain after receiving chemotherapy. The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted.

### Glioblastoma Disease & Population Estimates
Glioblastoma multiforme (GBM, WHO Astrocytoma grade IV) although considered the most common form of primary brain tumor is a rare disease. GBM is universally fatal and the disease is classified as "recurrent GBM" when the tumor recurs or progresses after standard treatment. Patients with recurrent GBM have a one-year survival rate of approximately 10% and a median overall survival time of 3 to 5 months when not treated with an effective (active) therapy.

Glioblastoma affects approximately 10,000 people annually in the US, of which fewer than 7,000 will likely seek treatment for recurrent GBM. The median age at diagnosis is approximately 64 years and approximately 65 percent of patients are under 65 years of age. The expected population for a private health care payer in the US is approximately 16 patients per 1 million covered lives (7,000 x 65% non Medicare x 70% with private health care coverage).

Page 94 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone 855-281-9301 | Fax (603) 215-2022

novocure

## Glioblastoma Current Standard of Care

At diagnosis patients with GBM undergo debulking surgery, if possible, followed by concomitant radiotherapy and chemotherapy using temozolomide (Merck; Temodar). Some patients have carmustine wafers (Gliadel Wafers) implanted in the resection cavity at the time of surgery. This initial treatment is then followed by monthly courses of temozolomide which are repeated for six months or until disease progression.

When the disease relapses (recurrent GBM) treatment options are limited. Only 20% of recurrent GBM patients are candidates for additional debulking surgery, with or without Gliadel Wafer placement, at the time of recurrence. A small number of patients can receive an ionizing radiation boost to the area of recurrence.

Most recurrent glioblastoma patients in the US are treated with bevacizumab (Avastin), or experimental treatments. Bevacizumab is the only chemotherapy specifically approved by FDA for recurrent glioblastoma. The FDA approved bevacizumab for this indication on the basis of data from a non-randomized trial. Bevacizumab for recurrent glioblastoma has not been demonstrated to extend overall survival versus a control group.

## Scientific Basis of TTF Therapy

Tumor treating fields therapy (TTF therapy) is an electric field based loco-regional, antimitotic treatment modality, which has been shown to inhibit the growth of cancerous tumors *in vitro* and *in vivo*. TTF therapy has been shown to:

- inhibit cancer cell replication by interference with the proper formation of the mitotic spindle during anaphase; and

- cause intracellular dislocation of macromolecule and organelles during late telophase.

Acting together, these two processes, which are specific to dividing cells only, lead to apoptosis and can result in tumor arrest or regression *in vivo*. Most healthy adult brain cells proliferate very slowly, if at all, and are thus not affected by the TTFields. Additionally, the antimitotic effect of TTF therapy has been shown to be frequency-specific to the cell type treated. Specifically, TTFields that inhibit the replication of GBM tumor cells do not affect the replication of other cell types (e.g., neurons), nor do they affect neuronal function.

TTFields are intermediate frequency (200 kHz) and low intensity (1-3 V/cm) alternating electric fields. At this frequency and intensity, TTFields cannot stimulate nerves or muscles, nor do they lead to heating of the tumor or surrounding tissues. Since TTFields are applied using electrically insulated arrays, there is no direct current flow into the tissue so that electrolysis and tissue damage do not occur over time.

Page 95 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_59173E312028    25976

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

novocure

## Product Description

The NovoTTF-100A System is a prescription only device that is intended for continuous use throughout the day by the patient. The NovoTTF is comprised of two main components: 1) an Electric Field Generator (the device) and 2) INE Insulated Transducer Arrays. The device delivers TTFields to the patient through four electrically-insulated, disposable, surface transducer arrays placed on the patient's shaved scalp. The NovoTTF-100A System also contains a power supply, portable batteries, battery rack, battery charger, connection cable and carrying case. (See Figure 1 for illustration of components.)

## Device Use

The treating physician must complete training and receive certification from the manufacturer prior to prescribing the treatment. Additionally, nurses, nurse practitioners, physician's assistants and any other health care professional providing direct patient care related to the NovoTTF-100A System must also have completed training and certification.

Prior to starting treatment the physician plans the appropriate layout of transducer arrays around the tumor location. The patient then has their scalp shaved to ensure proper contact of the transducer array to the skin. The physician then places the arrays (or provides supervision to a nurse or PA) on the patient's scalp in accordance with the layout plan. The physician then directly initiates treatment by turning the machine on and ensures safe treatment start. The physician and/or nurse trains the patient and the caregivers on proper use of the system including battery charging and replacement, transducer array replacement and problem solving procedures.

The INE Insulated Transducer Arrays (the "Arrays") are disposable and approved for single use only. The Arrays are removed, the scalp re-shaved, and new Arrays are placed as hair grows back, typically every 2 to 3 days. The Arrays are highly engineered and designed to deliver and monitor the therapy simultaneously, while maintaining electrical insulation and patient safety. Due to the advanced engineering requirements and their unique material composition, the Arrays will contribute meaningfully to the device cost.

The prescribing physician will likely require that patients return to their office for Array placements in the first two weeks after starting therapy, and as needed thereafter. The physician, during these visits, will be able to provide the patient with additional training and ensure that the Array placement is in accordance with the treatment plan. Once properly trained, the patient is expected to make Array placements at home with the assistance of caregiver. (See Figure 2 for illustration of device usage.)

The physician-prescribed device is used until clinical disease progression. The recommended average daily use is at least 18 hours a day. The median duration of treatment with the NovoTTF was 2.4 months in the pivotal trial. Some patients in the

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 527 of 631   Document 11-5

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone. 855-281-9301 | Fax: (603) 215-2022

**novocure**

pivotal trial were treated with the NovoTTF for greater than one year, which reflects that fact that the device produced durable tumor responses in certain patients.

## EF-11 Pivotal Trial for the NovoTTF-100A System

The FDA approved the NovoTTF on the basis of a multicenter, randomized, controlled clinical trial that enrolled 237 patients. The study design:

- evaluated the safety and effectiveness of the NovoTTF as a monotherapy in the treatment of recurrent GBM,

- randomized patients in two arms: 1) NovoTTF alone, or 2) active chemotherapy selected by the physician (chemo), and

- enrolled patients with balanced characteristics between the two arms.

The chemotherapy treatments in the control arm were comprised mainly of the following chemotherapies: bevacizumab, temozolomide, platinum based chemotherapy (Carboplatin), nitrosureas (CCNU), procarbazine alone, procarbazine with lomustine and vincristine (PCV), and imatinib, erlotinib, irinotecan.

The primary efficacy endpoint for the trial was overall survival (OS). The secondary efficacy endpoints were one year survival rate, progression free survival rate at six months (PFS6), radiologic response rate, and quality of life (QOL).

The efficacy data was analyzed in an intent-to-treat (ITT) population that included all patients randomized to the trial. The efficacy data demonstrated that NovoTTF produces clinically comparable outcomes to chemotherapy in both primary and secondary endpoints with more radiographic responses and a higher PFS-6 seen in NovoTTF patients than chemotherapy patients (not statistically significant):

### Table 1. Pivotal Trial Efficacy Results – Intent to Treat Population

| Treatment Arm | Overall Survival | Radiographic Response Rate | 1-year Survival% | PFS-6 |
|---|---|---|---|---|
| NovoTTF | 6.3 m | 14% | 22% | 21% |
| Chemo | 6.4 m | 10% | 22% | 15% |

Page 97 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

novocure

Additionally, QOL based on validated questionnaires was consistently higher for NovoTTF-100A patients than for active chemotherapy patients in the following important domains: vomiting, nausea, pain, diarrhea, constipation, cognitive functioning and emotional functioning.



The primary safety endpoint was the safety and tolerability of the NovoTTF based on the incidence and severity of adverse events (AE) and toxicities. The NovoTTF-100A System was well tolerated by patients during the study as indicated by an average daily use of over 20 hours. Expected mild to moderate localized skin irritation on the scalp at the site of transducer array contact was observed. Patients in the active chemotherapy group, as anticipated, experienced significantly higher rates of chemotherapy-associated AEs e.g. hematological, gastrointestinal, and infectious AEs.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 529 of 631   Document 11-5   4760

Page 98 of 284 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_59173E312028   25976

5018213X6123S

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 655-281-9301 | Fax: (603) 215-2022

**novocure**



**CONCLUSION: The pivotal study data established that the NovoTTF-100A System produces clinically comparable outcomes to chemotherapy, including bevacizumab (Roche; Avastin) across both primary (OS) and secondary effectiveness end-points for recurrent glioblastoma patients. The device produces these efficacy outcomes with fewer side-effects, including a reduced hospitalization rate, and provides the patients with an improved quality of life.**

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

# novocure

## Regulatory Approval Outside the United States
The manufacturer has applied the CE Mark to the device and received marketing approvals in the UK, Ireland, France, Germany, Italy, Greece and Switzerland for treatment of both recurrent and newly diagnosed GBM. The NovoTTF-100A System has been commercially available in the European Union since 2009.

## About Novocure
Novocure Ltd., a private oncology company based in Europe, manufacturers the NovoTTF. The device is marketed and distributed in the United States by Novocure (USA) Inc. of Portsmouth, NH (together "Novocure"), a wholly-owned subsidiary. Novocure is dedicated to the development of a novel, low toxicity, non-pharmaceutical cancer treatment modality that will positively impact patient survival while maintaining a high quality of life. Investors in the company include Johnson & Johnson Development Corporation (JJDC), Pfizer, Medtronic, Index Ventures and WFD Ventures.

## Product Dossier Outline
This NovoTTF-100A System dossier includes the following:

1] Burden of Illness and Standard of Care for GBM
2] Description and Use of the NovoTTF-100A System
3] NovoTTF-100A Mechanism of Action and Preclinical Data
4] Summary of Clinical Studies

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 531 of 631   Document 11-5   4762

Page 100 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_5B173E312028   25976

novacure

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

## Figure 1. NovoTTF-100A System Components



1. **Plug in power supply**
2. **Charger for portable batteries**
3. **Transducer array**
4. **Device and battery carrying bag**
5. **NovoTTF-100A electric field generator (the Device)**
6. **Portable battery**
7. **Connection cable**

ट्वठ ट्टठ्र ट्टठ्र ट्ट्टठ्र ट्ठ्टठ्रठ्रठ्रठ्रट

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

**novocure**

### Figure 2. Use of Device Overview



**1. Prepare Scalp**
Shave and clean

**2. Remove 4 Arrays From Package**



**3. Place Arrays on Scalp**
Add color coded rings to indicate position; Apply based on array position diagram from physician

**4. Connect Arrays to Connection Cable & Box**
Match colored rings to color coded sockets



**5. Place Device and Battery in Bag (if applicable) and Connect Battery or Power Supply**

**6. Connect Connection Cable to Device**

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 533 of 631    Document 11-5        4764

Page 102 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]        JB_5B173E312028        25976

Novocure | http://www.novocure.com/
198 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 216-2022

**novocure**

 

**2. Start Treatment!**
Turn on power switch and push TTFields button



**8. Place Bag Over Shoulder and Clip**
if applicable

**9. Replace Arrays as Needed          10. Recharge Batteries When Not in Use**

2 01 9 21 2 X0 2 8 83

501 31 3 X 2 15 5 X 3 4

Novacure | http://www.novacure.com/
185 Commerce Way | Portsmouth, NH 03801
Phone: 865-281-9301 | Fax: (803) 215-2022

**novocure**

## 1] Burden of Illness and Standard of Care for GBM

Glioblastoma, a malignant form of astrocytoma, is the most common form of primary brain cancer.

**Burden of Illness**
The incidence of GBM increases steadily above 45 years of age with approximately 10,000 new cases annually in the United States. GBM tends to occur more frequently in males than females by a ratio of about 3:2. The outcome of patients with this disease has not improved significantly in the past decade, despite the introduction of improved chemotherapies, including temozolomide (Merck; Temodar), bevacizumab (Roche; Avastin), and the use of Gliadel Wafers (carmustine). The 4-year survival of these patients is only 12%, with a median overall survival of 14.7 months (Stupp, 2005). Thus, with optimal therapy, OS of these patients currently is less than 15 months from initial diagnosis.

Recurrent GBM is an end-stage condition; it is uniformly fatal with a 1-year survival of about 10%. Overall survival from time of recurrence is approximately 3 to 5 months without additional effective treatment. QOL for patients with recurrent GBM is poor due to the neurological deficits caused by the tumor itself together with the overwhelming side effects of the various standard chemotherapies and experimental treatments. Patients receiving chemotherapies suffer from wound healing complications, infections, diarrhea, constipation, nausea, vomiting, pain, decreased blood cell counts (and their complications), bleeding disorders and thromboembolic events (e.g., stroke).

**Recurrent Glioblastoma Population Estimates**
Glioblastoma affects approximately 10,000 people annually in the US, of which fewer than 7,000 will likely seek treatment for a recurrent GBM. This estimate is based on the fact that Stupp et al. (NEJM 2005) reported that 73% of glioblastoma patients had a recurrence in the first year.

The median age at diagnosis is approximately 54 years and approximately 65 percent of patients are under 65 years of age. Therefore, the expected population for a private health care payer in the US is approximately 16 patients per 1 million covered lives (7,000 x 65% non Medicare x 70% with private health care coverage = 3,185 divided by 198 million covered lives with private insurance = 16 lives per million covered).

**Existing Treatment Options for Recurrent Glioblastoma**
There are currently four principal treatment options for recurrent GBM, each with its own drawbacks and major side effects.

- **Surgical Resection** – The rate of re-operation for glioblastoma at the time of tumor recurrence was 20.5±12.8% (median ± standard deviation) in a recent

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 535 of 631 Document 11-5
4766
Page 104 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time) JB_5B173E312028 25976

501 651 531 063 506

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

**novocure**

review (Romanelli, 2009). The effect of reoperation on disease progression and survival is controversial. (Brandes, 1999)

- **GLIADEL® Wafer in Combination with Surgical Resection** – The Gliadel Wafer delivers carmustine (BCNU) directly to the site of the brain tumor (interstitial chemotherapy). It is indicated for newly diagnosed as well as recurrent GBM. The package insert indicates that for recurrent GBM, Gliadel increased median OS from 4.5 to 5.8 months compared to placebo. Unfortunately, this approach is limited to those selected cases undergoing surgical resection for GBM, as discussed above. It is also limited by significant toxicity and wound healing complications.

  Treatment with the GLIADEL® Wafer is associated with the following common side effects: fever (12%), pain (6%), wound healing abnormalities (14%), nausea and vomiting (8%), seizures (19%), brain edema (4%) and intracranial infections (4%). (Brem, 1995)

- **Radiation Therapy** - The full standard dose of 60 gray (Gy) typically is given after initial diagnosis with glioblastoma such that irradiation for recurrence of the disease usually is not possible. However, focal radio-surgery upon recurrence of a small tumor in a single anatomic location may be possible. (Romanelli, 2009)

  Side effects of radiation therapy depend on the type of radiation received, the amount of the surface of the brain targeted, the site targeted, and the total dose of radiation. In general, there will be hair loss, skin irritation, possible hearing problems, nausea, vomiting, loss of appetite and neurologic effects. The most prevalent side effect is fatigue, which may last through treatment and for many months afterwards. The neurological effects most affecting patients' QOL are permanent memory and speech problems. (Taphoorn, 2005)

- **Cytotoxic Chemotherapy** - There is no established standard treatment for recurrent GBM. Chemotherapy treatment strategies are ill-defined with several different regimens being used. The most common are: nitrosureas, (BCNU), procarbazine, PCV (procarbazine, CCNU and vincristine), and platinum based (e.g. carboplatin). None of these agents is FDA approved specifically for recurrent glioblastoma.

  Treatment with chemotherapy commonly (in >30% of patients) causes leucopenia, anemia, nausea and vomiting, electrolyte disturbances, renal toxicity, pain or burning at administration site, redness of face, skin flushing (usually associated with rapid infusion rate of nitrosureas), loss of appetite, headache, fatigue and constipation. Thus, most patients suffer from

Page 105 of 204 received on 6/5/2018 11:36:24 AM [Central Daylight Time]     4767

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (803) 215-2022

**novocure**

combinations of unpleasant and sometimes life threatening side effects of their chemotherapeutic treatments. (DaVita, 2001)

More recently, bevacizumab (Avastin), a recombinant humanized monoclonal antibody, has been approved in the US as monotherapy for patients with previously treated GBM (Cohen, 2009) based on two single arm trials comparing bevacizumab to historical control data. Benefit was seen in radiological response rates and PFS6 compared to historical control data (based on the meta-analysis by Wong et al. (Wong, 1999) OS was shown to be between 8 to 9 months; (Friedman, 2009) however, an OS claim is not made in the approved labeling, noting the comparator arm was not a randomized control group.

In addition to the common chemotherapy side effects listed above, treatment with bevacizumab has other associated AEs, including gastrointestinal perforations, surgery and wound healing complications, hemorrhage (including brain hemorrhage), non-gastrointestinal fistula formation, arterial thromboembolic events, hypertensive crisis, reversible posterior leukoencephalopathy syndrome and proteinuria. (Avastin package insert and FDA Briefing Book, Avastin, 2009)

In summary, patients with recurrent glioblastoma have limited treatment options. Only 20% of patients are eligible for re-operation. Few patients are eligible for re-irradiation. And no gold standard for chemotherapy treatment is available at recurrence. The majority of the agents used by physicians are older generation chemotherapy products. These products have significant risk for adverse events and are not approved by FDA for use specifically in this indication. Finally, bevacizumab (Avastin), while approved for this indication by FDA, has never demonstrated a survival versus a control group.

Page 106 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 216-2022

novocure

## 2] Description and Use of NovoTTF-100A System

### Overview
The NovoTTF-100A System ("NovoTTF") is a portable, wearable medical device which produces alternating electrical fields, tumor treating fields or "TTFields", within the brain by means of electrically-insulated surface transducer arrays placed on the scalp. The TTFields are believed to disrupt the rapid cell division exhibited by cancer cells. (Kirson, 2004 and 2007)

*Indication for Use: The NovoTTF-100A is intended as a treatment for adult patients [22 years of age or older] with histologically-confirmed glioblastoma multiforme [GBM], following histologically- or radiologically-confirmed recurrence in the supra-tentorial region of the brain after receiving chemotherapy. The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted.*

### System Components
The NovoTTF-100A System is comprised of two main components: 1) an Electric Field Generator (the "Device") and 2) INE Insulated Transducer Arrays (the "Arrays"). (See Figure 1 for illustration.)

- The Electric Field Generator is a portable, battery- or power supply-operated device. The device is connected to two pairs of insulated transducer array sets, which are operated sequentially. The intensity of the field, the frequency of the waves, and the temperature of the transducer arrays are pre-set. The device and battery weigh about six pounds together.

- Two sets of INE Insulated Transducer Arrays ("Arrays") are connected to the Electric Field Generator. The Arrays are disposable and for single use only. The Arrays are removed, the scalp re-shaved, and new Arrays are placed as hair grows back, typically every 2 to 3 days. The Arrays should be replaced at a minimum every 7 days to ensure contact with the skin. The Arrays utilize proprietary technology to deliver and monitor the therapy and, due to their advanced engineering requirements and unique material composition, contribute meaningfully to the device cost.

**Additional Components:** In addition to the Electric Field Generator and INE Transducer Arrays the NovoTTF-100A System includes a power supply, portable battery, battery rack, battery charger, connection cable and carrying case.

### Treatment Overview
### Overview
The US FDA requires that the treating physician must complete training and receive certification from the manufacturer prior to prescribing treatment with the NovoTTF-

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

**novocure**

100A System. Additionally, nurses, nurse practitioners, physician's assistants and any other health care professional providing direct patient care related to the NovoTTF-100A System must also have completed training and certification.

The training conducted by the manufacturer is designed to educate the prescribing physician on the scientific basis for TTF therapy, the process to interpret an MRI to determine the Array layout plan, the training required for the patient, and also the steps to start and oversee treatment, including the process of assessing monthly compliance.

### Array Layout Plan
The physician must plan the appropriate layout of the Arrays around the tumor location prior to starting treatment. This layout planning process requires a current patient MRI and visual inspection of the patient's scalp. The physician determines the appropriate Array placement to maximize TTF intensity within the tumor.

### Treatment Start
The patient then has their scalp shaved to ensure proper contact of the Arrays to the skin. The physician (or nurse under supervision) then places the arrays on the patient's scalp in accordance with the prescribed Array layout plan. The physician then confirms appropriate placement and the physician initiates the treatment by turning the Electric Field Generator on under his or her direct supervision.

### Patient and Caregiver Training
The physician and his/her staff are responsible for training the patient and caregiver on the appropriate use of the device. This training includes technical training related to the device operation, including educating the patient on battery replacement, battery charging, using the power supply, connecting and disconnecting from the device and on the appropriate placement of Arrays in accordance with the treatment plan. The training also includes advice on proper skin care, as skin irritation at the treatment site is a known complication of the device. Additionally, the patient and caregiver will have access to a 24-hour technical support service offered by the device manufacturer.

### Array Placements – Initial Period
The prescribing physician will likely require that patients return to the office for Array placements in the first two weeks after starting therapy, and as needed thereafter. The physician and his/her staff, will be able to provide the patient with additional training. Based on clinical trial experience, it is likely that after the first 2 weeks the patient and caregiver will be able to manage Array replacements independently, without returning to the physician, in most cases.

### Array Placements – After Successful Patient Training
The patient and caregiver, once properly trained, are expected to do the Array placements at home. The caregiver will be trained to shave the patient's scalp,

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 539 of 631   Document 11-5     4770

Page 108 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)     JB_5B173E312028     25976

maintain good skin care protocols, and to place the Arrays in accordance with the prescribed treatment plan.

## Monthly Treatment Assessment

Recurrent glioblastoma patients are typically scheduled to meet the physician once per month, exclusive of NovoTTF treatment. The physician is trained and instructed to download a compliance log from the NovoTTF during this monthly appointment. The compliance log provides the physician with an overview of device usage by day and by time of day (day versus night). The physician is trained to use this compliance log to encourage appropriate use of the NovoTTF. During this monthly appointment the physician will also review the location of the Arrays to ensure appropriate placement in accordance with the prescribed treatment plan. If compliance is low, patients and caregivers may be retrained in the proper use of the device.

## Device Use Overview
### Treatment Time

The physician-prescribed device is used until clinical disease progression. The recommended average daily use is at least 18 hours a day. The median duration of treatment with the NovoTTF was 2.4 months in the pivotal trial. Some patients in the pivotal trial were treated with the NovoTTF for greater than one year, which reflects that fact that the device produced durable tumor responses in certain patients.

### Device Settings

Novocure pre-sets all treatment parameters; there are no electrical output adjustments available to the patient. The patient simply connects the device to an appropriate power supply (i.e., a charged battery or connection of the power supply to an electrical outlet) and turns it on and off.

### Practical Considerations

Treatment may be interrupted for personal needs such as bathing, exercise, or any situation in which the device may be a distraction. For example, in order to take a shower, the patient must disconnect from the device (leaving the Arrays on the head), put on a shower cap and be cautious not to get his/her head wet. Treatment also must be stopped to replace the Arrays. When leaving the house, patients can put a wig or hat over the Arrays, if desired.

### Device Service

The Electric Field Generator and batteries requires frequent servicing. Novocure will provide the patient with access to replacements for these components (shipped on an overnight basis). For minor technical issues, an alarm will sound to notify the patient. The patient manual has a simple troubleshooting guide that addresses the most common problems that may arise. In addition, Novocure has around-the-clock technical support. Patients are encouraged to call the Novocure technical support telephone number with questions about operations or device function.

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

novocure

**Contraindications:** The NovoTTF-100A System is contraindicated in patients with an active implanted medical device, a skull defect (such as, missing bone with no replacement), a shunt or bullet fragments. Further, it should not be used in patients known to be sensitive to conductive hydrogels like the gel used on electrocardiogram (ECG) stickers or transcutaneous electrical nerve stimulation (TENS) transducer arrays. The device should not be used for patients 21 years old or younger or those pregnant or hoping to get pregnant, as it has not been tested in these populations. Interruptions in treatment may lower response rate to treatment.

**FDA Approval**
The US Food and Drug Administration (FDA) approved the NovoTTF-100A System under the pre-market approval (PMA) pathway in April 2011. The PMA approval pathway is the most rigorous medical device approval pathway and is analogous to the FDA new drug application (NDA) pathway. The FDA approved the device on the basis of results from a multi-center randomized active controlled pivotal (phase III) trial. The FDA PMA approval followed a positive vote from the FDA's independent Medical Device Advisory Committee's Neurological Devices Panel. (See FDA Approval Letter, **Appendix A.**)

> **Indication for Use:** The NovoTTF-100A is intended as a treatment for adult patients [22 years of age or older] with histologically-confirmed glioblastoma multiforme [GBM], following histologically- or radiologically-confirmed recurrence in the supra-tentorial region of the brain after receiving chemotherapy. The device is intended to be used as a monotherapy, and is intended as an alternative to standard medical therapy for GBM after surgical and radiation options have been exhausted.

**OUS Regulatory Approvals**
The manufacturer has applied the CE Mark to the device and received marketing approvals in the UK, Ireland, France, Germany, Italy, Greece and Switzerland for treatment of both recurrent and newly diagnosed GBM. The NovoTTF-100A System has been commercially available in the European Union since 2009.

Page 110 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_5B173E312028    25976

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

· novocure

## 3] NovoTTF-100A Mechanism of Action and Preclinical Data

**Background**
The NovoTTF-100A System delivers tumor treating fields (TTF) therapy to the tumor. TTF therapy is intended to disrupt cancer cell division utilizing the unique electrical and geometric properties of cells during the mitotic process.

Electric fields have traditionally been used in medicine in two different modes: 1) steady or low frequency electric fields (<1 kHz); and 2) high frequency alternating fields (>10 MHz). Steady or low frequency electric fields generate action potentials in excitable cells. These fields are used therapeutically in bone and soft tissue repair, pain control (TENS), and stimulation (neurologic or cardiac). In contrast, very high frequency alternating fields generate heat in the tissues by dielectric losses. Applications in therapeutic use include ablation, diathermy and hyperthermia.

In contrast, the NovoTTF-100A System uses intermediate frequency (200 kHz), low intensity (single volts per cm), alternating electric fields to achieve its therapeutic effect. These intermediate electric fields, known as TTFields, are delivered non-invasively to solid tumors through electrically insulated surface transducer arrays using the NovoTTF-100A device.

**Mechanism of Action**
TTF therapy targets two specific characteristics of cancer cells: the presence of electrically charged particles during mitosis and the geometrical shape of dividing cancer cells. TTFields have been shown to disrupt mitotic spindle microtubule assembly and to lead to dielectrophoretic dislocation of intracellular macromolecules and organelles during cytokinesis (Kirson et al., 2004). These processes lead to physical disruption of the cell membrane and to programmed cell death (apoptosis).

In contrast, TTFields do not affect cells that are in stasis, that is, that are not dividing. Since most normal adult brain cells proliferate very slowly, if at all, scientists hypothesize that these cells are affected minimally by the TTFields. Testing demonstrates no differences between treated and control animals in histology of the major internal organs (including the brain), blood examination, cardiac rhythm, body temperature, or in animal behavior. In addition, because the fields alternate so rapidly, they have no effect on normal quiescent cells nor do they stimulate nerves and muscles. TTFields are only applied to the brain, and thus have no effect on rapidly proliferating cells in the rest of the body. The intensities of the electric fields within the tissues are very small and do not result in any clinically meaningful increase in tissue temperature.

These mechanisms of action are consistent with the extensive peer-reviewed research regarding the effects of TTFields. These results demonstrate both disruption of cancer cell division up to complete cessation of the process, as well as complete destruction of

Novocure | http://www.novocure.com/
196 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

**novocure**

the dividing cancer cells. There is no direct current flow into the tissue so that electrolysis and tissue damage do not occur over time. Thus, TTField application has the advantage of being highly selective and is not expected to be associated with significant toxicity. (Kirson, 2004)

### Preclinical Data

TTFields have been shown both *in vitro* and *in vivo* to inhibit cancer cell replication effectively without systemic side effects. At intensities of approximately 1 V/cm, TTFields can be frequency-tuned to effectively inhibit different cancer cell types (i.e., the smaller the cell, the higher the frequency needed), due to disruption of microtubule polymerization and physical disruption of cell integrity at the cleavage plane during telophase. (Kirson, 2004)

Specifically, TTFields have been shown to inhibit glioblastoma cells in vitro and in vivo at a frequency of 200 kHz and an intensity of 0.7 V/cm RMS. Based on realistic finite element mesh simulations and direct measurements of TTFields intensity in experimental animals, and in the human brain, Novocure has concluded that effective TTField intensities can be generated in the brains of large animals and humans.

Extensive safety studies in healthy animals (mice, rats and rabbits) have shown that TTFields are not associated with significant systemic toxicities. Neither acute, nor chronic systemic toxicities were seen when TTFields were applied to the torso or head, at different frequencies (100-200 kHz), different intensities and for different periods of time. (Kirson, 2007)

Using a model developed to simulate the growth kinetics of a malignant tumor, the minimal treatment course duration for the NovoTTF-100A System has been determined to be approximately 4 weeks to reach tumor stabilization. Stopping treatment prior to completion of a 4 week treatment course most likely will lead to continued tumor growth and appearance of symptoms within approximately 1-2 weeks.

In summary the preclinical data demonstrate the following (See **Appendix B** for more detailed discussion of the preclinical data.):

* TTFields are a low toxicity, antimitotic physical treatment modality.

* Extensive *in vitro* and *in vivo* data consistently show a clear frequency and intensity dependent inhibition of mitosis and reversal of tumor growth.

* The NovoTTF-100A device generates effective TTField intensities within the brain.

Page 112 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

**novocure**

* **Preclinical data support tumor growth inhibition without damage to normal neuronal function or structure or any systemic toxicity**

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone 866-281-9301 | Fax: (603) 215-2022

novocure

## 4] Summary of Clinical Studies

### Pilot Study for Recurrent GBM

A European 10-patient pilot study initially evaluated the effectiveness and safety of the NovoTTF-100A System in the treatment of recurrent GBM. The study was an open-label prospective single arm study in which patients received treatment with the NovoTTF-100A System as a monotherapy without concurrent chemotherapy. Patients were followed for six months after disease progression. The median time to progression in the NovoTTF-100A subjects was 26 weeks compared to 9 weeks in historical control data (Wong et al., 1999). Overall survival was 14.7 months for NovoTTF-100A subjects compared to the 6 months expected for effective chemotherapy or Gliadel wafers. Response rate in the NovoTTF-100A treated subjects was 25%. The study demonstrated an excellent safety profile for the device and served as the basis for the design of the pivotal (phase III) clinical trial described below.

### EF-11 Pivotal (phase III) Clinical Study in Recurrent GBM
#### Overview

The FDA approved the NovoTTF-100A System on the basis of results from the EF-11 pivotal trial. The EF-11 trial was a multicenter, randomized, active controlled clinical trial designed to evaluate the safety and effectiveness of NovoTTF-100A System in the treatment of recurrent GBM. The results from this trial were presented at ASCO 2010 (Stupp, 2010) and have been audited by the FDA and approved by FDA for inclusion in the Instructions for Use (IFU) for the device. (Stupp, 2010 and IFU 2011).

The EF-11 study was a prospective, randomized, open label, active parallel control trial to compare the effectiveness and safety outcomes of recurrent GBM subjects treated with NovoTTF (alone) to those treated with an effective (active) chemotherapy (including bevacizumab) selected by the treating physician.

The specific aims of the study were:

- To prospectively compare the OS of recurrent GBM patients treated with NovoTTF-100A to those treated with chemotherapy.

- To prospectively determine the percent one year survival rate, PFS6, median TTP, radiological response rate and QOL of patients treated with the NovoTTF-100A compared to chemotherapy.

- To collect evidence of the safety of TTFields applied to patients with recurrent GBM using the NovoTTF-100A System.

- To compare the median OS of recurrent GBM patients treated with NovoTTF-100A to historical control data.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 545 of 631   Document 11-5    4776

Page 114 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_5B173E312028    25976

202 921 23 x0 3 8 1 5

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

novocure

### Study Population

Patients with previously diagnosed GBM who had relapsed or progressed despite conventional therapy (surgery and chemo-radiotherapy followed by chemotherapy) were recruited into the study. A total of 237 patients were enrolled in the study from 28 clinical centers. (US-16; Europe-11; and Israel-1) (See **Appendix C** for trial sites.). This number of patients is approximately 3% of the entire US population of recurrent GBM patients. The maximum number of patients recruited at one site was 21 patients, less than 10% of the total number of patients in the study. Approximately 50% of the patients were enrolled at the US sites. The final study analysis compared 120 NovoTTF-100A patients with 117 chemotherapy patients.

NOTE: the large study size and use of a control group compare favorably to the trial for bevacizumab in recurrent GBM, which had only 167 patients and no control arm. (Avastin Package Insert). Also note, the EF-11 trial of the NovoTTF-100A System is largest randomized clinical trial ever completed in this disease indication.

Key eligibility criteria follow:

- **Inclusion Criteria**
  - Pathological evidence of GBM using WHO classification criteria
  - ≥ 18 years of age
  - Not a candidate for further radiotherapy or additional resection of residual tumor
  - Subjects with disease progression (by Macdonald criteria (i.e., > 25% or new lesion)) documented by CT or MRI within 4 weeks prior to enrollment
  - Karnofsky scale ≥ 70
  - Life expectancy at least 3 months
  - Participants of childbearing age must use effective contraception
  - All subjects must sign written informed consent

- **Exclusion Criteria**
  - Actively participating in another clinical treatment trial
  - Within 4 weeks from surgery for recurrence
  - Within 4 weeks from any prior chemotherapy
  - Within 4 weeks from radiation therapy
  - Pregnant
  - Significant co-morbidities within 4 weeks prior to enrollment:
    - Significant liver function impairment - AST or ALT > 3 times the upper limit of normal
    - Total bilirubin > upper limit of normal
    - Significant renal impairment (serum creatinine > 1.7 mg/dL)
    - Coagulopathy (as evidenced by PT or APTT >1.5 times control in subjects not undergoing anticoagulation)

Page 115 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)    J8_5B17-3131-2028    259/6

5018351x03810

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone. 855-281-9301 | Fax: (603) 215-2022

novocure

- Thrombocytopenia (platelet count < 100 x 103/μL)
- Neutropenia (absolute neutrophil count < 1 x 103/μL)
- Anemia (Hb < 10 g/L)
- Severe acute infection
- Implanted pacemaker, defibrillator or deep brain stimulator, or documented clinically significant arrhythmias.
- Infra-tentorial tumor
- Evidence of increased intracranial pressure (midline shift > 5mm, clinically significant papilledema, vomiting and nausea or reduced level of consciousness)

### Study Procedures

**Treatment Arm:** At treatment initiation, baseline examinations were performed and the investigator initiated NovoTTF-100A treatment under continuous medical supervision. The investigator also instructed patients on the operation of the NovoTTF-100A System and battery replacement. The patients then received continuous NovoTTF-100A treatment at home. Treatment was discontinued in the case of non-compliance or clinical disease progression.

**Control Arm:** All patients had baseline examinations performed prior to treatment initiation. Patients received chemotherapy practiced at each of the participating centers. The effective chemotherapy treatments used in the study comprised mainly of the following chemotherapies: Bevacizumab (Avastin), platinum based chemotherapy (carboplatin), Nitrosureas (BCNU), procarbazine, procarbazine, lomustine and vincristine (PCV), temozolomide, and imatinib, erlotinib, irinotecan (mainly in Europe).

**Randomization and Blinding:** Patients who met the eligibility criteria were randomized in a 1:1 ratio to either the treatment group or to the chemotherapy group. The randomization schedule was stratified by clinical site, and by patients who did or did not undergo re-operation for their recurrence to avoid unequal distribution of operated patients between study groups.

**Follow Up:** During treatment, and until progression for patients who stopped treatment before progression, all patients were seen once a month at an outpatient clinic where they underwent medical follow up and routine laboratory exams. Patients received a MRI every 2 months until disease progression. Central MRI review was performed by a neuro-radiologist blinded to the treatment group of each patient. Medical follow-up continued for 2 months following disease progression. Patient survival was assessed monthly based on telephone interviews with the patients' caregivers.

**Patient Characteristics:** 237 patients (120 NovoTTF-100A; 117 chemotherapy) with progressive or recurrent GBM were enrolled in the study. Baseline characteristics were similar between treatment groups with slightly more men in the NovoTTF-100A group than in the chemotherapy group, and a lower incidence of frontal lobe tumors in the

Page 116 of 204 received on 6/5/2018 11:39:24 PM [Central Daylight Time]   JB_SB173E12028   25976

Novocure | http://www.novocure.com/,
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

novocure

### Study Population

Patients with previously diagnosed GBM who had relapsed or progressed despite conventional therapy (surgery and chemo-radiotherapy followed by chemotherapy) were recruited into the study. A total of 237 patients were enrolled in the study from 28 clinical centers. (US-16; Europe-11; and Israel-1.) (See Appendix C for trial sites.). This number of patients is approximately 3% of the entire US population of recurrent GBM patients. The maximum number of patients recruited at one site was 21 patients, less than 10% of the total number of patients in the study. Approximately 50% of the patients were enrolled at the US sites. The final study analysis compared 120 NovoTTF-100A patients with 117 chemotherapy patients.

NOTE: the large study size and use of a control group compare favorably to the trial for bevacizumab in recurrent GBM, which had only 167 patients and no control arm. (Avastin Package Insert). Also note, the EF-11 trial of the NovoTTF-100A System is largest randomized clinical trial ever completed in this disease indication.

Key eligibility criteria follow:

- **Inclusion Criteria**
  - Pathological evidence of GBM using WHO classification criteria
  - ≥ 18 years of age
  - Not a candidate for further radiotherapy or additional resection of residual tumor
  - Subjects with disease progression (by Macdonald criteria (i.e., > 25% or new lesion)) documented by CT or MRI within 4 weeks prior to enrollment
  - Karnofsky scale ≥ 70
  - Life expectancy at least 3 months
  - Participants of childbearing age must use effective contraception
  - All subjects must sign written informed consent

- **Exclusion Criteria**
  - Actively participating in another clinical treatment trial
  - Within 4 weeks from surgery for recurrence
  - Within 4 weeks from any prior chemotherapy
  - Within 4 weeks from radiation therapy
  - Pregnant
  - Significant co-morbidities within 4 weeks prior to enrollment:
    - Significant liver function impairment - AST or ALT > 3 times the upper limit of normal
    - Total bilirubin > upper limit of normal
    - Significant renal impairment (serum creatinine > 1.7 mg/dL)
    - Coagulopathy (as evidenced by PT or APTT >1.5 times control in subjects not undergoing anticoagulation)

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 548 of 631   Document 11-5

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

**novocure**

- ▪ Thrombocytopenia (platelet count < 100 x 103/µL)
- ▪ Neutropenia (absolute neutrophil count < 1 x 103/µL)
- ▪ Anemia (Hb < 10 g/L)
- ▪ Severe acute infection
- Implanted pacemaker, defibrillator or deep brain stimulator, or documented clinically significant arrhythmias.
- Infra-tentorial tumor
- Evidence of increased intracranial pressure (midline shift > 5mm, clinically significant papilledema, vomiting and nausea or reduced level of consciousness)

*Study Procedures*
*Treatment Arm:* At treatment initiation, baseline examinations were performed and the investigator initiated NovoTTF-100A treatment under continuous medical supervision. The investigator also instructed patients on the operation of the NovoTTF-100A System and battery replacement. The patients then received continuous NovoTTF-100A treatment at home. Treatment was discontinued in the case of non-compliance or clinical disease progression.

*Control Arm:* All patients had baseline examinations performed prior to treatment initiation. Patients received chemotherapy practiced at each of the participating centers. The effective chemotherapy treatments used in the study comprised mainly of the following chemotherapies: Bevacizumab (Avastin), platinum based chemotherapy (carboplatin), Nitrosureas (BCNU), procarbazine, procarbazine, lomustine and vincristine (PCV), temozolomide, and imatinib, erlotinib, irinotecan (mainly in Europe).

*Randomization and Blinding:* Patients who met the eligibility criteria were randomized in a 1:1 ratio to either the treatment group or to the chemotherapy group. The randomization schedule was stratified by clinical site, and by patients who did or did not undergo re-operation for their recurrence to avoid unequal distribution of operated patients between study groups.

*Follow Up:* During treatment, and until progression for patients who stopped treatment before progression, all patients were seen once a month at an outpatient clinic where they underwent medical follow up and routine laboratory exams. Patients received a MRI every 2 months until disease progression. Central MRI review was performed by a neuro-radiologist blinded to the treatment group of each patient. Medical follow-up continued for 2 months following disease progression. Patient survival was assessed monthly based on telephone interviews with the patients' caregivers.

*Patient Characteristics:* 237 patients (120 NovoTTF-100A; 117 chemotherapy) with progressive or recurrent GBM were enrolled in the study. Baseline characteristics were similar between treatment groups with slightly more men in the NovoTTF-100A group than in the chemotherapy group, and a lower incidence of frontal lobe tumors in the

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 549 of 631   Document 11-5
4780
Page 118 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_5B173E312028   25976

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 866-281-9301 | Fax: (603) 215-2022

**novocure**

NovoTTF-100A group than in the chemotherapy group. Adjusted analyses for all pre-specified or all statistically significant baseline covariates for OS did not change the outcome of the trial. (See **Table 2** below.) Four patients in the NovoTTF-100A group and 26 patients in the chemotherapy group never received any treatment on trial. (See **Appendix D** for patient disposition for all randomized patients.)

501 021 2X 02 0

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (803) 216-2022

**novocure**

### Table 2. Demographics and Baseline Characteristics by Treatment Group

Statistically significant p-values (p<0.05) given in bold.

| Characteristics | NovoTTF-100A (N=120) | CHEMOTHERAPY (N=117) | P-Value |
|---|---|---|---|
| **Race** | | | |
| Caucasian | 111 (93) | 106 (91) | Ns |
| African American | 2 (2) | 5 (4) | |
| Asian | 0 | 3 (3) | |
| Hispanic | 7 (6) | 2 (2) | |
| Other | 0 | 1 (1) | |
| Female Gender | 28 (23) | 44 (38) | **0.0169** |
| Frontal Tumor Position | 38 (32) | 58 (50) | **0.0016** |
| Bilateral or Midline Tumor Location | 23 (19) | 17 (15) | Ns |
| Prior Avastin Use | 24 (20) | 21 (18) | Ns |
| Re-operation for Recurrence | 33 (28) | 29 (25) | Ns |
| Prior Low-grade Glioma | 12 (10) | 11 (9) | Ns |
| Median Age (years) (min, max) | 54 (24, 80) | 54 (29,74) | Ns |
| Median Weight (kg) | 80 | 80.5 | Ns |
| Mean # of Prior GBM Recurrences | 1.6 | 1.3 | Ns |
| Mean KPS Score (min, max) | 83±10.84 | 80.1±11.01 | **0.0450** |
| Median Tumor Area (mm$^2$) | 1440 | 1391 | Ns |
| Median Time from GBM Diagnosis to Randomization (days) | 334.5 | 340 | Ns |
| Mean Time from last RT dose to Randomization (months) | 13.71 | 13.93 | Ns |

Page 120 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_18173E312028    2/3/16

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (803) 215-2022

**novocure**

**Effectiveness Results**

*Primary Effectiveness Endpoint:* Overall Survival (OS)

In the pivotal trial, patients assigned to the NovoTTF-100A group had a median OS identical to those assigned to the effective chemotherapy group. In the ITT population, which included all randomized patients (Novo-TTF=120, chemo = 117), the median OS for NovoTTF patients was 6.3 months vs. 6.4 months for chemotherapy patients; p=0.98; HR=1.0). (See Table 3 below.) In the US, the median OS was 6.1 vs. 5.3 months in the ITT population. (See Table 4 below.)

- **The pivotal study data establish that NovoTTF-100A therapy is comparable to chemotherapy in extending OS; 6.3 months vs 6.4 months.**

**Table 3. Primary Effectiveness Endpoint Analysis**

|  | Novo TTF-100A (n=120) | Chemo (n=117) |
|---|---|---|
| Summary of Censored and Uncensored Value |  |  |
| Number of Patients | 120 | 117 |
| Descriptive Statistics for OS (Months) |  |  |
| Median (95% CI) | 6.3 (5.6, 7.8) | 6.4 (5.2, 7.4) |
| Minimum, Maximum | 0.77, 42.03 | 0.03, 68.67 |

**Table 4. Overall Survival by Region**

| | NovoTTF-100A [N=120] | | Chemotherapy [N=117] | |
|---|---|---|---|---|
| COUNTRY | N | Median OS* (95% CI) | N | Median OS^ (95% CI) |
| US | 57 | 6.1 (4.0, 7.7) | 58 | 5.3 (3.6, 7.2) |
| OUS | 63 | 7.1 (5.6, 8.6) | 61 | 7.2 (5.4, 8.5) |

*Months    United States (US), Outside United States (OUS)

The Kaplan-Meier survival curve for the two treatment groups overlapped during the first 12 months of follow-up, where 80% of the events occurred in both groups. Between 12

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

**novocure**

and 24 months, the survival curves separated slightly in favor of the chemotherapy control group. However, after 12 months, the number of patients remaining may be too small to reliably estimate the long term survival outcome. (See **Figure 3** below.)

**Figure 3. Kaplan-Meier Curves for Overall Survival**



**Secondary Effectiveness Endpoints:** The one-year survival is the same in the NovoTTF-100A and chemotherapy groups, 21.9% vs. 22.1%. PFS6 was 21.4% NovoTTF-100A vs 15.2% chemotherapy and median TTP was 9.3 weeks for NovoTTF-100A vs. 9.6 weeks for chemotherapy. Radiological response rates were reported as 14% for the NovoTTF-100A group compared to 9.8% for the chemotherapy group. (See **Table 6** below.)

- The secondary effectiveness endpoint results support the findings of the primary endpoint; they show the NovoTTF-100A device is clinically comparable to chemotherapy.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 553 of 631   Document 11-5      4784

Page 122 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]     JB_5B173E312028     25976

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

novocure

## Table 6. Summary of Secondary Effectiveness Endpoints

| Secondary Endpoints | Treatment Group | |
|---|---|---|
| | NovoTTF | Chemo |
| N | 120 | 117 |
| 1-year survival | 21.0% | 22.1% |
| PFS6 | 21.4% | 15.2% |
| Radiological Response Rate (%) | 14.0% | 9.6% |
| Median TTP (weeks) | 9.3 | 9.8 |

**Quality of Life:** QOL, based on validated questionnaires, was consistently higher for patients using the NovoTTF-100A than for patients receiving chemotherapy. Improvements were seen in five out of six general scales and seven out of nine symptom scales including, nausea, vomiting, diarrhea, constipation and pain. Additionally, major improvements were seen in emotional and cognitive functioning for the NovoTTF-100A patients. (See Figures 4 and 5 below.)

- **QOL for patients treated with the NovoTTF-100A is significantly improved compared to patients treated with active chemotherapies.**

### Figure 4. Quality of Life-QLQ C30 General Scales



(Bars above the baseline show _improvement_ in QOL)

Page 123 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    J8_58173E312028    25976

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 885-281-9301 | Fax: (803) 215-2022

**novocure**

### Figure 5. Quality of Life-QLQ C30 Symptom Scale



(Bars above the baseline show decline in QOL)

**Safety Results:** The NovoTTF-100A System was well tolerated by patients during the study as indicated by an average daily use of over 20 hours. The chemotherapy control patients experienced significantly more characteristic chemotherapy side effects than the NovoTTF-100A patients: gastrointestinal (30% vs. 8%), hematological (19% vs. 4%) and infections (12% vs. 4 %). Mild to moderate skin reaction on the scalp beneath the device transducer arrays was observed in 16% of NovoTTF-100A patients. The investigators determined that none of these cases was severe. All resolved after discontinuing treatment, and all could be treated successfully with topical steroids and periodic shifting of transducer array positions. There was a lower incidence of AEs in almost all body systems in NovoTTF-100A. (See Figure 6 below.)

A similar incidence of serious adverse events (SAEs) was seen in both the NovoTTF-100A and CHEMOTHERAPY chemotherapy groups (13% vs. 11%, respectively). None of the SAEs was seen in more than 3% of patients. Three SAEs of convulsion and two SAEs of headache were reported in the NovoTTF-100A group. All five of these central nervous system (CNS) events in the NovoTTF-100A group were directly related to disease progression. (See Appendix E for complete list of AEs and SAEs.)

- **The NovoTTF-100A is safe and well tolerated with significantly less toxicity than existing treatment options for recurrent GBM.**

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 555 of 631 Document 11-5

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

novocure

#### Table 8. Treatment Emergent AEs by Body System

| System Organ Class | Novo TTF-100A (n=116) | Chemotherapy (n=91) | μ-Value Chi-Squared |
|---|---|---|---|
| Blood and lymphatic system disorders | 5 (4.3%) | 17 (18.7%) | 0.0009 |
| Cardiac disorders | 8 (6.9%) | 8 (8.8%) | 0.9313 |
| Ear and labyrinth disorders | 1 (0.9%) | 3 (3.3%) | 0.2068 |
| Endocrine disorders | 2 (1.7%) | 2 (2.2%) | 0.8059 |
| Eye disorders | 3 (2.6%) | 5 (5.5%) | 0.2813 |
| Gastrointestinal disorders | 9 (7.8%) | 27 (29.7%) | <.0001 |
| General disorders and administration site disorders | 15 (12.9%) | 14 (15.4%) | 0.6137 |
| Infections | 5 (4.3%) | 11 (12.1%) | 0.0376 |
| Injury, poisoning and procedural Complications | 21 (18.1%) | 1 (1.1%) | <.0001 |
| Investigations | 8 (6.9%) | 5 (5.5%) | 0.6798 |
| Metabolism and nutrition disorders | 9 (7.8%) | 12 (13.2%) | 0.1992 |
| Musculoskeletal and connective tissue Disorders | 6 (5.2%) | 8 (8.8%) | 0.3034 |
| Neoplasms,benign, malignant and Unspecified (cysts and polyps) | 2 (1.7%) | 2 (2.2%) | 0.8059 |
| Nervous system disorders | 50 (43.1%) | 33 (36.3%) | 0.319 |
| Psychiatric disorders | 12 (10.3%) | 7 (7.7%) | 0.6116 |
| Renal and urinary disorders | 7 (6.0%) | 3 (3.3%) | 0.3619 |
| Respiratory, thoracic and mediastinal disorders | 7 (6.0%) | 10 (11.0%) | 0.1975 |
| Skin and subcutaneous tissue Disorders | 9 (7.8%) | 9 (9.9%) | 0.5891 |
| Vascular disorders | 5 (4.3%) | 6 (6.6%) | 0.4673 |

**CONCLUSION:** The pivotal study data established that the NovoTTF-100A System produces clinically comparable outcomes to chemotherapy, including bevacizumab (Roche; Avastin) across both primary (OS) and secondary effectiveness end-points for recurrent glioblastoma patients. The device produces these efficacy outcomes with fewer side-effects, including a reduced hospitalization rate, and provides the patients with an improved quality of life.

Page 125 of 204 received on 6/5/2018 11:50:24 PM [Central Daylight Time]
Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 556 of 631   Document 11-5
4787

Novocure | http://www.novocure.com/
198 Commerce Way | Portsmouth, NH 03801
Phone: 866-281-9301 | Fax: (603) 215-2022

**novocure**

## Appendix A

### FDA Approval Letter

http://www.accessdata.fda.gov/cdrh_docs/pdf10/p100034a.pdf

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 557 of 631 Document 11-5
4788
Page 126 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_5B173E312028    25976

301931395857

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

novocure

## Appendix B

## Summary of Preclinical Studies

TTFields have been shown both *in vitro and in vivo* to effectively inhibit cancer cell replication during mitosis without systemic side effects. At intensities of approximately 1 V/cm, TTFields can be frequency-tuned to effectively inhibit different cancer cell types (i.e., the smaller the cell, the higher the frequency needed), due to disruption of microtubule polymerization and physical disruption of cell integrity at the cleavage plane during telophase. (Kirson, 2004)

Specifically, TTFields have been shown to inhibit glioblastoma cells *in vitro and in vivo* at a frequency of 200 kHz and an intensity of 0.7 V/cm RMS. Based on realistic finite element mesh simulations and direct measurements of TTFields intensity in experimental animals, and in the human brain, Novocure has concluded that effective TTField intensities can be generated in the brains of large animals and humans. Extensive safety studies in healthy animals (mice, rats and rabbits) have shown that TTFields are not associated with significant systemic toxicities. Neither acute nor chronic systemic toxicities were seen when TTFields were applied to the torso or head at different frequencies (100-200 kHz), different intensities or for different periods of time.

Using a model developed to simulate the growth kinetics of a malignant tumor, the minimal treatment course duration for the NovoTTF-100A device was determined to be approximately 4 weeks to reach tumor stabilization. This finding was later validated in independent animal studies and human pilot clinical studies. Stopping treatment prior to completion of a 4 week treatment course will most likely lead to continued tumor growth and appearance of symptoms within approximately 1-2 weeks.

### In Vitro Studies

Novocure has shown that when properly tuned, TTFields stunt the growth of tumor cells. This inhibitory effect has been demonstrated in all proliferating cell types tested; whereas, non-proliferating cells and tissues were unaffected. Different cell types showed specific intensity and frequency dependences of TTField-induced inhibition.

- ***Mechanism of Action Studies:*** Studies assessing the mechanism of action of TTFields have confirmed two main processes that occur at the cellular level during exposure to TTFields: 1) arrest of proliferation, and 2) dividing cell destruction. These mechanisms of action have been studied and confirmed via Novocure's early preclinical testing involving finite element simulations and calculations, and demonstrate no significant elevation in temperature compared to control cultures/mice.

Page 127 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)    JB_SB173E312026    29976

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

**novocure**

In addition to the above early studies, Novocure conducted studies using timelapse microphotography, colormetric determination, staining of subcellular constituents, and measurements of electric fields to demonstrate the specific effects of TTFields on proliferating cancer cells grown in tissue culture, and to elucidate the mechanism of action of these effects. Based on these studies, it was determined that:

- TTFields arrest cell proliferation and result in cell death;
- the inhibitory effects of TTFields are not limited to a specific cell type;
- cell recovery can be prevented either by applying the TTFields for longer duration, or by applying fields in two directions normal to each other, that are interleaved in time; and
- the axis of division of the dividing cells in relation to the electric fields is important in effecting cell death.

- **Proof of Concept Studies:** Novocure performed *in vitro* studies to assess the relationship between dose and frequency response using tumor cells from four of the most common types of cancer: malignant melanoma, glioblastoma, breast carcinoma and non-small cell lung carcinoma. This testing demonstrated that the optimal frequency of the fields is 200 kHz for rat glioblastoma (F-98) and human glioma (U-87), and that effective inhibition of glioma culture growth can be achieved at low field intensities (0.7-1.4 V/cm).

Finally, preclinical research both *in vitro* and *in vivo* has shown that, upon cessation of TTFields treatment, tumor growth rate does not increase beyond that seen before treatment, so that no rebound effect is expected.

- **Treatment Duration Simulations:** Novocure assessed tumor growth kinetics to evaluate optimal treatment duration and timing. Using a multi-compartmental model to simulate the growth kinetics of a malignant tumor, Novocure tested the time to tumor growth stabilization and reversal when exposed to TTFields using the NovoTTF-100A device. Based on the model, the minimal treatment course duration for the NovoTTF-100A device was determined to be approximately 4 weeks to reach tumor stabilization. This finding was validated in independent animal studies.

## In Vivo Studies

Novocure conducted a series of early experiments in mice, rats, rabbits, sheep and pigs to verify the data that was previously obtained in prior simulations of TTField distribution. These experiments demonstrate that effective TTField intensities on the order of 0.7V/cm can be obtained within tumors in the brains of various animal models.

- **Animal Effectiveness Studies:** Novocure has shown that TTFields can be applied effectively to tumors through transducer arrays placed on the surface

Page 128 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_5B173E312028   25976

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 885-281-9301 | Fax: (603) 215-2022

**novocure**

of the body. Using a special type of electrically insulated transducer array, significant inhibition of the growth of both intradermal melanoma (BI6FI) in mice and intracranial glioma (F-98) in rats was seen after less than one week of treatment. (Kirson, 2007) In addition, Novocure has studied the effect of TTFields on metastatic spread of solid tumors and investigated the development of an immune response following TTField treatment. (Kirson, 2009) Importantly, in the rabbit kidney model, TTField treatment could be extended for up to 5 weeks due to the large size of the animals being used. Analysis of the time-dependence of the effect of TTFields in tumor bearing rabbits showed that a minimum TTField treatment duration of 4 weeks is necessary in order to achieve complete arrest of macroscopic tumor growth. Thus, the extrapolated minimal treatment course duration in GBM subjects was set at 28 days.

▪ *Animal Safety Studies:* Extensive safety studies in healthy rabbits and rats exposed to TTFields for protracted periods of time have shown no treatment related side effects or pathologic damage to the brain. The reasons for the low toxicity of TTField treatment can be explained in light of the known passive electric properties of normal tissues within the body and the effects of electric fields applied via insulated transducer arrays. In both acute and chronic application of TTFields to healthy animals, no evidence of abnormal cardiac rhythms or pathologic neurological activity is seen. In addition, no treatment related toxicities were found in any of the animal safety trials performed, even when field intensities 3 times higher than the effective anti-tumoral dose were applied. Finally, these studies demonstrated that hematopoietic cell replication should not be affected, even with application of TTField intensities that are 10 times higher than necessary to inhibit tumor growth.

**Biocompatibility, Electromagnetic Compatibility (EMC) and Electrical Safety, Shelf-Life and Software**

The NovoTTF-100A System has passed extensive hardware and software verification and validation. The system also passed testing of applicable electrical safety and electromagnetic compatibility (EMC) standards at a certified laboratory. The transducer arrays that contact the subject were shown to be biocompatible in dermal sensitization, cytotoxicity and delayed type hypersensitivity studies. The batteries used with the system were shown to meet their specifications after more than 100 recharge cycles. Finally, the transducer arrays passed shelf life and sterilization validation according to the applicable standards. All of this testing demonstrates that the NovoTTF-100A System operates per its specifications and in accordance with its intended use.

Novocure | http://www.novocure.com/
196 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 218-2022

novocure

## Appendix C

### Pivotal Trial Sites and Investigators

### United States

| Center | Investigator |
|---|---|
|  |  |
| Memorial Sloan Kettering, NY | Dr. Philip Gutin |
| University of Virginia, VA | Dr. David Schiff |
| University of Illinois Chicago, IL | Dr. Herbert Engelhard |
| Northwestern Hospital, IL | Dr. Jeffrey Raiser |
| Beth Israel Deaconess Medical Center, MA | Dr. Eric Wong |
| University of Pittsburgh Medical Center, PA | Dr. Frank Liebermann |
| Evanston Northwestern, IL | Dr. Nina Paleologus |
| Columbia University, NY | Dr. Jeffrey Bruce |
| JFK Medical Center, NJ | Dr. Josef Landolfi |
| Allegheny Medical Center, PA | Dr. Lara Kunschner |
| Cleveland Clinic Foundation, OH | Dr. Robert Weil |
| Medical College Wisconsin, WI | Dr. Mark Malkin |
| Boston University, MA | Dr. Lawrence Chin |
| Lahey Clinic, MA | Dr. Rees Cosgrove |
| Weil Cornell Medical Center, NY | Dr. Susann Pannullo |
| University Hospitals, OH | Dr. Andrew Sloan |

Page 130 of 204 received on 6/5/2018 11:30:21 PM [Central Daylight Time]     JB_58173E312028     25976

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone 855-281-9301 | Fax (603) 215-2022

# novocure

## Outside United States

| Center | Investigator |
|---|---|
| | |
| CHUV Lausanne, CH | Dr. Roger Stupp |
| Zurich University, CH | Dr. Silvia Hofer |
| Brno University Hospital, CZ | Dr. Martin Smrjca |
| Na Homoloe Hospital – Prague, CZ | Dr. Vladimir Dbaly |
| Innsbruck University, AU | Dr. Franz Payer |
| Augsburg Clinic, DE | Dr. Volkmar Heidecke |
| University Graz, AU | Dr. Franz Payer |
| Tel Aviv Medical Center, IL | Dr. Andrew Kanner |
| Hopital de la Pitie-Salpetriere, FR | Dr. Sophie Taillibert |
| CHU Lyon, FR | Dr. Jerome Honnorat |
| University of Kiel, DE | Dr. Maximilian Mehdron |
| University of Hamburg, DE | Dr. Manfred Westphal |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 562 of 631   Document 11-5
4793
Page 131 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   J8 5B173E312028   25976

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone 855-281-9301 | Fax. (603) 215-2022

novccure

## Appendix D
## Adverse Events

### Adverse Events by Body System
(Incidence > 2%)

| | TTF THERAPY [N=116] | CHEMOTHERAPY [N=91] |
|---|---|---|
| System Organ Class | # of Pts. | # of Pts. |
| Preferred Term | (Incidence) | (Incidence) |
| Number with ≥1 AE | 64 ( 55) | 54 ( 59) |
| Blood and lymphatic system disorders | 5 ( 4) | 17 ( 19) |
| Leukopenia | 1 ( 1) | 6 ( 7) |
| Lymphopenia | 2 ( 2) | 3 ( 3) |
| Thrombocytopenia | 3 ( 3) | 11 ( 12) |
| Cardiac disorders | 8 ( 7) | 8 ( 7) |
| Edema peripheral | 6 ( 5) | 3 ( 3) |
| Tachycardia | 1 ( 1) | 3 ( 3) |
| Ear and labyrinth disorders | 1 ( 1) | 3 ( 3) |
| Eye disorders | 3 ( 3) | 6 ( 6) |
| Gastrointestinal disorders | 9 ( 8) | 27 ( 30) |
| Abdominal pain | 0 ( 0) | 6 ( 7) |
| Constipation | 2 ( 2) | 4 ( 4) |
| Diarrhea | 0 ( 0) | 11 ( 12) |
| Nausea | 3 ( 3) | 15 ( 16) |
| Vomiting | 6 ( 5) | 6 ( 7) |
| General disorders and administration site conditions | 16 ( 13) | 14 ( 15) |
| Malaise | 11 ( 9) | 10 ( 11) |
| Infections and infestations | 5 ( 4) | 11 ( 12) |
| Candidiasis | 4 ( 3) | 3 ( 3) |
| Urinary tract infection | 0 ( 0) | 3 ( 3) |
| Injury, poisoning and procedural complications | 21 ( 18) | 1 ( 1) |
| Fall | 5 ( 4) | 0 ( 0) |
| Medical device site reaction | 18 ( 16) | 0 ( 0) |
| Investigations | 8 ( 7) | 5 ( 5) |
| Metabolism and nutrition disorders | 9 ( 8) | 12 ( 13) |
| Anorexia | 0 ( 0) | 4 ( 4) |
| Hyperglycemia | 2 ( 2) | 2 ( 2) |
| Hypokalemia | 2 ( 2) | 4 ( 4) |

Page 132 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone 865-261-9301 | Fax (603) 215-2022

## novocure

| | TTF THERAPY [N=116] | CHEMOTHERAPY [N=91] |
|---|---|---|
| System Organ Class | # of Pts. | # of Pts. |
| Preferred Term | (Incidence) | (Incidence) |
| Musculoskeletal and connective tissue disorders | 6 ( 5) | 8 ( 9) |
| Back pain | 2 ( 2) | 3 ( 3) |
| Muscular weakness | 0 ( 0) | 3 ( 3) |
| Pain in extremity | 0 ( 0) | 2 ( 2) |
| Nervous system disorders | 50 ( 43) | 33 ( 36) |
| Amnesia | 3 ( 3) | 0 ( 0) |
| Convulsion | 11 ( 9) | 4 ( 4) |
| Coordination abnormal | 2 ( 2) | 4 ( 4) |
| Cranial nerve disorder | 3 ( 3) | 1 ( 1) |
| Dizziness | 3 ( 3) | 2 ( 2) |
| Dysphasia | 4 ( 3) | 2 ( 2) |
| Headache | 18 ( 16) | 9 ( 10) |
| Hemianopia | 2 ( 2) | 4 ( 4) |
| Hemiparesis | 11 ( 9) | 4 ( 4) |
| Hyperreflexia | 3 ( 3) | 2 ( 2) |
| Hypoaesthesia | 2 ( 2) | 3 ( 3) |
| Nervous system disorder | 3 ( 3) | 3 ( 3) |
| Psychiatric disorders | 12 ( 10) | 7 ( 8) |
| Depression | 2 ( 2) | 5 ( 6) |
| Mental status changes | 6 ( 5) | 1 ( 1) |
| Renal and urinary disorders | 7 ( 6) | 3 ( 3) |
| Urinary incontinence | 4 ( 3) | 2 ( 2) |
| Respiratory, thoracic and mediastinal disorders | 7 ( 6) | 10 ( 11) |
| Cough | 4 ( 3) | 4 ( 4) |
| Dyspnea | 2 ( 2) | 4 ( 4) |
| Skin and subcutaneous tissue disorders | 9 ( 8) | 9 ( 10) |
| Alopecia | 0 ( 0) | 3 ( 3) |
| Rash | 5 ( 4) | 0 ( 0) |
| Vascular disorders | 5 ( 4) | 6 ( 7) |
| Hypertension | 1 ( 1) | 3 ( 3) |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 564 of 631   Document 11-5   4795
Page 133 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_5B173E312028   25976

Novocure | http://www.novocure.com/
196 Commerce Way | Portsmouth, NH 03801
Phone. 855-281-9301 | Fax: (603) 215-2022

novocure

## Serious Adverse Events by Body System

| Preferred Term | NovoTTF-100A [N=116] # of Pts. (Incidence) | CHEMOTHERAPY [N=91] # of Pts. (Incidence) |
|---|---|---|
| Number with ≥1 SAE | 15 ( 13) | 10 ( 11) |
| Febrile neutropenia | 0 ( 0) | 1 ( 1) |
| Peripheral edema | 2 ( 2) | 0 ( 0) |
| Intestinal perforation | 0 ( 0) | 1 ( 1) |
| General physical health deterioration | 1 ( 1) | 0 ( 0) |
| Cellulitis | 0 ( 0) | 1 ( 1) |
| Pneumonia | 0 ( 0) | 1 ( 1) |
| Urinary tract infection | 0 ( 0) | 1 ( 1) |
| Cerebrospinal fluid leakage | 1 ( 1) | 0 ( 0) |
| Anorexia | 0 ( 0) | 1 ( 1) |
| Dehydration | 1 ( 1) | 0 ( 0) |
| Neoplasm progression | 2 ( 2) | 2 ( 2) |
| Convulsion | 3 ( 3) | 0 ( 0) |
| Headache | 2 ( 2) | 0 ( 0) |
| Nervous system disorder | 0 ( 0) | 1 ( 1) |
| Mental status changes | 1 ( 1) | 0 ( 0) |
| Dyspnea | 1 ( 1) | 0 ( 0) |
| Cerebral hemorrhage | 1 ( 1) | 0 ( 0) |
| Pulmonary embolism | 1 ( 1) | 2 ( 2) |

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 565 of 631    Document 11-5    4796
Page 134 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_5B173E312028    25976

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax: (603) 215-2022

## novocure

# Bibliography

Avastin (bevacizumab) package insert. South San Francisco, CA: Genentech, Inc. http://www.genentechaccesssolutions.com/portal/site/AS/menuitem.d2298922302dba96 5663250bd79c23a0/?vgnextoid=3c0d630e9f6c6210VgnVCM1000007dc9320aRCRD&v gnextchannel=6cdb57e77eb07210VgnVCM1000007dc9320aRCRD

Brandes AA, Vastola F, Monfardini F. Reoperation in recurrent high-grade gliomas: literature review of prognostic factors and outcome. *Am J Clin Oncol* 1999; 22(4): 387-390.

Brem H, Piantadosi S, et al. Placebo-controlled trial of safety and efficacy of intraoperative controlled delivery by biodegradable polymers of chemotherapy for recurrent gliomas. The Polymer-brain Tumor Treatment Group. *Lancet* 1995; 345(8956): 1008-1012.

Cohen MH, Shen YL, et al. FDA drug approval summary: bevacizumab (Avastin) as treatment of recurrent glioblastoma multiforme. *Oncologist* 2009; 14(11): 1131-1138.

DeVita VT, Hellman S, Rosenberg SA. *Cancer, principles and practice of oncology.* 6th ed. 2001 Philadelphia, PA: Lippincott, Williams & Wilkins.

FDA Briefing Document – Oncology Drug Advisory Committee Meeting. BLA STN 125085/169 Avastin® (bevacizumab), 2009.

Friedman HS, Padros MD, et al. Bevacizumab alone and in combination with irinotecan in recurrent glioblastoma. *J Clin Oncol* 2009; 27(28): 4733-4740.

GLIADEL® Wafer package insert. Woodcliff Lake, NJ: Eisai, Inc. http://www.gliadel.com/Docs/Pdf/201241R1_Gliadel_PI.pdf

*Instructions for Use, NovoTTF-100A System.* FDA approved, 2011. To be furnished upon request.

Kirson ED, Gurvich Z, et al. Disruption of cancer cell replication by alternating electric fields. *Cancer Res* 2004; 64(9): 3288-3295.

Kirson ED, Dbaly V, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. *Proc Natl Acad Sci* 2007; 104(24): 10152-10157.

Kirson ED, Giladi M, et al. Alternating electric fields (TTFields) inhibit metastatic spread of solid tumors to the lungs. *Clin Exp Metastasis* 2009; 26(7): 633-640.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 566 of 631   Document 11-5
Page 135 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)   JB_5B173E312028   25976   4797

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax (603) 215-2022

novocure

Kirson ED, Schneiderman RS, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields), *BMC Medical Physics* 2009; 9:1.

Kirson ED, Wasserman Y, et al. "Modeling tumor growth kinetics and its implications for TTFields treatment planning". In *The 2010 SNO Scientific Meeting and Education Day*. 2010: Montreal, Canada.

Kirson ED, Weinberg U, et al. "A phase I study of Tumor Treating Fields (TTFields) in combination with pemetrexed for pretreated advanced non small cell lung cancer." Poster Presented at *European Respiratory Society Annual Congress*, September 18-22, 2010.

Plesa M, Betlicher DC, et al. A phase II study of tumor treating fields (TTFields) in combination with pemetrexed for advanced non small cell lung cancer (NSCLC). *Ann Oncol* 2010; 21(suppl 8): viii122-viii161.

Ram Z, Gutin GH, et al. Subgroup and quality of life analyses of the phase III clinical trial of NovoTTF-100A versus best standard chemotherapy for recurrent glioblastoma. *Neuro-Oncology*, Abstracts from the 15th Annual Meeting of the *Society for Neuro-Oncology* (SNO). 2010, Vol 12, Supplement 4.

Romanelli P, Conti A, et al. Role of stereotactic radiosurgery and fractionated stereotactic radiotherapy for the treatment of recurrent glioblastoma multiforme. *Neurosurg Focus* 2009; 27(6): E8.

Salzberg M, Kirson ED, et al. A Pilot Study with Very Low-Intensity, Intermediate-Frequency Electric Fields in Patients with Locally Advanced and/or Metastatic Solid Tumors. *Onkologie* 2008; 31:362-365.

Schneiderman RS, Kirson ED, et al. "Synergism between chemotherapy and alternating electric fields (TTFields) in cancer cell proliferation inhibition and solid tumor treatment." Poster presented at AACR Annual Meeting; April 12-16, 2008.

Schneiderman RS, Shmueli E, et al. TTFields alone and in combination with chemotherapeutic agents effectively reduce the viability of MDR cell sub-lines that over-express ABC transporters. *BMC Cancer* 2010; Vol. 10: 229.

Stupp R, Mason WP, et al. Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. *N Engl J Med* 2005; 352(10): 987-996.

Stupp R, Kanner A, et al. A prospective, randomized, open-label, phase III clinical trial of NovoTTF-100A versus best standard of care chemotherapy in patients with recurrent

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 567 of 631 Document 11-5

Page 136 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]

4798

Novocure | http://www.novocure.com/
195 Commerce Way | Portsmouth, NH 03801
Phone: 855-281-9301 | Fax· (603) 215-2022

**novocure**

glioblastoma. *Journal of Clinical Oncology*, 2010 ASCO Annual Meeting Proceedings (Post-Meeting Edition). Vol 28, No 18_suppl (6/20 Suppl) 2010.

Summary of Safety and Effectiveness Data for the NovoTTF-100A (SSED), US FDA, 2011. http://www.accessdata.fda.gov/cdrh_docs/pdf10/P100034b.pdf

Taphoorn MJ, Stupp R, et al. Health-related quality of life in patients with glioblastoma: a randomized controlled trial. *Lancet Oncol* 2005; 6(12): 937-944.

Wong ET, Hess KR, et al. Outcomes and prognostic factors in recurrent glioma patients enrolled onto phase I clinical trials. *J Clin Oncol* 1999; 17(8): 2572-2578.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 568 of 631   Document 11-5   4799
Page 137 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   J8_5B173E312028   25976

European Journal of Cancer (20...) xxx ...



Available at www.sciencedirect.com

**SciVerse ScienceDirect**

journal homepage: www.ejconline.com



EJC

# NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: A randomised phase III trial of a novel treatment modality

Roger Stupp [a,*], Eric T. Wong [b], Andrew A. Kanner [c], David Steinberg [d], Herbert Engelhard [e], Volkmar Heidecke [f], Eilon D. Kirson [g], Sophie Taillibert [h], Frank Liebermann [i], Vladimir Dbalý [j], Zvi Ram [c], J. Lee Villano [e], Nikolai Rainov [f], Uri Weinberg [g], David Schiff [k], Lara Kunschner [l], Jeffrey Raizer [m], Jerome Honnorat [n], Andrew Sloan [o], Mark Malkin [p], Joseph C. Landolfi [q], Franz Payer [r], Maximilian Mehdorn [s], Robert J. Weil [t], Susan C. Pannullo [u], Manfred Westphal [v], Martin Smrcka [w], Lawrence Chin [x], Herwig Kostron [y], Silvia Hofer [z], Jeffrey Bruce [aa], Rees Cosgrove [ab], Nina Paleologous [ac], Yoram Palti [g], Philip H. Gutin [ad]

[a] Centre Hospitalier Universitaire Vaudois, University of Lausanne, Lausanne, Switzerland
[b] Harvard Medical School, Beth Israel Deaconess Medical Center, Boston, MA, United States
[c] Tel Aviv Medical Center, Tel Aviv, Israel
[d] Department of Biostatistics, Tel Aviv University, Tel Aviv, Israel
[e] University of Illinois at Chicago, Chicago, IL, United States
[f] Augsburg Clinic, Augsburg, Germany
[g] Novocure Ltd., Haifa, Israel
[h] Hospital de la Pitié-Salpêtrière, Paris, France
[i] Na Homolce Hospital, Prague, Czech Republic
[k] University of Virginia, Charlottesville, VA, United States
[l] Allegheny Neurological Brain Tumor Center, Pittsburgh, PA, United States
[m] Northwestern University, Chicago, IL, United States
[n] Department of Neuro-Oncology, Hospices Civils de Lyon, Université Claude Bernard, Lyon, France
[o] University Hospitals of Cleveland, Case Western Reserve University School of Medicine, Cleveland, OH, United States
[p] Medical College of Wisconsin, Milwaukee, WI, United States
[q] New Jersey Neuroscience Institute at JFK Medical Center, Edison, NY, United States
[r] University Graz, Graz, Austria
[s] University of Kiel, Kiel, Germany
[t] The Cleveland Clinic Foundation-Taussig Cancer Center, Cleveland, OH, United States
[u] New York Presbyterian Hospital-Weill Cornell Medical Center, New York, NY, United States
[v] University of Hamburg, Hamburg, Germany
[w] Brno University Hospital, Brno, Czech Republic
[x] Boston Medical Center, Boston, MA, United States

* Corresponding author: Address: Department of Neurosurgery, Centre Hospitalier Universitaire Vaudois (CHUV), 46, rue du Bugnon, Lausanne 1011, Switzerland. Tel.: +41 21 314 0156; fax: +41 21 314 0737.
E-mail address: Roger.Stupp@chuv.ch (R. Stupp).

0959-8049/$ - see front matter © 2012 Published by Elsevier Ltd.
http://dx.doi.org/10.1016/j.ejca.2012.04.011

Please cite this article in press as: Stupp R. et al., NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: A randomised phase III trial of a novel treatment modality, Eur J Cancer (2012), http://dx.doi.org/10.1016/j.ejca.2012.04.011

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 569 of 631 Document 1175
4800
JB_SB173E312028 29976

2  *R. Stupp et al./European Journal of Cancer xxx (2012) xxx–xxx*

[y] University of Innsbruck, Austria
[z] University Hospital Zurich, Switzerland
[aa] Columbia University Medical Center, New York, NY, United States
[ab] Lahey Clinic, Boston, MA, United States
[ac] NorthShore University Health System, Evanston, IL, United States
[ad] Memorial Sloan Kettering Cancer Center, New York, NY, United States

KEYWORDS
Glioblastoma
Brain tumour
Chemotherapy
Randomised trial

Abstract *Purpose:* NovoTTF-100A is a portable device delivering low-intensity, intermediate frequency electric fields via non-invasive, transducer arrays. Tumour Treatment Fields (TTF), a completely new therapeutic modality in cancer treatment, physically interfere with cell division.

*Methods:* Phase III trial of chemotherapy-free treatment of NovoTTF (20–24 h/day) versus active chemotherapy in the treatment of patients with recurrent glioblastoma. Primary endpoint was improvement of overall survival.

*Results:* Patients (median age 54 years (range 23–80), Karnofsky performance status 80% (range 50–100) were randomised to TTF alone ($n = 120$) or active chemotherapy control ($n = 117$). Number of prior treatments was two (range 1–6). Median survival was 6.6 versus 6.0 months (hazard ratio 0.86 [95% CI 0.66–1.12]; $p = 0.27$), 1-year survival rate was 20% and 20%, progression-free survival rate at 6 months was 21.4% and 15.1% ($p = 0.13$), respectively in TTF and active control patients. Responses were more common in the TTF arm (14% versus 9.6%, $p = 0.19$). The TTF-related adverse events were mild (14%) to moderate (2%) skin rash beneath the transducer arrays. Severe adverse events occurred in 6% and 16% ($p = 0.022$) of patients treated with TTF and chemotherapy, respectively. Quality of life analyses favoured TTF therapy in most domains.

*Conclusions:* This is the first controlled trial evaluating an entirely novel cancer treatment modality delivering electric fields rather than chemotherapy. No improvement in overall survival was demonstrated, however efficacy and activity with this chemotherapy-free treatment device appears comparable to chemotherapy regimens that are commonly used for recurrent glioblastoma. Toxicity and quality of life clearly favoured TTF.

© 2012 Published by Elsevier Ltd.

## 1. Background

Glioblastoma is the most prevalent primary malignant brain tumour in adults. Median survival with optimal therapy is only 15 months from diagnosis, and most tumours recur within 9 months of initial treatment.[1] At the time of disease recurrence, treatment options for glioblastoma patients are limited. Repeat surgery may be considered in approximately 20% of patients;[2–4] and re-irradiation is possible in rare circumstances. For most patients chemotherapy is indicated at disease recurrence, with the choice of drug varying greatly. In the United States, bevacizumab has been provisionally approved for recurrent glioblastoma, while the European Medicines Agency (EMEA) rejected the application in the absence of a controlled trial.[5,6] Cytotoxic agents most frequently used are alkylating agents like nitrosoureas (e.g. lomustine [CCNU] or carmustine [BCNU], procarbazine[7] or re-treatment with temozolomide.[9,10] Response rates are below 10%, progression-free survival rates at 6 months <20%.[7,8] In the absence of an established and satisfactory standard treatment, bevacizumab alone and in combination with irinotecan and experimental treatments are commonly used.[11–13]

Overall survival (OS) from recurrence is commonly short and without effective therapy rarely exceeds 3–5 months.[14–19] In a randomised trial of repeat surgery with implantation of carmustine wafers versus placebo median survival was 6.5 versus 4.7 months.[20] With active therapy, a median survival of 7 months (range 5–9.2 months)[1–10,12,13,21–24] has been reported. A recent randomised comparison of enzastaurin versus lomustine at first recurrence demonstrated a median survival of 7.1 months, with 19% of patients alive and progression-free at 6 months when treated with lomustine.[7] Based on these results active chemotherapy as salvage treatment for patients with recurrent glioma is recommended, which strives to improve survival and quality of life despite inherent chemotherapy-related toxicity.

The NovoTTF-100A system (Novocure Ltd., Haifa, Israel) is a portable device delivering low intensity, intermediate frequency, alternating electric fields (Tumour Treating Fields; TTF) using non-invasive, disposable transducer arrays (Fig. 1A). These fields physically



Fig. 1. Female patient wearing the portable NovoTTF-100A device (A). Grade 2 skin rash underneath transducer arrays in a different patient (B). With the patients' permission.

interfere with cell division by causing misalignment of microtubule subunits in the mitotic spindle during the metaphase to anaphase transition[25] and by dielectrophoretic movement of intracellular macromolecules and organelles during telophase.[26,27] This causes failure of cytokinetic furrow formation and resultant mitotic blebbing, leading to the disruption of chromosome segregation and eventual cell death. The exact pathways by which spindle disruption and physical aggregation of macromolecules lead to cell death are unknown. TTF has been tested in several pilot clinical studies[26,28,29] including a small single arm study as monotherapy for recurrent glioblastoma. The results of this pilot trial were promising[26] and served as the basis of this phase III trial comparing NovoTTF-100A monotherapy (TTF) to best active chemotherapy according to the physician's best choice (active treatment control group). This report describes for the first time the efficacy and safety of this entirely novel treatment modality compared to widely accepted active chemotherapies for the treatment of recurrent glioblastoma patients.

## 2. Methods

### 2.1. Patient selection

Patients 18 years or older with histologically confirmed glioblastoma (World Health Organization grade IV astrocytoma) were eligible following radiologically confirmed disease progression (Macdonald criteria). Patients had a Karnofsky performance status ⩾70% and adequate haematologic, renal and hepatic function (absolute neutrophil count ⩾1000/mm³; haemoglobin ⩾100 g/L platelet count, ⩾100,000/mm³; serum creatinine level ⩽1.7 mg/dL (<150 μmol/L); total serum bilirubin level ⩽ the upper limit of normal and liver-function values, <3 times the upper limit of normal). Prior therapy must have included radiotherapy (with and without concomitant and/or adjuvant temozolomide). There was no limit on number or type of prior

therapies or recurrences. Patients with infra-tentorial tumour location were excluded, as were patients with implanted electronic medical devices (e.g. pacemaker, programmable ventriculo-peritoneal shunt). All patients provided written informed consent, and the study was approved by the institutional review boards or ethics committees of all participating centres.

### 2.2. Study design and treatment

Patients were randomised at a 1:1 ratio to receive either TTF monotherapy (without chemotherapy) or the best available active chemotherapy according to the local physician's choice (active control). Randomisation was performed using random block sizes and was stratified by centre and according to whether patients underwent surgery for their latest recurrence prior to trial entry. Assigned treatment had to start within 1 week of randomisation, and was to be continued until disease progression or intolerance.

For patients assigned to the TTF group four transducer arrays were placed on the patient's shaved scalp and connected to a portable, battery or power supply operated device (NovoTTF-100A) which was set to generate 200 kHz electric fields within the brain in two perpendicular directions (operated sequentially). Field intensity was set at >0.7 V/cm at the centre of the brain. Patients were trained on how to operate the device and then continued treatment at home. Treatment was continuous while maintaining normal daily activity. Transducer arrays were replaced by the patients, their caregivers or device technicians once or twice a week. Prior to placement, the scalp was shaved carefully with an electric razor in order to avoid skin wounding, transducer arrays were supplied sterile. Although uninterrupted treatment was recommended, patients were allowed to take treatment breaks of up to an hour, twice per day, for personal needs (e.g. shower). In addition, they were allowed to take 2-3 days off treatment at the end of each 4 weeks of treatment (which is the minimal

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 571 of 631 Document 11-5

*R. Stupp et al. / European Journal of Cancer xxx (2012) xxx–xxx*

required treatment duration for TTF therapy to reverse tumour growth).[30]

Patients assigned to the active control received chemotherapy at the local investigator's discretion. The best available chemotherapy was prescribed according to local practice and depending on prior treatment exposure.

## 2.3. Patient surveillance and follow up

Baseline examinations included a gadolinium-enhanced magnetic resonance imaging (MRI) of the brain, full blood counts, blood chemistry tests, blood coagulation tests, electrocardiogram (ECG), physical examination including a detailed neurological examination and quality of life (QoL) questionnaire (European Organisation for Research and Treatment of Cancer (EORTC) QLQ C-30).

Patients were followed once a month, including laboratory tests. MRI was repeated every 2 months, QoL questionnaires were completed at baseline and then every 3 months. Tumour response and progression were determined by blinded central radiology review, according to Macdonald criteria.[31] When an MRI could not be obtained, progression was assessed clinically based on neurological status, steroid dosing, adverse events and investigator assessment of progression.

Adverse events were recorded prospectively according to National Cancer Institute Common Toxicity Criteria (NCI CTC V3.0)

## 2.4. Statistical analysis

The primary end-point was OS. Secondary endpoints were progression free survival (PFS), the percentage of patients alive and progression-free at 6 months (PFS6), 1-year survival rate, radiological response rate (RR), QoL and safety. OS and PFS were computed from the day of randomisation until event or censored at last follow-up according to the Kaplan–Meier method, with 2-sided logrank statistics for comparison. The study had an 80 per cent power at a significance level of 0.05 to detect a 60 per cent increase in median OS (hazard ratio for death, 0.63). All analyses were performed using the intent to treat population of all randomised patients, patients lost to follow-up were censored at the time of last contact. A Cox proportional hazards model was used to adjust for confounding baseline variables (continuous and categorical). The survival data were tested for proportional hazards and the assumption of proportionality met. The Cox model was performed in two steps; first, all protocol pre-specified baseline variables were tested directly for interactions with OS; then a reduced model was performed testing the effect of all variables with significant interactions ($p < 0.05$) with OS together on the treatment effect of TTF versus active chemotherapy. Secondary endpoints are presented without adjustment. QoL is pre-

sented as change from baseline to 3 months for each of the subscale domains and symptom scales of the QLQ-C30 questionnaire.

## 2.5. Organisational aspects

The trial was registered on www.clinicaltrials.gov, NCT#00379470. The trial was funded and sponsored by Novocure Ltd. Statistical analysis was performed by David Steinberg. The manuscript was written by Roger Stupp and Eilon Kirson, with substantial input by all co-authors. The final manuscript was reviewed and approved by all authors. The statistician and the corresponding author had unrestricted access to all data.

## 2.6. Role of the funding source

Representatives of the study sponsor were involved in the study design, data collection, data analysis, data interpretation and writing of the report. Data analysis was performed by David Steinberg, a compensated independent biostatistician. The corresponding author had full access to all data in the study and had final responsibility for the decision to submit for publication.

## 3. Results

### 3.1. Patients

From September 2006 until May 2009, 237 patients from 28 institutions in 7 countries were randomly assigned to receive TTF monotherapy (120 patients) or active control chemotherapy (117 patients). The baseline patient characteristics were balanced (Table 1). The median age was 54, and a quarter of the patients had undergone some surgical resection of the recurrent tumour prior to enrolment into the trial. More than 80% of patients had failed two or more prior lines of chemotherapy (≥second recurrence) and 20% of the patients had failed bevacizumab prior to enrolment. Histology was per local pathological diagnosis; in 8% a history of a prior lower grade glioma had been reported (secondary glioblastoma). *Methyl-guanine methyl-transferase (MGMT)* gene promoter methylation, an important predictive factor for benefit of temozolomide chemotherapy in newly diagnosed glioblastoma, was not assessed in this trial of patients with recurrent disease.

### 3.2. Patient disposition, treatment and compliance

In the TTF group, 116 of 120 patients (97%) started treatment and 93 patients (78%) completed 4 weeks of therapy (1 cycle). Twenty-seven patients discontinued treatment early, often within a few days, due to non-compliance or inability to handle the device (trial flow

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 572 of 631 Document 11-3

*R. Stupp et al./European Journal of Cancer xxx (2012) xxx–xxx*

diagram). Four patients had pre-treatment events related to the progressive nature of their disease and never started therapy with the device. In the TTF patients who started treatment (116 patients) mean compliance was measured by downloading a log file from the device, which recorded the actual time TTF therapy was delivered. Median compliance was 86 per cent (range 41–98%) of the time in each treatment month, translating into a mean use of 20.6 h per day.

apy (6.6 versus 6.0 months, respectively). One-year survival proportion was 20% in both groups, the 2- and 3-year survival rates survival rates were 8% (95% CI 4, 13) and 4% (95% CI 1, 8) versus 5% (95% CI 3, 10) and 1% (95% CI 0, 3), for TTF versus active control, respectively (Fig. 1A). The hazard ratio for death was 0.86 (95% CI 0.66, 1.12) in favour of NovoTTF (*p* = 0.27). Adjusting for baseline characteristics using a Cox proportional hazards model did not substantially



In the active control group, 113 of 117 patients (97%) started chemotherapy and all but 1 patient completed one full treatment course of the chosen chemotherapy. In four patients disease related adverse events and tumour progression prevented the initiation of the planned chemotherapy, they only received supportive care (hospice care). Twenty-one patients randomised to the control group decided not to return to the investigational site for treatment, thus details on disease progression and toxicity are not available. Most of patients received single agent or a combination chemotherapy regimen containing bevacizumab (31%), or irinotecan (31%), followed by nitrosoureas (25%), carboplatin (13%), temozolomide (11%) or various other agents (5%; Supplementary Table 1).

### 3.3. Survival, progression and radiological response

At a median follow up of 39 months, 220 patients had died (93%). Median survival was marginally higher in the TTF group compared to active control chemother-

alter the results. In the active chemotherapy control arm of the trial, survival was not significantly affected by the choice of chemotherapy (Cox proportional hazards test; *p* = 0.66).

More objective radiological responses (partial and complete responses) were seen in the TTF group than in the active control chemotherapy group (14 versus 7, respectively), translating into a response rate in evaluated patients of 14.0% (95% CI 7.9–22.4%) versus 9.6% (95% CI 3.9–18.8%), respectively (chi squared *p* = 0.19). All three complete responses were observed in the TTF group. Two exemplary partial responses from TTF are shown in Fig. 3.

The trial had been designed for superiority. Since the control group in the trial is an active chemotherapy control which showed similar efficacy to that seen in previous trials and the device was used as monotherapy it is reasonable to analyse the results also in the context of a non-inferiority analysis. The HR for death in the TTF group compared to the active control chemotherapy group was below 1.0 (0.86; 95% CI 0.66–1.12), indi-

[faded watermark text]

Case 1:20-cv-00194-WCG  Filed 04/28/20  Page 573 of 631  Document 11-5  4804

6        *R. Stupp et al. / European Journal of Cancer xxx (2013) xxx–xxx*

Table 1
Baseline characteristics.

| Characteristics | Tumour Treatment Fields (TTF) (n = 120) # pts (%) | Active control (n = 117) # pts (%) |
|---|---|---|
| Age, median (range) | 54 years (24–80) | 54 years (29–74) |
| Gender | | |
|   Male | 92 (77) | 73 (62) |
|   Female | 28 (23) | 44 (38) |
| Histology | | |
|   Glioblastoma | 100% | 100% |
|   Prior lower grade glioma | 10 (8) | 9 (8) |
| Karnofsky performance status, median (range) | 80% (50–100) | 80% (50–100) |
| Steroid use at enrolment | | |
|   Yes | 55 (46) | 62 (53) |
|   No | 55 (46) | 49 (42) |
|   Unknown | 10 (8) | 6 (5) |
| Largest tumour diameter at randomisation, median (range) | 6.1 cm (0–15.2) | 5.5 cm (0–16.2) |
| Interval from initial glioma diagnosis, median (range) | 11.8 months (3.2–99.3) | 11.4 months (2.9–77.1) |
| *Prior therapy* | | |
| 1st recurrence | 11 (9) | 17 (15) |
| 2nd recurrence | 58 (48) | 54 (46) |
| 3rd or greater recurrence | 51 (43) | 46 (39) |
| Surgery | | |
|   Debulking before enrolment | 33 (28) | 29 (25) |
|   Debulking at any stage | 95 (79) | 99 (85) |
|   Biopsy only | 25 (21) | 18 (15) |
| Radiotherapy | 100% | 100% |
|   With concomitant temozolomide | 103 (86) | 96 (82) |
|   No concomitant temozolomide | 15 (13) | 20 (17) |
|   Unknown | 2 (1) | 1 (1) |
| Prior adjuvant (maintenance) temozolomide | 100 (83) | 89 (76) |
|   Median no. of cycles | 4 (0–19) | 3 (0–27) |
| Prior bevacizumab | 23 (19) | 21 (18) |



Fig. 2. Overall survival (A) and progression free survival (B) Kaplan–Meier curves.

cating that TTF may be at least equivalent to active chemotherapy.

PFS showed a similar trend in favour of TTF patients as seen for OS (Fig. 1B). Median PFS was 2.2 and

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 574 of 631 Document 11-5
Page 143 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time] JB_5B173E312028 25976

2.1 months for TTF and active control groups, respectively (Fig. 2; HR 0.81, 95% CI 0.60–1.09; log rank $p = 0.16$). PFS6 was 21.4 per cent (95% CI 13.5–29.3) in the TTF group and 15.1 per cent (95% CI 7.8–22.3) in the active control group (chi squared $p = 0.13$).

### 3.4. Safety and toxicity

As expected from the mechanism of action of TTF therapy and the fact that its delivery is localised to the head, the typical systemic side-effects of chemotherapies were not observed in the TTF treated patients. Mild to moderate (grade 1 and 2) contact dermatitis on the scalp beneath the transducer arrays occurred in 16% of TTF patients (Fig. 1B). This condition was easily treated with topical corticosteroids, resolved completely after treatment, was stopped and did not require substantial treatment breaks.

Patients receiving active control chemotherapy experienced toxicity related to pharmacologic mechanism of the agents used. A list of grade 2–4 adverse events by organ system and adverse event terms seen in more than 2% of patients in either group is presented in Table 2. As expected, there were significantly more gastrointestinal, haematological and infectious adverse events seen in the chemotherapy group than in the TTF group. Severe

(grades 3 and 4) toxicity was observed in only 3% of patients.

### 3.5. Quality of life

Longitudinal Quality of Life (QOL) could be analysed in the patients who remained on study therapy for ⩾3 months and for whom QoL data were available (63 patients, 27%). In the domains of global health and social functioning no meaningful differences between chemotherapy and TTF were observed. However, cognitive and emotional functioning favoured TTF. Physical functioning may be slightly worse with TTF, while role functioning favoured TTF (Fig. 4A). Symptom scale analysis is in accordance with treatment-associated toxicity; appetite loss, diarrhoea, constipation, nausea and vomiting were directly related to the chemotherapy administration. Increased pain and fatigue was reported in the chemotherapy-treated patients and not in the TTF treatment group (Fig. 4B).

### 3.6. Treatment after progression

In order to rule out the effect of subsequent treatments on the OS results reported above, we compared the number and type of post-progression treatments patients received after failing the trial therapy. Due to



Fig. 3. Exemplary T1 weighted magnetic resonance imaging (MRI) images with gadolinium from two Tumour Treatment Fields (TTF) patients with partial response to therapy. (A) A 48 years old male with prior grade II astrocytoma which transformed to glioblastoma (based on tissue biopsy. The subject progressed 7 months after receiving chemoradiotherapy, and subsequently responded to TTF therapy (partial response at 12 months) and remained stable for an additional 36+ months on TTF. (B) A 55 years old male with primary glioblastoma who recurred for the third time after receiving chemoradiotherapy, adjuvant temozolomide (2 cycles), bevacizumab with irinotecan (3 months) and erlotinib with sorafenib (one cycle). The subject had a partial response to TTF therapy after 4 months of treatment and remained stable for an additional 8 months while on TTF.

R. Stupp et al. / European Journal of Cancer xxx (2012) xxx–xxx

8

Table 2
Treatment-emergent adverse events ≥ grade 2 by body system.

| System | Adverse event term | Tumour Treatment Fields (TTF) ($n = 116$) % (% gr. 3 + 4) | Active control ($n = 91$) % (% gr. 3 + 4) |
|---|---|---|---|
| Haematological | | 3 (0) | 17 (4) |
| | Leucopenia | 0 (0) | 5 (1) |
| | Neutropenia | 0 (0) | 2 (1) |
| | Thrombocytopenia | 1 (1)[a] | 7 (2) |
| Gastrointestinal disorders | | 4 (1) | 17 (3) |
| | Abdominal pain | 0 (0) | 3 (0) |
| | Diarrhoea | 0 (0) | 6 (2) |
| | Nausea/vomiting | 2 (0) | 7 (0) |
| General deterioration and malaise | | 5 (1) | 6 (1) |
| Infections | | 4 (0) | 8 (1) |
| Skin rash (transducer arrays) | | 2 (0) | 0 (0) |
| Metabolism and nutrition disorders | | 4 (1) | 6 (3) |
| Musculoskeletal disorders | | 2 (0) | 5 (0) |
| Nervous system disorders | | 30 (7) | 28 (7) |
| | Brain oedema | 0 (0) | 2 (0) |
| | Cognitive disorder | 2 (1) | 2 (1) |
| | Convulsion | 7 (2) | 5 (2) |
| | Dysphasia | 2 (0) | 1 (0) |
| | Headache | 8 (1) | 6 (0) |
| | Hemianopsia | 1 (0) | 3 (1) |
| | Hemiparesis | 3 (1) | 2 (1) |
| | Neuropathy peripheral | 2 (0) | 2 (0) |
| Psychiatric disorders | | 5 (0) | 4 (0) |
| Renal and urinary disorders | | 3 (1) | 3 (0) |
| Respiratory disorders | | 1 (0) | 3 (1) |
| Vascular disorders | | 3 (1) | 4 (3) |
| | Pulmonary embolism | 1 (1) | 2 (2) |
| | Hypertension | 1 (0) | 1 (1) |
| | Deep vein thrombosis | 1 (0) | 1 (0) |

[a] Thrombocytopenia from prior chemotherapy, normalised subsequently.

the very advanced stage they were recruited to the study (most patients were at their second or subsequent recurrence), only 5.8% of the TTF-treated patients and 10.3% of the chemotherapy-treated patients received subsequent salvage antitumour therapy (chi square $p = 0.24$) (mainly bevacizumab, irinotecan, nitrosoureas and temozolomide). The majority of patients received only supportive care once tumour progression developed.

## 4. Discussion

Tumour treatment with alternating electrical fields that interfere with the metaphase to anaphase transition in dividing tumour cells is an entirely novel cancer treatment modality. We report the first prospective, randomised, controlled study using this new treatment modality in the most aggressive primary brain tumour. Although glioblastoma diffusely infiltrates the brain, it almost never metastasises and is thus amenable to a loco-regional therapy.

Prognosis of patients with recurrent glioblastoma is poor, and chemotherapy is usually recommended. Depending on prior treatments and treatment centre expertise, variable chemotherapy agents alone or in combination are commonly prescribed. Our randomised trial compared this standard chemotherapy per local practice (active treatment control group) with TTF in a prospective, multicentre phase III trial. Although the trial did not reach its primary end-point of improved survival compared to active chemotherapy, this new minimally invasive and chemotherapy-free treatment modality demonstrated a statistically non-significant increased response rate (14 versus 9.6%, $p = 0.19$), an improved PFS6 rate (21% versus 15%, $p = 0.13$), and a trend towards reduction of the risk of death (hazard ratio 0.86, 95% CI 0.66–1.12, $p = 0.27$), as well as sustained improvement in QoL.

These results cannot be explained by subsequent salvage chemotherapy, as few patients received additional therapy after failure of protocol treatment. Importantly, the majority of our patients were recruited to the trial at an advanced stage of the disease, after failure of two or more chemotherapy agents, while other trials in recurrent glioblastoma usually only enrol patients at first recurrence. It is also notable that 20% of patients had failed prior bevacizumab therapy, a population that usually fares poorly with most subsequent treatments.

One limitation of the study was the absence of a placebo or treatment-free control arm. In the setting of advanced disease and chemotherapy considered indicated and effective, such a control would hardly have been acceptable to patients and physicians alike. Fur-

Page 145 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)

R, Stupp et al, I European Journal of Cancer xxx (2012) xxx–xxx

9





Fig. 4, QLQ C30 longitudinal change from base to 3 months. (A) General functional scales (an increase in percentage corresponds to an increase in QOL). (B) Symptom scales (an increase in percentage corresponds to a decrease in QOL).

thermore, chemotherapy with lomustine has shown superior efficacy versus investigational treatments in two recent randomised trials. And based on high response rates and prolonged survival compared to historical controls bevacizumab has received accelerated Food and Drug Administration (FDA) approval. Furthermore, the observation of objective responses in 14 patients with NovoTTF alone (median time since end of prior RT 7 months, thus unlikely to be all pseudoprogression) strongly suggests singular activity of this device.

Another limitation is the somewhat heterogeneous patient population, with patients included after progression of one or several lines of prior chemotherapy. This underscores the demand from patients for further treatments, even when the expected benefit of a 2 months prolongation in PFS may appear modest. In the ongoing randomised phase III trial for newly diagnosed glioblastoma, only patients non-progressive after completion of chemoradiation are eligible (Novocure EP-14, www.clinicaltrials.gov, NCT#00916409).

As expected with a local treatment, toxicity was limited to skin irritation from transducer arrays (Fig. 1B). After proper instructions, most patients became independent in handling this device and replacing transducer arrays, allowing them to be ambulatory and even going to work. Despite the inconvenience of carrying and using the device almost permanently, compliance was high and patients reported improvement in QoL in the absence of chemotherapy related toxicities.

In vitro and animal experiments suggest enhanced effect when TTF is combined with chemotherapy.[20,32] We therefore initiated a subsequent randomised phase III trial currently enrolling newly diagnosed glioblastoma patients after completion of standard radiochemotherapy, parallel to starting the adjuvant or maintenance temozolomide chemotherapy. Patients randomised to the experimental arm will receive TTF in addition to maintenance temozolomide (www.clinicaltrials.gov, NCT#00916409).

Based on the result of this trial TTF therapy has recently been approved in the US and Europe for the treatment of recurrent glioblastoma (www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm251669.htm).

The universal anti-cancer effect of TTF may be applicable to other solid tumour types, alone or in combination with chemotherapy. In particular, in a situation of morbidity induced by a heavy local tumour burden, and in conditions where further radiotherapy is not an option, this non-invasive treatment may allow for a clinical benefit and will substantially expand our treatment armamentarium.

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 577 of 631    Document 11-5

4808

10                R. Stupp et al./European Journal of Cancer xxx (2012) xxx-xxx

## Conflict of interest statement

Eilon Kirson and Uri Weinberg are employees of Novocure Ltd., and have stock options in the company.

Herwig Kostron has received honoraria from Novocure Ltd.

Yoram Palti is the inventor of the Novo-TTF principle. He received consulting honoraria and travel support by Novocure Ltd.

Nina Paleologos has served on advisory boards and speakers bureau to Genentech, Merck & Co (previously Schering-Plough).

Susan Panullo has received research grants from Novocure, NTI Pharma, Eisai, Immunocellular and Parexel, and honoraria for lectures from Merck & Co (previously Schering-Plough).

Zvi Ram is a board member for Novocure, and received consultancy honoraria.

Jeffrey Raizer has received research support from Novocure Ltd., performed consultancy for Merck and Genentech/Roche, and lectures on behalf of Merck & Co, Genentech and Enzon.

David Schiff has performed consultancy for Genentech and Tau Pharmaceuticals.

Andrew Sloan has provided consultancy to Genentech/Roche, Real Bio Inc., Nuvilber Solutions, Surgical Theatre and Monteris Medical Inc.

Roger Stupp has served on scientific advisory boards for Merck-Serono, Roche, Actelion, MDxHealth (previously OncoMethylomeSiences) and Merck and Co (previously Schering-Plough).

Manfred Westphal has received consultancy honoraria from Roche, OncoScience and Ark Therapeutics.

Eric T. Wong has received research support from Novocure Ltd.

The following authors declare no potential conflict of interest: Jeffrey Bruce, Lawrence Chin, Rees Cosgrove, Vladimir Dbaly, Herbert Engelhard, Philip Gutin, Volkmar Heidecke, Silvia Hofer, Andrew Kanner, Lara Kunscher, Joseph Landolfi, Frank Lieberman, Marc Malkin, Maximillian Mehdorn, Franz Payer, Martin Smrcka, David Steinberg, J. Lee Villano, and Robert Weil.

## Acknowledgements

We are indebted to the patients and their families for agreeing to participate in this trial. We thank all the local site co-investigators, and trial coordinators at the participating centres for their hard and diligent work, as well as the nurses at the trial site and Novocure technicians for the great patient care provided. We express our special thanks to Martine Lionnet, Francois Ducray, Stéphanie Cartalat-Carel, Marie Fasol, Valerie Elsig, Mike Ambrogi, Shawn Andrews, Yoram Wasserman and Zoya Gurvich.

## Appendix A. Supplementary data

Supplementary data associated with this article can be found, in the online version, at http://dx.doi.org/10.1016/j.ejca.2012.04.011.

## References

1. Stupp R, Mason WP, van den Bent MJ, et al. Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. N Engl J Med 2005;352(10):987-96.

2. Brandes AA, Vastola F, Monfardini S. Reoperation in recurrent high-grade gliomas: literature review of prognostic factors and outcome. Am J Clin Oncol 1999;22(4):387-90.

3. Guyotat J, Signorelli F, Frappaz D, Madarassy G, Ricci AC, Brel P. Is reoperation for recurrence of glioblastoma justified? Oncol Rep 2000;7(4):899-904.

4. Mandl ES, Dirven CM, Buis DR, Postma TJ, Vandertop WP. Repeated surgery for glioblastoma multiforme: only in combination with other salvage therapy. Surg Neurol 2008;69(5):506-9 [discussion 509].

5. Verhoeff JJ, van Tellingen O, Claes A, et al. Concerns about anti-angiogenic treatment in patients with glioblastoma multiforme. BMC Cancer 2009;9:444.

6. Wick W, Weller M, van den Bent M, Stupp R. Bevacizumab and recurrent malignant gliomas: a European perspective. J Clin Oncol 2010;28(12):188-9 [author reply e190-2].

7. Wick W, Puduvalli VK, Chamberlain MC, et al. Phase III study of enzastaurin compared with lomustine in the treatment of recurrent intracranial glioblastoma. J Clin Oncol 2010;28(7):1168-74.

8. Yung WK, Albright RE, Olson J, et al. A phase II study of temozolomide vs. procarbazine in patients with glioblastoma multiforme at first relapse. Br J Cancer 2000;83(5):588-93.

9. Balmaceda C, Peereboom D, Panullo S, et al. Multi-institutional phase II study of temozolomide administered twice daily in the treatment of recurrent high-grade gliomas. Cancer 2008;112(5):1139-46.

10. Chang SM, Theodosopoulos P, Lamborn K, et al. Temozolomide in the treatment of recurrent malignant glioma. Cancer 2004;100(3):605-11.

11. Cohen MH, Shen YL, Keegan P, Pazdur R. FDA drug approval summary: bevacizumab (Avastin) as treatment of recurrent glioblastoma multiforme. Oncologist 2009;14(11):1131-8.

12. Friedman HS, Prados MD, Wen PY, et al. Bevacizumab alone and in combination with irinotecan in recurrent glioblastoma. J Clin Oncol 2009;27(28):4733-40.

13. Vredenburgh JJ, Desjardins A, Herndon 2nd JE, et al. Bevacizumab plus irinotecan in recurrent glioblastoma multiforme. J Clin Oncol 2007;25(30):4722-9.

14. Rosenthal MA, Gruber ML, Glass J, et al. Phase II study of combination fluxol and estramustine phosphate in the treatment of recurrent glioblastoma multiforme. J Neurooncol 2000;47(1):59-63.

15. Ondard S, Carpentier A, Rami E, et al. Phase II study of fonlanisine and diazepam in the treatment of recurrent glioblastoma multiforme. J Neurooncol 2003;63(1):81-6.

16. Chamberlain MC, Tsao-Wei DD. Salvage chemotherapy with cyclophosphamide for recurrent, temozolomide-refractory glioblastoma multiforme. Cancer 2004;100(6):1213-20.

17. Kesari S, Schiff D, Doherty L, et al. Phase II study of metronomic chemotherapy for recurrent malignant gliomas in adults. Neurooncol 2007;9(3):354-63.

18. Puduvalli VK, Yung WK, Hess KR, et al. Phase II study of fenretinide (NSC 374551) in adults with recurrent malignant gliomas: a North American Brain Tumor Consortium study. J Clin Oncol 2004;22(21):4282-9.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 578 of 631   Document 11-5

19. Rots PA, Martin DH, Nguyen-Khac MT, et al. Early termination of ISRCTN45828668, a phase 1/2 prospective, randomized study of sulfasalazine for the treatment of progressing malignant glioma in adults. *BMC Cancer* 2009;9:372.

20. Brem H, Piantadosi S, Burger PC, et al. Placebo-controlled trial of safety and efficacy of intraoperative controlled delivery by biodegradable polymers of chemotherapy for recurrent gliomas. The polymer-brain tumor treatment group. *Lancet* 1995;345(8956):1008–12.

21. Brada M, Hoang-Xuan K, Rampling R, et al. Multicenter phase II trial of temozolomide in patients with glioblastoma multiforme at first relapse. *Ann Oncol* 2001;12(2):259–66.

22. Rich JN, Reardon DA, Peery T, et al. Phase II trial of gefitinib in recurrent glioblastoma. *J Clin Oncol* 2004;22(1):133–42.

23. Neyns B, Sadones J, Joosens E, et al. Stratified phase II trial of cetuximab in patients with recurrent high-grade glioma. *Ann Oncol* 2009;20(9):1596–603.

24. Perry JR, Belanger K, Mason WP, et al. Phase II trial of continuous dose-intense temozolomide in recurrent malignant glioma: rescue study. *J Clin Oncol* 2010;28(12):2051–7.

25. Lee S, Wong P, Swanson K. Mitotic interference of cancer cells during anaphase by electric field from NovoTTF-100A. In: *Society for Neuro Oncology*, 2011, Orange County, CA; 2011. *Neuro Oncol* 2011;13(Suppl. 3):1–167 [Abstract CB-17].

26. Kirson ED, Dbaly V, Tovarys F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. *Proc Natl Acad Sci U S A* 2007;104(24):10152–7.

27. Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of cancer cell replication by alternating electric fields. *Cancer Res* 2004;64(9):3288–95.

28. Kirson ED, Schneiderman RS, Dbaly V, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). *BMC Med Phys* 2009;9(1):1.

29. Salzberg M, Kirson E, Palti Y, Rochlitz C. A pilot study with very low-intensity, intermediate-frequency electric fields in patients with locally advanced and/or metastatic solid tumors. *Onkologie* 2008;31(7):362–5.

30. Kirson ED, Wasserman Y, Izhaki A, Murdechovich D, Gurvich Z, Dbaly V, et al. Modeling tumor growth kinetics and its implications for TTFields treatment planning. In: *The 2010 Society of Neuro-Oncology Scientific Meeting and Education Day*, Montreal, Canada; 2010. *Neuro Oncol* 2010;12(Suppl. 4):1–148 [Abstract NO-94].

31. Macdonald DR, Cascino TL, Schold Jr SC, Cairncross JG. Response criteria for phase II studies of supratentorial malignant glioma. *J Clin Oncol* 1990;8(7):1277–80.

32. Schneiderman RS, Shmueli E, Kirson ED, Palti Y. TTFields alone and in combination with chemotherapeutic agents effectively reduces the viability of MDR cell sub-lines that over-express ABC transporters. *BMC Cancer* 2010;10:229.

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 579 of 631    Document 11-5
Page 148 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]
4810



For reprint orders, please contact reprints@expert-reviews.com



# NovoTTF-100A: a new treatment modality for recurrent glioblastoma

Expert Rev. Neurother. doi:10.1586/ERN.12.80 (2012) (Epub ahead of print)

**Ekokobe Fonkem[1,2] and Eric T Wong*[1,2]**

[1]Brain Tumor Center and Neuro-Oncology Unit, Beth Israel Deaconess Medical Center, Harvard Medical School, 330 Brookline Avenue, Boston, MA 02215, USA
[2]Departments of Neurology, Beth Israel Deaconess Medical Center, Harvard Medical School, Boston, MA, USA
*Author for correspondence:
Tel.: +1 617 667 1665
Fax: +1 617 667 1664
ewong@bidmc.harvard.edu

NovoTTF-100A (Novocure Inc., Haifa, Israel) is a first-of-a-kind device approved by the US FDA for the treatment of recurrent glioblastoma. It works by emitting a low-intensity, intermediate-frequency (200 kHz), alternating electric field administered via insulated transducer arrays applied onto the scalp. The electric field penetrates the brain and inhibits the growth and proliferation of glioblastoma by interfering with tumor cell mitosis at anaphase. Results from a Phase III clinical trial indicate that the efficacy of NovoTTF-100A is equivalent to standard-of-care chemotherapy. The side effect profile favors device-treated patients, obviating typical toxicities associated with chemotherapy or targeted drugs, and results in improvements in their quality of life. NovoTTF-100A is a new modality of cancer treatment that offers equivalent efficacy, but less toxicity, to recurrent glioblastoma patients when compared with existing treatments.

KEYWORDS: chemotherapy • electric field • glioblastoma • NovoTTF-100A • tumor-treating field

## Overview of the market

Despite continuing research in drug treatments for glioblastomas, median patient survival remains a dismal 14.6 months from the time of initial diagnosis using combined radiation and chemotherapy [1]. Fewer than 10% of patients survive to the 5-year time point [2]. At the time of glioblastoma recurrence or progression, the overall survival (OS) of patients is even worse – typically 6 months or less [3]. The only US FDA-approved medical treatment for recurrence is bevacizumab, but this drug has never been tested in a Phase III clinical trial. Current salvage treatment with bevacizumab prolongs only the progression-free survival (PFS), but not OS, and the tumor invariably progresses in an infiltrative pattern, causing neurological deficits and eventual death [4,5]. Both bevacizumab and cytotoxic chemotherapies have serious side effects that include hemorrhage, thromboembolism, infection, hypertensive crisis, renal failure, diarrhea, nausea and vomiting [4–6]. Therefore, there is a great unmet need for novel therapies that have new mechanisms of action against glioblastoma and a more favorable toxicity profile.

## Introduction

NovoTTF-100A (Novocure Inc., Haifa, Israel) is a novel class of therapeutic device being used

for the treatment of recurrent glioblastoma. It works by emitting low-intensity, intermediate-frequency (200 kHz), alternating electric fields administered by insulated transducer arrays to inhibit the growth and proliferation of intracranial glioblastomas [7]. This device, which consists of the transducer arrays, electric field generator (set at a frequency of 200 kHz) and battery (FIGURE 1), was approved for use by the FDA on 8 April 2011 [101]. This review summarizes its mechanisms of action, Phase III efficacy and safety data, and current use in clinical practice.

## Mechanism of action

NovoTTF-100A exerts its anti-tumor effect on glioblastoma cells by interfering with mitosis at anaphase. In synchronized cell culture, such a tumor-treating electric field (TTField) first disrupted cytokinesis and then impaired chromosome separation from the metaphase plate [8]. Biochemical assays also confirmed that these cells had already transited from metaphase to anaphase [8]. Immunofluorescence of treated cells demonstrated lagging chromosomes, dispersion of chromosomes, chromosome decondensation in the absence of cytokinesis, and asymmetric chromosome segregation [8,9]. Exposed cells showed no p53 induction, suggesting that cell death was mediated via a p53-independent

Page 149 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]




**Figure 1. The NovoTTF-100A device setup.** Left panel: The NovoTTF-100A device. Right panel: Two opposing pairs of transducer arrays (A) are applied to the scalp and the cables are linked to the connection box (B). The connection box is then attached to the electric field generator (C), which is connected to a power supply (D). The entire set up weighs approximately 7 lbs.

mechanism [8]. Furthermore, susceptibility to TTField is cell type dependent. Both glioma cells from rats (F-98) and humans (U87 and U118) have a significantly decreased growth rate when exposed to TTField [9]. The best result appears to occur at an intensity of 2.25 V/cm and a frequency of 200 kHz [9]. Taken together, TTField represents a new modality of anticancer treatment via a mechanism that differs from conventional radiotherapy, cytotoxic chemotherapies or targeted kinase inhibitors. However, additional research is needed to determine the effect on postmitotic neurons and glia, as well as dividing progenitor cells, within the brain.

## Clinical efficacy

NovoTTF-100A underwent initial testing in a pilot trial of ten patients with recurrent glioblastoma [7]. The results showed that the median time to disease progression was 26.1 weeks (range: 3.0–124.0 weeks), the PFS at 6 months (PFS6) was 50% (95% CI: 23–77%), and the median OS was 62.2 weeks (range: 20.3–124.0 weeks) [7]. There were two durable responses, including two patients with complete and partial responses lasting 43.3+ weeks and 30.3+ weeks, respectively [7]. These preliminary data compared favorably to benchmark outcomes from conventional cytotoxic chemotherapies, which had a response rate of 9%, PFS6 of 15%, median PFS of 9.0 weeks, and a median OS of 25.0 weeks (95% CI: 21–28 weeks) [5].

NovoTTF-100A was subsequently compared to best standard of care (BSC) chemotherapy for recurrent glioblastoma after initial temozolomide chemoirradiation in a prospective, randomized, open-label Phase III clinical trial. Among the 28 centers in the USA and Europe, 237 individuals were randomized to NovoTTF-100A alone (120 subjects) or BSC (117 subjects) [10,11]. The primary end point was OS and secondary end points included PFS, PFS6, 1-year survival rate, objective radiological response, quality of life and safety. All analyses were performed on the intent-to-treat population, and Kaplan–Meier OS and PFS were computed from the time of randomization until event or censoring at last

follow-up. The trial was powered at 80%, with a significance of p ≤ 0.05 and a hazard ratio (HR) for death of ≤0.67. The median age, Karnofsky Performance Score and other clinical characteristics were balanced between the two cohorts, with the exception of slightly larger tumor size in the NovoTTF-100A group versus the BSC group, at a median size of 6.1 cm (range: 0.0–15.2 cm) and 5.5 cm (range: 0.0–16.2 cm), respectively (TABLE 1) [10,11]. BSC chemotherapies chosen by the treating physician included single-agent or combination irinotecan (31%), bevacizumab (31%), BCNU/CCNU (25%), carboplatin (13%), temozolomide (11%), combination procarbazine, CCNU and vincristine (9%), etoposide (3%), imatinib (2%), hydroxyurea (1%), or nothing (3%) [10,11]. In the intent-to-treat population, the median OS was 28.6 versus 26.0 weeks (HR: 0.86; 95% CI: 0.66–1.12), the median PFS was 9.5 versus 9.1 weeks (HR: 0.84, 95% CI: 0.64–1.13), and the median PFS6 was 21 versus 15% for NovoTTF-100A and BSC chemotherapy, respectively (TABLE 2) [10,11]. The data indicate that NovoTTF-100A has an equivalent efficacy when compared to salvage cytotoxic chemotherapies and targeted drugs for recurrent glioblastoma. Interestingly, patients who failed bevacizumab and then enrolled to receive NovoTTF-100A (n = 23) had a significantly longer survival than those who received BSC chemotherapy (n = 21), at 19.1 versus 13.4 weeks (p < 0.02), respectively [12].

## Safety & tolerability

The side effect profile favors NovoTTF-100A treatment significantly more than BSC. Notably, there were only 3 versus 17% hematological toxicities, 4 versus 17% gastrointestinal side effects, and 4 versus 8% infections at grade 3 or 4 severity in the NovoTTF-100A versus BSC cohorts, respectively [10,11]. Other systemic toxicities were well-balanced between the two groups. However, scalp irritation from transducer array placement did occur at a higher frequency, with 17% grade 1 and 2 skin rash in the NovoTTF-100A subjects when compared with 0% in those treated with BSC chemotherapy [10,11]. However, none of the device-treated patients experienced skin toxicity higher than grade 2. Additional self-reported quality-of-life analysis by EORTC QLQ C-30 showed positive scores from NovoTTF-100A usage due to improved cognitive function, decreased constipation and diarrhea complications, as well as absence of pain [11,12].

## Use in practice

Certain medical conditions are contraindicated in NovoTTF-100A usage and may pose unknown risks to patients. First, it is inadvisable to prescribe this device to patients with active implanted medical devices, such as cardiac pacemakers, defibrillators, deep-brain stimulators, vagus nerve stimulators and

Page 150 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]

JB_SB173E312028

25976

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 581 of 631    Document 11-5

4812



SEE PROFILE

### NovoTTF-100A: a new treatment modality for recurrent glioblastoma

**Table 1. Baseline characteristics of subjects enrolled in the Phase III NovoTTF-100A trial for recurrent glioblastoma.**

| | NovoTTF-100A (n = 120) | Active control (n = 117) |
|---|---|---|
| Age, median (range) | 54 (24–80) years | 54 (29–74) years |
| Gender: | | |
| – Male | 92 (77%) | 73 (62%) |
| – Female | 28 (23%) | 44 (38%) |
| Histology: | | |
| – Primary glioblastoma | 110 (92%) | 108 (92%) |
| – Secondary glioblastoma | 10 (8%) | 9 (8%) |
| Karnofsky performance status, median (range) | 80 (50–100) | 80 (50–100) |
| Corticosteroid use at the time of enrollment: | | |
| – Yes | 55 (46%) | 62 (53%) |
| – No | 55 (46%) | 49 (42%) |
| – Unknown | 10 (8%) | 6 (5%) |
| Maximum tumor diameter at randomization, median (range) | 6.1 (0.0–15.2) cm | 5.5 (0.0–16.2) cm |
| Time from initial glioma diagnosis, median (range) | 11.8 (3.2–99.3) months | 11.4 (2.9–77.1) months |
| First recurrence | 11 (9%) | 17 (15%) |
| Second recurrence | 58 (48%) | 54 (46%) |
| Third or greater recurrence | 51 (43%) | 46 (39%) |
| Surgery: | | |
| – Debulking surgery prior to enrollment | 33 (28%) | 29 (25%) |
| – Debulking at any stage | 95 (79%) | 99 (85%) |
| – Biopsy only | 25 (21%) | 18 (15%) |
| Radiotherapy: | 120 (100%) | 117 (100%) |
| – Radiotherapy with concomitant temozolomide | 103 (86%) | 96 (82%) |
| – Radiotherapy without concomitant temozolomide | 15 (13%) | 20 (17%) |
| – Unknown | 2 (1%) | 1 (1%) |
| Prior adjuvant (maintenance) temozolomide | 100 (83%) | 89 (76%) |
| Median number of cycles | 4 (0–19) | 3 (0–27) |
| Prior bevacizumab use | 23 (19%) | 21 (18%) |

Data taken from [11].

programmable ventriculoperitoneal shunts. These devices may cause reciprocal electromagnetic interference, induction or both, and the extent of this risk is unknown. Second, patients with major skull defects cannot receive this treatment. For example, those with a missing section of the calvarium may experience elevated electric field strength on the brain. However, those with healed burr holes and craniotomy sutures can receive this treatment without complications. Third, metals within the brain are also contraindicated because NovoTTF-100A has not been tested in patients with bullet fragments or aneurysm clips in their head. Last, those with hypersensitivity to hydrogel, which is used as a

conductive interface between the transducer array disks and the scalp, may not be able to receive this treatment.

Pretreatment evaluation consists of baseline history, physical examination (including evaluation of skin integrity on the scalp), blood work and gadolinium-enhanced head MRI. The MRI images are used to construct a mapping diagram for placement of the transducer arrays. Typically, there are two pairs of opposing arrays, which are separately color coded (FIGURE 1). The wires of the arrays are then connected to the electric field generator and power supply (FIGURE 1). The patient's hair is then shaved off with an electric shaver instead of a razor in order to avoid superficial

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 582 of 631 Document 11-5

Page 151 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time] JB_5B173E312028   25976   4813

2018312303852

Fonkem & Wong



**Figure 1. Data from a Phase III NovoTTF-100A trial for recurrent glioblastoma.** (A) Kaplan–Meier curves showing equivalent overall survival between the NovoTTF100A therapy group and the BPC active control. (B) Kaplan–Meier progression-free survival curves showing a greater number of subjects with disease stabilization in the NovoTTF-100A-treated group than BPC active control: four subjects without disease progression at 78 weeks and three at 91 weeks versus none in the control.
BPC: Best physician choice; m: Months; PFS: Progression-free survival; w: Weeks.
Reproduced with permission from [11].

cuts. The scalp is then cleaned with alcohol prior to application of the arrays. This procedure typically requires the help of another individual and it is necessary to bring a family member or assistant to learn array placement and operation of the NovoTTF-100A device. Follow-up clinic visits are scheduled monthly in the first 3 months and then every 2 months thereafter. Gadolinium-enhanced head MRI is performed once every 2 months for monitoring the status of glioblastoma during treatment.

The efficacy of NovoTTF-100A on brain tumors other than glioblastoma is unknown. However, other gliomas may respond to the same frequency (200 kHz) emitted by the NovoTTF-100A device, based on published preclinical data. However, it is still unknown whether or not TTField at 200 kHz would be effective in controlling metastatic brain tumors because the optimal frequency for specific metastasis may be different. For example, in preclinical cell culture melanoma was most sensitive at a frequency of 120 kHz [9].

### Regulatory affairs

NovoTTF-100A is currently approved by the FDA and the EMA for the treatment of recurrent or progressive glioblastomas.

### Conclusion

NovoTTF-100A is a novel therapy for the treatment of recurrent glioblastoma. It emits TTField that interferes with dividing tumor cells at anaphase. The clinical trial results indicate that it has comparable efficacy, and less toxicity, when compared to conventional drug treatments in the recurrence setting.

### Expert commentary

The Phase III clinical trial demonstrated comparable, but not superior, efficacy when compared to conventional drug treatments. This result is likely to be influenced by a number of factors. First, the population of patients with recurrent glioblastomas has neurological deterioration and death within a shorter time than those with newly diagnosed disease. As a result, these patients may deteriorate early and therefore their tumors may not receive enough exposure to NovoTTF-100A treatment. Unlike conventional cytotoxic chemotherapies that have a biological effect lasting the entire duration of the treatment cycle (typically 4–6 weeks), the TTField needs to be applied continuously otherwise the anti-tumor effect would disappear as soon as the generator is switched off. Consistent with this reasoning, the per-protocol analysis of the Phase III trial data, in which patients who received less than 4 weeks of NovoTTF-100A treatment were removed from analysis, showed that NovoTTF-100A offered a statistically significant survival advantage when compared to BSC chemotherapy. Second, compared to newly diagnosed glioblastomas, recurrent glioblastomas have additional genetic alterations making them more resistant to treatment [13,14]. Therefore, NovoTTF-100A may have a greater benefit to newly diagnosed patients than those with recurrent disease. A Phase III clinical trial is currently underway investigating the efficacy of NovoTTF-100A with temozolomide chemoirradiation compared to standard temozolomide chemoirradiation for newly diagnosed glioblastoma. Last, NovoTTF-100A does not appear to have overlapping toxicity with conventional drug treatments [10,11]. Therefore,

doi:10.1586/ERN.12.80

Page 152 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 583 of 631   Document 11-5

JB_SB173E312028
29976
4814

## NovoTTF-100A: a new treatment modality for recurrent glioblastoma 

combining it with cytotoxic chemotherapies or targeted agents can potentially result in increased efficacy and without added toxicity. The pivotal Phase III trial did include patients after failure of polifeprosan 20 with carmustine implant (Gliadel wafer) [11]. However, for patients who have undergone wafer implantation, it would be best to withhold the use of NovoTTF-100A until complete dissolution of the wafer, which typically occurs in 4 weeks. However, more preclinical data are needed in order to find the optimal NovoTTF-100A and drug combinations before they can be applied in a clinical trial setting.

be accomplished by the addition of drugs that have synergistic or additive activities. A logical combinatorial treatment would include NovoTTF-100A and bevacizumab because these two therapies do not have overlapping toxicity and both are approved by the FDA for the treatment of recurrent glioblastomas. Furthermore, the device could also be used to treat patients with metastatic brain tumors. However, more preclinical and clinical research is needed to support its use in these patients, as well as the specific type of metastatic brain tumor that shows sensitivity to TTField.

### Five-year view
In the next 5 years, more preclinical studies are needed in order to determine the mechanisms of TTField's action on tumor cells. The results would most likely offer ideas for investigator-initiated clinical research that would help to maximize the efficacy of NovoTTF-100A against glioblastomas. This will most likely

### Financial & competing interests disclosure
*Dr ET Wong receives research support from NovoCure, Inc. The authors have no other relevant affiliations or financial involvement with any organization or entity with a financial interest in or financial conflict with the subject matter or materials discussed in the manuscript apart from those disclosed.*

*No writing assistance was utilized in the production of this manuscript.*

### Key issues
- NovoTTF-100A (Novocure Inc., Haifa, Israel) emits a low-intensity, intermediate-frequency (200 kHz) alternating electric field that treats recurrent glioblastomas.
- NovoTTF-100A exerts its anti-tumor effect on glioblastoma cells by interfering with mitosis at anaphase.
- NovoTTF-100A treatment offers comparable efficacy when compared to conventional drug treatments, including bevacizumab, for recurrent glioblastoma.
- The toxicity profile favors NovoTTF-100A over conventional drug treatments.

### References
1 Stupp R, Mason WP, van Den Bent MJ *et al.* Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. *N. Engl. J. Med.* 352(10), 987–996 (2005).

2 Stupp R, Hegi ME, Mason WP *et al.* Effects of radiotherapy with concomitant and adjuvant temozolomide versus radiotherapy alone on survival in glioblastoma in a randomized Phase III study: 5-year analysis of the EORTC-NCIC trial. *Lancet Oncol.* 10(5), 459–466 (2009).

3 Wong ET, Hess KR, Gleason MJ *et al.* Outcome and prognostic factors in recurrent glioma patients enrolled onto Phase II clinical trials. *J. Clin. Oncol.* 17(8), 2572–2578 (1999).

4 Norden AD, Young GS, Setayesh K *et al.* Bevacizumab for recurrent malignant gliomas: efficacy, toxicity, and patterns of recurrence. *Neurology* 70(10), 779–787 (2008).

5 Iwamoto FM, Abrey LE, Beal K *et al.* Pattern of relapse and prognosis after bevacizumab failure in recurrent glioblastoma. *Neurology* 73(15), 1200–1206 (2009).

6 Nieder C, Grosu AL, Molls M. A comparison of treatment results for recurrent malignant gliomas. *Cancer Treat. Rev.* 26(6), 397–409 (2000).

7 Kirson ED, Dbalý V, Tovaryš F *et al.* Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. *Proc. Natl Acad. Sci. USA* 104(24), 10152–10157 (2007).

8 Lea S X, Wong ET, Swanson KD. Mitotic interference of cancer cells during anaphase by electric field from Novo-TTF-100A. *Neuro-Oncol.* 13(Suppl. 3), iii13–iii14 (2011).

9 Kirson ED, Gurvich Z, Schneiderman R *et al.* Disruption of cancer cell replication by alternating electric fields. *Cancer Res.* 64(9), 3288–3295 (2004).

10 Wong ET, Ram Z, Gutin PH, Stupp R. Updated survival data of the Phase III clinical trial of NovoTTF-100A versus best standard chemotherapy for recurrent glioblastoma. *Neuro-Oncol.* 13(Suppl. 3), ii87 (2011).

11 Stupp R, Wong ET, Kanner AA *et al.* NovoTTF-100A versus physician's choice chemotherapy in recurrent glioblastoma: a randomized Phase III trial of a novel treatment modality. *Eur. J. Cancer* doi:org/10.1016/j.ejca.2012.04.011 (2012) (Epub ahead of print).

12 Ram Z, Gutin PH, Stupp R. Subgroup and quality of life analyses of the Phase III clinical trial of NovoTTF-100A versus best standard chemotherapy for recurrent glioblastoma. *Neuro-Oncol.* 12(Suppl. 4), iv48–iv49 (2010).

13 Sidransky D, Mikkelsen T, Schwechheimer K, Rosenblum ML, Cavance W, Vogelstein B. Clonal expansion of p53 mutant cells is associated with brain tumour progression. *Nature* 355(6363), 846–847 (1992).

14 Cahill DP, Levine KK, Betensky RA *et al.* Loss of the mismatch repair protein MSH6 in human glioblastomas is associated with tumor progression during temozolomide treatment. *Clin. Cancer Res.* 13(7), 2038–2045 (2007).

### Website
101 US FDA News Release 4 April 2011: FDA approves new medical device for form of brain cancer. www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm251669.htm

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 584 of 631 Document 11-5
Page 153 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time] JB_SB173E3I2028 25976



# By Philip H. Gutin, MD, and Eric T. Wong, MD

*Overview:* Tumor treating fields (TTF) therapy is a novel antimitotic, electric field-based treatment for cancer. This nonchemical, nonablative treatment is unlike any of the established cancer treatment modalities, such as surgery, radiation, and chemotherapy. Recently, it has entered clinical use after a decade of intensive translational research. TTF therapy is delivered to patients by a portable, battery-operated, medical device using noninvasive transducer arrays placed on the skin surface surrounding the treated tumor. TTF therapy is now a U.S. Food and Drug Administration (FDA)-approved treatment for patients with recurrent glioblastoma (GBM) who have exhausted surgical and radiation treatments. This article will introduce the basic science behind TTF therapy, its mechanism of action, the preclinical findings that led to its clinical testing, and the clinical safety and efficacy data available to date, as well as offer future research directions on this novel treatment modality for cancer.

THE DEFINITION of the electric field is attributed to Michael Faraday and was later formulated by James Clerk Maxwell in his electromagnetic theory in 1865.[1] It is a field of electric forces that surround a source charge. When a test charge is placed within an electric field, a force acts on it. Negative charges attract positive charges, while similar signed charges repel each other. As seen in Fig. 1A, an electric field surrounding a source charge can be described using diverging lines of force. The closer the test charge is to the source charge, the closer the lines of force are to each other, which represents higher field intensity.

To understand the effects of electric fields within cells, it is important to introduce three definitions. First, electric fields can be uniform or nonuniform. A uniform electric field is represented by parallel lines of force (Fig. 1B). A nonuniform electric field is represented by converging or diverging lines of force (Fig. 1A and 1D). Second, an electric field can be a constant field or a time-varying field, resulting in electrostatic or electrodynamic phenomena, respectively. In a constant field, the source charges remain the same over time. A test charge will move in one direction within a constant electric field toward the oppositely charged source (Fig. 1B). In a time-varying or alternating electric field, the charge of the sources alternates over time (Fig. 1C). Third, the test charge can be an electric charge or an electric dipole (an element with a positive charge on one end and a negative charge on the opposite end). An electric charge will move back and forth, while a dipole will rotate within an alternating uniform electric field and align with the direction of the field. In a nonuniform converging electric field, both dipoles and charges move in the direction of the higher field intensity through a process known as dielectrophoresis (Fig. 1D).

## Mechanism of Action of TTF Therapy

Over 100 years after Maxwell's original publication, Yoram Palti, MD, PhD, hypothesized that properly tuned alternating electric fields at physiological intensities (i.e., 1–3 V/cm) would disrupt the mitotic process of dividing cancer cells.[2,3] Dr. Palti hypothesized and subsequently demonstrated in vitro that at frequencies between 100 and 300 kHz, alternating electric fields disrupt the formation of the mitotic spindle during metaphase and lead to dielectrophoretic movement of charged and/or polar molecules and organelles during anaphase and telophase, disrupting normal cytokinesis and leading to apoptosis.[2,3] According to this model, the first mechanism is explained by the fact that the tubulin subunits are one of the most polar molecules in the cell. These tubulin subunits align in the direction of the applied electric field (Fig. 2A), interfering with the normal polymerization of the mitotic spindle, which results in formation of abnormal mitotic figures in vitro.[3] The second mechanism of action is explained by examining the change in shape of the electric field within a dividing cell from anaphase to telophase. When the cell division axis is aligned with the direction of the electric field, the field lines that enter the cell at one end converge at the cytokinetic furrow between the developing daughter cells and then diverge on the opposite side (Fig. 2B). This nonuniform electric field within the cell generates dielectrophoretic forces that act on polar and charged elements in the cell, pushing them toward the cytokinetic furrow leading to violent blebbing of the plasma membrane.[3] This finding was also validated by researchers from Beth Israel Deaconess Medical Center and is explained as being mediated by improper placement of the contractile elements that form the cytokinetic ring on anaphase entry.[4]

## Preclinical Studies of the Antitumor Effects of TTF Therapy

Between 2004 and 2010, a series of publications and conference presentations addressed the issue of the applicability range of TTF therapy to different in vitro and in vivo cancer models either alone or in combination with standard chemotherapy.[3,5-8] Tables 1 and 2 summarize the state-of-the-art preclinical research with TTF therapy. TTF therapy has been shown to effectively inhibit cancer cell growth in various cell lines in vitro (Table 1). This effect was clearly dose (field intensity) dependent in the range of 1 to 3 V/cm.[3] The optimal frequency for the inhibitory effect of TTF therapy differed between cell types and was inversely related to cell size (Table 1; e.g., glioma cell cultures at 200 kHz[3,6]). In addition, based on the directional nature of TTF

*From the Department of Neurosurgery, Memorial Sloan-Kettering Cancer Center Brain Tumor Center, New York, NY; and Brain Tumor Center and Neuro-Oncology Unit, Beth Israel Deaconess Medical Center, Boston, MA.*

*Authors' disclosures of potential conflicts of interest are found at the end of this article.*

*Address reprint requests to Philip H. Gutin, MD, Department of Neurosurgery, C-703, Memorial Sloan-Kettering Cancer Center, 1275 York Ave., New York, NY 10065; email: gutinp@mskcc.org.*

*© 2012 by American Society of Clinical Oncology.*

*1092-9118/11/1017-10*

126

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 585 of 631   Document 11-5

4816

TTF THERAPY IN GLIOBLASTOMA



Fig. 1. Electric field theory. (A) Opposite charges attract. (B) A constant, uniform, electric field. (C) Charges and dipoles in a time-varying, uniform electric field. (D) A dipole in a time-varying, nonuniform electric field (dielectrophoresis).

therapy, its antimitotic effect in cultures was enhanced by sequentially applying more than one field direction to the treated cells.[6] The combination of TTF therapy with different chemotherapeutic agents has been shown to have at least additive if not synergistic effects.[7,8] Specifically, the combination of TTF therapy with temozolomide in glioma cell lines was shown to be additive. Interestingly, in breast cancer cells, TTF therapy showed overt synergism with taxanes (e.g., paclitaxel), probably a result of the temporal proximity of taxanes' effect in metaphase and TTF therapy's mitotic interference on cell entry into anaphase.[6]

TTF therapy has been tested in numerous in vivo cancer models (Table 2).[3,5,6,10] Noninvasive application of TTF therapy to animals was performed using electrically insulated transducer arrays placed on the head or torso surrounding the region of the tumor. Inhibition of tumor growth was seen in each of these models when the correct frequency of TTF therapy was applied. Specifically, 200 kHz TTF therapy applied in two sequential and perpendicular field directions lead to significant (p < 0.01) inhibition of a syngeneic, orthotopic F-98 glioma in rats after 7 days of treatment.[6] An additional syngeneic, orthotopic model of non-small cell lung cancer in mice showed that 150 kHz TTF therapy significantly (p < 0.01) inhibited tumor growth within 7 days of treatment.[3,15] Furthermore, the additive effect of TTF therapy with chemotherapy seen in vitro was recapitulated in different in vivo models.[5,6] Finally, in a metastatic tumor model using a squamous carcinoma tumor implanted in the kidney capsule of rabbits, TTF therapy applied to the abdomen blocked metastatic spread of tumor from the kidney to the lungs.[10,27]

### Translating TTF Therapy into Clinical Use

Since TTF therapy is a physical antimitotic modality with no half-life, its application should be continuous. Kinetic modeling was used to predict the minimal treatment duration needed with TTF therapy.[15] Based on these data, a minimal treatment course of 4 weeks was defined and implemented in clinical studies. In vivo animal experiments and pilot clinical data subsequently verified the 4-week minimal treatment duration.[15] Such continuous delivery was made possible by the development of a portable, battery-operated, medical device that patients can use at home (NovoTTF-100A, Novocure, Haifa, Israel). Finally, extensive toxicity studies of TTF therapy were performed in healthy

---

**KEY POINTS**

- Tumor treating fields (TTF) therapy is an emerging, low-toxicity treatment modality for solid tumors based on the delivery of antimitotic alternating electric fields to the tumor, which interfere with cytokinesis and microtubule assembly that eventually lead to cell death.
- As a monotherapy, TTF therapy is at least as effective as currently available active chemotherapy and biologic therapies for the treatment of recurrent glioblastoma (GBM).
- The efficacy of this noninvasive treatment modality is achieved with significantly less toxicity and a better quality of life compared with chemotherapy.
- Preliminary data suggest TTF therapy acts synergistically with temozolomide and other chemotherapy in both preclinical and clinical trials.
- Future research should focus on integrating TTF therapy into the treatment of GBM in the adjuvant and maintenance settings, as well as in the treatment of other solid tumor malignancies.

127

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 586 of 631   Document 11-5



Fig. 2. Effects of tumor treating fields therapy on intracellular structures during mitosis. (A) During metaphase, tubulin dimers align with the external electric field, interfering with the formation of the mitotic spindle. (B) During cytokinesis, the nonuniform electric field formed within the dividing cell drives charged and polar macro-molecules, and organelles toward the cleavage furrow.

mice, rats, and rabbits.[5,9] Clinical, laboratory, and pathologic analyses showed that TTF therapy is well tolerated and does not lead to systemic toxicity in animals. As expected by the frequency range of TTF therapy (100–300 kHz), these electric fields do not have any effect on excitable tissues (neural, muscular, or cardiac), nor do they cause significant heating.[16-18]

## Clinical Testing of TTF Therapy as a Monotherapy

The NovoTTF device was first applied to patients in a small feasibility trial in Switzerland in 2000.[19] In 2004, TTF therapy was tested in a pilot clinical trial in patients with recurrent GBM (Table 3).[5] This single-center, single-arm trial included patients with favorable prognostic character

**Table 1. In Vitro Evidence Overview**

| Histology | Cell Line | Optimal/Effective TTF Frequency (kHz) | Additive/Synergistic with Chemotherapy | Reference |
|---|---|---|---|---|
| High-grade glioma | F-98; C-6; RG-2 | 200 | Temozolomide (dacarbazine) | Can Res, 2004[5] |
|  | U-118; U-87 |  |  | Proc Natl Acad Sci U S A, 2007[9] |
| Breast adenocarcinoma | Normal: | 120 | Cyclophosphamide | Can Res, 2004[5] |
|  | MDA-MB-231 |  |  |  |
|  | MCF7 |  | Doxorubicin | Neuro Oncol, 2011[4] |
|  | Multidrug resistant: | 120 | Paclitaxel | BMC Cancer, 2010[7] |
|  | MDA-MB-231Dox |  |  |  |
|  | A88/EmR[1] |  | Doxorubicin |  |
|  | MCF7/Mx |  | Paclitaxel |  |
| Non-small cell lung cancer (adenocarcinoma) | H1299 | 150 | Paclitaxel | ERS, 2010[8] |
|  | LLC |  | Pemetrexed | AACR, 2007[6] |
|  |  |  |  | Can Res, 2004[5] |
| Colorectal adenocarcinoma | CT-26 | 100* | NA | Can Res, 2004[5] |
| Malignant melanoma | B16F1 Patricia | 100 | NA | Can Res, 2004[5] |
| Prostate | PC-3 | 100* | NA | Can Res, 2004[5] |
| Cervical cancer | Hela | 200* | NA | Neuro Oncol, 2011[4] |

Abbreviations: TTF, tumor treating fields; NA, not available (was not reported by the authors).
* Effect seen at this frequency; additional frequencies were not tested.

128

TTF THERAPY IN GLIOBLASTOMA

Table 2. In Vivo Evidence Overview

| Tumor Type | Anatomic Location | Animal Model | Aerial Frequency (kHz) | Effect of TTF | References |
|---|---|---|---|---|---|
| GBM | Right hemisphere | Rat | 200 | Tumor growth inhibition with 2 and 3 field directions | Proc Natl Acad Sci U S A, 2007[3] |
| Non-small cell lung cancer | Lung parenchyma | Mouse | 150 | 1. Tumor growth inhibition with 2 field directions<br>2. Additive tumor inhibition with pemetrexed | ERS, 2010[9] |
| Malignant melanoma | Intradermal | Mouse | 100 | Tumor growth inhibition with 1 and 2 field directions | Can Res, 2004[3]<br>Proc Natl Acad Sci U S A, 2007[3] |
| Malignant melanoma | Intravenous | Mouse | 100 | Inhibition of metastatic seeding in the lungs | Clin Exp Metastasis, 2009[10] |
| VX-2 (anaplastic) | Kidney capsule | Rabbit | 150–200 | 1. Tumor growth inhibition seen with 2 field directions<br>2. Increase in median survival<br>3. Inhibition of metastatic seeding in the lungs<br>4. Additive tumor inhibition with paclitaxel | Clin Exp Metastasis, 2009[10]<br>AACR, 2009[27]<br>Neuro Oncol, 2010[12] |

Abbreviation: GBM, glioblastoma

istics. Treatment with the device was well tolerated, and no treatment-related serious adverse events were reported. Most patients developed grade 1 to 2 contact dermatitis beneath the transducer arrays on the scalp. Efficacy endpoints were very encouraging with a 20% objective response rate, progression-free survival (PFS) at 6 months of 50%, median time to progression (TTP) of 26 weeks, and median overall survival (OS) of 62.2 weeks (14.4 months). Compared to the historic results of salvage chemotherapy, these results showed clear activity of TTF therapy when used as a monotherapy in recurrent GBM.[17]

Based on the results of this pilot trial, a pivotal phase III, multicenter, randomized (1:1) clinical study was initiated in patients with recurrent GBM (Table 3). The randomized study, which recruited 237 patients between 2006 and 2009, compared the efficacy and safety of monotherapy with the NovoTTF device to that of the best available active chemotherapy according to physician's choice. Thirty-six patients received bevacizumab, 36 received nitrosureas, 12 received temozolomide, and 33 received other agents. This was the largest randomized study in recurrent GBM to be completed to date. The results of the study were presented at the 2010

ASCO Annual Meeting and were updated at the 2011 Society for Neuro-Oncology (SNO) Annual Meeting.[18,19] Baseline characteristics of patients were balanced between the two treatment groups. In both groups, patients had poor prognostic predictors compared with previous clinical trials of recurrent GBM (90% of patients were at their second or subsequent recurrence; 20% had failed bevacizumab before entering the trial; and the average tumor diameter was above 5 cm). In the conservative intent-to-treat (ITT) analysis, the study showed that patients with recurrent GBM treated with NovoTTF alone had comparable OS to that of patients who received chemotherapy and/or bevacizumab (6.6 months vs. 6.0 months, respectively; p = 0.26; hazard ratio [HR] = 0.86; Table 3). Although NovoTTF did not show superiority over active chemotherapies, it was clear that it was at least as effective as these treatments. Secondary endpoints in the trial were supportive: blinded radiology review showed that PFS at 6 months was 21.4% in the NovoTTF group compared with 15.2% in the chemotherapy group (p = 0.24). There were more radiological responses seen in the NovoTTF group compared with the chemotherapy group (14% vs. 9%, respectively; p = 0.07), including

Table 3. Clinical Evidence Overview

| Indication (Analysis Group) | Trial Phase (# of Subjects) Analysis | Overall Survival (Months) | | Hazard Ratio (p) | Progression-Free Survival (PFS) at 6 Months or Median PFS (Weeks) | | P value | References |
|---|---|---|---|---|---|---|---|---|
| | | TTF | Chemo | | TTF | Chemo | | |
| Recurrent GBM (at first relapse) | Phase I-II (n = 10) ITT Analysis | 14.3 m | 6.0 m* | Non-randomized | 50% | 15%* | NA | Proc Natl Acad Sci U S A, 2007[4] |
| Recurrent GBM (at second and fourth relapse) | Phase III (n = 237) ITT analysis | 6.6 m | 6.0 m | HR = 0.86 (p = 0.26) | 21.4% | 15.2% | p = 0.24 | J Clin Oncol, 2010[18]<br>Neuro Oncol, 2011[19] |
| Recurrent GBM (treated patients only) | Phase III (n = 210) PP Analysis | 7.8 m | 6.0 m | HR = 0.67 (p = 0.012) | 26.2% | 15.2% | p = 0.03 | J Clin Oncol, 2010[18]<br>Neuro Oncol, 2011[19] |
| Recurrent GBM (KPS ≥ 80, age < 61) | Phase III (n = 110) Subgroup analysis | 8.9 m | 6.6 m | HR = NA (p < 0.01) | 25.6% | 7.7% | NA | Neuro Oncol, 2010[19] |
| Recurrent GBM (after bevacizumab failure) | Phase III (n = 43) Subgroup analysis | 4.4 m | 3.1 m | HR = NA (p = 0.02) | NA | NA | NA | Neuro Oncol, 2010[20] |
| Recurrent GBM (TTF versus bevacizumab) | Phase III (n = 156) Subgroup analysis | 6.6 m | 5.0 m | HR = 0.65 (p = 0.049) | 21% | 21% | p > 0.05 | Neuro Oncol, 2011[21] |
| Newly diagnosed GBM (together with temozolomide) | I-II (n = 10) ITT Analysis | 39+ m | 14.7 m* | HR = NA (p = 0.002) | 90%<br>155 w | 50%*<br>26 w | NA | BMC Med Phys, 2009[9] |
| Relapsed advanced NSCLC (together with pemetrexed) | I-II (n = 42) ITT Analysis | 13.8 m | 8.2 m* | NA | 20 w | 12 w* | | ESMO, 2010[25]<br>ERS, 2010[9]<br>Expert Opin Investig Drugs, 2010[11] |

Abbreviations: GBM, glioblastoma; ITT, intention to treat; NA, not available (was not reported by the authors); HR, hazard ratio; PP, per protocol; KPS, Karnofsky performance status; TTF, tumor treating fields; NSCLC, non-small cell lung cancer.
* Single-arm trials with literature control

129

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 588 of 631 Document 11-5   4819

three sustained complete responses in the NovoTTF group compared with none in the chemotherapy group. These results were accompanied by significantly ($p < 0.05$) less treatment-related adverse events with NovoTTF compared with chemotherapy. Patients in the NovoTTF group reported a higher quality of life compared with patients treated with chemotherapy. This analysis was based on the European Organisation for Research and Treatment of Cancer QLQ-C30 and mirrored the lack of chemotherapy-related toxicities in the NovoTTF group. Interestingly, patients in the NovoTTF group reported better cognitive and emotional functioning and much less pain than patients in the chemotherapy group, although these domains of the questionnaires are not related to known side effects of chemotherapy.

The data, several exploratory analyses of the study data, have been performed. The first analysis compared patients who received the same "amount" of therapy in both groups. This prospectively defined per-protocol analysis excluded patients from both groups who received less than one predefined treatment course. The analysis demonstrated superior survival in the NovoTTF group compared with the chemotherapy group (7.8 months vs. 6.0 months; $p = 0.012$, $HR = 0.67$).[18,19] The rationale behind this analysis is that TTF is a physical modality with no half-life, so that the moment the therapy is stopped, its antimitotic effect stops as well. In contrast, chemotherapies have measurable plasma and tissue half-life, which results in continued efficacy and toxicity long after a dose has been given. Therefore, to achieve pharmacokinetic balance in the "amount" of treatment in both groups, this analysis used a simplified criterion that one course of chemotherapy (e.g., 1 day of carmustine or 5 days of temozolomide) is equivalent to four weeks of continuous TTF therapy.

Two more analyses of the study data were presented at the 2010 and 2011 SNO Annual Meetings.[20,21] The first study analyzed known clinical prognostic factors of age and Karnofsky performance status (KPS). This analysis demonstrated that in patients age 60 and younger with a KPS greater than 70, treatment with NovoTTF resulted in superior OS compared with chemotherapy (8.9 months vs. 6.6 months; $p < 0.01$). This survival advantage could be attributed to better compliance with TTF therapy in this group of patients. In support of this finding, a statistically significant correlation was seen in the NovoTTF group between treatment compliance (as measured by the device computerized log file) and OS ($p = 0.0475$).

The second analysis is a post hoc, exploratory analysis of the treatment of 120 patients with NovoTTF compared with 86 patients with bevacizumab. Although without a prespecified analysis in the trial, patients in the study treated with NovoTTF lived significantly longer than those treated with bevacizumab (6.0 months vs. 5.0 months, respectively; $p = 0.048$, $HR = 0.66$).[21] This analysis included all TTF patients who received either bevacizumab or NovoTTF. Patient characteristics were almost identical and, in fact, favored the bevacizumab group pragmatically. Clearly, this analysis cannot be taken as final evidence of superiority of NovoTTF over bevacizumab; however, it should be treated as hypothesis-generating data for future clinical studies. Finally, in the 48 patients who entered the study after bevacizumab therapy failure (approximately 20% of patients in both groups), OS was significantly longer with TTF therapy

than with chemotherapy (4.4 months vs. 3.1 months, respectively; $p = 0.02$). The data for the chemotherapy-treated group is in line with previous publications, which showed that following bevacizumab failure, the survival of patients with recurrent GBM is limited.[22]

Based on the results of this pivotal phase III study, the FDA approved the NovoTTF-100A device on April 8, 2011, through the premarket approval (PMA) regulatory pathway. The PMA pathway is reserved for class III (high-risk) medical devices and requires preclinical, clinical, and manufacturing evidence, including review of both efficacy and safety data by a panel of independent experts. The FDA concluded that the study results showed NovoTTF to be comparable in efficacy to active chemotherapy, without many of the side effects associated with chemotherapies and with a better quality of life.[23]

## Clinical Trials Evaluating TTF Therapy in Combination with Chemotherapy

Two studies of combined TTF therapy and chemotherapy have been published to date. The first was a single-arm, single-center trial performed in 2006 in patients with newly diagnosed GBM.[4] Patients received the Stupp protocol with TTF therapy added to maintenance temozolomide.[24] This trial showed promising PFS and OS data (PFS > 14 months; OS > 39 months; Table 3) and served as the basis for an ongoing, multicenter, pivotal phase III, randomized clinical study comparing TTF therapy and temozolomide with temozolomide alone in the maintenance stage of the Stupp protocol.

The second study tested TTF therapy together with pemetrexed in 42 patients with pretreated, advanced non-small cell lung cancer.[8,13,25] Efficacy and safety with this combined treatment paradigm were promising. Time to local disease progression in the lungs and liver (where TTF was applied) was 28 weeks, and OS was 13.8 months. In contrast, TTF and OS for pemetrexed alone were previously reported to be 12 weeks and 8.3 months, respectively.[26]

TTF therapy is still in its early days. However, it has an established mechanism of action, and a growing body of preclinical evidence has shown its wide applicability in solid tumor malignancies either alone or in combination with standard chemotherapies. Objective antitumor activity and an unprecedented safety profile of this treatment modality have been seen in patients with recurrent GBM. Although TTF monotherapy has been shown to be at least as effective as the best available chemotherapies today for recurrent GBM, in-depth analysis of the phase III study data identified at least two subgroups where TTF therapy was superior to chemotherapy and could be offered to patients as an alternative to chemotherapy: younger patients with a better functional status and patients in whom bevacizumab treatment has failed in the past.

## Conclusion

The approval of TTF therapy for recurrent GBM ushers in a fourth modality of cancer treatment. More importantly, TTF treatment has a superior safety profile, and its minor side effects do not appear to overlap with those of cytotoxic chemotherapies, targeted agents, or antiangiogenic drugs. Therefore, the rational combination of TTF therapy with specific pharmacologic agents may enhance tumor cell death

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 589 of 631   Document 11-5

Page 158 of 204 received on 6/5/2018 11:39:24 PM (Central Daylight Time)   JB_5B173E312028   25976

4820

because of potential additive or synergistic effects. First, as demonstrated in preclinical and clinical models, chemotherapy administered together with TTF therapy may result in additive or synergistic tumor control without increasing systemic toxicities. Second, TTF treatment could be combined with targeted agents that block survival signaling within the tumor cell. This block may be sufficiently strong to enhance the cytotoxic effect of TTF therapy or vice versa.

Third, the combination of TTF and antiangiogenesis agents may be another promising path that combines different antitumor treatments to improve tumor control. Lastly, the proper scheduling of TTF therapy with other agents is unknown. Additional research may shed light on the optimal scheduling that may achieve a synergistic effect on tumor growth leading to long-term tumor control and enhanced patient survival.

## Authors' Disclosures of Potential Conflicts of Interest

| Author | Employment or Leadership Positions | Consultant or Advisory Role | Stock Ownership | Honoraria | Research Funding | Expert Testimony | Other Remuneration |
|---|---|---|---|---|---|---|---|
| Philip H. Gutin | | | | | Novocure | | Novocure |
| Eric T. Wong | | | | | Novocure | | |

## REFERENCES

1. Maxwell JC. A Dynamical Theory of the Electromagnetic Field. *Royal Society Transactions*. CLV:1865.

2. Palti Y, Schneiderman R, Gurvich Z, et al. Cell proliferation arrest and tumor cell destruction by low intensity, frequency tuned electric fields. 2004 *AACR Meeting Abstracts*. (abstr 1000).

3. Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of cancer cell replication by alternating electric fields. *Cancer Res.* 2004;64:3288-3295.

4. Leu EX, Wong ET, Swanson KD. Mitotic Interference of Cancer Cells During Anaphase By Electric Field from NovoTTF-100A. *Neuro Oncol.* 2011;13:iii10-iii51 (suppl 3; abstr OS-17).

5. Kirson ED, Dbaly V, Tovaryc F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. *Proc Natl Acad Sci U S A.* 2007;104:10152-10157.

6. Schneiderman R, Shmueli E, Kirson B, et al. Synergism between chemotherapy and alternating electric fields in the inhibition of cancer cell proliferation in-vitro. 2007 AACR Meeting Abstracts. (abstr 2376).

7. Schneiderman RS, Shmueli E, Kirson ED, et al. TTFields alone and in combination with chemotherapeutic agents effectively reduce the viability of MDR cell sub-lines that over-express ABC transporters. *BMC Cancer.* 2010;10:229.

8. Weinberg U, Proserl I, Kuang M, et al. An Open Label Pilot Study of Tumor Treating Fields (TTFields) in Combination with Pemetrexed for Advanced Non-small Cell Lung Cancer (NSCLC). 2010 *RINJ Annual Congress*. (abstr 368).

9. Kirson ED, Schneiderman RS, Dbaly V, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). *BMC Med Phys.* 2009;9:1.

10. Kirson ED, Giladi M, Gurvich Z, et al. Alternating electric fields (TTFields) inhibit metastatic spread of solid tumors to the lungs. *Clin Exp Metastasis.* 2009;26:633-640.

11. Flora M, Weinberg U. Tumor treating fields: Concept, evidence and future. *Expert Opin Investig Drugs.* 2010;80:1099-1106.

12. Kirson ED, Wasserman Y, Ishaki A, et al. Modeling tumor growth kinetics and the implications for TTFields treatment planning. *Neuro Oncol.* 2010;12:iv39-iv57 (suppl 4; abstr NO-54).

13. Palti Y. Stimulation of muscles and nerves by means of externally applied electrodes. *Bull Res Counc Isr Sect E Exp Med.* 1966;12:54-56.

14. Shiegal P, Mathews G. Electrical stimulation of the rat diencephalon: Differential effects of interrupted stimulation on on- and off-responding. *Brain Res.* 1977;128:319-333.

15. Yearwood TL, Hershey B, Bradley K, et al. Pulse width programming in spinal cord stimulation: A clinical study. *Pain Physician.* 2010;13:321-335.

16. Salzberg M, Kirson E, Palti Y, et al. A pilot study with very low-intensity, intermediate-frequency electric fields in patients with locally advanced and/or metastatic solid tumors. *Onkologie.* 2008;31:362-366.

17. Wong ET, Gisera MJ, et al. Outcomes and prognostic factors in recurrent glioma patients enrolled onto phase II clinical trials. *J Clin Oncol.* 1999;17:2572-2578.

18. Stupp R, Kanner A, Engelhard H, et al. A prospective, randomized, open-label, phase III clinical trial of NovoTTF-100A versus best standard of care chemotherapy in patients with recurrent glioblastoma. *J Clin Oncol.* 2010;28:18s (suppl; abstr LBA2007).

19. Wong ET, Ram Z, Gutin PH, et al. Updated survival data of the phase III clinical trial of NovoTTF-100A versus best standard chemotherapy for recurrent glioblastoma. *Neuro Oncol.* 2011;13:iii83-iii91 (suppl 3; abstr OT-007).

20. Ram Z, Gutin PH, Stupp R. Subgroup and quality of life analyses of the phase III clinical trial of NovoTTF-100A versus best standard chemotherapy for recurrent glioblastoma. *Neuro Oncol.* 2010;12:iv48-iv67 (suppl 4; abstr NO-55).

21. Ram Z, Gutin PH, Wong GT. Comparing the effect of NovoTTF to bevacizumab in Recurrent GBM: A Post-Hoc Sub-Analysis of the Phase III Trial Data. *Neuro Oncol.* 2011;13:iii1-iii89 (suppl 3; abstr NO-63).

22. Iwamoto FM, Abrey LE, Beal K, et al. Patterns of relapse and prognosis after bevacizumab failure in recurrent glioblastoma. *Neurology.* 2009;73:1200-1206.

23. FDA: NovoTTF-100A Information for Use. 2011. http://www.accessdata.fda.gov/cdrh_docs/pdf10/P100034a.pdf. Accessed February 26, 2012.

24. Stupp R, Mason WP, van den Bent MJ, et al. Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. *N Engl J Med.* 2005;352:987-996.

25. Flora M, Scthlcher DC, Busso M, et al. A phase II study of tumor treating fields (TTFields) in combination with pemetrexed for advanced non-small cell lung cancer (NSCLC). *Ann Oncol.* 2010:viii122-viii101.

26. Hanna N, Shepherd FA, Fossella FV, et al. Randomized phase III trial of pemetrexed versus docetaxel in patients with non-small-cell lung cancer previously treated with chemotherapy. *J Clin Oncol.* 2004;22:1589-1597.

27. Kirson E, Gurvich Z, Ishaki A, et al. Alternating electric fields (TTFields) inhibit metastatic spread of solid tumors to the lungs in-vivo. 2009 AACR Meeting Abstracts. (abstr 161).

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 590 of 631   Document 11-5

# Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors

Eilon D. Kirson*, Vladimír Dbalý†, František Tovaryš‡, Josef Vymazal‡, Jean F. Soustiel§, Aviran Itzhaki*, Daniel Mordechovich*, Shirley Steinberg-Shapira*, Zoya Gurvich*, Rosa Schneiderman*, Yoram Wasserman*, Marc Salzberg¶, Bernhard Ryffel∥, Dorit Goldsher§, Erez Dekel*, and Yoram Palti*,**††

*NovoCure Limited, Matam Advanced Technology Centre, Haifa 31905, Israel; †Na Homolce Hospital, Roentgenova 2, 150 30 Prague 5, Czech Republic; ‡Nemocnice Na Homolce Medical Center, PO Box 9502, Haifa 31096, Israel; §Basel University Hospitals, Hebelstrasse 32, 4031 Basel, Switzerland; ¶Centre National de la Recherche Scientifique, Laboratoire d'Immunologie et Embryologie Moléculaire, Rue de la Ferollerie, 45071 Orleans, France; ∥Weizmann Institute of Science, PO Box 26, Rehovot 76100, Israel; and **B. Rappaport Faculty of Medicine, Technion–Israel Institute of Technology, Technion City, Haifa 32000, Israel

Communicated by Joseph Schlessinger, Yale University School of Medicine, New Haven, CT, January 15, 2007 (received for review January 15, 2007)

We have recently shown that low intensity, intermediate frequency, electric fields inhibit by an anti-microtubule mechanism of action, cancerous cell growth in vitro. Using implanted electrodes, these fields were also shown to inhibit the growth of dermal tumors in mice. The present study extends these findings to additional cell lines [human breast carcinoma MDA-MB-231, and human non-small-cell lung carcinoma (H1299)] and to animal tumor models (intradermal B16F1 melanoma and intracranial F-98 glioma) using external insulated electrodes. These findings led to the initiation of a pilot clinical trial of the effects of TTFields in 10 patients with recurrent glioblastoma (GBM). Median time to disease progression in these patients was 26.1 weeks and median overall survival was 62.2 weeks. These time to disease progression and OS values are more than double the reported medians of historical control patients. No device-related serious adverse events were seen after >70 months of cumulative treatment in all of the patients. The only device-related side effect seen was a mild to moderate contact dermatitis beneath the field delivering electrodes. We conclude that TTFields are a safe and effective new treatment modality which effectively slows down tumor growth in vitro, in vivo and, as demonstrated here, in human cancer patients.

cancer | glioblastoma | tumor treating fields

**B**ecause living cells consist of ions, polar or charged molecules, membranes, and organelles, they are responsive to and often generate electric fields and currents. The electric activity of cells plays a key roll in many essential biological processes. The electric fields associated with all of the above phenomena are in the range of 0–10 V/cm, except within cell membranes (1) where they may reach 10⁵ V/cm. Whereas electric fields induce ion flow, polar molecules only orient themselves along the lines of a uniform field (2). However, nonuniform electric fields exert forces on polar molecules forcing them to move toward higher field intensity, a well known process known as dielectrophoresis (3, 4). Electric fields and resulting currents, when sufficiently large, stimulate nerves, muscles, cardiac muscle, etc. Only much larger fields generate heat that may damage cells (5).

In an electric field of alternating direction (ac field) all charges and polar molecules are subjected to forces, of alternating direction so that ionic flows and dipole rotation oscillate (1). In view of the relatively slow kinetics of the bioelectrical responses, as the ac fields' frequency is elevated, their biological effect (except for heating) is reduced such that, >10 kHz, it becomes negligible. Therefore, it is generally believed that ac fields of 100 kHz or above have no meaningful biological effects (5), although a number of nonsignificant effects have been described (6–8).

In contradiction to this belief, we have recently demonstrated (9) that 100 kHz to 1 MHz ac fields have significant specific effects on dividing cells. The basis of these effects during cytokinesis was shown to be the unidirectional forces induced by

the inhomogeneous fields at the bridge separating the daughter cells (Fig. 1D) that interfere with spindle tubulin orientation and induce dielectrophoresis.

It is the aim of this work to further study the effects of ac fields on quiescent and proliferating cells in culture, animal cancer models, and cancerous tumors in humans. Following a basic work on cell cultures (9), we demonstrate here that such fields, termed tumor treating fields (TTFields), are effective when applied by insulated external electrodes to animal cancer models and patients with recurrent glioblastoma (GBM). In a pilot clinical trial conducted on this extremely malignant tumor of glial cell origin (10, 11), TTFields treatment was found to be both safe and effective in slowing tumor progression. These promising results raise the possibility that TTFields could become a new treatment modality for cancer.

## Results

### Cells in Culture

The effects of a 24-h exposure of four of the most common types of cancer [malignant melanoma, glioma (part of the data for malignant melanoma and glioma cells was taken from ref. 9), breast carcinoma, and non-small-cell lung carcinoma to TTFields] are illustrated in Fig. 2. It is seen that the number of unexposed (control) cells roughly doubles every 24 h, whereas the proliferation rate of the exposed cells is slowed down during exposure and gradually recovers after treatment is terminated (Fig. 2A). The frequency dependency of the effects is depicted in Fig. 2B. It is seen that the optimal frequency is 100 kHz for mouse melanoma (B16F1), 150 kHz for human breast carcinoma (MDA-MB-231), and 200 kHz for rat glioma (F-98). In addition, similar experiments were performed in two human glioma cell lines (U-118 and U-87). In both, the optimal TTFields frequency was identical to rat glioma cell lines (i.e., 200 kHz).

The "dose-response curve," i.e., the relationship between the TTFields effects and field intensity, is given in Fig. 2C. It is seen that effect on cell division and cell death (by apoptosis) is intensity dependent, the sensitivity being highest for mouse

Author contributions: E.D.K., D.M., A.I., Y.W., E.D., and Y.P. designed research; E.D.K., V.D., F.T., J.V., J.F.S., A.I., D.M., S.S.-S., Z.G., R.S., M.S., B.R., D.G., D.O., and Y.P. performed research; E.D. contributed new reagents/analytic tools; E.D.K., V.D., F.T., J.V., D.M., S.S.-S., Z.G., R.S., Y.W., E.D., and Y.P. analyzed data; and E.D.K., R.S., and Y.P. wrote the paper.

Conflict of interest statement: Y.P. has a minority holding in NovoCure Ltd. and is a member of the company board of directors; E.D.K., A.I., D.M., S.S.-S., Z.G., R.S., and Y.W. are employed in full or part by NovoCure Ltd.; and M.S. is a clinical trial consultant to NovoCure Ltd.

Freely available online through the PNAS open access option.

Abbreviations: FEM, finite element model; GBM, glioblastoma; OS, overall survival; PFS6, progression-free survival at 6 months; TTFields, tumor treating fields; TTP, time to disease progression.

††To whom correspondence should be addressed. E-mail: yoram@nova-cure.com

This article contains supporting information online at www.pnas.org/cgi/content/full/0702916104/DC1.

© 2007 by The National Academy of Sciences of the USA

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 591 of 631 Document 11-5
Page 160 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]





**Fig. 1.** acfield distribution in and around quiescent(A) and dividing (B) cells. Inside quiescent cells, the field is uniform, and the oscillating electric forces result only in "vibration" of ions and dipoles (the forces associated with each half cycle are denoted white and gray arrows). In contrast, the nonuniform field within dividing cells (B) induces forces pushing all dipoles toward the furrow. Note that at frequencies of 0.1–1.0 MHz, the cell membrane impedance is relatively high, so only a small fraction of the currents penetrate the cells as seen from the density of lines.

melanoma cells, decreasing for rat glioma and for human non-small-cell lung carcinoma and lowest for human breast carcinoma.

From the mechanism of action of TTFields, as illustrated in Fig. 1, it can be deduced that their efficacy must be a function of the angle between the field and axis of division; when the two are parallel its maximal and when one is perpendicular to the other, it must be minimal. Because in culture the axis of division is randomly oriented, only a fraction of the dividing cells are subjected to optimal treatment. To overcome this problem, multiple field directions were applied sequentially every 0.25-1 sec. Two perpendicular fields were found to be ~20% more effective than the single-direction one for B16F1 and F-98 cells. This result is consistent with the previously reported effects on malignant melanoma cells (9).

### Animal Tumor Models

**Intracranial Glioblastoma.** Our report (9) described the effects of TTFields applied by means of implanted electrodes to intradermal malignant melanoma in mice. This report compares 40 Fischer rats inoculated intracranially with glioma cells, treated by means of external electrodes with a temperature, and geometry matched electrode control group. The treatment duration was 6 days, using the optimal frequency of 200 kHz (see Fig. 2) at 2 V/cm. Fig. 3 depicts the computed field distribution in the rat brain (Fig. 3A), exemplary posttreatment MRI images of a control (Fig. 3B) and a treated tumor (Fig. 3C). The maximal diameter of the treated tumor is about half that of the control one.

The average inhibitory effect of unidirectional TTFields (in a temporal-temporal direction) was small and did not reach statistical significance (treated tumor volume 19.8% smaller than sham control tumors; $n = 26$; $P = 0.19$, Student's $t$ test). However, increasing the number of TTFields directions caused statistically significant inhibition of tumor growth, reaching 42.6% and 53.4% for two ($n = 42$; $P < 0.01$, Student's $t$ test) and three ($n = 10$; $P < 0.01$, Student's $t$ test) directions positioned at 45–90° to each other, respectively.

**Frequency Dependence of the Inhibitory Effect of TTFields.** The TTFields inhibitory efficacy vs. frequency was studied on mice inoculated with B16F1 melanoma. The mice ($n = 26$) were treated for 5 days by single-direction TTFields of different frequencies. The maximal growth inhibition was found at 100 kHz, with the treated tumor size $62.7 \pm 8.9\%$ that of control tumors. Although this frequency dependence *in vivo* did not reach statistical significance (single-factor ANOVA, $P = 0.11$), it shows the same frequency dependency as the dependence of cultured B16F1 cells reported in ref. 9, which supports the



**Fig. 2.** Time, frequency, and intensity dependence of the effect of TTFields on cancer cell proliferation. (A) The number of cells in untreated cultures (filled symbols) as compared with cultures treated with TTFields (open symbols) for 24 h (1.75 V/cm for MDA-MB-231, F-98, and H1299 cells and 1.1 V/cm for B16F1 cells). (B) The relative change in number of cells after 24 h of treatment of different frequencies (same TTFields intensity). (C) The effect of 24 h of exposure to TTFields of increasing intensities (at optimal frequencies). ■ and ○, B16F1; ■ and □, MDA-MB-231; ▲ and △, F-98; ♦ and ◇, H1299.

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 592 of 631 Document 11-5   4823
Page 161 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_9B173E312028   29576

PNAS

5 0 1 8 3 1 3 X 0 5 8 6 5



**Fig. 3.** TTFields inhibition of the growth of intracranial glioma. (A) FEM simulations (using a three-dimensional mesh) of the distribution of TTFields intensity within a simplified rat brain model. (B and C) Exemplary T1 weighted coronal MRI sections (after IV injection of Gd-DTPA) of the heads of a control and a TTFields treated (200 kHz, two-directional TTFields) rat, respectively. In both examples, the section shown is that with the largest diameter tumor. Head simulations are 3.1 × 1.9 cm ellipsoid; skin thickness, 0.4 mm ($\sigma$ = 0.00045 S/m; $\epsilon$ = 1,120); skull thickness, 1.1 mm ($\sigma$ = 0.015 S/m; $\epsilon$ = 16); thickness of the CSF surrounding the brain, 0.5 mm ($\sigma$ = 2 S/m; $\epsilon$ = 109); and brain itself has the properties of a uniform white matter ($\sigma$ = 0.15 S/m; $\epsilon$ = 3,200). The electrodes placed over a 0.5-mm layer of hydrogel. Note the almost uniform field intensity in most brain volume. (Scale bars, 1 cm.)

conclusion that this is the optimum frequency. In contrast, rats bearing intracerebral glioma were unaffected by 100 kHz TTFields, whereas 200 kHz TTFields caused significant inhibition of tumor growth.

**Safety Profile of TTFields in Healthy Animals.** TTFields (100 kHz) at 6 V/cm were applied to the chest of three New Zealand rabbits. No changes were seen in the rate or regularity of cardiac rhythm

throughout and following the exposure. To test the safety of chronic TTFields application TTFields were applied to either the head ($n$ = 30, 1 V/cm for 4 weeks) or the chest ($n$ = 10, 9 V/cm for 2 weeks) of New Zealand Rabbits. All animals were assessed weekly for weight, temperature, ECG, CBC, wide chemistry panel and coagulation. After a 1-month follow-up period, all animals were killed and had samples of major organs examined by a pathologist. No treatment-related toxicities were recorded in any of the animals.

### GBM Patients

**TTFields Treatment of Patients with Recurrent GBM Brain Tumor.** Ten patients with recurrent GBM were included in the trial [see *Materials and Methods* and supporting information (SI) Table 1].

As seen in Fig. 4A, the median time to disease progression (TTP) of the patients is 26.1 weeks (range 3–124 weeks) and the progression-free survival at 6 months (PFS6) is 50% (23–77%, 95% confidence interval). Two of the patients were still progression free at study closure.

The median overall survival (OS) of TTFields treated patients is currently 62.2 weeks (range 20.3–124.0 weeks). These TTP and OS values are more than double the reported medians of historical control patients. Three of the patients are still alive at this time. The Kaplan–Meier survival curve (12) of the treatment results is shown in Fig. 4B.

The TTFields treatment resulted in one complete response (Fig. S4) which is still tumor free per MRI ten months after stopping treatment and one partial response (Fig. S5) that is still responding 7 months after stopping treatment. Both are still progression free >2 years from treatment initiation. In addition one patient had minimal response and four had stable disease for over 4 months before progressing.

**Safety Profile of TTFields Applied to GBM Patients.** The 10 recurrent GBM Patients received treatment for a total of 280 weeks without a single treatment-related serious adverse event and no significant changes were seen in serum chemistry or blood count in any of the patients. The only changes seen consistently were elevated liver enzymes, attributed to anti-epileptic drug usage. Two patients had partial seizures that were unrelated to treatment. Nine of ten patients suffered from a mild to moderate contact dermatitis beneath the electrode gel. This treatment-related adverse event responded well to application of steroid creams and periodic electrode relocation.



**Fig. 4.** Efficacy of TTFields treatment in recurrent GBM. (A) TTP of treated patients ($n$ = 10); median TTP is 26.1 weeks (dashed black line). (B) Kaplan–Meier OS curve for NovoTTF-100A treated patients ($n$ = 10). The median OS in these patients is 62.2 weeks (black dashed line), and the 1-year survival rate is 67.5% (blue dashed line).

Page 162 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 593 of 631    Document 11-5
JB_SB173E312028          25976          4824



**Fig. 5.** Exemplary T1-weighted, post contrast, MRI scans of recurrent GBM patients before (*Left*) and after (*Right*) TTFields treatment. (*A*) Complete response after 8 months of treatment. (*B*) Stable disease (10% reduction in contrast enhancing area) after 9 months of treatment.

## Discussion

Alternating electric fields have been shown to have a wide range of effects on living tissues. At very low frequencies (<1 KHz), electric fields stimulate excitable tissues through membrane depolarization (13) and have been claimed to stimulate bone growth and accelerate fracture healing (14). However, as the frequency of the electric field increases the stimulatory effect diminishes, whereas above MHz a completely different biological effect, tissue heating, becomes dominant (15, 16).

Alternating electric fields of intermediate frequencies (10 kHz to 1 MHz) were considered not to have any meaningful non-thermal biological effects (5). An exception, are the TTFields described in ref. 9. This presumed lack of effect of such fields is consistent with the fact that when electric fields, that exert forces only on charges and dipoles reverse direction at a high frequency, their net effect tends to null out. Thus, the effects were minor and have neither been shown to be beneficial or detrimental to humans (5, 8, 17).

In this study we try to use TTFields as a new cancer treatment modality. We first extended the In Vitro study of TTFields effect on glioma and melanoma cells (9) to several of the most prevalent cancers: breast carcinoma and non-small-cell lung carcinoma. It was found that the proliferation of these cells is arrested and the cells are destroyed (Fig. 2). The optimal frequencies differed between cancer cell types. To understand this finding we calculated the force on a 1 μm polarizable spherical particle in a dividing cell as a function of cell radius, membrane thickness and cytoplasm conductivity. It was found that optimal TTFields frequency is inversely related to cell size (see SI Appendix A) in a way consistent the diameter variability of the different cell types studied.

In the previous study (9) animal treatment was done by using implanted electrodes. In the present study we used the much more practical externally applied electrodes. Furthermore, as the available data suggests that treatment may need to be prolonged, the use of conducting electrodes may result in serious problems: local damage to the skin because of electrolysis and the generation of free radicals at the electrode-tissue interface, skin permeabilization by the transdermal currents (18, 19), and calcium accumulation within cells (20) that can result in cell death (21). Clearly, the first 2 adverse effects do not occur at the surface of insulated electrodes. Using fluorescence calcium imaging techniques, we could demonstrate that electric field

induced calcium accumulation is eliminated by the use of insulated electrodes (see SI Appendix B). However, the large potential drop across the insulation high impedance poses a serious problem; to generate the fields of the required intensity potentials of >1,000 V must be used. As such high voltages may compromise patient safety, low impedance electrodes were developed. The impedance of insulation is lowered by using an insulating material, lead magnesium niobate–lead titanate (PMN-PT) (EDO, New York, NY), that has a dielectric constant of e > 5,000. Under these conditions the electrodes have a capacitance of ~10nF/cm², i.e., an impedance of 100–200 Ω at the TTFields frequency range. Thus, only 50% of the applied voltage is lost on the insulation in the mice experiments. The corresponding potential drop on the 22.5 cm² electrodes placed on the patient's head, in the trial presented here, is only ~10% of the applied voltage.

A major limitation of all current cancer treatments is their unfavorable therapeutic index. Two types of toxicities may be expected from an electric field based treatment. First, the fields could theoretically affect excitable tissues causing cardiac arrhythmias or seizures. However, such effects are not expected to occur, because for sinusoidal alternating fields of >10 kHz, excitation of nerves and muscles decreases dramatically, because of the parallel resistor-capacitor nature of the cell membrane (22). Indeed, in both acute and chronic application of TTFields to animals and patients, there was no trace of abnormal cardiac or neurological activity. Secondly, TTFields might be expected to damage rapidly dividing normal cells within the body, i.e., bone marrow and small intestine mucosa. However, no treatment-related toxicities were found in any of the treated patients or upon animal exposure to field intensities threefold higher than the effective anti-tumoral dose. With regards to hematopoiesis the reason for this is that these cells, which reside mainly in the bone marrow, are protected from the TTFields by the high impedance of both the bone and bone marrow (23). This was demonstrated by calculating the TTFields distribution in an extremity, such an a leg, by using the finite element mesh (FEM) method. It was found that the field intensity is 100-fold lower within the bone marrow compared with the surrounding tissues. The lack of damage to intestinal mucosa probably reflects that the small intestine mucosal cells have a slower replication rate than neoplastic cells (24) and that the intestine changes its orientation, relative to the applied field, often lowering the efficacy of the mitotic disruption.

The tumor inhibitory effect of TTFields has been attributed previously to two separate mechanisms (9): interference with the formation of the mitotic spindle microtubules and physical destruction of cells during cleavage, both of which are strongly dependent on the orientation of mitosis axis versus the field vectors. Because the relative orientation of the mitosis axis during cytokinesis is random, it would be expected that only a fraction of dividing cells would be affected by TTFields of any specific direction. To overcome this problem, we applied sequentially several field directions and have shown that increasing the number of directions from 1 to 3, resulted in a significant increase in the anti-proliferative efficacy of TTFields in vitro and in vivo.

Following encouraging evidence from experimental animals, a clinical trial of the effect of TTFields on patients with recurrent GBM was initiated. Because in vitro data indicate that TTFields are most effective when applied for >16 h continuously (data not shown), patients were treated daily for an average of 18 h per day until progression. The results reported here are the first evidence of the safety and efficacy of TTFields used to treat cancer in patients. Preliminary accounts of this data were published in

Page 163 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)

abstract form.[11][12][13] Because this was a pilot trial there was no randomized control group and the results were evaluated by comparing to historical control data. Most historically controlled pilot studies in recurrent GBM are centered around a large metaanalysis performed by Wong et al. in 1999 (10) and to this data we added the four prospective trials (25–28), which included >50 GBM patients, performed since that date. The average historical PFS6 based on the above studies is 15.3 ± 3.8%, and the average historical TTP is 9.5 ± 1.6 weeks. On averaged 29.3 ± 6 weeks (see SI Table 2). When compared with these outcomes, the efficacy data collected in the current pilot trial is extremely promising (TTP, 26.1 weeks; PFS6, 50%; and OS, 62.2 weeks). These results were not accompanied by hematological or gastrointestinal toxicities, epileptic seizures, cardiac arrhythmias, etc., despite >70 months of cumulative treatment. The only side effect detected was contact dermatitis beneath the electrodes. This reaction is most likely the result of a combination of factors, including chronic moisture, heat, and occlusion of the skin; chemical irritation by constituents of the hydrogel and medical tape (29); and possibly inhibition of cellular replication in the skin by the TTFields. Thus, in conclusion, this treatment modality was well tolerated and caused almost no toxicity at all.

In summary, we demonstrated initially that TTFields are effective in arresting the proliferation and inducing death in a wide range of tumor cells in culture as well as solid tumors in animals. On this basis a clinical trial was carried out treating human patients suffering from recurrent GBM, a malignant brain tumor. It was demonstrated that the TTFields inhibit the growth of this highly treatment-resistant tumor by using special insulated electrodes, with little or no side effects. Can we expect to have similar efficacy on other human tumors? The fact that in cultures and animal models TTFields were found to be effective on all cells and tumors tested is definitely encouraging. Furthermore, TTFields being a physical, rather than chemical, modality, their efficacy is likely to be highly insensitive to specific interactions with tumor and patient receptors and other characteristic elements. Thus, like irradiation, they have the potential to be effective over a wide range of tumors. However, from the above it is apparent that their practical specificity to cancerous cells is significantly higher than that of irradiation, the therapeutic efficacy of which is often severely limited by toxicity. Therefore, we believe that there is a high probability that TTFields may prove to be an effective and safe therapeutic modality for a large number of human cancers.

## Materials and Methods

**Cell Cultures.** Cell cultures were grown in DMEM plus 10% FCS media in a $CO_2$ incubator (5% $CO_2$) at 37°C. Cell suspension (200 μl; total 20 × 10³ cells) were placed as a drop in the center of 35-mm Petri dishes, incubated for 24 h and then the cell number was estimated by using standard XTT method (Cell proliferation assay Kit; Biological Industries Ltd., Israel) and expressed as $OD_1$. Temperature was measured by a thermocouple (Omega, Stamford, CT) placed at the center of the dish. Two pairs of electrodes, insulated by a high dielectric constant ceramic [lead magnesium niobate–lead titanate (PMN-PT)], positioned in the petri dish perpendicular to each other were connected to a sinusoid function generator and amplifier. Two-directional fields were generated sequentially (1) by switching the output of the amplifier between two pairs of electrodes every

0.25–1 sec. The electric field intensity in the culture medium was measured as described in ref. 1.

At the end of 24 h of treatment, the cell number was measured by using the XTT method and expressed as $OD_2$. The rate of cell proliferation was expressed as the $OD_1/OD_2$ ratio.

**Animal Models. Tumor Inoculation and in vivo size assessment.** Animal experiments were conducted after approval by the Technion–Israel Institute of Technology committee for the care of laboratory animals. Intracranial glioma (F-98) was inoculated stereotactically into the subcortical white matter in the right hemisphere of Fischer rats (Harlan laboratories, Israel) by using a modification of the method described in refs. 30 and 31. Briefly, a hole, 1 mm in diameter, was punched through the scalp, 2 mm to the right of the midline and 4 mm rostral to the line connecting the external ear canals. A 0.5 mm burr hole was drilled in the bone at same location and a 26G needle was inserted to a depth of 7 mm beneath the scalp surface. Five microliters of saline containing $2.5 \times 10^5$ F-98 cells was then injected by using a microsyringe operated by a micromanipulator. The needle was left in position for 60 sec and then retracted slowly at a rate of 2 mm/min. Rats were allowed to recuperate for 24 h before treatment initiation. Tumor volume was assessed based on serial (2-mm interval) T1 weighted axial MRI images (0.5 Tesla MRI; Gyrex orbital coil, Elscint, Haifa, Israel) obtained 10 min following injection of 0.7 ml of Gadolinium (Magnetol; Soreq Radiopharmaceuticals, Yavne, Israel) into the tail vein. Tumor volume was assessed by calculating the area in square millimeters of the contrast enhanced lesion in each section. In view of the small size of the head of the rat, only three electrodes could be positioned on it, generating one to three different field directions.

**Computation of the distribution of electric fields generated by external insulated electrodes.** The distributions of the alternating electric field generated by external electrodes within the brains of rats were estimated by using FEM simulations. These field distributions are determined by the geometry and electrical properties of the electrodes and tissues. On average, the capacitance of each electrode is 8 nF. This translates into an impedance of 190 and 95 Ω at 100 and 200 kHz, respectively. Because the impedance of the rat head is on the order of 400 Ω, when applying 42 V, 200 kHz TTFields to rats, 14-V drop on the insulation of both electrodes and the remaining 28 V on the rat itself. The fields generated in the areas of interest are in the range of 1–2 V/cm. The calculated field distribution for the rat head is given in Fig. 3A.

**Human GBM Trial. GBM patient eligibility and characteristics.** Twelve patients, suffering from the brain tumor GBM were enrolled to the study. Patients eligible for enrollment had recurrence based on Macdonald criteria (32), were >18 years old, had histologically established GBM (World Health Organization grade IV), had a Karnofsky performance scale ≥ 70, and were at least 4 weeks from any brain surgery and at least 8 weeks from radiotherapy. Patients could be at any recurrence and may have received other salvage therapies before enrollment. All patients had received adjuvant Temozolomide for their primary tumor. No concomitant chemotherapy was allowed. Multifocal disease was allowed. Patients with significant comorbidities, infratentorial tumors, implanted pacemakers or documented clinically significant arrhythmias, were excluded from the trial. During review of the histology from postprogression debulking surgery, one patient was excluded from efficacy analysis because of failure to meet histological criteria for grade IV glioma. An additional patient dropped out of the trial immediately following the baseline visit because of withdrawal of consent. Individual patient characteristics are listed in SI Table 1.

[25]Ram, E. D., Obalp, V., Nechilrz, C., Towarzi, E., Safiberg, M., Palti, V., AACR Meeting Abstracts April 5, 2006, Washington, DC, Abstract 5259.

[26]Oblaij, V., Kirson, E. D., Palti, Y., Gutin, P.H., Congress of Neurological Surgeons, October 13, 2005, Boston, MA (abstr.).

[27]Gutin, P., Kirson, E., Palti, Y., International Brain Tumor Research and Therapy Meeting, April 26, 2006, Napa Valley, CA (abstr.).

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 595 of 631 Document 11-5

Page 164 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]

*The clinical trial.* A single arm, pilot trial of the safety and efficacy of TTField treatment was performed in 10 patients with recurrent GBM. Written informed consent was obtained from each subject. The trial was performed after approval by the Na Homolce Institutional Review Board and the Czech Ministry of Health. Efficacy analysis was performed for 10 recurrent GBM patients by comparing TTP, PFS6, and OS in recurrent GBM patients treated with the NovoTTF-100A device with the TTP, PFS6, and OS of recurrent GBM patients in a literature based historical control group (10, 25–28). No statistical hypothesis testing was planned because of the small sample size. Ninety-five percent confidence intervals of survival proportions were calculated from Kaplan–Meier survival curves, by using standard formulae (33).

*Measurement and simulation of TTFields intensity within the human brain.* To plan the TTFields intensity necessary to treat patients with intracranial tumors, we performed FEM simulations of the intensity distribution of TTFields within a three-dimensional model of the human head. Field intensity was slightly higher in the cortex than in the center of the brain (by ~30%), but effective (1–2 V/cm) TTFields could be generated at the center of the brain by applying ~50 V to surface electrodes placed on the scalp. To validate these findings, TTFields intensity was measured within the brain of a volunteer undergoing surgery because of obstructive hydrocephalus because of a huge meningioma of the pineal region. The study was performed according to an experimental protocol approved by the Rambam Medical Center ethics committee. The measured TTFields intensity was accurate within 10% of the FEM simulated values.

*TTFields treatment of GBM patients.* TTFields were applied to recurrent GBM patients by using the NovoTTF-100A device (Novo-Cure Ltd., Haifa, Israel). This portable battery-operated device generates TTFields in GBM patients by means of insulated electrodes placed on their shaved scalps. The area of each insulated electrode array used was 22.5 cm$^2$. Fields of 1–2 V/cm were generated by controlling the current density through the electrodes <31 mA/cm$^2$ RMS, approximately one-third of the level that is generally recognized to present a risk of skin injury (100 mA/cm$^2$). (34). In addition, the maximal power density beneath the electrodes was kept beneath 0.22 W/cm$^2$, i.e., below the level associated with thermal skin injury (35). Electrode temperature was monitored and the power was lowered automatically when the temperature of any electrode exceeded 41°C. This value is well below the threshold of 44°C, i.e., the lowest prolonged temperature that can cause thermal injury (34).

TTFields having the optimal frequency of 200 kHz for rat and human gliomas (see Fig. 2) and an intensity of 1–2 V/cm (peak) were used in the trial. TTFields were switched sequentially every 1 sec between two perpendicular directions; lateral and anterior-posterior, through two sets of insulated electrode pairs. Patients received treatment continuously until disease progression or for a maximum of 18 months. Treatment was applied daily for an average of 18 h per day.

*Patient evaluation.* Objective tumor assessment was performed by Gd-enhanced MRI according to a strictly defined protocol. MRI scanning was performed at trial entry within one week of NovoTTF-100A treatment initiation and after every treatment course (28–30 days). All scans were reviewed by a board certified radiologist (I.V.). The assessment of tumor response was based on criteria defined by Macdonald et al. (32). Study visits were performed once per week during the first month of treatment and monthly thereafter. The following examinations were carried out at each visit: Neurological evaluation; EKG; complete blood count with differential, chemistry panel, and coagulation studies. Adverse events occurring during treatment or up to 60 days after termination of therapy were scored according to the common toxicity criteria scale (version 3). Disease progression was not captured as a serious adverse event.

This work was supported by NovoCure Ltd.

1. Cole KS (1968) *Membranes, Ions and Impulses: A Chapter of Classical Biophysics* (Univ of Calif Press, Berkeley).
2. Keller EH, Oettys WE, Skove MJ (1992) *Physics* (McGraw-Hill, New York).
3. Chyan DS, Wheeler BK (2001) *Phys Rev E Stat Nonlin Soft Matter Phys* 64:026605.
4. Gonzalez CF, Remcho VT (2005) *J Chromatogr A* 1079:59–68.
5. Polk C, Postow E (1995) *Biological Effects of Electromagnetic Fields Handbooks, Manuals, Etc.* (CRC, Boca Raton, FL), p 618.
6. Gunter AD, Peilrig R (1982) *Parasitology* 117:S177–S189.
7. Schwan AJL (1984) *J Cell Biol* 99:1885–1996.
8. Takashima S, Schwan HP (1985) *Biophys J* 47:513–518.
9. Kirson BD, Gurvich Z, Schneiderman R, Dekel E, Itzhekh A, Wasserman Y, Schatzberger R, Palti Y (2004) *Cancer Res* 64:3288–3295.
10. Wong ET, Hess KR, Gleason MJ, Jaeckle KA, Kyritsis AP, Prados MD, Levin VA, Yung WK (1999) *J Clin Oncol* 17:2572–2578.
11. DeVita VT, Rosenberg SA, Hellman S (2001) *Cancer, Principles and Practice of Oncology* (Lippincott Williams & Wilkins, Philadelphia).
12. Kaplan EL, Meier P (1958) *J Am Stat Assoc* 457–481.
13. Polk C (1995) in *The Biomedical Engineering Handbook*, ed Bronzino JD (CRC, Hartford, CT), pp 1404–1416.
14. Bauset CA (1985) *Clin Plast Surg* 12:239–277.
15. Sloan E (1999) in *The Biomedical Engineering Handbook*, ed Bronzino JD (CRC, Hartford, CT), pp 1417–1423.
16. Chou CK (1995) in *The Biomedical Engineering Handbook*, ed Bronzino JD (CRC, Hartford, CT), pp 1424–1430.
17. Maier H (1997) *Biophys J* 73:1617–1626.
18. Webster JG, Clerk JW (1998) *Medical Instrumentation: Application and Design* (Wiley, New York).
19. Burnette RR, Ongpipattanakul B (1988) *J Pharm Sci* 77:132–137.
20. Cho MR, Thatte HS, Silvia MT, Golan DE (1999) *FASEB J* 13:677–683.
21. Orrenius S, McCabe MJ, Jr, Nicotera P (1992) *Toxicol Lett* 64–65 Spec:357–364.
22. Palti Y (1962) *Bull Res Counc Isr Sect E Exp Med* 10:54–56.
23. Bronzino JD (1995) *The Biomedical Engineering Handbook* (CRC, IEEE Press, Boca Raton, FL).
24. Ross MH, Kaye GI, Pawlina W (2003) *Histology: a Text and Atlas* (Lippincott Williams & Wilkins, Philadelphia).
25. Yung WK, Albright RE, Olson J, Fredericks R, Fink K, Prados MD, Brada M, Spence A, Hohl RJ, Shapiro W, et al. (2000) *Br J Cancer* 83:588–593.
26. Brada M, Hoang-Xuan K, Rampling R, Dietrich PY, Dirix LY, Macdonald D, Heimans JJ, Zonnenberg BA, Bravo-Marques JM, Henriksson R, et al. (2001) *Ann Oncol* 12:259–266.
27. Chang SM, Theodosopoulos P, Lamborn K, Malec M, Rabbitt J, Page M, Prados MD (2004) *Cancer* 100:605–611.
28. Rich JN, Reardon DA, Peery T, Dowell JM, Quinn JA, Penne KL, Wikstrand CJ, Van Duyn LB, Dancey JH, McLendon RE, et al. (2004) *J Clin Oncol* 22:133–142.
29. Ancona A, Arevalo A, Macotela B (1990) *Dermatol Clin* 8:95–105.
30. Langaa KJ, Claus RF, Holzshuch M, Muhlnaizigen H, Kiwit JC, Ziliex K, Coenen HH, Muller-Gartner HW (1998) *J Nucl Med* 39:1596–1599.
31. Sahi M, Ballinzona M, Mayor F, Cali O, Samii M (1999) *J Neurooncol* 42:39–67.
32. Macdonald DR, Cascino TL, Schold SC, Jr, Cairncross JG (1990) *J Clin Oncol* 8:1277–1280.
33. Altman DG (1999) *Practical Statistics for Medical Research* (Chapman & Hall, London).
34. Moritz AR, Henriques FCJ (1947) *Am J Pathol* 23:695–720.
35. Rocker CM, Malhotra IV, Houley-Whyte J (1973) *Anesthesiology* 38:106–122.

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 596 of 631   Document 11-5
4827
Page 165 of 204 received on 6/6/2018 10:24 PM (Central Daylight Time)   JB_5B173E312028   29976

[CANCER RESEARCH, 2268 3295, May 1, 2004]

# Disruption of Cancer Cell Replication by Alternating Electric Fields

Eilon D. Kirson,[1] Zoya Gurvich,[2] Rosa Schneiderman,[2] Erez Dekel,[3] Aviran Itzhaki,[4] Yoram Wasserman,[1,4] Rachel Schatzberger,[2] and Yoram Palti[2]

[1]Department of Biomedical Engineering, NovoCure Ltd., Haifa, Israel; [2]B. Rappaport Faculty of Medicine, Technion—Israel Institute of Technology, Haifa, Israel; [3]Department of Molecular Cell Biology, Weizmann Institute of Science, Rehovot, Israel; and [4]Rffrin Medical Centre, Haifa, Israel

## ABSTRACT

Low-intensity, intermediate-frequency (100–300 kHz), alternating electric fields, delivered by means of insulated electrodes, were found to have a profound inhibitory effect on the growth rate of a variety of human and rodent tumor cell lines (Patricia C, U-118, U-87, H-1299, MDA231, PC3, B16F1, F-98, C-6, RG2, and CT-26) and malignant tumors in animals. This effect, shown to be nonthermal, selectively affects dividing cells while quiescent cells are left intact. These fields act in two modes: arrest of cell proliferation and destruction of cells while undergoing division. Both effects are demonstrated when such fields are applied for 24 h to cells undergoing mitosis that is oriented roughly along the field direction. The first mode of action is manifested by interference with the proper formation of the mitotic spindle, whereas the second results in rapid disintegration of the dividing cells. Both effects, which are frequency dependent, are consistent with the computed directional forces exerted by these specific fields on charges and dipoles within the dividing cells. In vivo treatment of tumors in C57BL/6 and BALB/c mice (B16F1 and CT-26 syngeneic tumor models, respectively), resulted in significant slowing of tumor growth and extensive destruction of tumor cells within 3–6 days. These findings demonstrate the potential applicability of the described electric fields as a novel therapeutic modality for malignant tumors.

## INTRODUCTION

In the laboratory setting and in clinical practice, alternating electric fields show a wide range of effects on living tissues. At very low frequencies (under 1 kHz), alternating electric fields stimulate excitable tissues through membrane depolarization (1). The transmission of such fields by radiation is insignificant, and therefore they are usually applied directly by contact electrodes, although some applications have also used insulated electrodes. Some well-known examples of such effects include nerve, muscle, and heart stimulation by alternating electric fields (1, 2). In addition, low-frequency pulsed electric fields have been claimed to stimulate bone growth and accelerate fracture healing (3). However, as the frequency of the electric field increases above 1 kHz, the stimulatory effect diminishes. Under these conditions, although a greater fraction of the fields penetrate the cells, due to the parallel resistor-capacitor nature of all biological membranes, the stimulatory power greatly diminishes as the alternating cell membrane hyper-depolarization cycles are integrated such that the net effect is nulled. At very high frequencies (i.e., above many MHz), although the integration becomes even more effective, a completely different biological effect is observed. At these frequencies tissue heating becomes dominant due to dielectric losses. This effect becomes more intense as frequency, field intensity, or tissue dissipation factor increases (4). This phenomenon serves as the basis for some commonly used medical treatment modalities (including diathermy and radio frequency tumor ablation, which can be applied through insulated electrodes (5). Intermediate-frequency electric

fields (i.e., tens of kilohertz to megahertz) alternate too fast for causing nerve-muscle stimulation and involve only minute dielectric losses (heating). Such fields of low to moderate intensities are commonly considered to have no biological effect (4). However, a number of nonthermal effects of minor biological consequence have been reported even at low field intensities. These include microscopic particle alignment (i.e., the pearl chain effect; Ref. 6) and cell rotation (7, 8). With pulsed electric fields of $10^3$ V/cm and 100-ms pulse length, reversible pore formation appears in the cell membrane, a phenomenon usually called electroporation (9).

In the present study we show for the first time, to our knowledge, that very low-intensity (<2 V/cm), intermediate-frequency (100–300 kHz), alternating electric fields induced by insulated electrodes have specific inhibitory effects on dividing cells in culture. We demonstrate that applying these fields to cancerous cells leads to proliferation arrest and cell destruction. When applied to syngeneic mice tumor models, these tumor treating fields (TTFields) cause a significant reduction in tumor growth rate without any significant side effects.

## MATERIALS AND METHODS

**In Vitro Experimental Set Up.** Cultures were grown in standard culture dishes (4-well cell culture chambers; SN 138121; Nalge Nunc International). The TTFields were generated by pairs of 13-mm-long, completely insulated wires (WN K-30-1000; VT Corporation; outer diameter, 0.5 mm; ethylene tetrafluoroethylene insulation thickness, 0.125 mm; dielectric breakdown, 1800 V/mil) fixed to the bottom of each dish at a distance of 1 mm from each other. The wires were connected to an oscillator (GFG8219A; Instek) and a high-voltage amplifier (A303; A. A. Lab Systems Ltd.) that generated the required sine-wave signals (range, 300–800 V). Cells were plated by carefully smearing 10 μl of DMEM (Biological Industries Ltd., Beit Haemek, Israel) containing $1.5 \times 10^4$ cells along the gap between the wires (Fig. 1A). After the cells settled and attached to the plate surface, 500 μl of DMEM were added to each culture dish, which was then transferred to a 5% $CO_2$ humidified incubator held at 36°C. The culture was incubated for a control period of 24 h before treatment. Culture medium was replaced manually every 24 h throughout the experiments. TTFields were then applied by connecting the wires to a high-voltage amplifier operated by a signal generator with frequency and amplitude controls. Finite element simulation of the TTFields generated between the wires demonstrated that the field in the vicinity of the cell culture was homogeneous (not shown). Eleven different types of cancerous cell lines were subjected to TTFields. These included human melanoma (Patricia), glioma (U-118, U-87), Lung (H-1299), prostate (PC3), and breast (MDA231) cancerous cell lines as well as mouse melanoma (B16F1), rat glioma (F-98, C-6, and RG2), and mouse adenocarcinoma (CT-26) cell lines (all from American Type Culture Collection, except for Patricia, which was a generous gift from Dr. Ruth Halaban, Department of Dermatology, Yale University School of Medicine). In addition, a noncancerous cell line (BHK) was grown under conditions that stunt cell replication (0.1% FCS) and then subjected to TTFields. Also, segments of excised rat mesentery and diaphragm were subjected to the fields in vitro. Colorimetric cell counts were made every 24 h after seeding using the standard 2,3-bis(2-methoxy-4-nitro-5-sulfophenyl)-5-[(phenylamino)carbonyl]-2H-tetrazolium hydroxide method to measure cell proliferation as described previously (10) using cell proliferation assay kit (Biological Industries, Beit Haemek, Israel). In brief, culture media was replaced with 0.2 ml of preheated 2,3-bis(2-methoxy-4-nitro-5 sulfophenyl)-5-[(phenylamino)carbonyl]-2H-tetrazolium hydroxide reagent and incubated for 1 h at 37°C in a 5% $CO_2$ incubator. After incubation and gentle stirring,

Received 1/11/04; revised 2/17/04; accepted 2/17/04.

Grant supports: NovoCure Ltd.

The costs of publication of this article were defrayed in part by the payment of page charges. This article must therefore be hereby marked advertisement in accordance with 18 U.S.C. Section 1734 solely to indicate this fact.

Requests for reprints: Yoram Palti, Department of Physiology, B. Rappaport Faculty of Medicine, Technion—Israel Institute of Technology, Haifa 31096, Israel. Phone: 972-4-8501204; Fax: 972-4-8501207; E-mail: yoramp@netvision.net.il.

3288

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 597 of 631    Document 11-5
4828

0.15 ml of the reaction solution was transferred to a 96-well plate (8N 92696; TPP, Trasandigen, Switzerland). The absorbance of the samples was then read with a spectrophotometer (Tecan ELISA Reader; 450 nm). The colorimetric measurements at each time point were normalized to the measurement performed immediately before beginning of treatment. To verify that the colorimetric assessments were accurate, direct visual cell counts were performed on sample culture dishes. At the optic densities used (0.2–2), optic density was linearly related to the number of cells in the culture dishes ($n = 10$; $r^2 = 0.99$). The growth rate of both treated ($GR_t$) and control cultures ($GR_c$) was calculated for each experiment by plotting the optic density values on a logarithmic scale and fitting a linear regression line to the values. The growth rate for each culture dish was the slope of this linear regression. The therapeutic enhancement ratio (TER) was calculated as the ratio of the decrease in the growth rate of treated cells compared with the growth rate of control cells ($(GR_c − GR_t)/GR_c$). Thus, if the increase in the number of treated cells is equal to that of the controls, TER = 0; if the increase in cell number is smaller in the treated cultures than in the controls, TER > 0; and if the number of cells in the treated cultures decreases absolutely, TER > 1.

In time-lapse microphotography experiments, cell lines were grown on a 35-mm standard culture dish (SN 430165; Corning Inc.) by plating $3 × 10^5$ cells in 2.5 ml of DMEM with 25 mM HEPES. The Petri dish temperature was controlled at 34°C (B16F1) or at 37°C (all other cell lines). During experiments, two parallel insulated wires were positioned on the bottom of the dish with 1 cm distance between through which TTFields was applied. The entire set-up was placed on an inverted microscope (Eclipse TS-100; Nikon) and video microphotography at ×200 magnification was taken with a standard VCR camera (Handicam X 320; Sony). Photographs were captured using a personal computer every 60–120 s for 6–10 h/culture.

Fluorescent Labeling of α-Tubulin, Actin, and DNA. Mouse melanoma cells were grown on coverslips and subjected to TTFields for 24 h. After treatment, the medium was removed, and the cells were washed in a buffer solution [10 mM 4-morpholinoethanesulfonic acid, 150 mM NaCl, 5 mM EGTA, 5 mM MgCl₂, and 5 mM glucose (pH 6.1)], permeabilized, and fixed with 0.5% Triton X-100 and 0.25% glutaraldehyde (Sigma) for 5 min and then post-fixed with 1% glutaraldehyde for 20 min. Subsequently, the cells were washed in PBS and 1 mM sodium borohydride (Sigma) to eliminate autofluorescence. The coverslips were then incubated with a primary antibody clone for α-tubulin (DM1A; Sigma) for 30 min, washed, and incubated for 30 min with a secondary antibody (Alexa Fluor 488 goat antimouse IgG; Molecular Probes). Rhodamine-conjugated phalloidin (Sigma) was added with the secondary antibody to stain actin filaments. The cells were then washed and incubated with 4′,6-diamidino-2-phenylindole (Molecular Probes) to stain the DNA. After staining, the coverslips were mounted and viewed with a fluorescence microscope at ×630 magnification and photographed.

Electric Field Measurement. The electric field intensity in the culture medium was measured by means of a probe, consisting of two (0.25 mm in diameter) insulated wires with exposed tips 0.5 mm apart, that was dipped in the culture medium. The wires were connected to a high-input impedance differential amplifier that translated the waveform amplitude into a calibrated steady voltage that was digitally recorded. Field intensities throughout the manuscript are expressed in peak voltage amplitude per centimeter (V/cm). Care was taken to eliminate any pickup from the field outside the culture medium. Continuous field monitoring could also be made by measuring the potential drop across a 10Ω resistor placed in series with one of the field-generating wires. The voltage drop on this resistor was linearly correlated to the field intensity ($r^2 = 0.96$). To verify that the experimental setups were not exposed to any significant magnetic fields, the electromagnetic radiation in the immediate vicinity of the treated cultures was measured using a loop antenna (EMCO 6507 1 kHz to 30 MHz) connected to a spectrum analyzer (Anritsu 9 kHz to 2.2 GHz). The electromagnetic radiation in the 100–300-kHz range within the incubators containing treated culture dishes was found to be $10^{-12}$ Tesla and within animal cages containing TTFields-treated mice, $10^{-14}$ Tesla, i.e., negligible.

Finite Element Simulations of Electric Field Distribution. The calculations of the electric field within the cells are based on finite element mesh (11), using a simplified description of the cell morphology (see Fig. 7). In all calculations, the dielectric constant of both the cytoplasm and medium was 80, their conductance was 0.3 S/m, the cell diameter was 10 μm, and the membrane thickness was 3 nm (with a dielectric constant of 3). The electric field

intensity was mapped within the cell, based on the amplitude (1 V/cm), frequency (100 kHz) and waveform (sine) of the electric field applied to the cell culture. The force exerted by an inhomogeneous field, such as that created inside the cells on a single tubulin dimer, was calculated based on the direct interaction between the electric field and the dipole. The force exerted on a microscopic polarizable organelle was calculated by the following equation (12):

$$\langle \vec{F} \rangle = 2\pi r^3 \varepsilon_m \text{Re}[K(\omega)] \vec{\nabla} E_{RMS}^2 \qquad (1)$$

where $\langle \vec{F} \rangle$ is the expectation value of the force vector. Re symbolized the real component of the variable, $\vec{\nabla}$ is the divergence of the variable, $\varepsilon_m$ is the cytoplasm dielectric constant, $r$ is the tubulin dimer length or particle radius, $E_{RMS}$ is the RMS value of the electric field, and $K(\omega)$ is the Clausius-Mossotti factor;

$$K(\omega) = \frac{\varepsilon_p^* - \varepsilon_m^*}{\varepsilon_p^* + 2\varepsilon_m^*} \qquad (2)$$

$$\sigma^* = \varepsilon - i \cdot \frac{\sigma}{\psi}$$

where $\varepsilon_p$, $\varepsilon_m$ are the complex dielectric constants of the particle and cytoplasm respectively, each of which is calculated from the dielectric constant ($\varepsilon$) and conductance ($\sigma$) as a function of frequency ($\omega$). $K(\omega)$ in this case is always positive at the relatively low frequencies used (i.e., 100 kHz), assuming that at these frequencies, $\varepsilon_p > \varepsilon_m$. This means that the force acting on a polarizable particle will always act in the direction of the convergence of the electric field lines. The terminal velocity of particles due to these forces was calculated using Stoke's law.

In Vivo Experimental Setup. TTFields treatment was applied by means of 10-mm-long pairs of parallel, insulated wires (outer diameter, 0.5 mm insulation thickness, 0.125 mm; Teflon) placed intradermally on the back of a mouse. Another pair of identical wires was placed parallel to the first pair in each mouse, with an interval of 5 mm between the pairs. Cell line inoculums were injected (4 μl; $3 × 10^5$ cells) intradermally in between the two membranes of each pair of implanted wires. Only one pair was then connected to a voltage amplifier to apply 100 kHz of TTFields treatment to one tumor. The other pair of wires was left disconnected, and the tumor between them served as a paired control of the treated tumor (see Fig. 1B). Tumors were measured using a caliper. Tumor size was calculated by multiplying maximal tumor length by maximal tumor width. Animal experiments were conducted in accordance with the Technion—Israel Institute of Technology guidelines for the care of laboratory animals.

## RESULTS

Effect of TTFields on Cells in Culture. More than 500 culture dishes were exposed to TTFields. The number of cells in each treatment dish was assessed periodically using colorimetric determination (as described in "Materials and Methods"). Because under control conditions, most of the cell lines had doubling times of less than 24 h (range, 17–24 h; except for PC-3 for which the doubling time was 73 h), treatment duration was at least 24 h. Exposure began 24 h after seeding and was continued for up to 72 h. In all cell lines tested, 24-h exposure to TTFields at 100 kHz (at an intensity of 1.0–1.4 V/cm) caused significant inhibition of cell proliferation (TER range, 0.14–0.96; $P < 0.05$; Fig. 1C). This effect lasted beyond the exposure time of the cells to TTFields. In fact in some experiments (e.g. malignant melanoma), culture growth was stunted for as long as 72 h after TTField exposure was terminated (Fig. 2A).

We next checked whether nonreplicating cultures and tissues are affected by TTFields. BHK cultures were maintained in low-serum (0.1% FCS) conditions to slow their replication rate. These cultures were then exposed to 100 kHz of TTFields (at an intensity of 1.2 V/cm) for 24 h. No significant difference in cell number between control and TTField-treated cultures was observed under these con-

3289

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 598 of 631 Document 11-5

2018 ECX 21 E5 1 3 8 8

CANCER CELL DESTRUCTION BY ALTERNATING ELECTRIC FIELDS





Fig. 1. Schematic representations of experimental setups in vitro (A) and in vivo (B) are shown. C, TTFields inhibit the growth of cancerous cell lines in vitro. Cultures were exposed to 100-kHz TTFields at an intensity of 1–1.4 V/cm. Ordinate, TER, i.e., the ratio of the decrease in the growth rate of treated cells compared with the growth rate of control cells ($(GR_c - GR_t)/GR_c$). In all four animal cell lines (□) and seven human cell lines (■) tested, the ratio is greater than 0, indicating an inhibition in the growth rate of the treated cultures compared with temperature-matched controls. All effects were statistically significant ($P < 0.05$; Student's t test).

ditions ($P = 0.97$). After returning these cultures to normal media (10% FCS), normal replication resumed both in cultures exposed to TTFields and in control cultures. We also tested the effect of TTField treatment on the number of viable cells in nonreplicating tissues dissected from rats. Four segments of rat mesentery and four segments of rat diaphragm were exposed to 100 kHz of TTFields at an intensity of 1.2 V/cm for 24 h. No differences were observed between the number of viable cells in both types of treated tissues compared with control tissues (mesentery, $P = 0.3$; diaphragm, $P = 0.54$).

To test the relationship between TTField intensity and inhibition of cell proliferation, mouse melanoma (B16F1) and rat glioma (F-98) cell lines were exposed to TTFields of different intensities between 1 and 2.5 V/cm. The inhibitory effect of TTFields on cell proliferation increased as intensity was raised (Fig. 2B) until complete proliferation arrest was achieved at intensities of 1.4 and 2.25 V/cm in melanoma and glioma cells, respectively.

The effects of TTFields are expected to be frequency dependent in view of the dependence of cell membrane electric impedance on frequency (due to the cell membrane capacitance). These changes in impedance render the fraction of field penetrating the cells a function of frequency. Therefore, we tested the frequency dependence of the inhibitory effect of TTFields on growth rate of cultured melanoma (B16F1) and glioma (F-98) cells. Comparison between the efficacy of the TTFields at different frequencies was performed by normalizing the TER to the electric field intensity. As seen in Fig. 2C, the inhibitory effect of TTFields was frequency dependent. Interestingly, the frequency at which maximal inhibition was achieved differed between cell types (120 kHz versus ~200 kHz for melanoma and glioma, respectively).

**The Effects of TTFields on Cellular and Molecular Processes in Proliferating Cells.** To gain insight into the cellular processes by means of which TTFields affect cell proliferation, time-lapse microphotography was performed while TTFields were applied to mouse melanoma cultures (see "Materials and Methods"). Several unique processes became evident in time-lapse microphotography of TTField-treated cultures. The most pronounced phenomenon was

prolongation of mitosis. In the treated cells, mitosis seemed to begin normally but was prolonged for variable periods of time before completing cleavage into two daughter cells. Fig. 3A shows an exemplary mitosis in a TTFields-treated cell. As seen in the treated cell, mitosis was not complete within 3 h. Due to this proliferation arrest, in treated cultures, mitosis lasted on average 124 ± 91 min (mean ± SD, $n = 53$; range, 40–541 min), whereas under control conditions, average mitosis duration was 62 ± 8 min from cell rounding to cytokinesis (mean ± SD, $n = 12$; range, 47–78 min). This prolongation is statistically significant ($P < 0.01$, Mann-Whitney $U$ test).

The second major phenomenon, seen in the TTField-treated melanoma cultures, was that one-fourth of cells undergoing mitosis were destroyed as the formation of the cleavage furrow approached complete cell separation. During this process, the cell membrane ruptured, and many small membrane blebs formed, resembling post-mitotic apoptotic cell death (13). Two exemplary cells undergoing such destruction are shown in Fig. 3, B and C. Destructive effects were observed only in mitotic cells, whereas quiescent cells remained morphologically and functionally intact.

The third phenomenon, seen only in TTField-treated cultures, was nuclear rotation. In early mitosis, after cell rounding, nuclei could be seen rotating within the cell. A full rotation lasted on average 15 min. This effect resembles the whole-cell rotation previously described during exposure to intermediate-frequency alternating electric fields (7, 8).

A fundamental characteristic of electric fields is that at any point in space, they have a defined orientation corresponding to the direction of the force they exert on charges and polar elements. With regard to the latter, the force exerted by the field is maximal when the dipole is oriented in the direction of the field. With regard to the cells, there are two main structural differences between quiescent and dividing cells. First, the latter contain highly polar, spatially oriented microtubules; and thus they develop a directional, hourglass-shaped cell morphology during the cytokinesis phase. In view of these facts, one may expect that the electric field forces will have maximal effect

3290

Page 168 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_5B173E312028   25976   4830



Fig. 2. Time, field frequency, and intensity dependences of the effect of TTFields on malignant melanoma (B16F1, left column) and glioma cell (F-98, right column) proliferation. A, the number of cells in untreated cultures (control; ☐) as compared with cultures treated with TTFields (■). The number of cells at each time point (OD_t) was normalized by the number of cells in the culture before initiation of treatment (OD_0). The number of control cells is seen to roughly double every 24 h throughout the experiment. TTFields were applied for 24 h continuously (solid lines) at 100 kHz in the melanoma cultures and at 200 kHz in the glioma cultures. The increase in the number of treated melanoma (left) and glioma (right) cells over time is significantly smaller than control cells (P < 0.001). B, the effect of 24-h exposure to TTFields of increasing intensities. The magnitude of the effect is expressed using the TER. The inhibitory effect of the TTFields on proliferation increases with intensity in both cell types. Complete proliferation arrest (TER = 1) is seen at 1.35 and 2.25 V/cm in melanoma and glioma cells, respectively. EF, electric field. C, change in the melanoma (left) and glioma (right) growth rate after 24 h of exposure to TTFields of different frequencies is normalized to the field intensity (TER/EF). A window effect is seen with maximal inhibition by TTFields at 120 kHz in melanoma cells and at ~200 kHz in glioma cells. Data are mean + SD.

on the mitotic process when it is oriented along the lines of force of the field. To investigate this point, we fixed melanoma cell cultures and stained them with toluidine blue, immediately after 24 h of TTField treatment, to demonstrate mitoses and to distinguish vital from damaged or dead cells. The live and damaged mitotic cells (at the time of fixation) were grouped according to the orientation of their cleavage axis relative to the electric field direction. The cells were counted separately in each of four equal sectors that form angles of 0°, 45° (two sectors, 45 and 135), and 90° relative to the field direction. As seen in Fig. 4A, the live cells were randomly distributed in all sectors. In contrast, a much higher proportion of the damaged cells had their axis of division oriented along the field: 56% at 0° versus an average of 15% in each of the other orientations. Surprisingly, the number of cells per unit area in the 0° sector was found to be one-half that in the 0° sector. This finding may serve as an indication of an additional effect of TTFields: orientation of the cell division in the field direction. The cells in each of the above spatially oriented defined groups were further divided according to stages of mitosis at the time of fixation. At all stages, a higher fraction of damaged cells

had their axis of division oriented along the field. Moreover, 74% of the parallel oriented cells were damaged while being in metaphase (Fig. 4B).

The spatially organized mitotic spindle, which forms in dividing cells, consists of microtubules that have very large electric dipole moments (14) and may therefore be disoriented by the forces of the electric fields (15, 16). Actin filaments are also polar, however, they have no defined spatial orientation within the cells and are therefore not expected to be significantly affected by the fields. This prompted us to test whether TTFields disrupt mitosis by interfering with the normal formation, orientation, and movement of microtubules as compared with actin filaments. Melanoma cell cultures were treated with TTFields for 24 h. After treatment, the cells were fixated, stained with monoclonal antibodies directed against microtubules and actin filaments, as well as for DNA, and thereafter studied with fluorescence microscopy (see "Materials and Methods"). In control cultures, 95% of cells undergoing mitosis exhibited the normal stages of mitosis with intact mitotic spindles. However, in TTField-treated cultures, more than one-half of the mitoses were abnormal.

3291

CANCER CELL DESTRUCTION BY ALTERNATING ELECTRIC FIELDS



+2h    +3h

A

+30m    +50m

B

+30m    +60m

C

Fig. 3. Time-lapse microphotography of malignant melanoma cells exposed to TTFields: A, an example of a cell in mitosis treated by TTFields. Contrary to normal mitosis, the duration of which is less than 1 h, the depicted cell is seen to be undergoing an anti-cytokinesis for 3 h. B and C, two examples of disintegration of TTFields-treated cells during cytokinesis. Three consecutive stages are shown: cell rounding (left), formation of the cleavage furrow (middle) and cell disintegration (right). Scale bar = 10 μm.

Fig. 3 shows examples of the different forms of abnormal mitosis seen under TTField treatment. These included polyploid cells in prophase, ill-separated, multi-spindled and single-spindled cells in metaphase, asymmetric anaphases, and a large proportion of cells in metaphase (>20%) with rosette shaped chromosome assemblies. The normal and abnormal stages of mitosis in control and TTField-treated cultures are summarized and compared in Fig. 5C. In general, these abnormalities may serve as an indication of interference of TTFields with the normal behavior of the microtubules. In contrast, staining for actin filaments showed no difference between TTField-treated and control cultures.

**Effect of TTFields on Tumors in Vivo.** To test whether TTFields are effective in destroying tumor cells in vivo, we tested their effect on two animal tumor models: C57BL/6 mice inoculated intradermally with malignant melanoma cells (B16F1) and BALB/c mice inoculated intradermally with adenocarcinoma cells (CT-26). TTFields were generated between implanted (intradermal) wholly insulated wires placed on both sides of the tumor (see Fig. 1B). Mice with implanted electrodes were treated for 3–6 days continuously beginning 1 day after cell line inoculation. We found that 100–200 kHz of TTFields at low intensities of <2 V/cm effectively inhibited malignant melanoma growth compared with the growth of nontreated control tumors. Photographs of examples of treated and nontreated malignant melanoma tumors are given in Fig. 6 for comparison. Treated tumors were significantly smaller than control tumors at the end of treatment (average treated tumor size was 47% of control tumor size; n = 78 mice, P < 0.001; Student's t test). Histopathological analysis of treated tumors showed extensive necrosis with aggregations of karyorrhectic and karyolytic debris (Fig. 6F). To test whether TTFields are effective on different tumor types, BALB/c mice with intradermal adenocarcinomas were treated with the same field parameters. Photographs of examples of such a treated and a nontreated adenocarcinoma tumors are provided for comparison in Fig. 6B. The average effect of TTFields on adenocarcinoma carrying mice was less dramatic than that seen for malignant melanoma (average treated tumor size was 73% of control tumor size at the end of treatment; n = 14 mice). After treatment, the tumors and their adjacent tissues were fixated, stained with H&E, and analyzed histopathologically. No damage to the surrounding tissues was detected.

## DISCUSSION

In this study, we have shown that when properly tuned, very low-intensity, intermediate-frequency electric fields (TTFields) stunt the growth of cancerous cells. We have demonstrated this inhibitory effect in all proliferating cell types tested, whereas, nonproliferating cells and tissues were unaffected. Interestingly, different types of cancerous cells showed specific intensity and frequency dependences of TTField inhibition. We have demonstrated that two main processes occur at the cellular level during exposure to TTFields: arrest of proliferation and cell destruction. The damage caused by TTFields to these replicating cells was shown to be dependent on the orientation of the division process in relation to the field vectors, indicating that this effect is nonthermal. Indeed, temperature measurements made within culture dishes during treatment and on the skin above treated tumors in vivo showed no significant elevation in temperature compared with control cultures/mice. Also, TTFields caused the dividing cells to orient in the direction of the applied field in a manner similar to that described in cultured human corneal epithelial cells exposed to constant electric fields (17). At the subcellular level, we have found evidence indicating that TTFields disrupt the normal polymerization-depolymerization process of microtubules during mitosis. Indeed, the described abnormal mitotic configurations seen after exposure to



Fig. 4. Dependency of TTFields-induced cellular damage on the orientation rate of cell division relative to field direction. Ordinate represents the number of mitotic cells counted in two TTField-treated malignant melanoma cultures (100 kHz). A, total number of damaged (■) and live (□) mitotic cells in each of three species of different angles relative to the field direction (inset). The number of damaged cells is more than 3-fold larger than the corresponding number of live cells when division is aligned at or close to 0° relative to the electric field direction. In section A further angles, the number of damaged cells only slightly exceeds the live ones. Note that because the 45° cone is a double unit of each of the other two species, the number of cells presented in this orientation was halved. B, dividing cell sensitivity to fields of different orientation in different stages of mitosis. When cell division axis is aligned at 0° to the electric field, the number of damaged cells (■) is significantly larger than that of intact cells (□) at all three phases of mitosis. However, the highest number of damaged cells in this orientation is seen in metaphase (B-fold more than intact cells).

3292

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 601 of 631    Document 11-5

201931X6C871

CANCER CELL DESTRUCTION BY ALTERNATING ELECTRIC FIELDS



Fig. 5. Immunohistochemical staining of abnormal mitotic figures in TTFields-treated embryos. Malignant melanoma cultures ($n = 9$) were treated for 24 h at 100 kHz and then stained with monoclonal antibodies for microtubules (green), actin (red), and DNA (blue). The photomicrographs show exemplary abnormal mitoses including: polyploid prophase (A); rosette (B); III separated metaphase (C); multispindled metaphase (D); single-spindled metaphase (E); and asymmetric anaphase (F). G, the percentage of treated (□) and control (■) mitotic cells in each of the normal and abnormal phases of mitosis.



TTFields are similar to the morphological abnormalities seen in cells treated with agents that interfere directly (18, 19) or indirectly (20–22) with microtubule polymerization (e.g., Taxol).

To explain how TTFields cause orientation-dependent damage to dividing cancerous cells and disrupt the proper formation of the mitotic spindle, we modeled the forces exerted by TTFields on intracellular charges and polar particles using finite element simulations (see "Materials and Methods"). We identified two main mechanisms by means of which the electric fields may affect dividing cells. The first relates to the field effect on polar macromolecule orientation. Within this framework, during the early phases of mitosis, i.e., in pre-telophase, when tubulin polymerization-depolymerization drives the proliferation process, the electric field forces any tubulin dimer, positioned further than 14 nm away from the growing end of a microtubule, to orient in the direction of the field (Fig. 7A). This force moment, ($10^{-5}$ pN) acting on the dimers, is sufficient to interfere with the proper process of assembly and disassembly of microtubules that is essential for chromosome alignment and separation (23). This effect can explain the mitotic arrest of TTField-treated cells (24). The second mechanism, which interferes with cell division and is most likely to play an important role in cell destruction, becomes dominant during cleavage. As seen in the simulations depicted in Fig. 7B, the electric field within quiescent cells is homogenous, whereas the field inside mitotic cells, during cytokinesis, is not homogenous. We see an

increased field line concentration (indicating increased field intensity) at the furrow, a phenomenon that highly resembles the focusing of a light beam by a lens. This inhomogeneity in field intensity exerts a unidirectional electric force on all intracellular charged and polar entities, pulling them toward the furrow (regardless of field polarity). For example, for a cleavage furrow that reached a diameter of 1 μm in an external field of only 1 V/cm, the force exerted on the microtubules is in the order of 5 pN. This magnitude is compatible with the reported forces necessary to stall microtubule polymerization that is 4.3 pN (25). With regard to other particles such as cytoplasmatic organelles, they are polarized by the field within dividing cells. Once polarized, the forces acting on such particles may reach values up to an order of 60 pN resulting in their movement toward the furrow at velocities that may approach 0.03 μm/s. At such velocity, cytoplasmatic organelles would pile up at the cleavage furrow within a few minutes, interfering with cytokinesis and possibly leading to cell destruction. We also found that the electric forces acting on intracellular particles are maximal when the axis of division is aligned with the external field. This is consistent with the dependence of the destructive effect of TTFields on the angle between division axis and the field (Fig. 4). In addition, the calculated dependence of the magnitude of this force on frequency (data not shown) is consistent with the experimentally determined frequency dependence of the

3293

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 602 of 631    Document 11-5    4833

501 951 259 65 5

CANCER CELL OBSTRUCTION BY ALTERNATING ELECTRIC FIELDS



Fig. 6. *In vivo* effects of TTFields on intraabdominal tumors in mice. Malignant melanoma (A) and adenocarcinoma (B) tumor cells were injected in two parallel locations intradermally on the back of each mouse. Only the tumor on the left side of the mouse was treated. After 4 days of TTFields treatment (at 100 kHz), no tumor can be discerned on the treated side, whereas on the untreated side a large tumor has grown. C–F, histological sections of TTFields-treated intradermal melanoma versus a control (untreated) melanoma on the same mouse. C, after H&E staining, a large (5 mm diameter) nodule of melanoma cells can be seen in the dermis of the control tumor (X40). Note that due to the large size of the tumor, its deep portion has been lost in preparation. D, treated tumor; only two small (<0.4 mm diameter) nodules are present (scale bar = 0.5 mm). The nonlinear structures of the dermis are morphologically intact. E, control tumor, malignant melanoma cells appear intact and viable (X200). (Scale bar = 100 μm). F, only necrotic tissue and cellular debris are seen in the treated tumor.



Fig. 7. A, schematic representation of two tubulin dimers positioned near the tip of an elongating microtubule in a dividing cell. The force that a 1-V/cm extracellular TTFluid exerts on a tubulin dimer located less than 14 nm away from the microtubule (i) is smaller than the force created by the polar microtubule tip, and therefore it will align according to the field generated by the microtubule tip. In contrast, dimers further than 14 nm from the end of the microtubule (b) are aligned by the forces of the TTFields (global field) in a direction that may not be compatible with the polymerization-depolymerization process. B, finite element field simulation of the lines of force of the electric field inside a quiescent cell (left) and a cell undergoing mitotic cytokinesis (right). The diameter of the cells in the simulation was 10 μm and membrane thickness 3 nm. Inside the quiescent cell, the electric field is mostly uniform (equal distances between the lines of force). In contrast, in the dividing cell, the field is inhomogeneous—the field intensity (line density) increases toward the cleavage furrow.

inhibitory effect of TTFields on melanoma and glioma cell proliferation (Fig. 2C).

In conclusion, we have demonstrated that TTFields inhibit both the proliferation of malignant cells in culture and the growth of tumors in mice while showing no general side effects or local histopathological damage. The mechanism of action of the fields is, at least in part, dependent on disruption of the microtubules of the mitotic spindle and the electric forces resulting from focusing of the field in the dividing cells. The highly specific effects of these fields on dividing cells, together with the relative ease of applying them, focusing them, and screening from them, make them an attractive candidate to serve as a novel treatment modality for cancer.

## REFERENCES

1. Polk C. Therapeutic applications of low-frequency sinusoidal and pulsed electric and magnetic fields. In: Bronzino JD, editor. The biomedical engineering handbook. Boca Raton, FL: CRC Press, Inc.; 1995. p. 1404–16.

2. Palti Y. Stimulation of internal organs by means of externally applied electrodes. J Appl Physiol 1966;21:1619–23.

3. Ueno GN. The development and application of pulsed electromagnetic fields (PEMFs) for stimulated functions and antiseizure. Clin Phet Surg 1995;12:459–77.

4. Stein R. Biologic effects of radiofrequency and microwave fields: in vivo and in vitro experimental results. In: Bronzino JD, editor. The biomedical engineering handbook. Boca Raton, FL: CRC Press, Inc.; 1995. p. 1417–23.

5. Chou CK. Radiofrequency hyperthermia in cancer therapy. In: Bronzino JD, editor. The biomedical engineering handbook. Boca Raton, FL: CRC Press, Inc.; 1995. p. 1424–30.

6. Takashima S, Schwan HP. Alignment of microscopic particles in electric fields and its biological implications. Biophys J 1985;47:513–8.

7. Zimmermann U, Vienken J, Pilwat G. Rotation of cells in an alternating electric field: the occurrence of a resonance frequency. Z Naturforsch C 1981;36:173–7.

8. Holzapfel C, Vienken J, Zimmermann U. Rotation of cells in an alternating electric field theory and experimental proof. J Membr Biol 1982;67:13–26.

3294

CANCER CELL DESTRUCTION BY ALTERNATING ELECTRIC FIELDS

9. Pawlowski P, Szutowicz I, Marszalek P, Fikus M. Bioelectrorheological model of the cell. 3. Electrodestruction of cellular membrane in alternating electric field. Biophys J 1993;63:541–9.

10. Jost LM, Kirkwood JM, Whiteside TL. Improved short- and long-term XTT-based quantitative cellular cytotoxicity assay for melanoma and other tumor cells. J Immunol Methods 1992;147:153–65.

11. Volakis JL, Chatterjee A, Kempel LC. Finite element method electromagnetics: antennas, microwave circuits, and scattering applications. New York, NY: IEEE/OUP; 2001.

12. Celli AR. Dielectrophoresis. Cambridge, UK: Cambridge University Press; 1970.

13. Krolich D, Radford IR, Forrester HB, Dewey WC. Computerized video time-lapse microscopy studies of ionizing radiation-induced rapid-interphase and mitosis-related apoptosis in lymphoid cells. Radiat Res 2000;153:36–48.

14. Alberts B, Bray D, Lewis J, Raff M, Watson JD. Molecular biology of the cell. 2nd ed. New York: Garland Publishing, Inc.; 1989, p. 1216.

15. Maggs WJ. Electric fields determine the spatial organization of microtubules and actin filaments. Med Hypotheses 1988;26:163–70.

16. Cho MR, Thatte HS, Lee RC, Golan DH. Reorganization of microfilament structure induced by ac electric fields. FASEB J 1996;10:1552–8.

17. Zhao M, Forrester JV, McCaig CD. A small, physiological electric field orients cell division. Proc Natl Acad Sci USA 1999;96:4942–6.

18. Jordan MA, Thrower D, Wilson L. Effects of vinblastine, podophyllotoxin and nocodazole on mitotic spindles: implications for the role of microtubule dynamics in mitosis. J Cell Sci 1992;102:401–16.

19. Rowinsky EK, Donehower RC. Paclitaxel (Taxol). N Engl J Med 1995;332:1004–14.

20. Kline-Smith SL, Walczak CE. The microtubule-destabilizing kinesin XKCM1 regulates microtubule dynamic instability in cells. Mol Biol Cell 2002;13:2718–31.

21. Kapoor TM, Mayer TU, Coughlin ML, Mitchison TJ. Probing spindle assembly mechanisms with monastrol, a small molecule inhibitor of the mitotic kinesin, Eg5. J Cell Biol 2000;150:975–88.

22. Maiato H, Sampaio P, Lemos CL, et al. MAST/Orbit has a role in microtubule-kinetochore attachment and is essential for chromosome alignment and maintenance of spindle bipolarity. J Cell Biol 2002;157:749–60.

23. Gagliardi LJ. Electrostatic force in prometaphase, metaphase, and anaphase-A chromosome motions. Phys Rev E Stat Nonlin Soft Matter Phys 2002;66:011901.

24. Rabbind DJ, Silverman JD, Wang YL. Function of spindle microtubules in directing cortical movement and actin filament organization in dividing cultured cells. J Cell Sci 1996;109:2041–51.

25. Dogterom M, Yurke B. Measurement of the force-velocity relation for growing microtubules. Science 1997;278:856–60.

Page 173 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]
JB 5B173E312028
25976

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 604 of 631    Document 11-5
4835

Schneiderman et al. BMC Cancer 2010, 10:229
http://www.biomedcentral.com/1471-2407/10/229



BMC
Cancer

RESEARCH ARTICLE · · · Open Access

# TTFields alone and in combination with chemotherapeutic agents effectively reduce the viability of MDR cell sub-lines that over-express ABC transporters

Rosa S Schneiderman[1]†, Esther Shmueli[1], Eilon D Kirson[1] and Yoram Palti*[1,2]

## Abstract

**Background:** Exposure of cancer cells to chemotherapeutic agents may result in reduced sensitivity to structurally unrelated agents, a phenomenon known as multidrug resistance, MDR. The purpose of this study is to investigate cell growth inhibition of wild type and the corresponding MDR cells by Tumor Treating Fields - TTFields, a new cancer treatment modality that is free of systemic toxicity. The TTFields were applied alone and in combination with paclitaxel and doxorubicin.

**Methods:** Three pairs of wild type/MDR cell lines, having resistivity resulting from over-expression of ABC transporters, were studied: a clonal derivative (C11) of parental Chinese hamster ovary AA8 cells and their emetine-resistant sub-line Emt$^{R1}$; human breast cancer cells MCF-7 and their mitoxantrone-resistant sub lines MCF-7/Mx and human breast cancer cells MDA-MB-231 and their doxorubicin resistant MDA-MB-231/Dox cells. TTFields were applied for 72 hours with and without the chemotherapeutic agents. The numbers of viable cells in the treated cultures and the untreated control groups were determined using the XTT assay. Student t-test was applied to asses the significance of the differences between results obtained for each of the three cell pairs.

**Results:** TTFields caused a similar reduction in the number of viable cells of wild type and MDR cells. Treatments by TTFields/drug combinations resulted in a similar increased reduction in cell survival of wild type and MDR cells. TTFields had no effect on intracellular doxorubicin accumulation in both wild type and MDR cells.

**Conclusions:** The results indicate that TTFields alone and in combination with paclitaxel and doxorubicin effectively reduce the viability of both wild type and MDR cell sub-lines and thus can potentially be used as an effective treatment of drug resistant tumors.

## Background

Multidrug resistance (MDR) [1] is encountered when cancer cells are exposed to chemotherapeutic agents for a few replication cycles. It is manifested in reduced sensitivity to both the specific chemotherapy as well as to a number of structurally unrelated agents. This phenomenon obviously poses a serious impediment to successful chemotherapy. Three decades of multidrug resistance research have identified a number of mechanisms by means of which cancer cells elude the effects of chemotherapeutic agents. The most often encountered MDR is the one resulting from over-expression of ATP-binding cassette transporters such as P-glycoprotein (MDR1), multidrug resistance-associated protein-1 (MRP1), and the breast cancer resistance protein (BCRP) [1-3]. These transporters, that recognize substrates of diverse chemical nature, lower the intracellular concentration of these substrates and are normally involved in detoxification [4,5].

MDR can potentially be overcome by the use of antitumor modalities that are not involved in membrane transport, for example, anti-angiogenic agents and physical

* Correspondence: Yoram@nove-cure.com
1 NovoCure Ltd, MATAM Advanced Technology Centre, Haifa 31905, Israel
† Contributed equally
Full list of author information is available at the end of the article



© 2010 Schneiderman et al; licensee BioMed Central Ltd. This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 605 of 631 Document 11-5

4836

Schneiderman et al. BMC Cancer 2010, 10:229
http://www.biomedcentral.com/1471-2407/10/229

modalities such as radiotherapy, heat and electric fields. Different types of electric fields were reported to inhibit cancer cell proliferation and cause cancer cell destruction, for example: exposure of cancer cells to low amplitude DC currents [6], low intensity, low frequency (50 Hz) AC currents [7] and the intermediate frequency (100-300 kHz) alternating electric fields, termed TTFields [8-12].

TTFields are a new physical cancer treatment modality that has recently been demonstrated to be highly effective when applied to cell cultures, animal cancer models, as well as patients suffering from locally advanced and/or metastatic solid tumors [8-12]. TTFields are alternating electric fields of low intensity (1-3 V/cm) and intermediate frequency (100 - 300 kHz) that are generated by special insulated electrodes applied to the skin surface. These specially tuned fields have no effect on quiescent cells while having an anti-proliferation and destructive effect on mitotic cells. This effect is due to the fact that during cytokinesis, TTFields exert forces that move charged or polar macromolecules and organelles towards the narrow neck, separating the newly forming daughter cells [8,9]. They also interfere with the polymerization processes of the microtubule spindle during cell division. Thus, TTFields disrupt the cell structure, inhibit cell division and result in cell death. In contrast to most anti-cancer agents, TTFields are not associated with any meaningful systemic toxicity [9-12]. Furthermore, it was recently shown that TTFields may be used clinically, not only as an anti-proliferation agent, but also as effective adjuvant to currently used chemotherapeutic agents [9].

In view of the above, the target of the present study was to test the possibility of using TTFields for treating multidrug resistant cancerous and non cancerous cell lines, both as a standalone treatment and in combination with chemotherapy.

## Methods

### Materials

All cell culture media, serum and media supplements were obtained from Biological Industries, Beth Haemek, Israel. All drugs and chemical agents were obtained from Sigma.

### Cell lines

The following cell lines and their drug resistant derivatives were used: A clonal derivative (C11) of parental Chinese hamster ovary AA8 cells and their emetine-resistant sub-lines Emt$^{RI}$ cells having ATP dependent MDR1 type drug resistance [13], a kind gift from Prof. G. Eytan Dept. of Biology, Technion, Haifa, Israel; Human breast cancer wild type MCF-7 cells, obtained from ATCC and their mitoxantrone-resistant sub-lines MCF-7/Mx having ABCG2 transporter [14], a kind gift from Prof. M. Lisco-

vitch, Dept. of Biological Regulation Weizmann Institute of Science, Rehovot, Israel; Human breast cancer wild type MDA-MB-231 cells obtained from ATCC and from which doxorubicin resistant MDA-MB-231/Dox cells were developed in our laboratory using a stepwise increase in drug concentration protocol. This procedure is identical with that developed for these cells in other laboratories [15] for inducing MDR1 type of ABC transporters. The AA8/Emt$^{RI}$ cell lines were maintained as a monolayer in -minimal essential medium containing 5% fetal calf serum, 2 mM glutamine, 100 units/ml penicillin G, and 100 µg/ml streptomycin sulphate. The Emt$^{RI}$ cell medium also included 1 µM of emetine. The MCF-7/ MCF-7MX and MDA-MB-231/MDA-MB-231Dox cell lines were maintained under monolayer conditions in DMEM containing 10% fetal calf serum, 2 mM glutamine, 100 units/ml penicillin G, and 100 µg/ml streptomycin sulphate. The MCF-7/Mx cell medium also included 250 nM of mitoxantrone and the MDA-MB-231/Dox cells medium also included 0.1 µM of doxorubicin.

All cells were kept in a 5% $CO_2$ incubator at 37°C. Exponentially growing cells were passaged twice a week using a standard trypsinization procedure.

### Cytotoxicity assay

The level of resistance to doxorubicin and paclitaxel was determined by means of the XTT assay as previously described [8,9]. Briefly, $2 \times 10^4$ cells/well were plated in 24-well plate (NUNC), incubated without drugs for 24 h and then the initial number of cells, $OD_0$, was determined following incubation of with the XTT reagent using ELISA Reader (TECAN Sunrise, USA). The medium was then exchanged with ones containing different drug concentrations, 4 wells for each drug concentration (doxorubicin: 0.001-100 µM; paclitaxel: 0.0001-100 µM). After 72 h, the culture media was discharged, XTT reagent was added and the final cell number, $OD_{72 h}$, was determined. Data obtained from 3 - 5 experiments were collected and the mean values and standard deviations (SEM) of $OD_{72 h}$, representing final number of viable cells, were calculated for each drug concentration. Cell survival was presented as percentage of viable cells as compared to the corresponding viable cell number in no - drug controls. Drug concentrations inhibiting cell growth by 50% ($IC_{50}$) were calculated from relative survival curves using the median-affect principle [16].

### Exposure to TTFields

As previously described [9,11], two pairs of electrodes, insulated by a ceramic having a very high dielectric constant (NovoCure Ltd, Haifa, Israel), were positioned at 90° with respect to each other in both treatment and control Petri dishes. The distance between the electrodes in each

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 606 of 631   Document 11-5

Schneiderman et al. BMC Cancer 2010, 10:229
http://www.biomedcentral.com/1471-2407/10/229

pair was 20 mm. Each pair of electrodes was alternatively connected for 250 ms to a sinusoidal waveform generator (NovoTTF, NovoCure Ltd. Haifa, Israel) that produced 1.75 V/cm, 150 kHz fields in the medium [8]. The 150 kHz frequency of TTFields was found to be effective for treatment of all cells studied.

Four different sets of conditions in each experiment were conducted for each cell line in conjunction with each chemotherapeutic agent: untreated control cells, cells treated by the chemotherapeutic agent alone, cells exposed to TTFields, and cells having a combined TTFields – Chemo exposure (3 Petri dishes for each condition). After 72 h, the culture media was discharged, XTT reagent was added and the final number of viable cells, $OD_{72 h}$, were determined. Data obtained from 3 - 5 experiments were collected and the mean values and standard deviations (SEM) of $OD_{72 h}$, representing final viable cell numbers were calculated for each set of conditions. Cell survival was presented as percentage of viable cells out of the corresponding viable cell number in untreated controls. Student t-test was applied to asses the significance of the differences between results obtained for each of the four conditions tested. In order to assess the extent of possible chemotherapeutic dose reduction when applied in combination with TTFields, dose reduction indexes (DRI) for each TTFields/drug combination were calculated according to [17].

The DRI for the same level of effect ($DRI_m$) was calculated as the ratio of the concentration of drug alone to that of the combined drug-TTFields treatment:

$$DRI_m = D_{m(drug alone)}/D_{m(combined treatment)}.$$ The DRIs determine the magnitude of dose reduction allowed for each drug when given in combination with TTFields, as compared with the agent dose that achieves the same level of effect. DRI values larger than 1 indicate increased sensitivity to the drug.

### Intracellular Doxorubicin Accumulation

The intracellular accumulation of doxorubicin was determined for both wild type and drug resistant sub-lines. Cells were grown in total 16 Petri dishes (35 mm, NUNC) as monolayers for 24 h in drug-free medium and then incubated for 1 h in the absence or presence of doxorubicin with or without exposure to TTFields (1.75 V/cm, 150 kHz) (4 Petri dishes for each treatment condition). The cells were washed with ice cold PBS three times and solubilised with 100 μl of 2% SDS. The solutions were then transferred to black 96-well plates (NUNC) and doxorubicin fluorescence was measured by spectrofluorometry (ELISA Reader TECAN F-200) at $\lambda_{em}$ 600 nm and $\lambda_{ex}$ 450 nm. Data obtained from 2 - 4 experiments were collected and the mean values and standard deviations (SEM) of doxorubicin fluorescence were calculated for each condi-

tion. Student t-test was applied to asses the significance of the differences between results obtained for each of the three cell pairs.

### Results

#### Effect of TTFields on wild type cells and their MDR sub-lines

In order to study the TTFields effect, field intensities that reduce the WT cell survival by about 50% were used. A comparison between the survival of wild type and MDR cells, when exposed to such TTFields, is given in Figure 1. The reduction in the number of viable cells is seen to be very similar (48-61% of control) in all wild type and paired MDR lines. In other words, the drug resistant cell lines have about the same sensitivity to TTFields as their corresponding wild type cell lines.

#### Exposure to doxorubicin or paclitaxel in combination with TTFields

Figure 2 compares between the cytotoxicity-dose curves of chemotherapeutic agents (paclitaxel and doxorubicin) of wild type cells and MDR sub-lines. It is seen that the resistivity of the MDR sub-lines is manifested in a significant right shift of the drug cytotoxicity-dose curves. As a result of these shifts the calculated $IC_{50}$ values (Table 1) for doxorubicin and paclitaxel, for all pairs of WT-MDR cell lines studied, give very high $IC_{50}$ ratios (resistance index RI): 55 - 79 for doxorubicin and 128 - 653 for paclitaxel.

A comparison between cell viability following separate and combined TTFields/drug exposures are presented in Figure 3. It is seen that in all combined exposures cell survival is lower as compared with exposure to any of the



Figure 1 The reduction in the number of viable WT and MDR cells following a 72 h exposure to TTFields. Open bars - WT cells; filled bars - MDR cell sub-lines. TTFields intensity - 1.75 V/cm. Data presented as mean ± SEM of 30-36 replicate measurements from 4-5 experiments. Note that there is no statistical difference between WT and MDR pairs (student t-test).

Schneiderman et al. BMC Cancer 2010, 10:229
http://www.biomedcentral.com/1471-2407/10/229



**Figure 2** Cytotoxicity of doxorubicin and of paclitaxel for wild type cells and the corresponding MDR sub-line cells. A, B & C - doxorubicin; D, E & F - paclitaxel. A & D - AA8 & EmtR1 cell lines; B & E - MCF-7 & MCF-7/Mx cell lines; C & F - MDA-MB-231 & MDA-MB-231/Dox cell lines. Open symbols - wild type cell lines. Filled symbols - MDR cell sub-lines. treatment duration - 72 h. Data presented as mean ± SEM of 12-20 replicate measurements from 3-5 experiments.

chemical agents (doxorubicin or paclitaxel) or TTFields alone (see Figure 1). Moreover, the cell survival of the MDR sub-lines and WT cell lines, when subjected to the combined exposure is similar, i.e. the resistivity or reduced drug sensitivity of MDR cells are not evident under these conditions.

Table 2 summarizes the combined treatment efficacy for MDR cells (see Figures 2 &3) expressed in terms of Dose Reduction Index (DRI). TTFields are seen to increase the sensitivity to doxorubicin of all three MDR sub-lines by at least two orders of magnitude. The corre-

sponding increase for paclitaxel is even greater, i.e. two to three orders of magnitude. In other words, the efficacy of combined drug/TTFields treatment of MDR cells greatly exceeds that of treatment with drug alone.

### Intracellular Doxorubicin Accumulation

An inherent feature of overexpressed ABC transporters phenotype is the reduction in cell uptake of doxorubicin due to its exclusion [18]. The ability of MDR cells to exclude doxorubicin was determined by means of spectrofluorometric analysis, Figure 4A illustrates the intra-

**Table 1: IC$_{50}$ values for doxorubicin and paclitaxel**

| Drug | IC50 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | AA8 | EmtR1 | MCF-7 | MCF-7/Mx | MDA-MB-231 | MDA-MB-231/Dox |
| Doxorubicin (μM) | 0.6 | 48.4 | 0.5 | 30.5 | 0.04 | 2.2 |
| Paclitaxel (μM) | 0.1 | 65.3 | 0.09 | 9.9 | 0.005 | 0.829 |

Drug concentrations inhibiting cell growth by 50% (IC$_{50}$) were calculated from relative survival curves (see Figure 2) using the median-effect principle [16].

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 608 of 631   Document 11-5
4839
Page 177 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_5B173E312028   25976

Schneiderman et al, BMC Cancer 2010, 10:229
http://www.biomedcentral.com/1471-2407/10/229

Page 5 of 7



**Figure 3** Effects of doxorubicin and paclitaxel when applied separately and in combination with TTFields on the viability of wild type and MDR cells. A - MDA-MB-231 & MDA-MB-231/Dox; B - MCF-7 & MCF-7/Mx; C - AA8 & Emt⁸¹. Open bars - wild type cells; filled bars - MDR cell sub-lines. I,II,III - Separate exposures, II & IV - combined exposures. TTFields intensity - 1.75 V/cm. Doxorubicin concentrations: A - 0.04 µM; B - 0.5 µM; C - 0.6 µM. Paclitaxel concentrations: A - 5 nM; B - 0.1 µM; C - 0.1 µM. Treatment duration - 72 h. Data presented as mean ± SEM of 24-36 replicate measurements from 3-5 experiments. * P < 0.01, student t-test.

**Table 2: Dose reduction indexes for MDR cell sub-lines treated alone and in combination with TTFields.**

| Drug | Dose reduction index (DRI) | | |
| --- | --- | --- | --- |
| | Emt⁸¹ | MCF-7/Mx | MDA-MB-231/Dox |
| Doxorubicin | 105 | 195 | 250 |
| Paclitaxel | 815 | 4404 | > 10,000 |

The DRI estimates the extent to which the dose of one or more agents in the combination can be reduced to achieve effect levels that are comparable with those achieved with single agents. The effect of TTFields/drug combined treatment for each MDR cell sub-line was as shown in Figure 3. The same effect of single drug was obtained from dose-response curves (see Figure 2). The DRI was calculated as a ratio of drug concentrations used alone vs. drug concentrations used in combination with TTFields.

ellular concentration of doxorubicin in AA8 (WT) and Emt⁸¹ (MDR) cell lines as a function of extracellular doxorubicin concentration with and without exposure to TTFields. In the drug resistant sub line, the relative intracellular doxorubicin concentration in Emt⁸¹ cells is lower by 44.9, 49.7 and 49.8% at 15, 30 and 45 µM extracellular doxorubicin concentration respectively, as compared with the wild type cells (Figure 4A, open symbols). Exposure of AA8 (WT) and Emt⁸¹ (MDR) cell lines to TTFields during incubation with doxorubicin had no effect on the intracellular concentration of the drug in both wild type and drug resistant sub lines indicating that TTFields affect neither doxorubicin uptake nor its exclusion (Figure 4A, filled symbols). Figure 4B depicts doxorubicin accumulation by MDR sub-lines relative to the corresponding WT cell

lines exposed to 30 µM of doxorubicin with and without TTFields. The relative intracellular doxorubicin concentration is lower by 49.7 ± 5% for Emt⁸¹, 66.4 ± 5% for MCF-7/Mx and by 32.6 ± 5% for MDA-MB-231/Dox as compared with the corresponding wild type cells (Figure 4B, open bars). TTFields have no effect on intracellular doxorubicin concentrations in all wild type and drug resistant cell lines (Figure 4D, filled bars).

## Discussion

ABC transporters provide vital protection from foreign compounds by exporting these compounds from the cell, thus lowering their intracellular concentration. Unfortunately, exposure of cancer cells to chemotherapeutics, mainly during relapse treatment, causes transporter upregulation such that the resulting over-expression of ABC transporters becomes one of the main causes of treatment failure. Moreover, various tumors such as renal cell, adrenocortical, colon and hepatocellular cancers express ABCB1 and are practically chemoresistant [19]. To overcome this problem chemosensitizers that block ABC transporter-mediated efflux were developed and have been used to combat MDR. However, this approach has not been clinically successful and therefore novel approaches that bypass, rather than block ABC transporters, are being sought for [20]. As the TTFields do not affect drug transport (see Figure 4) they fall into this category.

The results of this study clearly indicate that both the MDR and WT cells are similarly sensitive to TTFields. Moreover, TTFields were shown to enhance MDR cell sensitivity to chemotherapeutic agents, so as to equal that of WT cells under the same set of conditions (Figure 3). This phenomenon can only be partially explained on the basis of the corresponding dose-response curves (Figure 2) and the drug export rate (Figure 4). As demonstrated

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 609 of 631   Document 11-5

Schneiderman et al. BMC Cancer 2010, 10:229
http://www.biomedcentral.com/1471-2407/10/229

Page 6 of 7





Figure 5 Effect of 72 h application of TTFields and chemotherapeutic agents, separately and in combination on the viability of MDA-MB-231 wild type cells and MDA-MB-231/Dox MDR cells. - O- MDA-MB-231 cells treated with doxorubicin alone; - △ - MDA-MB-231 cells treated with doxorubicin in combination with TTFields (ref. [9]); - □ - MDA-MB-231/Dox cells treated with doxorubicin alone.

Figure 4 Effect of TTFields on doxorubicin accumulation. A - Dose response curve for AAB cells and for their MDR sub-line Emt⁶⁰. Open symbols - cells exposed to drug alone; filled symbols - cells exposed simultaneously to drug and TTFields. Circles - AAB cell line; squares - Emt⁶⁰ sub line. Intensity of TTFields - 1.75 V/cm, frequency - 150 kHz. Treatment duration - 1 h. Data presented as means ± SEM of 16-24 replicate measurements from 2-3 experiments. B - Effect of TTFields on doxorubicin accumulation by different MDR cell sub-lines relative to their parental wild type cell lines. Ordinate: relative intracellular doxorubicin concentration in the drug resistant sub lines presented as % of the corresponding concentration in the wild type cells. Open bars - cells exposed to drug alone; filled bars - cells exposed simultaneously to drug and TTFields. Doxorubicin concentration: 30 μM. TTFields intensity - 1.75 V/cm, TTFields frequency - 150 kHz. Treatment duration - 1 h. Data are presented as mean ± SEM of 12-24 replicate measurements from 3-4 experiments.

In Figure 5, the dose-response curve of the drug resistant cells is shifted to the right relative to the WT cells (see also Figure 2). The magnitude of the shift is such that the 50% inhibition of WT cells that is obtained at a concentration of 0.04 μM requires a concentration of 2.2 μM for the MDR sub-line, i.e. a 55 fold higher concentration. However the data depicted in Figure 4 and corresponding reports for low doxorubicin doses [21] indicate that the drug export lowers the intracellular concentration only by a factor of about 2. This means that some other factors must be responsible for the MDR resistance that corresponds to additional 20-30 fold drug concentration change. From the data in Figure 5A we also learn that both the MDR and WT cells are similarly highly sensitive to combined chemotherapy - TTFields treatments. Thus, while a 50% inhibition of MDR cells by doxorubicin alone requires a concentration of 2.2 μM, the combined treat-ment of TTFields and low concentration of doxorubicin (0.0017 μM) is sufficient to induce a similar inhibition. This is equivalent to an increased intracellular concentration of doxorubicin by a factor of over 1000. Thus, TTFields seem to have effects specific to MDR cells, not related to drug transport, that increase the MDR cell's sensitivity to chemotherapy. This conclusion is consistent with that of others [22-24] that attribute the MDR resistance, in addition to reduced drug uptake, to a number of potential mechanisms such as: sugar metabolism and energy production, alterations in cytoskeletal elements, microtubule and mitochondria distribution, etc. Within the framework of the above suggested mechanisms [22-24] it seems that the integrity of cytoskeleton and microtubule as well as the mitochondria distribution may be the most vulnerable to the forces produced by TTFields. The former may be disrupted by particle movements induced by the dielectrophoresis induced during TTFields application [8] while the latter are highly polar in themselves and are therefore directly subjected to the alternating field forces.

## Conclusions

The results of this study support the notion that TTFields may be used, both as an effective stand alone anti-proliferation agent for MDR cells, as well as an effective adjuvant that enhances chemotherapy efficacy. Furthermore, since TTFields are a physical modality, their therapeutic efficacy is independent of interaction with cell receptors. Therefore their efficacy is not expected to be limited to a specific set of cell types [8-12]. On the basis of the above, we believe that there is a high probability that TTFields

4841

Schneiderman et al. BMC Cancer 2010, 10:229
http://www.biomedcentral.com/1471-2407/10/229

may prove to be an effective therapeutic modality to a wide range of human cancers including those that developed multi drug resistance.

## List of abbreviations

MDR: multidrug resistance; TTFields: tumor treating electric fields; DRI: dose reduction index; WT: wild type.

### Competing interests

RSS, ES and EK are employees of NovoCure Ltd. YP has a minority holding in NovoCure Ltd.

### Authors' contributions

YP - Conceived the concept of TTFields, designed experiments, was involved in data analysis & interpretation of results and wrote the majority of the manuscript. RSS - Participated in experimental design, supervised the experiment execution, analyzed results and wrote parts of the manuscript. ES - Carried out the experiments EDR - Participated in experimental design and in the interpretation of the results.
All authors read and approved the final manuscript.

### Acknowledgements

We wish to thank Dr. Yoram Wasserman for technological supervision of the experiments. YW is an employee of NovoCure Ltd.
RSS, ES and EK are employees of NovoCure Ltd. YP is a consultant of NovoCure Ltd.
This study was sponsored by NovoCure Ltd, Haifa, Israel.

### Author Details

[1]NovoCure Ltd, MATAM Advanced Technology Centre, Haifa 31905, Israel and [2]Rappaport Faculty of Medicine, Technion - Israel Institute of Technology, Haifa 32000, Israel

Received: 28 December 2009 Accepted: 23 May 2010
Published: 23 May 2010

### References

1. Ling V: Multidrug resistance: molecular mechanisms and clinical relevance. Cancer Chemother Pharmacol 1997, 40(Suppl):S3-8K.
2. Stein U, Lage H, Jordan A, Walther W, Bates SE, Litman T, Hohenberger P, Dietel M: Impact of BCRP/MXR, MRP1 and MDR1/P-Glycoprotein on thermoresistant variants of atypical and classical multidrug resistant cancer cells. Int J Cancer 2002, 97:751-760.
3. Lage H: An overview of cancer multidrug resistance: a still unsolved problem. Cell Mol Life Sci 2008, 65:3145-67.
4. Ambudkar SV, Kimchi-Sarfaty C, Sauna ZE, Gottesman MM: P-glycoprotein: from genomics to mechanism. Oncogene 2003, 22:7468-85.
5. Gottesman MM, Fojo T, Bates SE: Multidrug resistance in cancer: role of ATP-dependent transporters. Nat Rev Cancer 2002, 2:48-58.
6. Wartenberg M, Witz N, Grob J, Niedermeier W, Hescheler J, Peters SC, Sauer H: Direct current electrical fields induce apoptosis in oral mucosa cancer cells by NADPH oxidase-derived reactive oxygen species. Bioelectromagnetics 2000, 29:47-54.
7. Janigro D, Perju C, Fazio V, Hallene K, Dini G, Agarwal MK, Cucullo L: Alternating current electrical stimulation enhanced chemotherapy: a novel strategy to bypass multidrug resistance in tumor cells. BMC Cancer 2006, 6:72-84.
8. Kirson ED, Gurvich Z, Schneiderman R, Dekel E, Itzhaki A, Wasserman Y, Schatzberger R, Palti Y: Disruption of cancer cell replication by alternating electric fields. Cancer Res 2004, 64:3288-95.
9. Kirson ED, Schneiderman RS, Dbalý V, Tovaryš F, Vymazal J, Itzhaki A, Mordechovich D, Gurvich Z, Shmueli E, Goldsher D, Wasserman Y, Palti Y, Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). BMC Med Phys 2009, 9:1-13.
10. Salzberg M, Kirson E, Palti Y, Rochlitz C: A pilot study with very low-intensity, intermediate-frequency electric fields in patients with locally advanced and/or metastatic solid tumors. Onkologie 2008, 31:362-5.
11. Kirson ED, Dbalý V, Tovaryš F, Vymazal J, Soustiel JF, Itzhaki A, Mordechovich D, Steinberg-Shapira S, Gurvich Z, Schneiderman R, Wasserman Y, Salzberg M, Ryffel B, Goldsher D, Dekel E, Palti Y, Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. Proc Natl Acad Sci USA 2007, 104:10152-7.
12. Kirson ED, Giladi M, Gurvich Z, Itzhaki A, Mordechovich D, Schneiderman RS, Wasserman Y, Ryffel B, Goldsher D, Palti Y: Alternating electric fields (TTFields) inhibit metastatic spread of solid tumors to the lungs. Clin Exp Metastasis 2009, 26(7):633-40.
13. Dangria MJ, Eytan GD, Assaraf YG: Competition of hydrophobic peptides, cytotoxic drugs, and chemosensitizers on a common P-glycoprotein pharmacophore as revealed by its ATPase activity. J Biol Chem 1996, 271:3163-71.
14. Johnsson A, Vallon-Christersson J, Strand C, Litman T, Eriksen J: Gene expression profiling in chemoresistant variants of three cell lines of different origin. Anticancer Res 2005, 25:2661-8.
15. Yen WC, Lamph WW: The selective retinoid x receptor agonist bexarotene (LGD1069, Targretin) prevents and overcomes multidrug resistance in advanced breast carcinoma. Mol Cancer Ther 2005, 4:824-34.
16. Chou TC, Talalay P: Quantitative analysis of dose-effect relationships: the combined effect of multiple drugs or enzyme inhibitors. Adv Enzyme Regul 1984, 22:27-54.
17. Chou TC: Theoretical basis, experimental design, and computerized simulation of synergism and antagonism in drug combination studies. Pharmacol Rev 2006, 58:621-681.
18. Pérez-Tomás R: Multidrug resistance: retrospect and prospects in anti-cancer drug treatment. Curr Med Chem 2006, 13:1859-76.
19. Fojo AT, Ueda K, Slamon DG, Poplack DG, Gottesman MM, Pastan I: Expression of a multidrug-resistance gene in human tumors and tissues. Proc Natl Acad Sci USA 1987, 84:265-269.
20. Wu CP, Calcagno AM, Ambudkar SV: Reversal of ABC drug transporter-mediated multidrug resistance in cancer cells: Evaluation of current strategies. Curr Mol Pharmacol 2008, 1:93-105.
21. Hembruff SL, Laberge MN, Villeneuve DJ, Guo B, Veitch Z, Cecchetto M, Parissenti AM: Role of drug transporters and drug accumulation in the temporal acquisition of drug resistance. BMC Cancer 2008, 8:318-434.
22. Binkhathlan Z, Brocks DR, Sulová Z, Ujhelk B: P-glycoprotein—implications of metabolism of neoplastic cells and cancer therapy. Curr Cancer Drug Targets 2009, 8:457-68.
23. Hait W, Wang Y, Veeraraghavan S, Cabral F: Mutations in alpha- and beta-tubulin that stabilize microtubules and confer resistance to colcemid and vinblastine. Mol Cancer Ther 2003, 2:597-605.
24. Villa AM, Doglia SM: Mitochondria in tumor cells studied by laser scanning confocal microscopy. J Biomed Opt 2004, 9:385-94.

### Pre-publication history

The pre-publication history for this paper can be accessed here:
http://www.biomedcentral.com/1471-2407/10/229/prepub

doi: 10.1186/1471-2407-10-229
Cite this article as: Schneiderman et al., TTFields alone and in combination with chemotherapeutic agents effectively reduce the viability of MDR cell sub-lines that over-express ABC transporters BMC Cancer 2010, 10:229

# BMC Medical Physics

( )
**BioMed** Central

Research article

**Open Access**

# Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields)

Eilon D Kirson*[1], Rosa S Schneiderman[1], Vladimír Dbalý[2],
František Tovaryš[2], Josef Vymazal[2], Aviran Itzhaki[1], Daniel Mordechovich[1],
Zoya Gurvich[1], Esther Shmueli[1], Dorit Goldsher[3,4], Yoram Wasserman[1] and
Yoram Palti[1,4]

Address: [1]NovoCure Ltd., MATAM Advanced Technology Centre, Haifa 31905, Israel, [2]Na Homolce Hospital, Roentgenova 2, Prague 5, 150 30, Czech Republic, [3]Rambam Medical Center, PO Box 9602, Haifa 31096, Israel and [4]B. Rappaport Faculty of Medicine, Technion – Israel Institute of Technology, Technion City, Haifa 32000, Israel

Email: Eilon D Kirson* - eilon@novo-cure.com; Rosa S Schneiderman - rosa@novo-cure.com; Vladimír Dbalý - vladimir.dbaly@homolka.cz; František Tovaryš - frantisek.tovarys@homolka.cz; Josef Vymazal - josef.vymazal@homolka.cz; Aviran Itzhaki - aviran@novo-cure.com; Daniel Mordechovich - daniel@novo-cure.com; Zoya Gurvich - zoya@novo-cure.com; Esther Shmueli - etl@novo-cure.com; Dorit Goldsher - dgoldsher@rambam.health.gov.il; Yoram Wasserman - yoramw@novo-cure.com; Yoram Palti - yoram@novo-cure.com
* Corresponding author

Published: 8 January 2009

Received: 3 September 2008
Accepted: 8 January 2009

BMC Medical Physics 2009, 9:1 doi:10.1186/1756-6649-9-1

This article is available from: https://www.biomedcentral.com/1756-6649/9/1

© 2009 Kirson et al; licensee BioMed Central Ltd.
This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

## Abstract

**Background:** The present study explores the efficacy and toxicity of combining a new, non-toxic, cancer treatment modality, termed Tumor Treating Fields (TTFields), with chemotherapeutic treatment in-vitro, in-vivo and in a pilot clinical trial.

**Methods:** Cell proliferation in culture was studied in human breast carcinoma (MDA-MB-231) and human glioma (U-118) cell lines, exposed to TTFields, paclitaxel, doxorubicin, cyclophosphamide and dacarbazine (DTIC) separately and in combinations. In addition, we studied the effects of combining chemotherapy with TTFields in an animal tumor model and in a pilot clinical trial in recurrent and newly diagnosed GBM patients.

**Results:** The efficacy of TTFields-chemotherapy combination in-vitro was found to be additive with a tendency towards synergism for all drugs and cell lines tested (combination index ≤ 1). The sensitivity to chemotherapeutic treatment was increased by 1–3 orders of magnitude by adjuvant TTFields therapy (dose reduction indexes 23 – 1316). Similar findings were seen in an animal tumor model. Finally, 20 GBM patients were treated with TTFields for a median duration of 1 year. No TTFields related systemic toxicity was observed in any of these patients, nor was an increase in Temozolomide toxicity seen in patients receiving combined treatment. In newly diagnosed GBM patients, combining TTFields with Temozolomide treatment led to a progression free survival of 155 weeks and overall survival of 39+ months.

**Conclusion:** These results indicate that combining chemotherapeutic cancer treatment with TTFields may increase chemotherapeutic efficacy and sensitivity without increasing treatment related toxicity.

Page 181 of 204 received on 6/6/2018 11:50:24 PM [Central Daylight Time]    JB_5B173E312028    25976

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 612 of 631    Document 11-5    4843

*BMC Medical Physics* 2009, 9:1      http://www.biomedcentral.com/1756-6649/9/1

## Background

A new physical cancer treatment modality termed Tumor Treating Fields, or TTFields, has recently been demonstrated to be highly effective when applied to cell cultures, animal cancer models, as well as to patients suffering from locally advanced and or metastatic solid tumors [1-3]. In a pilot clinical trial, the medians of time to disease progression and overall survival of recurrent GBM patients treated by TTFields alone were more than double the reported medians of historical control patients [1]. In contrast to the widely used physical treatment modality, ionizing radiation, TTFields are not associated with significant side effects.

TTFields are low intensity (1–2 V/cm), intermediate frequency (100 – 200 kHz) alternating electric fields generated by special insulated electrodes applied to the skin surface. These specially tuned fields have no effect on quiescent cells while having an anti-mitotic effect on dividing cells. During cytokinesis, TTFields generate non-uniform intracellular fields that exert forces that move polar macromolecules and organelles towards the narrow neck, separating the newly forming daughter cells, by a process termed dielectrophoresis. These molecular and organelle movements, together with an interference with the spindle tubulin polymerization process, inhibit cell division and lead to cell death[2]. Fortunately, the dividing cells of the hematopoietic system are not affected by TTFields as the muscles surrounding the marrow containing bones serve as an effective electric field shield. Moreover, due to their relatively high frequency range and very low intensity, TTFields do not stimulate nerves and muscles, do not generate meaningful temperature elevation or puncture the cell membrane (as the strong electroporation fields do [4]). Thus, TTFields are not associated with meaningful toxicity in contrast to most anti-cancer agents currently in use [5].

In view of the unfavorable therapeutic indexes of the available effective chemical and physical (i.e. ionizing radiation) therapeutic agents, many cancer treatment protocols require simultaneous or sequential use of a number of therapeutic agents in an attempt to increase efficacy while maintaining tolerable toxicity [5-7]. Within this framework it is generally accepted that by adding ionizing radiation [8] to chemotherapy one gets both the benefit of the radiation effect as well as sensitization leading to an increased efficacy without a corresponding increase in toxicity. On the basis of the above this study explores the potential use of the new physical treatment modality, TTFields, in combination with chemotherapeutic agents in cell cultures, an animal tumor model, as well as in patients with glioblastoma (GBM). As TTFields are not associated with systemic toxicity [1] the expectation is that their addition will result in an increase in efficacy alone.

## Methods

### Cell cultures

Cells were cultured and maintained as previously described [1,2]. In brief: Human breast cancer (MDA-MB-231) and human glioma (U-118) obtained from ATCC (USA) were cultured in DMEM + 10% FCS media in a 5% $CO_2$ incubator at 37°C. Drops consisting of 200 µl suspension of cells ($100 \times 10^3$ cells/ml) were placed at the centre of 35 mm Petri dishes, incubated for 2 hours to allow for cell attachment, then 1.5 ml of media were added and incubation was continued for an additional 22 h. Following this, the baseline cell count was estimated using the XTT colorimetric method (expressed as $OD_0$). The media in the Petri dishes was replaced by fresh media (3 ml), with or without a chemotherapeutic agent and incubated at a final temperature of 37° ± 0.5°C for 24 to 72 hours after which the cell number was re-estimated ($OD_1$). The relative number of viable cells at each time point following baseline was expressed as $OD_1/OD_0$ and treatment efficacy as the % change in proliferation relative to control:

$$(OD_1/OD_0)_{experiment} * 100/(OD_1/OD_0)_{control} \quad (1)$$

### TTFields treatment of cultures

As previously described [1,2], two pairs of electrodes, insulated by a high dielectric constant ceramic, were positioned normal to each other at a distance of 20 mm in treatment and control dishes. In the former, the electrodes were connected to sinusoidal waveform generator that generated fields of optimal frequencies in the medium [1,2,9]: 150 kHz for breast cancer and 200 kHz for glioma, that changed direction by 90° every 250 ms. Field intensity was measured as described previously [2] and expressed as V/cm. For 72 h experiments the TTFields intensity of 1.75 V/cm was used. For 24 h experiments 0.65, 1.25 and 1.75 V/cm TTFields were used.

Four different sets of experiments were conducted in conjunction with each chemotherapeutic agent: untreated sham control, treatment with TTFields, treatment with the chemotherapeutic agents, and combined TTFields – Chemo treatment.

### Assessment of combination index and dose reduction index

The Chou and Talalay [10] method for assessing the combined effect of multiple drugs was used for the drug – TTFields combinations. In order to assess whether the interactions between TTFields and each of the chemotherapeutic agents is synergistic, additive or antagonistic, combination indexes were calculated as follows: TTFields intensity replaced the concentration (dose) variable in the analyses. Dose-response curves were generated for TTFields and each drug to determine the median effect

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 613 of 631 Document 11-5    4844

Page 182 of 204 received on 6/5/2018 11:39:24 PM [Central Daylight Time]    JB_5B173E1E2028    25976

50185373505985

BMC Medical Physics 2009, 9:1       http://www.biomedcentral.com/1756-6649/9/1

points. Variable ratios of drug concentrations to TTFields intensities were used to calculate the Combination Indexes (CI) as follows:

$$CI = (C_{Drug(incombination), X\% effect}/C_{Drug(alone), X\% effect}) + (I_{TTFields(incombination), X\% effect}/I_{TTFields(alone), X\% effect}) \quad (2)$$

Where: C are the drug concentrations and I the TTFields intensities use to achieve a preset X% effect. Relationships of CI<1 indicate more than additive - synergy, CI = 1 reflects additivity - summation and CI>1 indicates less than additive or antagonism.

In order to asses whether TTFields increase the sensitivity of tumor cells to various chemotherapeutic agents, the dose reduction index (DRI) of for each of these agents was calculated according to [11]. In short, the median-effect plots were for each chemotherapy-TTFields combination, were constructed. The ratio of affected to unaffected number of cells ($f_a/f_u$) was plotted versus drug concentration on a log-log scale. The median effect point ($D_m$) was assessed by deriving the slope of the linear regression for each of the plots. The DRI for a 50% effect ($DRI_m$) was calculated as the ratio of $D_m$ for drug alone and for combined drug-TTFields:

$$DRI_m = D_{m(drug alone)}/D_{m(combined treatment)} \quad (3)$$

A DRI greater than 1 indicates an increase in sensitivity to the drug. The greater the DRI, the more significant the possible dose reduction.

### In-vivo experiments

Combined TTFields and Paclitaxel efficacy study in VX2 tumor bearing rabbits was conducted after approval by the NovoCure Internal Animal Care and Use Committee. All painful or anxiogenic procedures were performed under general anesthesia induced by intramuscular administration of 30 mg/kg of ketamine hydrochloride, 10 mg/kg xylazine hydrochloride and 1.5 mg/kg Acepromazine. The tumor tissue required for implantation was obtained from VX-2 tumor bearing carrier rabbits. The carrier rabbits had VX-2 tumors implanted intramuscularly in the thigh. When the tumor reached approximately 1 cm in diameter (about 3 weeks from implantation), the tumor was excised, minced in sterile saline and VX-2 tumor fragments obtained. Two fragments were injected using a large bore needle into the thigh muscles of both legs in a recipient rabbit for tumor propagation. For experimental animals, after laparotomy, a fragment of tumor tissue (1 mm³) was implanted beneath the kidney capsule of the recipient rabbit.

The current experiment comprised 28 animals (7 in each of 4 groups). Fourteen days after tumor implantation the

initial tumor volume was assessed based on serial (2.2 mm interval) T1 weighted axial MRI images (1.5 Tesla, GE Genesis-Signa) obtained 3 minutes following IV injection of 3 ml of Gadolinium. Tumor volume was assessed from the area of the contrast enhancing lesion in each section. The animals were assigned randomly into 4 groups before treatment start:

1. TTFields treated group: TTFields were applied by using the NovoTTF-100A device (NovoCure LTD., Haifa, Israel). An optimal frequency of 150 kHz and intensity of 1–2 V/cm were used. TTFields were switched sequentially between two perpendicular field directions.

2. Control group: sham electrode heated to mimic heat generated by the TTFields treatment. (38–39.9°C)

3. Paclitaxel (Medixel Injection., Taro Pharmaceutical Industries LTD., Israel) treated group: 5 mg/animal diluted in 100 ml of normal saline were infused intravenously over a period of 30 minutes. Premedication was given subcutaneous 8 hours before and immediately prior to Paclitaxel administration (Dexamathasone (Dexaveto-0.2 veterinary, V.M.D n.v/s.a Belgium) 0.5 mg/animal; Pramine (Metoclopramide HCL, Rafa Laboratories LTD., Israel) 1 mg/animal; Diphenhydramine (10%, Medical M., Israel) 10 mg/animal).

4. Combined TTFields and Paclitaxel treatment as above.

TTFields were delivered to awake and behaving rabbits through four insulated electrode arrays placed circumferentially around the animal's abdomen, caudal to the ribcage. The electrode insulation consisted of a high dielectric constant (>10,000) ceramic (PMN-PT) allowing efficient energy transfer through the insulation into the animals body at the given frequencies. The electrodes were connected by a spiral cable to a swivel mechanism at the top of the cage, enabling the free movement. TTFields were generated using the NovoTTF-100A system (NovoCure Ltd., Haifa, Israel). The animals were treated for 21 days continuously with MRI performed on days 14 and 21 for tumor volume assessment. The TTFields intensity within the kidneys of the rabbits, using this electrode configuration, is between 1–3 V/cm (based on both finite element mesh simulations and direct measurements using an invasive probe – data not shown).

### Pilot clinical trial

A single arm, pilot trial of the safety and efficacy of TTFields treatment was performed in 20 patients with histologically proven glioblastoma multiforme (GBM) that met the inclusion/exclusion criteria specified in Supplemental Material Appendix A (briefly, KPS 70–100%, Age ≥ 18). The trial was performed according to a protocol

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 614 of 631   Document 11-5   4845

Page 183 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)   JB_5B173E312028   25976

BMC Medical Physics 2009, 9:1

http://www.biomedcentral.com/1756-6649/9/1

approved by the Na Homolce Institutional Review Board and the Czech Republic Ministry of Health. The patients were divided into two groups: The first group included 10 patients with recurrent GBM treated with TTFields alone following failure of maintenance Temozolomide [1]. The second group consisted of 10 newly diagnosed patients who were at least 4 weeks post radiation therapy, who received TTFields combined with maintenance Temozolomide. Prior to initiation of treatment, all patients underwent a baseline contrast MRI of the head, chest radiograph, EEG, ECG, complete blood & urine analyses, physical examination and neurological status. The patients were hospitalized for 1–3 days for observation and then released home where they received multiple 4-week courses of continuous NovoTTF-100A treatment until progression. The patients were seen once/month at an outpatient clinic where they underwent an examination similar to the initial one. TTFields were applied to the patients using the NovoTTF-100A device set to deliver 200 kHz, 0.7 V/cm (RMS) fields (at the center of the brain) in 2 perpendicular directions, 1 second in each direction sequentially. The TTFields were applied continuously using four insulated electrode arrays, each having a surface area of 22.5 cm², placed on opposing sides of the head with the tumor positioned directly between the electrode pairs [1]. As previously reported, to avoid electrolysis at the electrode surface and intracellular ion concentration changes that accompany long term current application, the electrodes were completely insulated by a ceramic having a very high dielectric constant [1,2] that allowed the generation of the necessary electric fields [1,2]. Using this electrode configuration, the lowest TTFields intensity at the center of the brain was 0.7 V/cm (RMS). This intensity was calculated using finite element mesh simulations and verified by direct measurement in large animals and a human volunteer [1].

The outcome endpoints of the study included safety, overall survival (OS) and progression free survival (PFS). Assessment of tumor response was based on monthly MRIs according to the Macdonald criteria [12]. Median OS and PFS were determined using Kaplan Meier curves [13]. In the first group, PFS in NovoTTF-100A treated patients was compared to a matched group of concurrent control patients who received salvage chemotherapy at recurrence (n = 18). PFS in Temozolomide/NovoTTF-100A treated patients was compared to the PFS of a

matched group of concurrent control patients (n = 32) who received Temozolomide (according to the protocol described by Stupp et al. [14]). OS in both groups was compared to matched historical control data with the same Karnofsky performance score (>60) and age [14].

## Results

### Breast cancer cell cultures

*Dose – response of culture exposure to TTFields, paclitaxel, doxorubicin and cyclophosphamide, alone and in combination*

The relationship between TTFields intensity, at 150 kHz, and cell proliferation rate is given in Figure 1A. At the lowest field intensity of 0.63 V/cm there is no significant change in cell proliferation. For TTFields intensities of 1.25, 1.75 and 2.95 V/cm cell proliferation decreases (control = 100%) to: $90 \pm 3\%$, $74 \pm 4\%$ and $25 \pm 5\%$, respectively. The dose-response curves of cells exposed to paclitaxel, doxorubicin and cyclophosphamide, alone and in combination with 1.75 V/cm TTFields for 72 hours, are given in Figures 1B, C & D. For each drug alone there is a decrease in cell proliferation with increase in concentration. For cyclophosphamide and doxorubicin complete inhibition of proliferation is achieved at high drug concentrations. For paclitaxel, the inhibitory effect of the drug saturates at about 500 nM, near the 13% level, indicating that a fraction of the cells are insensitive to the agent. Combined treatment with TTFields and each of the chemotherapeutic agents caused a leftward shift of the dose response curves. This shift can be expressed as a decrease in the drug concentration leading to 50% inhibition of cell proliferation ($IC_{50}$ – Table 1).

### Time course of the effects TTFields, paclitaxel, doxorubicin and cyclophosphamide

Figure 2 displays the time course of proliferation inhibition during a continuous 72 hour exposure to TTFields, paclitaxel, doxorubicin and cyclophosphamide alone and in combination with 1.75 V/cm TTFields. It is seen that in all cases the inhibition during combined exposure is greater than for the chemotherapeutic agent alone. The differences between the separate and combined effects increase with time.

### Recovery from treatment

Figure 3 demonstrates that a 24 hour exposure to individual chemotherapeutic agents induces a reduction of approximately 25% in viable cell number compared to

**Table 1: $IC_{50}$ for chemotherapeutic drugs alone and in combination with 1.75 V/cm TTFields after 72 hours of continuous treatment.**

| Chemotherapy | $IC_{50}$ (drug alone) | $IC_{50}$ (drug-TTFields combination) |
|---|---|---|
| Paclitaxel | 5.00 nM | 0.005 nM |
| Doxorubicin | 0.04 µM | 0.002 µM |
| Cyclophosphamide | 6.60 mM | 0.044 mM |

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 615 of 631    Document 11-5

Page 184 of 204 received on 6/5/2018 11:36:24 PM [Central Daylight Time]    JB_5B173E312028    25976    4846

BMC Medical Physics 2009, 9:1                    http://www.biomedcentral.com/1756-6649/9/1



**Figure 1**
Effect of 72 hour continuous application of TTFields and chemotherapeutic agents, separately and in combination on the cell proliferation of ER-negative MDA-MB-231 cells (presented as percent viable cells compared to control). (A) Percent viable cells vs. TTFields intensity. Effect of different concentrations of paclitaxel (B), doxorubicin (C) and cyclophosphamide (D), alone and in combination with TTFields of 1.75 V/cm. In B, C and D Filled Circles – represent drug alone; Filled Squares – drug in combination with TTFields. Each point represents mean values ± SEM of 10 to 36 replicate measurements. Dotted lines demarcate the IC$_{50}$ values for each curve.

controls. The proliferation rate (slope of the graph) recovers almost completely during the following 48 hours, except for doxorubicin, where recovery is slower and

delayed by about 24 hours. In contrast, addition of TTFields to any one of these chemotherapeutic agents results in irreversible and complete inhibition of cell pro-

Page 185 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_59173E31202B    25976

BMC Medical Physics 2009, 9:1                    http://www.biomedcentral.com/1756-6649/9/1



**Figure 2**
**Time course of the effects of 72 hour exposure of MDA cells to Paclitaxel (A), Doxorubicin (B) and Cyclophosphamide (C) alone and in combination with 1.75 V/cm TTFields.** Each graph shows the number of viable cells in culture over time in control cells (interrupted lines), drug alone (open squares), TTFields alone (open circles) and drug-TTFields combination (closed squares). Data are presented as mean ± SEM. Each experimental condition included 18-36 samples.

liferation rate manifested as a decrease in the number of cells in culture. For Cyclophosphamide there is an almost complete loss of viable cells after 72 hours of combined treatment.

**Glioma cell cultures**
*Combined effect of DTIC and TTFields in human glioma cell cultures*
In order to asses the combination between Temozolomide and TTFields in glioma cells, DTIC and TTFields

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 617 of 631    Document 11-5          4848
Page 186 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_5B173E312028          25976

2 0 1 9 2 1 2 X 0 5 8 8 7

BMC Medical Physics 2009, 9:1    http://www.biomedcentral.com/1756-6649/9/1



**Figure 3**
Time course of recovery from 24 hour exposure to Paclitaxel (A), Doxorubicin (B) and Cyclophosphamide (C) alone and in combination with 1.75 V/cm TTFields. Each graph shows the number of viable cells in culture over time in control cells (interrupted lines), drug alone (open squares), TTFields alone (open circles) and drug-TTFields combination (closed squares). Data are presented as mean ± SEM. Each experimental condition included 18–36 samples.

were applied alone and in combination to U-118 cells in culture. Both DTIC and Temozolomide act through a common degradation product (MTIC). Thus light activated DTIC was used for these experiments as described

previously [15,16]. Figure 4 compares the DTIC dose-response curve, with that obtained with DTIC - TTFields combination. As we have shown in breast cancer cultures, the addition of TTFields to a chemotherapeutic agent

Page 187 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 618 of 631    Document 11-5    4849

*BMC Medical Physics* 2009, 9:1



**Figure 4**
**Effect of light activated DTIC and TTFields (1.75 V/cm) on cell proliferation of U-118 glioma cells**, presented as percent of viable cells compared to control. Open Circles – 72 hours of DTIC treatment alone. Filled Circles – 72 h of Combined DTIC – TTFields treatment.

**Table 2: Calculated Combination Indexes for human breast cancer (MDA-MB-231) cells treated with paclitaxel, doxorubicin or cyclophosphamide in combination with TTFields.**

| | Combination Index | | |
|---|---|---|---|
| | MDA-MB-231 cells | | |
| TTFields Intensity (V/cm) | Paclitaxel | Doxorubicin | Cyclophosphamide |
| | $CI_{40}$ | $CI_{50}$ | $CI_{50}$ |
| 0.625 | - | - | 0.74 |
| 1.25 | 0.97 | 0.99 | 0.84 |
| 1.75 | 0.88 | 0.98 | 0.95 |

causes a leftward shift in the dose-response curve in glioma cells as well. The $IC_{50}$ for DTIC alone in Figure 4 is 6.4 mM, whereas the $IC_{50}$ for combined DTIC-TTFields is two orders of magnitude lower (0.023 mM).

### Analysis of combination efficacy and sensitivity in-vitro
#### Combination Indexes

The mode of interaction between TTFields and chemotherapeutic agents (synergism, additivity or antagonism) can be analyzed using Combination Indexes (CI) as described by [10,17]. In order to calculate the CIs for TTFields-Chemotherapeutic agents, the extent of inhibition of cell growth was assessed after 24 hours of treatment with Paclitaxel, Doxorubicin and Cyclophosphamide alone or in combination with different intensities of TTFields (0.625–1.75 V/cm; see Materials and Methods). Table 2 demonstrates that for breast cancer cells the CI for Doxorubicin is very close to 1, indicating additivity [10,11]. In contrast, for TTFields with Paclitaxel and Cyclophosphamide the CIs are <1 indicating additivity with a tendency towards synergism.

#### Dose reduction indexes

In order to assess the extent of possible chemotherapeutic dose reduction when applied in combination with TTFields, dose reduction indexes (DRI) for each drug-TTFields combination were calculated based on the meth-

odology described by [11]. The DRIs for TTFields-drug interaction after 72 hours of combined treatment was 1316 for paclitaxel, 29 for doxorubicin, 132 for cyclophosphamide and 175 for DTIC (in U-118 glioma cells). Thus a significantly reduced dose (1–3 orders of magnitude lower drug concentration) may be used in combination with TTFields to achieve the same level of efficacy.

### Effect of combined paclitaxel and TTFields on VX2 tumors in rabbits

Prior to testing the combined efficacy of paclitaxel and TTFields on VX2 tumors implanted within the kidneys of rabbits, the dose-response in this animal tumor model was determined. A dose of Paclitaxel leading consistently to a 15–20% inhibition in tumor growth (5 mg/rabbit) was chosen for subsequent combination experiments with TTFields.

As seen in Figure 5, untreated tumors increased in volume by a factor of 70 from baseline, Paclitaxel treated tumors grew by a factor of 58 from baseline, TTFields treated tumors grew by a factor of 34 from baseline and tumors treated by TTFields-Paclitaxel combination grew by a factor of 22 from baseline. Thus the TTFields-Paclitaxel combination treatment inhibited tumor growth by 69% compared to the growth of control tumors, while Paclitaxel alone inhibited tumor growth by 15% compared to the growth of control tumors, and TTFields alone by 53% compared to the growth of control tumors. Thus, additivity was seen between TTFields and Paclitaxel at the intensity and concentration used. Differences between curves were statistically significant (p < 0.01; ANOVA).

### Pilot clinical trial in GBM patients

Twenty patients with histological diagnosis of GBM were treated continuously for an average of 1 year (range 2.5–24 months). Ten recurrent GBM patients were treated with TTFields alone as salvage therapy. Ten newly diagnosed

Page 188 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 619 of 631    Document 11-5
4850

BMC Medical Physics 2009, 9:1

http://www.biomedcentral.com/1756-6649/9/1



**Figure 5**
**Effect of combined Paclitaxel/TTFields on VX2 tumors in Rabbits.** A VX-2 kidney tumor volumes were normalized to pre-treatment tumor volume (day 7) and are presented over time for control (diamonds), 5 mg Paclitaxel (circles), TTFields (squares) and combined TTFields-Paclitaxel (triangles). The effect of combined TTFields and Paclitaxel is equal to the sum of the effects of either treatment alone at both time points measured during the study (2 and 3 weeks from treatment start; n = 23; bars are standard errors of means). B Exemplary MRIs of the maximal contrast enhancing tumor area (demarcated by orange boarders) in the kidneys of rabbits in each of the experimental groups (sham control, Paclitaxel 5 mg, TTFields 2 V/cm, combined Paclitaxel and TTFields).

GBM patients, that had undergone surgery and thereafter received radiation therapy with adjuvant Temozolomide, were treated with the combination of TTFields in parallel to maintenance Temozolomide [14]. In both groups of patients no device related serious adverse effects were observed. The only device related toxicity reported was a dermatitis which appeared most often (18 of 20 patients) during the second month of treatment. The severity of the dermatitis decreased upon use of topical corticosteroids and periodic electrode relocation. The dermatitis continued for the duration of treatment and resolved completely within days to weeks from treatment termination.

In the second group, no increase in Temozolomide related adverse events was seen due to the combination with TTFields (see Table 3).

As reported previously [1], both progression free survival (PFS) and overall survival (OS) in the recurrent GBM salvage therapy group were at least double that of concurrent and historical controls, respectively. The efficacy of the TTFields-Temozolomide combination in the second group of patients was assessed using Kaplan Meier curves [15] of PFS and OS. The Kaplan Meier curves for the PFS of these patients, treated by combined TTFields – Temozolomide are shown in Figure 6A. The median PFS of the

combination treated patients is 155 weeks versus 31 weeks for concurrent controls treated with maintenance Temozolomide alone. Note that 5 of 10 patients are currently progression free. Figure 6B compares the OS of the patients that received the combination treatment (red line) with a matched historical control (KPS>50, Median age 54) (black line [14]). It is seen that for the TTFields – Temozolomide combination treated patients, the Median OS > 39 months versus about 14.7 months for matched historical control patients who received maintenance Temozolomide alone. It should be noted that at the time

**Table 3: Toxicities by grade and causality in the newly diagnosed GBM patients treated with combined TTFields-Temozolomide.**

|  | Grade | | Causality assessment |
|---|---|---|---|
|  | I-II | III-IV |  |
| Elevated LFTs | 8/10 | 0/10 | Anti Epileptic Drugs |
| Hyperglycemia | 4/10 | 0/10 | Oral Steroids |
| Anemia | 6/10 | 0/10 | Temozolomide |
| Thrombocytopenia | 2/10 | 0/10 | Temozolomide |
| Leucopenia | 3/10 | 0/10 | Temozolomide |
| Headache | 2/10 | 0/10 | Underlying disease |
| Seizures | 1/10 | 0/10 | Underlying disease |
| Dermatitis | 10/10 | 0/10 | NovoTTF-100A |

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 620 of 631   Document 11-5
Page 189 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]
4851

501621525b898

BMC Medical Physics 2009, 9:1

http://www.biomedcentral.com/1756-6649/9/1



**Figure 6**
**Kaplan Meier curves for A – progression free survival (PFS) and B – overall survival (OS) of newly diagnosed GBM patients receiving either combined TTFields – Temozolomide treatment or Temozolomide treatment alone.** Red line – patients receiving combined TTFields – Temozolomide treatment (n = 10). Black line – concurrent/historical control patients that received Temozolomide treatment alone. A – The difference between the PFS curves is highly significant – Log-Rank Test (P = 0.0002), Hazard Ratio 3.32 (95%CI 1.9–5.9). B – The difference between the OS curves is highly significant – (Log-Rank Test; P = 0.0018). Dashed lines mark the median values for each curve.

of this report 8 of 10 patients, receiving the TTFields-Temozolomide combination treatment, are alive.

## Discussion

Cancer treatment with drug combinations was introduced in order to improve therapeutic indexes through dose reduction of each drug and increase treatment efficacy. In this study the exposure of cancer cells to combined chemotherapy and TTFields was studied in cell cultures, an animal tumor model and in a pilot clinical trial in recurrent and newly diagnosed GBM patients. The results of this study support the possibility that TTFields may be used, not only as an effective stand alone anti-proliferation agent (as shown previously in [1]), but also as an effective adjuvant that enhances chemotherapy efficacy without an increase in toxicity. In addition to this increase in efficacy, these results raise the possibility of dose reduction of chemotherapy when used in combination with TTFields. This is of outmost importance since, at tolerable doses the efficacy of available cancer therapeutic agents is often far from optimum while being associated with a high degree of toxicity.

With regards to the mechanisms involved, one may assume that tumor cells are sensitized to TTFields by chemotherapy, much like another well established physical therapy – ionizing radiation [8,18,19]. In the specific case of Paclitaxel, one of the most commonly used treatments for late-stage human breast cancer [20], the combined effect may be attributed to their similar site of action – the spindle microtubules [1,2,21]. Taxanes act by stabilizing the link between individual tubulin dimmers [21]. As illustrated schematically in Figure 7A taxanes increase the length of tubulin filaments within the cell. One of the mechanisms of action of TTFields is the misalignment of mitotic spindle filaments as a result of TTFields forces on tubulin chains [2]. The increase in filament length due to taxanes, increases the dipole moment of these macromolecules, leading to an increase in the TTFields induced forces and thus to a higher sensitivity of the cell to TTFields (see Figure 7A).

Doxorubicin that has a broad spectrum of activity both in experimental tumor models and in human malignancy, affects both DNA and RNA synthesis [22]. Cyclophosphamide (an alkylating agent) inhibits DNA replication by

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 621 of 631    Document 11-5    4852
Page 190 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_SB173E312028    25976

*BMC Medical Physics* 2009, 9:1      http://www.biomedcentral.com/1756-6649/9/1

A      B



**Figure 7**
**Mechanisms of potentiation of chemotherapeutic efficacy by TTFields.** A Tubulin chains are elongated by Paclitaxel, leading to an increase in the average dipole moment of free tubulin chains (d – length of an individual tubulin dimmer; f – force between the microtubule chain and the dimmer; F-force acting on the tubulin dimmers by TTFields; Arrow length is proportional to the intensity of these forces), The forces TTFields exert on these larger dipoles, F, are enhanced leading to an increase in the disruption of the mitotic spindle by TTFields. B TTFields act as an M-phase inhibitor, while alkylating agents act at the G and S phases of the cell cycle. This separation between cell cycle phases affected explains the additivity seen experimentally.

interfering with the separation of the double stranded DNA essential for transcription [23]. As illustrated in Figure 7B, since TTFields act at a completely different stage (M phase) of the cell cycle from both these agents, additivity between chemotherapy and TTFields can be expected.

Since the data for newly diagnosed GBM patients, which points to well over a 300% increase in PFS and OS, was obtained only with combination treatment, one cannot directly separate the TTFields effects from the chemotherapeutic effect. However, if we assume that the TTFields therapeutic efficacy for newly diagnosed patients is similar to recurrent GBM, i.e. the median of OS is increased by 270% [1] while the published Temozolomide data indicates an increase of about 20% in OS compared to ionizing radiation treatment alone [14], the results presented in Figure 6 point towards additivity between TTFields and Temozolomide. It is important to note that this significant increase in efficacy was obtained without any increase in device or drug related toxicity (see table 3).

An additional important finding is that both 24 h and 72 h combination treatments in-vitro result in severe irreversible cellular damage in contrast to chemotherapy alone. This result strengthens the assumption that combination therapy with TTFields may be much more effective than treatment by individual agents.

## Conclusion
The results of the present study support the notion that TTFields may be used clinically not only as an anti-proliferation agent as shown before [1], but also as effective sensitizers of currently used chemotherapeutic agents. Such sensitization was not shown to be associated with any additional systemic toxicity. Moreover, as demonstrated by the high DRIs calculated in this study, chemo/TTFields combinations are expected to provide the same or even greater therapeutic efficacy with much lower drug concentrations thus lowering further the overall toxicity.

## Competing interests
EK, RSS, AI, DM, ZG, ES and YW are employees of Novo-Cure Ltd.

YP has a minority holding in NovoCure Ltd.

VD, FT, JV and DG have no competing interests.

## Authors' contributions
EK – planned the pre-clinical and clinical experiments, supervised their execution, analyzed results and wrote parts of the manuscript, RSS and ET – Performed the in-vitro experiment and assisted in the in-vivo experiments. DM, ZG and AI – Performed the in-vivo experiments, DG – Performed the MRI imaging for the in-vivo experiments. YW – Planned the medical devices and treatment parame-

Page 191 of 204 received on 6/6/2018 11:30:24 PM [Central Daylight Time]   JB_5B173E312028   25976

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 622 of 631   Document 11-5    4853

BMC Medical Physics 2009, 9:1
http://www.biomedcentral.com/1756-6649/9/1

ters for all experiments. VD, FT and JV – performed the clinical trial in GBM patients (clinical investigators). YP – invented the concept of TTfields, helped interpret all results and wrote the majority of the manuscript.

## Appendix
Appendix A – Eligibility criteria for the pilot GBM trial

Inclusion criteria:

Histologically proven diagnosis of GBM.

Age over 18 years.

Karnofsky scale ≥ 70.

Participants of child bearing age had to be receiving efficient contraception.

Willing and able to sign an informed consent prior to participation in the study.

Exclusion criteria:

Patients actively participating in another clinical trial

Patients who received any anti-tumor therapy in the four weeks prior to trial initiation (steroids are permitted; however, the dose must be stable or decreasing during the trial).

Patients suspected of suffering from radiation necrosis (according to a PET scan).

Pregnancy

Patients with one of the following co-morbidities:

Patients with an implanted pacemaker or documented arrhythmias.

Significant renal, hepatic or hematologic disease.

Significant additional neurological disorder.

Seizure disorder unrelated to the patient's tumor

Pre-existing dementia

Progressive degenerative neurological disorder

Meningitis or encephalitis

Hydrocephalus associated with increased intracranial pressure (ICP)

## Acknowledgements
We wish to thank Mr. Michael Parlamuni and Mrs. Orly Aarad for providing technical support and study coordination for the clinical study. Both MP and OA are employees of NovoCure Ltd. EK, RSS, AI, DM, ZG, ES and YW are employees of NovoCure Ltd. VD, FT, and JV performed the clinical trial which was sponsored by NovoCure Ltd.

## References
1. Kirson ED, Dbaly V, Tovarys F, Vymazal J, Soustiel JP, Itzhaki A, Mordechovich D, Steinberg-Shapiro S, Gurvich Z, Schneiderman R, Wasserman Y, Salzberg M, Ryffel B, Goldsher D, Dekel E, Palti Y: Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. Proc Natl Acad Sci USA 2007, 104(24):10152-10157.
2. Kirson ED, Gurvich Z, Schneiderman R, Dekel E, Itzhaki A, Wasserman Y, Schaubarger R, Palti Y: Disruption of cancer cell replication by alternating electric fields. Cancer Res 2004, 64(9):3288-3295.
3. Salzberg M, Kirson E, Palti Y, Rochlitz C: A pilot study with very low-intensity, intermediate-frequency electric fields in patients with locally advanced and/or metastatic solid tumors. Onkologie 2008, 31(7):362-365.
4. Heller R, Gilbert R, Jaroszeski MJ: Electrochemotherapy an emerging drug delivery method for the treatment of cancer. Adv Drug Deliv Rev 1997, 16(3-4):185-197.
5. Berdinos R, Hahl R, Peterson D: Management of Drug Toxicity. In The Chemotherapy Source Book 3rd edition. Edited by: Perry MC. Lippincott Williams & Wilkins 2001;399-959.
6. Fryer M: Combined Modality Therapy. In The Chemotherapy Source Book 3rd edition. Edited by: Perry MC. Lippincott Williams & Wilkins 2001;73-81.
7. Burris H: Combination Chemotherapy. In The Chemotherapy Source Book 3rd edition. Edited by: Perry MC. Lippincott Williams & Wilkins; 2001;69-73.
8. Leonard CE, Chan DC, Chou TC, Kumar R, Bunn PA: Paclitaxel enhances in vitro radiosensitivity of squamous carcinoma cell lines of the head and neck. Cancer Res 1996, 56(22):5198-5204.
9. Kirson ED, Dbaly V, Rochlitz C, Tovarys F, Salzberg M, Palti Y: Treatment of locally advanced solid tumors using alternating electric fields (TTFields) – a translational study. Proceedings of 97th AACR Annual Meeting: 2006 Washington, DC 2006.
10. Chou TC, Talalay P: Quantitative analysis of dose-effect relationships: the combined effects of multiple drugs or enzyme inhibitors. Adv Enzyme Regul 1984, 22:27-55.
11. Chou TC: Theoretical basis, experimental design, and computerized simulation of synergism and antagonism in drug combination studies. Pharmacol Rev 2006, 58(3):621-681.
12. Macdanald DR, Cascino TL, Schold SC Jr, Cairncross JG: Response criteria for phase II studies of supratentorial malignant glioma. J Clin Oncol 1990, 8(7):1277-1280.
13. Jagar KJ, van Dijk PC, Zoccali C, Dekker FW: The analysis of survival data: The Kaplan-Meier method. Kidney Int 2008.
14. Stupp R, Mason WP, Bent MJ van den, Weller M, Fisher B, Taphoorn MJ, Belanger K, Brandes AA, Marosi C, Bogdahn U, Curschmann J, Janzer RC, Ludwin SK, Gorlia T, Allgeier A, Lacombe D, Cairncross JG, Eisenhauer E, Mirimanoff RO: Radiotherapy plus concomitant and adjuvant temozolomide for glioblastoma. N Engl J Med 2005, 352(10):987-996.
15. Lev DC, Ruth M, Mills L, McGary EC, Price JE, Bar-Eli M: Dacarbazine causes transcriptional up-regulation of interleukin 8 and vascular endothelial growth factor in melanoma cells: a possible escape mechanism from chemotherapy. Mol Cancer Ther 2003, 2(6):753-763.
16. Shirouzu H, Kato Y, Saito M, Iraha T, Tsuboi R, Koga M, Toyota H, Mizuguchi B: Induction of apoptosis and/or necrosis following exposure to antitumour agents of a melanoma cell line, probably through modulation of Bcl-2 family proteins. Melanoma Res 2001, 13(5):157-164.
17. Steel GG, Peckham MJ: Exploitable mechanisms in combined radiotherapy-chemotherapy: the concept of additivity. Int J Radiat Oncol Biol Phys 1979, 5(1):85-91.

Page 192 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]
Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 623 of 631   Document 11-5
JB_SB173E3I2028
4854

BMC Medical Physics 2009, 9:1

http://www.biomedcentral.com/1756-6849/9/1

18. Novello S, Le Chevalier T: Use of chemo-radiotherapy in locally advanced non-small cell lung cancer. *Eur J Cancer* 2002, 38(3):292-299.
19. Choy H, Kim DW: Chemotherapy and irradiation interaction. *Semin Oncol* 2003, 30(4 Suppl 9):3-10.
20. Rowinsky EK, Donehower RC: Paclitaxel (taxol). *N Engl J Med* 1995, 332(15):1004-1014.
21. Abal M, Andreu JM, Barasoain I: Taxanes: microtubule and centrosome targets, and cell cycle dependent mechanisms of action. *Curr Cancer Drug Targets* 2003, 3(3):193-203.
22. Plosker GL, Faulds D: Epirubicin. A review of its pharmacodynamic and pharmacokinetic properties, and therapeutic use in cancer chemotherapy. *Drugs* 1993, 45(5):788-856.
23. Sladek NE: Influence of aldehyde dehydrogenase activity on the sensitivity of lymphocytes and other blood cells to oxazaphosphorines. *Methods Find Exp Clin Pharmacol* 1987, 9(9):617-626.

## Pre-publication history

The pre-publication history for this paper can be accessed here:

http://www.biomedcentral.com/1756-6849/9/1/prepub

Publish with **BioMed Central** and every scientist can read your work free of charge

"BioMed Central will be the most significant development for disseminating the results of biomedical research in our lifetime."

Sir Paul Nurse, Cancer Research UK

Your research papers will be:

• available free of charge to the entire biomedical community

• peer reviewed and published immediately upon acceptance

• cited in PubMed and archived on PubMed Central

• yours — you keep the copyright

Submit your manuscript here:
http://www.biomedcentral.com/info/publishing_adv.asp


BioMedcentral

Page 193 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]    JB_58173E312028    25976

Case 1:20-cv-00194-WCG    Filed 04/28/20    Page 624 of 631    Document 11-5    4855

expertopinion.com by Tel Aviv University on 06/06/2011 — Downloaded from informa
Expert Opin. Investig. — For personal use only.

**Review**

# *Expert Opinion*

1. Background
2. TTFields's mechanism of action
3. Preclinical studies with TTFields
4. Clinical studies with TTFields
5. Summary
6. Expert opinion

# Tumor treating fields: concept, evidence and future

Miklos Pless† & Uri Weinberg
†Medical Oncology, Department of Internal Medicine and Tumor Centre, Kantonsspital Winterthur, Winterthur, Switzerland

*Introduction:* Local control is fundamental, both for the curative as well as the palliative treatment of cancer. Tumor treating fields (TTFields) are low intensity (1 – 2 V/cm), intermediate frequency (100 – 200 kHz) alternating electric fields administered using insulated electrodes placed on the skin surrounding the region of a malignant tumor. TTFields were shown to destroy cells within the process of mitosis via apoptosis, thereby inhibiting tumor growth. TTFields have no effect on non-dividing cells.

*Areas covered:* This article reviews *in vitro* and *in vivo* preclinical studies, demonstrating the activity of TTFields both as a monotherapy as well as in combination with several cytotoxic agents. Furthermore, it summarizes the clinical experience with TTFields, mainly in two indications: one in recurrent glioblastoma multiforme: in a large prospective randomized Phase III trial TTFields was compared with best standard care (including chemotherapy); TTFields significantly improved median overall survival (OS) compared with standard therapy (7.8 vs 6.1 months) for the patients treated per protocol. Importantly, quality of life was also better in the TTFields group. The second indication was a Phase II study in second-line non-small cell lung cancer, where TTFields was administered concomitantly with pemetrexed. This combination resulted in an excellent median OS of 13.8 months. Interestingly, the progression-free survival (PFS) within the area of the TTFields was 28, however, outside the TTFields the PFS was only 22 weeks.

*Expert opinion:* The proof of concept of TTFields has been well demonstrated in the preclinical setting, and the clinical data seem promising in various tumor types. The side effects of TTFields were minimal and in general consisted of skin reaction to the electrodes. There are a number of ways in which TTFields could be further evaluated, for example, in combination with chemotherapy, as a maintenance treatment, or as a salvage therapy if radiotherapy or surgery is not possible. While more clinical data are clearly needed, TTFields is an emerging and promising novel treatment concept.

*Keywords:* cancer, electric fields, glioblastoma, non-small cell lung cancer, TTFields

*Expert Opin. Investig. Drugs (Early Online)*

## 1. Background

Alternating electric fields have been used since many years for the diagnosis, research and treatment of various medical conditions. Such electric fields have different properties, depending on their frequency and intensity (Table 1). Very low frequencies (lower than 1 kHz) are used to excite the membrane of muscles and nerves, thereby leading to membrane depolarization and finally to action potentials (i.e. Higher frequency alternating electric fields penetrate cells better, but the overall effect of hyper-depolarization on the cell membrane balances in a way that the integrated stimulation does not yield an action potential. However, at frequencies higher than 10 MHz, the electrophysiological properties of the eukaryotic

# informa
healthcare

10.1517/13543784.2011.583236 © 2011 Informa UK, Ltd. ISSN 1354-3784
All rights reserved: reproduction in whole or in part not permitted

1

**RIGHTSLINK()**

Case 1:20-cv-00194-WCG   Filed 04/28/20   Page 625 of 631   Document 11-5
Page 194 of 204 received on 6/5/2018 11:30:24 PM [Central Daylight Time]   JB_SB173E312028   25976
4856

2013X13X05895

**Tumor treating fields: concept, evidence and future**

Expert Opin Investig Drugs Downloaded from informahealthcare.com by Tel Aviv University on 06/06/18 For personal use only.

---

> **Article highlights.**
>
> • Tumor treating fields (TTFields) are low intensity (1 – 2 V/cm), intermediate frequency (100 – 200 kHz) alternating electric fields, which can induce apoptosis.
> • TTFields are able to inhibit tumor growth in various cell lines and animal models.
> • The combination of TTFields with several cytotoxic agents resulted in a supra-additive tumor growth inhibition in vitro and in vivo.
> • Two clinical trials, a Phase III trial in glioblastoma multiforme (GBM) and a Phase II study in non-small cell lung cancer (NSCLC) have shown antitumor activity of TTFields.
> • Toxicity was low; it consisted mainly of skin reactions at the site of the electrodes.
>
> This box summarizes key points contained in the article.

membrane lead to dielectric polarization that eventually heats the tissue [4,5]. Intermediate-frequency alternating electric fields, at frequencies between 10 kHz and 1 MHz, neither cause net depolarization nor significant dielectric losses, therefore, cannot stimulate nerves/muscles, but also cannot seriously heat tissues at low enough intensities. It was thought that such electric fields have no meaningful biological effect on cells [4,6-9]. Nevertheless, it was recently found that such fields, named tumor treating fields (TTFields), have an anti-mitotic activity and may lead to the death of dividing cells. The fields were found to have these properties already at a very low intensity (< 2 V/cm) and at intermediate frequency of 100 – 300 kHz.

## 2. TTFields's mechanism of action

Each cell contains numerous electrically charged molecules, such as proteins and DNA. Under an alternating electric field, these molecules will oscillate according to the changing direction of the field and its density (Figure 1). If the field is uniform, the forces acting intermittently to opposite directions will cause a movement parallel to the direction of the field. When the frequency of the field is high enough, such as in the case of TTFields, this molecular movement will reduce. In the case of dipoles, where there is an electric split between the positive and negative poles of a molecule, it will align with the direction of the electric field and remain at the same place. All charged molecules, including dipoles, will move toward the higher field density in a non-uniform alternating electric field. Within a non-dividing cell, there is mostly uniform and the net force on charges and dipoles will, therefore, yield minimal movement. Non-uniform electric fields, on the other hand, force polar molecules to move toward higher field intensity, in a process called dielectrophoresis [10,11]. Such fields are characteristic of dividing cell when a narrow furrow connects the two forming daughter cells.

### 2.1 Arrest of mitotic spindle formation
Mitotic spindle is the organelle that separates the cell's chromosomes to each of the daughter cells during mitosis. The arms that hold to the chromosomes consist of small polar molecules called tubulins, which polymerize to form a 'chain' of subunits that will reach the genetic material at the center of the cell. As noted before, the field is uniform within the non-dividing cells, but the tubulin subunits will tend to align according to the direction of the field. Finite element simulations showed that the electrical forces acting on the subunits prevent them from attaining the orientation required for efficient polymerization, therefore, mitosis becomes arrested for an abnormally long time [12]. This happens since subunits far enough from the growing microtubule will be subjected to an electric force strong enough to prevent further polymerization. When this process takes place, cells could either complete mitosis or disintegrate.

### 2.2 Mitotic furrow destruction
Not all cells seem to be affected by means of disruption of mitotic spindle formation. The membranes of cells that completed metaphase will start dividing into two daughter cells, pulling the daughter chromosomes to each of the cells' poles. During the last step in mitosis, that is, cytokinesis, a cleavage furrow is eventually formed, which completes the process of cell separation. This narrow membranous link results in an hourglass-shaped non-uniform electric field, unlike non-dividing cells, in which the electric field is uniform. During cytokinesis, the densest electric field is found in the narrow center. This focusing of the field directs all electric charges and dipoles to the furrow due to the unidirectional character of the electric force (dielectrophoretic force) under this condition. Finite element simulations have shown that polarized molecules and organelles within the cell will be affected by forces high enough to move toward the furrow so as to disrupt the internal cell structure and cause the cell destruction seen under TTFields therapy [12].

## 3. Preclinical studies with TTFields

A number of preclinical trials have shown the efficacy of TTFields in the inhibition of cancer cell proliferation and their destruction in vitro [12,13]. Many cell lines were cultured and tested under TTFields, among others melanoma, glioma, lung, prostate and breast cancers. TTFields was applied continuously for 24 – 72 h, in all cases, proliferation was significantly inhibited, compared with control cultures and to non-replicating cultures (baby hamster kidney (BHK) cells) treated with TTFields. For some of the cell lines, a specific optimal frequency that demonstrated maximal inhibitory effect was found, possibly reflecting different cell size and shape (Table 2) [13]. Under time-lapse microscopy, cancer cells demonstrated significantly prolonged mitosis and even cell destruction on the formation of the cleavage furrow. Immunohistochemistry studies of cell cultures treated with TTFields showed many abnormal

RIGHTSLINK⟩

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 626 of 631 Document 11-5
Page 195 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time) JB_SB173E312028 29976
4857

Ploss & Weinberg

**Table 1. Alternating electric fields used in medicine**

| Frequency | Biological activity | Application |
|---|---|---|
| < 1 kHz | Membrane depolarization | Defibrillators, ECT, bone growth, fracture healing, ICD |
| 100 – 300 kHz | Mitotic arrest and apoptosis | TTFields |
| 1 – > 10 MHz | Dielectric polarization | Diathermy, radio frequency tumor ablation |

ECT, electroconvulsive therapy; ICD, Implantable cardioverter-defibrillator; TTFields, tumor treating fields.



**Figure 1. Antimitotic effects of tumor treating fields (TTFields).** At the beginning of mitosis, the electric field is uniform within the cell, causing tubulin subunits to align with the direction of the field and inhibiting their polymerization to form a normal microtubule spindle. In a non-uniform electric field formed during cytokinesis, charges and dipoles move toward the high field density at the mitotic furrow, disrupting mitosis and disintegrating the daughter cells.

mitotic figures that could be related to the interference of TTFields with the mitotic spindle formation. These figures resemble the presentation of cancer cells treated with agents that interfere with mitotic spindle formation, such as paclitaxel. Further experiments showed that the efficacy of TTFields in combination with different chemotherapies is additive and could be synergistic [14].

Interestingly, TTFields caused cultured cells to orient in the direction of the electric field [12]. This could be explained by the fact that the electric forces are maximal when the axis of division is aligned with the external field. This also implies that the angle of the cell affects its vulnerability to TTFields during mitosis.

TTFields was also shown to inhibit tumor growth in several mouse, rat and rabbit animal models [12,15]. Implanted cell lines were used to test the most effective frequency and intensity for this *in vivo* treatment. Postmortem analysis of the treated animals showed a significant tumor size reduction in the case of TTFields-treated animals, compared with control animals. No difference of the local temperature in the vicinity of the tumor was found between the two groups. *In vivo* experiments showed that it is possible to deliver the field to the target region using

insulated non-invasive electrodes. While there was no statistically significant inhibition of tumor growth when a unidirectional TTFields was delivered this way, two- and three-directional fields led to a statistically significant growth inhibition [15]. *In vivo* tumor models have shown the same optimization in tumor inhibition when using the effective specific frequency for each cell type. No abnormality in vital signs, electrocardiograms (ECG), complete blood counts (CBC), chemistry and coagulation panels was found during the follow-up period of animals treated with TTFields, and no treatment-related pathologies were found postmortem.

In a metastatic melanoma mouse model and metastatic kidney cancer rabbit model, TTFields was shown to reduce the extent of metastatic spread, possibly due to metastasis growth inhibition, migration capability impairment and primary tumor local control [15].

## 4. Clinical studies with TTFields

Prior to applying TTFields to human patients, feasibility was tested using finite element mesh (FEM) simulations and measurements within the brain of a volunteer undergoing brain

Expert Opin. Investig. Drugs Downloaded from informa... care.com by Tel Aviv University on 05/10/17. For personal use only.

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 627 of 631 Document 11-5
Page 196 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)
4858

Expert Opin Investig — Downloaded from informahealthcare.com by Tel Aviv University www.10/11 For personal — only.

Tumor treating fields; concept, evidence and future

**Table 2. Optimal TTFields frequency for tested cell lines**

| Cell line | Optimal frequency (kHz) |
|---|---|
| B16F1 (mouse melanoma) | 120 |
| AA8 (Chinese hamster ovary) | 150 |
| VX-2 (rabbit kidney) | 150 |
| MCF-7 (human breast) | 150 |
| MDA-MB-231 (human breast) | 150 |
| F-98 (rat glioma) | 200 |
| U-87 (human glioma) | 200 |
| U-118 (human glioma) | 200 |

TTFields, tumor treating fields.

surgery, it was found that TTFields can be effectively applied to the cerebrum using surface electrodes. TTFields was first tested on 10 recurrent malignant glioblastoma multiforme (GBM) patients. No concomitant chemotherapy was used during the clinical trial, and TTFields was the only antitumor therapy. TTFields was delivered via a portable, light-weight (~ 3 kg) device carried by the patient (NovoTTFields-100A, NovoCure Ltd, Haifa, Israel), connected to two pairs of insulated electrodes that were applied to the patients' skin. The device continuously (18 h/day on average) delivered two perpendicular 1 – 2 V/cm, 200 kHz alternating electric fields (Figure 2). Patients had a highly significant increase in the median time to disease progression (26.1 weeks) and progression-free survival (PFS) at 6 months (50%) compared with historical controls, with a median overall survival (OS) of more than 62 weeks [15]. In addition, no treatment-related serious adverse event was detected in a total of 280 treatment weeks. The only treatment-related adverse event was mild-to-moderate contact dermatitis beneath the electrode gel, which was easily managed using topical treatments.

These preliminary findings led to a Phase III clinical trial of TTFields compared with best standard of care chemotherapy in 237 patients with recurrent GBM [16,17]. Patients in this study were previously treated with an unlimited number of surgeries/chemotherapy lines. They were randomized to either a TTFields arm, given as a monotherapy without additional antitumor treatments, or to the best standard chemotherapy (BSCh) arm, which was at the treating physician's discretion. TTFields was administered continuously and patients' compliance was excellent, with a median duration of 20 h/day. Patient characteristics were balanced in both groups, with median age of 54 years and median Karnofsky performance status (KPS) of 80%. Mean treatment duration was 4.4 months in the TTFields group versus 2.5 months in the BSCh group. In the group of 185 patients who were treated per protocol, a statistically significant survival benefit was seen for the TTFields group (median OS 7.8 vs 6.1 months for TTFields and BSCh, respectively). Moreover, patients with better prognostic baseline characteristics (KPS 80% or higher, age 60 or lower) demonstrated an even higher survival benefit when treated with TTFields (median OS 8.8 vs 6.6 months; n = 110). These results show that TTFields

as a monotherapy are at least as effective as the best available chemotherapy or supportive care in this poor prognosis disease. It is noteworthy that quality of life (QOL) was equivalent or superior in patients treated with TTFields compared with BSCh. This clinical trial also showed that the only TTFields-related adverse events were mild-to-moderate contact dermatitis beneath the electrodes in a minority of patients. The incidence of toxicities was significantly higher in the BSCh arm.

TTFields was also explored in a Phase I/II single arm study in combination with pemetrexed for advanced (stage IIIB/IV) non-small cell lung cancer (NSCLC) as a second-line treatment, after failure of standard first-line chemotherapy [18]. Electrodes were applied to the chest and upper abdomen and the device (NovoTTFields-100 L, NovoCure Ltd) generated 150 kHz TTFields, in accordance with the preclinical findings relating to lung cancer cell lines. Forty-one patients were treated, including 7 (17.1%) with squamous cell carcinoma and 30 (73%) with stage IV disease. The device was well tolerated and the average daily use was 11.2 h. No TTFields-related serious adverse event was reported for a cumulative time of over 720 weeks. Median PFS was 22 weeks and in-field PFS (i.e., PFS within the area of the TTFields; the study's primary end point) in the lungs and liver was 28 weeks. This is an important finding because it can be assumed that in the same patient the higher tumor control within the TTFields area was a specific effect of TTFields. Median OS was 13.8 months and 1-year survival was 57% (Figure 3). Six patients (14.6%) had a radiological partial remission (PR) and 16 patients had stable disease (SD) (39%). These results are very promising and compare extremely well with matched historical controls treated with pemetrexed alone in second-line treatment [19].

Special attention was given to potential adverse events using TTFields: in the glioblastoma trial careful neurological examination and documentation was required once a month. In the lung cancer trial, ECGs were mandated at the beginning of the trial, during the treatment if adverse effects occurred and at the end. Finally, skin reactions were monitored at every visit and documented according to the National Cancer Institute (NCI)-Common Toxicity Criteria (CTC) (version 3.0) in all studies. All other adverse events were monitored routinely at every visit according to the CTC criteria. In all studies involving TTFields the only side effect, which occurred more frequently was grade 1 – 2 skin toxicity. In the glioblastoma trial there was a direct control group, in the lung cancer trial we compared the side effects with the large Phase III study by Hanna et al., in which pemetrexed was given as a second-line treatment [19].

## 5. Summary

TTFields was shown to inhibit proliferation and to cause cell destruction of many cancer cells in vitro and in vivo. In addition, TTFields significantly improved human patients' prognosis in recurrent GBM and probably also in NSCLC. At the time this review was submitted, there were no serious adverse events found related to TTFields,

RIGHTSLINK()

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 628 of 631 Document 11-5    4859

Page 197 of 204 received on 6/5/2018 11:30:24 PM (Central Daylight Time)    JB_SB173E312028    29976

Expert Opin. Investig. I....... downloaded from informa
for personal
.......com by Tel Aviv University o.......,/11
by.



**Figure 2. The tumor treating fields (TTFields) generating portable device (NovoTTFields-100A).**

On the contrary, the treatment was toxicity-free for treated patients, except for mild-to-moderate contact dermatitis underneath the electrodes. Importantly, there were no cardiac or neurological abnormalities as a result of TTFields treatment. The use of non-invasive surface electrodes prevented the flow of ionic currents [20,21] or cell death [22] as a result of direct currents, and thus decreased skin damage and enabled continuous treatment.

TTFields can actively inhibit different cell types, including multi-drug-resistant (MDR) ovarian and breast cancer cell lines that overexpress ABC (ATP-binding cassette) transporters [23]. It may not only be useful in the treatment of locally advanced tumors, but also in the prevention and treatment of metastatic disease. TTFields has the potential to inhibit the migration of metastases from a primary tumor, it can inhibit the growth of metastases in the lungs once they have been seeded in the target organ, through the presence of the fields in the lungs themselves.

In the first Phase III study published to date [16,17], TTFields had minimal toxicity and patients' compliance was excellent, over an extended period of time. The application of TTFields resulted in an improved median OS, higher response rate and longer time to treatment failure compared with best standard chemotherapies and also led to an improvement in many QOL parameters. A large-scale Phase III clinical trial is newly diagnosed GBM is currently being conducted.

In the first clinical trial for NSCLC patients, TTFields was well tolerated in a second-line setting, it was safe and efficacy

end points were excellent, compared with historical data for pemetrexed alone [19].

The good safety profile along with the significant clinical efficacy and QOL advantages make TTFields an attractive treatment in GBM, and perhaps in many other malignancies.

## 6. Expert opinion

TTFields is a novel and promising concept for treating solid tumors. *In vitro* and *in vivo* experiments have repeatedly shown a significant inhibitory effect on cancer cell proliferation upon application of TTFields. We already know that at least two physical mechanisms are involved: the first is interference with the mitotic spindle formation as a result of electric forces preventing the normal polymerization of the tubulin subunits. The second mechanism results from the non-uniformity of the electric field in the context of cytokinesis, and the movement of molecules in the direction of the mitotic furrow as a result of the unidirectional force generated by TTFields.

There are also some data indicating that combining chemotherapeutic cancer treatments with TTFields may increase efficacy and sensitivity to chemotherapy [14]. Several tumor types are sensitized to radiation after adding different chemotherapies, even at low doses [24-26]. Could some tumors similarly be more susceptible to TTFields treatment if treated concomitantly with certain cytotoxic agents? This is a plausible idea, since TTFields acts on specific organelles (e.g., the mitotic spindle), which are also the target of some of the anticancer drugs. Taxanes act through stabilizing the link between tubulin dimers in the spindle microtubules. It could be that the abnormal increase in microtubule length caused by this class of agents, which leads to the formation of a larger dipole moment, results in an increase in the efficacy of TTFields [14]. This possible synergism could be used to achieve a better response, but alternatively also as a way to decrease chemotherapy intensity in patients who cannot tolerate the toxicity of full-dose chemotherapy. The fact that TTFields itself was not toxic and in combination with pemetrexed did not increase the known side effects of the latter in the clinical trials mentioned above, makes combination therapies an attractive therapeutic option.

Preclinical experiments showed the frequency-dependent effect of TTFields, with different frequencies showing a maximal inhibitory effect in certain cancer cell types [18]. In the future, it will be interesting to see how this characteristic could be exploited in order to maximize the effect, by adjusting the frequency on an individual tumor basis, using cytological/pathological specimens for the analysis. Such adjustments could be possible for tumors of the same entity but in different patients, and maybe even at different stages in the course of the same disease.

Other fields of interest that will probably be investigated in the future include the pathway in which cell death occurs following exposure to TTFields. Unpublished findings show that apoptosis is the process that leads to cancer cell death

**RIGHTSLINK**

56195153X03893

Tumor treating fields: concept, evidence and future



**Figure 3. Phase II trial using tumor treating fields (TTFields) in combination with pemetrexed in non-small cell lung cancer as a second-line therapy. Median in-field progression-free survival (PFS) was 28 weeks. Median overall survival (OS) was 13.8 months; n = 41.**
Adapted from poster presentation ESMO 2010 [18].

Expert Opin Investig Drugs Downloaded from informahealthcare.com by Tel Aviv University on 06/11/12
For personal use only.

under TTFields. Finding the specific pathway through which apoptosis is carried out will provide a better understanding of the basic mechanism and will pave the way for other combinations or treatment optimization. The immune system plays an important role in the pathogenesis of cancer [27]. TTFields has the potential to beneficially affect the microenvironment of the tumor: it could act directly on recruited immune cells, alternatively, it could change the interaction between these cells and the tumor following changes to the tumor cell structure, vasculature, etc. Preliminary data show that there is a change in the presence of immune cells that interplay with cancer cells, following TTFields treatment [15].

Both the Phase III (for recurrent GBM patients) and the Phase II (for advanced NSCLC) trials have given some important insights on using TTFields [16-18]. The high compliance demonstrates that it is feasible to administer TTFields continuously using a light-weight portable device, in spite of the necessity to be attached to the device. Since most patients enrolled in the trials were somewhat hindered by their malignant disease, they generally adjusted to TTFields quite quickly and well. In the NSCLC trial, the majority of patients used TTFields overnight and was free at daytime. It can be assumed that other cancer patients will tolerate TTFields as well. It will be interesting to see how other chemotherapies administered concomitantly to TTFields will affect the course of these patients. A Phase III trial (NCT00916409) for newly diagnosed GBM patients treated with a combination of temozolomide and TTFields is currently ongoing.

As a physical treatment modality, TTFields has the potential to be active in other solid tumors as well. In a pilot study,

TTFields therapy was very well tolerated and safe for four patients bearing skin lesions from breast and melanoma tumors. These tumors showed transient inhibition in the growth rate during a 2- to 4-week treatment and the findings warrant further investigations [28]. While systemic chemotherapy usually has significant toxicities, biologically targeted therapies often affect only a subset of tumors carrying specific mutations or proteins. Glioblastoma and NSCLC, like many other tumors, harbor many different genotypes [29,30] and it has been difficult to show a major impact of chemotherapy or even targeted agents in these tumor types, at least for the majority of patients. TTFields acts independently of the expression of cell surface receptors or other tumor biomarkers. There are no alternative mitosis mechanisms, thus cancer cells are unlikely to be or to become resistant to TTFields.

There are several ways of further developing TTFields clinically. TTFields is a regional treatment: it could be employed in situations where radiotherapy is not possible anymore, for example, after a full course of radiation to the brain. Another option would be to test it in situations in which prophylactic radiotherapy is used: for example, prophylactic cranial irradiation (PCI) small cell lung cancer, hopefully circumventing the late toxicity of PCI. Lastly, it can of course be tested together with radiotherapy. Even though TTFields is a regional treatment, it still managed to decrease the likelihood of metastases formation in animal experiments [15], the most common cause of death in cancer. It could be that TTFields was able to prevent malignant cell evasion from the primary tumor in the lung cancer treated population, thereby leading to decreased formation of micrometastases [18].

RIGHTSLINK

Case 1:20-cv-00194-WCG Filed 04/28/20 Page 630 of 631 Document 11-5

4861

501931230500

In summary, TTFields could be considered as a potential effective treatment for patients suffering from different cancer types. The non-toxic characteristics and promising clinical outcomes in several clinical trials conducted to date should encourage investigators to further evaluate TTFields, either as a monotherapy or in combination with other treatments.

## Declaration of interest

M Ploss declares no conflicts of interest. U Weinberg works for NovoCure Ltd. as Medical Director. Novocure has supported experiments described in this review and was the sponsor for the clinical trials. The paper was not supported by a commercial company.

## Bibliography

Papers of special note have been highlighted as either of interest (•) or of considerable interest (••) to readers.

1. Polk C. Therapeutic applications of low-frequency sinusoidal and pulsed electric and magnetic fields. In: Bronzino JD, editor. The biomedical engineering handbook. CRC Press, Inc., Boca Raton, FL; 1995. p. 1404-16

2. Stimulation of internal organs by means of externally applied electrodes. Pahl Y J Appl Physiol 1966;21(5):1619-12

3. Bassett CA. The development and application of pulsed electromagnetic fields (PEMFs) for ununited fractures and arthrodeses. Clin Plast Surg 1985;12:259-77

4. Elson E. Biological effects of radiofrequency and microwave fields: in vivo and in vitro experimental results. In: Bronzino JD, editor. The biomedical engineering handbook. CRC Press, Inc., Boca Raton, FL; 1995. p. 1417-23

5. Chou CK. Radiofrequency hyperthermia in cancer therapy. In: Bronzino JD, editor. The biomedical engineering handbook. CRC Press, Inc., Boca Raton, FL; 1995. p. 1424-30

6. Gouter AD, Pethig R. Electrorotation and dielectrophoresis. Parasitology 1998;117(Suppl):S177-89

7. Sowers AR. Characterization of electric field-induced fusion in erythrocyte ghost membranes. J Cell Biol 1986;102(4):1358-62

8. Tshushima S, Sowan HP. Alignment of microscopic particles in electric fields and in biological implications. Biophys J 1985;47(4)515-10

9. Maier H. Electrorotation of colloidal particles and cells depends on surface charge. Biophys J 1997;73(3):1617-26

10. Clague DS, Wheeler EK. Dielectrophoretic manipulation of macromolecules: the electric field.

Phys Rev E Stat Nonlin Soft Matter Phys 2001;64(2 Pt 2):026605

11. Gonzalez CF, Rometho VT. Harnessing dielectric forces for separations of cells, fine particles and macromolecules. J Chromatogr A 2005;1079(1-2)59-68

12. Kirson ED, Gurvich Z, Schneiderman R, et al. Disruption of cancer cell replication by alternating electric fields. Cancer Res 2004;64(9):3288-95
   • TTFields significantly inhibited different cancer cell lines by disrupting cells undergoing mitosis.

13. Kirson RD, Dbaly V, Tovarys F, et al. Alternating electric fields arrest cell proliferation in animal tumor models and human brain tumors. Proc Natl Acad Sci USA 2007:104(24):10152-7
   • Proof of concept — TTFields was shown to inhibit tumor growth both in vitro and in vivo in a frequency- and intensity-dependent manner.

14. Kirson ED, Schneiderman RS, Dbaly V, et al. Chemotherapeutic treatment efficacy and sensitivity are increased by adjuvant alternating electric fields (TTFields). BMC Med Phys 2009;9:1
   • Combining chemotherapy with TTFields may increase efficacy and sensitivity without any increase in the toxicity of treatments.

15. Kirson ED, Giladi M, Gurvich Z, et al. Alternating electric fields (TTFields) inhibit metastatic spread of solid tumors to the lungs. Clin Exp Metastasis 2009;26(7):633-40
   • TTFields inhibited metastatic spread of solid tumors to lungs and may have a role in preventing metastatic spread from the primary tumor

16. Stupp R, Kanner A, Engelhard H, et al. A prospective, randomized, open-label, phase III clinical trial of NovoTTFields-100A versus best standard

of care chemotherapy in patients with recurrent glioblastoma. J Clin Oncol 2010;28(18S):abstract LBA2007
   •• NovoTTFields-100A is at least as effective as active BSC chemotherapies, without the toxicities associated with chemotherapy and with a much better quality of life.

17. Ram Z, Gutin PH, Stupp K. Subgroup and quality of life analyses of the phase III clinical trial of NovoTTFields-100A versus best standard chemotherapy for recurrent glioblastoma. Neuro Oncol 2010;12(Suppl_4):iv56-iv57

18. Ploss M, Berticher DG, Bucra M, et al. A phase II study of tumor-treating fields (TTFields) in combination with pemetrexed for advanced non-small cell lung cancer (NSCLC) [abstract 371PD]. ESMO; 2010

19. Hanna N, Shepherd FA, Fassella FV, et al. Randomized phase III trial of pemetrexed versus docetaxel in patients with non-small-cell lung cancer previously treated with chemotherapy. J Clin Oncol 2004;22(9):1589-97

20. Webster JG, Clark JW. Medical instrumentation: application and design. Wiley, New York; 1998

21. Burnette RR, Ongpipattanakul B. Characterization of the pore transport properties and tissue alteration of excised human skin during iontophoresis. J Pharm Sci 1988;77(2):132-7

22. Orrenius S, McCabe MJ Jr, Nicotera P. Ca(2+)-dependent mechanisms of cytotoxicity and programmed cell death. Toxicol Lett 1992;64-65 Spec Nuo357-64

23. Schneiderman RS, Stmuell E, Kirson ED, Palti Y. TTFields alone and in combination with chemotherapeutic agents effectively reduces the viability of MDR cell sub-lines that over-express AUC transporters. BMC Cancer 2010;10:229

24. Leimund CB, Chen DC, Chou TC, et al. Paclitaxel enhances in vitro

RIGHTSLINK⟨›

Expert Opin Investig Drugs Downloaded from informa.healthcare.com by Tel Aviv University on 03/10/11
For personal use only.